APPEAL,CLOSED

# U.S. District Court
# Western District of Missouri (Kansas City)
# CIVIL DOCKET FOR CASE #: 4:12−cv−08001−GAF
## *Internal Use Only*

Montgomery v. United States of America
Assigned to: District Judge Gary A. Fenner
related Case: 5:05−cr−06002−GAF−1
Cause: 28:2255 Motion to Vacate / Correct Illegal Sentenc

Date Filed: 03/22/2012
Date Terminated: 03/03/2017
Jury Demand: None
Nature of Suit: 510 Prisoner: Vacate Sentence
Jurisdiction: U.S. Government Defendant

**Movant**

**Lisa M. Montgomery** represented by

**Kelley J. Henry**
Office of the Federal Public Defender
810 Broadway Street
Suite 200
Nashville, TN 37203
(615) 736−5047
Fax: (615) 736−5265
Email: kelley_henry@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Lisa G. Nouri**
2526 Holmes
Kansas City, MO 64108
(816) 471−1000
Fax: (816) 471−1285
Email: lisanouri_atty@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Christine M. Blegen**
Blegen Law Firm, LLC
PO Box 344
Lees Summit
Lees Summit, MO 64063
(816) 213−0384
Fax: (816) 817−0614
Email: christine@blegenlawfirm.com
***TERMINATED: 01/26/2015***
*Bar Status: Active*

**Miscellaneous**

**Christine Blegen** represented by

**Christine M. Blegen**
(See above for address)

*TERMINATED: 01/26/2015*
*Bar Status: Active*

**interested party**

**Frederick A. Duchardt, Jr.** represented by **Frederick A Duchardt , Jr.**
P O Box 216
Trimble, MO 64492
(816) 213−0782
Fax: (816) 635−5155
Email: fduchardt@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**interested party**

**John O'Connor** represented by **John O'Connor**
Wagstaff & Cartmell
4740 Grand Avenue
Suite 300
Kansas City, MO 64112
(816) 701−1100
Fax: (816) 531−2372
Email: joconnor@wcllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Respondent**

**United States of America** represented by **David M Ketchmark**
United States Attorney's Office−KCMO
400 E 9th Street
Suite 5510
Kansas City, MO 64106
816−426−4102
Fax: 816−426−7080
Email: david.ketchmark@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Jeffrey E. Valenti**
United States Attorney's Office
400 E. 9th Street
5th Floor
Kansas City, MO 64106
(816)426−4262
Fax: (816)426−4328
Email: jeff.valenti@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Philip M Koppe**
United States Attorney's Office
400 E 9th St
Ste 5510
Kansas City, MO 64106
(816) 426−4288
Fax: (816) 426−2569
Email: phil.koppe@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Cynthia L. Cordes**
United States Attorney's Office−KCMO
400 E 9th Street
Suite 5510
Kansas City, MO 64106
(816) 426−3188
Fax: (816) 426−7080
Email: teresa.moore2@usdoj.gov
***TERMINATED: 06/15/2014***
*Bar Status: Inactive*

**Roseann Ambrosia Ketchmark**
United States Attorney's Office−KCMO
400 E 9th Street
Suite 5510
Kansas City, MO 64106
(816) 426−4320
Fax: (816) 426−4210
Email:
USAMOW.ECFGeneralCrimes@usdoj.gov
***TERMINATED: 10/06/2015***
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/22/2012 | 1 | | MOTION to appoint counsel filed on behalf of Lisa M. Montgomery. (This motion was originally filed in 05cr6002 and given document #428. It is also being filed in this case as the initiating document.) (Terry, Bill) (Entered: 07/30/2012) |
| 03/22/2012 | 3 | | All docketing involving the 28:2255 portion of the criminal case shall be made in this civil case. Attached is a docket sheet from the criminal case as of July 30, 2012. Documents 431−442 available in the criminal file apply to this civil case but will not be redocketed in the civil case. (Terry, Bill) (Entered: 07/30/2012) |

| | | | |
|---|---|---|---|
| 04/17/2012 | 2 | | ORDER granting in part and denying in part 1 motion to appoint counsel Signed on 04/17/2012 by District Judge Gary A. Fenner. (This order was originally filed in 05cr6002 and given document #430. It is also being filed in this case.) (Terry, Bill) (Entered: 07/30/2012) |
| 09/07/2012 | 10 | | MOTION for leave to file *Ex Parte Motion for Additional Investigation Funds* filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 9/24/2012 unless otherwise directed by the court. (Blegen, Christine) (Entered: 09/07/2012) |
| 11/01/2012 | 20 | | NOTICE of appearance by Kelley J. Henry on behalf of Lisa M. Montgomery (Henry, Kelley) (Entered: 11/01/2012) |
| 03/19/2013 | | | NOTICE OF DOCKET MODIFICATION. A modification has been made to delete the documents filed on 03/18/13 as Document Nos. 31; 33−39; 41 and 46, MOTION to seal; MOTION to vacate, set aside or correct sentence (2255) Court Form; MOTION to vacate, set aside or correct sentence (2255); NOTICE(S) of filing Additional Exhibits in Support of Motion; MOTION(S) to seal document, respectively. Counsel will refile the documents and attach all exhibits to a disk. This is a text entry only − no document is attached. (McDowell, Shelly) (Entered: 03/19/2013) |
| 03/19/2013 | 31 | | MOTION to seal document filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 4/5/2013 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 03/19/2013) |
| 03/19/2013 | 32 | | MOTION to vacate, set aside or correct sentence (2255) filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. (Attachments: # 1 Exhibit Completed 2255 Form)(Nouri, Lisa) (Entered: 03/19/2013) |
| 03/19/2013 | 33 | | NOTICE of filing *Exhibits to Motion* by Lisa M. Montgomery re 32 Motion to Vacate/Set Aside/Correct Sentence (2255) (Nouri, Lisa) Received original disk containing exhibits which has been forwarded to the records section on 3/20/2013 (Diefenbach, Tracy). (Entered: 03/19/2013) |
| 03/19/2013 | 34 | | ORDER granting 31 motion to seal document Signed on 3/19/13 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Diefenbach, Tracy) (Entered: 03/19/2013) |
| 03/19/2013 | 35 | | MOTION to seal document 32 Motion to Vacate/Set Aside/Correct Sentence (2255) *Unredacted Motion and Specified Exhibits* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 4/5/2013 unless otherwise directed by the court. (Related document(s) 32 ) (Nouri, Lisa) (Entered: 03/19/2013) |
| 03/19/2013 | 36 | | RETURN OF SERVICE (non cmp) returned unexecuted re 21 . (McDowell, Shelly) (Entered: 03/19/2013) |
| 03/19/2013 | 37 | | NOTICE of filing *Motion and Exhibits Under Seal* by Lisa M. Montgomery re 34 Order on Motion to Seal Document, 31 MOTION to seal document (Nouri, Lisa) Received original disk containing exhibits which has been placed under seal and forwarded to the records section on 3/20/2013 (Diefenbach, Tracy). (Entered: 03/19/2013) |
| 03/19/2013 | 38 | | ORDER granting 35 motion to seal document Signed on 3/19/13 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is |

| | | | |
|---|---|---|---|
| | | | attached.(Diefenbach, Tracy) (Entered: 03/19/2013) |
| 03/19/2013 | 39 | | NOTICE of filing *Unredacted Motion and Specified Exhibits* by Lisa M. Montgomery re 32 Motion to Vacate/Set Aside/Correct Sentence (2255), 38 Order on Motion to Seal Document (Nouri, Lisa) Received original disk containing exhibits which has been forwarded to the records section on 3/20/2013 (Diefenbach, Tracy). (Entered: 03/19/2013) |
| 03/20/2013 | 40 | | ORDER TO SHOW CAUSE directing Respondent is directed to answer Movant's allegations. Show Cause Response due by 4/19/2013. Signed on 3/20/13 by District Judge Gary A. Fenner. (Diefenbach, Tracy) (Entered: 03/20/2013) |
| 03/21/2013 | 41 | | MOTION for Order (SEALED) filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 4/8/2013 unless otherwise directed by the court. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Nouri, Lisa) (Entered: 03/21/2013) |
| 04/09/2013 | 42 | | SUGGESTIONS in opposition re 41 MOTION for Order (SEALED) filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 4/26/2013 unless otherwise directed by the court (Related document(s) 41 ) (Ketchmark, Roseann) (Additional attachments that were inadvertently omitted have been added on 4/9/2013: # 1 Attachment 1, # 2 Attachment 2) (McDowell, Shelly). (Entered: 04/09/2013) |
| 04/10/2013 | 43 | | MOTION for extension of time to amend 32 Motion to Vacate/Set Aside/Correct Sentence (2255) filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 4/29/2013 unless otherwise directed by the court. (Related document(s) 32 ) (Blegen, Christine) (Entered: 04/10/2013) |
| 04/15/2013 | 44 | | NOTICE OF HEARING − This is the official notice for this hearing. Hearing set for 5/6/2013 01:30 PM in Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner. (Mitchell, Lisa) Modified on 4/16/2013 (Mitchell, Lisa). (Entered: 04/15/2013) |
| 04/19/2013 | 45 | | RESPONSE to motion re 43 MOTION for extension of time to amend 32 Motion to Vacate/Set Aside/Correct Sentence (2255) filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 5/6/2013 unless otherwise directed by the court (Ketchmark, Roseann) (Entered: 04/19/2013) |
| 04/23/2013 | 46 | | REPLY SUGGESTIONS to motion (Sealed) re 41 MOTION for Order (SEALED) filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. (Attachments: # 1 Exhibit Declaration Of Janet Santana)(Related document(s) 41 ) (Blegen, Christine) (Entered: 04/23/2013) |
| 04/23/2013 | 47 | | REPLY SUGGESTIONS to motion re 43 MOTION for extension of time to amend 32 Motion to Vacate/Set Aside/Correct Sentence (2255) filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. (Related document(s) 43 ) (Blegen, Christine) (Entered: 04/23/2013) |
| 05/02/2013 | 48 | | ORDER of Notice. Signed on 5/2/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 05/02/2013) |
| 05/02/2013 | 49 | | |

| | | | |
|---|---|---|---|
| | | | ORDER directing that interview with Judge Maughmer be on the record. Signed on 5/2/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 05/02/2013) |
| 05/03/2013 | 50 | | NOTICE of filing *Notice of Supplemental Authority in Support of Motion to Reassign* by Lisa M. Montgomery re 41 MOTION for Order (SEALED) (Nouri, Lisa) (Entered: 05/03/2013) |
| 05/06/2013 | 51 | | Minute Entry. Proceedings held before District Judge Gary A. Fenner: Motion Hearing. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Diefenbach, Tracy) (Entered: 05/06/2013) |
| 05/06/2013 | 52 | | ORDER authorizing counsel for movant and government to depose Mr. Raymond C. Conrad, Jr., Federal Public Defender for Western District of Missouri. Signed on 5/6/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 05/06/2013) |
| 05/09/2013 | 53 | | ELECTRONIC TRANSCRIPT of motion hearing held May 6, 2013 before Judge Gary A. Fenner. Court Reporter: Kathy Calvert, 816−512−5741, kathy_calvert@mow.uscourts.gov. Number of pages: 34. NOTICE RE: REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the parties' intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.mow.uscourts.gov. Please read this policy carefully. **NOTICE: Attorneys must contact the court reporter for copies during this 90 day period. Notice of Intent to File Redaction of Transcripts due by 5/16/2013. Release of Transcript Restriction set for 8/8/2013.**(Calvert, Kathy) (Entered: 05/09/2013) |
| 06/06/2013 | 54 | | SUGGESTIONS in support re 41 MOTION for Order (SEALED) filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. (Related document(s) 41 ) (Blegen, Christine) (Entered: 06/06/2013) |
| 06/07/2013 | 55 | | ORDER granting, in part, 43 motion for extension of time to amend 32 Motion to Vacate/Set Aside/Correct Sentence (2255). Movant granted extension of time to and including 10/1/13. Amended motion is limited to no more than 250 pages total, which is to include the existing motion if any amendment is filed as an addendum to that motion, rather than as a superseding amended motion. Signed on 6/7/13 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) Modified on 6/7/2013 regarding page limit (Mitchell, Lisa). (Entered: 06/07/2013) |
| 06/11/2013 | 56 | | MOTION for extension of time to file response/reply as to 54 Suggestions in Support of Motion filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 6/28/2013 unless otherwise directed by the court. (Related document(s) 54 ) (Ketchmark, Roseann) (Entered: 06/11/2013) |
| 06/12/2013 | 57 | | ORDER granting in part 56 motion for extension of time to file response/reply. Suggestions in opposition/response due by 6/18/2013 unless otherwise directed by the court. Signed on 6/12/13 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 06/12/2013) |

| | | | |
|---|---|---|---|
| 06/18/2013 | 58 | | SUGGESTIONS in opposition re 41 MOTION for Order (SEALED) filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 7/5/2013 unless otherwise directed by the court (Related document(s) 41 ) (Ketchmark, Roseann) (Entered: 06/18/2013) |
| 06/25/2013 | 59 | 27 | ORDER denying 41 Motion to Reassign Case. Signed on 6/25/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/25/2013) |
| 06/28/2013 | 60 | | ORDER re Notice Concerning Budget and CJA Representation for Movant. Signed on 6/28/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/28/2013) |
| 09/05/2013 | 64 | | MOTION to stay *Proceedings in this Court* filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 9/23/2013 unless otherwise directed by the court. (Blegen, Christine) (Entered: 09/05/2013) |
| 09/10/2013 | 65 | 35 | ORDER Supplementing Order Denying Motion to Reassign Addressing Ex Parte Conversations re 59 Order on Sealed Motion. Signed on 9/10/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 09/10/2013) |
| 09/18/2013 | 66 | | SEALED TRANSCRIPT of in chambers conference held July 12, 2013 before Judge Gary A. Fenner. Court Reporter: Kathy Calvert, 816−512−5741, kathy_calvert@mow.uscourts.gov. Number of pages: 29.(Calvert, Kathy) (Entered: 09/18/2013) |
| 09/23/2013 | 67 | | SUGGESTIONS in opposition re 64 MOTION to stay *Proceedings in this Court* filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 10/10/2013 unless otherwise directed by the court (Related document(s) 64 ) (Ketchmark, Roseann) (Entered: 09/23/2013) |
| 09/23/2013 | 68 | | REPLY SUGGESTIONS to motion re 64 MOTION to stay *Proceedings in this Court* filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. (Related document(s) 64 ) (Blegen, Christine) (Entered: 09/23/2013) |
| 09/23/2013 | 69 | | MOTION to expedite *Ruling on Mrs. Montgomery's Motion to Stay* filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/10/2013 unless otherwise directed by the court. (Blegen, Christine) (Entered: 09/23/2013) |
| 09/24/2013 | 70 | | ORDER denying 64 motion to stay. Signed on 9/24/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 09/24/2013) |
| 10/01/2013 | 71 | | MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/18/2013 unless otherwise directed by the court. (Blegen, Christine) (Entered: 10/01/2013) |
| 10/01/2013 | 72 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* (Blegen, Christine)Received original disk containing exhibits which has been forwarded to the records section on 10/2/2013 (Diefenbach, Tracy). (Entered: 10/01/2013) |

| | | | |
|---|---|---|---|
| 10/17/2013 | 73 | | MOTION for extension of time to file response/reply as to 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 11/4/2013 unless otherwise directed by the court. (Related document(s) 71 ) (Ketchmark, Roseann) (Entered: 10/17/2013) |
| 10/18/2013 | 74 | | ORDER granting 73 motion for extension of time to file response/reply re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* Suggestions in opposition/response due by 1/15/2014 unless otherwise directed by the court. Signed on 10/18/13 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 10/18/2013) |
| 11/25/2013 | 75 | | MOTION to compel *Defense Counsel to Provide an Affidavit* filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 12/12/2013 unless otherwise directed by the court. (Ketchmark, Roseann) (Entered: 11/25/2013) |
| 12/10/2013 | 76 | | SUGGESTIONS in opposition re 75 MOTION to compel *Defense Counsel to Provide an Affidavit* filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 12/27/2013 unless otherwise directed by the court (Related document(s) 75 ) (Blegen, Christine) (Entered: 12/10/2013) |
| 12/10/2013 | 77 | | ORDER granting 75 motion to compel. Signed on 12/10/13 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 12/10/2013) |
| 12/27/2013 | 78 | | MOTION for reconsideration re 77 Order on Motion to Compel *with suggestions* filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 1/13/2014 unless otherwise directed by the court. (Related document(s) 77 ) (Attorney Frederick A Duchardt, Jr added to party Frederick A. Duchardt, Jr(pty:intp))(Duchardt, Frederick) (Entered: 12/27/2013) |
| 01/09/2014 | 79 | | SUGGESTIONS in opposition re 78 MOTION for reconsideration re 77 Order on Motion to Compel *with suggestions* filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 1/27/2014 unless otherwise directed by the court (Attachments: # 1 Attachment A, # 2 Attachment B)(Related document(s) 78 ) (Ketchmark, Roseann) (Attachment 1 replaced on 1/9/2014) (Diefenbach, Tracy). (Attachment 2 replaced on 1/9/2014) (Diefenbach, Tracy). (Entered: 01/09/2014) |
| 01/09/2014 | 80 | | RESPONSE to motion re 78 MOTION for reconsideration re 77 Order on Motion to Compel *with suggestions* filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 1/27/2014 unless otherwise directed by the court (Blegen, Christine) (Entered: 01/09/2014) |
| 01/10/2014 | 81 | | REPLY SUGGESTIONS to motion re 78 MOTION for reconsideration re 77 Order on Motion to Compel *with suggestions* filed by Frederick A Duchardt, Jr on behalf of interested party Frederick A. Duchardt, Jr. (Related document(s) 78 ) (Duchardt, Frederick) (Entered: 01/10/2014) |
| 01/15/2014 | 82 | | |

| | | | |
|---|---|---|---|
| | | | ORDER granting Government's request for extension of time to file response to Movant's 2255 Motion re 79 Suggestions in Opposition to Motion, filed by United States of America. Signed on 1/15/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 01/15/2014) |
| 01/16/2014 | 83 | | RESPONSE to motion re 78 MOTION for reconsideration re 77 Order on Motion to Compel *with suggestions* filed by Kelley J. Henry on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 2/3/2014 unless otherwise directed by the court (Henry, Kelley) (Entered: 01/16/2014) |
| 01/17/2014 | 84 | | ORDER denying 78 motion for reconsideration. Signed on 1/17/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 01/17/2014) |
| 05/30/2014 | 85 | | MOTION for extension of time *to file affidavits* filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 6/16/2014 unless otherwise directed by the court. (Duchardt, Frederick) (Entered: 05/30/2014) |
| 05/31/2014 | 86 | | MOTION for order for return of complete, intact files and for copies of documents filed under seal filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 6/19/2014 unless otherwise directed by the court. (Duchardt, Frederick) (Entered: 05/31/2014) |
| 06/02/2014 | 87 | | RESPONSE to motion re 85 MOTION for extension of time *to file affidavits* filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 6/19/2014 unless otherwise directed by the court (Ketchmark, Roseann) (Entered: 06/02/2014) |
| 06/02/2014 | 88 | | Minute Entry. Proceedings held before District Judge Gary A. Fenner: MOTION HEARING held on 6/2/2014 re: 85 MOTION for extension of time *to file affidavits* 86 MOTION for order for return of complete, intact files and for copies of documents filed under seal. Attorney Lisa Nouri, Fred Duchardt, Jr., and Roseann Ketchmark appearing. To order a transcript of this hearing please contact Jeannine Rankin, 417−225−7713. This is a TEXT ONLY ENTRY. No document is attached.(Moore, Terri) (Entered: 06/02/2014) |
| 06/02/2014 | 91 | | ORDER granting Duchardt and O'Connor's Motion for Extension of Time to File Affidavits 85 ; allowing the Government until July 31, 2014, to submit its response to Movant's 2255 Motion; granting Duchardt and O'Connor's Motion for Orders Directing Return of Files and Allowing Access to All Filings Made 86 . See Order for other further information. Signed on June 2, 2014 by District Judge Gary A. Fenner. (Moore, Terri) (Entered: 06/03/2014) |
| 06/03/2014 | 89 | | MOTION for reconsideration *of conference call ruling* filed by Kelley J. Henry on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 6/20/2014 unless otherwise directed by the court. (Attachments: # 1 Exhibit Attachment A, # 2 Exhibit Attachment B, # 3 Exhibit Attachment C, # 4 Exhibit Attachment D, # 5 Exhibit Attachment E, # 6 Exhibit Attachment F)(Henry, Kelley) (Entered: 06/03/2014) |
| 06/03/2014 | 90 | | ORDER denying 89 motion for reconsideration. Signed on 6/3/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/03/2014) |
| 06/04/2014 | 92 | | |

| | | | |
|---|---|---|---|
| | | | MOTION for order for production of recording of interview of Frederick A. Duchardt, Jr., and any transcription of the recording filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 6/23/2014 unless otherwise directed by the court. (Duchardt, Frederick) (Entered: 06/04/2014) |
| 06/04/2014 | 93 | | SUGGESTIONS in opposition re 92 MOTION for order for production of recording of interview of Frederick A. Duchardt, Jr., and any transcription of the recording filed by Kelley J. Henry on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 6/23/2014 unless otherwise directed by the court (Related document(s) 92 ) (Henry, Kelley) (Entered: 06/04/2014) |
| 06/05/2014 | 94 | | NOTICE of filing *Notice Of Compliance With Court Order* by Lisa M. Montgomery re 91 Order on Motion for Extension of Time, Order on Motion for Miscellaneous Relief,, (Henry, Kelley) (Entered: 06/05/2014) |
| 06/11/2014 | 95 | | MOTION for order granting leave of Court to withdraw motion (Doc. 92) re 92 MOTION for order for production of recording of interview of Frederick A. Duchardt, Jr., and any transcription of the recording filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 6/30/2014 unless otherwise directed by the court. (Related document(s) 92 ) (Duchardt, Frederick) (Entered: 06/11/2014) |
| 06/11/2014 | 96 | | MOTION for order clarifying previous order of the Court re 84 Order on Motion for Reconsideration filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 6/30/2014 unless otherwise directed by the court. (Related document(s) 84 ) (Duchardt, Frederick) (Entered: 06/11/2014) |
| 06/11/2014 | 97 | | ORDER granting 95 motion to Withdraw Motion for Production of Copy of Audio Recording and Transcription of Interview 92 . Signed on 6/11/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 06/11/2014) |
| 06/13/2014 | 98 | | MOTION for extension of time to file response/reply as to 96 MOTION for order clarifying previous order of the Court re 84 Order on Motion for Reconsideration filed by Kelley J. Henry on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 6/30/2014 unless otherwise directed by the court. (Related document(s) 96 ) (Henry, Kelley) (Entered: 06/13/2014) |
| 06/16/2014 | 99 | | SUGGESTIONS in opposition re 96 MOTION for order clarifying previous order of the Court re 84 Order on Motion for Reconsideration *and Motion for Protective Order* filed by Christine M. Blegen on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 7/3/2014 unless otherwise directed by the court (Related document(s) 96 ) (Blegen, Christine) (Entered: 06/16/2014) |
| 06/16/2014 | 100 | | ORDER denying 98 MOTION for extension of time to file response/reply as to 96 MOTION for order clarifying previous order of the Court re 84 Order on Motion for Reconsideration filed by Lisa M. Montgomery, and granting 96 MOTION for order clarifying previous order of the Court re 84 Order on Motion for Reconsideration filed by Frederick A. Duchardt, Jr. Signed on 6/16/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/16/2014) |

| | | | |
|---|---|---|---|
| 06/16/2014 | 101 | | Emergency MOTION to stay *Order* filed by Kelley J. Henry on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 7/3/2014 unless otherwise directed by the court. (Henry, Kelley) (Entered: 06/16/2014) |
| 06/16/2014 | 102 | | NOTICE of appearance by Philip M Koppe on behalf of United States of America (Koppe, Philip) (Entered: 06/16/2014) |
| 06/17/2014 | 103 | | ORDER denying 101 motion to stay. Signed on 6/17/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/17/2014) |
| 06/19/2014 | 104 | | ORDER allowing Frederick A. Duchardt, Jr. a copy of Doc. 80 in the underlying criminal case. A copy of Doc. 80 in case no. 05−6002−CR−SJ−GAF is being emailed to Mr. Duchardt on this date. Signed on 6/19/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/19/2014) |
| 06/20/2014 | 105 | | ORDER of US COURT OF APPEALS in Case No. 14−2437: The district courts June 16, 2014 order 103 is hereby stayed pending this courts ruling on Montogemerys petition for writ of mandamus/prohibition, which must be filed by 5:00 p.m., June 27, 2014.(McDowell, Shelly) (Entered: 06/20/2014) |
| 06/20/2014 | 106 | | Second MOTION for extension of time *to file affidavits* filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 7/10/2014 unless otherwise directed by the court. (Duchardt, Frederick) (Entered: 06/20/2014) |
| 06/20/2014 | 107 | | RESPONSE to motion re 106 Second MOTION for extension of time *to file affidavits (no position)* filed by Kelley J. Henry on behalf of Movant Lisa M. Montgomery. Reply suggestions due by 7/10/2014 unless otherwise directed by the court (Attachments: # 1 Exhibit A Email to Frederick Duchardt)(Henry, Kelley) (Entered: 06/20/2014) |
| 06/20/2014 | 108 | | ORDER granting 106 motion for extension of time. Affidavits due by 8/29/14. Signed on 6/20/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 06/20/2014) |
| 06/23/2014 | 109 | | ORDER for Parties to Respond to Discovery Requests. Signed on 6/23/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/23/2014) |
| 06/23/2014 | 110 | | NOTICE of filing *Government's Response to Discovery Request* by United States of America (Attachments: # 1 Exhibit, # 2 Exhibit)(Ketchmark, Roseann) (Entered: 06/23/2014) |
| 06/25/2014 | 111 | | NOTICE of filing *Response to Court Court* by Lisa M. Montgomery re 109 Order (Attachments: # 1 Exhibit A Stay Motion, # 2 Exhibit B Email, # 3 Exhibit C Email, # 4 Exhibit D Email, # 5 Exhibit E Email, # 6 Exhibit F Email, # 7 Exhibit G Email, # 8 Exhibit H Email, # 9 Exhibit I Email, # 10 Exhibit J Email, # 11 Exhibit K Email, # 12 Exhibit L Email)(Henry, Kelley) (Entered: 06/25/2014) |
| 06/26/2014 | 112 | | ORDER regarding discovery requests. Signed on 6/26/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/26/2014) |
| 06/26/2014 | 113 | | NOTICE of filing by Lisa M. Montgomery (Attachments: # 1 Exhibit 1 Transcript, April 21, 2006, # 2 Exhibit 2 Email)(Henry, Kelley) (Entered: 06/26/2014) |

| | | | |
|---|---|---|---|
| 06/30/2014 | 114 | | ORDER Limiting Public Funded Representation. Signed on 6/30/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 06/30/2014) |
| 07/14/2014 | 116 | | ORDER of US COURT OF APPEALS: This court's June 20, 2014 order granting a stay of the district court's June 16, 2014 order is vacated. (Crespo, Wil) (Entered: 07/14/2014) |
| 07/14/2014 | 117 | | MOTION for protective order *Renewed Motion For Protective Order* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 7/31/2014 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 07/14/2014) |
| 07/21/2014 | 119 | | MOTION to stay re 114 Order filed by Christine M. Blegen on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 8/7/2014 unless otherwise directed by the court. (Attachments: # 1 Exhibit Affidavit of Lisa Montgomery)(Related document(s) 114 ) (Blegen, Christine) (Entered: 07/21/2014) |
| 07/23/2014 | 120 | | SUGGESTIONS in opposition re 117 MOTION for protective order *Renewed Motion For Protective Order* filed by Philip M Koppe on behalf of Respondent United States of America. Reply suggestions due by 8/11/2014 unless otherwise directed by the court (Related document(s) 117 ) (Koppe, Philip) (Entered: 07/23/2014) |
| 07/24/2014 | 121 | | REPLY SUGGESTIONS to motion re 117 MOTION for protective order *Renewed Motion For Protective Order Reply To Government's Response To Renewed Motion For Protective Order* filed by Lisa G. Nouri on behalf of Movant Lisa M. Montgomery. (Attachments: # 1 Exhibit 1− Lisa Montgomery's Writs Of Mandamus And Prohibition, # 2 Exhibit 2− Government's Response In Opposition To Petition For Writ, # 3 Exhibit 3− Michael Downey, Affidavit)(Related document(s) 117 ) (Nouri, Lisa) (Entered: 07/24/2014) |
| 07/25/2014 | 122 | | MOTION for extension of time to file response/reply as to 91 Order on Motion for Extension of Time, Order on Motion for Miscellaneous Relief,, filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 8/11/2014 unless otherwise directed by the court. (Related document(s) 91 ) (Ketchmark, Roseann) (Entered: 07/25/2014) |
| 07/28/2014 | 123 | | ORDER granting 122 motion for extension of time to file response/reply. Government's response due within 30 days from date of receipt of trial counsel's affidavits. Signed on 7/28/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 07/28/2014) |
| 07/30/2014 | 124 | | ORDER denying 117 renewed motion for protective order. Signed on 7/30/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 07/30/2014) |
| 08/20/2014 | 125 | | ORDER removing Christine Blegen as counsel for movant. Signed on 8/20/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 08/20/2014) |
| 09/02/2014 | 126 | | Third MOTION for extension of time *to file statements* filed by Frederick A Duchardt, Jr on behalf of Frederick A. Duchardt, Jr. Suggestions in opposition/response due by 9/19/2014 unless otherwise directed by the court. |

| | | | |
|---|---|---|---|
| | | | (Duchardt, Frederick) (Entered: 09/02/2014) |
| 09/02/2014 | 127 | | ORDER granting 126 motion for extension of time to file statements. Signed on 9/2/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 09/02/2014) |
| 09/02/2014 | 128 | | ORDER regarding filing of Frederick Duchardt, Jr. and John O'Connor's statement. Signed on 9/2/14 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 09/02/2014) |
| 09/02/2014 | 129 | | DISCOVERY DOCUMENT by Frederick A. Duchardt, Jr re 128 Order, 127 Order on Motion for Extension of Time, 90 Order on Motion for Reconsideration *Statement of Frederick A. Duchardt, Jr.* filed by Frederick A Duchardt, Jr on behalf of interested party Frederick A. Duchardt, Jr. Related document: 128 Order, 127 Order on Motion for Extension of Time, 90 Order on Motion for Reconsideration.(Duchardt, Frederick) Modified on 2/6/2015 − document unsealed per order (Doc. 143) (Francis, Alexandra). (Entered: 09/02/2014) |
| 09/02/2014 | 130 | | DISCOVERY DOCUMENT by John O'Connor filed by John O'Connor on behalf of interested party John O'Connor.(Attorney John O'Connor added to party John O'Connor(pty:intp))(O'Connor, John) Modified on 2/6/2015 − document unsealed per order (Doc. 143) (Francis, Alexandra). (Entered: 09/02/2014) |
| 09/26/2014 | 131 | | MOTION for Order (SEALED) filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/14/2014 unless otherwise directed by the court. (Attachments: # 1 Exhibit 1− Proposed Redactions To Duchardt Statement)(Nouri, Lisa) (Entered: 09/26/2014) |
| 10/02/2014 | 132 | | MOTION for extension of time to file response/reply as to 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 10/20/2014 unless otherwise directed by the court. (Related document(s) 71 ) (Ketchmark, Roseann) (Entered: 10/02/2014) |
| 10/21/2014 | 133 | | ORDER granting 132 motion for extension of time to file response/reply re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* Suggestions in opposition/response due by 12/3/2014 unless otherwise directed by the court. Signed on 10/21/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 10/21/2014) |
| 12/02/2014 | 134 | | MOTION for extension of time to file response/reply as to 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 12/19/2014 unless otherwise directed by the court. (Related document(s) 71 ) (Ketchmark, Roseann) (Entered: 12/02/2014) |
| 12/03/2014 | 135 | | ORDER granting 134 motion for extension of time to file response/reply re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*.Suggestions in opposition/response due by 1/2/2015 unless otherwise directed by the court. Signed on 12/3/14 by |

| | | | |
|---|---|---|---|
| | | | District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 12/03/2014) |
| 01/02/2015 | 136 | | MOTION for extension of time to file response/reply as to 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Roseann Ambrosia Ketchmark on behalf of United States of America. Suggestions in opposition/response due by 1/20/2015 unless otherwise directed by the court. (Related document(s) 71 ) (Ketchmark, Roseann) (Entered: 01/02/2015) |
| 01/21/2015 | 137 | | ORDER granting 136 motion for extension of time to file response/reply re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* Suggestions in opposition/response due by 2/2/2015 unless otherwise directed by the court. Signed on 1/21/15 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 01/21/2015) |
| 01/21/2015 | 138 | | MOTION for reconsideration *of denial of CJA funds* filed by Christine M. Blegen on behalf of Christine Blegen. Suggestions in opposition/response due by 2/9/2015 unless otherwise directed by the court. (Attachments: # 1 Exhibit January 13, 2015 Letter)(Attorney Christine M. Blegen added to party Christine Blegen(pty:misc))(Blegen, Christine) (Entered: 01/21/2015) |
| 01/26/2015 | 139 | | ORDER denying 138 motion for reconsideration. Signed on 1/26/15 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 01/26/2015) |
| 02/02/2015 | 140 | | SUGGESTIONS in opposition re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 2/20/2015 unless otherwise directed by the court (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C)(Related document(s) 71 ) (Ketchmark, Roseann) (Entered: 02/02/2015) |
| 02/03/2015 | 141 | | MOTION for extension of time to file response/reply as to 140 Suggestions in Opposition to Motion, filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 2/20/2015 unless otherwise directed by the court. (Related document(s) 140 ) (Nouri, Lisa) (Entered: 02/03/2015) |
| 02/04/2015 | 142 | | ORDER granting in part 141 motion for extension of time to file response/reply. Movant's reply to Government's suggestions in opposition to 2255 motion due by 5/1/15. Signed on 2/4/15 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 02/04/2015) |
| 02/06/2015 | 143 | | ORDER denying 131 Sealed Motion to strike affidavit. Signed on 2/6/15 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 02/06/2015) |
| 02/13/2015 | | | ***Remark: At the direction of the presiding judge, docs. 41 , 46 , 71 , 131 , and 140 were unsealed on 2/9/15. (Moore, Terri) (Entered: 02/13/2015) |
| 04/08/2015 | 144 | | MOTION for extension of time *to file Traverse* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 4/27/2015 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 04/08/2015) |

| | | | |
|---|---|---|---|
| 04/21/2015 | 145 | | RESPONSE to motion re 144 MOTION for extension of time *to file Traverse* filed by Roseann Ambrosia Ketchmark on behalf of Respondent United States of America. Reply suggestions due by 5/8/2015 unless otherwise directed by the court (Ketchmark, Roseann) (Entered: 04/21/2015) |
| 04/21/2015 | 146 | | ORDER granting 144 motion for extension of time to file traverse by 9/1/2015 unless otherwise directed by the court. Signed on 4/21/15 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 04/21/2015) |
| 08/18/2015 | 147 | | MOTION for extension of time *to file traverse* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 9/4/2015 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 08/18/2015) |
| 08/18/2015 | 148 | | ORDER denying 147 motion for extension of time. Movant's traverse remains due on or before 9/1/15. Signed on 8/18/15 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 08/18/2015) |
| 09/01/2015 | 149 | | REPLY SUGGESTIONS to motion re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Lisa G. Nouri on behalf of Movant Lisa M. Montgomery. (Attachments: # 1 Exhibit 1. Supplemental Declaration of Russell Stetler, # 2 Exhibit 2. Affidavit of David Owen, # 3 Exhibit 3. Contract with Dr. Dean Delis, # 4 Exhibit 4. Contract with Dr. Judith Herman, # 5 Exhibit 5. Email Communication From Madelaine Carderella to Frederick Duchardt, # 6 Exhibit 6. Declaration of Desiree Bowman Offutt, # 7 Exhibit 7. Juror 129 Questionnaire (redacted), # 8 Exhibit 8. Deposition of Ray Conrad, # 9 Exhibit 9. Fred Duchardt Partial Time Records for May, 2006)(Related document(s) 71 ) (Nouri, Lisa) (Entered: 09/01/2015) |
| 09/03/2015 | 150 | | First MOTION for discovery filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 9/21/2015 unless otherwise directed by the court. (Attachments: # 1 Exhibit)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 151 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, (Attachments: # 1 DE 71−1 Dec of Susan Hunt, # 2 DE 71−2 Dec of David L. Owen, # 3 DE 71−3 dec of Judy Clarke, # 4 DE 71−4 4.28.05 email from Holly Jackson, # 5 DE 71−5 Susan Hunt ltr to Dick Burr, # 6 DE 71−6 Richard Burr Email 5.1.06, # 7 DE 71−7 Ltr to Dick Burr 5.2.06, # 8 DE 71−8 Ltr frm Lisa Montgomery, # 9 DE 71−9 David Owen Ltr 5.9.06, # 10 DE 71−10 Memo Authored by Fred Duchardt 7.14.06, # 11 DE 71−11 Dr. William Logan Ltr 3.7.05, # 12 DE 71−12 Lisa Rickert Memo, # 13 DE 71−13 Ltr frm Lisa Rickert 8.8.05, # 14 DE 71−14 Dani Waller email to Ron Ninemire, # 15 DE 71−15 Dec of Dr. George Woods, MD)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 152 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Jan Vogelsang Social History, # 2 DE 71−16 Attach 1. Dec of Thomas Allen Hedberg, # 3 DE 71−16 Attach 2. Lisa Rickert Declaration, # 4 |

| | | | |
|---|---|---|---|
| | | | DE 71−16 Attach 3. Marie Josephine Miller Birth Cert, # 5 DE 71−16 Attach 4. Dearth Cert of Marie Josephine Miller Stelma, # 6 DE 71−16 Attach 5. Dec of Mary Lee Coleman)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 153 | | NOTICE of filing by Lisa M. Montgomery re 149 Reply Suggestions to Motion,,, 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach. 6 Dec of John Joseph Patterson, # 2 DE 71−16 Attach 7. John Joseph Patterson Military Records)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 154 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 8. Dec of Christina Juarez Patterson, # 2 DE 71−16 Attach 9. Dec of Diane Rae Mattingly, # 3 DE 71−16 Attach 10. Mary Lee Coleman Harborview Med Records, # 4 DE 71−16 Attach 11. Dec of Heather Hedberg, # 5 DE 71−16 Attach 12. Dec of Lori Mae Hedberg Yates, # 6 DE 71−16 Attach 13. Mary Lee Hedberg Coleman Gray Jr High, # 7 DE 71−16 Attach 14. Topeka KS School Rec of Desiree Boman, # 8 DE 71−16 Attach 15. Marriage Cert of Robert Lee Patterson and Marie Miller, # 9 DE 71−16 Attach 16. Robert Lee Patterson Birth Cert., # 10 DE 71−16 Attach 17. Robert Lee Patterson Draft Card, # 11 DE 71−16 Attach 18. Dec of Grace A. Figg Baum, # 12 DE 71−16 Attach 19. Dec of Wendy Alexander Treibs, # 13 DE 71−16 Attach 20. Death Certificate of Robert Patterson, # 14 DE 71−16 Attach 21. Dec of Ronald J. Figg, # 15 DE 71−16 Attach 22. Gordon Hedberg Enlistment Records, # 16 DE 71−16 Attach 23. Marriage license of John Hedberg and Joyce Hammer, # 17 DE 71−16 Attach 24. Diane Hedberg State Dept of Social Welfare of KS Rpt, # 18 DE 71−16 Attach 25. Diane Hedberg Riley Co. Ct. Rec. Child in Need of Care, # 19 DE 71−16 Attach 26. Diane Hedberg Adoption Records Index, # 20 DE 71−16 Attach 27. Hope Kleiner OK Dept of Human Services Home Study, # 21 DE 71−16 Attach 28. Birth Certificate of Judy Rignell, # 22 DE 71−16 Attach 29. In Matter of Justin Kleiner, Tr 149, Testimony of Desiree Boman, # 23 DE 71−16 Attach 30. Ron Ninemire Interview of Ron Gieck 6.27.07, # 24 DE 71−16 Attach 31. Dec of Teddy Kleiner 2.15.13, # 25 DE 71−16 Attach 32. SSA Itemized Stmt of Earn of Judy Shaughnessy, # 26 DE 71−16 Attach 33. Cert of Still Birth (fetal death) KS Bd of Health, # 27 DE 71−16 Attach 34. Leo Barabash and Judy Rignell Divorce Decree, # 28 DE 71−16 Attach 35. John Hedberg and Judy Hedberg Divorce Decree, # 29 DE 71−16 Attach 36. Cert of Live Birth of Lisa Marie Hedberg, # 30 DE 71−16 Attach 37. FBI 302 Interview of Patty Hedberg Baldwin, # 31 DE 71−16 Attach 38. Jack Kleiner and Judy Hedberg marriage certificate, # 32 DE 71−16 Attach 39. Kleiner v Kleiner divorce transcript, # 33 DE 71−16 Attach 40. FBI Interview of Jerri Jo Kleiner Leonard)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 155 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 41. Dec of Tommy Kleiner, # 2 DE 71−16 Attach 42. Marriage license of Judy Boman and hector Ochoa, # 3 DE 71−16 Attach 43. Ochoa v Ochoa Petition for Divorce and Final Decree, # 4 DE 71−16 Attach 44. Danny Shaughnessy and Judy Ochoa marriage record, # 5 DE 71−16 |

| | | | |
|---|---|---|---|
| | | | Attach 45. Dec of Dani Waller, # 6 DE 71−16 Attach 46. Dec of Jessica Marie Robinson Thompson Brown, # 7 DE 71−16 Attach 47. Diane Hedberg Central KS Mental Health Report, # 8 DE 71−16 Attach 48. Ron Ninemire and Dani Waller Interview with Diane Rae Hedberg Mattingly, # 9 DE 71−16 Attach 49. Jack Kleiner Death Certificate, # 10 DE 71−16 Attach 50. Jack Kleiner Grave and Obituary, # 11 DE 71−16 Attach 51 Penny Craig 12 & 12 Ctr for Addiction Trmnt and Recovery Rec, # 12 DE 71−16 Attach 52. Willadean Kleiner v. Jack Kleiner Divorce Riley Co. Case No. 17,260, # 13 DE 71−16 Attach 53. Josie Kleiner telephone call summary, # 14 DE 71−16 Attach 54. Ron Ninemire Interview of Teddy Kleiner, # 15 DE 71−16 Attach 55. Ron Ninemire interview of Penny Kleiner Craig, # 16 DE 71−16 Attach 56. Ron Ninemire interview of Tommy Kleiner, # 17 DE 71−16 Attach 57. Dec of Holly Jackson, # 18 DE 71−16 Attach 58. Teddy Kleiner KS DOC Mental Health Exam, # 19 DE 71−16 Attach 59. Vacation Bible School Certificate, # 20 DE 71−16 Attach 60. Lisa Montgomery Manhattan KS Unified SD No. 383 Kindergarten, # 21 DE 71−16 Attach 61. Lisa Montgomery Tulsa Public Schools Cumulative Record, # 22 DE 71−16 Attach 62. Dec of John Francisco)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 156 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 63. Lisa Montgomery Cert of Merit in Art, # 2 DE 71−16 Attach 64. Lisa Montgomery Cert of Merit in Reaading, # 3 DE 71−16 Attach 65. Lisa Montgomery Children's Med Center Records, # 4 DE 71−16 Attach 66. Lisa Montgomery Tulsa Tribune Spelling Award, # 5 DE 71−16 Attach 67. Lisa Montgomery Pershing Elementary Good Citizenship Award, # 6 DE 71−16 Attach 68. Lisa Montgomery Report to Parents, Tulsa Public Schools)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 157 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 69. Dec of Eunice Copeland, # 2 DE 71−16 Attach 70. Dec of Kenneth Alexander, # 3 DE 71−16 Attach 71. Kenneth Alexander San Antonio State Hosp. Med Rec., # 4 DE 71−16 Attach 72. Kenneth Dale Alexander Florida St. Hosp, # 5 DE 71−16 Attach 73. Kenneth Alexander SSDI Rec, Mental Status Eval., # 6 DE 71−16 Attach 74. Kenneth Alexander Snowy Range Consulting, # 7 DE 71−16 Attach 75. Kenneth Alexander, WY Behavioral Institute, # 8 DE 71−16 Attach 76. Kenneth Alexander WY State Hosp. Psychotropic Drug History, # 9 DE 71−16 Attach 77. Kenneth Alexander WY State Hosp Psych Adm Note, # 10 DE 71−16 Attach 78. Lisa Montgomery Sperry Public Schools Trans., # 11 DE 71−16 Attach 79. Dec of Chelsea Boman Veal, # 12 DE 71−16 Attach 80. Dec of Jonathan Caleb Thompson, # 13 DE 71−16 Attach 81. Dec of Marvin Alexander, # 14 DE 71−16 Attach 82. Dec of Becky Perkey, # 15 DE 71−16 Attach 83. Dec of Jacqueline Moffett, # 16 DE 71−16 Attach 84. Dec of Jeff Batson, # 17 DE 71−16 Attach 85. Dec of Penny Craig, # 18 DE 71−16 Attach 86. Dec of David L. Owen, # 19 DE 71−16 Attach 87. Dec. of Alice Mae Derry, # 20 DE 71−16 Attach 88. Dec of Mary Osborn Hodges, # 21 DE 71−16 Attach 89. Dec of Janet Eastman McNickle, # 22 DE 71−16 Attach 90. Dec of Rachael Boman Johnson, # 23 DE 71−16 Attach 91. Dec of Brenda Cox)(Nouri, Lisa) |

| | | | |
|---|---|---|---|
| | | | (Entered: 09/03/2015) |
| 09/03/2015 | 158 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 92. Ron Ninemire Interview with Lewis Priest, # 2 DE 71−16 Attach 93. Jeff Batson Tarrant Co. Crim. Ct., # 3 DE 71−16 Attach 94. Defense Interview of Allen Baldwin, # 4 DE 71−16 Attach 95. Nils Rignell Death Certificate, # 5 DE 71−16 Attach 96. Ron Ninemire Interview of Susan Barrow−Swartz, # 6 DE 71−16 Attach 97. Dec of Susan Barrow Swartz, # 7 DE 71−16 Attach 98. Dec of Nita Milburn Montgomery, # 8 DE 71−16 Attach 99. Lisa Montgomery Cert of Merit, Project Upward Bound, # 9 DE 71−16 Attach 100. FBI Interview of Judy Shaughnessy, # 10 DE 71−16 Attach 101. FBI Interview of Patty Baldwin, # 11 DE 71−16 Attach 102. Lisa Montgomery 1984 Counseling Rec with Nancy Walentiny, # 12 DE 71−16 Attach 103. Ron Ninemire Interview of Judy Shaughnessy, # 13 DE 71−16 Attach 104. Boman v Boman OK Divorce File 1993, # 14 DE 71−16 Attach 105. Dec of Carl James Boman, # 15 DE 71−16 Attach 106. Dec of Richard Leroy Boman, # 16 DE 71−16 Attach 107. Lisa Montgomery Cleveland High School Transcript, # 17 DE 71−16 Attach 108. Lisa Montgomery Enlistment Records, # 18 DE 71−16 Attach 109. Michael Boman Valhalla High School Records, # 19 DE 71−16 Attach 110. Michael Boman Cleveland Public School Records, # 20 DE 71−16 Attach 111. State of KS v. Carl Boman, Motion for Involuntary Assign of Competency, # 21 DE 71−16 Attach 112. Dec of Ann Walker−King, # 22 DE 71−16 Attach 113. Michael Boman Mar Vista High School Records, # 23 DE 71−16 Attach 114. Dec of David J. Stadler, # 24 DE 71−16 Attach 115. Carl Boman and Lisa Hedberg OK marriage certificate, # 25 DE 71−16 Attach 116. Desiree Boman Birth Certificate, # 26 DE 71−16 Attach 117. Dec of Darlene Alexander, # 27 DE 71−16 Attach 118. CJ Boman Deming School Records, # 28 DE 71−16 Attach 119. CJ Boman Birth Certificate, # 29 DE 71−16 Attach 120. Lisa Montgomery SSN Itemized Statement)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 159 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 121. 1988 Datebook, # 2 DE 71−16 Attach 122. CJ Boman Jane Phillips Birth Records, # 3 DE 71−16 Attach 123. Kenneth Alexander Mental Ret. Comp. Exam, # 4 DE 71−16 Attach 124. Lisa Montgomery Jane Phillips Med. Ctr Records, # 5 DE 71−16 Attach 125. 1989 Datebook, # 6 DE 71−16 Attach 126. Lisa Montgomery Scripps Mem. Hospital, # 7 DE 71−16 Attach 127. Carl Boman OK Workers Comp Med Rec., # 8 DE 71−16 Attach 128. Carl Boman C.B. Pettigrew, D.O. Records, # 9 DE 71−16 Attach 129. Dec of Gerald Upshaw)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 160 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 130. Kayla Boman Univ of CA San Diego Birth Rec, # 2 DE 71−16 Attach 131. Kayla Boman Univ. of CA San Diego Post Birth Rec., # 3 DE 71−16 Attach 132. Kayla Boman Childrens Hosp San Diego Records, # 4 DE 71−16 Attach 133. CJ Boman Scripps Memorial Hosp Admitting |

| | | | |
|---|---|---|---|
| | | | Physical Exam, # 5 DE 71−16 Attach 134. Desiree Boman Childrens Hosp and Health Ctr San Diego, H&P Exam, # 6 DE 71−16 Attach 135. CJ Boman Childrens Hospital San Diego, # 7 DE 71−16 Attach 136. CJ Boman Childrens Hosp San Diego, # 8 DE 71−16 Attach 137. Chelsea Boman Scripps Mem. Hosp Chula Vista, # 9 DE 71−16 Attach 138. Desiree Boman Childrens Hosp San Diego, # 10 DE 71−16 Attach 139. Desiree Boman Childrens Hosp & Health Ctr Discharge Summary, # 11 DE 71−16 Attach 140. Desiree Boman Jane Phillips Med Ctr, # 12 DE 71−16 Attach 141. Chelsea Boman Jane Phillips Mem. Med. Ctr Rec.)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 161 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 142. Lisa Montgomery Jane Phillips Mem. Med. Ctr., # 2 DE 71−16 Attach 143. Chelsea Boman, Jane Phillips Mem. Med. Ctr., # 3 DE 71−16 Attach 144. Desiree Boman Deming School Rec., # 4 DE 71−16 Attach 145. Desiree Boman Jane Phillips Med. Center, # 5 DE 71−16 Attach 146. CJ Boman Jane Phillips Mem Med. Rec., # 6 DE 71−16 Attach 147. Dec. of Eithol Marie Boman Towery, # 7 DE 71−16 Attach 148. Order Authorizing Disc of Rec Under Protective Order, # 8 DE 71−16 Attach 149. Lisa Rickert Telephone Interview of Brett Owens, # 9 DE 71−16 Attach 150. Lisa Montgomery statement to Dr. Brian Shane, # 10 DE 71−16 Attach 151. Kayla Boman Jane Phillips Mem Medical Ctr., # 11 DE 71−16 Attach 152. Boman v Boman Luna New Mex. Divorce file, # 12 DE 71−16 Attach 153. Kenneth D. Alexander and Kimberly Alexander Decree of Divorce, # 13 DE 71−16 Attach 154. Lisa Montgomery Jane Phillips Mem Med Ctr Radiology Rpt, # 14 DE 71−16 Attach 155. Desiree Boman Bayside School Records, # 15 DE 71−16 Attach 156. Lisa Montgomery Tulsa Comm. College, # 16 DE 71−16 Attach 157. Desiree Boman, Dewey Public School Rec., # 17 DE 71−16 Attach 158. Chelsea Boman Springdale Public School Rec, # 18 DE 71−16 Attach 159. Desiree Boman Springdale Public School Records, # 19 DE 71−16 Attach 160. FBI Interview of Carl Boman, # 20 DE 71−16 Attach 161. Lisa Rickert Inv. of Roberta and James Upshaw)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 162 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 162. Lisa Montgomery Med. Rec. Dr. Brian Shane, # 2 DE 71−16 Attach 163. Chelsea Boman Deming Public School Rec., # 3 DE 71−16 Attach 164. Kayla Boman Deming Public School Rec., # 4 DE 71−16 Attach 165. Desiree Boman, Sunshine Elementary School Rec., # 5 DE 71−16 Attach 166. Kayla Boman, Jane Phillips Mem. Med. Ctr., # 6 DE 71−16 Attach 167. Dec. of Kayla Deanne Boman, # 7 DE 71−16 Attach 168. Dec of Carl James (CJ) Boman II, # 8 DE 71−16 Attach 169. Tommy Kleiner, Shawnee Co. KS Case No. 99−CR−3250, # 9 DE 71−16 Attach 170. CJ Boman, Stormont Vail Reg. Health Ctr., # 10 DE 71−16 Attach 171. Lisa Montgomery St. Francis Med. Ctr Rec., # 11 DE 71−16 Attach 172. Kevin Montgomery St. Francis Hospital Rec., # 12 DE 71−16 Attach 173. Montgomery v. Montgomery Dist Ct of Osage Co. KS, # 13 DE 71−16 Attach 174. Dec of Kevin Montgomery, # 14 DE 71−16 Attach 175. Desiree Boman Topeka School Records, # 15 DE 71−16 Attach 176. Chelsea Boman, William Magnet School Rec. Topeka KS, # 16 DE 71−16 Attach 177. CJ Boman |

| | | | |
|---|---|---|---|
| | | | Bartlesville Public School Rec.)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 163 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 178. Kayla Boman Bartlesville Public School Rec., # 2 DE 71−16 Attach 179. Kayla Boman Stormont Vail Reg. Health Ctr Rec, # 3 DE 71−16 Attach 180. Lisa Montgomery KS Dept of Labor Workers Comp Claim, # 4 DE 71−16 Attach 181. FBI Interview of Teddy Kleiner, # 5 DE 71−16 Attach 182. Lisa Montgomery Stormont Vail Reg Health Ctr., # 6 DE 71−16 Attach 183. Danny Shaughnessy and Judy Ochoa marriage record, # 7 DE 71−16 Attach 184. State of KS ex rel v. Boman, Osage Co. KS No. 00D157, # 8 DE 71−16 Attach 185. Kevin Montgomery Social Security Itemized Statement, # 9 DE 71−16 Attach 186. CJ Boman St. Francis Hosp, # 10 DE 71−16 Attach 187. Chelsea Boman St. Francis Hosp, # 11 DE 71−16 Attach 188. Desiree Boman St Francis Hosp, # 12 DE 71−16 Attach 189. Lisa Montgomery Lawrence Mem Hospital, # 13 DE 71−16 Attach 190. Kevin Montgomery St Francis med Ctr, # 14 DE 71−16 Attach 191. FBI Physical Evidence from glove box, Notice to Appear, # 15 DE 71−16 Attach 192. Desiree boman Coffey Co. Hosp Med rec, # 16 DE 71−16 Attach 193. USA v. Montgomery, No. 05−06−002, Vol. 5, p. 1074., # 17 DE 71−16 Attach 194. Lisa Montgomery St. Francis med. Ctr Rec., # 18 DE 71−16 Attach 195. Desiree Boman Marais des Cygnes Valley High School transcript, # 19 DE 71−16 Attach 196. Kayla Boman, Carroll High School, Alabama, # 20 DE 71−16 Attach 197. Declaration of Vanita June Boman, # 21 DE 71−16 Attach 198. Dec of Cheryl Fine, # 22 DE 71−16 Attach 199. notes of Dr. Sallye Wilkinson, # 23 DE 71−16 Attach 200. Kayla Boman, J.Rob Hutchinson MD physical exam, # 24 DE 71−16 Attach 201. CJ Boman, J.Rob Hutchinson MD physical exam, # 25 DE 71−16 Attach 202. Chelsea Boman, J. Rob Hutchinson MD physical exam, # 26 DE 71−16 Attach 203. Chelsea Boman, Newman Mem. Co. Hosp)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 164 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 204. Kayla Boman Coffey Co. Hosp Sports Physical, # 2 DE 71−16 Attach 205. Chelsea Boman Dewey Public School records, # 3 DE 71−16 Attach 206. Lisa Montgomery Coffey Co Hosp Records, # 4 DE 71−16 Attach 207. Justin Jo Lee Kleiner, The Farm History, # 5 DE 71−16 Attach 208. Bonnie Jean Taylor and teddy J. Kleiner Pwr of Atty to Judy Shaughnessy, # 6 DE 71−16 Attach 209. CJ Boman Coffey Co. Hospital Rec, # 7 DE 71−16 Attach 210. Teddy Kleiner KS Dept of Corrections, Intake and Social History, # 8 DE 71−16 Attach 211. KS Dept of Social and Rehab Serv. Child & Fam Service Crt Rpt., # 9 DE 71−16 Attach 212. FBI Interview of Lori Colwell, # 10 DE 71−16 Attach 213. In the matter of Justin Kleiner, Tr 179, Test of Lisa Montgomery, # 11 DE 71−16 Attach 214. KS Interstate Compact on Placement of children, # 12 DE 71−16 Attach 215. State of KS v Tommy Kleiner, Dist. Ct. for Osage Co., # 13 DE 71−16 Attach 216. Tommy Kleiner Franklin Co. 2003 Misc. Court Records, # 14 DE 71−16 Attach 217. Justin Kleiner adoptive home study, # 15 DE 71−16 Attach 218. Justin Kleiner pediatric Assoc. Med. Screening rcrds, # 16 DE 71−16 Attach 219. Justin Kleiner case Log for monthly family contact, # 17 DE 71−16 Attach 220. |

| | | | |
|---|---|---|---|
| | | | Chelsea Boman Coffey co. Hospital Records 6.25.03, # 18 DE 71−16 Attach 221. Casey's General Store employment records of Lisa Montgomery, # 19 DE 71−16 Attach 222. Cotton O'Neal Clinic, Topeka, KS, # 20 DE 71−16 Attach 223. KS v. Kleiner, Dist. Ct. of Franklin co., # 21 DE 71−16 Attach 224. Lisa Montgomery Coffey Co. Hosp Rec. 12.12.03, # 22 DE 71−16 Attach 225. KS v. Tommy Lee Kleiner, Dist Ct. of Shawnee co., KS, # 23 DE 71−16 Attach 226. FBI Interview of Kevin Montgomery, # 24 DE 71−16 Attach 227. Death certificate of Lori Diane Blalock, # 25 DE 71−16 Attach 228. Declaration of Jenny Hays, # 26 DE 71−16 Attach 229. FBI file 1A32, request for leave form, # 27 DE 71−16 Attach 230. State of OK v. Teddy Kleiner, Tulsa OK, # 28 DE 71−16 Attach 231. teddy Kleiner KS DOC Mental Health Eval and Classification Rpt., # 29 DE 71−16 Attach 232. Letter to Kevin from Lisa referring to baby Sarah)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 165 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−16 Attach 233. Coffey Health Sys v. Montgomery, # 2 DE 71−16 Attach 234. James H. mcMuray DDS Acct. History report, # 3 DE 71−16 Attach 235. Testimony of Lisa Montgomery, Prob. Rev. hearing of Tommy Kleiner, # 4 DE 71−16 Attach 236. Montgomery v. Shaughnessy, no. 2004 DM−23 Order of Dismissal, # 5 DE 71−16 Attach 237. Chelsea Boman, Newman Reg. Health Ctr. Patient Discharge Sheet, # 6 DE 71−16 Attach 238. Chelsea Boman Waverly Med. Clinic, # 7 DE 71−16 Attach 239. CJ Boman Marias des Cygnes Valley High School Transcript, # 8 DE 71−16 Attach 240. Desiree boman, Coffey co. Hospital Med. Records, # 9 DE 71−16 Attach 241. Chelsea Boman, Cert of Release or Discharge from Duty, # 10 DE 71−16 Attach 242. Kayla Boman Certificate of Release or Discharge from Active duty, # 11 DE 71−16 Attach 243. Tommy Kleiner v. Nina Green, Petition for Protective Order, # 12 DE 71−16 Attach 244. FBI Interview of Cheryl Fine, # 13 DE 71−16 Attach 245. FBI Interview of Lisa Green, # 14 DE 71−16 Attach 246. State of KS v. Tommy Lee Kleiner, Osage co. KS No. 2004−CR−168, # 15 DE 71−16 Attach 247. FBI Interview of Katheryn Dewey, # 16 DE 71−16 Attach 248. Kayla Boman, Marias des Cynes Valley High School Transcript, # 17 DE 71−16 Attach 249. FBI Interview of Kayla Boman, # 18 DE 71−16 Attach 250. FBI Interview of Mona Marcotte, # 19 DE 71−16 Attach 251. FBI physical evidence glove box 1B15(18), application for reg. of birth, # 20 DE 71−16 Attach 252. FBI physical evidence retrieved from house, receipt from toys r us, # 21 DE 71−16 Attach 253. Desiree boman Jane Phillips School Records 2nd Grade)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/03/2015 | 166 | | NOTICE of filing by Lisa M. Montgomery re 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial*, 149 Reply Suggestions to Motion,,, 151 Notice of filing,,, (Attachments: # 1 DE 71−17 − Declaration of Dr. William Logan, MD, # 2 DE 71−18 − Declaration of Phillip Thompson, # 3 DE 71−19 − Declaration of Chris Armstrong, # 4 DE 71−20 − Declaration of Janet Santana re Ray Conrad, # 5 DE 71−21 − Declaration of janet Santana re Ron Ninemire, # 6 DE 71−22 − CCA Visitor Logs, # 7 DE 71−23 − Memorandum Authored by Fred Duchardt on March 7, 2007, # 8 DE 71−24 − Fred Duchardt letter to DOJ, # 9 DE 71−25 − Fred Duchardt CJA Voucher 5, # 10 DE 71−26 − Fred Duchardt CJA Voucher 6, # 11 DE 71−27 − Leona Hayes Deposition, # 12 DE 71−28 − |

| | | | |
|---|---|---|---|
| | | | Email from Fred Duchardt to Court, # 13 DE 71−29 − ABA Guidelines, # 14 DE 71−30 − Supplemental Guidelines on the Mitigation Function, # 15 DE 71−31 − Declaration of Debra Garvey, # 16 DE 71−32 − Ray Conrad Deposition, # 17 DE 71−33 − Declaration of Denny LeBoeuf, # 18 DE 71−34 − Declaration of Russ Stetler, # 19 DE 71−35 − Report of Dr. Siddhartha Nadkarni)(Nouri, Lisa) (Entered: 09/03/2015) |
| 09/22/2015 | 167 | | ORDER TO SHOW CAUSE for failure to respond to Movant's Motion for Discovery 150 .Show Cause Response due by 10/6/2015. Signed on 9/22/14 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached. (Mitchell, Lisa) (Entered: 09/22/2015) |
| 10/05/2015 | 168 | | RESPONSE TO ORDER TO SHOW CAUSE by United States of America. (Koppe, Philip) (Entered: 10/05/2015) |
| 10/06/2015 | 169 | | ORDER granting United States extension of time in which to file response to Movant's Motion for Discovery re 168 Response to Order to Show Cause filed by United States of America. United States of America's response due by 10/11/2015. Signed on 10/6/15 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached. (Mitchell, Lisa) (Entered: 10/06/2015) |
| 10/06/2015 | 170 | | NOTICE of appearance by David M Ketchmark on behalf of United States of America (Attorney David M Ketchmark added to party United States of America(pty:res))(Ketchmark, David) (Entered: 10/06/2015) |
| 10/13/2015 | 171 | | SUGGESTIONS in opposition re 150 First MOTION for discovery filed by Philip M Koppe on behalf of Respondent United States of America. Reply suggestions due by 10/30/2015 unless otherwise directed by the court (Related document(s) 150 ) (Koppe, Philip) (Entered: 10/13/2015) |
| 10/27/2015 | 172 | | REPLY SUGGESTIONS to motion re 150 First MOTION for discovery filed by Lisa G. Nouri on behalf of Movant Lisa M. Montgomery. (Related document(s) 150 ) (Nouri, Lisa) (Entered: 10/27/2015) |
| 12/21/2015 | 173 | 40 | ORDER granting in part and denying in part 71 Motion to vacate ; denying 150 motion for discovery. Signed on 12/21/15 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Main Document 173 replaced on 12/21/2015 to correct typographical errors only)and NEF regenerated (Mitchell, Lisa). (Entered: 12/21/2015) |
| 12/29/2015 | 174 | | NOTICE of appearance by Jeffrey E. Valenti on behalf of United States of America (Attorney Jeffrey E. Valenti added to party United States of America(pty:res))(Valenti, Jeffrey) (Entered: 12/29/2015) |
| 01/05/2016 | 175 | | NOTICE OF HEARING − This is the official notice for this hearing. At parties' request, status conference is set for 1/27/2016 at 10:30 AM in Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner. (Moore, Terri) (Entered: 01/05/2016) |
| 01/27/2016 | 176 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: STATUS CONFERENCE held on 1/27/2016. Written Scheduling Order to follow. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Main Document 176 replaced on 1/27/2016) (Moore, Terri). (Entered: 01/27/2016) |

| | | | |
|---|---|---|---|
| 01/27/2016 | 177 | | SCHEDULING ORDER: Movant's expert witness designations due by 3/27/16; Respondent's due twenty (20) days thereafter. Witness and exhibit lists due by 10/1/2016. Evidentiary Hearing set for 10/31/2016 09:00 AM in Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner. Pre−hearing Status Conference set for 10/12/2016 10:00 AM Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner. Signed on January 27, 2016 by District Judge Gary A. Fenner. (Moore, Terri) Modified on 1/27/2016 to correct docket text (Moore, Terri). (Entered: 01/27/2016) |
| 01/29/2016 | 178 | | MEMORANDUM emailed to counsel regarding 1/27/16 status conference (SEALED). Access restricted to counsel only. (Attachments: # 1 Exhibit Email to counsel)(Mitchell, Lisa) Modified on 1/29/2016 (Mitchell, Lisa). (Entered: 01/29/2016) |
| 02/04/2016 | 179 | | ELECTRONIC TRANSCRIPT of status conference held January 27, 2016 before Judge Gary A. Fenner. Court Reporter: Kathy Calvert, 816−512−5741, kathy_calvert@mow.uscourts.gov. Number of pages: 19. NOTICE RE: REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the parties' intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.mow.uscourts.gov. Please read this policy carefully. **NOTICE: Attorneys must contact the court reporter for copies during this 90 day period. Notice of Intent to File Redaction of Transcripts due by 2/11/2016. Release of Transcript Restriction set for 5/5/2016.**(Calvert, Kathy) (Entered: 02/04/2016) |
| 08/04/2016 | 180 | | MOTION for order Motion for Leave to File Ex Parte and Under Seal *Motion for Leave to File Ex Parte and Under Seal*, MOTION for leave to file filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 8/22/2016 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 08/04/2016) |
| 08/08/2016 | 181 | | ORDER granting in part and denying in part 180 motion file ex parte and under seal. Movant granted leave to file motion under seal. Signed on 8/8/16 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 08/08/2016) |
| 08/08/2016 | 182 | | MOTION for Order (SEALED) filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 8/25/2016 unless otherwise directed by the court. (Attachments: # 1 Exhibit Proposed Order)(Nouri, Lisa) (Entered: 08/08/2016) |
| 08/09/2016 | | | NOTICE OF DOCKET MODIFICATION. A modification has been made to the document filed on 8/8/2016 as Document No. 182, MOTION for Order (SEALED). The proposed order attached to the motion has been deleted. Per Administrative Procedures any proposed orders are to be emailed to the Courtroom Deputy in Word or WordPerfect format. This is a text entry only − no document is attached. (Houston, Kiambu) (Entered: 08/09/2016) |
| 08/10/2016 | 183 | | ORDER granting 182 Sealed Motion. Signed on 8/10/16 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 08/10/2016) |
| 09/12/2016 | 186 | | NOTICE of filing *Movant's Notice of Agreed Waiver of Appearance* by Lisa M. Montgomery (Attachments: # 1 Affidavit Voluntary Waiver of |

| | | | |
|---|---|---|---|
| | | | Appearance)(Nouri, Lisa) (Entered: 09/12/2016) |
| 09/19/2016 | 187 | | MOTION for leave to file *a motion under seal* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/6/2016 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 09/19/2016) |
| 09/20/2016 | 188 | | MOTION to continue *pre−evidentiary hearing status conference* filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/7/2016 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 09/20/2016) |
| 09/21/2016 | 189 | | ORDER granting 187 motion for leave to file motion under seal. Signed on 9/21/16 by District Judge Gary A. Fenner. This is a TEXT ONLY ENTRY. No document is attached.(Mitchell, Lisa) (Entered: 09/21/2016) |
| 09/21/2016 | 190 | | MOTION for Order (SEALED) filed by Lisa G. Nouri on behalf of Lisa M. Montgomery. Suggestions in opposition/response due by 10/11/2016 unless otherwise directed by the court. (Nouri, Lisa) (Entered: 09/21/2016) |
| 09/22/2016 | 191 | | NOTICE OF HEARING − This is the official notice for this hearing. This is a TEXT ONLY ENTRY. No document is attached. The Status Conference set for 10/12/16 at 10:00 AM is CONTINUED TO 10/14/2016 09:30 AM in Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 09/22/2016) |
| 09/22/2016 | 192 | | ORDER (SEALED) granting 190 MOTION for Order (SEALED) filed by Lisa M. Montgomery. Signed on 9/22/16 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 09/22/2016) |
| 09/30/2016 | 193 | | PROPOSED EXHIBIT LIST by United States of America. (Valenti, Jeffrey) (Entered: 09/30/2016) |
| 09/30/2016 | 194 | | PROPOSED WITNESS LIST by United States of America . (Valenti, Jeffrey) (Entered: 09/30/2016) |
| 10/03/2016 | 195 | | PROPOSED WITNESS LIST by Lisa M. Montgomery *Movant's Initial Witness List*. (Nouri, Lisa) (Entered: 10/03/2016) |
| 10/03/2016 | 196 | | PROPOSED EXHIBIT LIST *Movant's List of Exhibits* by Lisa M. Montgomery. (Attachments: # 1 Exhibit Movant's Exhibit List)(Nouri, Lisa) (Entered: 10/03/2016) |
| 10/14/2016 | 197 | | Minute Entry. Proceedings held before District Judge Gary A. Fenner: PRE−HEARING STATUS CONFERENCE held on 10/14/2016. The Court notifies parties that it intends to maintain a 9:00 AM to 5:00 PM daily schedule. Parties are reminded that witnesses should be scheduled so that there is minimal downtime between evidence presentation. Time in court: 9:30 AM to 9:34 AM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 10/14/2016) |
| 10/30/2016 | 198 | | Amended PROPOSED WITNESS LIST by Lisa M. Montgomery . (Henry, Kelley) (Entered: 10/30/2016) |
| 10/30/2016 | 199 | | Amended PROPOSED EXHIBIT LIST by Lisa M. Montgomery. (Attachments: # 1 Index Amended Proposed Exhibit List)(Henry, Kelley) |

| | | | |
|---|---|---|---|
| | | | (Entered: 10/30/2016) |
| 10/31/2016 | 200 | | PROTECTIVE ORDER directing release of court services officer files pursuant to Kansas Supreme Court Rule 106(c). Signed on 10/31/16 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 10/31/2016) |
| 10/31/2016 | 201 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 1 held on 10/31/2016. Parties are to return by 9:00 a.m. on 11/1/16. Time in court: 8:58 AM to 3:17 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 10/31/2016) |
| 11/01/2016 | 202 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 2 held on 11/1/2016. Parties instructed to return by 9:00 a.m. on 11/2/16. Time in court: 8:58 AM to 2:52 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/01/2016) |
| 11/02/2016 | 203 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 3 held on 11/2/2016. Parties instructed to return by 9:00 a.m. on 11/3/16. Time in court: 8:58 AM to 4:39 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/03/2016) |
| 11/03/2016 | 204 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 4 held on 11/3/2016. Parties instructed to return by 9:00 a.m. on 11/4/16. Time in court: 8:58 AM to 5:05 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/03/2016) |
| 11/04/2016 | 205 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 5 held on 11/4/2016. Parties instructed to return by 9:00 a.m. on 11/7/16. Time in court: 8:57 AM to 3:14 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/04/2016) |
| 11/07/2016 | 206 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 6 held on 11/7/2016. Parties instructed to return by 9:00 a.m. on 11/8/16. Time in court: 8:56 AM to 4:58 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Main Document 206 replaced on 11/8/2016) (Moore, Terri). (Entered: 11/07/2016) |
| 11/08/2016 | 207 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 7 held on 11/8/2016. Parties instructed to return by 9:00 a.m. on 11/9/16. Time in court: 8:58 AM to 5:24 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/09/2016) |
| 11/09/2016 | 208 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 8 held on 11/9/2016. Parties instructed to return by 9:00 a.m. on 11/10/16. Time in court: 9:00 AM to 5:14 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/10/2016) |

| | | | |
|---|---|---|---|
| 11/10/2016 | 209 | | Minute Entry for proceedings held before District Judge Gary A. Fenner: EVIDENTIARY HEARING − DAY 9 (FINAL DAY) held on 11/10/2016. Matter taken under advisement. Time in court: 9:00 AM to 2:20 PM. To order a transcript of this hearing please contact Kathy Calvert, 816−512−5741. (Moore, Terri) (Entered: 11/10/2016) |
| 11/10/2016 | 210 | | EXHIBIT INDEX by Lisa M. Montgomery. (Moore, Terri) (Entered: 11/10/2016) |
| 11/10/2016 | 211 | | EXHIBIT INDEX by United States of America. (Moore, Terri) (Entered: 11/10/2016) |
| 03/03/2017 | 212 | 106 | ORDER Denying 71 MOTION to vacate *Motion For Collateral Relief To Vacate, Set Aside, Or Correct Sentence And For New Trial* filed by Lisa M. Montgomery. Signed on 3/3/17 by District Judge Gary A. Fenner. (Mitchell, Lisa) (Entered: 03/03/2017) |
| 03/03/2017 | 213 | 235 | CLERK'S JUDGMENT (Moore, Terri) (Entered: 03/03/2017) |
| 03/31/2017 | 214 | 236 | NOTICE OF APPEAL as to 213 Clerk's Judgment, 212 Order, 59 Order on Sealed Motion, 173 Order on Motion to Vacate,, Order on Motion for Discovery, 65 Order by Lisa M. Montgomery. (Henry, Kelley) (Entered: 03/31/2017) |
| 03/31/2017 | 215 | 238 | TRANSMISSION of Notice of Appeal Supplement to US Court of Appeals, 8th Circuit via electronic mail. Related document 214 Notice of Appeal. (Crespo, Wil) (Entered: 03/31/2017) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-08001-CV-W-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## ORDER

Presently before the Court is Movant Lisa M. Montgomery's ("Movant") Motion to Reassign Case, requesting the Court reassign the above-captioned case to a different judge. (Doc. # 41). Respondent United States of America (the "Government") opposes.[1] (Doc. # 42). On May 6, 2013, the Court held a hearing concerning Movant's Motion to Reassign. (Docs. ## 51, 53). For the reasons set forth below, Movant's Motion is DENIED.

## DISCUSSION

### I. FACTS

In October 2007, following a jury trial, Movant was found guilty of the offense of kidnapping resulting in death. (Doc. # 32, p. 3). After hearing additional evidence, the jury recommended Movant be sentenced to death. (*Id.*). On April 4, 2008, the Court sentenced Movant and ordered she be sentenced to death. (*Id.*).

Throughout Movant's trial, and during the pre-trial proceedings, I was the judge conducting the proceedings. Movant now seeks reassignment of her current § 2255 Motion to another judge. Movant alleges reassignment is necessary because: 1) I am no longer neutral and

[1] Movant had until June 24, 2013, to file any reply to the Government's opposition. (Doc. # 52). As of the date of this Order, Movant has failed to timely file a reply. (*See* Docket Sheet).

detached, 2) there is an appearance of impartiality, 3) I have personal knowledge about disputed facts, and 4) I am a material witness in this case. (Doc. # 41). Movant's allegations stem from several ex parte conversations conducted with Movant's original defense team and also my removal of attorneys Judy Clarkee ("Clarkee") and Susan Hunt ("Hunt") from Movant's original defense team. (*Id.*). Specifically, Movant points to six (6) ex parte conversations: 1) a conversation in October 2005 concerning the Court's initial hesitation to admit Clarkee to Movant's original defense team; 2) an April 20, 2006, conversation wherein Ray Conrad ("Conrad") stated attorney David Owen ("Owen") had a problem with Clarkee 3) an April 20, 2006, conference in chambers concerning Clarkee; 4) an April 20, 2006, conference in chambers involving Hunt and Owen; 5) an April 25, 2006, conversation at the end of an on-the-record conference; and 6) a May 1, 2006, conference in chambers concerning problems between Owen and Hunt. (Doc. # 54, pp. 3-5).

## II. LEGAL STANDARD

Section 455 of Title 28 states:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> >
> > * * *
> >
> > (5) He or his spouse . . .
> >
> > > (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

A judge "is presumed to be impartial." *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976) (citation omitted). Accordingly, "unless facts are presented alleging 'personal' as opposed to 'judicial' bias, the judge need not recuse himself." *Id.* (citations omitted).

## III. ANALYSIS

Movant argues this case should be reassigned under 28 U.S.C. § 455(a), (b)(1), and (b)(5)(iv), and the Fifth, Sixth, and Eighth Amendments. (Doc. # 41). The Court will respond to each of Movant's arguments in turn.

### A. 28 U.S.C. § 455(a)

According to Movant, I must disqualify myself under § 455(a) because "of impropriety inherent in [my] consideration of information that [I] acquired through off-the-record proceedings." (Doc. # 54, p. 1). Movant argues I demonstrated my prejudice with three (3) comments at the May 6, 2013, hearing: 1) my comment that Clarkee was "unproductive," 2) my comment that my removal of Clarkee was a mere "case management decision," and 3) my comments concerning the basis for Movant's claim for fraud on the court. (*Id.*). The "purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988) (citation omitted). "The test for recusal under § 455(a) is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220 (3rd Cir. 2003) (citation omitted); *see Liljeberg*, 486 U.S. at 865 ("[I]t is critically important [when determining whether disqualification is appropriate under § 455(a)] to identify the facts that might reasonably cause an objective observer to question [the judge's] impartiality.").

After considering all the facts, the Court determines a reasonable person could not conclude my impartiality might reasonably be questioned. First, the Record demonstrates Movant's original defense team had come to an impasse. Evidence introduced by both Movant and the Government establish that Owen, Hunt, and Clarke would not continue working together, which was recognized by Conrad. My comments concerning the productivity of the defense team, taken in that context, indicate no bias or prejudice. Second, my use of the phrase "case management decision" does not indicate any bias or prejudice. The decision to remove Clarke was a case management decision, regardless of my justifications. Accordingly, whether the representations made to me by Hunt, Owen, Conrad, or anyone else were true, my decision to remove Clarke was a case management decision and any comments to that effect do not demonstrate bias or prejudice. Third, it is common for a judge to comment on or question the basis for a party's legal theories, including the comments I made concerning Movant's claim of fraud on the court. But, exploration of a party's legal theory does not indicate prejudice on behalf of the judge. Accordingly, for these reasons, disqualification under § 455(a) is not warranted.

Additionally, the Court had discretion to remove Clarke from the defense team. In death penalty cases, a court has discretion to substitute an attorney in "the interests of justice." *Martel v. Clair*, -- U.S. --, 132 S. Ct. 1276, 1281 (2012) (holding that courts "should employ the same 'interests of justice' standard that they apply in non-capital cases" in capital cases); *United States v. Espino*, 317 F.3d 788, 799 (8th Cir. 2003) ("'[S]ubstitution of counsel is a matter committed to the sound discretion of the trial court.'" (quoting *Meyer v. Sargent*, 854 F.2d 1110, 1114 (8th Cir. 1988))). Clarke's status as pro hac vice counsel additionally supports discretion of the district court. Under Local Rule 83.5(*l*), an attorney admitted pro hac vice must be sponsored by local

counsel. In this case, Clarke's sponsoring attorney was Owen. (*United States v. Montgomery*, 05-06002-CR-SJ-GAF-1, Doc. # 63). At the time Clarke was removed from the case, Owen and his office had clearly removed their support for Clarke. Accordingly, she was left without local counsel to sponsor her. Further, after the Court removed Clarke, neither Movant nor Clarke sought reconsideration of that decision, nor did any other local counsel move to sponsor Clarke under Rule 83.5(*l*).

Movant also alleges her Fifth Amendment right for a neutral and detached judge is violated unless I recuse myself. Any "[p]etitioner is entitled to a neutral and detached judge in the first instance." *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 61-62 (1972). However, for the same reasons disqualification is inappropriate under § 455(a), recusal is inappropriate under the Fifth Amendment.[2]

**B. 28 U.S.C. § 455 (b)(1)**

Movant asserts I must also disqualify myself under § 455(b)(1). Under that section, "mere[] prior knowledge by the judge of facts concerning a party is not in itself sufficient to require disqualification." *Patrick*, 542 F.2d at 390 (citing *United States v. Seiffert*, 501 F.2d 974, 978 (5th Cir. 1974)). "Moreover, facts learned by a judge in his judicial capacity cannot be the basis for disqualification." *Id.* (citing *United States v. Bernstein*, 533 F.2d 775, 785 (2nd Cir. 1976)).

Notwithstanding Movant's argument, the ex parte discussions were not extrajudicial and therefore cannot be a basis for my disqualification under § 455(b)(1). *See United States v. Bailey*, 175 F.3d 966, 968 (11th Cir. 1999) (citation omitted) ("Bias sufficient to disqualify a

[2] Although Movant mentioned the Sixth and Eighth Amendments in her Motion, she did not discuss her theories. Accordingly, the Court will similarly limit its discussion to § 455 and the Fifth Amendment.

judge under . . . 455(b)(1) must stem from extrajudicial sources . . . ."). The ex parte discussions were not extrajudicial because they took place during the course of a judicial proceeding. *See id.* at 969 (determining that knowledge gained in chambers from attorneys was not extrajudicial because it was acquired during the course of a judicial proceeding); *United States v. Sims*, 845 F.2d 1564, 1570 (11th Cir. 1988) (holding that movant failed to demonstrate bias when the knowledge learned by the judge was acquired during an *in camera* hearing).

Movant argues the information discussed during the ex parte hearings was extrajudicial, as determined by the Seventh Circuit in *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996). Contrary to Movant's argument, *Edgar* supports the Court's decision. As explained in *Edgar*, the discussions in this case do not implicate § 455(b)(1) because "§ 455 is principally concerned with knowledge that is 'extrajudicial' in the sense that the judge acquires it outside a courthouse." *Id.* at 259 (citing *Liteky v. United States*, 510 U.S. 540 (1994)). Additionally, although the court in *Edgar* determined § 455 was implicated by the judge's behavior, the circumstances in *Edgar* are distinguishable from this case. In this case, the ex parte conversations have been summarized in on-the-record proceedings and the parties interviewed the individuals involved in the discussions, including Owen, Hunt, Conrad, and Judge Maughmer. *Cf. id.* ("Off-the-record briefings in chambers, by contrast, leave no trace in the record – and in this case the judge has forbidden any attempt at reconstruction.").

Additionally, § 455(b)(1) requires disqualification only if a judge has personal knowledge of disputed evidentiary facts. In this case, the substance of the ex parte conversations is not in dispute. All the parties Movant has interviewed – Hunt, Owen, Conrad, and Judge Maughmer – and myself, have stated the conversations concerned the relationships between Owen, Clarke, and Hunt and their inability to work together as a team. Movant has not disclosed any evidence

that indicates a dispute about that fact, nor has Movant stated any contradictory facts she thinks she would uncover in any further interview or deposition. Accordingly, the substance of the ex parte conversations is not in dispute and disqualification under § 455(b)(1) is not warranted.

**C. 28 U.S.C. § 455(b)(5)(iv)**

Movant additionally alleges I should be disqualified under § 455(b)(5)(iv). However, § 455(b)(5)(iv) does not apply because, to my knowledge, I will not be a material witness in this case. First, as described above, the substance of the ex parte discussions is not in dispute. Accordingly, my testimony would be only duplicative and cumulative. Additionally, at the May 6, 2013, hearing, I described my recollection of the ex parte discussions. Movant's counsel were given an opportunity to inquire as to my recollections at that time. Further, I provided Movant an opportunity to interview Conrad and Judge Maughmer concerning the substance of the ex parte discussions, and Movant has already discussed those matters with Owen and Hunt. For all these reasons, disqualification under § 455(b)(5)(iv) is not appropriate.

**D. Evidentiary Hearing with a Different Judge**

Movant argues I am disqualified from deciding this Motion and should instead allow another judge to hear and decide this Motion, after an evidentiary hearing. Movant's requests are denied. The evidentiary record is developed concerning this issue, especially considering Owen and Hunt were consulted, I have ordered Conrad and Judge Maughmer to be interviewed, and a hearing on this matter was held. Accordingly, any further evidentiary record is unnecessary.

Additionally, determining whether disqualification is necessary under § 455 '"is a matter confined to the consideration and discretion of the judge himself.'" *Patrick*, 542 F.2d at 390 (quoting *Shadid v. Okla. City*, 494 F.2d 1267, 1268 (10th Cir. 1974)). Specifically, courts

"harbor serious reservations about assigning a § 455 disqualification motion to a different judge," particularly at a later stage in the proceedings. *Kensington*, 353 F.3d at 223 n.12 (citing *Bernard v. Coyne*, 31 F.3d 842, 843 (9th Cir. 1994) (additional citations omitted)). Therefore, I am qualified to determine this Motion and assignment to another judge is inappropriate.

**CONCLUSION**

Disqualification, recusal, and reassignment is not appropriate under 28 U.S.C. § 455 or the Fifth Amendment because there is no reasonable appearance of impartiality, I have no personal knowledge about disputed facts in this case, and I will not be a material witness in the proceedings. Accordingly, for these reasons and the reasons set forth above, Movant's Motion is DENIED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: June 25, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-8001-CV-W-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER SUPPLEMENTING ORDER DENYING MOTION TO REASSIGN ADDRESSING *EX PARTE* CONVERSATIONS**

*Ex parte* communications in death penalty cases are necessary when they relate to budget issues and matters of trial strategy relating to experts and composition of the defense team. While it is certainly my practice to make a record, that can be sealed, on any conversation of substance, in this case an issue of case management arose that I deemed in need of immediate attention and a record was not made. It is the lack of a record that Movant contends supports her allegation of fraud.

Movant's complaint of six (6) *ex parte* conversations include *de minimis* contacts which have no bearing on the essence of Movant's complaint of me being a "material witness" to the propriety of *pro hac vice* Federal Defender Judy Clarke's removal. Further, the record has been fully developed.

Movant complains of a conversation between me and defense counsel in October 2005, wherein counsel inquired about adding Federal Defender Clarke to the defense team. In that conversation, I expressed reluctance to defense counsel in bringing in counsel from California, but deferred to their judgment and granted the request. Movant fails to show any prejudice from

the conversation regarding defense counsel's initial approach suggesting they would like to add Ms. Clarke.

Movant also complains of a telephone call I received from Ray Conrad, Federal Public Defender for the Western District of Missouri, on April 20, 2006, wherein I was advised by Mr. Conrad that his first assistant, David Owen, who was defense counsel for Movant at trial, had difficulties with their *pro hac vice* sponsored co-counsel, Ms. Judy Clarke. Mr. Conrad has no specific recollection of making this phone call, but I remember receiving the call. The issue was not further discussed on the phone call and Mr. Conrad and Mr. Owen came to chambers to discuss the issues they felt needed to be addressed. Shortly after the phone call, Mr. Conrad and Mr. Owen arrived at chambers and discussed with me the difficulties they were having with Ms. Clarke. This conversation in chambers between me, Mr. Conrad and Mr. Owen, which again Mr. Conrad does not recall, is the conversation which counsel argues as the essence of the allegation that Mr. Conrad and Mr. Owen, long standing federal defenders, perpetrated a fraud on the court. Even after hearing from everyone who was part of the conversation in chambers on April 20, 2006, and in spite of the fact that the record refutes the allegation of fraud, Movant insists that this allegation will somehow be supported if I can be questioned as a material witness on matters that I have already addressed, in a hearing on May 6, 2013. My explanation and clarification of the reasons Ms. Clarke was removed have not been disputed by anyone in any material aspect which supports Movant's claim of fraud. My explanation in the hearing on May 6, 2013, was as follows:

> There was a comment that I made about Ms. Clarke being nonproductive, and I think that comment is misunderstood or taken out of context in the scope of the entire matter, and those choice of words were my words. They were not the

> words of Mr. Owen or Mr. Conrad, and what I meant when I said that, was that the defense team was not able to be productive because of the conflict that existed between counsel, and I think that's rather obvious in the record.
>
> Further my comment that Ms. Clarke was only appointed in an effort to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team; however, no one conveyed to me Ms. Clarke should only be involved to assist with the plea, and her appointment in the case was not limited and no one at any time suggested to me that it should be. (Transcript of Proceedings May 6, 2013 p.3)

Counsel for Movant had the opportunity to inquire of me regarding my explanation of the language they claimed as evidence of fraudulent behavior, but chose not to do so.

Movant also complains of a possible conference in chambers on April 20, 2006, between me and her trial counsel, Susan Hunt and David Owen. While I have no specific recollection of when I talked with Ms. Hunt, I do recall that at some point, shortly after I met with Mr. Conrad and Mr. Owen regarding their complaints of Ms. Clarke, Ms. Hunt expressed agreement with the removal of Ms. Clarke only to change her mind in that regard just a few days later. The fact that Ms. Hunt at some point concurred in the removal of Ms. Clarke only to shortly thereafter change her position is also reflected in Ms. Hunt's statement herein.

My decision to remove Judy Clarke was based on the complaint from Mr. Owen and Mr. Conrad that they could not continue to work with her. I was familiar with the local Federal

Defenders and not familiar with Ms. Clarke. The situation left me with the choice of the office of the local federal defender continuing to represent Movant or *pro hac vice* counsel from California for whom support by local counsel had been withdrawn.

Movant next complains of a notation at the end of an on the record conference on April 25, 2006, that a conversation was had off the record. From this, counsel assumes or implies that something improper took place. I have no recollection of what might have been discussed and no one else has expressed a recollection. Nonetheless, it seems that Movant assumes that the court allowed something improper and prejudicial to take place. That is not a fair or appropriate assumption.

Finally, counsel reference a conference in chambers concerning problems between Mr. Conrad and Mr. Owen regarding Mr. Owen's inability to continue to work with Susan Hunt. My recollection of that meeting is that Mr. Owen and Mr. Conrad came to see me expressing issues with Susan Hunt and I told them I wanted to meet with the three of them and scheduled a conference on May 3, 2006. The May 3, 2006, conference was conducted and recorded.

Without any evidence to support their claim of fraud, counsel persists in an effort to have this case reassigned. I was surprised and quite disappointed at the lack of ability to cooperate in a professional manner among trial counsel. Nonetheless, decisions had to be made to address and handle the conflicts I determined to be irreconcilable. In my judgment, it was a dysfunctional situation which needed to be resolved quickly to allow Movant's defense to proceed.

Movant has a full record of the matters that transpired. What was discussed, what was not discussed, and the reasons for the decisions I made. My recollection, as well as that of everyone else involved in the disappointing and difficult conflict among trial counsel has been stated on

the record and reflects trial counsel's inability to work together in a productive fashion on Movant's behalf. The conversations which took place are either matters of record or have otherwise been fully reviewed and fail to support Movant's allegation of fraud by her trial counsel herein.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: September 10, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-08001-CV-SJ-GAF** |
| | ) | **Crim. No. 05-06002-CR-SJ-GAF** |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## ORDER

Presently before the Court is Movant Lisa M. Montgomery's ("Movant") Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255, which includes a request for an evidentiary hearing. (Civ. Case[1], Doc. # 71 ("2255 Mtn")). Respondent United States of America (the "Government") opposes. (Civ. Case, Doc. # 140). Also before the Court is Movant's Motion to Authorize Discovery. (Civ. Case, Doc. # 150). The Government opposes. (Civ. Case, Doc. # 171). For the reasons set forth below, Movant's Motion to Vacate is DENIED in part, Request for Hearing is GRANTED in part, and Motion to Authorize Discovery is DENIED.

## DISCUSSION

### I. FACTS

### A. Procedural History

On March 3, 2007, Movant was indicted pursuant to a Superseding Indictment, charging her with the interstate kidnapping of Victoria Jo Stinnett and resulting death of Bobbie Jo

[1] "Civ. Case" refers to the present civil case, Case No. 12-08001-CV-SJ-GAF.

Stinnett. (Crim. Case[2], Doc. # 154). The Superseding Indictment alleged Movant had prematurely cut Victoria Jo from the womb of her mother, Bobbie Jo. (*Id.*). In October 2007, following a jury trial in this Court, Movant was found guilty of kidnapping Victoria Jo resulting in the death of Bobbie Jo and was sentenced to death. (Crim. Case, Docs. ## 341, 354). The Eighth Circuit affirmed Movant's conviction and sentence of death. *See United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011). The Supreme Court denied her petition for a writ of certiorari on March 19, 2012. *See Montgomery v. United States*, -- U.S. --, 132 S. Ct. 174 (2012). Thereafter, Movant initiated the present Motion to Vacate her judgment and sentence. (*See* Civ. Case, Docket Sheet).[3]

**B. Appointment of Counsel**

On December 28, 2004, Magistrate Judge Maughmer appointed the Office of the Federal Public Defender (the "FPD") as Movant's counsel. (Crim. Case, Doc. # 8). Two days later, the FPD notified the Court that it had internally assigned Anita Burns, an attorney in its office, to the case. (Crim. Case, Docket Sheet, 12/30/04 text entry). On January 30, 2005, Judge Maughmer appointed Susan Hunt as learned counsel pursuant to 18 U.S.C. § 3005. (Crim. Case, Docs. ## 16, 69, p. 13). On April 25, 2005, Burns's motion to withdraw was granted, and David Owen, First Assistant Federal Public Defender, assumed the FPD's representation in the case. (Crim. Case, Docs. ## 41, 43, 69, pp. 13-14). Historically, Judges in Western District of Missouri, including the undersigned, generally prefer to appoint local counsel because proceedings tend to

[2] "Crim. Case" refers to the underlying criminal case, Case No. 05-06002-01-CR-SJ-GAF.

[3] Other facts will be referenced in conjunction with the respective issues relevant to them. The Court is aware that Movant included copious facts in her brief; however, most of these facts relate to issues that the Court cannot rule on prior to an evidentiary hearing, and therefore are not included herein.

run smoother with attorneys familiar with the Court's procedures.[4] (Civ. Case, Doc. # 53 ("Reassign Hearing Tr."), 10:7-13, 23:17-22). But here, upon Owen's request, the Clerk of Court admitted Judy Clarke, a veteran capital defense attorney licensed in the State of California, *pro hac vice* to appear in the case on October 7, 2005. (Crim. Case, Doc. # 63; Civ. Case, Doc. # 151-3 ("Clarke Decl."), ¶¶ 1, 3).

Almost immediately following Clarke's appointment to the case, she and Owen began having difficulty working together. (Civ. Case, Doc. # 151-1 ("Hunt Decl."), p. 6; Civ. Case, Doc. # 151-2 ("Owen Decl."), p. 6; Clarke Decl., ¶¶ 17-19). In early November, Hunt, Owen, and Clarke met at a restaurant and Clarke loudly stated Owen did not possess the requisite experience and abilities to make decisions in the case, which he found embarrassing and offensive. (Owen Decl., pp. 6-7; Clarke Decl., ¶¶ 17-18). Their relationship continued to deteriorate following this exchange. (Hunt Decl., p. 6; Owen Decl., p. 5). Owen found Clarke abusive and demeaning while Clarke found Owen controlling and inexperienced. (Civ. Case, Doc. # 41-5 ("Chambers Conf. Tr."), 10:13-15; Civ. Case, Doc. # 151-7, pp. 2-3; Clarke Decl., ¶ 16). Hunt described the situation as "doomed to fail." (Civ. Case, Doc. # 151-5, p. 6).

On April 19, 2006, Hunt, Owen, and Clarke met to discuss the ongoing friction between the defense team members. (Hunt Decl., p. 7; Owen Decl., p. 7; Clarke Decl., ¶ 20). They also discussed the possibility of Clarke leaving the case. (Hunt Decl., p. 7; Owen Decl., p. 7). At the conclusion of the meeting, Hunt and Owen agreed to meet with the undersigned the next day about the situation. (Hunt Decl., p. 8; Owen Decl., p. 8).

The next morning, on April 20, 2006, Owen relayed the prior evening's events to his supervisor, Ray Conrad, the then-appointed Federal Public Defender. (Hunt Decl., p. 8; Owen

[4] It should also be noted that local counsel is more readily available without the extra expense of travel from out of state.

Decl., p. 8). Owen and Conrad, without Hunt, then met with the undersigned and Judge Maughmer regarding Clarke's involvement in the case. (Hunt Decl., p. 8; Owen Decl., p. 8; Reassign Hearing Tr. 22:21-25:8). By the end of the meeting, it was clear that there was a significant breakdown in communication within the defense team and that serious personality conflicts between the various members of the defense team existed. (Reassign Hearing Tr. 7:1-6; 13:10-18, 16:1-18; 21:12-19; 22:17-25:8; Civ. Case, Doc. # 65). While there was not a problem expressed with Clarke's work product, the defense team was becoming unproductive due to the ongoing conflicts, and the FPD was recommending termination of Clarke's appointment as a resolution. (Reassign Hearing Tr. 3:8-15, 7:1-6; 13:10-18, 16:1-18; 21:12-19; 22:17-25:8; Civ. Case, Doc. # 65). Nothing occurred off the record that was not later discussed on the record. (Reassign Hearing Tr. 14:2-6). Nothing in the record contradicts that the defense team was dysfunctional at that point.

On April 20, 2006, the Court entered the following order:

> Upon good cause shown, and finding that it is no longer necessary for Judy Clarke, Federal Defenders of San Diego, Inc., to continue in a *pro hac vice* status as additional counsel representing the defendant herein, the appointment of Judy Clarke in this cause is hereby terminated effective immediately."

(Crim. Case, Doc. # 79). The next day, the Court conducted an ex parte hearing regarding the termination of Clarke's appointment, with Movant, Hunt, and Owen present. (Civ. Case, Doc. # 113-1 ("4/21/2006 Tr.")). The Court addressed the situation concerning Clarke's removal as counsel and asked Movant if she had any questions or concerns or if she wanted to speak to the matter. (4/21/2006 Tr. 2:1-3:22). Movant responded that she did not. (*Id.* at 3:25-4:15). Hunt, as well as FPD investigator Ron Ninemire, explained that Movant was upset but had not expressed any complaints. (*Id.* at 4:1-25).

On April 25, 2006, Hunt and Owen met with the undersigned about Clarke's removal. (Chambers Conf. Tr. 2:1). Hunt explained the unforeseen consequences of Clarke's removal and the necessity of having an attorney with mental health experience on the team. (*Id.* at 2:1-4:19, 5:13-6:21). Hunt proposed two options: the FPD office could withdraw and Clarke could be reinstated to the case or the FPD's office could remain on the case, find a new mitigation specialist, and be given additional time to "rebuild" the mental health defense. (*Id.* at 7:7-21, 10:24-11:4). The Court preferred the second option. (*Id.* at 11:11-15).

Nearly two weeks later, on May 3, 2006, Movant submitted a letter explaining her preference for Clarke as her attorney. (Crim. Case, Doc. # 84). Also on May 3, 2006, and in an effort to address lingering case management issues between defense counsel, the Court met with Hunt, Owen, and Conrad to discuss any progress or lack thereof (*i.e.*, "where things stand") in their representation of Movant. (Chambers Conf. Tr. 16:1-13). At this meeting, Hunt expressed that there were "fundamental problems with our continuing on." (*Id.* at 18:8-13). Owen and Conrad acknowledged that there were problems between them and Hunt. (*Id.* at 23:17-24:13, 31:7-33:1). At this point, Hunt and Owen both stated they could not work together in Movant's interest. (*Id.* at 23:17-21, 25:8-15, 27:6-18). Owen suggested that the FPD withdraw from the case. (*Id.* at 26:6-9). Hunt then advised the Court that, in her opinion, it would be in Movant's best interest for her to withdraw from the case. (*Id.* at 33:8-12).

On May 12, 2006, Judge Maughmer granted Hunt's motion to withdraw and appointed John O'Connor as learned counsel. (Crim. Case, Doc. # 86). Four days later, Judge Maughmer appointed Fred Duchardt as additional counsel in the "interests of justice." (Crim. Case, Doc. # 87). Neither Hunt, Clarke, nor any of Movant's other attorneys filed any written request with the

Court seeking Clarke's reinstatement to the case or for a hearing on the issue. (*See* Crim. Case, Docket Sheet).

**II. LEGAL STANDARD**

Under 28 U.S.C. § 2255, a movant may collaterally attack her sentence on four grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States', (2) 'that the court was without jurisdiction to impose such sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *Hill v. United States*, 368 U.S. 424, 426-27 (1962) (quoting 28 U.S.C. § 2255). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Arguments that might warrant reversal on direct appeal do not necessarily support collateral attack. *United States v. Frady*, 456 U.S. 152, 165 (1982). A basis for collateral attack is ineffective assistance of counsel. *See United States v. Davis*, 452 F.3d 991, 994 (8th Cir. 2006).

Generally, ineffective assistance of counsel claims raised in a § 2255 motion are examined under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Supreme Court established a two-part test to determine whether counsel's purported "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. First, the defendant must show that counsel's performance was deficient, *i.e.* that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Second, the defendant must show the deficient performance so prejudiced the defense to affect the outcome of the trial. *Id.*

Some circumstances, however, are so likely to prejudice the defendant that it is unnecessary for the defendant to prove actual prejudice. *United States v. Cronic*, 466 U.S. 648, 658 (1984). Courts have uniformly presumed prejudice "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* (collecting cases); *see also Mickens v. Taylor*, 535 U.S. 162, 166 (2002). It is only in "circumstances of that magnitude" that the Court may "forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict." *Mickens*, 535 U.S. at 166. Accordingly, the Court must first determine if the alleged error is a "structural defect," which "is presumptively prejudicial and requires reversal," or if the harmless-error analysis applies. *Sweeney v. United States*, 766 F.3d 857, 860 (8th Cir. 2014) *cert. denied*, 135 S. Ct. 1841 (2015); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-48 (2006).

## III. ANALYSIS

A number of Movant's claims have factual issues that need to be resolved before they can be considered by this Court. (2255 Mtn, Grounds V – VII, XII – XIII, XV, XVIII, and XXII). Accordingly, as discussed below, the Court will reserve ruling on these claims until after an evidentiary hearing.

Additionally, some claims currently raised by Movant were not raised on direct appeal, but should have been. (*Id.* at Grounds I – III, VI – IX, portions of X, XI – XIII, portions of XVI, XVII, XX). Claims not raised on direct appeal are waived. *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997). This waiver is excused if there is cause and prejudice. *Id.* Ineffective assistance of counsel can establish both cause and prejudice. *Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005). Because many of the ineffective assistance of counsel claims cannot be addressed at this juncture, the Court reserves judgment on whether claims were procedurally defaulted until after the evidentiary hearing.

## A. Grounds I – IV: The Clarke Issues

In her § 2255 motion, Movant argues the removal of Clarke as one of Movant's co-counsel deprived her of effective assistance of counsel throughout the trial proceedings and on appeal, unconstitutionally interfered with the attorney/client relationship, and resulted in a purported fraud on the court and conflicts of interests for remaining counsel. (2255 Mtn, Grounds I – IV). Movant further argues that appellate counsel was ineffective for failing to raise these issues on direct appeal. (*Id.* at Ground IV). While not explicitly arguing such, Movant seemingly implies that only a defense team including Clarke could have provided her effective assistance of counsel. Accordingly, Movant contends that the termination of Clarke's appointment resulted in structural error, thus prejudice must be presumed and a new trial granted.

### *1. Authority to Terminate Appointment/Attorney-Client Relationship (Ground I)*

Movant argues the Court exceeded its authority when terminating Clarke's appointment, thereby violating her constitutional right to effective assistance of counsel. (2255 Mtn, pp. 39-47). Movant contends that, as a capital defendant, she is entitled to an "enhanced" right to counsel. In addition to Movant's constitutional right to counsel, Congress has enacted statutory provisions which enhance the rights of representation for capital defendants "in light of what it calls 'the seriousness of the possible penalty and . . . the unique and complex nature of the litigation.'" *Martel v. Clair*, -- U.S. --, --, 132 S. Ct. 1276, 1284-85 (2012) (quoting 18 U.S.C. § 3599(d)). Under these enhanced rights, a court must assign a capital defendant two attorneys upon her request. 18 U.S.C. § 3005. Of those two attorneys, at least one must be knowledgeable in and have experience with death penalty cases. *Id.* Courts are directed to consider the recommendation of the Federal Public Defender organization when assigning counsel to such cases. *Id.* At least one attorney appointed before judgment must have been admitted to practice before the court in which the case is tried for not less than five years and have at least three years

of actual trial experience in felony cases in that court. 18 U.S.C. § 3599(b). Courts may appoint additional counsel should it be deemed warranted under the circumstances of the case. § 3599(d). "Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings . . . ." § 3599(e).[5] As the Supreme Court has noted, "those measures 'reflec[t] a determination that quality legal representation is necessary' in all capital proceedings to foster 'fundamental fairness in the imposition of the death penalty.'" *Martel*, 132 S. Ct. at 1285 (citing *McFarland v. Scott*, 512 U.S. 849, 855, 859 (1994)) (alternation in original).

A trial judge plays an important role in ensuring all criminal defendants, including those facing capital charges, receive a fair trial and their right to counsel. *Geders v. United States*, 425 U.S. 80, 86 (1976). In a capital case, the judge oversees the process of appointing "learned counsel," *United States v. Wilson*, 354 F. Supp. 2d 246, 246 (E.D.N.Y. 2005), and ensures that counsel, whether chosen or appointed, does "not obstruct orderly judicial procedure or deprive courts of their inherent power to control the administration of justice." *United States v. Edelmann*, 458 F.3d 791, 806 (8th Cir. 2006). Unfortunately, "[a] criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process." *Geders*, 425 U.S. at 86. "If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings." *Id.* at 87.

---

[5] To attract better counsel, Congress authorized higher rates of compensation and provided additional resources for investigative and expert services in death penalty cases. *Martel*, 132 S. Ct. at 1285. *Compare* § 3599(g)(1) *with* § 3006A(d) *and* § 3599(f) and (g)(2) *with* § 3006A(e).

There is no question the circumstances surrounding Clarke's involvement in this case did not play out as one would have liked. The conflicts between the defense team members presented the Court with a difficult and unusual issue of how to proceed. Regardless of whether Movant knew about it, her defense was being impacted by the dysfunction within her defense team and the communications amongst the team were continually deteriorating. Considering all of the surrounding circumstances, this District's preference for local counsel, and § 3005's direction to consider the FPD's recommendation, the undersigned determined that terminating Clarke's appointment to the case was the most appropriate way to prevent the obstruction of judicial procedures and ensure Movant continued with an effective team of attorneys representing her.

*i. Sua Sponte Removal*

Nonetheless, Movant argues the termination of Clarke's appointment was a violation of her constitutional right to effective assistance of counsel because it interfered with the attorney-client relationship. (2255 Mtn, pp. 39-47). Movant acknowledges that indigent defendants are not entitled to choose their appointed counsel; who to appoint is a decision left to the discretion of the court. *See Gonzalez-Lopez*, 548 U.S. at 151 (stating "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them"); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) (stating that the Sixth Amendment "guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts"). The Eighth Circuit has held the "substitution of counsel is a matter committed to the sound discretion of the district court." *Hunter v. Delo*, 62 F.3d 271, 274 (8th Cir. 1995) (citation omitted). And statutory law supports

this proposition. "The United States magistrate judge or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings." 18 U.S.C. § 3006A(c).

Section 3599(e), on the other hand, suggests that appointed counsel cannot be removed in capital cases unless the attorney or defendant so move. Some courts have permitted *sua sponte* removal of previously appointed counsel, *see, e.g., United States v. Orleans-Lindsay*, 572 F. Supp. 2d 144, 174 (D.D.C. 2008), while others have found a *sua sponte* removal error under the facts of those cases. *See, e.g., Stotts v. Wisser*, 894 S.W.2d 366, 367 (Tex. Crim. App. 1995); *Harling v. United States*, 387 A.2d 1101, 1105 (D.C. 1978). Both courts finding error in a *sua sponte* removal of appointed counsel stated that situations may arise in which a court may replace counsel without denying the defendant's constitutional right to counsel. The *Stotts* court stated there must be some principled reason for the judge's *sua sponte* replacement of appointed counsel. *Stotts*, 894 S.W.2d at 367. The *Harling* court stated a judge "may not arbitrarily remove the attorney, over the objections of both the defendant and his counsel" once the attorney is serving under a valid appointment and an attorney-client relationship has been established, but may "in the interest of justice substitute one counsel for another." *Harling*, 387 A.2d at 1105.

This Court does not believe § 3599(e) precluded it from terminating Clarke's appointment to the case. The Court had principled reasons for its decision and did not arbitrarily enter the order terminating the appointment. No one denies that Movant's defense team was dysfunctional following Clarke's appointment. After Hunt's appointment as learned counsel in January 2005, Movant was at all times represented by a minimum of two attorneys, at least one of whom had knowledge and experience in death penalty cases, fulfilling the requirements of § 3005. Clarke's appointment was not necessary to comply with statutory obligations, but rather,

she was appointed to aid in Movant's defense in the interests of justice. When it became clear that Clarke's appointment was no longer in the interests of justice due to the breakdown in communication between her and other defense team members, her appointment was terminated. *Cf. Martel*, 132 S. Ct. at 1286-87 (adopting the "interests of justice" standard to § 3599 motions to substitute counsel filed by capital defendants).

This is quite similar to the facts in *Orleans-Lindsay*. In that case, the defendant was facing charges punishable by death. *Orleans-Lindsay*, 572 F. Supp. 2d at 153. Two attorneys, Ponds and Kiersh, were initially appointed to represent the defendant. *Id.* at 154. Kiersh was a death penalty qualified attorney while Ponds was not. *Id.* Kiersh withdrew from the case and was replaced by Boss, another death penalty qualified attorney, and Tucker, an Assistant Public Defender. *Id.* The defendant was not satisfied with the representation provided by Boss and Tucker. *Id.* at 154-55. The Court removed them and replaced them with O'Toole and Ricco, two highly experienced death penalty qualified attorneys. *Id.* at 155. Upon O'Toole and Ricco's appointment, the Court determined *sua sponte* that Ponds's services were no longer necessary and terminated his appointment. *Id.* The defendant argued that Ponds's removal resulted in a deterioration of his ability to communicate with his lead counsel and that he was not familiar with O'Toole and Ricco and had no confidence in their ability to represent him. *Id.* at 174. The reviewing court concluded removal was proper. *Id.*

Like the defendant in *Orleans-Lindsay*, Movant contends that Clarke was the only counsel she trusted, that she did not have a good relationship with the other counsel, and she would have preferred for Clarke to continue representing her and have the other appointed attorneys removed. But Movant's right to counsel "does not involve the right to a 'meaningful relationship' between an accused and [her] counsel." *Hunter*, 62 F.3d at 274 (citing *Swinney*,

970 F.2d at 499). Like in *Orleans-Lindsay*, Movant had at least two appointed attorneys qualified under the statutes at all times but now contends she preferred the attorney who was removed. Here, because of the communication issues between defense members, the significant personality conflict, the FPD's recommendation, and the preference for local counsel, there is even a stronger case for preferred counsel's removal. Just as in *Orleans-Lindsay*, these other considerations outweigh Movant's position that she preferred Clarke's continued representation as part of her defense team.

Movant also argues that Supreme Court precedent precluded the trial court from terminating Clarke's appointment, citing *Gonzalez-Lopez*. (2255 Mtn, pp. 39-47). In *Gonzalez-Lopez*, the Supreme Court concluded that the trial court erroneously deprived the defendant's counsel of choice, entitling him to reversal of his conviction. 548 U.S. at 150. In that case, the defendant did not require appointed counsel, but rather retained an out-of-state attorney to represent him. *Id.* at 142. The trial court repeatedly denied retained counsel's numerous motions for admission *pro hac vice*. *Id.* at 142-43. The Supreme Court reiterated that, when the defendant can afford to hire an attorney, his Sixth Amendment right to counsel includes the right to choose that counsel. *Id*. at 144. The Court held that, to deprive a defendant not requiring appointed counsel the choice of counsel is a "structural defect" for which prejudice is presumed. *Id.* at 150. But, the Court also noted that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.* at 151.

Here, Clarke was not retained. Thus, the *Gonzalez-Lopez* holding is inapplicable. Moreover, Clarke did not engage in *any* effort to remain on the case. Clarke never filed a motion to reconsider or requested a hearing on the matter. Nor did Hunt or any other attorney associated



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 13 of 66 Mar 31 2017 p52
Appellate Case: 17-1716 Page: 52 Date Filed: 04/04/2017 Entry ID: 4519884

with the case.[6] By all appearances, Clarke consented to the termination of her appointment and acknowledged that it was appropriate.

*ii. Alleged Entitlement to Hearing*

Movant next argues that both she and Clarke were entitled to a hearing on the issue before the Court made its decision to terminate Clarke's appointment. (2255 Mtn, pp. 41-47). Courts are required to make factual findings on the record when disqualifying a defendant's counsel of choice. *United States v. Collins*, 920 F.2d 619, 628 (10th Cir. 1990). In some instances, trial courts should hold evidentiary hearings on a defendant's motion to remove appointed counsel. *United States v. Jones*, 795 F.3d 791, 796-97 (8th Cir. 2015) (discussing a trial court's obligation to inquire into complaints about counsel). But, Movant cites to no cases, nor is the Court aware of any cases, where it has been deemed error for a trial court to remove an appointed attorney on that attorney's motion to withdraw, co-counsel's motion to remove, or a court's *sua sponte* removal before holding a hearing on the matter. Movant does cite non-controlling decisions that *sua sponte* removal must be based on "some principled reasons," *Stotts*, 894 S.W.2d at 367, and cannot be arbitrary, *Harling*, 387 A.2d at 1105, but those cases do not indicate that a hearing is required. The record clearly establishes that the Court's decision was not arbitrary and was based on principled reasons to ensure a cohesive defense team for Movant.

Nor was Clarke entitled to a hearing on the termination of her appointment. When used as a sanction or disciplinary measure, *pro hac vice* counsel is entitled to notice and an opportunity to respond before being disqualified and having their status revoked. *Cole v. U.S.*

[6] Movant claims that Hunt orally moved for Clarke's reinstatement during the conferences in chambers. (2255 Mtn, pp. 39-47). It appears Movant is trying to recreate the record. The actual record reveals that Hunt presented Clarke's reinstatement as an option but made no formal motion, orally or in writing, to reinstate her.

*Dist. Court*, 366 F.3d 813, 822 (9th Cir. 2004); *Johnson v. Trueblood*, 629 F.2d 302, 303-04 (3d Cir. 1980). Here, the Court did not revoke Clarke's *pro hac vice* status. Rather, it terminated her appointment to the case. The Court did not find that Clarke had engaged in any unethical conduct warranting discipline such as a revocation of *pro hac vice* status. Rather, the Court has explicitly outlined the reasons behind its removal of Clarke: a breakdown in communication between members of the defense team, a significant personality conflict between her and co-counsel, the FPD's recommendation to terminate Clarke's appointment, and the preference for local counsel. The order terminating Clarke's appointment in no way references a revocation of *pro hac vice* status. There is simply nothing in the record indicating that Clarke's *pro hac vice* status was "revoked" as a disciplinary measure, thereby entitling her to notice and an opportunity to respond.

Again, Clarke did not personally challenge the Court's decision to terminate her appointment. Clarke did not file a request for reconsideration or a hearing. Nor did she seek a writ of mandamus or appeal the decision. Courts have routinely recognized that an attorney who has been unwillingly removed from a case has a personal stake in that decision and has standing to appeal that decision on her own behalf. *See Kirkland v. Nat'l Mortgage Network, Inc.*, 884 F.2d 1367, 1370 (11th Cir. 1989) (dismissal of underlying action did not moot attorney's disqualification because the "grounds of dishonesty and bad faith could well hang over his name and career for years to come"). To the extent Movant argues on Clarke's behalf, such argument has been waived.

*iii. No Structural Error*

For all of these reasons, the Court had the authority to terminate Clarke's appointment to the case and did not err in making this decision. However, even if the Court exceeded its



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 15 of 36 Mar 31 2017 p54
Appellate Case: 17-1716 Page: 54 Date Filed: 04/04/2017 Entry ID: 4519884

authority in making this decision, the termination of Clarke's appointment still was not a structural error for which prejudice is presumed and does not automatically entitle Movant to a new trial. As outlined above, "in order to succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense." *Sweeney*, 766 F.3d at 859-60 (internal quotation marks and citations omitted). Courts have presumed prejudice in three situations: (1) where "the accused is actually or constructively denied counsel during a critical stage of the criminal proceeding;" (2) where counsel "fails to subject the government's case to a meaningful adversarial testing, which failure must be complete and not limited to isolated portions of the proceeding;" or (3) "when circumstances are present that even competent counsel could not render effective assistance." *Garcia v. Bertsch*, No. A3-04-075, 2005 WL 4717675, at *6 n.5 (D.N.D. Sept. 12, 2005) *subsequently aff'd*, 470 F.3d 748 (8th Cir. 2006) (citing *Bell v. Cone*, 535 U.S. 685, 695-697 (2002); *United States v. White*, 341 F.3d 673, 677-679 (8th Cir. 2003)). Here, Movant argues that the termination of Clarke's appointment resulted in a denial of counsel during critical stages of the criminal proceedings, specifically the pretrial, guilt, and penalty phases of her trial.

The flaw in Movant's argument that Clarke's termination resulted in a structural error is that, at all times following Hunt's appointment, Movant was represented by at least two attorneys in accordance with the requirements listed in §§ 3005 and 3599. She was never actually denied counsel, let alone at a critical stage. She may have been denied Clarke's representation, but as stated above, indigent defendants are not entitled to counsel of their choice. *Gonzalez-Lopez*, 548 U.S. at 151. Thus, the termination of Clarke's appointment, by itself, cannot result in structural error requiring an automatic finding of prejudice even if the Court did not have

authority to remove her. Rather, Movant must establish that other appointed attorneys were ineffective either under the *Strickland* harmless error standard or because of some other structural error. *See People v. Noriega*, 229 P.3d 1, 5 (Cal. 2010).

***2. Purported Fraud on the Court (Ground II)***

Movant next argues that structural error occurred when Owen and Conrad purportedly perpetrated a fraud on the Court. (2255 Mtn, pp. 47-52). "Fraud on the court which justifies vacating a judgment is narrowly defined as fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009) (internal quotation marks and citations omitted). "A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as bribery of a judge or jury or fabrication of evidence by counsel . . . ." *Landscape Properties, Inc. v. Vogel*, 46 F.3d 1416, 1422 (8th Cir. 1995) (citation omitted). Only if the court is actually deceived by the misrepresentation may a judgment be set aside based upon fraud on the court. *Smiley*, 553 F.3d at 1144.

"The standard for 'fraud on the court' is demanding." *Johnson v. United States*, No. 4:07CV00365ERW, 2011 WL 940841, at *2 (E.D. Mo. Mar. 16, 2011) (citing *Williams v. Dormire*, No. 4:10-CV-1660-CAS, 2010 WL 3733862 , at *2 (E.D. Mo. Sept. 20, 2010); *Jackson v. Thaler*, 348 F. App'x 29, 34-35 (5th Cir. 2009); *Best v. United States*, Nos. 2:00-CR-171, 2:08-CV-59, 2011 WL 321153, at *1-2 (N.D. Ind. Jan. 26, 2011)). A finding of fraud on the court "must be supported by clear, unequivocal, and convincing evidence." *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1048 (8th Cir. 1991) (quotation omitted). All doubts are resolved in favor of the finality of a judgment. *Smiley*, 553 F.3d at 1144. "Conclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear

and convincing probative facts which support such belief do not serve to raise the issue of the existence of fraud." *Galatolo v. United States*, 394 F. App'x 670, 672 (11th Cir. 2010) (quoting *Booker v. Dugger*, 825 F.2d 281, 283-84 (11th Cir. 1987)).

Movant has no evidence that Owen and/or Conrad perpetrated a fraud on the Court. That memories have faded and some conversations went unreported is not clear, unequivocal, and convincing evidence of fraud. Movant merely speculates that there *must* have been some false information provided to the Court for it to terminate Clarke's appointment to the case. The Court's reasons for terminating Clarke's appointment have been thoroughly discussed above as well as during the hearing on Movant's Motion to Reassign the case and in resulting Orders. (Civ. Case, Docs. ## 53, 59, 65). The affidavits submitted, along with statements made by the undersigned and Judge Maughmer, establish that a disruptive conflict between appointed counsel existed, which was or was going to negatively impact Movant's defense. As Hunt put it, the defense team comprised of herself, Owen, and Clarke was "doomed to fail." Movant has no clear, unequivocal, and convincing evidence that Owen or Conrad misrepresented the nature of that conflict, let alone knowingly lied, to the Court.

***3. Purported Conflict of Interest (Grounds III-IV)***

Movant alternatively argues that Owen and Conrad had an actual conflict of interest that affected their performance when seeking removal of Clarke. (2255 Mtn, pp. 52-56). When a conflict of interest affecting representation is alleged, the Court begins by determining whether there is an actual conflict, a potential conflict, or no conflict. *See generally*, *Edelmann*, 458 F.3d at 807. Where an attorney has a potential conflict of interest, the defendant must demonstrate prejudice to prove that the conflict resulted in a violation of her Sixth Amendment right to effective assistance of counsel. *Id.* Prejudice is presumed, however, when a defendant



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 18 of 63 March 31 2017 p57
Appellate Case: 17-1716 Page: 57 Date Filed: 04/04/2017 Entry ID: 4519884

establishes that her attorney had an actual conflict of interest that adversely affected the attorney's performance. *Id.*; *Cuyler v. Sullivan*, 466 U.S. 335, 348 (1980). "An actual conflict occurs 'when, during the course of the representation, the attorney's and the defendant's interest diverge with respect to a material factual or legal issue or to a course of action.'" *Edelmann*, 458 F.3d at 807 (quoting *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994)).

Neither the Supreme Court nor the Eighth Circuit has extended the rule presuming prejudice "beyond cases in which an attorney has represented more than one defendant." *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006). The Court declines to extend the rule to the circumstances presented here. But, even if the Court assumed Owen and Conrad had an actual conflict of interest with Movant when seeking Clarke's removal, this does not end the inquiry. Movant still must demonstrate that the alleged conflict denied her her constitutional right to effective assistance of counsel *during a critical stage of the proceedings*. *See Mickens*, 535 U.S. at 166 (reaffirming that effective assistance must be denied entirely or during a critical stage of the proceeding for relief to be granted).

At all times after Hunt's appointment, Movant had at least two appointed counsel in accordance with §§ 3005 and 3599. Assuming Owen and Conrad had conflicts which prevented them from providing effective assistance of counsel when seeking Clarke's removal, Movant still had at least one attorney—first Hunt, then later O'Connor and Duchardt—providing her counsel.[7] In dicta, the Supreme Court has indicated that the rights in §§ 3005 and 3599 are not constitutional in nature, *see Martel*, 132 S. Ct. at 1286, but even if they were, Movant must establish that the period between the termination of Clarke's appointment on April 20, 2006, and the appointment of Duchardt on May 16, 2006, (which resulted in Movant being represented by

[7] Whether O'Connor's and Duchardt's counsel was effective will be determined following an evidentiary hearing.

O'Connor, Owen, and Duchardt) was a critical stage in the proceedings. This 22-day period constitutes a "critical stage" in the proceedings, if it was a "step[] in the proceeding in which the accused [was] confronted by the procedural system or the prosecutor or both and where available defenses may [have been] irretrievably lost." *Smith v. Lockhart*, 923 F.2d 1314, 1319 (8th Cir. 1991) (citations omitted).

During the 22-day period, no pretrial hearings where "counsel's absence might derogate [Movant's] right to a fair trial" occurred. *See United States v. Wade*, 388 U.S. 218, 226-27 (1967). Nor was she confronted by the prosecutors during this time period. And no defenses were irretrievably lost. It therefore cannot be said that this relatively brief period of time was a critical stage in the case. Accordingly, even if defendants facing the death penalty have a constitutional right to effective assistance of two attorneys, and even if there was an actual conflict of interest, Movant was not deprived of such a right during a critical stage in the proceedings.

Movant further contends that, because of Owen's purported conflict of interest, each additional member of the trial team also "had a conflict of interest barring further development of [her] claim." (2255 Mtn, p. 56). Movant cites no law in support of this proposition and thus has failed to establish a basis for relief. *Skinner v. United States*, 326 F.2d 594, 597 (8th Cir. 1964) (citation omitted). Moreover, the Eighth Circuit has stated that a public defender's conflict of interest cannot be imputed to attorneys who work in other offices without additional facts. *Nave v. Delo*, 62 F.3d 1024, 1034 (8th Cir. 1995). As O'Connor and Duchardt were private attorneys maintaining their own separate practices, Owen's purported conflict cannot be imputed to them. Regardless, this allegation at most suggests O'Connor and Duchardt, the other two attorneys appointed as trial counsel, had a *potential* conflict of interest. *See Edelmann*, 458

F.3d at 807 (defining potential conflict of interest). Thus, Movant must demonstrate prejudice to establish that O'Connor's and Duchardt's alleged potential conflicts violated her right to effective assistance of counsel. *See id.*

***4. Clarke Issue on Appeal (Ground IV)***

Movant additionally argues that Duchardt and John Gromowsky provided ineffective assistance of counsel as appellate counsel for failing to challenge Clarke's removal on appeal. (2255 Mtn, pp. 56-59). This argument is without merit. "When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain a[n] ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims." *Winters v. United States*, 716 F.3d 1098, 1106 (8th Cir. 2013) (quotation omitted). Movant implicitly admits that her appeals team raised some good points of error on appeal. Some points raised in her § 2255 Motion were previously raised on direct appeal, specifically (1) the Government's argument regarding her failure to apologize, (2) the absence of lesser included offense jury instructions, and (3) Victoria Jo was not a person under federal law until the moment of her birth. Moreover, the Eighth Circuit has routinely held that "one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed." *Link v. Luebbers*, 469 F.3d 1197, 1205 (8th Cir. 2006). Appellate counsel is not ineffective for failing to raise every conceivable issue. *Winters*, 716 F.3d at 1106. For the reasons explained above, the Clarke issues were not likely to succeed on appeal, and therefore, it cannot be said that failure to raise these issues resulted in error. *See Pfau v. Ault*, 409 F.3d 933, 939-40 (8th Cir. 2005) (concluding the defendant did not establish prejudice by appellate counsel's failure to raise a non-meritorious issue on direct appeal).



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 21 of 63 Mar 31 2017 p60
Appellate Case: 17-1716 Page: 60 Date Filed: 04/04/2017 Entry ID: 4519884

In short, Movant has not established the termination of Clarke's appointment resulted in structural error. Thus, the Court will not presume prejudice. Accordingly, even assuming other counsel deficiently performed, Movant still must demonstrate she was prejudiced by her other appointed counsel's alleged ineffective assistance by producing credible evidence establishing that the outcome of her trial and appeal would have been different had counsel been effective.

**B. Grounds VIII, X, XIV: Prosecutorial Misconduct**

Movant asserts that she is entitled to relief due to prosecutorial misconduct. (2255 Mtn, pp. 198-203, 212-13). Specifically, she claims that then United States Attorney for the Western District of Missouri, Todd Graves was an interested prosecutor; the Government made several errors in its penalty phase opening statement and closing argument; and the Government suppressed exculpatory evidence and knowingly used perjured testimony.

***1. Claimed Interested Prosecutor (Ground VIII)***

Movant contends that former United States Attorney Todd Graves was impermissibly motivated by political reasons in his prosecution of this case. (2255 Mtn, p. 198-200). Todd Graves's brother is Sam Graves, who has been a United States Congressman since 2001 for the district which includes Skidmore, Missouri. Movant alleges that, because of his brother, Todd Graves had a conflict of interest that "skewed both the decision to federally prosecute [Movant] and the determination to authorize a capital prosecution" and should have recused himself.

"[P]rosecutors must be disinterested such that they may not represent the United States 'in any matter in which they, their family, or their business associates have any interest.'" *United States v. Sigillito*, 759 F.3d 913, 927-28 (8th Cir. 2014) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987)). The appointment of an interested prosecutor is a fundamental error which "undermines confidence in the integrity of the criminal proceeding." *Young*, 481 U.S. at 810. However, "the standards of neutrality for prosecutors are

not necessarily as stringent as those applicable to judicial or quasi-judicial officers." *Id.* "An arrangement represents an actual conflict of interest if its potential for misconduct is deemed intolerable." *Id.* at 807 n.18. Further, the burden is on the movant to "show that an actual conflict of interest is present." *Sigillito*, 759 F.3d at 928.

Movant has not met her burden to show Todd Graves had an actual conflict of interest. Movant merely alleges that a conflict of interest exists because "[t]he murder occurred in the same district where [Todd Graves's] brother was a United States Congressman." (2255 Mtn, p. 199). Alleged prosecutorial conflicts of interest that are too remote or speculative do not meet the burden placed upon the movant. *See United States v. Tierney*, 947 F.2d 854, 865 (8th Cir. 1991). In *Tierney*, the defendant alleged a conflict of interest because "[t]he prosecutor's husband was a partner in a law firm representing [the] defendant's insurer, and the insurer ha[d] sued [the] defendant for a declaratory judgment rescinding [the] defendant's liability insurance policy." *Id.* at 864-65. The Eighth Circuit concluded, "[a]lthough such partners may have an interest in prevailing, we believe that this interest is simply too insubstantial to require disqualification of a partner's spouse in related litigation." *Id.* at 865. Similarly, in *Sigillito*, one of the victims was a cousin of a supervisory prosecuting attorney for the Eastern District of Missouri. *Sigillito*, 759 F.3d at 928. Although two attorneys from the Eastern District of Missouri were part of the defendant's prosecution team, the Eighth Circuit concluded a conflict of interest did not exist because the defendant "failed to demonstrate that [the cousin] exercised any authority in the case that would call the fairness of the trial into question." *Id.*

Like in *Tierney* and *Sigillito*, Movant's claim is too remote, speculative, and insubstantial to amount to an actual conflict of interest. Movant fails to explain how having a brother who is a United States Congressman creates an intolerable potential for misconduct or even why Sam

Graves would have an interest in the outcome of one of many criminal cases within his district. Further, Movant does not cite to any facts in the record which support the claim that Todd Graves was improperly motivated or even that he was directly involved with Movant's prosecution. Movant additionally fails to cite to any law, and this Court was unable to find any, which indicates a prosecuting attorney must recuse himself from high profile cases occurring within a family members' political district. Even if Todd Graves's prosecution of this case rose to the level of an ethical violation, the question for a court reviewing a habeas petition "is not whether the prosecutor's actions violated the ethical code. Habeas corpus relief is available only where there are errors of constitutional magnitude." *Wilkins v. Bowersox*, 933 F. Supp. 1496, 1522 (W.D. Mo. 1996) *aff'd*, 145 F.3d 1006 (8th Cir. 1998). Accordingly, Movant has failed to demonstrate that there was a prosecutorial conflict of interest.

***2. Penalty Phase Opening Statement and Closing Argument (Ground X)***

Movant outlines numerous alleged errors in the Government's penalty phase opening statement and closing argument. (2255 Mtn, pp. 201-03). These allegations are largely unsupported and laid out in a conclusory manner. Movant outlines thirteen alleged errors; however, this Court has combined some for purposes of discussion, resulting in nine subsections.

*i. Mitigating Factors and Unanimity*

Movant first contends that the Government misstated the law when it "implied that the jury must unanimously find mitigating factors by a preponderance of the evidence" in its opening statement. (2255 Mtn, pp. 201-02). Movant argues that this implication violated the Supreme Court's decision in *Mills v. Maryland*, 486 U.S. 367 (1988). In *Mills*, the Supreme Court held that a sentence must be overturned if a reasonable jury could have interpreted the instructions to require unanimity before a mitigating factor could be considered. 486 U.S. at 384.

In the cited portion of its opening statement, the Government said, "Now aggravating factors, as the judge has told you, must be proven by us beyond a reasonable doubt. Mitigating factors are only required to be proved by a preponderance of the evidence." (Crim. Case, Docs. ## 411-421, Penalty Phase Transcript ("Penalty Tr.") 2865:15-19). At no point in this portion of the trial did the Government even say the word "unanimous." (*See id.*). Further, the penalty phase jury instructions given in this case clearly stated that "[a] unanimous finding [was] not required" to consider mitigating factors and that "[a]ny one of you may find the existence of a mitigating factor, regardless of the number of other jurors who may agree." (Crim. Case, Doc. # 356 ("Penalty Jury Instructions"), No. 1). Thus, no misstatement of the law occurred.

*ii. Alleged Concession Regarding Death Penalty*

Movant also contends that the Government in its closing argument "argued that the defense had conceded that death was the only appropriate sentence by describing the crime as 'unimaginable, unspeakable, off the charts.'" (2255 Mtn, p. 202). In reality, the Government never argued that the defense conceded the death sentence was appropriate. (*See* Penalty Tr. 3151). Instead the Government stated that the defense "said it is unthinkable, it is unimaginable, it is unspeakable, it is off the chart." (*Id.* at 3151:7-10). An argument was not made that the defense supported the death penalty, only that they recognized the horrible nature of the crime. (*Id.*). Thus, no misstatement was made.

*iii. Use of Personal Opinions*

Movant additionally argues that the Government improperly injected personal opinions into the closing argument. (2255 Mtn, p. 202). "'Except to the extent [counsel] bases any opinion on the evidence in the case, [counsel] may not express his [ ] personal opinion on the merits of the case or the credibility of witnesses.'" *United States v. Segal*, 649 F.2d 599, 604

(8th Cir. 1981) (quoting *United States v. Garza*, 608 F.2d 659, 662-63 (5th Cir. 1979)). However, "an attorney may urge a conclusion based on the evidence." *United States v. Felix*, 867 F.2d 1068, 1075 (8th Cir. 1989).

Movant fails to identify which specific statements she believes amount to improper injections of opinion. It is a Movant's burden to identify and support a basis for relief. *See Taylor v. United States*, 229 F.2d 826, 832 (8th Cir. 1956). This, in and of itself, causes her argument to fail. However, Movant does cite to a number of pages in the Penalty Phase Transcript. This Court has reviewed those pages and finds no examples of any improper personal opinions. For example, the Government stated "Death is warranted in this case." (Penalty Tr. 3151:9-10). This was not an improper opinion, but a conclusion reached by reviewing the evidence supporting the existence of aggravating factors.[8] *See Bucklew v. Luebbers*, 436 F.3d 1010, 1022-23 (8th Cir. 2006).

On the cited pages, there were two examples of colorful language: the Government referred to the crime as "horrifying" and referred to Movant as a "cold-blooded predator." (*Id.* 3151:16; 3153:6). Again Movant does not specifically quote these statements, but out of an abundance of caution, this Court will briefly address them. Such caution is necessary because Movant failed to identify which statements she was challenging. "Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial." *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999). These statements do not rise to the prohibited level. Courts have

[8] The Government later similarly argued "[t]he death penalty is warranted in this case," "[t]his case is death worthy," and "this case is one of those rare senseless murders that deserves the ultimate punishment, a death sentence." (Penalty Tr. 3153:7; 3154:10; 3181:12-14). These statements are also examples of urging conclusions based on the evidence.



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 26 of 66
Mar 31 2017 p65
Appellate Case: 17-1716 Page: 65 Date Filed: 04/04/2017 Entry ID: 4519884

determined that characterizing a crime as horrifying in a closing argument does not necessitate habeas relief. *See Havens v. Solem*, 455 F. Supp. 1132, 1136 n.7 (D.S.D. 1978). Thus, the Government did not err by doing so.

Further, when the evidence allows a reasonable inference that the defendant was in fact a predator, it is not error to characterize her as such. In *Jackson v. Purkett*, No. 4:07CV0435 TCM, 2010 WL 908488 (E.D. Mo. Mar. 9, 2010), the court found no error in the prosecution's argument that the defendant was a predator when he shot the victim in the back, stole his car, and then tried to pass the car off as the defendant's own. 2010 WL 908488, at *4. Here, Movant stalked her pregnant victim online, strangled her, stole her baby, and tried to pass the baby off as Movant's own. Clearly, Movant's actions were more predatory than those in *Jackson*. "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury." *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997). Thus, the Government's statements that the crime was "horrifying" and that Movant was a "cold-blooded predator" do not provide grounds for relief.

*iv. Reference to Apology*

Next, Movant contends it was error for the Government to argue that she had never apologized for her actions. (2255 Mtn, p. 202). "It is well settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003) (internal quotation marks and citation omitted). Moreover, the law of the case doctrine requires Eighth Circuit decisions be left undisturbed "absent an intervening change in controlling authority." *Baranski v. United States*, 515 F.3d 857, 861 (8th Cir. 2008). In her direct appeal, Movant argued it was improper

for the Government to bring up whether she had apologized. *Montgomery*, 635 F.3d at 1096. The Eighth Circuit considered and rejected this argument, finding that the comments were permissible. *Id.* at 1097. Thus, it cannot be relitigated in the present posture.

*v. Calls for Justice for the Family*

Movant also alleges that the Government improperly appealed to the jury's emotions when it argued that the death penalty should be imposed to provide justice for the victim's family. (2255 Mtn, p. 202). The Supreme Court has stated that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). The Government asked the jury to consider whether a life sentence would be "justice for the Stinnett family" and then later stated "please give the Stinnett family justice. Please give Bobbie Jo justice." (Penalty Tr. 3182:4-7; 3194:16-17).

Movant contends the Government's request for justice on behalf of the Stinnett family violated the Eighth Circuit's holding in *Miller v. Lockhart*, 65 F.3d 676 (8th Cir. 1995)). In *Miller*, the prosecutor "[r]eferr[ed] to the family's desire for the death penalty . . . . None of the family members, however, testified during the penalty phase, nor did any of them at any time testify that he or she wanted [the defendant] put to death." 65 F.3d at 682. The Eighth Circuit concluded that because "no evidence was introduced regarding the wishes of the family;" the statements regarding the family's desire for death should not have been made. *Id.* at 685. Like in *Miller*, the Stinnett family did not testify that they desired the death penalty for Movant. (*See* Penalty Tr.). However, unlike in *Miller*, the Government never stated that the Stinnett family desired the death penalty. (*See id.*).

Further, other courts have determined that statements which do not reference the family's preference for the death penalty but instead are "merely pleas on behalf of the [s]tate and the family of the victim to return a sentence of death" are proper even when the state "introduced no victim impact testimony." *Thorson v. State*, 895 So. 2d 85, 114 (Miss. 2004). Additionally, "a prosecutor may argue the jury should do justice for the victim and the victim's family if the argument does not specifically relate to the family's opinions about the defendant or the crime." *State v. Prevatte*, 570 S.E.2d 440, 490 (N.C. 2002). Accordingly, the comments made by the Government urging the jury to do justice for the Stinnett family were not improper because they did not state that the family desired the death penalty.

*vi. Characterization of Mitigating Evidence*

Movant next argues that the Government improperly demeaned the mitigation evidence. (2255 Mtn, p. 202). In its closing argument, the Government referred to Movant's mitigating arguments regarding her past abuse and mental illness as excuses. (Penalty Tr. 3155:19-20; 3183:7-10; 3184:8-10; 3189:8-9). However, "[a]s long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it." *Bland v. Sirmons*, 459 F.3d 999, 1026 (10th Cir. 2006). In *Bland*, the prosecutor "referred to [the defendant's] mitigating evidence as 'excuses.'" *Id.* The Tenth Circuit concluded that such a reference was proper because, the prosecutor "never told the jury it could not consider [the] mitigating evidence . . . and [the prosecutor's comments] bore only on the weight of the evidence." *Id.* Like in *Bland*, the Government never told the jury not to consider the mitigating evidence, instead its argument bore only on the appropriate weight to give to the



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 29 of 63
Mar 31 2017 p68
Appellate Case: 17-1716 Page: 68 Date Filed: 04/04/2017 Entry ID: 4519884

argument.[9] Movant fails to cite to any case, and this Court knows of none, where the statements in question were found to be improper.

Movant also alleges the Government improperly argued the jury should not consider the evidence of her PTSD because it was not causally connected to the crime. (2255 Mtn, p. 202-03). In its closing argument, the Government argued Movant "may have some post-traumatic stress disorder. It didn't have anything to do with her thinking or her conduct." (Penalty Tr. 3154:25-3155:2). Movant argues that this statement violated the Supreme Court's decision in *Lockett v. Ohio*, 438 U.S. 586 (1978). Ohio's death penalty statute only allowed for consideration of a limited range of mitigating factors. *Lockett*, 438 U.S. at 607-08. In striking down Ohio's statute, the Supreme Court held that a jury, in deciding whether to impose the death penalty, must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis in orginal). However, in this case the jury was not precluded from considering Movant's PTSD as a mitigating factor. Instead, the Government properly argued the amount of weight that the jury should place on the evidence in question. *See Bland*, 459 F.3d at 1026.[10]

*vii. Facts not in Evidence*

---

[9] Movant does allege in her Motion that the Government "suggested the jury should not consider [the mitigation evidence]." However, Movant fails to cite to any specific portion of the Record where she believes this suggestion occurred. This Court has reviewed the generic citation provided by Movant and finds no statements from the Government which encourage the jury not to consider the mitigation evidence. (Penalty Tr. 3154-57, 3183-4, 3186-93).

[10] The other cases cited by Movant for support similarly speak to when a jury should be allowed to consider evidence in mitigation. *See Smith v. Texas*, 550 U.S. 297, 315-16 (2007); *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004). Since evidence of Movant's PTSD was admitted for consideration, Movant's argument fails.



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 30 of 66
Mar 31 2017 p69
Appellate Case: 17-1716 Page: 69 Date Filed: 04/04/2017 Entry ID: 4519884

Movant also contends the Government improperly argued facts not in evidence when it suggested that there are thousands of victims of abuse in response to Movant's mitigation argument and when it gave an anecdote encouraging the jury to look at the big picture of the crime.[11] (2255 Mtn, p. 202). Movant contends the use of this evidence violated the Supreme Court's decision in *Gardner*. In *Gardner*, the defendant challenged the judge's use of a confidential presentence investigation report that was not made available to the parties in sentencing. *Gardner*, 430 U.S. at 353-54. The Supreme Court held that the court's reliance on the report was improper stating the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 362. Unlike in *Gardner*, in this case, Movant's sentence was not dependent on a report kept outside the record that neither party had an opportunity to examine or challenge. The comments in question were made on the Record in open court. (Penalty Tr. 3154:21-23). Defense counsel heard the statements and could have challenged them had they so desired. Thus, Movant was not denied an opportunity to deny or explain the statements in question.

While, "[p]rosecutorial comments in closing argument that argue facts not in evidence may constitute grounds for reversing a conviction," *United States v. Vazquez-Garcia*, 340 F.3d 632, 641 (8th Cir. 2003), the statements in question were not arguments of fact, like the report in *Gardner*, but statements made to help the jury weigh and analyze the evidence before it. "[A]n attorney's role is to assist the jury in analyzing, evaluating, and applying the evidence." *United*

[11] In her Brief, Movant argues that the Government "told the story of [the prosecutor's] older brother and an abused child he helped. In reality, the prosecutor told a story about his niece who wrote him a letter. (Penalty Tr. at 3183). The prosecutor said that when he first read the letter he focused on all of its little mistakes and lost sight of the letter's true purpose. (*Id.*). The prosecutor then encouraged the jury to focus on the big picture of the crime instead of the mitigation evidence from twenty years previously put forth by Movant. (*Id.* at 3184).

*States v. Beckman*, 222 F.3d 512, 527 (8th Cir. 2000). "A prosecutor is given wide latitude in making a closing argument." *Clayton v. Roper*, 515 F.3d 784, 792 (8th Cir. 2008). "Anecdotes and personal experiences, including those involving counsel's family members, are common place in both opening [statements] and closing arguments." *Niles v. Owensboro Med. Health Sys., Inc.*, No. 4:09-CV-00061-JHM, 2011 WL 3205369, at *5 (W.D. Ky. July 27, 2011). Movant offers no case law to support her argument that such statements were improper. Thus, the Government's use of a personal anecdote was not error.

*viii. Crime Scene Photographs*

Next, Movant alleges the Government improperly stated it had to show the jury the crime scene photographs. (2255 Mtn, p. 203). During its closing argument the Government, in reference to the crime scene photographs, stated "I am going to have to show these pictures again." (Penalty Tr. 3149:25). Presumably, Movant is arguing that the Government lied when it said it had to show the crime scene photographs, when in reality, it was not required to show them. This must be presumed because Movant fails to explain why she believes this statement was improper. In fact, Movant's entire argument on the subject is less than a sentence in length. As explained above, a prosecutor has wide latitude in making her closing argument. *See Clayton*, 515 F.3d at 792. A prosecutor's comments only violate a defendant's rights when the comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974)). While Movant may be correct that the Government was not required to show the photographs again, such a phrase is a figure of speech and not outside the range of appropriate conduct.

Movant also argues that the photographs were shown as "a blatant attempt to encourage the jury to sentence [Movant] to death out of emotion, vengeance, [and] caprice." The Eighth

Circuit held that when crime scene photographs have already been shown to the jury and when they are at least arguably relevant to an element in question, presentations of them again during closing argument does not "render the trial fundamentally unfair and the resulting verdict d[oes] not constitute a denial of due process." *Strong v. Roper*, 737 F.3d 506, 522 (8th Cir. 2013). This is true even when the photographs in question are "flagrantly gruesome." *Kuntzelman v. Black*, 774 F.2d 291, 292 (8th Cir. 1985). In this case, the photographs were shown in the guilt phase of the trial and then were presented in the closing argument of the penalty phase to prove the heinous and depraved nature of the crime, an aggravating factor. (Penalty Tr. 3149:18-22; Penalty Phase Instruction No. 1). Accordingly, it was proper for the Government to show the photographs again during its closing argument.

*ix. Characterization of the Death Penalty*

Movant alleges the Government improperly characterized the death penalty when it argued that a life sentence was not sufficient punishment, the jury could not exercise mercy of sympathy, the death sentence was not ultimately the jury's responsibility, and the jury had a societal obligation to impose the death penalty. (2255 Mtn, p. 203). These allegations are not only conclusory but also largely unsubstantiated by the Record. In a Section 2255 motion, the burden is on the movant to establish a basis for relief. *Taylor*, 229 F.2d at 832. "At the threshold of [a movant's] undertaking is the necessity of alleging facts which, if proven, would entitle him to relief. Such allegations must particularize definitely." *Id.* "[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). On this basis alone, her arguments are insufficient.

In its closing argument, the Government spoke about the possibility of a life sentence. (Penalty Tr. 3281-82). It stated that a life sentence is "a very serious penalty. There is no

question about it." (*Id.* at 3181:23-24). However, the Government also urged the jury to consider whether such a sentence was justice and whether they were "really punishing [Movant] severely if [they] gave her a life sentence" because in prison Movant would get medications, decent meals, television, and reading materials. (*Id.* at 3182:8-17; 3186:19-20). Movant argues such comments were improper; yet, fails to explain how and why she believes the statements were improper. (2255 Mtn, p. 203).

The only situation where such statements were found to be improper was when a prosecutor compared a life sentence with the plight of the victim. Several courts have determined that it is improper to compare the plight of the victims with a defendant's life in prison. *See United States v. Johnson*, 495 F.3d 951, 979-80 (8th Cir. 2007) (The prosecutor argued "that ten, twenty, and thirty years from now, the victims would still be dead and [ ] would still be ten and six-years old. . . . No matter how small [the defendant's] cell may be, it's going to be larger than the coffin that [the victims] are laying in now.") (internal quotation marks omitted); *Bland*, 459 F.3d at 1027-28 ("it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison"). Although they found these statements to be undesirable, both courts ultimately determined that the comments in question did not necessitate relief. *See Johnson*, 495 F.3d at 980; *Bland*, 459 F.3d at 1028. In this case, while the Government spoke about what Movant's life would be like in prison, it did not juxtapose that with the plight of the victims. (*See* Penalty Tr.). When not made in comparison to the plight of the victim, comments about the conditions of life in prison made to show that "the death penalty rather than life imprisonment was the more appropriate punishment" are permissible. *Rodriguez v. Zavaras*, 42 F. Supp. 2d 1059, 1130 (D. Colo. 1999). Accordingly, such comments were not improper.

Movant also contends that the Government improperly argued that the jury could not exercise mercy or sympathy. (2255 Mtn, p. 203). The Government never made any such statements. (*See* Penalty Tr.). Instead, the Government stated that Movant "wants sympathy because she had bad parents. The sympathy in this case belongs with the Stinnett family." (*Id.* at 3190:14-16). Later the Government stated Movant "wants mercy. What kind of mercy did she show Bobbie Jo Stinnett, no mercy . . . . And I submit you should show her no mercy with your verdict." (*Id.* at 3193:1-7). At no point did the Government ever argue the jury was forbidden from exercising mercy or sympathy; it only argued that such an exercise was not warranted in this case.

As discussed above, "a prosecutor is given wide latitude in making a closing argument." *Clayton*, 515 F.3d at 792. "Prosecutors can discuss mercy in closing arguments because mercy is a valid sentencing consideration . . . . A prosecutor is allowed to argue that the defendant does not deserve mercy under the facts of a particular case." *State v. Rousan*, 961 S.W.2d 831, 851 (Mo. 1998) (en banc); s*ee also Rousan v. Roper*, 436 F.3d 951, 960 (8th Cir. 2006). Thus, it was not improper for the Government to ask the jury to refrain from showing Movant mercy or sympathy.

Movant next argues that the Government improperly stated that the responsibility for her death sentence was not borne by the jury. (2255 Mtn, p. 203). Again, Movant fails to cite to any specific portion of the Record where she believes such a violation has occurred, and, accordingly, her claim must fail.

Her argument also fails on the merits. In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court concluded that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for

determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29. In *Caldwell*, the prosecutor stated that the defense "would have you believe that you're going to kill this man and they know – they know that your decision is not the final decision. . . . Your job is reviewable." *Id.* at 325. The Supreme Court determined that this statement was improper because is suggests that the jury may shift its responsibility to another party, which may encourage the jury to sentence a defendant to death for reasons other than a belief that death is truly the appropriate sentence. *Id.* at 330-34. At the heart of *Caldwell* was the need for the jury to recognize "the gravity of its task and proceed with the appropriate awareness" of its responsibility. *Id.* at 341.

In applying *Caldwell*, the Eighth Circuit has concluded that "*Caldwell* is limited to comments 'that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Middleton v. Roper*, 455 F.3d 838, 858 (8th Cir. 2006) (quoting *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)). "'To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" *Id.* at 858-59 (quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)). This Court has reviewed the Record in this case and sees no mention by the Government regarding the availability of appellate review or any statements indicating that another party had the final decision regarding Movant's sentence. (*See* Penalty Tr.). Instead, the Government stated the sentencing decision was "extremely important" and "shouldn't be taken lightly." (*Id.* at 3192:16-17). Movant has failed to establish a *Caldwell* violation.

Finally, Movant contends the Government improperly argued it was the juror's societal obligation to impose the death penalty. (2255 Mtn, p. 203). In closing argument, the

Government reasoned Movant was using her past abuse as an excuse for the present crime and stated "[m]embers of the jury, as a society, we cannot let this happen." (Penalty Tr. at 3192:1-6). Movant fails to explain why she believes such a statement was improper, or what doctrine it supposedly violated. In fact, Movant fails to cite to a single piece of authority in support of her claim. For this reason alone, her claim on this issue fails. *See Taylor*, 229 F.2d at 832.

In the event Movant is attempting to argue the Government was intending to inflame the jury, such an argument is without merit. "A prosecutor should not urge a jury to convict for reasons other than the evidence; arguments intended to inflame juror emotions or implying that the jury's decision could help solve a social problem are inappropriate." *United States v. Tulk*, 171 F.3d 596, 599 (8th Cir. 1999). However, "[u]nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." *United States v. Sanchez-Garcia*, 685 F.3d 745, 753 (8th Cir. 2012) (quotation omitted). In this case, the Government did not urge the jury to act as the conscience of the community, or to impose the death penalty out of such an obligation. (*See* Penalty Tr. at 3192:1-6). The statement was not calculated to inflame in that it did not include a warning about potential danger to the community or a request for the jury to send a message to other potential defendants. *See Sanchez-Garcia*, 685 F.3d at 753-54; *United States v. Johnson*, 968 F.2d 768, 770-71 (8th Cir. 1992). Thus, the Government's isolated reference to 'society' does not require relief. *See United States v. Grauer*, 701 F.3d 318, 323 (8th Cir. 2012); *United States v. Levering*, 431 F.3d 289, 293 (8th Cir. 2005).

***3. Alleged Evidence Violations (Ground XIV)***

Movant next contends that the Government knowingly used false testimony which it failed to correct and suppressed exculpatory evidence. (2255 Mtn, p. 212-13). As explained above, in a Section 2255 motion, the burden is on the movant to establish a basis for relief.

*Taylor*, 229 F.2d at 832. It is necessary to allege "facts which, if proven, would entitle [a defendant] to relief. Such allegations must particularize definitely." *Id.* A movant must do more than present "conclusory allegations unsupported by specifics." *Blackledge*, 431 U.S. at 74. Movant alleges these violations in a conclusory statement in the heading of her argument. In the body of her argument, Movant cites to law outlining the requirements for disclosure of exculpatory evidence and the prohibition against the use of false testimony. However, at no point does Movant support her arguments with any facts from the record.

Such support is required. "Generally, to obtain relief on a claim that the State introduced 'false evidence,' petitioner has the burden of demonstrating: (1) that a witness testified falsely, (2) that the false testimony was material, and (3) that the prosecution offered the testimony knowing it to be false." *Bragg v. Norris*, 128 F. Supp. 2d 587, 604 (E.D. Ark. 2000) (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). Movant failed to identify which witness allegedly testified falsely, what the claimed false statements were, when the statements were made, or how or why the Government knew them to be false.

"To establish a *Brady* violation, a defendant must show that the government suppressed exculpatory evidence that was material either to guilt or to punishment." *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005). "[N]onspecific contentions [that] do not even identify the material allegedly withheld" are insufficient to establish a violation. *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008). Movant failed to identify any material allegedly withheld or even which agency she believes withheld material improperly. Accordingly, these arguments are insufficient to establish a basis for relief.[12]

---

[12] Movant herself seems to agree that this argument is insufficient and indicated that this argument was raised only in an attempt to preserve it for further amendment, which never occurred. (2255 Mtn, p. 212 n.32).



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 38 of 66
Mar 31 2017 p77
Appellate Case: 17-1716 Page: 77 Date Filed: 04/04/2017 Entry ID: 4519884

## C. Ground XI: Composition of the Grand Jury

Movant argues that women and African-Americans were unconstitutionally underrepresented on the Grand Jury which indicted her. (2255 Mtn, pp. 204-05). Movant has only made conclusory statements that the grand jury did not represent a cross-section of the community without providing any evidence to that effect. In fact, she implicitly admits that her argument lacks a factual basis: "Mrs. Montgomery will expeditiously seek discovery in order to supplement this claim with additional facts and evidence." (*Id.* at p. 205 n.30). Over two years later, Movant has yet to supplement this claim.[13]

As noted throughout this Order, in a § 2255 motion, the burden is on the movant to establish a basis for relief. *Taylor*, 229 F.2d at 832. Here, Movant alleges the empaneled grand jury unconstitutionally underrepresented women and African-Americans in conclusory statements. Her argument correctly cites to a plethora of law regarding grand jury composition. However, Movant provides no facts to support her claim.

Factual support is required. In order to establish a claim of unconstitutional make-up of a grand jury, Movant must prove each of the following elements: "(1) that the allegedly excluded group is distinctive in the community; (2) that the group's representation in jury pools is not fair and reasonable in relation to the number of its members in the community; and (3) that this

---

[13] Given that over two years passed between Movant filing her § 2255 Motion and her Traverse, Movant should have discovered facts necessary to support this claim. *See Ringo v. Roper*, 472 F.3d 1001, 1008-09 (8th Cir. 2007) ("[The defendant] failed to avail himself of the numerous alternative sources of evidence that might have been useful in proving systemic discrimination."). Had Movant encountered resistance from the sources of the relevant evidence, she could have sought an order compelling discovery on the grand jury's composition or its selection process, but she did not. The Court would likely have granted such request as the Eighth Circuit has stated that "[g]rounds for challenges to the [grand] jury selection process may only become apparent after an examination of the records" and thus, "[e]ven if the defendant's anticipated challenges to the [grand] jury selection process . . . are without merit, the defendant may still inspect the jury records." *United States v. Alden*, 776 F.2d 771, 775 (8th Cir. 1985).

underrepresentation is due to systematic exclusion in the jury selection process." *United States v. Di Pasquale*, 864 F.2d 271, 282 (3d Cir. 1988) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Even assuming that women and African-Americans were underrepresented on the grand jury that indicted her, Movant has not alleged any facts suggesting that the purported underrepresentation is due to a systematic exclusion in the jury selection process. Where nothing in the record indicates how a grand jury was selected or what its racial and ethnic composition was, the Eighth Circuit has held that the defendant failed to satisfy the elements of a prima facie case. *United States v. Deering*, 179 F.3d 592, 597 (8th Cir. 1999) (citations omitted). Movant's argument on this ground is, therefore, without merit.

**D. Grounds IX, XVI: Claims of Trial Court Errors**

***1. 911 Tape (Ground IX)***

In her first allegation of trial court error, Movant alleges that the Court improperly admitted the 911 recording during the penalty phase. (2255 Mtn, pp. 200-01). Movant argues that its admission violates *Payne v. Tennessee*, 501 U.S. 808 (1991). *Payne* allows for the admission of "evidence about the victim and about the impact of the murder on the victim's family [as it] is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827. This is because the Government "'has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'" *Id.* at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., Dissenting)). Thus, *Payne* allows for evidence, such as the 911 call, that shows the jury the impact the murder had on the victim's family.

Movant also argues that the tape's admission violates *Booth*. (2255 Mtn, pp. 200-01). In *Booth*, the Supreme Court determined that "family members' opinions and characterizations of the crimes and the defendant" are irrelevant to capital sentencing. 482 U.S. at 502-03.[14] However, the opinions and characterizations prohibited by *Booth* are statements such as the victims were "butchered like animals", that no one "should be able to do something like that and get away with it", and that the victim's family felt that "the people who did this could [n]ever be rehabilitated." *Booth*, 482 U.S. at 508. The statements contained in the 911 recording were not these types of opinions and characterizations. As Movant admits in her summary of the recording, it contained simply a mother's anguish at finding her daughter dead. Thus, the admission of the recording was not inappropriate under *Payne* or *Booth*.

Finally, Movant argues that the admission of the recording was improper because it was more prejudicial than probative as there was other evidence establishing the victim's uniqueness and the recording was meant only to inflame the jury. (2255 Mtn, p. 201). Under Federal Rule of Evidence 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by . . . unfair prejudice." However, "[c]laimed errors in evidentiary rulings . . .do not state a claim for relief under [§] 2255." *Houser v. United States*, 508 F.2d 509, 515-16 (8th Cir. 1974). Accordingly, this claim is insufficient to establish relief.

**2. *Wendy Treibs's Testimony (Ground XVI(A))***

Movant contends that this Court erred when it excluded testimony from her cousin, Wendy Treibs, regarding a familial history of mental illness. (2255 Mtn, pp. 214-16). Ms. Treibs was called to testify during the penalty phase of Movant's trial. (*See* Penalty Tr. 2977). Movant's counsel questioned Ms. Treibs about her own mental illness and then asked her about

[14] While much of *Booth* was overruled by *Payne*, the Supreme Court in *Payne* specifically stated that this portion of *Booth* was not overruled. *Payne*, 501 U.S. at 830 n.2.

her brother Kenny. (*Id.*). Counsel asked Ms. Treibs to tell the jury what Kenny had been diagnosed with. (*Id.* at 2977:17-22). Ms. Treibs responded "I have talked to some psychologists that have treated him but they're not allowed to tell me his exact diagnosis. I, my brother, has told me they told him he had bi-polar disorder." (*Id.* at 2977:24-2978:2). The Government objected to the statement, arguing it was speculative, irrelevant, and hearsay. (*Id.* at 2978:4-7). This Court sustained the objection, noting that hearsay is admissible in the penalty phase if it is otherwise reliable, but that Ms. Treibs's testimony was not reliable. (*Id.* at 2978:8-12).

Movant argues the evidence was excluded in error pursuant to the Supreme Court's ruling in *Green v. Georgia*, 442 U.S. 95 (1979). In *Green*, the Supreme Court determined that hearsay testimony is admissible in the penalty phase of a trial when it is "highly relevant to a critical issue" and "substantial reasons exist to assume its reliability." 442 U.S. at 97; *see also Sears v. Upton*, 561 U.S. 945, 950 n.6 (2010) ("reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule"). If either relevance or reliability is lacking, the evidence in question need not be admitted. *See Brown v. Luebbers*, 371 F.3d 458, 467 (8th Cir. 2004).

In this case, the statement in question was not reliable. Evidence is not reliable if it is not "based on the personal knowledge of the declarant." *Mahlandt v. Wild Canid Survival & Research Ctr., Inc.*, 588 F.2d 626, 631 (8th Cir. 1978). The omitted testimony was not based on Ms. Treibs's personal knowledge, but instead was based upon something her brother claimed his doctor told him and he passed along to her. (Penalty Tr. at 2977:24-2978:2). This is hearsay upon hearsay without any corroboration of the parties' reliability or the information involved. The omitted testimony contains none of the indicia of reliability the Eighth Circuit has in the past found to be sufficient. *See Skillicorn v. Luebbers*, 475 F.3d 965, 971 (8th Cir. 2007) (noting that

a spontaneous admission or a statement against the declarant's penal interests and corroborated by other evidence would be reliable). Accordingly, it was not error to exclude the statement in question.

### 3. *Guilt Phase Jury Instructions (Ground XVI(B))*

Movant challenges several instructions given during the guilt phase of her trial. (2255 Mtn, pp. 216-18). She specifically challenges jury instruction numbers four, twelve, thirteen, fifteen, sixteen, seventeen, eighteen, and nineteen. She further argues that an instruction for lesser included offense should have been given.

#### *i. Jury Instruction Numbers Four and Twelve*

Movant argues that jury instructions four and twelve were improper because they unconstitutionally limited the jury to considering only certain factors in weighing the credibility of witnesses. (2255 Mtn, p. 216). In the instructions, the Court stated

> In deciding what testimony of any witness to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

(Crim. Case, Doc. # 339 ("Guilt Jury Instructions"), Nos. 4, 12). Movant argues these instructions improperly precluded the jury from evaluating the evidence using other considerations, such as body language or word choice, not included in the list. The challenged language is a direct quote from the Eighth Circuit Model Criminal Jury Instructions. 8th Cir. Model Crim. Jury Instr. Nos. 1.05, 3.04 (2014). The Eighth Circuit has concluded that this language "fairly and adequately submit[s a witness's] credibility to the jury" and thus is not error. *United States v. Bamberg*, 478 F.3d 934, 940 (8th Cir. 2007).

*ii. Jury Instruction Number Thirteen*

Movant next argues that jury instruction thirteen was improper. (2255 Mtn, p. 217). Instruction thirteen provided:

> You have heard testimony that the defendant made statements to law enforcement officers from the Maryville Department of Public Safety and the Federal Bureau of Investigation. It is for you to decide: First, whether the defendant made the statements and second, if so, how much weight you should give them. In making these two decisions you should consider all of the evidence, including the circumstances under which the statements may have been made.

(Guilt Jury Instructions, No. 13). Movant argues this instruction was improper because it failed to instruct the jury that it should disregard the statements unless they unanimously found that Movant properly waived her *Miranda* rights before making the statements; that the statements were knowingly, intelligently, and voluntarily made; and that the statements were truthful. However, the determination about whether a statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and about whether a statement was voluntarily made is one to be made by the Court, not the jury. *See* 18 U.S.C. § 3501(a); *see also Lego v. Twomey*, 404 U.S. 477, 490 (1972); *Pinto v. Pierce*, 389 U.S. 31, 32 (1967); *United States v. Davis*, 936 F.2d 352, 355 (8th Cir. 1991). Movant cites to no law to support her contention that such a determination should have been made by the jury or that a jury must unanimously find the statement was truthful before they may consider it.

Additionally, the language of the challenged instructions is a direct quote from the Eighth Circuit Model Criminal Jury Instructions. 8th Cir. Model Crim. Jury Instr. No. 2.07 (2014). The Eighth Circuit has determined that Model Instruction 2.07 properly instructs the jury to give such weight to the confession as it feels is deserved. *See Davis*, 936 F.2d at 355.

*iii. Jury Instruction Numbers Fifteen, Seventeen, and Nineteen*

Movant next contends that instructions fifteen and nineteen were improper because they required the jury to find that she suffered from a severe mental disease or defect. (2255 Mtn, p. 217). Movant argues that the mental disease or defect need not be severe. However, the Eighth Circuit has determined that "[t]o establish an insanity defense, a federal defendant must prove by clear and convincing evidence (1) that he was suffering from a *severe* mental disease or defect . . . ." *United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994) (emphasis added); *see also* 18 U.S.C. § 17(a). Movant presents no cases or support for her argument that severity is not required.

Movant also alleges that instructions fifteen and seventeen were improper because they required Movant to prove her insanity by clear and convincing evidence. (2255 Mtn, p. 217). Movant contends that she need only prove insanity by a preponderance of the evidence. 18 U.S.C. § 17(b) unequivocally states that the defendant has the burden to prove the insanity defense by clear and convincing evidence. Moreover, the Eighth Circuit has determined that a defendant must prove insanity by clear and convincing evidence. *Hiebert*, 30 F.3d at 1007. As support for her claim, Movant cites to *Cooper v. Oklahoma*, 517 U.S. 348 (1996). However, *Cooper* applied specifically in the context of competency to stand trial, not in the context of the affirmative defense of insanity. *See Cooper*, 517 U.S. at 368. Movant cites to no case, and this Court is unaware of any, which extends *Cooper* to the affirmative defense of insanity.

Movant's last argument surrounding these three jury instructions is that instruction seventeen failed to inform the jury that her mental state should be considered as it decided whether the Government met their burden of proof. (2255 Mtn, p. 217). However, the jurors were informed that in making their decision they should consider "all the evidence." (Guilt Jury Instructions, No. 21). The Court instructed the jury to consider "any statements made and acts

done by the defendant, and all the facts and circumstances in evidence which may aid in a determination of the defendant's knowledge or intent" when determining whether the Government proved intent or knowledge. (*Id.* at No. 20). The jurors were also informed that the evidence in the case consisted of all the testimony, documents, and other exhibits in the case. (*Id.* at No. 11). Accordingly, the jurors were informed that they could consider all of the evidence, including evidence regarding Movant's mental state, in determining whether the Government met their burden of proof.

*iv. Jury Instruction Number Sixteen*

Movant next argues that instruction sixteen incorrectly defined reasonable doubt. (2255 Mtn, p. 218). In the instruction, the Court defined reasonable doubt as "a doubt based upon reason and common sense, and not the mere possibility of innocence." (Guilt Jury Instructions, No. 16). Movant argues this language is improper as it overstates the amount of doubt required to acquit. This challenged language is a direct quote from the 2007 version of the Eighth Circuit Model Jury Instructions. *See* 8th Cir. Model Crim. Jury Instr. No. 3.11 (2007). The Eighth Circuit has "repeatedly upheld the use of [Model] Instruction 3.11, specifically upholding the 'mere possibility of innocence' language challenged by [Movant]." *United States v. Cruz-Zuniga*, 571 F.3d 721, 726 (8th Cir. 2009); *see also United States v. Foster*, 344 F.3d 799, 802 (8th Cir. 2003). Thus, the instruction was not improper.

*v. Jury Instruction Number Eighteen*

Movant also contends that instruction eighteen overstated the burden of proof required for clear and convincing evidence. (2255 Mtn, pp. 217-18). In the instruction, the Court stated

> Clear and convincing evidence is an evidentiary standard that is greater than a preponderance of the evidence but less than a reasonable doubt. It is evidence of a character that creates in a reasonable person a firm belief or conviction or high probability that the allegation sought to be established is true.



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 46 of 66 Mar 31 2017 p85
Appellate Case: 17-1716 Page: 85 Date Filed: 04/04/2017 Entry ID: 4519884

(Guilt Jury Instructions, No. 18). Movant argues that a high probability of truth is not required, instead only a firm belief or conviction of the truth is necessary. Contrary to Movant's belief, the questioned jury instruction did not require the jury to find a high probability of truthfulness. (*Id.*). Instead, the jury was instructed that clear and convincing evidence was established if it created a firm belief or conviction of the truth *or* if it created a high probability of truth. (*Id.*). Thus, even assuming Movant's argument about the burden of proof for clear and convincing evidence is correct, no error occurred as the jury was instructed in line with the definition Movant puts forth.

Moreover, the "high probability" language was not an error. Courts have often used that language to define the clear and convincing evidence burden. *See, e.g., Troknya v. Cleveland Chiropractic Clinic*, 280 F.3d 11200, 1209 (8th Cir. 2002); *Cornell v. Nix*, 119 F.3d 1329, 1334-35 (8th Cir. 1997) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

*vi. Absence of Lesser Included Offenses*

Movant finally argues that her guilt phase jury instructions were improper because the instructions did not provide for lesser included offenses. (2255 Mtn, p. 218). Movant argues that an instruction should have been submitted for the lesser included offense of attempted interstate kidnapping. In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that a death sentence may not be imposed if the jury was not permitted to consider a lesser included offense when the evidence would have supported the lesser included offense and required acquittal of the greater. 447 U.S. at 627, 635.

Movant argues that the evidence required acquittal of the greater (*i.e.* there was insufficient evidence to convict her), but supported conviction of the latter because at the time Bobbie Jo Stinnett died, she had not yet taken Victoria Jo Stinnett across state lines. However,



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 47 of 63
Mar 31 2017 p86
Appellate Case: 17-1716 Page: 86 Date Filed: 04/04/2017 Entry ID: 4519884

as explained above "[i]t is well settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." *Bear Stops*, 339 F.3d at 780 (quotation omitted). Movant argued on direct appeal that she could not be found guilty of death resulting from interstate kidnapping because Bobbie Jo died before she took Victoria Jo across state lines. *Montgomery*, 635 F.3d at 1087. The Eighth Circuit rejected this argument stating "a death may precede the completion of the crime of kidnapping, but nonetheless result from the kidnapping." *Id.* Accordingly, Movant's argument is meritless because the evidence supported conviction of the greater offense, interstate kidnapping resulting in death. *See Garrett v. Wallace*, No. 4:12-CV-00402-JAR, 2015 WL 1433991, at *3-4 (E.D. Mo. Mar. 27, 2015).

**4. *Penalty Phase Jury Instructions (Ground XVI(C))***

Movant also challenges several instructions given during the penalty phase of her trial. (2255 Mtn, pp. 218-25). Specifically she challenges jury instruction numbers one, two, three, seven, eight, ten, and eleven. She further argues that an additional reasonable doubt instruction was necessary. Movant's argument challenging instructions two and three are nearly identical to challenges she made to their corresponding guilt phase instructions. Accordingly, for the reasons specified above, these challenges fail.

*i. Instruction Number One*

Movant argues the jury was misinformed on the meaning of the word "mitigate." (2255 Mtn, pp. 218-19). The Court defined "mitigate" as "'to make less severe' or 'to moderate.'" (Penalty Jury Instructions, No. 1). Movant argues that this definition violates the Supreme Court's opinion in *Lockett*. As discussed above, *Lockett* holds that a jury in deciding whether to impose the death penalty must "not be precluded from considering, *as a mitigating factor*, any

aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original). The definition used by the Court in no way prevented the jury from considering any aspect of Movant's character, record, or circumstances as a mitigating factor. In fact, in the next sentence the jury was informed that "[a] mitigating factor is any aspect of a defendant's character or background, any circumstance of the offense, or any other relevant fact or circumstance which might indicate that the defendant should not be sentenced to death." (Penalty Jury Instructions, No. 1). Accordingly, the Court's definition did not violate *Lockett*.

*ii. Instruction Number Two*

Movant complains that the second instruction improperly placed the burden on her. The Court instructed that Movant bears the "burden to establish any mitigating factors, by a preponderance of the evidence." (Penalty Jury Instructions, No. 2). Movant alleges this was error because a defendant bears no such burden. However, as the Eighth Circuit has consistently recognized, "[t]he defendant has the burden to prove mitigating factors." *United States v. Bender*, 33 F.3d 21, 23 (8th Cir. 1994). As Movant cites no law to the contrary, her argument is without merit.

*iii. Instruction Number Seven*

Movant next takes issue with four of the statutory aggravating factors the jury was asked to consider. (2255 Mtn, pp. 219-20). The first aggravating factor was that

> The death of Bobbie Jo Stinnett occurred during the commission of the kidnapping of Bobbie Jo Stinnett's daughter, Victoria Jo Stinnett, by the defendant. The Government must prove beyond a reasonable doubt that: *One*, on or about December 16, 2004, the defendant unlawfully kidnapped, abducted, carried away or held Victoria Jo Stinnett; *Two*, the defendant did so for the purpose of claiming Victoria Jo Stinnett as her own child; *Three*, the defendant willfully, knowingly and unlawfully transported Victoria Jo Stinnett across the

> state line from Missouri to Kansas; and *Four*, Bobbie Jo Stinnett died as a result of the defendant's actions.

(Penalty Jury Instructions, No. 7). Movant contends that this aggravating factor was the substantive offense itself which led the jury to unconstitutionally double-count the offense conduct and did not narrow the class of persons eligible for the death penalty. Movant is correct that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). The fact that an aggravating factor repeats the elements of a crime is insufficient to alone establish a need for relief. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988).

Movant made the same argument challenging the inclusion of this aggravating factor prior to trial. *See United States v. Montgomery*, No. 05-6002-CV-SJ-GAF, 2007 WL 2711511, at *3 (W.D. Mo. Sept. 13, 2007) *aff'd*, 635 F.3d 1074 (8th Cir. 2011). Movant's argument was rejected by this Court. *Id.* In rejecting this argument, the Court stated

> The recent opinion in *United States v. Mayhew*, 380 F.Supp.2d 936 (S.D.Ohio 2005) is instructive.
>
> In *Mayhew*, the federal government charged the defendant with murder arising from a kidnapping. *Id.* at 940. Further, the government sought the death penalty against the defendant, including as one aggravating factor that a death occurred during the commission of another crime. *Id.* at 946. Prior to trial, the defendant moved to strike the aggravating factor, arguing that it was essentially duplicative of the indictment. *Id*. . . . . [T]he defendant argued that "the kidnapping and subsequent death of [the victim] in both the Indictment and a statutory aggravating factor [would] fail to narrow adequately the class of individuals eligible for the death penalty, thereby violating the defendant's rights." *Id.* The district court, however, rejected the defendant's argument and followed the "majority of courts." *Id.* at 947.
>
> The *Mayhew* court found that Congress, in drafting the [Federal Death Penalty Act (the "FDPA"), 18 U.S.C. §§ 3591 *et seq.*], specifically anticipated that the sentencing jury would consider the circumstances of the underlying crime as evidenced by the incorporation of "death during the commission of another

> crime" as a statutory aggravator. *Id.* Moreover, such a result was not improper duplication:
>
> "[D]uplication occurs when the jury is asked, at the sentencing stage, to consider two or more *aggravating factors* that are essentially interchangeable; here, however, the sentencing jury will only consider the underlying one time during the trial phase and one time during the sentencing phase, not twice during the latter." *Id.*
>
> In fact, the court was "troubled by the notion of asking the jury to determine [the] defendant's sentence without allowing the jury to consider the crime itself." *Id.* The Court agrees with the reasoning in Mayhew and similar cases and concludes that there is no improper duplication between the Superseding Indictment charging kidnapping and the aggravating factor that the crime was committed "during the commission and attempted kidnapping of Bobbie Jo Stinnett's infant daughter, Victoria Jo Stinnett."

*Id.* at *4. This Court agrees with its previous rationale and does not see cause to change it.

The second aggravating factor was that in the course of the offense, Movant created a grave risk of death to an additional person, Victoria Jo Stinnett. (Penalty Jury Instructions, No. 7). Movant argues that this instruction was improper because Victoria Jo was not a person under federal law until the moment of her live birth. (2255 Mtn, p. 219). In Movant's direct appeal, the Eighth Circuit recognized that under federal law "the term 'person' does not necessarily include fetuses." *Montgomery*, 635 F.3d at 1087. Even assuming that any risk of death created prior to the moment Victoria Jo was born alive could not be considered as an aggravating factor, Movant still created a grave risk of death to Victoria Jo after the moment of her birth. The evidence showed Movant took the premature, newborn Victoria Jo out into the cold January air, stopped at numerous locations, and failed to provide any medical care to the child. (Penalty Tr. 3149:6-14). Thus, even after she was born, Movant created a grave risk of death to Victoria Jo.

The third aggravating factor was that Movant "committed the offense in an especially heinous or depraved manner." (Penalty Jury Instructions, No. 7). Movant argues that this factor was improper because it relied upon the same conduct as the second aggravating factor and, thus,

improperly double-counted the conduct. (2255 Mtn, p. 220). This has no merit; the aggravating factors in this case were not duplicative. In *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), the Eighth Circuit used the Tenth Circuit's test to determine whether aggravating factors were duplicative. *Purkey*, 428 F.3d at 762. Under the Tenth Circuit's test, "to overlap impermissibly, one aggravating circumstance must necessarily subsume another. It is not impermissible for certain evidence [to be] relevant to both aggravators." *Medlock v. Ward*, 200 F.3d 1314, 1319 (10th Cir. 2000) (alteration in original) (quotation omitted). The second aggravating factor dealt only with the risk to Victoria Jo, while the third aggravating factor dealt only with the abuse to Bobbie Jo. (Penalty Jury Instructions, No. 7). Some of the evidence such as Movant using a kitchen knife to cut Victoria Jo from her mother's womb was relevant to both aggravators. However, as explained above, other evidence such as Movant's care and treatment of Victoria Jo after she was cut from her mother is also relevant to the second aggravating factor but not to the third. Because the aggravating factors involve different evidence and reference different victims, one cannot subsume the other. They are thus not duplicative. *See Medlock*, 200 F.3d at 1319. In any event, both the Supreme Court and the Eighth Circuit have declined to determine that aggravating factors could be so duplicative as to render them constitutionally invalid. *See Jones v. United States*, 527 U.S. 373, 398 (1999); *United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005)..

The fourth aggravating factor was that Movant committed the offense "after substantial planning and premeditation." (Penalty Jury Instructions, No. 7). Movant argues that the jury never unanimously found the existence of this aggravating factor. (2255 Mtn, pp. 219-20). Movant argues as such because in the verdict form, for every other aggravating factor the jury

was asked "[d]o you, the jury, unanimously find that . . ." but for the fourth aggravating factor the jury was asked "[d]o you, the jury, find that . . ." (Penalty Jury Instructions, Verdict Form).

This case is similar to *United States v. Frazier*, 48 F. App'x 222 (8th Cir. 2002). In *Frazier*, there was an error in the verdict form; however, the Eighth Circuit instructed that the verdict form should be considered as a whole, in combination with the jury instructions. 48 F. App'x at 224. The Court further "presume[d] the jury followed the court's instructions." *Id.* Because the jury instructions themselves were clear, the Court concluded that "the error on the verdict form [wa]s harmless." *Id.*

In this case, the word unanimously should have appeared in the verdict form for the fourth aggravating factor because "[a] finding with respect to any aggravating factor must be unanimous." 18 U.S.C. § 3593(d). However, the Penalty Phase Jury Instructions advised the jury fifteen times that their decision regarding each aggravating factor must be unanimous. (Penalty Jury Instructions, Nos. 1, 7, 8, 9, 11). Thus, taking the instructions as a whole and presuming that the jury followed the law, the error was harmless. Further, for a death sentence to be imposed "only one statutory aggravating factor need be found." *United States v. Bolden*, 545 F.3d 609, 617 n.6 (8th Cir. 2008). In this case, the jury unanimously found the existence of four other statutory aggravating factors. (Penalty Jury Instructions, Verdict Form). Accordingly, even without the fourth aggravating factor, the death penalty could have been properly imposed.

*iv. Instruction Number Eight*

In addition to statutory aggravating factors, the jury was also instructed that it was "permitted to consider and discuss" one non-statutory aggravating factor. (Penalty Jury Instructions, No. 8). This non-statutory factor was victim impact evidence and asked the jury to consider whether "[t]he offense caused injury, loss and harm because of victim Bobbie Jo



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 53 of 63 March 31 2017 p92
Appellate Case: 17-1716 Page: 92 Date Filed: 04/04/2017 Entry ID: 4519884

Stinnett's personal characteristics as an individual human being and the impact of the death upon victim Bobbie Jo Stinnett's family." (*Id.*). Movant argues that this factor applies in every homicide case and thus does not constitutionally narrow the class of persons eligible for death. (2255 Mtn, p. 220-21).

In *Payne*, the Supreme Court determined that victim impact evidence may be admitted to inform "the sentencing authority about the specific harm caused by the crime in question." 501 U.S. at 825. In the sentencing phase, a jury may "consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." *Jones*, 527 U.S. at 395. In *Jones*, the defendant argued that the non-statutory, victim impact aggravating factor used in his case was overbroad because it could have applied in every murder case. *Id.* at 401. The Supreme Court, in a plurality opinion, disagreed stating "though the *concepts* of victim impact and victim vulnerability may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular case is inherently individualized. . . . So long as victim vulnerability and victim impact factors are used to direct the jury to the individual circumstances of the case, [the] principle will be disturbed." *Id.* at 401-02 (emphasis in original). Thus, pursuant to *Jones* and *Payne*, the non-statutory, victim impact aggravating factor was proper in this case.

*v. Instruction Number Ten*

Movant next takes issue with two of the mitigating factors the jury was asked to consider. (2255 Mtn, pp. 221). The first mitigating factor in this case was that Movant's "capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired . . . ." (Penalty Jury Instructions, No. 10). The second mitigating

factor was that Movant "committed the offense under severe mental or emotional disturbance." (*Id.*). Movant alleges these factors were improper because they required a finding of significant impairment and severe illness which thereby precluded the jury from fully considering these issues.

The language used by this Court in the mitigating factors was a direct quote from 18 U.S.C. § 3592 which recognizes committing "the offense under severe mental or emotional disturbance" and significant impairment of the "capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law" as mitigating factors. The Southern District of Ohio has analyzed the constitutionality of this statutory mitigating factor. *United States v. Henderson*, 485 F. Supp. 2d 831, 853 (S.D. Ohio 2007). In that case, the defendant argued the "'restrictive' language contained in the mitigating circumstances defined in 18 U.S.C. § 3592(a), such as . . . 'severe' [mental] disturbance" was improper. *Id.* The court noted Section 3592(a) allows for consideration of any mitigating factor in addition to the ones listed in the statute and thus § 3592 "does not limit the mitigating evidence Defendant may produce." *Id*. Like in *Henderson*, in this case the jury was informed it could "consider <u>anything</u> else about the commission of the crime or about [Movant's] background or character that would mitigate against imposition of the death penalty." (Penalty Jury Instructions, No. 10 (emphasis in original)). Thus, the jury was not improperly precluded from considering Movant's alleged mental illness or capacity while deliberating, even though the instruction included qualifiers such as "severe" and "significant."

*vi. Instruction Number Eleven*

In the eleventh instruction, the Court advised the jury that they could "unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 55 of 66
Mar 31 2017 p94
Appellate Case: 17-1716 Page: 94 Date Filed: 04/04/2017 Entry ID: 4519884

justify a sentence of death." (Penalty Jury Instructions, No. 11). Movant argues that this allowed the jurors to impose the death penalty on the basis of a single invalid aggravating factor. (2255 Mtn, p. 222). However, Movant's argument relies on the fact that one or more statutory aggravating factor was improper. As explained above, all aggravating factors were proper in this case. Thus, Movant's argument fails.

Movant also argues that the eleventh instruction was improper because it instructed jurors that in order to impose a life sentence, they had to determine that death was not justified. (2255 Mtn, pp. 222-23). The eleventh instruction stated "whether or not the circumstances in this case justify a sentence of death is a decision that the law leaves entirely to you." (Penalty Jury Instructions, No. 11). In *U.S. v. Allen*, 247 F.3d 741 (8th Cir. 2001), the defendant challenged the use of a similar jury instruction. 247 F.3d at 780, *vacated on other grounds*, 536 U.S. 953 (2002). The Eighth Circuit upheld the use of such an instruction stating that it "accurately explain[ed] the jury's role in sentencing under the FDPA, which reads as follows: '[T]he defendant . . . *shall* be sentenced to death *if*, after consideration of the [aggravating and mitigating] factors . . . it is determined that imposition of a sentence of death is *justified* . . . .'" *Id.* (second alteration, first and third omission, and emphasis in original) (quoting 18 U.S.C. § 3591(a)(2)). Accordingly, the instruction was valid.

*vii. Need for a Reasonable Doubt Instruction*

In the penalty phase, the jury is called upon to make three determinations,

> First it must find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite mens rea. Second, again unanimously and beyond a reasonable doubt, it must find the existence of at least one statutory aggravating factor. [Third, i]f the above two requirements are satisfied, the jury must then determine whether the aggravating factors, both statutory and non-statutory, sufficiently outweigh the mitigating factors presented by the defendant to justify a death sentence.



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 56 of 63
Mar 31 2017 p95
Appellate Case: 17-1716 Page: 95 Date Filed: 04/04/2017 Entry ID: 4519884

*Purkey*, 428 F.3d at 749 (internal citations and quotation marks omitted). The first two determinations are required for the defendant to become eligible for the death penalty. *Jones*, 527 U.S. at 376-77. Movant argues that the jury should have been required to make the third determination, that the aggravating factors sufficiently outweigh the mitigating factors, beyond a reasonable doubt. (2255 Mtn, pp. 223-24). As support, Movant cites to the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490.

This exact argument was considered by the Sixth Circuit in *U.S. v. Gabrion*, 719 F.3d 511 (2013) (en banc). In rejecting Movant's position, the Sixth Circuit noted *Apprendi* did "not apply to every 'determination' that increases a defendant's maximum sentence. Instead it applies only to findings of 'fact' that have that effect." *Id.* at 532 (citing *Apprendi*, 530 U.S. at 490).

> *Apprendi* findings are binary—whether a particular fact existed or not. Section 3593(e), in contrast, requires the jury to "consider" whether one type of "factor" "sufficiently outweigh[s]" another so as to "justify" a particular sentence. Those terms—consider, justify, outweigh—reflect a process of assigning weights to competing interests, and then determining, based upon some criterion, which of those interests predominates. The result is one of judgment . . . .

*Id.* at 532-33 (alteration in original). Thus, the third determination is not a finding of fact within the meaning of *Apprendi* and need not be made beyond a reasonable doubt. *Id.* at 533.[15] In addition to the Sixth Circuit, five other circuits have agreed that the requested reasonable doubt instruction is not required. *See United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d

[15] Interestingly, Movant cites to a previous version of *Gabrion* in her Brief as support for her position. (2255 Mtn, p. 225). In this version, a panel of the Sixth Circuit determined that the reasonable doubt instruction was required. *United States v. Gabrion*, 648 F.3d 307, 325 (6th Cir. 2011). However, this opinion was vacated upon rehearing of the case en banc. *Gabrion*, 719 F.3d 511.

931, 994 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345 (5th Cir. 2007). Accordingly, Movant's argument is without merit.

**E. Grounds XVII, XIX, XX, XXI: Constitutionality of the Death Penalty**

Movant raises four challenges to the constitutionality of the death penalty. (2255 Mtn, pp. 225-33). First, she alleges that the death penalty is racially biased. Next she alleges that death is not a suitable punishment for those suffering from severe mental illness. Third, she contends her sentence is not proportional to other women and fetal abductors. Finally, Movant argues the death penalty violates international law.

***1. Alleged Racial Bias of Death Penalty (Ground XVII)***

Movant alleges that the death penalty is an unconstitutional violation of the Equal Protection Clause and the Eighth Amendment because it is disproportionately applied according to the race of the victim. (2255 Mtn, pp. 225-27). Movant's challenges are generally based on a study conducted in 2001 by David Baldus (the "Baldus Study") and a 2008 study by Lauren Bell, but Movant fails to include any citations to specific research articles, publications, or portions of the mentioned studies in support of her claim. Instead, Movant simply summarizes alleged findings without references.

Even if it were well-supported, Movant's argument fails as a matter of law. In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the defendant, an African-American male, challenged his death sentence using an older version of the Baldus Study. 481 U.S. at 292-93. The Supreme Court rejected the defendant's equal protection argument stating "to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* at 292 (emphasis in original). "[T]he Baldus study is clearly

insufficient to support an inference that any of the decisionmakers in [the defendant's] case acted with discriminatory purpose. *Id.* at 297. The Court also rejected the defendant's Eighth Amendment argument stating that, "[a]t most, the Baldus study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system." *Id.* at 312. "Despite these imperfections, our consistent rule has been that constitutional guarantees are met when 'the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible.' . . . [W]e hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias." *Id.* at 313 (quoting *Singer v. United States*, 380 U.S. 24, 35 (1965)) (first alteration in original).[16]

Since *McCleskey*, other courts have reviewed updated versions of the Baldus Study and similarly concluded that "[b]are statistical discrepancies are insufficient to prove a Fifth Amendment violation." *Sampson*, 486 F.3d at 26. When a defendant fails to provide "specific evidence of purposeful discrimination . . . against himself . . ., his Fifth Amendment challenge fails." *Id.* In *Sampson*, the First Circuit concluded that the defendant's Eighth Amendment challenge also failed because the updated Baldus Study "provides no basis for attributing the statistical discrepancies with respect to . . . race in [federal death penalty] prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved." *Id.* at 26-27.

Like in *McCleskey* and *Sampson*, the statistical evidence offered by Movant fails to prove that the decisionmakers in Movant's case were motivated by a discriminatory purpose. Thus, Movant's equal protection challenge fails. Movant's Eighth Amendment claim similarly fails

[16] In Movant's heading for this ground, she also alleges that the statistical discrepancies violate her due process rights and her right to effective assistance of counsel. She provides no argument on these bases and therefore the Court declines to consider them.

because the evidence presented does not raise a constitutionally significant risk of racial bias rather than other non-invidious factors.

### *2. Mental Illness (Ground XIX)*

Movant next alleges that she suffers from severe mental illness and brain damage which prohibits execution under the evolving standards of decency of the Eighth Amendment. (2255 Mtn, pp. 228-30). In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court concluded that "death is not a suitable punishment for a mentally retarded criminal." 536 U.S. at 321.[17] However, Movant does not contend that she suffers from an intellectual disability. Instead, Movant alleges the Supreme Court's prohibition on the execution of those with intellectual disabilities should be extended to include those with serious mental illnesses.

"*Atkins* did not cover mental illness separate and apart from mental retardation." *In re Woods*, 155 F. App'x 132, 136 (5th Cir. 2005). Movant cites to no other precedent, neither from the Supreme Court nor any lower courts, that extends *Atkins'* prohibition to individuals with severe mental illness. Movant is essentially asking this Court to apply a new constitutional standard, a standard which every court who has been asked to consider has rejected. *See e.g.*, *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) *cert. denied*, 135 S. Ct. 951, 190 L. Ed. 2d 844 (2015); *In re Woods*, 155 F. App'x at 136; *Lockett v. Workman*, No. CIV-03-734-F, 2011 WL 10843368, at *36-38 (W.D. Okla. Jan. 19, 2011); *Scott v. Mitchell*, No. 1:95CV2037, 2001 WL 1692113, at *2-3 (N.D. Ohio May 14, 2001); *Martin v. Dugger*, 686 F. Supp. 1523, 1572 (S.D. Fla. 1988). That is something this Court cannot do. This Court is "bound to follow controlling United States Supreme Court precedents." *Union Pac. R. Co. v. 174 Acres of Land*

---

[17] Current guidelines reference the condition formerly known as "mental retardation" as "intellectual disability."

*Located in Crittenden Cnty., Ark.*, 193 F.3d 944, 946 (8th Cir. 1999). Thus, this Court is not free to, and must decline Movant's invitation to, redefine the law.

***3. Sentence Proportionality (Ground XX)***

Movant additionally alleges that her death sentence is disproportionate to her crime because she is the both the only woman and the only fetal abductor to be sentenced to death under the FDPA. (2255 Mtn, pp. 230-31). The Eighth Amendment requires that punishment not be excessive. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "*Gregg* instructs that capital punishment is excessive when it is grossly out of proportion to the crime." *Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008). The Supreme Court has concluded that "when a life has been taken deliberately by the offender, we cannot say that the [death penalty] is invariably disproportionate to the crime." *Gregg*, 428 U.S. at 187.

The Supreme Court has "occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." *Pulley v. Harris*, 465 U.S. 37, 43 (1984). This traditionally only includes "an abstract evaluation of the appropriateness of a sentence for a particular crime." *Id.* at 42-43. Thus, "traditional proportionality review hinges on whether a particular kind of crime warrants a particular punishment." *Johnson*, 495 F.3d at 961. For example, the Supreme Court determined that the death penalty is "grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden." *Coker v. Georgia*, 433 U.S. 584, 592 (1977).

Movant asks this Court to take traditional proportionality review a step further, requiring not only proportionality within a particular crime such as rape or murder, but also proportionality between defendants of the same gender as well as similar manners in which crimes are committed. However, as the Supreme Court has already stated, a defendant "cannot prove a

constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey*, 481 U.S. at 306-07 (emphasis in original). In *Johnson*, the Defendant argued that her death sentence was disproportionate to her crime because her codefendants did not receive the death penalty. 495 F.3d at 960. The Eighth Circuit rejected this argument, concluding that it was not disproportionate for some codefendants to receive the death penalty while others did not. *Id.* at 961. The Eighth Circuit stated

> Two juries hearing similar, but not identical, evidence may well reach different conclusions regarding the proper penalty for their respective defendants. In addition, different verdicts may permissibly reflect not only differences between the facts presented at trial, but differences between the juries themselves. . . . One cannot expect that two different juries—each of which is composed of citizens with diverse backgrounds and values—must necessarily reach the same verdict.

*Id.* Thus, it is not unconstitutional that other women or other fetal abductors, in different cases with different juries did not receive the death penalty while Movant did. Movant has produced no law or support to the contrary.

***4. International Law (Ground XXI)***

Movant also alleges that the imposition of the death penalty violates the Supremacy Clause of the United States Constitution because the death penalty violates treaties and customary international law. (2255 Mtn, pp. 231-33). The Supremacy Clause states "[t]his Constitution, . . . and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ." U.S. Const. Art. VI, cl. 2. As an initial matter, the Supreme Court has as recently as the 2014 Term held that the imposition of the death penalty is constitutional. *See Glossip v. Gross*, -- U.S. --, 135 S. Ct. 2726 (2015).

The Sixth Circuit Court of Appeals examined this argument and concluded the claim "that international law completely bars this nation's use of the death penalty . . . is unsupportable

since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *Coleman v. Mitchell*, 268 F.3d 417, 443 n.12 (6th Cir. 2001) (quotation omitted) (omission in original). Though this case was decided in 2001, Movant cites to no more recent treaties or customary international laws.

Two months later, the Sixth Circuit conducted a more extensive examination of this argument. It stated

> Customary international law, then, consists of two components. First, there must be a "general and consistent practice of states." This does not mean that the practice must be "universally followed;" rather "it should reflect wide acceptance among the states particularly involved in the relevant activity." Second, there must be "a sense of legal obligation" . . . . In other words, "a practice that is generally followed but which states feel legally free to disregard does not contribute to customary law;" rather, there must be a sense of legal obligation. States must follow the practice because they believe it is required by international law, not merely because that they think it is a good idea, or politically useful, or otherwise desirable.

Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001) (quoting Restatement (Third) of Foreign Relations Law § 102(2)). The Court went on to state "[t]here is no indication that the countries that have abolished the death penalty have done so out of a sense of legal obligation, rather than for moral, political, or other reasons." *Id.* at 373. The court further concluded that even if the death penalty violated customary international law, such law could not be used as a defense by a United States citizen against the United States government. *Id.* at 374-75. Instead, a determination of whether customary international law prevents the death penalty "is a question that is reserved to the executive and legislative branches of the United States government, as it [is] their constitutional role to determine the extent of this country's international obligations and how best to carry them out." *Id.* at 376. Additionally, every other court who has examined this argument has similarly concluded it is without merit. *See e.g.*, *Hain v. Gibson*, 287 F.3d 1224,

1243-44 (10th Cir. 2002); *White v. Johnson*, 79 F.3d 432, 440 n.2 (5th Cir. 1996); *United States v. Savage*, No. CRIM.A. 07-550-03, 2012 WL 4068416, at *2 (E.D. Pa. Sept. 14, 2012) ("no federal court has ever held that international law superseded the FDPA") (collecting cases); *United States v. Quinones*, No. 00 CR.761(JSR), 2004 WL 1234044, at *2 (S.D.N.Y. June 3, 2004).

Movant fails to cite to a single case in support of her argument that international law and treaties prohibit the use of the death penalty. Perhaps more importantly, Movant fails to even cite to specific portions of any treaties or customary international laws she believes were violated. Such blanket argument does not fulfill Movant's burden. *See Taylor*, 229 F.2d at 832. This Court agrees with the weight of authority that neither customary international law nor treaties prevent the imposition of the death penalty in this country.

## IV. EVIDENTIARY HEARING AND CERTIFICATE OF APPEALABILITY

"A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless 'the motion and the files and the records of the case conclusively show that [she] is entitled to no relief.'" *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (quoting *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 835-36 (8th Cir. 2005)). However, no hearing is required "'where the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based.'" *Id*. (quoting *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007)). The issues discussed above are either inadequate on their face or affirmatively refuted by the Record, and thus are entitled to no evidentiary hearing.

In contrast, the remaining claims brought by Movant – which include her claims of ineffective assistance of counsel not otherwise addressed herein, competency and effects of her medication, exclusion of Venireperson Torres, prosecutorial misconduct regarding Tommy



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 64 of 68 March 31 2017 p103
Appellate Case: 17-1716 Page: 103 Date Filed: 04/04/2017 Entry ID: 4519884

Kleiner, and exclusion of Dr. Gur – all raise issues of fact not conclusively resolved by the Record. (2255 Mtn, Grounds V-VII, XII-XIII, XV, XVIII, XXII). Thus, an evidentiary hearing is proper only for those remaining issues not resolved in this Order. Counsel will be contacted by the Court to set up a hearing on these remaining issues, and a scheduling order shall follow.

Additionally, a movant can appeal a decision to the Eighth Circuit only if a court issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability should be issued only if a movant can make a substantial showing of a denial of a constitutional right. *Id.* § 2253(c)(2). To meet this standard, a movant must show reasonable jurists could debate whether the issues should have been resolved in a different manner or the issues deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). Whether to issue a certificate of appealability will be determined following the evidentiary hearing.

**V. DISCOVERY**

Movant also requests the Court to authorize discovery to allow Movant to depose five witnesses and request the production of documents. (Doc. # 150, p. 1). "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). A court, in its discretion "may, for good cause, authorize a party to conduct discovery" under the rules governing § 2255 proceedings. *Aldridge v. United States*, No. 06-1025-CV-W-NKL-P, 2007 WL 1289684, at *2 (W.D. Mo. May 1, 2007). Good cause for discovery has not been established in this case. Instead, Movant may call and question witness and further develop the record on the remaining issues at the forthcoming evidentiary hearing.

**CONCLUSION**

Movant was not denied effective assistance of counsel due to the removal of Judy Clarke,

nor was the attorney/client relationship unconstitutionally interfered with. Movant has failed to establish that a fraud on the Court occurred or that conflicts of interest denied her effective assistance of counsel. There was no prosecutorial misconduct or errors in the Government's closing argument which would support relief. Movant has no evidence that the Grand Jury was unconstitutionally composed. Further, the jury instructions were proper and the Court did not err in its evidentiary decisions. The death penalty is constitutional; Movant's generic claims to the contrary are insufficient to establish relief. For these reasons and the reasons stated above, Movant's Motion to Vacate is DENIED on grounds I – IV, VIII – XI, XIV, XVI – XVII, and XIX – XXI. Movant's request for an evidentiary hearing is GRANTED for grounds V – VII, XII – XIII, XV, XVIII, and XXII. Movant's Motion to Authorize Discovery is DENIED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: December 21, 2015



Case 4:12-cv-08001-GAF Document 173 Filed 12/21/15 Page 66 of 66
March 31 2017 p105
Appellate Case: 17-1716 Page: 105 Date Filed: 04/04/2017 Entry ID: 4519884

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-08001-CV-SJ-GAF** |
| | ) | **Crim. No. 05-06002-CR-SJ-GAF** |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER**

Presently before the Court is Movant Lisa M. Montgomery's ("Movant" or "Montgomery") Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255. (Civ. Case,[1] Doc. # 71 ("2255 Mtn")). Respondent United States of America (the "Government") opposes. (Civ. Case, Doc. # 140 ("Gov't Resp.")). On December 21, 2015, the Court issued its Order denying Movant's Motion to Vacate on grounds I – IV, VIII – XI, XIV, XVI – XVII, and XIX – XXI, and granting an evidentiary hearing on grounds V – VII, XII – XIII, XV, XVIII, and XXII. (Civ. Case, Doc. # 173 ("12/21/2015 Order")). The evidentiary hearing commenced on October 31, 2016, and concluded on November 10, 2016, after which closing arguments were heard. (Civ. Case, Docs. ## 201-209). The Court then took the case under advisement. (Civ. Case, Doc. # 209). For the reasons set forth below, Movant's 2255 Motion to Vacate is DENIED on grounds V – VII, XII – XIII, XV, XVIII, and XXII, and thus, DENIED in its entirety.

[1] "Civ. Case" refers to the present civil case, Case No. 12-08001-CV-SJ-GAF.

# <u>DISCUSSION</u>[2]

## I. BACKGROUND

### A. The Crime

On direct appeal, the Eighth Circuit summarized the facts surrounding the crime as follows:

> Montgomery and Bobbie Jo Stinnett met at a dog show in April 2004. Both women were involved in the breeding of rat terriers and were acquainted through online message boards dedicated to their mutual interest. Stinnett maintained a website to promote Happy Haven Farms, her dog breeding business located in her home in Skidmore, Missouri. The website included pictures of Stinnett and her dogs. After she became pregnant in spring 2004, Stinnett shared the news with her online community, which included Montgomery. Stinnett was eight months pregnant in December 2004.
>
> In spring 2004, Montgomery began telling her friends, family, and online community that she was pregnant. More than a decade earlier, however, she had undergone tubal fulguration, a sterilization procedure that involved occluding her fallopian tubes by cauterization. Montgomery was thus incapable of becoming pregnant. Nonetheless, Montgomery reported testing positive for pregnancy, began wearing maternity clothes, and began behaving as if she were pregnant. Unaware of the permanent sterilization, Montgomery's husband, Kevin Montgomery (Kevin), and her children believed that she was expecting. Some of Montgomery's acquaintances believed that she was pregnant and showed signs of pregnancy, but others did not. Those who knew that Montgomery had been sterilized—including her former husband and his wife—accused Montgomery of deceiving her family. She responded that she would prove them wrong.
>
> Using the alias Darlene Fischer, Montgomery contacted Stinnett on December 15, 2004, via instant message. Stinnett had a litter of puppies for sale, and Montgomery expressed interest in purchasing one. The women agreed to meet the next day. Although Montgomery lived in Melvern, Kansas, she told Stinnett that she was from Fairfax, Missouri, a town near Skidmore. That night, Stinnett told her husband and her mother, Becky Harper, that a woman from Fairfax was going to stop by and look at the puppies.

---

[2] At the evidentiary hearing, Movant presented a wide range of evidence to the Court, including testimony and exhibits. The Court has considered all of the evidence submitted and finds that much of the evidence was collateral to the issues raised and not relevant. The Court addresses only the evidence it deems relevant.

On December 16, Montgomery drove from Melvern to Skidmore and arrived at Stinnett's home around 12:30 p.m. Montgomery carried a sharp kitchen knife and a white cord in her jacket pocket. The women brought the puppies outside and played with them. At 2:30 p.m., Stinnett received a phone call from Harper and confirmed that she would give Harper a ride home from work at 3:30 p.m.

Some time after the phone call ended, Montgomery attacked Stinnett and used the cord to strangle her until she was unconscious. Montgomery then used the kitchen knife to cut into Stinnett's abdomen, causing Stinnett to regain consciousness. A struggle ensued, and Montgomery strangled Stinnett a second time, killing her. Montgomery extracted the fetus from Stinnett's body, cut the umbilical cord, and left with the baby. Montgomery entered her car and drove away from the Stinnett home, holding the baby in her arms and pinching the umbilical cord.

Harper called Stinnett shortly after 3:30 p.m. When no one answered, Harper walked the two blocks to Stinnett's home. The front door was open, and Harper went inside, calling for her daughter. She reached the dining room and found Stinnett's body lying there, covered in blood. Harper called 911 and told the operator that her daughter was eight months pregnant and in need of medical assistance. Harper said that it looked like Stinnett's stomach had exploded.

Meanwhile, after driving a short distance from Stinnett's home, Montgomery stopped to clamp the umbilical cord and to suction any mucus from the baby's mouth. The baby cried, but other than a cut above her eye, she was uninjured. After cleaning the baby with wipes, Montgomery retrieved the car seat she had stored in the trunk of her car and placed the baby in the seat. She drove to Topeka, Kansas, and called her husband, telling him that she had gone into labor while Christmas shopping and that she had given birth at a women's clinic in Topeka. She asked him to meet her at a parking lot near the clinic, which he did. They returned to Melvern together, with Montgomery's daughter and son driving her car home.

The Montgomerys called friends and relatives to announce the birth of their daughter, Abigail. They slept in the living room, next to the baby's bassinet. The next day, they ran errands and went out for breakfast, introducing Abigail to the people they met. Shortly after they returned home, law enforcement officials knocked on their door. Kevin answered the door and invited the officers into the home. Montgomery was sitting on the couch, holding the baby.

Sergeant Investigator Randy Strong explained that they were investigating the murder of Bobbie Jo Stinnett. He asked about the baby, and Montgomery said that she had given birth at a women's clinic in Topeka. She asked Kevin to retrieve the discharge papers from his truck. Kevin searched the truck, but he could not find the papers.

> Strong then asked to speak to Montgomery outside the home. Montgomery allowed a law enforcement officer to hold the baby and accompanied Strong. Montgomery explained that her family was having some financial problems, so, unbeknownst to her husband, she had given birth at home, with the help of two friends. When asked the names of the friends, Montgomery responded that they had not been with her at the house but were available by phone in case she had trouble delivering the baby. Montgomery said that she had given birth in the kitchen and had disposed of the placenta in a nearby creek. At Montgomery's request, the officers moved their questioning to the sheriff's office. Shortly thereafter, Montgomery confessed to killing Stinnett, removing the fetus from Stinnett's womb, and abducting the child.
>
> After the baby was returned to her father, she was named Victoria Jo Stinnett.

*United States v. Montgomery*, 635 F.3d 1074, 1079-80 (8th Cir. 2011).

**B. Movant's Personal History**

Evidence from trial established that Movant's biological father was an alcoholic and her mother consumed alcohol, to the point of inebriation, throughout her pregnancy with Movant. (Trial Tr.[3] 1709-10). Movant's young life was filled with turmoil, from multiple moves to eventually seeing her half-sister, Diane, being taken from the home and adopted by another family. (*Id.* at 1717, 1726-29). Movant's biological parents divorced when she was three, and her mother then married Jack Kleiner. (*Id.* at 1729-30). Jack physically abused Movant and her sister, Patty, for years before beginning to sexually assault Movant around the age of fourteen. (*Id.* at 1803-04, 1923-24). In February 1984, her mother witnessed Jack raping Movant and sought a divorce in June 1984. (*Id.* at 1733, 1747-48). Movant entered counseling in December 1984 and concluded counseling commensurate with the end of the divorce proceedings. (*Id.* at 1748-49, 1922). Jack was never prosecuted for the sexual abuse. (*Id.* at 1742). The Eighth Circuit further summarized:

> When she was sixteen, her mother and stepfather divorced. Some family members believed that Montgomery's mother blamed her for the abuse and for

[3] "Trial Tr." refers to the transcript of the 2007 criminal trial in Case No. 05-06002-CR-SJ-GAF.

> the divorce, but her mother denied ever doing so. From childhood on, Montgomery had endured a tumultuous relationship with her mother.
>
> Montgomery married Carl Boman, her step-brother, when she turned eighteen in August 1986. She had her first child in January 1987, and three more in the three years that followed. In 1990, Montgomery underwent the sterilization procedure described above. The procedure was successful, and a pretrial hysterosalpingogram confirmed that the sterilization rendered Montgomery unable to become pregnant. Montgomery claimed that her mother and Boman forced her to undergo the sterilization procedure.
>
> In the years following the sterilization procedure, Montgomery claimed that she had four more pregnancies. In 1994, while separated from Boman, Montgomery had an affair and claimed that she was pregnant. Montgomery and Boman later reconciled, and she ceased making the claim. She and Boman divorced in 1998. In 2000, before she and Kevin were married, she told him that she was pregnant and intended to have an abortion. Kevin gave her forty dollars, and the pregnancy was not mentioned again. In 2002, Montgomery told her friends and family that she was pregnant again. Although she said that she was receiving prenatal care from her physician, she would not allow Kevin to attend the appointments. Her physician testified that he had treated Montgomery for ankle pain and a cold, but he did not provide her any prenatal care, despite Montgomery's claims to the contrary. When the alleged due date passed, Montgomery told Kevin that the baby had died and that she had donated its body to science. As described above, Montgomery claimed in spring 2004 that she was pregnant and that she was due in December.
>
> Throughout the fall of 2004, Montgomery was involved in a custody dispute with Boman. He knew that Montgomery was unable to become pregnant and that she was again claiming that she was pregnant. He and his wife sent emails to Montgomery, telling her that they planned to expose her deception and use it against her in the custody proceedings. Montgomery said that she would prove them wrong. On December 10, 2004, days before the kidnapping, Boman filed a motion for change of custody of the two minor children who lived with Montgomery.

*Montgomery*, 635 F.3d at 1080-1081.

Additional testimony was presented at trial concerning other custody disputes within Movant's family. In 1994, Movant's then-husband, Carl Boman, placed his and Movant's four children with Movant's mother, Judy Shaughnessy, and told Judy not to allow Movant to take the children from her. (Trial Tr. 1750-51). She complied with that request. (*Id.* at 1751).

Additionally, Movant and Judy were on opposing sides in a custody dispute concerning Movant's nephew. (*Id.* at 1757-58).

### C. Procedural History and Trial

Movant was first charged with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) in January 2005. (Crim. Case,[4] Doc. # 14). A Superseding Indictment filed in March 2007 alleged:

> [Movant] willfully and unlawfully kidnapped, abducted, carried away, and held Victoria Jo Stinnett, for the purpose and benefit of claiming Victoria Jo Stinnett as her child, and willfully transported Victoria Jo Stinnett in interstate commerce from Skidmore, Missouri, across the state line to Melvern, Kansas, the actions of the defendant resulting in the death of Bobbie Jo Stinnett.

(Crim. Case, Doc. # 154). The Superseding Indictment further alleged several statutory aggravating factors. (*Id.*). The Department of Justice ("DOJ") authorized the Government to seek the death penalty against Movant. (Crim. Case, Doc. # 64-1). The Government subsequently filed its Notice of Intent to Seek the Death Penalty. (Crim. Case, Doc. # 64).

Movant's case was initially set for trial on March 14, 2005. (Crim. Case, Doc. # 18). The Court granted a continuance to April 24, 2006 to allow counsel time to adequately prepare the defense. (Crim. Case, Doc. # 37). The Court granted a second continuance at Movant's request, continuing the trial to October 23, 2006. (Crim. Case, Doc. # 72). Nearly a complete turnover of Movant's defense team occurred in April and May 2006. (Crim. Case, Docs. ## 79, 86-87). The Court accordingly continued the trial to April 30, 2007 to give new counsel time to review and prepare the case. (Crim. Case, Doc. # 93). In April 2007, the defense and the Government jointly requested, and the Court granted, a continuance to October 1, 2007. (Crim. Case, Docs. ## 210, 223).

---

[4] "Crim. Case" refers to the underlying criminal case, Case No. 05-06002-CR-SJ-GAF.

On October 1, 2007, a jury trial on the Superseding Indictment commenced. (Crim. Case, Doc. # 313). Prior to trial, Movant filed her notice of intent to rely on defenses related to mental disease or defect. (Crim. Case, Doc. # 193).

> Defense counsel engaged Vilayanur Ramachandran, M.D., and William Logan, M.D., to evaluate Montgomery. Both Drs. Ramachandran and Logan diagnosed Montgomery with depression, borderline personality disorder, post-traumatic stress disorder, and pseudocyesis. The government's expert, Park Dietz, M.D., agreed that Montgomery suffered from depression, borderline personality disorder, and post-traumatic stress disorder but did not diagnose her as suffering from pseudocyesis.
>
> The Diagnostic and Statistical Manual of Mental Disorders (DSM–IV) defines pseudocyesis as "a false belief of being pregnant that is associated with objective signs of pregnancy, which may include abdominal enlargement, . . . reduced menstrual flow, amenorrhea, subjective sensation of fetal movement, nausea, breast engorgement and secretions, and labor pains at the expected date of delivery." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 485, 511 (4th ed. text revision 2000). The DSM–IV classifies pseudocyesis as a somatoform disorder. *Id.* "The common feature of Somatoform Disorders is the presence of physical symptoms that suggest a general medical condition, . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder." *Id.* at 485.
>
> Before trial, defense counsel asked Ruben Gur, Ph.D., to opine whether Montgomery suffered from any mental abnormality, injury, or illness. Dr. Gur was prepared to testify that Montgomery's brain had structural and functional abnormalities consistent with the diagnosis of pseudocyesis. To reach this conclusion, Dr. Gur relied upon neuropsychological testing, magnetic resonance imaging (MRI), and positron emission tomography (PET). The government challenged Dr. Gur's proffered testimony in a pretrial motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), and Federal Rules of Evidence 702 and 403, arguing that Dr. Gur's principles and methods were unreliable. The government sought to exclude Dr. Gur's analysis of Montgomery's MRI and PET scan. The government also asserted that its experts could not properly examine the underlying data because Dr. Gur had failed to produce the data from which his conclusions were drawn.
>
> After hearing two days of expert testimony, the district court concluded that Montgomery's MRI results were not abnormal and thus did not show "any mental condition or circumstance that would be relevant to matters at issue in this case." The court indicated that it would allow some PET evidence. Although concerned about the reliability of Dr. Gur's PET analysis, the court determined that it would

> permit Dr. Gur to testify (1) that Montgomery's PET scan showed abnormalities in the somatomotor region of the brain and (2) that abnormalities in the somatomotor region are consistent with a diagnosis of pseudocyesis. The government requested that certain data be produced so that its experts could reproduce Dr. Gur's analysis, and the district court ordered that Montgomery produce the data.
>
> * * *
>
> After the jury had been selected and before opening statements, the district court ruled that Dr. Gur's testimony regarding his PET scan analysis would be excluded, finding that the evidence had minimal probative value because the abnormalities were consistent with many disorders, including pseudocyesis. The district court noted that the government's experts were unable to replicate Dr. Gur's calculations and that although Dr. Gur had produced the data that formed the basis of his opinion, he had failed to produce the original data from the PET scan centers. The district court concluded that the dispute over Dr. Gur's calculations would confuse the jury and distract it from the relevant and significant issues.

*Montgomery*, 635 F.3d at 1082-83.

The first phase, also called the guilt phase, of the trial encompassed eleven days of testimony regarding the offense charged and Movant's not guilty by reason of insanity ("NGRI") defense. (Crim. Case, Docs. ## 321, 323-327, 330-334). Several fact and expert witnesses testified how Movant's background contributed to her mental illnesses. Nancy Wallentini, the counselor that worked with Movant when she was 16 years old during her mother and Jack Kleiner's divorce proceedings, described the impact of sexual abuse on children. (Trial Tr. 1931-33).

Dr. Linda McCandless, Movant's psychiatrist at the Corrections Corporation of America ("CCA"), described the mental illnesses with which she had diagnosed Movant and the treatment for those illnesses. (*Id.* at 2068-94). After her first evaluation of Movant, Dr. McCandless diagnosed Movant with bipolar disorder with rapid dysthymic disorder. (*Id.* at 2071). Dr.

McCandless also provided rule-out diagnoses[5] of brief psychotic episode and dissociate amnesia. (*Id.*). Dr. McCandless explained how she reached these diagnoses. (*Id.* at 2071-81). She then explained why she changed her rule-out diagnosis of brief psychotic episode to delusional cycling psychosis. (*Id.* at 2085-87, 2090-94).

Dr. Ramachandran explained the diagnosis of pseudocyesis, its general symptoms, and its predisposition factors. (*Id.* at 2181-85, 87-91). Dr. Ramachandran also described post-traumatic stress disorder ("PTSD"). (*Id.* at 2191-92). Dr. Ramachandran testified that a person in a dissociative state usually cannot appreciate the nature and quality or wrongfulness of their conduct. (*Id.* at 2179-80).

> Dr. Ramachandran testified that Montgomery suffered from severe pseudocyesis delusion and that she was in a dissociative state when she murdered Stinnett and delivered the baby. According to Dr. Ramachandran, Montgomery's childhood sexual abuse and post-traumatic stress disorder predisposed her to pseudocyesis. He testified that Montgomery sustained her pregnancy delusion with Internet research on cesarean sections, home birth, and hormones to assist in delivery. Montgomery's purchases of maternity clothes, a home birthing kit, and items for a baby nursery were consistent with pseudocyesis.
>
> Dr. Ramachandran further testified that inconsistent stories [such as the presence of her half-brother, Tommy Kliener, at the murder] were not evidence of malingering, but of Montgomery's delusional state. He explained that malingering involves a consistent story because "it's a planned volition and a lie" and that a delusional state involves "constantly chang[ing] the story to accommodate the delusion and then forgetting what you said earlier." Because Montgomery's delusional state fluctuated, her story also fluctuated. Dr. Ramachandran stated that Montgomery's symptoms of pregnancy, her extensive internet research on home birthing, and her minimal research on cesarean-section delivery supported his opinion that she was not malingering. Dr. Ramachandran opined that Montgomery was suffering from a severe mental disease or defect when she committed the crime and that she was unable to appreciate the nature and quality of her acts.

---

[5] A rule-out diagnosis "means that the disorder is suspected, but not confirmed—*i.e.*, there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." *Byers v. Astrue*, 687 F.3d 913, 916 n.3 (8th Cir. 2012).

*Montgomery*, 635 F.3d at 1083-84. On direct-examination, Dr. Ramachandran affirmatively stated that, to a reasonable degree of medical certainty, Movant was suffering from a severe mental disease or defect, pseudocyesis with delusions and a dissociative state, at the time of the murder. (Trial Tr. 2250-51). He further stated that a person in a delusional and dissociative state caused by pseudocyesis would not be able to discriminate between right and wrong. (*Id.* at 2251).

Dr. Logan also testified during the first phase of the trial. (*Id.* at 2379). Dr. Logan, a clinical and forensic psychiatrist, described many things that a psychiatrist looks at when evaluating a patient's mental health: genetics; developmental milestones; prenatal events, such as exposure to alcohol in the womb; childhood home environment, including violence in the home; and physical, emotional, and sexual abuse. (*Id.* at 2381, 2391-92). In Movant's case, many of the predisposition factors for mental illness were present. (*Id.* at 2393-98). Her parents separated when she was quite young. (*Id.* at 2393). Her half-sister was removed from the home and adopted by a different family. (*Id.* at 2393). Her family frequently moved throughout her formative years. (*Id.* at 2393). She suffered from significant physical and sexual abuse at the hands of her step-father, Jack. (*Id.* at 2394). Dr. Logan noted that Movant received no counseling until ten months following the discovery of the sexual abuse, and what counseling she did receive was not sufficient. (*Id.* at 2396). Further, it appeared Movant's mother portrayed Movant as a seducer or a home wrecker. (*Id.* at 2397). The home was violent. (*Id.* at 2397-98). Despite this, Dr. Logan found that Movant still strived for approval from her mother. (*Id.* at 2398). Dr. Logan also noted a theme in Movant's family of using children as weapons. (*Id.* at 2399-2401).



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 10 of 131 March 2017 p115
Appellate Case: 17-1716 Page: 115 Date Filed: 04/04/2017 Entry ID: 4519884

Dr. Logan described the coping mechanisms Movant developed during childhood to deal with conflict. (*Id.* at 2401-06). Movant would read and escape into fantasy or would literally escape by running away or changing her environment. (*Id.* at 2401). In adulthood, she married early to escape her mother's home. (*Id.* at 2401). A pattern developed where she would have affairs, separate, and then reconcile her marriages. (*Id.* at 2402). She abused alcohol at times. (*Id.* at 2402). And she feigned several false pregnancies. (*Id.* at 2402). Dr. Logan opined that the loss of her ability to reproduce due to the tubal fulguration was a real emotional trauma in that her role in life was so defined by raising children. (*Id.* at 2403). Movant suffered from PTSD and used the condition to escape triggers that re-traumatized her. (*Id.* at 2405). She also attempted suicide to escape her problems. (*Id.* at 2405).

Dr. Logan went on to describe pseudocyesis as a delusion. (*Id.* at 2406-07). He stated that there is an association between pseudocyesis and incest and that, in Movant's case, another trigger was the tubal fulguration. (*Id.* at 2407). Dr. Logan opined that if Movant gets an unpleasant truth, "she does not check outside of herself to see whether something is true but instead goes on what she feels inside." (*Id.* at 2407-08). This is what happened with her pseudocyesis. (*Id.* at 2408). Dr. Logan stated that a delusion is a symptom of an illness. (*Id.* at 2408). Dr. Logan explained that the harder one challenges a delusion, the more motivated the delusional individual is to prove the delusion. (*Id.* at 2409-10). Dr. Logan stated that Movant's actions after the murder were consistent with Movant attempting to prove the delusion that the baby was indeed hers. (*Id.* at 2411). Dr. Logan opined that Movant was delusional, particularly with the issue of the pseudocyesis, and not malingering. (*Id.* at 2412-13). Dr. Logan believed that all of the various stressors in Movant's life "drove her to kill without really an adequate consideration of the reality of the wrongfulness of what she was doing and the gravity of what



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 11 of 139 March 31 2017 p116
Appellate Case: 17-1716 Page: 116 Date Filed: 04/04/2017 Entry ID: 4519884

she was doing." (*Id.* at 2419). Dr. Logan stated that, to a reasonable degree of medical certainty, Movant was suffering from several severe mental illnesses, including pseudocyesis. (*Id.* at 2420). He further stated that a person in a delusional, dissociative state caused by pseudocyesis would not be able to appreciate the nature, quality and wrongfulness of her conduct. (*Id.* at 2423).

The Government's expert, forensic psychiatrist Dr. Park Dietz, countered that Movant did not suffer from pseudocyesis "because she did not hold a sincere belief that she was pregnant," citing to evidence of her sterilization, her failure to seek medical confirmation of the pregnancy, cancellations of doctor's appointments, and an insurance application dated September 2004 in which she stated she was not pregnant. *Montgomery*, 635 F.3d at 1084. Dr. Dietz opined that, at the time of the offense, Movant "did not suffer from any mental disease or defect[] that affected her ability to appreciate the nature and quality of wrongfulness of her acts." *Id.* at 1085. Dr. Daniel Martell, the Government's other expert witness, performed psychological testing on Movant. (Trial Tr. 2457). Based on the results of the psychological testing, his observations of Movant, a review of psychological testing by other doctors, and interviews of witnesses, Dr. Martell concluded that Movant was malingering. (*Id.* at 2458-61, 2463, 2477-80).

Both Drs. Dietz and Martell based their opinions in part on the interviews of Movant's mother, Judy Shaughnessy, and Movant's ex-husband, Carl Boman. (*Id.* at 2477-79, 2667-69, 2693-94, 2700-03). Dr. Martell testified that Judy described Movant's role in her sexual abuse by Jack as a "willing participant." (*Id.* at 2477-78). He specifically testified that he did not believe Movant brought the sexual abuse on herself. (*Id.* at 2479). Dr. Dietz noted that Movant's "mother claimed to have found her in a compromising situation with her stepfather." (*Id.* at 2554). He also affirmatively stated that Movant was "physically and sexually abused by

her stepfather, Jack and she witnessed violence in the home." (*Id.* at 2567). Dr. Dietz also said "I am convinced that Lisa Montgomery was physically abused for a long time by Jack Kleiner and that she was sexually abused for a shorter period of time." (*Id.* at 2697). He further recounted that Judy accused Lisa of bringing the abuse on herself. (*Id.* at 2700-01).

At the close of the guilt phase, the jury found Movant guilty of kidnapping Victoria Jo Stinnett resulting in the death of Bobbie Jo Stinnett. (Crim. Case, Doc. # 341). The case proceeded to the second phase, or penalty phase, of the trial, which spanned two days and included testimony from Movant's friends, family, coworkers, and Drs. Logan and Ruth Kuncel. *Montgomery*, 635 F.3d at 1085. In particular, Movant's half-sister, Diane Mattingly, testified regarding her life growing up in the care of Judy Shaughnessy. (Trial Tr. 2955-59). Diane described her early life with Judy as "walking on egg shells" and being made to feel like she was not good enough. (*Id.* at 2956). She described protecting Movant and her sister Patty from a violent man. (*Id.* at 2957). But she did not testify that she was molested while Movant was in the room with her. (*See id.* at 2955-59).

Dr. Kuncel presented a comprehensive overview of Movant's life history and how events, such as her father and sister disappearing from her life and the physical and sexual abuse, affected her. (*Id.* at 3016-32). On direct, Dr. Kuncel also responded to the comments made by Dr. Martell regarding her psychological testing of Movant, explaining why she tested as she did, her conclusions gleaned from those tests, and her observations. (*Id.* at 3033-52). On cross, Dr. Kuncel was often nonresponsive and was actually admonished by the Court. (*Id.* at 3075, 3085-86). The Court specifically directed Dr. Kuncel that:

> You do not have to give a lengthy explanation to simple questions that are put to you. And I am instructing you to answer concisely and directly the questions that are provided to you and you need to understand that if the defendant's attorneys

> feel further explanation needs to be given they will have an opportunity to inquire of you in that regard.

(*Id.* at 3085-86). A portion of cross-examination focused on the appropriateness of Dr. Kuncel's testing procedures in Movant's case. (*Id.* at 3067-80).

After hearing the Government's presentation and Movant's mitigating evidence, the jury determined Movant should be sentenced to death. (Crim. Case, Doc. # 354). The special verdict form reveals that the jury found the Government established beyond a reasonable doubt all six aggravating factors. (*Id.*). As for mitigating factors, eight jurors found Movant "was the victim of childhood physical and sexual abuse at the hands of her stepfather, Jack, and was psychologically and emotionally damaged as a result of that abuse"; seven jurors found Movant "was the victim of childhood emotional abuse at the hands of her mother, Judy Kleiner (now Judy Shaughnessy), and was psychologically and emotionally damaged as a result of that abuse"; ten jurors found that Movant "never received adequate treatment for the abuse which she received"; and nine jurors found that "[d]espite having been the victim of significant sexual, physical and emotional abuse, Movant raised four good children and worked many jobs to support her children." (*Id.*). On April 4, 2008, the Court sentenced Movant to death. (Crim. Case, Doc. # 402).

Movant appealed, arguing the Government failed during the guilt phase to prove that Bobbie Jo's death resulted from the kidnapping of Victoria Jo; the Court erred in excluding expert evidence concerning PET scan and MRI results during both phases and in excluding polygraph evidence; prosecutorial misconduct during the penalty phase; improper jury instructions during the penalty phase; and the submission to the jury of an unproven aggravating factor. *See generally Montgomery*, 635 F.3d 1074. The Eighth Circuit affirmed Movant's conviction and sentence of death. *Id.* Regarding the brain imaging evidence, the Eighth Circuit

specifically found that the PET scan was "sufficiently reliable to be admitted" to show Movant had abnormalities in the limbic and somatomotor regions of her brain, but that any error in excluding it was harmless because it had minimal probative value. *Id.* at 1090. The Eighth Circuit further stated Dr. Gur's testimony that the "PET results showed abnormalities consistent with a diagnosis of pseudocyesis" was not reliable and therefore inadmissible during the guilt phase. *Id.* at 1090-91. Additionally, the Eighth Circuit found that the PET scan was arguably admissible during the penalty phase because the "parties may present evidence as to any matter relevant to the sentence." *Id.* at 1092 (quotation omitted). However, the Eighth Circuit stated that any error in excluding the PET scan during the penalty phase was harmless because it had "minimal probative value of the evidence and the overwhelming evidence and jury findings of serious aggravating factors." *Id.* The Eighth Circuit also held that the Court did not abuse its discretion when excluding the MRI evidence because it was irrelevant and did not bear on Movant's character, prior record, or circumstances of the offense. *Id.* at 1093.

The Supreme Court denied her petition for a writ of certiorari on March 19, 2012. *See Montgomery v. United States*, 565 U.S. 1263 (2012). Thereafter, Movant initiated the present 2255 Motion to vacate her judgment and sentence. (*See* Civ. Case, Docket Sheet).

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a movant may collaterally attack her sentence on four grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States', (2) 'that the court was without jurisdiction to impose such sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *Hill v. United States*, 368 U.S. 424, 426-27 (1962) (quoting 28 U.S.C. § 2255). "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 15 of 131
March 21 2017 p120
Appellate Case: 17-1716 Page: 120 Date Filed: 04/04/2017 Entry ID: 4519884

for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Arguments that might warrant reversal on direct appeal do not necessarily support collateral attack. *United States v. Frady*, 456 U.S. 152, 165 (1982).

## III. ANALYSIS

As noted above, the Court denied grounds I – IV, VIII – XI, XIV, XVI – XVII, and XIX – XXI in its Order dated December 21, 2015. (12/21/2015 Order). Accordingly, only the remaining grounds (V – VII, XII – XIII, XV, XVIII, and XXII) are discussed in this Order along with a claim of newly discovered evidence, which was raised at the evidentiary hearing. Each of the remaining claims is discussed in turn.

### A. Ground V: Ineffective Assistance of Trial Counsel

Movant alleges twenty-four specific claims of ineffective assistance of counsel, and one general claim of ineffective assistance based on the cumulative prejudicial effect of the twenty-four specific claims. (2255 Mtn, pp. 59-195).[6] The Sixth Amendment guarantees the right to assistance of counsel for the accused's defense. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "'[T]he right to counsel is the right to the effective assistance of counsel.'" *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

Courts evaluate ineffective assistance claims under Strickland's two-pronged analysis. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390 (2000). First, the defendant must show that counsel was deficient. *Wiggins*, 539 U.S. at 521. To establish

[6] The claims vacillate between allegations against all defense counsel, trial counsel, and Fred Duchardt alone. The Court refers to the party or parties it believes are the subject of the particular claim; however, the Court's conclusions apply equally to all members of Movant's trial counsel.

deficiency, "a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688). The United States Supreme Court has not stated specific rules for what is considered effective assistance, and instead commands that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (alteration omitted).

Second, the movant must show she was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693. The movant bears the burden of proving prejudice from counsel's ineffective assistance. *Id.* The movant must demonstrate there is a reasonable probability the trial's outcome would have been different, absent counsel's deficiencies. *Williams*, 529 U.S. at 391; *Freeman v. Graves*, 317 F.3d 898, 900 (8th Cir. 2003). This reasonable probability arises when the reviewing court lacks confidence in the outcome after surveying the entire record below. *White v. Luebbers*, 307 F.3d 722, 728 (8th Cir. 2002). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). A reviewing court is not obligated to assess the reasonableness of an attorney's performance if the movant cannot establish prejudice, as failure to demonstrate prejudice is dispositive of a case. *Apfel*, 97 F.3d at 1076.

*Strickland* warns of the distorting effects of hindsight and the danger of empowering defendants to challenge strategic decisions made through counsel's assistance after an adverse outcome. *Strickland*, 466 U.S. at 689. *Strickland* must be applied scrupulously to prevent an ineffective assistance claim from becoming "a way to escape rules of waiver and forfeiture and

raise issues not presented at trial." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689-90). Failing to do so would "threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id*. A reviewing court must evaluate ineffectiveness claims with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also United States v. Luke*, 686 F.3d 600, 604 (8th Cir. 2012).

Some circumstances, however, are so likely to prejudice the defendant that it is unnecessary for the defendant to prove actual prejudice. *United States v. Cronic*, 466 U.S. 648, 658-59 (1984). Such errors are considered structural defects, which are "presumptively prejudicial and require[] reversal." *Sweeney v. United States*, 766 F.3d 857, 860 (8th Cir. 2014) *cert. denied*, 135 S. Ct. 1841 (2015); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-148 (2006). The Supreme Court has identified three narrow categories of structural error, as the analysis applies to ineffective assistance of counsel claims: "(1) assistance of counsel has been denied completely, (2) 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,' or (3) counsel is denied during a critical stage of the proceedings." *Freeman*, 317 F.3d at 900 (quoting *Cronic*, 466 U.S. at 658-59).

Many of Movant's ineffective assistance of counsel claims involve an argument that trial counsel did not comply with the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), available at Movant Exhibit 103, and prevailing professional norms. (2255 Mtn, p. 141). However, as instructed by the Supreme Court in *Strickland*, the guiding principal for judging a claim for unconstitutional ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 18 of 139 March 2017 p123
Appellate Case: 17-1716 Page: 123 Date Filed: 04/04/2017 Entry ID: 4519884

result." *Strickland*, 466 U.S. at 686; *see also Luke*, 686 F.3d at 604. The Supreme Court has criticized the use of the ABA Guidelines and their predecessors as specific commands. *Strickland*, 466 U.S. at 688-689 ("More specific guidelines are not appropriate . . . [and] the existence of detailed guidelines for representation could distract counsel."); *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009).[7] This is not to say the ABA Guidelines have never been considered by the Supreme Court. To the contrary, the Court has accepted the ABA Guidelines for their evidentiary value as they relate to proving prevailing professional norms under *Strickland*. *See Rompilla v. Beard*, 545 U.S. 374, 387 (referring to the ABA Guidelines "as guides to determining what is reasonable."); *Wiggins*, 539 U.S. at 524-25 (citing ABA Guidelines); *Williams*, 529 U.S. at 396 (using ABA Guidelines to support assertion that trial counsel failed to conduct necessary survey of defendant's prison and mental health records). Private organizations, like states, can create standards for criminal defense attorneys to promote quality representation, but the Supreme Court has "held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." See *Van Hook*, 558 U.S. at 9. (quotation omitted).[8]

---

[7] The Supreme Court discussed the expansion of the guidelines from a two-page commentary in the 1980 edition to a 131-page publication in 2003. *Van Hook*, 558 U.S. at 8. "They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from the moment of conception, and that counsel contact virtually everyone who knew the defendant and his family and obtain records concerning not only the client, but also his parents, grandparents, siblings, and children." *Id.* (alteration, ellipses, and quotations omitted).

[8] Justice Alito, in his concurring opinion, opined that "[t]he ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole . . . and I see no reason why the ABA Guidelines should be given a privileged position . . . ." *Van Hook*, 558 U.S. at 13-14 (Alito. J., concurring).



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 19 of 139 March 31 2017 p124
Appellate Case: 17-1716 Page: 124 Date Filed: 04/04/2017 Entry ID: 4519884

The Eighth Circuit has likewise stated that "the ABA guidelines may serve as 'guides to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.'" *Sinisterra v. United States*, 600 F.3d 900, 908 (8th Cir. 2010) (quoting *Van Hook*, 558 U.S. at 7). Trial counsel's failure to follow each suggestion made in the ABA Guidelines does not itself justify habeas relief. *See id.* at 908-09 (acknowledging a proper mitigation investigation obviates the need for the ABA Guidelines' recommendation of a mitigation specialist).

Additionally, the Supreme Court has instructed that it is inappropriate to rely on ABA Guidelines announced after a criminal defendant's trial. *Van Hook*, 558 U.S. at 7-8. Movant cites to the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines") in her motion. The Supplementary Guidelines were published in 2008, after Movant's 2007 trial. Consequently, the Supplementary Guidelines cited by Movant are neither controlling as previously discussed nor relevant because they post-date all of the work completed by counsel for her trial. Thus, the Court references only the ABA Guidelines adopted in 2003 as they were the guidelines in effect during Movant's trial in 2007.

Further, many of Movant's alleged bases for habeas relief attack the theories of defense pursued by trial counsel. *Strickland* expressly cautions reviewing courts on simply second-guessing trial counsel's strategy decisions on ineffective assistance of counsel claims. *Strickland*, 466 U.S. at 689. The test is not "'what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 795 (1987) (quoting *Cronic*, 466 U.S. at 665 n.38). Effective assistance under the Sixth Amendment requires defense counsel to present a defense that reflects a thorough investigation of relevant fact and law. *See Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 20 of 131
March 31 2017 p125
Appellate Case: 17-1716 Page: 125 Date Filed: 04/04/2017 Entry ID: 4519884

to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 490. Counsel has a duty to consult with a defendant about overarching defense strategy. *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (citing *Strickland*, 466 U.S. at 688). This obligation certainly extends to the exercise or waiver of basic trial rights, but not necessarily to every tactical decision. *Nixon*, 543 U.S. at 187 (citing *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988)).

Because each ineffective assistance of counsel claim must stand or fall on its own, the Court now examines them in turn. *See Shelton v. Mapes*, 821 F.3d 941, 950 (8th Cir. 2016) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation.").

***i. Subgrounds 9-10, 13-15, 18-19, 23: Issues Involving Trial Strategy***

Movant alleges several claims that relate to the substance and manner of the strategy employed by her trial team. Effective assistance under the Sixth Amendment "includes an adequate investigation of the facts of the case, consideration of viable theories, and development of evidence to support those theories." *Henderson v. Sargent*, 926 F.2d 706, 711 (8th Cir. 1991). "Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 562 U.S. at 107. Courts on habeas review must avoid the "'natural tendency to speculate as to whether a different trial strategy might have been more successful.'" *Maryland v. Kulbicki*, --U.S.--, 136 S. Ct. 2, 4 (2015) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)); *see also Nave v. Delo*, 62 F.3d 1024, 1036 (8th Cir. 1995) ("Hindsight now suggests that a different strategy might have been more effective, but this does not mean trial counsel was ineffective."). A habeas petitioner cannot later challenge the sufficiency of trial counsel's defense theory simply because the defense was unsuccessful. *James v. Iowa*, 100 F.3d 586, 590 (8th Cir. 1996).

Movant's claims range from purported tactical errors made prior to trial to improper and ineffective strategies employed throughout the trial. However, as discussed *infra*, these claims require the Court to engage in hindsight and second-guess the strategies trial counsel advanced after a thorough investigation of the facts and circumstances of Movant's case. *See Williams v. United States*, 452 F.3d 1009, 1013 (8th Cir. 2006) (citing *Anderson v. United States*, 393 F.3d 749, 753 (8th Cir.) *cert. denied* 546 U.S. 882 (2005)).

Pervasive throughout these claims is the argument that trial counsel should not have presented an insanity defense based on pseudocyesis, but rather should have employed all mental health evidence in the penalty phase as mitigating evidence. Movant argues that pursuing an NGRI defense was not objectively reasonable under the then-prevailing professional norms, citing to commentary to the ABA Guidelines. (2255 Mtn, pp. 163, 178-83). The commentary suggests that counsel risks losing credibility with a jury in the penalty phase when they present a failed insanity defense. ABA Guideline intro. cmt. at 927.

As noted throughout this decision, the ABA Guidelines are just that—guides. *Strickland*, 466 U.S. at 688-689; *Sinisterra*, 600 F.3d at 908. They are not commandments. *See Van Hook*, 558 U.S. at 8. As Duchardt aptly pointed out in his written statement, the facts of Movant's crime were so "uniquely and horribly aggravating that they would overwhelmingly outweigh a standard mitigation defense," like that suggested in the ABA Guidelines. (Duchardt Statement,[9] p. 61). "Had [Movant] been accused of murdering her mother Judy, or her ex-husband Carl . . . a simple defense strategy, like that envisioned by [habeas counsel], would have made sense." (*Id.* at 60-61). But here, Movant was accused of killing an innocent acquaintance for the purpose of

[9] "Duchardt Statement" refers to the Written Statement of Fred Duchardt, available at Government Exhibit 42.

stealing her baby. (*Id.* at 61). Thus, the defense team was forced to devise a strategy that could account for such a "rare" and "exotic" crime. (*Id.*). Duchardt testified at the evidentiary hearing that the trial team followed the evidence, which lead them to believe that pseudocyesis was Movant's best chance at achieving a sentence for less than death. O'Connor concurred, adding that using pseudocyesis in the guilt phase allowed them to introduce Movant's obsession with pregnancy and mental health problems early on in the trial and then carry that theme through the penalty phase.

And counsel did have evidence supporting the pseudocyesis defense from both lay and expert witnesses. Some family and friends testified that Movant looked pregnant. *Montgomery*, 635 F.3d at 1079. Drs. Ramachandran and Logan testified that Movant suffered from pseudocyesis, depression, borderline personality disorder, and PTSD. *Id.* at 1082. Both doctors also testified that Movant was in a delusional, dissociative state at the time of the offense. *Id.* at 1083; Trial Tr. 2250-51, 2423). Insanity defenses themselves are rather uncommon; however, when used, an insanity defense generally includes allegations of delusions and dissociation. *See, e.g.*, *United States v. Lasley*, 832 F.3d 910, 912 (8th Cir. 2016); *United States v. Samples*, 456 F.3d 875, 877-78 (8th Cir. 2006); *Weekley v. Jones*, 76 F.3d 1459, 1462-63 (8th Cir. 1996); *United States v. Blumberg*, 961 F.2d 787, 789 (8th Cir. 1992).

The evidence, both from testimony at the evidentiary hearing and the written statements of the trial team attorneys, demonstrates the decision to proceed with their defense strategy during the guilt phase was the result of reasoned process. *See Nixon*, 543 U.S. at 192 (opining that "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed"). "Reasonable performance of counsel includes an adequate investigation of the facts of the case, consideration of viable theories, and development of

evidence to support those theories." *Henderson*, 926 F.2d at 711.[10] Reasonable trial strategy does not constitute ineffective assistance simply because the strategy proved unsuccessful. *James*, 100 F.3d at 590 (citing *Stacey v. Solem*, 801 F.2d 1048, 1051 (8th Cir. 1986)). Trial counsel pursued one of the few viable guilt-phase strategies by alleging Movant suffered from a wide range of mental illnesses, which included pseudocyesis. As trial counsel supported Movant's theory of defense with testimony from multiple experts and lay witnesses, the Court determines that Movant's argument lacks merit. Trial counsel's strategy was within the wide range of effective assistance permitted under the Sixth Amendment and was thus objectively reasonable. *See Strickland*, 466 U.S. at 690.

That being said, many of the claims attacking trial counsel's strategic decisions can be resolved on other bases as well. For the sake of thoroughness, the Court further discusses subgrounds 10, 15, 18, 19, and 23 in turn.

*a. Subground 10: Dr. Gur's Opinions*

Trial counsel intended to present expert testimony from Dr. Ruben Gur showing that Movant suffered from structural and functional brain deficiencies that are consistent with a diagnosis of pseudocyesis. *Montgomery*, 635 F.3d at 1087-88. Dr. Gur was prepared to support his testimony with positron emission topography ("PET") and magnetic resonance imaging ("MRI") scans, but the Government successfully excluded Dr. Gur's opinion after a *Daubert* hearing. *Id.*

Movant claims trial counsel should have employed habeas counsel's preferred strategy, that is, to forego the insanity defense in favor of presenting all mental health evidence in the penalty phase as mitigating evidence. Movant argues trial counsel did not perform within

[10] As discussed in Section III(A)(iii), the defense team completed a thorough investigation of the facts and law.

objectively reasonable norms by offering Dr. Gur's testimony "in support of the doomed first-phase defense" but instead, should have offered it in the penalty phase. (2255 Mtn, pp. 166-67). Movant argues trial counsel's attempt to link Dr. Gur's PET and MRI evidence to pseudocyesis caused the Government to move to exclude Dr. Gur's testimony. (*Id.* at pp. 163-65).

The record reveals, however, that the Government intended to seek exclusion of Dr. Gur's testimony regardless of whether the trial was continued to allow development of the first phase NGRI defense based on pseudocyesis. (*See* 4/5/2007 Conf. Tr.,[11] 14). It is true that, at the outset of the *Daubert* hearing, the Government did indicate Dr. Gur's results might be admissible during the penalty phase. (Duchardt Statement, p. 80). However, the Government changed its position after hearing Dr. Gur's testimony and thereafter fought "tooth and nail" to keep the testimony out of the case entirely. (*Id.*). The record reveals that the Government did just that after hearing the Court was inclined to allow presentation of the PET scan on a very limited basis. (*Daubert* Tr. 3,[12] 6). The Government requested the raw data, and the Court ordered that it be produced. (*Id.* at 9-10, 17). The Court determined that Dr. Gur's testimony would be excluded in its totality just before opening statements when the requested raw data had not been produced, among other reasons. *Montgomery*, 635 F.3d at 1089.

The transcript of the *Daubert* hearing, the Government's motion to exclude Dr. Gur's testimony, and Duchardt's written statement evinces no Government intent to stipulate to the admission of Dr. Gur's opinions in either the guilt or penalty phase. Movant offers no proof to support her contention that trial counsel's decision to pursue an insanity defense in and of itself

[11] "4/5/2007 Conf. Tr." refers to the pretrial held on April 5, 2007 before Judge Maughmer, available at Movant Ex. 59.

[12] "*Daubert* Tr. 3" refers to the Court's remarks at the conclusion of the *Daubert* hearing, which begin on page 199 of Crim. Case, Doc. # 424.

triggered the Government's objection to inclusion of Dr. Gur's PET and MRI evidence in the penalty phase. Rather, the record establishes the Government intended to seek exclusion of Dr. Gur's testimony regardless of whether Movant pursued an NGRI defense. Thus, the factual basis that the Court excluded Dr. Gur's testimony because Duchardt unreasonably tied his opinion to pseudocyesis is without merit.

*b. Subground 15: Hard-Working Mother*

Throughout the trial, defense counsel emphasized Movant was a loving mother who worked many jobs to support her family. Movant argues this was an ineffective strategy for the guilt phase and trial counsel instead should have presented different evidence to lay the foundation for a more effective penalty phase defense. (2255 Mtn, pp. 182-83). However, for the reasons stated throughout this Order, that Movant can now articulate other alternatives to defense counsel's presentation does not mean that the representation that Movant was a loving and hard-working mother was unreasonable. *See Strickland*, 466 U.S. at 689.

Movant's argument simply boils down to the same one made many times in her motion: trial counsel should have chosen a different trial strategy. In this instance, Movant claims that the decision to portray her as a loving and hard-working mother did not fit in with the defense theme. (2255 Mtn, pp. 182-83). Although the ABA Guidelines are not controlling authority, *Strickland*, 466 U.S. at 688, Movant "quotes"[13] the commentary to support her argument. The commentary does suggest that a mitigation presentation may be more persuasive if it is consistent with the defense made during the guilt phase and links the circumstances of the client with the evidence offered in mitigation. ABA Guideline, intro. cmt. at 927. The commentary further suggests that "counsel may wish to show the combination of factors that led the client to

---

[13] The "quotes" provided in Movant's motion are not direct quotes from the ABA Guidelines' commentary, nor does she cite to the appropriate page numbers.

commit the crime" if a direct cause and effect relationship between the crime and a mitigating factor cannot be established. (*Id.* at pp. 1060-61).

First, John O'Connor testified at the evidentiary hearing that the defense theme was that Movant was severely mentally ill and had an obsession with pregnancy. The defense team understood that Movant had many flaws that may or may not be attributed to the chosen theme. One of those was evidence suggesting that Movant was a neglectful and abusive mother. Although Movant was admittedly an imperfect mother, the trial team determined that they needed to highlight her positive qualities to counter any presentation by the Government that Movant was a bad mother. Among them were the facts that Movant had raised four good children and Movant had worked hard to provide for them. While perhaps not directly on point, this strategy was not inconsistent with the defense's theme and was a perfectly reasonable strategic decision when faced with the Government's less-than-favorable evidence regarding Movant's mothering.

Moreover, Duchardt testified that Movant desired to be portrayed as a loving mother. In fact, Movant felt betrayed by prior counsel who gave credence to the negative statements made by her mother, Judy Shaughnessy, about her. (Duchardt Statement, pp. 72-73). Trial counsel was acting at the direction of Movant when they worked to portray her as a hard-working, loving mother, despite her imperfections. *See Nixon*, 543 U.S. at 178-79 (stating trial counsel has a duty to consult with the client about strategic matters).

Further, trial counsel linked the guilt phase portrayal of Movant as a hard-working mother to the penalty phase, where they continued this portrayal. Movant submitted the following mitigating factor: "[d]espite having been the victim of significant sexual, physical and emotional abuse, Mrs. Montgomery raised four good children and worked many jobs to support



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 27 of 131
March 31 2017 p132
Appellate Case: 17-1716 Page: 132 Date Filed: 04/04/2017 Entry ID: 4519884

her children." (Crim. Case, Doc. # 354, p. 6). Nine jurors found for Movant regarding this factor. (*Id.*). Not only does this support the conclusion that trial counsel's performance was objectively reasonable, but it demonstrates the jury found the aggravating factors of Movant's offense particularly severe. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (reversing Ninth Circuit's grant of habeas relief regarding a state court's sentence when state court noted the circumstances of the crime were "simply overwhelming").

The evidence, both from testimony at the evidentiary hearing and the declarations of the trial team attorneys, demonstrates the decision to proceed with their defense strategy during the guilt phase, including portraying Movant as a loving and hard-working mother, was the result of reasoned process.[14] *See Nixon*, 543 U.S. at 192 ("In a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed."). The Court will not use the benefit of hindsight to second-guess trial counsel's tactical decisions. *See United States v. Bean*, 373 F.3d 877, 880-81 (8th Cir. 2004). Thus, Movant fails to demonstrate objectively unreasonable assistance, nor does she show she was prejudiced by trial counsel's attempt to portray her as a hard-working mother in the guilt phase.

*c. Subground 18: Announcing and Relying on the Tommy Defense*

Movant next alleges trial counsel was ineffective for announcing a defense at the April 3, 2007 pretrial conference, relying on that defense during trial preparation, and then abandoning the defense prior to trial. (2255 Mtn, p. 186). This defense, the "Tommy defense," came to light in March 2007 when Movant implicated her half-brother, Tommy Kleiner, in the crime. What

[14] "It seemed to our team that those facts [of Movant's alleged crime] were so uniquely and horribly aggravating that they would overwhelmingly outweigh a standard mitigation defense, and that only with an explanation for such a 'rare' and 'exotic' offense could we hope to save [Movant's] life." (Duchardt Statement, p. 61).

Movant fails to appreciate is that at the time of the April 3, 2007 conference, the trial date was April 30, 2007. (Crim. Case, Doc. # 93).[15] Discovery deadlines had passed. (Crim. Case, Docs. ## 95, 166). The night before, Leona Hayes provided the defense team a tentative eyewitness identification that indicated Tommy Kleiner could have been the getaway driver. (Movant Ex. 158, 20-23). Trial counsel knew they must disclose the "Tommy defense" at the April 3, 2007 conference in order to have any chance of presenting it at the then-looming April 30, 2007 trial.

The urgency of the disclosure was solely attributable to Movant herself. Counsel's April 3, 2007 notice to the Court resulted from the timing of Movant's own statements. Movant's counsel did their best to corroborate Movant's statement in the limited time given, by interviewing eyewitnesses, Leona Hayes, but was unable to further investigate before the April 3, 2007 conference. Failure to promptly disclose could have resulted in the Court excluding the underlying supporting testimony from Leona Hayes. (Crim. Case, Doc. # 95). "Reasonable performance includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Cox v. Norris*, 133 F.3d 565, 573 (8th Cir. 1997). If counsel had instead ignored Movant's statement that she was not alone the day of the killing and not investigated, Movant would have a stronger argument to support her ineffectiveness claim. *See Henderson*, 926 F.2d at 710-11 (determining failure to investigate and pursue an alternative suspect was ineffective assistance). Counsel's actions were objectively reasonable.

*d. Subground 19: Dr. McCandless's Testimony*

Movant next alleges that trial counsel was ineffective for using Dr. Linda McCandless as a witness during the guilt phase of Movant's trial. (2255 Mtn, pp. 186-88). Dr. McCandless was

[15] The case would not be continued until over three weeks later. (Crim. Case, Doc. # 223).

Movant's treating psychiatrist at CCA, prior to Movant's trial. Trial counsel called Dr. McCandless to testify regarding her experiences with Movant during the course of treatment. The Government conversely contends that Dr. McCandless was an effective witness. (Gov't Resp., pp. 118-19).

Movant contends that trial counsel rushed Dr. McCandless's preparation. (2255 Mtn, p. 186-88). Movant points to the transcript of the Government's cross-examination of Dr. McCandless to support her assertion. (*Id.*). During the cross-examination, the Government played recorded calls from Movant's time at CCA in which Movant joked with her husband about not being entirely truthful with Dr. McCandless. (Trial Tr. 2113-14). The Government offered the calls as impeachment evidence against Dr. McCandless's testimony. (*Id.* at 2112). Movant argues that these phone calls damaged Dr. McCandless's standing with the jury. (2255 Mtn, p. 188).

Movant's argument that Dr. McCandless was a disastrous witness for her defense is contradicted by a wide range of evidence. Close review of the transcript shows that Duchardt anticipated the attempt to impeach Dr. McCandless and laid foundation to rebut the attempt. (Tr. at 2084-85). Further, Dr. McCandless's testimony advanced numerous important facts that were crucial to Movant's defense. Dr. McCandless visited with Movant dozens of times during Movant's stay at CCA, and Dr. McCandless witnessed Movant progress through various stages of mental illness. Dr. McCandless testified to Movant being placed on suicide watch; Movant's intense mood swings, bipolar disorder, and severe depression; as well as Dr. McCandless's eye toward wanting to evaluate Movant for suffering from psychotic episodes. (*Id.* at 2068-74). Trial counsel was not ineffective simply because the Government attempted to impeach Dr. McCandless's credibility.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 30 of 139 March 31 2017 p135
Appellate Case: 17-1716 Page: 135 Date Filed: 04/04/2017 Entry ID: 4519884

Movant also argues that Dr. McCandless's admission of not knowing the legal standard for an NGRI defense damaged Movant's standing with the jury. Movant's argument might hold more credibility had Dr. McCandless been offered as a forensic witness. While the transcript reveals that Dr. McCandless indeed admitted on cross-examination that she was unable to testify whether Movant was legally insane during the commission of the offense, Duchardt had previously laid foundation that Dr. McCandless was simply a treating psychiatrist. Trial counsel did not intend to offer Dr. McCandless as an expert that could render a legal opinion regarding Movant's state of mind during the offense. (*Id.* at 2096-97).

It follows that trial counsel did not ineffectively prepare Dr. McCandless for her testimony and possible impeachment. *See Underdahl v. Carlson*, 381 F.3d 740, 742-43 (8th Cir. 2004) (upholding state court determination that trial counsel could render effective assistance despite opening the door to bad character evidence on cross-examination). Dr. McCandless was called to testify as to her experiences with Movant as Movant's treating psychiatrist at CCA. Further, Movant fails to demonstrate how she was prejudiced by any alleged deficiency. Movant's claim is denied.

*e. Subground 23: Failure to Present Mitigation Case*

Movant next claims her trial counsel failed to present mitigation evidence at their disposal, failed to uncover additional mitigating evidence, and generally gave up after losing at the guilt phase. (2255 Mtn, p. 192-93). The Government argues that Movant is less alleging a constitutional violation as she is questioning the manner and style in which trial counsel presented the mitigation evidence. (Gov't Resp., pp. 126-30). Much of Movant's argument focuses on a statement David Owen made to former counsel Susan Hunt, in which Owen expressed his dissatisfaction with the mitigation presentation and alleged that trial counsel was

not telling Movant's story during the penalty phase. (2255 Mtn, p. 193).[16] Movant also presented testimony at the evidentiary hearing that discussed witnesses trial counsel should have called, as well as highlighted shortcomings of witnesses trial counsel called. The Government's response heavily quotes Fred Duchardt's written statement to rebut Movant's assertions. (Gov't Resp., pp. 127-29).

The Supreme Court has assessed the reasonableness of penalty phase mitigation presentations in recent relevant circumstances. The Supreme Court held that trial counsel's mitigation presentation was deficient in *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, trial counsel began his preparation for a capital murder mitigation presentation a week before trial. *Williams*, 529 U.S. at 395. Trial counsel's investigation failed to uncover a large amount of evidence that might have been useful in mitigation, such as evidence of the client being the victim of child abuse, his father's imprisonment, and his borderline mental retardation. *Id.* Trial counsel failed to provide effective assistance when they failed to uncover such records "not because of any strategic calculation but because they incorrectly thought the state law barred access to such records." *Id.* Such basic failure precluded trial counsel from being in a position to reasonably limit investigative decisions. *See id.*; *Strickland*, 466 U.S. at 690-91.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), a death row defendant challenged the adequacy of his representation, alleging his attorneys failed to investigate and present evidence of his dysfunctional background during his trial's penalty phase. *Wiggins*, 539 U.S. at 516. Trial counsel did not hire a social worker to evaluate his client and failed to prepare a social history report to present in the penalty phase. *Id.* Trial counsel merely limited his mitigation

---

[16] "At one point during the trial, I [David Owen] called Susan Hunt upset at what was happening in the presentation of the defense. I said to her 'Lisa's story is not being told.' The mitigation presentation was weak and the mental health evidence lacked foundational support." (Movant Ex. 62, p. 17).

investigation to the review of the trial court's pre-sentence investigation report ("PSI report") and records prepared by the Maryland Department of Social Services ("DSS report"). *Id.* at 544 (Scalia, J., dissenting). The Court reasoned that although *Strickland* does not require trial counsel to investigate every possible line of defense and does not require counsel to present mitigating evidence in every case, such "choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 533 (quotation omitted). The Supreme Court determined Wiggins's trial counsel was not in a position to reasonably limit the scope of his investigation after merely reviewing the PSI and DSS reports. *Id.*

Finally, in *Rompilla*, the Supreme Court found trial counsel ineffective for failing to examine the client's prior conviction file when counsel had notice the prosecution intended to use the client's prior convictions to support aggravating factors during the penalty phase. *Rompilla*, 545 U.S. at 383.

> Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt.

*Id.* at 389-90.

In each of *Rompilla*, *Wiggins*, and *Williams*, the Supreme Court found trial counsel's investigations objectively unreasonable, which in turn led trial counsel to advance ineffective mitigation presentations. *See Rompilla*, 545 U.S. at 389-90; *Wiggins*, 539 U.S. at 533-34; *Williams*, 529 U.S. at 395-96. However, as discussed in Section III(A)(iii), the Court has determined that counsel's mitigation investigation in this case was reasonable.

Much of Movant's evidentiary hearing presentation focused on arguing that trial counsel failed to follow up on multiple "red flags" that would have led the team to discover previously unknown facts. Movant argued these unknown facts could have assisted in a mitigation presentation. Had Movant demonstrated a deficiency similar to *Rompilla*, *Wiggins*, and *Williams*, trial counsel likely would not have been in a position to make reasonably objective strategic decisions. However, the unknown facts Movant advanced at the evidentiary hearing were few in number and in some cases came from tenuous and speculative sources as addressed in Section III(H). This was not a situation, such as in *Sears v. Upton*, where trial counsel presented a questionable and misleading mitigation presentation that resulted from counsel's failure to discover a wealth of information that did not come until the post-conviction process. 561 U.S. 945, 948-51 (2010). There was no broad failure to conduct a sufficiently lengthy mitigation investigation, nor a failure to examine public documents the prosecution intended to introduce to establish aggravating factors. *See Williams*, 529 U.S. at 395; *Rompilla*, 545 U.S. at 383. Movant's trial counsel conducted an investigation that resulted from the team's analysis of a wealth of information relating to Movant's biopsychosocial history. Indeed at the time of the filing of Movant's § 2255 motion, Movant had yet to advance any information unknown by trial counsel during her trial. In this circumstance, trial counsel's actions fail to rise to any resemblance of the deficient performance during pretrial investigation that would preclude counsel's ability to make reasoned decisions of mitigation strategy. *See Sears*, 561 U.S. at 948-51; *Wiggins*, 539 U.S. at 533-34; *Williams*, 529 U.S. at 395.

Movant's remaining argument would be that trial counsel, despite having enough information to make a reasonable trial decision, chose the wrong strategy. Again, choices made after such thorough investigation are presumptively reasonable. *See Strickland*, 466 U.S. at 689-



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 34 of 139
March 31 2017 p139
Appellate Case: 17-1716 Page: 139 Date Filed: 04/04/2017 Entry ID: 4519884

90. Movant asserts trial counsel failed to tell Movant's story, and argues the team should have called witnesses, such as Jan Vogelsang, to testify during the penalty phase. Duchardt's written statement and evidentiary hearing testimony criticizes Movant's assertions. (Duchardt Statement, pp. 70-75). Movant does not establish unconstitutional ineffective assistance by presenting an expert at a habeas proceeding that may have been more helpful to her defense. *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007). Movant must demonstrate that counsel's failure to find or present the witness was objectively unreasonable. *See Sidebottom v. Delo*, 46 F.3d 744, 752-53 (8th Cir. 1995) (applying *Strickland* to determine whether counsel's failure to call expert witness was reasonable). Duchardt stated that, while he was aware of Vogelsang's practice at the time of the trial, he was skeptical of her efficacy, as prosecutors across the country were successfully challenging her testimony through objections based on grounds of hearsay and improper expert opinions. (Duchardt Statement, pp. 70-75). Whether Duchardt correctly forecasted the Court's potential exclusion of Vogelsang's presentation, the record demonstrates he strategically considered whether her mitigation presentation would be useful. *See United States v. Battle*, 264 F. Supp. 2d 1088, 1194-95 (N.D. Ga. 2003) (excluding Vogelsang's attempt to testify about defendant's family's mental health conditions when Vogelsang failed to provide the sources of her findings).[17] The scope of the trial team's investigation and the testimony that recreated the reasoning behind the trial team's strategic decisions fails to establish objectively unreasonable performance.

Further, Movant would need to demonstrate she was prejudiced by the trial team's alleged deficient performance. *Strickland*, 466 U.S. at 693. Movant asserts that "[her] life has

[17] State courts have also expressed skepticism regarding Vogelsang's sources and utility. *See Davis v. State*, 9 So.3d 539, 558-59 (Ala. Crim. App. 2008); *Gudinas v. State*, 816 So.2d 1095, 1108-09 (Fla. 2002).



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 35 of 139
March 31 2017 p140
Appellate Case: 17-1716 Page: 140 Date Filed: 04/04/2017 Entry ID: 4519884

been one filled with trauma, suffering, and abuse at the hands of one person after another, resulting in brain damage, mental illness, and loss of contact with reality." (2255 Mtn, p. 193). She believes trial counsel failed to present this sad story to the jury, and "[n]o reasonable jury could have heard the evidence collected by post-conviction counsel and be unmoved." (*Id.*). However, the record reflects the jury heard the vast majority of the evidence post-conviction counsel alleges to have discovered. Any alternative strategy would have encompassed much of the same information as the trial team originally presented. The aggravating evidence's seriousness simply outweighed the mitigation evidence presented. "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." *James*, 100 F.3d at 590. Movant was not prejudiced by any unconstitutional short coming of trial counsel's mitigation presentation.

***ii. Subground 1: Failure to Retain Competent Experts***

Movant claims trial counsel was ineffective for failing to retain competent experts. (2255 Mtn, pp. 135-36). She contends that "defense counsel must identify and retain the appropriate experts" following a sufficient investigation and that "trial counsel failed to retain competent experts in the areas of post-traumatic stress disorder, trauma spectrum disorders, or any field relevant to the diagnosis and presentation of Movant's debilitating traumatization." (*Id.* at 135). Further, she alleges that "[n]o expert retained by the defense was able to identify Movant's dissociative states or explain to the jury how Movant could appear to be engaging in deliberate behavior that was nonetheless beyond her capacity to control." (*Id.*).

The record reveals, and the Eighth Circuit acknowledged, that Movant's trial team presented extensive expert testimony to the jury that substantially covered all of the deficiencies Movant alleges. *See Montgomery*, 635 F.3d at 1083. "The jury heard eleven days of testimony



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 36 of 129
March 31 2017 p141
Appellate Case: 17-1716 Page: 141 Date Filed: 04/04/2017 Entry ID: 4519884

related to the offense charged in the indictment and Montgomery's insanity plea." *Id.* After finding her guilty of kidnapping resulting in murder, the jury heard an additional two days of testimony before determining her sentence. *Id.* at 1085. Drs. Vilayanur Ramachandran, William Logan, and Ruth Kuncel, as well as Movant's treating psychiatrist at CCA, Dr. Linda McCandless, testified on behalf of Movant. Their testimony aligned with the NGRI defense presented during the guilt phase and the mitigation evidence presented during the penalty phase.

During the guilt phase, Drs. Ramachandran and Logan testified regarding their diagnoses that Movant suffered from pseudocyesis, depression, borderline personality disorder, and PTSD. *Id.* at 1082. Dr. Ramachandran also testified that Movant was in a delusional and dissociative state during her commission of the offense. *Id.* at 1083. He provided alternative explanations for the Government's evidence of premeditation. *Id.* at 1083-84; Trial Tr. 2250-51. He explained how Movant's actions could occur as a result of a delusion and how Movant went into a dissociative state during the murder. (Trial Tr. 2250-51). Dr. Logan explained the predisposition factors for mental illnesses, particularly PTSD, and how they were present in Movant's case. (*Id.* at 2390-98). He further testified that Movant was delusional and in a dissociative state at the time of the murder. (*Id.* at 2419-23). Both doctors testified that Movant suffered from a mental disease or defect at the time of the killing of Bobbi Jo Stinnett, and that her mental disease or defect caused her to be unable to understand the wrongful nature of her acts, which mirrors the NGRI standard. 18 U.S.C. § 17; Trial Tr. 2250-51, 2419-23.[18]

In addition to Drs. Ramachandran and Logan, Movant also presented Dr. McCandless, Movant's treating psychiatrist at CCA, to testify as to the mental illnesses with which she had

[18] Dr. Ramachandran stated during his deposition that he did not know the standard for NGRI at the time of the trial. However, the record reflects that his testimony correctly stated the insanity standard. (Trial Tr. 2250-51). Dr. Logan similarly distanced himself from his trial testimony at the evidentiary hearing, but his trial testimony speaks for itself. (Trial Tr. 2419-23).

diagnosed Movant, including bipolar disorder and psychosis, and the treatment Movant had undergone for those illnesses. (Trial Tr. 2068-94). Movant also attempted to present Dr. Gur's testimony regarding her brain abnormalities and any mental abnormality, injury, or illness. *Montgomery*, 635 F.3d at 1090-93. However, as discussed in the Eighth Circuit's opinion, Dr. Gur's testimony was excluded. *Id.* The exclusion was affirmed on direct appeal. *Id.*

During the penalty phase, Movant called Dr. Kuncel and recalled Dr. Logan. Dr. Kuncel presented a comprehensive overview of Movant's life history and trauma and explained how events, such as her father and sister disappearing from her life and the physical and sexual abuse, affected Movant. (*Id.* at 3016-32). Dr. Logan reiterated his diagnoses of PTSD, depression, pseudocyesis, dissociation, and a borderline personality disorder. (*Id.* at 2986-87). Dr. Logan affirmatively stated that his "opinion is her ability to appreciate the nature, quality and wrongfulness of her actions at [the time of the offense] was substantially impaired to a medical [sic] degree of medical certainty." (*Id.* at 2988). He testified that he believed Movant's obsession with pregnancy "was to such a degree she really could no longer rationally understand the magnitude of what she was doing." (*Id.*). He further opined that her obsession with pregnancy and her borderline personality disorder constituted a severe mental or emotional disturbance under which she was operating at the time of the offense. (*Id.* at 2988-89). He reiterated how certain life events in Movant's past contributed to the development of these severe mental or emotional disturbances. (*Id.* at 2989-93).

Despite the fact that trial counsel did identify and retain experts that could and did explain PTSD, trauma, and dissociative states, Movant claims such effort was insufficient. (2255 Mtn, pp. 135-36). The evidentiary hearing clarified that Movant was actually arguing that trial counsel should have hired different experts whose testimony would align better with what



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 38 of 131
March 31 2017 p143
Appellate Case: 17-1716 Page: 143 Date Filed: 04/04/2017 Entry ID: 4519884

she now believes should have been her defense strategy. At trial, counsel presented a first phase NGRI defense based on a theory that Movant suffered from pseudocyesis, which caused her to go into a delusional and dissociative state. (*See generally* Trial Tr. 2065-2439). Movant now argues trial counsel should not have presented an NGRI defense and should have focused solely on mitigation evidence for the penalty phase. Movant contends the experts her habeas counsel located were better suited for this trial strategy.

However, as thoroughly discussed above, trial counsel's decision to move forward with an NGRI defense centered on pseudocyesis and continue the theme of her obsession with pregnancy through the penalty phase was a reasonable trial strategy, and thus, virtually unchallengeable. *See Weaver v. United States*, 793 F.3d 857, 860 (8th Cir. 2015). The experts Movant presented at the evidentiary hearing as examples of who should have been used at trial would not have supported the pseudocyesis diagnosis and would have overlapped with testimony presented by other experts. *See Hall v. Luebbers*, 296 F.3d 685, 693 (8th Cir. 2002) ("[F]ailure to present cumulative evidence is neither contrary to nor an unreasonable application of the governing principles found in *Strickland*."). Those experts are Jan Vogelsang, a clinical social worker who conducts biopsychosocial investigations; Dr. Charles Sanislow, a clinical neuropsychologist; Dr. Kate Porterfield, a clinical psychologist specializing in trauma associated with torture and sex crimes; Dr. George Woods, a clinical psychiatrist with a focus in psychopharmacology; and Dr. Siddhartha Nadkarni, an expert in epilepsy, neurology, and psychiatry.

Movant's habeas counsel enlisted Jan Vogelsang to complete a biopsychosocial history of Movant and prepare a presentation based on information gathered that could have been presented during the trial. Movant asserts that an expert like Vogelsang was necessary to

summarize Movant's history for the jury. While the Court did not allow Vogelsang to make a complete presentation of the information she compiled, the Court did listen to a sampling of her testimony for approximately two and a half hours and has reviewed all of the evidence submitted under Movant Exhibit 1 and accompanying attachments 1-1 through 1-293 along with the PowerPoint slides admitted into evidence as Movant Exhibit 154.

Vogelsang admitted that nearly all of the evidence included in her biopsychosocial history and accompanying attachments and PowerPoint presentation came from trial counsel's database. The vast majority of this evidence was presented at trial through lay witnesses and Drs. Kuncel and Logan. Some evidence in the database was statements from Movant's mother and ex-husband, which trial counsel deemed unreliable and made a strategic choice not to present. And some evidence was not available at the time of trial, specifically Movant's alleged sexual abuse by friends of her step-father, Jack Kleiner, and alleged sex trafficking of Movant by her mother, all during her teenage years.

Nonetheless, Vogelsang believes the evidence was not presented in an appropriate manner and should have been presented in a way similar to her PowerPoint presentation. However, a review of Vogelsang's PowerPoint presentation reveals its contents are riddled with issues. For example, Vogelsang represents that numerous individuals in Movant's family suffer from mental impairments, citing to various attachments to the biopsychosocial history she completed. Most of these purported impairments are solely supported by the individual's statement they suffer from an impairment without stating they have a diagnosis and without medical records to confirm a diagnosis. Two specific examples follow. First, Movant's father, John Patterson, stated he suffered from depression and indicated he had some anxiety, but nowhere in his declaration did he state he was diagnosed with either condition. (Movant Ex. 1-

6). Second, Movant's aunt, Mary Lee Coleman, claims she was diagnosed with depression and treated with the drug Zoloft. However, the medical records contain no diagnosis of depression or any reference to Zoloft. (Movant Ex. 1-10). While the Court does not recount all of the discrepancies it found when comparing Vogelsang's PowerPoint presentation with the documents supposedly supporting the statements therein, suffice it to say the Court would have excluded any testimony from Vogelsang found unreliable or cumulative.

Dr. Sanislow testified at the evidentiary hearing regarding his background with Minnesota Multiphastic Personality Inventory ("MMPI") testing and to rebut Dr. Martell's conclusions that Movant exaggerated her symptoms when taking the MMPI, which is referred to as malingering. Dr. Sanislow also testified regarding the difference between clinical and forensic psychologists and the different standards for reports. He acknowledged that he is a clinical practitioner while Dr. Martell is a forensic psychologist. Dr. Sanislow's testimony generally mimicked testimony given by Dr. Kuncel at trial. At trial, Dr. Kuncel challenged Dr. Martell's conclusions regarding malingering by explaining her opinion on the MMPI testing protocol and the results of Movant's MMPI tests.

Dr. Kate Porterfield, a clinical psychologist, testified regarding childhood development and how trauma, like that suffered by Movant, affects development. Dr. Porterfield began meeting with Movant in 2016 and diagnosed her with Complex PTSD, a diagnosis not recognized in the DSM-IV. She also explained the adverse childhood experiences ("ACEs") tool, noting that Movant had nine out of ten risk factors on the ACEs scale. Additionally, Dr. Porterfield discussed Movant's dissociation and ability to parent. While not framed in the same way as Dr. Porterfield's testimony, Drs. Logan's and Kuncel's testimony at trial contained many of the same themes.

Dr. Porterfield was also very critical of the Government's trial experts, Drs. Martell's and Dietz's testimony which supposedly indicated that the sex between Movant and Jack Kleiner was consensual. However, the transcript shows that was not their opinions—they were merely reporting what Judy Shaughnessy had told them. (Trial Tr. 2477-79, 2567, 2697, 2700-01).

Dr. George Woods, a clinical psychiatrist with a focus in psychopharmacology, testified regarding Movant's mental capacity at the time of the offense and during trial, her neurobehavioral history, and the impact of her medications before and during trial. He testified that Movant has brain and mental impairments, which were present at the time of the offense. He further testified that she did not have the capacity to appreciate the wrongfulness of her actions and her ability to conform her conduct to the expectations of the law was impaired. He does not believe adequate forensic assessments were done prior to trial and that her clinical treatment undermined her ability to assist counsel. However, Dr. Woods testified he has only met with Movant four times, twice in 2013 and twice in 2016, long after the crime and trial. Although based on different reasoning, Dr. Woods's ultimate conclusions regarding her capacity to appreciate the wrongfulness of her conduct due to a mental disease or defect at the time of the offense mimic those of Drs. Ramachandran and Logan. But unlike Dr. Woods's position, Drs. Ramachandran and Logan testified consistent with Movant's trial strategy.

Dr. Woods also testified concerning the impact of medications on demeanor and affect. He believes the medications Movant was taking during trial masked her symptoms and their severity and created a false impression of her emotional state. However, as discussed in Section III(B), the Court does not find his testimony persuasive given that he was not witness to Movant's actions and behaviors before and during the trial.

Dr. Siddhartha Nadkarni is an expert in epilepsy, neurology, and psychiatry. Dr. Nadkarni performed a neurological examination on Movant and found deficits indicating she has epilepsy. Epilepsy causes seizures. Seizures can take many forms beside convulsions, including a psychotic experience; the ability to retain awareness but smell something strange; an out of body experience; a loss of time; or dissociation. Dr. Nadkarni believes Movant suffers from seizures that could explain some of her symptoms. While trial counsel had no expert witness testifying that Movant had epilepsy, they did attempt to introduce evidence regarding brain damage. The Court's exclusion of this evidence was deemed harmless error or was within the Court's discretion. *Montgomery*, 635 F.3d at 1090. Moreover, Dr. Nadkarni's diagnosis of epilepsy stands alone against all other diagnoses of Movant, and does not fit into either trial counsel's theme or habeas counsel's proposed theme.

"The fact that a later expert, usually presented at habeas, renders an opinion that would have been more helpful to the defendant's case does not show that counsel was ineffective for failing to find and present that expert." *Marcrum*, 509 F.3d at 511; *United States v. Davis*, 406 F.3d 505, 509-510 (8th Cir. 2005). Movant's trial counsel made a strategic decision as to how the case would proceed and hired experts in accordance with that strategy. *See Forrest v. Steele*, 764 F.3d 848, 858-59 (8th Cir. 2014) (finding trial counsel's decision to hire experts and pursue trial defense strategy was not ineffective, though habeas evidence showed counsel could have hired other experts and pursued different strategy). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choice' that, when made 'after thorough investigation of the law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, --U.S.--,

134 S. Ct 1081, 1089 (2014) (alterations omitted) (quoting *Strickland*, 466 U.S. at 690).[19] Because Movant presented expert testimony at trial consistent with the trial strategy and, in many ways, consistent with the proposed testimony presented during the evidentiary hearing, Movant's trial team was operating within the broad latitude of constitutionally reasonable professional assistance and was not ineffective for failure to hire competent mental and neurological experts.

***iii. Subground 2: Failure to Conduct Appropriate Mitigation Investigation***

Movant next argues that her defense team was ineffective for failure to conduct a mitigation investigation that complied with the ABA Guidelines and prevailing professional norms. (2255 Mtn, p. 136-44). Movant specifically alleges that trial counsel had a complete lack of understanding of the importance of a mitigation investigation and that trial counsel completely failed to conduct a mitigation investigation in compliance with ABA Guidelines. (*Id.* at pp. 136, 141).

The Supreme Court has never adopted a bright-line rule to determine what constitutes a constitutionally sufficient mitigation investigation. To be sure, the Supreme Court has held that each ineffectiveness claim must be viewed under the facts and circumstances of the particular case. *Strickland*, 466 U.S. at 688-89. However, some Supreme Court cases do serve as guideposts on this specific ineffective assistance claim. Trial counsel was found ineffective when the defendant's mitigation investigation began only a week before trial. *See Williams*, 529 U.S. at 395. Likewise, the Supreme Court found trial counsel ineffective for failing to broaden the scope of an investigation beyond merely the defendant's presentence investigation report and Department of Social Services report. *See Wiggins*, 539 U.S. at 524. The Court also found trial

[19] As discussed in the following next subsection, the investigation conducted by the defense team was constitutionally sufficient.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 44 of 139
March 31 2017 p149
Appellate Case: 17-1716 Page: 149 Date Filed: 04/04/2017 Entry ID: 4519884

counsel ineffective for failing to consult defendant's prior conviction file, when that file "was a public document, readily available for the asking at the very courthouse [the defendant] was to be tried." *Rompilla*, 545 U.S. at 383-84. On the other hand, the Supreme Court has refused to find trial counsel ineffective when extensive evidence has been uncovered and presented, but the defendant later objects to various aspects of counsel's presentation. *Van Hook*, 558 U.S. at 10. As discussed *infra*, Movant's trial counsel's performance more closely mirrors the representation received in *Van Hook* and clearly exceeded the level of investigatory diligence exercised in *Rompilla*, *Williams*, and *Wiggins*.

Regarding Movant's contention that trial counsel did not understand the importance of mitigation investigation, testimony from the evidentiary hearing refutes this. While prior iterations of the defense team may have struggled with understanding the concept of mitigation, all three of Movant's trial attorneys testified that they understood the importance of mitigation evidence in a capital case. From Anita Burns on, every defense attorney ensured there was at least one mitigation specialist on the team, showing they understood the importance of mitigation. The mitigation specialists may have felt slighted by certain attorneys at certain times, but the fact remains that the evidence they gathered was used at Movant's trial in an attempt to save her life. While Duchardt did testify that he feels the title of "mitigation specialist" is an overly broad term, he recognizes the importance of investigating a defendant's life history and uncovering as much reliable mitigating evidence as possible. Even Movant's own expert witness on mitigation investigations, Russell Stetler, admitted that Duchardt is not skeptical of mitigation.

Movant also contends the mitigation investigation failed to meet the standards laid out in the ABA Guidelines. However, as noted above, the ABA Guidelines are not controlling. *See*,



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 45 of 139
March 31 2017 p150
Appellate Case: 17-1716 Page: 150 Date Filed: 04/04/2017 Entry ID: 4519884

*e.g.*, *Sinisterra*, 600 F.3d at 908. Rather, they "are guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. Accordingly, the Court views the ABA Guidelines as evidence of the prevailing professional norms. *See Wiggins*, 539 U.S. at 524-25; *Williams*, 529 U.S. at 396.

ABA Guideline 4.1(A) provides that a capital defense team should include no fewer than two lawyers, an investigator, and a mitigation specialist and that at least one of these team members should be qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments. ABA Guideline 4.1. At the evidentiary hearing, Movant presented Russell Stetler, National Mitigation Coordinator for the Federal Death Penalty Resource Counsel Project and Habeas Assistance and Training Counsel Project, and Marc Bookman, Director of the Atlantic Center for Capital Representation, as experts on the ABA Guidelines and prevailing professional norms in capital defense representation. While some iterations of Movant's defense team arguably did not meet the standard set out in ABA Guideline 4.1(A), Stetler admitted that Movant's trial team met it on paper. Movant's trial team had three lawyers (O'Connor, Duchardt, and Owen), two investigators (Ninemire and Moss), one mitigation specialist (Waller), one paralegal (Elliott), and one computer forensics specialist (Schnack), with Duchardt and Waller having training and/or experience with mental health issues. The composition of the trial team not only met the guideline, but exceeded it.

Under ABA Guideline 5.1, defense counsel should demonstrate several important skills, including the ability to investigate, prepare, and present evidence bearing upon mental status and mitigating evidence. *Id.* at Guideline 5.1. The ABA Guidelines provide that the attorney designated as "lead counsel" bears overall responsibility for the performance of the defense team and is charged with selecting the mitigation specialist, fact investigator, and any other members needed to provide high quality representation. *Id.* at Guideline 10.4.

All iterations of Movant's defense team met this standard. The record is replete with examples of counsel's ability to investigate, prepare, and present mental health and mitigating evidence. This is not a situation where counsel began the mitigation investigation a mere week before trial. *See Williams*, 529 U.S. at 395-96; *see also Van Hook*, 558 U.S. at 18. Investigation into Movant's mental status and mitigating evidence began within days of her arrest. While Movant's case was in its infancy in the District of Kansas, the Federal Public Defender for the District of Kansas engaged Bret Dillingham, a trial consultant and licensed social worker, to perform what he called a "mitigation triage assessment." Upon transfer of the case, the Federal Public Defender for the Western District of Missouri ("FPD") promptly hired Lisa Rickert as the mitigation specialist in early 2005. The early teams focused mainly on gathering mitigation evidence for use during the penalty phase. The defense team also had two fact investigators, Ron Ninemire and Phillip Thompson, aiding Rickert in the collection of evidence.

In July 2005, Debra Garvey, a mitigation specialist in the capital habeas unit of the Federal Public Defender for the Central District of California, joined Movant's defense team to aid in document collection. David Freedman, a trial consultant on mental health issues, also joined the team at this time. He helped the local team understand Movant's underlying mental illnesses and began investigating possible mitigation defense theories, including pseudocyesis, and the possibility of a co-conspirator. Additionally, Judy Clarke, Resource Counsel for the Federal Death Penalty Projects and Assistant Public Defender with the San Diego Federal Defenders, began consulting on the case and eventually was admitted *pro hac vice* to represent Movant to, among other duties, further develop the mental health and mitigation presentation.

Holly Jackson replaced Rickert as mitigation specialist in August 2005. Prior to her departure, Rickert had interviewed between 25 and 30 individuals. Jackson continued

interviewing and collecting mitigation evidence. The FPD hired Stephanie Elliott as a paralegal on Movant's case to organize all documents collected and distribute them to the other team members. Document collection appears to have increased with the addition of Garvey, Jackson, and Elliott to the team.[20]

In April and May 2006, a nearly complete turnover of the team occurred. Only Owen, Ninemire, and Elliott remained on the case. The Court appointed John O'Connor as learned and lead counsel and Fred Duchardt as additional counsel to address the mental health aspects of the case. O'Connor brought with him his investigator, Thomas Moss, to the team. Shortly after their appointment, the FPD hired Dani Waller as a mitigation specialist to replace Holly Jackson. Movant's defense team was therefore comprised of O'Connor, Duchardt, and Owen as counsel, Waller as mitigation specialist, Ninemire and Moss as investigators, and Elliott as paralegal. Troy Schnack, the FPD's computer system administrator, also joined the team to help with the computer forensics aspect of the case.

Owen, Ninemire, and Elliott shared the information gathered by the previous teams with all of the new team members. Elliott believed that most of the documents had been collected by this point in time. Hunt also shared a database of information with Duchardt and discussed outstanding discovery issues with him. The newly composed team then picked up where the

[20] Movant attributes this increase in document collection to Garvey alone and presented a bar-graph to show the number of exhibits collected after Garvey joined the team in July 2005. (*See* Movant Ex. 101). The graph shows a significant spike for the time period of October 5, 2005 through April 19, 2006. (*Id.*). However, this bar represents a six-month period as compared to the bars representing significantly shorter time periods for as little as three days during which far fewer documents were collected. (*Id.*). Moreover, the vertical axis does not provide a unit of measurement (*i.e.* number of pages or number of documents). And Movant provided no explanation of the graph during the hearing. At best, the graph was poorly crafted and explained to the Court. At worst, it was a misrepresentation intended to mislead the Court. In either event, the Court finds no evidentiary value in it.

prior team left off. They culled through the voluminous documents collected by the prior teams and determined what information still needed to be gathered.

The team decided Duchardt would take the lead on the mental health and mitigation presentation. Waller was to continue collecting mitigation evidence, which Elliott distributed to Duchardt and the rest of the team. Of important note, Waller identified and located Movant's half-sister, Diane Mattingly, so she could testify regarding Movant's life from birth to approximately four years old. Waller is attributed with identifying Dr. Ruth Kuncel as an expert witness. She also interviewed Movant's cousin, David Kidwell, who stated Movant had told him "that sometimes Jack [Movant's step-father] would come home drunk with his friends and make her perform sexually with them." (Movant Ex. 1-283, p. 2). Although the statement could have led to additional mitigating evidence, the team was unable to corroborate it through Jack Kleiner or Movant herself. This was objectively reasonable as trial counsel only limited the scope of the investigation after reasonable diligence to corroborate Kidwell's statement. *See Strickland*, 466 U.S. at 690-91; *see also Weaver*, 793 F.3d at 860-62 (determining attorney reasonably investigated potential witnesses' testimony on his client's behalf).

Other team members assisted in gathering mitigation evidence. O'Connor interviewed Leona Hayes, an eyewitness, regarding the possibility of a co-conspirator, which could have been a mitigating factor. Owen retained the primary relationship with Judy Shaughnessy, Movant's mother, who he felt could provide important mitigating evidence regarding her background. Duchardt worked with Movant to find out more about her past and even went to the extent to involve his wife, Ryland, to gain trust and confidence with Movant. Duchardt also engaged experts to aid in both the guilt and penalty phases of the trial.

The record reveals O'Connor, Duchardt, and Owen prepared and presented at trial the reliable mental health and mitigating evidence gathered through the team's thorough investigation. In short, defense counsel exhibited the skills outlined in ABA Guideline 5.1. Both Hunt and O'Connor, as "lead" counsel, ensured Movant had high quality representation by the team of lawyers, investigators, mitigation specialists, and other professionals on the team in accordance with ABA Guideline 10.4.

Pursuant to ABA Guideline 10.7, defense counsel is expected to fully investigate evidence regarding the client's guilt and potential penalties regardless of the client's wishes or statements to the contrary. ABA Guideline 10.7. The ABA Guidelines also provide that, when preparing a mitigation case, counsel should consider the following: testimony and evidence relating to the client's life and development; expert and lay witnesses along with supporting documentation to provide medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state; evidence on the impact of client's execution on client's family and loved ones; and evidence humanizing the client in a positive light. *Id.* at Guideline 10.11. Before presenting such evidence, counsel should consider whether the evidence opens the door for the government to present aggravating evidence which would be otherwise inadmissible. *Id.* If a legal claim opens the client up to interviews by government witnesses, counsel should consider if any appropriate legal challenges to the interviews and any legal or strategic issues implicated by the client's cooperation or non-cooperation. *Id.* Further, counsel must ensure that the client understands the significance of any statements made during the interviews. *Id.*

Movant's trial team substantially satisfied each of these guidelines. At the evidentiary hearing, O'Connor testified that Movant never placed any restrictions on the team's ability to

investigate the crime or her past. There is little question that Movant's defense teams fully explored her culpability in the crime by trying to determine if there was a co-conspirator and who it might be. It is equally apparent that her defense teams spent years gathering mitigating evidence which might impact on Movant's sentence.

Testimony at the evidentiary hearing further established that trial counsel considered Movant's turbulent childhood and the physical and sexual abuse she endured as a child. Counsel called both expert and lay witnesses to describe her mental and emotional state at various times in her life. Such testimony was often bolstered by documentation, particularly the testing done by Dr. Kuncel. Movant's children, half-sister, and biological father all testified as to the impact Movant's execution would have on them. Counsel attempted to show that Movant was a loving and caring mother despite her faults in order to humanize her and because that was how Movant wanted to be portrayed. Counsel testified at the evidentiary hearing that all of these tactical decisions were made in light of the Government's evidence. O'Connor and Duchardt also discussed how they reached the determination to proceed with an NGRI defense, weighing both the benefits and pitfalls of such approach. Particularly, trial counsel was aware that pleading the NGRI defense would open Movant to examination by the Government's experts, but made the calculated decision to proceed with the defense based on the totality of the evidence. Movant presented no evidence at the evidentiary hearing showing she did not understand the significance of any statements she made to the Government or their experts. Consequently, trial counsel complied with ABA Guideline 10.11.

Despite this, Stetler stated trial counsel did not meet these standards. Stetler testified that he did not believe the mitigation investigation performed in Movant's case complied with the prevailing professional norms due to the team turnover causing trust issues with the client; the



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 51 of 139 March 31 2017 p156
Appellate Case: 17-1716 Page: 156 Date Filed: 04/04/2017 Entry ID: 4519884

number of people involved; the gender composition of the team; use of multiple interviewers resulting in witness fatigue; failure to keep institutional memory; failure to follow up on "red flags"; the lack of biopsychosocial history narrative; and a lawyer also serving as a mitigation specialist. Stetler seems to be setting a much higher standard for capital defense attorneys than contemplated by the ABA Guidelines, let alone the Supreme Court. Nothing in the ABA Guidelines creates such detailed standards. And some of these alleged deficiencies were not within the control of the ultimate trial team, such as prior team turnover.

Bookman opined that defense counsel did not properly follow up on certain leads and that the trial team did not make a reasonable strategic decision by pursuing the pseudocyesis defense theory because the theory was not fully investigated and discussed. The evidence adduced at the evidentiary hearing refuted Bookman's opinion that counsel did not follow up on leads. In particular, Owen and Ninemire followed up with Jack Kleiner and Movant on David Kidwell's statement that she was sexually abused by Jack's friends, but neither provided any corroborating evidence. Bookman is correct that counsel must make a reasonably complete investigation of the law and facts relevant to counsel's client. *See Strickland*, 466 U.S. at 691. But, as discussed above, trial counsel did fully investigate and discuss the use of pseudocyesis as the basis for an NGRI defense before deciding to move forward with it. This strategic choice is virtually unchallengeable. *See id.*

"This is not a case in which defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained." *Van Hook*, 558 U.S. at 11 (citing *Wiggins*, 539 U.S. at 525; *Rompilla*¸ 545 U.S. at 389-393). This is a circumstance where *years* of pretrial investigation yielded a wealth of evidence relating to Movant's particular circumstances and

potential conditions. *Compare with Wiggins*, 539 U.S. at 524 (finding counsel ineffective when "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of [the defendant's] history from a narrow range of sources"). Movant's trial counsel conducted a mitigation investigation that complied with prevailing professional norms at the time of her trial. Movant was not prejudiced by any alleged failure of trial counsel to do so. Movant's second claim of ineffectiveness of counsel is denied.

***iv. Subground 3: Failure to Function as a Cohesive Team***

Movant next alleges trial counsel was ineffective because the defense team did not function as a cohesive unit. (2255 Mtn, pp. 144-46). She argues that her team was adversely affected by personnel turnover, as well as Duchardt's decision on how to assign tasks to members of the trial team. (*Id.*). Movant expanded on this argument at the evidentiary hearing, presenting testimony relating to team meetings and institutional knowledge. She also alleges the gender composition of the team was inappropriate.

First, the Court notes that Movant supports her rather novel assertions with no citations to the law, only a citation to the declaration of Denise LeBoeuf (Movant Ex. 50), an experienced capital defense lawyer. The Court is unaware of any legal requirement governing the internal workings of a capital defense team. The 2003 ABA Guidelines are silent to this respect, only stating that the lead attorney has a duty to oversee the performance of the defense team. ABA Guideline 10.4(B). But the ABA Guidelines do contemplate defense team turnover in Guideline 10.13. Additionally, Movant contends many of the purported problems with the trial team fall at the feet of attorney Fred Duchardt. While Duchardt may have presented a larger portion of Movant's case at trial than John O'Connor or David Owen, he was not appointed as lead



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 53 of 139
March 21 2017 p158
Appellate Case: 17-1716 Page: 158 Date Filed: 04/04/2017 Entry ID: 4519884

attorney. O'Connor held that designation. Thus, Movant's accusations are unsupported by law and, in many instances, misplaced.

Movant presented extensive testimony about the team's membership turnover between Movant's arrest and trial. She had at least five distinct combinations of attorneys: (1) Charles Demond and Ron Wurtz; (2) Anita Burns and Susan Hunt; (3) Susan Hunt and David Owen; (4) Susan Hunt, David Owen, and Judy Clarke; and (5) John O'Connor, Fred Duchardt, and David Owen. A significant amount of turnover also occurred among the non-attorney team members. Of note, three different mitigation specialists—Lisa Rickert, Holly Jackson, and Dani Waller—served on Movant's team at different times, interviewing witnesses. However, turnover is not uncommon, as Susan Hunt testified at the evidentiary hearing. Further, with the O'Connor/Duchardt/Owen trial team, the turnover issues ceased and the team worked together for over one-and-a-half years on Movant's behalf. Testimony at the evidentiary hearing showed that Movant's ultimate trial team was the most stable team of attorneys and non-attorneys she experienced in the process. While any trial team turnover is not ideal, the Court is unaware of any authority supporting the concept that turnover itself violates either *Strickland's* performance prong or prejudice prong. Indeed, such authority could lead to absurd results. If turnover did violate *Strickland*, then many capital defense teams could not provide effective assistance as turnover is not uncommon in death penalty cases. Further, Movant makes no argument how she was prejudiced. Movant did not receive ineffective assistance of counsel based on the turnover in her defense team.

Movant next argues that Duchardt was ineffective for dividing the labor in the manner he chose. (2255 Mtn, pp. 145-46). This argument fails for multiple reasons. First, testimony at the evidentiary hearing established that the three attorneys collectively decided to divide the labor as



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 54 of 131 March 2017 p159
Appellate Case: 17-1716 Page: 159 Date Filed: 04/04/2017 Entry ID: 4519884

follows: O'Connor would handle guilt/innocence evidence; Duchardt would handle mental health and mitigation aspects; and Owen would handle the computer forensics. Next, as noted above, Duchardt was not lead counsel; O'Connor was. Thus, the responsibility for overseeing the work and determining whether work was appropriately divided fell on O'Connor. Lastly, it is not deficient counsel for attorneys to divide tasks among themselves. *Link v. Leubbers*, 469 F.3d 1197, 1203 n.2 (8th Cir. 2006) (citing *Bucklew v. Luebbers*, 436 F.3d 1010, 1019 (8th Cir. 2006). In fact, it is quite common according to Hunt.

Movant additionally argues that her trial team lacked cohesion by failing to meet on a regular basis. A substantial amount of testimony at the evidentiary hearing compared the team meetings by the Hunt-led teams to the meetings held by the O'Connor-led team. Meetings of the Hunt-led teams were described as frequent, organized, and structured and lasted three to four hours. The Hunt-led teams used a to-do list to inform all team members of the progress on the case. The meetings supported a free-flow exchange of information and provided an opportunity to delegate tasks and build consensus. Among the topics discussed were Tommy Kleiner's possible involvement in the crime, pseudocyesis, and the use of Dr. Ramachandran.

In contrast, the O'Connor-led team did not hold lengthy meetings nor were the meetings as frequent. However, the team members communicated and exchanged information through various means in addition to meetings, such as by email, phone, or in person. Some team members viewed this to be a result of the fact that most of the documentation had been collected at this point. Duchardt, in particular, testified that he does not like to have meetings for the sake of having them and prefers to meet if there is something to accomplish. Otherwise, he will use the best form of communication for the situation.

Regardless of whether one team arguably communicated in a more desirable way than another, there is no requirement or guideline dictating how information must be communicated among team members. Even if the ABA Guidelines gave affirmative advice, "[a]ny such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689; *see also Strong v. Roper*, 737 F.3d 506, 520 (8th Cir. 2013). Absent the conclusory assertion that Duchardt should have communicated with and relied on the team more, Movant cannot demonstrate how she was prejudiced by his actions. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (stating that "conclusory allegations unsupported by specifics [are] subject to summary dismissal").

Next, Movant complains that institutional knowledge generated by prior counsel was not properly transmitted to new counsel and ultimately the trial team. In particular, Movant contends that the Hunt-led teams ruled out Tommy Kleiner as a possible co-conspirator; determined pseudocyesis, if used, should be a part of mitigation and not a first phase defense; and decided Dr. Ramachandran should not be used as an expert witness. Movant alleges that the trial team's failure to know this, along with the names of expert witnesses purportedly retained by Judy Clarke, demonstrates institutional knowledge was not properly passed between defense teams.

The ABA Guidelines lend some support that prevailing professional norms require prior counsel to share with successor counsel the client's files and potential areas of legal and factual research. *See* ABA Guideline 10.13. The evidence adduced at the evidentiary hearing demonstrates that the vast majority of institutional knowledge reached the O'Connor-led team. The trial team received the database of evidence gathered by the prior teams from both Stephanie Elliott and Susan Hunt. Duchardt spoke with Anita Burns, Hunt, and Clarke shortly after his

appointment to the case. While Clarke testified that she told Duchardt that two experts had been retained and Duchardt disputed this, Movant cannot show prejudice because the experts presented at trial were competent as discussed in Section III(A)(ii).

Moreover, it is not clear that the Hunt-led teams ruled out Tommy as a co-conspirator or decided against using Dr. Ramachandran or pseudocyesis in the first phase. Movant presented conflicting evidence on whether the Hunt-led teams had investigated and ruled out Tommy as a possible accomplice, or whether they had determined that Dr. Ramachandran should not be used as an expert witness. Holly Jackson and David Freedman both recalled that Tommy Kleiner had been ruled out as an accomplice and that this information had been shared with the team. However, Clarke stated that she could not firmly refute Tommy's presence at the scene of the crime following her removal from the case. Further, Erin Garman, Tommy's probation officer, testified that she has no record of Freedman, or any other defense team member from that time period, contacting her about Tommy's whereabouts on the date of the murder. Freedman also testified that he investigated pseudocyesis, determined it should be used during the mitigation presentation, and decided Dr. Ramachandran did not have the appropriate expertise for the case. Freedman believes he informed the team of these items. Freedman also said he probably recorded this on his chronology, but the chronology was not entered into evidence. Debra Garvey agreed with Freedman's recollection regarding pseudocyesis and Dr. Ramachandran. However, while Owen recalls these items being discussed, he does not recall any conclusions on the matters being presented to him. And Stephanie Elliott testified that the Hunt-led team had not ruled out Dr. Ramachandran as a witness.

Well over ten years has passed since any of these discussions would have taken place and memories have naturally faded. Thus, the Court determines the best evidence of what the Hunt-

led teams had accomplished and had been communicated to the entire team is the team's "to-do" list. (*See* Movant Ex. 57). The "to-do" list does not show that Tommy Kleiner had been ruled out as an accomplice, nor does it state that Dr. Ramachandran should not be used as an expert or that pseudocyesis should only be used in the penalty phase. (*Id.* at pp. 20, 24-25). Thus, the Court does not find Jackson's, Garvey's, and Freedman's testimony on these points credible.

Finally, Movant argues the gender composition of her team precluded it from functioning properly. Movant contends that, because she was a victim of sexual abuse, she was unable to trust men and fully disclose important mitigating evidence to her trial team. Movant argues that interviews conducted by only one man stunted her ability to trust the team.

It is true that her final trial team had no female attorneys and only two of the non-attorney team members—Dani Waller and Stephanie Elliott—were female. However, the testimony at trial established that all iterations of her defense team were sensitive to possible trust issues with men and did their best to compensate. Further, testimony established that Movant had trusting relationships with various men throughout her representation. Bret Dillingham, a licensed social worker who conducted the "mitigation triage" after Movant's arrest, testified that he interviewed Movant alone on four occasions and described Movant as fairly open and willing to discuss Jack Kleiner's sexual abuse of her during their first meeting. Lisa Rickert, the first mitigation specialist, noted that Movant had a good relationship with Ron Ninemire, one of the investigators. And Fred Duchardt, one of her trial attorneys, recognized Movant may have issues trusting men and therefore brought his wife, Ryland, to assist him when meeting with Movant.

Moreover, beyond speculation from expert witnesses, there was no testimony suggesting that any female attorney (*i.e.* Anita Burns, Susan Hunt, or Judy Clarke) actually had a better relationship with Movant than Duchardt on account of their gender. In fact, Susan Hunt herself

acknowledged that Movant had reservations with her even after over a year of representation. The three female attorneys had as much success as Duchardt in extracting information from Movant. The facts adduced at the evidentiary hearing simply do not substantiate the expert witnesses' speculation that Movant would have fewer trust issues, and therefore a better working relationship, with female attorneys.

In short, Movant's arguments that her trial team failed to act as a cohesive unit does not overcome the strong presumption that counsel's assistance was effective and the reason for approaching tasks as they did was for sound tactical reasons. *See Barnes v. Hammer*, 765 F.3d 810, 814-15 (8th Cir. 2014) (describing the presumption of effective assistance). Movant's third specific claim of ineffective assistance of counsel for failure to act as a cohesive team is denied.

***v. Subground 4: Involvement of Ryland Duchardt***

Movant alleges Duchardt was ineffective for bringing his wife, Ryland, to meetings with Movant. (2255 Mtn, pp. 146-50). Movant argues Duchardt did not keep his team adequately informed of his decision to bring his wife to meetings with Movant; that such actions violate the ABA Guidelines; and that such contact was generally inappropriate. (*Id.*).

Beginning in March 2007, Duchardt began taking Ryland with him to his meetings with Movant. Duchardt had been working with Movant for months to discover information to aid in her defense but Movant was reluctant to disclose her history. Duchardt understood that Movant had trust issues with men. Believing his wife was the best person to humanize Duchardt to Movant and show her he could be trusted, Duchardt made the strategic decision to bring Ryland with him to Philadelphia while Movant was there for Dr. Gur's testing. Duchardt admits this was an unusual move, but as O'Connor testified, sometimes unorthodox strategies are necessary when defending a capital case.

"It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 689). Counsel must be able to tailor defense strategy to any wide array of potential circumstances each case presents. *See Strickland*¸ 466 U.S. at 688. Here, Duchardt was faced with a client who was reluctant to disclose information that may be helpful to her case. He had to determine how to overcome Movant's reluctance and settled on utilizing his wife. Arguing merely that another strategy could have been pursued is not alone a test for whether trial counsel acted reasonably. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alterations in original) (stating "'[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way'" (quoting *Strickland*, 466 U.S. at 689)). "Surmounting *Strickland's* high bar is never an easy task." *Premo*, 562 U.S. at 122 (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Turning to Movant's more specific claims, the evidence adduced at the evidentiary hearing generally contradicted Movant's argument that the team was not informed of Ryland's involvement. John O'Connor could not recall if he knew about Ryland's involvement before she and Movant first interacted, but stated that he trusted Duchardt's judgment on the matter in any case. David Owen[21] and Troy Schnack testified that they did not know about Ryland's involvement until after the fact and were surprised by her presence at counsel table. While that may be true, within days of Ryland and Movant's first interaction, Duchardt sent a letter to the rest of the team which, among other things, informed the team of Ryland's involvement. (*See* Movant Ex. 157, p. 1). However, no one on the team objected to Ryland's involvement at that

[21] Movant relies heavily on Owen's account to attack Ryland's involvement in the case. Ironically, Owen is the same individual Movant also accuses of committing a fraud on the Court, which the Court deemed unfounded in its December 21, 2015 Order.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 60 of 131 March 31 2017 p165
Appellate Case: 17-1716 Page: 165 Date Filed: 04/04/2017 Entry ID: 4519884

time or at any other time until these habeas proceedings were initiated. Consequently, and to the extent relevant, the Court finds the team was adequately and timely apprised of Ryland's involvement.

Movant next cites to commentary in the 2003 ABA Guidelines to establish that the involvement of Ryland somehow violated prevailing professional norms. However, the commentary actually bolsters Duchardt's decision to bring in Ryland. The commentary provides:

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.

ABA Guideline 10.5 cmt. at 1008. Movant fails to consider that Duchardt including his wife in meetings with his client was a legitimate, pre-trial strategy to cope with a client that had been otherwise intermittently cooperative.

As previously mentioned, Duchardt understood Movant was reluctant to trust men and needed to find a way to foster Movant's trust in him. He believed Ryland was the best person to help him develop a trusting relationship with Movant. Duchardt testified that Movant did in fact begin to open up more after Ryland became involved. He stated that his first session with Ryland present was the most productive session he had ever had with Movant. O'Connor agreed that Ryland helped the team communicate with Movant and that Ryland had a good relationship with Movant.

Movant also argues that Ryland's presence was disruptive and generally unproductive. (2255 Mtn, p. 149). Notwithstanding the fact that the primary purpose of bringing Ryland with Duchardt to meet Movant was to establish and foster a trusting relationship, testimony from both



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 61 of 139 March 31 2017 p166
Appellate Case: 17-1716 Page: 166 Date Filed: 04/04/2017 Entry ID: 4519884

Duchardt and O'Connor establish that Ryland helped the team communicate with Movant. However, Owen testified that Movant showed an aversion to Ryland during the trial. But Owen did not share his concerns with O'Connor or Duchardt during the trial; he only complained to Schnack and Stephanie Elliott. O'Connor and Duchardt disagree with Owen's recollection. The Court recalls nothing to suggest there was a problem between Movant and Ryland during the trial and therefore gives more credence to O'Connor's and Duchardt's testimony on this fact.[22]

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 690. In this circumstance, Duchardt strategically decided to include Ryland in his interactions with Movant. Duchardt's purpose was to foster trust with Movant and to further develop a trial strategy. Duchardt based this decision on his observation that Movant was reluctant to establish a trusting relationship with her defense team – a relationship encouraged by prevailing professional norms of capital defense. *See* ABA Guideline 10.5. The Court does not find Duchardt's decision to include Ryland in his contact with Movant to be ineffective. Further, Movant fails to demonstrate how she was prejudiced by any such ineffectiveness. Movant's fourth claim of ineffective assistance of counsel is denied.

---

[22] In her remaining argument, Movant makes broad allegations that tangentially relate to the narrow issue of Duchardt's involvement of his wife in the mitigation process. (*Id.* at 147-49). These include the arguments that Duchardt should have managed his time and mitigation investigation differently and failed to employ women on the team. (*Id.*). These issues are more closely related to the analysis in other parts of this Order, respectively Sections III(A)(iii), III(A)(iv), and III(A)(ix).

Movant also asserted Duchardt was ineffective because he supposedly misrepresented Ryland's credentials on a visit to the Bureau of Prison's ("BOP") location in Carswell. Movant cannot establish she suffered any prejudice as a result of an alleged misrepresentation to the BOP.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 62 of 129 March 31 2017 p167
Appellate Case: 17-1716 Page: 167 Date Filed: 04/04/2017 Entry ID: 4519884

### *vi. Subground 5: Plea Negotiations/De-authorization*

Movant next argues that her trial team was ineffective because the team did not pursue plea negotiations with the Government. (2255 Mtn, pp. 150-52). The Government opposes, stating that a plea agreement was never an option and that defense trial counsel did in fact attempt to negotiate a life sentence. (Gov't Resp., pp. 83-84, 92).

Defendants enjoy a Sixth Amendment right to effective assistance of counsel during the plea bargaining process. *Padilla*, 559 U.S. at 373. Claims of ineffective assistance of counsel during the plea negotiation stage are subject to the same *Strickland* analysis as general claims of ineffectiveness. *See Missouri v. Frye*, 566 U.S. 133, 140 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)); *see also Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1104-05 (8th Cir. 2011) (applying *Strickland* analysis). Movant must demonstrate counsel's representation "fell below an objective standard of reasonableness" and that she was prejudiced by counsel's deficiency. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).

Testimony at the evidentiary hearing established that the Government must seek authorization from the Department of Justice ("DOJ") before pursuing the death penalty for any crime. Defense counsel is afforded the opportunity to persuade the DOJ to deny death penalty authorization by presenting mitigation evidence. Generally, the authorization hearing is conducted before a mitigation investigation is completed. In the present case, the DOJ authorized the use of the death penalty, due the relative severity of the underlying charges, while Movant was represented by Susan Hunt, David Owen, and Judy Clarke.

Movant correctly asserts that pursuit of a pre-authorization plea is generally one of a capital defendant's best opportunities to avoid a death sentence. Testimony at the evidentiary hearing yielded that only ten to twenty percent of death-authorized cases are decertified through

later efforts by defense counsel. As Clarke testified, a defendant must balance the benefit of pursuing a pre-authorization plea with the risk of presenting a mitigation theory that is underdeveloped, as an underdeveloped or "half-baked" theory might prejudice later plea negotiations. Movant makes the brief argument that a better-conducted mitigation investigation would have helped her avoid death penalty authorization. (2255 Mtn, p. 151). However, testimony at the evidentiary hearing established that Movant's then-defense team was in the middle of the mitigation investigation and had only an underdeveloped mitigation theory. Testimony also yielded that it is not unusual for death penalty authorization to occur before a mitigation investigation is complete. Clarke herself acknowledged that a defense team has no control over when the DOJ holds the authorization hearing. Consequently, Movant cannot demonstrate she was prejudiced by any vaguely-argued claim that relates to the rate at which counsel conducted the investigation. *See Strickland*, 466 U.S. at 693 (stating *Strickland's* requirement to demonstrate prejudice).[23]

Movant also argues the trial team's post-authorization efforts were ineffective. (2255 Mtn, p. 151-52). Movant argues that trial counsel failed to pursue any further plea negotiation, except for a letter to the Government the weekend before trial requesting reconsideration of the death penalty authorization. (*Id.*). The Government argues that trial counsel continued to pursue a plea with the Government after authorization and that any efforts at de-authorizing were futile. (Gov't Resp., p. 83).

The evidence established that it is very difficult to convince the Government, particularly in the Western District of Missouri, to de-authorize a case after the DOJ and the United States Attorney determines a charge warrants the pursuit of the death penalty. Again, only ten to

[23] To the extent that claim involves an attack on counsel's performance during the mitigation investigation, that claim is discussed above in Section III(A)(iii) and is without merit.

twenty percent of death-authorized cases nationwide are de-authorized through later efforts by defense counsel. None of the witnesses at the evidentiary hearing were familiar with a circumstance in which the United States Attorney for the Western District of Missouri decertified a previous decision to pursue the death penalty. O'Connor, Duchardt, and Owen all testified that they did not expect the Government to accept a plea deal for anything less than death in Movant's case.

Despite the likely futility of future attempts to negotiate a plea, trial counsel approached the Government with a plea offer on April 3, 2007. This offer was made in light of Movant's disclosure that her half-brother, Tommy Kleiner, had been with her at the time of the offense, which has since been disproven, and in light of the then-looming trial date of April 30, 2007. The Government refused to negotiate. Trial counsel made a final request to decertify Movant's case through a letter dated September 29, 2007. (Movant Ex. 139).

Movant argues that trial counsel's efforts were insufficient. (2255 Mtn, p. 151-52). "Bargaining is, by its nature, defined to a substantial degree by personal style. . . . [and] it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process." *Frye*, 566 U.S. at 145. "'The art of negotiation is at least as nuanced as the art of trial advocacy and it presents questions farther removed from immediate judicial supervision.'" *Id.* at 144-45 (quoting *Premo*, 562 U.S. at 125). "Defense counsel does not always have a duty to initiate plea negotiations." *Beans v. Black*, 757 F.2d 933, 936 (1985). Counsel is simply tasked with the duty to make reasonable decisions. *Strickland*, 466 U.S. at 691. Defense counsel has no duty to pursue futile attempts to negotiate a

plea when the Government has no similar interest. *Beans*, 757, F.2d at 936.[24] In the present case, the Government presented evidence that trial counsel pursued plea negotiations despite a prosecution that was entirely disinterested in such discussions. Trial counsel likely could have forgone this pursuit but continued as new mitigation themes surfaced in the investigation. This satisfies the objective standard of reasonableness contemplated by *Strickland*.

Further, Movant's claim fails the second prong of *Strickland* analysis. Movant must demonstrate not only that counsel provided objectively unreasonable assistance, but also the reasonable probability that counsel's assistance deprived her of a plea bargain offer from the Government that she would have accepted. *See Ramirez v. United States*, 751 F.3d 604, 608 (8th Cir. 2014) (requiring petitioner to show reasonable probability the government would have extended a plea off, in order to demonstrate prejudice); *see also United States v. Barth*, 488 F. Supp. 2d 874, 878 (D.N.D. 2007) (stating "[t]o establish actual prejudice, [Movant] must establish . . .that (1) the Government would have offered a plea bargain, and (2) [Movant] would have accepted such an offer . . ."). The record is clear; the Government had no interest negotiating a plea agreement that took death off the table. Because the Government refused to entertain such plea negotiations, Movant fails to show she was prejudiced by any alleged ineffective assistance of counsel during plea negotiations.

### ***vii. Subground 6: Misrepresentations & Failures During Pretrial Proceedings***

In Movant's sixth claim of ineffectiveness of counsel, she claims that trial counsel, Fred Duchardt, was ineffective for failure to request necessary continuances, making several misrepresentations to the Court, and prematurely announcing defenses the defense team intended

[24] Despite this clear law against her position, Movant persists, arguing trial counsel violated ABA Guideline 10.9.1, which charges defense counsel with an obligation to seek an agreed-upon disposition even if the government initially refuses to negotiate. ABA Guideline 10.9.1. Unlike the cited case law, the guidelines are not controlling and are treated accordingly.

to present. (2255 Mtn, pp. 152-62). Movant levels this claim solely against Duchardt and not O'Connor or Owen. (*Id.*). The Government opposes, arguing the evidence shows Movant's contentions are factually baseless, and that Movant fails to demonstrate prejudice under *Strickland*. (Gov't Resp., pp. 92-93).

Movant first claims defense counsel failed to make necessary requests for continuances before trial. (2255 Mtn, pp 152-62). Prior to Duchardt's appointment to the case, the trial was scheduled to begin on October 23, 2006. (Crim. Case, Doc. # 76). Shortly thereafter, Duchardt moved to continue the case and a continuance to April 30, 2007 was granted. (Crim. Case, Docs. ## 91, 93). In March and early April 2007, two defense theories emerged: the so-called "Tommy defense" and pseudocyesis. Movant had recently revealed to Duchardt that Tommy Kleiner, her half-brother, was with her at the time of the offense, and the defense team had just received a possible identification of Tommy by eyewitness Leona Hayes. (Movant Ex. 157, p. 4; Movant Ex. 158, 20-23).

At the same time, Duchardt was diligently working to meet the March 30, 2007 disclosure deadline for mental health defenses. Duchardt had concluded that "Dr. Ramachandran was far and away the most accomplished on the subject" of pseudocyesis. (Duchardt Statement, p. 55). However, Dr. Ramachandran was out of the country and unavailable during March 2007. (*Id.* at pp. 55-56). In Dr. Ramachandran's absence, Duchardt turned to Dr. William Logan to help him evaluate the issues in light of Movant's recent revelations. (*Id.*). Dr. Logan agreed to help, even under the time constraints. (*Id.* at p. 56). Then on April 1, 2007, Duchardt learned Dr. Ramachandran would return to the United States soon and had agreed to discuss Movant's case with him. (*Id.* at p. 57). During a telephone call on April 2, 2007, Duchardt provided Dr. Ramachandran a brief overview of Movant's history with false pregnancies, and Dr.

Ramachandran told Duchardt that it sounded like a possible case of pseudocyesis.[25] (*Id.*). Dr. Ramachandran agreed to examine Movant on a shortened time period in the event the trial date could not be moved. (*Id.*). Duchardt testified that he emailed some materials to Dr. Ramachandran on April 2, 2007 so he could begin his review and concurrently mailed other documents to him.

Pursuant to the Amended Scheduling and Trial Order then in effect, the relevant discovery deadlines were as follows: for defense expert witness—March 23, 2007; and for mental health experts and evidence—March 30, 2007. (Crim. Case, Docs. ## 95, 166). Because those dates had passed, the trial team knew they had to inform the Government and the Court of the new defense theories as soon as possible to ensure they could be used at the April 30, 2007 trial. John O'Connor approached the Court about the matter, and the Court promptly set a status conference. (Movant Ex. 58, 1).

The next day, on April 3, 2007, the Court held a status conference. (Crim. Case, Doc. # 201). The transcript of the conference reveals that Duchardt told the Court that the eyewitness identification was "tentative" and the Court was aware that Dr. Ramachandran's diagnosis of pseudocyesis was only "preliminary." (Movant Ex. 58, 4, 14-15). Dr. Logan's possible testimony was only briefly mentioned and the status of Dr. Logan's diagnosis was not discussed. (*Id.* at 4). However, the Court understood the pseudocyesis defense was in its infancy and that neither Dr. Ramachandran nor Dr. Logan was in a place to supply a report at that time. Based on Dr. Ramachandran's agreement to examine Movant and prepare a report before the April 30, 2007 trial date, Duchardt told the Court the defense could be ready in time for the trial. (*Id.* at

[25] Dr. Ramachandran does not recall the substance of the phone call. (Movant Ex. 36, 14-15). During his deposition, he testified that he would not give a medical opinion based on one phone call, but might state that a particular diagnosis may be in play based on the description given by the caller. (*Id.* at 8).

18). The Government, on the other hand, expressed concerns that their own experts would not have sufficient time to examine Movant and write reports to rebut the defense's experts. (*Id.* at 5, 7). The Court did not grant a continuance at that time. (*Id.* at 19).

Although Duchardt told the Court that the defense could be ready in time for trial on April 3, 2007, he filed a second motion for continuance on April 13, 2007. (Crim. Case, Doc. # 210). The Government joined in the request. (*Id.*). The Court granted the motion and continued the trial date to October 1, 2007. (Crim. Case, Doc. # 223). No more continuances were requested by or granted to either party. (*See* Crim. Case, Docket Sheet).

Contrary to Movant's argument, Duchardt did not fail to request continuances. In fact, by requesting the described continuances, Duchardt gained roughly one year of preparation time. (Crim. Case, Docs. ## 93, 223). However, a closer review of Movant's argument reveals she believes Duchardt should have requested the continuances sooner. This is a non-issue. Under *Strickland*, a movant must prove both ineffectiveness and prejudice. First, Movant cites no law, and the Court is unaware of any law, to support her contention that continuances must be sought during a certain time period. Thus, Duchardt was not ineffective for failing to seek a continuance sooner. Second, Movant cannot show prejudice. The case was ultimately continued, which allowed counsel time to fully develop the defense theories.

Next, beyond a fleeting reference in the last ten words of the subsection, Movant does not supply any real argument that trial counsel should have sought a continuance of the October 1, 2007 trial date. Even if such argument was advanced, it would fail. The trial team had fleshed out the pseudocyesis defense and mitigation evidence as discussed in Sections III(A)(i) and III(A)(iii) by the October 1, 2007 trial date and had determined that they would not move

forward with the Tommy defense after discovering his alibi. Based on the observations of the Court, the defense team was fully prepared to present its evidence to the jury on October 1, 2007.

Movant next contends that Duchardt made misrepresentations to the Court during the April 3, 2007 status conference. (2255 Mtn, pp. 152-61). Specifically, Movant contends that Duchardt lied to the Court when he advised that Dr. Ramachandran had diagnosed Movant with pseudocyesis. (*Id.*). At the evidentiary hearing, Movant additionally contended that Duchardt lied about Dr. Logan's diagnosis. Movant further alleges that these lies misled the Court about the progress her trial team was making in preparing her defense. (*Id.*). The Government opposes, arguing that no misrepresentations were made. (Gov't Resp., p. 93).

Movant's claim arises from the exchange between Duchardt and the Court during the April 3, 2007 pretrial conference, which is reproduced here:

> [Duchardt speaking] And the issue that has come to the fore because of everything is a diagnosis called pseudocyesis, p-s-e-u-d-o-y-e-s-i-s, and that will be a diagnosis that will impact upon the first phase defense in terms of mental disease or defect.
>
> THE COURT: Who is it that is giving you a preliminary diagnosis.
>
> MR. DUCHARDT: That is Dr. Ramachandran and also Dr. Logan.

(Movant Ex. 58, 4). The transcript is clear. The Court understood that any diagnosis from Drs. Ramachandran or Logan was merely preliminary. Duchardt did not misrepresent the status of those diagnoses or otherwise lie to the Court during the April 3, 2007 pretrial conference.

Movant further argues that Duchardt announcing pseudocyesis and the Tommy defense gave the Government a preview of Movant's intended defenses before the defenses could be thoroughly investigated. The argument that Movant was prejudiced by Duchardt's "preview" of the defenses is baseless. The Court had yet to grant a continuance and Duchardt was facing an



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 70 of 131 March 21 2017 p175
Appellate Case: 17-1716 Page: 175 Date Filed: 04/04/2017 Entry ID: 4519884

April 30, 2007 trial date. (Crim. Case, Doc. # 93). The disclosure deadlines had passed and Duchardt risked being barred from advancing the theories had he not disclosed them to the Court at the pretrial conference. *See* Fed. R. Crim. P. 16(d)(2)(C). Moreover, Duchardt and the rest of the defense team were attempting to use the theories as a basis for opening plea negotiations on the eve of the April 30, 2007 trial date. The culmination of these facts demonstrates that Duchardt was acting in an objectively reasonable manner given the circumstances at the time. *See Fretwell*, 506 U.S. at 371 (emphasizing that courts must view the challenged conduct in light of the circumstances and facts known at the time of counsel's conduct).

Movant's claims of ineffectiveness of counsel regarding Duchardt's performance at the April 3, 2007 pretrial conference have no merit. Movant fails to demonstrate how Duchardt's performance in regard to requesting continuances and informing the Court of intended defenses is objectively unreasonable assistance. *See Strickland*, 466 U.S. at 688. Further, even if counsel should have requested additional continuances or veiled his intended defense from the Court's inquiry, Movant cannot demonstrate how she was prejudiced by counsel's actions. *See id.* at 687. Failure, such as here, to demonstrate either deficient performance or prejudicial effect is fatal to an ineffective assistance of counsel claim. *Id.* Movant's sixth claim of ineffective assistance is without merit.

***viii. Subground 7: Duchardt's Purported Conflict of Interest***

Movant next argues that Duchardt was no longer acting as counsel for Movant during April 2007, as his performance at the April 3, 2007 pretrial conference created a conflict of interest in violation of *Cronic*. (2255 Mtn, p. 162). *Cronic* contemplates circumstances where counsel representation is so deficient that it justifies the presumption that counsel was ineffective under the Sixth Amendment. *Cronic*, 466 U.S. at 662. This presumption would render further



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 71 of 139 March 31 2017 p176
Appellate Case: 17-1716 Page: 176 Date Filed: 04/04/2017 Entry ID: 4519884

inquiry into counsel's performance unnecessary. *Id.* The Supreme Court has identified three narrow categories in which this presumption will arise: "(1) assistance of counsel has been denied completely, (2) 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,' or (3) counsel is denied during a critical stage of the proceedings." *Freeman*, 317 F.3d at 900 (quoting *Cronic*, 466 U.S. at 658-59).

Movant claims "[Duchardt] had put his own interest in appearing prepared for trial above the best interests of his client" in relation to the April 3, 2007 pretrial conference. (2255 Mtn, p. 162). Such an allegation would presumably implicate the third situation the *Cronic* presumption would apply. *See Freeman*, 317 F.3d at 900. Duchardt's representation at the April 3, 2007 pretrial conference was effective under the Sixth Amendment as discussed in Section III(A)(vii). Movant was not denied the assistance of counsel at any critical stage of the proceedings. Nor did Duchardt have any conflict of interest with Movant.

***ix. Subground 8: Failure to Maintain Appropriate Caseload***

Movant next alleges that Duchardt was ineffective for failing to maintain an appropriate caseload. (2255 Mtn, pp. 162-63). The ABA Guidelines provide that "[c]ounsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines." ABA Guideline 10.3. The commentary to Guideline 10.3 states:

> It is each attorney's duty under the Model Rules of Professional Conduct neither to accept employment when it would jeopardize the lawyer's ability to render competent representation nor to handle cases without "adequate preparation." Applying these professional norms to the special context of defense representation in death penalty cases, this Guideline mandates that attorneys maintain a workload consistent with the provision of high quality legal representation.

*Id.* at cmt. 997.

Movant's argument focuses on Duchardt's representation of John Phillip Street in the death penalty case captioned *United States v. Street*, No. 04-00298-01-CR-W-GAF ("*Street* Case"). Duchardt was appointed as Street's counsel in November 2004. (*Street* Case, Doc. # 10). Street's initial trial was held in July and August 2006, but ended in a mistrial. (*Street* Case, Docs. ## 322-23, 325, 329, 332, 336-37, 341-42, 345, 349-52, 354-56). Duchardt was forced to retry the case in November and December 2006. (*Street* Case, Doc. #406).[26] Movant argues that, as the result of Duchardt's representation in *Street*, he was not maintaining an appropriate caseload and was unable to devote the necessary time to Movant's defense. (Civ. Case, Doc. # 71, p. 163).

Duchardt was appointed to represent Movant in May 2006. (Crim. Case, Doc. # 87). At that time, her trial was scheduled to commence on October 23, 2006. (Crim. Case, Doc. # 72). Recognizing that he and O'Connor would need additional time to review the voluminous documents collected by prior counsel, research the myriad of legal issues existing in the case, and retain experts, notwithstanding Duchardt's duties to Street, he moved for a continuance of Movant's trial to April 30, 2007. (Crim. Case, Doc. # 91). The continuance was granted. Movant argues that the four months between the end of the *Street* retrial and her April 30, 2007 trial date was not enough time to mount an effective defense. (*Id*.).

The amount of time counsel spends on a case is not a court's sole line of inquiry when reviewing ineffective assistance of counsel claims. *Freeman v. Mabry*, 570 F.2d 813, 814 (8th Cir. 1978); *see also Cronic*, 466 U.S. at 663-66 (analyzing other relevant factors); *United States v. Clay*, 579 F.3d 919, 928 (8th Cir. 2009) (stating counsel was not presumptively ineffective when twenty-four volumes of transcripts and evidence were introduced one week before trial).

---

[26] Street was ultimately acquitted after Duchardt successfully appealed the jury's guilty verdict from the retrial in November and December 2006.

Despite the ABA Guidelines' vague suggestions, whether counsel's assistance complied with prevailing professional norms is evaluated through "context-dependent consideration of the challenged conduct." *Wiggins*, 539 U.S. at 523. In this circumstance, Duchardt was not acting alone. He had two co-counsels: John O'Connor and David Owen. Additionally, he had an entire team supporting him and his co-counsel on Movant's case, including two investigators, a mitigation specialist, a paralegal, and a computer forensics specialist.

Further, the context-dependent consideration commanded by *Wiggins* is conducted "from counsel's perspective at the time" of the challenged conduct. *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 689); *see also Escobedo v. Lund*, 760 F.3d 863, 872 (8th Cir. 2014) (finding context-specific analysis proper under *Strickland*). Duchardt had no reason to expect, when he accepted the appointment to represent Movant in May 2006, that *Street* would require a second trial. The Court fails to see how counsel's conduct, including counsel's request to continue that was filed in July 2006, demonstrates objectively unreasonable assistance under *Strickland* and its progeny given what counsel knew in July 2006.

Even assuming Duchardt's caseload management was objectively unreasonable, Movant fails to demonstrate how she was prejudiced by such deficiency. *See Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011) ("Failure to establish either *Strickland* prong is fatal to an ineffective-assistance claim."). Movant's argument regarding Duchardt's caseload focuses on the trial schedules for the *Street* case and Movant's case as the schedules stood in July 2006. (2255 Mtn, p. 163). Her argument fails to discuss the six-month continuance granted after the April 3, 2007 pretrial conference. (*See* Crim. Case, Doc. # 223). Even had Duchardt's efforts at managing his caseload between May 2006 and April 2007 been deficient, Movant did not go to

trial until October 2007. Movant demonstrates no prejudice regarding this claim, and thus her eighth specific claim of ineffective assistance of counsel is without merit.

***x. Subground 12: Jury Selection***

Movant next argues that trial counsel provided her ineffective assistance during jury selection. (2255 Mtn, pp. 170-178). Movant refers to trial counsel's performance during *voir dire* as "novice" and "abysmal," and argues that trial counsel "showed no skill in the area of capital defense jury selection . . . ." (*Id.* at 86).[27] The Government opposes, arguing that "[trial counsel] was an experienced, skilled trial attorney with many years of experience conducting *voir dire* examinations," and "[a]bsent some showing that a particular juror should have been struck for cause . . . claims concerning [trial counsel's] performance during *voir dire* is simply [] pointless . . . ." (Gov't Resp., p. 87).

"The Constitution . . . does not dictate a catechism for *voir dire*," but the Sixth Amendment guarantees a defendant an impartial jury, and part of that guarantee includes a right to adequate *voir dire*. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Adequate *voir dire* questioning identifies venire members that cannot fulfill the guarantees of the Sixth Amendment, and excludes those persons for cause. *See id.* at 735-36 (discussing disqualifying misconceptions held by potential jurors). Juror impartiality is presumed; the remote exceptions arise in extreme circumstances. *United States v. Blom*, 242 F.3d 799, 805 (8th Cir. 2001); *see also Smith v. Phillips*, 455 U.S. 209, 222 (1992) (O'Connor, J., concurring) (discussing possible circumstances); *Sanders v. Norris*, 529 F.3d 787, 791-93 (comparing Eighth Circuit cases regarding presumed biases). Ineffective assistance challenges to the adequacy of counsel's performance on *voir dire* are evaluated under *Strickland*. *See Sanders*, 529 F.3d at 790-91

---

[27] As shown by the review of these claims herein, these personal and extreme professional attacks on trial counsel are improper, inappropriate, and unfounded.

(applying cause and prejudice standard to ineffective assistance on *voir dire* claim); *see also White v. Dingle*, 757 F.3d 750, 754-55 (8th Cir. 2014) (same).

Movant argues that trial counsel did not exercise the necessary skill that is required of counsel for such a unique and public case. (2255 Mtn, p. 170). The Supreme Court has visited several situations involving cases of intense public scrutiny, though not necessarily in the context of an ineffectiveness claim. *See Skilling v. United States*, 561 U.S. 358, 385 (2010) (finding no presumption of juror prejudice, despite highly public nature of trial); *Mu'Min v. Virginia*, 500 U.S. 415, 431-32 (1991) (same); *but see Rideau v. Louisiana*, 373 U.S. 723, 725-26 (1963) (finding presumption of juror bias when defendant's confession was televised to community). In the present case, the jury questionnaires inquired into various news sources consumed by the potential jurors and gauged how much exposure the jurors had to Movant's case. (*See* Movant Ex. 162, pp. 9-10, 30, 33-35). The subject of pretrial publicity was revisited during *voir dire*. (Trial Tr. 61-67, 82-83, 338, 414). And Movant makes no specific argument relating to what trial counsel should have done differently. Trial judges are in the best position to determine the extent of the effect of pretrial publicity on the proceedings and may base that evaluation on their personal perception. *Skilling*, 561 U.S. at 386 (citing *Mu'Min*, 500 U.S. at 427). The Court finds any potential problem regarding pretrial publicity to have been thoroughly and fairly addressed in the jury questionnaire and during *voir dire*.

Movant further argues trial counsel failed to obtain important information about jurors which would have led to some jurors' exclusion because they were unwilling or unable to consider mitigation factors or a life sentence. (2255 Mtn, p. 86). She argues that trial counsel's failure to find this information resulted in the failure to strike for cause jurors whose views would have disqualified them from being empaneled. (*Id.*). To the contrary, the concept of

mitigation and aggravation factors was discussed with the potential jurors many times over the course of *voir dire*, by both the Court and the attorneys. (Trial Tr. 10-15, 86-125, 141-423 151, 156-60, 166-80, 183-89, 194-97, 204, 208-211, 222-226, 229-247, 251, 254, 263-73, 287-292, 360-62, 365-89, 397, 399, 405, 408, 410-13). The potential jurors were questioned at length regarding their ability to consider a life sentence. (*Id.* at 158-59, 170-80, 183-90, 196-97, 208-12, 214-16, 223, 229-47, 250-54, 263-74, 369-89, 400-01, 404-05, 408-413). In fact, trial counsel was ordered to limit his line of *voir dire* inquiry because he was being too intrusive with his questions. (*Id.* at 132, 195). Further, Movant does not identify such jurors that were struck or not struck due to counsel's alleged ineffectiveness. The Court finds no evidence of ineffective questioning regarding the venire's acceptance of mitigation and aggravation evidence, nor does the Court find the venire members were inadequately questioned regarding their ability to consider the alternative sentences of life and death.

Movant asserts that "Counsel Failed to Oppose the Removal of Jurors Whose Views on Capital Punishment Would Not Substantially Impair Their Ability to Serve" by citing to pages of the *voir dire* transcript but without explaining how the pages apply to her argument. (2255 Mtn, p. 178). Close scrutiny yields that Movant's general assertion misrepresents the record. Eighteen jurors were struck in the thirty-six pages of *voir dire* transcript that Movant cites in support of her assertion.[28] These jurors were struck for hardships or opinions that would impair their abilities to serve.[29] Trial counsel objected to the removal of venirepersons Kastl and

[28] Movant cites pages 77-78, 85-87, 103-104, 106, 126-27, 131-32, 135-36, 156, 163, 192-97, 200, 206, 219-221, 231, 356-57, 361-65, and 367 of the trial transcript.

[29] Venirepersons Crouch (#3), Newman (#9), Wright (#14), Lightle (#23), Simpson (#32), Leone (#37), Youngs (#39), Griffin (#50), Beckert (#69), Adams (#70), Butler (#76), De Leon (#77), Raines (#78), Kastl (#87), Randolph (#104), Redding (#117), Richardson (#118), and Murphy (#201).

Redding and was overruled. (Trial Tr. 77-78). Duchardt objected to venireperson Wright's removal and the Court granted him leave to further question the potential juror. (*Id.* at 127). Trial counsel withheld objection to the remaining potential jurors. (*Id.* at 163, 219). The Court determines the *voir dire* transcript reflects trial counsel's prudent use of objections throughout the process. Trial counsel's decisions were strategic and Movant "has not overcome the 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *See Huls v. Lockhart*, 958 F.2d 212, 215 (8th Cir. 1992) (quoting *Strickland*, 466 U.S. at 689).

Movant next contends trial counsel was ineffective for allowing the venire to hear various alleged misstatements of law during *voir dire*. (2255 Mtn, p. 178). Movant argues trial counsel allowed the venire to be misinformed on mitigation and aggravation factors, and was led to believe the responsibility for giving a death sentence was borne by someone other than the jury. (*Id.*). Movant cites to several pages in the *voir dire* transcript, but does not specifically argue either prong of *Strickland*'s cause and prejudice standard. *See Murray v Delo*, 767 F. Supp. 975, 980 (E.D. Mo. 1991) (applying *Strickland* analysis to alleged misstatement of law during *voir dire*). The record clearly shows the jury was correctly instructed on the law at various times, including during jury instructions. (12/21/2015 Order, pp. 43-57). It was not the case here, but even when there are misstatements of law during *voir dire* that are subsequently corrected by later instruction, the misstatements during *voir dire* constitute harmless errors. *Lingar v. Bowersox*, 176 F.3d 453, 460-461 (8th Cir. 1999); *see also Griffin v. Delo*, 33 F.3d 895, 906 (8th Cir. 1994). Further, Movant cannot demonstrate prejudice as she fails to identify how the jury composition would have changed had counsel corrected the alleged misstatements during *voir*

*dire*. *Murray*, 767 F. Supp. at 980; *see also White*, 307 F.3d at 728-29 (discussing the need to demonstrate prejudice).

Finally, Movant's ineffective assistance during jury selection claim discusses a wide range of constitutional guarantees, which relate to jury selection. (2255 Mtn, pp. 171-77). Such issues should generally be raised on direct appeal. *See Youngerman v. United States*, No. 94-2299EM, 56 F.3d 69 (Table) (8th Cir. May 17, 1995) (per curiam). To the extent Movant argues a deprivation of rights related to constitutional claims, but outside the context of an ineffective assistance claim, the Court concludes such claims are both insufficiently pled and procedurally barred. *Jennings v. United States*, 696 F.3d 759, 762-63 (8th Cir. 2012). "'Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.'" *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 624 (1998)).

***xi. Subground 16: Failure to Recognize Impact of Medications***

Movant next argues trial counsel was ineffective for failing to advise the jury that Movant was under the influence of medications during trial. (2255 Mtn, pp. 184-85). Such medications allegedly caused Movant to have a flat affect that could have been interpreted by the jury as evidence she lacked remorse. (*Id.*). The Government opposes, challenging the factual and legal basis for the requested relief. (Gov't Resp., pp. 111-12).

The Supreme Court has held that a prisoner has a cognizable Due Process interest in being free from involuntary administration of antipsychotic drugs, and the state cannot involuntarily treat a prisoner with antipsychotic drugs absent an overriding justification. *Riggins v. Nevada*, 504 U.S. 127, 133-34 (1992); *see also Washington v. Harper*, 494 U.S. 210, 221-22 (1990). Such liberty interest cannot be encroached upon unless the state demonstrates an important government interest, such as bringing an accused to trial. *Sell v. United States*, 539

U.S. 166, 180 (2003). Second, the state much show the involuntary administration will significantly further that important interest. *Id.* at 181. Finally, the court must find that the involuntary administration is necessary to further the important interest. *Id.* Application of this test assumes a scenario where a prisoner challenges the prospect of involuntary medication. *See id.* at 180 (contemplating *Harper* and *Riggins*, the Court states "[t]his standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances").

There is no allegation of involuntary administration of drugs in the present case, so *Riggins* itself does not provide Movant with a basis for relief. Movant fails to demonstrate either *Strickland* prong regarding any alleged failure of trial counsel to advise the jury she was under the influence of medication at trial. As discussed in Section (III)(B)(ii), Movant has failed to demonstrate her medications produced a flat affect at trial. It follows that trial counsel could not have been objectively unreasonable for failing to warn the jury of a flat affect that was not apparent. Similarly, Movant cannot have been prejudiced.

***xii. Subground 17: Failure to Prepare Defense Witnesses***

In her seventeenth claim of ineffective assistance of counsel, Movant asserts Fred Duchardt did not adequately prepare defense witnesses to testify at trial. (2255 Mtn, pp. 185-86). In her Motion, Movant asserts her children were not prepared to testify. (*Id.*). At the evidentiary hearing, Movant's argument expanded to include her sister, Diane Mattingly, Dr. Ruth Kuncel, and Dr. Linda McCandless.[30] Dr. McCandless's preparation was fully discussed in Section (III)(A)(i)(d).

[30] Movant may additionally be claiming that Dr. Ramachandran was not prepared, but Dr. Ramachandran stated he felt prepared. (Movant Ex. 36, 31)

*a. Movant's Children*

Duchardt maintained the primary relationship with Movant's children and believed they would testify that their mother was generally a loving and caring mother. Dani Waller had cautioned the team she had concerns that the children's testimony could raise instances when Movant was mean, allowing the Government to portray Movant as abusive and neglectful. (*See* Movant Ex. 130). And Duchardt was well aware of the possible pitfalls in using the children's testimony at trial. (*See* Duchardt Statement, pp. 90-93). Duchardt explained in his written statement that he spent substantial time with the children and fully understood their mixed feelings about their mother. (*Id.*). He testified at the evidentiary hearing he was also aware that accusations had been made against Movant that she was a neglectful parent. However, he made the strategic decision to have two of the children testify during the guilt phase regarding Movant's appearance, specifically that she appeared pregnant. (*Id.*). He also made the strategic decision to have the children testify during the penalty phase to show the impact a sentence of death would have on them. (*Id.*). With one exception—Movant's eldest daughter during the guilt phase—the children testified as Duchardt expected. (*Id.*). That exception did surprise him and he admits it is fair to say that portions of the eldest daughter's testimony went badly. (*Id.*).

As the Government points out in its Suggestions in Opposition, Duchardt had no control over the children's testimony or cross-examination. He only had control of the questions asked on direct. Duchardt cannot be held accountable for testimony that was not as favorable as he would have liked or expected after spending substantial time with the children. The trial team made the strategic decision to call the children as witnesses, in part, for the reasons cited above. As noted throughout this Order, strategic decisions made after a thorough investigation are virtually unchallengeable. *See Escobedo*, 760 F.3d at 869.

"Even assuming for the purposes of argument that [Duchardt's preparation of the children was deficient, the Court] must assess prejudice by 'reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence' to determine whether 'the result of the proceeding would have been different.'" *Purkey v. United States*, 729 F.3d 860, 866 (8th Cir. 2013) (second alteration in original) (quoting *Wiggins*, 539 U.S. at 534). The fact is that the jury found the Government had proven all aggravating factors, including the heinous nature of the crime. These "isolated examples of 'prejudicial' testimony" are "insignificant" compared to the overwhelming evidence of the heinous nature of the crime. *Id.*; *see also Hanegan v. Miller*, 663 F.3d 349, 354-56 (8th Cir. 2011), *cert. denied*, --U.S.--, 132 S. Ct. 2393 (2012) (assuming counsel's performance was deficient but denying habeas relief because petitioner failed to establish prejudice).

*b. Diane Mattingly*

Diane Mattingly is Movant's half-sister who was adopted by another family when Movant was only three. At the evidentiary hearing, Diane testified that she was first contacted by Dani Waller approximately one year before the trial. Waller and Ron Ninemire later visited her at her home in Kentucky. During the interview, Diane revealed that she endured physical abuse at the hands of Judy Shaughnessy, her step-mother and Movant's mother, and sexual abuse by Judy's friends as a young child. Diane met with Duchardt only once before she testified at trial. At this meeting, she also met Movant's husband for the first time and saw her biological father, John Patterson, for only the second time since she was a young child. She stated Duchardt did most of the talking. She does not recall if he went over the questions he would be asking her on the witness stand or anything about her sexual abuse. However, she did not ask any questions herself.

Diane, who is four years older than Movant, testified at the trial that she was like a mother to Movant by feeding, clothing, and protecting her. (Trial Tr. 2957-58). Diane described how Judy treated them and the moments when she was taken away from the home. (*Id.* at 2956-57). She described how Movant clung to her during a fight between Judy and one of Judy's boyfriends. (*Id.* at 2957). However, Diane did not discuss the times when she would be molested while Movant laid in a nearby bed. Diane described testifying at trial as overwhelming and terrifying.

Movant argues that Duchardt failed to properly prepare Diane for her testimony because he did not bring out the fact that Diane was molested while Movant, age three or younger, was in the room. However, Duchardt's examination of Diane did show that Movant's infancy and toddler years were tumultuous and abusive. It also served to impeach some of Judy's testimony regarding Diane's adoption. While the molestation evidence was not brought out at trial, it is "insignificant compared to the rest of the extensive case in mitigation." *Purkey*, 729 F.3d at 866. Moreover, in comparison to the heinous nature of the crime, it is unlikely such fact would have made any difference in the jury's determination. *See Van Hook*, 558 U.S. at 12 (finding no prejudice where "[the movant] has shown why the minor additional details the [fact finder] did not hear would have made any difference"); *Wong*, 558 U.S. at 22-23 (concluding that additional evidence of the defendant's "humanizing" features would not have affected the sentencing jury's decision).

*c. Dr. Ruth Kuncel*

Movant also claims Duchardt did not adequately prepare Dr. Ruth Kuncel. At the evidentiary hearing, Dr. Kuncel stated she did not feel that Duchardt had properly prepared her to testify at trial. She did not know how to address the pseudocyesis defense on cross-



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 83 of 131 March 21 2017 p188
Appellate Case: 17-1716 Page: 188 Date Filed: 04/04/2017 Entry ID: 4519884

examination and felt that Duchardt had not properly constructed his direct-examination in a way that provided her ammunition for the cross-examination. She believes Duchardt made her look bad on direct by not asking her the right questions. Duchardt, on the other hand, testified at the evidentiary hearing that he did not know Dr. Kuncel felt unprepared and wished that she had shared that with him.

Dr. Kuncel does agree that it was Duchardt's choice on what evidence to emphasize. Dr. Kuncel is correct; it is trial counsel's province to decide what questions to ask and what evidence to emphasize. *See Strickland*, 466 U.S. at 690-91 (concluding that strategic choices made after thorough investigation are virtually unchallengeable). On direct-examination, Dr. Kuncel presented extensive testimony about Movant's background and childhood and how certain events impacted her development. (Trial Tr. 3017-27). She then explained her diagnoses of PTSD, major depression, and general anxiety. (*Id.* at 3027-29). She did not diagnose Movant with pseudocyesis because she is not a physician and felt it was not within her expertise. (*Id.* at 3030). While she did not diagnose Movant with pseudocyesis, she did discuss how Movant's obsession with having children played a role in her coping strategies, thus tying Movant's first phase defense to her penalty phase mitigation presentation. (*Id.* at 3031-32). However, Dr. Kuncel testified during the penalty phase, and thus, her testimony was not designed to get an NGRI verdict, but rather to mitigate any aggravating factors to achieve a life sentence. In particular, Dr. Kuncel testified that Movant's capacity to appreciate the wrongfulness of her conduct and to conform her conduct to the requirement of the law was "very seriously impaired" at the time due to a severe mental or emotional disturbance. (*Id.* at 3030). Duchardt also allowed Dr. Kuncel to respond to some of the criticisms made by Dr. Martell about her testing protocol. (*Id.* at 3033-52).



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 84 of 129
March 31 2017 p189
Appellate Case: 17-1716 Page: 189 Date Filed: 04/04/2017 Entry ID: 4519884

A reading of the transcript shows that Dr. Kuncel's direct-examination went smoothly. (*Id.* at 3009-52). However, Dr. Kuncel's cross-examination did not go as well. Dr. Kuncel was often non-responsive and argumentative, and the Court admonished her to answer the questions as asked. (*Id.* at 3075, 3085-86). The Court specifically stated:

> If Mr. Duchardt believes that further explanation needs to be provided he will have an opportunity to question you about that again. You do not have to give a lengthy explanation to simple questions that are put to you. And I am instructing you to answer concisely and directly the questions that are provided to you and you need to understand that if the defendant's attorneys feel further explanation needs to be given they will have an opportunity to inquire of you in that regard.

(*Id.* at 3085-86). This passage reveals that the Court explained to Dr. Kuncel that Duchardt would clarify any issues raised on cross-examination. However, Dr. Kuncel's testimony continued to be somewhat evasive and argumentative. (*See generally id.* at 3087-3110). Additionally, Duchardt had no control over what questions were asked on cross-examination or how Dr. Kuncel answered them. On redirect, Duchardt rehabilitated Dr. Kuncel's testimony by allowing her to explain her answers to many of the issues raised during cross. (*Id.* at 3116-41). However, Duchardt did not ask her questions about pseudocyesis on redirect.

Dr. Kuncel is an experienced expert witness having worked on at least 40 capital cases. That she did not communicate to Duchardt that she felt unprepared is telling. It indicates that Dr. Kuncel was in fact prepared, but is having "buyer's remorse" based on the outcome of the trial. Dr. Kuncel was well aware that Drs. Ramachandran and Logan had diagnosed Movant with pseudocyesis. Duchardt helped her explain to the jury why she was not qualified to join in that diagnosis. Thus, it cannot be said that Duchardt's handling of and preparation for Dr. Kuncel's testimony regarding pseudocyesis was deficient.

However, even assuming Duchardt's preparation of Dr. Kuncel was deficient, Movant was not prejudiced. At the evidentiary hearing, the Court observed Dr. Kuncel react in much the



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 85 of 131 March 31 2017 p190
Appellate Case: 17-1716 Page: 190 Date Filed: 04/04/2017 Entry ID: 4519884

same way to cross-examination by the Government as she did at the trial. She was argumentative, non-responsive, and evasive to questions asked by the Government. The Government aptly pointed out that the effect of Dr. Kuncel's testimony on the jury could have been diminished by items outside Duchardt's control, namely her compromised data, psychological testing done using a questionable protocol (*i.e.* asking MMPI taker to place herself into a former state of mind), and testing results showing that Movant malingered. Based on observations of Dr. Kuncel's cross-examination by two different AUSAs on separate occasions, it is the Court's opinion that Dr. Kuncel presents as argumentative by nature and additional preparation would not have changed her approach. And again, in comparison to the heinous nature of the crime, it is unlikely a perfect examination would have affected the jury's determination. *See Purkey*, 729 F.3d at 866 (quoting *Wiggins*, 539 U.S. at 534); *Hanegan*, 663 F.3d at 354-56.

***xiii. Subground 21: Expert Opinion Support for NGRI***

Movant next alleges, in entirety, the following:

> Though the defense in the case was Not Guilty By Reason of Insanity, a defense for which the defendant bore the burden of proof, trial counsel never presented proof from his experts that as a result of her pseudocyesis, Mrs. Montgomery was unable to conform her behavior to the law. He also failed to explain how her pseudocyesis was in any way related to the killing of Mrs. Stinnett. This failure prejudiced Montgomery as the jury could not accept her defense without proof to support it.

(2255 Mtn, p. 190).

Movant's assertion is simply untrue. Drs. Ramachandran and Logan extensively testified to Movant's pseudocyesis, delusions, dissociation, and her inability to conform her behavior to the commands of the law at the time of the offense. (*See* Section I(C)). Movant did not present additional evidence at the evidentiary hearing to support her claim. Conclusory claims are

insufficient to support a claim for ineffective assistance of counsel. *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001). Movant's claim is denied.

***xiv. Subground 22: Preparation for & Cross of Government's Experts***

In Movant's next claim of ineffective assistance of counsel, she contends trial counsel was ineffective in preparing for and cross-examining the Government's two mental health experts, Drs. Daniel Martell and Park Dietz. (2255 Mtn, pp. 190-92). Specifically, Movant argues trial counsel should have prepared for and cross-examined both doctors on the underlying sources of their opinions; challenged the relevancy of Dr. Dietz's testimony in other high profile cases; objected to speculative and character testimony; and better prepared to cross-examine Dr. Dietz about his testimony in *Yates v. Texas*, 171 S.W.3d 215 (Tex. App. 2005). (*Id.*). The Government opposes, arguing trial counsel could not question Drs. Martell and Dietz on unsubstantiated facts and that trial counsel made reasonable, tactical decisions for cross-examining the witnesses in the manner in which they did. (Gov't Resp., pp. 123-26).

Movant first argues that trial counsel was unprepared to challenge the doctors' sources for their opinion that Movant was a manipulative liar. (2255 Mtn, pp. 190-91). Movant asserts that Drs. Martell and Dietz based their opinion on statements from her mother, Judy Shaughnessy, and her ex-husband, Carl Boman. (*Id.*). Movant goes on to assert that a proper mitigation investigation would have shown that both Judy and Carl tortured and terrorized her, and armed with this information, trial counsel could have "successfully undermine[d] the theories and speculation of the government's expert witnesses." (*Id.* at 191).

The problem with this argument is that it is simply untrue. Both Drs. Martell and Dietz based their opinions on much more than just the statements of Judy and Carl. (Trial Tr. 2456-63, 2540-41, 2545-48). They reviewed the evidence obtained by the Government, considered the



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 87 of 131 March 31 2017 p192
Appellate Case: 17-1716 Page: 192 Date Filed: 04/04/2017 Entry ID: 4519884

Movant's experts' reports, and interviewed other witnesses. (*Id.*). The doctors also spent a total of five days with Movant, interviewing her and conducting psychological testing. (*Id.* at 2456-57, 2539-40).

Moreover, trial counsel did cross-examine Drs. Martell and Dietz about their reliance on statements by Judy and Carl. (Trial Tr. 2477-79, 2667-69, 2693-94, 2700-03). In fact, trial counsel successfully got Dr. Dietz to testify that Judy was emotionally abusive and a negligent mother and admit that Judy would malign Movant if given the opportunity. (*Id.* at 2567, 2693-94, 2700-03, 2707). Trial counsel also cross-examined Dr. Dietz about the wisdom of relying on Carl, Movant's ex-husband, as a source for his opinions. (*Id.* at 2667-69). Dr. Dietz admitted Carl held a grudge against Movant. (*Id.* at 2707).

While trial counsel did not question Dr. Martell about alleged sadistically forced sexual violence and torture by Carl or Judy's consumption of alcohol while pregnant with Movant, he did question Dr. Martell whether an ex-husband and a mother who accused her 16-year-old daughter of stealing her husband were credible sources. (*Id.*). Nor would the Court expect trial counsel to cross-examine the doctors about sadistic sexual violence and torture perpetrated by Carl. This accusation is completely unsupported by the record. Movant cites to Jan Vogelsang's declaration (Movant Ex. 1) to support this allegation. Vogelsang makes wild accusations against Carl but cites no supporting evidence. (Movant Ex. 1, pp. 94-95).[31] For all of these reasons, trial counsel's preparation for and cross-examination of Drs. Martell and Dietz did not fall "below the minimum standards of professional competence." *Hamberg v. United States*, 675 F.3d 1170, 1172 (8th Cir. 2012).

[31] These wholly unsupported accusations are just the type of evidence the Court would have excluded had trial counsel attempted to present them through Vogelsang or someone like her. (*See, supra*, at Section III(A)(ii)).

Next, Movant argues trial counsel should have challenged the relevancy of Dr. Dietz's testimony in other high profile cases. (2255 Mtn, p. 191). However, trial counsel made a strategic decision to paint Dr. Dietz as a "gun for hire." (Duchardt Statement, p. 95). Trial counsel allowed Dr. Dietz to explain his roles in the series of high profile cases as part of that approach. (*Id.*). As has been repeatedly discussed throughout the discussion of Movant's ineffective assistance of counsel claims, tactical and strategic decisions made after a thorough investigation, such as this, are virtually unchallengeable. *Brooks v. United States*, 772 F.3d 1122, 1123 (8th Cir. 2014).

Additionally, Movant argues trial counsel should have objected to "speculative" opinions and "character" testimony. (2255 Mtn, p. 191-92). The Eighth Circuit has stated that expert testimony need not be excluded if there is some speculation involved; indeed, speculation is inevitable. *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003). "[W]hen experts testify in court they [must] adhere to the same standards of intellectual rigor that are demanded in their professional work." *Id.* (quotation omitted). "A certain amount of speculation is necessary, an even greater amount is permissible (and goes to the weight of the testimony), but too much is fatal to admission." *Id.*

A review of the transcript reveals that Drs. Martell and Dietz did speculate at times, but not to the point where their testimony in part or in whole should have been excluded. In his written statement, Duchardt explained that he believes the doctors' opinions and the information on which they base their opinions are subjects for cross-examination. (Duchardt Statement, p. 95). This is perfectly congruent with the idea that speculation is permissible and goes to the weight of the testimony. *Group Health Plan*, 344 F.3d at 760. And Movant does not direct the Court to any specific testimony in the trial transcript for which she believes an objection based

on character evidence should have been mounted. A review of the transcript yields no improper character testimony by either doctor. Because trial counsel cross-examined Drs. Martell and Dietz in a fashion to undermine the speculative testimony, Movant can prove neither *Strickland* prong.

Lastly, Movant argues trial counsel was not properly prepared to impeach Dr. Dietz concerning his testimony in the *Yates* case. (2255 Mtn, p. 192). As noted in the Background section of this Order, the State of Texas used Dr. Dietz as an expert witness in the *Yates* trial. (Trial Tr. 2526-28). In that case, a mother faced charges for and was convicted of drowning her five children in a bathtub. (*Id.* at 2526). Dr. Dietz testified during the *Yates* trial that a television show had aired an episode wherein a mother had similarly murdered her children by drowning. (*Id.* at 2526-27). However, that episode never actually aired. (*Id.* at 2527). Yates's conviction and sentence to death was overturned on appeal because of Dr. Dietz's testimony. (*Id.* at 2528). On cross-examination, Duchardt questioned Dr. Dietz about his testimony at the *Yates* trial. (Trial Tr. 2661-66). During this line of questioning, Duchardt brought out that Dr. Dietz was accused of lying[32] and was investigated by a grand jury. (*Id.* at 2663-64). Dr. Dietz testified at Movant's trial that the grand jury's testimony was "invited" by George Parnham, Yates's defense attorney. (*Id.* at 2664).

At the evidentiary hearing, habeas counsel argued Duchardt should have gone further in his impeachment of Dr. Dietz by calling George Parnham to testify that he did not instigate the grand jury investigation. However, as made abundantly clear by Parnham's testimony at the

---

[32] Habeas counsel accused Dr. Dietz of committing perjury. Such an accusation is of serious nature and indicates Dr. Dietz was involved in criminal conduct. However, the Texas appellate court reviewing the case concluded that his testimony was false. And the grand jury investigation yielded no indictment. Such unfounded, inflammatory accusations leveled by habeas counsel are entirely unprofessional.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 90 of 131 March 31 2017 p195
Appellate Case: 17-1716 Page: 195 Date Filed: 04/04/2017 Entry ID: 4519884

evidentiary hearing, Duchardt was wise not to attempt to call Parnham to further impeach Dr. Dietz. At the evidentiary hearing, Parnham admitted he contacted the grand jury and suggested that they investigate Dr. Dietz for perjury. Simply put, Parnham instigated the grand jury investigation. Moreover, the Court made clear at Movant's trial that Duchardt would not be allowed to question Dr. Dietz about the grand jury investigation. (Trial Tr. 2665). The Court stated that it "would sustain the objection about getting into an investigation that didn't indict him on anything. That's totally irrelevant." (*Id.*). Thus, Movant has not proven either ineffective performance or prejudice based on trial counsel's cross-examination of Dr. Dietz about his testimony at the *Yates* trial.

Because trial counsel's cross-examinations of Drs. Martell and Dietz were within the wide range of professionally competent assistance, Movant's ineffective assistance of counsel claims based on these cross-examinations are without merit.

***xv. Subgrounds 11, 20, 24: Withdrawn Claims***

During the evidentiary hearing, Movant withdrew the following claims of ineffective assistance of counsel: (11) failure to move to exclude testimony of Mary Case pursuant to *Daubert* or object to it at trial; (20) eliciting testimony harmful to the defense at trial; and (24) failure to have the 911 tape excluded, objecting to it at trial, or raising issue on direct appeal. As these claims have been withdrawn, the Court need not address them here and they are dismissed.

***xvi. Subground 25: Cumulative Effect***

Movant's final ineffectiveness of counsel claim argues that the cumulative effect of defense counsel's separately alleged ineffective actions resulted in prejudice to the defense. (2255 Mtn, p. 194-95). Movant's argument is foreclosed by precedent. *Kennedy v. Kemna*, 666 F.3d 472, 485 (8th Cir. 2012). *Strickland* does not provide a basis for cumulatively analyzing

counsel's allegedly deficient performance. *Shelton*, 821 F.3d at 950. "'[A] habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test.'" *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006) (quoting *Hall*, 296 F.3d at 692). As no alleged ineffectiveness error set forth above qualifies as unconstitutional ineffectiveness under *Strickland*, the Court finds no merit in Movant's cumulative prejudicial effect claim.

***xvii. Ineffective Assistance of Prior Counsel***

The evidentiary hearing raised the additional question of whether Movant received ineffective assistance by attorneys representing her prior to the O'Connor/Duchardt/Owen team. Movant did not directly present arguments relating to the assistance of her prior representation by Wurtz, Dedmon, Burns, Hunt, and Clarke, so the Court does not decide whether any of their assistance was objectively unreasonable. However, the Court notes that Movant was not prejudiced by such assistance, because the O'Connor/Duchardt/Owen team performed consistent with objectively reasonable norms.

**B. Grounds VI & VII: Incompetency & the Effects of Psychotropic Medications**

In Grounds VI and VII of her § 2255 Motion, Movant alleges separate yet overlapping claims regarding her competency to assist in her defense at trial and the effects of the medications she was taking on her affect at trial. (2255 Mtn, pp. 195-98). Movant first contends that her mental illnesses rendered her incompetent to assist her counsel in preparation for and during the trial and that the medications she was prescribed and taking at the time of trial did not adequately address her mental illnesses. (*Id.*). Next, she contends the combination of drugs she took during the trial resulted in a flat affect, which the jury may have interpreted to mean she was cold and unremorseful. (*Id.*). The Government argues Movant has waived these claims



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 92 of 131 March 31 2017 p197
Appellate Case: 17-1716 Page: 197 Date Filed: 04/04/2017 Entry ID: 4519884

because she did not raise them at trial or on direct appeal. (Gov't Resp., pp. 133-36). Alternatively, the Government argues Grounds VI and VII are without merit. (*Id.*).

***i. Ground VI: Incompetency***

The Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)). "The test for incompetence is also well settled." *Id.* To determine if a defendant is competent to stand trial, he must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and have] a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see also Drope v. Missouri*, 420 U.S. 162, 172 (1975). It is the defendant's burden to prove by a preponderance of the evidence that he is incompetent. *Cooper*, 517 U.S. at 355.

Prior to trial, Movant's defense team had concerns about her ability to assist in her defense given her reluctance to share information regarding her past and the crime itself with her counsel. These concerns started with her first defense team and persisted through her ultimate trial counsel of O'Connor, Duchardt, and Owen. No iteration of the defense team sought a competency hearing though, likely due in part to an expert opinion finding her competent. In March 2005, the defense team employed Dr. Marilyn Hutchinson to examine Movant. Her examination revealed Movant was competent to stand trial.

Duchardt testified at the evidentiary hearing that he and the rest of the team did have concerns about Movant's ability to assist in her defense; however, the trial team did not believe her struggles to reveal information about herself and the crime would lead a court to find her

incompetent.[33] Frankly, Duchardt was never sure Movant would tell the team everything that had happened to her in the past. Movant's purported fall 2016 revelation of sex trafficking, well over ten years since she was charged and mitigation evidence collection began, lends credence to trial counsel's concern.

Further, the trial team had good reason to doubt the Court would find Movant incompetent. At pretrial appearances and throughout the trial, Movant appeared engaged in and displayed understanding of the proceedings. As testified by all three of her trial defense attorneys and observed by the Court, Movant passed notes to her counsel asking questions and giving suggestions. Moreover, Movant's own consulting expert had determined she was competent to stand trial.

Despite all of the evidence to the contrary, Movant persists in arguing she was incompetent at trial because she was not on Risperdal, a drug that controls psychosis. However, there is no evidence that Movant was in a state of psychosis during the trial or at any critical juncture in the proceedings leading up to the trial. Dr. Linda McCandless, Movant's treating psychiatrist at CCA, initially did not rule out a diagnosis of psychosis. However, it was not until after the trial had commenced that Dr. McCandless formally diagnosed Movant with delusional cycling psychosis. (Trial Tr. 2071-2094). Thus, even accepting the McCandless diagnosis, Movant was not in a constant state of psychosis such that she could not understand and assist in her defense at all critical junctures according to testimony given by trial counsel and the Court's own observations.

---

[33] Owen testified that he personally believed a competency hearing was warranted, but did not inform the Court of his feelings because the team collectively determined it was unlikely that the Court would find Movant incompetent.

There is little doubt that Movant suffers from serious mental illnesses and brain damage to some extent. Drs. George Woods and William Logan opined at the evidentiary hearing that Movant was not competent to assist in and understand her defense. Dr. Woods pointed to Movant's comment at the end of the trial regarding how she was now ready to help in her defense as evidence that she was incompetent because it purportedly showed problems with frontal lobe sequencing. However, Dr. Woods did not examine Movant prior to or concurrently with her trial and bases his belief solely on examinations of Movant several years following the trial and his academic knowledge of possible drug side effects.[34] While Dr. Logan did examine Movant as a consulting expert in March 2005 following a suicide attempt and ultimately as a testifying expert, he did not express his belief that she lacked decisional competency until these habeas proceedings, excusing this failure on the fact that he was not asked to do so. Because Dr. Logan had several opportunities to raise concerns about Movant's ability to assist in her defense but failed to do so on each occasion, his opinion on Movant's competency warrants little credence.

Viewing the facts in their totality, the evidence that Movant was unable to understand and assist in her defense does not satisfy the preponderance of the evidence standard required for a finding of incompetency in light of the Court's own observations during pretrial proceedings and the trial; opinions from her own consulting expert who examined her before the trial; and all iterations of her defense teams' decisions not to seek a competency hearing. *See Cooper*, 517 U.S. at 355. Additionally, trial counsel was not ineffective for failing to raise the competency issue with the Court as it would have been futile.

[34] Interestingly, Dr. Woods stated that he agreed with Dr. Hutchinson's conclusions, the same doctor that had examined Movant in March 2005 and found her competent.

***ii. Ground VII: Effects of Psychotropic Medications***

Movant next alleges the medications she was taking at the time of trial left her with a flat affect, which violated her purported right to have the jury view her in an unaltered state. (2255 Mtn, pp. 197-98). First, it is unclear that Movant has raised a valid constitutional challenge based on her purported flat affect resulting from medications she voluntarily took. Movant cites only to the concurring opinion in *Riggins* for the proposition that she had a constitutional right to have the jury view her and her reactions to the proceedings in a fair and unadulterated way. In *Riggins*, the defendant sought to cease the *involuntary* administration of psychotropic and regulating medications prior to trial to allow the jury an unaltered view of him, just as he had been at the time of the offense. *Riggins*, 504 U.S. at 130. While *Riggins* may be instructive regarding general principals of the relationship between psychotropic medication and the demands of the adversarial system, its judicial legacy is that the case starts the analytical framework to determine whether a prisoner can be medicated against her will without compromising the adversarial process. Here, there is simply no evidence that Movant took the drugs involuntarily. Consequently, *Riggins* is not particularly instructive in a case such as this where the defendant voluntarily took prescribed psychotropic medications throughout the proceedings. On this basis alone, the Court could deny relief on her seventh ground for habeas relief; however, the credible evidence does not support Movant's claims of a flat affect.

Prior to trial, Dr. McCandless had diagnosed Movant with bipolar disorder with rapid dysthymic disorder and alcohol abuse, probable dependence. (Trial Tr. 2071). She also made rule-out diagnoses of brief psychotic episode and dissociate amnesia. (*Id.*). To treat Movant's mental illnesses, Dr. McCandless prescribed Movant Wellbutrin, an anti-depressant; Depakote, a mood stabilizer; and Elavil, a sleeping aid and headache treatment in early 2006. (*Id.* at 2082-

84). Movant also took Zantac for stomach acid relief. (Movant Ex. 159, slide "Dr. Bradford (contd – 7)). Movant continued with this treatment throughout trial without any objection. (Trial Tr. 2084).[35]

Dr. George Woods, a clinical psychiatrist with a focus in psychopharmacology, testified at the evidentiary hearing regarding the effects the combination of these drugs would have on an individual.[36] Dr. Woods testified that medications prescribed to Movant at the time of the trial sedate, cause somnolence, and slow motor and cognitive functions. In particular, Elavil (generic name: amitriptyline) produces moderate to severe sedation/somnolence. Dr. Woods stated that the amount of Elavil given to Movant was sufficient to sedate both night and day. Movant reported feeling better when the dosage was reduced. The use of Depakote (generic name: valproic acid) with Elavil prolongs Elavil's presence in the body. The effects are further compounded in persons who have suffered head trauma.

Dr. Woods opined that Dr. McCandless struggled to control Movant's symptomology and that her psychotic behaviors were untreated at the time of trial. While some bipolar symptoms were reduced with the treatment regimen, Movant was still reporting frequent bouts of depression and mania. Dr. Woods concluded that the combination of drugs had cumulative

---

[35] Movant has continued treatment for bipolar disorder under the supervision of Dr. Camielle Kempke, the psychiatrist at the BOP's Carswell location, under a different drug regimen. By all accounts, her current treatment seems to have improved her mental functioning. However, this alone does not prove she was incompetent at the time of trial or that her prior treatment left her with a flat affect. As described in this Order, the Court has concluded Movant was competent and did not have a flat affect at trial.

[36] Dr. Woods endorsed the views of Dr. DiAnne Bradford, a psychiatrist with a focus on psychopharmacology, who had passed away after publishing her report in this case but prior to the evidentiary hearing. Dr. Woods adopted Dr. Bradford's opinions as his own. For the sake of clarity and brevity, the Court will refer to Dr. Woods's and Dr. Bradford's findings, conclusions, and opinions concerning the effects of psychotropic drugs on Movant as Dr. Woods's findings, conclusions, and opinions.

effects which affected her outward appearance, reduced her ability to respond to nonverbal cues, dulled her senses, decreased her reaction time, gave her a flat affect, and could cause her to appear unsympathetic. In his opinion, the medications Movant was on at time of trial masked her symptoms and their severity and created a false impression of her emotional state. He further opined that there was no way that Movant's flat affect could be attributed to her circumstances. According to Dr. Woods, the drugs would overwhelm Movant's ability to appear in any particular way. However, he admitted he was not at the trial and has only heard of accounts about her affect.

Testimony at the evidentiary hearing both supported and contradicted these accounts of an alleged flat affect. Troy Schnack, who assisted the defense team with technology and was present throughout the trial, believed Movant looked sullen. He testified she had her head down, did not show much activity, interacted every once in a while with counsel, and was not animated. Likewise, Susan Hunt, former learned counsel for Movant, attended the trial as an observer on a few occasions and felt Movant showed no affect. Hunt believed that it was obvious Movant was medicated. Neither Schnack nor Hunt was privy to any advice Movant received from her trial counsel regarding her demeanor.

On the other hand, trial counsel Fred Duchardt and John O'Connor observed that Movant's affect was normal and appropriate given the circumstances. O'Connor testified at the evidentiary hearing that he had advised Movant to appear engaged in the trial. Not only did Movant appear engaged, she actively participated in her defense. She passed notes to counsel throughout the trial and asked them questions during breaks. She also dressed nicely and took their advice on how to portray herself. While she had a natural trepidation, she worked very hard to pay close attention and interact with the team. Duchardt testified that, had he observed a flat

affect or any other sign of disengagement, he would have addressed it with her and with the jury by questioning a witness about what they were seeing.

The Court's observations at the trial parallel that of Duchardt's and O'Connor's recollections. Nothing about Movant's demeanor gave the Court pause to question Movant's competency. She was engaged in the proceedings and had an appropriate affect given the nature of the circumstances. Given this, the fact that Hunt and Schnack did not know how trial counsel had advised Movant regarding her demeanor, and that Duchardt and O'Connor sat at counsel table with Movant throughout the trial, the Court gives more credence to Duchardt's and O'Connor's views of Movant's affect and demeanor during the trial. While the medications Movant was taking at the time of trial may have had effects on her appearance, the evidence does not support the severity of the effects suggested by Dr. Woods. Therefore, to the extent Movant has a valid constitutional challenge to have the jury view her in an unaltered state when she voluntarily took medications that may have influenced her affect, Movant has not shown that her state was altered in such a way that resulted in an unfair trial.

**C. Ground XII: *Batson* Challenge**

Movant contends in her twelfth basis for habeas relief that her rights to equal protection of the law, Due Process, a fair trial, and a fair and impartial jury were violated when the Court struck venireperson Torres from the prospective jury pool. (2255 Mtn, pp. 208-211). Movant claims that Torres was excluded on the basis of her race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (*Id.*). The Government opposes, contending that trial counsel had adequate grounds to withhold an objection to Torres's removal. (Gov't Resp., p. 143).

The Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory strikes made on the basis of race. *Batson*, 476 U.S. at 89; *United States v. Arnold*,

835 F.3d 833, 841 (8th Cir. 2016).[37] "If a party makes a prima facie showing that a peremptory challenge is race based, the proponent must show a race neutral justification to overcome the objection." *United States v. Ellison*, 616 F.3d 829, 832 (8th Cir. 2010). *Batson* objections must be timely. *See Batson*, 476 U.S. at 99-100 (stating the trial court is to apply the holding to strikes made after timely challenge). "[The objection] clearly comes too late if not made until after the trial has concluded." *United States v. Dobynes*, 905 F.2d 1192, 1196 (8th Cir. 1990). Issues not objected to in a timely manner can be reviewed on direct appeal, but for plain error. *Id.* at 1197. In the present case, Movant did not request plain error review on direct appeal, but instead raised her *Batson* objection for the first time in this § 2255 collateral attack. However, "a claim which could have been presented on direct appeal" can be "considered in a section 2255 proceeding" if Movant makes "a showing of cause for the failure to raise the issue and actual prejudice resulting from that failure." *Boyer v. United States*, 988 F.2d 56, 57 (8th Cir. 1993). Ineffective assistance of counsel can establish both cause and prejudice. *Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005). As discussed fully in Section III(F), Movant cannot establish she received ineffective assistance of appellate counsel.

Nevertheless, Movant argues that she need not establish cause and prejudice to obtain relief on this ground. (2255 Mtn, p. 210). Movant asserts that *Batson* violations are structural in nature and require automatic reversal. (*Id.*) Movant cites *Rosa v. Peters*, 36 F.3d 625 (7th Cir. 1994), a Seventh Circuit case, in support of her argument. In a footnote in *Rosa*, the Seventh Circuit opines that harmless error analysis would not be applied on habeas review of state court *Batson* violations in jury selection. *Rosa*, 36 F.3d at 634 n.17. The Supreme Court agrees that in rare situations, certain constitutional errors rise above simple harmless error analysis. *See*

---

[37] The Fourteenth Amendment was been made applicable to the federal government in *Bolling v. Sharpe*, 347 U.S. 497 (1954).



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 100 of 139 March 1 2017 p205
Appellate Case: 17-1716 Page: 205 Date Filed: 04/04/2017 Entry ID: 4519884

*Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (describing how trial errors differ from structural constitutional errors); *see also Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993). The Eighth Circuit's closest analog to *Rosa* is *Ford v. Norris*, 67 F.3d 162 (8th Cir. 1995) in which the panel determined that a "constitutional violation involving the selection of jurors in a racially discriminatory manner is a structural defect in the trial mechanism which cannot be subjected to a harmless error analysis." *Ford*, 67 F.3d at 171 (internal quotation marks omitted).[38] *Ford*'s holding has been called into question by later cases within the Eighth Circuit. *See United States v. Lee*, 715 F.3d 215, 221-224 (8th Cir. 2013); *United States v. Kehoe*, 712 F.3d 1251, 1254-55 (8th Cir. 2013); *Young v. Bowersox*, 161 F.3d 1159, 1160-1161 (8th Cir. 1998). In *Lee*, *Kehoe*, and *Young*, the defendants advanced both structural habeas and ineffective assistance claims like Movant does here. However, in each case, the Eighth Circuit determined *Strickland*, rather than *Cronic*, controlled the analysis of *Batson* challenges.[39]

Assuming *Lee*, *Kehoe*, and *Young* did not supersede *Ford*, Movant must establish a constitutional violation involving race-based exclusion of jurors that infected the trial process. *Ford*, 67 F.3d at 171. Movant alleges that venireperson Torres was excused solely on the basis of race. (2255 Mtn, p. 210). The transcript recounts the exchange initiated by the Court which resulted in venireperson Torres being struck for cause:

> THE COURT: You know that last lady, Miss Torres, I think she has a hard time understanding.
> MR. DUCHARDT: She's Cuban.

---

[38] *Ford* was analyzed under *Swain v. Alabama*, 380 U.S. 202 (1965), because the defendant's underlying conviction became final prior to *Batson*. *Ford*, 67 F.3d at 165 n.4. *Batson* does not apply retroactively on collateral review. *Allen v. Hardy*, 478 U.S. 255, 261 (1986). For the purpose of this claim, the Court assumes without deciding that *Ford*'s *Swain*-analysis is congruent with a *Batson* analysis.

[39] The ineffectiveness of counsel for failure to offer *Batson* objections is contained at Section III(A)(x).

THE COURT: I just think she doesn't understand.
MR. DUCHARDT: I was going to ask you to consider –
MR. WHITWORTH: There is going to be a lot of reading involved in this.
THE COURT: Do you have any objection to her being struck?
MR. WHITWORTH: No.
MR. DUCHARDT: No.

(Trial Tr. 274-75).

First, it must be noted that the comment made by Duchardt related to Torres's nationality and not her race. The Supreme Court has not indicated *Batson* applies to claims beyond discrimination in race and gender. *See Miller-El v. Dretke*, 545 U.S. 231, 269-70 (2005) (Breyer, J., concurring) (discussing extent of *Batson* progeny); *Davis v. Minnesota*, 511 U.S. 1115, 1115-1117 (1994) (Thomas, J., dissenting) (determining whether *Batson* contemplates religion-based strikes); *see also United States v. Ehrmann*, 421 F.3d 774, 781-82 (8th Cir. 2005) (declining to extend *Batson* to sexual orientation-based strikes); *Weber v. Strippit, Inc.*, 186 F.3d 907, 911 (8th Cir. 1999) (declining to extend *Batson* to age-based strikes); *Rico v. Leftridge-Byrd*, 340 F.3d 178, 182 (3rd Cir. 2003) (stating Supreme Court has not extended *Batson* to national origin-based strikes). Trial counsel's errant remark during *voir dire* related to Torres's nationality, and not her race. Even if *Batson* claims can be properly alleged for the first time on § 2255 collateral review, no *prima facie* case of discrimination under *Batson* can be established.

Regardless, the Court finds that Movant has misrepresented the exchange. The Court and both parties recognized that Torres was having difficulty understanding the proceedings. In her exchanges with counsel and the Court, the Court observed her having difficulty understanding the questions asked both in writing and orally. The exchanges involving venireperson Torres are reproduced here:

MR. WHITWORTH: [Ms.] Torres, last but not least. You indicated you didn't have any strong feelings one way or the other in the circle choice you made. Then you wrote that you believe God is the only person in charge of giving or taking a life.
VENIREPERSON TORRES: Right.
MR. WHITWORTH: So when you write that could you explain that to me a little bit more.
VENIREPERSON TORRES: I would but I would be happy to listen to both sides of the case and decide everything I can choose.
MR. WHITWORTH: So can you agree to follow the law --
VENIREPERSON TORRES: Yes.
MR. WHITWORTH: In this case and I know you obviously have strong religious principles and I respect that. When you write only God should take away life, could you vote for a sentence of death.
VENIREPERSON TORRES: I think so.
MR. WHITWORTH: If you find aggravated evidence outweighing the mitigation evidence.
VENIREPERSON TORRES: Yes.
MR. WHITWORTH: If you find the aggravated evidence does not outweigh the mitigation evidence you could also consider a life sentence?
VENIREPERSON TORRES: Yes.
MR. WHITWORTH: Will you give both sides of this case a fair shake?
VENIREPERSON TORRES: Yes.
THE COURT: And Miss Torres, on the question about whether you have heard anything or read anything about the case in the media you said you had not, but then a follow up question to that asked that if what you had heard would cause you to have difficulty with being fair, and you answered you could not be fair, was that your answer, was that just mistaken.
VENIREPERSON TORRES: It was mistaken.
THE COURT: It was mistaken?
VENIREPERSON TORRES: Yes.

(Trial Tr. 246-47).

MR. DUCHARDT: Thank you ma'am. Miss Torres, do you feel you would be open to listening to evidence of mental illness to decide if the person was not guilty by reason of insanity.



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 103 of 139 March 3, 2017 p208
Appellate Case: 17-1716 Page: 208 Date Filed: 04/04/2017 Entry ID: 4519884

VENIREPERSON TORRES: Yes, sir.

(*Id.* at 272). The first exchange reveals Torres gave conflicting answers on questions from the juror questionnaire. When responding to a multiple-choice question, she would answer one way, but her responses to open-ended questions indicated that her feelings leaned in another direction. Her explanations to these differences did little to confirm she could follow the proceedings in the case. For example, she stated she could "decide everything I can choose," indicating that she did not understand she would have to decide everything asked of her by the Court. She also admitted she made a rather glaring mistake regarding her ability to serve based on media accounts. Moreover, the transcript itself does not reflect Torres's demeanor or language skills or difficulties. The Court and counsel were in a unique perspective to observe Torres and her English language abilities at the time of *voir dire*.

The Supreme Court has stated that "[i]t is understandable . . . to strike a potential juror who might have difficulty understanding English." *Davis v. Ayala*, --U.S.--, 135 S. Ct. 2187, 2203 (2015); *see Hernandez v. New York*; 500 U.S. 352, 370-72 (1991) (stating that language can be legitimate race-neutral ground to strike a potential juror when trial judge determines it is not a proxy for race-based discrimination); *see also Wren v. Fabian*, No. 07-4353(JNE/JSM), 2008 WL 4933950, at *10 (D. Minn. Nov. 14, 2008) (stating a trial judge's observations of a prospective juror's language skills are entitled to deference "because it is difficult to review a record for evidence of a prospective juror's language difficulties" (quotation omitted)).[40] Further, *Ayala* represents a scenario in which the prosecution exercised a peremptory strike that

[40] That Ben Leonard interviewed venireperson Torres in November 2016 and found she was able to fully converse in English a full nine years after the trial does not alter what the Court and the parties observed during *voir dire*. Nor does her affidavit, which was written in English but prepared by Movant's habeas counsel. (*See* Movant Ex. 161).

was actually challenged by the defendant. *Ayala*, 135 S. Ct. at 2193-94. In the present case, the parties agreed to the strike. (Trial Tr. 274-75). Striking jurors by agreement is not an uncommon practice. *See, e.g., Miller-El*, 545 U.S. at 240-41 (jurors struck for cause or agreement); *Blom*, 242 F.3d at 806 (striking jurors by agreement among opposing parties).

These findings are supported by Fred Duchardt's written statement:

> It is also claimed that I conspired in a *Batson* violation supposedly because I sought removal of Juror 129, Doralis Torres, on the basis that "she's Cuban" (Doc. 71, p. 170, 208). My words, "she's Cuban", were used to express the plain fact which Ms. Torres explained in her questionnaire, that she was born, raised, and lived most of her life in Cuba. After hearing her speak during voir dire, it seemed to me, to Matt Whitworth and to Judge Fenner that Ms. Torres had difficulty understanding questions and expressing herself in English. I attributed her difficulties in English to the fact that she grew up in a Spanish language country, and that was the point I was making when I used the words "she's Cuban". My reference had nothing to do with her race; rather it was a shorthand to express that she spent most of her life in a country in which Spanish was her language.

(Duchardt Statement, p. 108). Venireperson Torres was struck by the parties' agreement because the parties recognized the potential difficulties Torres might face during the proceedings. Torres was not the subject of a racially discriminatory strike.

Moreover, trial counsel had legitimate reason to remove venireperson Torres, beyond her issues with language. Duchardt testified at the evidentiary hearing regarding his reasons for agreeing to striking venireperson Torres from the panel. Duchardt testified that this agreed to strike for cause saved him a preemptory strike that he had planned to use on Torres. He believed her answers on the juror questionnaire indicated she would be prosecutor-friendly, specifically her statement that she was following the JonBenet Ramsey case and could not understand why someone would hurt a child. Duchardt's written statement echoes his testimony:

> However, I was concerned about Ms. Torres because of other answers she gave on the questionnaire. Ms. Torres' answer to question 41 was very pro-death penalty, but was tempered by the phrase that "God is the only person who is

> charge of giving or taken (sic) a live (sic)." Matt Whitworth made voir dire inquiry of Ms. Torres about her meaning for that phrase, and she made clear that her faith would not stop her from giving a sentence of death if she thought that appropriate (Tr. 246-247). In my mind, those voir dire responses made her question 41 answer that much stronger. In addition, she indicated in question 46 of the questionnaire that she followed a child killing case in the news and could not understand how someone could commit such a crime. And, in questions 83, 84 and 85, she seemed to express misgivings about mental defenses. Because of her views on the death penalty, on cases involving children, and on mental defenses, I likely would have used a peremptory challenge to remove her had she remained on the panel to that point in the process, and so angling for her removal for cause saved that peremptory challenge.

(Duchardt Statement, pp. 108-09). Thus, had trial counsel been forced to use a peremptory strike on Torres, Duchardt had an adequate race-neutral reason to exclude her from the eventually empaneled jury, beyond her language difficulties.

Finally, Movant claims that trial counsel was ineffective for failure to make a *Batson* objection during jury selection. (2255 Mtn, pp. 208-211). "In order to prevail on a claim of ineffective assistance of counsel, [a movant] must show that his attorney's assistance 'fell below an objective standard of reasonableness,' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Young* , 161 F.3d at 1160 (quoting *Strickland*, 466 U.S. at 688). The deficient performance and prejudice requirements to prevail on a claim for ineffectiveness of counsel for failure to lodge a *Batson* objection is unchanged from general ineffectiveness claims. *Young*, 161 F.3d at 1161 (citing *Wright v. Nix*, 928 F.2d 270, 273 (8th Cir. 1991)); *see also Lee*, 715 F.3d at 222 (rejecting structural error analysis for *Batson*-related ineffectiveness of counsel claims); *Kehoe*, 712 F.3d at 1254 (same). Here, Movant's claim is defeated on both *Strickland* prongs.

Attorneys are obligated to provide reasonably effective assistance to their clients. *Strickland*, 466 U.S. at 687. The obligation of reasonably effective assistance does not contemplate the duty to make meritless objections. *Gray v. Bowersox*, 281 F.3d 749, 756 n.3

(8th Cir. 2002). As discussed above, the Court did not excuse venireperson Torres at the behest of a pre-textual discriminatory strike, so any potential objection would fail. (*Id.* at 755-56).

Again, Duchardt stated that Torres's written answers on the juror questionnaire and her *voir dire* responses made him concerned about how sympathetic a juror she would be to Movant's defense. (Duchardt Statement, pp. 108-09). Movant cannot argue she was prejudiced under *Strickland* because Duchardt himself would have used a peremptory strike on Torres had she not been dismissed. (*Id.*). Trial counsel made a strategic trial decision to agree to remove Torres from the panel. (*Id.*). Decisions involving such trial strategy are virtually unchallengeable. *Bowman v. Gammon*, 85 F.3d 1339, 1345 (8th Cir. 1996) (citing *Strickland*, 466 U.S. at 690); *see Umphfrey v. Groose*, No. 97-1692WM, 133 F.3d 923 (Table) (8th Cir. Dec. 29, 1997) (stating trial counsel was not ineffective when counsel, for tactical reasons, declined to challenge potentially biased jurors). Movant's claim that counsel was ineffective for failure to advance a *Batson* objection during jury selection fails.

Ultimately, "[j]ury selection . . . is particularly within the province of the trial judge." *Skilling*, 561 U.S. at 386 (quotation omitted). The trial court has wide latitude to operate during *voir dire*, and alleged errors are reviewed for an abuse of discretion. *United States v. Paul*, 217 F.3d 989, 1004 (8th Cir. 2000). "In contrast to the cold transcript . . . in-the-moment *voir dire* affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." *Skilling*, 561 U.S. at 386-87. In this circumstance, the cold transcript of the prior proceedings has been argued out of context. Once again, habeas counsel has harshly and unfairly attacked Duchardt with a twisted interpretation of the record. For the reasons discussed in this section, the Court finds no merit in Movant's twelfth basis for habeas relief.

### D. Ground XIII: Government Misconduct Regarding Tommy Kleiner

In her thirteenth ground for relief, Movant asserts that the Government interfered in the investigation, preparation, and presentation of her penalty phase defense by telling her half-brother, Tommy Kleiner, that Movant was implicating him in the murder. (2255 Mtn, pp. 211-12). Movant further asserts the Government engaged in misconduct by advising Tommy not to cooperate with defense counsel and promising him help with pending charges against him. (*Id.*) The Government counters that Movant waived the issue by not raising it at trial or on direct appeal, and alternatively, that the claim is simply without merit. (Gov't Resp., pp. 143-44).

The Eighth Circuit employs a two-part test to determine if prosecutorial misconduct has occurred. *See Graves v. Ault*, 614 F.3d 501, 507 (8th Cir. 2010). "[F]irst, the prosecutor's conduct or remarks must have been improper, and second, the remarks or conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial." *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001). However, a defendant is generally not entitled to federal habeas relief for prosecutorial misconduct "unless the misconduct infected the trial with enough unfairness to render a petitioner's conviction a denial of due process." *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002) (alteration and quotation omitted).

In this case, Movant has proved neither prong of the two-part test. Movant has not shown the Government's actions when interacting with Tommy Kleiner were improper or prejudicially affected her right to a fair trial. The Government did not act improperly by informing Tommy that his half-sister was implicating him in the murder. It is undisputed that Movant did, in fact, claim Tommy was involved in the murder in March 2007 through at least June 2007. That the Government chose to confront Tommy with this information was well within its investigative responsibilities and duties to ensure the proper individuals were held accountable for Victoria

Jo's kidnapping and Bobbie Jo's death. At the time the Government approached Tommy with Movant's accusations, it was unknown that Tommy had an alibi for the date and time of the murder. While there is evidence that Movant's family did push away from her after she had implicated Tommy in the murder, nothing in the evidence suggests the Government approached Tommy for the sole purpose of interfering with the investigation, preparation, and presentation of Movant's penalty phase defense. (Movant Ex. 142, 18).

Nor can it be said that Tommy being informed of Movant's accusations so infected her trial with unfairness that she was denied due process. The record establishes that Movant presented all evidence available to and believed by her counsel at the time of trial, as discussed above in Section III(A), in spite of any obstacles Tommy's knowledge of Movant's accusations may have raised. Further, defense counsel was able to present expert testimony that Movant's implication of Tommy was yet another symptom of her mental illnesses.

The second part of Movant's claim of prosecutorial misconduct involving Tommy Kleiner relates to the Government purportedly offering Tommy assistance on charges he faced in other jurisdictions in exchange for him not cooperating with defense counsel. Movant bases this solely on the transcript of Tommy's rambling and sometimes incoherent deposition. (*See* Movant Ex. 142).

During his deposition, Tommy stated he first met FBI Agent Kurt Lipanovich at Patty Baldwin's house and Agent Lipanovich questioned him about his whereabouts on the day of Bobbi Jo's death. (*Id.* at 6). At the time of this meeting, Tommy did not know where he had been on the day of the offense so he presented his casino cards, which would give the FBI information about when and where he was cashing fraudulent checks. (*Id.* at 6-8). Tommy stated that Agent Lipanovich promised to help him get leniency on pending charges and a case

for which he had already been sentenced. (*Id.* at 8-12, 16-17). Some of these charges stemmed from police reports filed by Movant. (*Id.* at 10-11, 39). Tommy stated that, in return, he was not supposed to cooperate with defense counsel and specifically should not tell defense counsel about his whereabouts on the day of the murder. (*Id.* at 13). Tommy admits this was only a verbal agreement and that he did speak with Ron Ninemire, an investigator for the defense team. (*Id.* at 48-49, 59). Tommy also admitted he had anger problems and had only been taking medication for his issues for two days preceding the deposition. (*Id.* at 23).

Agent Lipanovich provided a different account of the first meeting between himself and Tommy when he testified at the evidentiary hearing regarding his interactions with Tommy. Agent Lipanovich stated that he interviewed Tommy at Patty Baldwin's home about his whereabouts on the day of the murder. Agent Lipanovich described Tommy as not the brightest person, emotional, a drug-user with possible psychiatric issues, and not having the best employment track record. Because of Tommy's work history, Agent Lipanovich recalled that it was difficult for Tommy to remember where he was on the day of the murder. Tommy guessed that he was working for a concrete company around the time of the crime, which Agent Lipanovich was able to confirm through interviews with others. Agent Lipanovich was able to retrieve a DNA sample from Tommy. The conversation between Agent Lipanovich, Tommy, and Tommy's sister, Patty, led to Agent Lipanovich finding out that Tommy had been on probation at the time of the murder. Agent Lipanovich agreed that they discussed the charges Movant had leveled against him. However, Agent Lipanovich denied Tommy's accusation that he directed Tommy not to cooperate with Movant's defense. Instead, he would have given Tommy his standard answer: you can talk to the defense, not talk with them, or you can ask the U.S. Attorney for representation.

Agent Lipanovich followed up with Tommy's probation officer, Erin Garman.[41] Garman testified at the evidentiary hearing, noting that Tommy was a memorable client because he was emotionally volatile. Garman confirmed that Agent Lipanovich had reached out to her regarding Tommy's whereabouts on December 16, 2004. She told Agent Lipanovich that Tommy had been at her office, but that Agent Lipanovich would need to get a subpoena to get the records, which indicated that Tommy was meeting with Garman on the day of the murder. (*See* Movant Ex. 145). The distance between the probation office and the scene of the crime was 137 miles, giving Tommy a solid alibi. Garman further testified that Agent Lipanovich asked her to let him know if anyone else contacted her about the case. He stated she did not have to talk to anyone about the case or could speak with their staff attorney about it. Garman did speak with Ninemire in 2007. She has no records of contacts by any other person with the defense from the date of the murder through the trial.

Based on the testimony presented at the evidentiary hearing and in Tommy Kleiner's deposition, the Court finds Tommy's accusations that Agent Lipanovich promised to help Tommy with charges he faced in other jurisdictions if he did not cooperate with Movant's defense incredible. The transcript of Tommy's deposition shows that he had a difficult time following and understanding what was being asked of him due to his obvious emotional volatility. The Court finds Tommy mistook Agent Lipanovich's comment that Tommy did not have to speak with the defense as a directive rather than an option. The Court further finds that Agent Lipanovich did not promise Tommy any help with past charges on which he had been sentenced, pending charges, or future charges. The evidence shows that Tommy voluntarily

[41] Movant attempted to raise an issue of Agent Lipanovich purportedly questioning both Tommy and his probation officer, Erin Garman, about an alleged affair between them. The Court finds no such affair took place and notes this is merely a collateral issue which bears no impact on the claims in Movant's 2255 Motion.

provided Agent Lipanovich with damning evidence with no promise for assistance in return. Consequently, there is no reliable evidence that the Government engaged in prosecutorial misconduct when approaching Tommy with Movant's claim that he was present at Bobbie Jo's murder. Ground XIII is without merit.

### E. Ground XV: Drs. Mayberg's and Evans's *Daubert* Testimony

In her fifteenth ground for § 2255 relief, Movant alleges the following:

> The trial court relied on the testimony and questions raised by Dr. [Helen] Mayberg and Dr. [Alan] Evans to exclude the testimony of Dr. Gur as to the MRI results and used their speculative and specious allegations challenging the normative sample used for the PET analysis to require last minute production of raw (cpp) data. Because it was not possible to obtain that data until the trial was nearly over, Dr. Gur's testimony was excluded in *toto*, including in the penalty phase even where the Government had previously admitted its admissibility.
>
> It is Drs. Mayberg and Evans that offered "junk science" to the Court. Their testimony was baseless, specious, and scientifically indefensible. Dr. Gur was finally able to address all of their questions scientifically, but the trial court refused to even consider the report.

(2255 Mtn, p. 214 (internal citations omitted)).

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). "[A] conviction obtained through use of false evidence . . . must fall . . . ." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[S]uppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.'" *Giglio*, 405 U.S. at 153 (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). However, a new trial is not automatically required. *Id.* at 154. "A finding of materiality of the evidence is required under *Brady*." *Id.* "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.* (ellipses in original) (quoting *Napue*, 360 U.S. at 271).

On direct appeal, the Eighth Circuit decided that the exclusion of Dr. Gur's opinion that Movant's "PET scan showed abnormalities in the limbic and somatomotor regions of the brain [during the guilt phase] was harmless" and that "considering the minimal probative value of the evidence and the overwhelming evidence and jury findings of serious aggravating factors," the PET scan's exclusion from the penalty phase was harmless. *Montgomery*, 635 F.3d at 1090, 1092. Accordingly, even if Movant's accusations that Drs. Mayberg and Evans presented false, misleading, unreliable, unscientific, and specious testimony during the *Daubert* hearing were true, exclusion of Dr. Gur's testimony in these two regards remains harmless and would not have affected the outcome.

As to Dr. Gur's opinion that Movant's PET scan showed abnormalities consistent with a pseudocyesis diagnosis, the Eighth Circuit noted that "Dr. Gur's opinion does not meet Rule 702's reliability requirement because it was at most a working hypothesis, not admissible scientific knowledge." *Id.* at 1090. "A hypothesis without support, like the one posited here, is no more than a subjective belief or an exercise in speculation." *Id.* at 1091. No evidence presented at the evidentiary hearing changes the fact that Dr. Gur's opinion was a hypothesis, not scientific knowledge. While Drs. Robert Fucetola's, Christos Davatzikos's, and Andrew Newberg's testimony at the *Daubert* hearing could have bolstered the validity of the raw data if presented, they would not have raised Dr. Gur's opinion from a working hypothesis to admissible scientific knowledge. Thus, the Court did not abuse its discretion by excluding Dr. Gur's opinion that Movant's PET scan showed abnormalities consistent with a pseudocyesis diagnosis during the guilt phase.

Regarding the MRI evidence, the Eighth Circuit concluded that the Court did not abuse its discretion in excluding this evidence. *Id.* at 1093.

> According to Dr. Gur's report, Montgomery's MRI revealed structural abnormalities, including reduced brain volume in the right parietal lobes and right medial gray matter. Right parietal dysfunction, according to the report, "manifests itself behaviorally in loss of sense of self, difficulties in emotion processing, attentional neglect and depressed or flat affect."
>
> At the *Daubert* hearing, the experts interpreted a graph in Dr. Gur's report that charted the deviation of Montgomery's MRI results from normal. Montgomery's parietal and medial gray matter regions were less than one standard deviation from normal. Dr. Evans explained that Montgomery's results were within the normal range and that approximately fifty percent of the population would have comparable results. Montgomery's ventrical measurements were one standard deviation from normal, and Dr. Evans stated that approximately thirty percent of the population would have similar results. Drs. Evans and Mayberg testified that Montgomery's deviations were not statistically significant because none of her measurements deviated more than one standard deviation from the mean. Dr. Mayberg also testified that to infer statistical analysis from numbers within the normal range "and extrapolate about complex behavior that doesn't have a known brain organization is basically having an opinion that far exceeds both the data we have here and what is known in the literature."
>
> Dr. Gur testified that, even if the deviations were not statistically significant, they were nonetheless clinically significant. Dr. Gur compared Montgomery's right parietal and medial gray matter to her left-side counterparts. Based on his "eyeball" comparison, he determined that Montgomery's right parietal and medial gray matter appeared abnormally low. Dr. Evans testified, however, that Dr. Gur had failed to show that Montgomery's left-right difference was abnormal.
>
> The district court did not abuse its discretion in excluding the MRI evidence from both the guilt and the penalty phases of the trial. It found unreliable the methodology underlying Dr. Gur's opinion that the results were clinically significant. Moreover, it found that the MRI results had no scientifically recognized significance. Accordingly, the district court concluded that the results were irrelevant to Montgomery's insanity defense and the mitigating factors she pleaded. The district court thus exercised its authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of [her] offense." *Lockett v. Ohio*, 438 U.S. 586, 604 n. 12 (1978) (plurality opinion).

*Montgomery*, 635 F.3d at 1092-93. Nothing Drs. Fucetola, Davatzikos, and Newberg stated at the evidentiary hearing would impact the Eighth Circuit's thorough analysis of the MRI issue.

However, it must be said that the Court takes very seriously all accusations of false statements made to it, whether by counsel, a party, or a witness. While not in the body of her



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 114 of 139
March 13 2017 p219
Appellate Case: 17-1716 Page: 219 Date Filed: 04/04/2017 Entry ID: 4519884

argument, Movant accuses Drs. Mayberg and Evans of presenting false testimony at the *Daubert* hearing. (2255 Mtn, p. 213). As Movant has done in other claims against trial counsel and then-FPD Ray Conrad, these accusations of false statements to the Court against Drs. Mayberg and Evans are extremely serious and are treated as such. But, Movant does not appear to have taken them quite as seriously as the Court does. She did not provide one shred of evidence beyond her bald accusation that Drs. Mayberg and Evans in any way testified falsely. At the evidentiary hearing, Movant presented evidence establishing that other experts, like Drs. Fucetola, Davatzikos, and Newberg, could have testified at the *Daubert* hearing to bolster the data produced. But the evidence did not establish that Drs. Mayberg and Evans knowingly gave false testimony. Neither Dr. Fucetola nor Dr. Davatzikos nor Dr. Newberg stated that Drs. Mayberg or Evans gave false or misleading testimony. Rather, their testimony showed they disagreed with Drs. Mayberg's and Evans's interpretations, conclusions, and questions about the data and its sources, which does not stray from Dr. Gur's testimony at the *Daubert* hearing. This is yet another instance of habeas counsel's willingness to recklessly level personal and damaging attacks which they cannot support. With that said, Ground XV is without merit.

**F. Ground XVIII: Ineffective Assistance of Appellate Counsel**

Due process of the law entitles a defendant to effective assistance of counsel on a first appeal when that appeal is a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Bear Stops v. U.S.*, 339 F.3d 777, 780 (8th Cir. 2003). The standard for ineffective assistance of counsel on appeal claims is co-extensive with general ineffectiveness of counsel claims under *Strickland*. *See Evitts*, 469 U.S. at 395 (discussing *Strickland* analysis). To prevail on an ineffective assistance of counsel on appeal claim, Movant must show that "(1) his attorney's performance was deficient and outside the range of reasonable professional assistance, and (2)

that he was prejudiced by his counsel's deficient performance to the extent that there is a reasonable probability that but for counsel's error, the result of the proceeding would have been different." *Bear Stops*, 339 F.3d at 780 (quoting *Strickland*, 466 U.S. at 687). The attorney "need not advance *every* argument, regardless of merit . . . [but] must play the role of an active advocate . . . ." *Evitts*, 469 U.S. at 394 (emphasis in original). "While the Constitution guarantees criminal defendants a competent attorney, it 'does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'" *Anderson*, 393 F.3d at 754 (quoting *Engle v. Isaac*, 456 U.S. 107, 134 (1982)).

Throughout her Motion, Movant intersperses miscellaneous claims of ineffective assistance on appeal within her larger claims of ineffectiveness at trial. (2255 Mtn, pp. 56, 193, 208-211, 214-216). Movant specifically alleges her appellate counsel was ineffective for: (1) failure to raise the issue of Judy Clarke's removal from the defense team prior to trial on appeal; (2) failure to raise the issue of the Court's inclusion of the 911 tape on appeal; (3) failure to appeal the agreed upon strike for cause on venireperson Torres; and (4) failure to appeal the Court's exclusion of portions of Wendy Treibs's testimony. (*Id.*).

The Court's prior Order dated December 21, 2015 specifically addressed the claim of ineffectiveness on appeal for failure to raise the Judy Clarke removal issue and determined the claim had no merit. (12/21/2015 Order, pp. 21-22). As noted in Section III(A)(xv), Movant withdrew her claim that Duchardt was ineffective for failing to have the 911 tape excluded, objecting to it at trial, or raising it on direct appeal. Consequently, the Court need not address this claim any further. In any event, however, Movant's claim that trial counsel was ineffective for failing to appeal the Court's penalty phase inclusion of the tape has no merit, as the Court determined the 911 tape was admissible in its prior Order. (*Id.* at 40-41). Counsel is not



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 116 of 139 March 13 2017 p221
Appellate Case: 17-1716 Page: 221 Date Filed: 04/04/2017 Entry ID: 4519884

deficient for failing to make a futile objection. *Woodall v. United States*, 72 F.3d 77, 80 (8th Cir. 1995); *see also Cook v. United States*, 310 F. App'x. 932, 934 (8th Cir. 2009). Because the tape was admissible, Movant cannot show prejudice for counsel's failure to raise the issue on appeal. *Flieger v. Delo*, 16 F.3d 878, 887 (8th Cir. 1994). Even assuming the possibility the tape was inadmissible, Movant fails to overcome the presumption that appellate counsel's conduct "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Movant similarly alleges ineffectiveness of counsel for failure to appeal the agreed upon strike for cause of venireperson Torres. (2255 Mtn, 208-211). Movant argues the strike violates *Batson*. (*Id.*) As analyzed above, all parties agreed at trial that Torres should be struck for cause. (Trial Tr. 274-75). Further, counsel had adequate race-neutral grounds to justify a peremptory strike that would have overcome a potential *Batson* challenge as discussed in Section III(C). Thus, the claim has no merit, as Movant cannot show she was prejudiced by counsel's failure to appeal this issue. *See Woodall*, 72 F.3d at 80 (determining habeas petitioner was not prejudiced for trial counsel's failure to make futile objection); *see also Cook*, 310 F. App'x. at 934. Movant's contention is foreclosed on *Strickland's* prejudice prong alone.

Further, "[e]rrors not properly preserved are reviewed only for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure." *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005). Errors are preserved "by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." *Pucket v. United States*, 556 U.S. 129, 135 (2009). Plain error is analyzed under four prongs:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 117 of 139 March 31 2017 p222
Appellate Case: 17-1716 Page: 222 Date Filed: 04/04/2017 Entry ID: 4519884

> appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* (internal quotations, citations, and alteration omitted) (emphasis in original).

As analyzed above, Movant attempts to portray the strike of venireperson Torres as a discriminatory violation of *Batson* and its progeny. (2255 Mtn, pp. 208-10). The record is clear that this is an inaccurate portrayal as discussed in Section III(C). The removal of venireperson Torres represented no deviation from a legal rule, and thus there was no clear and obvious legal error, nor were Movant's substantial rights affected. Movant's claim does not rise to the level required to grant plain error relief. *See United States v. Poitra*, 648 F.3d 884, 889 (8th Cir. 2011) (applying plain error review's rigorous standards). In addition to finding Movant was not prejudiced by any possible error, the Court finds appellate counsel's choice to omit a request for plain error review of the strike of venireperson Torres was within the wide range of reasonable professional assistance prescribed by Supreme Court precedent.

Finally, Movant contends that appellate counsel was ineffective for failure to appeal the exclusion of Wendy Treibs's penalty phase testimony regarding Movant's familial mental illness history. (2255 Mtn, pp. 214-16). In its Order dated December 21, 2015, the Court determined it was not error to exclude this testimony. (12/21/2015 Order, pp. 41-43). Because exclusion of the testimony was proper, Movant cannot show she was prejudiced by appellate counsel's decision to not appeal the issue. Even if it were error to exclude the testimony, an appellate "attorney need not advance *every* argument, regardless of merit, urged by the appellant." *Evitts*, 469 U.S. at 394 (emphasis in original). Appellate counsel's decision to omit this issue on direct

appeal was within the range of reasonable professional assistance that permits appellate counsel to select the most promising issues for review. *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983).

In addition to Movant's specifically alleged claims of ineffective appellate counsel, Movant's motion includes a general, unspecific claim of appellate ineffectiveness. (2255 Mtn, pp. 227-28). "In order to warrant relief . . . a habeas corpus petitioner must allege sufficient facts to establish a constitutional claim. Mere conclusory allegations will not suffice." *Wiggins v. Lockhart*, 825 F.2d 1237, 1238 (8th Cir. 1987) (citing *Allard v. Nelson*, 423 F.2d 1216, 1217 (9th Cir. 1970)). Movant's general claim does not state a sufficient basis for which habeas relief can be granted. *See Spillers v. Lockhart*, 802 F.2d 1007, 1009-10 (8th Cir. 1986) (denying habeas relief when petitioner failed to allege any facts or specifics to support his ineffective assistance claim). After reviewing the record of Movant's appellate process, the Court determines that Movant received effective assistance of counsel on appeal.

**G. Ground XXII: Cumulative Effect**

In her last written argument, Movant argues that, even if none of the claims presented in her 2255 Motion individually warrant reversal, the purported errors denied Movant her constitutional rights when considered cumulatively. (2255 Mtn, pp. 233-34). As with her ineffective assistance of counsel cumulative effect claim discussed at Section III(A)(xvi), Movant's argument is foreclosed by precedent. *See Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) ("This court has said that cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own."). Rather, the central concern of a habeas petition is the fundamental fairness of the trial. *Strickland*, 466 U.S. at 697-98. As shown above and in the December 21, 2015 Order, none of the grounds advanced by Movant have merit and Movant

received a constitutionally and fundamentally fair trial. Movant's cumulative prejudicial effect claim is also denied.

## H. New Evidence

### *i. Sex Trafficking/Gang Rape*

After all briefing concluded and this Court issued its December 21, 2015 Order denying in part Movant's § 2255 Motion and granting in part an evidentiary hearing, Movant told Dr. Kate Porterfield that she had been a victim of sex trafficking and gang rape at the hands of her mother when she was a child. (*See* Movant Ex. 8). Purportedly, her mother would trade sex with an underage Movant for work on the house, such as plumbing and electrical repairs. (*Id.*) Movant provided a note to habeas counsel with two of the alleged perpetrators' names. (Movant Ex. 16). Both of these men's names appear in the record of the divorce proceedings for Jack and Judy Kleiner. (Movant Ex. 17). Habeas counsel for Movant located the obituary for one of the men and confirmed he was a plumber that lived in the same area Movant lived in during her childhood. (Movant Ex. 18). Movant further claims that her ex-husband, Carl Boman, recently informed habeas counsel that Movant told him about this abuse years before the kidnapping of Victoria Jo and murder of Bobbi Jo. (Movant Ex. 13). The record reflects that her cousin, David Kidwell, told Dani Waller, the final mitigation specialist, that Movant disclosed to him that her stepfather and his friends would rape her after a night of drinking. (Movant Ex. 10).

At the evidentiary hearing, Movant asserted that this evidence should have been discovered by trial counsel and presented it as proof that trial counsel was ineffective by failing to discover it during their mitigation investigation. To prove the prejudice prong of the *Strickland* test, Movant argued that this evidence would have impacted the outcome of the trial if presented to the jury. As noted in Section III(A)(iii) of this Order, however, trial counsel's

mitigation investigation satisfied Movant's constitutional rights, particularly the fact that trial counsel attempted to corroborate David Kidwell's statement with Jack Kleiner and Movant herself to no avail. However, a secondary argument emerged during the evidentiary hearing: that Movant's revelation of alleged sex trafficking and gang rape constituted newly discovered evidence and, had it been presented at the trial, it would have resulted in a life sentence if presented to the jury. While this argument was not fully briefed, the Court will address it here in the interest of judicial economy.

"'When newly discovered evidence is the ground for a § 2255 motion, the district court should apply the same substantive test which governs a motion for a new trial under Fed. R. Crim. P. 33 premised upon the same ground.'" *Weaver*, 793 F.3d at 863 (quoting *Lindhorst v. United States*, 658 F.2d 598, 602 (8th Cir. 1981)). Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Even where an affidavit is not available until after trial, if the factual basis for the testimony in the affidavit existed before trial, then it is not newly discovered evidence." *United States v. Bell*, 761 F.3d 900, 911 (8th Cir. 2014).

As noted previously, David Kidwell gave his statement regarding sexual abuse by Jack Kleiner's friend to Movant's trial team well before the trial began. The trial team attempted to follow up on this allegation. Jack Kleiner was confronted with this information but refuted Kidwell's accusations and refused to provide names of the alleged perpetrators. Further, Movant herself failed to corroborate Kidwell's statement at that time. Carl Boman, although interviewed several times by Movant's trial team, never disclosed any statements by Movant regarding the purported sex trafficking and gang rapes. While both Movant and her ex-husband could have corroborated Kidwell's statement at the time of trial, they did not for whatever reason. Thus, the

factual basis for Movant's claim of new evidence existed at the time of trial and Movant is not entitled to relief for it. Additionally, it is not objectively unreasonable for trial counsel to not present evidence that Movant and other witnesses either did not or would not discuss at or before the time of trial.

***ii. Purported Report of Movant's Neglect***

Additionally, habeas counsel located a report filed with the Oklahoma child protective agency purportedly accusing Movant of neglecting her children. The report was not admitted into evidence at the evidentiary hearing. The defense team did not uncover the report. However, the trial team was aware that accusations of child abuse and neglect had been leveled against Movant while her family lived in Oklahoma. Thus, the report was merely cumulative evidence. Accordingly, Movant suffered no prejudice from defense counsel's failure to uncover it. *See Pinholster*, 563 U.S. at 200-01 (finding no prejudice where "new" evidence largely duplicated the evidence presented at trial).

## IV. IMPROPER CONDUCT BY HABEAS COUNSEL

At this point, the Court deems it important to reflect on instances of inappropriate and unprofessional conduct in the prosecution of this Motion. The Court is compelled to address these matters by an obligation to the legitimacy of our legal process and the need for professionalism by those who are part of the process. In that regard, there have been numerous accusations and personal attacks on the character and ability of those who have participated in this case. Some instances of improper and unprofessional conduct by habeas counsel have been addressed herein. Under Section III(A)(x), the inappropriate and false description of trial counsel's performance during *voir dire* as "novice" and "abysmal" and the claim that trial counsel "showed no skill in the area of capital defense jury selection" is discussed. Under Section III(A)(xiv), the false accusation that Dr. Dietz committed perjury is discussed. Under



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 122 of 139 March 3 2017 p227
Appellate Case: 17-1716 Page: 227 Date Filed: 04/04/2017 Entry ID: 4519884

Section III(C), the twisted interpretation of the record to accuse trial counsel of discrimination is discussed. Under Section III(E), the accusation that Drs. Mayberg and Evans presented false testimony without any support for that claim is discussed. Other instances of such conduct are addressed hereafter.

Initially, there was significant conflict among the trial team of Susan Hunt, David Owen, and Judy Clarke, much of which seems to have been personality based. It is unfortunate that this group could not get past their differences. Capable and professional attorneys should certainly be able to do so. However, determining that the conflicts within this group were not going to be resolved by the attorneys themselves, the Court stepped in and acted in an attempt to make certain that defendant's representation was not compromised by the inability or unwillingness of her attorneys to work together. That never should have been the case, but it was and required the Court's intervention to resolve the dispute. Beyond that initial conflict among Hunt, Owen, and Clarke, a number of personal and professional attacks leveled by habeas counsel need to be addressed.

The Motion for Collateral Relief to Vacate, Set Aside, and Or Correct Sentence and for a New Trial (Civ. Case, Doc. # 32) was initially filed by Criminal Justice Act ("CJA") appointed attorneys Lisa Nouri and Christine Blegen. Subsequent thereto, the Office of the Federal Public Defender for the Middle District of Tennessee was allowed to join on behalf of Movant, and Kelley Henry from that office, a member of the Missouri Bar, entered her appearance. An Amended § 2255 Motion (2255 Mtn) was filed by Nouri, Blegen, and Henry, which contained the allegations addressed herein. The amended motion was also prosecuted by Amy Harwell, an assistant federal defender from Tennessee.

In the initial motion and amended motion, it was alleged that Federal Public Defenders Ray Conrad and David Owen perpetrated fraud by alleging to the Court: (1) that Clarke had only been brought on the defense team to work out a plea agreement; (2) that Clarke had been obstructive to the defense team; (3) that Clarke had been an unproductive member of the defense team; and (4) that Clarke had been abusive to the federal defender staff. Unfortunately, the conversation upon which the allegations are supposed to have been made was an unrecorded conversation between the undersigned, Magistrate Judge John T. Maughmer, Conrad, and Owen.

This Court accepts responsibility for not having this meeting recorded. It is not this Court's practice to have meetings of substance with attorneys go unrecorded, and this Court does not recall another instance where this has taken place. The Court has no memory of what the circumstances were that caused this to happen, whether a court reporter was not available or it was merely an oversight in the midst of a busy day. Nonetheless, the lack of recording and the poor choice of words used by the Court thereafter in addressing the removal of Clarke provided the basis upon which habeas counsel made their allegations of fraud.

Once fraud was alleged, discovery was conducted on the allegations. Depositions were taken of Conrad and Owen; Judge Maughmer was interviewed as to his recollection of the conversation requesting the removal of Clarke; and the undersigned reported the representations made by Conrad and Owen which precipitated the removal of Clarke. There was no evidence of fraud. Clarke was removed as *pro hac vice* counsel because it was reported to the Court that the defense team at that time was not able to work cooperatively and effectively together. After having previously requested that Clarke be added to the defense team, Owen and Conrad were requesting that she be removed because of the lack of ability to work cooperatively. Thereafter, Hunt, at least for a short period of time, expressed agreement in the removal of Clarke.

However, shortly after Clarke was removed from the defense team, Hunt suggested that her representation of Movant be terminated because of Hunt's disagreements with Owen. There is no dispute that the defense team of Hunt, Owen and Clarke was dysfunctional because of their lack of ability to work together. Without casting blame for the circumstances, Clarke, a federal defender from California, was removed in favor of the local public defender, Owen, and local CJA appointed counsel, Hunt.

Fraud is a strong and potentially damaging accusation. In the course of discovery on the fraud claim, it was made abundantly clear that any alleged basis for the claim was from a misunderstanding and misinterpretation of what had taken place in the removal of Clarke from the trial team. No allegations were made to the Court that Clarke should be removed because she was only brought on the team to negotiate a plea or because she was not working on the case. The only allegation of substance was that the defense team was not able to get along and work together. The extensive record can be culled for statements made off the cuff, words used that are subject to interpretation, and/or matters taken out of context. A hindsight review of the record reflects that some of the Court's descriptions of what precipitated the removal of Clarke could be argued to imply that the Court believed Clarke was the source of the dysfunction of the original trial team. That is unfortunate and words should have been chosen more carefully because no such determination was made. Issues at times call for fairly quick decisions to be made, and this was the case regarding the dysfunction within this particular iteration of the trial team. The Court sought to solve the reported discord among this iteration of the trial team by accepting the request of the local attorneys involved.

As the discovery undertaken herein unequivocally reflects, the decision to remove Clarke was made by the Court because of friction between Hunt, Owen and Clarke. For Movant's


Appellate Case: 17-1716 Page: 230 Date Filed: 04/04/2017 Entry ID: 4519884

habeas counsel to maintain such a personal and professionally damning allegation of fraud against Conrad and Owen, given the totality of the record herein, is disturbing to the Court.

Additionally, in their initial motion herein and amended motion, habeas counsel alleged that the Government's decisions to federally prosecute Movant and to authorize her case as a capital prosecution were based on improper and inapplicable factors in violation of her Fifth, Sixth, Eighth and Fourteenth Amendment rights.

Habeas counsel alleged in support of their claim that at the time of the offense, and continuing through the date of this motion, Sam Graves was the United States Congressman for the Sixth District of Missouri. The murder was committed in Skidmore, Missouri in the Sixth District of Missouri. Todd Graves, the brother of Sam Graves, was the United States Attorney for the Western District of Missouri at the time of this offense. Skidmore, Missouri is also in the Western District of Missouri for purpose of federal criminal jurisdiction.

Habeas counsel argues that since United States Attorney Todd Graves's brother was a United States Congressman, that Todd Graves had a conflict of interest in the case. The claim was dismissed without an evidentiary hearing given its total lack of support under the law or otherwise. Movant failed to explain how Todd Graves would have an improper interest in the outcome of the case merely because of the fact that his brother is a congressman in the district where the crime was committed. To claim that Todd Graves acted unethically under these circumstances is offensive and an abuse of this process.

In yet another example of highly unprofessional conduct, it was alleged that the Court had engaged in a disturbing pattern of the removal of female attorneys in this case. This allegation was made in a Petition for Writ of Mandamus, which asked the Eighth Circuit Court of Appeals to direct this Court to vacate its Order directing then-habeas counsel Christine Blegen



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 126 of 129
March 31 2017 p231
Appellate Case: 17-1716 Page: 231 Date Filed: 04/04/2017 Entry ID: 4519884

to conclude her representation of Movant and withdraw from the case. The Petition for Writ of Mandamus was signed by Nouri, Blegen, Henry, and Harwell.

As set forth above, Movant was initially represented by CJA appointed counsel Nouri and Blegen. The Office of the Federal Public Defender for the Middle District of Tennessee was later allowed to join on behalf of Movant. From that office, Kelley Henry entered her appearance and Amy Harwell joined in the prosecution of the motion. In an effort to control attorney fees, the Court met with counsel and provided an opportunity for budget input from counsel. Ultimately determining that CJA appointed counsel did not offer an acceptable plan for budget control, the Court determined that, since Movant had the resources of the Office of the Federal Public Defender for the Middle District of Tennessee which included two attorneys from that office, it was no longer necessary for Movant to have the assistance of two CJA appointed counsel. Consequently, Blegen was directed to withdraw as a cost control measure. Whereupon the writ in question was filed alleging among other matters a disturbing pattern of the removal of female attorneys in this case, a totally improper, offensive, and baseless accusation.

The only conceivable reason for counsel to allege a disturbing pattern of the removal of female attorneys was to raise the specter of gender discrimination on the part of this Court. The reality is that the management of this case was difficult, but decisions had to be made and were made to the best of the Court's ability. Nothing supports the allegation raising gender bias in any decision made.

Habeas counsel in the instances cited acted with disregard for the personal and professional reputation of individuals involved in the handling of this case. The Court understands that the stakes are high and counsel has vigorously and passionately represented Movant, but that is no excuse to ignore professional decorum and conduct one's self without

regard for anything other than one's cause. Lisa Nouri, Christine Blegen, Kelley Henry and Amy Harwell are hereby admonished for their improper and unprofessional conduct as addressed herein. However, such admonishment should not be perceived as providing Movant ineffective assistance in this habeas proceeding. While habeas counsel did engage in improper and unprofessional conduct, such conduct did not impact the reasoning and determinations made in this Order.

## V. CERTIFICATE OF APPEALABILITY

A movant can appeal a decision to the Eighth Circuit only if a court issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability should be issued only if a movant can make a substantial showing of a denial of a constitutional right. *Id.* § 2253(c)(2). To meet this standard, a movant must show reasonable jurists could debate whether the issues should have been resolved in a different manner or the issues deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). As discussed above and in the Court's prior Order dated December 21, 2015, the merits of Movant's claims are not debatable among jurists or deserving of further proceedings.

## CONCLUSION

The Court denied relief on grounds I – IV, VIII – XI, XIV, XVI – XVII, and XIX – XXI of Movant's 2255 Motion in its Order dated December 21, 2015. (*See* 12/21/2015 Order). Following an evidentiary hearing on grounds V – VII, XII – XIII, XV, XVIII, and XXII, the Court has determined Movant is not entitled to relief on these claims either. Specifically, Movant has not shown that trial or appellate counsel were ineffective under *Strickland* or *Cronic*. Nor has she proved she was incompetent or under the effects of psychotropic medications such that she was denied a fair trial. Further, counsel had a race-neutral reason for agreeing to strike

venireperson Torres from the jury panel. The Government did not interfere with the defense's investigation, preparation, and presentation of its penalty phase defense or engage in prosecutorial misconduct when interacting with Tommy Kleiner following Movant's implication of him in the crime. Lastly, the Eighth Circuit's opinion on direct appeal forecloses any argument that expert witnesses Helen Mayberg's and Alan Evans's testimony, even if deemed unreliable, unscientific, and specious, would have affected the outcome of Movant's trial. For these reasons and the reasons stated above, Movant's Motion to Vacate is DENIED in its entirety and no certificate of appealability shall be issued.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 3, 2017



Case 4:12-cv-08001-GAF Document 212 Filed 03/03/17 Page 129 of 129 March 31 2017 p234
Appellate Case: 17-1716 Page: 234 Date Filed: 04/04/2017 Entry ID: 4519884

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 12-08001-CV-SJ-GAF |
| | ) | Crim. No. 05-06002-CR-SJ-GAF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**JUDGMENT IN A CIVIL ACTION**

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision of the Court.** This action came for consideration before the Court. The issues have been considered and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that Movant's Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 (Doc. # 71) is DENIED in its entirety and no certificate of appealability shall be issued.

Entered on: March 3, 2017

PAIGE WYMORE-WYNN
Clerk of Court

/s/ T. Moore
(By) Deputy Clerk

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| *Movant,* | ) | |
| | ) | |
| | ) | **Case No. 4:12-cv-08001-GAF** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| *Respondent.* | ) | |

**NOTICE OF APPEAL**

Comes now movant Lisa Montgomery, by and through counsel, and appeals to the United States Court of Appeals for the Eighth Circuit the Court's final judgment and order denying Movant's Motion To Vacate For Collateral Relief To Vacate, Set Aside Or Correct Sentence And For New Trial including the following orders: Docket Entry No. 59, June 25, 2013 Order Denying Motion to Reassign Case; Docket Entry No. 65, September 10, 2013 Order Supplementing Order Denying Motion to Reassign; Docket Entry No. 173, December 21, 2015 Order Denying In Part Motion To Vacate And Denying Motion For Discovery; and Docket Entry No. 212, March 3, 2017 Order Denying Motion To Vacate For Collateral Relief To Vacate, Set Aside Or Correct Sentence And For New Trial.

Respectfully submitted,

LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

KELLEY J. HENRY, Mo. Bar No. 38849
Supervisory Asst. Federal Public Defender
AMY D. HARWELL
Asst. Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

BY: /s/ *Kelley J. Henry*
Counsel for Lisa Montgomery

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2017, the above-captioned document was served electronically on David Ketchmark and Jeffrey Valenti, Assistant United States Attorneys representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Kelley J. Henry*
Counsel for Lisa Montgomery

U. S. COURT OF APPEALS - EIGHTH CIRCUIT
NOTICE OF APPEAL SUPPLEMENT

# MISSOURI WESTERN DISTRICT - **KANSAS CITY**

Please note any additions or deletions to the style of the case from the style listed on the docket sheet (or attach an amended docket sheet with the final style of the case).

---

Case Caption: Montgomery v. United States of America

Case No. 12-cv-8001-GAF

---

Appellant: **Lisa M. Montgomery**

Appellee: USA

Appellant's Attorney(s):

**Kelley J. Henry**
Office of the Federal Public Defender
810 Broadway Street
Suite 200
Nashville, TN 37203
(615) 736-5047
Fax: (615) 736-5265
Email: kelley_henry@fd.org

Appellee's Attorney(s):

**David M Ketchmark**
United States Attorney's Office-KCMO
400 E 9th Street
Suite 5510
Kansas City, MO 64106
816-426-4102
Fax: 816-426-7080
Email: david.ketchmark@usdoj.gov

Court Reporter(s):

Kathy Calvert, Jeannine Rankin

Please return files and documents to:
**United States District Court**
**400 East 9th Street, Room 1510**
**Kansas City, MO 64106**

Contact Person for Appeal:
**Willie Crespo** 816-512-5068

---

| | | | |
|---|---|---|---|
| Length of Trial: 0 | Fee: $505 | IFP: No | Pending IFP Motion: No |
| Counsel: Retained | Pending Motions? No | Local Interest? **No** | Simultaneous Release? **No** |

**Special Comments:**