**Capital Case**

No. 17-1716

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

**LISA MONTGOMERY,**

*Appellant,*

vs.

**UNITED STATES**,

*Appellee.*

---

APPLICATION FOR CERTIFICATE OF APPEALABILITY

---

LISA G. NOURI
Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

Kelley J. Henry
Mo. Bar No. 38849; Tn. Bar No. 021113
Supervisory Asst. Federal Public Defender

Amy D. Harwell
Tn. Bar No. 18691
Asst. Federal Public Defender
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

## TABLE OF CONTENTS


Table of Contents ........................................ i

Table of Authorities ........................................ xx

I. Introduction/References to the record. ........................................ 1

II. Issues for which COA is requested. ........................................ 11

III. Procedural History. ........................................ 14

IV. COA Standard in a capital 2255 case. ........................................ 20

V. Statement of Facts. ........................................ 23

A. How Lisa Montgomery lost a highly trained and qualified team and came to be represented by conflicted counsel who refuse to follow professional norms. ........................................ 23

1. Mr. Owen causes Mrs. Montgomery to lose attorney Anita Burns and mitigation Specialist Lisa Rickert. ........................................ 28
2. Inexperience and micromanagement cripple the Hunt/Owen team ....31
3. At the urging of resource counsel, the team seeks help from Judy Clarke. ........................................ 34
4. Progress begins with Judy Clarke leading the team. ........................................ 36
5. The FPD develops resentments. ........................................ 48
6. FPD unilaterally goes to the court with untrue accusations against Ms. Clarke. ........................................ 53
7. What was said off-the-record. ........................................ 57
8. Ms. Hunt, Ms. Clarke, Mrs. Montgomery belatedly learn that Ms. Clarke is off the case. ........................................ 64
9. Mrs. Montgomery is devastated. ........................................ 67
10. Ms. Hunt tries to bring Ms. Clarke back to the case. ........................................ 70
11. At Ms. Hunt's instruction, Mrs. Montgomery writes the court a letter: She is devastated by the loss of Ms. Clarke, has lost trust in attorneys, but expresses appreciation for Ms. Hunt. ........................................ 75

12. After more off the record communication, the court removes Ms. Hunt. ....77
13. Mr. Owen fires second mitigation specialist, Holly Jackson. ....82
14. The court appoints Mr. Duchardt as learned counsel. ....83

B. How counsel failed to comply with professional norms regarding preparation of a social history, latched onto an improbably defense theory, lied to the court thereby committing to an unqualified expert and unsupportable defense, and missed a "field of red flags" signaling the need for investigation of Mrs. Montgomery's lifetime of trauma and mental impairment. ....85

1. Mr. Duchardt jumps on hiring Dr. Ruben Gur. ....88
2. Regular team meetings and record collection stop. ....89
3. Institutional knowledge of the case is lost in the turnover. ....90
4. Mr. Owen floats his pseudoceysis theory again. ....95
5. Mr. Owen resumes his special relationship with Mrs. Montgomery's mother. ....95
6. New mitigation specialist is hired but not allowed to do her job. ....96
7. Personality problems continue to compromise the team's efforts. ....98
8. Due to turnover, mental illness, and trauma, Mrs. Montgomery can't trust her lawyers. ....105
9. Case conflicts distract Mr. Duchardt. ....108
10. Focused elsewhere, counsel sends consulting expert's work product to government expert. ....109
11. FPD demotes Mr. Owen. ....111
12. Mr. Duchardt misrepresents his wife's role to the BOP warden. ....112
13. Ms. Waller alerts Mr. Duchardt that mental health evidence is not ready for trial. ....113
14. Mr. Duchardt locks himself into a pseudocyesis defense by announcing his experts have spoken to Mrs. Montgomery and are writing reports on pseudocyesis. ....118
15. Missing symptoms of dissociation, the counsel pursue 'the Tommy Defense'. ....121
16. Mr. Duchardt relies on Mrs. Montgomery for his mitigation script. 130
17. Mr. Duchardt *et al* miss obvious red flag signaling need for investigation. ....133
18. NGRI defense needlessly subjects Mrs. Montgomery to interrogation by government expert. ....134



Appellate Case: 17-1716 Page: 3 Date Filed: 11/01/2017 Entry ID: 4596229

19. Failing to comply with professional norms regarding development of a social history, Duchardt team misses critical mitigation evidence. ..138
a. Information that Lisa was serially raped by multiple perpetrators is ignored. ..........................................................................140
b. The names of the perpetrators contained in records collected by prior teams are ignored. ........................................................145
c. The database cannot and does not function as a social history ...........................................................................................147
d. An intergenerational history is not developed. .......................149
e. Evidence regarding cruelty in the Kleiner home is not developed, presented to experts, or integrated into the mitigation strategy. ..........................................................................155
f. Mr. Duchardt fails to recognize, investigate, and develop Lisa's history of dissociation unrelated to the crime. ........................164
g. Proof that Lisa was mistreated even as an adult – reflecting and exacerbating the effect of her traumatic upbringing – was ignored. ............................................................................167
h. Counsel fail to investigate Mrs. Montgomery's pre-crime functioning: If they had, would have known this was not a "good mother" who "just snapped". ...............................................169
i. Counsel fail to investigate neurobehavioral symptoms of brain dysfunction and to consult a neurologist. ...............................179
j. Counsel fail to investigate and develop proof of Mrs. Montgomery's remorse. .......................................................180
k. Counsel fail to investigate other, similar crimes for proportionality argument. ......................................................183
20. Stretching Dr. Gur's conclusions into support for pseudocyesis draws a *Daubert* challenge to Dr. Gur's testimony in the first phase of the trial. ...........................................................................................183

C. Trial: How counsel's improbable, unsupported pseudocyesis defense stepped on the mitigation proof counsel had developed.........................................187
1. The team's pseudocyesis theory is inconsistent with the facts, Mr. Duchardt can't back out of his misrepresentation to the court. .......189
2. 'The Tommy Defense' is not ruled out until after *voir dire* has begun. ...........................................................................................206



Appellate Case: 17-1716 Page: 4 Date Filed: 11/01/2017 Entry ID: 4596229

3. Despite concerns about Mrs. Montgomery's competence, no one seeks an assessment or a competency determination. ................................211
4. Counsel fail to protect Mrs. Montgomery's right not to proceed with expert evaluation. ..........................................................................214
5. Counsel inadvertently creates (erroneous) proof that Mrs. Montgomery malingered by mishandling Hutchinson notes and data, undermining all mental health evidence. ........................................216
6. Counsel's inadequate, incomplete presentation of mental health evidence in support of NGRI steps on its mitigating value. ............226
    a. PTSD. ...........................................................................226
    b. Other major mental illnesses. ...............................................231
7. The team's presentation of Mrs. Montgomery's children backfires. ..........................................................................................................233
8. Mr. Duchardt mishandles the expert witnesses. ...............................235
    a. Ramachandran. .............................................................235
    b. Dietz. ...........................................................................238
    c. Martell. .........................................................................239
    d. Logan. ..........................................................................241
    e. McCandless. .................................................................243
    f. Kuncel. ..........................................................................245
9. Counsel fails to present mitigation evidence readily available through the witnesses who testified at trial. ................................................248
    a. Despite calling David Kidwell as a witness, the defense team fails to present proof of serial, gang rape, by Mr. Kleiner's friends. ..........................................................................249
    b. Despite calling Diane Mattingly as a witness, the team fails to present that as a child, Lisa witnessed her sister being raped. ..........................................................................................251
    c. The team fails to present Judy's cruelty in repeatedly forcing Diane out of the home. .........................................................253
    d. Failed to present all the available information in Nancy Wallentini's report. ............................................................257
10. Counsel fails to explain to the jury that Mrs. Montgomery is under the influence of psychotropic medications. ...................................259



Appellate Case: 17-1716 Page: 5 Date Filed: 11/01/2017 Entry ID: 4596229

D. §2255 Proceedings: Mrs. Montgomery establishes her entitlement to relief despite denial of process, removal of habeas counsel, and the district court's limitation of proof. ....................263
1. Mrs. Montgomery filed her Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255. ....................263
2. Counsel pleads claims relating to the removal of Judy Clarke upon information and belief and seeks reassignment of the motion to allow discovery of Judge Fenner's testimony. ....................266
3. The district court hears oral arguments on the motion to reassign. .270
4. The court denies the motion to reassign and contemplates removing counsel. ....................275
5. The district court denies motion to stay and supplements the record. ....................277
6. The district court compels trial counsel to provide affidavit to the government and grants discovery to trial counsel. ....................280
7. The district court removes Ms. Blegen as counsel for Mrs. Montgomery. ....................283
8. The district court grants an evidentiary hearing and sets the matter for hearing expeditiously. ....................286
9. The district court limits the hearing. ....................287
a. The district court limits the testimony of Mrs. Montgomery's expert witnesses. ....................288
b. The district court excludes expert testimony. ....................290
c. The district court chastises counsel for failing to anticipate the exclusion of Professor Fox. ....................292

E. The proof at the hearing entitles Mrs. Montgomery to relief. ....................296
1. Mrs. Montgomery establishes that standards for effective capital representation and identifies the red flags ignored by the trial team. ....................297
2. Testimony by capital defense practitioners confirmed that the standards presented by the expert witnesses are the standard of practice in representation of capital clients. ....................317
3. Mrs. Montgomery presents the history of the disruption of counsel including its case and effects on representation. ....................322
a. Because the Hunt/Owen team was "floundering," it sought help from Mr. Burr and Ms. Clarke. ....................322



Appellate Case: 17-1716 Page: 6 Date Filed: 11/01/2017 Entry ID: 4596229

b. Ms. Clarke and her team made progress in the six months they were on the case. ....................325
c. The team began developing rapport with Mrs. Montgomery and noted her symptoms of impairment. ....................326
d. Under Ms. Clarke's leadership, record collection "skyrocketed". ....................328
e. Under Ms. Clarke's leadership the team identified a "whole field of red flags". ....................330
f. Team members qualified to identify and assess symptoms of trauma and mental illness began the process of observation, investigation, and assessment. ....................332
g. Team members qualified to identify and assess symptoms of trauma and mental illness perceived that Mrs. Montgomery's competence was impaired. ....................334
h. The team ruled out the possibility that Tommy Kleiner was present at the crime. ....................335
i. The team ruled out Dr. Ramachandran as an appropriate defense expert. ....................337
j. The team began identifying and retaining experts. ....................339
k. Mrs. Montgomery was devastated by the loss of Ms. Clarke and the loss further weakened her ability to trust any lawyer. ....................340

4. Mrs. Montgomery presented proof that Mr. Owen's lack of awareness, pettiness, and misogyny was the source of the team's problems. ....................342
5. Mrs. Montgomery established that resource counsel and their mitigation team remained available to assist even after Ms. Clarke was removed, but were never invited to help. ....................350
6. Mrs. Montgomery presented trial counsel's testimony, providing ample opportunity for counsel to explain their reasoning and strategy. ....................353
   a. Trial counsel's testimony established that removal of Ms. Clarke harmed Mrs. Montgomery and the defense. ....................353
   b. Trial counsel's testimony supported Mrs. Montgomery's IAC for failure to competently handle experts claim. ....................355
   c. The proof established that counsel failed to reasonably investigate mitigation. ....................355
   d. The proof rebutted Mr. Duchardt's prior statements. ....................359
7. The proof supported Mrs. Montgomery's *Riggins* claim. ....................361

8. The proof showed that Mr. Duchardt took his wife on visits with Mrs. Montgomery, misrepresented his wife's (non)role to the warden, and failed to discuss involving his wife with the other attorneys. ..........361
9. The proof established that Mr. Owen and Mr. Duchardt thought Mrs. Montgomery lacked the ability to rationally assist counsel but did not alert the court to her incompetence. ...............................................363
10. The proof established that counsel were ineffective in their pursuit of 'the Tommy Defense'. ....................................................................364
11. The proof established that counsel were ineffective in putting forward a NGRI defense based upon an unqualified expert's opinion based upon an erroneous, presumption of facts. ........................................365
12. The proof established that counsel failed to protect Mrs. Montgomery's Fifth Amendment Rights. ..............................................................367
13. The proof established that counsel failed to effectively develop expert testimony/evidence. ........................................................................368
    a. Movant presented the testimony of Dr. Hutchinson to demonstrate the proof available to trial counsel through Dr. Hutchinson who had begun an evaluation of Mrs. Montgomery in 2005 and who, had she been provided a comprehensive social history, could have provided expert psychological testimony regarding the deleterious effect of trauma. .............................368
    b. Movant presented the testimony of Dr. Logan in support of her claims of ineffective assistance of counsel as to Mr. Duchardt's misrepresentations to the court and as to the team's handling of the pseudocyesis defense. .....................................................380
    c. Movant presented Dr. Fucetola's testimony regarding the evidence of brain damage identified by his neuropsychological testing, his recommendation to trial counsel that additional investigation of Mrs. Montgomery's brain impairments was needed, and further information he would have been able to present had he had a biopsychosocial history. ........................388
    d. Movant presented Dr. Kuncel's testimony regarding trial counsel's failure to provide her adequate social history information, to insure her testing conditions met protocol, to adequately prepare her to testify, and the trial team's bungling of the proof regarding Mrs. Montgomery's MMPI profile. ........392



Appellate Case: 17-1716 Page: 8 Date Filed: 11/01/2017 Entry ID: 4596229

e. Movant presented Dr. Sanislow, the nation's preeminent expert on the MMPI, who testified that the government's expert's use of the MMPI data did not conform to standard of care and misrepresented that which can be gleaned from Mrs. Montgomery's MMPI profile. ....................................................396

f. Movant presented Dr. Davatzikos to support her ineffective assistance of trial counsel claim regarding counsel's failure to adequately defend Dr. Gur's MRI data at the *Daubert* Hearing. ....................................................................................406

g. Movant presented the testimony of Dr. Newberg to support her claim of ineffective assistance of counsel for failure to defend the reliability of Dr. Gur's PET results thereby opening the door to the government's discovery dispute that resulted in the exclusion of the PET data.......................................................411

h. Movant presented Dr. Gur's testimony that was available but not presented – at trial regarding his behavioral image, his testimony regarding the reliability of his MRI data, and the difficulty posed by counsel's mishandling of the discovery dispute that resulted in the exclusion of the PET analysis. .....................................417

i. Movant presented testimony that Dr. Ramachandran never was the expert Mr. Duchardt represented him to be. .....................427

14. Proof Lisa Montgomery was sexually trafficked becomes available once Kidwell memo investigated. ...................................................432

15. Proof at the hearing established that trial counsel failed to comply with prevailing professional norms and prepare a comprehensive social history. ...............................................................................................435

a. Mrs. Montgomery's social history – both the historical narrative reflecting family dysfunction and abuse and also the description of Mrs. Montgomery's impaired functioning pre-crime – is the foundation for the reliable expert assessments and opinions presented at the hearing as well as providing mitigation. .......435

b. Ms. Vogelsang's proof is uncontested, scrupulously sourced, and supported by social work literature. .................................437

c. Ms. Vogelsang's testimony is rooted in the narrative life history of Lisa Montgomery as framed by the discipline of clinical social work. ......................................................................438



Appellate Case: 17-1716 Page: 9 Date Filed: 11/01/2017 Entry ID: 4596229

d. Ms. Vogelsang sets the stage with intergenerational history showing patterns of dysfunction and mental illness. ..............439
e. Ms. Vogelsang's chaos map illustrates the instability and rootlessness of Lisa's upbringing. ........................................450
f. Ms. Vogelsang describes the terror, isolation, and abuse that permeated Lisa's childhood and demonstrates Lisa was subjected to strategies of coercive control. .............................451
g. Ms. Vogelsang points to information indicating Lisa's dissociation and other mental health problems began in childhood. ........................................................................462
h. Ms. Vogelsang points to the critical point at which Lisa almost escaped. ..........................................................................463
i. Ms. Vogelsang describes, with reference to clinical literature, the devastating effect of the chronic trauma, instability and helplessness on Mrs. Montgomery's functioning as an adult. 465

16. Mrs. Montgomery presents proof that, once sexual trafficking and gang rape are presented, proof of the debilitating effect of complex posttraumatic stress disorder on Lisa's development and functioning is compelling. ..........................................................................482
17. Mrs. Montgomery present proof of her significant brain impairments. ...........................................................................................502
18. Mrs. Montgomery presents proof that her brain impairments, mental illness, and Complex Post-Traumatic Stress disorder are more than the sum of each added together: The conditions are compounding, each worsening the impairment cause by the other. .................................511

VI. Argument. ..........................................................................................542

A. It is reasonably debatable that the district court's abrupt removal of attorney Judy Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery, contrary to the wishes of Ms. Clarke and Mrs. Montgomery, and without a hearing, violated Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. §3599. ............................542



Appellate Case: 17-1716 Page: 10 Date Filed: 11/01/2017 Entry ID: 4596229

1. In April, 2006, Judy Clarke had established attorney/client relationship with Mrs. Montgomery and was the only attorney on the team qualified to represent Mrs. Montgomery. ..........542
   a. Prior to Ms. Clarke's appointment, the defense team was crippled by inexperience, fear, and power struggles. ..542
   b. Judy Clarke joined the team. .....................................545
   c. Without consulting the client and behind lead counsel's back, Mr. Owen and Mr. Conrad unilaterally asked the court to remove Ms. Clarke in an unrecorded *ex parte* meeting. ..................................................................547
   d. Susan Hunt tried to undo the damage done, but the court refused and then instructed Ms. Hunt to withdraw from the case. ...................................................................551
2. It is reasonably debatable that the trial court's decision to remove Ms. Clark as counsel without notice or hearing was an unconstitutional denial of Mrs. Montgomery's Sixth Amendment right to counsel. ...............................................552
3. The district court's error is structural. ..................................564
4. Even though error is structural, Mrs. Montgomery, has demonstrated actual prejudice. .............................................566

B. David Owen and Ray Conrad rendered ineffective assistance of counsel by engaging in conduct leading to the district court's decision to abruptly remove Ms. Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery and contrary to the wishes of Ms. Clarke and Mrs. Montgomery resulting in a violation of Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599. ...........................570

C. Mrs. Montgomery was deprived of counsel at a critical stage in the proceedings when David Owen and Ray Conrad met with the district court without her knowledge or consent resulting in the removal of Judy Clarke as counsel for Mrs. Montgomery in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. .........................................................................574

D. Claims A-C are not subject to Procedural Bar. ................................577

E. It is at least debatable that the district court denied Mrs. Montgomery due process and a fair hearing on claims relating to the removal of Judy Clarke as counsel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. §2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under §2255. ..........................................................................583

1. It is at least debatable that the district court should have recused itself. ..................................................................583
2. The district court erroneously limited discovery. .................591
3. The district court erroneously denied an evidentiary hearing. ..........................................................................................595
4. Constitutional concerns. .....................................................596

F. Multiple deficiencies by successor trial counsel including: failure to consult with prior counsel, virtually stopping record collection; stalling the investigation; working on other cases while ignoring Mrs. Montgomery's; failing to communicate with other working on the case; zeroing in on an improbable NGRI defense and an equally improbable and logically inconsistent innocence defense; refusing to work with his mitigation expert; failing to develop competent expert proof; and making false statements to the court, constitute ineffective assistance of counsel. ..................................................................599

1. Legal standard. ..................................................................599
2. Prevailing professional norms. .............................................606
    a. The proof at the hearing established that the ABA Guidelines defined the prevailing professional norms at the time of Mrs. Montgomery's trial. However, contrary to the district court's opinion, Mrs. Montgomery's proof regarding prevailing professional norms was corroborated and animated by Judicial Conference Policy, scholarly research, professional literature, and expert testimony. The district court's order fails to engage with the proof in the record. ............................606
    b. Prevailing professional norms at the time of Mrs. Montgomery's trial required at a minimum a functioning

team of two lawyers, an investigator, a mitigation specialist, and a person qualified to identify and screen for mental health symptoms. ....................................613

c. Prevailing professional norms at the time of Mrs. Montgomery's trial required frequent communication among all the team members. ....................................625

d. Prevailing professional norms at the time of Mrs. Montgomery's trial required thorough and complete investigation. ............................................................627

e. Prevailing professional norms at the time of Mrs. Montgomery's trial required counsel to be honest with the court, to put the interest of the client ahead of professional interest, and prohibited trial counsel from continuing its representation once a conflict of interest arose. ........................................................................634

i. The Federal Public Defender's Office had an actual conflict of interest in the representation of Lisa Montgomery. ..........................................634

ii. Mr. Duchardt was also operating under an actual conflict of interest that adversely effected Mrs. Montgomery, when he knowingly made untrue statements to the trial court thereby pitting his interest in not being found out against Mrs. Montgomery's interest in a fair trial and effective representation. ................................................636

3. Counsel's unprofessional errors prejudiced Mrs. Montgomery where her first phase defense utterly destroyed any chance she had in the second phase of trial. ..........................................641

a. The Tommy Defense. ................................................642

b. Counsel were ineffective in pleading NGRI thereby waiving important Rule 12.2 protections, in tying their evidence of brain damage to the unsupportable NGRI defense resulting in loss of powerful proof of brain damage, in failing to prepare witnesses to testify, and for failing to obtain a biopsychosocial history to present a multidisciplinary team. ..............................................655



Appellate Case: 17-1716 Page: 13 Date Filed: 11/01/2017 Entry ID: 4596229

i. Counsel chose a factually insupportable defense. ....................................................................655

ii. The NGRI plea exposed Lisa Montgomery to an expensive five day video-taped interrogation by seasoned government experts Drs. Park Dietz and Daniel Martell. ................................................662

c. Trial counsel's inattention, ineffective investigation, and lack of preparation led to the disclosure of privileged information – represented to be the report of Dr. Marilyn Hutchinson, which was then presented by the governments experts as proof that a defense expert had concluded that Mrs. Montgomery was a malingerer. Dr. Hutchinson testified that she never wrote a report, she never concluded that Mrs. Montgomery was a malingerer, and that which was represented as her impressions was not even her work. ............................666

d. Resulting ineffectiveness in cross-examination of Dr. Dietz, Dr. Martell, and failure to rebut testimony. ......670

i. Mr. Duchardt's cross examination of Dr. Martell was so poor that his co-counsel became visibly upset at counsel table and one team member had to leave the courtroom. .........................................671

ii. Mr. Duchardt's incomplete social history investigation left him unprepared to challenge Dr. Dietz's testimony. ............................................678

e. The defense pursuit of NGRI resulted in the exclusion of powerful evidence of Mrs. Montgomery's brain injury because of the defense insistence of presenting the evidence in the first phase and the resulting *Daubert* challenge that was poorly litigated. .............................687

f. Trial counsel failed to object to improper argument which prejudiced the penalty phase. ............................695

g. Conclusion. .................................................................697

G. Mrs. Montgomery's entitlement to relief is reasonably debatable where, in contravention of prevailing professional norms of counsel

unreasonably failed to investigate, develop, and present readily available, compelling penalty phase evidence. ................................697
1. Contrary to prevailing professional norms, counsel failed to investigate, develop, and present a full social history despite obvious red flags signaling familially linked mental illness, chronic trauma and abuse, an inter-generational family pattern of custodial interference. ....................................................701
2. Counsel failed to present evidence of the pervasive trauma that permeated Mrs. Montgomery's life. ....................................711
    a. Counsel failed to investigate the readily available proof of the justice's system's failure to address Jack Kleiner's rape of Lisa. ............................................................713
    b. The defense undermined their own narrative by presenting that Lisa's mother believed that Lisa stole her husband. ......................................................................717
    c. Counsel failed to present readily available proof of Judy's lack of care for and silencing of Lisa. ..............719
    d. Counsel failed to investigate the Kidwell Memo despite its obvious red flag signaling extreme sexual trauma. 721
        i. The record refutes the district court's finding that the Kidwell evidence was unavailable. .............723
        ii. The record refutes the district court's finding that trial counsel made a strategic decision to abort further investigation into Kidwell. ....................725
        iii. The district court's finding that the trial counsel only aborted their investigation after "reasonable diligence to corroborate Mr. Kidwell's statement" is refuted by the record and contrary to case law. ......................................................................727
    e. Counsel failed to investigate, develop, and present other proof of the coercive control and trauma that defined Lisa's existence. ....................................................... 737
    f. Counsel failed to effectively use experts to explain the debilitating effects of lifelong, chronic trauma on Lisa. ..........................................................................739
3. Counsel failed to investigate, develop, and present Mrs. Montgomery's impaired functioning prior to the crime. .......742



Appellate Case: 17-1716 Page: 15 Date Filed: 11/01/2017 Entry ID: 4596229

4. Counsel bungled the presentation of evidence about Mrs. Montgomery's brain impairments. .......................................750
    a. Because counsel failed to conduct a reasonable investigation and create social history, counsel did not glean Mrs. Montgomery's neurobehavioral history from available documents, records, and witness interviews. ...........................................................................751
    b. Counsel failed to investigate or develop proof regarding the neurological effect of trauma on Lisa's developing brain. ....................................................................754
    c. Counsel failed to present the neuropsychological findings indicative of brain damage found by Dr. Fucetola. .....757
    d. Counsel sought to present Dr. Gur's finding in the first phase of trial in support of NGRI/pseudocyesis, thereby drawing the state's *Daubert* motion, but failed to present evidence of Mrs. Montgomery's brain damage – including Dr. Gur's MRI or behavioral image – in the penalty phase. ..........................................................758
    e. Counsel failed to obtain a neurological consult – thereby failing to investigate or develop proof of Mrs. Montgomery's neurological impairments. ..................761
    f. Counsel failed to present the synergistic effect of brain damage, trauma and mental illness, failing to show the jury that each impairment is both a cause and effect and the combined nature of all together is greater than the sum of each. ...............................................................765
5. Counsel failed to present readily available proof of statutory mitigating circumstances. ...................................................766
6. Mrs. Montgomery's entitlement of relief is at least reasonably debatable where, had counsel complied with prevailing professional norms and conducted a reasonable investigation, provided a social history to trial experts for accurate and reliable diagnosis, and explained both the nature of Mrs. Montgomery's impairments and their causes, including the devastating Complex PTSD she suffered as a result of her mother sexually trafficking her – one juror could have decided to choose life. ......................................................................768

H. It is reasonably debatable that Mrs. Montgomery was incompetent to stand trial because she was unable to rationally assist counsel due to her brain damage, mental impairments, severe complex trauma, and the incomplete, ineffective and inappropriate regimen of psychotropic medication administered to her by CCA before and during her capital trial. As such, it is reasonably debatable that Mrs. Montgomery's rights to due process, a fair trial, effective assistance of counsel, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendment were violated. ........................774
1. Constitutionality test for competence to stand trial. ..............774
2. Evidence available pre-trial placed counsel and the district court on notice that Mrs. Montgomery's competency was in questions. ........................................................................775
3. The record establishes that Mrs. Montgomery was unable to rationally assist counsel at trial. ...........................................784
4. It is reasonably debatable that Mrs. Montgomery was tried while incompetent. (Substantive due process claim) .............790
5. It is reasonably debatable that the district court should have conducted a competency hearing. (Procedural due process claim) ..........................................................................793
6. It is reasonably debatable that trial counsel was ineffective in failing to raise a competence claim at trial. (IAC claim) .......795
a. Prevailing professional norms. ...................................796
b. Red flags. ..................................................................796
c. Prejudice. ...................................................................798

I. It is reasonably debatable that Mrs. Montgomery's Fifth Sixth, Eighth, and Fourteenth Amendment rights to due process, full and fair trial, and reliable sentencing were violated when she was administered multiple psychotropic medications during her trial which distorted her affect, while at the same time incompletely treating her comorbid mental illnesses without a detailed pre-trial determination that the administration of the drugs during trial was necessary. Further, trial counsel was ineffective for failing to raise issue with the trial court; failing to explain this issue to Mrs. Montgomery; and failing to elicit

testimony that would explain the physiological impact of medications to the jury........................................................................................799

1. Riggins v. Nevada and its progeny hold that a criminal defendant may not be forcibly medicated during trial absent detailed findings that support the involuntary administration of the medication and ameliorative steps are taken to lessen the impact of the medication on the trial rights of the defendant. ........................................................................................799
2. The incomplete and ineffective treatment regimen of multiple psychotropic medications administered to Mrs. Montgomery had significant side effects resulting in her loss of a full and fair trial, interfered with her right to counsel and right to present a defense, and deprived her of a fair sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. ....................................................................804
   a. Opinion of Dr. Bradford. ..........................................804
   b. Dr. Woods corroborates Dr. Bradford's opinion. ........................................................................807
3. The evidence in the record establishes that Mrs. Montgomery did not voluntarily agree to be medicated during her capital trial in violation of *Riggins*. ........................................................813
4. It is reasonably debatable that trial counsel was constitutionally ineffective in failing to protect Mrs. Montgomery's rights under Riggins v. Nevada and in failing to ameliorate the impact of the jury observing Mrs. Montgomery under the influence of psychotropic medication. ....................................................818
   a. It is reasonably debatable that trial counsel's performance fell below prevailing professional norms. ..................818
   b. It is reasonably debatable that Mrs. Montgomery was prejudiced in multiple was by trial counsel's professional errors. ........................................................................822
      i. The jury observed Mrs. Montgomery display a flat affect without any understanding that the medications, and her major mental illness, were responsible. ....................................................822
      ii. Government took advantage of Mrs. Montgomery's appearance. ..............................824



Appellate Case: 17-1716 Page: 18 Date Filed: 11/01/2017 Entry ID: 4596229

iii. Mrs. Montgomery was not competent. .............825

iv. Mrs. Montgomery's trial while involuntarily medicated undermined her insanity defense. ....826

v. Penalty phase. .................................................827

J. Mrs. Montgomery was denied due process at the evidentiary hearing below were the court denied discovery, failed to honor stipulations, cut short testimony, and displayed bias towards habeas counsel. ....827

1. The court's decision to grant an evidentiary hearing, by definition, meant that Mrs. Montgomery met the standard for conducting discovery under Rule 6 of the Rules on Motion Attacking Sentence Under §2255. The denial of discovery was therefore a denial of due process and a full and fair hearing. 829

2. Mrs. Montgomery was denied due process and a full and fair hearing where without notice to Mrs. Montgomery, in its final order the district court failed to treat stipulations as agreements between the parties, and where the district court truncated witness' testimony based on the stipulation of the government. ..........................................................................833

3. Mrs. Montgomery was denied due process and full and fair hearing where the district court decided her case without post-hearing briefing or a transcript. .............................................835

4. Mrs. Montgomery was denied procedural due process and a full and fair hearing where the district court excluded the testimony of Lawrence Fox, Esq. .......................................................835

5. Mrs. Montgomery was denied procedural due process in the district court because she was denied a hearing before an impartial arbiter. ..................................................................837

K. It is reasonably debatable that Mrs. Montgomery's rights to due process and a fair reliable sentence free from emotion and caprice under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the introduction of overly prejudicial victim impact evidence. Trial counsel was constitutionally ineffective for failing to object to this proof. ....................................................................839




Appellate Case: 17-1716 Page: 19 Date Filed: 11/01/2017 Entry ID: 4596229

L. Mrs. Montgomery's capital sentence violates the Eighth Amendment, because it is constitutionally disproportionate where Mrs. Montgomery is the only individual to be sentenced to death for these crime facts and where Mrs. Montgomery suffers from brain damage and severe mental illness. ....................840

M. Government witness, Dr. Park Dietz, presented untrue and prejudicial testimony regarding the nature of the Grand Jury investigation into his untrue testimony in the Andrea Yates trial and the circumstances surrounding that untrue testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). ..............843

VII. Conclusion ....................845

Certificate of service ....................846

## TABLE OF AUTHORITIES


*Amadeo v. State*, 384 S.E. 2d 181 (Ga. 1989) ........................................553, 560

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................................840

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) ............................691, 751, 753

*Beck v. Alabama*, 447 U.S. 625 (1980)...........................................................22

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ..........................................................607

*Bond v. Beard*, 539 F.2d 256 (3d Cir. 2008) ............................................690,751

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990) ..........................790,791, 798

*Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005).......................................736, 737

*Bracy v. Gramley*, 520 U.S. 899 (1997) .........................................596, 830, 831

*Brown v. Sternes*¸ 304 F.3d 677 (7th Cir. 2002)..............................................797

*Buck v. Davis*, 137 S.Ct. 759 (2017)..........................................................11, 20

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) ..................................................22

*Caperton v. A.T. Massey Coal Co*., 556 U.S. 868, 872 (2009) ................590,837

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 24–625 (1989)..................................................................................................................555

*Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)............................................790

*Carnley v. Cochran*, 369 U.S. 506 (1962).....................................................817

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) .....................690, 750, 751,753

*Christeson v. Roper*, 135 S.Ct. 891 (2015).....................................291,576, 636

*Christeson v. Griffith*, 845 F.3d 1239 (8th Cir. Jan. 18, 2017)..........................291

*Coker v. Georgia*, 433 U.S. 584 (1977).........................................................841

*Cone v. Bell*, 556 U.S. 449 (2009)..................................................604, 678,772

*Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978) .......................................601

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) .................................................794

*Cuyler v. Sullivan*, 446 U.S. 335 (1980).......................................................636

*Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) ..................................passim

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).....................passim

*Davis v. Ayala*, 135 S.Ct. 2187 (2015) .........................................................814

*Davis v. Cain*, 662 So. 2d 453 (La. 1995) .....................................................553

*Deitrich. V. Ryan*, 619 F.3d 1038 (9th Cir. 2010) ....................................690,751

*Drope v. Missouri*, 420 U.S. 162 (1975) ................................................775,785

*Dusky v. United States*, 362 U.S. 402 (1960) ...................................775,785,794

*Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) ......801

*Faretta v. California*, 422 U.S. 806, (1975) ..................................................803

*Federal Deposit Insurance Corporation v. Icard, Merrill, Cullis, Timm, Duren & Ginsburg, P.A., et al.*., United States District Court, Middle District of Florida, Tampa Division, Case No. 8:11-CV-283-lt-33-MAP........................291

*Ferguson, et al. v Stout, et al.*, Circuit Court of the 11th Judicial Circuit and for Miami-Dade County, Florida, Case No. 08-09767-CA-40 .............................291

*Ford v. Wainwright*, 477 U.S. 399 (1986).......................................................22

*Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003) ....................................691,752

*Frazier v. Mitchell*, 354 F.3d 1073 (9th Cir. 1998) .........................................691

*Frazier v. United States*, 18 F.3d 778 (9th Cir. 1994).....................................633

*Frierson v. Woodford*, 463 F.2d 982 (9th Cir. 2006) .......................................691

*Gardner v. Florida*, 430 U.S. 349 (1977)..................................................22,853

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ..................................................599

*Giglio v. United States,* 405 U.S. 150 (1972) ...................................................14

*Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2005) ..................................................697

*Graham v. Florida*, 560 U.S. 48 (2010) .........................................................840

*Gregg v. Georgia*, 428 U.S. 153 (1976) ....................................................609, 840

*Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) ..................................691, 751

*Harling v. United States*, 387 A.2d 1101 (D.C. 1978) ....................................554

*Harris v. Nelson*, 394 U.S. 286, 300 (1969) ....................................................830

*Harris v. People*, 567 P.2d 750, 752 (Cal. 1977) ............................................553

*Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995) ..................................................601

*Hodge v. Hurley*, 426 f.3d 368 (6th Cir. 2005)...................................................696

*Holloway v. Arkansas*, 435 U.S. 475 (1978) ...........................................597, 636

*Hummel v. Rosemeyer*, 564 F.3d 290 (3d Cir. 2009) ......................................798

*In re: Go Fig, et al; Strauss, Trustee v. Helfrey, Neiers & Jones, P.C.,* United States District Court, Eastern District of Missouri, Eastern Division, Case No. 08-40116-705, Chapter 7 ........................................................................291

*In re: Lisa Montgomery,* Case No. 13-2958 ......................................................16

*In re: Lisa Montgomery,* Case No. 14-2437 ..........................................17, 18, 588

*In re: Murchison*, 349 U.S. 133 (1955) ..........................................................837

*In re: Pray*, 336 A.2d 174 (Vt. 1975) ..........................................................826,827

*Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008) .....................................701, 733

*Johnson v. Secy. DOC,* 643 F.3d 907 (11th Cir. 2011) .............................736, 737

*Kyles v. Whitley*, 514 U.S. 419 (1995).....................................................601, 772

*Lafler v. Cooper*, 566 U.S. 156 (2012).....................................................562, 575

*Lockett v. Ohio*, 438 U.S. 586 (1978)........................................22, 710, 840, 841

*Lokos v. Capps*, 625 F.2d 1258, 1267 (5th Cir. 1980) ....................................791

*Machibroda v. United States*, 368 U.S. 487 (1962) ........................................596

*Mackey v. Russell*, 148 F. App'x 355 (6th Cir. 2005) ......................................601

*Maples v. Thomas*, 565 U.S. 266 (2012) .........................................576, 599, 636

*Martel v. Clair*, 565 U.S. 648 (2012) ....................................................560, 563

*Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005) ........................................696

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................................599

*Mary Bucksbaum Scanlan v. Marshall Eisenberg, et al.,* United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:09-cv-05026..........................................................................................................291

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ....................................................834

*Matter of Welfare of M.R.S.*, 400 N.W.2d 147, 152 (Minn. Ct. App. 1987)....555

*McFarland v. Scott*, 512 U.S. 849, 114 S.Ct. 2568 (1994) .............................561

*McGregor v. Gibson*, 248 f.3d 946 (10th Cir. 2001).......................................794

*McMurtrey v. Ryan*, 539 F.3d 1112 (9th Cir. 2008)........................................795

*Mickens v. Taylor*, 535 U.S. 162 (2002).........................................................636

*Miller v. Alabama*, 567 U.S. 460 (2012) .........................................................840

*Miller-EL v. Cockrell*, 537 U.S. 322 (2003)..........................................11,20,21

*Montgomery v. United States,* 565 U.S. 1263 (2012).......................................25

*Montgomery v. United States,* 17-1716, Entry ID 4557812 ..............................20

*Moore v. Mitchell*, 708 F.3d 760 (6th Cir. 2013) ....................................576, 582

*Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008).........................................22

*Musladin v. Lamarque*, 555 F.3d 830 (9th Cir. 2009)......................................562

*Napue v. Illinois,* 360 U.S. 264 (1959)..........................................................14

*Padilla v. Kentucky*, 559 U.S. 356 (2010).............................................298, 613

*Pate v. Robinson*, 383 U.S. 375 (1966) ..........................................775, 790,791

*Payne v. Tennessee*, 501 U.S. 808 (1991) ......................................................839

*Penry v. Lynaugh*, 492 U.S. 302, 331 (1989) .........................................690, 750

*Porter v. McCollum*, 558 U.S. 30 (2009) ..................................................passim

*Powell v. Alabama*, 287 U.S. 45 (1932) ....................................................599

*Presnell v. Georgia*, 439 U.S. 14 (1978) ....................................................834

*Purkey v. United States,* 2009, U.S. Dist. LEXIS 89664, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009 ....................................................100

*Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013) ....................................100

*41Reid v. Covert, 354 U.S. 1 (1957)* ....................................................21

*Riggins v. Nevada*, 504 U.S. 127 (1992) ....................................................passim

*Rock v. Arkansas*, 483, U.S. 44, 107S.Ct. 2704, 97 L.Ed. 2d 37 (1987)..........803

*Rompilla v. Beard*, 545 U.S. 374 (2005) ....................................................passim

*Roper v. Simmons*, 543 U.S. 551 (2005) ....................................................840

*Saddler v. United States*, 531 F.2d 83 (2d Cir. 1976) ....................................795

*Sears v. Upton*, 561 U.S. 945 (2010) ....................................................passim

*Sell v. United States*, 539 U.S. 166 (2003) ....................................................818,825

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) ................................601, 603

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) ..................597,712,830

*Slack v. McDaniel,* 529 U.S. 473 (2000) ....................................................12,21

*Smith v. Superior Court of L.A. Cty*., 440 P.2d 65 (Cal. 1968) ................554, 559

*Stearnes v. Clinton*, 780 S.W.2d 216 (Tex. Crim. App. 1989)........................553

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................576, 600

*Summers v. Singletary*, 119 F.3d 917 (11th Cir. 1997) ....................................583

*Trevino v. Thaler*, 569 U.S. 413 (2013) ....................................................599

*Trop v. Dulles*, 356 U.S. 86 (1958) ....................................................840

*United States v. Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987) ...................585

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................600, 772

*United States v. Cook*, 997 F.2d 1312 (10th Cir. 1993) ....................................599

*United States v. Cronic*, 466 U.S. 648 (1984) .................................................576

*United States v. Dubray*, 727 F.2d 771, 772 (8th Cir.1984).............................597

*United States v. Elbert*, No. 06-00257-01.......................................................111

*United States v. Fazio*, 599 F.3d 835 (8th Cir. 2010).......................................821

*United States v. Fiorelli*, 337 F.3d 282 (3d Cir. 2003)....................................598

*United States v. Gonzales-Lopez*, 548 U.S. 140 (2006) ..................555, 556, 577

*United States v. Gordon*, 634 F.2d 638 (1st Cir 1980).....................................599

*United States v. Howard*, 381 F.3d 873 (9th Cir. 2004)...................................792

*United States v. John Phillip Street*, No. 4:04-CR-00298-GAF.......................108

*United States v. Martin*, 226 F.3d 1042 (9th Cir. 2000)...................................598

*United States v. Montgomery,* Case No. 2:04-mj-08107-DJW.D.Kansas..........14

*United States v. Montgomery*, Case No. 05-06002.........................................184

*United States v. Montgomery*, 635 F.33599d 1074 (8th Cir. 2011) ....................15

*United States v. Nelson*, 297 Fed. Appx. 563, 565 (8th Cir. 2008) ..................596

*United States v. Rodham*, 233 F. App'x 320 (4th Cir. July 11, 2007)...............791

*United States v. Tucker*, 82 F.3d 1423 (8th Cir. 1996).....................................583

*United States v. Quin*, 836 F.2d 654 (1st Cir. 1988) .......................................798

*U.S. Bank National Association v. Verizon Communications, Inc., et al.*, United States District Court, Northern District of Texas, Dallas Division, C.A. No. 10-CV-1842-G ..........................................................................................291

*Warrior Sport, Inc. v. Dickinson Wright, PLLC,* United States District Court, Eastern District of Michigan, Southern Division, Case No. 09-12102 ............291

*Wellons v. Hall*, 558 U.S. 220 (2010)..................................................596,831

*Wiggins v. Smith*, 539 U.S. 510 (2003)....................................................passim

*Williams v. Allen,* 542 F.3d 1326 (11th Cir. 2008)...................................735, 737

*Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016) ...................................590,837

*Williams v. Taylor*, 529 U.S. 362 (2000) .................................................passim

*Williams v. United States*, 984 F.2d 28 (2d Cir. 1993) ..................................798

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ..............................796, 798

*Willis v. Cockrell*, No. P-01-CA-20 CAPITAL HABEAS, 2004 WL 1812698 (W.D. Tex. Aug. 9, 2004) ........................................................................818

*Withrow v. Larkin*, 421 U.S. 35 (1975) ........................................................591

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ..........................................22

*Yates v. State*, 171 S.W.3d 215 (Tex. App. Houston [1st Dist.] 2005) ............843

*Zapata v. Estelle*, 588 F.2d 1017 (5th Cir. 1979) ..........................................792

*Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015) .........................................696

**Constitutional Clauses**

U.S. Constitution, Article III .........................................................................11

5th Amendment to the U.S. Constitution..................................................passim

6th Amendment to the U.S. Constitution..................................................passim

8th Amendment to the U.S. Constitution..................................................passim

14th Amendment to U.S. Const. ..................................................................passim

**Federal Rules**

Federal Rule 12.2 ..........................................................................................passim

Fed. R. Evid. 803(5)........................................................................................ 720

**Statutes**

Anti–Drug Abuse Act, 102 Stat. 4393–4394, 21 U.S.C. §§ 848(q)(4)–(10) (1988 ed.) (recodified at 18 U.S.C. § 3599 (2006 ed. and Supp. IV)..............562

18 U.S.C. 1201(a) (2012)........................................................................15

18 U.S.C. 3005 (2012)..............................................................passim

18 U.S.C. 3006A (1988)..............................................................26, 561

18 U.S.C. 3006A (2012)..............................................................26, 561

18 U.S.C. 3592(a)(6) (2012)........................................................184

18 U.S.C. 3592(a)(8) (2012)........................................................184

18 U.S.C. 3592(6) (2012)............................................................184

18 U.S.C. 3599 (2012)..............................................................passim

18 U.S.C. 4242 (2012)..................................................................662

21 U.S.C. 848(q)(4)(10) (1988 & Supp. IV)....................................562

21 U.S.C. 3006A(d)(2006 & Supp. IV)............................................562

28 U.S.C. 455(b)(1) (2012)...........................................................583

28 U.S.C. 455(b)(5)(iv) (2012)......................................................583

28 U.S.C. 455(b) (2012)................................................................603

28 U.S.C. 2253 (2012)....................................................................11

28 U.S.C. §2254...................................................................597, 599

28 U.S.C. 2255 (2012)..............................................................passim

**Publications**

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Pub. 1989..................................................567

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Pub. 2003...........................................passim

Geimer & Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am. J. Crim. L. 1, 5153 (1987, 1988)......801

Jeffrey Coe, Note, *Seeking a Sane Solution: Reevaluating Interests in Forcibly Medicating Criminal Defendants to Trial Competency*, 54 Ariz. L.Rev. 1073, 1088 (2006)......801

Brenda A. Likavec, Note, *Unforeseen Side Effects: the Impact of Forcibly Medicating Criminal Defendants on Sixth Amendment Rights*, 41 Val. U.L. Rev. 455, 144 (2006)......802

Louis Hansen, *Hey defendants: Wardrobe can be a factor in verdict,* The Virginian-Pilot, August 13, 2012......189

Paula Christian, *Defense Attorneys Clean Up Clients Before Court,* Tampa Tribune, Nov. 25, 2001......189

Jeff Weiner, *Clothing for court: Lawyers hunt for trial attire,* Orlando Sentinel, June 29, 2017......189

Judith Herman, *Trauma and Recovery,* Basic Books, 1992......39, 684

V.S. Ramachandran, *Phantoms In the Brain*, 294, Harper Collins, 1999 (1998)......196

Robert Blecker, *The Death of Punishment, Searching for Justice Among the Worst of the Worst*, Palgrave MacMillan (2013)......530

*Guide to Judiciary Policy, Vol. 7A*......608

Honorable James Spencer, et al., *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, May 1998......610, 612

https://www.justice.gov/pardon/obama-commutations#CJAN172017 (last visited October 31, 2017)......619

https://deathpenaltyinfo.org/documents/OrtizClemencyStatement.pdf(last visited October 31, 2017)......619

Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43......819

## I. Introduction

This case contrasts two capital proceedings: the one that should have been and the one that was. Juxtaposed within this record is: a) evidence that would have been discovered in Lisa Montgomery's defense had the district court not terminated – without notice and against Mrs. Montgomery's wishes – the appointment of one of the most successful federal death penalty lawyers in the country, with b) the superficial, disjointed, and prejudicial defense actually presented by replacement counsel who willfully eschewed professional norms.

While appointed to Lisa Montgomery's case, Judy Clarke and her team of top-notch mitigation experts were on a path that would have led them to the discovery that Lisa Montgomery had been the victim of severe, sustained, massive trauma her entire life. The type of trauma that Ms. Clarke and her team would have discovered, and that the habeas team did discover, differs in quality and kind from the snapshot of abuse presented by trial counsel. Had Ms. Clarke and her team not been replaced, they unquestionably would have learned that Lisa Montgomery was sexually trafficked by her own mother. They would have learned that Lisa Montgomery's mother allowed men to rape her eight year old half-sister, Diane, while four year-old Lisa lay in the bed next to hers, close enough that they could reach and touch each other. They would have learned of the mother's unspeakable cruelty as she placed Diane, naked, outside in the

dark and cold for punishment. They would have understood her ruthlessness when she sent Diane away into the state foster system – whispering to Diane it was all her fault she was being discarded.

Ms. Clarke's team would have understood how the mother's sadism repeated itself time and again with Lisa Montgomery. They would have discovered that the mother told Lisa it was her fault that Lisa was raped by the many men who came in and out of their house. They would have discovered that the mother used sex with Lisa to pay the bills to the gas man and the roofer, among others. They would have known that Lisa was gang-raped on multiple occasions by multiple men and that those rapes involved anal, oral, and vaginal penetration. And that when the men were through, they urinated on her.

They would have uncovered the chronic and constant physical violence that pervaded Lisa's childhood home. They would have learned of how Lisa cowered, shivered, and cried as her stepfather beat her mother. They would have understood how, as an adult, Lisa fell prey to the cycle of violence she witnessed as child – leading her to prostitution and involvements with multiple men who sexually violated her.

Ms. Clarke's team would have discovered that this chronic, pervasive, massive trauma resulted in Lisa suffering from Complex Post-Traumatic Stress Disorder. They would have known that this disorder causes Lisa to detach from



Appellate Case: 17-1716 Page: 31 Date Filed: 11/01/2017 Entry ID: 4596229

reality – that Lisa has had a life long struggle of not knowing what is real and not real. They would have comprehended the impact of that trauma on Lisa's memory and understood her mental vulnerabilities.

Ms. Clarke's team would have uncovered a multi-generational history of severe mental illness and placed Lisa's demonstrated mental health symptoms which include hallucinations, psychosis, mania, and depression into context. They would have understood the effect of the mother's drinking during pregnancy on the development of Lisa's brain. They would have understood how trauma also effects brain development and how, together with sustained head injuries, Lisa's brain is forever compromised.

Ms. Clarke's team would not have shied away from the fact that Lisa was often unable to care for her children. They would have learned the facts about Lisa that were ultimately presented by the government (with the help of successor trial counsel) as evidence of Lisa's bad character were actually symptoms of her severe mental illness.

Ms. Clarke's team would have done all of this by conducting the sort of thorough social history investigation that is the accepted standard of care in a capital case. They would not have relied on their client as the sole source of information as successor trial counsel did. In fact, they recognized that the client was mentally fragile and that the best source of information was

documents, third party interviews, and empirical data. They would have secured competent, reliable, expert witnesses who understood the role of a mental health professional in a courtroom.

Ms. Clarke's team would never have raised a first phase insanity defense thereby exposing Lisa Montgomery to a five-day, pre-trial interrogation by the government's experts and injecting character proof in the first phase of the trial. Ms. Clarke's team would never have relegated the role of trauma in Lisa Montgomery's life to a footnote designed to support an improbable defense that Lisa Montgomery suffered from a mental illness that is rarely seen, barely understood, and unsupported by any objective measure of the proof.

By the time they were terminated from the case, Clarke and her team already knew that Lisa's brother, Tommy Kleiner, could not have been a participant in the crime, because they had his alibi documented in their file.

But Ms. Clarke and her team were terminated. They were terminated because the local public defender's ego was bruised, and he went to the judge – without the knowledge of Clarke or the client – and caused the court to immediately terminate Clarke, barring her from all communication with Mrs. Montgomery. The reverberations from that decision were catastrophic.

Ms. Clarke was replaced by Fred Duchardt. The record shows that Mr. Duchardt does not adhere to prevailing professional norms and does not follow

the team defense approach. The record shows that Mr. Duchardt refuses to consult with death penalty experts. The record shows that Mr. Duchardt eschews the help of mitigation specialists in favor of using his family members to assist him on interviews – in this case misrepresenting his wife as an expert to gain her access to attorney/client meetings.

Moreover, the record shows that Mr. Duchardt failed to begin serious preparation for the trial of this case until four months before a firm trial date. As this application will detail, because of the understandable panic which must have descended, a series of uninformed decisions were made which forever altered the trajectory of the trial and ultimately doomed the defense.

As of January, 2007, Lisa Montgomery had never claimed that her brother was present with her at the murder. To the contrary, she had accepted responsibility and expressed remorse for the crime. Then, Mr. Duchardt – who has never accepted that Mrs. Montgomery could have committed the murder – began to work on her. The record reflects that, as Lisa curled into fetal position and rocked back and forth, Mr. Duchardt told her that he did not have time or patience and that she needed to tell him who else was with her.

In the meantime, on February 20, 2007, the attorney who obtained Ms. Clarke's termination, was demoted because of improper communications with a client. That attorney made it clear that his days as a public defender would end

with the verdict in Mrs. Montgomery's case. As Mr. Duchardt continued to push Lisa, on March 1, 2007, the mitigation specialist hired by the public defender, Dani Waller, first learned from a relative, David Kidwell – who has a law enforcement background – that Lisa Montgomery had been gang raped by her step-father and his friends. Though this information was documented in a memo, the lead was ignored. Perhaps it was ignored because, as the record shows, Mr. Duchardt did not have much use for Ms. Waller. Or, perhaps it was ignored because on March 6, 2007, Mrs. Montgomery gave Mr. Duchardt the answer he had been pushing for by naming her brother, Tommy Kleiner.

Although Tommy Kleiner's alibi was in his file, Mr. Duchardt sought to prove that Mr. Kleiner was the real culprit and Lisa was a bystander. The record shows that Mr. Duchardt believes this absurdity to this day. His belief is not based on thorough investigation, but his intuitive feeling that Mrs. Montgomery could not have done such a thing. Because he could not comprehend how Mrs. Montgomery could have committed the crime, though she had readily confessed to the FBI, Mr. Duchardt did not comprehend how very mentally ill she was. Mr. Duchardt's defense at trial was tethered to his unshakeable belief in what came to be known as 'the Tommy defense.'

As the Tommy defense did not explain the series of false pregnancies Mrs. Montgomery reported, Mr. Duchardt sought to prove that they were the result

of pseudocyesis – even though Mrs. Montgomery did not fit the first diagnostic criteria for pseudocyesis. Though pseudocyesis (even if she had it) would not qualify Mrs. Montgomery as legally insane at the time of the crime as Mrs. Montgomery never believed that the baby was her own, Mr. Duchardt showed the same rigid intransience about the pseudocyesis defense as he did the Tommy defense. Further, the two defenses were inconsistent. When it was decided to abort the Tommy defense on the eve of trial, the defense was left with an insanity defense that did not relate to the crime and did not address whether Mrs. Montgomery knew or could appreciate the wrongfulness of her acts at the time of the murder: pseudocyesis really only addressed whether she knew that she was not pregnant when she claimed to be.

To support this non-insanity, insanity defense, Mr. Duchardt presented witnesses who were incompetent to testify as witnesses in a capital trial. He failed to heed the warning of his only forensic witness resulting in that witness all but confessing on cross-examination that the crime facts refuted the insanity defense. Mr. Duchardt oversold the brain damage evidence he had developed, evidence of Mrs. Montgomery's brain damage, ultimately resulting in the exclusion of that evidence from the trial.

Mr. Duchardt cobbled together this inconsistent and factually insupportable defense theory and announced it in open court before he had conducted the

necessary investigation and before any expert had endorsed his pseudocyesis defense. He unabashedly told the Court on April 3, 2007 that he had two experts who had diagnosed Mrs. Montgomery with pseudocyesis and who were first phase witnesses. He told the court that Dr. Ramachandran was writing a report. The record establishes as a matter of uncontroverted fact that these statements were false and Mr. Duchardt knew that they were false.

The dominoes fell predictably and the picture of Mrs. Montgomery went from reality – that she was a remorseful, mentally ill defendant who accepted responsibility – to a fiction – that she was a remorseless, cold, calculating, manipulative woman who sought to evade her responsibility by blaming her brother.

The defense painted a false picture of Lisa Montgomery and the government capitalized on and amplified that false picture. As a result, the defense evidence in support of the unbelievable NGRI/pseudocyesis theory became aggravating – undermining the defense's mitigation story. The death sentence was pre-ordained the moment that Mr. Duchardt allowed Mrs. Montgomery to be interviewed on videotape placing her brother at the scene of the crime.

**About the length of this application:**

Undersigned counsel are aware that the length of this application far exceeds that with which the Court has ever dealt. For this, counsel apologize. Counsel wish to explain the reason that counsel feel compelled to provide so much factual detail as well as explain the structure of the pleading. The original motion in this case raised twenty-two claims. Counsel have winnowed those claims to the fourteen in this application. However, the fourteen claims in this case are factually driven and the facts of each claim overlap and are inextricably intertwined with facts that support other claims. The district court order, which was written without any post-hearing briefs or a transcript, fails to engage with the facts as presented or Mrs. Montgomery's legal theories. It appears that the district court failed to consider voluminous exhibits and testimonial declarations, presumably because it misunderstood the legal claims and the ways in which the data was interrelated. The record in this case involves a 2,381 page evidentiary hearing, over six thousand pages of exhibits that trial counsel did not discover or, in the case of documents obtained by prior counsel, failed to review (e.g. Tommy Kleiner's alibi and the memo documenting Mr. Kidwell's revelation regarding the gang rape), and a 3,199 page trial transcript.



Appellate Case: 17-1716 Page: 38 Date Filed: 11/01/2017 Entry ID: 4596229

Because the district court did not entertain briefing, there is no analysis of the record and the legal claims for counsel to reference. Because this is a COA application, the Court will not have the entire record before deciding whether to grant a COA. The only summary of the facts that counsel can refer to is the one contained herein.

Further, the district court's order directly assails the professional integrity of habeas counsel.[a] For this court to be assured of the evidentiary support for the claims in this application, counsel have taken great care to source the statement of facts with extreme detail. The record cites alone take substantial space. It is not the intent of counsel to vex or harass this Court or opposing counsel.

To aid the Court in its review of this lengthy application, counsel have provided a detailed table of contents to each section of the application. To improve readability, record citations to factual statements are contained in consecutively numbered endnotes. Footnotes are given an alphabetical designation which restarts on each page. Cross-reference will be by page number and footnote letter. Each claim is written with an assumption that the reader is fully versed with the facts as detailed in the statement of facts. Effort

[a] Habeas counsel do not concede the truth or fairness of these accusations. However, these allegations are not separately appealed because to do so would be to create a conflict with Mrs. Montgomery causing another disruption in her legal team and resulting in overall delay.



Appellate Case: 17-1716 Page: 39 Date Filed: 11/01/2017 Entry ID: 4596229

was made to limit factual discussion to within the claims themselves to the most essential facts necessary to make a coherent and understandable argument, or to address additional facts which are not easily incorporated into the overarching statement of facts. The evidentiary hearing exhibits are available on electronic format and can easily be uploaded to the Court's docket if the Court so directs.

**References to the record**

References to the record will be as follows: Criminal Trial Transcript (TT. Vol. #, page #, Witness Name) Criminal Pleadings and Orders (Crim. D.E. #, p. #); §2255 Pleadings and Orders (D.E. #, p.#); Transcript (Vol. #, p.#, Witness Name); Exhibits (Exhibit #, p.#, Description).

## II. Issues for which a COA is requested.

Pursuant to Article III of the United States Constitution; the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; 18 U.S.C. §3599; 28 U.S.C. §2253; and Rule 11 of the Rules on Motion Attacking Sentence Under §2255; *Miller-El v.* Cockrell, 537 U.S. 322 (2003); and *Buck v. Davis*, 137 S.Ct. 759 (2017), Lisa Montgomery requests this Honorable Court to grant her a certificate of appealability on the following interrelated issues which are debatable among jurists of reason:

1. Whether the district court's abrupt removal of attorney Judy Clarke from the defense team without notice to Ms. Clarke or Mrs.

Montgomery, contrary to the wishes of Ms. Clarke and Mrs. Montgomery, and without a hearing, violated Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. §3599.

2. Whether the trial court's decision to remove Ms. Clarke as counsel without notice or hearing was an unconstitutional denial of Mrs. Montgomery's Sixth Amendment right to counsel.

3. Whether counsel David Owen and Federal Public Defender Ray Conrad rendered ineffective assistance of counsel by engaging in conduct leading to the district court's decision to abruptly remove Ms. Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery and contrary to the wishes of Ms. Clarke and Mrs. Montgomery resulting in a violation of Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.

4. Whether Mrs. Montgomery was deprived of counsel at a critical stage in the proceedings when David Owen and Ray Conrad met with the district court without her knowledge or consent resulting in the removal of Ms. Clarke as counsel for Mrs. Montgomery in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5. Though the district court's ruling on claims 1-4 was on the merits, if the Court believes any of those claims are subject to procedural default, Mrs. Montgomery requests a COA under *Slack v. McDaniel*, 529 U.S. 473 (2000), as to whether any such claim is subject to procedural default and if so, whether Mrs. Montgomery has shown cause and prejudice sufficient to overcome the procedural bar.

6. Whether the district court denied Mrs. Montgomery due process and a fair hearing on claims relating to the removal of Ms. Clarke as counsel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. §2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under §2255



Appellate Case: 17-1716 Page: 41 Date Filed: 11/01/2017 Entry ID: 4596229

7. Whether multiple deficiencies by successor trial counsel including: failure to consult with prior counsel, virtually stopping record collection; stalling the investigation; working on other cases while ignoring Mrs. Montgomery's; failing to communicate with others working on the case; zeroing in on an improbable NGRI defense and an equally improbable and logically inconsistent innocence defense; refusing to work with his mitigation expert; failing to develop competent expert proof; and making false statements to the court, constitute ineffective assistance of counsel.

8. Whether Mrs. Montgomery is entitled to relief where, in contravention of prevailing professional norms, counsel unreasonably failed to investigate, develop, and present readily available, compelling penalty phase evidence

9. Whether Mrs. Montgomery was incompetent to stand trial because she was unable to rationally assist counsel due to her brain damage, mental impairments, severe complex trauma, and the incomplete, ineffective, and inappropriate regimen of psychotropic medication administered to her by CCA before and during her capital trial. As such, it is reasonably debatable that Mrs. Montgomery's rights to due process, a fair trial, effective assistance of counsel, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendment were violated.

10. Whether Mrs. Montgomery's Fifth Sixth, Eighth, and Fourteenth Amendment rights to due process, full and fair trial, and reliable sentencing were violated when she was administered multiple psychotropic medications during her trial which distorted her affect, while at the same time incompletely treating her comorbid mental illnesses without a detailed pre-trial determination that the administration of the drugs during trial was necessary. Further, whether trial counsel was ineffective for failing to raise issue with the trial court, failing to explain this issue to Mrs. Montgomery, and failing to elicit testimony that would explain the physiological impact of medications to the jury

11. Whether Mrs. Montgomery was denied due process at the evidentiary hearing below where the court denied discovery, failed to honor stipulations, cut short testimony, and displayed bias towards habeas counsel.



Appellate Case: 17-1716 Page: 42 Date Filed: 11/01/2017 Entry ID: 4596229

12. Whether Mrs. Montgomery's rights to due process and a fair reliable sentence free from emotion and caprice under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the introduction of overly prejudicial victim impact evidence. Whether trial counsel was constitutionally ineffective for failing to object to this proof.

13. Whether Mrs. Montgomery's capital sentence violates the Eighth Amendment, because it is constitutionally disproportionate where Mrs. Montgomery is the only individual to be sentenced to death for these crime facts and where Mrs. Montgomery suffers from brain damage and severe mental illness.

14. Whether Dr. Park Dietz, presented untrue and prejudicial testimony regarding the nature of the Grand Jury investigation into his untrue testimony in the Andrea Yates trial and the circumstances surrounding that untrue testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).

## III. Procedural History

On December 20, 2004, Mrs. Montgomery was arrested and charged with kidnapping resulting in death in the United States District Court for the District of Kansas in Case No. 2:04-mj-08107-DJW. D. Kans. D.E. 1. Assistant Federal Public Defenders Charles Dedmon and Ronald Wurtz were appointed counsel. *Ibid*. On December 23, 2004, a removal hearing was held in the District of Kansas and the case was transferred to the United States District Court for the Western District of Missouri. D. Kans. D.E. 5-7. On December 28, 2004, Mrs. Montgomery was arrested on the Western District of Missouri Warrant and made her initial appearance in that court. Crim. D.E. 6. The Federal Public

Defender for the Western District of Missouri was appointed counsel Crim. D.E. 8. Assistant Federal Public Defender Anita Burns was assigned to the case.

Mrs. Montgomery was indicted on January 12, 2005 and charged with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a). Crim. D.E. 14. On March 30, 2007, Mrs. Montgomery was arraigned on a superseding indictment charging her with kidnapping resulting in death in violation of 18 U.S.C. § 1201(a) (1). Crim. D.E. 154, 198.

Mrs. Montgomery was convicted of the charge in the indictment after a jury trial. Crim. D.E. 341. The jury returned a verdict recommending a sentence of death on October 26, 2007. Crim. D.E. 354. The Court imposed sentence on April 4, 2008. Crim. D.E. 402. Mrs. Montgomery timely filed a notice of appeal. Crim. D.E. 403. This Court upheld Mrs. Montgomery's conviction and sentence. *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011). The United States Supreme Court denied certiorari review on March 19, 2012. *Montgomery v. United States*, 565 U.S. 1263 (2012).

On March 22, 2012, Mrs. Montgomery, through her appellate counsel, filed a motion for the appointment of counsel for purposes of filing a Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for a New Trial. Crim. D.E. 482. The Motion specifically requested the Court to appoint "two counsel, learned in the capital case law, to represent her." Crim. D.E. 428, p. 7.

Specifically, the motion details the experience of two experienced capital lawyers and prayed that the court appoint the "Office of the Federal Capital Habeas Project of the Federal Defender for the District of Maryland, and particularly Ruth Friedman, Director of that Office, and Miriam Gohara, a Senior Staff Attorney in that Office." *Id.*, p. 8. The motion noted that the one year statute of limitations was running and time was of the essence.

On April 17, 2017, the district court granted the motion in part and denied it in part. The Court appointed local CJA counsel, Lisa Nouri and Christine Blegen as counsel. Crim. D.E. 430. On September 21, 2012, at the request of Ms. Nouri and Ms. Blegen, the Court appointed the Office of the Federal Public Defender for the Middle District of Tennessee as co-counsel. D.E. 13. On March 18, 2013, Mrs. Montgomery timely filed her "Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for a New Trial." D.E. 32. On March 18, 2013, she also filed a Motion to Reassign. D.E. 41. The motions were both refiled on the record due to problems with the court's electronic docketing system. The Motion to Reassign was denied on June 25, 2013. D.E. 59. Mrs. Montgomery sought an extraordinary writ in this Court to review the district court's order on the Motion to Reassign. *In Re: Lisa Montgomery*, Case No. 13-2958. This Court ordered a response from the district court. *Id.*, Entry ID: 4072350. The government responded instead of Judge Fenner. Mrs.

Montgomery replied. This Court denied the writ without comment on October 17, 2013. *Id.,*Entry ID: 4086367.

While the extraordinary writ was pending, Mrs. Montgomery timely amended her §2255 motion. D.E. 71. The exhibits to the motion were lodged electronically.

After the district court granted discovery to a non-party and compelling witnesses to cooperate and confer with that party on issues relevant to their testimony, Mrs. Montgomery again sought an emergency stay of that order pending the filing of a writ of mandamus and/or prohibition in this Court. *In Re: Lisa Montgomery*, No. 14-2437. This Court granted the stay motion on June 20, 2014. *Id.*, Entry ID: 4167134. Mrs. Montgomery filed her petition in compliance with the Court's deadline on Friday, June 27, 2014. The following Monday morning, without notice or a hearing, the district court *sua sponte* entered an order terminating Christine Blegen's appointment and ordering her to withdraw from the case. D.E. 114. On July 1, 2014, this Court directed the United States to respond to the pending Writ and they complied. On July 11, 2014, this Court denied the writ without comment. *In Re: Lisa Montgomery*, No. 14-2437, Entry ID: 4174361.

After filing a motion to reconsider the order terminating Ms. Blegen as counsel, which was denied, Mrs. Montgomery sought relief in this Court for a

third time. *In Re: Lisa Montgomery*, No. 14-2725. On July 24, 2014, this Court ordered the district court judge to respond to the petition for writ of mandamus. *Id.*, Entry ID: 4178889. The district court complied. *Id.*, Entry ID: 4179320. Mrs. Montgomery replied. *Id.*, Entry ID: 4179414. The petition was denied on August 13, 2014. *Id.*, Entry ID: 4185600. The district removed Ms. Blegen from the case on August 20, 2014. A timely petition for rehearing and suggestions for rehearing *en banc* was denied on September 23, 2014. *Id.*, Entry ID: 4199494.

Thereafter, the district court refused to pay Mrs. Blegen for any of her work on the case from January 1, 2014 through August, 2014 and refused to release substantial funds which had been withheld from previous vouchers. D.E. 138. In an order denying Ms. Blegen's motion to reconsider the denial of payment, the district court wrote "Ms. Blegen challenged the Court's Order directing her to withdraw from this case in the Court's effort to reasonably control public funded representation and failed to comply with the Court's Order that she minimize her representation. Even after counsel's challenge of the Court's Order directing her to withdraw was denied by the Eighth Circuit Court of Appeals, counsel failed to withdraw requiring her removal by the Court." D.E. 139.

Meanwhile, after two of the trial counsel took more than a year to file court ordered statements in opposition to the motion, the Government filed its response. D.E. 129, 130, 140. Mrs. Montgomery filed her Traverse in compliance with the Court's order on September 1, 2015 and a Motion for Discovery on September 3, 2015. D.E. 149, 150. Mrs. Montgomery electronically filed all of the exhibits in support of her amended motion on September 8, 2015. D.E. 151-D.E. 166.

On December 21, 2015, the district court entered its order denying specified claims, including all claims relating to the termination of Judy Clarke as trial counsel, denying discovery, and granting an evidentiary hearing on Grounds V-VII, XII-XIII, XV, XVIII, XXII in the motion. D.E. 173, p. 65. After two status conferences, the evidentiary hearing was held from October 31, 2016 through November 10, 2016. D.E. 200-209. Without allowing post-trial briefs and without a transcript, the district court entered its order denying relief as to all claims and denying a certificate of appealability. D.E. 212. Mrs. Montgomery filed a timely notice of appeal. D.E. 214.

This Court granted Mrs. Montgomery's request to extend the time to file her application for certificate of appealability to November 1, 2017. *Montgomery v. United States*, No. 17-1716, Entry ID: 4557812. This application is filed in compliance with that order.

## IV. The COA standard in a capital § 2255 case.

Mrs. Montgomery is entitled to a COA if she demonstrates that her claims are reasonably debatable among jurists of reason. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The COA standard is not difficult to meet. "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338. In *Buck v. Davis*, 137 S.Ct. 759 (2017), the Court explains, "the only question is whether . . . 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.*, at 773 (quoting *Miller-El*, 537 U.S. at 327).

In *Buck,* the Court describes the inquiry as, "limited", and instructs that, "[t]his threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Id.* (quoting *Miller –El*, 537 U.S. at 336). This is so, the Court held, because the COA inquiry is not "coextensive with a merits analysis." *Id.* When a court of appeals bypasses the COA "process by first deciding the merits of an appeal, and then justifying its denial of a COA based on its adjudication of the actual merits, it is in essence

deciding an appeal without jurisdiction." *Id*. (quoting *Miller-El*, 537 U.S. at 336-37).

When a claim is denied on procedural grounds without reaching the merits of the underlying claim, movants are entitled to a COA where "jurists of reason would find it debatable whether the "[motion] states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The claims at issue directly relate to the constitutionality and reliability of Mrs. Montgomery's capital sentence. In capital cases, the Supreme Court has long required heightened due process to secure reliability and fundamental fairness. To ensure the requisite degree of reliability, the Court requires additional safeguards not present in noncapital cases. *Reid v. Covert*, 354 U.S. 1, 45-46 (1957) (Frankfurter, J., concurring) ("It is in capital cases especially that the balance of conflicting interests must be weighted most heavily in favor of the procedural safeguards of the Bill of Rights."). "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North*

*Carolina*, 428 U.S. 280, 305 (1976). "In capital proceedings generally, [the Supreme] Court has demanded that fact-finding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *see also Caldwell v. Mississippi*, 472 U.S. 320, 343 (1985) (O'Connor, J., concurring); *Beck v. Alabama*, 447 U.S. 625, 638 (1980); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977). "In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner." *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008).

Because this is a capital case, the requirement for heightened due process mandates that the court give Mrs. Montgomery the benefit of the doubt in resolving the motion for COA and err on the side of permitting a full appeal to go forward.

The district court granted an evidentiary hearing on most of the claims at issue in this motion.[1] Movant presented 38 witnesses, 17 of which were expert witnesses. The government called no witnesses. The government stipulated to the introduction of 432 exhibits, which included 83 testimonial declarations. Given that the standard for obtaining an evidentiary hearing is similarly low, it follows that Mrs. Montgomery is entitled to a COA on those issues for which she received an evidentiary hearing in the district court. *See* D.E. 173 (granting



Appellate Case: 17-1716 Page: 51 Date Filed: 11/01/2017 Entry ID: 4596229

hearing on specified claims.) As to the claims presented here that were not included in the evidentiary hearing, Mrs. Montgomery will show that those claims are reasonably debatable.

Accordingly, a COA should issue for all claims discussed in this motion.

## V. STATEMENT OF FACTS

### A. How Lisa Montgomery lost a highly trained and qualified team and came to be represented by conflicted counsel who refuse to follow professional norms.

Lisa Montgomery's confusion, remorse, and horror at that which she had done was apparent upon her arrest on December 17, 2004. "She did not seem to comprehend what had happened and could not believe that she had done such a thing."[2] Once it became apparent to her that she had killed Ms. Stinnent, Mrs. Montgomery was "overcome with guilt and remorse."[3] CCA deemed her at risk of suicide and placed her on suicide watch.[4] When first seen by counsel, "[s]he was just totally wrung out . . . like she's been drug through a keyhole. She looked like she had been constantly crying. She seemed disoriented. She was difficult [for her lawyers] to communicate with."[5]

Her first attorneys thought her "fragile and confused"[6] and testified that it was "obvious . . . that we needed to get a psychiatric evaluation as soon as possible or psychological evaluation for a baseline."[7] Within five days of arrest, the defense's social worker recorded that Lisa had no memory of the crime,[8]



Appellate Case: 17-1716 Page: 52 Date Filed: 11/01/2017 Entry ID: 4596229

and felt as though she were "living in a dream."[9] She was unable to answer basic questions about her life, and at times became "shut down and silent" when asked simple questions.[10] Though she had no memory of the crime, Mrs. Montgomery was by then clear that she "must have done" that with which she was accused.[11] Despite her confusion, Mrs. Montgomery never claimed that anyone else was responsible for the crime.[12]

Mrs. Montgomery's counsel observed that her affect was not steady – she was depressed but at times her speech would become quite pressured.[13] When asked about issues regarding pregnancy, miscarriages, and babies, she "became shut down and silent."[14] "She was very emotional during [meetings with counsel] and often cried. At other times she appeared detached. Her mood was definitely unstable."[15]

Within a week of her arrest – before the transfer of her case to Missouri – Mrs. Montgomery repeatedly referenced Mr. Kidwell in her conversations with her defense team.[16] Mr. Kidwell, her first cousin once removed and a former law enforcement officer, was the person who knew that as a child Lisa was sadistically raped and beaten by her step-father and his friends.[17]

Before Mrs. Montgomery's case was removed to the Western District of Missouri, the Office of the Federal Public Defender for Kansas represented her. Charles Dedmon and Ron Wurtz were counsel of record.[18] Mr. Dedmon and



Appellate Case: 17-1716 Page: 53 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Wurtz visited with Mrs. Montgomery and saw her extreme distress.[19] Dedmon and Wurtz believed they urgently needed to get a psychiatric evaluation.[20] In anticipation of a mental health evaluation, and in order to document and describe Mrs. Montgomery's symptoms, Dedmon and Wurtz hired Bret Dillingham, a social worker, to visit with Mrs. Montgomery – observing and documenting her symptoms.[21] Mr. Dillingham visited with Mrs. Montgomery two times before her case was removed to Missouri.[22] Mr. Dillingham noted that Lisa spoke of some past events in the present tense "as if it were actually happening" and noted her pressured speech.[23] "It became clear to me that Lisa exhibited symptoms of a major mental disorder including delusions, dissociation and possible psychosis. I also believe Lisa to have been the victim of serious trauma. It is normal for survivors of severe trauma to fail to report all that they have experienced in initial meetings. Often survivors of trauma will deny the trauma altogether. In my experience it takes multiple meetings for the complete trauma history to emerge . . . My memory of Lisa's affect is that it seemed weird and inappropriate for the situation. As I spent more time with her I believed her thought processes to be bizarre, delusional and possibly psychotic."[24]

Upon Mrs. Montgomery's arraignment to the capital murder charges, the Office of the Federal Public Defender for the Western District of Missouri

(hereafter FPD) was appointed to represent Mrs. Montgomery on December 28, 2004.[25] Initially the FPD assigned Anita Burns as counsel for Mrs. Montgomery,[26] and Susan Hunt, a private CJA counsel attorney, was appointed as "additional" counsel pursuant to 18 U.S.C. § 3005 & 3006(a).[27a]

Anita Burns recognized it was important to have someone with mental health experience interacting with Mrs. Montgomery – observing her symptoms and monitoring her for suicidality.[28] She determined that it would be beneficial for Bret Dillingham to continue in that role as he had developed a relationship with Mrs. Montgomery.[29] She recognized that the team would need a mitigation specialist, and hoped that Mr. Dillingham could provide information or advice about that as well as continuing his relationship with Mrs. Montgomery. Mr. Dillingham met with Mrs. Montgomery twice after her removal hearing.[30]

Dave Owen "asserted himself as a controlling figure in the case from the beginning."[31] Mr. Owen's attempts to control the case were "problematic because David has never worked a capital case."[32] Mr. Owen was known in his office for being "belligerent, "misogynistic," and "a bully in every sense of the word."[33] Ms. Burns wanted to keep Mr. Dillingham on the case as a consultant,

---

[a] The Federal Death Penalty Resource Project did not consider Susan Hunt qualified to be "learned counsel" – rather the project considered Ms. Hunt to be "learning counsel" (Vol. 3, p. 548, *Burr Testimony*).



Appellate Case: 17-1716 Page: 55 Date Filed: 11/01/2017 Entry ID: 4596229

but she was overruled by Mr. Owen, who was her supervisor.[34] Mr. Dillingham's contact with Mrs. Montgomery stopped when Ms. Burns left the team.[a]

In January 2005, the team began to consult with Dr. Marilyn Hutchinson, a Kansas City psychologist who practices both clinical and forensic psychology. Dr. Hutchinson understood her role on the team: she was a consultant – a member of the team who attended team meetings, shared in client confidences, and expected that her work with the team would be confidential.[35,b] Dr. Hutchinson interviewed Mrs. Montgomery, conducted targeted psychological testing and then contracted with a psychometrist, Dr. Karen Willing, to assist with additional psychological testing.[36] Despite Dr. Hutchinson's expressed concern that Mrs. Montgomery was "not psychologically stable enough" to be

---

[a] Mr. Dillingham testified that after four visits with Mrs. Montgomery, he met with the team – though Ms. Burns was not present for the meeting. Mr. Dillingham testified that he felt unwelcome at the team meeting and that it was his perception that Ms. Hunt was uninterested in the work done before she entered the case. Exhibit 141 reflects this team meeting to have been January 14th 200[5]) (Vol. 2, p. 307-08, *Dillingham Testimony*).

[b] Dr. Hutchinson explained her role as a consultant on a multi-disciplinary team:

> Often I will be asked to suggest what do you think needs to be done? Do we need a neuropsych? Do we need brain imaging? Do we need to bring in a medical person? Do we need to bring in a drug person? Do we need to bring in some kind of psychiatrist or medical interactions? And I'm often the one that tries to spear head that.

(Vol. 4, p. 987, *Hutchinson Testimony*).



Appellate Case: 17-1716 Page: 56 Date Filed: 11/01/2017 Entry ID: 4596229

interviewed on her social history, on March 1-3, she was interviewed.[37] Mrs. Montgomery experienced a dissociative event following that interview and CCA became concerned that Mrs. Montgomery was at an acute risk for suicide.[38] The team asked Dr. Hutchinson and a Dr. William Logan to clinically evaluate Mrs. Montgomery and make recommendations as to how the team could best protect her.[39] Both Drs. Hutchinson and Logan understood their role as consultants and Dr. Logan understood that he was consulting as a clinician, not as a forensic expert.[40] Dr. Logan, a psychiatrist, noted Mrs. Montgomery's self-destructive behavior, and diagnosed her as "in the midst of major depressive disorder and that she had some psychotic features."[41,a] Both doctors found that Mrs. Montgomery was a present danger to herself and recommended that she be transferred to an in-patient psychiatric hospital.[42]

**1. Mr. Owen causes Mrs. Montgomery to lose attorney Anita Burns and mitigation specialist Lisa Rickert.**

By April 25, 2005, Anita Burns had filed a motion to withdraw as counsel of record[43] and David Owen, the First Assistant at the FPD assumed

[a] Dr. Logan testified that at the time he evaluated Mrs. Montgomery in March 2005, there was "no pending forensic question at all," (Vol. 4, p. 930) but that if he had been asked about her competence at that time, he would have said she lacked decisional competency (Vol. 4, p. 934).



Appellate Case: 17-1716 Page: 57 Date Filed: 11/01/2017 Entry ID: 4596229

representation of Mrs. Montgomery.[44] Ms. Burns explained that she withdrew from representing Mrs. Montgomery because of Mr. Owen:

> [I]t really had started over hiring a mitigation specialist and other things and the fact that I was told that he was going to be making the decisions in the case and that I was to report him but he was not going to be trying the case with me . . . I was uncomfortable with him making the decisions on the case and then me carrying them out. I felt like I should make at least – I'm not opposed to compromising or talking with other attorneys, but I feel like if I'm going to be responsible, I should at least be comfortable with the decision that's made, and that was not happening. I mean, I expressed that to Mr. Conrad, and at that point he took me off the case.[45]

When Ms. Burns withdrew from Mrs. Montgomery's case, Lisa Montgomery lost her relationship with another attorney – she had briefly been represented by Dedmon and Wurtz and they had already been lost to her when the case was removed to Missouri. Ms. Burns was the first woman to work on her case, but Ms. Burns simply withdrew from representation – without informing Mrs. Montgomery of that fact or discussing it with her.[46] Susan Hunt also did not address Ms. Burns' withdrawal with Mrs. Montgomery, "If anybody was going to talk to her [about why Anita left the team], it would be Anita's place . . . I didn't."[47] "No thought or discussion was had about losing Ms. Burns from the team or what impact that might have on Mrs. Montgomery."[48]



Appellate Case: 17-1716 Page: 58 Date Filed: 11/01/2017 Entry ID: 4596229

Dave Owen also caused Lisa to lose her first mitigation specialist, Lisa Rickert. Anita Burns retained Ms. Rickert in February 2005, but by the time she began working on the case in early March, she was told Ms. Burns was no longer on the case.[49] Ms. Rickert worked on the case for approximately six months, until August when she learned that Mr. Owen had been publically speculating that she was having an affair with Ron Ninemire, the FPD investigator who Owen insisted accompany Rickert on her interviews. Upon learning of Owen's speculating, Lisa Rickert resigned.[50] With Ms. Rickert's resignation, the team lost her rapport with the 25-30 witnesses she had already interviewed, lost her knowledge of the case, her observations of witnesses and the client, and Mrs. Montgomery lost another (female) member of her team.[51,a] Mrs. Montgomery struggled to trust her legal team as people left without explanation: "I've already lost several team members without explanation: Anita Burns, one of the first attorneys appointed, and then Lisa Rickert, an investigator. Because of these losses, I have had to struggle with trusting that members of my team would stay after building a relationship with them."[52]

---

[a] "[This sort of turnover could be a barrier to disclosure of mitigating information] because it's a reason to be unsure of whether the person I'm talking to is even going to be here the next time. So why should I agonize and pour out things they want to discuss when it's not certain who will be around" (Vol. 1, p. 109, *Stetler Testimony* (expert mitigation specialist testifying to ABA standards for capital investigation)).

**2. Inexperience and micromanagement cripple the Hunt/Owen team.**

The attorneys realized that they needed help dealing with Mrs. Montgomery's case. Mr. Owen did not have prior capital case experience[53] and Susan Hunt did not have significant experience with mental health issues in capital cases.[54] Despite counsels' lack of experience, both Ms. Hunt and Mr. Owen recognized that the team needed assistance in handling the mental health and mitigation portion of the proceedings.[55] As Ms. Hunt testified, "We knew there was some real mental health issues going on. We didn't understand what they were or how to even deal with it . . . We needed somebody that really understood mental health much better than we did and somebody who could really, you know, find out what we're dealing with, what experts we needed, how we needed to present this case in the mitigation phase because there was no guilt-and-innocence phase in our mind."[56] The team reached out to Dick Burr, the Federal Death Penalty Resource Counsel,[a] asking for help.[57]

The Federal Resource Counsel provided both the Hunt/Burns and the Hunt/Owen teams with resources.[58] Mr. Burr met with the team repeatedly and

---

[a] Federal Death Penalty Resource Counsel is a project started by the Federal Defender Services Committed in the early 1990's with the mission to provide consulting assistance to defense counsel appointed in federal capital prosecutions (Vol. 3, p. 527, *Burr Testimony*).



Appellate Case: 17-1716 Page: 60 Date Filed: 11/01/2017 Entry ID: 4596229

also brought David Freedman, an expert mitigation specialist, in to consult with the team.[a] Despite Mr. Burr's and Mr. Freedman's assistance, Mr. Owen did not understand how to conduct a mitigation investigation – and was antagonistic to the methods resource counsel attempted to teach him. "He understood the concept that there are things in people's lives that can provide a reason for not putting somebody to death. That's the simple thing to understand. But how you develop those reasons is something he had no understanding about and not much openness to learning about."[59, b]

> It was very problematic because David [Owen] had never been involved in a capital case. He did not – I mean, mitigation seems like a simple thing to understand from just the surface. Developing mitigation is extremely complex. It requires interview – people to interview – first of all, to identify, find, and interview life history witnesses, some of whom come from the client herself or himself, many of whom come

[a] "David [Freedman] was not a lawyer but was a mitigation specialist and a really good mitigation specialist, and we contract – he had a contract with [Federal Death Penalty Resource Counsel] to provide expert mitigation assistance to defense teams, and this was a case that was all about mitigation from the very beginning, at least in my perspective, and David [Freedman] had more expertise than I, and I thought he ought to be part of the consultation early on" (Vol. 3, p. 549-50. *Burr Testimony*).

[b] The record suggests that Mr. Owen's resistance to the instruction of Resource Counsel was perhaps due to his failure to appreciate the expertise David Freedman brought to the team. The district court commented that Mr. Freedman "sounds pretty well qualified to me" (Vol. 3, p. 826) – and indeed he was/is: Mr. Freedman has a PhD in psychiatric epidemiology from Columbia University and a master's in Public Health from Harvard. Despite Mr. Freedman's credentials, Mr. Owen persisted in a belief that Mr. Freedman was "a [male] nurse" (Vol. 3, p. 827, *Freedman Testimony*).



Appellate Case: 17-1716 Page: 61 Date Filed: 11/01/2017 Entry ID: 4596229

> from other people, from looking at records. You know, you find people through a variety of means who had some substantial window into the life of this person. You then begin interviewing them, and sequencing the interviews is important because there are some people who may know more than others, but you may want to know more before you start talking with those people.[60]

Mr. Owen controlled the purse strings of the team which became a problem.[61] "Dave didn't have the basis of experience to understand why something was necessary. He also kind of micromanaged the mitigation specialist when they were in. Whenever a mitigator was going to interview somebody, it had to be cleared with Dave; and if it was somebody Dave already had some contact with, he didn't see any need for the mitigation specialist to go see them, because he didn't understand that he did not have the skill to interview a mitigation witness . . . So he did a lot of micromanaging that slowed things down."[62],[a]

[a] Another impediment to progress was noted by Holly Jackson, mitigation investigator. When attempting to educate the team regarding mitigation investigation, "I tried to present my suggestions in an unthreatening and supportive manner because dynamics in the federal defender office seemed very bizarre. They were very paranoid about any hint of criticism and paid excessive attention to gossip and rumors. Counsel [Hunt and Owen] dismissed my suggestions and recommendations as if I were an alien from Mars. Counsel were hostile and uninterested in learning my observations and findings in my investigation. They belittled and ridiculed well established consequences of severe trauma on individuals, even when it was apparent that Ms. Montgomery had survived extreme trauma in childhood at the hands of her parents. They rejected out of hand possible relationships between Ms. Montgomery's behavior over the course of her adult life and the presence of mental illness, in spite of growing evidence that her behavior

Mr. Owen's micromanaging hindered the team's attempt to get a handle on the mitigation investigation. Mr. Owen and Ms. Hunt both had difficulty appreciating the way in which a mitigation investigation must build from the information gathered, instead they wanted to develop hypotheses and then send their mitigation investigator, initially Lisa Rickert and then – after Ms. Rickert's resignation – Holly Jackson, to find proof to support their theory.[63, a]

**3. At the urging of resource counsel, the team seeks help from Judy Clarke.**

In the summer of 2005, resource counsel determined that the team was floundering and suggested that the team meet with Judy Clarke.[64] Despite Mr. Burr's attempts to suggest to the team that Mrs. Montgomery's sense that someone else was at the crime scene with her was "pointing toward an aspect or feature of mental illness" the team just could not "see it that way."[65] "Despite my suggestions and guidance, the team seemed not to get it. They seemed to be

---

was inextricably linked to significant impairments" (Exhibit 1-57, p. 2, *Jackson Declaration*).

[a] Ms. Rickert testified to her concept of the work of a mitigation specialist under the ABA Guidelines: "A mitigation specialist assists the defense counsel in investigating the life of a defendant. So it is my job to do kind of, in technical terms, a biopsychosocial cultural history of the defendant, and you do that by interviewing everybody and everyone who's ever known the person in various ways and at different times in their life, and you also do a lot of document gathering, pretty much every piece of paper that exists on the defendant, and then you prepare a social history for the defense" (Vol. 2, p. 429, *Rickert Testimony*).



Appellate Case: 17-1716 Page: 63 Date Filed: 11/01/2017 Entry ID: 4596229

stuck on what I think were sort of silly issues of guilt/innocence, that somebody else actually did this."[66] Susan Hunt told Dick Burr "that [Hunt and Owen] just didn't understand mental illness and could not understand why digging deeper and deeper into records and talking with mitigation witnesses was so important."[67] Mr. Burr suggested that the team meet with Judy Clarke to see if she could help them begin to understand.[68] Judy Clarke was introduced to the team in July of 2005.[69]

Though she initially was just brought to meet the team as a resource,[70] on October 5, 2005, Mr. Owen (FPD) moved the court for the admission of Judy Clarke *pro hac vice* to assist in the representation of Mrs. Montgomery.[71] Susan Hunt and David Owen met with Judge Fenner to discuss adding Ms. Clarke as counsel of record in this case.[72] Mr. Owen recalled explaining to the court "our desire of having Judy Clarke handle the mental health issues and experts at trial" and that Judge Fenner had no real concerns about the appointment, "but did express knowledge of Judy Clarke's aggressive manner."[73] The court granted Owen's motion, and on October 7, 2005, Ms. Clarke's appearance was entered in the case.[74]

Susan Hunt and David Owen "wanted [Judy Clarke] to basically take over the mitigation part of this case."[75] As Ms. Hunt explains:

> She could bring in, as she told us, Debra Garvey who was chief investigator for the Federal PD's Office in Los Angeles who had extensive experience in mitigation investigation. David Freedman . . . did life histories and he combed through the records to find themes or issues to explore . . . and we wanted to utilize those sources to put this case together. We wanted her to take the lead on it.[76]

Susan Hunt recognized that the mitigation component of the case was "the majority of the case."[77] Mr. Owen recalls asking Judy Clarke to do "as much as possible" on Mrs. Montgomery's case.[78]

**4. Progress begins with Judy Clarke leading the team.**

With Judy Clarke leading the team, the team had "regular and lengthy" team meetings "very frequently."[79] Ms. Hunt termed these meetings "very helpful" while Debra Garvey elaborated that "the idea was to prioritize what we had, what we were learning, what we had, what we still needed to do, developing some themes around what we could see was evolving and what we had collected, or who we had talked to."[80] The team kept a "to-do" list which reflected things on which they were working.[81] Ms. Clarke also worked to change the culture of the team: when she came on the team, "the lawyers had a feeling for the government's case, but not for Lisa Montgomery, that there was a – they talked about her in relatively hostile terms which – and not the warmth that you would like to think that your legal team would think of the client."[82] Ms. Clarke recognized that the team needed to move to a client-centered model

in conformance with professional norms of death penalty representation. Ms. Clarke began to introduce the team to the ABA Guideline's concept of a capital team as "observational caretakers, and that's really one of the best things that we can bring to a case is to observe without judgment and to observe as objectively as we can so that we can figure out the right experts to hire and know the right story to tell."[83a]

With Ms. Clarke on board, team changed how it related to Mrs. Montgomery:

> Once I joined the team as counsel, I learned that the assigned FPD investigator, Ron Ninemire, believed he had a "special relationship" with the client, Lisa Montgomery; it also appeared that Mr. Ninemire was the primary team member visiting with Lisa. I knew from experience that it is not healthy for the client or their case for any member of the capital team to have a "special" relationship with the client, exclusive of other team members. This is particularly true in a capital case with a client who has an extensive history of sexual abuse. It can be damaging to investigative efforts, trust building with the client, and simply unhealthy for the client to permit or encourage "special" relationships, those relationships that are independent of the rest of the team. In my experience, these divided relationships can have negative consequences in working on mitigation, working with experts, and in working toward settlement of a case. I encouraged the team to broaden the number of team members who visited with Lisa, to have regular

---

[a] The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereafter ABA Guidelines) were first published in 1989, then republished in 2003. Testimony at the trial reflected that the prevailing professional norms for the Western District of Missouri in capital cases contemplated adherence to the Guidelines (Vol. 2, p. 296, *Finding of the Court* ("…I think you've established that the ABA Guidelines are a barometer to be used to determine professional norm."); Vol. 3, p. 688, *Cardarella Testimony*).



Appellate Case: 17-1716 Page: 66 Date Filed: 11/01/2017 Entry ID: 4596229

> visits with Lisa by as many members of the team as possible, and to share the content of each visit with the team in a consistent and purposeful manner. Whether reluctantly or not, the team as a whole discussed this, and agreed to this approach; however, it quickly became clear that Mr. Ninemire resisted this approach and friction developed within the team as a result.[84]

While Ms. Clarke was on the case, the team has a working hypothesis which involved "trying to understand the relationship between [Mrs. Montgomery's] psychotic disorder, bipolar disorder, and severe trauma, sexually based trauma."[85] The team recognized, as Ms. Jackson explained, that "[i]t was critical to the case that we document the manner in which her day to day functioning was impaired and that we determine the etiology of the impairments. I suspected fetal alcohol spectrum disorder, bipolar disorder, disorders of extreme stress, and neurologic impairments were at work in Lisa's life for a long time, not just the year leading up to the offense."[86] The team had begun to identify the impairments which crippled Ms. Montgomery's functioning and which would be relevant to experts the team would retain:

> I heard hints and suggestions from witnesses that required follow up that Ms. Montgomery was unable to attend to the needs of her children, despite her considerable love for them; her hygiene was terrible; she could not keep a safe and sanitary home; she worked in extremely low level positions but had performed well academically; she was unable to focus and sustain attention; and she initiated and failed to complete project after project. I also suspected that the severe child abuse she survived contributed to much of the chaos and confusion in her life.[87]

Working toward an understanding of the interplay of Mrs. Montgomery's disorders, Ms. Clarke's team identified the first tier of experts with whom they wished to consult and sent contracts to Dr. Dean Delis (an expert in neuropsychology) and Dr. Judith Herman (a leading expert in trauma, author of the seminal book *Trauma and Recovery*).[88] The team was in the process of identifying a jury consultant, and Ms. Clarke consulted with Dr. George Woods (a neuropsychiatrist).[89]

The document collection increased sharply.[90] As Ms. Garvey explained, the obligation of a capital team is to gather every document they can that touched the client's life in any way in a multigenerational process, because it's hard to tell without looking at all those papers that you can collect what might be important and what might be critical even to the understanding of the client in the presentation to the court or in trying to resolve the case."[91] Few records had been collected before Ms. Garvey joined the team[a] – "and even more

[a] *See* Exhibit 64, *Garvey Declaration* ("Upon our becoming part of the Montgomery team, it became clear that the investigation had not yet gotten off the ground. Though Ms. Rickert (prior mitigation specialist) and then Ms. Jackson had been collecting historical records and documents on Mrs. Montgomery, the team seemed to be at a standstill as to what to do with the information they were acquiring. There was no system in place for a careful and thoughtful analysis of the documents coming in – it wasn't clear who would review the documents, extract the relevant information and then share it with the team in a meaningful way. Information contained in records is only helpful if read and synthesized into an



Appellate Case: 17-1716 Page: 68 Date Filed: 11/01/2017 Entry ID: 4596229

critically [they] had almost no releases signed from any relevant immediate family members that would need to authorize our collection of records that touched their lives."[92] This was problematic, because "you can't really effectively talk to witnesses until you've seen the documents that are relevant to them, that might form your inquiry with them . . . so [for the team] to have proceeded to represent [Mrs. Montgomery] for that period of time and not systematically begin a record collection is really outside the curve of the standard practice.[93]

The team began to prioritize witness interviews:

> Generally, capital trial teams establish a hierarchy of witness interviews, determining the order of those interviews as information is available. While it is the goal of the team to obtain as much information as possible as quickly as possible, it is important to avoid conducting an interview without as much preparation and information as possible. In capital case, particularly where the client has been traumatized, it is critical to be savvy as to the order of the interviews to maximize the amount of information obtained before a witness becomes hostile or avoidant particularly when you are working to uncover abuse or collusion against your client. Ms. Jackson and [Ms. Garvey] worked well together in developing investigative priorities which we proposed to the team for their review. The goal was to have the team collaborate and agree on an overall plan of investigation.[94]

Under Ms. Clarke's leadership, the team determined that Ms. Montgomery's sensation that she was not alone while committing the crime was

---

overall developing picture of the client and her family, then cross-referenced, and recorded in some accessible way").

most likely a symptom of severe dissociation.[95] The team investigated the possibility that a second person was with Mrs. Montgomery and definitively ruled out the possibility that Tommy Kleiner, her brother, could have been present.[a] The team also consulted Dr. Werner Spitz, a pathologist, who confirmed that one person could have committed the crime.[96]

Though the team accomplished a lot while Ms. Clarke and her resources were in the case – and was poised to accomplish more with the hiring of experts, Mr. Owen continued to be obstructive. Mr. Owen objected to paying for document collection.[97] Mr. Owen compromised Ms. Jackson's ability to efficiently investigate by refusing to approve funding for her to interview a witness more than one time[98] – in contravention of the ABA Guidelines which recognize that multiple in-person interviews are often necessary for

---

[a] In addition to three team members testifying that they recall that Tommy's alibi was established during the Clarke period, that the Clarke team collected the criminal court records wherein Mr. Kleiner's probation officer had filed his probation records also indicates that the team ruled out any possibility that Mr. Kleiner was involved. Vol. 3, p. 703-04, *Jackson Testimony* (team ruled out Tommy as possible co-perpetrator because realized that he was with his probation officer at the time of the crime); Vol. 4, p.844, *Freedman Testimony* (same); Vol. 8, p. 2145, *Owen Testimony* (Tommy was ruled out because he had an alibi); Vol. 2, p. 334, *Elliot Testimony* (testified that during the time Ms. Clarke was on the team records were coming in including "some of the criminal records were kind of coming in regarding her two brothers"); Vol. 4, p. 902, *Garman Testimony* (all of the forms related to Mr. Kleiner's probation were filed with Clerk of Court and those records are public documents).

development of mitigation information.[a] Mr. Owen also undermined the team's attempts to have a trained mitigation specialist establish rapport with Judy Shaughnessy, Lisa's mother.[b] Because of her training in mental health and trauma, the team wanted Ms. Jackson to interview Ms. Shaughnessy. Mr. Owen was resistant to giving up his role as Ms. Shaughnessy's contact with the defense team.[c] "Mr. Owen believed he had a special relationship with Ms.

---

[a] The ABA Guidelines call for multiple, in-person, face-to-face interviews of mitigation witnesses. Vol. 1, p. 103, *Stetler Testimony* ("it means having a skilled listener as the person who spends the most time with the client, who listens non-judgmentally and begins to develop the rapport and trust needed to elicit sensitive information, and that's why the supplementary guidelines talk repeatedly of the need for multiple in-person, face-to-face, one-on-one meetings, not just with the client but the mitigation witnesses that were interviewed").

[b] Vol. 4, p. 836, *Freeman Testimony* (Owen hindered investigation by maintaining relationship with Judy Shaughnessy after Owen agreed in team meetings to stop contacting her. Owen later admitted to continuing to contact Judy Shaughnessy and tell her things about the case and admitted that he kept that information from the team).

[c] Vol. 3, p. 649, *Clarke Testimony* (Owen wanted to have a special relationship with Judy Shaughnessy); Vol. 4, p. 700-02, *Jackson Testimony; see also* Vol. 8, p. 2164, *Owen Testimony* (discussing his relationship with Judy Shaughnessy, describing her as "woefully narcissistic. If anything that she might perceive would bring her into a bad light of any kind, whatsoever, she would do whatever she could to bulldoze that out of the way"); and *Id*. at p. 2165 (describing his sense of his role viz. Mrs. Montgomery and her mother: "part of what I felt was my job was try to at least break that chain that kept them separate, you know, maybe get to where they could make up and, you know, become somewhat of a family so Lisa would at least feel a little bit better about herself"). While Mr. Owen's intent to work to make Mrs. Montgomery feel better about herself was well intended, in light of the reality of Mrs. Montgomery's history with her mother selling her to multiple men to be raped and beaten, his efforts were misguided and uninformed.

Montgomery's mother, Judy Shaughnessy. In team meetings it was agreed that Mrs. Shaughnessy had to be approached carefully as she was a witness to the rape of Mrs. Montgomery by her step-father, a possible colluder in his continual abuse of Mrs. Montgomery, and presented as mentally ill herself. In contravention of the team decision, Mr. Owen repeatedly emailed with Mrs. Shaughnessy and – on at least two occasions – Mr. Owen went to interview Mrs. Shaughnessy without notice to the rest of the team and without direction from any of the team trained in mental health investigation."[99]

The team carefully did not question Mrs. Montgomery regarding the facts of the crime. As Ms. Clarke explained: "We had a lot of discussions about that because we probably would be confronting – we would either be planting memories in this very traumatized woman or confronting a delusional belief system which wasn't going to be healthy for developing a relationship of trust."[100]

The team recognized that Mrs. Montgomery had trouble differentiating that which was real from that which was not: "she had a variety of symptoms, including what appeared to be sort of hallucinations and experiences that nobody else in the room was having and dissociative periods which may have been trauma related or neurologically driven . . . she had symptoms of a psychotic disorder."[101] In order to investigate Mrs. Montgomery's

symptomology, the visits with Mrs. Montgomery were carefully choreographed: two team members visited together and memorandum were prepared to keep all members of the team informed not only of the information Mrs. Montgomery might have provided during the meeting but also documenting all symptoms noted by the team.[a, b]

---

[a] Vol. 3, p. 638, *Clarke Testimony* ("the starting point would be, This is what I'm seeing. What's everybody else seeing? So we encouraged a report of – this would be called symptoms. We didn't know what it is a symptom of, but it is a symptom of something going on. So we would encourage everybody to recognize it and observe it and report it"); Vol. 2, p. 342, *Elliot Testimony* (during the Clarke era, observations from visits were recorded in a memo so that team was informed); Vol. 4, p. 839, *Freedman Testimony* ("from investigators to lawyers and paralegals, everybody on the team needed some basic understanding of how mental illness works and how trauma works; and because people were seeing Lisa and the visits are important opportunities to observe symptoms, we needed people to know what they were seeing. So, as in all teams, we did training every chance we got").

[b] Despite the progress the team made, the record indicates that Ron Ninemire was resistant to the team's approach toward relationships with Mrs. Montgomery:

> Despite an explanation of why exclusive relationships between a capital client and any one team member are detrimental to capital defense teams, both Mr. Ninemire and Mr. Owen persisted in their individualized approach to Ms. Montgomery and her family. Mr. Ninemire insisted that he had a special bond with Ms. Montgomery. He was territorial and protective of that relationship. He and Mr. Owen believed Lisa had some additional information about the crime itself and thought that Mr. Ninemire was in a position to pressure her, through his personal relationship with her, to reveal that information. Mr. Ninemire believed facts about Lisa's relationship with her family would only be revealed to him through his conversations with her and Lisa's belief that she was telling him these details in confidence.

(Exhibit 64*, p. 4, Garvey Declaration*).

While Ms. Clarke was on the case, the team determined that further investigation of whether Mrs. Montgomery suffered from pseudocyesis was not necessary or beneficial to the case.[a] When Mr. Owen and Ms. Hunt were struggling with understanding mental illness before asking for help, pseudocyesis was identified as a possible theory.[b] Once people trained in mental health and mitigation joined the team, Mr. Freedman was assigned to research the pseudocyesis and the theory was discounted.[102] As David Freedman explained, "it's not a condition that is terribly helpful [as mitigation] . . . it's a symptom description. It's not a diagnosis. It's not a life course sort of thing. It's the kind of symptom that comes about in the context of mental illness. But what we cared about was the mental illness that would have given rise to those symptoms, those symptomatic set of symptoms. The way in which mental illness gets embodied is what we would have cared about, not the name of pseudocyesis."[103] Likewise, the team investigated Dr. Ramachandran and

---

[a] Vol. 4, p. 845-846, *Freedman Testimony; see also,* Vol.3, p. 740-41, *Garvey Testimony* (the team realized that pseudoceysis was a symptom of psychosis so were investigating the cause of the psychosis not the symptom); Vol.8, p. 2146, *Owen Testimony* (pseudocyesis had all but been abandoned by time Mr. Duchardt added to the team, the Clarke team "figured it was an additional factor to be explored" – "We [the Clarke team] thought it was a mitigation situation, not a factual situation").

[b] Mr. Freedman began consulting with Owen and Hunt prior to Judy Clarke being introduced to the team, and he testified that, "[pseudocyesis] had come up before I joined the team as an idea." (Vol. 4, p. 845, *Freedman Testimony*).



Appellate Case: 17-1716 Page: 74 Date Filed: 11/01/2017 Entry ID: 4596229

determined that, while he had written a book of popular science on the brain which included a case study on pseudocyesis, Dr. Ramachandran was not really an expert in the underlying broader mental illness which would have caused symptoms like pseudocyesis.[104] As the Clarke team knew, decision makers (be they DOJ or juries) only find a fact to be mitigating if a diagnosis is supported "by lay witnesses, historical experts, people who knew the client in the pre-offense years who can talk about how particular events affected the individual's functioning and shaped their adult life."[105]

The Judy Clarke team recognized that the simple fact that Mrs. Montgomery had been abused as a child was not, in and of itself, mitigating.[106] As David Freedman explained, "The simple fact of abuse – I mean, going to court and saying our client was abused doesn't really do anything, right? I mean, nobody cares anymore. I mean since Dershowitz wrote the Abuse Excuse article . . . it's the details of what happened and the consequences . . . that matter for mitigation."[107]

> So the pursuit of the scope of what it was and how it happened and how often and whether people whose responsibility it is to protect a child are participating in the perpetration of the offense against that child changes the context in which that child develops. And so you have to find that, right? It's not enough to just be able to say, Oh, well, there was a court case and in that court case it says the person was abused. That's good. That's a red flag. That's the kind of thing that helps you, guide[s] you to continue to pursue the investigation.[108]

As Ms. Jackson related, "[m]itigation for Ms. Montgomery required more than a list of diagnoses, tests, and criteria. It required the story of her life in rich detail and narrative so that ordinary jurors could see and believe the interplay of mental illness and her day to day life. It is especially important in mental health cases, such as Lisa Montgomery's to provide the jury and the court with a credible and reliable, empathy provoking narrative that puts human context around otherwise off-putting labels. The narrative must be detailed, documented, and persuasive. Simply presenting disconnected facts, summary descriptions, and historical data is not sufficient."

Ultimately, the Judy Clarke team focused on identifying the ways in which trauma shaped Lisa Montgomery – both developmentally and at a neurological level. "[I]t's the details of what happened and the consequences and how people have to adapt – the abused person has to adapt to kind of keep themsel[ves] safe and alive, and so we knew that things had happened, but we didn't yet know the scope of what that was or what it meant."[109] The team had begun to suspect that Judy Shaughnessy (Lisa's mother) was part of the trauma Lisa suffered, but before they could investigate, the team was dismantled.[a]

[a] Vol. 4, p. 836, *Freedman Testimony;* Vol. 3, p. 710-11, *Jackson Testimony* (the team did not believe that the abuse Lisa suffered at the hands of her step-father was the whole story).

**5. The FPD develops resentments.**

"David became very resentful of Judy Clarke because she was controlling the case, which is what [Susan Hunt] wanted her to do, but David wanted to control the case. It was David's ego was the problem that got in the way, and he wanted to be in charge and he wanted to be the leader of this team."[110] David Owen's resentments became apparent by early November 2005, and Susan Hunt asked Judy Clarke to help corral Owen so that the team could work productively.[111] Ms. Hunt perceived that the problem stemmed from Mr. Owen's dislike of "mitigation people": "he believed in mitigation but did not understand what [Judy Clarke and her team] considered to be mitigation."[112a] At the same time the attorneys were aware that FPD investigator, Ron Ninemire, had become resentful of Debra Garvey's role on the team.[113] As Ninemire expressed it, "I am not going to take any orders from any damn woman."[114] "Ray put me in charge so that's the way I'm going to operate."[115] As Ms. Clarke described the situation:

> I kept my focus on the team's interactions with Ms. Montgomery, learning about the work already done in the case, planning the work ahead, and assessing how individual team members could best serve case needs. Mr. Ninemire did not have the experience or skill to serve

[a] Later, Ms. Hunt explained the team problems to the district court with reference to Mr. Owen's lack of experience, "I am no expert," said Ms. Hunt, "and I know David doesn't like hearing that, but he doesn't have that background and experience to make those decisions" (Exhibit 68, p. 29, *5/3/2006 Transcript*).

as the lead investigator or mitigation specialist on the case. My understanding was that he had worked on only one federal capital case through sentencing (where the client received a death sentence) and he did not appear to understand the role and function of a mitigation specialist, the protocol for investigating mental health and cognitive issues, or how to screen for psychiatric and cognitive impairments. He also did not understand the relationship between chronic and extreme trauma and subsequent behavior and symptoms. Given the likely extensive nature and severity of the trauma Ms. Montgomery suffered, it was imperative that the investigation be conducted by an experienced and well trained mitigation specialist. Ms. Garvey and Mr. Freedman had the requisite training, experience, and knowledge about trauma, psychiatric issues, and cognitive impairments and how to organize and implement an investigation plan around mental health hypotheses. I hoped that Mr. Ninemire would be open to learning from Ms. Garvey and Mr. Freedman, both of whom had extensive experience in training and supervising mitigation investigation, and to following the direction of Ms. Garvey as the lead mitigation investigator. That was not the case, and Mr. Ninemire did not take direction from Ms. Garvey. He was instead resistant and reluctant to accept her supervision, perform tasks assigned him, or work collaboratively with her.[116]

On November 2, 2005, the team had a meeting to discuss the dysfunction. As Ms. Clarke observed:

> Ms. Hunt and Mr. Owen did not have experience in addressing the complexity of the mental health issues found in this case. Ms. Hunt understood this and expressed gratitude that she had an opportunity to learn about these issues. Over time, Ms. Hunt began to tell me that she had been having problems with Mr. Owen not respecting her role as learned counsel since the beginning of the case. She said she felt like Mr. Owen wanted to control the case, and in essence did so by controlling the funding for investigation, travel and experts. Mr. Owen also wanted to take multiple trips to meet with witnesses, with little appreciation for some of the sensitive topics that needed to be addressed. Ms. Hunt asked me to discuss these concerns with Mr. Owen and to help him understand that he needed to allow her to carry out her role in leading the team, and accept help in developing the



Appellate Case: 17-1716 Page: 78 Date Filed: 11/01/2017 Entry ID: 4596229

> mental health case. Ms. Hunt told me that it would be very hard for her to have this conversation with Mr. Owen and raise these issues, and asked me to raise the concerns with Mr. Owen.[117]

When Ms. Hunt "asked Ms. Clarke to confront or counsel Mr. Owen on his shortcomings so that she could continue to make crucial decisions about the mental health and mitigation defense for the team. Mr. Owen was extremely angry after the meeting and felt he had been attacked unfairly. He never got over this and continued to complain about Judy Clarke and her people."[118] As Ms. Clarke observed:

> Mr. Owen interpreted my comments and observations as an all-out attack on him and his professional abilities. I explained that the team needed to function in a better way and that we had to change the way the team was functioning. I stated matter-of-factly that he did not know enough to be the leader of the team and that he needed to relinquish control, and take this experience as an opportunity to learn about capital investigation and litigation. I gave examples of how his actions were impeding the investigation, especially his insistence on participating in sensitive interviews . . . it was clear he was angry and hurt. I do not believe he ever got over it, though I did try to smooth things over and apologized for hurting his feelings.[119]

Dave Owen indicated that he wanted Clarke and her people (Garvey and Freedman) off the team.[120] The matter was at least somewhat smoothed over and the team plowed on, having team meetings, obtaining and reviewing records,[a] and interviewing witnesses until April 2006.[121]

---

[a] Though the team collected voluminous records, at times Mr. Owen was obstructive of those efforts:

Though things were superficially better, Mr. Owen and Mr. Ninemire continued to seethe. Mr. Owen and Mr. Ninemire complained frequently to their boss, the Federal Defender Ray Conrad, about Judy Clarke and her team, "[the complaints about Judy Clarke] were on a regular basis after almost every meeting by David and Ron."[122] Though Mr. Conrad "probably saw Judy one time after she got on the case,"[123] he believed that the problems were "constant insults and things were taken personally."[124] "Almost from the first meeting [Owen] would come in separately [from Ninemire], say the same thing [as Ninemire said], he had been insulted."[125]

On April 17, 2006 David Owen went to Magistrate Judge Maughmer to discuss removing Judy Clarke from the case.[126] Though Judge Maughmer was unable to remember any details of that conversation, he told counsel for the

---

> Mr. Owen controlled the purse strings on the case even though I was lead counsel. I had no authority to make decisions. Stephanie Elliott told me that one set of preliminary medical records for Mary Coleman, the sister of Mrs. Montgomery's father, had been obtained. From the preliminary records the defense team learned that she had adult-onset epilepsy, occasional seizures, migraine headaches, AVM (arterio venous malformations), and an aneurism resulting in a slight stroke. Ms. Elliot said that Mr. Owen told her not to order additional medical records because he had not decided whether he wants to spend the money. I recognized the value of this medical evidence of possible mitigation on behalf of Mrs. Montgomery and was upset that Mr. Owen had again not consulted me about whether or not to order the medical records. Mr. Owen wanted to be in charge of everything.

(Exhibit 60, p. 7, *Hunt Declaration*).



Appellate Case: 17-1716 Page: 80 Date Filed: 11/01/2017 Entry ID: 4596229

parties that he recalls Mr. Owen making him aware of the problems prior to April 20, 2006.[127] Susan Hunt was unaware that Mr. Owen went to discuss the matter with Judge Maughmer until days later.[128] Mr. Owen did not consult Mrs. Montgomery in making his decision to seek judicial intervention in the defense team.[129]

Not knowing that David Owen was working to break up the defense team, Judy Clarke came to Kansas City on April 19, 2006 for a team meeting that evening.[130] During the meeting, David Owen, Susan Hunt, and Judy Clarke discussed the "problems" and the "potential of [Ms. Clarke] leaving the case" though Mr. Owen did not disclose that he had already begun speaking with the court about Ms. Clarke's removal.[131] "The meeting was a bit heated and when I [Judy Clarke] left, Ms. Hunt told me that we would talk again the next day about whether I would continue with the team. I called Dick Burr on my cell phone to ask for his help in patching up the situation and helping us all see a way forward. He agreed to help."[132]

After Ms. Clarke left the meeting, Ms. Hunt and Mr. Owen continued to discuss what to do.[133] Ultimately, Ms. Hunt told Mr. Owen that she, Ms. Hunt, wanted to sleep on the question of whether or not Ms. Clarke should withdraw from the case.[134] It was agreed between Ms. Hunt and Mr. Owen that Ms. Hunt would think about the issue and then call Ms. Clarke the following day to



Appellate Case: 17-1716 Page: 81 Date Filed: 11/01/2017 Entry ID: 4596229

discuss further before getting back with Mr. Owen with a decision.[a] Ms. Hunt later explained, "before Mr. Owen heard back from me, he went with Ray Conrad, the Federal Public Defender for the Western District of Missouri, to Judge Fenner's chambers. I was not consulted or advised of this in chambers conference. Neither was Ms. Clarke, or our client, Lisa Montgomery."[135]

### 6. FPD unilaterally goes to the court with untrue accusations against Ms. Clarke.

Without waiting to hear from Ms. Hunt, David Owen went to his supervisor, Ray Conrad, the Federal Public Defender for the Western District of Missouri, the following morning (Thursday, April 20, 2006) and shared his complaints about Judy Clarke.[b] Mr. Owen and Mr. Conrad's accounts of this conversation – and their versions of that which they did as a result – differ sharply.[136] According to Mr. Owen, without prompting from Mr. Owen, Mr. Conrad suddenly called Judge Fenner directly "to apprise him of the

---

[a] Exhibit 60, p. 8, *Hunt Declaration*; Exhibit 65, *Hunt Letter to Burr, 4/30/06*; *but see*, Exhibit 62, *Owen Declaration* (acknowledging that Ms. Hunt wished to sleep on the decision, but reflecting that Hunt and Owen agreed to meet the next morning to visit with Judge Fenner "after Susan [Hunt] was finished with a court hearing in another courtroom").

[b] Exhibit No. 62, p. 8, *Owen Declaration*, ("The next morning I reported to Ray Conrad the events of the previous night. Ron Ninemire and I had been keeping Ray Conrad fully apprised of the progress of the defense case and the problems experienced with Judy Clarke, Deb Garvey and David Freedman. Mr. Conrad, without consulting me, called Judge Fenner to apprise him of the situation"); Exhibit 60, p. 8, *Hunt Declaration*.



Appellate Case: 17-1716 Page: 82 Date Filed: 11/01/2017 Entry ID: 4596229

situation."[a] Owen protests that he meant only to discuss the situation with his boss, not to go behind Ms. Hunt's back and have Ms. Clarke removed.[b] Mr. Conrad has testified that he may have called Judge Fenner – though he denied having any memory of going with Owen to chambers. Mr. Conrad is clear, however, that whatever happened occurred only because Owen told him that Owen had finally gotten Susan Hunt's approval to remove Clarke from the team.[c,d]

In response to Mr. Conrad's telephone call, Judge Fenner summoned Mr. Conrad and Mr. Owen to his chambers immediately.[137] Mr. Owen recalls that

---

[a] Exhibit 62, p. 8, *Owen Declaration*; *but see* Exhibit 72, *Conrad Deposition*, (Owen represented to Conrad that Hunt was ready to have Clarke removed from the case).

[b] Exhibit 62, p. 8, *Owen Declaration* ("[Susan Hunt] had the impression I made the decision to involve Judge Fenner and thereby not respecting her role as lead counsel. I had not made that decision. That was Ray Conrad's decision and he was my boss").

[c] Exhibit 72, *Conrad Deposition* (On the morning of April 20, 2006, David Owen came to his office and said that Judy Clarke had "attacked" Susan Hunt. Conrad "took it to mean that [Clarke] started insulting, it become personal with Susan as she had with Ron and David." "[Owen] said – let me think about this. He said – he said, Susan is now agreement that we need Judy off the case and I said, Tell the judge."

[d] Exhibit 72, *Conrad Deposition*, Though Conrad denies any memory of the meeting in chambers, he recounted that after Owen told him that Hunt had agreed to remove Clarke, Owen told him that Clarke was going to the prison to see Mrs. Montgomery. Conrad testified that he then told Owen, "and I said, Tell the judge he can cancel the visitation if he wants to." Mr. Conrad's memory of suggesting this course of action is pertinent, given the court's later actions, canceling Ms. Clarke's visitation privileges precisely as Conrad suggested.



Appellate Case: 17-1716 Page: 83 Date Filed: 11/01/2017 Entry ID: 4596229

no court reporter was present during this in-chambers meeting and no transcript of that meeting has been prepared, accordingly it is difficult to present exactly that which transpired in the meeting except through the recollections of the people who attended who provided declarations or interviews with counsel.[138,a]

---

[a] 2255 counsel attempted to take the deposition of Judge Maughmer and Judge Fenner so to have a more complete record of this meeting. *See*, No. 13-2958, Entry ID 4072350. Judge Fenner declined to make himself available for such a deposition, though he ordered Judge Maughmer to allow an on-the record interview by counsel. D.E. 49. However, when counsel arrived at chambers for the interview, Judge Maughmer stated that the interview would not be recorded. *See* No. 13-2958, Entry ID 4072350, Attachment 5, 5/6/2013 *Transcript of Proceedings*. The government placed a summary of the Maughmer interview on the record on 5/6/2013. *Id*. P. 23-24 (stating Maughmer related that the 4/20/06 meeting with Conrad, Owen, Fenner and Maughmer was 15-20 minutes long; that funding was not an issue in the decision to remove Judy Clarke; that Judge Fenner had a strong preference for "local control of the cases for a variety of reasons and that when asked about was there input from Ms. Montgomery or Judy Clarke, that the view was that this was a matter for the court to determine"; that prior to the 4/20/06 discussion with Judge Fenner, Owen had made Maughmer aware of the problems, though "[Maughmer] couldn't remember any detail"; Judge Fenner invited Judge Maughmer to the 4/20/2006 chambers meeting; Maughmer emphasized that the problem was a "break down in communication of relationship"; that ex parte unrecorded communications with the court are not common "but it's not atypical"; that Maughmer notified Fenner that he remembered being in chambers on 4/20/06 and that Maughmer assumed that Fenner would ask him to be interviewed). The defense added facts to the account. *Id.* (Maughmer denied any specific memory of anything Mr. Conrad said to Judge Fenner regarding Judy Clarke). *See also*, 13-2958, Entry ID 4072350, Attachment 5: May 6, 2013 *Transcript of Proceedings,* the only time Judge Fenner addressed the in-chambers, unrecorded meeting:

> There are a couple of matters that are raised in the motion to reassign the case that I would like to comment on and I think deserves some clarification. There was a comment that I made about Ms. Clarke being



Appellate Case: 17-1716 Page: 84 Date Filed: 11/01/2017 Entry ID: 4596229

Though Mr. Conrad does not recall attending the meeting in Judge Fenner's chambers,[139] both David Owen and Magistrate Judge Maughmer have stated that Mr. Conrad did most of the talking at the meeting and told Judge Fenner the complaints he had received from Mr. Owen and Mr. Ninemire about Ms. Clarke.[140] Mr. Conrad had not been involved in the defense team meetings, yet – according to Owen and Maughmer – he was the one who "explained the friction being experienced between Judy Clarke, her team and the other members of Lisa Montgomery's defense team."[141] Significantly, lead counsel Susan Hunt was not invited to this conference in chambers or given an opportunity to be heard – nor was Ms. Clarke.[142] No one informed Mrs.

---

nonproductive, and I think that comment is misunderstood or taken out of context in the scope of the entire matter, and those choice of words were my words. They were not the words of Mr. Owen or Mr. Conrad, and what I meant when I said that, was that the defense team was not able to be productive because of the conflict that existed between counsel, and I think that rather obvious in the record.

Further my comment that Ms. Clarke was only appointed in an effort to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team; however no one conveyed to me Ms. Clarke should only be involved to assist with the plea, and her appointment in the case was not limited and no one at any time suggested to me that it should be. Ms. Nouri, there are a couple people with you at counsel table, would you like to introduce them? . . .

Montgomery of the meeting or of the FPD's decision that they would no longer work with Ms. Clarke.[143]

**7. What was said off-the-record.**

There is little direct evidence of the substance of Ray Conrad's representations regarding Judy Clarke to Judge Fenner, given 1) the absence of a transcript or recording;[a] 2) Mr. Conrad's denial of being present for the

[a] *See* D.E. 212, p. 124 ("It is not the Court's practice to have meetings of substance with attorneys go unrecorded, and this Court does not recall another instance where this has taken place. The Court has no memory of what the circumstances were that caused this to happen . . . Nonetheless, the lack of recording and the poor choice of words used by the Court thereafter in addressing the removal of Clarke provided the basis upon which habeas counsel made their allegations of fraud"); *but see*, 13-2958, Attachment 5, *Transcript of Proceedings* May 6, 2013 (citing multiple unrecorded conversations between Judge Fenner and counsel) (the dates of those meetings are believed to be: 4/20/2006 (two separate meetings: 1) Maughmer, Conrad, Fenner, and Owen, 2) Hunt, Owen, and Fenner); 4/25/2006 (though the majority of the discussion between Judge Fenner, Hunt and Owen was recorded and transcribed, the parties went off the record at the end of the transcript); 5/1/2006 (meeting with Judge Fenner, Conrad and Owen); 5/8/2006 (Hunt, Owen, and Fenner – unclear if Conrad also present). For ease of reference, a chart of the in-chambers conversations in this matter is attached, here:

| Date | Who Present in Chambers | Recorded? | Document Supporting | What occurred |
|---|---|---|---|---|
| October 2005 | Hunt, Owen & Judge Fenner | no | Exhibit 62, *Owen Declaration* | Discussed bringing Clarke onto the case. *See also*, 4/25/06 Transcript of In-Chambers Proceeding (Clarke "only appointed in an effort |

| | | | | |
|---|---|---|---|---|
| | | | | to see if she could assist in getting a plea"; "I was very hesitant to have Judy Clarke involved in it from the first place"). |
| 4/17/2006 | Owen (to Judge Maughmer) | no | Vol. 2, p. 415, *Testimony of Susan Hunt*; *see also*, Exhibit 60, *Declaration of Susan Hunt; See* No. 13-2958, Attachment 5, *5/62013 Transcript of Proceedings* (government's recitation of the information disclosed by Judge Maughmer in the unrecorded interview by the parties: that prior to the 4/20/06 discussion with Judge Fenner, Owen had made Judge Maughmer aware of the problems, though "[Judge Maughmer] couldn't remember any detail"). | Owen made Judge Maughmer aware of problems within the defense team. |
| 4/20/2006 | Conrad, Owen, Judge Maughmer, & Judge Fenner | no | | |
| 4/21/2006 | Owen, Hunt & Judge Fenner | no | D.E. 71-7 5/2/06 *Dave Owen letter to Dick Burr* ("the next day, at a meeting with the judge, both Susan and I | |

| | | | | |
|---|---|---|---|---|
| | | | expressed our problems concerning the continued involvement of [Clarke]") | |
| 4/25/2006 | Hunt, Owen, Conrad (listed as present but does not speak on the record) & Judge Fenner | Yes (except for an unknown portion) | Exhibit 68, Transcript of 4/25/2006 In Chambers Hearing | Hunt and Owen complain about conflict between them. Hunt presented idea of FPD/San Diego; FPD will never work with Clarke again. Owen says, "I'm not asking to get off this case."<br><br>NOTE: Off-the record discussion at end of transcript |
| 5/1/2006 | Owen, Conrad & Judge Fenner | no | Exhibit 68, Transcript of 5/3/2006 In Chambers Hearing (begins by court telling Hunt of this meeting) | |
| 5/3/2006 | Owen, Conrad, Hunt & Judge Fenner | yes | Exhibit 68, Transcript of 5/3/2006 In Chambers Hearing | FPD moves to withdraw; Hunt suggests substituting FPD San Diego; denied; Hunt moves to withdraw; court says will decide |
| 5/8/2006 | Owen, Hunt & Judge Fenner | no | Vol. 2, p. 419, *Testimony of Susan Hunt* (Ms. Hunt testified that there was a meeting on "Monday" in chambers when told to withdraw; May 9, 2006 when Mr. Owen removed | Hunt told to withdraw |

meeting;[144] 3) Judge Maughmer's lack of memory as to the "detail" of Mr. Owen's complaints;[145] and 4) Judge Fenner's refusal to recuse himself to allow for discovery of his testimony about the meeting.[146] However the statements by the various parties to the meeting on the record in subsequent proceedings demonstrate that Mr. Conrad (and/or Mr. Owen) represented that Ms. Clarke was "abusive," "nonproductive," and "obstructive."[a,b] For example, on April

| | | | | |
|---|---|---|---|---|
| | | | Ms. Hunt from the CCA visitation list was a Tuesday, ergo the meeting appears to have been on May 8, 2006). | |

[a] *See* Exhibit 63, *Clarke Declaration* ("I do not know what was said to Judge Fenner to cause him to remove me from the case. I was told by Ms. Hunt that Mr. Owen and Ray Conrad talked with the judge asking for my removal from the case, and did so without her agreement or permission . . . I have since been told that I was accused of not liking men, being abusive to FPD office staff, and allegedly becoming so angry that I spit on Stephanie Elliot. None of this is true. I was never abusive to staff. I never spit on anyone. I did express anger once in front of Stephanie Elliot and Ms. Hunt when I was told that Mr. Owen continued to delay approving an expert contract after the team, including Mr. Owen, had agreed on the expert. My response was not personal. I felt like Mr. Owen's continued delay and refusal to retain the expert could have a negative impact on the work of the case").

[b] Seven years after the recorded and unrecorded discussions referenced above, Judge Fenner took habeas counsel to task for accusing Mr. Conrad and Mr. Owen of unethical conduct:

> I understand that you had some questions about the fact as to what was said between us, actually basically what was said by Mr. Owen

> and Mr. Conrad, but I don't see any basis to accuse Mr. Conrad and Mr. Owen of that type of unethical conduct.

No. 13-2958, Entry ID 4072350, Attachment 5, *Transcript of Proceedings* 5/6/2013. This was so, despite the court's admission that the court's own words caused counsel to question Owen's and Conrad's representations:

> There was a comment that I made about Ms. Clarke being nonproductive, and I think that comment is misunderstood or taken out of context in the scope of the entire matter, and those choice of words were my words. They were not the words of Mr. Owen or Mr. Conrad, and what I meant when I said that, was that the defense team was not able to be productive because of the conflict that existed between counsel, and I think that rather obvious in the record.
>
> Further my comment that Ms. Clarke was only appointed in an effect to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team.

No. 13-2958, Entry ID 4072350, Attachment 5: *May 6, 2013 Transcript of Proceedings.* In entry of Judgment in this matter, the court further admonished counsel that "it was made abundantly clear that any alleged basis for the claim was from a misunderstanding and misinterpretation of what had taken place in the removal of Clarke from the trial team . . . the only allegation of substance was that the defense team was not able to get along and work together . . . For Movant's habeas counsel to maintain such a personal and professionally damning allegation of fraud against Conrad and Owen, given the totality of the record herein, is disturbing to the Court" (D.E. 212 at p. 126).

Despite the court's *post hoc* characterization of its language as not reflecting the representations made by Owen and Conrad, it is clear from the record that no party attempted to correct the court's understanding of what Conrad/Owen said. A reasonable inference exists, therefore, that the court's subsequent explanation either is mistaken (and the court's original language did reflect the substance of the complaints) or that no information is known as to what Conrad/Owen said given

25, 2006, Mr. Owen and Ms. Hunt met again with Judge Fenner. In that meeting, Mr. Owen twice referenced putative "abuse" by Ms. Clarke:

- p. 11: MR.OWEN: Judge, I will throw this out on that line. My office will not work with Judy Clarke ever again. We just are not going to take that **abuse**.[a]

And more significantly, given the court's response:

- p. 24: MR. OWEN: Speaking to that particular issue, Judy Clarke being in the case, [Susan Hunt] can assume that is her decision or not her decision. I have overruled [Ms. Hunt's suggestion of putting the team back together] by saying I can't work with this person, I don't know how you want to view it. Our office cannot work with that woman. It is impossible. She is just **abusive beyond reasonability**. We just can't work with her.

  THE COURT**: I accepted that.**[147]

Judge Fenner's "acceptance" of Ms. Clarke's abusiveness and the FPD's refusal to work with her must refer to that which was said on April 20, 2006 – when the court removed Ms. Clarke from the case. Further information regarding that which was told to the court on April 20, 2006

---

that the court's on-the-record account of their representations is somehow inaccurate and misleading.

[a] This language mirrors that in Mr. Owen's letter to Dick Burr regarding the team problems which emphasizes "I never claimed that all the problems are centered on Judy Clarke and the abusive manner in which she treated me and Ron Ninemire. But, I was not and still am not willing to continue to be abused and will not tolerate any employee of the Federal Public Defender being abused the way Ron Ninemire was abused" (D.E. 151-7).



Appellate Case: 17-1716 Page: 91 Date Filed: 11/01/2017 Entry ID: 4596229

is found in the court's on-the-record, April 25, 2006 discussion of the basis for his decision to remove Ms. Clarke:

> And if [Ms. Clarke] was being **obstructive** toward the case being handled properly, and there being good communication among all the attorneys and if she was presenting difficulty with the two of you who are the ones who are going to have to try the case, I don't really have any reservation about the judgment call that needs to be made in that kind of a circumstance . . . I don't have any reservation about the fact that [Ms. Clarke] needed to be taken off the case because her involvement was **obstructive** in getting a defense for Miss Montgomery put together.[148]

Finally, on May 3, 2006, Judge Fenner recapped that which had previously presented to him:

> THE COURT: I am very, very surprised by everything that has taken place in this case over the last couple of weeks. First the two of you come and say Judy Clark (sic) is a **nonproductive** member of the team, causing problems, we need to have her removed from the defense. And based on your explanation of the situation I did that.[149,a]

---

[a] The court's attempt to resolve the Hunt/Owen differences on May 3, 2006, provides a negative inference that Owen's complaints on April 20 were more than personality problems:

> THE COURT: . . . And then a few days later we have a situation where the two of you say that you are not able to work together and get along. And as I told David and remember when they came in and talked that, knowing both of you I find it hard to believe you would have some kind of issue you couldn't sit down and talk about and get it resolved and get it behind you . . . **Just on a broad proposition that you can't work together my reaction to that is then you need to work it out and you need to resolve it and you need to get past it.** If there is something that happened, somebody feels that there are specific things that have taken place that have destroyed the ability to have a working



Appellate Case: 17-1716 Page: 92 Date Filed: 11/01/2017 Entry ID: 4596229

**8. Ms. Hunt, Ms. Clarke, and Mrs. Montgomery belatedly learn that Ms. Clarke is off the case.**

As Susan Hunt left an unrelated court proceeding on the morning of April 20th, David Owen found her and explained "it [was] done and Judy Clarke had been removed from the case."[150] Ms. Hunt was upset as a final decision had not been made to seek the removal of Ms. Clarke from the case; she felt that Mr. Owen had acted precipitously.[151] Ms. Hunt was very frustrated and felt that Mr. Owen was once again not respecting her role as lead counsel.[152] Ms. Hunt further questioned Ray Conrad interjecting himself into the case when she was lead counsel.[153]

Judy Clarke went to CCA on the afternoon of April 20th intending to meet with her client. She was accompanied by Ron Ninemire of the Federal Public Defender's Office. Because of the court's order, Ms. Clarke was not allowed to see Mrs. Montgomery, however Ron Ninemire met with Mrs. Montgomery for an hour and a half.[154] Mr. Ninemire did not discuss the removal of Judy Clarke from the defense team with Mrs. Montgomery that

---

relationship to provide effective counsel to Lisa Montgomery then tell me what they are.

No. 13-2958, Entry ID: 4072350, Attachment 4, *Transcript of In Chambers hearing 4/25/05 and 5/3/2006*; also in the record as Exhibits 67 and 68.

afternoon.[155] According to Mr. Ninemire, he had no idea what was going on when he arrived at CCA so he could not explain anything to Mrs. Montgomery.[156] Mr. Ninemire stated that, like Mrs. Montgomery and Ms. Clarke, he had not been given any notice that Judy Clarke was being removed from the case.[157]

The following day, on Friday, April 21st, Lisa Montgomery was taken to the federal courthouse for a hearing before Judge Fenner.[158] According to the court's Minute Sheet, this proceeding lasted ten minutes.[159] David Owen, Susan Hunt, and Ron Ninemire were present. Judy Clarke was not informed of this hearing or afforded an opportunity to be heard.[160] The court told Mrs. Montgomery that she had been brought to court "so that I could discuss with you and inform you of my decision to remove Miss [sic] Clarke as one of the attorneys representing you in this case."[161] The court indicated, "I have come to the opinion that her involvement is no longer necessary and/or helpful."[162] The court "wanted to make sure [Mrs. Montgomery] heard from [him] what [his] decision was in this case and that [she] had the opportunity to have an explanation from [him] as to why [he] made the decision that [he] made."[163] The only explanation provided to Mrs. Montgomery was that Ms. Clarke's involvement was "no longer necessary or helpful."[164]

The court then asked Mrs. Montgomery if there was anything she would like to ask him about the decision.[165] Mrs. Montgomery was only able to shake her head no.[166] The court then asked Susan Hunt if she had had an opportunity to discuss the removal of Ms. Clarke with Mrs. Montgomery and whether Mrs. Montgomery had expressed any concerns.[167] Ms. Hunt responded, "Yesterday Mr. Ninemire met with her for about an hour and a half at CCA. We met with her this morning just before this hearing and while I think she's upset obviously - - . . . I don't know how she feels but she hasn't expressed any problems so far."[168]

According to Ron Ninemire, he did not discuss the removal of Ms. Clarke from the case with Mrs. Montgomery because he had no idea what was going on when Ms. Clarke was denied entry to CCA.[169] Yet on April 21st, when asked by the court if he had anything further to offer from his conversation with Mrs. Montgomery the previous day, Mr. Ninemire responded, "No, Your Honor, I believe we had a long time to discuss it and I think she just expressed a lot of upset and I didn't hear any other concerns."[a]

**9. Mrs. Montgomery is devastated.**

---

[a] D.E. 113-1, *April 21, 2006 Transcript*, p.3; Mr. Ninemire was either untruthful about not knowing Mr. Owen was going to seek Ms. Clarke's removal or he misled the court by stating that he and Mrs. Montgomery "had a long time to discuss it."



Appellate Case: 17-1716 Page: 95 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery was completely blind-sided by the loss of her trusted attorney – in part because the team had consciously attempted to shield her from their quarrels: "We were working toward building a relationship of trust with her where we focused on consistency, predictability and uniformity. I had not told her about any intra-team disputes or difficulties and did not want to alarm her about team conflicts."[170] This was part of the team's method and strategy, because "like many trauma victims and capital clients with cognitive impairments, Ms. Montgomery was extremely sensitive to conflict. She was anxious, paranoid, and fearful, and she desperately wanted to please others. It was clear to [Judy Clarke] that she was unstable and was often out of contact with reality."[171] The team had focused on demonstrating to Mrs. Montgomery that she could count on the entire team and that it was safe to trust the team's members to act in her best interest.[172] "We were proceeding slowly and cautiously to build a safe and trusting relationship with her so that she could reveal her perceptions and experiences to the extent she was able. Our observations and interactions with her revealed that her mental state was very fragile. I wanted the team to avoid any disruptive, dramatic, or unsettling interactions with her and though other team members understood the importance of being cautious and predictable."[173] The protective hedge Ms.



Appellate Case: 17-1716 Page: 96 Date Filed: 11/01/2017 Entry ID: 4596229

Clarke had built around Mrs. Montgomery shattered with the news of Ms. Clarke's removal.

Mrs. Montgomery was devastated by the court's removal of Ms. Clarke from her defense team.[174] "She was just inconsolable . . . She absolutely somehow blamed herself. She felt that she had done something wrong. She was sobbing. She was sort of incoherent. She was sort of inconsolable . . . she was just in complete distress."[175] Mr. Owen allowed Holly Jackson, the mitigation investigator, to sit with Mrs. Montgomery in the days following the court hearing, observing Ms. Montgomery over multiple visits.[176] Ms. Jackson, who had previously described seeing Mrs. Montgomery in varied, extreme states of mind from extreme mania to near catatonia, described that after Ms. Clarke was removed from the defense, Mrs. Montgomery's mental health was worse than Ms. Jackson had ever seen before: "[It was] something like I had never really seen before. I mean, she was just inconsolable."[177] As Susan Hunt described it, "[Mrs. Montgomery] had just gotten to the point where she had trusted Judy Clarke and she was beginning to trust me as far as her legal representation. When Judy was dismissed, [Mrs. Montgomery] lost all hope. She told me that. She called me crying. I had many, many phone conversations with her."[178] Ms. Hunt attempted to describe Ms. Montgomery's situation and feelings to the court in an in-chambers conference on April 25, 2006:

> She also told me she feels like – and this unfortunately when you stop, take a look back objectively at it, this is how things have happened her whole life, made her re-live some parts of her life unintentionally. She feels like this decision was made for her without consulting her and she has no say. To her it was a very serious decision that affects her life and she feels like we didn't consult her, it was made for her and she is told after-the-fact which is exactly what happened.[179]

Realizing that Mrs. Montgomery's opinions, feelings, and possible responses had not been taken into account in the decision to remove Ms. Clarke, Ms. Hunt asked Mrs. Montgomery to write the court a letter expressing her response to the events.[a]

**10. Ms. Hunt tries to bring Ms. Clarke back into the case.**

Susan Hunt quickly realized that the removal of Judy Clarke from the defense team was a "disaster."[180] In addition to Ms. Hunts' own concerns – both about Mrs. Montgomery's reaction and about the team's lack of knowledge about mental health – Ms. Jackson, the mitigation specialist,

[a] Vol. 2, p. 418, *Hunt Testimony* (it was "extremely difficult" to get Mrs. Montgomery to write the letter. "She didn't confront people. She kept it all inside. She had her whole life. That's the way she dealt with it or didn't deal with painful subjects. . . finally she wrote that letter and I think it took her – I think she wrote it three times, and it took her several days to write it.); *see also*, Exhibit 71, *Montgomery Letter*



Appellate Case: 17-1716 Page: 98 Date Filed: 11/01/2017 Entry ID: 4596229

indicated that she might resign, because Ms. Jackson believed that the removal of Ms. Clarke had done "devastating damage" to Mrs. Montgomery's case.[a]

Two more conferences were held in the court's chambers.[181] On Tuesday, April 25, 2006, Susan Hunt and David Owen met with the court, and Ms. Hunt expressed concern about the events of the previous week.[182] Ms. Hunt explained to Judge Fenner that Lisa Montgomery has "serious, serious mental problems" and because the attorneys did not "think it through, and don't have the mental health background maybe we have created more problems than we ever thought would happen."[183] Ms. Hunt explained that Mrs. Montgomery was a "mess" and "devastated" by the removal of Ms. Clarke.[184] Mrs. Montgomery had lost trust in her defense team as she felt "betrayed, lied to, everything."[185] Ms. Hunt conceded at this time that "It was so fast nobody had a chance to really talk to [Mrs. Montgomery]."[186] Ms. Hunt related that Mrs.

---

[a] No. 13-2958, Attachment 4, Entry ID No. 40721350, *April 25, 2006 Transcript,* p.8; Ms. Jackson also indicated that while she had extensive experience in investigation of mental illness, she, unlike Ms. Clarke, did not have "the background and experience to go and look for experts." *Id. See also, Exhibit 1*-57, *Jackson Declaration,* (Although I had extensive experience in mitigation investigation and commonly seen mental illnesses, the emerging picture in Ms. Montgomery's case required more than I could provide. No mitigation specialist can replace competent counsel; we can only supplement their work. In Mrs. Montgomery's case, however, Ms. Clark's removal from the case left the team bereft of any team member competent to guide the investigation and develop the mental health aspects of the case").

Montgomery said Ron Ninemire had lied and "she thinks we all lied to her."[187,a] More importantly, Ms. Hunt explained that the actions taken the previous week had caused Lisa Montgomery to "re-live some parts of her life unintentionally. She feels like this decision was made for her without consulting her and she has no say. To her it was a very serious decision that affects her life and she feels like we didn't consult her, it was made for her and she is told after-the-fact which is exactly what happened."[188]

The court did not address Mrs. Montgomery's response or reaction. The court responded only that "from [his] perspective Ms. Clarke was a third attorney who was only appointed in an effort to see if she could assist in getting a plea worked out and that was what the situation was from the very beginning."[189] It is unclear why the court perceived this as the only purpose for which Ms. Clarke was brought into the case – her appointment was in no way qualified or limited.[190] Ms. Hunt clarified that while one goal in bringing Ms. Clarke to the defense team had been negotiating a plea, Ms. Clarke also "brought to this case . . . a tremendous experience in mental health issues which

---

[a] Mrs. Montgomery believed that Mr. Ninemire had lied to her at CCA when he claimed not to know why Ms. Clarke was being refused a visit. Mr. Ninemire's representation to Mrs. Montgomery is in conflict with his representation to the court that he had discussed the removal of Judy Clarke with her at length at CCA the day prior to the hearing on April 21, 2006. He could not both have not known what was going on and have discussed the matter with Mrs. Montgomery.

the court is aware of is one of the guidelines for representation. You have to have somebody on your team with a mental health background, experience and ferreting those issues out and handling them and presenting them. I have never had a serious mental health case and I don't think Dave has."[191] Mr. Owen conceded that he did not "have the level of experience necessary to handle Lisa."[192]

Hunt and Owen presented the court with two options for obtaining qualified counsel for Mrs. Montgomery. Because, as Ms. Hunt explained, the FPD rejected the option of putting the team back together with Ms. Clarke,[193] the first option was for Judy Clarke to come in the place of the Office of the Federal Public Defender for the Western District of Missouri, working with Ms. Hunt.[194] This option was presented as keeping the case on track and on schedule for trial.[195] The second option was to have Ms. Hunt and Mr. Owen continue as trial counsel, but they noted that they would need a new mitigation specialist and a third attorney with experience in mental health issues.[196] Ms. Hunt also added that this would be the defense team's third mitigation specialist and "we look like a bunch of idiots to these witnesses."[197] Judge Fenner responded that he "would much rather see [Ms. Hunt and Mr. Owen] try to make up with [the mitigation specialist] than trying to make up with Miss Clarke."[198]



Appellate Case: 17-1716 Page: 101 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Owen stated that his office would never work with Judy Clarke again.[199] Mr. Owen further declared, "I am not asking to get off this case."[200] Ms. Hunt said they just wanted to keep the judge informed as to what was going on with the defense team.[201] Judge Fenner responded, "I appreciate that and I am not inclined to want Miss (sic) Clarke to be involved in it. For whatever that is worth to you, that tells you what you need to try and do."[202] Judge Fenner continued, "I can tell you all that I think, as you know, I was very hesitant to have Judy Clarke involved in it from the first place. But that is just the way it goes and I can see why you all at that time thought that would be helpful. I don't have any reservation about the fact that she needed to be taken off the case because her involvement was obstructive in getting a defense for Miss [sic] Montgomery put together."[203]

Ms. Hunt explained that the defense team had "a lot of re-building" to do as a result of Ms. Clarke's removal and that "I just don't think we thought it through."[204] Ms. Hunt noted that Mrs. Montgomery "had a different relationship with Judy Clarke that was good . . . ."[205,a]

---

[a] At the end of the transcript there is a notation of a discussion off the record. Following that discussion, Dave Owen said, "We do need to have this under seal. I am being serious about that" No. 132958, Attachment 4, Entry ID 40721350, April 25, 2006 and May 3, 2006 *Transcript,* p.15; also in the record at Exhibit 68.

On Friday, April 28, 2006, Holly Jackson, the mitigation specialist, sent an email to Susan Hunt expressing her concern about continuing to work with David Owen.[206] Ms. Jackson noted that Mr. Owen "played a critical role in removing a key member of the defense team without any meaningful consideration of the client's needs or sensitivity to the effect on her mental health (depression, suicidality, abandonments, detachments, just to name a few) – not to mention the lack of consideration over the loss of Judy's relationships with experts, her legal skills, negotiating genius and many other talents Judy brought to the team."[207] Ms. Jackson was particularly upset that Mr. Owen acted unilaterally in seeking the removal of Ms. Clarke from the defense team, without discussing it with the team as promised and without considering the impact it would have on Mrs. Montgomery.[208] Ms. Jackson noted the detrimental impact the decision to remove Judy Clarke was having on Mrs. Montgomery.[209] Ms. Jackson expressed "grave concerns about David Owen's judgment; his rash and uninformed decisions in significant matters, and his overall concern (and compassion) for Lisa Montgomery."[210]

**11. At Ms. Hunt's instruction, Mrs. Montgomery writes the court a letter: She is devastated by the loss of Ms. Clarke, has lost trust in attorneys, but expresses appreciation for Ms. Hunt.**

On May 3, 2006, Susan Hunt filed, under seal, a letter written to the court by Mrs. Montgomery.[211] In her letter, Mrs. Montgomery explained that



Appellate Case: 17-1716 Page: 103 Date Filed: 11/01/2017 Entry ID: 4596229

"due to a history of problems with lawyers in family courts, I have not trusted lawyers, even the ones appointed to me in this case. I have struggled greatly with being able to trust them."[a] Mrs. Montgomery continued, "I've already lost several team members without explanation: Anita Burns, one of the first attorneys appointed, and then Lisa Rickert, an investigator. Because of these losses, I have had to struggle with trusting that members of my team would stay after building a relationship with them"[212] Mrs. Montgomery stated, "Of all the lawyers I have had to date, I have felt the most comfortable with Judy."[213] According to Mrs. Montgomery, "I have felt she answered me in ways I could understand and I had started to feel a part of what was going on."[214] Mrs. Montgomery felt that Judy Clarke "truly cared" about her well-being and "being able to find an attorney that understands me and I in turn understand them is a difficult task. I felt I had found that combination in Judy."[215]

---

[a] As will be discussed later, Mrs. Montgomery had good reason to be distrustful of the criminal justice system and lawyers. She began encountering lawyers when she was sixteen and her mother used Mrs. Montgomery as an unwilling pawn in the mother's divorce trial from Jack Kleiner. Despite Lisa testifying to the fact that Jack had repeatedly raped her – and despite the fact the trial judge admonished her mother for sitting emotionless as Lisa related those horrible events, the justice system failed to investigate or punish Mr. Kleiner. See,§V.E.

Mrs. Montgomery related that she was looking forward to seeing Ms. Clarke on April 20, but "only minutes before the visit, I found out she had been removed from my defense team. No explanation was given to me. When I asked what was going on, I feel [sic] that information was being withheld from me."[216] Mrs. Montgomery stated that she wondered if she had done something wrong as she was not aware of any problems with Ms. Clarke, "either with the rest of the defense team or myself."[217]

Mrs. Montgomery expressed that she had been in a state of shock since learning of the decision to remove Ms. Clarke from the defense team.[218] She had been having trouble sleeping, did not want to get out of bed, had been missing activities, and had been having trouble eating.[219] The removal of Ms. Clarke had caused her to lose all hope.[220] "With Judy gone, it's difficult to have any confidence in the future of my case. Particularly since the decision to remove her was made without any input from me or any prior knowledge of it by me. Am I to now expect the same thing to happen in any other decisions to be made?"[221] "Removing Judy from my team has been a devastating blow to me. This is a critical time in my life and I need to be surrounded by professionals who I can fully trust and I no longer feel that way"[222]

Mrs. Montgomery concluded by noting that "Throughout this past week, Susan [Hunt] has shown a genuine concern for how I was feeling about this

decision and I appreciate her effort to do so."[223] The letter made no mention of Mr. Owen.

### 12. After more off the record communications, the court removes Ms. Hunt.

The same day the letter was filed, May 3, 2006, Susan Hunt, David Owen, and Ray Conrad met with Judge Fenner in his chambers.[224] Judge Fenner began the meeting by telling Ms. Hunt that Mr. Owen and Mr. Conrad visited with him earlier in the week, on Monday, May 1st.[225,a] At that earlier meeting, according to Judge Fenner, Mr. Conrad and Mr. Owen "represented that you and David were at a point you weren't able to work together anymore and David did not feel that he would be able to at this point represent Miss (sic) Montgomery."[226] Judge Fenner asked to hear Ms. Hunt's position on where things stood with the defense team.[227]

Ms. Hunt provided Judge Fenner with the original of Mrs. Montgomery's letter and outlined the contents for him, stressing Mrs. Montgomery's concern that the team had continuously made decisions without informing her or consulting her wishes.[228] "She's not blaming anybody. She just is expressing basically her concern about the removal of Judy and the fact .

---

[a] In his deposition, Mr. Conrad stated that May 3, 2006 was the first meeting he attended with Judge Fenner (Exhibit 72, p. 19, 21-22, *Conrad Deposition*).



Appellate Case: 17-1716 Page: 106 Date Filed: 11/01/2017 Entry ID: 4596229

. . she feels she wasn't frankly notified about it and it wasn't discussed with her. And I think that frankly is a problem that I think we should have talked to her about it prior to it being done. The fact she has had trouble trusting lawyers in the past, that she has gone through other team members being removed without her knowledge or understanding, Anita Burns who was initially on this; another, Lisa Rickert . . . she expressed some concerns about that. Are decisions going to continue to be made without [Mrs. Montgomery's] knowledge or consent."[229] Susan Hunt explained that she had not anticipated "the depth of the devastation on Lisa Montgomery by the removal of Judy."[230] Ms. Hunt noted that Ms. Clarke "had gotten Lisa to open up more and there were some changes" and Ms. Hunt felt it was wrong to have removed Ms. Clarke from the case.[231]

Ms. Hunt again proposed that the court reassemble the team with Judy Clarke – replacing the FPD. Though the record is somewhat unclear, it appears that Ms. Hunt suggested that the court "bring Judy Clarke and the resources she brings back on board in place of the public defender's office and the public defender's office out [there]."[a] Ms. Hunt prefaced the introduction of this idea

[a] Note: the transcript reads "out here" which makes no sense in context. It appears from the context of the conversation and from Ms. Hunt's subsequent testimony that Ms. Hunt was referencing the FPD "out there" – ie. San Diego, the office that housed Judy Clarke. The San Diego Office of the Federal Public Defender, through

with the caveat: "One option, and this is probably never going to happen, but I am throwing it out for whatever it's worth" – indicating her hesitance in proposing the idea, which may explain why the record regarding this suggestion is so garbled. Ms. Hunt restated the proposition a bit more clearly later in the transcript:

> MS. HUNT: The first option, their office maybe, frankly was and that is – David and I , we still get along, nothing personal here – but the first option their office withdraw and **that office** be added and the opportunity remains and you have two lawyers and all the mitigation people we need, that is the first option.[232]

The court's succinct response to Ms. Hunt clarifies why Ms. Hunt did not press that suggestion more vigorously:

> THE COURT: What's your other option. I am not inclined to do that.[233]

Judge Fenner stated that he found it hard to believe that Ms. Hunt and Mr. Owen could not resolve their differences and work together.[234] Judge Fenner told Ms. Hunt that he considered her the lead attorney and that while he felt the attorneys needed to "talk things through and work with each other," what "it comes right down to if there is a difference of opinion where a

---

the Defender, Reuben Cahn, offered to accept appointment in the Montgomery case and to fund the defense through that office's budget. Exhibit 99, *Cahn Letter*; *see also*, Vol. 2, p. 417, *Hunt Testimony*; see also Exhibit 44, *Hunt Letter to Burr* ("I told the court my next option was to remove the Federal Public Defender and have the San Diego Office take over the case with Judy Clarke and myself as co-counsel").



Appellate Case: 17-1716 Page: 108 Date Filed: 11/01/2017 Entry ID: 4596229

decision has to be made then somebody has to be in a position to make that decision."[235] Ms. Hunt explained that she was concerned about the inability to locate an attorney with a mental health background to join the defense team as Dick Burr was advising her and David Owen that "basically there is nobody that can do this."[236] Ms. Hunt added that while the court might consider her to be lead counsel, "in reality I am not. And decisions are made I am not consulted on and things are ignored that we all agreed to. And that situation cannot occur and I can effectively represent Lisa."[237]

Despite the court's designation of her as lead counsel, Ms. Hunt expressed that Mr. Owen was obstructing her efforts – much as Ms. Burns had encountered months before. Ms. Hunt noted that as lead counsel, her goal had been to put the defense team back together as "we had the resources, mental health people we needed, we had all this in place," but that Mr. Owen overruled her and "said absolutely not and that is where we are at."[238] Ms. Hunt said that was just one example of her decisions not being respected by Mr. Owen.[239]

Mr. Owen reiterated Ms. Hunt's suggestion that the best interest of the client would be served by removing his office from the case.[240] Mr. Owen noted that Ms. Hunt could continue to represent Mrs. Montgomery and the mitigation specialist, Holly Jackson, would most likely continue on the case if he was no longer part of the defense team.[241] Mr. Owen explained that if Holly



Appellate Case: 17-1716 Page: 109 Date Filed: 11/01/2017 Entry ID: 4596229

Jackson left, "this case goes back to square one with mitigation investigators and things like that. All that has been done. This person has developed a relationship with the various witnesses that needed to be developed."[242] Mr. Owen stated that for the good of the defense and to keep the case on track, it would be best for his office to get off the case.[243]

Later in the conference, Ms. Hunt also offered to withdraw, expressing concern (in light of the court's refusal to appoint the San Diego FPD) about her ability to obtain resources for an effective defense.[244] Judge Fenner stated he was "going to have to think about it" and then "I will make a decision what we are going to do."[245] Following that conversation, the court reached out to John O'Connor regarding possible appointment to represent Mrs. Montgomery.[a]

There is no record of a May 8, 2006 conference in chambers, but Ms. Hunt remembers one.[b] Ms. Hunt testified that she told Mrs. Montgomery that "we were going to have this hearing or meeting with Judge Fenner in his chambers, and I said, I believe one of us is going to be gone. I don't know it

---

[a] The court, likely through Magistrate Judge Maughmer, reached out to Mr. O'Connor 3 or 4 days before he was formally appointed on 5/12/06, regarding whether he would accept an appointment in this case (Vol.7, p. 1866, *O'Connor Testimony*).

[b] Ms. Hunt testified that there was a meeting on "Monday"; May 9, 2006 when Mr. Owen removed Ms. Hunt from the CCA visitation list was a Tuesday, ergo the meeting appears to have been on May 8, 2006 (Vol. 2, p. 419, *Hunt Testimony*).



Appellate Case: 17-1716 Page: 110 Date Filed: 11/01/2017 Entry ID: 4596229

it's going to be me or Dave Owen. She didn't want me to be gone. I said, You call me on Monday and I can tell you what the decision is."[246] Ms. Hunt later succinctly summed up her removal: "I was told to withdraw, so I did."[247] Mrs. Montgomery called Ms. Hunt on "Monday" (presumably May 8, 2006) and Ms. Hunt informed her of the court's decision. "She called me that Monday and I told her that Monday afternoon. . . she was upset."[248]

**13. Mr. Owen fires second mitigation specialist, Holly Jackson.**

Despite Mr. Owens' admission to the court that the case would flounder without Ms. Jackson,[249] Mr. Owen fired Ms. Jackson on May 9, 2006.[250] His email to her simply stated that "in light of the personnel changes in the Lisa Montgomery case and the manner in which you have conducted yourself, please submit your final statement of services for payment."[251] He also indicated that her name had been removed from the visitation list and instructed Ms. Jackson to have no further contact with Mrs. Montgomery.[252]

Despite her awareness that loss of another trusted team member would negatively affect both Mrs. Montgomery's mental health and her ability to communicate with her team, Ms. Jackson honored Mr. Owens' instructions and did not contact Mrs. Montgomery again.[253] As Ms. Jackson put it, Mr. Owens' failure to allow her to alert Mrs. Montgomery that Ms. Jackson was leaving the team, "showed disregard, again, for the feelings of Ms. Montgomery because,



Appellate Case: 17-1716 Page: 111 Date Filed: 11/01/2017 Entry ID: 4596229

you know, this is a client that needed, you know, help during a very difficult process and she was, again, sort of disconnected from people that were trying to help her . . at a human level I thought it was, you know, something that didn't help the client."[254]

**14. The court appoints Mr. Duchardt as learned counsel.**

On May 9, 2006 David Owen faxed a letter to CCA removing Susan Hunt and Holly Jackson from Lisa Montgomery's approved visitor and telephone call list – thereby cutting off Mrs. Montgomery's contact with the remaining female members of her team.[255] Mr. Owen requested that John O'Connor and P.J. O'Connor be added to Mrs. Montgomery's visitor and telephone number lists.[256] On May 10, 2006, Susan Hunt filed a Motion to Withdraw "at the court's direction."[257] Susan Hunt's Motion to Withdraw was granted on May 12, 2006 and John O'Connor was formally appointed as lead counsel.[258]

Federal Resource Counsel reached out to Mr. O'Connor, offering assistance.[259] Mr. O'Connor asked resource counsel for suggestions as to who Mr. O'Connor should seek to have appointed to assist on the case.[260] Implied within that consultation was everyone's understanding that Mr. Owen could not sufficiently assist lead counsel such that two attorneys could be constitutionally



Appellate Case: 17-1716 Page: 112 Date Filed: 11/01/2017 Entry ID: 4596229

adequate[a] – and that Mr. O'Connor was not qualified to handle a mental health case. As he phrased it, while he had put on a mental health defense in his career, he was not as familiar with mental health as "someone like Mr. Duchardt or [habeas counsel] or others who have done this for a longer period of time."[261] Mr. Burr reminded Mr. O'Connor that the Office of the Federal Public Defender for San Diego was available to accept appointment – which would allow Ms. Montgomery's preferred counsel, Judy Clarke, to rejoin the team.[262] Mr. O'Connor was initially open to the idea of bringing Judy Clarke back on the team,[263] and requested that the court allow him to bring someone on to the team with mental health experience.[b] Mr. O'Connor has said that he "advocated for the appointment of Second Counsel Fred Duchardt to the defense team because of his distinguished experience as a capital litigator, his outstanding litigation results, his loyalty to all the tasks in defending capital cases, and his total commitment to the clients he represents."[264] Mr. O'Connor

---

[a] Vol. 7, p. 1870, *O'Connor Testimony* (he had not spoken with Mr. Owen at the point he was appointed, but assumed that Mr. Owen did not have the mental health experience necessary. "I just assumed that. It turned out to be true"); *see also*, Vol. 8. p. 2137, *Owen Testimony* (Mr. Owen was not capital qualified and did not have expertise in mental health cases, "no expertise, no").

[b] Vol. 7, p. 1869, *O'Connor Testimony* ("So if I was given the choice of having another counsel, and I'm not saying I was given a choice, but I did make a request, and that was certainly up to the court to make an independent decision on that, I preferred to have someone who had that experience).

subsequently admitted he was unaware that Mr. Duchardt had earned the distinction as the attorney with the most clients on federal death row.[265] On May 16, 2006, Fred Duchardt was appointed to represent Mrs. Montgomery as "learned counsel."[266] Approximately sixteen months after being charged, Mrs. Montgomery was starting over with yet another team of lawyers.

**B. How counsel failed to comply with professional norms regarding preparation of a social history, latched onto an improbable defense theory, lied to the court thereby committing to an unqualified expert and an unsupportable defense, and missed a "field of red flags" signaling the need for investigation of Mrs. Montgomery's lifetime of trauma and mental impairment.**

With the introduction of Mr. O'Connor and Mr. Duchardt onto the defense, a division of labor approach was adopted: "After a meeting between John O'Connor, Fred Duchardt and myself it was decided the division of labor would be John handling the offense investigation and presentation during the guilt phase of the case. Fred Duchardt was to seek out and work with mental health experts and present that aspect of the mitigation phase. I was to fill in where necessary as well as handle all the computer forensics for both the factual and mitigation phases."[267] Though Mr. O'Connor delegated the mental health and mitigation aspects to Mr. Duchardt, Mr. O'Connor was lead counsel – as he said, "I take full responsibility for all the tactics employed and the decisions made with regard to the defense of Mrs. Montgomery.[268]



Appellate Case: 17-1716 Page: 114 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Duchardt likened the situation to having walked into a bomb scene. "[T]he case had exploded and he was trying to figure out what triggered the entire problem."[269] Mr. Owen explained to Mr. Duchardt that Ms. Clarke had been "condescending" and "emasculating." "It struck [Mr. Duchardt] that that said volumes more about [Mr. Owen] than it did Judy [Clarke]."[a] Mr. Duchardt maintains that no one told him about the experts retained by the Clarke/Hunt/Owen team, "if I had been told at the beginning that a couple of experts that the team, basically Judy and Susan, believed were good, they'd been the first people I'd called."[270] It is unclear whether Mr. Owen deliberately

---

[a] Exhibit 83, p. 2, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence). Mr. Armstrong's declaration reflects habeas counsel's interview with Mr. Duchardt prior to the filing of the 2255 Motion. Mr. Duchardt spoke in an unguarded way, distinct from his statement in response to the Motion. It should be noted that prior to the filing of Mr. Duchardt's statement which is cited throughout this Application (D.E.129), the court granted Mr. Duchardt discovery of interviews with various of his team as well as requiring habeas counsel to return the entirety of Mr. Duchardt's file so that he could prepare his Statement. There are stark differences in tone (and, in some instances, content) between Mr. Duchardt's forthright statements reflected in Mr. Armstrong's memorialization of the interview and in his carefully crafted Declaration. Mr. Duchardt filed a motion in the district court claiming that §2255 counsel had requested permission to tape record his interview and requesting a copy of that tape (D.E. 92). Counsel had not requested permission nor tape recorded the interview, rather Mr. Armstrong and Ms. Harwell took copious notes of the interview – in full view of Mr. Duchardt. Mr. Armstrong prepared his declaration from his notes after confirming the accuracy of his notes by comparing with Ms. Harwell's notes. (Vol. 4, p. 914, *Armstrong Testimony*).

did not fill the new lawyers in on the work done by the Clarke/Hunt/Owen team[a] or whether poor team communication[b] caused Mr. Duchardt to miss that which was said.[c] In either case, the case suffered from a lack of institutional memory, including that Mr. Duchardt expressed that "Basically where we were with Lisa is that we were making it up as we went along, because there was nothing obvious wrong with her except her suicide [attempts]."[271] Mr. Duchardt felt that he "essentially started from scratch," upon entering his appearance."[272]

Mr. Duchardt's assumption of the "lead" on mental health evidence meant "yeah, I would have been the mitigation specialist."[273] As he has said, "As for my being the choice as the leader of our team when it came to mitigation and mental health defense efforts, that had to do with an objective measure, experience."[274] Though ultimately the FPD hired a replacement for Holly Jackson, Mr. Duchardt is unequivocal that he was "the person in charge of mitigation."[275]

---

[a] Mr. Owen certainly has claimed that he did so, *see* Vol. 8, p. 2141, *Owen Testimony* ("It would have been myself, Mr. Ninemire, Ms. Elliot, the mitigation specialist at the time. We all – when Fred came on, we all met and told him everything we knew").

[b] The team had few meetings (*see* § 2., below).

[c] Whether Mr. Owen filled Mr. Duchardt in regarding the experts already retained to work on the case or not, Mr. Duchardt's statements that he was unaware that the team had retained experts is contradicted by Ms. Clarke's testimony. Vol. 3, p. 675, *Clarke Testimony.*

**1. Mr. Duchardt jumps on hiring Dr. Ruben Gur.**

Mr. Duchardt had long wanted to work with Dr. Ruben Gur of the University of Pennsylvania. At the time he entered the case, Mr. Duchardt knew that he wanted to get Dr. Gur involved: "quite frankly we had the money to spend and I was looking for additional ideas."[276]

Dr. Gur is an expert in neuropsychology and neuroimaging who developed a "behavioral image" which depicts the regions of the brain which neuropsychological data reveal to be impaired.[277] Mr. Duchardt contacted Dr. Gur prior to meeting Mrs. Montgomery,[a] first speaking with him May 17, 2006, the day following his appointment as counsel.[278] Though the speed with which he contacted Dr. Gur reflects that Mr. Duchardt could not have had much personal knowledge upon which to determine the need for Dr. Gur's expertise, Mr. Duchardt, "figured that if anybody was going to find an issue here, it was Ruben."[279] Mr. Owen observed, "it appeared early on Fred Duchardt was focusing solely on brain imagining and PET scans."[280] Mr. Duchardt admitted he had "wanted to use Ruben in a previous case and the opportunity just did not work out."[281] As Mr. Duchardt dove into the case, hurrying to contract with

[a] Mr. Duchardt did not meet Mrs. Montgomery until May 26, 2006, some nine days after contacting Dr. Gur. Exhibit 82, *Duchardt's CJA Vouchers.*

experts before his attention was required elsewhere,[a] he delegated the task of providing materials to the experts to the FPD.[b]

**2. Regular team meetings and record collection stop.**

The team virtually stopped meeting.[282,c] "We had a few team meetings; however they were not on a regular basis and John O'Connor did not attend most of them."[283] Mr. Duchardt has described himself as "not a big meetings guy,"[284] explaining that if he needed something, he would email or call the person directly rather than consult the whole team. "If I thought of something I thought needed to be done, I would call Ron [Ninemire] and he would be on it."[285]

---

[a] Mr. Duchardt has indicated he contracted with Gur and Fucetola quickly, before his time was consumed by the Street trial and re-trial. D.E. 129, p.64 ("I knew that the *Street* case was scheduled to begin trial just about a month and a half later, and so I needed to proactively get things started on Lisa's case before I became buried in the *Street* case.").

[b] Vol. 8, p. 2215, *Duchardt Testimony*" (I'm almost certain that in terms of getting records to the experts that I relied on Stephanie [Elliot, the FPD paralegal] to do that").

[c] When asked if the ultimate trial team had regular meetings, Ms. Elliot testified that "when [Mr. Duchardt and Mr. O'Connor] first came on maybe a couple where it was like all of us together . . . at the federal defender's office." (Vol. 2, p. 337, Testimony of Stephanie Elliot).

The team also stopped seeking additional social history records. "[T]he attorneys thought most of the records had been gathered so [Stephanie Elliot] wasn't really asked to do that as much."[286, a]

**3. Institutional knowledge of the case is lost in the turnover.**

No one followed up with the experts retained by the Clarke/Hunt/Owen team. According to Mr. Duchardt, he was unaware that Ms. Clarke's team had hired experts and, accordingly, did nothing to follow up with Drs. Spitz, Herman, or Delis.[287] As Mr. Duchardt testified, "it appeared to me and to John [O'Connor] that nobody had taken the necessary steps to pull the trigger and get experts involved into the case. Basically when we came into it we thought we were starting from scratch."[288] "[A]ll information which I had received indicated was that in the six months Judy was on the case there were no experts

---

[a] *See* Exhibit 101, *Records Requested Chart* (Red line showing document requests sent out during the Clarke/Garvey time on the team, also reflecting negligible document collection after Clarke/Garvey left the team): generated after Ms. Clarke and Ms. Garvey left the team).





Appellate Case: 17-1716 Page: 119 Date Filed: 11/01/2017 Entry ID: 4596229

who had been identified, much less enlisted by Judy. To be more specific, no one ever mentioned the names of Dean Delis or Judith Hermann to me."[289,a]

Mr. Owen's testimony contradicts Mr. Duchardt in that Mr. Owen testified he told Mr. Duchardt about the experts Ms. Clarke had hired: "I'm sure we told him when he took on the case."[290] "[M]yself, Mr. Ninemire, Ms. Elliot, the mitigation specialist at the time. We all – when Fred [Duchardt] came on, we all met and told him everything we knew."[291] Despite Mr. Owen's memory, Mr. Duchardt maintains that, had he known about the experts hired by Judy Clarke, ""they'd been the first people I'd called."[292]

Though in charge of mitigation, Mr. Duchardt remained uninformed about the records collections which had preceded his time on the team. Though virtually every document collected regarding Mrs. Montgomery's social history

---

[a] Mr. Duchardt lays the blame for his ignorance of the expert contracts at the feet of Judy Clarke, maintaining that his time records show they talked for some 1.3 hours and that as she never mentioned the contracts to him he can only conclude that the "only explanation for Judy failing to provide information about Delis and Hermann to me and the rest of the Montgomery defense team is that she perceived whatever she had produced to that point to be unimportant (D.E. 129, p.11). Mr. Duchardt's conclusion is faulty, given Mr. Owen's role on both teams as the person through whom all contracts had to be made. However, Mr. Duchardt's blink of Mr. Owen's role is instructive: as shown *infra*, having been successful in removing Ms. Clarke and then having Ms. Hunt removed, Mr. Owen was thereafter essentially side-lined.



Appellate Case: 17-1716 Page: 120 Date Filed: 11/01/2017 Entry ID: 4596229

was collected during the time Judy Clarke and Debra Garvey were on the team,[a] "I didn't get the impression that they had collected much from what I understood."[293] Mr. Duchardt's lack of knowledge also extended to the team's records of work performed by the consulting experts, Drs. Logan and Hutchinson. Mr. Duchardt did not realize that Dr. Hutchinson attended team meetings and took notes which were contained in her file of materials.[294]

The team lost institutional knowledge of Mrs. Montgomery's expressed willingness to plead guilty and her documented remorse. Mr. Duchardt has sworn:

> I have never seen any indication in any materials related to the case that Lisa ever expressed a willingness to plead guilty for any reason. I personally never heard Lisa utter such words. To the contrary, Lisa never could come to grips that she had done something wrong and always wanted to find a way to go home.[295]

Yet Mr. Duchardt's own database contained the materials FPD obtained from Dr. Hutchinson, among them materials discussing Mrs. Montgomery's desire to plead guilty and her obvious and profound remorse.[b] Mr. Owen testified that he

---

[a] If Mr. Duchardt thought that the Clarke/Hunt/Owen team did not collect much, query why he did not then spring into action collecting records himself. *See*, Exhibit 101, *Chart of Records Request*, above (reflecting the negligible number of record requests generated after Ms. Clarke and Ms. Garvey were off the team).

[b] When Dr. Hutchinson asked Mrs. Montgomery if she were willing to plead guilty, Mrs. Montgomery responded, "heck yeah" (Vol. 4, p. 1030, *Hutchinson Testimony* (indicating those responses were in her materials she turned over to counsel).



Appellate Case: 17-1716 Page: 121 Date Filed: 11/01/2017 Entry ID: 4596229

was aware Mrs. Montgomery would have pled "from day one."[296] How Mr. Duchardt was unaware of such a central fact of his case – his client's desire to resolve the case through a plea – is unclear.[a]

Lack of knowledge regarding the document collection and hiring of experts undermines Mr. Duchardt's criticism of the Clarke/Hunt/Owen Team's efforts. Though Mr. Duchardt was "not very impressed with the work product level that had been done for the amount of time that Judy [Clarke] and her people had been connected with the case" and "couldn't really identify anything that I could that much attribute to their work,"[297] that he did not request additional document collection – along with his ignorance of the experts Judy had retained – underscores that his criticism was unfounded.

The loss of institutional knowledge and approach to the case caused a number of problems that compromised the representation by the O'Connor/Duchardt/Owen team. Without knowing that a defense expert had

[a] Additionally, the NGRI defense selected by Mr. Duchardt was in conflict with Mrs. Montgomery's stated desire to plead – creating a difficulty for counsel. *See*, Vol. 4, p. 658, *Clarke Testimony* (pleading NGRI had negated potential mitigating factors of acceptance of responsibility and showing of remorse: "Its in conflict, right. I have remorse but I was crazy at the time I did it. It's in conflict . . . I don't know that's water that can be navigated [by counsel with client] well at all.").



Appellate Case: 17-1716 Page: 122 Date Filed: 11/01/2017 Entry ID: 4596229

determined that one person could have committed the crime,[a] the team engaged (and continues to engage) in fantastical thinking: both Lead (O'Connor) and Learned (Duchardt) counsel refused to accept that Mrs. Montgomery committed the crime.[b] Without the observation of and relationship with Mrs. Montgomery built by the Clarke/Hunt/Owen team, the team started all over in terms of approach to mitigation, unfortunately eschewing the focus on Mrs. Montgomery's symptoms and history in pursuit of a singular, grandiose diagnosis that was inconsistent with the facts – pseudocyesis.[c]

---

[a] Vol. 3, p. 670, *Clarke Testimony* (Dr. Werner Spitz, expert retained by Clarke/Hunt/Owen team, determined that one person could have committed the crime).

[b] Mr. O'Connor testified that he has "always believed" that some other person committed the murder not Lisa Montgomery (Vol. 8, p. 1961, *O'Connor Testimony*); Mr. Duchardt has said, he has "no doubt" that Mrs. Montgomery's brother Tommy Kleiner was present during the killing of Ms. Stinnett. . . "I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on." (Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence)).

[c] It must be noted that Dave Owen was – or could have been – the bridge between the two teams. However, Mr. Owen has testified that he was marginalized and that Mr. Duchardt did his own thing in terms of mitigation without working with the rest of the team (*See* Exhibit 62, p. 13-15, *Owen Declaration*) (identifying mitigation theories that Mr. Duchardt abandoned, including fetal alcohol effect, PTDS, bi-polar, and psychosis). Mr. Owen expressed his frustration, "I truly believe that if Fred Duchardt had put his ego in check, listened to the views of the rest of the defense team and permitted the team to assist more, a different outcome would have resulted." *Id.* at p. 18.



Appellate Case: 17-1716 Page: 123 Date Filed: 11/01/2017 Entry ID: 4596229

4. **Mr. Owen floats his pseudoceysis theory again.**

With the Ms. Clarke, Mr. Freedman, Ms. Jackson and Ms. Garvey gone, Mr. Owen re-introduced the pseudocyesis theory. As Mr. Duchardt put it, "Dave never could pronounce that word to save his life, but he came up with that thought from day one."[298] Mr. Duchardt claims that Mr. Owen introduced the idea of pseudocyesis, though Mr. Owen claims that he understood that Mrs. Montgomery's delusional pregnancies were a "mitigation situation, not a factual situation."[299] However Mr. Duchardt says that when Mr. Owen brought it up, "[i]t was like a light bulb came on."[300]

5. **Mr. Owen resumes his special relationship with Mrs. Montgomery's mother.**

Mr. Owen continued his relationship with Lisa's mother. "From the beginning of the representation of Lisa Montgomery, it was necessary to cultivate some kind of relationship with Lisa Montgomery's mother, Judy Shaughnessy. That responsibility fell to me . . . This assignment continued after John O'Connor and Fred Duchardt were appointed."[301] Mr. Owen met with Ms. Shaughnessy for over one hundred hours, learning that she was the product of incest – both in that she had been raped by her father and that her father was

also her grandfather.[a] Mr. Owen felt this information about Ms. Shaughnessy should be explored and reported it to the team, however that information was not incorporated into a social history, presented to the experts, nor used in the trial presentation.[302] Mr. Owen understood that keeping Mrs. Shaughnessy on-board was critical to the defense team's ability to investigate for mitigation evidence and feared that she would obstruct the team's investigation if she felt that the team were investigating her son Tommy Kleiner.[303]

**6. New mitigation specialist is hired but not allowed to do her job.**

When no one else did anything to find a mitigation specialist, Ron Ninemire stepped up. Mr. Ninemire, the FPD investigator with little capital experience and no appreciation for the development of mitigation evidence, located a new mitigation specialist, Dani Waller.[304] Mr. Owen recalls "if I remember correctly, Ron Ninemire took it upon himself to investigate, find out who mitigation specialists were and investigated them on his own."[b] The team hired her in early June 2006.

---

[a] Ms. Shaughnessy told Mr. Owen that her sister Ann was actually her mother, impregnated by their mutual father. She also told him that her father had raped her (Vol. 8, p. 2143-44, *Owen Testimony*).

[b] Vol. 8, p. 2159, *Owen Testimony*. Perhaps Mr. Ninemire recognized his own limitations, *see* Exhibit 1, Attachment 2, p. 6, *Rickert Declaration* ("after my resignation letter was submitted I heard that the attorneys wanted Ron to be in charge of the mitigation case. Ron knew that this was not a good idea, but he did not believe that he was free to speak his mind").



Appellate Case: 17-1716 Page: 125 Date Filed: 11/01/2017 Entry ID: 4596229

Except for Mr. Owen, the team largely ignored Ms. Waller. Mr. Owen found Ms. Waller, "knowledgeable, personable"[305] and said that she "worked easily with the rest of the defense team, with the exception of Fred Duchardt."[306] Mr. Duchardt explained that he "did not really have a lot of a relationship with Dani Waller," though he characterized her as a "good gal."[307] Mr. Duchardt confirmed that Mr. Owen was the person who primarily assigned Ms. Waller's tasks; her "role in terms of what I was doing was not a whole lot."[308] Mr. O'Connor, while adamant that he recalled at least speaking to Ms. Waller, admitted that "nothing really sticks out" about his interactions with her.[309, a]

Because of the posture of the case and the team at the time Ms. Waller came on-board, she did not follow her normal procedures or adhere to her professional standard of care.[310] As Ms. Waller explained, this case was distinct from other cases in that "my role was very truncated. So instead of it being a comprehensive, global type of investigation and holistic, it was task oriented with few specific things that needed to be done."[311] Ms. Waller described that

---

[a] Ms. Waller, however, recalls interacting with Mr. O'Connor: "I do remember walking up to him to ask him something and he said to me something like, I don't think you should wear that shirt. It's cut too low." Q: Is that the only significant memory you have of interacting with John O'Connor? A: That's the only memory I have." (Vol. 6, p. 1570, *Waller Testimony*).



Appellate Case: 17-1716 Page: 126 Date Filed: 11/01/2017 Entry ID: 4596229

which she was asked to do: "They had a list of people that had already been interviewed and I was to go to those people and see if what they had said before was still true and if they were willing to testify to it . . . there were other witnesses that they wanted interviewed for some peripheral issues."[312] The team told Ms. Waller that it was not necessary for her to evaluate Mrs. Montgomery's mental health: "That was not necessary, that for what I was doing, they'd already had her evaluated and for our part there was nothing there."[313]

**7. Personality problems continue to compromise the team's efforts.**

The personality problems which had plagued the earlier teams continued. Mr. Owen's office, the FPD, had a known preference not to work with Mr. Duchardt.[314] This was so, because, as Mr. Owen explained, "[t]hroughout the course of the time our office had observed Fred [Duchardt] and how he did death penalty cases in this courthouse, and we felt that – I really don't want to talk about anybody, but at the time we felt that he was real milquetoast in his defense."[315] Mr. Owen reluctantly accepted Mr. Duchardt as learned counsel. "[b]ecause of the messy way the case had developed through the time, we needed somebody on the case that could handle, you know, supposedly as learned counsel, handle the case."[316] Mr. Owen recognized that "[a]t that point we had no choice."[317] For his part, Mr. Duchardt also noted that Mr. Owen is



Appellate Case: 17-1716 Page: 127 Date Filed: 11/01/2017 Entry ID: 4596229

not the easiest person to get along with: "Dave [Owen]'s issues were not just gender. Dave is very proud of Dave's capabilities and can be very abrasive."[318,a] Mr. O'Connor told Mr. Duchardt of the FPD's qualms about working with him to which Mr. Duchardt laughingly speculated, "I guess my reputation precede[d] me."[b]

Fred Duchardt never accepted Dani Waller as a necessary, productive, or contributing member of the team. Mr. Owen described, "Their relationship was not good and I have no understanding as to why. Personally I think it was turf

---

[a] Both Federal Defender Laine Cardarella and Asst. FPD Anita Burns offered a different perspective on Mr. Owens. Ms. Burns testified that "I just don't think he was going to be able to work with a woman on equal footing . . . I don't think I would say he treated [women] differently. I think it was just more the way he interacted with women . . . I think it was just more his personal interaction (Vol. 2, p. 327-28, *Burns Testimony*). Ms. Cardarella was more blunt: "he was very hard to work with. He was belligerent. He was misogynistic. He was a bully in every sense of the word . . . He was an angry, angry person. Yes, the more authority he had the more he tended to lord it over us. He would often ask, especially when [she and Ms. Burns] first got hired, he asked Anita and me, You're not one of those militant female lawyer types are you? We found that he would ask that after we had done something that he clearly thought was militant female lawyer type behavior. To be honest, I was – I needed my job. We have just started our family, and I was making twice as much money as I did at the State. So I sort of swallowed it and said, You know, I better not act that way again. The writing was on the wall that David was going to be around and be in charge." (Vol. 3, p. 689-91, *Cardarella Testimony* (referencing Mr. Owen's title as "First Assistant" and the office assumption the he was heir apparent to Ray Conrad)).

[b] Mr. O'Connor told Mr. Duchardt that the FPD was reluctant to work with Mr. Duchardt; Mr. Duchardt laughingly speculated, "I guess my reputation precedes me" (Exhibit 83, p. 1, *Armstrong Declaration* (quoting Mr. Duchardt)).

war over the mitigation and relationship with Lisa Montgomery's children. Fred wanted to do everything himself and insisted he was the only member of the team to visit and speak with Lisa's children."[319] Ms. Waller has said, "it was clear to me Mr. Duchardt did not have any use for mitigation specialists."[320] She expressed the conflict with reference to the warning she received before meeting Mr. Duchardt:

> It was, I think, my first trip to Kansas City, and then he – we went to a restaurant and [Duchardt] was coming to meet me, and [Ninemire and Owen] told me to not be offended by him if he was rude to me because he doesn't believe in mitigation specialists, and they just don't want me to be offended . . . He was fine. But I was, you know, I was kind of anxious because they just said he was going to be rude to me but he wasn't.[321]

Ms. Waller did not have much contact with Mr. Duchardt and considered herself to work for Mr. Owen rather than Mr. Duchardt.[322] She understood that Mr. Owen was the attorney who would be presenting the mitigation case, so reporting to him made sense to her.[323] Mr. Duchardt did not assign her tasks.[324] Once Ms. Waller understood that Mr. Duchardt has assumed responsibility for the mitigation case, she felt "iced out" of preparation.[325] It was clear to her "that Mr. Duchardt did not have any use for mitigation specialists."[a] She explained

---

[a] Exhibit 1-45, p. 1, *Waller Declaration.* Given Mr. Duchardt's testimony in *Purkey v. U.S.*, Ms. Waller's perceptions were spot-on. *Purkey v. United States,* 2009, U.S. Dist. LEXIS 89664, 2009 WL 3160774 (W.D. Mo. Sept. 29, 2009, ("a

that if she said something that wasn't what the lawyers on the team already thought, they were not interested: "it was pretty clear I wasn't – if I wasn't on board it wasn't welcomed. My input just wasn't welcomed . . . I'm talking more about David [Owen], but there were a few times that Fred [Duchardt] made it pretty clear he wasn't interested in what I thought or was doing."[326] Mr. Duchardt ultimately filed a motion with the district court in §2255 averring, "Undersigned counsel and Mr. O'Connor know for certain that, though they perceived that Ms. Waller put forth her best efforts, she did not develop any information worthy of use at time of trial."[327]

Mr. Duchardt touted Ron Ninemire as his mitigation specialist. In Mr. Duchardt's statement filed with the court in response to Petitioner's Motion, he

---

forensic social worker is a particularly important part of a capital defense team in a case in which the lawyer, while fine practitioners in the normal criminal case, have no precious capital case experience, and thus no experience in development of capital case mitigation themes. However, the experienced capital case litigator, by training and experience, can and should be expected to develop case themes him/herself;" "It has been my experience that social workers invariably lack the skill set to ferret out people who, in cases like these, are almost always difficult to locate, and who, when found are often situated in areas where the social worker fears to tread alone"); *see also* Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt, "Someone calling themselves a mitigation expert is almost laughable"); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).



Appellate Case: 17-1716 Page: 130 Date Filed: 11/01/2017 Entry ID: 4596229

answered the government's interrogatory as to why he told Petitioner's counsel that he found the entire concept of mitigation specialists "laughable":

> What I find laughable is that there are people, particularly those cited as experts by Current Counsel for Mrs. Montgomery, whose only real qualifications amount to having previously done capital case mitigation work, who think that they should be reverently referred to with the label of 'mitigation specialist'; that they should be able to command large per-hour fees because they tout the 'mitigation specialist' label, and that they and they alone, without any sort of process, should be allowed, on their bare say-sos alone, to deign those who should be included in their 'mitigation specialist' club and those who should be excluded. What gives me a belly laugh is Judy Clarke presuming to brand that Ron Ninemire, the Federal PD investigator who was a crucial member of the team from the beginning, who has a world of relevant experience and who conducted a tremendous amount of quality investigation related to both phases of the case for our team, was 'not qualified as a mitigation specialist'. To put it simply, I heartily disagree with Judy's inaccurate assessment of Ron's worth.[328, a]

---

[a] Contrary to Mr. Duchardt's characterization, it was not just Ms. Clarke who recognized Mr. Ninemire's limitations: virtually everyone who worked with Mr. Ninemire recognized this fact. Vol. 2, p. 325, *Burns Testimony* (Ninemire is not a mitigation specialist); Vol. 2, p. 395, *Hunt Testimony* (Ninemire is not a mitigation specialist); *Id*. (Ninemire "flat out told me he didn't really believe in mitigation"); Exhibit 1-2, *Rickert Declaration* ("after my resignation letter was submitted I heard that the attorneys wanted Ron to be in charge of the mitigation case. Ron knew that this was not a good idea, but he did not believe that he was free to speak his mind"); Vol. 2, p. 739, *Garvey Testimony* (Ninemire had been a fact investigator a long time and his standard of practice was not standard of care for a capital case "and it was really hard for him to adjust what he was doing); Exhibit 41, p. 3, *Logan Declaration* ("another problem in the case was that Mr. Duchardt did not appear to be working with a qualified mitigation expert. I have known Ron Ninemire, who is an investigator employed by the Office of the Federal Defender, for years and I respect his work, but he is not a mitigation investigator"). Perhaps most persuasive is the opinion of Dave Owen, Mr. Ninemire's supervisor at the



Appellate Case: 17-1716 Page: 131 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Ninemire continued to obstruct the development of mitigation proof. Because Mr. Ninemire had an adopted daughter, he felt it inappropriate for the team to try to locate Mrs. Montgomery's missing sister, Diane. "[T]he idea of somebody coming in years later and interviewing [his daughter] about a past family really upset [Mr. Ninemire], and he didn't want to interrupt – I mean, at that point we had no idea what her life was like. He didn't want to interrupt her life . . . I think he felt paternal toward [Mrs. Mattingly], you know, he was projecting because of his own daughter."[329] Ultimately Ms. Waller was able to assert herself over Mr. Ninemire's objections, because "I had a different relationship with Ron [Ninemire]. Ron and I were friendly, and I didn't feel that Ron was going to – Ron didn't have the ability to fire me either; but you know, Ron wasn't disrespectful to me when he disagreed with me."[330] At Ms. Waller's insistence, Diane was located, interviewed, and provided haunting details about Mrs. Montgomery's life prior to age 5.[331]

Problems within the FPD infected the trial team. Dani Waller observed tension between Mr. Ninemire and Mr. Owen: "after we worked together a while because [Ninemire] was always with me, he opened up more and more,

---

FPD who testified, "[Ninemire] was not qualified to be a mitigation specialist. He's qualified to be the chief investigator." (Vol. 8, p. 2183, *Owen Testimony*).

but at first I could tell – I could just tell there was something going on, and Ron [Ninemire] didn't want to speak. It was – you could just tell there was a lot of tension and drama; and then as we worked together more, he would say, I'm not going to speak up if David [Owen]'s there. David gets mad. And David would get mad if I [Ms. Waller] was with Ron and not him. It was just clear something had happened."[332]

Perhaps because he worked alone, Mr. Duchardt was unaware of the problems on the defense team. When asked about team dysfunction, Mr. Duchardt said there was "[n]one that I detected at the time . . . Dani, if I can characterize it, is my understanding of it that she felt that she wasn't included enough, and Dave indicating that he had misgivings and/or downright objections to certain ways that certain things were being done."[333] Mr. Duchardt's reflections indicate that he considered Ms. Waller essentially superfluous: "in this case Dani many times wanted the investigator, Ron, to go with her on some of the investigations, and they were certainly investigations that Ron could have done himself."[334] Mr. Duchardt was unaware that Mr. Owen obligated Ms. Waller to be accompanied on her interviews.[a] The

[a] Exhibit 1, Attachment 45, p. 2, *Waller Declaration* ("During the time I was on the case, David Owen made it clear that he wanted someone with me when I went out on interviews. Usually it was Ron Ninemire").

dysfunction with regard to the mitigation investigation might best be summed up by Mr. Duchardt's assessment that Ms. Waller's (the mitigation specialist's) "role in terms of what I was doing [mitigation investigation and experts regarding mental health] was not a whole lot."[335]

For his part, lead counsel John O'Connor was unaware of how much work got done on the team. When asked about whether Ms. Waller was to take direction from Dave Owen, Mr. O'Connor testified, "I am assuming that probably happened."[336] When asked about the paralegal, Stephanie Elliot, visiting Mrs. Montgomery and whether she was qualified to observe and report symptoms of mental illness, Mr. O'Connor confessed "I don't know much about Ms. Elliott's experience."[337]

**8. Due to turnover, mental illness, and trauma, Mrs. Montgomery can't trust her lawyers.**

As a result of the removal of Ms. Clarke, Mrs. Montgomery lost faith in her legal team.[338] Mr. Duchardt recognized that Mrs. Montgomery was guarded as a result of the turn-over.[339] Some of her distrust was focused on Ron Ninemire, who she believed had lied to her on April 20th when he claimed to not know why Ms. Clarke was not allowed into CCA to visit her.[340] As Mrs. Montgomery wrote the court, "Only minutes before the visit I found out she had been removed from my defense team. No explanation was given to me. When I

asked what was going on, I feel that information was being withheld from me."[341] When Ms. Clarke was removed from the case, Mrs. Montgomery "said that she has given up and that she lost all hope."[342] As Ms. Hunt observed right before she was ordered to withdraw from the case, "[i]t is apparent [Mrs. Montgomery] has given up and any cooperation would just be going through the motions and will not lead to meaningful or useful information."[343] As Mrs. Montgomery put it, "with Judy gone, it's difficult to have any confidence in the future of my case."[344]

In addition to a loss of faith, the fact that the legal team was all male created problems. Mr. Duchardt admitted, "I was gender challenged in my dealings with Lisa."[345] "It was a whole milieu of problems that [Mrs. Montgomery] was dealing with, which she worked very hard at not making an issue; but in terms of her being able to communicate stuff that we were needing to be able to help her best, that was difficult for her, and one of the things that I identified as being a problem for her was the whole issue of not trusting men."[346]

Because of the loss of faith combined with her difficulty interacting with men, Mrs. Montgomery was unable to communicate much of her trauma history to counsel. "[W]e could only get so far before she shut down."[347] As Mr. Duchardt explained, the way Mrs. Montgomery learned to cope with her history



Appellate Case: 17-1716 Page: 135 Date Filed: 11/01/2017 Entry ID: 4596229

was to put the bad stuff inside a room inside herself and shut the door and never open that door again.[348] He spent a lot of time telling her that they had to open the door and have a look at what was inside.[349] Mr. Duchardt said he did not have a lot of information to share with experts, because Mrs. Montgomery was never able to open up.[350] Mr. Duchardt's memos reflect that Mrs. Montgomery was intensely uncomfortable even being in the room with men, and that, at times, his discussions with her resulted in her in a fetal position, "curling up in a ball and saying nothing."[351]

Mr. Duchardt's failure to appropriately engage with the nature and severity of Mrs. Montgomery's trauma history is plainly manifest in Exhibit 23, a memorandum from Mr. Duchardt to the team on March 7, 2007 where Mr. Duchardt recounts his "good, direct talk" with Mrs. Montgomery about the team's need for information from her (at the point of this "talk" the trial was set for April 30, 2007):

> I reminded her that she had been very closed with me, and had even mildly complained to Dave about my pushing these things. I reminded her that, while I was in the *Street* trial, we all had an agreement to not push her on talking to us about facts, to give her some space and time, before pushing things again. And, I told her I was back to pushing her to reveal things to us because of the essential nature of the issues in terms of our defending her at trial. . . Lisa also accepted, and even embraced, that she has a hard time directly telling people she will not talk about a subject. As she put it "I was not raised that way." She was not empowered to speak directly about her wishes, and would have been punished for being so straightforward. However she also readily



Appellate Case: 17-1716 Page: 136 Date Filed: 11/01/2017 Entry ID: 4596229

> admitted that she is very adroit at avoiding a subject through a host of more passive means, like saying "I don't know," or changing the subject, or curling up in a ball and saying nothing.[a]

Mr. Duchardt turned a blind eye to the sequelae of trauma manifest in Mrs. Montgomery's body language and affect. Instructing Mrs. Montgomery to stop "curling up in a ball" rather than appropriately noting and then investigating her symptoms is, itself, symptomatic of the problems the team had engaging with the facts presented.

**9. Case conflicts distract Mr. Duchardt.**

In the fall of 2006, Mr. Duchardt was unable to focus on developing mitigation in the Montgomery case as he was busy with another capital case, *U.S. v. John Phillip Street*, No:4:04-CR-00298-GAF.[352] Mr. Duchardt does not believe that the *Street* trial impaired his ability to effectively represent Ms. Montgomery, because "I've learned to be able to juggle multiple cases."[353] However, despite his juggling, Mr. Duchardt admitted that "in the middle of trial . . . you're not going to be able to do anything else."[354] The *Street* trial was

---

[a] Exhibit 157, 3/7/2007 *Memorandum*. It is worth noting that after Mr. Duchardt told Mrs. *Montgomery* she could no longer avoid his questions and had to stop curling into a ball, she "became firm on Tommy's involvement." Mr. Duchardt and the team ran with this information, attempting to develop Tommy as a co-conspirator, ignoring the irrationality of both Tommy's putative involvement and Mrs. Montgomery's strong belief "that Judy Shaughnessy is involved and put Tommy up to this." *Id.*



Appellate Case: 17-1716 Page: 137 Date Filed: 11/01/2017 Entry ID: 4596229

held July 24. 2006 through August 14, 1006 (ending in a mistrial) and November 28, 2006 through December 14, 2006.[355]

Mr. Duchardt's distraction from *Montgomery* is perhaps best demonstrated by his terminology at the evidentiary hearing. When testifying to an interaction with Mrs. Montgomery in March 2007, almost a year after his appointment in May 2006, Mr. Duchardt dismissed an impediment to their communication at that visit because, as he termed it, "that was early on."[356] Ten months had lapsed, yet for Mr. Duchardt it was still "early on."

**10. Focused elsewhere, counsel sends consulting expert's work product to government expert.**

While simultaneously preparing for the *Street* trial, Mr. Duchardt began the process of sending materials out to experts in *Montgomery*. As Mr. Duchardt explained in his sworn statement:

> What I gleaned from reading of case documents confirmed Susan's and Judy's takes on the need for brain-injury-related testing. Susan and Judy mentioned no experts they had identified and left me with the distinct impression that one of my major tasks would be finding of experts to do proper testing in anticipation of trial. Fortunately, from my work in other cases, I knew that neuropsychological testing needed to initially be done in order to assess brain damage and determine whether brain imaging would be in order. Also, from my work in other cases, I was familiar with Dr. Fucetola and Dr. Gur and the high quality work they could perform. Plus I knew that, because both Dr. Fucetola and Dr. Gur were busy men, we needed to get them contacted quickly in order fit (sic) into their busy schedules the work we needed them to do. And, I knew that the Street case was scheduled to begin trial just about a month and a half later, and so I needed to proactively get things started on



Appellate Case: 17-1716 Page: 138 Date Filed: 11/01/2017 Entry ID: 4596229

> Lisa's case before I became buried in the Street case. Thus I made the initial contacts with Fucetola and Gur, setting Fucetola's testing for just a few weeks later.[a]

Mr. Duchardt contacted Dr. Robert Fucetola briefly in June 2006 and then emailed him August 15th – the day after the *Street* mistrial – to set up a call.[357] Mr. Duchardt and Dr. Fucetola talked on August 17th for a little over half an hour and then Mr. Duchardt called Mr. Owen regarding "case issues."[358] Subsequently, Mr. Owen's office, the FPD, sent materials to Dr. Fucetola on September 18, 2006, including materials from Dr. Marilyn Hutchinson regarding her consultation with the team in 2005.[359]

Mr. Duchardt did not supervise the production of documents to his experts. "I'm almost certain that in terms of getting records to the experts that I relied on Stephanie [Elliot, the FPD paralegal] to do that."[360] Duchardt was unaware that Dr. Hutchinson had attended team meetings – and was therefore unaware that she took notes at those meetings which were then passed along to Dr. Fucetola along with her other materials.[361] Given that Mr. Duchardt never spoke with Dr. Hutchinson until after he sent her materials to Dr. Fucetola, that

---

[a] D.E. 129, p. 64-65 Note: the "reading of case documents" to which Mr. Duchardt refers here are necessarily limited as he contacted Dr. Gur within 36 hours of his appointment as counsel (Exhibit 82, *Duchardt's CJA Vouchers*, first contact with Dr. Gur was May 17, 2006 following Duchardt's appointment on May 16, 2006).



Appellate Case: 17-1716 Page: 139 Date Filed: 11/01/2017 Entry ID: 4596229

he was unaware she attended team meetings, and that he did not review the documents sent to Dr. Fucetola, it would seem he failed to appreciate that Dr. Hutchinson's materials contained work she did not perform, opinions she did not endorse, and misleading data which could be (and, inevitably, was) used to harm the case.[a]

**11. FPD demotes Mr. Owen.**

In February 2007 at the urging of Magistrate Judge Maughmer, Ray Conrad demoted Mr. Owen.[b] Once Mr. Owen was no longer the first assistant, he "didn't make himself as present in the office as he had been."[362] He disengaged and "[the FPD] did not see as much of him after that."[363] In addition to stepping back, Mr. Owen was physically absent from the case for two months when he had back surgery and was off of work for May and June 2007.[364] As

---

[a] Vol. 4, p. 983-1069, *Hutchinson Testimony* (Hutchinson used a psychometrist to perform psychological testing of Mrs. Montgomery; the computer generated MMPI report was not consistent with Hutchinson's opinions and observations; Mrs. Montgomery was remorseful; the government misused Hutchinson's documents; Hutchinson did not find Mrs. Montgomery to malinger ; Government expert Dan Martell mischaracterized the data; Duchardt misrepresented Hutchinson's data).

[b] The court took judicial notice that the FPD was ordered to withdraw from *U.S. v. Elbert*, No. 06-00257-01 on February 20, 2007, Crim. D.E. 134. Ms. Cardarella testified that Mr. Owen was demoted from first assistant in conjunction with the FPD being ordered to withdraw from that case. Vol. 3, p. 691, *Testimony of Laine Cardarella* ("after the hearing, Judge Maughmer told Ray [Conrad], This is unacceptable and if you don't do something about this, I will. And after that, David [Owen] was demoted.")



Appellate Case: 17-1716 Page: 140 Date Filed: 11/01/2017 Entry ID: 4596229

Ms. Waller observed Mr. Owen "was demoted as some point and he became less involved, but in a way it honestly got worse in the fact that he was never less – he was always in his office with the door shut and Stephanie [Elliot, the paralegal] in there and then he wanted me in there. So that almost made it harder in a way because if I wasn't in there, he was mad. But, you know, a lot of times they were just in there talking . . . I think he was kind of lonely . . . at that point you walked in that office you could feel the tension in the public defender's office. It was really rough."[365]

**12. Mr. Duchardt misrepresents his wife's role to the BOP warden.**

In February and March 2007 Mr. Duchardt took his wife, Ryland Duchardt, with him to Philadelphia to visit with Mrs. Montgomery. Though Mr. Duchardt began his memo of his and his wife's March visit indicating that he "believe[d] that I shared with everyone that I took Ryland with me to visit Lisa when I went to see her in Philly last month," the proof indicates that he did not.[a] Mr. Owen's declaration reflects:

> Only after Fred had written a memo concerning [the trip to Philadelphia] did the defense team learn Ryland not only accompanied Fred, she also interacted with Lisa. When asked why Ryland, who was not a member of the defense team and thus not covered by any attorney-client privilege, was meeting with Lisa Montgomery, Fred stated she

[a] *Compare* Exhibit 157, p. 1 3/7/2007 *Duchardt Memo with* Vol. 8, p. 2148, *Owen Testimony* (he only learned of Ryland Duchardt's visit to Mrs. Montgomery after the fact; "the rest of the team had no prior knowledge or say in the matter").

> was an expert therapist. Ultimately we learned she had no training as a therapist . . . Mr. Duchardt also claimed Ryland had developed a special bond with Lisa. The rest of the defense team saw no evidence of this, and in fact, when Ryland was permitted to sit at counsel table during trial, Lisa seemed to display a certain aversion to Ryland.[366]

To accomplish the visit, Mr. Duchardt misled the Warden of the facility holding Mrs. Montgomery. Mr. Duchardt wrote letters to the Warden at FDC Philadelphia and FMC Carswell seeking admission for his wife, Ryland, to visit with Mrs. Montgomery on the basis that Mrs. Duchardt was an expert and "has been working with me on Mrs. Montgomery's defense."[367] However Mr. Duchardt later admitted that Mrs. Duchardt's role "was not to try to act as an expert but essentially to be my – to kind of vouch for me, to be a protective mechanism for Lisa as against Lisa's fears that I would somehow be like every other – like the vast majority of men who had dealt with her before, that I would have some kind of sexual agenda with her."[368] Mr. Duchardt elaborated that, while Mrs. Duchardt, a trained social worker, knows how to ask questions "she wasn't there for that purpose."[369]

**13. Ms. Waller alerts Mr. Duchardt that mental health evidence is not ready for trial.**

In March of 2007, Ms. Waller "started getting a little panicky" about the state of the preparation for sentencing.[370] At that point the case was set for an April trial date.[371] Mr. Owen had been controlling Ms. Waller's



Appellate Case: 17-1716 Page: 142 Date Filed: 11/01/2017 Entry ID: 4596229

investigation,[372,a] but his participation had declined after his demotion.[373] Ms. Waller described that "I always had this low-level anxiety happening but I was – like that sick feeling in your stomach that you are on a sinking ship and there is no way to get off this, and I just thought I needed to say something to somebody."[374] Ms. Waller was under the impression that Mr. Owen would be the attorney presenting the mitigation case at the trial since he was the attorney who was overseeing her work as the mitigation specialist.[375] Ms. Waller had worked with Mr. Owen to bring Dr. Kuncel into the case to assess Mrs. Montgomery, and Mr. Owen was Dr. Kuncel's attorney contact in March 2007.[376] Due to her panic, Ms. Waller approached Mr. Duchardt at a conference in Dallas in March 2007:

---

[a] Ms. Waller testified that she did not do a full mitigation investigation or work up, "they had a list of people that had already been interviewed and I was to go to those people and see if what they had said before was still true and if they were willing to testify to it . . . [and] there were other witnesses that they wanted interviewed for some peripheral reason" (Vol. 6, p. 1556, *Waller Testimony*). Mr. Owen had a witness list that was color coded by region, indicating which witnesses Ms. Waller was to see, though her interviews were conducted on Mr. Owen and Mr. Ninemire's schedule, "because they went with me. At least one of them was always with me and so it was according to their schedules. So they had a, you know, spreadsheet thing" (*id*. at p. 1557). Ms. Waller also testified that Mr. Owen was counterproductive to the interview process (*id*. at p. 1563). Mr. Owen was, on at least two occasions, rude to witnesses and disruptive to the interview. Ms. Waller testified that she did not "want to rock the boat" by attempting to address these issues, because she had just started her private practice and did not want to be fired like Ms. Rickert (*id*. at p. 1563-64).

Q: And how did that go? What did you say?

A: I mean, he [Duchardt] was polite. I just said that I was concerned that it wasn't going well and –

Q: When you say "it wasn't going well," what wasn't going well?

A: David Owen's preparation for sentencing – sentencing in general. I just – I didn't feel like it was together and it was going well, and I didn't feel like David knew what he was doing, and I was worried about how it was all going to go.

Q: And is that what you expressed to Fred [Duchardt]?

A: Yes.

Q: And what was Mr. Duchardt's response?

A: He told me not to worry about it and that he would take care of it and that was it.[377]

Mr. Duchardt took Mr. Owen's idea about pseudocyesis and "chased it down."[378] As Mr. Duchardt has sworn, he determined that "there seemed to be only one diagnosis for Lisa which made sense and told her 'story', and that was pseudocyesis."[379] He began researching mental health in March: "as my timesheets reflect, I spent many, many hours in March of 2007 researching all



Appellate Case: 17-1716 Page: 144 Date Filed: 11/01/2017 Entry ID: 4596229

of the mental health issues confronting us, including pseudocyesis."[a, b] "[T]here were a lot of approaches we were taking to the case. Actually in choosing pseudocyesis we were at the infancy of the pseudocyesis matter."[380]

Mr. Duchardt arrived at his pseudocyesis diagnosis without the benefit of any mental health professional. Though Dr. Logan had evaluated Mrs. Montgomery for suicidality in 2005 for the Burns/Hunt team, Mr. Duchardt did not speak with him about the case until March 22, 2007 – retaining him to do a "diagnostic evaluation which might include pseudocyesis."[381] After they spoke Mr. Duchardt provided Dr. Logan some biographical information on Mrs. Montgomery which Dr. Logan termed "not anything extensive."[382] "I think he faxed over something that kind of caught me up to speed."[c,383] Mr. Duchardt told Dr. Logan "about Ramachandran – that either had or would be seeing her in the near future . . . I think [Duchardt] presented [Ramachandran] was an

---

[a] D.E. 129, *p.55.*

[b] Mr. Duchardt has sworn to "many, many hours in March researching . . .mental health issues." His time sheets reflect that he researched mental health on 3/15 (3.8hrs); 3/19 (2.4hrs); 3/29 (1.6hrs); 3/30 (4.7hrs); and 3/31 (5.4hrs) for a total of 17.9 hours. (Exhibit 82 *Duchardt's CJA Vouchers*); *see also*, Vol. 8, p. 2269, Duchardt Testimony (that his time records, Exhibit 82) were the best accounting of his time).

[c] Dr. Logan clarified that the fax was not historical documents, it was "Mr. Duchardt's overview of the case" (Vol. 4, p. 938, *Logan Testimony* ).



Appellate Case: 17-1716 Page: 145 Date Filed: 11/01/2017 Entry ID: 4596229

expert in pseudocyesis and would be part of the evaluation in a group that would be seeing her."[384] Mr. Duchardt did not speak with Dr. Logan again after the March 22 phone call until after an April 3, 2007 court appearance.[385]

Mr. Duchardt has said that he found Dr. Ramachandran, because "if you look up pseudocyesis, you find Ramachandran."[386] He says that through his research, "It became clear to me that Dr. Ramachandran was far and away the most accomplished on the subject."[387,a] Though Drs. Hutchinson, Logan, Fucetola, and Gur had already evaluated Mrs. Montgomery, the team "had none of that pseudocyesis stuff 'till we got Ramachandran."[388]

Mr. Duchardt first contacted Dr. Ramachandran on April 2, 2007. As Mr. Duchardt recounts:[389]

> Then, on April 1, the unexpected happened. I got word that though Dr. Ramachandran had been in India, he was now expected back very soon, and I might be able to make contact with him right away. I was actually able to talk with Dr. Ramachandran for about 20 minutes on April 2. In that conversation I explained the case in brief. While Dr. Ramachandran gave appropriate caveats to his opinion, Dr. Ramachandran confirmed that it sounded to him like pseudocyesis was in play in this case.[390]

---

[a]Mr. Duchardt's assessment is contradicted by Ramachandran's testimony (Exhibit 36, *Ramachandran Deposition* (admitting he is not an expert in pseudocyesis and noting his book's endnotes reference two sources who are)).



Appellate Case: 17-1716 Page: 146 Date Filed: 11/01/2017 Entry ID: 4596229

Following their call, Mr. Duchardt emailed some materials to Dr. Ramachandran who was in India[391] so Dr. Ramachandran could "get started."[392] Mr. Duchardt also prepared materials to mail.

### 14. Mr. Duchardt locks himself into a pseudocyesis defense by announcing his experts have spoken to Mrs. Montgomery and are writing reports on pseudocyesis.

Despite having only spoken to Dr. Ramachandran once and having just emailed him documents – and not yet put the written materials in the mail – on April 3, 2007, Mr. Duchardt represented to the court that Dr. Ramachandran has made a preliminary diagnosis of pseudocyesis and was writing a report. This was not true: Dr. Ramachandran had not given a preliminary finding and would not do so without seeing the subject. As Dr. Ramachandran has sworn, it is "inconceivable" that he would diagnose a patient over the phone based on that which a lawyer said.[393]

Mr. Duchardt's representations to the court were inconsistent with the facts. At the April 3, 2007 pretrial conference, Mr. Duchardt told the court that Mrs. Montgomery had spoken with defense experts about 'the Tommy defense.'[a] This created the untrue impression that the defense experts had

---

[a] Trial counsel's phrase, 'the Tommy defense,' is used throughout this document as a short-hand for trial counsel's theory that Mrs. Montgomery's brother, Tommy Kleiner, was the actual killer. Trial counsel used that phrase repeatedly and it is

completed assessments of Mrs. Montgomery. Though Dr. Ramachandran had never met Mrs. Montgomery and Dr. Logan had not seen her since his consultation in 2005 when he absolutely did not discuss the crime with Mrs. Montgomery, Mr. Duchardt told the court, "she did talk to our experts about [her memory that Tommy was with her] but we had to get her to agree to be able to go forward with the, with any kind of mental defense she had to agree to talk to the government's experts as well."[394]

Though he had spoken with Dr. Ramachandran only once, then emailed Dr. Ramachandran documents and had prepared a packet of additional documents that he would mail after the hearing, Mr. Duchardt told the court that Dr. Ramachandran was preparing a report:

> THE COURT: Who is it that is giving you a preliminary diagnosis?
>
> MR. DUCHARDT: That is Dr. Ramachandran and also Dr. Logan.
>
> THE COURT: And is Dr. Ramachandran **preparing a report** reflecting his opinions?
>
> Mr. DUCHARDT: **He is.** He has reviewed information we have provided to him. He needs additional time to review additional information. There are all kinds of materials in this case. So him being

---

adopted here due to its common usage in the case by the participants and for its brevity.

able to generate a report we are looking at, as I understand it, at the earliest the third week of this month.[395]

Mr. Duchardt also represented to the court that Dr. Ramachandran "is the only person I have seen who has actually written on the subject [of pseudocyesis] and written fairly extensively on the subject."[396] Unfortunately, while Dr. Ramachandran may have been the only person Mr. Duchardt had located who wrote about pseudocyesis, his book provides citations to the source of his knowledge regarding pseudocyesis and the entirety of his writing "on the subject" was a five page case review of a case from 1930.[a]

Like Dr. Ramachandran, Dr. Logan had no idea he was supposedly preparing a report on pseudocyesis on April 3, 2007. On April 4, 2006, Mr. Duchardt again contacted Dr. Logan[397] and Dr. Logan then evaluated Mrs. Montgomery on April 10, 2007 and May 11, 2007.[398] When asked as to whether Mr. Duchardt's representations to the court on April 3, 2007 (reflected above) were an accurate representation of what he had told Mr. Duchardt, Dr. Logan confirmed that Mr. Duchardt's representations were not accurate.[399]

---

[a] Not only does Dr. Ramachandran not hold himself out as an expert in pseudocyesis, he has never published original work on the subject. His book on the connection between mind and body contains a chapter which opens with a 5 page case study on pseudocyesis. The endnotes to that chapter cites two actual experts in pseudocyesis. (Vol. 1, p. 52, *Depo. of Ramachandran admitted*; Exhibit 36, p. 14, 34 *Ramachandran Depo.).*



Appellate Case: 17-1716 Page: 149 Date Filed: 11/01/2017 Entry ID: 4596229

**15. Missing symptoms of dissociation, the counsel pursue 'the Tommy Defense'.**

In March 2007, the team decided to pursue 'the Tommy Defense.' Though the Clarke/Hunt/Owen team had confirmed that Tommy had an alibi,[a] the O'Connor/Duchardt/Owen team just could not believe Mrs. Montgomery committed the crime by herself.[b] The record is unclear whether Mr. Owen shared with Mr. Duchardt and Mr. O'Connor that the team had ruled out Tommy's participation and the team decided to ignore that information or whether Mr. Owen kept the previous team's determination that Tommy had an

---

[a] Vol. 4, p. 844-45, *Freedman Testimony* (testifying that the Clarke/Hunt/Owen team ruled out Tommy's participation, that everyone on the team knew Tommy had been ruled out, "I think some people were disappointed that Tommy had an alibi, but that's the kind of thing you do investigation to figure out, right?"); Vol. 3, p. 704, *Testimony of Holly Jackson ("*I just have a vivid memory of hearing at a meeting with David Owen in Kansas City that Tommy was absolutely, impossibly not involved because he was definitely at a meeting with a probation or parole officer for sure at the time of the crimes").

[b] In spite of the fact that Mrs. Montgomery had Ms. Stinnett's blood under her fingernails at the time of her arrest (TT, Vol. 7, p.1647-48, *Strong Testimony*) and her statement to the FBI "You have Bobbie Jo's baby," (TT. Vol. 7, p. 1646, *Strong Testimony*) trial counsel believed that Mrs. Montgomery could not have committed the crime by herself. Vol. 8, p. 1961, *O'Connor Testimony* (testifying he has "always believed" that some other person committed the murder); Exhibit 83, p. 5, *Armstrong Declaration* ("as [Duchardt] put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there . . . 'I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on'"); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).

alibi to himself.[a] As Mr. Owen explained, "Because Lisa Montgomery had alluded many times to vague memories of someone else being with her at the Stinnett residence, Ron Ninemire and I developed a theory that possibly Lisa's brother, Tommy Kleiner, might possibly have been the person Lisa vaguely remembered. At no time did Lisa ever directly acknowledge it was Tommy Kleiner who was with her, but Ron Ninemire and I did try to independently investigate this possibility."[400]

Mr. Duchardt "honestly [doesn't] remember exactly when Tommy's name came out"[401] though his "best recollection" was that "it finally came out" that Tommy was the person Mrs. Montgomery remembered being with her

---

[a] Compare Vol. 3, p. 704, *Jackson Testimony ("*testifying that she has a "vivid memory of hearing at a meeting with David Owen in Kansas City that Tommy was absolutely, impossibly not involved because he was definitely at a meeting with a probation or parole officer for sure at the time of the crimes") *with* Vol. 8, p. 1973, *O'Connor Testimony* (testifying that based on Leona Hayes' statements he believed that "being able to identify the person driving the car, whether that was Tommy Kleiner or whoever, I still believed was in play"); *see also* Vol.8, p. 2305, *Duchardt Testimony* (testifying that he is "still the person who still thinks that [the Tommy Kleiner probation records] don't prove that, and I was the one who argued all the way along that we should drill down further past those records . . . I believed we were in good shape to make a very creditable, it not, strong argument that the – what had been accounted into the computers by the probation officer was actually covering up that she had failed to make that accounting for her time on the date that Tommy actually appeared"); *but see*, Vol. 8, p. 2145, *Owen Testimony* (admitting that the team ruled out Mr. Kleiner as participating in the crime because he had an alibi).



Appellate Case: 17-1716 Page: 151 Date Filed: 11/01/2017 Entry ID: 4596229

when Mr. Duchardt and his wife, Ryland visited with Mrs. Montgomery in Philadelphia on March 5, 2007.[402, a] Of course by that time, the team had required Mrs. Montgomery to review discovery, including the statements of Leona Hayes, and had questioned Mrs. Montgomery repeatedly regarding Tommy's presence.[b,c] Mr. Duchardt's contemporaneous memo of the meeting

---

[a] Mr. Duchardt has made contradictory statements about whether his wife was present at the interview where Mrs. Montgomery finally "remembered" who was present at the crime scene with her. Mr. Duchardt's testimony (quoted above) is consistent with documentation that shows that his wife accompanied him on the visit to FDC in Philadelphia (Exhibit 157, *Duchardt Memo*; Exhibit 160, 3/4/2007 Memo to FDC Warden). However in his sworn statement Mr. Duchardt maintained otherwise: "As I accounted in my memo, it was at an earlier meeting, one at which Ryland was not present, that Lisa revealed Tommy as the person who was with her" (D.E. 129, p.48). The memo referenced in his sworn statement appears to be Exhibit 157, which, in fact, reflects that Mrs. Duchardt was present during the visit (Exhibit 157, Duchardt Memo). Finally, Mr. Duchardt told the court during the April 4, 2007 announcement of 'the Tommy Defense' and the pseudocyesis defense that "We finally got Lisa to confide in us in January that the other person was Tommy Kleiner, her brother" (Exhibit 58, p.13, *Transcript of Court Proceeding 4/3/2007*).

[b] Vol. 2., p. 341, *Elliot Testimony* (began her more than 40 visits to review discovery with Mrs. Montgomery in November 2006 reviewing discovery); *see also*, Exhibit 58, p. 13, 4/3/2007 *Transcript of Proceedings* (Mr. Duchardt told the court "we finally got Lisa to confide in us in January that the other person was Tommy Kleiner, her brother"). As Mr. Duchardt told the court that the team "finally" got Mrs. Montgomery to confide about Tommy in January but his memo to the team reflects that Mrs. Montgomery did not "bec[o]me firm on Tommy's involvement" until Mr. Duchardt took his wife to visit Mrs. Montgomery in Philadelphia March 7, 2007, it appears Mrs. Montgomery was questioned about Tommy's involvement more than once.

[c] The Clarke/Hunt/Owen team had been careful not to question Mrs. Montgomery regarding the facts of the crime out of an awareness that both mental illness and trauma cause disorders of memory which increase the chance of memory



Appellate Case: 17-1716 Page: 152 Date Filed: 11/01/2017 Entry ID: 4596229

in Philadelphia on March 7, 2007 shows that, "during our discussions on what happened the day Bobbie Jo was killed, Lisa *became firm* on Tommy's involvement. As all of you are well aware, while Lisa has consistently indicated that she was not alone in this, she has been reluctant to specifically name Tommy as being another person involved."[403] As Mr. Owen recalls, Lisa "never specifically told us it was Tommy."[404]

Mr. O'Connor claims the team was unaware that the Hunt/Clarke/Owen team had determined that Tommy Kleiner had an alibi for the time of the murder.[405] As he said, "That was never told to me or I believe, obviously, that would stop us in our tracks."[406] Mr. Duchardt's take is that the proof Tommy was elsewhere would not have stopped him from presenting the theory. Only Mr. O'Connor asserting his role as lead counsel kept Mr. Duchardt from presenting 'the Tommy defense': " I am still the person who still thinks that [the Tommy Kleiner probation records] don't prove that [he wasn't at the crime], and I was the one who argued all the way along that we should drill down further past those records . . . I believed we were in good shape to make a

---

contamination. *See* Vol. 4, p. 853-854, *Freedman Testimony* ("this is true in all mental illnesses, not just trauma, but especially in trauma which is a disorder of memory, you have to worry that you're filling things in that the person doesn't actually remember so the next time they get asked a question, what they remember is something you've told them, not their original memory").

very creditable, if not strong argument that the – what had been accounted into the computers by the probation officer was actually covering up that she had failed to make that accounting for her time on the date that Tommy actually appeared . . . But having said all of that, yes, the records that were presented and that we essentially by decision of John for the team, we conceded that Tommy wasn't there."[407] Despite proof that Mr. Kleiner was at his probation officer's office hundreds of miles away from the crime scene, Mr. Duchardt continues to have "no doubt" that Tommy Kleiner was present during the killing of Ms. Stinnett.[408] He "absolutely believe[s]" that Mr. Kleiner's probation officer fudged her records to create Mr. Kleiner's alibi.[409] Mr. O'Connor, similarly testified that he has "always believed" that some other person committed the murder not Lisa Montgomery.[410] Unlike Mr. O'Connor, who ultimately made the decision to abort the idea of presenting 'the Tommy defense,' had Mr. Duchardt been lead counsel, "he would still be arguing that Tommy Kleiner was there."[411]

Mr. Duchardt testified that after learning of Tommy's possible involvement in March, 2007, Mr. O'Connor "took the lead" on the Tommy issue.[412] "While I was doing all of this mental-health-related work, John concentrated on investigation related to Tommy's possible involvement in the crime. At that point, we still had some six-plus weeks before trial was



Appellate Case: 17-1716 Page: 154 Date Filed: 11/01/2017 Entry ID: 4596229

scheduled to begin, and so there was hope that we could accomplish much in the time left."[413] The team sent Ron Ninemire and another investigator to interview Ms. Leona Hayes, the woman who saw a red car fleeing the crime scene immediately after the murder.[414] Ninemire showed Ms. Hayes a photograph of Tommy Kleiner.[415] On March 29, 2007 the team sent Ron Ninemire and Dave Owen to meet with Tommy and covertly obtain his DNA.[416] The following day the team had Mrs. Montgomery take a polygraph examination regarding her memory that Tommy Kleiner was present at the crime scene.[417]

Mr. Owen has sworn that he tried to keep the team from going down 'the Tommy Defense' line of inquiry: Mr. Owen "feared that if [the team] looked at another of [Mrs. Shaughnessy's] children, Tommy [Kleiner], as a possible co-suspect [the team] would alienate her."[418] Lead counsel O'Connor supports Mr. Owen's recollection, "I somewhat recall a conversation along those lines [Owen warning the defense team that if they went forward with the Tommy defense they risked alienating the entire family because Tommy was Judy's favorite] that there was some issues that could cause problems, I think."[419] Despite Mr. Owen's admonitions, Duchardt and O'Connor went to the government with their theory about Tommy's involvement. Mr. O'Connor testified that he



Appellate Case: 17-1716 Page: 155 Date Filed: 11/01/2017 Entry ID: 4596229

"didn't think twice" about going to the government with 'the Tommy defense.'[420]

The team contacted ASUA Whitworth to arrange for a meeting to discuss 'the Tommy Defense.' Though his memory of the call to Whitworth is fuzzy, Mr. O'Connor agreed that it "sounds about right" that he called AUSA Whitworth about a week prior to the April 3, 2007 meeting: "whenever we got the information and talked about it and was (sic) wanting to meet."[421] The parties agreed to meet for the defense to make a formal presentation of their 'Tommy defense.'[422] Before that meeting, however, AUSA Whitworth instructed FBI Special Agent Kurt Lipanovich to interview Tommy Kleiner. Agent Lipanovich interviewed Mr. Kleiner at Mr. Kleiner's sister's house so on March 29, 2007.[423]

The team met with the US Attorneys on April 3, 2007 and presented the possibility of Tommy being the actual killer.[424] AUSA Roseann Ketchmark's notes reflect that the team had obtained Mr. Kleiner's DNA from a cigarette and that his profile "not included not excluded." The team also represented that "Leona made positive id of Tommy."[425] Later in the day on April 3, Mr. O'Connor took Ms. Hayes' sworn statement.[426] Ms. Hayes was unable to make a positive identification of Tommy.[427]



Appellate Case: 17-1716 Page: 156 Date Filed: 11/01/2017 Entry ID: 4596229

After the presentation to the government, Mr. Owen's fears were realized. As Tommy explained, "Lisa's attorneys came to see me and I didn't trust them for one second. They were shady and the FBI told me they took my cigarette butts after I met with them. They tried to make it like I was with Lisa when she did this and I wasn't."[428] "I freaked out, you know. I can't tell you exactly what that meant – with the defense attorneys at Denny's somewhere. There's got to be a record that I met with these defense attorneys. I call them the men in black or whatever with the wiggly eyes. This dude or whatever. They were being real sneaky. I didn't know [about the defense attorneys taking his cigarette butts for DNA] until Kurt Lipanovich was saying 'Hey, look, so you better back up from Lisa, you know, because Lisa is saying you was there.'"[429]

As a result of Agent Lipanovich telling Mr. Kleiner that the defense was investigating him, Mrs. Montgomery's family became hostile to the defense:

> Numerous attempts were made to speak with Lisa's extended family – aunts, uncles, and cousins. The defense team felt it was necessary to learn about family dynamics and Lisa's childhood. However, no one would talk with the defense team. Ron Ninemire made several attempts at cold calls on Lisa's sisters, but they would not speak with him. Many times a family member would say Judy Shaughnessy had directed no one was to talk with Lisa's defense team.[430]

Mr. Kleiner testified that when FBI Agent Lipanovich made clear that Mr. Kleiner was a suspect in the murder, "What happened, [the family] knew I

was innocent . . . My whole family pushed away from Lisa because of how Kurt Lipanovich was saying, 'Look, we're going to take care of him, make sure he's all right,' trying to pamper me, you know, and knowing that I didn't have nothing to do with it. And he was like – had my whole family pushed away from Lisa . . . [information from Agent Lipanovich that Mrs. Montgomery was supposedly accusing Mr. Kleiner of committing the crime] makes everybody turn against Lisa, you know, for real."[431] Mr. Kleiner indicated that though he unconditionally loved his sister, the idea that she was accusing him of murder, "[i]t does change your actions, 100 percent does change them. Kurt Lipanovich said Lisa said I was there at the time. You know what I'm saying. And then I got some defense attorneys trying to take my cigarette butts for DNA . . . I mean you're juggled."[432]

Despite clear proof that Tommy was not the person Mrs. Montgomery "felt" like was present at the crime, the team did not attempt to investigate Mrs. Montgomery's sensation as a symptom of her mental illness, rather they let her believe that Tommy might have been present – and to present that to both defense and government experts as the truth.[433] "In keeping with this strategy [of giving the government everything in hopes of getting a plea], when we developed the Tommy and pseudocyesis defenses, even though those like Current Counsel for Mrs. Montgomery might have had misgivings about the



Appellate Case: 17-1716 Page: 158 Date Filed: 11/01/2017 Entry ID: 4596229

approach, we candidly and immediately laid all of that our for Matt [Whitworth] as well as for the Court."[434]

**16. Mr. Duchardt relies on Mrs. Montgomery for his mitigation "script".**

Despite her obvious impairments,[a] Mr. Duchardt based his mitigation strategy on information from Mrs. Montgomery. As Mr. Duchardt put it, "he got social history information from Ms. Montgomery during a long interview with her while she was in Pennsylvania for testing 'and really that was the script.'"[435] Mr. Duchardt documented the interview where he obtained his "script," including that Mrs. Montgomery related that "she is afraid of what will happen to her" if she were to try to access her memories of that which was done to her, that she feared she might "lose herself in those bad things," and that Mr. Duchardt believed that his admonishing her that she was no longer allowed to say "I don't know," change the subject, or curl up into a ball had opened the door for Lisa to "bec[o]me firm" about Tommy's involvement.[436] As Mr. Duchardt has said that the meeting documented in Exhibit 157 became his script for mitigation, it is worth noting that the memo does not reflect any social

[a] While Mr. Duchardt initially saw "nothing obvious wrong with her," he eventually understood that Mrs. Montgomery was impaired – particularly in her inability to disclose the extent of the trauma she had suffered. Exhibit 83, p.2, 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).



Appellate Case: 17-1716 Page: 159 Date Filed: 11/01/2017 Entry ID: 4596229

history discussion. The memo documents that over two days of visits, Mr. Duchardt covered several topics with Mrs. Montgomery: "four preliminary issues;"[a] "Memories about the day Bobbie Jo was killed;" "Lisa's Pregnancies after 1990;"[b] and "Mental Defense Matters."[c] None of those sections contain social history information – other than discussion about pregnancy.

After his interview with Mrs. Montgomery, Mr. Duchardt "chas[ed] down" his mitigation strategy without input from his mitigation specialist. As Ms. Waller has testified, she believed that Mr. Owen was in charge of the mitigation/penalty phase – not Mr. Duchardt.[437] She became increasingly distressed as 2007 progressed, "I always had this low-level anxiety happening

---

[a] Though the heading on the section of the memo reads "four preliminary issues" the text of that section describes only three issues: 1) a paper doll of a baby had been slid under Mrs. Montgomery's door before the meeting; 2) Mrs. Montgomery was upset upon learning that her teenaged daughter, Kayla, is pregnant; 3) Mr. Duchardt "raised with Lisa her not sharing things with us and the reasons behind that." Exhibit 157, *Duchardt Memo.*

[b] This section covers Mr. Duchardt's and Mrs. Montgomery's discussion of her belief that she was pregnant in 1994 and her mother took the baby. This section culminates with Mr. Duchardt assuring Mrs. Montgomery that "we would work to try to have an OB-GYN evaluate whether [her] tubes are tied." Exhibit 157, *Duchardt Memo.*

[c] This section reflects that Mr. Duchardt discussed the possibility of trying hypnosis to help Mrs. Montgomery remember what happened at the crime, including Tommy's presence. Mr. Duchardt "I also discussed the idea about the MRI polygraph, again explaining that such a procedure could help, posing the question to her about Tommy's presence at the time of Bobbie Jo's death, if we cannot develop any other physical evidence to connect Tommy with the crime." Exhibit 157, *Duchardt Memo.*

but I was – like that sick feeling in your stomach that you are on a sinking ship and there is no way to get off this, and I just thought I needed to say something to somebody, and so I pulled [Mr. Duchardt] aside and asked him if I could talk to him." Ms. Waller and Mr. Duchardt attended the same conference in March 2007, where Ms. Waller approached Mr. Duchardt about perception that Mr. Owen was not going to be ready for the penalty phase: "I just said that I was concerned that it wasn't going well . . . David Owen's preparation for sentencing – sentencing in general. I just – I didn't feel like it was together and it was going well, and I didn't feel like David knew what he was doing, and I was worried about how it was all going to go." When she expressed her concern to Mr. Duchardt, "He told me not to worry about it and that he would take care of it and that was that."[438] Unfortunately Mr. Duchardt thereafter "made it pretty clear he wasn't interested in what I thought or was doing."[439]

Mr. Duchardt had conceded that "because Ms. Montgomery could not disclose the extent of her trauma, he did not have much information to provide the experts, 'there wasn't a hell of a lot to share.'"[440] Unfortunately Mr. Duchardt blinked what Mr. Burr later referred to as "a whole field of red flags" signaling the need for investigation into Mrs. Montgomery's history and impairments.[441]



Appellate Case: 17-1716 Page: 161 Date Filed: 11/01/2017 Entry ID: 4596229

## 17. Mr. Duchardt *et al* miss obvious red flag signaling need for investigation.

While Duchardt and O'Connor were busy tracking down 'the Tommy defense' and pseudocyesis,[a] Ms. Waller found the key witness to Lisa Montgomery's traumatic sexual history. On March 1, 2007, Ms. Waller interviewed David Kidwell, Mrs. Montgomery's maternal cousin.[442] Ms. Waller memorialized that interview and sent the memo to the legal team.[443] The most critical portions of that memo provided the team with a witness who was a former law enforcement officer to whom Mrs. Montgomery contemporaneously disclosed that her step-father forced her to sexually service his friends:

> David always got along with Lisa. David felt Judy attempted to keep Lisa isolated without friends or close family. David and Lisa often talked, but Judy would tell him to stay away from Lisa. Judy told David that Lisa would try to seduce him.
>
> Lisa had trouble dealing with the fact that she had been molested by Jack Kleiner. Right after it happened, Lisa was very depressed. She would isolate herself and wouldn't talk to anyone. Then it seemed that Lisa began going out with many different men. David felt Lisa was acting out and using the men as a type of escape.
>
> David advised [Lisa] to go talk to someone about what had happened to her. Lisa told him that sometimes Jack would come home drunk with his friends and make her perform sexually with them. She didn't have anyone she could tell or trust then while it was going on. David asked

---

[a] As Dr. Logan characterized it, "By the time I got involved in 2007, it was full speed ahead on pseudocyesis." Exhibit 41, p.3, *Logan Declaration*.

Judy one time where she was at while this was happening to Lisa. Judy's reply was that she couldn't be home 24 hours, 7 days a week.[444]

No one on the legal team requested any follow up to Ms. Waller's memo.[445] As Ms. Waller was contracted just to perform discrete tasks dictated primarily by David Owen, Ms. Waller did not do any further follow-up, though she later served Mr. Kidwell with a subpoena to come testify at the trial.[446]

**18. NGRI defense needlessly subjects Mrs. Montgomery to interrogation by government expert.**

By pleading Mrs. Montgomery NGRI, the team exposed Mrs. Montgomery to five full days of videotaped interrogation by Park Dietz and Dan Martell.[447] "[A]n insanity defense essentially opens the client up to a governmental evaluation and discussion of the crime."[448] Dr. Dietz's reputation as a skilled interrogator is well known.[449] As a result of these interviews, the jury heard:

- Now she's also been described as a good worker so I don't mean to say she's a lazy employee. It's just walking off a job without notice is a kind of **impulsive behavior that is not really very adaptive** since it could hurt in your reference to get your next job if they called the employer who says she just walked off without telling us.[450]
- Another issue is that her mother and her first husband both said she was **neglectful** to children in the home. She denied that and sought to portray herself as a devoted, caring, loving mother, but there was quite a bit of evidence that wasn't always the way she behaved.[451]

- The defendant was repeatedly **unfaithful** to her husband Carl and **repeated infidelity** is kind of mal-adaptive behavior that is found in some of the **personality disorders**.[452]
- **That's the kind of behavior that people with personality disorder engage in that manipulate other people.** Tries to **control** them. Tries to engage in things that are not really what you want a loving parent to do.[453]
- Carl Boman described the defendant as **manipulative, untrustworthy, deceptive.** According to him she will tell any story or combination of lies that is to her advantage and she lies about everything.[454]
- That Teddy stated the defendant exhibited erratic and even **mean** behavioral traits as long as he knew her. It was Tommie (sic) that described the defendant as **deceitful, impulsive, and a liar.**[455]
- **And the anti-social features I thought were clear her illegal activities, the times she threw things at people or struck the children, deceitfulness, lying, infidelity, the use of alias.**

  Q: You are referring to her use of Darlene Fischer?

  A: Yes. **Impulsivity**, the times she has moved without any plan or how they are going to pay for it or who is going to have what jobs. Walking off of jobs unexpectedly, **irritability and aggressiveness**. The instances I just described. **Reckless disregard for the safety of herself and others**. She has been in a number of car crashes and in some of them she said it was her fault. Others it wasn't. Even when there were kids in the car she didn't have them restrained. And then her **irresponsibility**. She would write bad checks. There were times she did not pay bills even though they had the money to pay the bills and she neglected her children. So those all suggest in addition to this emotionally unstable borderline patter, there is some **anti- social behavior**.[456]

Mr. Duchardt has attempted to justify his decision by characterizing the resulting testimony by Drs. Dietz and Martel as something of a battle of the experts: "Even the government's expert, Dr. Park Dietz, never denied the



Appellate Case: 17-1716 Page: 164 Date Filed: 11/01/2017 Entry ID: 4596229

severity of the sort of mental illness diagnosed by Dr. Ramachandran and Dr. Logan, only registering his opinions that Lisa did not suffer from pseudocyesis and that the constellation of the mental problems he detected in Lisa did not constitute a severe mental illness."[457] However, the fact that the government's expert believed that pseudocyesis was a serious mental illness does not justify pleading NGRI where the proof did not demonstrate that she suffered from pseudocyesis.[a] Mr. Duchardt complains, "Current Counsel for Mrs. Montgomery criticize us for letting Lisa talk about [the 'Tommy defense'], though failing to explain how, short of either not using any mental defense whatsoever or telling Lisa to lie, we could have hidden Lisa's firm recollections about Tommy from thorough expert questioning."[458] Mr. Duchardt blinks now –

[a] Any 'battle of experts' between Dr. Ramachandran and Dr. Dietz over Mrs. Montgomery's diagnosis would be unreasonable trial strategy where Dr. Ramachandran found Mrs. Montgomery had symptoms of pseudocyesis based in part on his belief that she desired to become pregnant – which he based on the fact she talked about her teenaged children, ignoring Mrs. Montgomery's protestations that she did not really want another baby (*see* TT. Vol. 11  p. 2276 (Mrs. Montgomery said she could go "either way" with regard to another baby in her interview with Dr. Ramachandran), *but see*, TT. Vol. 11, 2279, *Video of Dietz Interview with Lisa Montgomery played during Ramachandran Testimony* (saying wanted to miscarry)) and misapprehended the legal definition for insanity. *See*, Exhibit 36, p. 919, *Ramachandran Deposition* (testifying that he believed the legal test for insanity was the M'Naghten Rule).



Appellate Case: 17-1716 Page: 165 Date Filed: 11/01/2017 Entry ID: 4596229

as he did pre-trial – the obvious, appropriate way for counsel to handle a client's symptoms of mental illness – ie. as symptoms of mental illness.[a]

With respect to Federal Rules of Evidence, Rule 12.2 when a defendant is raising a mental health defense just for the penalty phase, the government is prevented from even seeing those evaluations until sentencing:[459]

> The rule lays out a process by which reports are submitted and not exchanged until after the guilty verdict comes and defendant says, I'm going to put on a mental health presentation, then the government gets it and you get the government's reports and you still have an opportunity, I think after that, I think to [pull] it. So there are layers of protections.[b]

---

[a] *See*, § V.E., Vol. 4, p. 1693, *Porterfield Testimony* (explaining psychological concepts of depersonalization and de-realization, which are components of dissociation and verifying that when dissociated a person may feel as if another person were present); *see also*, Vol. 4, p. 998, *Hutchinson Testimony* (on psychological testing Mrs. Montgomery showed "profound dissociative experiences or tendencies"); Vol. 3, p. 561, *Burr Testimony* (when only one perpetrator but client says feels like someone else was there "it's much more pointing towards an aspect or feature of mental illness than it is about actual witnesses or actual co-conspirator status, and that's how I saw this, and yet [Hunt and Owen] couldn't see it that way . . . they kind of latched on something they were more comfortable with which was somebody else being involved that perhaps might have some responsibility"); Vol. 8, p. 2145, *Owen Testimony* (while Judy Clarke was on the team, Mrs. Montgomery never said Tommy was involved, just that she felt that someone else was in the room; Owen learned that the sort of sensation was a symptom of dissociative disorder).

[b] Vol. 3, p. 659, *Clarke Testimony*; *see also*, Vol. 1, p. 227, *Bookman Testimony* (presenting mental health as mitigation rather than as a defense opens client "to a different, very different scope of examination. For instance, if you're putting on – if you're putting on evidence just of, you know, background of trauma or posttraumatic stress, there is different instructions that are going to measure that, not an NGRI is going to open you up to all sorts of instruments that wouldn't be opened up with a more limited presentation").



Appellate Case: 17-1716 Page: 166 Date Filed: 11/01/2017 Entry ID: 4596229

In the midst of the Dietz/Martell interrogation, Mrs. Montgomery became emotionally overwhelmed and unable to finish the examination.[460] On May 9, 2007 the court directed Mrs. Montgomery to complete the forensic interview with Drs. Dietz and Martell.[461] While Lead counsel O'Connor acknowledged that it is incumbent on defense counsel to make sure a record is created of proceedings, no official transcript or record exists of the May 9, 2007 hearing.[462] Exhibit 137, *Handwritten Notes by AUSA Roseann Ketchmark* is the best evidence of that which occurred at that hearing.[463] AUSA Ketchmark's notes reflect:

> Court directs defendant to fully cooperate to see that exams are complete. Must to present defense. Do not expect there to be any more difficulty with exams. Defendant, through Fred [Duchardt] apologizes to court and will do her best.[464]

Lead counsel O'Connor acknowledged that the notes do not reflect any colloquy with Mrs. Montgomery regarding her Fifth Amendment right not to participate in those examinations.[465] He also agreed, "[T]hat would be defense counsel's responsibility."[466]

**19. Failing to comply with professional norms regarding development of a social history, Duchardt team misses critical mitigation evidence.**

Failing to comply with prevailing professional norms regarding the necessity of creating a comprehensive social history, Duchardt *et al* missed



Appellate Case: 17-1716 Page: 167 Date Filed: 11/01/2017 Entry ID: 4596229

critical mitigation evidence. As Russ Stetler, expert mitigation specialist explains, the standard in capital defense is to investigate "how does this person function, what are the things which influence the individual's development? What are the multigenerational influences? What was encoded in the DNA on both sides of the family? As well as, what were the learned behaviors from the patterns of behavior that occurred on both sides of the family."[467] Mr. Duchardt, however, eschews the preparation of a social history in favor of his "database" which is the collection of primary documents that "is the source for every important fact about Lisa Montgomery relied upon by the experts used by Current Counsel for Mrs. Montgomery."[468]

While Mr. Duchardt was myopically focused on the NGRI/pseudocyesis defense and Mr. O'Connor was focused on 'the Tommy Defense,' Mr. Owen was sidelined by his demotion, his back injury, and the team's lack of regard for his opinion. No one listened to Ms. Waller.[469,a] As a result, not only did the team miss the glaring red flag waving obviously in the middle of the Kidwell Memo, the team also failed to compile a comprehensive social history that

[a] Not that Ms. Waller spoke up about how the investigation should have been conducted. Vol. 6, p. 1564, *Waller Testimony* (admitting she did not speak up because she did not want to get fired and crying from embarrassment, "I feel really bad about [not saying anything] because I should have, you know, said something [about the way mitigation interviews should be conducted].")



Appellate Case: 17-1716 Page: 168 Date Filed: 11/01/2017 Entry ID: 4596229

could contextualize the “bad stuff” they learned about Mrs. Montgomery as symptoms of her mental illness and trauma.

**a. Information that Lisa was serially raped by multiple perpetrators is ignored.**

The team ignored information that Lisa Montgomery was serially raped by multiple perpetrators as a young girl.[a] Had the team followed up on Ms. Waller’s initial interview with David Kidwell, they would have learned the details of how teen-aged Lisa contemporaneously disclosed to Mr. Kidwell that her step-father was not just raping her – he was sharing her with his friends. Mr. Kidwell was ready and willing to tell what happened to Lisa:

> I will never forget how I learned that Jack had been abusing Lisa. I had come down from Kansas for a visit. This was the first time I had been to see them since Lisa had been little. They were living in Sperry in the trailer that had the add on room where Lisa stayed. Judy, the kids and I were just sitting in the living room visiting. Then Jack came in with four of his friends. They had been off to a side room drinking beer. I did not know the men, I just knew that they were older. They came into get another beer. Everything about Lisa totally changed. You could tell that something was wrong with these guys and she was afraid. It bothered me, but I couldn’t’ quite place what was wrong. It was a long drive back home and I had to leave. It bothered me to leave.
>
> I went back down a month or two later and this time Lisa’s whole demeanor was different. It was like night and day from what she had been when she was little. She was very quiet. She was nervous and jumpy. The slightest noise would startle her. She was constantly

[a] Vol. 6, p. 1569, *Waller Testimony* (Q: After you sent that memo to the defense team, what follow-up did they request you to do with Mr. Kidwell? A: None. Q: What follow-up did you do with Mr. Kidwell? A: None).



Appellate Case: 17-1716 Page: 169 Date Filed: 11/01/2017 Entry ID: 4596229

looking around. Eventually Lisa got up and went to her room. I was really bothered by what I was picking up on. I asked Judy what was wrong and she said, "Oh Lisa is just having a bad day." It seemed like more than that to me. This time Jack was there with three other men. These three had been there on the visit before. When they came into the room and saw me, Lisa just got behind me. They said that they were just coming to get a beer. I could tell that Lisa was terrified of them. But nobody said anything.

Eventually Lisa went back to her room. When it came time to leave, I went to Lisa's room. She was just sitting on her bed. I told her we were leaving I could tell she didn't want for me to go. She had the saddest look in her eyes. She looked up at me and said, "Do you have to?" I said, "Yes, sweetie, I've gotta get back home." She just looked down and said, "Ok, Bye."

After I got back to Kansas, Lisa's reaction to those men just kept eating at me. I was in law enforcement at the time and had also worked at the Topeka State Hospital. My training and instincts told me something was not right. I decided to go back down and ask Lisa what was wrong. I drove back down to Oklahoma like I was just coming for a visit. I got Lisa off to the side and said, "Lisa what is wrong? Is somebody hurting you?" She said, "Can we go somewhere?" I said, "Sure, let's go get a coke."
Before Lisa would agree to tell me anything she made me promise to never tell a soul. She said that "He (meaning Jack) said he would kill me if I ever told anyone." She also said that Jack threatened the rest of the family if Lisa ever told. I promised her I would never tell. I was not prepared to hear what she was about to tell me.

Lisa told me that those men and Jack raped her. The rapes were anal, oral, and vaginal. She said it was over and over, one man right after the other, and went on for hours. They were also physically violent. They would beat and slap her if she was "doing it wrong." When they were done, they urinated on her like she was trash. I asked Lisa if these men did this to her just one time and she said no. It happened a lot of times. I was horrified. I wanted to go and beat the living daylights out of Jack right then. I told Lisa that she needed to tell the police. She said that she couldn't. She was terrified that Jack would kill her. I knew she had



Appellate Case: 17-1716 Page: 170 Date Filed: 11/01/2017 Entry ID: 4596229

> reason to believe that. Jack was a ruthless person and a mean drunk. I had seen the bruises on Judy, I knew what a drunk Jack was and if he would do all these things it wasn't a stretch to believe that he was capable of killing Lisa. I didn't have any law enforcement contacts in Sperry. Sperry was just a little rural town and I know how those places work. I couldn't protect her from Jack down there. If it had been in my jurisdiction it would have been a whole different story. I was afraid for Lisa and I had given her my word. I was sick to my stomach and heart broken. But I dropped Lisa back at home and went back to Kansas.[470]

The team did not learn this history, because they did nothing with the information Kidwell provided to Ms. Waller. No one requested any follow-up with Mr. Kidwell.[471] Mr. O'Connor indicated that the team did not follow up on the Kidwell information:

> Q: And **if Mr. Kidwell had been followed up on** and you had learned that Lisa Montgomery's mother and father subjected her to oral, anal, and vaginal intercourse with men who were much older than her, sometimes three and four at a time, who would urinate on her when they were done, is that information you would have wanted the jury to know?
>
> A: Again, yes.[472]

Mr. Owen admitted the team did not follow up: "When I testified with regard to a question about follow up on Ms. Waller's 2007 memo [of interview of David Kidwell], I was **solely** referencing the 2005 interviews with Jack Kleiner. I testified that 'we' had asked Jack Kleiner about the allegations that he had sexually assaulted Lisa. By 'we' I was referring to Ron Ninemire and myself. Ron Ninemire and I interviewed Jack Kleiner two times, both of those



Appellate Case: 17-1716 Page: 171 Date Filed: 11/01/2017 Entry ID: 4596229

interviews took place in 2005."[473] Mr. Owen did not cite any other follow-up to the Kidwell Memo besides his recollection that he and Mr. Ninemire had asked Mr. Kleiner whether he raped Lisa – explicitly stating that asking Kleiner (which occurred in 2005) was the extent of his investigation of the sex abuse: "We went and talked to Jack Kleiner about it, and he denied it ever happened . . . Q: And that was the extent of the follow-up? A: As far as I know."[474]

Mr. Kidwell's declaration provides further confirmation that the team never investigated further. As Mr. Kidwell says, he was confused by the team's lack of interest in the information he provided. As he recalled "I had spoken to someone on Lisa's defense team many months before the trial, but that wasn't the lawyer who was asking me questions in court." Mr. Kidwell, "told [Ms. Waller and Mr. Ninemire] a lot of what is in this declaration, but not the graphic details." He said that when he came to testify, "It seems like they didn't spend that much time with me. I thought that I was going to be asked these questions in court. I was willing to testify to all of this information. It bothered me that the lawyer didn't ask me these questions." He observed, "It seems like it took longer to swear me in than for my testimony."[475]

Expert mitigation specialist Russ Stetler explained that the information contained in the Kidwell Memo written by Ms. Waller was a red-flag which, under the standards of practice in 2006-07, demanded additional investigation

and development: "[I]t changes the trauma-triggering event from a single perpetrator to serial rape by multiple men. So it's a whole area that needs to be investigated, developed. You are going to need to bring in somebody who can – you are going to need to bring in a specialist in trauma who is going to be able to elicit more information than any of us can get from a client, somebody who's got the experience to elicit that information and to assess its credibility, to make behavioral observations about how the client experiences the reports that she will ultimately give on this area."[476] As Mr. Stetler elaborated, competent mitigation investigation of the Kidwell Memo required the team to explore "how long it [went on], how many men, what exact acts were performed" and to spend more time with Mr. Kidwell.[477] "You have to assume that you haven't gotten the whole story from the first time you have talked to [Mr. Kidwell]."[a]

As Mr. Owen explains, the team's failure to follow-up on the red flag in the Kidwell Memo was not strategic: they simply did not notice the mitigation proof that was staring them in the face. "At the time Ron and I interviewed Jack Kleiner we did not know of the allegations of trafficking or gang rape. When I testified that Jack denied it, what I meant was that Jack had denied he had ever

[a] Vol. 1, p. 117-18, *Stetler Testimony* (setting out possible barriers to disclosure Mr. Kidwell may have experienced which would have led to the truncated initial report, including that a witness who fails to protect a victim has survivor's guilt which may affect the ease with which that witness will recount details).

abused Lisa. I did not believe Jack's denials. We would not have been deterred from investigating any avenue on the basis of what Jack Kleiner said."[478] Had the team followed-up on the Kidwell Memo, the team could have found the testimony David Kidwell has provided in the 2255 proceedings (above) and could have presented to the jury the expert testimony of an expert in trauma such as Dr. Katherine Porterfield as shown, below at § V.E.

**b. The names of the perpetrators contained in records collected by prior team are ignored.**

The names of some of the men who raped Lisa Montgomery were available to the Duchardt/O'Connor/Owen team in their database. The prior team collected the *Kleiner v. Kleiner* divorce records from Tulsa County.[479] In those records were Exhibit 17, the interrogatories to which Judy Shaughnessy, then Kleiner, was obligated to respond. Ms. (then) Kleiner was required to list the men in whose company she had been in the last year.

INTERROGATORY NO. 3: Have you been in the company of any men other than your husband, children or relatives within the last year up to and including the date of these interrogatories? If so, please state the name and address with whom you have kept company with other than your son or relatives since that time.

ANSWER NO. 3: Yes. Ernest Kinsley, West of City, Sperry, Oklahoma; Jeff Batson, address unknown at this time; Ed Sierer, 1530 E. 72 N., Turley, Oklahoma; Harold Allee, 1440 S. Canton, Tulsa, Oklahoma; G.N. Shipley, 916 S. 63 W. Ave.,; Keith Hollandsworth, West of City, Sperry, Oklahoma; Warren Applegate, address unknown; Bill Ladd, Attorney at Law, 5142 S. Sandusky, Tulsa, Oklahoma; Richard Boman, 9917 N. Garrison, Sperry, Oklahoma; Richard White, Attorney at Law, 10122 E. 22nd, Tulsa, Oklahoma.

0 AM 11: 12

480

Among those Ms. Shaughnessy (neé Kleiner) listed in her response were G.N. Shipley and Harold Allee, two of the men who raped Lisa. As Exhibit 16 shows, Lisa Montgomery provided the names of two of the perpetrators – names she could not have known would also be found in her mother's divorce records.[a]

[a] Exhibit 18, *"Shorty" Shipley Obituary* shows that G.N. Shipley's given name was Gerald. *See also*, Exhibit 8, *Supplemental Declaration of Katherine Porterfield* (setting out that Mrs. Montgomery discussed that the plumber's nickname was "Uncle Shorty" and that he left money in her nightstand because he knew Lisa was not receiving any of the money he paid for the sex)(note: Exhibit 18 shows that Gerald Shipley's nickname was "Shorty").



[481]

Had the team investigated the men listed in Mrs. Kleiner's divorce records, they could have found additional proof of Mr. Kidwell's first hand-observations and Lisa's disclosure.

**c. The database cannot and does not function as a social history.**

The Duchardt/O'Connor/Owen team failed to investigate and develop a framework for their social history presentation. Instead, as Mr. Duchardt said, he got social history information from Mrs. Montgomery during a long interview with her while she was in Pennsylvania for testing "and really that was the script."[482] Mr. Duchardt equates the materials in the team's "database" with a biopsychosocial evaluation: "Contrary to the accusation by Current Counsel for Mrs. Montgomery that we had not developed for Lisa a complete biopsychosocial history, our database gave us a good handle on Lisa's complicated background."[483]

Mr. Duchardt's focus on the fact the team amassed a lot of information misses the point. The team's job was not to merely collect the information but to also synthesize it so that the complied facts could be provided to their experts



Appellate Case: 17-1716 Page: 176 Date Filed: 11/01/2017 Entry ID: 4596229

for an accurate diagnosis and also presented as mitigation. As expert mitigation specialist, Russ Stetler explained, a social history is a framework for information about a client's life which allows many, many pieces of information to have meaning. "You have to put that [life history] material into a framework that makes sense."[484] As clinical social worker, Jan Vogelsang explained, the task is "to examine a person's life and try to shed some light on what has happened to them and to explain how they have come to their current circumstances."[485] "It's the details of what happened and the consequences and how people have to adapt – the abused person has to adapt to kind of keep themselves safe and alive" that matters for mitigation.[486]

As Ms. Vogelsang explained:

> Data in Lisa's biopsychosocial history also identify environmental and developmental factors associated with mental illness and poor social outcomes, including extreme poverty, head injuries and loss of consciousness, child sexual exploitation, malnutrition, unstable family constellations, and early and ongoing neglect and abandonment. It is especially important to identify medical conditions and other psychiatric or neurological disorders which must be ruled out or explained in order to understand the complexity of her inherited genetic predisposition to mental impairments and her chronic exposure to extreme sexual, physical, and emotional trauma, which are now recognized to have enduring effects on brain structure and functioning. Lisa's maternal and paternal families contained formal diagnoses of or patterns of behavior associated with psychosis, autism, learning and developmental disabilities, dementia, epilepsy, bereavement, hypothyroidism, intellectual disability, substance abuse, drug dependence, schizophrenia spectrum disorders, impaired memory and bipolar mood disorders.[487]



Appellate Case: 17-1716 Page: 177 Date Filed: 11/01/2017 Entry ID: 4596229

The team's failure to develop the information they had available into a social history narrative resulted in their failure to present information[a] and in the information they did present being effectively rebutted by the government.[b]

**d. An intergenerational history is not developed.**

The team did not investigate Mrs. Montgomery's familial heritage. Though the Clarke/Hunt/Owen team collected historical documents regarding Mrs. Montgomery's relatives, nothing was presented at trial – either directly or through experts[c] – regarding the generations preceding Mrs. Montgomery's parents.[488] Because the team did not mine that source material, the team failed to understand the inter-generational forces which pre-disposed Mrs.

---

[a] See, § V.C.
[b] See, § V.C. – 4 jurors not finding sex abuse to be mitigation, gov't arguing that LM wasn't sexually abused.
[c] Though Dr. Logan testified during the guilt/innocence portion of the trial that he looked at Mrs. Montgomery's family history, he did not cite to or provide the jury with any family history other than of Mrs. Montgomery's life with her mother and step-father. (TT. Vol 11, p. 2379).



Appellate Case: 17-1716 Page: 178 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery to mental illness and substance abuse and the team failed to appreciate the family culture of stealing children.[a,b]

By the team's failure to synthesize the historical data in their "database," the team failed to contextualize Mrs. Montgomery's mental illness in light of her family's history of mental illness. "Lisa has a paternal grandmother whose life partially reflects this pattern that emerged in the family. She was raised in Washington state and was known throughout her life to have these bouts of temper, of rage, of outburst and uncontrollable emotions . . . on Lisa's paternal

---

[a] *See*, Exhibit 4, *Genograms*; Exhibit 154, *Biopsychosocial PowerPoint*. The government stipulated both to the admission of Ms. Vogelsang's report, supplemental report, supporting attachments to each, and also to her PowerPoint. "We're not contesting the information that she was able to compile and put together in the biosocialpysch (sic) history here." (Vol. 6, p. 1490, *Argument of the USA*).

[b] As will be discussed, below in § V.E., appropriate mental health and trauma experts discuss the familial and genetic vulnerability Mrs. Montgomery inherited from her ancestors. *See, e.g*., Exhibit 7, p. 2, *Porterfield Report* ("Lisa's paternal and maternal sides of her family have a significant history of psychiatric and neurologic impairments that place them at increased risk for developing mental disorders . . ."); Exhibit 15, p. 8, *Woods Declaration* ("Medical pediatric, psychiatric, and education records and descriptions by first degree and extended family members document a lengthy history of familial, genetic vulnerability to psychiatric and neurologic impairment"); Exhibit 23, p. 3-4, *Nadkarni Report* ("Mrs. Montgomery's biological family history is replete with psychiatric and neurologic impairments, including: mood disorders, intellectual disability, post-traumatic stress disorder, and schizophrenia. Mrs. Montgomery's paternal family is remarkable for alcoholism, depression, and significant neurological impairment of her paternal aunt. Her maternal family history is replete with symptoms and behaviors indicative of undiagnosed mental illness, including mood disorders and psychosis; the family history also evidences neurological defects.")

side of the family there was a significant number of family members who suffered from depression and anxiety; and so her father, her paternal aunt, her half-sister, her paternal uncle, two of her -- three of her cousins . . . the maternal side of Lisa' family had an even greater pattern of mental and emotional problems going back to her great-grandmother, Maude Berry, who ran away at [age] 13, started having children at 13 and 14 and had six children and then just took the baby and ran off, leaving the other five behind. There are some indications there was actually a great-great grandmother who died in an insane asylum in Indiana."[489] Mrs. Montgomery's sibling and cousin cohort is rife with mental illness. "Lisa's first cousin, Wendy Triebs . . . has had a long history of psychiatric hospitalizations . . . the hospital noted that [Ms. Triebs] had the word 'evil' – she had inscribed it on her abdomen with a razor blade . . . she received [electro-shock therapy] eight times. She had self-inflicted stab wound of the vagina . . . She'd been committed more than nine times and medicated with [antipsychotics]."[490] Lisa's cousin Kenny Alexander also was committed multiple times for psychosis, including belief that the CIA had placed implants in his mouth as part of a "Democratic and Republican military experiment;" he also, at times, expressed a belief that he was the president's dog and in a relationship with Jesus Christ.[491] Mrs. Montgomery's siblings, likewise, have been treated with antipsychotics – largely while incarcerated: "These are not as

clearly documented because Teddy and Tommy both have spent time in jail and in prison and so some of our information comes from those sources, but her half-brother Teddy, says that he has been diagnosed and treated with psychotropic drugs, and the records shows Geodon and Zyprexa which are – they are prescribed for major mental disorders . . . Tommy also reports that he has been on Paxil, Trazadone, and Lithium."[492,a] The intergenerational family history of documented mental and emotional disturbance speaks volumes to Mrs. Montgomery's predisposition toward similar problems as shown in Exhibit 4, *Genograms*, which highlights the familial pattern of mental, emotional, and behavioral dysregulation in green:

Family Pattern of Mental, Emotional, and Behavioral Dysregulation



[a] Mr. Tommy Kleiner also testified that he is currently on Risperdal and has been prescribed Depakote and Lithium in the past (Exhibit 142, p. 4, p. 32, *Kleiner Deposition*).

The team also failed to develop proof that Mrs. Montgomery's family has a singularly disturbing pattern of familial interference with child custody.[a] "The pattern that emerges on this family tree is called a family pattern of custodial interference, and what that means is that this pattern demonstrates people who were involved in the taking of children or threatening to take children either with or without the benefit of the law, and this is a very unusual pattern to emerge . . . this is actually family members involving themselves in decisions about where children should be without necessarily going through the court."[493] Exhibit 4, *Genograms*, highlights in red each of the people within 3 generations of Mrs. Montgomery who have committed or been the victim of custodial interference:



[a] While Dr. Logan testified that "there was quite a theme in this family of using the children somewhat as weapons," (TT., Vol. 11, p. 2399) his testimony was limited to a discussion of the custody disputes/problems between Mrs. Montgomery and her husband and mother. As trial counsel did not perform an intergenerational history, his testimony lacked the perspective provided by a more complete picture.

In the same way, the team failed to investigate Mrs. Montgomery's family history to contextualize Mrs. Montgomery's substance abuse issues. As Exhibit 4, Genograms, shows with blue highlights, many members of Mrs. Montgomery's family had history of substance abuse:



As Ms. Vogelsang indicated, this genogram had "an unusual cluster just around the immediate family, and it appeared to me that the use of alcohol in this family was partially due to a lack of professional care for the mental health problems. So you see people using alcohol to self-medicate or to deal with their behavioral problems."[494]

The trial team failed to develop and present to the jury the interconnections of Mrs. Montgomery's family which undergird her diagnosis and inability to function. "We don't grow up in a vacuum. We're shaped by the experiences of others and by the people that we're exposed to growing up; and just as a doctor's interested who in your family have had heart attacks or strokes



Appellate Case: 17-1716 Page: 183 Date Filed: 11/01/2017 Entry ID: 4596229

or other medical problems, we do the same thing in mental health. We look at the different behaviors and signs and symptoms and know that some of those are literally passed down through the generations from family member to family member."[495]

**e. Evidence regarding cruelty in the Kleiner home is not developed, presented to experts, or integrated into the mitigation strategy.**

The trial team failed to investigate and develop proof regarding other cruelty in the Kleiner house. Focused solely on Jack Kleiner's rape of Lisa as the source of the PTSD they presented as the cause of Mrs. Montgomery's putative pseudocyesis, the team failed to develop proof that Lisa was subjected to strategies of coercive control that undermined her agency and her perceptions of reality.[496,a]

The team failed to discover that Judy and Jack used strategies of coercive control to establish complete dominance over Lisa. Coercive control is "a concept that has been very clear when it's been discussed as it regards war, prisoners of war, cults, brothels, any situation of captivity where someone is not free and independent and is under the control of another person who is

[a] Ms. Vogelsang only presented an abbreviated discussion of coercive control as her testimony was limited by the court-imposed time constraint (Vol. 6, p. 1507-10, *Vogelsang Testimony*; *see* §V.E.).

dominating them; and what has been discovered through studies, for example of communist regimes, of the situation of U.S. soldiers in Korea, that a set of strategies had been used to bring them into compliance so that they would do whatever their captors wanted. In the last several years in mental health, researchers have applied this concept of coercive control to domestic violence, because they have found that children who are captive in a home where there is total control, there is no opportunity for independence and where the children are exposed to behaviors by the parents that actually can and do border at times on torture, that these children will start to demonstrate the same kinds of behaviors, the same kinds of results that we see with soldiers."[a]

The strategies of coercive control include (in broad categories): Isolation, Domination and the Destruction of Autonomy, Climate of Terror, and Demand for Collusion.[497]

> **ISOLATION** – undermines or destroys attachments, removes from peer activities, subject to frequent humiliation, scapegoated within the family, called degrading names, forced to give up values or ideals, robbed of key child development task to create a sense of self and to learn where one fits in the larger social world. When core attachment relationships are a source of danger, the child can lose hope and a sense of trust. The perceptions of reality may be undermined.
>
> **DOMINATION AND THE DESTRUCTION OF AUTONOMY** – The capricious and arbitrary exercise of power such as taking control

[a] Ms. Vogelsang provided citations to Dr. James Garbarino, Evan Stark, Dr. Pearman, and Kathy Whelan as pioneers in developing this understanding (Vol. 6, p. 1507-08, *Vogelsang Testimony*).



Appellate Case: 17-1716 Page: 185 Date Filed: 11/01/2017 Entry ID: 4596229

> over bodily functions, grooming, hygiene, can be devastating for a child. The will of the perpetrator is frequently asserted without regard for the victim's needs, desires, perceptions, aspirations, or goals. Expressing one's emotions or feelings may trigger an attack. This blocks efforts to become autonomous and be independent and confident.
> **CLIMATE OF TERROR** – Threats, surveillance, and degradation are three of the many ways a perpetrator instills a climate of fear and terror using unpredictable violence with no provocation. The threat of violence can be just as powerful as the act itself. One must imagine the child living with this fear daily and nightly, not as a discrete incident. Fear focuses the child on basic survival, and attention on the person who induces that fear. This constant focus distracts from normal developmental behavior. The survivor lives in a state of sickening anticipation and dread. This can possibly leave the victim in a persistent state of hyperarousal.
> **DEMAND FOR COLLUSION** – A child who has been sexually abused may be forced to participate in sexual acts creating the illusion of being complicit. This undermines her ability to accurately assess responsibility and confuses the role of victim and perpetrator.[498]

If the team had investigated the Kleiner household, they would have discovered that "Lisa's mother used extreme strategies of coercive control to maintain mastery and omnipotence over her: Lisa's mother humiliated and degraded her, controlled her bodily functions, did not allow her to speak or make sounds, subjected her to extreme temperatures, forced her to endure stress positions, forced her to confess falsely to wrongdoings of others, destroyed Lisa's treasured ideals, occasionally indulged her with small gifts or amenities, and choked, beat and whipped her."[499] As a result, "Lisa suffered predictable and longstanding psychosis due to the severity of the torture she survived.

Torture and coercive control by her mother destroyed Lisa's autonomy, sense of self, and independence. It made her psychotic in that she lost contact with reality, became disconnected from events and circumstances around her, and developed distorted and irrational perceptions of her place in the world."[500]

The team could have shown that the Kleiners used isolation to control Lisa. The Kleiner home-stead outside Sperry, Oklahoma was isolated in the extreme. As shown in photos and map evidence created as part of Ms. Vogelsang's Biopsychosocial, the Kleiners had no close neighbors:



[501]

> The Kleiners lived in a run down trailer. The trailer was old even back then. I think it had to have been built in the 1950's or 60's. It was at the end of a circle on a dead end road. The area where the trailer sat had been a pasture . . . The trailer was small. It was single wide that probably only had two bedrooms. I don't know what it looked like inside because I was never invited in. It sat up on blocks and had skirting around it. It had a small wooden porch that needed to be repainted. It might have had a shed built on to the trailer . . . They had electricity but they didn't have water. They had a truck with a water tank in the back so they hauled water. I think they had a phone because once in a while they would call me if they weren't going to school.[502]



Appellate Case: 17-1716 Page: 187 Date Filed: 11/01/2017 Entry ID: 4596229

"Lisa's mother, Judy, in collusion with a series of men, isolated Lisa from those who could help her. They forced Lisa to sleep in a closet, in a laundry room, and in a structure attached to the family trailer where she was subject to observation 24 hours a day. Judy and her designees controlled Lisa's sleep, bodily functions and movements."[a] The isolation was so complete that as one neighbor put it: "Jack had them out in the country kind of in his own little kingdom. They were isolated. They could have screamed and the neighbors probably wouldn't have heard them."[503]

The team could have shown that Jack and Judy exercised extreme domination over Lisa. "Lisa's mother and others used a variety of methods to condition her to be compliant, accept control, and accept sexual assault. These methods included confinement, beatings, physical abuse, rape, threats of violence to her or her siblings, and the threat of shaming by revealing her

---

[a] Exhibit 1, p. 41, 174, *Biopsychosocial* (Exhibit 1-6, *Patterson Declaration*: "If Lisa played and made noise, Judy screamed at her. Judy yelled at the girls for acting just like little girls do. Judy belittled the girls, making them feel poorly about themselves. I could see it. I should have stopped it. At the time, I was drinking and trying to lose myself. Judy was a terrible mother and I regret not stepping in and making her stop abusing my girls") (Exhibit 1-9, *Mattingly Declaration*: "Judy was a very angry person. She shouted and screamed and yelled and hit us. Judy punished us in terrible ways. If little Lisa didn't want to eat all of the food on her tray, Judy left Lisa strapped into her highchair for hours. Judy spanked my bare bottom, strapped me across the legs, and slapped me across the face with an open hand. She hit me on the head with a broom handle repeatedly.")



Appellate Case: 17-1716 Page: 188 Date Filed: 11/01/2017 Entry ID: 4596229

activities to other family members. Judy brainwashed Lisa to believe that Judy was omnipotent and Lisa was powerless and helpless. Lisa was not allowed to speak or make any noise – even the noise of a fork tine on a plate – as a child. Often Judy duct taped Lisa's mouth shut, and forced Lisa to stand in the corner waiting on her stepfather to come home and beat her. Lisa was not allowed to voice an opinion. Lisa's safety depended on her ability to monitor Judy's every facial expression to determine how to stay on Judy's good side.[a] "Not only did Judy silence Lisa with use of duct tape, she also used stress positioning as punishment. As a small child, Lisa was forced to stand in the corner for hours – often from breakfast until time for lunch. Lisa was ordered to not move, not even to scratch. She could not touch the walls or the floor for support. She never knew when her mother was watching to check to make sure she obeyed; Judy seemed to always be watching or paying the other children to tattle. Judy seemed omnipotent and omnipresent. Lisa developed hyper-vigilance."[504] Judy's omnipotence over her children was best expressed by her son, Teddy Kleiner, who said, "My dad was one mean dude, and I was very scared of him but not as scared as I was of my mom. I have nightmares about what she did

[a] Exhibit 1, p.69-70, 175-76, *Biopsychosocial* (*citing* Exhibit 1- 83, *Moffett Declaration*: "[the] silence in the house was deafening" as Lisa and Patty "tried to be quiet all the time. They were not allowed to play and carry on. They walked on eggshells because they didn't know where the next blow was coming from.")

and will do to me. She's destroyed or taken everything I've ever loved and she holds so much power that I know she is capable of anything."[505]

The team could have shown that the Kleiners used coercive control to undermine Lisa's sense of agency by showing that Judy destroyed that which Lisa treasured. One of the things Lisa most enjoyed as a child was playing her violin. "Lisa played absolutely beautifully."[506] "Lisa especially loved her violin and was devastated when her mother, Judy sold Lisa's violin.[507] Even more tragically, Judy destroyed Lisa's relationship with her older sister, Diane, who was Lisa's only protector.[508]

> In February 1972 two social workers came back to Judy's house. The case worker assigned to me sat and talked to Judy. They talked about places that I could go and live and have a permanent home. Judy told the social worker that my Grandma Marie was dead. The social worker took me away! As I was leaving Judy leaned over and told me that I was being taken away from her because I was bad. She told me that it was my fault! What a terrifying thing for a young . . . girl to hear. I clung to Lisa as I was leaving. I knew deep down that if I left for good, the sexual abuse that I had continually experienced while living with Judy would start to happen to Lisa . . . I was eight and a half years old and I thought that I would never see my beloved sister Lisa again. I was sort of correct. The next time that I laid eyes on my sister Lisa, I was being placed on the stand to testify at her trial. Thirty four years had passed."[509]

That Judy destroyed Lisa's treasured ideals could have been confirmed by Judy's similar treatment of Lisa's siblings – none of which was discovered by trial counsel or presented at trial. Diane expressed it this way:



Appellate Case: 17-1716 Page: 190 Date Filed: 11/01/2017 Entry ID: 4596229

> Judy's greatest pleasure was finding the one thing that I held sacred and destroying it. Judy exploited my greatest fear. Judy knew that my greatest fear was being sent away from my family. She saw that I found joy in being with baby Lisa. Judy tortured me by pretending that I was about to be sent away from the family, all the time. She stripped me naked, packed all of my clothes into a suitcase, and forced me outside onto the stoop of the house. She told me that people were just about to come and take me away. I stood out on the stoop of the house, naked and afraid, many many times. Judy continued to tell me that I was about to be taken from the family. She knew that this was my greatest fear and she played on it.[510]

Teddy also experienced Judy's destructive violence:

> One day I got off the school bus and my mom had my dog. As soon as I got off the bus I knew. She hit my dog in the head with the back end of a shovel and he started walking and falling and losing his balance. His brains came out of his head. He wouldn't die. Grandma Margaret Applegate shot him in the head. Grandma Margaret wasn't our grandma – she was a drinking buddy of my mom's. I wasn't old enough to understand that my dog didn't know the rules, but I knew it was my fault that he was killed. It devastated me. My mom waited to kill my dog until I was home from school. She wanted me to see her kill him.[511]

The team could also have shown that Judy required Lisa to collude in her own victimization, framing her sexual trafficking of Lisa as something Lisa "wanted." "Lisa's mother would blame Lisa and say things like 'you wanted your own room, well you have to pay for it.' Lisa was clear that 'paying for it' meant 'doing whatever [these men] wanted."[512] "Lisa heard her mother tell others, including family members, that the sexual abuse from Jack was brought on by Lisa – that Lisa had 'stolen' Judy's husband. Lisa said she could not speak up for herself and simply didn't talk about what happened."[513]



Appellate Case: 17-1716 Page: 191 Date Filed: 11/01/2017 Entry ID: 4596229

The team could have developed unbiased witnesses who would have testified to the environment of terror from which young Lisa could not escape. For instance, Jimmy Miller, who lived with the Kleiners for a period as a young adult would have testified:

> Jack was brutal. Something as simple as Judy not having butter on the table could set him off and he would beat her. Jack had to control everything and he wanted everything just perfect. If Judy didn't do what he wanted or what he said, then he would beat her. He would use his hands, fists, a belt, a coat hanger, or whatever he had in his hands. Patty and Lisa saw the beatings. They would cry and say, "Please stop." Jack even brutally beat Judy when she was pregnant. She had given birth to Teddy and was pregnant with Jeri Jo when I left their house.
>
> Jack beat the girls too. And these were not short beatings. If he was set off he would come at them with whatever he had in his hands and the only thing the girls could do was duck. I am sure there were times he hit them in the head. He would beat them so badly they had welts on them. He would yell and curse at them while he was beating them. He told them it was their fault he was beating them. If Judy tried to interfere he would beat her. She couldn't stop him.
>
> How bad the beatings were was directly related to how much Jack had to drink. Every night he drank a fifth of vodka, a fifth of Canadian Club and then he chased it with beer. Jack was extremely mean when he was drunk.[514]

The Kleiner's closest neighbor, Wesley Gann, a preacher, would have testified:

> Almost every Sunday, Jack came outside as my family and I were leaving for church. Once, he stuck a large stick in the ground and fell to his knees, He said that the stick was his god and he mocked us by pretending to pray to or worship the stick. He didn't respect me as a preacher or as a man. It seemed like he showed very little regard for any human being.



Appellate Case: 17-1716 Page: 192 Date Filed: 11/01/2017 Entry ID: 4596229

> On many other Sundays, Jack acted like he was playing with himself in front of my wife and my little girl. My daughter was about one year old at the time. He stood across from our house and pretended to masturbate.
>
> . . .
>
> Jack Kleiner did more than just verbally threaten me and my family. Once I was mowing my lawn . . . and out of nowhere, Jack came after me with a 4X4, ready to hit me on my head . . . Living so close to Jack Kleiner was living in hell. I could not stand to live that close to him for more than one year. I can't imagine what it would have been like to spend my childhood in his household.[515]

Had the team investigated to learn the nature of the abuse Lisa endured as a child and properly developed the understanding that the abuse "destroyed Lisa's autonomy, sense of self, and independence," how it "made her psychotic in that she lost contact with reality, became disconnected from events and circumstances around her, and developed distorted and irrational perceptions of her place in the world" the team would have had a framework within which to present an accurate (and mitigating) picture of Mrs. Montgomery's compromised functioning as an adult.[516]

**f. Mr. Duchardt fails to recognize, investigate, and develop Lisa's history of dissociation unrelated to the crime.**

Though Mr. Duchardt has stressed that he was in charge of mitigation because he was the person on the team qualified by experience to recognize



Appellate Case: 17-1716 Page: 193 Date Filed: 11/01/2017 Entry ID: 4596229

symptoms of mental illness,[a] he did not investigate or develop information that reflected Lisa's behaviors as a young girl were symptomatic of dissociation. Though the team possessed information from several sources that as a young girl Lisa behaved in ways consistent with dissociation, the team did not develop that information, leaving their experts without the available historical support for their finding that Mrs. Montgomery dissociated at the time of the crime.[b]

The team possessed information that:

- Susan Barrow, one of Lisa's classmates in Sperry remembered that the teacher often had "to say something to get [Lisa's] attention like,

---

[a] The ABA Guidelines and prevailing professional norms require that a member of the team be qualified to screen and assess for mental illness Exhibit 103, p. 88, 91 *ABA Guidelines*. Mr. Duchardt has claimed that he is: "As for my being the choice as the leader of our team when it came to mitigation and mental health defense efforts, that had to do with an objective measure, experience . . . I note that I have prepared and tried more than a dozen capital cases, and I have addressed complex mental health issues in many of those capital cases as well as in various non-capital cases. My guess is that my credentials stack up well as against most any capital case attorney or 'mitigation specialist' to be found. I know that my credentials are as good as or better than those who have been relied upon as experts by Current Counsel for Mrs. Montgomery" (D.E. 129, p. 35).

[b] As will be shown in §V.C., Drs. Logan and Ramachandran opined that Mrs. Montgomery dissociated at the time of the crime, but neither cited any historical information showing that Lisa had been prone to dissociation since childhood, because they were not provided any of that information. *See*, TT. Vol. 10 p. 2200, *Ramachandran Testimony* (Mrs. Montgomery did not remember the crime, and this is "typical of dissociate states"); TT. Vol. 11, p. 2314, *Logan Testimony* (Dr. Logan opines that Mrs. Montgomery dissociated at the time of the crime); *see also* TT. Vol. 14 p. 3025 *Kuncel Testimony* (Dr. Kuncel discussed the concepts of dissociation, depersonalization and derealization but, again, did not have the historical data to support that Lisa had been experiencing such since she was a small girl).



Appellate Case: 17-1716 Page: 194 Date Filed: 11/01/2017 Entry ID: 4596229

"Wake up!" Susan also reported that Lisa spaced out when they were together outside of class.[517]

- Teddy Kleiner said that Lisa was "in her own little world growing up."[518]

- Teddy Kleiner described that Lisa had an uncharacteristic outburst in family court during a custody proceeding and began crying hysterically."[s]he looked dramatically different like she got a shot of something – 'like her soul left her.'"[519]

- In the year before the offense, Lisa took on the character and appearance of her cousin Wendy. According to witnesses interviewed by the trial team, Lisa seemed to be "trying to be her cousin Wendy Triebs. She dressed like her, acted like her, and had her hair the same as Wendy.[520]

Had the team investigated, they could have developed more information supporting Lisa's tendency to dissociate:

- Teddy Kleiner described, "Lisa was different from other people and even as a child I knew that. She went into her own little world a lot. She often spaced out, stared into space or lost herself in a book for hours on end."[521]

- "[Lisa] was often in her own little world and seemed to like being alone. She could read for hours and hours. My mom used to say that the house could burn down around Lisa and she wouldn't notice."[522]

- Lisa's step-sister, Penny Craig remembered that as a child, "Lisa liked to read and she did it to drown everyone out and escape her reality. She sometimes got lost in her books or stared into space so that she was not really with it. You had to yell to get her attention. She'd eventually come back to and respond. My father especially was easily angered when Lisa would tune out."[523]



Appellate Case: 17-1716 Page: 195 Date Filed: 11/01/2017 Entry ID: 4596229

- Richard Boman (the man Judy married after divorcing Jack Kleiner) described Lisa as "in a world of her own" and said she was often found "just star[ing] into space."

- Her first husband, Carl Boman, described Lisa as "not emotionally present . . . she was in her own world and distant from everything."

- Mike Harlow, Lisa and Carl's landlord in Osage County, Oklahoma observed, "Lisa lived in a fantasy world . . . she was in her twenties but acted like she was fourteen or fifteen years old. Sometimes when I talked to Lisa, she went on and on about herself or topics that I did not care about. She could not pick up on the fact that I was not interested. She also did not allow me to speak during those [interactions]. It was like she just did not or could not listen."[524]

- Pre-crime, when Lisa was working at Wendy's with Chelsea and Desiree they (and other employees) had to call Lisa "Martha" to get her attention.[525]

- When asked about the abuse, Chelsea related that when Lisa got out of control "it was like she couldn't stop herself."[526]

- Teddy described that during the time Lisa was contesting Judy's claim for custody of Lisa's nephew Justin (in the year immediately before the crime), Lisa "spaced out even more than she normally did.[527]

**g. Proof that Lisa was mistreated even as an adult – reflecting and exacerbating the effect of her traumatic upbringing – was ignored.**

The team failed to develop proof that Lisa's traumatic upbringing prepared her for acceptance of mistreatment by her sexual partners and spouses – which further compromised her tenuous mental health. "By 1991, Lisa was unable to focus, pay attention, and attend to her four small children. Her symptoms of her mood disorder were more pronounced and deepened by re-

experiencing the sexual trauma of her youth at now Carl's hands. Carl described the change in her behavior:

> Lisa was unpredictable. She went from not talking to talking non-stop even to strangers . . . [S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking, she kept talking. She was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her."[528]

The Team did not investigate Carl's mistreatment of Lisa. "[Carl's] behavior became more aggressive and more violent during their marriage. He beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife to her throat, and sexually assaulted her. He bruised and hurt her. He recorded her screams and pleas for help on his video camera."[529] Had the team investigated, Lisa's brother, Teddy, could have testified about viewing a video of Carl raping Lisa:

> When I was around eighteen or nineteen years old, Lisa and Carl were living on Colorado Street in Bartlesville, Oklahoma . . . I went over to Lisa's to hang out with a guy named Kevin that lived down the street. Lisa and Carl were gone at the time. Kevin and I were sitting around and I put a video in the VCR. I thought it was a movie. It was a home video and it showed Carl raping and beating my sister. It was violent and like a scene out of a horror movie. My sister was crying and in pain. I felt sick watching the video.[530]

Had the team investigated, they could have shown that after their marriage in 2000, Kevin's sexual mistreatment of Lisa exacerbated her tendency to dissociate. Kayla could have described finding a box of ropes and



Appellate Case: 17-1716 Page: 197 Date Filed: 11/01/2017 Entry ID: 4596229

other objects used during sex by Kevin and Lisa in one of their houses in Melvern, Kansas.[531] Chelsea could have provided information about walking in and seeing Lisa tied up during sex with Kevin.[532] The facts provided by the children would have supported the social history that: "Lisa's enthusiasm for Kevin waned when he insisted on sexual violence as part of their relationship. She was not surprised that Kevin wanted to hurt her during sex because she had come to expect nothing less; she thought it was part of maintaining a relationship with a man. Kevin, she was quick to point out, was not as violent or hurtful as Carl, but he bruised her, used a horse whip on her, and tied her in forced stress positions. Kevin liked to go to the woods or barn to tie her up, and used clamps on her nipples. She did not seek or want the maltreatment, did not enjoy it, and did not know that forced and coerced sexual intercourse during marriage was considered a sexual assault. Instead of protesting, her mind simply went somewhere else as it had in such situations since she was a child."[533]

h. **Counsel fail to investigate Mrs. Montgomery's pre-crime functioning: If they had, would have known this was not a "good mother" who "just snapped".**

The team failed to investigate and develop the proof that trauma and mental illness compromised Lisa's every day functioning. "Lisa continues to be psychotic as a result of co-morbid conditions of serious mental illness,

neurological impairment, and complex trauma reactions. Lisa experiences sustained loss of contact with reality and extremely disordered perceptions of time, personhood, and events. She experiences temporal disconnection from events, relationships, and situations in which she is a major participant. This disconnection is greater and more than dissociation associated with traumatic events. She is ashamed, fearful, distrustful, paranoid, suicidal, anxious, depressed, sleep disturbed, hyperviligent, and self loathing."[534] "Despair, disorganization, confusion, and fear overcame her efforts to be a good mother and wife, to provide a safe and nurturing refuge for her children and to partner with her husband to build a future for them and their children."[535]

The team ignored information in their file which showed that Lisa's functioning began to decline after Jack began molesting her. When Lisa was 12 years old and living in Tulsa, Camille McKenzie, noted that she attended "special needs classes" and was curious why a child with "such great earlier grade and great standardized tests results would later need 'below average' or 'special needs' classes. McKenzie offered two theories (1) Lisa had not attended school for a long period of time before return to Tulsa; (2) Lisa was experience[ing] some severe emotional problems preventing her from concentrating on work."[536]

Had the team investigated, pre-crime proof of Lisa's inability to function effectively would have demonstrated her mental illness and corroborated her trauma history.

- Carl's pre-marital behavior towards Lisa could have warned a normally functioning person to beware, but Lisa had no ability to recognize what was her due, what to expect, or what to prohibit based on her maltreatment as a child. In one notable incident before marriage, Carl shoved Lisa, who was naked getting out of a shower, against a wall heater that burned her flesh while he had sexual intercourse with her.[537]

- Lisa was not able to keep up with the day-to-day tasks of parenting as she raced from one unrealistic plan to the next.[538]

- A friend saw Lisa after she moved back from Ponca City and remembered "how bad she looked and how terrible she smelled . . . The smell was very offensive, to the point you couldn't stand to be next to her. Her hair was greasy and her clothes were dirty, but she didn't seem to notice."[539]

- When [Lisa] would get a job, she never asked about the pay. She "didn't know to do that and did not know how to do that." She learned what her pay was when she received her first paycheck."[540]

- Neighbors contacted Oklahoma's Department of Human Services (DHS) and reported the conditions under which Lisa, Carl, and the children lived. One neighbor said that "children were running around naked in front yard. Mother is drunk . . . The house is filthy. Children come to him to get food and baths." The neighbor reported that Lisa "offered children" to him and wished "her husband would take them and leave." He also believed that Lisa had backed over Desiree in the driveway, that



Appellate Case: 17-1716 Page: 200 Date Filed: 11/01/2017 Entry ID: 4596229

CJ drank "plumbing stuff," and Kayla "ate a bottle of aspirin."[a] DHA conducted an investigation . . . [and] determined that the children were being neglected and needed DHS intervention.

Lisa "appeared tired during her interview with DHS staff. She was not employed. The first house at 427 Creek had dog feces on the floor along with cereal. Desi answered the social worker's questions and told her the house was "always dirty." Desi's shoes were too tight and "left marks on her feet." The kitchen was "a mess," and there were "roaches in her house." The family could not wash clothes because the washing machine was broken. Lisa was "sick." Desi reported that Lisa was "going out and drinking bad stuff." Desi also described Lisa's loss of control when "her mother hits her head on the wall."

Two weeks later, the social worker found Lisa and the children at an abandoned house . . . the house had no running water or plumbing. The house "was found unsafe due to loose wires hanging from the ceiling, floor missing in the kitchen, tools, including a power drill on the floor, and no water in the home" . . . It appeared that Desiree's teeth were still wired from the broken jaw she sustained in the car accident in San Diego [two years prior].[541, b]

- Lisa could not sort and arrange clothes to dress the children, figure out a plan for dressing them in the morning, plan their meals, shop for groceries necessary for meals, and prepare meals.

---

[a] The neighbor may not have been right that Lisa backed over Desiree, but Desiree did sustain injuries when a car ran over her (Exhibit 1-145, *Desiree Boman, Jane Phillips Memorial Medical Center, 12-26-1992*); C.J. drank trisodium phosphate left on a bathroom counter (Exhibit 1-135, *C.J. Boman. Children's Hospital, San Diego, 1-25-1991*).Kayla ingested about twenty-one 80 mg generic Tylenol. (Exhibit 1-151, *Kayla Boman, Jane Phillips Memorial Medical Center, 4-22-1993*)
[b] Because record collection essentially stopped once Judy Clarke and Deb Garvey left the case, see above, counsel never followed up and collected the Oklahoma Department of Human Services records that reflected Mrs. Montgomery's impairments (Exhibit 1-148, *Order Authorizing Disclosure of Records Under Protective Order, Case No JMI2013 3*).



Appellate Case: 17-1716 Page: 201 Date Filed: 11/01/2017 Entry ID: 4596229

These simple but time consuming tasks of mothering overwhelmed and confused her. She began each day by drinking whiskey and continued all day long.[542]

- The children described [living in Deming, New Mexico as] desperate times. Lisa "never seemed to have enough money to feed" all the children, and they ate "a lot of beans and rice. C.J. remembered "being hungry sometimes." Lisa's financial straits combined with mania to make her exuberant and hyper-sexual . . . Lisa "drank a lot" when they lived in Deming, so much so that Desiree "had to care for Kayla." Strange men came and left the trailer while the children played outside. Lisa asked the men to pay her for services with food and the men brought food with them for the children. Sometimes, she went to truck stops, met men, had sex with them in their trucks, and brought food home for the children. Later on, she bartered for legal services with her body.[a] Lisa drank excessively.[543]

- Chelsea figured the real reason Lisa decided to home school the children was because Lisa "couldn't get rid of Desiree's head lice, so she took us all out of school." Lisa was not able to organize, track, and teach lessons from week to week . . . The children ended up falling "way behind."[544] According to C.J., Lisa and the children were infested with lice. Chelsea confirmed that Lisa did not know how to get rid of the lice so they lived with lice 'for five years straight.' Chelsea estimated that Lisa did not shower for weeks at a time but the smell did not seem to bother her."[545]

- Kayla noted Lisa's hyper-sexuality and reported that Lisa slept with many men. Kayla offered first names of some of the men, but did not know the names of others. Desiree reluctantly revealed that some of the men were abusive and 'did things' to her and the other children. Chelsea recollected an incident where

[a] Tommy Kleiner verified that Mrs. Montgomery had sex for money with truckers in their trucks – with her children in the truck also (Exhibit 1-2, *Rickert Declaration*).

five men tied up and had sex with Lisa in the trailer where they lived.[546]

The team could have found proof that Lisa's inability to function persisted – and even worsened – after she married Kevin Montgomery in 2000.

- Lisa could not "talk about problems [with second husband Kevin] for very long" and "got a blank look on her face and didn't respond" when Kevin raised concerns. She "stayed in her room for days, not talking, leaving or interacting at all." She spent hour after hour on the computer. She drank, and Kevin argued with her about her drinking. She hid her alcohol, and mixed it with Pepsi. She started but did not finish project after project, and uncompleted projects piled up around the house.[547]

- Lisa could not keep up with housework, and her children had to help her with basic chores of cooking and cleaning. The children could not keep up with household chores in the confusing and unpredictable environment Lisa created. Dishes sat unwashed with mold on them. The children came up with a nickname to try and bring their mother out of her trances when she was tuned out. Instead of calling her "Mom," they called her "Martha." Calling her Martha "became a joke, and way of trying to get her tuning in to us for a little while."[548]

- Lisa had a challenging work load to carry for a fully functioning person, but for a person with longstanding impairments with ongoing family problems, it was impossible. Her house was "crowded" and "pretty filthy."[549]

- Desireé reported that Lisa's hygiene was quite poor. C.J. said that people called Lisa "butter teeth," and recalled that Lisa never brushed her teeth.[550]

- Dylan [step-son] went on to give an example of Lisa doing dangerous things with demonstrated lack of awareness of basic home safety: "She made homemade catsup. There was one



Appellate Case: 17-1716 Page: 203 Date Filed: 11/01/2017 Entry ID: 4596229

particular instance when ammonia was mixed into homemade catsup instead of vinegar. I have no idea why those two products were stored next to each other and in the kitchen."[551]

- Her youngest daughter Kayla described how Lisa's lack of contact with reality affected Lisa and the children:

  > My strongest memory about growing up, as well as one of the saddest parts of my life is the fact that my mom was not present. Mom wasn't able to be either mentally or emotionally present in my life, or in the lives of my brother and sisters. She definitely was with me physically, but that is all."[552]

- On the day of Lisa's arrest, law enforcement saw that the "house was extremely fouled with days/weeks-old canine and rodent droppings.[553]

The team ignored that which they considered "bad" information about Mrs. Montgomery – failing to recognize that the "bad" information was symptomatic of Mrs. Montgomery's inability to function appropriately. Ms. Waller attempted to alert the team to the need to incorporate Mrs. Montgomery's failure to function well as a mother into the team's theory for sentencing.[554] Ms. Waller pointed out in a September 2006 memo that "It's going to come out that Lisa was 'mean' to these kids at certain points."[555] The team possessed information that Lisa was abusive to her children and that she prostituted herself – but failed to investigate to determine how that proof fit into the constellation of Mrs. Montgomery's symptomology and functioning.

The team's file hinted at the information set forth above; for instance, the team possessed Holly Jackson's interviews from her work on the Clarke/Hunt/Owen team. Ms. Jackson interviewed the Upshaws, neighbors who lived near Carl and Lisa in 1988 who visited with Lisa in 1992:

> On the Upshaw's second visit, Lisa and Carl lived in a two-story home that was "filthy." Desiree and Chelsea instructed the Upshaws not to go in the "trash room." The door to the "trash room" was opened, with "trash piled almost to the ceiling."[556]

Ms. Jackson also interviewed Mrs. Montgomery's brother, Teddy Kleiner, who provided information regarding many of the symptoms discussed above:

> Teddy's time at Lisa's let him see many, many behaviors and symptoms of how mental illness affected Lisa's day to day life, everything from her disrupted sleep to her shifting and unpredictable moods. Her irrational behavior made Lisa "Difficult to live with." She "never slept more than four or five hours." Lisa did "several different things at once . . . reading . . . knitting/tatting" while she did "her spinning wheel" and helped "the kids with homework all at the one time." Lisa started one project, lost track of it, and then started another. She "changed her mind a lot." Lisa frequently had "severe" migraines, so painful that "she'd lay on the couch and cry" and "could not move."[557]

The team also had information that Mrs. Montgomery abused her children. Ron Ninemire's 2005 interview with Teddy Kleiner reflected Teddy relating an incident where "Lisa was spinning wool and Chelsea was spinning yarn. Chelsea dropped the tool she was using and Lisa became very angry. Lisa began punching Chelsea in the head. Kevin just stood there in shock and Lisa was shaking."[558] Mr. Kleiner also told this information to the FBI.[559]



Appellate Case: 17-1716 Page: 205 Date Filed: 11/01/2017 Entry ID: 4596229

Information that Mrs. Montgomery was abusive to her children is "a classic example of what's sometimes called double-edged information," expert mitigation specialist, Russ Stetler explained:

> On the one hand the children know their mother and they have important feelings for her that you want to potentially convey to a jury or other decision-makers, but it's not a simple world where everything is black or white. There are shades of gray. And you have to then unpack and say, we want to learn more about whatever these children will say about the negatives in the home.
> It's not surprising that a person with this background is not a perfect mother, and, you know, you need to find out exactly what was going on, what's the context, see who else was in the household at the time, at what period the negative events occurred. It's all part of the story and you can't make snap decisions about whether this is a good witness or a bad witness without knowing everything that witness has to convey.[560]

When this information was investigated in §2255 more information emerged. Teddy recounted that, "I had never seen Lisa go crazy like that and hit anybody . . . [After he stopped her from hitting Chelsea] she looked at me like she didn't know what I was doing or what was going on. I began to realize that something was really wrong with Lisa."[561] This accounting is consistent with Mrs. Montgomery's symptomology as discussed by Dr. Katherine Porterfield, "[Mrs. Montgomery's] clinical presentation is noteworthy for severe dissociative symptoms, reported across multiple contexts, by numerous reporters, including herself, and dating back to her adolescent years."[562] Rather than trying to ignore that which the trial team deemed unsavory, the team could



Appellate Case: 17-1716 Page: 206 Date Filed: 11/01/2017 Entry ID: 4596229

have developed a more accurate presentation of Mrs. Montgomery's impairments by embracing her failures.

The team's file contained documentation of a professional, psychological pre-crime determination of Mrs. Montgomery's impairment.[563] Exhibit 1-199, the Notes of Dr. Sallye Wilkerson shows that in 2002 Dr. Wilkinson found Mrs. Montgomery to be very impaired – and that her functioning was on the decline. "Axis V designated what they called Global Assessment of Functioning, abbreviated GAF, and her score last year in the opinion of this psychologist was a 59, which was – again, you would just go to the DSM and look up, What does that mean? And that means, you know, mild interference with her ability to function in the world. And then you look at the current [2002] GAF score and it's dropped to 48. And, in fact, if you go on the last page of this record, I think you'll see that there's even a handwritten notation which gives a slightly lower score; and when you get those scores down to the 40s, under the system that the DSM was using at that time, that's serious interference with everyday functioning."[564] The team failed to follow up with Dr. Wilkinson to develop proof that Mrs. Montgomery was profoundly compromised in her ability to function due to her dissociation, depression, and symptoms of trauma.[a] Such

[a] Exhibit 1- 289, p. 1, *Wilkinson Declaration* ("I believed that Mrs. Montgomery's depressive symptoms had a significant impact on her ability to function in

information should have been provided to the team's psychiatric and psychological experts to assist in accurate diagnosis and to rebut the government's claims that Mrs. Montgomery was malingering during the post-crime assessments.

**i. Counsel fail to investigate neurobehavioral symptoms of brain dysfunction and to consult a neurologist.**

Despite having in hand a report from Dr. Robert Fucetola recommending further investigation of Mrs. Montgomery's neurological impairments, the team failed to either investigate the symptoms of neurobehaviorial disorders present in Mrs. Montgomery's history or to seek a neurological assessment. Dr. Fucetola evaluated Mrs. Montgomery in July 2006 and determined that she had a profoundly abnormal split between her verbal and performance IQs. Dr. Fucetola researched both the rate of occurrence of this finding and its possible etiologies – including *en utero* exposure to alcohol – and reported his findings to trial counsel, pretrial.[565] Though Dr. Fucetola recommended that Mr. Duchardt pursue further investigation of Mrs. Montgomery's brain functioning as well as pursue brain imaging, Mr. Duchardt only heeded half his advice.[566]

---

everyday life . . . It would not surprise me to learn that Mrs. Montgomery suffered from complex trauma and bipolar disorder at the time I was treating her").

Because counsel failed to investigate Mrs. Montgomery's functioning and to create a social history, counsel could not provide the experts the neurobehaviorial history that reflected her brain damage. Counsel failed to investigate and provide proof to the experts that:

- Mrs. Montgomery repeatedly treated her children for lice but did not treat herself, thereby reinfecting the family;
- She was able to add, but could not competently go to the store and make purchases within a budget;
- She could not help her children with their homework;
- She could not plan a menu;
- She wanted to be a good mother, but impulsively hit her children;
- She bought all new tools each time she started a project;
- She was unable to complete projects – often because she repeatedly took things apart and started over;
- She often did not bathe or change clothes, she was unable to maintain a clean or orderly home.[567]

Counsel also failed to seek an assessment by a neurologist.

**j. Counsel fail to investigate and develop proof of Mrs. Montgomery's remorse.**



Appellate Case: 17-1716 Page: 209 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery was openly remorseful for her crime in the months immediately after her arrest. On the day of her apprehension, Mrs. Montgomery characterized herself as a "monster" while speaking with the F.B.I.[568] When offered something to drink, Mrs. Montgomery said, "I don't deserve anything."[569] Despite the team's knowledge of these immediate manifestations of her remorse, and though Mr. Owen admits knowing that Mrs. Montgomery would have pled "from day one,"[570] the team failed to pursue the information in their file regarding her remorse.

The team's file was replete with information about Mrs. Montgomery's remorse. Though Mr. Duchardt has said, "I have never seen any indication in any materials related to the case that Lisa ever expressed a willingness to plead guilty for any reason,[571] his file contained information that she would have. Dr. Marilyn Hutchinson, a psychologist, interviewed Mrs. Montgomery at the request of the Burns/Hunt/Owen team in 2005.[572] Dr. Hutchison's materials reflect that Mrs. Montgomery was remorseful and desired to accept responsibility for her crime.[573] The team possessed Dr. Hutchinson's notes and test data in the file.[574]

Mrs. Montgomery was "pretty overcome with guilty and remorse" and was "dissociating with some regularity" according to Dr. Hutchinson.[575] Dr. Hutchinson evaluated Mrs. Montgomery using psychological instruments,

including instruments which measure competency to stand trial.[576] Dr. Hutchinson's notes reflect Mrs. Montgomery's acceptance of responsibility for her crime: When Mrs. Montgomery was asked whether "when compared to other people who were charged with the same offense as you, do you think you are more likely, less likely, or just as likely to be found guilty?" Mrs. Montgomery replied, "I will be. I don't know about other because I am. It's not what they say. I finally read the indictment. This crime they have to have a reason to believe it, like, if I was caught with drugs but they have proof. They have proof I did it."[577] When the question was posed, "Prosecutors sometimes recommend less punishment if defendants agree to plead guilty. Let's say that the prosecutor makes an offer like that in your case compared to other people facing charges like yours, would you [be] more likely, less likely, or just as likely [to] plead guilty?" Mrs. Montgomery replied, "More likely. Heck, yeah. Because I am guilty. What punishment whether it's life or death, anything less would be good."[578] Mrs. Montgomery indicated that she had disagreements with her counsel regarding pleading not guilty: "They want to do not guilty. I don't feel that is right . . . If they asked me, I would not have agreed. The judge never asked me . . . I did it. I don't remember because if I – if doing it I deserve to be punished . . . I'm wasting the Court's time dragging through this guilty."[579]

Dr. Hutchinson's materials and notes reflect Mrs. Montgomery's remorse.[a] On a psychological instrument measuring her competency, when prompted to complete the sentence: "The worst thing I ever did . . ." Mrs. Montgomery responded, "Is the reason I am here."[580]

**k. Counsel fail to investigate other, similar crimes for proportionality argument.**

Mrs. Montgomery is the only woman on death row in the United States for a murder resulting from a fetal abduction.[b] John O'Connor admitted that "I don't believe I did [researched the sentences of women who have committed similar crimes]."[581] Though attorney standard of care expert, Marc Bookman testified that "[Exhibit 131, Chart of Similar Crimes] tells you that this is the sort of case that can result in a life sentence, the community can be satisfied with this," the team's file does not reflect any research or investigation into the proportionality of a death sentence for Mrs. Montgomery.[582]

**20. Stretching Dr. Gur's conclusions into support for pseudocyesis draws a *Daubert* challenge to Dr. Gur's testimony in the first phase of the trial.**

Though Mr. Duchardt built his case on Dr. Gur's findings regarding Mrs. Montgomery's brain damage, the trial court excluded much – though not all –

[a] They also reflect red flags indicating severe trauma (*see* §V.E.).
[b] Exhibit 131, *Chart of Similar Cases* (setting out the sentence and jurisdiction of all fetal abduction cases since 1987).



Appellate Case: 17-1716 Page: 212 Date Filed: 11/01/2017 Entry ID: 4596229

of Dr. Gur's evidence. After a *Daubert* hearing, the court excluded Dr. Gur's MRI findings but not his PET results. The government protested and ultimately the PET was also excluded.[a] Dr. Gur's behavioral image was not excluded, but was never presented.[b, 583] Despite Mr. Duchardt's earlier eagerness to obtain Dr. Gur's assistance with the case, in §2255 Mr. Duchardt has contended that he did not see the exclusion of Gur's testimony as compromising the defense: "To me he was not as important to the pseudocyesis defense as he would have been to a general penalty phase defense."[584] However Troy Schnack, the FPD computer specialist who assisted with the trial presentation and was present with the attorneys in court throughout the trial recalls "continual conversation about, 'I

---

[a] *See*, *U.S. v. Montgomery*, Case No. 05-06002, TT. Vol. 2, p. 426-27, Conference ("After the jury had been selected and before opening statements, the district court ruled that Dr. Gur's testimony regarding his PET scan analysis would be excluded, finding that the evidence had minimal probative value because the abnormalities were consistent with many disorders, including pseudoceysis. The district court noted that the government's experts were unable to replicate Dr. Gur's calculations and that although Dr. Gur had produced the data that formed the basis of his opinion, he had failed to produce the original data from the PET scan centers."); *see also*, §V.D, below, regarding testimony at the evidentiary hearing regarding the failures of trial counsel with regard to the discovery of Dr. Gur's data.
[b] *See* Vol. 8, p. 2041-46, 2060, *Gur Testimony* (setting forth what his behavioral image is, how he derived it, and the scientific acclaim and acceptance it enjoys, including that it was peer reviewed prior to initial publication and that it has been admitted in other courts and considered by juries in death penalty cases).



Appellate Case: 17-1716 Page: 213 Date Filed: 11/01/2017 Entry ID: 4596229

can't believe we can't get [the Gur evidence] in there' or even before the trial, 'We're going to reraise this because we need to get that evidence in."[585]

Contrary to that position, at the time of trial Mr. Duchardt was very focused on developing the Dr. Gur evidence. "[He was] focused on the Gur evidence, yes."[586] As he has said elsewhere, Mr. Duchardt wanted Dr. Gur's "pretty pictures" of Mrs. Montgomery's brain admitted.[587]After Dr. Gur was excluded from testifying, Mr. Duchardt expressed to the trial team that their defense has been eviscerated.[588] Mr. Duchardt has admitted that "The only significant omission [at trial of that which is now presented in 2255] was the part of the brain damage story which would have been told by Dr. Ruben Gur, PhD. but for Court rulings which prevented that."[589]

Mr. Duchardt's statement fails to address the fact that the evidentiary standards for the admission of mitigating evidence are somewhat more relaxed or the fact that even with the exclusion of the PET and MRI images, Dr. Gur's behavioral image was still available for him to present. Mr. Duchardt's only statement justifying his omission does not address either the lower evidentiary standard in penalty or the fact that he simply failed to offer the behavioral image at all:

> Matt Whitworth did indeed say at the outset of our *Daubert* hearings, preceding testimony, that the Gur results might be admissible at the second phase of trial. I reminded Matt of those words on numerous



Appellate Case: 17-1716 Page: 214 Date Filed: 11/01/2017 Entry ID: 4596229

> occasions thereafter. However, once Matt actually heard Dr. Gur and the power of the testimony he could offer, Matt fought tooth and nail to keep the Gur testimony out of the case entirely. Therefore, even if we had abandoned our first phase defense, there was no room for an agreement regarding the second phase because Matt was resolved to seek exclusion of the Gur evidence for that phase as well. [590]

To the contrary of Mr. Duchardt's contention regarding the government's intent to exclude the Gur evidence from the penalty phase, the government's *Daubert* motion only sought exclusion from the first phase of the trial.[591]

Though their defense had been "eviscerated," Mr. Duchardt did not seek a continuance after the exclusion of Dr. Gur's PET and MRI evidence:

> Though we persisted with making our record urging the admissibility of the Gur testimony, Judge Fenner had already given fair warning that it was unlikely that he would relent on his adverse ruling, and therefore we had ample time to prepare the substantial case we had left. We were ready to try the case our team wanted to try, and could try under Court rulings, when trial started.[592]

The trial court excluded Dr. Gur's MRI testing on September 5, 2007 after the *Daubert* hearing, but ruled that Gur's PET data and behavioral image would be admitted. The team had, therefore, about a month to readjust strategy regarding the loss of the MRI data. However, the trial court did not exclude Dr. Gur's PET data until October 3, 2007.[593] As *voir dire* had begun on October 1, this was hardly "ample" time for a strategy change. Though Mr. Duchardt characterized this exclusion as being "on the eve of trial," he did not seek a continuance: "it



Appellate Case: 17-1716 Page: 215 Date Filed: 11/01/2017 Entry ID: 4596229

wasn't that any time was going to change [the exclusion]."[594] Of note, the court never excluded Dr. Gur's behavioral image, but Mr. Duchardt did not call Dr. Gur as a witness.[595,a]

**C. Trial: How counsel's improbable, unsupported NGRI defense stepped on the mitigation proof counsel had developed.**

As the trial approached, the team's efforts for Mrs. Montgomery were compromised by their failure to engage with the factual realities of the case. Lead and Learned Counsel were unable to accept that the client they saw as "sweet" had committed such a violent crime.[596] Despite the overwhelming proof at trial – including that Mrs. Montgomery had the victim's blood under her fingernails when the FBI arrived at her home and admitted to the FBI, "You have Bobbie Jo's baby"[597] – Mr. Duchardt and Mr. O'Connor continue to believe Mrs. Montgomery did not commit the murder:[598] Mr. O'Connor has "always believed" that some other person committed the murder – not Lisa Montgomery;[599] Mr. Duchardt has said, "'I've no doubt Lisa got into the situation, had the baby dropped into her lap and carried on."[600] "Mr. Duchardt has 'no doubt' that Ms. Montgomery's brother, Tommy Kleiner, was present during the killing of Ms. Stinnett. He 'absolutely believe[s]' that Mr. Kleiner's probation officer fudged her records, thereby providing Mr. Kleiner's alibi."[601]

[a] *see also*, §§ V.C. and VI.G.

The team's failure to accept the facts of the murder made it impossible for the team to understand Mrs. Montgomery's extreme impairments and mental illness.

Unaware of the nature, severity, and pervasiveness of her mental illness, brain damage, and trauma, the team focused on making Mrs. Montgomery feel better. Mr. O'Connor described his efforts for Lisa, "It was easy for anyone to see Lisa did not have the appropriate attire for trial. I confess, however, that I did not know the first thing about women's fashion. I provided the expenses necessary for a group of women from my church to properly outfit Lisa. These acts seemed to uplift Lisa, and they helped Lisa to become more comfortable with her self-image. Through all of the mental issues Lisa had, I genuinely believe she began to feel good about herself."[602] Mr. Owen focused on fixing Mrs. Montgomery's relationship with her mother, "I felt my job was to at least break that chain that kept them separate, get to where they would make up and become somewhat of a family so Lisa would feel a little better about herself."[603] Mr. Duchardt echoed the theme of how Mr. O'Connor focused on Mrs. Montgomery's appearance: "John believed that Lisa was a beautiful woman inside and out, and that her beauty could be showcased for a jury's ready observation if she was outfitted properly for trial . . . John knew through review of all of the work product that Lisa's fragile mental and emotional state required

that she receive as much personal affirmation as we could give her to build her up for what would be the ordeal of trial upcoming. John knew these Church Ladies personally, and knew they would provide the sort of kindness and attention to Lisa which would make anyone, and particularly Lisa thrive. John accomplished all of these vital case-related tasks without thinking to charge for any of it."[604,a]

**1. The team's pseudocyesis theory is inconsistent with the facts, but Duchardt can't back out of his misrepresentation to the court.**

[a] Mr. O'Connor's actions, while kind, were unexceptional. State level public defenders routinely purchase trial clothes for their clients. *See, e.g*., Louis Hansen, *Hey, defendants: Wardrobe can be a factor in verdict*, The Virginian-Pilot, Aug. 13, 2012, https://pilotonline.com/news/local/crime/hey-defendants-wardrobe-can-be-a-factor-in-verdict/article_cce8832c-e861-5941-bcd7-fad3bedf2191.html (He had "no idea dressing clients would be a job duty"; "Many other local lawyer's offices, keep closets and drawers filled with shirts, slacks, and dress shoes to outfit their clients"); Paula Christian, *Defense Attorneys Clean Up Clients Before Court*, Tampa Tribune, Nov. 25, 2001http://www.harveymooreassociates.com/defense-clean-up.html ("When a client is in jail and is indigent and doesn't have relatives nearby, [dressing the client] becomes your responsibility" also noting that when juries see a client in an orange jumpsuit and handcuffs they will assume the client is guilty "so public defender's keep a stockpile of clothes for poor clients"); Jeff Weiner, *Clothing for court: Lawyers hunt for trial attire*, Orlando Sentinel, June 29, 2017, http://articles.orlandosentinel.com/2014-06-29/news/os-inmate-clothes-trial-witnesses-ruling-20140629_1_jurors-new-trial-charles-tiffany (citing Longtime Kissimmee defense attorney Charles Tiffany, who said he's become an expert Goodwill shopper. "If you're representing a client at trial "and you don't spend the money, 30 bucks, to get him looking like the jurors, you've committed malpractice," Tiffany says)

Mr. Duchardt has clarified that the team's theory at trial was that Lisa believed that Bobbie Jo Stinnett's baby was, in Lisa's delusional mind, Lisa's baby.[605] Of this theory, Mr. Duchardt said, "Frankly I think it was every bit as good as the government's theory."[606]

Unfortunately Mr. Duchardt lacked proof of his theory. No witness testified that Mrs.  Montgomery believed the baby to be hers – in fact, Sargent Randy Strong testified that within hours of her arrest, Mrs. Montgomery said, "You have Bobbie Jo's baby" – clearly indicating that she did not believe the baby to be her own.[607] In her statements to law enforcement, Mrs. Montgomery expressed remorse for her actions, "You understand the monster I am" and "I don't deserve anything [because of what I did]." Mrs. Montgomery's self-condemnation was inconsistent with any putative belief that she rescued her own baby from Ms. Stinnett.

The defense experts did not support Mr. Duchardt's theory. Psychiatrist Dr. William Logan was not on board with the idea that Mrs. Montgomery believed that Mrs. Stinnett had Mrs. Montgomery's baby. To the contrary, he testified that "at times [Mrs. Montgomery] has said she believed the baby was hers. But she also when confronted by the police on the 17th after some hours admitted the baby was Bobbie Jo's baby. At that point (following the murder) the idea had not become fixed in her head . . . she was acting the role as she

went from place to place . . . trying to convince herself or starting to believe this child was indeed hers."[608] Mr. Duchardt's star witness, Dr. Ramachandran more directly contradicted Duchardt's theory: "I think after she drove away she realized what had happened to some degree but with a plasticity she approaches life she started to pretend the baby was hers and I think came to believe the baby almost was hers. But the police interviewed her at a critical time. For a brief period of time they were able to break through that delusion. She told them she killed Bobbie Jo, the baby wasn't hers and she called herself a monster."[609]

Defense counsel did not argue Mrs. Montgomery believed that the baby was hers in any of their four arguments to the jury.[610] To the contrary, the closest counsel came to arguing that was John O'Connor saying in the closing of the guilt/innocence phase:

> On December 16, 2004 at the Stinnett residence Lisa believes she lost the baby, is still wanting to believe she has another baby inside her. She goes to Bobbie Jo to look at puppies. How do we know she does that? She's there for two hours. And Doctor Logan told you all the factors came together at that time. A woman who has never been assaultive in her life. She's in a pseudocyesis-fed dissociate state at the time. And remember what Doctor Ramachandran said when you were in a dissociated state you are up looking away, you are not the person that is doing it, you are looking away as if you are watching it happen.[611]

Learned counsel has admitted facts inconsistent with his trial theory. In his sworn statement to the §2255 Court, Mr. Duchardt acknowledged that Mrs.



Appellate Case: 17-1716 Page: 220 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery believed that she had given birth earlier in the week – some days before Mrs. Stinnett was killed and her baby taken: "Lisa provided intricate details about her strong beliefs that, despite having undergone a tubal fulguration sterilization procedure many years previous, she had nevertheless experienced multiple pregnancies since then, and had even given birth on a number of occasions, including at some time during the week that Bobbie Jo Stinnett was killed."[612] Mrs. Montgomery discussed her belief that she had given birth days before the murder/abduction openly with defense experts and never claimed to believe that the stolen baby was, in fact, hers.[a] That is to say

[a] TT. Vol. 10, p.2201, *Ramachandran Testimony* ("She said I don't remember what happened, maybe went out for a bit. Was a little bit inconsistent what she was saying but by-in-large she was there, I was for two hours and I suddenly saw the woman lying there, Bobbie lying there. And I tried to rouse her, I remember her saying that, tried to rouse her. And the baby was there and I grabbed hold of the baby and I cut the cord with a knife that was. available there and then I took the baby with me"); TT. Vol. 10, p. 2236, *Ramachandran Testimony* ("Well, the story has been that three days prior to the actual event she delivered in the kitchen and something along those lines, I don't remember the details. Q: And the baby died and she then buried it? A: That's correct, yes"); TT. Vol. 11, p. 2411, *Logan Testimony* ("No, the thing I would focus on is she went around saying this baby was hers. At times she has said she believed the baby was hers. But she also when confronted by police after some hours on the 17th later admitted the baby was Bobbie Jo's baby"); TT. Vol. 11, p. 2419, *Logan Testimony* ("But the police interviewed her at a critical time. For a brief period of time they were able to break through that delusion. She told them she killed Bobbie Jo, the baby wasn't hers and she called herself a monster."); TT. Vol. 11, p.2414-15, *Logan Testimony* ("I believe the connection in this case was that Lisa had another instance on the Monday of that week. This happened on a Thursday, where while home alone she represented that she had delivered a

though he fails to address Mrs. Montgomery's statements to the FBI that "you have Bobby Jo's baby," Mr. Duchardt's acknowledgment of these facts – demonstrating that they were known to him pretrial – should have precluded any theory that Mrs. Montgomery thought that the baby was hers.[613,a,b]

The pseudocyesis theory was unreasonable in light of other facts as well. Perhaps most salient was that the defense was built upon/around Dr. Ramachandran, a brain scientist with only one prior experience as a forensic

---

child, that she believed she buried out in the backyard and she had some responsibility because the child was having difficulty breathing but she did not seek any kind of assistance").

[a] In district court, the Government submitted questions to counsel (D.E. 79-1). Mr. Duchardt's 106 page response is at D.E. 129. Mr. Duchardt's statement in no way addressed these problems with his theory, despite the government's explicit questions:

> 31. Did Fred ignore the fact that LM never told anyone that she believed that the baby was hers?
>
> 32. Did Fred minimize LM's confession? (D.E. 79-1, p.2)

[b] In fairness to Mr. Duchardt, after the trial started, proof did develop that Mrs. Montgomery – at least at some point – expressed some memory of feeling like the baby was hers. Dr. McCandless, whose testimony Mr. Duchardt said "fell into our lap" "literally in the middle of trial" (Exhibit 83, *Armstrong Declaration*), testified that during a clinical interview in the course of the trial, Mrs. Montgomery told Dr. McCandless that "something didn't feel right" when she left Bobbie Jo's house and that later that night "I felt like it was my baby" (TT. Vol.10, p. 2133, *Dr. McCandless Testimony*). However Mr. Duchardt did not have this testimony in mind while deciding on the trial theory or strategy as Dr. McCandless' interview did not occur until after the trial started.

expert, who the defense mistakenly believed was: 1) a psychiatrist and 2) an expert in pseudocyesis. Mr. Duchardt's confusion as to Dr. Ramachandran's qualifications became evident at trial. Dr. Dietz testified that perhaps it was possible Dr. Ramachandran was confused as to the psychiatric definition of pseudocyesis "if he is not a psychiatrist."[614] The AUSA responded to Dr. Dietz and said, "he's not."[615] Mr. Duchardt objected. Mr. Whitworth, the AUSA, said, "he's a neurologist" to which Mr. Duchardt responded, "neurology and psychiatry, both."[616]

However Dr. Ramachandran was not a neurologist or a psychiatrist. As he had already clearly testified, he was (and is) a brain scientist who researches in the field of behavioral neurology (sometimes called cognitive neuroscience).[617] As Dr. Ramachandran testified in the §2255 proceedings, he never held himself out to be a psychiatrist and did not have a license to practice medicine in the United States.[618]

Dr. Ramachandran was also not an expert in pseudocyesis. Mr. Duchardt has sworn, "I spent many, many hours in March of 2007 researching all of the mental health issues confronting us, including pseudocyesis.[a] I identified those

[a] Mr. Duchardt's time sheets reflect that he researched mental health on 3/15 (3.8hrs); 3/19 (2.4hrs); 3/29 (1.6hrs); 3/30 (4.7hrs); and 3/31 (5.4hrs) for a total of 17.9 hours. (Exhibit 82 *Duchardt's CJA Vouchers*); *see also*, Vol. 8, p. 2269,

in the mental health field touted as experts in the field of pseudocyesis. It became clear to me that Dr. Ramachandran was far and away the most accomplished on the subject."[619] He also has explained, "If you look up pseudocyesis, you find Ramachandran."[620] In opening statement, Mr. Duchardt represented to the jury that "Dr. Ramachandran is . . . is one of the most widely published authors in the world on the subject of pseudocyesis."[621] However, as Dr. Ramachandran has explained, he is a brain scientist who has "a special interest in borderline syndromes that straddle the boundary between mental and neurological"[622] who published a book on the mind-brain connection, 5 pages of which was devoted to a case study of a woman who had pseudocyesis.[623] The case study was first published in 1930.[624] Dr. Ramachandran emphatically denied having held himself out as an expert in pseudocyesis, "of course not. There is no such thing" – clarifying that the syndrome is too rare for anyone to be truly well qualified to be an expert.[625] Dr. Ramachandran has never encountered pseudoceysis in his research and has only seen 5 cases of it – if one counts Mrs. Montgomery.[626] His book, *Phantoms In the Brain*, 294, Harper

---

Duchardt Testimony (that his time records, Exhibit 82) were the best accounting of his time); Exhibit 82, *Duchardt's CJA Vouchers*

Collins, 1999 (1998) provides endnotes citing the sources for his material about pseudocyesis – ie. the scientists who study pseudocyesis.[627,a]

The government highlighted Dr. Ramachandran's lack of qualifications in closing argument:

> Remember [the] quality of experts. When you judge these people, Doctor Ramachandran is not a board certified psychologist or psychiatrist. What did he say when Mr. Whitworth was challenging him about his technique, his forensic examination technique, how he would ask these very leading questions to the defendant. Mr. Whitworth asked about the leading questions, that's not the standard practice in forensic examinations, is it. I thought I misheard, I got the transcript. He says that's a legal matter which I am not qualified. Does he firmly convince you of much[?] Doctor Ramachandran's testimony about pseudocyesis is voodoo science.[628]

In addition to not being qualified, Dr. Ramachandran's diagnosis had several obvious problems. Dr. Ramachandran testified that the hallmark of pseudocyesis was an "intense desire to become pregnant" coupled with physical manifestations of pregnancy.[629] However, prior to trial, the defense was aware that Mrs. Montgomery told Dr. Dietz that she did not wish to be pregnant and, to the contrary wanted to lose the baby:

DR. DIETZ: It is not a secret you were pregnant?

---

[a] The Clark/Hunt/Owen team had investigated Dr. Ramachandran and determined that he was not an appropriate expert (*See*, Vol. 2, p. 354, *Elliot Testimony* (recalling the team decided there were better people to contact); Vol. 4, p. 845, *Freedman Testimony* (Dr. Ramachandran's expertise was "not right for a capital case")).



Appellate Case: 17-1716 Page: 225 Date Filed: 11/01/2017 Entry ID: 4596229

A: No

Q: Were you happy about it?

A: No. I wanted to lose –

Q: You wanted to lose the child?

A: Yeah.

Q: You didn't want to be pregnant, is that what you are saying?

A: Yes. They're (sic) things I want to do and that wasn't part of it.[630,a]

When Dr. Ramachandran asked Mrs. Montgomery whether she wished for another child, her response was "either way."[631] Counsel's theory thus was based on a diagnosis, the central requirement of which the client disavowed.

Despite the fact that Mrs. Montgomery expressed the opposite of a burning desire for pregnancy, Dr. Ramachandran's pretrial report opined that "her desire to become pregnant over the years is obvious."[632] Dr. Ramachandran linked Mrs. Montgomery's pride in her (at the time of the crime,

---

[a] Because the team filed notice of intent to use the defense of not guilty by reason of insanity before any defense experts supported the defense, the government's experts conducted their forensic assessment of Mrs. Montgomery before the defense experts ever saw her. *Compare* TT. Vol. 12, p. 2540 *Dietz Testimony* (Dietz and Martell assessment May 1-3, June 7) *with* TT. Vol. 11, p. 2198, *Ramachandran Testimony* (saw Mrs. Montgomery on May 9); see also Vol. 4, p. 935, *Logan Testimony* (first consulted on March 22, 2007 to see if would do a diagnostic evaluation); *id*. at p. 948 (saw Mrs. Montgomery for diagnostic evaluation on April 10, 2007).



Appellate Case: 17-1716 Page: 226 Date Filed: 11/01/2017 Entry ID: 4596229

teen-aged) children to this "obvious" desire. "It was obvious from the interview and from my examining the other evaluations that her life revolves around children; she takes great delight in them and is proud of them. [Her pride in her children] would have provided an intense desire to become pregnant and planted the seeds of pseudocyesis in her mind."[633]

The government used Dr. Ramachandran's lack of foundation for his opinion to undermine his testimony:

> So let's look at intense desire. There is no intense desire, no evidence of intense or burning desire. The defense in their opening statement said, and this all comes down to a body that just had a mind with a burning desire to have a child. Where is that evidence. When you have Doctor Ramachandran, their expert on pseudocyesis. That's what they brought you. He is your pseudocyesis expert. And he said you need an intense desire for pseudocyesis. But when Mr. Whitworth challenged him on that evidence Doctor Ramachandran said she did not say I have an intense desire to have a child, if that's what you mean. Mr. Whitworth said, in fact, she said the opposite, right? And Dr. Ramachandran said I think so, yes. Because that was the evidence. Play the videotape of Ramachandran and Doctor Dietz the intense desire. First Ramachandran. You may remember these [video] clips. Did you want a child. Not really. And in Doctor Dietz she flat out doesn't, said no. She flat out said no. No evidence of intense desire.
>
> So they don't get off, they don't get off the starting block with this pseudocyesis because there is no intense desire.[634]

The basis for many of Dr. Ramachandran's opinions were suspect (or non-existent). Dr. Ramachandran cited Mrs. Montgomery's reversal of her tubal fulguration as proof that "she intensely desired pregnancy."[635] However, Mrs.



Appellate Case: 17-1716 Page: 227 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery never had her tubal fulguration reversed.[636] Dr. Ramachandran relied on "a lot of eyewitness accounts and the physicians report, and expert reports" as basis for his opinions. His report enumerates those – though without specificity:

> RELEVANT DOCUMENTS
> In evaluating Ms Montgomery's neuropsychiatric status I have read all the documents supplied to me by Mr Duchardt, focusing especially on the reports of Dr. Gur (on brain injury and imaging) and of Dr. Hutchinson and Dr. Kuncel. I have also interviewed and tested Lisa for four hours to evaluate her directly.
> . . .
>
> BACKGROUND
> The circumstances surrounding this case are extraordinarily complex and would have provided a challenge worthy of Sherlock Holmes. They are contained in the original police reports, interviews following arrest, physical evidence from DNA testing, presence and credibility of alibis, eyewitness reports and self-reports of pregnancies (including the present one) following tubal ligation, eyewitness accounts of a second person having been present and a forensic expert's confirmation that in all likelihood two people would have been needed to commit the crime.[637]

However no forensic evidence that two people were required to commit the crime was presented to the jury, and the report Dr. Ramachandran supposedly reviewed was not addressed.[a] None of the statements or testimony of defense

[a] To the contrary, the Government presented the unrebutted testimony of Dr. Mary Case, who was declared an expert in pathology, who testified that Mrs. Stinnett regained consciousness during the attack because pressure was not consistently applied to the ligature:



Appellate Case: 17-1716 Page: 228 Date Filed: 11/01/2017 Entry ID: 4596229

counsel cite any forensic expert who made a conclusion such as was relied upon by Dr. Ramachandran.[a]

Finally, Dr. Ramachandran's report put the team on notice that his opinion was not strong on their key issues. Though Dr. Ramachandran ultimately said the magic "to a reasonable degree of medical certainty" words at trial, his report specifically says he was *not* certain to a reasonable degree of medical certainty as to whether "premeditated acts can be performed during a dissociative state" and "could her multiple head injuries – as revealed by Dr. Gur's brain imaging studies – render Lisa incapable of fully appreciating the nature and moral inappropriateness of her actions?"[638] Dr. Ramachandran explained his

---

> The pressure has to be continued for you to remain unconscious. If the pressure is let off then you may regain consciousness. So there is evidence here in my opinion that this woman has regained consciousness, she was not dead but she regained consciousness from the asphyxiation while the incision was being made into her abdomen, bleeding had begun and then she put up a struggle and then she was further restrained and strangulation was continued and she died as a result of that as well as blood loss from the incision made into her abdomen and uterus.

Such testimony was certainly indicative of one person strangling, then releasing the ligature so to perform the incision. TT. Vol. 4, p. 811, *Case Testimony*

[a] Mr. Duchardt addresses this issue in his Statement: "On top of [Mrs. Stinnett] having said 'they are here' and the Hayes' possible indication that two people were in the car] it had always seemed to those of us who dealt with Lisa on a daily basis that she was herself too physically weak to have been able to subdue and kill Bobbie Jo by herself." Mr. Duchardt does not cite any putative forensic expert proof that the defense had to support this idea (D.E. 129, p. 52).

ambivalence: "The answer to all these questions is, as we shall see, 'yes'; some with greater certainty than others. The Yes answer hold for all within a reasonable degree of medical certainty, except for 5 and 6 (for which the evidence is strong but not within reasonable degree of medical certainty."[639] Dr. Ramachandran explained that he was not prepared to answer the question of whether a person in a dissociative state was capable of judging right from wrong, "it's a philosophical question."[640]

The pseudocyesis theory was also unreasonable in light of Mrs. Montgomery's computer research. As Mr. Owen has said, "Lisa Montgomery's computer usage was not consistent with [the pseudocyesis as NGRI] theory. She had a tremendous amount of online research into how to perform cesarean sections, Pseudocyesis, home birthing techniques, Skidmore, Missouri, and Bobby Jo Stinnett, thus negating any real possibility this theory would be accepted by either the defense experts or the jury."[641]

Mr. Duchardt chose to go forward with the pseudocyesis defense based on a misconception of the mitigation proof available to him. As he has explained, "when we were preparing for trial and before I came to Judge Fenner to ask for the continuance with relation to developing the pseudocyesis defense that we were anticipating – that we ended up doing, it had been my intention to approach the defense the way that – or at least I think exactly the way that Ms.

Montgomery's current counsel are describing, because, frankly that had been the only way that we could have done things." As Mr. Duchardt explained, once Mr. Owen brought the idea of pseudocyesis to him, he decided that was the right strategy because "there was not any expert who believed that there was a mental disease of defect that excluded responsibility or even one that would amount to a statutory mitigating factor."[642] Mr. Duchardt was wrong.

Mr. Duchardt's justification of his decision to proceed with pseudocyesis rings hollow: his experts did support a statutory mitigating factor. By April 2007 when he "came to Judge Fenner to ask for the continuance with relation to developing the pseudocyesis defense," Dr. Kuncel had evaluated Mrs. Montgomery and actually was writing her report (which is dated April 9, 2007).[643] Dr. Kuncel found "signs of severe disturbances in Lisa's thinking" including PTSD characterized by "affective intrusion and defensive avoidance (blocking) with some tendencies toward dissociation." Dr. Kuncel also had findings "consistent with a delusional disorder."[644] Dr. Fucetola had noted the large discrepancy in Mrs. Montgomery's perceptual and verbal IQ (report faxed on March 27, 2007).[645] And Dr. Logan had documented his 2005 opinion that Mrs. Montgomery's depression had psychotic features.[646] Dr. Logan disagreed with Mr. Duchardt's focus on pseudocyesis and thought "[t]here were more diagnostically accurate and clinically appropriate diagnoses to explain her



Appellate Case: 17-1716 Page: 231 Date Filed: 11/01/2017 Entry ID: 4596229

symptoms of psychosis, symptoms that were grounded in her medical, family, psychiatric, and social history . . . Though she was able to form a plan, Ms. Montgomery's frame of reference was not rational; she was psychotic and her actions resulted from that psychosis and lack of contact with reality. It would have been more consistent with the evidence if the defense had presented a complete picture of the interaction of major depression with psychotic features, severe bipolar disorder, complex trauma, and neurologic impairments."[647] Dr. Logan has discussed his pretrial opinion to the defense theory and approach: "I thought it was important that Ms. Montgomery's actions at the time of the offense be understood in the context of her psychiatric and neurological history, which showed she was gravely disabled as a result of long standing and multiple mental impairments, not simply one rare and obscure delusional disorder. Even if the impairments did not provide a defense to the charges, they explained the intensity of her desperate acts and the irrationality of her thought process, all of which was relevant to mitigation of the sentence."[648] All of these experts' opinions would have been admissible in support of statutory mitigating factor 18 U.S. C. § 3592 (a)(6) that provides for a jury to consider whether the



Appellate Case: 17-1716 Page: 232 Date Filed: 11/01/2017 Entry ID: 4596229

defendant committed the offense "under severe mental or emotional disturbance."[a]

Despite having an expert who could not wholeheartedly support their theory and whose opinion required him (and the team) to ignore the information Mrs. Montgomery provided, the team proceeded to plead NGRI based on the pseudocyesis defense. Mr. Duchardt has explained, "[T]he good thing about Dr. Ramachandran is that he is not afraid to embrace the frailties of the entire defense."[649] According to Mr. Duchardt, Dr. Ramachandran saw the 'frailties' of the case as facts that could go either way.[650]

Despite the theory's "frailties" the team pled an affirmative defense and accepted the burden of proof accompanying the NGRI plea. In so doing, the team took the risk that that defense would undermine the mitigation they had. The danger of pleading NGRI in front of a jury without competent evidence is that the defense will lose credibility.[651] "We also know from the Capital Jury Project data that a failed innocence defense is a very likely death sentence, because it gives the appearance that a defendant has tried to fool the jury, has

[a] Of course all this information would also have been admissible under the statutory catch-all, 18 U.S. C. § 3592 (a)(8), which allows for the consideration of "other factors" from a defendant's background or "any other circumstance of the offense that mitigate against imposition of the death sentence."

tried to get over [on the jury] and is not willing to accept responsibility for what he or she has done."[652]

"[T]he important thing in a capital case . . . is integrating the first phase with the second phase. Some lawyers before they really think about what it takes to prove an insanity case will say, Well that's front loading mental health, but what it's doing is giving the jury an opportunity to reject your mental health presentation because it's an insanity defense that's planning or preparation, those kinds of things, just sort of intuitively juries say, I'm not going insanity. You've lost your credibility in the penalty phase."[653]

Because of Mr. Duchardt's misrepresentations to the Court, the defense could not abandon their pseudocyesis defense. Despite the contradictory proof and inconsistencies, Mr. Duchardt had to proceed forward with pseudocyesis as on April 3, he had told the Court he had experts who had diagnosed it and were writing reports documenting their findings. As Professor Fox, former chair of the ABA standing committee on ethics recounts:

> A review of the relevant transcripts and Mr. Duchardt's billing vouchers indicates that during an April 3, 2007 status conference, Mr. Duchardt knowingly made false statements of material fact to [the] Court regarding whether Mrs. Montgomery had already been diagnosed with pseudocyesis. By making these affirmative misrepresentations, Mr. Duchardt breached his duty of candor to the Court. The circumstances surrounding and resulting from Mr. Duchardt's breach of candor implicate two other foundational duties that undergird all attorney-client relationships: competence and loyalty. Specifically, Mr.



Appellate Case: 17-1716 Page: 234 Date Filed: 11/01/2017 Entry ID: 4596229

> Duchardt's dishonesty put his personal interests squarely at odds with the interests of his client by binding Mr. Duchardt to push the pseudocyesis defense whether or not that strategy was in Mrs. Montgomery's best interest.[654]

As a result of Mr. Duchardt's prevarications to the Court on April 3, "there was more than a significant possibility that Mr. Duchardt's personal and financial interest in hiding his dishonesty and lack of diligence from the Court locked him into pushing the pseudocyesis theory."[655]

### 2. 'The Tommy Defense' is not ruled out until after *voir dire* has begun.

The team continued to debate and plan to potentially present 'the Tommy Defense' until after the trial began. Though Mr. O'Connor made "the final call" not to present 'the Tommy Defense,' evidence suggests that did not happen until after *voir dire* had begun. Jury selection in this capital trial started on October 1, 2007. On October 3, two days into *voir dire*, the team filed an exhibit list containing an exhibit which purported to be an identification of Tommy Kleiner as the driver of the car speeding away from the crime scene.[656]

The team unreasonably refused to let go of 'the Tommy defense' despite Mr. Kleiner's alibi. Mr. Duchardt continues to believe the team should have presented 'the Tommy defense': "Current Counsel for Mrs. Montgomery correctly point out that I strongly disagreed with conceding the Tommy alibi. John as the lead counsel, with strong support from Dave, made that call for



Appellate Case: 17-1716 Page: 235 Date Filed: 11/01/2017 Entry ID: 4596229

strategy reasons which were understandable, but with which I disagreed."[657] Despite information that the government possessed not only the records generated contemporaneous to Mr. Kleiner's visit to his probation office,[658] but also the ability to produce the testimony of the probation officer, the team abandoned the putative defense after trial began.[a]

Dr. Logan describes the team's fixation with 'the Tommy defense': "I knew [the attorneys] seemed unusually fascinated by this, and I couldn't tell who the driving force was behind that, but I think I was reading a report that I mentioned there was a couple of discrepancies and said it will be left to the trier of fact, which is another way of saying the jury can make the determination but I'm not buying it. I don't want to come out and say that flat out."[659] Dr. Logan testified that he told the lawyers, "in shorthand, this is not very credible."[660] As Dr. Logan put it "I don't think you want to present a defense that obviously can be proved to be either a lie or fabrication along with the mental illness defense."[661] Dr. Logan explained that Mrs. Montgomery's sensation of someone

[a] Vol. 4, pps. 897-910, *Garman Testimony* (swearing she did not falsify the records and that Mr. Kleiner's alibi was real. Also noting that FBI Agent Lipanovich called to tell her that the defense team was suggesting she was involved in a sexual affair with Mr. Kleiner. Ms. Garman found that suggestion "ludicrous"); *see also* TT. Vol. 11, p. 2448-51, *Garman Testimony* (testifying at trial that Mr. Kleiner was in her office on 12/16/2004; introducing documentation computer time stamped at the time of his appointment).

else being there, "might be a sign of dissociation . . . but you have to be careful at that point because you don't want to induce a false memory and that's very easy to do with people who dissociate."[662] Dr. Logan thought that it would be best to present Mrs. Montgomery's memory of Tommy being present in terms of Mrs. Montgomery's "in light of the false pregnancies and her ability to kind of construct life events based on her emotional needs, that that might be a better explanation for Tommy than the fact that he was actually there . . . They were not open to that."[663]

Mr. Duchardt continued to try to fit together the competing someone-else-did-it and she-did-it-because-she-thought-the-other-woman-had-her-baby theories. Mr. Duchardt's statement reflects his belief that Dr. Ramachandran had the best explanation for how pseudocyesis and Tommy fit together:

> I . . . came to trust the true expert on the subject, Vilayanur Ramachandran, and his cogent explanation, accounted in his report and testimony, about how the Tommy revelations, true or untrue, were part and parcel of the pseudocyesis condition from which Lisa suffered.[664]

Contrary to Mr. Duchardt's characterization of Dr. Ramachandran's "cogent explanation" of how "Tommy did it" fit with the team's "she did it because she thought Bobbie Jo had her baby" theory, even Dr. Ramachandran waffled on whether 'the Tommy defense' could fit with pseudocyesis: Dr. Ramachandran found Mrs. Montgomery's bringing in her brother was



Appellate Case: 17-1716 Page: 237 Date Filed: 11/01/2017 Entry ID: 4596229

"moderately consistent" with the fluctuation of beliefs in a state of delusion and dissociation.[665]

Even with Mr. O'Connor's decision to abandon 'the Tommy Defense,' Mr. Duchardt continued to try to backdoor the defense. On October 10, 2007, eight days into trial, Mr. Duchardt filed a motion requesting the Court to "overrule the government's motion to prohibit testimony of defense polygraph expert in light of limited, impeachment purpose for which the evidence would be offered" requesting that the defense be allowed to use the results of a polygraph of Mrs. Montgomery regarding Tommy's presence at the crime scene.[666] As Mr. Duchardt has explained, he "disagreed with Mr. O'Connor's strategy and wanted to take it on the chin and battle it out – presenting the theory to the jury that Tommy Kleiner was the actual killer."[667]

Mr. Duchardt failed to recognize that Mrs. Montgomery's sensation that someone else was with her at the time of the crime was a symptom of her mental illness. Though the Clarke/Hunt/Owen team had recognized that this was a symptom of dissociation,[668] Mr. Duchardt pushed Mrs. Montgomery to identify who was with her.[669] Mr. Duchardt's memo to the team regarding Mrs. Montgomery's disclosure telegraphs his determination to oblige Mrs. Montgomery to provide the name of the person she "felt" was there: "My purpose in the meetings was to work on two main issues: what Lisa would tell



Appellate Case: 17-1716 Page: 238 Date Filed: 11/01/2017 Entry ID: 4596229

about what she remembered about the death of Bobbie Jo and Lisa's beliefs about her pregnancies she reports after the 1990 procedure when her tubes were tied . . . During our discussions on what happened the day Bobbie Jo was killed, Lisa became firm on Tommy's involvement. As all of you are well aware, while Lisa has consistently indicated that she was not alone in this, she has been reluctant to specifically name Tommy as being another person involved."[670]

The team "candidly and immediately laid all" the Tommy Defense out for the government.[671] In so doing, the team gave the government a key component of its closing argument to the jury:

> [O]ver two years later, the defendant changes and says she is sure that her younger brother Tommy is the killer. This defendant throws her brother under the bus. Tommy did it. You can't prosecute me. I was the savior. I am the one that got the baby even though I should claim its mine after Tommy killed the baby's mother. She throws her brother under the bus. She runs over him two times in her interview when she says and Tommy was laughing.[672,a]

---

[a] The government's closing argument, while expressed in terms that clearly indicated contempt for Mrs. Montgomery, actually tracked the way in which counsel mishandled the case: the government acknowledged that Mrs. Montgomery gave a confession – telling law enforcement that the baby was Bobbie Jo's, that the proof showed that when asked by her psychiatrist to explain what happened (within days of the crime) she said she couldn't remember what had happened, then two years later began "remembering" that her brother was present (though the government characterized it as she said her brother was the killer – which she never said, see above). The government was unaware that before "remembering" that her brother was with her, Mrs. Montgomery reviewed all the discovery in the case, including the witness statements indicating that there were two people seen fleeing the crime and the FBI 302s of where her brother had been on the day of the crime. The government also did not know that Mrs.

**3. Despite concerns about Mrs. Montgomery's competence, no one seeks an assessment or a competency determination.**

Mrs. Montgomery's trial team had serious concerns that she was incompetent to stand trial. Mr. Duchardt has said, "Lisa, because of her condition, was in a position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems."[673] Mr. Duchardt "do[esn]'t necessarily disagree" that Mrs. Montgomery was incompetent to proceed: "I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us."[674] When asked whether he was concerned that Mrs. Montgomery was not able to assist counsel, Mr. Duchardt said, "the answer to that is yes."[675] Mr. Owen was even more succinct:

> Q: And you, in fact, believed that Mrs. Montgomery was not competent to stand trial; is that correct?
>
> A: That's correct."[676]

Mr. Owen explained that he did not file any pre-trial motions for determination of Mrs. Montgomery's competency to proceed because "Mr. Duchardt was in charge of all pretrial motions."[677] For his part, Mr. Duchardt

---

Montgomery's lawyers had misapprehended her symptom of psychosis (her sensation that she was not alone at the time of the crime) and had repeatedly questioned Mrs. Montgomery as to who was with her when it happened.

said he did not file any motion, because he didn't think her competence could be restored – and he did not think the Court would rule in his favor:

> Do I think she was incompetent to where a Court would determine that we should have some kind of continuance to be able to restore her to competence? Absolutely not. I didn't think there was anything that we could take that difficulty for – that Lisa was experiencing and make that a viable argument as to her competence.
>
> And we also felt – I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them. In terms of a colloquial way of putting it, in terms of a legal defense that would keep a person from being able to stand trial, I don't think so.[678]

Mr. Duchardt has erroneously maintained: "it must be noted that Dr. Woods is the only professional who has evaluated Lisa who has expressed an opinion that Lisa was not competent at the time that she stood trial." Mr. Duchardt's position illustrates again his ignorance of the work done on the case prior to his take-over: in 2005, both Dr. Hutchinson and Dr. Logan had preliminarily found Mrs. Montgomery to be incompetent.[a]

---

[a] Both Dr. Hutchinson and Dr. Logan recommended that Mrs. Montgomery be transferred for inpatient commitment to a psychiatric facility (Exhibit 37 *Hutchinson Letter*; Exhibit 39, *Logan Letter*, see also Vol. 4, p. 1022-23, *Hutchinson Testimony* (testifying that at time of her consultation, she thought Mrs. Montgomery's competence was "at issue" though she had not completed her evaluation; "I was concerned about her decompensation to the point she would not be able to assist counsel"); Vol. 4, p. 934, *Logan Testimony* (at time of his 2005 consultation, Mrs. Montgomery lacked decisional competence)).

Mr. Duchardt did not follow up on the preliminary findings of incompetence, to the contrary he refused to listen to anything that was not pseudocyesis. Mr. Duchardt contacted Dr. Hutchinson in 2007 after he had developed the pseudocyesis theory.[679] When Dr. Hutchinson expressed skepticism regarding the appropriateness of that diagnosis, Mr. Duchardt did not contact her again.[680] When Mr. Duchardt contacted Dr. Logan in March 2007, "he had already zeroed in on pseudocyesis as the cornerstone of Ms. Montgomery's defense. Mr. Duchardt had run across Dr. Ramachandran and was quite taken with his scientific theories . . . Mr. Duchardt's primary focus of pseudocyesis was clinically incomplete, myopic, and misguided . . . Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis."[681]

Mr. Duchardt recognized that the team was unable to adequately explain trial procedure to Mrs. Montgomery in addition to her being unable to express her history. It took a great effort to explain to Mrs. Montgomery the process of a trial and what she was facing, "so much of [our effort] was us being able to



Appellate Case: 17-1716 Page: 242 Date Filed: 11/01/2017 Entry ID: 4596229

communicate to her; we could only get so far before she shut down."[682,a] "It was only after trial that Lisa began to open up about things related to the case."[683,b]

**4. Counsel fails to protect Mrs. Montgomery's right not to proceed with expert evaluation.**

---

[a] Mr. Duchardt has also taken positions to the contrary of his statements to counsel (reflected above and at Exhibit 83) though his testimony at the evidentiary hearing was similar. *See* D.E. 129, p 76 ("Lisa was readily able to engage anyone and everyone in cogent conversation, even at her darkest times. Lisa never had problems understanding the proceedings against her"). Notably, his official Statement contradicts his evidentiary hearing testimony in much the same way it contradicts that which he said to counsel. *Compare*, *id*. ("Lisa never had problems understanding the questions we were asking her about her background and the crime, and never had problems understanding why we were asking the questions which we were. Lisa's problems in answering certain of our questions were not on the level of lack of understanding. Rather, Lisa had a complex protective shield, developed over years of abuse, which she had to be persuaded to let down, and which she ultimately did let down in order for interchange to occur on matters of import") *with* Vol. 9, p. 2314 ("Lisa, because of her condition, was in a position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems. . . I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them").

[b] Mr. Duchardt's memory that Mrs. Montgomery only began to tell the team things after the trial is corroborated by Mr. Schnack's testimony regarding that which occurred shortly after the death verdict:

> As we got up to leave the table, her eyes kind of got wider and she turned to, I think it was David or Fred, I can't remember which one, but she kind of came to life and said, Okay, what can I do to help now? And I only remember it because I was kind of shocked by that.

(Vol. 2, p. 381, *Schnack Testimony; see also,* Vol. 2, p. 359-360, *Elliot Testimony* (confirming Mr. Schnack's memory that Mrs. Montgomery indicated wanted to help after the verdict)).



Appellate Case: 17-1716 Page: 243 Date Filed: 11/01/2017 Entry ID: 4596229

Despite Mrs. Montgomery's repeatedly expressed and abundantly manifest discomfort at being in close quarters with men,[684] the trial team did nothing to challenge or attempt to ameliorate the conditions of the government's experts' interview. Drs. Park Dietz and Dan Martell interviewed Mrs. Montgomery in a small room on May 1st, May 2nd, and May 3rd – from which, given that she was in custody, she could not escape. When, after two full days and several hours on the third in a small jail visitation room, alone with two men, Mrs. Montgomery burst into tears and could not continue,[a] counsel allowed the Court to tell her she had no choice but continue.[685,b]

Though there is no official transcript or recording, the Government and Movant have agreed that the best evidence of the admonition proceeding are the notes of, then, AUSA Roseann Ketchmark.[686] Ms. Ketchmark's notes indicate that Counsel failed to advocate for Mrs. Montgomery or to advise her of her rights under the Fifth Amendment.[687] Instead the notes reflect that the "court directs defendant to fully cooperate to see that exams are complete. Must to

---

[a]Dr. Martell testified that "during the third day of our examination Miss (sic) Montgomery got very upset and couldn't continue" (TT. Vol. 11, p. 2457, *Martell Testimony*).

[b] After the Court's admonishment of Mrs. Montgomery and Mr. Duchardt's assurance that Mrs. Montgomery would cooperate, Drs. Dietz and Martell returned to interview Mrs. Montgomery an additional several hours on June 7th (TT. 12, p. 2540, *Dietz Testimony*).

present defense. Do not expect there to be any more difficulty (with exams)."[688] The notes further reflect that Mr. Duchardt apologized for Mrs. Montgomery to the court and assured the court that Mrs. Montgomery "will do her best."[689]

**5. Counsel inadvertently creates (erroneous) proof that Mrs. Montgomery malingered by mishandling Hutchinson notes and data, undermining all mental health evidence.**

Mr. Duchardt included materials from Dr. Marilyn Hutchinson in records provided to Dr. Fucetola for his neuropsychological assessment.[a] Once the defense filed notice of intent to present a not guilty by reason of insanity defense, the government sought production of the materials considered by defense experts.[690] The materials sent to Dr. Fucetola, including Dr. Hutchinson's testing data, notes, and memos regarding defense team meetings, were forwarded to Dr. Dan Martell, who based much of his opinions and testimony on his interpretation of Dr. Hutchinson's materials – including his understanding that Dr. Hutchinson, a defense expert that the defense did not call at trial, had found Mrs. Montgomery to be "malingering."[691] This interpretation of Dr. Hutchinson's data formed the basis for the government's theory rebutting the insanity defense.[692] As defense counsel did not talk to Dr. Hutchinson about her conclusions,[693] they were unprepared to counter with the truth – indeed, the

[a] *See* above at §V.B.

defense experts incorporated this erroneous conclusion into their testimony as well.

At trial, the Government rebutted the defense's mental health evidence with unrelenting proof that Mrs. Montgomery was "malingering." The government said the word "malingering" in the hearing of the jury 77 times in the first phase of the trial, explaining that "malingering" means "faking."[694] The government used the word "faking" 79 times.[695] The government's expert psychologist, Dr. Dan Martell, explained, "Malinger is a fancy word for faking or pretending to have a mental illness you don't really have in order to get out of a situation."[696] The government articulated its theory using both words: "The government's experts will testify they also examined the defendant, reviewed the evidence and have concluded that the defendant was not insane and in fact she was malingering or faking mental illness."[697] The idea that Mrs. Montgomery was malingering was central to the government's refutation of the NGRI defense. The USA argued in closing, "As I told you, our contention this defendant is faking mental illness, she's malingering."[698]

The government began to develop its theme of Mrs. Montgomery's manipulative malingering in cross examination of the defense experts presented in support of NGRI. AUSA Cordes asked Dr. McCandless about malingering 6 times,[699] including having Dr. McCandless agree that malingering equates to



Appellate Case: 17-1716 Page: 246 Date Filed: 11/01/2017 Entry ID: 4596229

lying and faking.[700] Dr. Ramachandran, lacking any information about Dr. Hutchinson's findings other than that which Mr. Duchardt provided, admitted that "a defense expert" had found Mrs. Montgomery to be malingering: "I remember Dr. Hutchinson clearly saying there were signs of malingering and Doctor Kuncel."[701] Mr. O'Connor took on the "malingering" theme in his direct examination of Dr. Logan and brought out that Dr. Logan, like Dr. Ramachandran, was aware that Mrs. Montgomery sometimes malingered during examinations by psychologists.[702]

The government used Dr. Dan Martell's testimony to pound home the theme of malingering. Before asking Dr. Martell about the testing he performed, the government asked him about results he had reviewed of testing by defense experts. Dr. Martell cited data from Dr. Marilyn Hutchinson and Dr. Ruth Kuncel:

> Q: And before we get to your conclusions did you review Doctor Kuncel and Doctor Hutchinson's conclusions and detect anything related to malingering that caught your attention?
>
> A: I did.
>
> . . .
>
> A: Doctor Hutchinson and Doctor Kuncel found evidence she was malingering.[703]



Appellate Case: 17-1716 Page: 247 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Martell went on to testify that Dr. Hutchinson "noted evidence on both [the MMPI and the MCPMI, neuropsychological instruments] Miss (sic) Montgomery was exaggerating her symptoms or malingering."[704] He related that with Dr. Kuncel, Mrs. Montgomery "didn't fake everything . . . she didn't pretend to have a low I.Q., didn't pretend to be out of touch with reality or psychotic, but she did pretend to have an amnestic disorder . . . So [Mrs. Montgomery] is selective, Some days she seems to malinger and/or other tests at other time she doesn't. So it's a little bit like the boy who cried wolf, never quite sure when you are getting the truth and when you are getting what she wants you to hear or when you are being manipulated."[705]

The government's direct of Dr. Martell highlighted for the jury the importance of the fact that defense experts found malingering. Dr. Martell relied on the "history of malingering" for his determination that Mrs. Montgomery was a pathological liar.[706] As he said, "I was concerned of a history of malingering and those things led me to endorse pathological lieing (sic)."[707] Immediately before passing the witness, the government revisited Dr. Martell's testimony about Dr. Hutchinson and Dr. Kuncel, repeating information already established earlier:



Appellate Case: 17-1716 Page: 248 Date Filed: 11/01/2017 Entry ID: 4596229

Q: Doctor Marilyn Hutchinson was a psychologist retained by the defendant in this case, is that correct?

A: That's correct

Q: As was Doctor Kuncel

A: Yes, both defense retained experts.

Mr. Whitworth: That's all I have.[708]

The government further emphasized that two *defense* experts found Mrs. Montgomery to be "faking mental illness."[709] In closing argument, the government repeated this point twice: "I just mentioned this a few minutes ago but it's important, Dr. Hutchinson and Dr. Kuncel, they also at the time detected malingering."[710]

The government was only able to artfully paint this picture of Mrs. Montgomery as a manipulative psychopath/liar because the defense let them. The defense team revealed Dr. Hutchinson's data to the government without 1) having a reason to do so or 2) realizing that it would undermine their experts.[a] The defense team also failed to recognize that the government was totally

---

[a] Despite his memory of the packet of materials he personally assembled for "dispatch" to Dr. Ramachandran (*see*, Exhibit 82, *Duchardt CJA Voucher*); Duchardt deflected responsibility for providing materials to experts, testifying, "I'm almost certain that in terms of getting records to the experts, that I relied on Stephanie to do that" (Vol. 8, p. 2215, *Duchardt Testimony*).



Appellate Case: 17-1716 Page: 249 Date Filed: 11/01/2017 Entry ID: 4596229

misusing and misrepresenting the data – indeed the defense through Drs. Ramachandran and Logan bought into the "malingering" idea as well.

Contrary to the impression created by the trial testimony from both sides, Dr. Hutchinson did not find that Mrs. Montgomery had malingered. Dr. Hutchinson was a defense consultant who turned over to the defense team (at that point it was the Burns/Hunt/Owen team)[711] all of her notes regarding both her impressions of Mrs. Montgomery, the computerized results of her psychometrist's (Dr. Karen Willing's) testing of Mrs. Montgomery, and her notes from defense team meetings.[712] The government only knew about Dr. Hutchinson because the defense included her notes and data in a packet of information to Dr. Robert Fucetola, whose report and data was ultimately provided to the government.[713] As Mr. Owen testified, "there was no reason to turn [Dr. Hutchinson's] notes over."[714] Mr. Duchardt may have turned Dr. Hutchinson's data without ever realizing all that it contained.[a] As he testified, "I don't know that I knew that they actually had her attend any team meetings. I don't remember any memos with her name on them . . . she discussed that with me that she had, you know, kept notes. Now, in terms did I know that those

[a] *See* Vol. 4, pps. 996- 1006, *Dr. Hutchinson Testimony* (outlining and discussing each of the documents in her file and ascribing which she generated and why and which were generated by Dr. Willing)

generated out of team meetings? I don't have an independent recollection that I realized that."[715]

The government misrepresented Dr. Hutchinson's – and Dr. Willing's – work. Dr. Martell testified that Dr. Hutchinson administered the MMPI and the MCPMI to Mrs. Montgomery and that Dr. Hutchinson "noted evidence on both of those tests Miss (sic) Montgomery was exaggerating her symptoms or malingering."[716] Dr. Martell's testimony was false in two ways: 1) Dr. Martell knew (or should have known) that Dr. Hutchinson did not administer any test instruments to Mrs. Montgomery, and 2) Dr. Hutchinson did not reach any conclusions indicating – or even "note evidence" of – malingering.

Had the defense discussed her work with her, Dr. Hutchinson could have rebutted the government's claim that Mrs. Montgomery was malingering. Had Dr. Hutchinson been asked, she could have testified that the computer-generated M.M.P.I. report did not reflect her opinion about Mrs. Montgomery.[717] Dr. Hutchinson testified in §2255 that the computerized results obtained from the scoring of the M.M. P. I. are intended to be used by a trained psychologist "in conjunction with historical data, with evaluations."[718] The computer generated report is just a piece of the puzzle not a diagnosis.[719] What is more, the data in question was not even her work. The MMPI report was obtained by her associate, a psychometrist, Karen Willing, whose name

appeared on the test administration form.[720] Dr. Hutchinson testified that any trained psychologist would recognize the information on the Wechsler form as reflecting that Dr. Willing – not Dr. Hutchinson – performed the M.M.P.I.[721] No one – from either side – ever asked Dr. Hutchinson about Dr. Willing's name on the form.[722] And the defense did not confront Dr. Martell about his misrepresentation.[723]

Contrary to Dr. Martell's testimony, Dr. Hutchinson never reached any conclusions regarding Mrs. Montgomery as her work was not complete: "I wasn't done. I met with her a couple of times and had some psychological testing done by one of my associates and attended a couple of team meetings, and then was called in, I think it was on a Sunday morning one time, when they were concerned about her suicide, and then I [was not asked to perform more work on the case]."[724] Dr. Hutchinson did not conclude that there was "nothing much here to help" as was indicated by Dr. Martell.[725] Rather, her evaluation was just beginning. She met with Mrs. Montgomery 3 times,[726] but would have required ten to twenty additional hours with Mrs. Montgomery for further evaluation to complete her assessment. Before forming a professional psychological opinion, she would have wanted a neurological evaluation and a complete social history.[727] She would have wanted to meet with family



Appellate Case: 17-1716 Page: 252 Date Filed: 11/01/2017 Entry ID: 4596229

members to check her observations of Mrs. Montgomery and to check the reliability of information provided.[728]

The defense team failed to address the false testimony that Dr. Hutchinson found Mrs. Montgomery to malinger. The defense had not presented either Dr. Hutchinson or Dr. Kuncel in their case-in-chief, and they did not present either in sur-rebuttal to the government's proof.[729] Though the defense attempted to deal with the misrepresentations concerning Dr. Kuncel's testing and opinions in the penalty phase,[a] by the time the jury heard from her, the jury had already rejected the defense theory that Mrs. Montgomery was seriously mentally ill.[b] The defense team left the indication that Dr. Hutchinson – a defense expert – agreed with Dr. Martell completely unanswered.[730] The government argued in closing:

> And you heard [Dr. Martell] testify that he also examined some test results from two defense experts, we didn't hear from Doctor Marlin (sic) Hutchinson, and Dr. Ruth Kuncel and they all detected signs of malingering or faking mental illness. I didn't hear that addressed a minute ago [in defendant's closing argument]. That's what we have been contending, she was faking mental illness and the objective test proved that. We didn't hear anything to explain those away.
>
> . . .

---

[a] This did not go well, *see* §§ V.C. and V.E.

[b] *See*, Crim. D.E. 354, p. 5, *Special Verdict Form* (reflecting only one juror found the statutory mitigating circumstance and Mrs. Montgomery's capacity to appreciate the wrongfulness of the conduct or to conform her conduct to the requirements of the law was significantly impaired and no jurors found that she committed the offense under severe mental or emotional disturbance).



Appellate Case: 17-1716 Page: 253 Date Filed: 11/01/2017 Entry ID: 4596229

> And you know even their two defense experts, Doctor Martell told you about that. I just mentioned this a few minutes ago but it's important, Doctor Hutchinson and Doctor Kuncel, they also at the time detected malingering. We didn't here (sic) from them. Why? And again Mr. O'Connor didn't mention any of that. Ask yourself why, why didn't they address that. Why didn't they address those tests because those show she was faking and this defendant is a hoax.[731]

The defense never addressed Dr. Martell's contentions about Dr. Hutchinson's data and opinions because the defense never spoke with Dr. Hutchinson about her findings.[732] In 2007 Mr. Duchardt contacted Dr. Hutchinson indicating that he was going forward at trial with NGRI based on pseudocyesis.[733] Dr. Hutchinson told him, "I thought that was an unlikely diagnosis given how uncommon [pseudocyesis] was. I didn't have anything that supported it but that I had not finished, but that I thought that there might be other explanations."[734] Once Dr. Hutchinson made it clear she was not on board with Mr. Duchardt's pseudocyesis theory, he never contacted her again.[735]

Mr. Duchardt's failure to develop Dr. Hutchinson as a witness prevented the jury from hearing her expert testimony. Dr. Hutchinson specializes in the psychological effects of trauma and had she been presented with appropriate biographical information and history – and time to develop rapport and trust with Mrs. Montgomery – could have contextualized Mrs. Montgomery's



Appellate Case: 17-1716 Page: 254 Date Filed: 11/01/2017 Entry ID: 4596229

behaviors which reflected her traumatized past.[736, a] Instead, without developing Dr. Hutchinson as a witness, having released her confidential, attorney-work product protected observations and notes, having failed to correct the misrepresentation of her opinions, Mr. Duchardt instead allowed the government's characterization of Mrs. Montgomery as a "pathological," "manipulative" liar to go unrebutted. The jury was left with the impression that the defense experts supported Dr. Martell's conclusion: "I think she's a manipulative woman."[737,b]

### 6. Counsel's inadequate, incomplete presentation of mental health evidence in support of NGRI steps on its mitigating value.

#### a. PTSD

The defense bungled the presentation of Mrs. Montgomery's complex PTSD. Despite having a PTSD diagnosis from Drs. Logan,[738] and Kuncel[739] which was confirmed by the government's experts, Drs. Martell[740] and Dietz,[741]

---

[a] Dr. Hutchinson testified that in order to complete her evaluation, she would have wanted the team to obtain a neurological evaluation (Vol. 4, p. 1018, *Hutchinson Testimony*). Had Mr. Duchardt not been single-minded in his pursuit of pseudocyesis and continued to consult with Dr. Hutchinson, the team would have learned of Mrs. Montgomery's temporal lobe epilepsy and other brain dysfunction. For more of the information Dr. Hutchinson could have provided regarding her expert psychological opinions about Mrs. Montgomery, please *see* §V.E.
[b] Mr. Duchardt's mishandling of Dr. Martell's characterization that Mrs. Montgomery is a pathological liar is more thoroughly discussed, below, at §VI.G.

the defense failed to convince the jury that PTSD was a severe mental or emotional disturbance.[a] Based on the proof presented, the government argued:

> Let's look at post-traumatic stress disorder. Three things, a person must experience trauma and a person must be part of the minority of the people who after experiencing trauma begins to suffer from post traumatic stress disorder and a person who has post traumatic disorder must suffer a flash back at the time of the offense.
>
> Now there is evidence she experienced trauma. The United States does not contest she was physically and sexually abused when she was young when she had a rotten childhood. But what they want to do is say this is post traumatic stress disorder. Doctor Dietz says, yes, there is post traumatic stress disorder. Can't say maybe the horrific thing she did on December 17th would[n't] cause her post traumatic stress disorder. He can't pinpoint. But he's honest. But you have to have a flash back. Remember his examples you are in an elevator and you think the person is a rapist. So you attack the person in the elevator because of the flash back, you think they're the rapist. Or in war time you think you are in combat so you attack someone because you are having a flash back. There is no post traumatic disorder flash back. To believe this you would have to believe while at Bobbie Jo's house Bobbie Jo was Jack Kleiner, flash back that Bobby as Jack, was attacking the defendant, that Jack Kleiner was pregnant and in order to protect herself the defendant needed to strangle Jack and cut out his unborn fetus, which is ridiculous. It's not pseudocyesis and it's not post-traumatic stress disorder. And even if you bundled them together and you wrapped delusions around them you still don't have insanity.[742]

Though the government's argument of how PTSD works was far afield, the defense presentation did not counter the government's characterization. Mr.

[a] Crim. D.E. 354, p. 5 (not a single juror found Mrs. Montgomery to have committed the offense under severe mental of emotional disturbance).

O'Connor elicited only cursory testimony from Dr. Logan about PTSD (included here in its entirety):

> Q: What about post traumatic stress disorder?
>
> A: Post-traumatic stress disorder is a condition that is seen in individuals who have been exposed to something that kind of floods their body's alarm system or brain alarm system. Seen by people in combat. Here in Kansas City if you remember the Hyatt Regency collapse on the sky walk, remember those individuals had post traumatic stress disorder. Can be seen in individuals who have life threatening experiences in car accidents. Also can be seen in children who have been sexually and physically abused.
>
> The key elements are being extremely scared and feeling helpless to do anything about it. And apparently the body, the mind We (sic) set to an alarm clock. You get alterations in memory where the people will have memories of traumatic events, get triggered by things that remind them or similar in some way to the trauma.
>
> You also get a lot of avoidance. And I remember one of the other symptoms that came out of the post traumatic stress disorder was escape. You also get a disorder alarm clock, difficult sleeping, concentration, hyper vigilant, irritable, always keyed up and on edge. There is some instance of Lisa having post traumatic stress disorder that went untreated throughout her life and formed shifts in mood, nightmares, difficulty sleeping and it's not unusual in these conditions to have episodes of depression and anxiety.[743]

Had the team prepared him, Dr. Logan could have educated the jury on complex PTSD and how it affected Mrs. Montgomery at the time of the offense.[a] Dr. Logan found that Mrs. Montgomery dissociated at the time of the

---

[a] For a complete discussion of the testimony that could have been presented regarding complex trauma, see §V.E.



Appellate Case: 17-1716 Page: 257 Date Filed: 11/01/2017 Entry ID: 4596229

offense – testifying that Mrs. Montgomery's sensation of Tommy was a sign of her dissociation: "at the actual time it appeared she dissociated she had a feeling of unreality, she did not feel like herself. Something very uncharacteristic happened, something she could not explain very well."[744] However the team failed to provide Dr. Logan with a social history which would have supported a more global discussion of PTSD and Mrs. Montgomery's long-standing dissociation:

> The defense did not allocate resources to the development of a social history, because of the focus on pseudocyesis. An adequate social history would have permitted a more complete discussion of Ms. Montgomery's psychotic symptomatology in the context of her complete life history and her behaviors both related and unrelated to the offense. It was necessary for me to have had a full social history that included more collateral sources rather than being forced to rely almost exclusively on the information Ms. Montgomery was able to disclose to me. While a full social history is always desirable, such was especially critical in this case in light of the evidence that Ms. Montgomery was actively psychotic. A social history would have provided patterns of behavior related to trauma, neurologic deficits, and psychiatric disease. It also would have offered examples of how severely impaired Ms. Montgomery was in her day to day functioning . . . Had I been asked, I would have suggested that the focus of the mitigation be placed on Ms. Montgomery's symptomology . . . It would have been more consistent with the evidence if the defense had presented a complete picture of the interaction of major depression with psychotic features, severe bipolar disorder, complex trauma, and neurologic impairments.[745]



Appellate Case: 17-1716 Page: 258 Date Filed: 11/01/2017 Entry ID: 4596229

If the team had provided adequate biopsychosocial information, Dr. Logan could have woven together her history and the symptoms he saw during his interview. "[I]f you had to do a very complete biopsychosocial history with a lot of collateral evidence and one of the challenges of the case was her credibility and whether she was a fabricator or liar or something in between, it shows some of these things actually had occurred to her, the diagnoses had resulted from that and have impacted her life going forward, and that would have been most in terms of symptoms of PTSD and ability to trust others, mood regulation, depressive episodes, and could have blended in some of the underlying drive to have these pregnancies, even after she knew – should have known under rational terms that was physiologically not possible."[746]

Dr. Logan "thought it was important that Ms. Montgomery's actions at the time of the offense be understood in the context of her psychiatric and neurological history, which showed she was gravely disabled as a result of long standing and multiple mental impairments, not simply one rare and obscure delusional disorder. Even if the impairments did not provide a defense to the charges, they explained the intensity of her desperate acts and the irrationality of her thought process, all of which was relevant to mitigation of the sentence."[747]

Similarly, had counsel obtained a social history including that Mrs. Montgomery's own mother sold her for rape by as many as four or five men at a time who raped her orally, vaginally, and anally, and urinated on her, counsel could have effectively cross-examined Dr. Dietz regarding his lack of certainty as to whether Mrs. Montgomery had PTSD before the crime or whether her symptoms were the result of the crime.[748]

**b. Other major mental illnesses.**

The mental health experts agreed that Mrs. Montgomery suffered from a major mental illness – though they categorized her symptomology in varying ways. Dr. Logan termed it major depressive disorder which "at times included psychotic features such as hallucinations" and indicated that he had not ruled out bipolar disorder.[749] Dr. McCandless termed the illness "bipolar disorder not otherwise specified, most recent episode depressed with a history of rapid dysthymic disorder"[750] and indicated that Mrs. Montgomery suffered from "delusional cycling psychosis."[751] Dr. McCandless testified she had been medicating Mrs. Montgomery for bipolar disorder since 2004 and had witnessed Mrs. Montgomery cycle from one phase of the disorder to another.[752] Though Dr. Dietz was "skeptical" of Mrs. Montgomery's psychosis[753] and could not confirm any episode of mania for a bipolar disorder,[754] he acknowledged that Mrs. Montgomery either had depression or bipolar

disorder.[755] Dr. Martell diagnosed depression,[756] as did Dr. Dietz,[757] Dr. McCandless,[758] and Dr. Kuncel.[759]

To the exclusion of Mrs. Montgomery's longstanding impairments, the trial team focused solely on symptoms manifest at the time of the crime. Drs. Logan and Ramachandran opined that Mrs. Montgomery dissociated at the time of the crime, but neither cited any historical information showing that Lisa had been prone to dissociation since childhood.[a] They also did not explain that her impaired functioning as an adult was indicative of dissociative disorder.[760]

The defense failed to contextualize Mrs. Montgomery's mental illness. Instead they focused solely on her criminal actions, failing to show how mental illness compromised her daily life and relationships. Though the defense (and the government) put on expert testimony regarding diagnosis, scant attention was paid to how her mental illnesses (of whatever diagnostic description) vitiated her attempts to build a healthy, productive life for herself and her children. As a result, the defense failed to show how Mrs. Montgomery's mental illness was mitigating. Only one juror found her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the law was

[a] *Compare* TT. Vol. 11, p. 2416 *with* Vol. 7, p. 1688, *Dr. Porterfield Testimony* (discussing Mrs. Montgomery's lifelong history of dissociation, as set forth in §V.E. below.

impaired.[761] No jurors found she committed the offense under severe mental or emotional disturbance.[762] No jurors found that her mental health had substantially improved since her incarceration because of receiving psychiatric treatment.[763]

**7. The team's presentation of Mrs. Montgomery's children backfires.**

Attempting to shore up the ill-fated pseudocyesis defense, the trial team called Desireé Boman to testify to her mother's pregnant-looking belly. In opening statement, Mr. Duchardt promised, "You will hear from Desiree and Chelsea, her daughters, who both saw their mother with her shirt off and were convinced because of the size of her body she was pregnant."[764] That promised testimony not only did not materialize, Desireé affirmatively denied having seen Mrs. Montgomery without her shirt.[765] Thereafter the defense did not offer Chelsea as a witness.[766]

Mr. Duchardt also promised the jury in opening statement that they would hear proof that Mrs. Montgomery "never did anything but show those children love."[767] Mr. Duchardt made this promise despite the memo in his file reflecting that Ms. Waller and Mr. Ninemire made him aware that "It's going to come out that Lisa was 'mean' to these kids at certain points."[768] Desireé testified that Mrs. Montgomery sometimes did not take care of the children's needs.[769] "Sometimes I felt she wasn't doing her best."[770] Desireé testified that



Appellate Case: 17-1716 Page: 262 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery broke her sister Chelsea's arm by hitting Chelsea with a flashlight.[771] Desireé described Mrs. Montgomery as "mean" to Kevin Montgomery's children and related that Mrs. Montgomery was on the computer a lot, would yell at the children to bring her things, was stingy with food and pop, and would buy things for herself and then lie about where those things came from.[772] Chelsea Boman testified in the penalty phase about her mother hitting her.[773]

Mr. Owen described the effect of the children's testimony: "During trial, the government called Lisa's children as witnesses[774] and the testimony went badly. Fred Duchardt, after supposedly developing the 'closest' relationship with the children, was unable to rehabilitate their testimony. That testimony was very damaging and Fred was taken completely by surprise with what they said while testifying."[775]

Mr. Duchardt did not present the compelling mitigation testimony of Mrs. Montgomery's children's observations of Mrs. Montgomery's impaired functioning. Mrs. Montgomery's children could have testified to prove that "Lisa could not keep pace with the needs of her children, even routine needs that others met easily. Morning routines of getting the children up, preparing their breakfast, and helping them get ready for school exasperated and overwhelmed her. She would not structurally figure out how to go through the



Appellate Case: 17-1716 Page: 263 Date Filed: 11/01/2017 Entry ID: 4596229

steps others take for granted . . . Lisa's children were distressed by their mother's increasing bizarre behavior. They knew 'how different [Lisa] was from the other moms.' Her body was around, but her mind was not with [the children].'"[776,a]

**8. Mr. Duchardt mishandles the expert witnesses.**

**a. Ramachandran**

Mr. Duchardt found Dr. Ramachandran to be "just a delight."[777] However Dr. Ramachandran was not an expert in pseudoceysis.[778] As set forth, above, Dr. Ramachandran's lack of expertise and experience as a forensic expert resulted in his endorsement of a diagnosis that the proof did not support.[b] In addition to these fundamental flaws in his theory, Dr. Ramachandran's testimony was compromised by lack of preparation and information.

Duchardt failed to prepare Dr. Ramachandran for his testimony. As Dr. Ramachandran recalls, "I think we may have talked on the phone a few times, but he already told me about the case and the basic facts of the case, and told me a little bit more [during the preparation]. But I don't think we went into great detail. Certainly not these issues like McNaughten's Rules, criminal

[a] (*See*, §§V.E. VI.G., for proof of Mrs. Montgomery's limitations and inability to function that could have been presented or supported through testimony of Mrs. Montgomery's children).

[b] *See*, §V.E.

responsibility, dissociative state, we didn't go into any of that."[779] Though the federal NGRI standard required proof of Mrs. Montgomery's inability to know right from wrong, Dr. Ramachandran has testified that answering that question regarding someone in a dissociative state – such as he opined Mrs. Montgomery must have been – "it's a philosophical question . . . I don't know the answer to that."[780] When asked whether he conveyed to Mr. Duchardt that he was unable to opine regarding the central issue in the case, Dr. Ramachandran replied, "I don't think it ever came up."[781] In his trial testimony, Dr. Ramachandran cited Mrs. Montgomery's reversal of her tubal fulguration as proof that "she intensely desired pregnancy.[782]" However, Mrs. Montgomery never had her tubal fulguration reversed – as the jury heard from Dr. Vandenboom two witnesses before Dr. Ramachandran.[783, a] Mr. Duchardt also failed to prepare Dr. Ramachandran regarding the testimony of the government's expert – which resulted in Dr. Ramachandran telling the jury that Dr. Dietz had found Mrs.

---

[a] On cross examination, Dr. Ramachandran acknowledged that he was "aware of" Mrs. Montgomery's false testimony under oath in April 2004 regarding the reversal of her tubal fulguration. (TT., Vol. 11, p. 2329-30, *Ramachandran Testimony*). From context it is unclear whether Dr. Ramachandran was merely acknowledging that he had been made aware of that judicial proceeding or whether he, in fact, was aware that Mrs. Montgomery had not reversed the sterilization. In either event, this later testimony contradicted his earlier statement that he relied on her reversal of the sterilization as proof she desired to be pregnant (*id*. at p. 2280, "Can I mention that the fact she reversed the tubal fulguration suggests she intensely desired pregnancy").



Appellate Case: 17-1716 Page: 265 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery to have antisocial personality disorder (ASPD) – a much worse diagnosis than Dr. Dietz actually found.[a] Dr. Ramachandran undercut the testimony of defense witness Dr. Linda McCandless by saying bipolar disorder is "irrelevant . . . that diagnosis is a non-factor for me."[784] Worse, Dr. Ramachandran undercut Dr. McCandless' testimony that she had observed Mrs. Montgomery in a psychotic state, referring to Dr. McCandless' observation as a "non-issue."[785]

Under Mr. Duchardt's questioning, Dr. Ramachandran testified inconsistently with his report and with the facts. In his written report, he reported that Mrs. Montgomery demonstrated symptoms of pregnancy including pica,[b] but then testified to the contrary.[786] His testimony was that Mrs. Montgomery could not be malingering the false pregnancy because she denied

---

[a] Dr. Dietz explicitly did not find ASPD, rather he found borderline personality disorder with some antisocial features, citing her infidelity, lying, and throwing things (TT. Vol. 12, p. 2577, *Dietz Testimony*).

[b] Dr. Ramachandran's definition of pica varies from the definition provided by Merriam-Webster Medical Dictionary which defines: "an abnormal craving for and eating of substances (as chalk, ashes, or bones) not normally eaten that occurs in nutritional deficiency states (as aphosphorosis) in humans or animals or in some forms of mental illness." Dr. Ramachandran's report specifies that Mrs. Montgomery had "strange food cravings" which he clarified with the parenthetical "(pica)") (Crim. D.E. 248-4, p.15). However, the only strange craving Mrs. Montgomery endorsed in her interview with Dr. Ramachandran was for Wendy's baked potatoes.



Appellate Case: 17-1716 Page: 266 Date Filed: 11/01/2017 Entry ID: 4596229

symptoms of pica: "and when you say you are craving for food, she said no, I didn't have a craving for food."[787]

Mr. Duchardt, having failed to discuss Dr. Hutchinson's data and findings with her, also failed to prepare Dr. Ramachandran how to handle questions regarding Dr. Hutchinson's and Dr. Kuncel's data. Dr. Ramachandran cited Dr. Hutchinson as having found Mrs. Montgomery to be a malingerer:[788] "I remember Dr. Hutchinson clearly saying there were signs of malingering and Doctor Kuncel. What Doctor Hutchinson said is what I remember clearly."[789] Though Mr. Duchardt presumably knew Dr. Kuncel's opinion that her data did not reflect malingering (given that he called her to the stand in the penalty phase), he did not adequately prepare Dr. Ramachandran to respond to the government's questions regarding Dr. Kuncel's data, leaving Dr. Ramachandran with no option but to agree to the government's characterization of Dr. Kuncel's data.[790]

**b. Dietz**

The trial team failed to seize the opportunity presented by Dr. Dietz's testimony to convey proportionality information to the jury. Dr. Dietz testified to his knowledge of a FBI study of all infant abductions by women "over many decades."[791] Mr. Duchardt failed to present through Dr. Dietz that there are no other women on death row for those crimes.[792]

### c. Martell

Mr. Duchardt's handling of Dr. Martell's testimony was perhaps best critiqued by FPD computer specialist, Troy Schnack, "this witness [Dr. Martell] seemed to go – to give some basic information, but the feeling of myself and Stephanie [Elliot] and other people at [counsel] table were kind of like, hey, that went very well for us. He didn't really say anything. And then Mr. Duchardt began to do a cross-examination, and as that went, John [O'Connor] got – it was physically obvious that he was upset and would roll back and ask when [Duchardt] was going to stop. It was just not good."[793] Mr. O'Connor wrote a note to Mr. Schnack indicating "how can we get [Duchardt] to stop, or something like that."[794] Mr. O'Connor was frustrated with Mr. Duchardt's cross-examination.[795]

Ms. Elliot confirmed Mr. Schnack's testimony regarding Mr. O'Connor's frustration with Mr. Duchardt's handling of Dr. Martell: "Well, as I said, [O'Connor] was kind of at that front corner of the table, and he just kind of scooted his chair backwards where Troy [Schnack] and I were sitting and, you know, had written some notes on like a kind of larger Post-It notepad . . . I think at first it was – he said something like Fred has said pathological liar seven times now and Martell never has. Then he needs to stop, something like that."[796] "Dave said [the cross-examination of Dr. Martell] was a disaster."[797]

The team's sense that the examination was a disaster was focused on Mr. Duchardt's repeated highlight of Dr. Martell's finding that Mrs. Montgomery was a pathological liar: [798]

> Mr. Duchardt: I wanted to also go to the pathological lieing (sic), would you please look for the questions that she answered gave her your high score on pathological lieing (sic)?
> Dr. Martell: I seem to recall she denied being a liar or being very good at it. But the history suggested otherwise.[799]
>
> . . .
>
> Q: Next example and I am going, sir, quite honestly to the pathological lieing (sic), that's a pretty strong term especially when you are giving her a high score, right?
> A: I believe she will stay – I think she's a manipulative woman who says what she needs to in the situation to turn it to her advantage.
> Q: But that's just a subjective opinion by you, this is not anything you are doing pencil and paper to something to have her take a test that is indicating that, right. This is your suggestion?
> A: She did take tests that indicate she is exaggerating her psychopathology.[800]

Mr. Duchardt attempted to address Dr. Martell's use of Dr. Hutchinson's opinions, questioning him about Mrs. Montgomery's suicidality and conditions of confinement.[801] Dr. Martell discussed scales "that Doctor Hutchinson identified as being exaggerated have built in scales to catch people either faking bad or exaggerating their symptoms or faking good evidence . . . In Miss (sic) Montgomery's case she was exaggerating or faking bad and it was detected by the valid M.M.P. I. II and M.C. P. III. "[802] Mr. Duchardt accepted Dr. Martell's



Appellate Case: 17-1716 Page: 269 Date Filed: 11/01/2017 Entry ID: 4596229

testimony that Dr. Martell was "relying on [Dr. Hutchinson's] characterization."[803] Dr. Martell relied heavily on the putative Hutchinson report – referring to it 16 times during his examination.[804]

Because Mr. Duchardt never discussed Dr. Hutchinson's file with Dr. Hutchinson, he was not aware 1) that the tests to which Dr. Martell referred were not even administered by Dr. Hutchinson and 2) that Dr. Hutchinson had clinical observations and professional opinions which would have explained how the results of those tests were not indicative of malingering, but rather further proof of Mrs. Montgomery's extensive trauma history.[a]

**d. Logan**

The trial team botched the presentation of Dr. Logan's expert opinions. Prior to trial, Dr. Logan requested to review the forensic computer detailing of the emails Mrs. Montgomery deleted from her computer.[805] Mr. Duchardt told Dr. Logan that information concerning the deleted emails was not available.[806] "I kept asking about, Well, I was aware there were deletions. I said, What were the specifics of that, and was repeatedly told that this wasn't available, this wasn't available."[807] In the middle of the defense case at trial, Mr. Duchardt provided Dr. Logan Exhibit 89, a Memo from Troy Schnack (the computer

---

[a] *See* §V.E., below, regarding the proof presented by Dr. Hutchinson at the Evidentiary Hearing



Appellate Case: 17-1716 Page: 270 Date Filed: 11/01/2017 Entry ID: 4596229

specialist at the FPD) summarizing the deleted internet history found on Mrs. Montgomery's computer.[808] Dr. Logan found that memo to be worthless, "the primary reason is there's nothing about the content [of the websites] included in that memo."[809] (The memo lists sites by domain address, e.g.: http://members3.boardhost.com/RATTERIERS[810]). For the memo to have value for Dr. Logan, the memo would have needed to include the content of each deleted item as it existed at the time Mrs. Montgomery last visited that web site.[811]

Because Dr. Logan was unaware pretrial of the information Mrs. Montgomery deleted, he was surprised on the stand by the government's cross examination regarding Mrs. Montgomery's deletion of emails and internet history.[812] Mr. Duchardt's failure to show the deleted history to Dr. Logan set the team up for that which happened: when confronted with Mrs. Montgomery's deletion of incriminating information, Dr. Logan was forced to admit that he had incorrect information, his testimony that it "did not appear to be a conserted (sic) effort to conceal at that point" was based on his erroneous belief that Mrs. Montgomery did not erase all of the emails between herself and



Appellate Case: 17-1716 Page: 271 Date Filed: 11/01/2017 Entry ID: 4596229

the victim.[a] Dr. Logan then was forced to agree with the government that it was a "fair statement if the defendant here was selectively deleting criminating evidence before the murder we talked about earlier, [that was] an indication she knows what she was about to do was wrong"[813] thereby vitiating Mr. Duchardt's NRGI defense.

The team's failure to provide Dr. Logan information pretrial which would have revealed that he could not support NGRI also undermined the testimony he offered at the penalty phase. Though Dr. Logan attempted to present the devastating psychiatric effect on Mrs. Montgomery from childhood sexual abuse, his testimony was compromised because it was already clear the defense had withheld information from him relating to the emails.[814] Dr. Logan needed more social history to ward off the government's insinuations that Mrs. Montgomery had lied about the childhood sexual abuse.[815]

**e. McCandless**

The trial team failed to effectively present the testimony of Dr. Linda McCandless, Mrs. Montgomery's treating psychiatrist at CCA.[816] Dr. McCandless diagnosed Mrs. Montgomery with bipolar disorder and had

---

[a] TT. Vol. 11, p. 2421-22, *Logan Testimony*; *see also* Vol. 11, p. 2426, *Logan Testimony* (the government correcting Dr. Logan's misinformation on cross examination)

observed Mrs. Montgomery in a psychotic state.[817] Mr. Duchardt did not present testimony that Dr. McCandless prescribed an antipsychotic, Risperdal, for Mrs. Montgomery[818] or that Dr. McCandless' notes reflected that Mrs. Montgomery's thinking became more clear while on the Risperdal, confirming Dr. McCandless' clinical assessment of psychosis.[819]

Dr. McCandless' testimony on Mrs. Montgomery's behalf was compromised by the government's cross examination of Dr. McCandless – asking questions about a series of recorded phone conversations in which Mrs. Montgomery joked about having fooled her psychiatrist.[820] Mr. Duchardt has testified in response to accusations that he mishandled Dr. McCandless' testimony:

> Another was a criticism, again from Dr. Logan, with Logan expressing his from-the-bleachers impression that I did not prepare Dr. McCandless to address recordings, played during McCandless' cross-examination, in which recordings Lisa is heard to make jokes about Dr. McCandless and things she (Lisa) had told Dr. McCandless during therapy sessions. Since Dr. Logan was not present when I prepared Dr. McCandless, it is difficult to know why he would presume to comment on the subject. Actually, in preparation with Dr. McCandless, I did address with her the matter of Lisa's attempts at humor with Dr. McCandless, and I even laid the foundation in direct examination, for what of that ilk would come in cross. (Tr. 2084-2085). In this situation, again, I believed that untoward inferences from something had done were addressed as well as they could have been.[821]

Dr. McCandless's testimony contradicts Mr. Duchardt's memory:



Appellate Case: 17-1716 Page: 273 Date Filed: 11/01/2017 Entry ID: 4596229

Testifying at trial in the Montgomery case was a traumatic experience for me. I recall being very nervous and anxious the weekend before I was to testify. No attorney sad down with me to go over the questions that I would be asked on direct examination, nor did any attorney discuss with me questions that I might expect to get on cross examination. I do recall Fred Duchardt calling me at night during the trial. I want to say it was around 7:00pm. The reason I recall the conversation is because Mr. Duchardt was explaining to me that his witnesses were going to discuss pseudocyesis. I had never heard of pseudocyesis and I did not know what it was.

That weekend before my testimony, I visited Mrs. Montgomery on Saturday. I did not normally work on Saturdays. I remember a nurse questioning why I had come to the facility on Saturday. I have been told by Ms. Henry that Mr. Duchardt's billing records reflect that he spoke with me one time on that Saturday, once on Sunday and once on Monday. I do not recall those conversations. I only recall the one conversation discussing pseudocyesis which I believe must have been before my conversation with Mrs. Montgomery that Saturday.

I was very nervous when I was on the witness stand. When I testified that my previous interaction with Mrs. Montgomery was "superficial" I was referring to superficial discussions about the crime facts. I certainly do not believe that my contacts with Mrs. Montgomery regarding her mental health symptoms were superficial. I would not have developed a treatment plan based on superficial interactions.

I was surprised on cross examination when the government questioned me about tape recordings of phone calls from Mrs. Montgomery at CCA. I honestly did not know that the detainees phone calls were recorded. The content of the phone calls themselves were not surprising to me. I took them as a joke. People with mental illness are capable of humor. It is my experience that people with mental illness will make light of their illness to loved ones in an effort to appear "saner" than they are. These phone calls did not change my opinion about Mrs. Montgomery's diagnosis.[822]

**f. Kuncel**

The trial team put on nine pages of testimony concerning Mrs. Montgomery's social history.[823] That nine page testimony came in through Dr. Ruth Kuncel, a psychologist who Mr. Duchardt blames Mr. Owen for finding.[824] Duchardt admits,"[i]n hindsight, Ruth did not do a very good job."[825] As he explained that her testimony fell apart was all her fault: "I mean, in juvenile court, she'd probably do just fine, but she was in the big leagues."[826] For her part, Dr. Kuncel was unaware that the task of presenting Mrs. Montgomery's life history was to fall to her, "I did not know that."[827]

Mr. Duchardt, however, defends his presentation of the nine pages of social history through Dr. Kuncel: "Because I was aware of the peculiar vulnerabilities which Ms. Vogelsang or a social worker like her would bring, I decided instead to provide the raw materials of our mitigation investigation to those associated with our case who were qualified to assess them, i.e., Dr. Ramachandran, Dr. Logan, and Dr. Kuncel. I believed that these folks could find the critical information in our mass of materials, and it would seem that their performances in these regards confirmed my trust in them to do this work."[828] Mr. Duchardt's decision to use Dr. Kuncel to present the nine pages of social history testimony rather than to present someone like Ms. Vogelsang rings a bit hollow in light of the Government's stipulation at the evidentiary



Appellate Case: 17-1716 Page: 275 Date Filed: 11/01/2017 Entry ID: 4596229

hearing to all of Ms. Vogelsang's report, supporting documentation, and conclusions:

> Mr. KETCHMARK: Your Honor, if I might, it's not really an objection. It's more of a – we did stipulate to her original report and supplement. I would note the original report is 184 pages. The PowerPoint is also – there's objection to a stipulation of the PowerPoint. **We're not contesting the information** that she was able to compile and put together in the biosocialpsych (sic) history here. I don't know that we need to go through ad nauseam the PowerPoint because it's all sourced back, and I think they did an excellent job of providing the Court with a roadmap of the information in the 184 pages and then digesting it down with these source attachments here, and so I just think this is cumulative of stuff that we haven't objected to coming in, and I just don't know that we need to do this and go through the two-hundred page PowerPoint in this fashion.[829]

As with other experts, Mr. Duchardt claims to have spent copious time preparing Dr. Kuncel's testimony:

> Another criticism concerns the perception that Dr. Ruth Kuncel was "unprepared for the all-out assault" which she faced on cross-examination (D.E. 71 p91). In point of fact, and as my records reflect, I spent a goodly deal of time discussing Dr. Kuncel's testimony with her, and so preparation was not the problem. . . While the rather cantankerous tactics which Dr. Kuncel displayed are regularly allowed in Illinois state courts, there was no such leeway given by Judge Fenner. It is an unfortunate but fair reading of the record that Dr. Kuncel came off poorly in the exchange, and it is an unfortunate but fair inference that the power of Dr. Kuncel's other testimony was likely undercut, at least somewhat and perhaps greatly, as a result.[830]

As with the other experts, Mr. Duchardt's representations concerning trial prep is contested by the expert. Dr. Kuncel testified: "[M]y recollection is



Appellate Case: 17-1716 Page: 276 Date Filed: 11/01/2017 Entry ID: 4596229

leaving with kind of – seems to me he was in and out. I don't even have a clear recollection. We sat down and this is what we are going to do. That's not part of my memory. I simply remember going into court with the feeling—it had more the feeling of being about to be cross-examined where an attorney is going to stand up and ask you things and you have some general idea what it's going to be about but you don't have any degree of clarity[831] . . . when it came to discussing with him what I was going to do or how I was going to do it from my point of view, it was totally inadequate. I didn't know where I stood on that. I did not know with clarity how to deal with the pseudocyesis issue. That had not been worked out . . . I had been told that there were certain kinds of – certain testimony was not to be included in my testimony. So that left me uncertain and confused."[832] Dr. Kuncel was unaware at the time she testified that Dr. Martell had used her testing data in support of his conclusion that Mrs. Montgomery was malingering her psychiatric symptoms.[833]

**9. Counsel fails to present mitigation evidence readily available through the witnesses who testified at trial.**

The defense team failed to present critical mitigating evidence readily available through witnesses who testified at the trial. Though David Kidwell, Diane Mattingly, and Nancy Wallentini testified, the defense did not ask



Appellate Case: 17-1716 Page: 277 Date Filed: 11/01/2017 Entry ID: 4596229

questions regarding additional information each witness had provided to the team.

### a. Despite calling David Kidwell as a witness, the defense team fails to present proof of serial, gang rape by Mr. Kleiner's friends.

Though Mr. Kidwell could have testified to Lisa's disclosure as a young teenager that her step father and his friends were gang raping her, Mr. Duchardt did not know to present that proof. Instead, Mr. Duchardt subpoenaed Mr. Kidwell,[834] called him to the stand, and presented this testimony:

**BY MR. DUCHARDT**:
Q: Good afternoon, sir. Would you state your name, please.
A: David Kidwell.
Q: And would you share with the jury, are you in some way related to Judy Shaughnessy?
A: Judy is my aunt.
Q: And actually though she is your aunt, are you both very close in age to one another?
A: Well, I am 54 so - -
Q: Did you during your life have a close enough relationship that you would be around Judy and know what she was doing and her know what you were doing?
A: For the most part of our lives, yeah.
Q: I really only have a few questions for you. Basically as Judy was coming up was she kind of a wild person?
A: Yes, very much.
Q: Did she tend to go out drinking and partying and those kinds of things?
A: Well, I don't know about the drinking or that but I know she went out a lot.
Q: Did you, were you familiar with her when she got married particularly first to John Patterson, his name was Hedberg, before and then to Jack Kleiner?



Appellate Case: 17-1716 Page: 278 Date Filed: 11/01/2017 Entry ID: 4596229

A: Yes.
Q: Did you become familiar with the situation that Jack had abused, sexually abused, actually raped Lisa?
A: Yes.
Q: And did you know Lisa when she was little?
A: Off and on, yes.
Q: Just to show you Exhibit 291, do you remember her looking kind of like this when she was little?
A: Yes.
Q: Later was when Lisa, and let's see Exhibit 300 again. Do you remember her when she was more like about 14, 15, 16?
A Yes.
Q Did it come to your attention that Judy had actually caught Jack having sex with Lisa?
A: Well, I don't know. I know she told me that, that Jack raped Lisa.
Q: Did Lisa, did Judy talk to you about her belief that somehow, that Lisa had brought this on, had led Jack on?
A: Yes.
Q: Into this. She did tell you that?
A: Yes.
Q: Why don't you tell the jury what she told you.
A: I don't remember the exact words.
Q: As best you can remember?
A: We were at my mom's house. My mom of course has passed away but she was telling us that she believed that Lisa, you know, brought it on herself, that she, how you would say it, you know, enticed him, you know.
Q: Lisa is just a little girl, does this story kind of - -
A: Oh, I didn't believe it, no.

MR DUCHARDT: That's all I have sir. Thank you.

**CROSS EXAMINATION**
**BY MR. WHITWORTH**:

Q: Did you ever live with Jack and Judy, did you ever live with Jack and Judy?
A: No.

Mr. WITHWORTH: That's all I have

THE COURT: Thank you, Mr. Kidwell, you are excused.[a]

The superficiality of the testimony surprised even Mr. Kidwell:

> I remember testifying at Lisa's trial. I was surprised at how few questions the attorney asked me. It seems like it took longer to swear me in than for my testimony. I had spoken to someone on Lisa's defense team many months before the trial, but that wasn't the lawyer who was asking me questions in court. I told them a lot of what is in this declaration, but not the graphic details. It seems like they didn't spend that much time with me. I thought that I was going to be asked these questions in court. I was willing to testify to all of this information. It bothered me that the lawyer didn't ask me these questions.[835]

The record reflects that Mr. Kidwell was on the stand 4 minutes.[b]

**b. Despite calling Diane Mattingly as a witness, the team fails to present that as a child, Lisa witnessed her sister being raped.**

Though four-year old Lisa was two small girls' arm-lengths from her sister Diane when Diane was repeatedly raped by Judy's lovers, Mr. Duchardt failed to present that proof to the jury.[836] Having called Mrs. Mattingly to the stand, Mr. Duchardt could have asked her about the violence four-year old Lisa experienced lying near Diane as Diane was raped. Mrs. Mattingly would have testified that:

---

[a] Mr. Kidwell's testimony in its entirety is produced above (TT. Vol. 8, pps. 1824-26).

[b] D.E. 327 (reflecting that Mr. Kidwell took the stand at 3:25 and left the stand at 3:29).



Appellate Case: 17-1716 Page: 280 Date Filed: 11/01/2017 Entry ID: 4596229

A: Lisa and I shared a bedroom and when you walk in the door, the wall where the door was was Lisa's bed, then the opposite door was my bed.

Q: Was this a big room?

A: Huh-uh

Q: And so were your beds close together?

A: Yeah, if we reached out our hands, we could touch.

Q: And we're talking about a time leading up to you being eight years old and Lisa being four or five years old; is that right?

A: Yeah.

Q: And so when this man would come into the room, Lisa was close enough to you that you could touch her?

A: Yes.

Q: I'm not going to make you tell the details of what he did to you, but is it fair to say that he raped you?

A: Yes.

Q: I'd like the record to reflect that she indicated in the affirmative. Take your time, Ms. Mattingly.

A: I'm sorry.[837]

Mr. Duchardt did not ask Ms. Mattingly about this violence, though Ms. Waller's memos of her interview with Ms. Mattingly reflect that Ms. Mattingly shared that information with the team.[838]

The eight minute, superficial presentation of Ms. Mattingly's testimony reflected Mr. Duchardt's nominal preparation.[a] Ms. Mattingly recalls Mr. Duchardt's preparation for her testimony: "I met with one that I now know his name is Fred . . . at the hotel lobby" of the Westin at the Crown Plaza.[839] Her biological father, who she had met one time since he abandoned her as a toddler, was present, as was Lisa's husband who Mrs. Mattingly had never met.[840] Mr. Duchardt did not tell her what to expect or talk with her about her sexual abuse history.[841] He did not tell her what he was going to ask her on the witness stand.[842] "I spoke with Lisa's trial attorneys for five minutes the night before I had to testify . . . The jury never got to hear the whole story."[843]

**c. The team fails to present Judy's cruelty in repeatedly forcing Diane out of the home.**

Because Mr. Duchardt did not adequately prepare her to testify, Ms. Mattingly's trial testimony about Judy's cruelty "wasn't even the smallest part of what living in the house was."[844] At trial, Mrs. Mattingly said that living with Judy was "walking on eggshells . . . you could never please her, you know, it's like if you did something wrong you would get hit or, you know, you were told that you were not good enough. It was just constantly you felt like you could not please her."[845] Had she been asked to further elaborate on her answer, she

[a] Ms. Mattingly testified from 12:10-12:18 (D.E. 347).

would have provided detail about the abuse she suffered, including that Judy would strip her and put her outside in the dark:

A: Judy had a way of finding things that would hurt you and she would use them against you. Like she knew that I had this deep desire to have a family. I mean, not only did I lose my mom, I lost my grandmother. I was living in the home with her. I didn't have my father. It was just her. And every time she would pull me in and tell me that she loved me, then she would send me away, then she'd pull me in and tell me that she loved me. And then I would live with a family two weeks here, then I would live with a family for nine months there. I never had any stability with her . . . When she would put me out, she would take all my clothes off because I wasn't to take anything that she provided, and she would open up the door, shove me outside and shut the door.

Q: And this was before you were eight years old?

A: Yes

Q: Do you know how long she left you outside?

A: For a while. I can't tell you if it was five minutes, if it was ten minutes, or if was 30 minutes, I don't know. I was out there and I was scared.[846]

Mrs. Mattingly could have testified that life with Mrs. Shaughnessy was worse than she managed to present at trial because the questions she was asked did not allow her to respond with the full picture. "That's what I think threw me off last time [during testimony at trial] because the question to me was, How does she punish you? Well, you got whippings, You got hit. That was punishment. But Judy was more than that. If she was in a foul mood, whoever

was in front of her got it, either hit or thrown outside with no clothes on. It just was whatever at that moment she thought of." [847]

Trial counsel failed to elicit details of the physical manifestation of Judy's cruelty toward Diane:

Q: Did you ever feel that you had a home there with Judy that was stable –

A: No.

Q: -- or certain?

A: No.

Q: Did she make threats to send you away often?

A: Yes.

Q: Did you – was there a cause and effect? Was it like you misbehaved in some way and she'll say, I'll send you away if you do that again, or was it random?

A: It was random.

Q: When the Department of Children's Services ultimately showed up, I think the records show it was on Valentine's Day when you were eight years old.

A: That really sucks.

Q: Did you know why they were there?

A: Yeah. Judy told me they were coming to get me.

Q: And what did she say about why they were coming to get you?

A: That it was my fault.

Q: What did you think that meant?

A: That I did something bad.

Q: And you've never known why you were sent away.

A: I don't know.

Q: You've told me in the past that when the social workers put you in the car, you became physically sick?

A: I threw up all the way from Ogden to Salina. They would have to stop several times.

Q: And why was that?

A: Because I wasn't there to protect [Lisa and Patty] anymore.[848]

Mrs. Mattingly was willing to tell the whole story, she just was not asked:

Q: If a lawyer had talked to you and helped you plan to testify the way you did today, would you have been willing?

A: I would have. I would have told the whole thing. I just didn't know what to say. I didn't know what to say.[849]

The team's failure to ask Mrs. Mattingly about Judy's abuse, left the jury without context for Dr. Logan's post-traumatic stress disorder diagnosis.[850] Dr. Logan testified, "There is some instance of Lisa having post-traumatic stress disorder that went untreated throughout her life and formed shifts in mood, nightmares, difficulty sleeping and it's not unusual in these conditions to have episodes of depression and anxiety."[851] However without a full picture of Judy's

abusiveness and without knowing that Mrs. Montgomery's exposure to sexual violence began when she was four, Dr. Logan's opinions regarding PTSD lacked support.[852] The government's expert, Dr. Dietz, agreed with Dr. Logan that Mrs. Montgomery likely suffers from PTSD, but without more information about the abuse she suffered, he was unable to say whether the PTSD was long-standing or caused by the crime.[853] Had the defense presented the evidence from Mr. Kidwell and Mrs. Mattingly, the jury would have had information establishing that Mrs. Montgomery's PTSD was chronic and severe.[a]

**d. Failed to present all the available information in Nancy Wallentini's report.**

The Team failed to mine Nancy Wallentini's counseling records for information about young Lisa and her family. Though Nancy Wallentini testified regarding her records of the few counseling sessions she provided to Lisa Montgomery as a teen-ager, the defense agreed to not submit her records as an exhibit to the jury.[854] Though the defense elicited testimony that Lisa was brought for counseling by her mother and that Lisa was shy … and nervous and had difficulty talking about sexual abuse by the stepfather[855] that Lisa attended five sessions and that the goal of therapy was to make Lisa more assertive and

[a] For more on Dr. Porterfield's testimony regarding Mrs. Montgomery's diagnosis of complex post-traumatic stress, please see §V.E., below.



Appellate Case: 17-1716 Page: 286 Date Filed: 11/01/2017 Entry ID: 4596229

to address the sexual abuse, the defense failed to present details contained in Ms. Wallentini's records which would have painted a historical picture of the Kleiner family for the jury.

Had the defense mined Ms. Wallentini's records, they could have presented a more complete, accurate picture to the jury of Lisa's young life. Because Ms. Wallentini created her records in 1984, the records would have had great credibility – there could be no allegation that sixteen year old Lisa was manipulating Ms. Wallentini in anticipation of this testimony. Had the team mined the records, they could have shown:

1) Judy did not get help for Lisa, Judy's lawyer did: as the closing summary shows, the referral for counseling came from Ms. Kleiner's attorney.[856]
2) Ms. Wallentini noted in 1985 that Ms. Kleiner "appears to have lack of empathy for Lisa."[857]
3) Ms. Wallentini's notes show that Lisa could talk to Carl about the sexual abuse and that they were engaged by February 1985.[858, a]

---

[a] Given Mr. Boman's declaration in this matter confirming that sixteen year old Lisa did disclose that she was raped by multiple of Jack's friends, this evidence is important corroboration (Exhibit 13, *Carl Boman Declaration 9/18/2016*).

4) Ms. Wallentini's notes that "Mother verbally overwhelmed Lisa" on March 20, 1985[859] before terminating contact with Ms. Wallentini in April 1985.[860]

5) Once the family "completed legal process" Ms. Wallentini's notes reflect "[the family] was not interested in treatment"[861]

Thus, Ms. Wallentini's records painted a vivid picture of young Lisa as powerless over not only her step-father and his friends, but also over her mother – and even over her own attempt to process and heal from the rapes.

**10. Counsel fails to explain to the jury that Mrs. Montgomery is under the influence of psychotropic medications.**

Before she was medicated, lay-people who saw Mrs. Montgomery described her affect in terms of obvious distress and mental illness. Ron Wurtz, former First Assistant Federal Public Defender for the District of Kansas, was one of the first attorneys to come into contact with Mrs. Montgomery. He described Mrs. Montgomery's unmedicated mental state, "My recollection of her is that she was just totally wrung out. I've described it like she's been drug through a keyhole. She looked like she had been constantly crying. She seemed disoriented. She was difficult to communicate with."[862] Mr. Wurtz's co-counsel, Charles Dedmon, described Mrs. Montgomery as "fragile and confused."[863] Mrs. Montgomery "did not seem to comprehend what had happened" and



Appellate Case: 17-1716 Page: 288 Date Filed: 11/01/2017 Entry ID: 4596229

would alternate between being "emotional" and "detached."[864] Mr. Dedmon recalls that Mrs. Montgomery's "mood was definitely unstable."[865] In fact the local AUSA in Kansas, Ms. Morehead, commented that Mrs. Montgomery was "obviously insane."[866] After just a short time in her presence, the US Marshall who transported Mrs. Montgomery described her "the worst off of anyone he had transported."[867]

The Mrs. Montgomery the jury saw was medicated with psychotropic medications.[868] Troy Schnack, a computer systems administrator with the U.S. Courts, described Mrs. Montgomery's affect at trial: "She was, I guess I would say, sullen, always head kind of down, not much activity. There would be – I mean, there would be interactions once in a while with Dave and her or someone else but a lot of no movement."[869] Susan Hunt described Mrs. Montgomery's demeanor at trial: "She had a flat affect. She showed absolutely no emotion. She just sat in the chair and stared straight ahead. She looked like, you know, her body was just stuffed sitting in the chair. It was obvious to me she was medicated."[870,a]

---

[a] It is important to note that, unlike Mr. Duchardt and Mr. O'Connor, Ms. Hunt had seen Lisa Montgomery unmedicated (Vol. 2, p. 421, *Hunt Testimony*).

The team were armed with opinions from both Dr. Logan and Dr. Hutchinson concerning the effects the psychiatric medications had on Mrs. Montgomery. Dr. Hutchinson described the effect of Mrs. Montgomery's medication regimen in a letter to defense counsel dated, March 15, 2005 shortly after Mrs. Montgomery had attempted suicide and had become dissociative.[a] Dr. Hutchinson stated that the anti-depressants that were administered to Mrs. Montgomery by CCA were "quite sedating."[871]

The team's expert psychiatrist, Dr. Logan, also observed Mrs. Montgomery's demeanor early on, prior to extended medication.[872] Dr. Logan documented his observations in a report to counsel.[873] Dr. Logan described Lisa as depressed, suicidal, experiencing thought disturbances (hallucinations) and sleep disturbances.[874] Dr. Logan opined that Mrs. Montgomery had not responded to the treatment regimen at CCA.[875] In fact the medication "actually seemed to worsen her intrusive traumatic memories and difficulty sleeping."[876]

---

[a] During the episode at first Mrs. Montgomery was "numb." After the staff took all of Mrs. Montgomery's clothing (including her paper gown), her mattress and her blanket leaving Mrs. Montgomery literally naked in her cell, Mrs. Montgomery began to pull her hair out and pound on the wall. Dr. Hutchinson noted that CCA was providing Mrs. Montgomery with ineffective medication for her disorder and that Mrs. Montgomery did not trust her treatment provider. Dr. Hutchinson's overriding recommendation was that Mrs. Montgomery be removed from solitary confinement (Exhibit 37, *3/14/2005 Hutchinson Letter*).

Dr. Logan recommended that Mrs. Montgomery be hospitalized.[877] This recommendation was not followed.

Pretrial, the defense team discussed *Riggins v. Nevada* and the duty it conferred upon the team to advise the jury that Mrs. Montgomery's affect was the result of psychotropic medication.[878] Mr. Owen testified that he understood that the point of advising the jury was that otherwise a defendant might be misperceived as cold-blooded and remorseless. He said the team discussed that possibility and that both the fact that Mrs. Montgomery was on psychotropic medication and the effect of those psychotropic medications on her affect was to be explained through one of the experts.[879] However no such explanation was provided.[880]

Despite the team's discussions and the expert opinions, the team did not address the effect of the psychotropic drugs on Mrs. Montgomery's affect. "Lisa Montgomery was being medicated from the beginning of her incarceration awaiting trial. During the trial Lisa presented a very flat affect and the jury could have interpreted that as 'cold bloodedness.' At no time did Fred [Duchardt] bring the effects these medications had on Lisa to the jury's attention."[881]



Appellate Case: 17-1716 Page: 291 Date Filed: 11/01/2017 Entry ID: 4596229

Though Dr. Logan testified about other matters, Mr. Duchardt did not ask him questions which would have allowed him to explain Mrs. Montgomery's flattened affect:

> Mr. Duchardt did not ask me to explain to the jury the effect of Ms. Montgomery's medication on her affect. During the course of the trial the jury had opportunity to view video clips of Dr. Dietz's interview with Ms. Montgomery. Had I been asked, I could have explained that the medications Ms. Montgomery was taking pursuant to her psychiatrist's prescription flattened her affect, diminishing her ability to react emotionally to Dr. Dietz. The medication also affected her presentation in the courtroom.[882]

**D. §2255 Proceedings: Mrs. Montgomery establishes her entitlement to relief despite denial of process, removal of habeas counsel, and the district court's limitations to her proof.**

**1. Mrs. Montgomery files her Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255.**

Upon the conclusion of Mrs. Montgomery's direct appeal, the district court appointed Lisa Nouri and Christine Blegen to represent Mrs. Montgomery pursuant to the Criminal Justice Act on April 17, 2012.[883] Neither Ms. Nouri nor Ms. Blegen had any experience in capital cases nor with §2255 capital post-conviction matters; collectively they had previously represented one person on a homicide charge. On April 25, 2012, the court issued an Order Regarding Billing Procedures, Setting of Compensation, and Authorization to Make Interim Payments.[884] Lead counsel Lisa Nouri offered to submit a case budget,[885] but the court declined that offer.[886] After review of the file and in

recognition of the need for resources unique to this case, Ms. Nouri and Ms. Blegen submitted a proposed budget and request for investigation and expert witness funds in September, 2012.[887] In the motion for funds, counsel proposed the alternative of appointing the Federal Public Defender's Office for the Middle District of Tennessee to provide the resources needed to investigate and prove Mrs. Montgomery's claims.[888] The district court approved the appointment of the Federal Public Defender's Office for the Middle District of Tennessee[889] and Kelley Henry entered her appearance on November 1, 2012.[890]

Four months later on March 19, 2013, Mrs. Montgomery filed a motion in the district court to vacate, correct, or set aside the judgment in her case pursuant to 28 U.S.C. § 2255.[891] Simultaneous to the filing of the §2255 motion, Mrs. Montgomery filed a motion to reassign the case.[892] The motion to reassign was premised on the district court's participation in *ex parte*, off-the-record, discussions which resulted in the removal of Judy Clarke and Susan Hunt.[893]

The need for discovery regarding the removal of Ms. Clarke prompted the Motion to Reassign.[894] Though counsel investigated the claims as best they could, additional discovery, including the testimony of Judge Fenner, was necessary because several of the proceedings regarding removal of counsel



Appellate Case: 17-1716 Page: 293 Date Filed: 11/01/2017 Entry ID: 4596229

were off-the-record.[a] At the time the motion was filed, counsel pled upon information and belief that Judge Fenner had been misled in the off-the-record meetings regarding Ms. Clarke's role/non-productivity/obstruction of the team's work.[b] The district court's on-the-record statements regarding his

---

[a] *See* §V.A., Ftnt (a) *Chart of In-Chambers Conversations* and §V.A. regarding off-the-record proceedings.

[b] D.E. 41*; see also* D.E. 53, p. 26-27 ("We had to plead every claim we had on the basis of the record that we had, doing the investigation we were able to do without process of court. We didn't have the ability to come to get a subpoena from (sic) Mr. Conrad's deposition. We're certainly going to seek that later on, but we had to look at the record, what the record said was – and I understand Your Honor's explained it now to the best of his memory, but what you said to counsel on the record on April 25th was, Hey look, you represented to me that this woman was being unproductive in the case. Well, that is demonstrably untrue.

We also interviewed David Owen who told us – I'm not sure if it's in his declaration because I don't have it committed to memory, but one of his complaints about Ms. Clarke is that he claimed she was not getting expert witnesses. She wasn't' moving the case along. She wasn't getting evaluations. And that was a specific complaint about her work product. He told us that when we interviewed him in Denver. We know that to be untrue because we have copies of the contracts where she had actually made contact with expert witnesses. So if he had represented that to you or if Mr. Conrad had represented that to you, that would be untrue.

We have the record that says Mrs. Clarke was described as abusive to staff. That's a loaded word. It's a conclusory word. But it is a word based on our investigation having spoken to Ms. Elliot and Mr. Ninemire [that] we also believe to be untrue. That's what we believe. Our motion was filed based on information and belief, and we have an obligation to Ms. Montgomery to make those allegations because if we don't, under the law, they would be waived forever").



Appellate Case: 17-1716 Page: 294 Date Filed: 11/01/2017 Entry ID: 4596229

reasoning for removing counsel engendered §2255 Counsel's belief.[a]

### 2. Counsel pleads claims relating to the removal of Judy Clarke upon information and belief and seeks reassignment of the motion to allow discovery of Judge Fenner's testimony.

Counsel's knowledge of that which occurred off-the-record was limited at the time of the pleading of the motion. Counsel had been able to interview only one participant in the most relevant off-the-record discussion, David Owen;[895] Mr. Conrad refused to be interviewed.[896] Counsel's knowledge of that which led to Ms. Clarke's removal was, therefore, necessarily limited to Mr. Owen's memory of the off-the-record discussions and that which was reflected on the record regarding that which was said off-the-record.[b] What

---

[a] The district court has acknowledge that §2255 counsel had a basis for the claim: "the lack of recording and the poor choice of words used by the Court thereafter in addressing the removal of Clarke provided the basis upon which habeas counsel made their allegation of fraud" (D.E. 212, p. 124).

[b] As discussed in §V.A., *supra*, the district court's on-the-record statements reflected that the Court had been misled. On April 25, 2006, Judge Fenner conducted an in-chambers conference with Susan Hunt, David Owen, and Ray Conrad. During that conference, Judge Fenner alluded to information he had previously been provided off the record:

> 1) Judge Fenner stated that Ms. Clarke was "only appointed in an effort to see if she could assist in getting a plea worked out and that was what the situation was from the very beginning."
>
> 2) Judge Fenner went on to say, "And if [Judy Clarke] was being obstructive toward the case being handled properly and there being good communication among all the attorneys and if she was presenting difficulty with the two of you who are the ones who are going to have to try the case, I don't really have any reservation about the judgment call that needs to be made in that kind of circumstance."

counsel knew prior to pleading the fraud on the court claim was that the court had characterized Ms. Clarke in ways that were demonstrably untrue and had taken immediate action upon whatever was said – removing counsel from the case without notice or process to either counsel or the defendant. §2255 Counsel therefore pled the claim upon information and belief, reasoning that the false characterization of Ms. Clarke by the court had to reflect information the court received rather than an unsupported bias or flight of fancy by the court.[897]

Beyond the court's words on the record, the court's drastic and

---

> 3) And later, "I don't have any reservation about the fact that [Judy Clarke] needed to be taken off the case because her involvement was obstructive in getting a defense for Miss Montgomery put together."

Still another off-the-record conversation took place between the court and David Owen and Ray Conrad between the (mostly) recorded and transcribed conference of April 25, 2006[b] and the next recorded and transcribed conference on May 3, 2006. The transcript of the May 3 conference opens with the court noting for Ms. Hunt's benefit that the court "visited" with Ray Conrad and David Owen "earlier in the week." The court remarks that the subject discussed at the earlier unrecorded conference was Ray Conrad and David Owen's concern about the defense team. In the course of that conference, the court alludes to earlier conversations with "the two of you" (either Hunt and Owen or Owen and Conrad, the record is unclear) wherein the Court was told that "Judy Clarke is a non productive member of the team, causing problems and we need to have her removed from the defense." The court's characterization of Ms. Clarke as "non-productive," "only appointed . . . to . . . assist . . . in plea," "presenting difficulty," and "obstructive" predicated counsel's motion to reassign.



Appellate Case: 17-1716 Page: 296 Date Filed: 11/01/2017 Entry ID: 4596229

unprecedented action of removing counsel without process to counsel or the defendant further supported §2255 Counsel's belief that the court had been misled.[898] On April 20, during the off-the-record proceeding with Ray Conrad and Dave Owen,[a] the court picked up the phone, called CCA, and banned any contact between Ms. Clarke and Mrs. Montgomery.[b] This immediate and extreme action was prompted by whatever Ray Conrad said to the court.[c] On April 20, 2006 – without further proceedings and having heard from neither Ms. Clarke nor Mrs. Montgomery – the court issued an Order removing Ms.

---

[a] Counsel later learned that Judge Maughmer was also present, but was unaware of that fact at the time of pleading the Motion (D.E. 48).

[b] Exhibit 62*,* p.8 *Owen Declaration* ("Then, without further comment or questions, Judge Fenner picked up the phone, called CCA (where Lisa Montgomery was being housed) and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit with her").

[c] Ray Conrad called Judge Fenner to alert the Judge that David Owen had a problem working with Judy Clarke. The substance of what Ray Conrad said to the Judge on the telephone call remains unknown (D.E. 41-2, p. 8). Ray Conrad says now that he has no memory of making that phone call, but says that it is possible that he did phone the judge (D.E.149-8, p. 17). Judge Fenner is the only other known witness to whatever statements were made during the telephone call. David Owen has declared that he, Ray Conrad and Judge Fenner met on April 20th (D.E. 41-2, p. 8). Mr. Owen has never mentioned Judge Maughmer being present. Judge Maughmer has stated that he was present for that meeting and Judge Fenner has confirmed his presence (D.E. 41-2, p.8). Ray Conrad denies being present or participating in any way in this meeting (D.E. 149-8, p. 17). Both Judge Maughmer and David Owen indicate that Ray Conrad did all of the talking during the unrecorded, in chambers conference (D.E. 53, p. 16 ("Judge Maughmer advised that Mr. Conrad spoke for about – the whole thing wasn't more than 15 or 20 minutes. Mr. Conrad spoke most of the time. [Maughmer] didn't have any recall of David Owen saying anything")).



Appellate Case: 17-1716 Page: 297 Date Filed: 11/01/2017 Entry ID: 4596229

Clarke from the case.[899] The court addressed Mrs. Montgomery on April 21, 2006, informing her of the change in counsel and that he made the change because "I have come to the opinion that [Judy Clarke's] involvement is no longer necessary and/or helpful."[900] The court invited "if there is anything you would like to ask me further about that I would be happy to discuss that with you further."[901] The court did not conduct any inquiry into any accusations made against Ms. Clarke nor inquire as to Mrs. Montgomery's choice amongst her counsel.[a] The court never spoke with Ms. Clarke and provided her no process regarding the removal.[902]

Mrs. Montgomery's claims were based on the untruth of the off-the-record statements (as reflected by the on-the-record discussion). As shown at the evidentiary hearing, virtually all of the records collected on the case were collected during Ms. Clarke's tenure on the team,[903] the team had conducted extensive background mitigation work,[904] and were in the process of hiring

---

[a] The record reflects that the district court did not invite any comment or opinion from Mrs. Montgomery, but rather informed her of the *fait accompli* (Exhibit 66, p. 1, *4/21/2006 Transcript* ("I have asked that you and your attorneys come down today so that I could . . . inform you of my decision to remove Miss Clark as one of the attorneys representing you in this case. And in the process of making that decision there a number of things that I considered in determining Miss Clark should no longer be an attorney of record representing you in this case"); *id*. p.2 ("I wanted to make sure you heard from me what my decision was in this case and that you had the opportunity to have an explanation from me as to why I made the decision that I made")).

experts.[905] The team had ruled out pseudocyesis as a viable defense theory,[906] and had determined that Tommy Kleiner had an alibi for the time of the crime.[907] The allegations that Ms. Clarke was obstructing the team's progress in preparing a defense for Mrs. Montgomery and that she was "non productive," were demonstrably untrue.

### 3. The district court hears oral argument on the motion to reassign.

Counsel filed both the 2255 Motion and the Motion to Reassign on March 21, 2013.[908] On April 15, 2013, Counsel received an email from the district court CM/ECF notifying them of the hearing set on May 6, 2013. The notice purports to be the "official notice for this hearing: Oral Argument on Movant's Motion to Reassign Case set for 5/6/2013 01:30PM in Courtroom 8A, Kansas City (GAF) before District Judge Gary A. Fenner" (Attachment 3).[a] There was no indication at any time of any possibility of the development of testimony or evidence.[909]

At the May 6th oral argument, Judge Fenner's displeasure with counsels' allegations was manifest.[910] Judge Fenner opened the proceeding by stating there were "a couple of matters that are raised in the motion to reassign the case that I would like to comment on and I think deserves some

[a] Motion to Expand the Record, Attachment 3 – *CM/ECF Notice of Oral Argument.*



Appellate Case: 17-1716 Page: 299 Date Filed: 11/01/2017 Entry ID: 4596229

clarification."[911] He then discussed comments he made on the record which Mrs. Montgomery cited in the Motion.[912] Judge Fenner explained that his comment that Judy Clarke was "nonproductive" had been "misunderstood or taken out of context in the scope of the entire matter, and those choice of words were my words."[913] Judge Fenner stated, "They were not the words of Mr. Owen or Mr. Conrad, and what I meant when I said that, was that the defense team was not able to be productive because of the conflict that existed between counsel, and I think that's rather obvious in the record."[914]

Judge Fenner continued:

> Further my comment that Ms. Clarke was only appointed in an effort to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team; however, no one conveyed to me Ms. Clarke should only be involved to assist with the plea, and her appointment in the case was not limited and no one at any time suggested to me that it should be.[915]

Upon concluding his remarks, the court telegraphed that the discussion was at an end, directing counsel to introduce co-counsel.[916] Counsel were not permitted to cross-examine Judge Fenner regarding his comments and clarifications.[917] After Ms. Nouri introduced her co-counsel and expressed trepidation about the issue of asking the judge to re-assign the case, Judge Fenner interrupted her.[918] The court expressed that he was "surprised" that the



Appellate Case: 17-1716 Page: 300 Date Filed: 11/01/2017 Entry ID: 4596229

§2255 motion alleged Mr. Conrad and Mr. Owen committed a fraud on the court.[919] Then the court said, "I understand that you have some questions about the fact as to what was said between us, actually, basically what was said by Mr. Owen and Mr. Conrad, but I don't see any basis to accuse Mr. Conrad and Mr. Owen of that type of unethical conduct."[920]

The court did not see any basis to allege unethical conduct, because the court assumed the facts were as the court had been told. Though the court noted that "it seemed pretty apparent that the public defender's office here was deeply offended by Ms. Clarke,"[921] the court did not reveal what Conrad and Owen told the court was the basis for that offense.[922] The court summed up the court's position with respect to the removal of Ms. Clarke thusly: "Don't you think it's pretty obvious under the record that the defense team could not work together, they were not functioning, and they could not adequately represent Ms. Montgomery in the case on the basis of the record that's before [§2255 counsel on May 5, 2013]?"[923] The court continued, "Nobody pushed me to do anything. I had a case management decision to make. I was told that the team that had been composed was not able to work together. I was told that the public defender's office could not and would not work with Judy Clarke, and so I had to make a decision."[924] The court did not reveal why the court accepted the Public Defender's Office's decision not to comply with the appointment orders



Appellate Case: 17-1716 Page: 301 Date Filed: 11/01/2017 Entry ID: 4596229

(i.e. to continue to work with other appointed counsel), nor did the court reveal – other than the statements set forth above – from which the court subsequently backtracked[925] -- why the court chose to remove Ms. Clarke, then Ms. Hunt and to allow the Office of the Federal Public Defender to remain on the case.

At the oral argument, the district court termed the information and belief upon which Mrs. Montgomery pled her fraud on the court claim to be mere "supposition": "Well, what do you think about accusing attorneys of unethical conduct when you don't have a clear basis to do that when I guess, at best, it would be a supposition?"[926] When 2255 counsel asserted that "we had a basis for it. I believe the record as it existed at the time we reviewed it, which was not a record we created, but the record that was there was when Your Honor is saying to Mr. – apparently to Mr. Conrad and to Mr. Owen, You all represented to me that this woman was unproductive. You all represented –."[927] The court interrupted and said, "I never said that.[a] The truth of it is they were all unproductive. Ms. Clarke was unproductive. Mr. Owen was unproductive. Ms.

---

[a] *But see*, Exhibit 67, p. 4 *04/25/06 In Chambers Transcript* (Court tells Ms. Hunt not to regret the removal of Ms. Clarke, as Ms. Clarke was "only appointed in an effort to see if she could assist in getting a plea worked out" and "if [Ms. Clarke] was being obstructive . . . I really don't have any reservation about the judgment call"); *id*. at p. 19 ("First the two of you come and say Judy Clark is a nonproductive member of the team, causing problems, we need to have her removed from the defense").

Hunt was unproductive. They were all unproductive given the circumstances that existed at that time because they could not function together, and so maybe that was not as artfully stated as it possible could have been, but it certainly is not the basis for accusing someone of committing fraud."[928] When counsel indicated that counsel possessed proof of Ms. Clarke's productivity, the court again cut her short saying, "it's unproductive in a different sense than what you're choosing to imply."[929] The court did not explain what other "sense" of unproductive – other than not producing work – the court intended in using that word.[930] Instead the court continued to explain the court's criticism of counsel's pleading: "You make inferences. I'm not critical of that so much as I am critical of the conclusion that you're so quick to draw from your suppositions about what that phraseology meant, and I guess, my misstatement that she was just brought in to settle the case because that was never my impression and I just misspoke when I said that."[931]

During the oral argument, Judge Fenner alluded to the payment of CJA counsel – referring to Ms. Nouri as owing a fiduciary duty to the government:

> THE COURT: Well, I mean, doesn't there have to be some good faith [basis to pursue deposition of Ray Conrad] – **I mean, the government's paying you to do all of this, right?**
>
> Ms. Nouri: Yes, sir.



Appellate Case: 17-1716 Page: 303 Date Filed: 11/01/2017 Entry ID: 4596229

THE COURT: And, you know, shouldn't any client want some good-faith basis for the actions of **their attorney** that are being paid to pursue something?[932]

The court ultimately found a good faith basis for the discovery of Mr. Conrad's deposition[933] and did not otherwise explain his reference to the government as Ms. Nouri's client.

**4. The court denies the motion to reassign and contemplates removing counsel.**

Following the oral argument by counsel of the Motion to Reassign on May 6, 2013,[934] the court denied the motion on June 25, 2013.[935] Three days later, on June 28, 2013, the district court entered a Notice Concerning Budget and CJA Representation for Movant, scheduling a meeting with all counsel on July 12, 2013.[936] During the meeting, the district court initially considered removing both CJA attorneys.[937] The district court's alternative suggestion was to remove one CJA attorney.[938] Ms. Nouri responded that each attorney was extremely important to the case and that each attorney was taking on different responsibilities in the §2255 litigation.[939] Ms. Nouri noted that the removal of any of the attorneys would have a detrimental impact on Lisa Montgomery's case and urged the district court to leave Mrs. Montgomery's legal team in place.[940] Ms. Henry explained that her office is a small office and that she has a full caseload in addition to her work on Mrs. Montgomery's case.[941] She

expressed that it was never her intent to be lead counsel in this case.[942] Ms. Nouri specifically informed the court that Ms. Blegen was "the premier writer" and that "it would be devastating to lose her from the case."[943]

In the July 12, 2013 hearing, counsel reminded the district court that the court's past removal of Mrs. Montgomery's lawyers had caused her great mental anguish.[a] Upon hearing of Mrs. Montgomery strong preference that her team remain intact, the court stated, "I don't know. And, you know, I realize the less I say the better … But it's not up to Lisa Montgomery. She's not paying the bills."[944] The Judge went on to say, "I don't see the entitlement to that kind of representation."[945]

The district court issued an Order on July 18, 2013.[946] The district court described the response submitted by counsel for Mrs. Montgomery as a "less than conciliatory challenge to any cost control measures by the court" and as

---

[a] No. 14-2725, Entry ID 4177969, Attachment D. "Now I have a team of women lawyers that I am very comfortable with. They have taken the time to get to know me and my family and I feel trusting of them. Each of them has visited me and I understand that they each have different roles in my case. Because I am comfortable with my lawyers, I am able to discuss things with them that I really never talked to anyone much about before. Things about sexual abuse . . . I do not want the judge to remove any of my lawyers from my case. My lawyers tell me that they work very well together, and I am very happy to finally have a team of lawyers who like each other and all work together. If the court were to take any of my lawyers away, I would be frightened. I count on each of them to handle this case for me. My life is in their hands"); *id*. . Entry ID 4177969 Attachment M.

"inappropriately and unnecessarily argumentative."[947] The Order advised CJA counsel representing Mrs. Montgomery "that 25% will be withheld from all CJA vouchers as a cost control mechanism until the case is concluded before the district court."[948] In addition, the district court capped the total CJA fees in the case.[949] Neither Ms. Nouri nor Ms. Blegen challenged the Order.[950] Up to the district court's removal of Ms. Blegen, counsels' fees were well below the cap.[951] On September 5, 2013 Counsel filed a Petition for Writ of Mandamus to this court regarding the district court's refusal to reassign the case.[952]

### 5. The district court denies the motion to stay and supplements the record.

On September 5, 2013, Counsel filed a motion to stay proceedings in the district court while the writ was pending in this court.[953] Five days later, the district court filed an Order supplementing the record on his denial of the Motion to Reassign.[954] In that Order Judge Fenner recorded some of his memory of the events including:

1) That when Mr. Conrad called the Court on April 20, 2006 Mr. Conrad informed the court that David Owen "had difficulties with their *pro hac vice* sponsored co-counsel, Ms. Judy Clarke." "The issue was not further discussed on the phone call" before Mr. Owen and Mr. Conrad came to chambers;[955]



Appellate Case: 17-1716 Page: 306 Date Filed: 11/01/2017 Entry ID: 4596229

2) Owen and Conrad "discussed with me the difficulties they were having with Ms. Clarke."[956] The court did not provide any additional information as to what the "difficulties" were;

3) That the court recalls that in a discussion with the court Ms. Hunt agreed with the removal of Ms. Clarke and then subsequently changed her mind;[957]

4) That the court decided to remove Ms. Clarke because Mr. Owen and Mr. Conrad complained "they could not continue to work with her;"[958]

5) That the court has no memory of the conversation off the record at the April 25, 2006 in chambers conference;[959]

6) That the *ex parte*, unrecorded conference with Mr. Conrad and Mr. Owen involved "issues with Susan Hunt" and that the court, based on what was said (which is not specified) scheduled the May 3, 2006 conference;[960]

7) That the court, based on Mr. Conrad and Mr. Owens' representations (still unspecified) determined that the conflict between counsel was "irreconcilable."[961]

For the first time, in the Order Supplementing Order Denying Motion to Reassign, the court indicated that Mrs. Montgomery's counsel had opportunity

to question the court regarding the removal of Ms. Clarke. The court referred to the May 6th hearing as Mrs. Montgomery's "opportunity to inquire" as to the court's memory of the events.[962] The record refutes this. The court designated the proceeding an "oral argument" in its notice setting the hearing.[a] Ms. Henry did not directly ask questions of the court, who was not under oath and who was, to the contrary, presiding over an oral argument of counsel. Even were that hearing to have been counsel's "opportunity to inquire" as the court later characterized it, counsel had no way to obligate the court to answer, and indeed the judge did not answer counsel's implied questions as to his specific memory of that which was said to make him remove Ms. Clarke as shown by this exchange:

> Ms. Henry: [Judge Maughmer] has no specific memory of anything that Mr. Conrad said to you. Again, it's another individual who doesn't have a specific memory other than he was in the room and that there was a general concern about breakdowns, but he doesn't remember what that general concern was; and, again, it's our position you're a federal district court judge, you're not going to remove the most successful capital defense lawyer in this country simply because she's not from here.
>
> Judge Fenner: Well, I understand you think that I made the wrong decision.[963]

[a] Motion to Expand the Record, Attachment 3 – *CM/ECF Notice of Oral Argument.*

When Mrs. Henry discussed the need for discovery as to the cause of the exigency in removing Ms. Clarke, the court did not provide any answer:

> Ms. Henry: Judge, what we're saying is that we think somebody said something to you to cause you to make that decision without calling her in and without calling the client in and having a hearing like you did with Susan Hunt and David Owen.
>
> The court: I didn't really see it as her decision to make. I saw it as my decision to make.[a]

On September 24, 2013, the district court denied Mrs. Montgomery's motion to stay proceedings. This court denied the petition for writ of mandamus on October 17, 2013.

### 6. The district court compels trial counsel to provide affidavits to the government and grants discovery to trial counsel.

On December 10, 2013, the district court granted the government's motion to compel trial counsel to produce affidavits "to the Government in response to the claims raised by Movant in her §2255 motion."[964] Trial counsel filed a motion for reconsideration that the district court denied on January 17, 2014.[965] The court gave trial counsel until June to produce the court-ordered affidavits.[966] On May 30, 2014, trial counsel filed a motion for extension of time to file the affidavits and a motion for return of their trial files. The court

---

[a] D.E. 53, p. 30 (Ms. Henry was referencing the May 8, 2006 ex parte, unrecorded hearing where the court determined Ms. Hunt should move to withdraw. *See* Vol. 2, p. 416, *Hunt Testimony*).



Appellate Case: 17-1716 Page: 309 Date Filed: 11/01/2017 Entry ID: 4596229

held a motion hearing on trial counsels' motion on June 2, 2014[967] and granted the extension and return of trial counsels' files.[968]

On June 4, 2014, trial counsel moved for production of the tape recording and for transcription of the interview conducted of trial counsel by 2255 counsel.[969] In that motion, trial counsel referenced the March 12, 2013 interview recorded by 2255 counsel through the notes and declaration of investigator Chris Armstrong.[970] Trial counsel averred that "[a]t the time of the interview, current Counsel for Mrs. Montgomery requested permission to audio record the interview, and undersigned counsel agreed to that request."[971] 2255 Counsel had not requested permission to audiotape Mr. Duchardt, Mr. Duchardt did not give such permission, and, in fact, no one audio taped the interview with Mr. Duchardt.[a] On June 6, 2014, 2255 counsel shipped Mr. Duchardt and Mr. O'Connor's original files to them.[972] On June 11, Mr. Duchardt withdrew his motion for production of the tape recording of the interview.[973]

In June 2014, Mr. Duchardt and Mr. O'Connor filed a "Request for Detailed Clarification of Order Regarding Implied Waiver of Privileges."[974] In

---

[a] Mr. Armstrong and counsel Amy Harwell both took detailed notes of the interview; Mr. Armstrong relied on his own memory and notes to complete his declaration, using Ms. Harwell's notes as corroboration; it is against policy of the FPD of Middle Tennessee to record conversations with witnesses (Vol. 4, p. 913-14, *Armstrong Testimony*).

that document, Mr. Duchardt reflected that he perceived the court order to involve "preparation of [an] all-encompassing response to Mrs. Montgomery's petition . . . that [would] put former counsel into the position of having to do the work of the government, a Herculean task, requiring overwhelming factual and legal research and writing."[975] Counsel asked the district court for authorization to interview FPD investigator Ron Ninemire, Dr. Robert Fucetola (expert neuropsychologist retained by the defense at trial but who did not testify), along with other members of the FPD staff.[976] On June 16, 2014 Mrs. Montgomery filed suggestions in opposition to Mr. Duchardt's request, noting the need for additional time to fully respond.[977] Mrs. Montgomery opposed the motion on grounds that "Mr. Duchardt does not claim a failed memory on his part, or on the part of Mr. O'Connor. Rather . . . Mr. Duchardt seeks to interview witnesses in an effort to affirmatively attack Mrs. Montgomery's §2255 claims."[978] The district court entered an Order on June 16, 2014, finding:

> Nothing should be more important to a lawyer than his or her reputation for honesty and capable representation of the interests of their clients to the best of their ability. When a lawyer's representation is challenged as being less than honest and/or less than capable based upon the lawyer's lack of integrity, ability or effort, the lawyer should not be silenced or handicapped in defending their reputation. A former client waives attorney-client privilege to the extent necessary for a lawyer accused of ineffective assistance to respond fully to the allegations against them. In a difficult and complex case, such as any death penalty case, it is only reasonable that a lawyer might find it

> necessary to consult with some or all of their defense team to fully and adequately respond to allegations against them.[979]

fMrs. Montgomery filed an emergency motion to stay the Order in the district court, requesting a stay of the discovery order so that Mrs. Montgomery could seek review in this court.[980] The following day the district court denied the motion to stay.[981]

On June 20, 2014, this court stayed the district court's Order pending review of that writ.[982] On July 11, this court denied the writ.[983] Mrs. Montgomery then sought a protective order in the district court, asking that she be allowed to review counsels' affidavits prior to them being disclosed to the government so that she might interpose any objections and seek redactions.[984] In that Motion, Mrs. Montgomery highlighted that government's position in this court in opposing Mrs. Montgomery's writ, had included the argument that Mrs. Montgomery did not need a writ to protect her interests as she could seek redaction of trial counsel's affidavits in the district court.[985] On July 30, the district court denied Mrs. Montgomery's renewed motion for a protective order.[986]

**7. The district court removes Ms. Blegen as counsel for Mrs. Montgomery.**



Appellate Case: 17-1716 Page: 312 Date Filed: 11/01/2017 Entry ID: 4596229

When counsel filed Mrs. Montgomery's second writ (regarding the district court's grant of discovery to trial counsel) on Friday June 27, 2014 at 4p.m,[987] Counsel provided a courtesy copy of the writ to the district court by email.[988] The following Monday morning, June 30, 2014, at 9:07 a.m., the district court *sua sponte* issued an Order commanding Christine Blegen to "file a notice of withdrawal no later than July 28, 2014."[989] The stated purpose for the order was to control public-funded representation.[990] Six hours later, at 2:45 p.m., Ms. Blegen filed an *ex parte* motion to vacate the district court's order.[991] The district court denied the motion to vacate on July 15.[992] Counsel filed a motion to stay in order to present this court with a writ.[993] On July 22, 2014, counsel filed a third writ in this court regarding the trial court's removal of counsel.[994] On July 24, this court requested a response from the district court.[995] The district court responded on July 25, noting that the court had long been concerned about cost-containment, listing the amount paid counsel up to the date of the order for Ms. Blegen to withdraw.

In the Response, the district court emphasized counsel's litigation in this court – recounting that additional "activity" had transpired in the case since the attorneys had submitted vouchers for payment: "Notably, this is the third writ sought by Movant with Movant's second writ having been denied just two weeks

ago on July 11, 2014."[996] The district court also accused counsel of misrepresenting facts to this court:

> Furthermore, to suggest that Susan Hunt moved to withdraw at my behest because she urged reconsideration of the removal of Judy Clark is untrue, a misrepresentation to this Court, and refuted by the record relating to that decision. In my discussion with Susan Hunt relating to difficulties she was having going forward as counsel for Movant after Judy Clarke had been removed, Ms. Hunt advised me that she could not continue to work with the Federal Public Defender assigned to the case and that if anyone should be replaced, it should be her. To suggest that the decision to grant Ms. Hunt's request to withdraw was some form of retaliation is a totally false accusation . . . counsel's representations to this Court that Susan Hunt was somehow sanctioned or retaliated against for suggesting as an option that Judy Clarke might be brought back into the case is false and a misrepresentation to this Court.[a]

The district court's accusation against counsel did not explain the court's decision to remove Ms. Hunt over/against the FPD when both moved to withdraw and did not even reflect that the FPD had also moved to withdraw.[b]

---

[a] No. 14-2725, Entry ID 4179320, p. 4; *but see*, Vol. 2, p. 417, *Hunt Testimony* (acknowledging Exhibit 99 as letter from San Diego Defender as document she presented to the court requesting appointment of the SDFPD as co-counsel so that she and Ms. Clarke could continue to represent Mrs. Montgomery with the case funded through the SDFPD); *Id*. at p. 419 (indicating that she was awaiting in chambers meeting to find out who the court would "get rid of"); *Id*. (Hunt removed from the case; "I was told to withdraw, so I did").
[b] Exhibit 68, *May 3, 2006 Transcript*, at p. 21-22 (the Court reflects that "David and Ray represented . . . David did not feel that he would be able to at this point represent Miss Montgomery in the case. Basically my sense was that David and Ray were saying when we met on Monday that they needed out and now you are saying you need out"); *Id*. at p. 22 (reflecting that David Owen had come to the Court in prior meeting and said could not work with Susan Hunt); *Id*. at p. 27



Appellate Case: 17-1716 Page: 314 Date Filed: 11/01/2017 Entry ID: 4596229

This court denied Mrs. Montgomery's writ on August 13, 2014 and on August 20, 2014 the district court removed Christine Blegen as counsel for Mrs. Montgomery.[997]

**8. The district court grants an evidentiary hearing and sets the matter for hearing expeditiously.**

The Government filed its Suggestions in Opposition to Mrs. Montgomery's Motion on January 2, 2015. Mrs. Montgomery filed a Traverse on September 1, 2015[998] and a Request for Discovery on September 3, 2015.[999] On September 22, 2015, the court issued a show cause order for the government to show why it had failed to respond to Mrs. Montgomery's discovery request.[1000] On October 5, 2015, the government filed its response asking for additional time to respond to the Motion for Discovery.[1001] The court denied the motion for discovery on December 21, 2015, in the same order, the court denied relief as to 15 claims but set 8 claims (including many subparts) for evidentiary hearing.[1002]

On December 29, 2015, the court emailed the parties proposing that the hearing begin on April 4, 2016.[1003] On January 27, 2016 at the parties' request, the district court held a scheduling conference.[1004] At the hearing, counsel

---

(David Owen stating that "in the best interest of the client, best interest of proceeding in this case through to trial in a timely fashion that it would be best for our office [FPD] to get off [the case]"); *Id*. at p. 26.

explained that several of the already identified expert witnesses were unavailable until fall and suggested that the earliest counsel could be ready to go forward was September.[1005] The court ultimately set the matter for October 31, 2016.[1006] The court ordered the parties to file exhibit and witness lists thirty days prior to the hearing and to simultaneously identify exhibits to which the parties might stipulate.[1007]

The parties complied with the court's Order and met on September 12, 2016, agreeing to the stipulated admission of 139 exhibits and Mrs. Montgomery's counsel provided the government a proposed witness list/order.[1008] The parties agreed that FPD investigator Ron Ninemire, Dr. DiAnne Bradford, and investigator Phil Thompson were unavailable as witnesses and the court accepted that agreement.[1009] The parties crafted two evidentiary stipulations in lieu of testimony, which the court accepted as Exhibit 78 and 79.[1010] The government did not object to Mrs. Montgomery's proposed witness list or move pretrial to limit or exclude the testimony of any of Mrs. Montgomery's witnesses.[1011]

**9. The district court limits the hearing.**

Despite the parties' pre-hearing agreement as to the admission and order of testimony, the district court limited Mrs. Montgomery's proof during the



Appellate Case: 17-1716 Page: 316 Date Filed: 11/01/2017 Entry ID: 4596229

hearing and then admonished counsel for failing to anticipate that the proof would be cut short.[a]

#### a. The district court limits the testimony of Mrs. Montgomery's expert witnesses.

Despite the parties' pre-trial discussions regarding witnesses and stipulations,[1012] the government objected to the presentation of the testimony of two of Mrs. Montgomery's expert witnesses.[b] In each instance, both with regard to expert clinical social worker, Jan Vogelsang, and to forensic neuropsychiatrist, Dr. George Woods, the government complained that the testimony was needlessly effective.[1013] With regard to Ms. Vogelsang, the government was both complimentary of her work and also sought to limit its impact on the court:

> Mr. KETCHMARK: Your Honor, if I might, it's not really an objection. It's more of a – we did stipulate to her original report and supplement. I would note the original report is 184 pages. The PowerPoint is also – there's objection to a stipulation of the PowerPoint. **We're not contesting the information** that she

[a] Vol. 4, p. 1490, *Government's Objection to Vogelsang Testimony* (Characterizing her PowerPoint as "all sourced back"); Vol. 4, p. 1492, *Court's Ruling* (Limiting Ms. Vogelsang's proposed 3 hour testimony to 1 hour); Vol. 4, p. 180 8-09, *Objection to Dr. George Woods Testimony as Cumulative and Admonishment by the Court to "Skip Over What Was Said."*

[b] Vol. 6, p. 1490, *Government's Objection to Vogelsang Testimony* (Characterizing her PowerPoint as "all sourced back"); Vol. 6, p. 1492, *Court's Ruling on Objection* (Limiting Ms. Vogelsang's proposed 3 hour testimony to 1 hour); Vol. 4, p. 180 8-09, *Objection to Dr. George Woods Testimony as Cumulative and Admonishment by the Court to "Skip Over What Was Said.*



Appellate Case: 17-1716 Page: 317 Date Filed: 11/01/2017 Entry ID: 4596229

> was able to compile and put together in the biuosocialpsych (sic) history here. I don't that we need to go through ad nauseam the PowerPoint because it's all sourced back, and I think they did an excellent job of providing the Court with a roadmap of the information in the 184 pages and then digesting it down with these source attachments here, and so I just think this is cumulative of stuff that we haven't objected to coming in, and I just don't know that we need to do this and go through the two-hundred page PowerPoint in this fashion.[1014]

Ms. Vogelsang's PowerPoint was prepared in anticipation of her testimony: as she explained, "there has to be a way at some point to condense [the information gleaned from the social history investigation] and pull it together, and so for this case I created visual aids; and, again, it's an efficient way of bringing out the most important points that you found when you were conducting the assessment."[1015] The PowerPoint was not prepared in lieu of her testimony.[1016] Despite counsel's explanation to the court that the PowerPoint was an attempt to synthesize the information upon which Ms. Vogelsang's expert opinions were based, and the court's duty to not only receive the information but also to assess its potential impact on a reasonable juror, the court limited the proposed three hour testimony to one hour.[a] Counsel objected to the limitation of

---

[a]At the point where the Court cut Ms. Vogelsang's testimony short, counsel indicated the testimony would require an additional three hours. The Court granted Counsel one additional hour "with your presentation of giving me a good

Mrs. Montgomery's proof under the 5th, 6th, 8th, and 14th Amendments to the United States Constitution.[1017] The court repeated, "Do it in an hour."[1018]

Virtually the same scenario unfolded with regard to the expert testimony of Dr. George Woods, a neuropsychiatrist. As Dr. Woods prepared to outline for the court the findings of other experts which were significant to his findings and diagnosis, the government objected.[1019] The court instructed Dr. Woods, "Doctor, you understand I've heard the testimony of these experts, so if you can just kind of skip over specifically what was said and have the slides up and the slides are before me and Dr. Woods can give his conclusions."[1020]

### b. The district court excludes expert testimony.

Mid-trial, shortly after 3 pm on Friday November 4, the government objected to Mrs. Montgomery's introduction of the testimony of Professor Lawrence Fox.[1021] The government's objection was to the subject of Mr. Fox's testimony: "they basically want him to opine on ethical issues."[1022] Counsel for Mrs. Montgomery explained, "we have brought to the court an expert in legal

understanding of, in summary fashion, how Ms. Vogelsang would have presented all of the information contained in her report and the slides that you have" (Vol. 6, p. 1492, *Ruling of the Court*).



Appellate Case: 17-1716 Page: 319 Date Filed: 11/01/2017 Entry ID: 4596229

ethics. He will not be testifying to the court in regards to black letter law. Obviously the court knows that. But we are trying to provide the court with expert opinion regarding the rules of professional responsibility and the ethics governing the conduct of lawyers, specifically as to the issue that the court listed on page 2 of your memorandum to us regarding the things we were to address at this hearing."[a]

Without regard to Professor Fox's experience and the precedent of other Federal Courts accepting his expert testimony as to ethical issues,[b] the district

---

[a] Vol. 5, p. 1305, *Argument of Counsel*; *see also*, D.E. 173, p. 18 (granting an evidentiary hearing including on whether Mr. Duchardt's announcement at the April 3rd hearing of the pseudocyesis defense and the Tommy defense created a disqualifying conflict of interest).

[b] *See e.g*., *Christeson v. Roper*, 135 S.Ct. 891, 892 (2015) (reflecting the court's acceptance of legal ethics expert's opinion, referring to Professor Fox); *Christeson v. Griffith*, 845 F.3d 1239 (January 18, 2017) (same); *U.S. Bank National Association v. Verizon Communications Inc., et al.,* United States District Court, Northern District of Texas, Dallas Division, C.A. No. 10-CV-1842-G (Under Seal); *Warrior Sport, Inc., v. Dickinson Wright, PLLC*, United States District Court, Eastern District of Michigan, Southern Division, Case No. 09-12102 (Under Seal); *Federal Deposit Insurance Corporation v. Icard, Merrill, Cullis, Timm, Duren & Ginsburg, P.A., et al.,* United States District Court, Middle District of Florida, Tampa Division, Case No. 8:11-CV-283-1t-33-MAP; *Mary Bucksbaum Scanlan v. Marshall Eisenberg, et al*., United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:09-cv-05026; *Ferguson, et al. v. Stout, et al*., Circuit Court of the 11th Judicial Circuit and for Miami-Dade County, Florida, Case No. 08-09767-CA-40; *In re: Go Fig, et al.; Strauss, Trustee v. Helfrey, Neiers & Jones, P.C*., United States District Court, Eastern District of Missouri, Eastern Division, Case No. 08-40116-705, Chapter 7.



Appellate Case: 17-1716 Page: 320 Date Filed: 11/01/2017 Entry ID: 4596229

court excluded Professor Fox's testimony.[1023] The court ruled, "I think judging the ethics of an attorney is kind of like determining attorney's fees. I don't think I need an expert to tell me what is ethical behavior by an attorney and what isn't."[1024] Counsel objected to the exclusion of Professor Fox's testimony under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[1025]

### c. The district court chastises counsel for failing to anticipate the exclusion of Professor Fox.

Following the unforeseen exclusion of Professor Fox's testimony at 3:15 on a Friday afternoon, the district court chastised counsel for not having more witnesses ready to put on the stand.[1026] The court had warned counsel pre-trial that the court expected to work full days and that counsel should have witnesses available to fill the court's time.[1027] Unavoidably, the hearing was delayed on the first day when Lead Counsel, Lisa Nouri's only sibling died unexpectedly. Ms. Nouri was informed of her brother's death at the afternoon recess and was unable to continue for the afternoon.[1028] The court recessed the proceedings out of respect for Ms. Nouri's loss.[1029] The following day, counsel for Mrs. Montgomery wrongly anticipated that the government would cross examine each witness and only prepared for the presentation of eight witnesses.[1030] When counsel realized that the proof was proceeding much more quickly than



Appellate Case: 17-1716 Page: 321 Date Filed: 11/01/2017 Entry ID: 4596229

anticipated (the government did not cross examine 3 of the witnesses, and asked only minimal questions of the remaining 5), counsel apologized to the court:

**Ms. Henry**: Your Honor, at this time I have to apologize to the Court. I mis - - I mistimed today. Erin Garman, who was our next witness, who was a witness who was going to have to travel eight hours round trip today for what we anticipated to be testimony at the end of the day. Given the way things moved and what I thought was going to be a longer day, I told her to come on Thursday. All of our next witnesses, which are very lengthy tomorrow, and we may go longer tomorrow, are flying in. We don't have any local witnesses available, and I very much apologize to the Court. It's 100 percent my responsibility.

**The Court**: That it is. And there was some discussion of this, and I think there was recognition on your part when you gave notice that movant might need some additional time, that you did realize that oftentimes things move faster in this court, and I do try to keep things on track.

**Ms. Henry**: Your Honor, the subject matter of our witnesses got cut today in ways that I didn't anticipate, so their testimony would have been much longer. So I apologize for that.

**The Court**: Well, I mean, you know, there's no point in arguing things with you, but I don't know much of anything was cut today.

**Ms. Henry**: We edited based on objections.

**The Court**: All right. Well, I don't like it and I don't want it to happen again. You know, you get people her. I don't care how long they've got to travel. I don't care if you've got to put them up overnight. Things oftentimes, more often than not, move faster than counsel anticipate and, you never know what the extent of cross-examination of your witnesses are going to be, but it has not been extensive to this point, and so you need to take that into consideration as well.

**Ms. Henry**: Yes.

**The Court**: And you need to be prepared if there is not extensive cooperation to have your witnesses ready to go.

**Ms. Henry**: I do apologize and it is 100 percent my fault, Your Honor, and I apologize.[1031]

Ms. Nouri's brother's wake was scheduled for November 4.[1032] On November 3, the court informed counsel that the court intended to conclude by 4:00pm so that Ms. Nouri could attend the wake.[a] Accordingly, counsel planned witness availability based on the court's stated schedule.[1033] Indeed, as the hearing was proceeding much quicker than counsel had anticipated and scheduled, counsel arranged for Professor Fox to fly to Kansas City out of order so to insure that counsel did not run out of proof before the court adjourned.[1034] When the court unexpectedly excluded Professor Fox's testimony as Professor Fox was walking to the witness stand slightly after 3:15pm, counsel was unable

[a] Recognizing that Ms. Nouri's brother's wake required lead counsel to leave court at 3:30 or 3:45, the court indicated "I wonder if you could arrange your evidence tomorrow so that we could go until about four o'clock to try to minimize the amount of time that Ms. Nouri might need to miss and also maybe arrange your witnesses so that does not present any more of a problem with Ms. Nouri being able to be apprised of the testimony or being brought up to date as to what took place . . . we won't go past four o'clock unless you all request that we do that for the sake of a witness" (Vol. 4, p. 1070).



Appellate Case: 17-1716 Page: 323 Date Filed: 11/01/2017 Entry ID: 4596229

to provide another witness for the court. The transcript of the court's exchange with counsel demonstrates the court's ire:

> Ms. Harwell: I do then have the unenviable task of telling the Court that we anticipated about an hour testimony from Professor Fox who we had fly here from Philly last night to be prepared to fill the Court's time until the time the Court had told us. This leaves us short witnesses at this point. We have a lot of people flying in on Sunday to be prepared for all of next week, but at this moment -
>
> The Court: So you're telling me that once again you're out of witnesses?
>
> Ms. Harwell: We have Professor Fox but other than Professor Fox, we are out of witnesses.
>
> The Court: Well, this is becoming an intolerable habit. I mean, I don't know how - - what I can do to impress upon you the importance for us to be able to move this. I mean, I know it's not the only case you've got, it's not the only case they've got, it's not the only case I've got.
>
> Ms. Harwell: Certainly. And we had a witness here prepared to work for the Court this afternoon. I did not anticipate the government's motion. They did not notify use of any problem with Professor Fox's report prior to testimony starting this afternoon.
>
> The Court: I understand that. But I would have hoped given the difficulties that we've already had this week with the scheduling of witnesses, that you could err on the side of having more testimony available than less testimony available.
>
> Ms. Harwell: And we thought we had. I apologize to the court.
>
> The Court: So that's it for the day? You've got no more witnesses? . . . The last thing I said to you yesterday was don't run out of

witnesses at three o'clock, and here we are at 3:15 after I just came back. We took a break. And you're out of witnesses again.

Ms. Henry: And if we had been provided with the government's motion to exclude our witness, Your Honor, we would have been aware.

The Court: I understand we could have taken it up earlier, but I would think that a person might anticipate that there would be a challenge to that kind of testimony.

Ms. Henry: He's been accepted in 12 other courts.

The Court: Pardon?

Ms. Henry: He's been accepted in 12 other courts. We did not anticipate this objection.

The Court: Okay. Well - -

Ms. Henry: And our objection to the exclusion is under the Fifth, Sixth, Eighth, and Fourteenth amendments.

The Court: See you Monday morning at nine o'clock.[1035]

**E. The proof at hearing entitles Mrs. Montgomery to relief.**

The proof presented at the evidentiary hearing entitles Mrs. Montgomery to relief. Mrs. Montgomery presented historical proof tracking the progress of the case through the various trial teams, noting the break downs of effective representation. She presented proof to support her claim that trial counsel failed to effectively choose, develop, and present expert proof – including from the experts who testified at trial. She presented proof that trial counsel failed to



Appellate Case: 17-1716 Page: 325 Date Filed: 11/01/2017 Entry ID: 4596229

investigate and develop critical lay witness testimony which would have provided valuable mitigation. Finally, Mrs. Montgomery presented testimony from a multi-disciplinary team of evaluators, each providing distinct though complimentary expertise. She presented expert testimony from a clinical social worker, a psychologist whose expertise is in trauma, an expert in psychometric testing, a neurologist, a psychopharmacologist, and a neuropsychiatrist --- each of whom reflected, from his/her specialty, the indelible effect of familial/genetic predisposition, trauma, and brain dysfunction on Mrs. Montgomery's functioning. The proof from Mrs. Montgomery's presentation demonstrated the wealth of compelling mitigation that was available to trial counsel had counsel followed up on the red flags present in their file.

### 1. Mrs. Montgomery established the standards for effective capital representation and identifies the red flags ignored by the trial team.

As a foundation for the proof in support of her claims of ineffective assistance of counsel, Mrs. Montgomery presented expert testimony regarding the standards and practices in capital litigation in 2007. Russ Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects, testified regarding standards and practices in capital mitigation and Marc Bookman, Director of the Atlantic Center for Capital Representation testified regarding standards governing attorney representation.[1036]



Appellate Case: 17-1716 Page: 326 Date Filed: 11/01/2017 Entry ID: 4596229

The district court accepted Mr. Stetler as an expert in the field of capital mitigation investigation and Mr. Bookman as an expert in the attorney standard of care in capital cases.[1037] Mr. Stetler testified that at the time of Mrs. Montgomery's arrest in 2004 through the time of her trial in 2007, the 2003 ABA Guidelines for the Appointment and Performance of Defense counsel in Death Penalty Cases reflected the not only to the ABA's assessment of that which should be done in each case, but also the prevailing norms in the field of capital defense.[1038] Mr. Stetler explained, the ABA "wanted to say that these were really to be followed and [the Guidelines] were not aspirational. They were a reflection of the practices at the time."[1039] As support, Mr. Stetler cited the court to the *Wiggins* decision from 1989, which applied the 1989 ABA Guidelines to an assessment of Mr. Wiggin's counsel's performance, and the *Rompilla* decision from 2005 which acknowledged the 2003 Guidelines.[1040] Mr. Stetler cited the more recent case of *Padilla v. Kentucky*, 559 U.S. 356, 367-68 (2010) as setting forth that the court has always looked the ABA standards "because there's really nothing comparable. There's no alternative to these ABA standards and guidelines. They really are probably the best articulation of what the consensus is that's developed in these areas." Mr. Bookman wholeheartedly agreed with Mr. Stetler, adding that the Supplemental Guidelines for the mitigation function published in 2008 reflect the prevailing

professional norms during the relevant time period 2004-2007. He noted, that the Guidelines “clearly cit[e] lots of material from way before those publication dates.” The published reports were, according to Mr. Bookman and Mr. Stetler, simply a reflection of the best practices of people who were in the death penalty community.[1041]

The district court accepted that the ABA Guidelines reflect the prevailing professional norms. The court found, “I think you’ve established that the ABA Guidelines are a barometer to be used to determine professional norms.”[1042]

Mr. Stetler discussed that a veritable laundry list of Supreme Court cases dealing with mitigation relate to counsel’s failure to uncover mental illness in the pretrial mitigation investigation.[1043] The attorneys in *Wiggins*, *Williams*, *Rompilla*, *Porter*, and *Sears* all consulted with mental health experts, “but in all of those cases it was the depth of the mental health inquiry that was ultimately at issue and the fact that the experts had not been provided all of the relevant data for a more accurate and reliable determination.”[1044]

In Mr. Stetler’s opinion as a mitigation investigation expert, investigation is the cornerstone of a reliable mental health assessment and diagnosis. “I think what we have learned over the years is that the mitigation investigation is really a critical foundation for consolation with experts. It helps you figure out what kinds of experts, not just random experts, but what sort of specific experts are



Appellate Case: 17-1716 Page: 328 Date Filed: 11/01/2017 Entry ID: 4596229

appropriate to the needs of your case in terms of what you have learned about your client in the social history investigation; and, in turn, the expert's opinion is only going to be as reliable as that underlying investigation."[1045] Mr. Stetler testified that the more "hard data from convergent sources – from interviews, from documentary evidence, contemporaneous evidence that was created during the . . . developmental years of the client" one can provide to an expert, "that's going to make for more credible and more reliable mental health opinions."[1046]

Mr. Stetler testified that the effectiveness of the expert analysis is also affected by the attorney's formulation of the referral question, which is, in turn, related to the quality of the mitigation investigation.[1047] "Mitigation is as broad as can be. So there is no need for a mental health expert testifying in a penalty phase to force a diagnosis, to kind of categorize the client in terms of particular, you know, insurance categories . . . It's a very, very broad opportunity to say, How does this person function? What are the things which influence[d] the individual's development? What are the multigenerational influences? What was encoded in the DNA on both sides of the family? As well as, What were the learned behaviors from the patterns of behavior that occurred on both sides of the family."[1048]

Mr. Stetler educated the court on the robust empirical literature on how jurors look at expert testimony. He referred the court to the publications by the



Appellate Case: 17-1716 Page: 329 Date Filed: 11/01/2017 Entry ID: 4596229

Capital Jury Project, which began in 1991 and was initially funded by the National Science Foundation.[1049] Mr. Stetler testified that the findings of the Project are that "it is very dangerous for capital defense lawyers to rely on isolated experts . . . its not going to work for you in mitigation."[1050] The Project has reported that expert testimony must be "very very well corroborated by lay witnesses, historical experts, people who knew the client in the pre-offense years who can talk about how particular events affected the individual's functioning and shaped their adult life."[1051]

Mr. Stetler emphasized that record collection is a critical part of capital mitigation investigation. He quoted the descriptive social work narrative from *Williams v. Taylor*, 529 U.S. 362, 397 n. 19 (2000) noting that the Supreme Court's use of the report reflects how critical collection of the documentary evidence is. "It's a vivid example of the importance of records. And it also to me illustrates a story that you couldn't get just from interviewing the defendant and the family members . . . That vivid outside report was absolutely critical."[1052]

Mr. Stetler testified that in his opinion, the mitigation investigation conducted in Mrs. Montgomery's case did not comport with prevailing professional norms in 2004-2007.[1053] In so doing, Mr. Stetler specified that he reviewed the 8th Circuit opinion in the case, the penalty phase testimony, the

declarations of the trial team, as well as the declarations regarding the interview with Mr. Duchardt and Mr. Ninemire by habeas counsel. He also reviewed a biopsychosocial report by social worker Jan Vogelsang and the supporting documentation thereto as well as the reports of the government's experts.[1054] Mr. Stetler pointed to specific problems in the composition of the team, beginning with excessive turn-over in who compromised the team.[1055] Mr. Stetler explained, "We talk about multiple interviews [of mitigation witnesses] but we contemplate multiple interviews by the same person. In other words, if I wanted to develop rapport with a witness, I'm going to see that witness repeatedly until we have sufficient trust established and I can see the witness at a time when on one else is home or we can go down to the corner diner and sit quietly so that it really is a one-on-one interview. I want to do that multiple times until we have absolute real ability to share with one another."[1056] In this case, however, "the turnover meant that you had what is often referred to as witness fatigue, a brand new mitigation specialist asking the same questions about the same issues. [The witness begins to express] I've already told somebody else about this. I'm uncomfortable getting back into those discussions."[1057] Mr. Stetler indicated that the creation of such witness fatigue makes it more difficult to obtain information.[1058]



Appellate Case: 17-1716 Page: 331 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Stetler testified that team turn-over is a particularly difficult problem when the team is faced with a mentally ill client. He explained that a mentally ill client is one "who's got difficulties sorting out, Who can I trust? Who can I believe? What's real here? . . . who's got issues of abandonment from past relationship and uncertainties about whether anybody out there in the world is trustworthy. So think it's particularly hard given those issues."[1059] Turnover in the defense team creates a barrier to disclosure for the client, as well as the witnesses, "it's another reason to unsure of whether the person I'm talking to is even going to be here the next time. So why should I agonize and pour out all these things they want to discuss when I'm really not certain who's going to be around."[1060]

Mr. Bookman addressed a second problem which can present itself when working with a mentally ill client. Mr. Bookman explained that when dealing with a very mentally ill or traumatized person, the attorney must use great care to make sure not to suggest facts to that client, as such clients are more susceptible to false memory and/or suggestion than other people.[1061] He noted that "Mr. Dillingham's notes sort of suggest that initially [Mrs. Montgomery] was in that sort of state. So you want to be careful not to make suggestions."[1062]

Mr. Stetler acknowledge that the ultimate trial team met the technical requirements for an appropriately constituted capital defense team under the



Appellate Case: 17-1716 Page: 332 Date Filed: 11/01/2017 Entry ID: 4596229

Guidelines.[1063] "[O]n paper it looked as though it had the appropriate staffing. It had in fact three lawyers . . . It had a fact investigator from the Federal Defender office, and it had a mitigation specialist, but I think what was missing was teamwork itself."[1064] Mr. Stetler was critical of the "team's" functioning: "they were not functioning as a team and instead were kind of functioning as independent . . . entities."[1065]

Mr. Bookman elaborated on this theme, """I'm hesitant to call this a team, and I'll tell you why . . . This team didn't – they didn't meet. They didn't exchange – they didn't exchange ideas. They didn't – you know, when tasks were delegated, they didn't synthesize those tasks into a whole."[1066] Mr. Bookman addressed Mr. Duchardt's statement to §2255 counsel that he is "not a big meetings guy,"[1067] opining that Mr. Duchardt's position is "very contrary to the standard of care, obviously."[1068] When questioned about the fact that Mr. Duchardt's and Mr. O'Connor's billing records reflect that the "team" met as a team for less than ten hours over the course of 16 months, Mr. Bookman said, "I'm hesitant – I don't want to put a limit on it. It's not like a team can't – they didn't meet for ten hours, and ten hours I can say is not enough, but 20, 40, 60. This team never really met. They never discussed things." Mr. Bookman concluded, "[I]t can't just end at delegation because everybody has – everyday

has their insights about what they've done. If you don't bring those insights together and discuss them as a team, it's wasted."[1069]

Mr. Stetler identified gender issues as impeding the trial team's "cultural competence."[1070] Mr. Stetler explained that a team obtains cultural competence through representative composition: "we can't change who we are. I'm always going to be an old white man; but if I've got a client from another race, another gender, another culture, I'm going to recommend that we include in their team diversity so that we'll have personnel who will help bridge those human connections."[1071] In Mrs. Montgomery's case, Mr. Stetler pointed to the loss of women team members as something which crippled the ultimate trial team. "I think because of the loss of the precious women on the team, two women lawyers and two women mitigation specialists, that's another sort of clock there [between the team and the client]."[1072] Mr. Stetler acknowledge the two women on the trial team, but pointed out that each of them had limitations placed on their involvement: Ms. Waller was not allowed to visit with Mrs. Montgomery much, and Ms. Elliot was not trained in capital defense work and was not experienced in mitigation. "So there was not [a woman member of the team] who was seeing the client and observing on a regular basis."[1073] Mr. Stetler pointed out that observation of the client is an important function of the team, "because [providing information on the client's functioning and mental health

in jail] is something which is important to be able to convey to the experts who ultimately are selected."[1074]

Mr. Stetler reflected that over the course of the various teams' representation of Mrs. Montgomery, a lot of records were collected, "but I'm not sure they understood what to do with them." The trial team possessed a world of information in the records passed to them from the Clarke/Hunt/Owen team, but in Mr. Stetler's assessment, "they ended up being, you know, filed away but never integrated into the kind of comprehensive life story that you want to put together as you're selecting your experts for potential testimony and defining the referral questions that the experts should address."[1075]

Mr. Stetler selected several failings by the trial team to use during his testimony as examples of how the team failed to comply with the prevailing professional norms of 2004.[1076] Mr. Stetler began with reference to Exhibit 1-199, the 2002 Notes of Dr. Sallye Wilkinson from marriage counseling with Mr. and Mrs. Montgomery. Mr. Stetler highlighted that Dr. Wilkinson assigned a GAF (global assessment of functioning) score to Mrs. Montgomery of 48, indicating the GAF had fallen from the previous year's score of 59.[1077] Mr. Stetler indicated that "that's a snapshot of what was going on with [Mrs. Montgomery's] life at that time. It's a sorta of benchmark, if you will. So, if it was – if her score was 59 one year and it dropped to 48 the next, where was it



Appellate Case: 17-1716 Page: 335 Date Filed: 11/01/2017 Entry ID: 4596229

by the time of the capital defense? You could want to go back to Dr. Wilkinson and say, How did you choose these numbers? What were the symptoms that you were seeing that led you to the two different equivalent of assessment functioning scores?"[1078],[a] Mr. Stetler explained that the Guidelines and prevailing norms of capital practice indicate the team include "someone who is qualified by training and experience to screen for mental disorders" – that person should have been able to recognize the "GAF" score and know its purpose and that which it reflected so to signal the team that follow up with Dr. Wilkinson was needed.[1079]

Mr. Stetler reflected that Dani Waller's report of her interview with David Kidwell contained a glaring red flag that the trial team failed to investigate.[1080] According to Mr. Stetler, Mr. Kidwell's report "changes the trauma triggering event from a single perpetrator to serial rape by multiple men. So it's a whole area that needs to be investigated, developed. You are going to need to bring in somebody who can – you are going to need to bring in a specialist in trauma who is going to be able to elicit more information than any of us can get from a client, somebody who's got the experience to elicit that information and to

[a] §2255 counsel did interview Dr. Wilkinson and her testimony (including her response to those questions) was accepted as Exhibit 1-289, *Wilkinson Declaration*.

assess its credibility, to make behavioral observations about how the client experiences the reports that she will ultimately give on this area."[1081] Mr. Stetler set forth the investigation the trial team should have perceived was necessary from the red flag of this memo:

> You want to go find out who were these other men? What were the circumstances? What was the mother doing? How long did this go on? So there's a whole area of investigation that is absolutely critical.[1082]

Mr. Stetler also indicated that additional interviews of Mr. Kidwell would be required to suss out whether Mr. Kidwell had more details about Lisa's disclosure.[1083],[a] Mr. Bookman echoed Mr. Stetler with respect to Mr. Kidwell's information, "a full investigation is absolutely necessary." Mr. Bookman described that he was "shocked" when he saw the "two pages or whatever it was that Mr. Kidwell testified. He could have testified for half a day on just his observations of Lisa and the interactions between Lisa and her mother and Lisa and her stepfather. That statement alone, I mean, once you did a full investigation of it, you know, that's not a two page bit of testimony. That's a significant trauma."[b]

---

[a] §2255 Counsel did re-interview Mr. Kidwell who provided more detail about Lisa's disclosure. His testimony was accepted by declaration. Exhibit 10, *Kidwell Declaration*.

[b] Mr. Kidwell's testimony is from p. 1823 to 1826 of the trial transcript; D.E. 327, indicates that Mr. Kidwell was on the stand for 4 minutes.

Mr. Stetler discussed the concept of "double-edged evidence" with reference to a memo of Ms. Waller and Mr. Ninemire's interview of Mrs. Montgomery's children (Exhibit 130, *Memo from Dani Waller re: Interview of Family*).[1084] Mr. Stetler pointed to Ms. Waller's admonition to the team "it's going to come out that Lisa was 'mean' to these kids at certain points . . . we believe the government will present Lisa as a bad mother, producing a horrible family life and possible present her as an abusive mother too."[1085] Mr. Stetler opined, "So that's the kind of a classic example of what's sometimes called double-edged information. On the one hand the children know their mother and they have important feelings for her that you want to potentially convey to a jury or other decision-makers, but it's not a simple world where everything is black or white. There are shades of grey. And you have to then unpack and say, We want to learn more about whatever these children will say about the negatives in the home."[1086] Mr. Stetler explain that a competent defense team would recognize that "[i]t's not surprising that a person with this background is not a perfect mother, and, you know, you need to find out exactly what was going on . . . It's all part of the story, and you can't make snap decisions about whether this is a good witness or a bad witness without knowing everything that the witness has to convey."[1087] Mr. Stetler testified that it is not the standard of care/practice to sweep such bad information under the rug:

> I think when the Supreme Court say you have to conduct a thorough investigation, my dictionary tell me that thorough means complete and meticulous. So it isn't a question of quantity, how many witnesses did we call at the penalty proceeding, how many did we talk to, but what's the quality of the investigation? Did we get all the relevant facts? Did we follow up when we had that paragraph from Mr. Kidwell that said, you know, sexual rape by multiple men? Did we follow up when she may be portrayed as a bad mother because Chelsea is saying she was mean? Well, what does that mean? We need all those things to be unearthed so that we can make decisions about how best to present the mitigation in a way that it's fully accurate.[1088]

Mr. Bookman explained that when there is bad evidence, such as the proof Mrs. Montgomery was abusive to her children, "you have to investigate it and then you have to – you have to – for lack of a better word, use it in your case. If it's in the case, then you've got to confront it."[1089] Mr. Bookman explained with reference to *Sears v. Upton*, that it is contrary to the standard of care in capital cases to present a false picture to the jury regarding the client.[1090] As Mr. Bookman explained the lesson of *Sears*, "the lawyers tried to make Sears more likable, and, consequently, he was less understandable." Mr. Bookman analogized that Mrs. Montgomery's lawyers made the same mistake as Mr. Sears' counsel, "not just with [evidence regarding her treatment of her] children, but with the diagnosis."[1091]

Mr. Stetler discussed Exhibit 1-291, the genogram which was begun by social worker Bret Dillingham in Kansas prior to Mrs. Montgomery's removal to Missouri.[1092] Mr. Stetler noted that Mr. Dillingham's notes at the side of the



Appellate Case: 17-1716 Page: 339 Date Filed: 11/01/2017 Entry ID: 4596229

genogram reflect that "custody fight over children are repeating intense family pattern."[1093] Mr. Stetler reflected that had he inherited such a notation in a family from a previous team, the notation would prompt him to "want to know as much as possible about [that]. What prompted him to make that observation? Who else in the family has had issues with child custody? You want to elicit all of that in the course of your investigation."[1094]

> And we know that when he refers to family patterns, we know that there are patterns of behavior, sometimes called family scripts, that are learned and repeated because other family members are models; and so just as we have some things that are encoded in our DNA, we have other things that we have learned from our parents and other family members and they learn from earlier generations. So you want to develop what are those family patterns and how did that affect Lisa Montgomery?[1095]

Mr. Stetler also discussed the follow-up which he would have expected to see based on Ms. Waller's memo of her interview with Diane Mattingly (Exhibit 1-24) where Ms. Mattingly discussed her life as a young child in Judy Shaughnessy's home, including being raped by one of Judy's lovers.[1096] Mr. Stetler characterized the memo as being of a "rather extraordinary interview . . . this is another bombshell interview, because it suggests that – again, it kind of connects back to that interview with David Kidwell suggesting that there are multiple men being brought into this unsafe environment where these young girls are subjected to sexual assault."[1097] Mr. Stetler acknowledged that there

were many barriers to Ms. Mattingly disclosing more information than the "bombshell" she already divulged "she's pouring out this very, very difficult stuff, and she's say at some point she goes blank. She doesn't remember. Well, there's more there. You are going to need to explore it in detail. You're going to need to build up that trust that will enable her to share more with you."[a]

Mr. Stetler testified that in addition to not working together as a functioning team, the main problem of the trial team was failure to synthesize the information they did obtain. Mr. Stetler discussed the role of the mitigation specialist, Dani Waller, on the trial team. "[M]y sense from her declaration is that she viewed her work much more as performing the specific assignments that she received from the Federal Public Defender Office. She wasn't getting much direction or no direction from Mr. Duchardt and she barely knew that Mr. O'Connor was in the case. So this is just an example of how this team is not really functioning in the way that's contemplated when we talk about team work."[1098] Mr. Stetler explained that the standard of care would have been to provide the experts "a very, very detailed chronological distillation of all the information that we have collected rather than, you know – I'm sure thousands

---

[a] Vol. 1, p. 126, *Stetler Testimony*; §2255 Counsel spent extensive time with Ms. Mattingly and Ms. Mattingly testified to additional information at the Hearing which she would have been willing to say at trial, had trial counsel prepared her to discuss such (Vol. 6, p. 1153, *Mattingly Testimony*).



Appellate Case: 17-1716 Page: 341 Date Filed: 11/01/2017 Entry ID: 4596229

of pages of information but not digested in any way that could be – could be effectively presented to a jury."[1099] Mr. Stetler explained that it is difficult for an expert witness to find the supporting data in unsynthesized original documents: "it's a needle in the haystack . . . Experts need some sense of why particular records maybe important . . . You don't want to just have a data dump of raw material. You want to select the information that is going to be – you think is going to be most useful to help the expert understand the hypothesis you generated."[1100] Compliance with this professional norm is also effective for cost control.[1101]

Mr. Bookman testified that the responsibility for the choice of experts and the development of expert testimony falls to the attorney.[1102] Mr. Bookman was critical of Mr. Duchardt's decision to retain Drs. Fucetola and Dr. Gur prior to even meeting with Mrs. Montgomery, explaining that standard of care in the capital community requires the development of a biopsychosocial history prior to the selection of experts. "The standard of care is that you should be almost complete with your biopsychosocial history . . . it's also common sense."[1103] Mr. Bookman explained that any diagnosis requires history to be reliable.[1104]

Mr. Stetler testified that the social history which grows from the mitigation investigation provides a framework for the presentation of the mitigation case.[1105] "And you needed somebody to be able to provide that



Appellate Case: 17-1716 Page: 342 Date Filed: 11/01/2017 Entry ID: 4596229

framework to the jury, somebody – you needed both lay witnesses like Mr. Kidwell, like Diane to come and tell those vivid stories in detail, but then you also needed somebody to put together all the pieces in some sort of framework that would help the jury understand what had happened in Ms. Montgomery's life."[1106] He explained that this is so, because of the quantity of information which becomes available once a mitigation investigation is conducted according to professional norms: "you can't give anyone, whether it's an expert or a juror, a data dump of tens of thousands of pages of material. You've got to put that material into a framework that makes sense."[1107]

Mr. Bookman and Mr. Stetler were critical of the attorney decision to present an NGRI defense in this case. Mr. Stetler explained that the Capital Jury Project has shown that jurors have a skepticism of mental health defenses in general and NGRI in particular. Mr. Stetler would not say that such a defense could never be justified under the prevailing norms, but said, "if it's a well-document, credible presentation, [it would still be] something you have to think about very carefully, particularly in a death penalty case." Mr. Bookman noted that by pleading NGRI "you certainly are opening your client up to examinations [which would not otherwise occur]."[1108] He "totally agree[d]" with the proposition that before pleading NGRI it is incumbent upon the lawyer to make sure that he has an expert witness who is qualified and capable of

rending a diagnosis that's consistent with the definition of insanity in the jurisdiction.[1109] Mr. Bookman cited the Capital Jury Project literature regarding the impact of pleading NGRI when that defense is ill-conceived: "a failed innocence defense is a very likely death sentence, because it gives the appearance that a defendant has tried to fool the jury, has tried to get over it and is not willing to accept responsibility for what he or she has done."[1110] Mr. Bookman was critical of the Montgomery team, "it looks to me as if they came up with their theory then picked an expert . . . you have some insights into your case, but you don't settle concretely on your decision and then go get an expert that will say that."[1111]

Mr. Bookman critiqued the selection of the trial theory, explaining that the defense team had to know that many of the elements of their theory would be disproved.[1112] "[W]hen you have such concrete evidence that it's not true, that pseudocyesis was not true, and I'm talking about the leading emails and creating a false Hotmail address, and there's at least the research into C-sections. When you're an experienced litigator and you've dealt with insanity cases before, you know what to look for and you know what is going to be a big problem . . . Those three facts alone would alert any effective trial lawyer to say, This isn't going to work and I'm going to lose my credibility in front of this jury. And as far as I can tell, that's what happened."[1113]

Mr. Bookman discussed the attorney's obligation to pursue plea negotiations in capital cases.[1114] With regard to the trial team's attempts to negotiate a settlement in light of "the Tommy defense," while still investigating "the Tommy Defense," Mr. Bookman opined, "Obviously it's never a good idea to do that, and certainly it isn't good under those circumstances for any number of reasons . . . not only is it below professional standards but you're going to lose all your credibility as well in a situation where your credibility is crucial."[1115] Mr. Bookman was critical of the defense team's timing of the plea negotiations as not comporting with standard of care: "you would never come to the government with a theory that someone else did this or someone else was involved or you should seek to prosecute someone else unless you did a full investigation and had real evidence to support it."[1116]

Mr. Bookman testified competent plea negotiations would have included reference to the fact that every woman convicted of this particular type of homicide, other than Mrs. Montgomery, has received a life sentence.[1117] He testified that Movant's Exhibit 131, accurately reflects research conducted into other such crimes in the United States where women killed pregnant women and took their babies.[1118] Mrs. Montgomery is the only woman on death row in the United States for the crime of fetal abduction/maternal homicide.[1119] According to Mr. Bookman, Mr. Duchardt's defense that Mrs. Montgomery



Appellate Case: 17-1716 Page: 345 Date Filed: 11/01/2017 Entry ID: 4596229

never told him she wanted to plead guilty is "meaningless . . . in fact it's contrary to the guidelines and it's contrary to my experience" in that generally an attorney introduces the topic and opens the way for the client to become amenable.[1120]

Mr. Bookman stressed that the only strategic decisions in a capital case are those made after obtaining all available information. "Again, this is more common sense than anything. But capital – any decision made in a capital case can only be strategic if the team has all of the available information at its disposal . . .We have prevailing norms and we follow those prevailing norms because those prevailing norms have uniformly worked most of the time. That's why they're prevailing norms. And so to make a strategic decision you have to have all the information and have discussed it."[1121]

**2. Testimony by capital defense practitioners confirmed that the standards presented by the expert witnesses are the standard of practice in representation of capital clients.**

Corroborating the expert testimony, Mrs. Montgomery presented the testimony of capital defense practitioners regarding standard practice in the field of capital defense. Mrs. Montgomery presented two nationally recognized capital attorneys, Dick Burr[a] and Judy Clarke,[1122] along with mitigation and

---

[a] At the time of the trial in this matter, Dick Burr was federal death penalty resource counsel, under contract with the Administrative Office of the US Courts

investigation specialists each of whom discussed how the ABA standards set out by Mr. Bookman and Mr. Stetler are standard practice.

Ms. Clarke testified that it is a professional norm for capital teams to be "client centered."[1123] Ms. Clarke explained that, "as a member of a capital team, we're stepping into that client's world. They're not stepping into our world,"[1124] so the focus is appropriately on that client's point of view. The focus is "on the client, being focused on the issues that have affected the client's life, figure how it is to walk in that client's shoes, and understand where that client is coming from." She explained that teams which fail to adhere to this professional norm run a risk that "they're going to miss the client. They're going to miss the narrative of the client's life. They're going to miss understanding who that client is and what brought that client to their doorsteps."[1125] She explained that she encourages the teams she works with to follow the ABA Guidelines exhortation to be "observational caretakers" which she explained means "to observe without judgment and to observe as objectively as we can so we can figure out the right experts to hire and know the right story to tell."[1126]

---

(Vol. 3, p. 527, *Burr Testimony*). In addition to having served as counsel for Timothy McVeigh, Mr. Burr has represented many capital defendants in both state and federal trials (Vol. 3, p. 524-30, *Burr Testimony*). The Government stipulated to Mr. Burr's qualifications and the Court accepted Mr. Burr as an expert in capital litigation (Vol.3, p. 530, *Stipulation by the Government & Order of the Court*).



Appellate Case: 17-1716 Page: 347 Date Filed: 11/01/2017 Entry ID: 4596229

In assessing how to tell the client's story, Ms. Clarke emphasized the importance of considering the attorney's credibility with the fact-finder. She criticized the idea that it would be acceptable to try to front-load mitigation information through a NGRI plea, saying the NGRI burden is "a virtually impossible standard."[1127] The danger of attempting to front load mitigation through an unsuccessful NGRI defense is, according to Ms. Clarke, "[c]omplete loss of credibility. I mean, the important thing in a capital case . . . is integrating the first phase with the second phase. Some lawyers before they really think about what it takes to prove an insanity case will say, Well, that's front loading mental health, but what it's doing is giving the jury an opportunity to reject your mental health presentation because it's an insanity defense that's planning or preparation, those kinds of things, just sort of intuitively juries say, I'm not going insanity. You've lost your credibility in the penalty phase."[1128]

The capital defense practitioners discussed the importance of team meetings. Ms. Clarke emphasized the efficiency of getting all the team in one room: "it's more effective. It's a much more competent, effective representation; and if you don't have this kind of interaction, you would have a team member going off on a tangent that becomes a distraction and is not good for the client."[1129] Multiple witnesses testified that the standard practice to have team meetings is because team meetings allow for decisions to be

cooperative.[1130] Ms. Clarke emphasized that meetings allow for collaboration: "you want everybody engaged in the work of the case. If somebody's collecting records and they hear a conversation at the team meeting about the importance of a particular symptom that they're seeing the client and the person could say, 'Oh, we've got --- this record just came in and maybe we better follow up with this other record. So everybody at different skill levels brings something to the case."[1131] Ms. Clarke and Ms. Garvey testified that at team meetings, the goal is to figure out who is doing what and what needs to be followed up.[1132] "Collaboration is key. It can be agonizing but ultimately the product is better," Ms. Clarke testified.[1133]

The capital practitioners discussed the paramount importance of record collection. Ms. Clarke explained, "records speak volumes . . . records speak volumes that family members either are reluctant to reveal or have forgotten, and they're just a wonderful way to develop the narrative of a person's life and put it in context."[1134] Ms. Clarke explained that "it's really important to get a multigenerational collection of records . . . you're going to go after birth, death, school, military, employment, all medical obviously, any hospitalizations, Social Security earnings, Social Security disability. I mean, there are just a variety of records in all of our lives that help tell the story about us."[1135]

Ms. Garvey[a] and Mr. Freedman[b] explained how critical it is for the team to be purposeful about selecting documents to send to experts. Ms. Garvey testified that it is standard practice for teams to review documents before sending them to experts to make sure confidential attorney client work product is not included.[1136] Mr. Freedman testified that often that job falls to him, explaining that review is also necessary for cost-containment and efficiency: "I would know everything that's going and we would have chron'd – I would have chron'd those records so I would know the details of those records, and I would be able to say, You know, these 600 pages are completely irrelevant for this kind of expert. Let's not pay them to look at them, and things like that. You

---

[a] Debra Garvey is a mitigation specialist and licensed attorney who serves as the chief investigator at the Office of the Federal Public Defender for the Central District of California (Vol. 3, p. 718-20, *Garvey Testimony*). She testified that her Defender loans her to Federal Defender's offices around the country to assist with capital cases. When she works on a case, she has four or five other members of her staff who work with/under her on those cases (*id*. at p. 723).

[b] David Freedman is a post-doctoral fellow at the University of California, Los Angeles Semel Institute (Vol. 4, p. 811, *Freedman Testimony*). He has a Ph.D. from Columbia University in psychiatric epidemiology and a masters from Harvard in public health (*id*.). He teaches classes on Criminal Law and Mental Illness at Columbia Law School (*id*.). He worked with Judy Clarke as part of the Capital Resource Project as a mitigation specialist starting in 2002 and continues to contract and consult with the Project (*id*., at 818). The government objected to the testimony of Dr. Freedman on the grounds that Mrs. Montgomery had not provided notice of his expert testimony (*id*. at 825); Mrs. Montgomery responded that Dr. Freedman was a fact, not expert, witness. The district court, found 'he seems pretty qualified to me" (*id.* at 826).



Appellate Case: 17-1716 Page: 350 Date Filed: 11/01/2017 Entry ID: 4596229

don't just send your case file off to an expert and say, "tell me what you see. I mean, you have to help guide them a little bit."[1137]

### 3. Mrs. Montgomery presents the history of the disruption of counsel including its cause and effects on the representation.

#### a. Because the Hunt/Owen team was "floundering," it sought help from Mr. Burr and Ms. Clarke.

Federal Death Penalty Resource Counsel Dick Burr testified to the history of resource counsel's attempts to assist with the representation of Mrs. Montgomery. Mr. Burr testified that the goal of resource counsel is to increase quality of representation of capital defendants while keeping costs low, in response to the critique by the Spencer Report.[1138] Resource counsel help develop strategy, find resources, help draft pleadings, meet with the defense team, and provide back up for the court appointed "learned counsel."[1139] He testified that the Office of Defender services requires federal public defenders to consult with the resource counsel project (hereafter '"The Project" or "Resource Counsel") prior to recommending counsel to the district court because of the experience of the counsel in the project – and their resulting perspective on the work of other attorneys.[1140] However some defenders, including Ray Conrad of the Western District of Missouri, do not follow the

policy of Defender Services.[a] Mr. Burr testified that by the time counsel is appointed, The Project reaches out to counsel to offer assistance; the practice of The Project is for Resource Counsel to "become regular member of the defense team."[1141]

Mr. Burr testified that The Project did not regard the attorney appointed as "learned counsel" for Mrs. Montgomery to be qualified for that role. Mr. Burr had worked with Susan Hunt prior to her appointment in the Montgomery case and reflected, "I would characterize Susan as learning counsel rather than learned."[1142] He recalled that he asked Judy Clarke to consult on the case after Susan Hunt and David Owen began "floundering" around July of 2005.[1143] Mr. Burr explained, "the team seemed not to get it. They seemed to be stuck on what I think were sort of silly issues of guilt/innocence, that somebody else actually did this."[1144] Mr. Burr indicated the team's misdirection was the result of failure to understand Mrs. Montgomery's symptomology. Mrs. Montgomery's sense that someone else was with her when she committed the crime was, according to Mr. Burr, "more point towards an aspect or feature of mental illness than it is about actually witnesses or actual co-perpetrator status,

---

[a] Vol. 3, p. 536, 45 *Burr Testimony*; Vol. 3, *Order of the Court* ("You've established that Mr. Conrad rarely, if ever, followed the policy recommendation of the Defender Service Committee as adopted by the Judicial Conference").

and that's how I saw this and yet they wouldn't see it that way."[1145] Mr. Burr testified that he tried to caution the team about the potential danger of contaminating Mrs. Montgomery's memory if they continued to probe her about the crime: "I said, Look, if you do that with her, you will be simply stepping into what could be a delusion that she has about what went on, and you don't want to promote that with her. . . . [you need to] begin to understand [her sensation that someone else was present] at least in the context of the information you're gathering about her mental illness or mental illnesses and about the traumatic events that defined her life."[1146] Mr. Burr indicated he tried to steer the team toward understanding that trauma produces brain dysfunction and "away from treating the possibility of someone else's involvement as real."[1147]

Because Mr. Burr was able to observe the team's lack of direction,[1148] he introduced Judy Clarke to the team. Mr. Burr indicated he hoped that Ms. Clarke would be able to help the team understand that which he had failed to teach them.[1149] "Judy was in the Federal Defender system and had access to really good death penalty folk within the Federal Defender system at that point" including Ms. Garvey and Mr. Freedman.[1150]

Ms. Clarke testified that the team was not focused appropriately. "My memory of that [first] meeting was being concerned that the lawyers had a



Appellate Case: 17-1716 Page: 353 Date Filed: 11/01/2017 Entry ID: 4596229

feeling for the government's case but not for Lisa Montgomery, that there was a – they talked about her in relatively hostile terms which – and not the warmth that you would like to think that your legal team would think of the client. So I remember that and thinking well, there's got to be some work turning that. The team has to start to feel Lisa Montgomery, not the crime."[1151]

Ms. Clarke was invited to join the team in fall 2005. She, Susan Hunt, and David Owen had a discussion to establish her role on the team. "I actually had a specific conversation because I had seen confusion over what does a consultant do? Are you counsel of record for a specific part of the case or what is it you're looking at? I didn't – I've never thought that somebody could go in for a specific part of the case because of the team concept, but I did sit down with David Owen and Susan Hunt and say, What would you like from me? What is it you expect me to do? They said we want you to be as involved in all parts of the case as you can be."[1152]

**b. Ms. Clarke and her team made progress in the six months they were on the case.**

Movant presented testimony that while Ms. Clarke was assisting, the team made considerable progress. Records collection increased immediately.[1153] Ms. Clarke brought in Deb Garvey from the FPD in Los Angeles and they did a "blanket" of releases.[1154] Ms. Garvey and Mr. Freedman reviewed the



Appellate Case: 17-1716 Page: 354 Date Filed: 11/01/2017 Entry ID: 4596229

documents obtained and began making compilations of issues, things that the team needed to investigate and consider, and lists of symptoms.[1155]

**c. The team began developing rapport with Mrs. Montgomery and noted her symptoms of impairment.**

Ms. Clarke made progress with developing the team's rapport with Mrs. Montgomery. As Mr. Burr explained, Ms. Clarke's presence on the team stabilized the team's relationship with Mrs. Montgomery. "What I perceived was that Judy Clarke developed a relationship with her that was much more stabilizing for her than any relationship she had with anybody else on the defense team, but she was fragile."[1156]

Not only did Ms. Clarke develop her own relationship with Mrs. Montgomery, she trained other members of the team (and brought in people already skilled) to observe Mrs. Montgomery's symptoms: "the starting point would be, This is what I'm seeing, What's everybody else seeing? So we encouraged a report of – this would be called symptoms. We didn't know what it is a symptom of, but it is a symptom of something going on. So we would encourage everybody to recognize it and observe it and report it."[1157] Ms. Clarke described some of what she observed with Mrs. Montgomery: "She talked a lot. She talked fast. She was periodically tearful. She talked of suicide. She was a mess and you could just feel it in the interview memos. The team,

when I came into the case, was very concerned about having her discuss the crime, and I think she was unable to do that, and there's something going on when that is happening." Ms. Clarke clarified that she was describing Mrs. Montgomery as having "pressured speech" and reflected, "there's probably some mood disorder in there that could be the reflection of some kind of psychotic thinking. You know, you don't know. Something is happening when somebody cannot – you couldn't redirect her conversation often, even as much as you might try on the days where she was that pressured in relating to you."[1158] Ms. Clarke described symptoms of dissociation and psychosis: "I can remember a couple of times, and I have no good, clear memory of what the conversation or the context was, but that she would go off; and by going off, I mean stare out into space in the middle of a conversation and then come back"[1159]

Ms. Clarke recognized Mrs. Montgomery's behavior as significant, "I don't know exactly what's going on, but you know something is going on, and some of the Ph.D.'s and M.D.'s would call it dissociation. I don't know whether she was hearing something that was talking to her. She was never able to say where she went, and it wouldn't' be long period of time. It wasn't like catatonia or something, but there was a going off into space sometimes . . . Big picture, of course – this is pretty much a big picture memory for me – is that she described



Appellate Case: 17-1716 Page: 356 Date Filed: 11/01/2017 Entry ID: 4596229

at one point either seeing shadows or figures sitting on her bed in her cell, which would not have been real. She described interactions with her children that were more magical than real, you know . . . So, yes, I thought Lisa was psychotic and unable to distinguish sometimes reality from nonreality"[1160] Ms. Clarke explained that in capital practice symptom observation leads the "observational caretakers" (i.e. counsel) to the right experts and the right story to tell the jury.[1161]

### d. Under Ms. Clarke's leadership, record collection "skyrocketed."

While Ms. Clarke was on the team, the team began a massive project of record collection.[1162] Ms. Hunt described that after Ms. Clarke brought Ms. Garvey into the case, record collection "skyrocketed. We got a lot more."[1163] Ms. Hunt explained that Mr. Ninemire had told the team that he could only access driver's license records, which limited the information available to the team.[1164] According to Ms. Hunt, Ms. Garvey's office (FPD) "had access to a lot more databased in their public defender's office here."[1165] Ms. Clarke explained that Ms. Garvey sent releases, "you just blanket a lot of things. I think she probably got all the vitals, birth, death certificates. And then I believe she began to review records as well and recommend other records to get."[1166] Ms. Clarke explained that upon her entry into the case the team's immediate need



Appellate Case: 17-1716 Page: 357 Date Filed: 11/01/2017 Entry ID: 4596229

was for record collection, "and talking about how to pull important information out of records and get a chronology going. I think David Freedman may have started a chronology of the records so he could sort of help the team look at mental health symptoms."[1167]

Though the graph of record collection[1168] clearly demonstrates that the Clarke/Hunt/Owen team collected almost all the documents contained in the trial team database, Ms. Garvey testified that record collection was not close to complete when Ms. Clarke was kicked off the case.[1169] She testified that document collection was not nearly complete, because '[t]he work of document collection is really layered, and so one document often will tip you off to the existence, it's a clue or cue that there are more documents to be sought that are relevant to the client, client's life story, and that comes in that constant flow of information that's coming in. You have to follow up on what you see and what you become aware of in the documents themselves as well when you begin to talk to witnesses, you're aware of new information that should be collected in order to complete the picture as best you can."[1170]

Ms. Garvey testified as to some of the work remaining on the team's "to-do" list when Ms. Clark, Ms. Garvey and Mr. Freedman left the case. Ms. Garvey testified that among the records still left to acquire on the "to-do" list were "Denise Riley at DHS/CPS worker contacted by Wallentini." She testified



Appellate Case: 17-1716 Page: 358 Date Filed: 11/01/2017 Entry ID: 4596229

that Ms. Riley's notes had not been acquired at the time she left the case.[1171] She further testified that among the items left undone on the "to do" list were the ADC records from Deming, New Mexico.[1172]

#### e. Under Ms. Clarke's leadership the team identified a "whole field of red flags."

Mr. Burr testified he worked to help the team understand what to look for as mitigation. While Ms. Rickert was on the case, Ms. Hunt and Mr. Owen asked Mr. Burr to review "about 200 pages of memos of interviews of witnesses . . . it sort of confirmed, as I suspected, that Ms. Montgomery had serious mental illness issues. It wasn't clear at that point what they were, but just in my own experience over the years I developed – I've done a lot of work around mental health in these cases, and it looked to me like there were some aspects of bipolar disorder and maybe even some brain impairment, some temporal lobe impairment because of behaviors that I [have] seen associated with those afflictions. That wasn't a diagnosis by any means, but it was an indication that there were some very, very serious mental illness and brain dysfunction issues."[1173] Mr. Burr tried to help the team appreciate that there were a "whole field of red flags. Just about everybody [Ms. Rickert] talked with a red flag came up for me. Red flags simply mean this is something we've got to look at more deeply and more broadly. We [have] got to get records."[1174]



Appellate Case: 17-1716 Page: 359 Date Filed: 11/01/2017 Entry ID: 4596229

Despite Mr. Burr's help, Ms. Hunt and Mr. Owen – particularly Mr. Owen[1175] -- had trouble with the concept of investigating mitigation: "my sense was that they just – and Susan Hunt said this expressly to me, that they just didn't understand mental illness and could not understand why digging deeper and deeper into records and talking with mitigation witnesses was so important. So they kind of latched on [to] something they were more comfortable with which was somebody else being involved that perhaps might have some responsibility or some degree of responsibility."[1176] Where Ms. Hunt was open to learning, Mr. Owen was resistant.[1177] Mr. Burr admitted that he failed to redirect the team and that he brought Ms. Clarke in, hoping she could succeed where he failed.[1178]

Ms. Clarke testified that under her leadership the team was looking into many red flags. The team had information Ms. Shaughnessy drank during her pregnancy with Lisa, "yes, fetal alcohol syndrome was on the table to be investigated and considered."[1179] By the time Ms. Clarke was removed from the team, the team had developed a working hypothesis around "the relationship between a psychotic disorder, bipolar disorder, and severe trauma, sexually-based trauma. We were trying to head down that path."[1180] The team had begun to investigate Mrs. Montgomery's trauma and to hire experts to assess her neuropsychological functioning.[1181]

**f. Team members qualified to identify and assess symptoms of trauma and mental illness began the process of observation, investigation, and assessment.**

The team observed and documented Mrs. Montgomery's symptoms of complex trauma and engaged an expert to assist in assessment of Mrs. Montgomery's symptomology.

Because of Mrs. Montgomery's trauma history, the team could not rely on Mrs. Montgomery alone as historian. As Mr. Burr testified:

> People who have complex trauma histories, as Ms. Montgomery did, often cannot remember incidents. Some incidents will stand out but many will not, because all of us experience this to some degree. If we've been through something that felt traumatic, the memory for that event dissipates or gets suppressed because its' painful, and so – and yet it can emerge without our knowing it, without our appreciating it. It can come out as something volatile or it could come out as profound paranoia about something or it can come out as suicide. It's almost just an impulsive thing, you know, not consciously happening. The deeper the trauma someone has experienced, the more those sort of time bombs, as they were, are in that person's life and they can explode.
>
> With a person with this sort of history you can't trust what you learned from them totally. You certainly can't believe that you're getting the whole story, and you can't be condiment that that person is going to be there with you in the sense of being mentally and emotionally present and connected to what's going on, either in working up the case or appearing in court, and so those sort of problems were there.[1182]

Mr. Burr explained that gender can play a role in a female client's ability to reveal sexual trauma:

> When the trauma is sexual and perpetrated by males, which it usually is, not always but usually, then the mere presence of a male can trigger



Appellate Case: 17-1716 Page: 361 Date Filed: 11/01/2017 Entry ID: 4596229

> some of those time bombs that I mentioned earlier. Trauma plants time bombs in us. And there are various triggers that can make those things go off, and it triggers a re-experience of the trauma. And, again, that experience is not a conscious thing. It's not something you can call forth or suppress. It's just there. And the mere presence of a male can do that. There's usually greater comfort with females than with males for that reason in a female client. Oftentimes, as well, there can be some trust developed between a woman client and a woman lawyer or mitigation specialist in a way that just can't be developed with a man.[1183]

Ms. Clarke recalled that "this case brought up another layer of complexity because I think the records were showing and our interactions with Lisa showed that she was a victim of sexual abuse, that her step dad had sex with her and then her half brother who became her husband – how that relationship went I'm really vague how it was. It was an unusual relationship – had sex with her before they got married. He had sort of a power relationship over her. But, at any rate, there was a real atmosphere of sexual abuse and Lisa sexualizing relationships with men, so that was something to be concerned about with interactions with Lisa and concerned about getting information from her mom, if her mom had the same kind of history, you know, discussing those kind of very sensitive issues."[1184] Ms. Clarke testified that the team was trying to investigate and develop the "working hypothesis" that Mrs. Montgomery not only was seriously mentally ill but also suffered from "severe trauma, sexually-based trauma."[1185]



Appellate Case: 17-1716 Page: 362 Date Filed: 11/01/2017 Entry ID: 4596229

#### g. Team members qualified to identify and assess symptoms of trauma and mental illness perceived that Mrs. Montgomery's competence was impaired.

At the time Ms. Clarke was removed from the case, the team had serious concerns regarding Mrs. Montgomery's competence to stand trial. Mitigation specialist, Holly Jackson testified to her memory that her investigation led her to discuss with the team her concerns that Mrs. Montgomery "was truly suffering from a major mental illness and that she really couldn't assist rationally with her defense."[1186] Similarly, David Freedman recalled that the team "had a real question as to [Mrs. Montgomery's] competence. We had not tested it yet. We hadn't pushed to see whether there were things we could do that would keep her competent through a trial process, but there were – we had real questions as to whether she was competent to proceed."[1187]

Ms. Jackson and Ms. Hunt testified that concerns about Mrs. Montgomery's competence to stand trial intensified after Ms. Clarke was removed as counsel. Ms. Hunt reflected that Ms. Clarke had been able to gain Mrs. Montgomery's trust which helped to assist counsel: "Lisa Montgomery didn't trust anybody and she really didn't trust lawyers. She'd been let down by lawyers her whole life. She had been abused both sexually, mentally, physically by men her whole life. She had very huge trust issues with anybody. She had gotten to the point where she had trusted Judy Clark and she was beginning to

trust me as far as her legal representation. When Judy was dismissed, she lost all hope. She told me that. She called me crying."[1188] Ms. Jackson was with Mrs. Montgomery after Ms. Clarke was removed as counsel and testified she witnessed "something like I had never really seen before. I mean, she was just inconsolable. She was pretty devastated by Ms. Clarke being removed from the case. She absolutely somehow blamed herself. She felt that she had done something wrong. She was sobbing. She was sort of incoherent. She was sort of inconsolable . . . she was just in compete distress."[1189] She testified that Mrs. Montgomery was too distressed to process information because the loss of Ms. Clarke triggered a trauma reaction.[1190]

**h. The team ruled out the possibility that Tommy Kleiner was present at the crime.**

The Clarke-led team definitively ruled out Tommy Kleiner as a possible accomplice to Mrs. Montgomery. Though Bret Dillingham, the mitigation specialist who interviewed Mrs. Montgomery within days of her arrest testified that Mrs. Montgomery never mentioned the possibility of anyone having been with her at the crime,[1191] by the time Mr. Burr appreciated that the team was "stuck" and reached out to Ms. Clarke for assistance, the idea of an accomplice or alternate suspect – possibly Tommy Kleiner – had emerged.[1192] Perhaps in response to Mr. Owen and Ms. Hunt's fixation on the possibility of Mr.



Appellate Case: 17-1716 Page: 364 Date Filed: 11/01/2017 Entry ID: 4596229

Kleiner's involvement, Ms. Garvey testified that she requested Mr. Kleiner's court records – attempting to amass all of Mr. Kleiner's extensive criminal history.[1193] (Mr. Kleiner's probation officer, Erin Garman, testified that she filed documents reflecting Mr. Kleiner's probation intake on December 16, 2004 with the clerk of court).[1194]

Ms. Jackson and Mr. Freedman both recalled being present when the team discussed the impossibility of Mr. Kleiner having been present at the crime. Ms. Jackson's testimony reflected that the announcement made an impact on her, "I have a vivid memory about Tommy because I remember exploring the possibility that Tommy was involved in the crime itself, and so I just have a vivid memory of hearing at a meeting with David Owen in Kansas City that Tommy was absolutely, impossibly not involved because he was definitely at a meeting with a probation or parole officer for sure at the time of the crime, and I just kind of remember feeling kind of personally disappointed that somebody – the person that we were thinking might be involved had an alibi."[1195] Ms. Jackson specifically recalled that Mr. Owen was the person who related the information about Mr. Kleiner's alibi to her.[1196]

David Freedman's memory corroborated Ms. Jackson's. Mr. Freedman recalled that Mr. Kleiner was ruled out as a possible suspect because he was at his probation officer at the time of the offense.[1197] He recalled that information

being shared openly at a team meeting, recalling "I think some people were disappointed that Tommy had an alibi, but that's the kind of thing you do investigation to figure out, right? It's not that hard to find. Some of the things that you would explore, that was one of the things that we explored and it was not a viable option, and so we moved on to continue the investigation on things that were going to be relevant."[1198]

**i. The team ruled out Dr. Ramachandran as an appropriate defense expert.**

The team began looking into how the symptom of pseudocyesis might play into Mrs. Montgomery's constellation of impairments and ruled out Dr. Ramachandran as an appropriate expert. Ms. Clarke testified she "had done some looking into [pseudocyesis],"[1199] while both Ms. Garvey and Mr. Freedman remembered with specificity that the team had both discussed and moved on from a theory that pseudocyesis – in and of itself – would assist with either a legal defense or presentation of mitigation. Ms. Garvey explained, "I think we were pretty clear that pseudocyesis is a symptom of psychosis. It's not a – there's something else there. That is just one symptom in a package of things that we still needed to unpack."[1200]

Ms. Garvey recalled that Mr. Freedman had been tasked with investigating Dr. Ramachandran and the possible pseudocyesis diagnosis.[1201]



Appellate Case: 17-1716 Page: 366 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Freedman, recalled fulfilling his assignment.[1202] He testified that the idea of pseudocyesis "had come up before I joined the team as an idea,[a] but I think it was assigned to me to figure out whether it was a viable defense or, you know, mitigation presentation."[1203] Mr. Freedman recalled investigating Dr. Ramachandran and reflected, "I don't think his expertise is right for capital case presentation. He's an interesting man, but I mean, his goal is to write popular descriptions of case experiences that he's had or heard of and to bring them to popular life so people see how understand the brain in a popular way, and pseudocyesis was part of that. It's a chapter – or section of a chapter in one of his first books."[1204] Mr. Freedman reflected that pseudocyesis is "not a condition that is terrible helpful. I mean, you know, it's a symptom description. It's not a diagnosis. It's not a life course sort of thing. It's the kind of symptom that comes about in the context of a mental illness."[1205] Mr. Freedman explained that the Clarke-led team was looking for more than the presentation of an isolated symptom: "what we cared about was the mental illness that would have

---

[a] Notably, that pseudocyesis emerged as an idea for inquiry before Freedman began assisting the team is consistent with Mr. Duchardt's characterization of pseudocyesis as being Mr. Owen's idea, *see* §V.B.4., quoting Mr. Duchardt, "Dave never could pronounce that word to save his life, but he came up with that thought from day one." (Exhibit 83, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).

given rise to those symptoms, those symptomatic set of symptoms. The way in which mental illness gets embodied is what we would have cared about, not the name of pseudocyesis. And so he's not really an expert in the underlying broader piece of that."[1206]

#### j. The team began identifying and retaining experts.

Ms. Clarke testified that before the district court removed her from the case, she had begun the process of retaining experts to assist in the evaluation of Mrs. Montgomery for the development of mitigation evidence. The team had a working hypothesis around "the relationship between a psychotic disorder, bipolar disorder, and severe trauma, sexually-based trauma"[1207] and had retained Dr. Judith Herman, a nationally recognized specialist in trauma.[1208] They had retained a neuropsychologist, Dean Delis, to begin conducting testing.[1209] Ms. Clarke had begun consulting with Dr. George Woods, a neuropsychiatrist, and had retained Dr. Werner Spitz a pathologist to look at the autopsy for a possible *Daubert* challenge to Dr. Mary Case's theories.[1210]

Ms. Clarke explained that the standard of care in capital defense is not to rush out and retain experts without investigation. "[I]t's one step at a time. The life history developments such that you know enough to retain a neuropsychologist to do the neuropsych testing and then that testing will lead



Appellate Case: 17-1716 Page: 368 Date Filed: 11/01/2017 Entry ID: 4596229

you in other directions, and we certainly would have been hiring – finding and hiring the right experts for that."[1211]

k. **Mrs. Montgomery was devastated by the loss of Ms. Clarke and the loss further weakened her ability to trust any lawyer.**

After the court removed Ms. Clarke, Mrs. Montgomery was "inconsolable" and "devastated."[1212] Susan Hunt testified that due to her life experience, Mrs. Montgomery had difficulty trusting people – and lawyers in particular.[1213] "She'd been let down by lawyers her whole life. She had been abused both sexually, mentally, physically by men her whole life. She had very huge trust issues with anybody. She had gotten to the point where she had trusted Judy Clarke and she was beginning to trust [Ms. Hunt] as far as her legal representation. When Judy was dismissed, she lost all hope. She told me that. She called me crying."[1214]

Ms. Jackson testified that Mr. Owen "allowed" her to visit with Mrs. Montgomery in the days following Ms. Clarke's dismissal and she observed Mrs. Montgomery's distress.[1215] Mrs. Montgomery expressed that she felt as though she had done something wrong to cause the court to remove Ms. Clarke.[1216] The removal caused Mrs. Montgomery to lose trust in the remainder of the team.[1217] Ms. Jackson believed that Mrs. Montgomery's trauma was "triggered" by the precipitous loss of Ms. Clarke.[1218] After Ms. Jackson



Appellate Case: 17-1716 Page: 369 Date Filed: 11/01/2017 Entry ID: 4596229

consoled Mrs. Montgomery in two visits immediately after Ms. Clarke was removed, Mr. Owen fired Ms. Jackson – refusing her request to say goodbye to Mrs. Montgomery. Mrs. Montgomery, then, never heard from Ms. Jackson again.[1219]

Before Ms. Hunt was removed from the case, she encouraged Mrs. Montgomery to write to the court expressing her feelings about losing Ms. Clarke as her counsel. Mrs. Montgomery's letter was introduced as Exhibit 71. Mrs. Montgomery said:

> Due to a history of problems with lawyers in family courts, I have not trusted lawyers, even the ones appointed to me in this case. I have struggled greatly with being able to trust them. I've already lost several team members without explanation: Anita Burns, one of the first attorneys appointed, and then Lisa Rickert, an investigator. Because of these losses, I have had to struggle with trusting that members of my team would stay after building a relationship with them. When Judy was first appointed, I went through much of the same struggles with her. I have done my utmost to overcome these issues and learn to trust my attorneys again. Of all the lawyers I have had to date, I have felt the most comfortable with Judy . . . And then on April 20, I was looking forward to a much anticipated visit with Judy. Only minutes before the visit I found out she had been removed from my defense team. No explanation was given to me. When I asked what was going on, I feel that information was being withheld from me. Had I done something wrong? I was not aware of any problems with her, either with the rest of my defense team or myself. And so I have had trouble accepting what has happened. I have spent most of this past week in a state of shock. Little things have seemed to overwhelm me. I've had trouble sleeping, yet I don't want to get out of bed to do anything . . . with Judy gone it's difficult to have any confidence in the future of my case. Particularly since the decision to remove her was made without any input from me or any prior knowledge of it by me. Am I to now



Appellate Case: 17-1716 Page: 370 Date Filed: 11/01/2017 Entry ID: 4596229

expect the same thing to happen in any other decision to be made? Removing Judy from my team has been a devastating blow to me . . . Throughout this past week, Susan has shown a genuine concern for how I was feeling about this decision and I appreciate her effort to do so.[1220]

Ms. Hunt presented Mrs. Montgomery's letter to the district court at the May 3, 2006 chambers conference. The court instructed Ms. Hunt to withdraw from the case on May 8, 2006.[1221]

**4. Mrs. Montgomery presented proof that Mr. Owen's lack of awareness, pettiness, and misogyny was the source of the team's problems.**

Mr. Burr reflected that Mr. Owen asserted himself as a controlling figure in the case from the beginning:

> It was very problematic because David had never been involved in a capital case. He did not – I mean, mitigation seems like a simple thing to understand from just the surface. Developing mitigation is extremely complex. It requires interview – people to interview – first of all, to identify, find, and interview life history witnesses, some of whom come from the client herself or himself, many of whom come from other people from looking at records. You know, you find people through a variety of means who had some substantial window into the life of this person. You then begin interviewing them, and sequencing the interviews is important because there are some people who may know more than others, but you may want to know more before you start talking with those people, so sequencing interview is important.
>
> The interviews themselves are very important. You can't just sit down with someday and say, Tell me what you know. You have to know something about the person's relationship with the client, what that might reveal, and you have to ask a lot of very specific questions to help evoke people's memories, because we don't –



Appellate Case: 17-1716 Page: 371 Date Filed: 11/01/2017 Entry ID: 4596229

none of us think in terms of mitigation, you know. We know people and we know them sort of in a – in a Gestalt we have about each other but that's not details, but that Gestalt has come from a myriad of experiences and observations and feelings that arose during experiences.

And so the mitigation investigator's job is to get to those details, that whole mounting of incidents, as it were, that create the Gestalt that person has about the person we're looking at.[1222]

Mr. Burr testified that Mr. Owen never seemed to grasp the concept of mitigation:

> [I]t's not a discredit to Dave [that he never understood mitigation] because he'd never done this work. Interviewing people for mitigation is incredibly different from interviewing people for facts. In fact investigation you are trying to pull information out of people that's very specific, very concrete based on observations, you know, based on things you have perceived or heard, and it's not an accumulation of hundreds and thousands of little experiences that give you an impression about somebody. That's what mitigation is. Fact you are trying to pull information from them that is specific, very concrete, looking at a very limited amount of material. I'm sure Dave knew a lot about that, most lawyers do . . . But, you know, Dave didn't understand mitigation. He understood the concept that there are things in people's lives that provide reason for not putting somebody to death. That's the simple thing to understand. But how you develop those reasons is something he had no understanding about and not much openness to learning about.[1223]

Mr. Burr indicated that Mr. Owen exerted control over the case by controlling the purse strings, "That was sort of his leverage within the team is for any investigator, mitigation specialist, or expert the Federal Defender budget would pay for those folks."[1224] Mr. Owen's control over the team



Appellate Case: 17-1716 Page: 372 Date Filed: 11/01/2017 Entry ID: 4596229

finances became "cumbersome" and "problematic" according to Mr. Burr.[1225] This was so, including during the critical preauthorization time period.

> [B]ecause Dave didn't have the basis of experience to understand why something was necessary. He also kind of micromanaged the mitigation specialist when they were in. Whenever a mitigator was going to interview somebody, it had to be cleared with Dave; and if it was somebody Dave already had some contact with, he didn't see any need for the mitigation specialist to go see them, because he didn't understand that he didn't have the skill to interview a mitigation witness. He thought he did.
>
> So he did a lot of micromanaging that slowed things down, required the mitigation specialist to justify why it was necessary to go see people and see them in a particular order and go back to see them another time, because oftentimes you don't get what you need in one visit. You get what you need if you develop a relationship with a mitigation witness and give them time to start remembering things. So you have to come back again and somethings again and again before people begin to remember those little details that create their impressions about people.[1226]

Ms. Jackson, the mitigation specialist hired by Mr. Owen and Mr. Ninemire while Judy Clarke and Susan Hunt were still on the team, described the issue thusly: "At times I would have difficulty getting approval for travel. Over time I would have more and more resistance with accomplishing the goals set out in the [team] meetings . . . It's generally about multiple interviews. I



Appellate Case: 17-1716 Page: 373 Date Filed: 11/01/2017 Entry ID: 4596229

think there was some lack of understanding as to why people needed to be seen more than once."[1227],[a]

Mr. Owen and Mr. Ninemire created an on-going issue for the team by insisting on Mr. Ninemire continuing a "special relationship" with Mrs. Montgomery. Mr. Burr testified that there was "an on-going discussion" within the team about Mr. Ninemire wanting to play a special role with Mrs. Montgomery where other team members felt it inappropriate that he be the person who would try to elicit her trauma history because he was male and not trained.[1228] Ms. Clarke said when she came on the team "it was described as that [a special relationship]. And very early on I began to talk about the dangers of this sort of isolated or special relationship."[1229] Ms. Clarke attempted to educate the team about how dangerous such a relationship was for the team dynamic, creating opportunities for team splitting and also for loss of client trust.[1230] The issue also arose that Mr. Ninemire was not the right person to be interviewing Mrs. Montgomery about her trauma both because he was a man and untrained.[1231] His lack of experience was further complicated by his attitude; as Ms. Hunt testified, Mr. Ninemire "flat out" told her he "didn't believe in

---

[a] Though perhaps not the only reason for Ms. Rickert's resignation, Ms. Rickert testified that Mr. Owens' speculation that she was having an affair with Mr. Ninemire was the final insult that caused her to resign from the case (Vol. 2, p. 446-47, *Rickert Testimony*).



Appellate Case: 17-1716 Page: 374 Date Filed: 11/01/2017 Entry ID: 4596229

mitigation."[1232] Ms. Hunt also testified that Mr. Ninemire had issues accepting leadership from women and was particularly resentful of any instruction from Ms. Garvey.[1233] Ms. Hunt testified, "I heard him say – and if I heard it once, I heard it ten times, 'I am not going to take any orders from any damn woman.'"[1234]

Mr. Owen was resistant to accepting the expertise of Mr. Freedman. Though Mr. Freedman teaches at Columbia law school and has a Ph.D. in psychiatric epidemiology, Mr. Owen persisted in dismissing Mr. Freedman's contributions. Mr. Freedman's credentials are so impeccable and extensive that the government objected to Mrs. Montgomery calling him an expert without notice[a] -- when in fact he was just a fact witness – and the district court commented on his expertise: "He sounds pretty well qualified to me."[1235] However, despite his impressive and relevant credentials, Mr. Freedman testified that Mr. Owen repeatedly referred to Mr. Freedman as a male nurse.[1236] Mr. Freedman testified, "My experience of it was very much that he was dismissive and would not pay any attention to anything I said."[1237]

---

[a] Vol. 4, p. 825, *Objection of the USA* ("You Honor, if I might, at this point I would just interject. They didn't notice him up as an expert. I think they noticed him up as a fact witness").

Mr. Owen also obstructed document collection. As Ms. Clarke testified, "it was primarily purse strings, as I recall, and lack of desire to get records."[1238] Ms. Hunt was equally clear: after Ms. Clarke was removed, "I was thinking about getting this case back on track. I was very concerned with Judy being gone . . . we had experts that – I don't know if the contracts had actually been sent, but David [Owen] was supposed to get them. They never did get hired. We had mental health experts lined up. There were records that he refused to pay for which we needed and I told him to get."[1239]

In addition to putting procedural obstacles in the way of the development of mitigation evidence, Mr. Owen insisted on maintaining a relationship with Mrs. Montgomery's mother that the team deemed unhelpful to the investigation.[1240] As Ms. Clarke explained, the team wanted a trained mitigation investigator to establish a relationship with Ms. Shaughnessy, "there was a real atmosphere of sexual abuse and Lisa sexualizing relationships with men, so that was something to be concerned about with interactions with Lisa and concerned about getting information from her mom, if her mom had the same kind of history, you know, discussing those kind of very sensitive issues with somebody who's really not trained to sort of listen and get them could, you know, hide the facts."[1241] Ms. Jackson described that, "the team wanted me to begin to engage with [Ms. Shaughnessy] and begin to interview and really kind

of start that sort of sensitive process of beginning to engage with somebody that we believed had signs of real significant trauma and kind of a history of violence and probably alcoholism and just a serious history of mental health issues and trauma, and so that's a delicate and very sensitive issue and we approached it as a team. [She was] a witness you have to take carefully and sensitively . . . I had years of training in . . . trauma and bipolar."[1242] Despite the team's designation that Ms. Jackson was the appropriate person to interview Ms. Shaughnessy, Mr. Owen continued to contact her, "he felt that he had – my understanding was that because he had had contact with her himself that he just automatically somehow was better suited person."[1243] Mr. Owen continued his relationship with Ms. Shaughnessy despite the team's consensus that he should not: Mr. Freedman explained, "he was hindering the investigation by maintaining this relationship and doing it at times when as a team we had agreed he would stop, then he would later disclose that he had continued to have contact without telling anybody and continued to tell her things or not tell her things, all of which was interfering with us getting a mitigation specialist to begin the process of establishing rapport with her to elicit information that was critical to understand Lisa's history."[1244]

Mrs. Montgomery presented proof that Mr. Owen's resistance to working with Ms. Clarke was irrational and likely based in his gender bias. Laine



Appellate Case: 17-1716 Page: 377 Date Filed: 11/01/2017 Entry ID: 4596229

Cardarella, the current Federal Defender for the Western District of Missouri testified that Mr. Owens' problems with women were well known. "[H]e was very hard to work with. He was belligerent. He was misogynistic. He was a bully in every sense of the word."[1245] She elaborated, "He was an angry, angry person. Yes, the more authority he had the more he tended to lord it over us. He would often ask, especially when we first got hired, he asked Anita [Burns] and me, You're not one of those militant female lawyer types, are you? We found that he would ask that after we had done something that he clearly thought was militant female lawyer type behavior."[1246] Ms. Cardarella admitted that her behavior in the office reflected her deference to Mr. Owens' position of authority, because she needed her job, "I sort of swallowed it and said, You know I better not act that way again."[1247]

In response to the proof presented by Mrs. Montgomery, the government asked Mr. Owen if he was misogynistic, bullying, and downright mean to the women in the case. Mr. Owen replied that he was not.[1248] Mr. Owen also denied having any trouble working with women.[1249] To the contrary, Mrs. Montgomery introduced proof that Mr. Owen told Mr. Duchardt that he objected to Ms. Clarke's presence on the team because he found her "emasculating."[1250] Mr. Duchardt found that to say "volumes more about [Mr. Owen] than it did about [Ms. Clarke]."[1251]

Mr. Burr reflected on Mr. Owens' resistance to Ms. Clarke's attempts to teach him about capital defense, commenting that he didn't see the two (Owen and Clarke) as mutual combatants: "As to the combating between personalities, I didn't see it as mutual combat. I saw it as increasingly uncomfortable with trying to work with Judy Clarke, with Judy Clarke making efforts to overcome this uncomfortableness and with me trying to help facilitate that as well. I did not see Judy Clarke objectively engaging in any behavior that a rational person in a defense team would react negatively to."[1252]

### 5. Mrs. Montgomery established that resource counsel and their mitigation team remained available to assist even after Ms. Clarke was removed, but were never invited to help.

Mrs. Montgomery presented proof that Resource Counsel all remained ready and willing to assist the newly constituted trial team in whatever capacity permitted by the new team. During the hearing, the district court found that Ms. Clarke, Mr. Burr, Ms. Garvey, and Mr. Freedman were all available to Mr. Duchardt *et al* as resources.[a]

The Resource Counsel attempted to provide the ultimate trial team with support and resources. Mr. Burr testified that after Mr. O'Connor was

---

[a] "She was available as a resource as was Mr. Burr and the other two individuals in the resource counsel office . . . I understand she was available as a resource and the record should reflect that" (Vol. 2, p. 545, *Ruling of the Court*).



Appellate Case: 17-1716 Page: 379 Date Filed: 11/01/2017 Entry ID: 4596229

appointed, he initiated contact and offered assistance.[1253] Mr. O'Connor asked for Mr. Burr's suggestions as to other counsel, and Mr. Burr agreed to try to help find experienced capital counsel to sign on.[1254] Mr. Burr recommended Denise LeBouf and made Mr. O'Connor aware that the Office of the Federal Public Defender in San Diego was available.[1255] Mr. O'Connor and Mr. Burr discussed the possibility of bringing Ms. Clarke back into the case through appointment of the FPD San Diego to the case. Mr. Burr thought Mr. O'Connor was open to the possibility, but later learned that Mr. Duchardt had been appointed.[1256]

Mr. Burr testified that Mr. Duchardt has been historically resistant to advice or training from Resource Counsel.[1257] The Resource Counsel Project has a track record of being unable to communicate with Mr. Duchardt.[1258] The Project switched Resource Counsel for the Montgomery case to try to reach out to Mr. Duchardt, hoping that he would be more open to the overtures of new counsel.[1259] Mr. Burr testified, "The sense within The Project was over the years that none of us had been successful in engaging Mr. Duchardt to consult with us, and we thought that maybe a new face and somebody more local might have



Appellate Case: 17-1716 Page: 380 Date Filed: 11/01/2017 Entry ID: 4596229

been successful." Despite The Projects efforts, Mr. Duchardt did not respond to their overtures.[a]

Ms. Clarke testified about her two pretrial conversations with Mr. Duchardt. Ms. Clarke indicated that she and Mr. Duchardt spoke only about thirty minutes, primarily consisting of "Fred wanted to know, you know, how the case had landed up in his lap."[1260] Ms. Clarke recalled providing Mr. Duchardt with both the names and contact information of Mr. Freedman and Ms. Garvey.[1261] She recalled that she gave Mr. Duchardt the names of the experts already retained on the case and that Mr. Duchardt indicated that he was already thinking of retaining Dr. Gur.[1262] Her second contact with Mr. Duchardt was because she received a letter from Mrs. Montgomery and contacted Mr. Duchardt to see if there was "some way that he wanted to raise the issue of trying to get me back into the case."[1263] Ms. Clarke disputed Mr. Duchardt's written statement that he advised her to become admitted to the Missouri Bar and then file a notice of appearance.[1264] Ms. Clarke testified, "I don't think he

[a] Vol. 3, p. 586, *Statement of USA* (objecting to counsel's line of questioning and saying, "I think he established that Mr. Duchardt did not reach out to them. That's part of the record. What steps they took to try to entice him to come to – have contact with him, I don't know why this is relevant"); *see also*, Vol. 3, p. 586, *Statement of §2255 Counsel* (arguing that the relevance of the testimony was to rebut Mr. Duchardt's claim that resource counsel are "clubby and cliquish and unwilling to assist him" (referencing D.E. 129, p.33).



Appellate Case: 17-1716 Page: 381 Date Filed: 11/01/2017 Entry ID: 4596229

made that recommendation to me. It would have been impossible to do. I was a California bar member. I would have to take and pass the Missouri bar. You know, get scheduled, get in, study for the bar, and take the bar, and the case would be over by the time that happened. I don't – I mean, I think if he said anything to me, that would have stuck in my mind. No, he didn't suggest I do that. That would have been crazy to suggest I do that."[1265]

Interesting proof developed that after the trial and the direct appeal, Mr. Duchardt asked Ms. Clarke to visit Mrs. Montgomery in the BOP.[1266] Ms. Clarke testified that she visited Mrs. Montgomery at Mr. Duchardt's request, because he was concerned that Mrs. Montgomery would give up and not proceed to challenge her conviction on post-conviction.[1267] Ms. Clarke testified that Mr. Duchardt believed that she could help in convincing Mrs. Montgomery not to give up entirely.[1268]

**6. Mrs. Montgomery presented trial counsel's testimony, providing ample opportunity for counsel to explain their reasoning and strategy.**

**a. Trial counsels' testimony established that removal of Ms. Clarke harmed Mrs. Montgomery and the defense.**

Mrs. Montgomery presented proof that the Court's disruption of her attorney client relationship with Ms. Clarke negatively affected both Mrs. Montgomery's mental health and her relationship with trial counsel. Mr.



Appellate Case: 17-1716 Page: 382 Date Filed: 11/01/2017 Entry ID: 4596229

Duchardt testified that Mrs. Montgomery had suffered “innumerable assaults to her integrity as a person over the years” and that loss of her “very nice relationship with Judy and the circumstances under which she lost that relationship with Judy had a major impact on her, sure.”[1269] Both Mr. Owen and Mr. O’Connor testified that they were not qualified to handle clients/cases involving serious psychiatric illnesses.[1270]

Movant presented proof regarding the particular challenges Mrs. Montgomery faced in dealing with an all-male trial team. Mr. Duchardt explained, “because of her situation dealing with men in almost every relationship she had been in, that it always seemed to her that a man was looking for sex from her, and that it was very difficult for her to be trusting in those kinds of – in any kind of interaction with men.”[1271] According to Mr. Duchardt, it was difficult for Mrs. Montgomery to communicate with Mr. Duchardt regarding the information he needed to effectively represent her.[1272] Mr. Duchardt admitted, “I was gender-challenged in my dealings with Lisa.”[1273]

Mr. Duchardt’s testimony provided additional prejudice suffered by Mrs. Montgomery as a result of the removal of Ms. Clarke from her team. Mr. Duchardt testified that “a lot of [the] cadre that Judy Clarke used in connection with the case I would certainly call experts.”[1274] Mr. Duchardt specified that he would consider Dave Freedman and Deb Garvey to be experts in their fields.[1275]



Appellate Case: 17-1716 Page: 383 Date Filed: 11/01/2017 Entry ID: 4596229

However he continued to profess that he "didn't get the impression that they had collected much from what I understood."[1276] Despite that impression, Mr. Duchardt did concede that at the time he came into the case, there was "certainly an awful lot of information that was collected."

**b. Trial counsels' testimony supported Mrs. Montgomery's IAC for failure to competently handle experts claim.**[1277]

Movant presented proof that Mr. Duchardt failed to utilize standard of care practices with regard to the production of documents to experts. Mr. Duchardt admitted that he provided information to his experts with synthesizing the information for them.[1278] He testified, "I'm almost certain that in terms of getting records to the experts, that I relied on Stephanie [Elliot] to do that."[1279] Mr. Duchardt conceded that he was unaware that Dr. Hutchinson attended team meetings.[1280] He did not recall seeing Dr. Hutchinson's notes, but testified that Dr. Hutchinson told him she had taken notes during her work on the case.[1281]

**c. The proof established that counsel failed to reasonably investigate mitigation.**

The trial team failed to develop a factual record against which they could assess the information provided by those in Mrs. Montgomery's life. Mr. Duchardt testified that he presented Mrs. Montgomery was a "good mother" because "A, because she was, B, because that's what she wanted."[1282] Mr. Duchardt felt he could not rely on Ms. Shaughnessy or Mr. Boman "any further



Appellate Case: 17-1716 Page: 384 Date Filed: 11/01/2017 Entry ID: 4596229

than I could throw them, so the idea that I would rely upon their say-sos about those kinds of bad things about Lisa as against Lisa's own perceptions, which seemed to me to be a lot closer to the truth, no, I had no desire to approach that in that way because I didn't think it was factually right and I thought it was eviscerating Lisa."[1283] Mr. Duchardt initially admitted that he did not have information from sources other than Mrs. Montgomery's mother and ex-husband that Mrs. Montgomery had trouble parenting;[1284] later he testified that he did have information indicating Mrs. Montgomery's functioning as a parent was impaired long before the crime.[1285]

Mr. Duchardt testified that Dr. Kuncel presented the social history prepared by the team. He said, "[W]e essentially used [Dr. Kuncel] as a forensic psychologist to kind of draw together a lot of the themes of Lisa's troubled background in terms of a summary witness during the penalty phase."[1286]

Mr. Duchardt's testimony supports Mrs. Montgomery's claim that the team failed to engage with her true disabilities. Mr. Duchardt testified that his strategy was essentially to put on positive information: "what I was trying to do is counterbalance [the negative things presented by the government] with the things that she was doing right."[1287]

Mr. O'Connor and Mr. Owen testified that the trial team would have presented proof of the true nature of the abuse endured by Mrs. Montgomery



Appellate Case: 17-1716 Page: 385 Date Filed: 11/01/2017 Entry ID: 4596229

had they known it. Mr. O'Connor testified that information that Mrs. Montgomery was subjected to gang rape would have been important information to submit the jury.[1288] Mr. Owen testified that the first he had ever heard that Mrs. Shaughnessy was selling young Lisa for sex was at the evidentiary hearing, "This is the first I heard of that."[1289] Mr. Owen admitted that he had not known that multiple men were allowed to rape Mrs. Montgomery anally, orally and vaginally or that they were permitted to urinate on her.[1290]

Movant presented trial team testimony that supported her ineffective assistance at penalty phase claim. Mr. Owen testified that the team was unprepared for the devastating testimony by Mrs. Montgomery's children that Mrs. Montgomery had committed abusive acts against them.[1291] Mr. Owen did not recall Mr. Duchardt ever discussing with the team the possibility that the children might testify about abuse – Mr. Owen was taken by surprise by Desireé's testimony.[1292] Mr. Owen also testified that he believed that the jury needed to have evidence presented to teach the jury that "mentally ill individuals can premeditate . . . it never was."[1293]

Mr. O'Connor echoed Mr. Owen's testimony. Though Mr. O'Connor denied any specific memory of the trial team being surprised by the children's



Appellate Case: 17-1716 Page: 386 Date Filed: 11/01/2017 Entry ID: 4596229

testimony,[a] he indicated that "I believe there was some discussion about the fact that they [the children] – what they had said and what they'd told Fred were two different things, yes."[1294] When presented with Exhibit 130, Ms. Waller's report that reflected that the fact that Mrs. Montgomery abused her children was "going to come out," Mr. O'Connor testified, "she didn't tell me that, I don't believe."[b],[c]

---

[a] Mr. O'Connor testified to his lack of memory over thirty times during his direct examination (Vol. 7, p. 1866 -2026, *O'Connor Testimony*).

[b] Vol. 7, p. 1900, *O'Connor Testimony*; *but see*, Exhibit 130 *9.12.06 Waller Memo* (listing Mr. O'Connor as a recipient of the memo); Vol. 4, p. 1565,*Waller Testimony* (she presented Exhibit 130, her memo reflecting the child abuse, to the defense team)

[c] Mr. O'Connor's lack of knowledge regarding Ms. Waller was shown when he was asked:

Q: If Ms. Waller has testified before this Court that she doesn't have much of a recollection of ever meeting with you, would you dispute her memory?
A: I would dispute her memory because I remember talking with her.
Q: When do you remember talking with her?
A: Again, we're going back nine years. We had discussions at some point in time, I'm confident, but to tell you, as I sit here right now, an exact time and exact conversation, I cannot.
Q: Nothing really sticks out?
A: No, ma'am.
And again at p. 1894:
Q: So the only female member of the team who had any sort of training in mitigation was Ms. Waller?
A: Female member you're saying?
Q: yes.
A: I think that's true
Q: And Ms. Waller visited with Mrs. Montgomery only a handful of times?
A: And, again, whatever she said she did, I don't have a recollection of that.

Finally, the proof supports Mrs. Montgomery's contention that trial counsel failed to investigate the sentence given to other people who commit murder in the course of a fetal abduction. Mr. O'Connor testified that he did not believe that he did any proportionately research.[1295] Mr. Duchardt had previously provided testimony which indicated that he did not either, referring in his sworn statement to Mrs. Montgomery's crime as "uniquely and horribly aggravating."[1296] Mrs. Montgomery's Exhibit 131, the chart of similar crimes, shows that had counsel bothered to investigate other similar crimes, counsel would have learned that Mrs. Montgomery's crime was not "unique[]" and that every no other woman convicted of this method of murder is sentenced to death.

**d. The proof rebutted Mr. Duchardt's prior statements.**

At the hearing, Mr. Duchardt sought to distance himself from his prior statement regarding Ms. Clarke's failure to retain experts. Mr. Duchardt had previously sworn that the Judy Clarke team did not retain any experts.[1297] At the hearing, he admitted that the FPD had contracts with various experts – though

---

Q: And Ms. Waller, because she was employed by the Office of the federal Public Defender, took her direction from Mr. Owen.
A: Well, again, I'm assuming that either Mr. Owen or Ray Conrad had talked with her about that. I don't know. But I'm assuming that that probably happened.
(Vol. 7, p. 1876, *O'Connor Testimony*).

he continued to say he had never been aware of the existence of those experts until he asked Laine Carderella to look through FPD files as part of his investigation prior to filing his court-ordered statement.[1298]

Mr. Owen's testimony contradicted Mr. Duchardt's claims. Mr. Owen testified that he told Mr. Duchardt about the experts retained by Ms. Clark, "I'm sure we told him when he took the case."[1299] Mr. Owen was adamant that he "held nothing back" in relating to Mr. Duchardt that which had been done on the case prior to Mr. Duchardt's appointment.[1300] He recalled that "when Fred came on, we all met and told him everything we knew," specifying that he, Mr. Ninemire, Ms. Elliot and "the mitigation specialist at the time" were present for the meeting.[1301]

Mr. Owen, who was Mr. Ninemire's supervisor and boss, contradicted Mr. Duchardt's claims regarding Mr. Ninemire's qualifications. Mr. Duchardt's statement, D.E. 129, professes that "[w]hat gives me a belly laugh is Judy Clarke presuming to brand that Ron Ninemire, the Federal PD investigator who was a crucial member of the team from the beginning, who has a world of relevant experience and who conducted a tremendous amount of quality investigation related to both phases of the case for our team, was 'not qualified as a mitigation specialist.' To put it simply, I heartily disagree with Judy's inaccurate assessment of Ron's worth."[1302] To the contrary, Mr. Owen testified



Appellate Case: 17-1716 Page: 389 Date Filed: 11/01/2017 Entry ID: 4596229

that Mr. Ninemire "wasn't qualified to be a mitigation specialist. He's qualified to be the chief investigator."[1303]

**7. The proof supported Mrs. Montgomery's *Riggins* claim.**

Mrs. Montgomery presented proof that the trial team planned to explain to the jury that her demeanor in court was affected by her medication but that Mr. Duchardt failed to do so. Mr. Owen testified that prior to trial the team discussed the need to present *Riggins* testimony regarding the effect of medication on Mrs. Montgomery's demeanor to the jury.[1304] According to Mr. Owen's testimony, the team had discussed that one of the doctors would explain that Mrs. Montgomery was on psychotropic medication and the effect of that medication on her affect.[1305] Mr. Owen testified that the explanation discussed by the team was not presented.[1306] For his part, Mr. Duchardt testified that the idea that Mrs. Montgomery had a flat affect was "silly."[1307] He saw nothing of a flat affect at all.[1308] However the proof also established that by the time Mr. Duchardt met Mrs. Montgomery in May 2006, she was already under the influence of psychotropic medication[1309] – so Mr. Duchardt never saw her not medicated to be able to assess how medication affected her presentation.

**8. The proof showed that Mr. Duchardt took his wife on visits with Mrs. Montgomery, misrepresented his wife's (non)role to the warden, and failed to discuss involving his wife with the other attorneys.**



Appellate Case: 17-1716 Page: 390 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery presented proof regarding Mr. Duchardt's misrepresentations about his wife, Ryland Duchardt. Mr. Owen testified that he was not aware of Mr. Duchardt's plan to have Mrs. Duchardt accompany him on his visit with Mrs. Montgomery in Philadelphia until after the visit had occurred.[1310] Mr. Owen testified he was unaware that Mr. Duchardt represented that Mrs. Duchardt was an expert witness working on the Montgomery case – and that Mrs. Duchardt was not, in fact, an expert on the case.[1311] When asked whether Mrs. Duchardt was a member of the defense team, Mr. Owen testified, "I think Fred made her a member of the team on his own. The rest of the team had no prior knowledge or say in the matter."[1312] Mr. Owen testified that his observation was that Mrs. Montgomery seemed to have an aversion to Mrs. Duchardt.[1313] Mr. O'Connor testified that he, too, was unaware that Mr. Duchardt represented Mrs. Duchardt to be an expert on the case to the BOP officials in Philadelphia.[1314]

Mr. Duchardt acknowledged that he wrote Exhibit 160, the faxed memorandum to the BOP Warden which included a request for his wife "who works with me as an expert on these capital cases" to be admitted to the BOP.[1315] Mr. Duchardt admitted that Ryland's role "was not to try to act as an expert but essentially to be my – to kind of vouch for me."[1316] Mr. Duchardt has been inconsistent as to whether his wife, Ryland, was in the room during the



Appellate Case: 17-1716 Page: 391 Date Filed: 11/01/2017 Entry ID: 4596229

Tommy discussion,[a] but testified at the hearing that she was: "I just honestly don't remember exactly when Tommy's name came out. My best recollection is it came out to me and to Ryland in the discussion that we had with Lisa in Philadelphia."[1317]

**9. The proof established that Mr. Owen and Mr. Duchardt thought Mrs. Montgomery lacked the ability to rationally assist counsel but did not alert the court to her incompetence.**

Both Mr. Owen and Mr. Duchardt testified they had serious concerns that Mrs. Montgomery was incompetent to stand trial. Mr. Owen testified explicitly that he did not think Mrs. Montgomery was competent to stand trial.[1318] Mr. Duchardt testified that he was concerned that Mrs. Montgomery was unable to assist counsel.[1319]

> The problem we had with Lisa all along and it starts – well it starts. One of the primary instances that you see is that memo that we talked about the bringing out that Tommy was involved. Lisa because of her condition was in a position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems . . . The bottom line is that she was giving it to us every bit as quickly as she could, and so we were coming up with information when she was able to give it and it was coming at,

---

[a] *Compare* Exhibit 157, *Duchardt Memo* (saying Mrs. Montgomery revealed that Tommy was with her during his visit to BOP in Philadelphia at which his wife was present) *with* D.E. 129 ("As I accounted in my memo, it was at an earlier meeting, on at which Ryland was not present, that Lisa revealed Tommy as the person who was with her).



Appellate Case: 17-1716 Page: 392 Date Filed: 11/01/2017 Entry ID: 4596229

> you know, the last minute as we were sitting there in March of 2007 and before an April of 2007 trial date. That wasn't Lisa's fault. And so I absolutely attribute that to her mental illness . . . I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them. In terms of a colloquial way of putting it, in terms of a legal defense that would keep a person from being able to stand trial, I don't think so."[1320]

### 10. The proof established that counsel were ineffective in their pursuit of 'the Tommy Defense'.

Mrs. Montgomery presented proof in support of her claim that counsel were ineffective in their treatment of her sensation that someone was with her during the crime. Mr. Duchardt testified that his best recollection of when Mrs. Montgomery told him it must have been Tommy who was with her was "it came out to me and to Ryland in the discussion that we had with Lisa in Philadelphia."[a] Mr. Duchardt testified that he did not ask Mrs. Montgomery questions about Tommy's involvement in a leading fashion and agreed with the government that he took steps to make sure he did not plant the notion of Tommy's presence in Lisa's mind.[1321] Mr. Duchardt testified that he is "still the

---

[a] Vol. 8, p. 2230, *Duchardt Testimony*; Exhibit 157, *Duchardt Memo to Team 3/7/2007* (documenting that after he told Lisa she could no longer say she did not know the answer or curl into a fetal position, Lisa "became firm on Tommy's involvement").



Appellate Case: 17-1716 Page: 393 Date Filed: 11/01/2017 Entry ID: 4596229

person who still thinks that [the probation] records don't prove [that Mr. Kleiner was with his probation officer at the time of the crime]."[1322]

Mr. Owen testified that he cautioned the trial team about proceeding with the Tommy defense because he realized it could alienate Mrs. Montgomery's family and impede mitigation investigation.[1323] He testified that he and Mr. Ninemire investigated the Tommy defense, because Mrs. Montgomery said she felt like someone else was in the room after the crime.[1324] He later learned that Mrs. Montgomery's description of her sensation was a symptom of dissociation[1325] and learned that Tommy had an alibi.[1326]

Mr. O'Connor testified that he relied on Mr. Owen to inform the team of any significant events or discoveries developed by the earlier teams.[1327] He testified that "in light of what later happened" he "absolutely" would have wanted to know that the Clark/Hunt/Owen team determined that Mr. Kleiner had an alibi for the time of the murder.[1328] Mr. O'Connor testified that he was "never made aware" that the Clarke/Hunt/Owen team had discovered that Tommy had an alibi for the time of the murder: "That was never told to me or I believe, obviously, that would stop us in our tracks."[1329]

**11. The proof established that counsel were ineffective in putting forward a NGRI defense based upon an unqualified expert's opinion based upon an erroneous, presumption of facts.**

Mr. Owen testified that the idea of pseudocyesis had been all but abandoned before Mr. Duchardt came on the team. He indicated that if pseudocyesis was still being considered it was "a mitigation situation, not a factual situation" and considered it only as "an additional factor to be explored."[1330]

Mr. O'Connor testified that he would have hoped that Mr. Owen would provide to the trial team "whatever information he had" for the trial team to consider in making tactical decisions. For Mr. O'Connor, that hope included that he would have wanted to consider the Clark/Hunt/Owen team's determination that Dr. Ramachandran wasn't qualified to testify as an expert regarding pseudocyesis.[1331] It also would have included wanting to know that the prior team had determined that pseudocyesis was not going to credibly establish an NGRI defense.[1332] Mr. O'Connor testified that as he wasn't yet on the team to hear Mr. Freedman's analysis of Dr. Ramachandran or the merits of a pseudocyesis defense, it would have fallen to Mr. Owen to share that information with the trial team.[1333]

Mrs. Montgomery presented proof at the hearing regarding the conflict of interest that developed from Mr. Duchardt's misrepresentations to the Court on April 3, 2007. Mr. Duchardt testified that as of April 2007, "we were at the infancy of the pseudocyesis matter."[1334] Mr. Duchardt did not have any reason

to dispute his billing records which reflect that he "communicated" with Dr. Ramachandran for the first time on April 1, 2007; he clarified that "communication" in his billing records indicates a phone call.[1335] Mr. Duchardt agreed that his records' reflection of a "phone conference" with Dr. Ramachandran on April 2, 2007 reflects his first conversation with Dr. Ramachandran.[1336] Mr. Duchardt testified to an independent memory that he emailed materials to Dr. Ramachandran on April 2 and then, after court on April 3, mailed additional materials to Dr. Ramachandran.[1337] Mr. Duchardt agreed that the transcript's reflection that he told Judge Fenner on 4/3/2007 that Dr. Ramachandran was writing a report was a fair representation of what he said to the Court on that day.[1338]

**12. The proof established that counsel failed to protect Mrs. Montgomery's Fifth Amendment Rights.**

Mrs. Montgomery presented Mr. O'Connor's testimony regarding the trial team's failure to protect Mrs. Montgomery's Fifth Amendment Rights during her interviews with the government experts. Mr. O'Connor testified that he recalled that Mrs. Montgomery became overwhelmed during Drs. Dietz and Martell's forensic interview with her.[1339] Mr. O'Connor recalled that a hearing was held in front of Judge Fenner regarding Mrs. Montgomery's inability to continue the forensic interview.[1340] Mr. O'Connor testified that in an adversarial



Appellate Case: 17-1716 Page: 396 Date Filed: 11/01/2017 Entry ID: 4596229

judicial proceeding it is the responsibility of counsel to make sure a court reporter is present and transcribes proceedings.[1341] The government stipulated that Exhibit 137, which were notes made by then AUSA (now district court Judge) Roseann Ketchmark, is the best evidence of that which transpired during that proceeding.[1342] Mr. O'Connor reviewed Exhibit 137 and testified that based on that record there was no colloquy with Mrs. Montgomery regarding her Fifth Amendment right not to participate in the forensic interviews.[1343] Mr. O'Connor testified that it was counsels' responsibility to ensure that such a colloquy was given.[1344] Mr. O'Connor testified that it was important for Mrs. Montgomery to understand that under Federal Rule 12.2, the government would not have been entitled to review the information gathered by the government's experts until after a determination of guilt.[1345]

**13. The proof established that counsel failed to effectively develop expert testimony/evidence.**

**a. Movant presented the testimony of Dr. Hutchinson to demonstrate the proof available to trial counsel through Dr. Hutchinson who had begun an evaluation of Mrs. Montgomery in 2005 and who, had she been provided a comprehensive social history, could have provided expert psychological testimony regarding the deleterious effect of trauma.**

Movant presented the testimony of Dr. Marilyn Hutchinson, a psychologist who was retained as a consultant by the Burns/Hunt/Owen team



Appellate Case: 17-1716 Page: 397 Date Filed: 11/01/2017 Entry ID: 4596229

pretrial and whose data Mr. Duchardt supplied to the government. Dr. Hutchinson testified that she has been a psychologist for 42 years, that she is in a dual-fold practice in Kansas City, both providing clinical care for patients and also conducting forensic examinations for the courts and local counsel.[1346] She has provided forensic expertise in between 6 and 10 capital cases.[1347] Dr. Hutchinson testified, "trauma is my expertise."[1348]

As noted, above at §V.A., Dr. Hutchinson was retained by the Burns/Hunt/Owen team as a consultant at a point when the team was concerned that Mrs. Montgomery was suicidal.[1349] Dr. Hutchinson met with Mrs. Montgomery and performed some assessment (including enlisting her psychometrist to do some neuropsychological testing), but did not reach any conclusions as to Mrs. Montgomery's diagnosis.[1350] As outlined in §V.B above, Mr. Duchardt contacted Dr. Hutchinson in 2007.[1351] Mr. Duchardt indicated to Dr. Hutchinson that he intended to go forward at trial with some sort of insanity defense based on pseudocyesis.[1352] Dr. Hutchinson responded "that I thought that was an unlikely diagnosis given how uncommon [pseudocyesis] was/ I didn't have anything that supported it but that I certainly hadn't finished, but that I thought that there might be other explanations."[1353] Mr. Duchardt never contacted Dr. Hutchinson again after that initial conversation.[1354] No one else

contacted Dr. Hutchinson regarding Mrs. Montgomery until §2255 counsel contacted her in 2016.[1355]

Dr. Hutchinson conducted a review of the biopsychosocial history obtained by §2255 counsel and her own notes from her interviews and testing of Mrs. Montgomery and testified regarding her opinions as an expert in trauma as to how the information she gained in 2005 could have been used at trial.[1356]

Dr. Hutchinson was critical of the defense team's eagerness to question Mrs. Montgomery regarding traumatic life events.[1357] Though the Court cut off counsel's questioning regarding Dr. Hutchinson's experience, the Court recognized, "I understand that she says that [the defense team's approach to interviewing Mrs. Montgomery on her trauma] wasn't proper, and she's an expert in treating trauma victims."[1358] Dr. Hutchinson stressed that it takes repeated interviews to begin to get a client to a psychologically stable enough state to begin to reveal trauma.[1359] Even after a client gives Dr. Hutchinson a description of that which traumatized her, Dr. Hutchinson expects to corroborate that information before relying on it for her expert opinions.[1360] Dr. Hutchinson testified that a social history is an important tool for corroboration of the client's version of her life story.[1361] In capital cases, Dr. Hutchinson is accustomed to having a social history presented to her by the defense team.[1362]

Such corroboration is necessary, in part, because trauma affects memory and perception.[1363]

Dr. Hutchinson explained that trauma affects memory. "[I]f a trauma is overwhelming, whether that's a car crash or a sexual assault or a murder, that memory will often not be consciously available to the person because the emotion associated with it is too large. So that's what happens when we call repressed memories, and they may not surface forever or they may surface as screen memories." Dr. Hutchinson explained that a "screen memory" is "a memory that fits some kind of category, so there's not all the details of maybe ten that were sort of alike but there was one that is sort of a summary of them, and so it will be sort of a placeholder for that category of assault or abuse."[1364] Dr. Hutchinson verified that Lisa Montgomery's memory of her step-father raping her is the sort of placeholder memory which would indicate that the specifics of that trauma and of the other traumatic events it may have come to represent in Mrs. Montgomery's memory should be investigated.[1365] Dr. Hutchinson explained that, "when there is trauma, the hippocampus is the one that records it first, and it gets transferred and mediated through the amygdala; and if the prefrontal cortex is not able to sort through that, then it's just stored predominately as emotion and it will get generalized, and so many trauma



Appellate Case: 17-1716 Page: 400 Date Filed: 11/01/2017 Entry ID: 4596229

victims go through life with this sort of generalization of fear that 24/7 they feel like they're in danger."[1366]

Dr. Hutchinson testified that there is a protocol as to how to interview a traumatized person with an impaired memory so to not suggest or implant memories.[1367] She explained that with trauma, "attribution – or where did you learn something – is the first part of the memory to go."[1368] If a person's memory is impaired and a suggestion is made through questioning, the person pictures the suggestion then has the same memory of the mental picture as of the impaired (original) memory.[1369] "Then when they're subsequently asked, they're not going to be able to sort between the picture that they made in their mind when they were asked that question or the picture in their mind that was actually when they were there because that attribution is going to be lost."[1370] Dr. Hutchinson related that she and the Burns/Hunt/Owen team discussed the need to be careful to not implant memories in Mrs. Montgomery.[1371]

Dr. Hutchinson described her 2005 observations of Mrs. Montgomery. Mrs. Montgomery was on suicide watch in a paper-gown, under 15 minute checks by staff at the time Dr. Hutchinson saw her.[1372] She was medicated on trazodone.[1373] Dr. Hutchinson believed that Mrs. Montgomery's "psychological distress and her lack of trust and her apprehension, all of those played significant roles in what she was able to do testing-wise."[1374] Mrs. Montgomery

was “having thought disturbances. There certainly was some evidence of bipolar reactivity. She was not being medicated for her depression or for her thought disorders. She was being regularly interviewed by the treating doctor there who was quizzing her about the crime. So she was being told don’t really talk about the crime and yet this doctor that was, you know, allegedly trying to treat her kept talking to her about the crime and I think she felt very conflicted about what to do about that.”[1375] Dr. Hutchinson feared that Mrs. Montgomery would decompensate further.[1376] “I think the isolation led to a lot of catastrophizing on her part. She was pretty hopeless at that point. She had come to believe that she had in fact committed this crime. Initially she didn’t know that she had and was really pretty overcome with guilt and remorse about that. She was dissociating with some regularity. Dissociation that probably was learned in childhood since that’s really the only time when we’re emotionally immature enough to learn that level of dissociation.”[1377]

Regarding her training on dissociation, Dr. Hutchinson testified, “Dissociation is a blending of reality and fantasy, and children don’t have those two realities quite as firmly entrenched as we hope most adults do. So when children are traumatized, then they are lying between fantasy and reality and they dissociate to a fantasy place. So when someone is doing a lot of dissociation as an adult, it is a common inference that they learned that in

childhood."[1378] Dr. Hutchinson testified that it was difficult to determine in 2005 whether Mrs. Montgomery was psychotic or not, "she may have been and that wasn't my intent to try and push [to make that determination immediately]."[1379]

Mrs. Montgomery's extreme remorse was reflected in her answers to Dr. Hutchinson's competency assessment instruments. According to Dr. Hutchinson, Mrs. Montgomery made no attempt to malinger or exaggerate her mental illness.[1380] Mrs. Montgomery indicated she intended to try to assist her counsel, but stated, "there are some things that I can't remember and some things that I don't want to tell."[1381] In Dr. Hutchinson's opinion, such a remark was an "indication of an emotional issue that [she] couldn't yet talk about."[1382] Dr. Hutchinson found that remark, coupled with Mrs. Montgomery's subsequent "everybody has doubts and fears" to strongly indicate trauma.[1383] Mrs. Montgomery told Dr. Hutchinson that she would plead guilty if the prosecutor made an offer: "Heck, yeah. Because I am guilty."[1384] Dr. Hutchinson's competency assessment also revealed that Mrs. Montgomery's only disagreement with her counsel was on the nature of her plea: "They want me to do not guilty. I don't feel that's right . . .If they asked me, I would not have agreed. The judge never asked me . . . I did it. I don't remember because if I . . . if doing it I deserve to be punished."[1385] Dr. Hutchinson characterized Mrs.

Montgomery as having accepted responsibility for the crime – and was certain that Mrs. Montgomery did not indicate anyone else was involved in the crime with her.[1386]

Dr. Hutchinson indicated that as a specialist in trauma, she assigned meaning to Mrs. Montgomery's response to a particular fill in the blank question. The partial sentence was "My most vivid childhood memory." Mrs. Montgomery wrote: "I cannot talk about it."[1387] Dr. Hutchinson indicated that at the point Mrs. Montgomery wrote that sentence, Mrs. Montgomery had already discussed Jack Kleiner raping her: that which Mrs. Montgomery could not discuss was something more/other than the Kleiner rapes.[1388]

Dr. Hutchinson was given an opportunity to comment upon Dr. Martell's misuse of her and Dr. Willing's notes and testing. Dr. Martell represented that Dr. Hutchinson's testing revealed Mrs. Montgomery to be a narcissist,[1389] but Dr. Hutchinson clarified that the indication was 1) from Dr. Willing's notes and 2) that it said Mrs. Montgomery had a narcissistic injury.[1390] "A narcissistic injury is something that all of us can have and would be an indication of a stressor . . . I think what Dr. Willing was communicating was . . . [Mrs. Montgomery's daughter Kayla's decision to live with another family] had been a significant narcissistic injury to [Mrs. Montgomery' because her definition of herself was very entangled in being a mother and being a good mother, and so

having her daughter leave would have been a narcissistic injury which would have been a significant stressor."[1391] Dr. Hutchinson repeated that Dr. Martell's representation of Dr. Willing's computer generated scoring of the psychometric testing as Dr. Hutchinson's opinion was inaccurate.[1392]

Dr. Hutchinson took issue with the government's experts' representation of her opinions and notes. "They took individual sentences – I mean, what they seemed to quote were some of the lines out of Dr. Willing's report but would take part of a line and not all of the line or . . . for example, on one of them I remember it was, 'Profile is exaggerated but she is still extremely distressed,' and they just put profile exaggerated . . . I had emphasized that I thought that PTSD was a likely diagnosis. They completely left that off of their summary of my summary."[1393] Dr. Hutchinson reviewed Dr. Martell's testimony and agreed that her name featured in his discussion prominently.[1394] She testified that Dr. Martell's testimony that he reviewed her "psychological evaluation" was impossible, because she had not completed an evaluation – she had begun, but never formed any conclusions.[1395]

Dr. Hutchinson specifically rebutted Dr. Martell's testimony that she had found Mrs. Montgomery to be malingering.[1396] "I did not [find evidence of malingering]. That's never listed in anything I have, nor is it listed on any of the test narratives from the computer scoring."[1397] Dr. Hutchinson noted that Dr.

Willing (the psychometrist who performed the pencil and paper testing) was concerned with Mrs. Montgomery's effort on a test, but that "she concluded that because of some inattention issues which probably were related to depression and anxiety" not due to malingering.[1398] Dr. Hutchinson said that Dr. Martell's conclusion that Mrs. Montgomery was malingering memory problems and a mood disorder is wrong. "She has both of those problems . . . I mean, she's been diagnosed with bipolar disorder, and she had a lot of times when she talked about memory issues, so the fact that those two came up high [on the MMPI score] wouldn't be indicative of malingering."[1399] Dr. Hutchinson also objected to Mr. Duchardt's misuse of her data in his cross examination of Dr. Martell: "Those were, again, partial quotes out of the computer-generated information that did not represent even what the computer was saying."[1400]

Dr. Hutchinson provided the Court testimony concerning her administration of the MMPI – testimony which could have been available to trial counsel, had counsel provided her with a social history to allow her to contextualize Mrs. Montgomery's answers and scaled scores. Dr. Hutchinson explained a computer cannot drive the diagnosis – a diagnosis requires a qualified professional examiner. She also indicated that Mrs. Montgomery's high scores on the MMPI scales did not indicate malingering, but rather trauma: each of the items Mrs. Montgomery endorsed on the critical items list was



Appellate Case: 17-1716 Page: 406 Date Filed: 11/01/2017 Entry ID: 4596229

actually verified by her social history.[1401] If Dr. Hutchinson had had Ms. Vogelsang's social history (which she reviewed prior to her testimony) she could have concluded that Mrs. Montgomery's MMPI profile was in fact valid because the social history verified Mrs. Montgomery's honest report of her distress.[1402] Dr. Hutchinson explained that as Mrs. Montgomery has both a mood disorder and significant memory impairments, her scores on the MMPI were appropriately elevated, contrary to Dr. Martell's testimony.[1403,a]

Dr. Hutchinson testified that she shared with the Hunt/Owen team that Mrs. Montgomery had difficulty knowing what was real and what was not.[1404] She explained that such a difficulty is "most often found in trauma or in psychosis. So if a person is dissociated, then at the time of the event then that memory is not encoded in the way that a memory is encoded when they're present. So those memories have a dream-like quality to them usually, and then people who have gone through that dissociative experience don't know whether

---

[a] The Court cut short counsel's presentation of the specific questions which were indicated at trial to be elevated and to therefore be malingering, but which, in fact, were supported as true by the social history. The Court found that the record had been made, "I appreciate, you know, the fact you need to make a record, but at some point your record has been established" (Vol. 4, p. 1059, *The Court*). Counsel subsequently introduced Dr. Hutchinson's raw data reflecting the questions Mrs. Montgomery answered which resulted in elevated scores as Exhibit 146, *Hutchinson MMPI-2 Test*.

they dreamed it, whether they made it up, whether it was real, did somebody tell it to them, because they don't have the usual markers for what is real."[1405]

Now, in light of Mrs. Montgomery's social history, Dr. Hutchinson connects Mrs. Montgomery's inability to know that which is real and that which is not to Mrs. Montgomery's mother's denial of Mrs. Montgomery's perceptions of reality. "Her reality was denied on a regular basis. She was sexually assaulted. She was told it was her fault. Her mother held her at gunpoint and said, 'Why did you do this?' Someone whose reality is frequently negated begins to distrust, maybe I don't know what's real."[1406]

Dr. Hutchinson testified that she would have required additional time and information in order to complete her evaluation of Mrs. Montgomery. She stressed that it is necessary to gain the trust of trauma survivors for full disclosure of their experiences – and that sudden loss of a trusted person makes it much harder for the trauma victim to trust again.[1407] Dr. Hutchinson estimated that it would have required an additional ten to twenty hours for her to be able to establish rapport with Mrs. Montgomery and complete a full assessment.[1408] Dr. Hutchinson testified that to complete her assessment she would have required "a complete social history documented after I had done some interviewing."[1409] Dr. Hutchinson would have wanted a neurological evaluation,



Appellate Case: 17-1716 Page: 408 Date Filed: 11/01/2017 Entry ID: 4596229

as "it was an unusual enough situation that it sort of pointed to there might be something more significant."[1410]

**b. Movant presented the testimony of Dr. Logan in support of her claims of ineffective assistance of counsel as to Mr. Duchardt's misrepresentations to the court and as to the team's handling of the pseudocyesis defense.**

Dr. William Logan, a psychiatrist, testified regarding his consultation with the trial team and his opinions and testimony at trial. Dr. Logan has been in practice in Kansas City since 1981 and has testified regularly for both the prosecution and the defense – including for both sides in capital cases.[1411] He testified that his expert testimony is accepted in courts around thirty times a year.[1412] The Court accepted Dr. Logan as an expert witness in psychiatry.[1413]

Dr. Logan was initially retained as a consultant to the Burns/Hunt team in 2005 when the team perceived that Mrs. Montgomery was in acute distress.[1414] Dr. Logan received information that Mrs. Montgomery was dissociating and "not to be in good contact with others around her."[1415] The jail had her on suicide watch.[1416] Dr. Logan said "she was depressed. Oh, she had been banging her head against the wall. Nothing that would kill her but certainly self-destructive behavior"[1417] According to Dr. Logan, Mrs. Montgomery was "depressed and despondent, anxious,"[1418] "in midst of major depressive disorder," and her depression had "some psychotic features."[1419] Dr. Logan



Appellate Case: 17-1716 Page: 409 Date Filed: 11/01/2017 Entry ID: 4596229

provided Burns/Hunt with a letter stating his professional opinion as to her diagnosis, her condition, and the conditions of confinement necessary for amelioration of her acute mental deterioration.[1420] Dr. Logan was not provided any social history or biopsychosocial information,[1421] though he had information from the CCA staff regarding a suicide letter, medication history, and Mrs. Montgomery's behavior;[1422] "[t]here was no pending forensic question" asked of Dr. Logan at that time. Dr. Logan's diagnosis was "major depressive disorder with psychotic features . . . [she was experiencing] persistent sadness, lack of motivation or interests in her surroundings, feeling withdrawn, tearful, tired, difficulty concentrating, suicidal thoughts, and something you only see in severe cases of depression, which is seeing or hearing things that aren't there."[1423] Dr. Logan opined that, had he been called upon to provide an assessment of Mrs. Montgomery's competency in 2005, he would have said that Mrs. Montgomery lacked decisional competency.[1424]

In March of 2007, Mr. Duchardt contacted Dr. Logan to again assess Mrs. Montgomery. Dr. Logan was not surprised to be asked to engage again in the case, but noted that, in light of the impending April trial date, "they were kind of 11th hour."[1425] Between March 3 and March 22, Mr. Duchardt provided Dr. Logan a memo that contained some social history information which Dr. Logan described as "certainly not anything extensive."[1426] Dr. Logan

characterized this as "Mr. Duchardt's overview of the case."[1427] Those materials did not provide Dr. Logan with information to support a diagnosis of pseudocyesis: "It would have been nice to have some contemporaneous reports of outside observers or things of that nature that really weren't available at that time."[1428] When Dr. Logan and Mr. Duchardt first spoke about the case on March 22, 2007, Mr. Duchardt told Dr. Logan about Dr. Ramachandran, explaining that Dr. Ramachandran would be part of the team.[1429,a] Dr. Logan did not evaluate Mrs. Montgomery until April 10 and May 11, 2007[1430] – well after Mr. Duchardt announced Dr. Logan's preliminary diagnosis to the Court on April 3.[1431] Dr. Logan was asked to reflect on Mr. Duchardt's April 3, 2007 representations to the Court:

> Q: (reading from the transcript) The Court: "Who is it that is giving you a preliminary diagnosis?" Mr. Duchardt: That is Dr. Ramachandran and also Dr. Logan." Was that an accurate representation of what you had told Mr. Duchardt at that time?
>
> A: No.[1432]

Dr. Logan explained his diagnosis of Mrs. Montgomery with reference to the DSM-IV Axis: "one was posttraumatic stress disorder, chronic, that began in her adolescence with sexual abuse and physical abuse by her

---

[a] Mr. Duchardt first spoke to Dr. Ramachandran on April 2, 2007 (D.E. 129, p. 57; Exhibit 36, p. 7, *Ramchandran Depo*.).



Appellate Case: 17-1716 Page: 411 Date Filed: 11/01/2017 Entry ID: 4596229

stepfather…now carries the name…complex PTSD"[1433] "The second one was major depressive disorder, recurrent. I noted it was without psychotic features at that time but without full inter-episode recovery. In other words, she always remained somewhat depressed and there wasn't a complete recovery from the major depression."[1434] "I did mention that at times it had included psychotic features like hallucinations." Dr. Logan said he had a "rule out" of bipolar disorder, which he testified "means to continue to consider it but not eliminate it yet, a bipolar disorder"[1435] "[F]inally a somatoform disorder, not otherwise specified, which I labeled pseudocyesis."[1436] Dr. Logan explained that complex PTSD and Somatic Disorders can "track together."[1437] Dr. Logan's Axis II Diagnosis was "Basically it was a borderline personality disorder, not - - NOS stands for Not Otherwise Specified w/ borderline and dependent features."[1438] Dr. Logan clarified that "Borderline personality particularly is often seen in people who have long history of child sexual abuse[1439] . . . "Looking back you don't know what she would have been but for these events."[1440]

Dr. Logan Testified that he recognized the limitations of diagnostic categorizations: "one of the reasons to have a fairly rich biopsychosocial history so you can understand who the person is apart from the diagnostic label."[1441] He explained that in most capital cases the team prepares a biopsychosocial history to provide the jury that mitigating context.[1442] Up until the trial, Dr. Logan

thought Dr. Kuncel was preparing and presenting that information to the jury for Mrs. Montgomery.[1443]

Dr. Logan felt that the trial team's focus on pseudocyesis was misplaced and prevented an accurate picture of Mrs. Montgomery. He explained that Mr. Duchardt had "sophomore's disease," which is "when you get an unusual diagnosis, some people become overly fascinated with that diagnosis to the extent of blocking out other things that may be wrong with the individual."[1444] Dr. Logan's concern was Mr. Duchardt's extreme focus on pseudocyesis, "[b]ecause that was just one symptom in a person who was really quite mentally ill with a number of different and varying diagnoses, including a mood disorder and PTSD that also shaped her behavior, and to isolate out one among several diagnoses and try to make that the lead to the exclusion of other things really was not the most accurate picture one could obtain."[1445] Dr. Logan discussed his concerns with Mr. Duchardt: "I think I did mention that . . . My report is much more evenly distributed in terms of discussing the overall picture of her problem where the testimony tended to kind of narrowly focus on the pseudocyesis."[1446]

Dr. Logan was critical of the defense team's handling of Mrs. Montgomery's indication that she felt like someone was with her at the murder. "There was no credible evidence that Tommy was there, and to present that as a

legitimate defense along with a mental illness defense I thought really detracted from the mental illness defense. If anything, the mental illness might have been better able to explain why Tommy—she thought Tommy was there"[1447] Dr. Logan agreed that Mrs. Montgomery's ultimate "disclosure" to her team after repeated questioning that Tommy was at the scene brought up the specter of dissociation and PTSD[1448] explaining that a dissociative person can feel as if someone else were present – and that that sensation is a symptom of the dissociation.[1449] Dr. Logan was aware that Mrs. Montgomery had reviewed all the discovery in her case and in his opinion, "[Mrs. Montgomery] clung to fragments - - I think there was some witness that maybe had seen two people leave – to concoct the whole story that Tommy was actually there."[1450]

Dr. Logan expressed his frustration with the team's focus on 'the Tommy Defense': "I knew [her attorneys] seemed unusually fascinated by this, and I couldn't tell who the driving force was behind that, but I think I was reading a report that I mentioned there was a couple of discrepancies and said it will be left to the trier of fact, which is another way of saying the jury can make the determination but I'm not buying it."[1451] Dr. Logan explained, "Sometimes in a dissociative state a person can get a reaction where they feel they're observing what they do, but you have to be careful at that point because you don't want to induce false memory and that's very easy to do with people who dissociate . . .

Since their perception is actually kind of hazy at that point, they may be overly eager to grasp somebody else's explanation or add facts or actually fill in the blanks in confabulation to concoct a story that may be more palatable to them."[1452]

Dr. Logan testified that until the weekend before his testimony, all of his contact with the Montgomery team was with Mr. Duchardt. "Mr. Duchardt was the one who was pursuing the mental health aspects of this."[1453] However mid-trial, Mr. O'Connor attended a meeting with Dr. Logan and Mr. Duchardt and "kind of at the end they were kind of deciding who would do the direct and O'Connor said he would."[1454] According to Dr. Logan, Mr. O'Connor's preparation of Dr. Logan was not extensive, "I think the morning I testified [O'Connor] showed me briefly kind of a list of prospective questions."[1455] Dr. Logan explained that he did not have control over the defense presentation of the pseudoceysis defense. "They actually control what's synthesized and what's asked . . . they have to make the presentation and direct the testimony."

Dr. Logan faulted Mr. Duchardt for failing to provide Dr. Logan with materials used by the government to undermine his testimony on cross-examination. Mr. Duchardt, Mr. O'Connor, and Dr. Logan met mid-trial, on the weekend before Dr. Logan's testimony. At that meeting, Dr. Logan asked Mr. Duchardt for information on Mrs. Montgomery's email history. Mr. Duchardt



Appellate Case: 17-1716 Page: 415 Date Filed: 11/01/2017 Entry ID: 4596229

provided Dr. Logan with Exhibit 89, a list of URLs.[1456] Dr. Logan looked at the document and returned it to Mr. Duchardt, because it was not helpful to Dr. Logan.[1457] "[T]here was really no opportunity for me to look up all of those [URLs] two days before trial and certainly not be able to talk to [Mrs. Montgomery] about that."[1458] Dr. Logan learned, "during cross examination" that many of Mrs. Montgomery's emails had been deleted. [1459] "Not only that, [the government] had a lot of specifics about what had been deleted, particularly about caesarean sections and things of that nature, and it showed significantly that there obviously had been some degree of premeditation that morning before she went up to Skidmore in terms of her deliberately erasing things from her computer."[1460] Dr. Logan conceded that his response to cross-examination regarding the deleted materials meant that the evidence did not support a "strict interpretation" of the insanity defense.[1461] Dr. Logan was "not at all" surprised by the jury's guilty verdict.[1462]

Dr. Logan testified that he shared his concern about using pseudocyesis as a first phase defense with Mr. Duchardt, "I thought it would have been much more practical to present it in the second phase."[1463] Dr. Logan explained that "one of the challenges of the case was her credibility and whether she was a fabricator or liar or something in between, [a biopsychosocial history] shows some of these things actually had occurred to her, the diagnoses had resulted



Appellate Case: 17-1716 Page: 416 Date Filed: 11/01/2017 Entry ID: 4596229

from that and have impacted her life going forward, and that would have been most in terms of symptoms of PTSD and ability to trust others, mood regulation, depressive episodes, and could have blended in some of the underlying drive to have these pregnancies, even after she knew - - should have known under rational terms that was physiologically not possible."[1464]

**c. Movant presented Dr. Fucetola's testimony regarding the evidence of brain damage identified by his neuropsychological testing, his recommendation to trial counsel that additional investigation of Mrs. Montgomery's brain impairments was needed, and the further information he would have been able to present had he had a biopsychosocial history.**

Dr. Robert Fucetola testified regarding the work he did for the trial team as a neuropsychological expert. Dr. Fucetola explained that he is a professor of neurology and clinical neuropsychology at Washington University School of Medicine in Saint Louis.[1465] He related his credentials and the government stipulated that he is an expert in neuropsychology.[1466] Dr. Fucetola remembered that Mr. Duchardt contracted with Dr. Fucetola to "complete an independent neuropsychological evaluation of Ms. Montgomery. I understood that to mean a detailed cognitive and intellectual assessment of her capacities."[1467] Mr. Duchardt explained to Dr. Fucetola that he wanted this assessment so to provide the information to Dr. Gur for use in Dr. Gur's behavioral image.[1468] Dr.



Appellate Case: 17-1716 Page: 417 Date Filed: 11/01/2017 Entry ID: 4596229

Fucetola performed his assessment of Mrs. Montgomery over two days in July 2006.[1469]

Dr. Fucetola provided information in support of Mrs. Montgomery's claim of ineffective assistance of counsel for the mishandling of Dr. Hutchinson's materials. Dr. Fucetola testified that the FPD/Mr. Duchardt provided him the materials listed in his report.[1470] Ms. Elliot, the FPD paralegal, also sent him Dr. Hutchinson's raw data.[1471] Included with Dr. Hutchinson's raw data was some attorney-client work product.[1472] Dr. Fucetola testified that once Dr. Martell was hired by the government, Dr. Fucetola provided Dr. Martell his own data and the materials from Dr. Hutchinson.[1473]

Dr. Fucetola testified to the results he obtained from his testing of Mrs. Montgomery. Most of Mrs. Montgomery's neuropsychological profile was in the normal range, though she earned a high IQ.[1474] Mrs. Montgomery's scores were widely disparate – some very low and some quite high, which Dr. Fucetola acknowledged reflected the differing parts of the brain tested.[1475]

Dr. Fucetola highlighted the extremely rare disparity between Mrs. Montgomery's verbal and perceptual IQs. There was a "dramatic disparity between her verbal intelligence, which was at the high end of the average range, and her nonverbal intelligence, which was very superior and measured at above the 99th percentile . . . at the time that I saw Ms. Montgomery it struck me as

potentially significant because it's quite rare to have a difference that large."[1476] Dr. Fucetola reported the disparity and the significance of it to trial counsel and conducted research to determine possible causes of this disparity.[1477] "I told Duchardt in my report that this merited further investigation."[1478]

Dr. Fucetola testified that the significance of the split in Mrs. Montgomery's IQ is that it points to brain damage or brain dysfunction. Dr. Fucetola explained that the left hemisphere supports verbal IQ while the right hemisphere involves performance or nonverbal IQ.[1479] The type of differential seen here, indicates brain damage on one side. Dr. Fucetola testified that possible etiologies for such brain damage/dysfunction would be developmental in nature[1480] and could include prenatal alcohol exposure,[1481] multiple head injuries, and or major mental illness such as bipolar disorder.[1482] "Based on my results, I recommended to Duchardt that he pursue further investigation of her brain functioning and do further imaging."[1483] According to Dr. Fucetola, further investigation – including the neurodiagnostic testing listed in his report – was indicated because of the "unexpected differences" in the performance of the two hemispheres of Mrs. Montgomery's brain.[1484]

Dr. Fucetola reviewed two of the neuropsychological instruments which signaled brain impairment. Mrs. Montgomery's performance on the Faces Test showed problems in her cognitive function.[1485] Dr. Fucetola also saw weakness

in her performance on the "finger tapping test."[1486] Dr. Fucetola testified that at the time of the test administration, he "wrote [the low performance on the finger tapping test] off as an injury to the hand." After §2255 counsel provided him with hospital records appended to the biopsychosocial that "rule[d] out injury as a cause," Dr. Fucetola found "there's a strong possibility [that test] reflects a brain based difference."[1487] Had Dr. Fucetola had the hospital records (appended to Ms. Vogelsang's biopsychosocial as Exhibit 1-204) Dr. Fucetola could have provided trial counsel with even more proof of brain injury/dysfunction.[1488]

Dr. Fucetola disagreed with Dr. Martell's conclusions as well as Dr. Martell's characterization of Dr. Fucetola's results. Unlike Dr. Martell, Dr. Fucetola affirmatively found that Mrs. Montgomery was not malingering: "I ruled out any exaggeration or fabrication of intellectual or cognitive impairment."[1489] Dr. Fucetola ruled out malingering "through embedded performance validity tests" – all of which Mrs. Montgomery passed.[1490] "I also observed that she worked hard on the tests." Dr. Fucetola "disagree[d] with Martell's statement that the tests I administered were 'completely clean' given the unusual pattern of difference between verbal and non-verbal abilities."[1491] Dr. Fucetola, to the contrary to Dr. Martell's testimony, found that Mrs.



Appellate Case: 17-1716 Page: 420 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery's neuropsychological testing indicated a need for further investigation.[1492]

**d. Movant presented Dr. Kuncel's testimony regarding trial counsel's failure to provide her adequate social history information, to insure her testing conditions met protocol, to adequately prepare her to testify, and the trial team's bungling of the proof regarding Mrs. Montgomery's MMPI profile.**

Dr. Kuncel testified that she was ill prepared for trial, that her testimony was not incorporated into the trial team's theory of the case, that she had only the "basics" of Mrs. Montgomery's social history to present, and that her testimony was undermined by Dr. Martell before she even took the stand. Though Dr. Kuncel was accepted as an expert in the penalty phase of the trial and was accepted as an expert in psychometric testing as well as clinical psychology at the evidentiary hearing,[1493] Dr. Kuncel testified that, "I perceived myself as quite peripheral in this case; that the focus of the defense was elsewhere; that they had a diagnosis that they wanted to use, which I – pseudocyesis is not an expertise that I have. I didn't think it would be ethical to be directly supportive of something about which I'm not knowledgeable, and so I felt marginalized in the case that they were off doing with other people."[1494]

Though her primary attorney contact leading up to trial was Dave Owen, she found that Mr. Duchardt was responsible for preparing her to testify: "when



Appellate Case: 17-1716 Page: 421 Date Filed: 11/01/2017 Entry ID: 4596229

it came to discussing with [Mr. Duchardt] what I was going to do or how I was going to do it from my point of view, it was totally inadequate."[1495] Dr. Kuncel testified that generally teams want the focus of her testimony to be on social history and not on the mechanics of psychometric testing, and that that should have been the focus here – especially where her testing protocol was compromised.[1496] She further testified that she did not know that she was considered to be the witness who would present Mrs. Montgomery's trauma history to the jury.[1497]

Though the team perceived Dr. Kuncel as their social historian,[1498] they did not communicate that to Dr. Kuncel.[1499] Dr. Kuncel was not provided a social history or biopsychosocial by the team: "I had a bunch of records, bunch of bits and pieces and it was up to me to integrate them which I attempted to do and put in my report."[1500] Dr. Kuncel understood that her role was "to some extent" similar to that played by Jan Vogelsang in the §2255 proceedings, but she qualified that her testimony was to provide social history "in a basic kind of way."[1501] Dr. Kuncel agreed that the portion of her testimony relating to social history was much abbreviated – consisting of only 9 pages of testimony.[1502] Dr. Kuncel was not provided the wealth of social history information that was uncovered in §2255 and included in Ms. Vogelsang's report,[1503] including not knowing that Mrs. Montgomery's mother sold Lisa for sex.[1504] Dr. Kuncel



Appellate Case: 17-1716 Page: 422 Date Filed: 11/01/2017 Entry ID: 4596229

testified that a social history is necessary for an adequate understanding of neuropsychological test data.[1505]

Dr. Kuncel testified that her testing protocol was compromised by trial counsel's failure to insure that she had two days of back to back testing with Mrs. Montgomery.[1506] She completed half the administration of the MMPI-II on one day of testing, but when she returned the following day to continue, Mrs. Montgomery had been moved to Philadelphia.[1507] Though she decided to complete the testing on a later date in Philadelphia, she realized that her work had been compromised.[1508] Ultimately this failure to adhere to testing protocol became a major issue in her testimony.[1509]

Further, not only was she unable to administer the test all at one time as is protocol, the testing in Philadelphia was obstructed by the fact she and Mrs. Montgomery were in a room that looked into the visitation room where up to 70 people were milling around, "including there was one toddler who came up, put his mouth on the glass watching us while we worked."[1510] Such distractions, according to Dr. Kuncel, are not contemplated by the standards for the administration of neuropsychological instruments.[1511]

Dr. Kuncel testified that her penalty phase testimony was undermined by the fact that before she ever testified Dr. Martell characterized her data as

proving that Mrs. Montgomery malingered.[1512, a] Dr. Kuncel reviewed Dr. Martell's trial testimony and her own testimony at the penalty phase and testified that she now realizes that when she got on the stand the jury had already discredited her testing and information: "now they're looking at me testifying in mitigation where they already have – I would think in many cases – an entrenched opinion based upon their own decision and verdict around the quality of my information and data . . . I objected to how [Dr. Martell] represented malingering, for instance, how he dealt with the two instances that he referred to in my test data around malingering and that they were stated as, at least as I understood his report, and my opinion is they were stated as this is evidence of malingering, topic over. We can now proceed because we know she's a malingerer and she's shrewd enough to go and malinger sometimes and not others when, as far as I'm concerned, each of these are cherry picked. Each of these are evidence of possible malingering. But let's look at them separately and let's look at all the tests that did not show instances of malingering. Rather, these are pieces of evidence of malingering – no malingering rather than something where she knew enough about malingering to go fake successful

[a] Dr. Kuncel did not testify in the first phase of the trial despite the fact that her report reflected that the referral question posed to her by trial counsel was whether Mrs. Montgomery was not guilty by reason of insanity (Vol. 5, p. 1273, *Kuncel Testimony*).



Appellate Case: 17-1716 Page: 424 Date Filed: 11/01/2017 Entry ID: 4596229

testimony – or responses otherwise."[1513] Dr. Kuncel disagreed with Dr. Martell's interpretation of Dr. Kuncel's data as showing that Mrs. Montgomery "selectively malingered."[1514] Dr. Kuncel testified that the test which indicated possible signs of malingering was a "screening test" in which "false positives are purposefully incorporated into the test."[1515]

**e. Movant presented Dr. Sanislow, the nation's preeminent expert on the MMPI, who testified that the government's expert's use of the MMPI data did not conform to standard of care and misrepresented that which can be gleaned from Mrs. Montgomery's MMPI profile.**

Dr. Sanislow, an associate professor of neuroscience, behavior, and psychology at Wesleyan and Yale Universities, testified as an expert in clinical psychology.[1516] His testimony established that Dr. Martell's interpretation of the MMPI data[a] was misleading and should have been excluded pretrial through competent motions practice.[b]

---

[a] Dr. Willing was the psychotomitrist hired by Dr. *Hutchinson* to perform the pen and paper psychological testing in 2005. Dr. Willing's testing is referred to as Dr. *Hutchinson*'s data throughout the record, but Dr. *Hutchinson*'s testimony at Vol. 4, p. 999-1000, *Hutchinson Testimony*, clearly sets forth that which Dr. Willing performed, including the MMPI referred to in Dr. Sanislow's testimony. That MMPI will hereafter be referred to as the 2005 MMPI. Dr. Kuncel and Dr. Martell both administered the MMPI in 2007, so their results will be referred to respectively as "Kuncel MMPI" and "Martell MMPI."

[b] Vol. 6, p 1361-63, *Statement of Counsel* ("Some of Dr. Sanislow's testimony will be highly technical, and I don't want the Court to have the impression that we are suggesting that such highly technical information should necessarily have been presented in front of the jury. Instead, some of the technical information would

Movant established that Dr. Sanislow is one of the nation's preeminent scholars on the use and interpretation of the MMPI. Dr. Sanislow testified that while acquiring his PhD in clinical psychology from Duke University, he worked with one of the country's foremost experts on the MMPI, Professor Robert Carson and also with Grant Dahlstrom (one of the originators of the MMPI) at UNC Chapel Hill.[1517] Dr. Sanislow taught graduate students at Duke to use the MMPI appropriately.[1518] During and following his internship at Yale, Dr. Sanislow taught psychiatric residents at Yale University, including courses on the MMPI.[1519] Dr. Sanislow took a leave from Yale to join the National Institute of Mental Health, overseeing the portfolio of funding for all NIMH-funded research in the US for mood related and sleep disorders.[1520] This

---

have been appropriate for pretrial motion practice such as a motion under 12.2 to limit the evaluation of Mrs. Montgomery by Dr. Martell challenging whether or not an MMPI was even appropriate for someone like Mrs. Montgomery . . . Dr. Sanislow's testimony would have been relevant to a pretrial Daubert hearing to challenge the admissibility of testimony from Dr. Martell and Dr. Dietz regarding the MMPI. Further, Dr. Sanislow's testimony is relevant as to trial counsel's failure to seek competent mental health assistance in preparing for trial and to cross-examine Dr. Dietz and Dr. Martell; and, finally, someone such as Dr. Sanislow certainly could have testified to rebut the testimonies of Dr. Dietz and Dr. Martell should all of those measures [have] been unsuccessful and that testimony presented in front of the jury. So this testimony is relevant to several issues, the crux of which goes to the fact that Dr. Martell testified that the MMPI showed Mrs. Montgomery to be a malingerer. Dr. Dietz piggybacked on that testimony and devastated the defense by arguing that Mrs. Montgomery was not in any way mentally ill with the exception of having PTSD from the crime itself and was, therefore not believable").

included oversight of all grants by the NIMH for research into depressive and bipolar disorders.[1521] As part of NIMH's strategic planning, Dr. Sanislow was appointed to an internal working group to devise a research system parallel to the DSM that would help and form the development and improvement of future DSM editions.[1522] After leaving NIMH, Dr. Sanislow joined the faculty at Wesleyan as a tenured associate professor of psychology and neuroscience and behavior.[1523] He consults with the MMPI and uses the MMPI in his laboratory for assessment, he teaches the MMPI to his undergraduate students, and has participated in peer-reviewed research studies, theoretical articles and applications for funding, including such related to the MMPI.[1524] He is a consulting editor for the Journal of Abnormal Psychology.[1525]

Dr. Sanislow educated the Court as to the composition of the MMPI. He explained that in addition to ten "basic clinical scales" the MMP now has a "number of research scales."[1526] He also clarified that the clinical scales contain subscales "which have been around a long time that help the clinician decompose a scale elevation to see what might be driving that elevation."[1527] He testified "there are a variety of these computer reports. These are all now owned and licensed by the regents of the University of Minnesota, and depending on the version of the report and also the copywriter of the software, the output can vary and largely in significant ways. The most central scales that are presented

are the core validity scales and the core clinical scales, supplementary clinical scales, as well as traditional subscales, and then the critical items."[1528] He explained that in Dr. Willing's 2005 MMPI the computer used "correctional" norms to score Mrs. Montgomery's responses,[1529,a] while Dr. Martell used the "extended score report."[1530] Dr. Sanislow explained that the MMPI is not an X-ray of personality or psychopathology:[1531]

> When we give the MMPI, we don't see inside the person to know what's going on. So if somebody's depressed, we don't know if it's because they have a severe history of trauma. We don't know if it's because of neurological problems. We don't know it it's because their memory systems are not operating properly or their attentional systems are disrupted or if they had problems with reward processing, all things that could lead to somebody coming in and describing their clinical state in almost exactly the same way.[1532]

Dr. Sanislow reviewed MMPI test data from Dr. Willing's 2005 administration of the MMPI (Dr. Kuncel's raw data was unavailable[1533]) as well as Dr. Martell's data, report, and Drs. Martell and Dietz's testimony.[1534] He did not review social history information on Mrs. Montgomery or any reports or opinions of Drs. Porterfield, Woods, or Gur.[1535]

Dr. Sanislow testified that Drs. Martell and Dietz's use of and conclusions with respect to the MMPI were contrary to scientific standard of

[a] Dr. Sanislow testified at length explaining the distinctions between the correctional and clinical norms, setting forth the various distinctions between the sub-scales of each scoring (Vol. 6, p. 1393 and following).



Appellate Case: 17-1716 Page: 428 Date Filed: 11/01/2017 Entry ID: 4596229

care in the field of clinical psychology. According to Dr. Sanislow, Drs. Martell and Dietz improperly "focused on one single possibility that  that Mrs. Montgomery was exaggerating symptoms" and did not explore the range of other possibilities "that would be reasonable explanations" for the results obtained on the MMPI.[1536] "There are a number of possibilities that would be reasonable explanations in the context of other data, be it from clinical interviews, psychosocial history, and other tests that in the most ideal clinical standard of care would be integrated into that conclusion."[1537] The standard of care requires psychologists to test the hypothesis suggested by the MMPI testing, "not fulfilling the standard of care, though, would be to use one's judgment, to focus on one [possible conclusion] to the exclusion of others" as Drs. Martell and Dietz did here.[1538]  Dr. Sanislow explained that only after an "evidence based case were made" and "other possibilities . . . rule[d] out" would focus on a single conclusion be standard of care.[1539]

Dr. Sanislow proceeded to explain why Drs. Martell's and Dietz's focus on their theory of malingering was wrong. They failed to look underneath the computer-generated interpretation that Mrs. Montgomery's scores were widely disparate and therefore invalid. On Dr. Martell's 2007 test, Dr. Sanislow testified that, contrary to Dr. Martell's testimony that Mrs. Montgomery's results were inconsistent and therefore invalid, the F scale and the B report

show that Mrs. Montgomery "is consistently providing an ordered set of responses that are consistent about [her] level of distress."[1540] According to Dr. Sanislow, the subscales show that Mrs. Montgomery's level of distress was "consistent with what you would expect to see for somebody who was entering a treatment unit – a person with psychiatric illness entering a treatment unit."[1541] He also pointed out that Mrs. Montgomery's responses on the "f" scale "suggests that she, on these items, tended to be denying psychopathology rather than endorsing psychopathology."[1542]

Dr. Sanislow explained that Dr. Martel improperly used the "F" scale to invalidate Mrs. Montgomery's MMPI results and call her a malingerer. "So I wouldn't throw this out. I would look at this, and this is telling me there's very serious problems, but there's no way – there's no way that I would make a clinical judgment based on this without considering the other data; and because of the elevations, it would be more important to look at other test data and clinical data as well."[1543] Instead of invalidating Mrs. Montgomery's results, Dr. Sanislow testified that the results on the F scale were consistent with trauma – and that dissociation is also known to increase scores on the F scale.[1544] Further, the TRIN scale indicated that Mrs. Montgomery was trying to not look sicker than she was.[1545]



Appellate Case: 17-1716 Page: 430 Date Filed: 11/01/2017 Entry ID: 4596229

> I do believe this is the standard in most hospital settings these days. A person doesn't just have one diagnosis. The epidemiologic evidence studies by Kathleen Merikangas, for instance, have demonstrated that the more severely disabled somebody is, the more DSM diagnoses they meet criteria for, as have the national comorbidity studies of mental illness. SO in going forward to look at this list of hypotheses for potential problems [generated by the MMPI results and reports], it's not finding the one true disorder but looking at the combination of disorders or DSM psychiatric mental disorders that Ms. Montgomery would meet criteria for.[1546]

Dr. Sanislow testified that Mrs. Montgomery's MMPI results not only were not invalid, they clearly indicate she is seriously mentally ill. Mrs. Montgomery's results on the "clinical scales" of the MMPI showed serious psychiatric illness: "[E]ven in those cases if there's one or two high-point clinical scales, which may be characteristic of a particular diagnostic group, then it's oftentimes useful to go look at the subscales to see what may be driving an elevation. It's particularly important when so many scales are elevated on an MMPI to look at these other features."[1547]

> I will caution that the highest scientific standard of the MMPI would be actuarial interpretation. For instance, if you had a population of acute hospitalized inpatients and they were presenting a specific profile, you could assign a probability statement that they likely meet criteria for one, two, or three specific diagnoses on the basis of many studies. However when multiple scales are elevated, it's difficult to determine, again, this relates to the problem of co-occurrence of comorbidity what the nature of the psychopathology is. It's something we're seeing an overlap of many different problems that are coming together. I could be labeled in different ways, and in those instances it's particularly important to look at the subscales. The information that we would glean from the subscales is important information, but



Appellate Case: 17-1716 Page: 431 Date Filed: 11/01/2017 Entry ID: 4596229

> you might think about it as a second order hypothesis because it's not based on the highest standard of the actuarial interpretation[1548] . . . [Where there are elevations across many scales] this gets back to the comorbidity problem in that the boundaries represented by the scales aren't reflecting the boundaries that the scales were intended to capture since the elevation is so great.[1549]

Specifically, Dr. Sanislow testified that Mrs. Montgomery's test data showed that, "depression is moderately elevated as is a scale called conversion hysteria, which is often associated with dissociative problems . . . in short, [this scale] has become an understanding of when people are faced with psychological pain that's too difficult to tolerate. For instance during the course of experiencing a trauma or remembering a trauma, the psychological pain gets converted into a physical problem."[1550] Dr. Sanislow opined that Mrs. Montgomery's MMPI scores "reflect[] real psychiatric illness that needed to be investigated."[1551] He stressed that such investigation would necessarily involve considering the likelihood that Mrs. Montgomery suffered from comorbid conditions: "So looking at this profile in the context of the validity scales. I would make a list of things, of hypotheses that I would want to follow up in terms of psychiatric illnesses. This for me, because of my background and approach to psychopathology, I would also want to look at how these disorders interrelate."[1552]



Appellate Case: 17-1716 Page: 432 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Sanislow's analysis of the MMPI data supports Mrs. Montgomery's experts' opinions presented in §2255. Without knowing Mrs. Montgomery's social history or the diagnosis of the experts to be presented in the §2255 litigation,[1553] Dr. Sanislow noted that Mrs. Montgomery's MMPI results signaled comorbid disorders of mood and thinking. "So, the fact that this scale (the F scale) is at a clinically significant range that you would expect to see for somebody who was hospitalized for a severe dissociative or psychotic spectrum or bipolar spectrum disorder, this would not be unusual or if the person was suffering from delusions. So those lists of problems would be things I would be investigating with other data."[1554] He testified that the data showed evidence of PTSD, mood disorders, dissociative disorders, somatoform disorders, psychosis, and neurological problems.[1555]

Dr. Sanislow broke apart the significant findings he saw in each administration of the MMPI. In the 2005 MMPI, he testified that the 86T subscale was highly elevated: 86T relates to "familial discord, which reflects a history of a home life of family problems and conflict and oftentimes violence in the home, is at 86 T which is the most elevated of the subscale score."[1556] He pointed out that "the two next most highest elevations are self-alienation and social alienation, and those have to do with the ability to be able to communicate and connect with other people and not feel isolated and

estranged."[1557] He noted that in the 2205MMPI, "the two scales that are not elevated are authority problems, which is within normal limits, and social imperturbability."[1558] He explained, "[s]ocial imperturbability refers to the ability of somebody to be charming and glib in way we might think of an example of a psychopath from a movie."[1559] So, Mrs. Montgomery's 2005MMPI did not indicate problems with authority or with psychopathy, but indicated a pervasive and chronic trauma history was likely.[1560] Dr. Sanislow further confirmed this with reference to T scores regarding antisocial attitudes (for which Mrs. Montgomery was within normal limits) and antisocial behaviors (where her T score was elevated): "when I see that pattern there, it's indicating to me that we're not observing trait-like behaviors of antisocial behavior in the client or patient whose being tested when that's within normal limits. When I see the elevation of antisocial behavior in conjunction with a lack of the elevation of antisocial traits, I see somebody who's honestly and forthrightly reporting bad things that they've done in their life."

Dr. Sanislow's analysis of Dr. Martell's MMPI data provided further proof that Mrs. Montgomery did not malinger. Dr. Sanislow found Mrs. Montgomery's reporting in the 2005MMPI and Dr. Martell's 2007 MMPI to be "incredibly consistent."[1561] Dr. Sanislow testified that if proof existed as to the historical accuracy of Mrs. Montgomery's



Appellate Case: 17-1716 Page: 434 Date Filed: 11/01/2017 Entry ID: 4596229

endorsement of the "critical items" it should indicate to an honest examiner, "that Ms. Montgomery was doing her best to portray the most accurate sense of herself when presented her ordered set of responses on the MMPI-2."[1562] Dr. Sanislow also opined that in the standard of care, "clinical interviews, psychosocial history, and other tests [besides just the MMPI] would be integrated" into the clinician's conclusions.[1563]

**f. Movant presented Dr. Davatzikos to support her ineffective assistance of trial counsel claim regarding counsel's failure to adequately defend Dr. Gur's MRI data at the *Daubert* Hearing.**

Dr. Christos Davatzikos testified that he is a professional radiologist at the University of Pennsylvania, directing the center for brain imaging analytics.[1564, a] Dr. Davatzikos teaches brain imaging and courses related to nuclear medicine. He was conceded by the government and accepted by the

---

[a] Dr. Davatzikos' CV was entered as Exhibit 35, and his professional background was established at Vol. 5, p. 1121-22, *Davatzikos Testimony* (Bachelor's degree from University of Athens, Greece, Masters from Johns Hopkins, and Ph.D. from Johns Hopkins, with postdoctoral fellowship at Johns Hopkins School of Medicine; Faculty appointments at University of Pennsylvania: Primary appointment is in Dept. of Radiology at the School of Medicine, secondary appointments in engineering department, biomedical engineering, electrical engineering, and also applied math collaborates and is affiliated faculty with Penn's Center of Neurodegenerative Diseases; he is the director of the Center of Biomedical Image Analysis, which is an overarching entity across many departments; has received many grants from NIH; has published approximately 350 peer reviewed articles, and his research has been cited 21,000 times).



Appellate Case: 17-1716 Page: 435 Date Filed: 11/01/2017 Entry ID: 4596229

Court as an expert in computational neuroanatomy.[1565] Dr. Davatzikos testified regarding his collaboration with Dr. Ruben Gur, also of the University of Pennsylvania, on the analysis of Mrs. Montgomery's MRI.

Though Dr. Davatzikos provided data and graphs that were incorporated in Dr. Gur's report for trial counsel, no attorney for Mrs. Montgomery had ever contacted him about his work until §2255 counsel did so.[1566] Dr. Davatzikos testified that "figure 2" reflected in Dr. Gur's report was Dr. Davatzikos' work.[1567] He explained that he and Dr. Gur work in a multidisciplinary team,[1568] likening their process to labs providing information to a primary care physician – where Dr. Davatzikos is the lab and Dr. Gur is the primary care doctor.[1569] This is so, because where Dr. Davatzikos is an expert in the computation of neuroanatomy, Dr. Gur has perspective from psychology and neuropsychology to bring together the data from various experts and interpret the data in a wider context. Dr. Davatzikos testified that Dr. Gur is "perhaps the world's expert in the field of neuropsychiatry . . . we collaborate because my lab is well known for these type of measurements."[1570]

Dr. Davatzikos rebutted the claims by the government's experts, Drs. Mayberg and Evans. He testified that he has read the reports by Drs. Mayberg and Evans[1571] and that "I can sort of see what I think Drs. Evans and Mayberg are saying. They were trying to think of a different interpretation [of the data

regarding Mrs. Montgomery's brain abnormalities]. That wouldn't be my interpretation."[1572] Dr. Davatzikos stands by his 2007 interpretation of the data regarding Mrs. Montgomery's brain abnormalities and has conducted new analysis that proves his interpretation in 2007 was correct – if a bit conservative as to its reflection of the damage.[1573] His analysis, as seen in Figure 2 of Dr. Gur's 2007 report was generally accepted science.[1574]

Dr. Davatzikos testified to Mrs. Montgomery's brain abnormalities, first with reference to that which he knew in 2007. He explained that MRI studies involve "perform extensive precise and reproducible measurements and come up with a set of numbers that can show volume and activity in sections of the brain" those numbers are then compared to normative range, which he likened to a "brain growth chart."[1575] The normative brain data has been obtained from a large sample over time, "We have a database of about 700 people over the years, and our group is one of the best known internationally. We are a central imaging analytics center for multi-site studies in the nation and throughout the world."[1576] The criticisms of Drs. Evans and Mayberg notwithstanding, Dr. Davatzikos was comfortable that the results he produced in 2007 were reliable and scientifically acceptable.[1577]

Dr. Davatzikos' findings regarding Mrs. Montgomery's brain showed an absence of brain matter – reflecting that either her brain had deteriorated after



Appellate Case: 17-1716 Page: 437 Date Filed: 11/01/2017 Entry ID: 4596229

an injury or that her brain never formed properly.[1578] Dr. Davatzikos detected the brain abnormalities by measuring both the volume of brain tissue and the volume of the brain ventricles.[1579] His measurements reflected that the parietal and medial sections of Mrs. Montgomery's brain are below average, while her ventricles are above average.[1580] The large ventricles indicate loss of brain tissue – the ventricles have filled with spinal fluid instead of the space being occupied with brain tissue.[1581]

Dr. Davatzikos testified that Mrs. Montgomery's brain has an unusual structure which further points to brain loss. Generally speaking, when a brain is smaller, its substructures tend to be smaller.[1582] However, "[w]hat you see here in Ms. Montgomery's brain some areas are way above average, so the temporal, the frontal, and the occipital areas. Some areas like the parietal and the medial are well below average. So that's actually – it's not only the actual numbers but the contrast between some parts of the brain seemingly intact and some other parts of the brain seemingly affected. This contrast makes it a lot more abnormal."[1583]

The abnormalities reflected in Mrs. Montgomery's MRI study raised important clinical questions for Dr. Davatzikos.[1584] The variability and contrast of structure volume could signal neurodevelopmental disorders, psychiatric illness, or traumatic brain injury.[1585] With the information provided by the

studies, Dr. Davatzikos testified one would want to use social and medical history for the source of the brain abnormalities, looking for brain injuries, possible psychiatric illness, concussion, and *en utero* alcohol exposure as possible causes.[1586]

Dr. Davatzikos testified that he has read Dr. Gur's 2007 report and agrees with Dr. Gur's opinions with regard to the quantitative analysis Dr. Davatzikos performed. Dr. Davatzikos agreed with Dr. Gur's analysis in 2007. Had trial counsel called Dr. Davatzikos to testify in 2007, he would have supported Dr. Gur's opinions and analysis.[1587]

In 2016, Dr. Davatzikos compared Mrs. Montgomery's 2007 MRI to the University of Pennsylvania's new "pipeline" – the larger data set of MRI data reflecting the 9 years of accumulation of "more robust" data since the original analysis.[1588] Dr. Davatzikos testified that the results obtained with comparison to the new pipeline confirmed the results from 2007.[1589] In fact, though overall the data confirms that which was seen in the 2007 study, "the parietal and limbic lobe are even more abnormal [than was recognized in 2007]."[1590] Additionally, Mrs. Montgomery's third ventricle is five standard deviations larger than normal, which Dr. Davatzikos testified is "extremely abnormal" somewhere in the range of one in a million.[1591] Dr. Davatzikos testified that it has been long established that neuropsychiatric disorders reduce brain volume,



Appellate Case: 17-1716 Page: 439 Date Filed: 11/01/2017 Entry ID: 4596229

which in turn causes larger ventricles such as is seen with Mrs. Montgomery.[1592] With reference to Drs. Evans' and Mayberg's attempts to find a different interpretation of the 2007 data, Dr. Davatzikos testified that the 2016 data "completely confirm that Dr. Gur was right."[1593]

**g. Movant presented the testimony of Dr. Newberg to support her claim of ineffective assistance of counsel for failure to defend the reliability of Dr. Gur's PET results thereby opening the door to the government's discovery dispute that resulted in the exclusion of the PET data.**

Dr. Andrew Newberg testified that he is a physician, a professor of emergency medicine and nuclear medicine at Thomas Jefferson University Hospital in Philadelphia as well as a full professor at the University of Pennsylvania.[a] Among the courses he teaches at the University is one entitled 'Human Brain Imaging."[1594] Dr. Newberg testified that he was part of the group that designed the protocol for the PET imaging studies (generally) at the University of Pennsylvania, dictating the standard of care for all imaging

---

[a] Vol. 5, p. 1183, *Newberg Testimony*; Dr. Newberg's CV was entered as Exhibit 31, and his full credentials established at Vol. 5, pps. 1183-85, *Newberg Testimony* (M.D. from University of Pennsylvania and internship in internal medicine at Graduate Hospital in Philadelphia; nuclear medicine fellowship at U. Penn.; 3 year residency in internal medicine followed by 2-year fellowship in nuclear medicine at Penn.; trained in imaging, patient care and interpretation of imaging; board certified in nuclear medicine and internal medicine; 150 peer-reviewed articles and 150 published abstracts).

studies.[1595] The Court accepted Dr. Newberg as an expert in nuclear medicine and PET imaging.[1596]

Dr. Newberg testified he collaborates with Dr. Ruben Gur, providing Dr. Gur PET analysis for Dr. Gur's forensic assessments.[1597] Dr. Newberg was physically present when Mrs. Montgomery was scanned at the University of Pennsylvania.[1598] Like Dr. Davatzikos, Dr. Newberg testified that no one from Mrs. Montgomery's defense team (prior to §2255 counsel) had approached him regarding his contribution to the assessment of Mrs. Montgomery's brain dysfunction.[1599] Like Dr. Davatzikos, Dr. Newberg would have been available to defense counsel to discuss his involvement in the scanning and his analysis, had he been asked.[1600]

Dr. Newberg explained that the PET used in Mrs. Montgomery's case is "approved and the most common scan that is used in PET imaging for a variety of neurological and psychiatric purposes."[1601] He specified that he conducted Mrs. Montgomery's scan precisely as he conducts all scans of all subjects at the University of Pennsylvania: "that's the way we do all of our scans, both clinical and research, and certainly for Ms. Montgomery the scan was done exactly according to the typical standard of care approach that we use."[1602]

Dr. Newberg responded to Drs. Mayberg and Evan's critique of his methodology. Dr. Newberg first rebutted Drs. Mayberg and Evan by testifying



Appellate Case: 17-1716 Page: 441 Date Filed: 11/01/2017 Entry ID: 4596229

that, contrary to their contention, he properly calculated the PET results using his standard methodology: "I do what I do, and I did what I do in this case."[1603] He "dispute[s] their conclusion": "basically I process every scan I do the same exact way . . . We look at each region. We normalize to the patient's whole brain." Dr. Newberg expressed surprise that Drs. Evans and Mayberg argued that he normalized "to some larger sample of other people's brains." He emphatically testified, "That's just not what gets done."[1604]

Dr. Newberg's testimony addressed the discovery dispute which resulted in the exclusion of the PET data. The data the University was requested to provide was the scans from the control group to which Mrs. Montgomery's scans were compared.[1605] The PET center had difficulty obtaining that data in the five weeks before the trial: "the main issue was that some of the scans from the control group were on different computers that had been changed . . . and was in a different location and some – we also archive our scans over time. They get put on different hard drives . . . So part of the issue was trying to go back and make sure we have who were the controls, where they were, where they were coming from, when the date of their scans were."[1606] Dr. Newberg explained that the locating of that data fell to a physicist who helps with the computer-related issues in the clinical center – though tasks involving patient



Appellate Case: 17-1716 Page: 442 Date Filed: 11/01/2017 Entry ID: 4596229

care or time sensitive research took precedence over her time to address the discovery issue.[1607]

Dr. Newberg also addressed Drs. Mayberg and Evans' critique of Dr. Gur's willingness to compare Mrs. Montgomery's PET to normative data obtained with other PET scanners. As Dr. Newberg explained, Drs. Mayberg and Evans' critique was trumped up: "the bottom line is that on a more technical level these scanners are very comparable. There are multi-site trials done throughout the country. Obviously some are being done on one type of scanner, some are being done on a large scanner, a smaller scanner, brain scanner, different brands, and so forth, and people have come to realize that for the most part it is still within that same kind of range of variability we were talking about. That's kind of what that standard deviation is all about which is that for the most part the scanners are comparable."[1608] Dr. Newberg testified that the standard in the field allows for comparison of a subject to a control obtained on a different scanner: "it's become a fairly common practice to recognize that while there is some variability on scanners, that it is typically not sufficient to trump over whatever abnormalities a person may see."[1609]

Dr. Newberg addressed Drs. Mayberg and Evans' critique of his methodology. His understanding of their attack on his data was that "I was somehow normalizing her scan to the data from the . . . whole brain values of



Appellate Case: 17-1716 Page: 443 Date Filed: 11/01/2017 Entry ID: 4596229

the normal control scan."[1610] Dr. Newberg agreed with Drs. Evans and Mayberg that making the comparison they described would be inappropriate: "I appreciate that if someone were to do that, it would be the wrong thing to do, but that's why – I don't do that."[1611] He repeated, "that's just not the way it's done."[1612] Mayberg and Evans also criticized Dr. Newberg for reporting 35 out of 36 regions of interest, but Dr. Newberg testified that he provided all the regions of interest, "it's basically a standard spreadsheet, so it kind of comes as it is. I certainly didn't alter it in any way." [1613]

Dr. Newberg testified that in the interest of scientific inquiry he re-ran Mrs. Montgomery's PET data using MIMneuro software.[1614] MIMneuro software is a fully automated FDA approved software for analysis of PET scans.[1615] The results on the MIMneuro software corroborated Dr. Newberg's original analysis of Mrs. Montgomery's scans: he received "very similar results with the limbic system, the parts of the frontal lobe, temporal lobe, the areas that seemed to be high were generally high, the areas that were low seemed to be low. I thought that – it was very helpful for me to see that the original data seemed to hold up extremely well."[1616] Exhibit 48 was introduced as the printout from the MIMneuro software[1617] reflecting that "the parahippocampus, the midbrain, brainstem, the temporal lobe, the hippocampus, the amygdala,



Appellate Case: 17-1716 Page: 444 Date Filed: 11/01/2017 Entry ID: 4596229

those were all critical areas that were elevated prior on initial analysis and are elevated with this analysis."[1618]

Dr. Newberg explained the significance of the abnormalities in the structure of Mrs. Montgomery's brain. His findings were that her limbic system is abnormal, and he explained that the limbic system is the "emotional center of the brain . . . very very crucial to generate our emotional responses and how we react to different things."[1619] Dr. Newberg explained:

> When you talk about people who tend toward violence and violent criminals, what some of the data from my take on the literature shows is that often they either have a very hyperactive limbic system because their emotions are sort of too strong to be able to control properly, or another part of the brain, the frontal lobe, which normally helps to balance their emotions isn't working well enough, and we actually kind of see evidence of both of those in Ms. Montgomery that parts of the frontal lobe are not particularly – are actually reduced in their activity. The limbic system seems to be increased. The implications for that would be that there are going to be times when the emotions are not controllable.[1620]

Dr. Newberg testified that science establishes that persons with chronic sexual and physical abuse suffer changes in their brain structure:

> [T]here's a reasonable number of studies that have looked at people suffering a variety of different abuses, emotional abuse, physical abuse, sexual abuse. Again, people with posttraumtic stress disorder have become a very large area of study. Concussion, again, which is more a physical aspect of the trauma. All of these have shown and reflected a variety of changes going on in different areas of the brain, particularly emotional centers of the brain as well as some of the areas that help to regulate those emotional responses.[1621]



Appellate Case: 17-1716 Page: 445 Date Filed: 11/01/2017 Entry ID: 4596229

. . .

> [I]f you're talking about memory, some of these structures, the hippocampus in particular, is very prominent with regard to our memory. In general, that makes sense because our brains want to remember things that are very emotionally important to us. So we remember important events because of their emotional aspect, and that's how we write things into your brain. So when people have abnormal function or structure of their hippocampus as well as in parts of their parietal and temporal lobe, then it's certainly very possible that memories will not function properly, will not be remembered, will be altered, a variety of different circumstances depending on what the situation is.[1622]

**h. Movant presented Dr. Gur's testimony's that was available – but not presented -- at trial regarding his behavioral image, his testimony regarding the reliability of his MRI data, and the difficulty posed by counsel's mishandling of the discovery dispute that resulted in the exclusion of the PET analysis.**

Movant presented the testimony of Dr. Ruben Gur. Dr. Gur testified that he is a tenured professor at Penn Perelman School of Medicine. His primary appointment is in the department of psychiatry, though he has secondary appointments in departments of neurology and radiology and is a member of the committee that awards Ph.D.s in neuroscience.[1623] Dr. Gur works at the Brain Behavior Laboratory at the Department of Psychiatry at Penn, which he established around 1982 and which is dedicated to using neuroimaging to



Appellate Case: 17-1716 Page: 446 Date Filed: 11/01/2017 Entry ID: 4596229

understand brain and behavior.[1624] Dr. Gur's CV[a] and reports[1625] were accepted by the Court as Exhibits to the hearing and the Court accepted Dr. Gur as an expert in the field of neuropsychology and neuroimaging.[1626]

Dr. Gur explained his "behavioral image" of Mrs. Montgomery's brain with reference to how he developed the method of producing that image. He enlisted four top neuropsychologists in the country – "giants of the field" of neuropsychology[1627] – to rate neuropsychological test results that indicate the brain region corresponding to that result.[1628] The experts put together a table of weights for the brain regions implicated if there is deficit in a particular measure.[1629] The idea was to have "reliable ways of relating cognitive

---

[a] Dr. Gur's credentials are lengthy (Exhibit 156, *Gur CV.*; Vol. 8, p. 2028-41, *Gur Testimony*). Some highlights include: Since starting at U. Penn in 1974, has been a full professor since 1989.He is board certified by the Board of Professional Psychology with a subspecialty in clinical psychology; Is a diplomate in clinical neuropsychology; Most significant awards were the Lieber Prize from the Brain and Behavior Research Foundation that he received along with his wife Raquel, and the George Miller Prize from the American Psychological Association for distinguished contribution to an article (That article looked at sex differences in brain and behavior); He is on several editorial boards and editor of Brain and Cognition making the final decision about accepting manuscripts; over the years has worked with study sections of the NIH reviewing grant applications, and is currently chairing a committee called Adult Psychopathology and Disorders of Aging; has received NIH grants since about 1976 for neuroimaging, PET, MRI; his h-score (used to rate citation to scientific literature) is among the 1500 highest rated scientists in the world; was among the first to publish in the field of MRI; has several grants from NASA and participates in other grants that include neuropsychology and neuroimaging.

performance to brain regions, to the functioning of brain systems."[1630] The behavioral image was designed to be a graphic representation of the information gleaned from neuropsychological testing.[1631] The image (and methodology/algorithm for the production thereof) was peer-reviewed and accepted before being published in the journals Neuropsychiatry, Neuropsychology, and Behavioral Neurology.[1632]

Dr. Gur described his multi-disciplinary team for medicolegal consultation. Dr. Gur generally gives his data and opinions (based in part on the rest of his team) to a forensic expert as Dr. Gur is not a forensic expert.[1633] He also works with Christos Davatzikos and Andrew Newberg. Dr. Gur testified that Dr. Davatzikos is "world-renowned expert in imaging analysis, especially magnetic resonance images."[1634] Dr. Newberg is "probably the most skilled person I know in reading PET scans," according to Dr. Gur.[1635] Dr. Gur "put[s] it together, where that is the role of the neuropsychologist, where Davatzikos and Newberg do not have training in behavioral science."[1636] Dr. Gur testified that though he did not name Drs. Newberg and Davatzikos in his report, his report alluded to their contribution.[1637] Drs. Davatzikos and Newberg were paid for their work through separate contracts with the Office of the Federal Public Defender for the Western District of Missouri.[1638]

Dr. Gur explained his inability to produce the PET "raw raw data"[a] in the time frame dictated by the Court's discovery order. He first explained that the request by Drs. Evans and Mayberg was an unusual request that had "never happened before. It never happened since."[1639] Because he had never before been requested to provide such data, he was unprepared and had to request the university to dig it up.

The representation of Mrs. Montgomery's neuropsychological deficits on Dr. Gur's behavioral image tracked the relative strengths and weaknesses of her brain. Dr. Gur testified that "[l]ooking at variability within the individual is the way to find out if there is brain dysfunction."[1640] He elaborated that if a genius has a car wreck and damages his brain, he will still score higher on many tests than the general population – the damage to his brain is reflected in the relative weaknesses of the affected areas.[1641] Dr. Gur testified that the behavioral image primarily reflects areas of the brain in relation to the other areas of the brain, though he does get a general gauge of where the subject stands in relation to the rest of the population.[1642] Dr. Gur indicated that Dr. Fucetola's detection of the 29 point differential between Mrs. Montgomery's performance and verbal IQs is "exactly the variability I'm talking about."[1643] His behavioral image

[a] Referred to throughout the trial record as the "sushi data"

contributes "a pictorial depiction of what are the brain systems most likely involved in the deficits shown on the neuropsychological testing."[1644] In Mrs. Montgomery, that image indicates deficits that implicate deep gray matter:[1645] "From the behavioral image it looks like the area of damage is in the parietal lobe, which is roughly in the middle of your brain toward the back. Although there are indications of deficits that implicate deep gray matter. Notably the neuropsychological tests do not look at deep gray matter. They're blind to damage there. But when you see – when you see damage in surrounding areas, then very often when you do the imaging, there will be damage in those regions that a neuropsychological test do[es] not measure."[1646] Dr. Gur summed up his findings with respect to Mrs. Montgomery: "so the main finding you see in this image is that is parietal. I thought it was more severe on the right than on the left."[1647]

Dr. Gur testified that his behavioral image was congruent with the MRI and PET data. That is, the neuropsychological, and neuroanatomical data were consistent with each other.[1648] He concluded that "she suffers from brain dysfunction that affects areas that are important for behavior, and that people with that sort of brain dysfunction would have difficulty in certain aspects of their behavioral functioning."[1649] Dr. Gur testified that though the evidence for the correlation was not as "overwhelming" in 2007 as it is today, it was already

known that brain damage such as is seen in Mrs. Montgomery could be caused by posttraumatic stress.[1650] Dr. Gur also posited in 2007 that the damage could have been caused by en utero exposure to alcohol – he made that possibility known to Mrs. Montgomery's counsel, Mr. Duchardt.[1651]

Dr. Gur testified that the only social history information he had to weigh as potential etiology for the brain damage discovered came from trial counsel, Mr. Duchardt.[1652] He had counsel's summary of the data and some medical records regarding head injuries.[1653] If he had known that Mrs. Montgomery's head was pounded into a concrete floor during childhood rape, that would have been an important consideration in his assessment of possible etiology.[1654]

Though Mr. Duchardt muddled the presentation at the *Daubert* hearing, Dr. Gur never diagnosed Mrs. Montgomery with pseudoceysis. At the evidentiary hearing, Dr. Gur testified that Mr. Duchardt introduced pseudocyesis into the discussion by specifically asking whether the brain abnormalities Dr. Gur detected could be consistent or related to pseudocyesis.[1655] Contrary to the government's take on Dr. Gur's report,[1656] Dr. Gur did not represent that his data could be diagnostic for pseudocyesis, because "pseudocyesis is diagnosed . . . clinically. You don't need a PET scan to diagnose it, and there is no indication that the particular PET abnormalities were associated with pseudocyesis."[1657] Dr. Gur did see "abnormally high



Appellate Case: 17-1716 Page: 451 Date Filed: 11/01/2017 Entry ID: 4596229

activity in the hypothalamus, and that happens to be the same region that shows hyperactivity in mice who have pseudocyesis. So that's the extent of what I could say in terms of whether what she has is compatible or congruent with the possibility of pseudocyesis."[1658]

Dr. Gur was able to draw conclusions about Mrs. Montgomery's brain from the MRI study. "One conclusion was clear which is that the ventricles were large."[1659] Dr. Gur testified that "[l]arge ventricles it means that there is more fluid in the middle of the brain than there should be . . . if there is tissue loss in the so-called limbic structures, the structures that surround that fluid inside the brain, then every time a nerve cell dies its place is taken up by fluid. So increased ventricles indicate that there was either damage to the brain, either – what we call atrophy. . . or dystrophy which is that the tissue failed to develop and that's why we have larger ventricles."[1660] Dr. Gur explained that the limbic system is compromised of the basal forebrain, the hippocampus and the amygdala.[1661] "The other [significant finding based on MRI data] was that the parietal lobe seemed to be much smaller than it ought to be relative to the rest of the brain."[1662] He indicated that the right parietal seemed to be affected to an even greater extent than the left.[1663] He testified that this MRI data was consistent with the neuropsychological findings.[1664]



Appellate Case: 17-1716 Page: 452 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Gur explained that the MRI findings were clinically significant. Though the deviation of the results from the mean was not two standard deviations, Dr. Gur testified that the results were nevertheless scientifically significant:

> This is the definition acceptable not just in psychology but throughout medicine. Indeed, if you blood pressure is what is called high normal, which is not even one standard deviation above average, you will be placed on medication to reduce your blood pressure . . . So throughout medicine any value that is more than one standard deviation away from average is considered of clinical significance and your doctor will be paying attention to it . . . Two standard deviations is really definitely defective, and in fact many, many studies would remove all the subjects who are more than two standard deviations away from the mean . . . So one standard deviation is the place where a finding becomes clinically significant . . . That's what you learn when you learn how to do a psychological assessment. These are the standards in the field.[1665]

Dr. Gur testified consistently with Dr. Davatzikos that the MRI data compared to 2016 norms confirms the areas of significant damage identified in 2007.[1666] "First of all, the ratio of parietal lobe volume to the total volume [of Mrs. Montgomery's brain] is almost three and a half standard deviations below what it is in the normal sample. So the parietal lobe is significantly smaller in volume than expected based on the whole brain. And that is important."[1667]

Dr. Gur explained that Mr. Duchardt dictated the control sample used for the PET study thereby inadvertently causing the discovery dispute that resulted in the exclusion of the PET analysis from trial. Dr. Gur testified that having had



Appellate Case: 17-1716 Page: 453 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Newberg conduct Mrs. Montgomery's PET scan on the scanner at the University of Pennsylvania, Dr. Gur wanted to compare her PET study to the normative data derived from the control group of people scanned on that scanner.[1668] Doing so would have been Dr. Gur's usual practice.[1669] Mr. Duchardt felt that the normative data Dr. Gur had from people scanned on the same scanner was too small and asked Dr. Gur to use the normative data from the larger control group Dr. Gur developed for his study that was published in the journal Science in 1995.[1670] Dr. Gur did not object to using the control group from the Science paper, because the profiles obtained were nearly identical to the profiles obtained from the Penn scanner.[1671] Had Dr. Gur used the control group of people scanned on the same scanner, he could have provided Drs. Evans and Mayberg the "raw-raw" data as dictated by the Court's discovery order.[1672] Because the normative data from the 1995 Science group was so old, Dr. Gur was unable to provide that data in a timely way and the Court excluded the entirety of his PET findings.[a]

[a] Vol. 8, p. 2088, *Gur Testimony* (specifying that the discs containing the profiles of the subjects in the Science study were so old that "we had to go to literally to a museum to find a unit that could read some of those tapes . . . Literally. We went to the Medical Society of Philadelphia who happens to have a very nice museum that included that piece. That was the only place we could find it . . . I don't control the PET Center and the PET Center does routine work, both clinical work and research. They don't have extra staff. So they just couldn't place a request like that at the top of their priority, but I pushed as hard as I could").



Appellate Case: 17-1716 Page: 454 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Gur also testified that Drs. Evans and Mayberg's problems with his report were misunderstandings on their part. To the contrary of Drs. Mayberg and Evans' claims, Dr. Gur provided Drs. Evans and Mayberg PET data for all 36 regions of the brain. "[Their claim to the contrary] turned out to be an error in their reading of the file."[1673] They also claimed that Drs. Newberg and Gur had mistakenly published values for the normative sample based on dividing each region of interest's value by the average of all the regions of interest. Dr. Gur concurred with Dr. Newberg that, had they done as Drs. Evans and Mayberg claimed, such an analysis "would have been a mistake. I would not have passed the reviewers . . . What we use in order to divide the value of each region is the total value number of coincidental hits or the total value of the whole brain, and that is obtained routinely for the whole brain . . . they erroneously claimed that it should have been only gray matter, but that's not what is done. Nobody does that."[1674] Dr. Gur explained that the method Drs. Evans and Mayberg claimed that he used (and of which they were, understandably critical) is "more complicated than what I did, and it would have been wrong. So why do something more complicated. There's nothing to be gained from using that method. It just wouldn't have occurred to me to use a method like that."[1675] Dr. Gur explained that Drs. Mayberg and Evans' critique of the PET was levied after the Daubert hearing in support of their claim to

need the “raw raw data” and that Dr. Gur never got to explain to the Court why and how Drs. Evans and Mayberg were wrong, rather the Court simply excluded the PET because Dr. Gur could not produce the data on the normative samples which were locked in warehoused, obsolete computers.[1676] Dr. Gur attempted to explain the fallacy with Drs. Evans and Mayberg’s analysis in his January 8, 2008 memo (Exhibit 28(f)).[1677] Dr. Gur testified that he was aware of Dr. Newberg’s reanalysis of Mrs. Montgomery’s PET data using the updated pipeline and concurred with Dr. Newberg that the new analysis confirms the findings that they had in 2007.[1678]

**i. Movant presented testimony that Dr. Ramachandran never was the expert Mr. Duchardt represented him to be.**

Mrs. Montgomery presented the testimonial deposition of Dr. Vilayanur Ramachandran in support of her claims of ineffective assistance of counsel.[a] Dr. Ramachandran’s testimony supported Mrs. Montgomery’s claim that Mr. Duchardt affirmatively misled the court on April 3, 2007 when he told the Court that Dr. Ramachandran had given him a “preliminary diagnosis” of pseudocyesis. The testimony further supported Mrs. Montgomery’s ineffective assistance of counsel claims for presenting a NGRI defense based on

[a] Vol. 4, p. 917, *Announcement of Counsel* (introducing Exhibit 36, *Ramachandran Depo*.).



Appellate Case: 17-1716 Page: 456 Date Filed: 11/01/2017 Entry ID: 4596229

pseudocyesis, for hiring an expert who was not qualified to give the opinions he rendered, and for failing to adequately prepare Dr. Ramachandran to testify.

Dr. Ramachandran testified that he did not provide a "preliminary diagnosis" to Mr. Duchardt prior to the April 4, 2007 hearing where Mr. Duchardt announced that both Dr. Ramachandran and Dr. Logan were writing reports in support of that diagnosis. Dr. Ramachandran termed the suggestion that he would make even a preliminary diagnosis over the phone without seeing the patient "inconceivable."[1679] "If you ask me to give a legal document or a legal opinion, I'd have to see the patient first and interact with the patient," he explained.[1680] He would not give a definitive diagnosis over the phone,[1681] nor would he ever agree to write a report based on a phone call.[1682]

Dr. Ramachandran testified that his diagnosis was predicated on the materials provided to him by Mr. Duchardt. He relied on "other tests that had been done by other experts and physicians"[a] as well as documents provided to him by Mr. Duchardt regarding Mrs. Montgomery's history. Dr. Ramachandran testified that he did not observe any of the physical manifestations of pregnancy

---

[a] Exhibit 36, *Ramachandran Deposition* p. 9; *see also*, TT. Vol 10, pps. 2057-65, *Vandenboom Testimony* (reporting on the hysterosalpingogram results that Mrs. Montgomery cannot conceive); TT. p 2198, *Ramachandran Trial Testimony* (testifying that Mr. Duchardt provided him with a lot of eye witness accounts and the physician report and expert reports).

that are necessary for a diagnosis of pseudocyesis when he interviewed Mrs. Montgomery, for that element of the diagnosis, he relied on "reports from her husband, her daughter, from reports of various people who had already examined her, physicians who already examined her and given access – I was given to these reports."[1683]

Dr. Ramachandran clarified that he would never have represented himself to be a psychiatrist to Mr. Duchardt. "I do cognitive neuroscience, research in behavioral neurology and neuropsychiatry . . . I've never represented myself as a psychiatrist."[1684] Dr. Ramachandran does not have a license to practice medicine in the United States.[1685]

Further, Dr. Ramachandran testified that he would never represent himself as an expert in pseudocyesis. As he said, "of course not. There is no such thing . . . there is no such thing as an expert in pseudocyesis. It's a research area of a rare disorder."[1686] Dr. Ramachandran testified that he has only encountered 5 or 6 patients with pseudocyesis: three in India, only two (including Mrs. Montgomery) in the US.[1687] He explained that his book was not, in fact, about pseudocyesis but rather an attempt to make brain science, generally, more accessible to lay people.[1688] In the book, which focuses on the connection between mind and body, chapter 11 opens with a five page case study from 1930 of a woman with pseudocyesis.[1689] Dr. Ramachandran has not,

himself, conducted any research on anyone with pseudocyesis.[1690] In his book, Dr. Ramachandran provided endnotes citing the studies and materials from which he drew his information; the endnotes include two scientists who have authored studies on pseudocyesis.[1691]

Dr. Ramachandran's understanding of the question presented to him at trial was whether Mrs. Montgomery had committed the murder volitionally.[1692] He learned the M'Naghten rule while a medical student in England and learned that people can commit volitional acts while legally insane.[1693] Dr. Ramachandran testified that he understood that Mr. Duchardt "wanted me to review all the evidence available and pass an opinion on whether she had pseudocyesis or not, and whether there were underlying pathologies such as PTSD, abuse, predisposed to pseudocyesis and this in turn could have led to a delusional state, dissociative state which would have contributed to the act."[1694] He elaborated, "the whole question of whether or not in a dissociative state you know what's right from wrong. You know, nobody knows the answer to that. It's a philosophical question. Whether you know right from wrong in a dissociative state, is that individual responsibility when he's in that dissociative state capable of judgment right from wrong as his own volitional act. I don't know the answer to that."[1695] When asked whether he conveyed his lack of



Appellate Case: 17-1716 Page: 459 Date Filed: 11/01/2017 Entry ID: 4596229

expertise over this "philosophical question" to Mr. Duchardt, Dr. Ramachandran admitted, "I don't think it came up."[1696]

Dr. Ramachandran was loathe to criticize Mr. Duchardt. He was quick to point out that his time with Mr. Duchardt was "very pleasant."[1697] "[H]e was a very southern hospitable gentleman, very courteous. And then I think he took me to lunch or something and we went to his office, sat down and we chatted for a while . . . He seemed very professional."[1698] However, Dr. Ramachandran did not recall any formal preparation for his testimony, no discussion of the questions that would be asked: ""I think we may have talked on the phone a few times, but he already told me about the case and the basics facts of the case, and told me a little bit more . . . But I don't think we went into great detail. Certainly not these issues like [M'Naghten's Rule], criminal responsibility, dissociative state, we didn't go into any of that."[1699] As he explained his comfort with his role on the stand "was mixed. I felt sufficiently confident as far as the science and the medicine goes, but I haven't done this very much in courts, appeared in court and testifying."[1700] Actually, at the time of the trial, Dr. Ramachandran had never testified in front of a jury – he had just been deposed twice.[1701]

Mr. Duchardt's failure to clarify for Dr. Ramachandran the critical question with regard to NGRI set Dr. Ramachandran up for impeachment. If

Mr. Duchardt had made clear that he wanted Dr. Ramachandran to testify to whether Mrs. Montgomery knew right from wrong at the time of the murder, Dr. Ramachandran would have said, "I can only testify regarding pseudocyesis and the question of delusional states in general as it pertains to brain disease and brain dysfunction."[1702] As Dr. Ramachandran explained, as to the question of "specifically whether in her case there was a dissociative – do you know right from wrong in a dissociative state, as I said, it's you know, almost a philosophical question. Question of law, ethics, morality, philosophy, sociology and psychiatry."[1703] Dr. Ramachandran explained, "my research straddles the boundary between neurology and psychiatry. And we're not only talking about physical changes, I'm talking about her mental state. And I felt comfortable with that. Wandering into the territory of whether she had PTDS, whether she could tell right from wrong – I don't know if I did or not. That part I would be uncomfortable with."[1704]

**14. Proof Lisa Montgomery was sexually trafficked becomes available once Kidwell memo investigated.**

As demonstrated at the hearing, once counsel investigated the notation in the Kidwell memo – simply asking Mr. Kidwell what he meant when he told Dani Waller that Lisa was forced to have sex with "Jack and his friends" – reliable information became available that Mrs. Montgomery was a victim of



Appellate Case: 17-1716 Page: 461 Date Filed: 11/01/2017 Entry ID: 4596229

serial, chronic gang rape that was not only tolerated by her caregivers, but profitable to them. As discussed above, Dani Waller and Ron Ninemire interviewed Mr. Kidwell pretrial and provided counsel with a memorandum of their in interview.[1705] Trial counsel did not follow up on that information.[a] Mr. Kidwell was available to testify – and indeed did testify – but was not asked about the gang rape.[1706]

The stipulated evidence presented at the hearing showed that had counsel followed up on the Kidwell memo, Mr. Kidwell would have testified that as a young teen Lisa disclosed that Jack and his friends were raping her orally, vaginally, and anally.[b] "She said it was over and over, one man right after the

---

[a] Vol. 6, p. 1575-76, *Waller Testimony*; Vol. 8, p. 2025, *O'Connor Testimony* ; Vol. 8, p. 2186, *Owen Testimony* (he interviewed Jack Kleiner, team did not follow up on Ms. Waller's memorandum); Motion to Expand the Record – Attachment 1, *Supplemental Owen Declaration* ("When I testified with regard to a question about follow up on Ms. Waller's 2007 memo [of interview of David Kidwell], I was solely referencing the 2005 interviews with Jack Kleiner. I testified that 'we' had asked Jack Kleiner about the allegations that he had sexually assaulted Lisa. By 'we' I was referring to Ron Ninemire and myself. Ron Ninemire and I interviewed Jack Kleiner two times, both of those interviews took place in 2005 [prior to Waller's interview with Kidwell in 2007]"; *contra*, D.E. 212, *Order* (finding counsel's decision to abort investigation reasonable in light of counsel's attempts to corroborate Kidwell's information through Jack Kleiner and Mrs. Montgomery).
[b] As discussed above at §V.B., the trial team possessed the divorce records from *Kleiner v. Kleiner* wherein Mrs. Shaughnessy (then Kleiner) named the men with whom she had been keeping company. Two of the men who participated in the gang rapes of Mrs. Montgomery were named in those documents. *See,* Vol. 4, p. 837, *Freedman Testimony* (reflecting that the team knew information from the *Kleiner v. Kleiner* divorce records); Exhibit 17, *Kleiner v. Kleiner Interrogatories.*

other, and went on for hours. They were also physically violent. They would beat and slap her if she was "doing it wrong." When they were done, they urinated on her like she was trash. I asked Lisa if these men did this to her just one time and she said no. It happened a lot of times."[1707] Mr. Kidwell's testimony would have been corroborated by information from Mrs. Montgomery and records the trial team possessed.[1708] Had the trial team followed up with Mr. Kidwell and learned the truth of the nature of the torture and degradation Mrs. Montgomery suffered, counsel would have uncovered the fact that Mrs. Shaughnessy actually sold young Lisa to these men.[a]

The testimony presented at the hearing demonstrated the proof which could have been presented at trial as to the life-long impairments Mrs. Montgomery endured as a result of the trauma inflicted by her mother and step-father. Dr. Katherine Porterfield, a psychologist who specializes in the treatment of survivors of torture,[b] described the traumatic impact of childhood

---

[a] Vol. 6., p. 1672, *Porterfield Testimony*; Exhibit 8, *Porterfield Supplemental Declaration* at p. 3 (Mrs. Montgomery confirmed Mr. Kidwell's report and added "no one knows how involved my mom was in all of it . . . that's how they paid for the new living room").
[b] Dr. Porterfield is a clinical psychologist in practice at the Bellevue NYU Program for Survivors of Torture (Vol 6, p. 1578). She has treated survivors of sexual violence, gang rape, and forced prostitution as well as survivors of war and military torture from over seventy countries (*id.*). Shortly before testifying at the evidentiary hearing, Dr. Porterfield was asked to train prosecutors at the

sex trafficking on Mrs. Montgomery's development and functioning.[1709] As Dr. Porterfield summarized: "Lisa Montgomery's childhood and adolescent experiences as a victim of severe trauma, abuse, and neglect led to massive and pervasive impairments in her biopsychosocial functioning and capacities."[1710]

**15. The proof at the hearing established that trial counsel failed to comply with prevailing professional norms and prepare a comprehensive social history.**

**a. Mrs. Montgomery's social history – both the historical narrative reflecting family dysfunction and abuse and also the description of Mrs. Montgomery's impaired functioning pre-crime – is the foundation for the reliable expert assessments and opinions presented at the hearing as well as providing mitigation.**

Consistent with the ABA standards and the best practices outlined by the expert investigator and capital trial counsel, Mrs. Montgomery's habeas team conducted a full social history investigation.[1711] Ms. Jan Vogelsang, expert clinical social worker, compiled that information into a social history – and analyzed the data consistent with the discipline of clinical social work, creating a report termed a "biopsychosocial evaluation."[1712] Ms. Vogelsang testified –

---

International Criminal Court at The Hague regarding examination of witnesses in a war crime trial (*id*. at p. 1580). Mrs. Montgomery's case is only the second criminal case where Dr. Porterfield has testified as an expert witness for the defense; she previously has testified for the prosecution in a child murder case (*id*. at p. 1638).



Appellate Case: 17-1716 Page: 464 Date Filed: 11/01/2017 Entry ID: 4596229

and her testimony was echoed by each of the expert psychological and medical witnesses that comprised the multi-disciplinary team that evaluated Mrs. Montgomery – the biopsychosocial report provided the expert witnesses with the information necessary to conduct reliable assessments of Mrs. Montgomery.[a]

Had the Court allowed Ms. Vogelsang to testify fully,[b] her presentation would have supported the conclusions of all the experts who examined Mrs. Montgomery. Ms. Vogelsang's biopsychosocial history sets forth not only Mrs. Montgomery's social history – ie. the reasons for Mrs. Montgomery's impairments – but also details her impaired daily functioning that not only is consistent with the findings of the experts but, indeed, proves Mrs.

---

[a] Vol. 7, p. 1759, *Woods Testimony*; Vol. 4, p. 1021, *Hutchinson Testimony*; Vol. 7, p. 1744, *Nadkarni Testimony*; Vol. 7, p. 1584, *Porterfield, Testimony*; Vol. 4, p. 957, Logan Testimony; Vol. 5, p.1279, *Kuncel Testimony*; Vol. 4, p. 881, Fucetola Testimony (testifying that medical record attached to the social history furthered his understanding of Mrs. Montgomery's neuropsychological data).

[b] Vol. 4, p. 1490, *Objection by the USA* ("we did stipulate to her original report and supplement. I would note the original report is 184 pages. The PowerPoint is also – there's no objection to a stipulation of the PowerPoint. **We're not contesting the information** that she was able to compile and put together in the biuosocialpsych (sic) history here. I don't that we need to go through ad nauseam the PowerPoint because it's all sourced back, and I think they did an excellent job of providing the Court with a roadmap of the information in the 184 pages and then digesting it down with these source attachments here") (emphasis added); Vol. 4, p. 1491, *Argument of Counsel* (explaining that Ms. Vogelsang's testimony is not just the information contained in the PowerPoint slides, but also her expertise as a social worker in assessing that information).

Montgomery suffers as the doctors' diagnoses describe.[a] Such information is vital in the presentation of mitigation to a jury as jurors are known to be rightly skeptical of "the abuse excuse" and expert psychobabble.[1713]

**b. Ms. Vogelsang's proof is uncontested, scrupulously sourced, and supported by social work literature.**

The government admitted both the admissibility and reliability of Jan Vogelsang's biopsychosocial assessment of Mrs. Montgomery. At the evidentiary hearing, the government announced that the government was "not contesting the information that [Ms. Vogelsang] was able to compile and put together in the biuosocialpsych (sic) history here."[b] Ms. Vogelsang has been accepted as an expert in clinical social work in five federal district courts and thirteen state courts – her expertise has never not been accepted when offered to a court.[1714] The government stipulated to the admission of Ms. Vogelsang's report and PowerPoint – at one point indicating that it was unnecessary for the Court to hear Ms. Vogelsang's presentation because the report was so thorough.[1715] In so doing, the government conceded that Ms. Vogelsang's work

---

[b] Vol. 4, p. 1490, *Objection by the USA*; much of the information Ms. Vogelsang would have presented at the hearing is included in §V.B. of this COA, with citation to Ms. Vogelsang's report.



Appellate Case: 17-1716 Page: 466 Date Filed: 11/01/2017 Entry ID: 4596229

was scrupulously sourced,[1716] reflecting that which Ms. Vogelsang testified is her standard:

> We try to have more than one source for the information whenever possible, to have at least two or more, and contemporary document – contemporaneous documents and records are particularly helpful because they usually were created during a time when the current case was not at issue, and so the opinions and the notes of people who have had some relation to the person you're assessing at another period in time can be very enlightening in terms of that part of that person's life.[1717]

The government also accepted the substance of Ms. Vogelsang's life history of Mrs. Montgomery and her data regarding Mrs. Montgomery's pre-crime functioning – along with her clinical social work assessment of that information. As shown above, MISSED MITIGATION, Ms. Vogelsang documented and detailed historical data reflecting an overview of Mrs. Montgomery's familial history and heritage, Mrs. Montgomery's life history, and Mrs. Montgomery's impaired functioning prior to her arrest.

**c. Ms. Vogelsang's testimony is rooted in the narrative life history of Lisa Montgomery as framed by the discipline of clinical social work.**

As Ms. Vogelsang explained, part of the work of the biopsychosocial report by a social worker is to "refer to a person's life experiences, to their environment, to the things that have shaped and impacted them in terms of family, non-family, and it looks at areas such as education, socioeconomic



Appellate Case: 17-1716 Page: 467 Date Filed: 11/01/2017 Entry ID: 4596229

level, gender, culture, and all the many other things that affect a person and help shape them when they're developing."[1718] Such is required, Ms. Vogelsang explained, because the discipline of social work recognizes:

> [W]e don't grow up in a vacuum. We're shaped by the experiences of others and by the people that we're exposed to growing up; and just as a doctor's interested who in your family have had heart attacks or strokes or other medical problems, we do the same thing in mental health. We look at the different behaviors and signs and symptoms and know that some of those are literally passed down through the generations from family member to family member.[1719]

Particular attention is paid, of course, to the subject's parents and caregivers: "the kind of experiences that [the parents] had in their own childhoods, the way in which they were parented, the environment they lived in and how it shaped them has a significant and critical impact on the way they look at and raise their own children."[1720]

#### d. Ms. Vogelsang sets the stage with intergenerational history showing patterns of dysfunction and mental illness.

As shown, above (Missed Mitigation), Ms. Montgomery's family was rife with dysfunction, mental illness, and substance abuse. Ms. Vogelsang documented the family systems of dysfunction and created genograms which displayed the intergenerational history of 1) mental illness, 2) substance abuse, and 3) custodial interference.[1721] As she saw patterns develop in the historical data, Ms. Vogelsang created those genograms.[1722] As she explained, "everyone



Appellate Case: 17-1716 Page: 468 Date Filed: 11/01/2017 Entry ID: 4596229

on this family tree who's colored in green was found either through documents or interviews to have some sort of mental emotional, or behavioral dysregulation and that was a rather later pattern in Lisa's family on both sides."[a] Ms. Vogelsang documented an unusual family pattern of that which she termed "custodial interference."[b] Ms. Vogelsang explained that she had never seen a pattern such as this in another family: "this pattern demonstrates people who were involved in the taking of children or threatening to take children

---

[a] Exhibit 154, *Biopsychosocial PowerPoint* at slides 3:




[b] Exhibit 154, *Biopsychosocial PowerPoint* at slides 4:



either with or without the benefit of the law, and this is a very unusual pattern to emerge, and I don't recall ever seeing one emerge like this before."[1723] Ms. Vogelsang also prepared a genogram reflecting the inter-generational history of substance abuse:[a] "this family pattern emerged in terms of substance abuse, mostly alcohol, occasionally drugs, but mostly alcohol . . . it had an unusual cluster just around the immediate family and it appeared to me that the use of alcohol in this family was partially due to a lack of professional care for the mental health problems. So you see people using alcohol to self-medicate or to deal with their behavioral problems."[1724]

Ms. Vogelsang highlighted the history of some of Mrs. Montgomery's ancestors whose behaviors hinted at the mental illness and instability which seemed to run through later generations, "Thinking in terms of the behavioral issues, Lisa has a paternal grandmother whose life partially reflects this pattern

[a] Exhibit 154, *Biopsychosocial PowerPoint* at slide 5:





Appellate Case: 17-1716 Page: 470 Date Filed: 11/01/2017 Entry ID: 4596229

that emerged in the family. She was raised in Washington State and was known throughout her life to have these bouts of temper, of rage, or outburst, and uncontrollable emotions; and so while Lisa did not grow up around her, this was one of the significant parts of her family, members of her family that had some of these behaviors that became significant later on."[1725] Ms. Vogelsang included in her PowerPoint a quote from Thomas Hedberg, Ms. Montgomery's paternal uncle and son of the grandmother who recalled that if the grandmother "got into a fight, she blacked out and then came to banging someone's head against the ground. She could not remember getting in the fight or actually fighting . . . [she] blacked out during the whole fight and then woke back up at the end when she was getting pulled off the person."[1726]

Ms. Vogelsang compiled slides which listed the family members with documented impairments, providing reference to the documents from which she acquired the information and listing the type of impairment and the treatment (if treated).[1727] On Mrs. Montgomery's paternal side, Ms. Vogelsang documents that Mrs. Montgomery's father has been diagnosed with anxiety and depression, her aunt has been treated for depression, her half-sister is being medicated for bipolar disorder, her uncle admits to anxiety and depression, debilitating headaches and uncontrollable emotions; two of her female cousins are treated

for major depression, and her only male first cousin was being treated for depression though he committed suicide shortly before the hearing.[1728]

Mrs. Montgomery's maternal family is even more rife with mental illness and dysfunction than the paternal. "The maternal side of Lisa's family had an even greater pattern of mental and emotional problems going back to her great-grandmother, Maude Berry, who ran away at 13, started having children at 13 or 14 and had six children and then just took the baby and ran off leaving the other five behind."[1729] Ms. Vogelsang traced a pattern of notably odd[a] behavior through the maternal generations. Viola's son, Samuel "was known for his odd behavior. Samuel was eventually found dead on the railroad tracks from a mysterious death." According to Lisa's mother, Samuel was known for having sold and burned women.[1730] Ms. Vogelsang noted that there was an undocumented though pervasive story in the maternal family of a great-great-grandmother, Rebecca Short, who died in an insane asylum in Indiana.[1731]

Ms. Vogelsang found many of Lisa's generational cohorts to have formal diagnosis of severe mental illnesses: Lisa's maternal first cousins, Wendy Triebs and Kenny Alexander are floridly mentally ill. Ms. Vogelsang

[a] Where mental health diagnoses were not present, Ms. Vogelsang avoided ascribing medical terminology to the behaviors, but noted behaviors which were consistent with mental illness which later became rife in the family.



Appellate Case: 17-1716 Page: 472 Date Filed: 11/01/2017 Entry ID: 4596229

interviewed Ms. Triebs and related "this young woman has had a long history of psychiatric hospitalizations" she noted that the medical records from the hospitalizations reflect that Ms. Triebs had, among other self-harming actions, stabbed herself with scissors in her vagina[1732] and "inscribed the word 'evil' on her abdomen with a razor blade."[1733] Ms. Triebs' major depressive disorder was so extreme that she received electric shock therapy eight times and had been committed more than nine times.[1734] Ms. Triebs had diagnosis of major depression, personality disorders, and documented psychosis.[1735] Ms. Triebs' brother, Kenny Alexander is so severely mentally ill he has been adjudicated legally insane.[1736] He has been diagnosed with bipolar disorder and determined to be psychotic.[1737] Both Ms. Triebs and Mr. Alexander's children exhibit psychiatric illnesses as well.[1738]

Mrs. Montgomery's siblings also are mentally ill, though their mental health concerns are less clearly documented than the cousins'.[1739] Mrs. Montgomery's half-brother, Teddy Kleiner has been placed on psychotropic medications by the Kansas Department of Corrections.[1740] Mr. Tommy Kleiner has also been treated with antipsychotic medications, including Paxil, Trazadone, and Lithium and believes that his diagnosis is bipolar disorder.[1741]

In keeping with social work's understanding that upbringing affects the parenting that a parent provides,[1742] Ms. Vogelsang focused deeply on Mrs.



Appellate Case: 17-1716 Page: 473 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery's mother's up-bringing. Ms. Shaughnessy was "brought up in a very harsh and poverty-stricken environment in Kansas."[1743] Her father abused her mother, who was bedridden with what is believed to have been polio.[1744] Mrs. Shaughnessy's stories about her parents spoke volumes about her upbringing and mental health – despite Ms. Vogelsang's inability to substantiate her claims: Mrs. Shaughnessy reported that she was the product of paternal incest (her father allegedly raped her sister Ann) and also the victim of it.[1745]

Mrs. Vogelsang described Mrs. Shaughnessy as she was known by her friends and relatives.[1746] She was "conniving and manipulative"; "manipulative, crazy"; "a liar and also mean"; "cold hard and a survivor"; and twisted information to get "everyone . . . mad at everyone."[1747] She was known to have "intense mood swings,"[1748] to be "irritable, very aggressive, and hypersexual."[1749] Her first husband, Leo Barabash not only described her as "a hooker" but also prophetically opined that she would be "a terrible mother."[1750]

Ms. Vogelsang described Lisa's father, John Patterson's upbringing as similarly unstable. John's father abducted John when John was 4 years old, keeping him for about a year.[1751] John suffered "classic trauma symptoms" from this kidnapping: nightmares, developmental regressions, and unreasonable fears.[1752] Following an unhappy childhood with a hostile mother, John joined

the army to escape his upbringing.[1753] Though he did well in the military for a time – earning several awards and commendations, John's military records reflect some problems, namely inadequate hygiene, indebtedness, marital problems (with Lisa's mother), a drunken vehicle accident resulting in reprimands. John ultimately went AWOL.[1754]

Though the Court's admonition to condense Ms. Vogelsang's testimony to one additional hour (from her testimony regarding Mr. Patterson's military service, forward) required counsel to direct Ms. Vogelsang's courtroom testimony to merely the highlights of her planned testimony, her PowerPoint presentation reflects that Ms. Vogelsang planned to provide the Court with more in-depth information. For instance, at this point, Ms. Vogelsang had planned to present the court with the history of Lisa's parents' marriages – including reference to the 6 children John abandoned.[1755,a]

Ms. Vogelsang had prepared to discuss Mrs. Shaughnessy's and Mr. Patterson's tumultuous relationship with the Court, but had to merely summarily describe it including reference to Mrs. Shaughnessy's unabated

---

[a] Though Counsel will relate the rest of Ms. Vogelsang's information as she intended to present it – with reference to the PowerPoint and to her testimony, her presentation was highly curtailed, skimming the highpoints of that which she intended to present. While this was time effective, it did not allow the district court to assess the emotional power of the fully told story.

drinking during her pregnancy with Lisa.[a] Ms. Vogelsang showed the Court a photograph of Lisa's older sister Diane[b] at age 4 and explained that due to Judy's neglect, Diane was Lisa's primary caregiver.[1756] Ms. Vogelsang related that Mr. Patterson has admitted his and Judy's mistreatment of Diane and Lisa, "He admitted to going along with Judy and her punishment mistreatment. Some examples are that Judy knew that Diane's greatest treasure was Baby Lisa and so she used that to keep Diane in line and she would threaten to send Diane away from the home. She would strip her naked. She would make her pack her bag and make her sit out on the porch and wait for these nonexistent people who were coming to take her away; and so when John came home, he joined in that punishment much to his shame, and also joined in with spanking the girls, in restricting their movements and suppressing noise, and later was able to say

---

[a] Exhibit 154, *Biopsychosocial PowerPoint* at slide 31 (Showing Exhibit 1-31, *Patterson Declaration*) ("Judy and I had continued our lifestyle of going out drinking and socializing the entire time she was pregnant . . . one of the waitresses at a bar asked for ID and it was so funny because the waitress was actually pretending to ask my unborn child for ID!").

[b] Ms. Vogelsang had prepared a discussion of Diane's parentage, with reference to social services documents showing that Diane was taken from her drug addicted mother, Joyce Hammer and was severely malnourished when given to Mr. Patterson. Though Ms. Vogelsang was forced to skip this discussion, the point would have been to highlight Judy Shaughnessy's cruelty toward a child who was not only young and innocent, but also extremely vulnerable both physically and emotionally. *See*, Exhibit 154, *Biopsychosocial PowerPoint* at slide 34 (*quoting* Exhibit 1-9, *Mattingly Declaration*).



Appellate Case: 17-1716 Page: 476 Date Filed: 11/01/2017 Entry ID: 4596229

that they were just little girls. They are making noises that little girls make when they play, but he went along with Judy in almost all cases."[1757]

Judy allowed her sexual partners to molest and rape Diane. Ms. Vogelsang explained that, as Lisa shared a room with Diane, "from the time Lisa came into the world, whether she had any idea as a baby what this meant, [sexual assault] was something she continued to be exposed to over time."[1758]

Ms. Vogelsang related that Mr. Patterson repeated his family pattern of child abduction by kidnapping Lisa and Diane.[1759] "When John realized that, in spite his best efforts, that Judy was not going to stay in the relationship with him, one of his last times at home when he had been rejected by her for the last time . . . [he] picked up Diane and . . . Lisa and took them to the Fort Carson barracks and there was some empty barracks there and he kept them . . . he just walked off with the children."[1760]

Lisa's younger sister, Patty, was born to Judy during the time Judy was married to John Patterson,[1761] though John never believed that Patty was his child.[1762] Patty had a dark complexion and Judy regularly referred to her as her "nigger baby."[1763]

Lisa's personality was shaped by her mother's seeming omnipotence, according to Ms. Vogelsang.[a] Ms. Shaughnessy managed to turn over to the state Lisa's older half-sister, Diane, who was Lisa's sole protector and comfort.[1764] "Diane was Lisa's protector and it was a very powerful thing [for Lisa] to see Diane so easily dispensed with."[1765] The message Lisa internalized from Judy Shaughnessy's exile of Diane was "it tells the child that they have no control; that they have no power; that there's nothing they can do to stop these traumatic losses, and especially in this case that her mother is omnipotent."[1766] As a result, Lisa's personality was shaped to be "very timid, shy, quiet, passive little girl. She never rocked the boat. She was afraid to speak up. She was always polite. She wasn't a child who caused trouble even when she got into school, and it's the first time we start seeing it noted how much she was in her own little world."[1767]

As noted, the court cut Ms. Vogelsang's testimony short, preventing her from tying the family history directly to Mrs. Montgomery's functioning. Though other experts alluded to the enhanced reliability of diagnosis that are based in extensive social history (including family history), Ms. Vogelsang was

---

[a] Vol. 6, p. 1500, *Vogelsang Testimony* (noting the cruelty with which Mrs. Shaughnessy rejected Diane, telling 8 year old Diane that she had to leave her family because she was bad).



Appellate Case: 17-1716 Page: 478 Date Filed: 11/01/2017 Entry ID: 4596229

unable to provide her planned testimony that would have demonstrated how the family patterns both affected Mrs. Montgomery's development and were repeated in her functioning.[1768]

**e. Ms. Vogelsang's chaos map illustrates the instability and rootlessness of Lisa's upbringing.**

Ms. Vogelsang explained to the Court that as an expert witness she recognizes that the amount of information she has to covey to a fact-finder is overwhelming.[1769] To help convey the information effectively, she prepares visual aids to visually cue the jury/judge as to the importance of certain facts as she provides history and explains the clinical significance of events.[1770] "[T]he investigation covers volumes of information typically, hundreds, many times thousands of pages; and if I were to bring in everything I saw, every piece of paper, if I were to go through and detail every single interview that I did, I would be up here for days, maybe weeks. So you have to at some point have a way to condense the information."[1771]

To convey visually the physical instability to which Mrs. Montgomery was subjected as a child and teenager, Ms. Vogelsang prepared that which she referred to as a "chaos map."[1772] Though this map was divided up within Ms. Vogelsang's planned presentation, its purpose was to represent visually the 61 different locations Mrs. Montgomery lived in the 32 prior to settling down to

one address for the two years before the crime. Lisa lived at least eighteen locations prior to her marriage to her step-brother at age eighteen.[1773] Lisa "moved from one place to the next precipitously, without notice or much of a plan, acting in response to the combination of mood swings, trauma, and possible brain damage."[1774]

**f. Ms. Vogelsang describes the terror, isolation, and abuse that permeated Lisa's childhood and demonstrates Lisa was subjected to strategies of coercive control.[a]**

Ms. Vogelsang focused much of her report and testimony on the formative years Lisa spent at the mercy of Jack Kleiner.[b] "[H]e was described as a mean

---

[a] Ms. Vogelsang's PowerPoint included photographs of Lisa at each stage of development where available, including a slide of 4 or 5 year old Lisa showing her at the age Jack Kleiner came into her life:



Exhibit 154, *Biopsychosocial PowerPoint* at slide 52

[b] Vol. 6, p. 1503, *Vogelsang Testimony* (noting that Jack Kleiner had control of Lisa's life from age 4 or 5 through her 16th birthday and that those years are very formative in child development).



Appellate Case: 17-1716 Page: 480 Date Filed: 11/01/2017 Entry ID: 4596229

drunk. He drank from morning to night. He worked in an auto salvage yard and his employer . . . described him as a fruitcake, temperamental, irritable, that other people were scared of him and afraid of him."[1775] Ms. Vogelsang described that the family was "among the poorest of the poor. Judy claimed to have worked but her records show that there were several years when she was unemployed. Jack worked in an auto salvage and had a couple of expensive habits, including intoxication."[1776] The Kleiner household was described as "extremely chaotic. There was a lot of physical abuse, of domestic violence. It was described with Jack breaking Judy's jaw, knocking out her teeth, and the punishments that he inflicted particularly on Lisa and Patty were among the worst – where he would make them go into the bathroom, take their pants down and bend over the tub, then they had to stay that way for an unknown amount of time, and then he would come in and beat them."[1777]

> Jack beat the girls too. And these were not short beatings. If he was set off he would come at them with whatever he had in his hands and the only thing the girls could do was duck. I am sure there were times he hit them in the head. He would beat them so badly they had welts on them. He would yell and curse at them while he was beating them. He told them it was their fault that he was beating them. If Judy tried to interfere he would beat her. She couldn't stop him. How bad the beatings were was directly related to how much Jack had to drink. Every night he drank a fifth of vodka, a fifth of Canadian Club and

then he chased it with beer. Jack was extremely mean when he was drunk.[a]

According to the data amassed by Ms. Vogelsang, Ms. Shaughnessy (then Kleiner) was no better. Lisa's brother, Teddy, the first child born to Jack and Judy, was born addicted to alcohol.[b] She "had intense mood swings. She became angry very easily. She would strap the children. She would put Lisa in a highchair and leave her for hours. Lisa would have to stand in a corner and wasn't allowed to touch the walls, and Lisa came to know that she was always being watched, and so these punishments, again, certainly fall under the umbrella of coercive control."[1778]

Ms. Vogelsang introduced[c] the Court to the concept of coercive control, explaining the significance of scholarship applying knowledge regarding the

---

[a] Exhibit 154, *Biopsychosocial PowerPoint* at slide 55 (quoting Exhibit 1-286, *Miller Declaration*, a cousin of Judy's who lived with the Kleiner family for a while).

[b] Exhibit 154, *Biopsychosocial PowerPoint* at slide 53 (quoting Exhibit 1-31, *Teddy Kleiner Declaration*, "Drinking was a part of life; I don't remember a time not drinking. When I was very small, four or five years old, I made myself what everyone else was drinking. I didn't know what to call the feeling then, but I definitely was drunk a lot as a kid. My mom and dad didn't seem to notice or care. I didn't try and hide it, and no one ever told me I couldn't or tried to stop me. It was just a normal way of life; I didn't know any differently I was born addicted to alcohol. My mom told me and I've been told by other family members that I had to be weaned off alcohol as a baby. I was born blind in my left eye and hard of hearing in both ears").

[c] The segment of Ms. Vogelsang's presentation on coercive control and its significance from a clinical social work perspective was after the Court had curtailed counsel's presentation. Vol. 6, p. 1308, *Question of Counsel* (referencing "we probably will not finish in our hour allotted all of your slides . . .").



Appellate Case: 17-1716 Page: 482 Date Filed: 11/01/2017 Entry ID: 4596229

psychological and sociological effects of isolation and domination to domestic situations:

> It's a concept that has been very clear when it's been discussed as it regards war, prisoners of war, cults, brothels, any situation of captivity where someone is not free and independent and is under the control of another person who is dominating them; and what had been discovered through studies, for example of communist regimes, of the situation of U.S. soldiers in Korea, that a set of strategies had been used to bring them into compliance so that they would do whatever their captors wanted.
>
> In the last several years in mental health researchers have applied this concept of coercive control to domestic violence, because they have found that children who are captive in a home where there is total control, there is no opportunity for independence and where the children are exposed to behaviors by the parents that actually can and do border at times on torture, that these children will start to demonstrate the same kinds of behaviors, the same kinds of results that we see with solders.[1779]

Proof presented by Ms. Vogelsang showed that Judy Shaughnessy and Jack Kleiner exerted coercive control over young Lisa. Ms. Vogelsang presented proof that each of the elements of coercive control were present in the Kleiner household: isolation; domination and the destruction of autonomy; a climate of terror and the demand for collusion. [a]

---

[a] At this point in Ms. Vogelsang's testimony counsel, again, alluded to the extreme limitation of time and asked Ms. Vogelsang leading questions regarding some of the information she had gathered regarding the coercive control Jack and Judy exercised over Lisa (Vol. 6, p. 1508, *Statement of Counsel*)*;* Exhibit 154, *Biopsychosocial PowerPoint* at 70.

The family was isolated geographically: Ms. Vogelsang showed the Court a map and photographs showing the location of the Kleiner trailer – completely surrounded by 4 acres woods and farmland[1780] and provided the court with a description by a neighbor. "Jack had them out in the country kind of in his own little kingdom. They were isolated. They could have screamed and the neighbors probably wouldn't have heard them."[1781] Ms. Vogelsang also presented the testimony of Preacher Wesley Gann, a former neighbor of the Kleiners who described Jack's behavior, "He talked at length about incidents that happened of Jack making fun of him for going to church on Sunday and coming out to the road and falling on his knees and having a stick of wood in his hand and pretending like he was worshipping the stick of wood just to make fun of Mr. Gann, how he would masturbate as Mr. Gann went by with his young daughter and how disgusting that was to Mr. Gann, but yet made him feel afraid and intimidated for his child. Just story after story of this bizarre behavior that Kleiner engaged in."[1782]

The children were dominated. Judy dominated Lisa, destroying her autonomy: Judy often did not allow Lisa to speak or to make noise: "if she spoke when she was not supposed to speak – and she was never certain when she was allowed to speak – they taped her mouth with duct tape. Lisa was afraid she would suffocate and die if she cried when her mouth was duct taped. Lisa

was not allowed to make noise, even the sound of a fork tine hitting the plate during meals. If her fork tine made a noise, she was not allowed to use utensils for six months. If she made noise washing the dishes or cleaning the house, she was beaten." [1783]

The children were required to collude with Jack and Judy to harm each other. Lisa and her younger sister, Patty, were forced to fight each other. "Kleiner sent them out to the garage to fight and told them not to come back until one of them' had drawn blood.'"[1784] Ms. Vogelsang explained, "Its not an uncommon occurrence that in abusive homes children are set against each other. Children see what's happening to the other one and they become scared and so they seek approval from the parent – the abusive parent so it won't happen to them. They develop a dislike for the abused child, like Lisa, and work against that child in order to protect themselves."[1785]

The Kleiner children, including young Lisa, lived in a climate of terror. Ms. Vogelsang explained that in addition to the terrorizing effects of the beatings and restraint used on Lisa herself, witnessing Jack and Judy's terrorization of her siblings contributed to the coercive control over Lisa. Ms. Vogelsang gave a pointed example of Judy killing Teddy's dog:

> This stood out to me because one of the way to strike fear in children and to control them is to kill an animal or to kill one of their animals, and this is the second incident of Judy doing this. Teddy was getting

> off the school bus one day and he saw his mother and her drinking buddy out in the road near the house and he saw that she had his dog in her arm; and when he got over there, she took the shovel and hit the dog over the head, and Teddy watched as the dog fell and lost its balance and died and remembered the dog's brains spilling out.[1786]

Teddy remembered the incident and described, "I wasn't old enough to understand that my dog didn't know the rules, but I knew it was my fault that he was killed. It devastated me. My mom waited to kill my dog until I was home from school. She wanted me to see her kill him. I will never forget seeing that happen."[1787] Teddy eloquently described his mother's power over the family: "I wanted to kill my dad for what he did to Lisa and because he beat us so much. My dad was one mean dude, and I was very scared of him but not as scared as I was of my mom. I have nightmares about what she did and will do to me. She's destroyed or taken everything I've ever loved and she holds so much power that I know she is capable of anything."[1788]

Ms. Vogelsang described Mr. Kleiner's repeated rapes of Lisa, but emphasized that the harm from Jack Kleiner's rapes was not the most harmful of the abuse. "Judy was engaging, in my opinion, [colluding] with Jack regarding the molestation of Lisa, and this form of collusion is well known in studies on child abuse where the mother does nothing to prevent the abuse from happening and in fact goes about it almost as though it's not happening and the child becomes the surrogate for the mother, and in Lisa's case not only sexually



Appellate Case: 17-1716 Page: 486 Date Filed: 11/01/2017 Entry ID: 4596229

but in Judy's other responsibilities as well."[1789] Judy "had servicemen come to the trailer. Her son, Teddy, recalls that there were three or four that would come and all the children would be sent outside and that only Lisa and Judy would remain in the house."[1790] Ms. Vogelsang explained that "Judy was trading Lisa for those services."[1791] Ms. Vogelsang described this sexually trafficking as a "family secret."[a]

Ms. Vogelsang related that young Lisa had reported the rapes to her mother's cousin, David Kidwell, a deputy sheriff, but that he did nothing to make the abuse stop.[1792] David Kidwell visited the Kleiners and noted Lisa's distress, and "made the effort to get with her later and she did open up to him and tell him about these men and about them coming to the home and that they



[a] Vol. 6, p. 1512, 1520, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 79 (showing photograph of Lisa at age 11 when the sex trafficking began).



Appellate Case: 17-1716 Page: 487 Date Filed: 11/01/2017 Entry ID: 4596229

were molesting her, that they urinated on her life she was trash and were allowed to do pretty much anything."[1793] Mr. Kidwell reported that Lisa was crying and shaking when she disclosed to him.[1794] Ms. Vogelsang noted that Teddy Kleiner's description of the service men coming to the trailer and the other children being put outside while Lisa stayed in the trailer with her mother and the servicemen, corroborated Mr. Kidwell's report.[1795] Ms. Vogelsang further indicated that Lisa's disclosure when she was sixteen to her then step-brother, Carl Boman, further corroborated the event.[1796] Ms. Vogelsang testified that she found further corroboration of Mr. Kidwell's report of Lisa's disclosure in the divorce paperwork from *Kleiner v. Kleiner*.[1797] Mrs. Montgomery provided the names of two of the men who paid her mother to have sex with her: Harold Allee and Gerald Shipley. Mrs. Shaughnessy (then Kleiner) listed those men as men in whose company she had been in response to interrogatories during the divorce proceedings. Mrs. Montgomery also indicated that one of the men who raped her was named "Shorty" and would leave money on the dresser of the trailer. Mr. Shipley's obituary indicates that he was known as "Shorty."[1798]

When Lisa was fifteen, her mother walked in on Jack Kleiner raping Lisa.[1799] Ms. Vogelsang described the competing narratives as to what Mrs. Shaughnessy (then Kleiner) did upon the "discovery": "She walked in when



Appellate Case: 17-1716 Page: 488 Date Filed: 11/01/2017 Entry ID: 4596229

Jack had Lisa down on the floor and he was raping her, and she got a gun – and, again, there are two stories, that she got a gun and held it to Jack's head and threatened to kill him, and Lisa's memory is that [Judy] held a gun to [Lisa's] head as well."[1800] Ms. Kleiner later testified dispassionately about that moment, answering a question regarding what she saw, "He was in her. He was pumping her."[1801],[a] Ms. Vogelsang noted that Mrs. Shaughnessy (Kleiner) failed to protect Lisa even after she personally witnessed Jack raping Lisa: "Aside from pulling out the gun and that whole incident, [Judy] allowed [Jack] to come back to the trailer after two days; and so in spite of this incident, he was allowed to live there with them from February until May of 198[4]."[1802] Ms. Shaughnessy (Kleiner) only left Jack Kleiner after he hit Lisa's younger sister Patti.[1803]



[a] Exhibit 154, *Biopsychosocial PowerPoint* at slide 87



Appellate Case: 17-1716 Page: 489 Date Filed: 11/01/2017 Entry ID: 4596229

Ms. Vogelsang recounted the paltry treatment Lisa received for the sexual abuse she suffered. According to documentation, her mother did not seek assistance for Lisa, rather it was her mother's attorney who referred her for counseling.[1804] The counseling notes reflect that "Mo[ther] appeared to have lack of empathy for Lisa,"[1805] and that "mother verbally overwhelms Lisa."[1806] Mrs. Shaughnessy (then Boman) stopped taking Lisa to therapy as soon as the litigation was over.[1807] Ms. Vogelsang related the divorce court's description of Mrs. Shaughnessy (then Kleiner):

> The judge had a couple of opinions about her behavior. One, that her failure to report was inexcusable, and also that she appears to him to be emotionless; but further that judge also went on to say that it was very difficult for him to not report what he had heard to the juvenile court, and he was not comfortable with his decision not to do it. But that between the doctor not reporting and Judy not reporting it, it just seemed that it had gone way too gar without there being some sort of an intervention.[1808]

Ultimately, the defense lawyer referred the case to DCS.[1809]

Ms. Vogelsang explained that Lisa's failure to disclose the true nature and extent of the abuse is commonly seen in the field of social work. "nondisclosure is a common and typical behavior in abuse cases. She was, I think, now more afraid of her mother and her mother, you know, had this power. She had this omnipotence. Lisa was intimidated by her, and even more so maybe that in other cases you'd see; and because this one is so extreme, Lisa was not about to

talk about the things that her mother had done in terms of the family secrets and these servicemen coming to the house." Even though Lisa did not disclose the true nature of the abuse, Judy punished Lisa for Jack raping Lisa – Judy cut off Lisa's hair, telling her, "only good girls have long hair."[1810]

#### g. Ms. Vogelsang points to information indicating Lisa's dissociation and other mental health problems began in childhood.

Ms. Vogelsang pointed to information from multiple sources which signaled that Lisa began dissociating in response to trauma at a young age. "I think that just about everyone who was around Lisa had come to recognize her as a target and as the person that was receiving the most virulent types of abuse from Judy."[1811] Ms. Vogelsang acknowledge that lay people do not speak in terms of "dissociation" (or do not do so correctly) but rather provide descriptors that a trained social worker or mental health professional recognizes as dissociation.[1812]

> In Lisa's case from the time she was small and first able to read a book – in fact, going even farther back. I think many of these descriptions (referring to Exhibit 154, *PowerPoint of Jan Vogelsang's Biopsychosocial History* at slide 100 – listing signs of dissociation noted in the documents collected by Ms. Vogelsang) of Lisa as quiet, timid, shy, withdraw were possibly early coping strategies that she had; and then once she started school, started reading books, people started to notice that she could lose herself in a book, that this was her escape. So much so that Judy commented that the house could burn down around her and from that point on you hear all of these phrases over and over from her about her all the way through and into adult



Appellate Case: 17-1716 Page: 491 Date Filed: 11/01/2017 Entry ID: 4596229

> hood: "not emotionally present," "in her own world," "spaced out at times," "in a world of her own." Her daughters recalled, which they sort of thought was funny, but that Lisa would even read a book when she was driving the car with all of them in the car. So her strategies to cope and survive and escape things that she had no skills to deal with make up a very long list of behaviors that, in my opinion, would be related to someone who was dissociating.[1813]

#### h. Ms. Vogelsang points to the critical point at which Lisa almost escaped.

Ms. Vogelsang described the brief time where it appeared there was hope Lisa would rise above her family heritage of mental illness and trauma. "Lisa found a brief sliver of hope in the summer of her tenth grade year."[1814] Lisa was selected for the Upward Bound program and was able to attend Rogers State Community College.[1815] "this was a very special thing in her life, and she kind of got a glimpse of what maybe life could be like. She knew she wasn't going to be able to afford to go to college so she enlisted in the Air Force and got an enlistment date for right after she graduated."[1816] However Lisa's chance at freedom was thwarted:

> [W]hen Judy met Richard Boman, she wanted to spend as much time as possible with him, so Lisa was left at home with her younger brothers and sisters. She was going to school. She was cooking. She was cleaning. She was getting the kids off to school. When Richard's son, Carl, came home from the Army, [Judy and Richard] found a way to be together without all the children around, and they pushed Carl and Lisa together to care for these children and actually made it seem like it was cute or romantic, Look at the two of you together just like husband and wife.



Appellate Case: 17-1716 Page: 492 Date Filed: 11/01/2017 Entry ID: 4596229

> Lisa was able to break away from that briefly. She lived with Carl for just a little while. She moved back and continued taking care of the children, and finally called Carl and said she couldn't take it anymore. She moved back in with him and they got pregnant, and that was really the end of Lisa's dreams.[1817]

Ms. Vogelsang described that Lisa managed to leave home, but never managed to escape her mother. "Let me just begin by saying one more thing about that marriage. He was an adult and she was a minor. And given what Lisa had been through, it's worthy to comment, to say that Judy saw no problems with that relationship. This child had been through court testimony. She had been through years of rape. She had been through her mother's trading her. She had been through all these many things and still there doesn't seem to be any recognition at all that she is still a minor. As far as their marriage, this, in my opinion is when the initial decline of Lisa began."[a]



#### i. Ms. Vogelsang describes, with reference to clinical literature, the devastating effect of the chronic trauma, instability, and helplessness on Mrs. Montgomery's functioning as an adult.

"Not that the things that had happened to her before were not about as low as it can get for a child, but this decline now from the age of 16, 17, 18" marks the beginning of Mrs. Montgomery's descent into a life characterized by dissociation and psychosis, according to Ms. Vogelsang.[1818] "[S]he's pregnant. She has four children in succession, four in less than five years . . . By the time she finishes having those children, she is unable to cope in the little house she and Carl have. He is working. He turns out to be very controlling, very sexually aggressive toward her. He has control of the car. He does the grocery shopping. He controls the money. He controls what she wears. And so we begin to see Lisa decline even further."[1819],[a] In her testimony, Ms. Vogelsang attempted to summarize her more lengthy planned presentation of Mrs. Montgomery's declining functioning thusly:

> With Lisa [the decline] manifested with sexuality, with having affairs with many different men, with drinking. Her personal appearance declined. Her hygiene declined. And to such an extreme degree that people could not be around her. The odor, her appearance. It started to

[a] Vol. 6, p. 1525, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 108

[a] At this point, the Court indicated that he would permit only five more minutes of Ms. Vogelsang's presentation, though Ms. Vogelsang was on slide 110 of her 142 slide presentation (Vol. 5, p. 1526, *Statement of the Court*).



Appellate Case: 17-1716 Page: 494 Date Filed: 11/01/2017 Entry ID: 4596229

> affect the way she parented the children so that neighbors noticed and reported her . . . And it just becomes worse and worse and worse to the point that her children commented that for five years she had lice and was completely unaware of the lice as though she didn't have them at all; whereas, it was driving the children crazy, not only to have them themselves but to see their mother with this condition and be oblivious to it.[1820]

Ms. Vogelsang agreed that her information and conclusions contradicted the trial team's strategy of presenting Mrs. Montgomery as a good mother.[1821]

Ms. Vogelsang's report, which the government stipulated to – both as to admissibility and reliability – provides the remainder of her evidence regarding Mrs. Montgomery's inability to function prior to the crime. The report sets forth many details of Mrs. Montgomery's decline. After marriage, "Lisa's feeling of safety and security for her new family evaporated in the heat of her mental illness. She soon looked kind of 'slobby' dressed in clothes that looked old. Her houses 'were always roach-infested,' and she 'was a messy housekeeper.'"[1822] Early in her marriage to Carl, Lisa "had headaches and was depressed. She and Carl argued and she asked herself, 'why can't I do anything like I should?' She wished she had a job and recognized that she was 'not cut out to be a housewife.'"[1823] Those around her noticed that Lisa "seemed to be in a world of her own . . . She just stared off and wasn't engaged with the conversation."[1824] Lisa continued to let Judy run rough shod over Lisa; Judy always screamed at Lisa, according to numerous reports.[1825]

The report documents numerous car accidents – some of which caused head injuries.[1826]

Ms. Vogelsang's report (and planned testimony) highlights Judy Shaughnessy's involvement in Mrs. Montgomery's downward spiral. For instance, in 1990 "Judy colluded with Carl who learned too late that 'Judy knew how to manipulate people to get her way.' Judy convinced Carl 'to let her take the kids for the summer,' but intended all along to try to keep the children.'"[1827] Ms. Vogelsang notes that "inconsistent narratives surround the decision for Lisa to be sterilized after Kayla's birth. Lisa continued to function encumbered by a loss of contact with reality. From day to day she was unsure what was real and what was not. Judy's presence and contact pressure complicated Lisa's ability to make choices as Judy had always dictated what was true for Lisa."[1828] "Carl and Judy explained to Lisa that sterilization was the least she could do as Carl was agreeing to raise Kayla as his own child" (she was not his).[1829] "Whether such a threat was real or only in Lisa's mind, Lisa felt that if she did not have the procedure, Carl and Judy would force her to give Kayla up for adoption."[1830] In 1993 while Lisa and Carl were in the process of divorcing, Judy helped Carl take the children to California on one of his visitation weekends. Lisa tracked them to Long Beach, but was unable to get Carl and Judy to return her children to her. She went to Court in Oklahoma and obtained a temporary custody order,



Appellate Case: 17-1716 Page: 496 Date Filed: 11/01/2017 Entry ID: 4596229

but by that time, Judy had enrolled Desiree in school in California.[1831] When Lisa returned, court order in hand, to California to claim her children, Judy took off with the children to her sister's house in Texas.[1832],[1833] Ms. Vogelsang concludes that Mrs. Shaughnessy's mistreatment of Lisa profoundly impaired Lisa's ability to function in the world:

> Throughout her life, Lisa internalized the notion was that she was powerless. This helplessness was born of Judy's incessant control over Lisa's every movement and "decision." Judy was omnipresent in Lisa's life, weaving in and out and reasserting her threats to take Lisa's children and to expose Lisa as incompetent. She kidnapped Lisa's children multiple times but also occasionally indulged Lisa with the promise of being a good grandparent and bringing Lisa into the family fold. Judy whipsawed Lisa between offers of reunification and efforts to alienate Lisa from her spouse and in-laws. Judy made sure Lisa knew Judy was present, willing, and capable of disrupting Lisa's day-to-day life.[1834]

Ms. Vogelsang's report documents the sexual victimization which continued to exacerbate Mrs. Montgomery's trauma-compromised condition, furthering her descent into mental illness.[1835]

> Marriage to Carl catapulted Lisa back to the days of violent sexual assault by Jack when she was powerless to protect herself. Carl's pre-marital behavior towards Lisa could have warned a normally functioning person to beware, but Lisa had no ability to recognize what was her due, what to expect, or what to prohibit based on her maltreatment as a child. In one notable incident before marriage, Carl shoved Lisa, who was naked getting out of a shower, against a wall heater that burned her flesh while he had sexual intercourse with her. His behavior became more aggressive and more violent during their marriage, he beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife

> to her throat, and sexually assaulted her. He bruised and hurt her. He recorded her screams and pleas for help on his video camera. Lisa, ashamed, humiliated, and fearful, told her mother about it. Judy went to Carl and told him Lisa confided in her. Lisa did not seek help again. She grew to expect the violence and lived in sickening anticipation of its reoccurrence.[1836]

Lisa's daughter Kayla provided indirect confirmation of the sexual violence, reporting that Carl Boman bragged to her that while they were married, he could do anything to Lisa during sex "including hanging her from a ceiling fan if he wanted."[1837] Ms. Vogelsang's PowerPoint includes planned testimony regarding Lisa's brother Teddy's graphic corroboration of Carl's rapes of Lisa.[1838] As a teenager Teddy inadvertently watched one of the videos Carl made while raping Lisa. "It was a home video and it showed Carl raping and beating my sister. It was violent and like a scene out of a horror movie. My sister was crying and in pain. I felt sick watching the video. I didn't know what to do or how to talk to my sister about it."[1839]

"By 1991, Lisa was unable to focus, pay attention, and attend to her four small children. Her symptoms of her mood disorder were more pronounced and deepened by re-experiencing sexual trauma of her youth at now Carl's hands. Carl described her behavior:

> Lisa was unpredictable. She went from not talking to talking non-stop even to strangers . . . [S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking,

> she kept talking. She was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her."[1840]

Ms. Vogelsang prepared a slide recounting Mrs. Montgomery's verified behaviors/symptoms that the discipline of social work teaches are consistent with her trauma history: Depression, Anxiety, Fear, Sleep disruption, Hypervigilance, Overreaction, Withdrawal, Isolation, Timidity, Legal Problems, Mood Swings, Irritability, Aggression, Substance Abuse, Lack of Proper Hygiene, Dissociation, Problems in Relationships, Hypersexuality, Impulsivity, and Physical Problems.[1841]

Ms. Vogelsang's report documents that Mrs. Montgomery was a desperately inadequate parent contrary to the impression created at trial that she was "good mother." The Biopsychosocial documents each of the hospitalizations of Mrs. Montgomery's children, highlighting incidences which neglect seem obvious: [1842] daughter Desireé wandered into a ball field and sustained a concussion when hit with a softball, was seen at ER for dehydration secondary to herpes, was run over by a truck in the driveway, Desireé's jaw remained wired shut for over two years following a car accident;[1843] son C.J. drank trisodium phosphate left on a counter;[1844] daughter Kayla took a bottle of Tylenol.[1845] When neighbors reported her to Oklahoma Department of Human Services – for neglect and for the children being sexually inappropriate with



Appellate Case: 17-1716 Page: 499 Date Filed: 11/01/2017 Entry ID: 4596229

each other, DHS concluded the children were being neglected and required intervention:

> Lisa "appeared tired" during her interview with DHS staff. She was not employed. The first house at 427 Creek had dog feces in the floor along with cereal. Desi answer the social worker's questions and told her the house was "always dirty." Desi's shoes were too tight and "left marks on her feet." The kitchen was "a mess," and there were "roaches in her house." The family could not wash clothes because the washing machine was broken. Lisa was "sick." Desi reported that Lisa was "going out and drinking bad stuff." Desi also described Lisa's loss of control when "her mother hits her head on the wall."[1846]

Carl reported that sometimes, when they were married, Lisa "got so wired up" she left him "sometimes with the kids and sometimes without the kids" and "stayed gone a month, two months, or even four months one time, but then she came home to me."[1847] One of those times she left Carl, she and the children lived in an abandoned house, "found unsafe (by DHS) due to loose wires hanging from the ceiling, floor missing in the kitchen, tools, including a power drill on the floor, and no water in the home."[a] Desiree remembered that Lisa disappeared for days - and perhaps as long as two weeks at a time - when the children and Lisa lived in New Mexico in dire circumstances. Without any adult in the home, Desiree had to care for Kayla during these absences.[1848]

---

[a] These records were not obtained by trial counsel (Exhibit 1, p. 111 (*citing* Exhibit 1-148, *Order Authorizing Disclosure of Records Under Protective Order*, Case No. JMI 2013)).



Appellate Case: 17-1716 Page: 500 Date Filed: 11/01/2017 Entry ID: 4596229

Ms. Vogelsang explained that due to the on-set of mental illness, Lisa was unable to keep up with daily responsibilities. She "simply could not figure out how to do the things mothers routinely are expected to do. Lisa could not sort and arrange clothes to dress the children, figure out a plan for dressing them in the morning, plan their meals, shop for groceries necessary for meals, and prepare meals. These simple, but time consuming tasks, of mothering overwhelmed and confused her. She began each day by drinking whiskey and continued all day long. She did not recognize how layers of brain impairment, trauma, and mental illness interacted to prevent her from being the mother she wanted to be."[1849]

At times, Mrs. Montgomery's inability to care for herself and her children turned dangerously desperate. When Carl left the family in New Mexico, "Lisa did whatever it took to keep going without financial support from Carl and without the ability to work on her own with the children. She prostituted herself, not she claimed for money, but for food for her children. The children described these desperate times. Lisa 'never seemed to have enough money to feed' all the children, and they ate a lot of beans and rice.' C.J. remembered 'being hungry sometimes.' Lisa's financial straits combined with mania to make her exuberant and hyper-sexual."[1850] Sometimes Lisa "went to truck stops, met men, had sex with them in their trucks, and brought food home for

the children . . . Lisa drank excessively."[1851] Lisa's daughter Chelsea recalls an incident when "five men tied up and had sex with Lisa in the trailer where they lived."[1852] Desiree "reluctantly reveals that some of the men [her mother dated] were abusive and 'did things' to her and the other children."[1853]

Ms. Vogelsang's report and planned presentation reflects Mrs. Montgomery's false pregnancies and their place in the timeline of Mrs. Montgomery's deterioration in functioning.[1854] In 1994, Lisa re-married Carl and experienced her first, fictitious pregnancy.[1855] "Lisa told people she was pregnant with twins, but 'never told Carl.' Sometimes she told neighbors the babies were Carl's and sometimes she told them they were Brett's. Lisa 'ignored' Carl when he confronted her, and they argued."[1856] When Judy confronted Lisa about a crib Lisa had purchased, Lisa told her that she had miscarried.[1857] Ms. Vogelsang marks the false pregnancies as a sign that Mrs. Montgomery (then Boman) "was out of touch with reality."[1858]

Mrs. Montgomery's marriage to Kevin Montgomery only provided a brief respite from Mrs. Montgomery's general decline in functioning, according to Ms. Vogelsang. "Lisa had a challenging work load [given her four children and Kevin's three] to carry for a fully functioning person, but for a person with longstanding impairments with ongoing family problems, it was impossible. Her house was 'crowded' and 'pretty filthy.'""[1859]

> [M]ental illness affected Lisa's day to day life, everything from her disrupted sleep to her shifting and unpredictable moods. Her irrational behavior made Lisa "difficult to live with." She "never slept more than four or five hours." Lisa did "several different things at once .... reading ... knitting/tatting" while she did "her spinning wheel" and helped "the kids with homework all at one time." Lisa started one project, lost track of it, and then started another. She "changed her mind a lot." Lisa frequently had "severe" migraines, so painful that "she'd lay on the couch and cry" and "could not move."[1860]
>
> Lisa was like one of the kids in the house, often not doing much housework, playing with games, and "in her own little world." Lisa did not have a realistic appreciation of budgeting and finances. She "never waited until payday to buy things. Anything she wanted, she bought," and she often bought "useless stuff." Teddy witnessed Lisa's sudden mood changes. One day, as Chelsea helped her mother spin sheared Lamb's wool onto a spool, the spool slipped from Chelsea's hand and fell to the floor. Lisa "immediately flew into a verbal and physical rage," hitting Chelsea on her face.[1861]

Lisa’s ability to function continued to decline as she and her children settled into life in Kansas with Kevin. Ms. Vogelsang notes that Mr. Montgomery’s child, Dustin has been diagnosed with autism and that the family strongly suspects that Mr. Montgomery is on the spectrum as well: “Lisa's stepson Dustin (who is autistic) described his father, Lisa's second husband, as having autism: ‘I believe my dad shares my same battle with autism. I know he struggles daily . . . He tried hard to never let his limitations bother him. He also tried hard to hide them. I learned in the process of discovering that I had autism that it is a disorder one inherits genetically. I always assumed I inherited autism from my Dad.’”[1862] Ms. Vogelsang notes that “Dustin's observation of his father

supported what Kevin told me during my interview with [Kevin Montgomery]."[1863] In assessing the difficulties Mr. and Mrs. Montgomery encountered, Ms. Vogelsang analyzed the Notes of Dr. Sallye Wilkinson, highlighting the downward trajectory of Mrs. Montgomery's functioning documented by Dr. Wilkinson.[a] Ms. Vogelsang reviewed Dr. Wilkinson's notes:

> My memory of Mrs. Montgomery is that she presented as an eccentric, quirky, earth mother. Her ideas about marriage and parenting seemed to be outside the mainstream. It was my professional opinion at the time of treatment that Lisa Montgomery met the criteria for an AXIS I diagnosis of Depression NOS. Mrs. Montgomery did not have a personality disorder. My notes reflect that I assessed Mrs. Montgomery GAF score at a 48 and 45. Essentially, this means that I believed that Mrs. Montgomery's depressive symptoms had a significant impact on her ability to function in everyday life. I placed Mrs. Montgomery's GAF score at 59 for the previous year . . . It would not surprise me to learn that Mrs. Montgomery suffered from complex trauma and bipolar disorder at the time I was treating her. [1864]

Ms. Vogelsang's investigation revealed that the sexual violence which permeated Mrs. Montgomery's childhood and first marriage was replicated in her marriage to Kevin Montgomery. "Lisa's enthusiasm for Kevin waned when he insisted on sexual violence as part of their relationship. She was not surprised that Kevin wanted to hurt her during sex because she had come to

[a] Exhibit 154, *Biopsychosocial PowerPoint* at slide 138 (highlighting decrease in "global assessment of functioning" from 59 in 2001 to 48 in 2002)



Appellate Case: 17-1716 Page: 504 Date Filed: 11/01/2017 Entry ID: 4596229

expect nothing less; she thought it was part of maintaining a relationship with a man. Kevin, she was quick to point out, was not as violent or hurtful as Carl, but he bruised her, used a horse whip on her, and tied her in forced stress positions. Kevin liked to go to the woods or barn to tie her up, and used clamps on her nipples. She did not seek or want the maltreatment, did not enjoy it, and did not know that forced and coerced sexual intercourse during marriage was considered a sexual assault. Instead of protesting, her mind simply went somewhere else as it had in such situations since she was a child."[1865] "Lisa talked about how she sometimes goes away in her mind. This occurred in relationship to sexual activities. Lisa described that when she would go away, she went off to rooms she created in her mind. She has "all these houses I could live in, I get down to every detail of all these little things." And then when the sex was over Lisa wondered, "It was like did we do anything or not?"[1866] Ms. Vogelsang reported that she asked Mrs. Montgomery what would have happened if Mrs. Montgomery had said no to the painful sex with Kevin: Lisa said, "Now [after medications] I think he would've stopped, but then, I couldn't even imagine." Lisa agreed that it is possible her acquiescence could have appeared as if she liked the sex. Lisa related that one time she said "no" to Carl when he demanded painful sex, but he ignored her and proceeded. She does not recall what he was doing. She dreaded sex and felt numb when she had sex.



Appellate Case: 17-1716 Page: 505 Date Filed: 11/01/2017 Entry ID: 4596229

When asked why she was able to say no to Carl that one time when it was not something she could even imagine with Kevin, Lisa said that Carl did something that hurt so much she had to say no."[1867] Mrs. Montgomery's children provided confirmation of the sexual violence between Mr. and Mrs. Montgomery.[a]

Ms. Vogelsang would have presented proof that, contrary to the narrative presented by trial counsel, many people recognized that something was highly wrong with Mrs. Montgomery well before the crime. Despite the rancorous relationship between Mrs. Montgomery and her mother, "Judy considered involuntarily committing Lisa to a psychiatric hospital . . . Danny Shaughnessy [Judy's husband] told Justin's caseworkers 'he and Judy tried to get Lisa mental health help' early in 2004."[1868] Ms. Vogelsang also reported that "The lines of reality further blurred for Lisa, and she took on the character and appearance of her cousin, Wendy. Wendy was 'Lisa's best friend,' according to Teddy. When the family went to court on the custody of Justin, Lisa seemed to be 'trying to be her cousin Wendy Treibs. She dressed like her, acted like her, and had her hair the same as Wendy.' Wendy already had many children and told Lisa the

[a] Exhibit 1, p. 7, *Vogelsang Supplemental Declaration* ("Kayla described finding a box of ropes and other objects used during sex by Kevin and Lisa in one of their houses in Melvern, Kansas. Chelsea reported walking in and seeing Lisa tied up during sex with Kevin.")

next child she had would be named Abigail – the same name Lisa ultimately gave to the Stinnett baby. In January 2003, Wendy gave birth to a daughter after a tubal ligation reversal."[1869] Even Mr. Montgomery's family noticed that something was horribly wrong: "Lisa's erratic behavior concerned her father in law, Roger, who came to believe that Lisa had some 'psychological problem that he doesn't understand.'"[1870]

Ms. Vogelsang collected data which indicated that Mrs. Montgomery was often dissociated or otherwise out of touch with reality. "All Lisa's children vividly described their mother's episodes of altered consciousness when Lisa "zoned out" and the children could not gain their mother's attention or response. Desiree recollected that the children had to yell to get Lisa's attention. The children learned that

the only way to get their mother's attention was to call her "Martha," a made up name."[1871] Ms. Vogelsang reported that, "[c]ontrary to Lisa's descriptions of an idyllic life as a mother with four children, Lisa's four children described striking mood swings that were accompanied by very threatening and frightening behaviors. Chelsea believes that Lisa 'didn't always know what she was doing' when Lisa punished all four of her children by hitting them with belts, her own hands, and household objects. She does not believe that Lisa 'meant any of it. It was like she couldn't stop herself.' Lisa 'got out of control,' according to



Appellate Case: 17-1716 Page: 507 Date Filed: 11/01/2017 Entry ID: 4596229

Chelsea, who said Lisa 'could not stop herself from getting so worked up. You knew to run and hide when she got out of control.'"[1872]

Ms. Vogelsang collected data from interviews of Mrs. Montgomery's children and step children regarding Mrs. Montgomery's functioning in the months prior to the crime:

> Lisa's hopes [that marriage with Kevin would ameliorate her situation] crashed into the reality of her impairments and her ability to function spiraled downward. Her stepson, Dustin, recollected:
>
> > After the first time that were told that Lisa was pregnant, I noticed certain things about her. For example, Lisa used to have this look on her face, almost like a ghost. She could look at me without really seeing me; it was as if she instead was looking through me. She just stared through me. She had that look more often after she and my dad shared the news of her pregnancy.
> >
> > At some point, we found out that Lisa had miscarried. It was about six months later that we were told for the second time that Lisa was pregnant. Again, I was excited for a new sibling. However, during this time that I believed Lisa was pregnant, she became more and more distant and odd.
>
> In the months leading up to the offense, Lisa was reclusive. Chelsea and C. J. each reported they stayed away from home as much as possible because of Lisa's behavior. Chelsea reported she asked for a tent for her l6th birthday in July of 2004 so that she and Desiree could live outside the house . . . Kayla recollected that her mother's behavior changed during the month before the offense when Lisa stopped talking to her altogether. Chelsea also noted that Lisa deteriorated during December and reported that Lisa's hygiene deteriorated significantly during this time.



Appellate Case: 17-1716 Page: 508 Date Filed: 11/01/2017 Entry ID: 4596229

Lisa's stepson, Dustin, echoed the observations of Lisa's children regarding Lisa's declining mental health in the period leading up to the offense:

> In the last few months leading up to her arrest, Lisa began to spend hours upon hours in her room, on her computer or crocheting. Desiree brought her meals to her. She didn't speak to anyone while in her room. Desiree was left to keep up with a lot of the typical adult responsibilities by then. My dad worked so much during the day that he was rarely home . . . Desiree watched over the younger kids, cooked and even balanced the checkbook.[1873]

Ms. Vogelsang outlined the increasing pressures which compounded Mrs. Montgomery's descent into increasingly acute mental illness. Her PowerPoint presentation slides document the stressors Ms. Vogelsang felt most significant: Mrs. Montgomery's Order of Protection against her brother Tommy (December 2003); having to testify against Tommy (in contravention of her mother's wishes) at a Probation Violation Hearing (February 2004); Mrs. Montgomery was locked in a custody battle over her nephew Justin with her mother (April 2004); on-going financial indebtedness; her best friend from high school – the only friend with whom she regularly stayed in contact – Lori Blaylock, was killed in a motorcycle accident (July 29, 2004); child support conflict with both her ex-husband and her husband's ex-wife; custody conflict with ex-husband and her husband's ex-wife.[1874] In the months leading up to the crime:



Appellate Case: 17-1716 Page: 509 Date Filed: 11/01/2017 Entry ID: 4596229

> Lisa was not just out of touch with reality about her pregnancies. She was also out of touch with reality when it came to her two dogs, given to her by Carl in lieu of payment for child support. Lisa was consumed with the dogs and "paid attention only to the dogs." Even though she "was never much of a cleaner," the conditions in the home "got worse and worse." Lisa was not able to perform simple tasks. Kevin worried about Lisa but did not know what to do. Lisa had a "short temperament with the children, she did not clean the house, she spent too much time on the computer, paying too much attention to the dog breeding business, and she wasn't paying the bills." She was "very irritable." She was not able to make sure the family's animals were fed. In November 2004, when the weather turned colder, Lisa brought the dogs into the house to keep them warm. The dogs were not house trained, and urinated and defecated throughout the house. Lisa did not clean up after the dogs, and the rest of the family followed suit.[1875]

Ms. Vogelsang would have concluded her presentation with her opinions as an expert clinical social worker regarding the forces which brought Mrs. Montgomery to the place where she could commit such a bizarre and violent crime:

> By her early 20's Lisa experienced the full onset of major mental illness. Her perceptions, thoughts, and actions suffered under the weight of bipolar mood disorder, enduring effects of the torture from early childhood, and neurological impairments that likely caused in part by her mother's excessive drinking during her pregnancy with Lisa. Two of these profound disabilities originated in intentional acts of her parents and caregivers - torture and prenatal alcoholism. The third disability, however, evolved from genetic vulnerability and predisposition to psychiatric and neurologic impairments that were handed down through the generations.[1876]
>
> Torture and coercive control by her mother destroyed Lisa's autonomy, sense of self, and independence. It made her psychotic in that she lost contact with reality, became disconnected from events and circumstances around her, and developed distorted and irrational



Appellate Case: 17-1716 Page: 510 Date Filed: 11/01/2017 Entry ID: 4596229

> perceptions of her place in the world. After the birth of her four children in as many years, she experienced onset of major mental illness, most likely bipolar mood disorder, which caused erratic, unpredictable and extreme mood swings. The underpinnings of a healthy brain were already compromised by her mother's excessive alcohol consumption during her pregnancy with Lisa. These multiple impairments devastated Lisa's perception of reality, decision making ability, her insight, and her judgment.
>
> Lisa continues to be psychotic as a result of co-morbid conditions of serious mental illness, neurological impairment, and complex trauma reactions. Lisa experiences sustained loss of contact with reality and extremely disordered perceptions of time, personhood, and events. She experiences temporal disconnection from events, relationships, and situations in which she is a major participant. This disconnection is greater and more than dissociation associated with traumatic events. She is ashamed, fearful, distrustful, paranoid, suicidal, anxious, depressed, sleep disturbed, hypervigilant, and self-loathing.[1877]

### 16. Mrs. Montgomery presents proof that, once sexual trafficking and gang rape are presented, proof of the debilitating effect of complex posttraumatic stress disorder on Lisa's development and functioning is compelling.

At the hearing, Dr. Katherine Porterfield testified that counsel asked her to "examine Ms. Montgomery's child and adolescent development and history in the context of experiences of trauma, maltreatment, sexual abuse, emotional abuse, and neglect."[1878] Dr. Porterfield testified that she reviewed and considered the extensive biopsychosocial evaluation by Jan Vogelsang as part of her assessment.[1879] Dr. Porterfield said, "as I do that, I am going to be looking at not just Ms. Montgomery's history and what occurred in her life, what happened to her, what people describe about what happened to her, but



Appellate Case: 17-1716 Page: 511 Date Filed: 11/01/2017 Entry ID: 4596229

I'm also going to be looking at Ms. Montgomery herself, how she acts presently and also how people describe her in the past."[1880] Dr. Porterfield explained that in doing this type of assessment, "you're looking at sort of this tapestry of data that is historical as well as current, and then what you're doing is analyzing that data in the context of your expertise and what you know about children's development and trauma."[1881] Dr. Porterfield explained, the scientifically supported methodology she uses for an assessment results in two types of data: 1) "information regarding Ms. Montgomery's history of her life and her development" – coming "from everything from records to witnesses" to Mrs. Montgomery herself; and 2) the clinical condition as understood from Dr. Porterfield's own observations and application of her training to the information obtained.[1882]

Dr. Porterfield conducted in-person evaluation interviews of Mrs. Montgomery and also interviewed Mr. Kidwell.[1883] Mr. Kidwell related the information outlined above to Dr. Porterfield, describing his observations of Lisa's demeanor when in the presence of the perpetrators.[1884] Dr. Porterfield described her interview with Mrs. Montgomery wherein Mrs. Montgomery confirmed Mr. Kidwell's account and revealed her mother's participation in the events.[1885] As Mrs. Montgomery explained to Dr. Porterfield, "when I told



Appellate Case: 17-1716 Page: 512 Date Filed: 11/01/2017 Entry ID: 4596229

before no one did anything" and that "no one knows how involved my mom was in all of it . . . that's how they paid for the new living room."[1886]

> Lisa confirmed that at times as many as four men raped her in the same occurrence. Lisa stated that in addition to the anal, oral, and vaginal rapes, the men would also physically assault her in ways that left bruises. Lisa stated that "hitting was allowed." She reported having to wear long dresses and pants to cover bruising on her legs.
>
> Lisa's disclosures came in pieces. She was unable to give a linear, narrative account. Periodically she would report something in the past using the present tense – a common occurrence in individuals who are recounting traumatic events and suggestive of re-experiencing phenomena. She described having nightmares and flashes of memory, but she does not have a clear chronological memory of the events. Throughout the interview, Lisa repeatedly struggled to speak about the sexual violence, saying, "I can't," when asked to describe what had happened. It required several hours to conduct the interview, given Lisa's grave distress when asked to recall the rapes by these men.[1887]

In addition to her interview of Mr. Kidwell, Dr. Porterfield outlined the information upon which she relied to confirm Mrs. Montgomery's disclosure. Dr. Porterfield found the declaration of Carl Boman, Lisa's first husband, to be helpful confirmation: Mr. Boman related that when Lisa was 16 years old, she told him about the gang rapes. Mr. Boman's confirmation of Lisa's teenaged report contained consistent details, including the number of men involved, that sometimes Lisa was tied up during the assaults, and that Lisa reported that "she would go away in her mind and try not to be present" during the rapes.[1888] Dr. Porterfield also found confirmation of Mrs. Montgomery and Mr. Kidwell's



Appellate Case: 17-1716 Page: 513 Date Filed: 11/01/2017 Entry ID: 4596229

report in the declarations from Mr. Gann and Mrs. Baker who described Jack Kleiner's barbaric treatment of the children (and his neighbors). Finally, Dr. Porterfield related that she considered the confirmation of Mrs. Montgomery providing the names of two of the perpetrators, Gerald Shipley and Harold Alee – names which were subsequently located in the *Kleiner v. Kleiner* documents as having been associates of Judy Shaughnessy (neé Kleiner).[1889] Dr. Porterfield connected Mrs. Montgomery's report regarding Mr. Shipley, whose obituary reports his occupation was plumbing, with Teddy Kleiner's sworn declaration that his mother would send all of the children other than Lisa outside when repairmen came to the Kleiner home.[1890]

Dr. Porterfield testified that her expert opinions and testimony were based on her clinical training and experience and her review of relevant psychological literature, including the Adverse Childhood Experiences Study (ACE), ie. "the neurobiological research that underpins our understanding of what happens to kids who get abused"; "my own clinical knowledge from work for the past 18 years with traumatized people, and of course the clinical literature."[1891] Dr. Porterfield described normal childhood development as "learning to recognize his or herself, his bodily functions, her senses, her perceptions of the world, her feelings, her interactions, meaning the child is grown to learn how to manage being an organism in the world."[1892] Each

interaction the child has “is the foundation of what are these actually literally trillions, trillions of neurochemical connections that start to get made for that child about what it means to cry, what it means to be lying there feeling cold . . . there’s actually in the neurochemical wiring of the baby’s brain this incredible opportunity that happens over the course of the child’s life to make connections, and each of those connections happens as the child interacts with the environment.”[1893]

Dr. Porterfield described her professional opinion of Mrs. Montgomery’s development:

> So my clinical evaluation of Ms. Montgomery really yielded a conclusion that her environment was throughout her childhood one of coercion, violence, humiliation, degradation, exploitation. I mean, it was a very horrible childhood. That’s going to lead to an adaption that children make that is often called in our field ‘survival coping,’ and it’s kind of what it sounds like . . . it’s basically a description that the child is going to adapt. That’s the thing about the human organism. We adapt. So when a child’s environment is frightening, the child will adapt to managing fear by having physiological fear protection mechanisms that take place.[1894]

Dr. Porterfield described that “survival coping,” while a natural response to trauma, causes disruption in development and creates on-going difficulty for the survivor of trauma.[1895]



Appellate Case: 17-1716 Page: 515 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Porterfield described the effect of severe trauma on a child's development. Traumatized children experience neurochemical, neuroendocrinal, and neuroanatomical changes in their brains.[1896]

> [C]hildren have trillions of synapse connectivity moments, meaning moments when things are firing as they are developing, which is kind of an incredible idea, and those – what we've shown is that the chemicals that go across the synapses that create the connectivity between our nerves and our brains have shown alteration, if you study stressed, traumatized kids, and the alterations are that they have overactivation of some . . . neurotransmitters. There's overactivation of some of them, there's underactivation of others. You see impairments, frankly, in the quantity of the chemicals that are in the child's brain and how [those chemicals] are interacting.[1897]

Dr. Porterfield explained that "When children are put under severe stress and strain and fear, their neuroendocrine system has now been shown scientifically to have alteration."[1898] She gave an example of the change in cortisol in traumatized children, explaining that these cortisol changes affect the structure of the brain, specifically the corpus callosum resulting in traumatized children "have less connectivity between left and right parts of their brain."[1899] Dr. Porterfield related the trauma/cortisol/corpus callosum/connectivity to the finding that Mrs. Montgomery's perceptual IQ is significantly higher than her verbal IQ.[1900]

Dr. Porterfield testified that a traumatized brain functions differently than a brain which has developed more normally:



Appellate Case: 17-1716 Page: 516 Date Filed: 11/01/2017 Entry ID: 4596229

> One of those things that sometimes get used in my field is [the adage] "what fires together, wires together." The idea there is if a child's brain is required to be in a certain state, let's say a state of fear and threat detection, I have to protect myself, I'm under threat, the parts of the brain that handle fear and threat detection are firing, right? That's trillions of connections. And then they become wired. They become permanently connected. So that child's brain is now what we think of as "survival brain." It's a brain ready for fear. It's ready for threat. It's not a brain really ready to do sort of the normal things that kids have to do. That's how it becomes problematic.[1901]

The timing of the abuse affects which area of the brain is compromised. The limbic system "handles emotions," and "one of the critical developmental periods of the limbic development is early childhood."[1902] "What we find with teenagers who are abused is that they suffer more of those cognitive impairments that come from frontal lobe damage. So, trouble planning, trouble thinking things through, trouble with their reasoning capacity and handling emotion and reasoning together . . . making a good decision, essentially."[1903]

Dr. Porterfield testified that the duration of the abuse Mrs. Montgomery endured compromised multiple parts of her brain:

> Well, what's sad about it, frankly, in this case is that the critical periods of development for, let's say the limbic system. That limbic system, by the way, again is the emotional responses of the child. One of the crucial developmental periods of the limbic development is early childhood. So what we found is that if children are abused, maltreated, frightened during their younger years, sometimes they're going to demonstrate later what we call affective problems, problems with their feelings, handling them, what we call emotional dysregulation. So we've got Mrs. Montgomery certainly experienced in early childhood – while that limbic system was formulating itself and growing, she



Appellate Case: 17-1716 Page: 517 Date Filed: 11/01/2017 Entry ID: 4596229

experienced great abuse, fear abandonment, neglect . . . So then we've got Ms. Montgomery abused severely as an adolescent, and we see in Mrs. Montgomery's clinical condition the detrimental effect of that, which is terrible, terrible function in planning, impulse control, and reasoning. So sadly you see the critical periods for her because the abuse took place across her childhood, in her adolescence many of the critical periods [were] times she was under severe traumatic stress and, therefore, her functioning became impaired."[1904]

Dr. Porterfield explained – as Dr. Kuncel failed to do at trial[a] – the science behind why some children are able to overcome maltreatment where other children experience significant impairments. As Dr. Porterfield explained, scientific study has revealed that "dose matters."[1905] "If you are talking about multiple, six, seven, eight adverse childhood events, again, we're not even talking about looking at the length of these events in the child's life but if you are talking at that level of adversity, you're going to be looking at worse and worse functioning afterwards."[b] Dr. Porterfield then related the science to Mrs.

---

[a] TT. Vol. 15, p. 3106, *Kuncel Testimony* (agreeing with AUSA that the statistics regarding abused children are "very high" – AUSA cited 9,000/year)

[b] Vol. 7, p, 1657, *Porterfield Testimony*. As explained by Dr. Porterfield's testimony and PowerPoint, the ACE study – which was widely available in 2007 – studied the effects of basic categories of adverse childhood experiences: emotional abuse, physical abuse, sexual abuse, parental substance abuse, parental mental illness, mother treated violently, parental separation or divorce, emotional neglect, physical neglect (Exhibit 155, *Porterfield PowerPoint* at Slide 15). The risk of each negative outcome studied (including: mental health disturbances, somatic disturbances, substance use and abuse, sexual dysfunction, impaired memory, and high stress/ anger issues) increased in a graded fashion as the number of ACE factors increased (Id. at 14). Dr. Porterfield also provided the Court with an



Appellate Case: 17-1716 Page: 518 Date Filed: 11/01/2017 Entry ID: 4596229

Montgomery's functioning, "With Mrs. Montgomery, for instance, if we just do a broad-base look at her as a subject of the ACE evaluation, you see that she has nine out of ten ACE events in her childhood. That is an astonishing load of adversity."[1906] Dr. Porterfield explained that such pervasive trauma creates Complex Posttraumatic Stress Disorder (CPSTD):[1907]

> [T]here's a different sort of presentation and set of problems that emerges in people who have had to have a lifelong or chronic condition of fear, trauma, and being overwhelmed; and the sort of model of that is called complex posttraumatic stress, and that – we've learned this through war survivors, kids growing up in war zones, kidnap survivors, children who have been chronically abused. These are the populations who have a posttraumatic condition, but we look at it as having more impairments, more pervasive problems in the functioning, and it's sort of best understood, I think as a captivity condition, meaning the person's trauma came out of a situation they could not get out of, sometimes called learned helplessness, meaning – excuse me – the captivity sometimes is described as learned helplessness which is a condition in which the person realizes there is nothing they can do to escape.[1908]

Dr. Porterfield explained that Complex Posttraumatic Stress Disorder (CPSTD) involves the symptoms of PTSD (re-experiencing, avoidance, and inappropriate/hyper sense of threat) combined with additional symptoms of disrupted self-organization.[1909] Dr. Porterfield explained that that which people colloquially refer to as PTSD is actually more an anxiety disorder; "what we've

---

extensive bibliography of sources, including multiple publications by the Department of Justice, regarding the ACE study and the scientific knowledge derived therefrom (Exhibit 155, *Porterfield PowerPoint* at Slide 41-44).

actually learned in the last 30 years or so is that really posttraumatic stress disorder is a disorder coming out of our memory functioning in the brain and our arousal system or what I will call our fear network, and what we find is that people who have posttraumatic stress [have] a dysfunctional linkage between their memory of the event and their reaction in their body and that makes people really suffer . . . the dysfunction of PTSD is that we understand now that the part of the brain that encodes memory is the hippocampus, the larger system than that but the hippocampus is the main structure. If laying down that memory as the amygdala, the part of the brain we talked about in [in] the limbic system, is sending fear. So later the memory of the trauma activates the fear, and so the terrible thing about posttraumatic stress is that for people who have been traumatized, remembering is actually being afraid."[1910] In addition to the re-lives experience of fear, Dr. Porterfield testified that chronically abused children who are abused by caregivers "not only get that disorder arousal system that we talked about, right, their fear and threat detection is quite off-kilter, but they also develop a disordered sense of self and a disordered sense of other people and detachment, and that's from the perpetrator being trusted adults or people who are supposed to [protect] them."[1911]

Dr. Porterfield diagnosed Mrs. Montgomery with complex post-traumatic stress disorder (CPTSD) and explained how that diagnosis is a description of



Appellate Case: 17-1716 Page: 520 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery's life-long impairments. According to Dr. Porterfield, Mrs. Montgomery experiences emotional dysregulation, a distorted sense of self, distorted perception of interpersonal relationships and dissociation.[1912] "Lisa Montgomery's experiences of being groomed by Jack Kleiner starting at approximately age 11, if not earlier, with fondling, nudity, physical punishment being coupled with the nudity, being forced to bend over a bathtub with her bare bottom exposed and growing into at age 13 an experience frank rape by him is just an astonishing amount of abuse for a child to absorb. It is very, very severe. When you then add to what has emerged is that she was also trafficked by her mother, [her] other caretaker, who is supposed to protect [her], traffics [her] to other adult men who multiply raped her, beat her, and urinated on her, it is almost incomprehensible the kind of stress this child's body and mind suffered; and, frankly, her disorder behavior shows the cost in terms of how severely disturbed she is."[1913]

Dr. Porterfield discussed, in turn, how each of the ACE risk factors for poor outcomes as an adult were present in Lisa's history and upbringing: sexual abuse, physical abuse, emotional abuse as shown above, neglect, parental loss and separation, violence in the home, substance abuse, mentally ill parent, and multigenerational patterns of child objectification, abduction, and abandonment.[1914] First addressing sexual abuse, Dr. Porterfield explained how

Ms. Mattingly's experiences of abuse at the hands of Judy Shaughnessey (then Hedberg) and her paramours also harmed little Lisa. "We're going to start with [3 or 4 year old Lisa's witnessing the rape of seven or eight year old Diane by an adult male] -- a starting point of sexual abuse because for a four-year-old child to be lying in that situation would be unbelievably frightening and would be a condition of sexual abuse."[1915]

Dr. Porterfield discussed Mrs. Montgomery's trauma response of learned helplessness. "Mr. Kleiner by all accounts was just an unbelievably frightening man, and he threatened Lisa that he would rape her sister if she told. So Lisa now has the double bind, I have to submit to the rape because if I don't, my sister gets it. He also threatened, though to kill the family if she told. This was a very important point to me because it led to a real feeling of, I believe, learned helplessness that I talked about earlier in Lisa. He's saying, I will kill your family.[a] Dr. Porterfield discussed the pervasive physical violence in the home,

---

[a] Dr. Porterfield also discussed this threat as being confirmed by Mrs. Shaughnessy (neé Kleiner) during the divorce proceedings:

> If you want to sort of think about part of questioning was evaluating her, [determining] what was the believability of that threat? What I found in the records was that Judy Kleiner herself in her divorce proceeding says, Part of why I didn't want to leave or kick him out, rather, was I believed he was going to kill us. So there you've got a grown woman saying this man is capable of hurting/ killing his family. So when a little child, 11, 12, 13, 14 feels it that to me is quite credible.

Vol. 7, p, 1674, *Porterfield Testimony.*



Appellate Case: 17-1716 Page: 522 Date Filed: 11/01/2017 Entry ID: 4596229

including Jack Kleiner obligating Lisa and Patty to beat each other with two-by-fours and Mrs. Shaughnessy killing the family dog with a shovel in front of the children.[1916]

Dr. Porterfield also found the emotional cruelty toward Lisa by her mother to be significant abuse – and to reflect the mother's mental instability. "I believe Mrs. Kleiner was very mentally ill because her – the things she was capable of doing to her children are really astonishing in their cruelty."[1917] Dr. Porterfield again referred to Mrs. Mattingly's testimony saying, "There is just a tone across this family of disparagement and sort of vicious language being used toward children. There is -- the experience of Ms. Mattingly as a child being told, you are going to be removed from the home because you're bad, you're not ours. Again, this now – that's an emotionally abusive situation for Ms. Montgomery as well because she's a little child watching her big sister, beloved, being threatened with abandonment. This is so frightening for children. Watching Diane Mattingly being put on the porch naked. This is emotionally abusive to Lisa Montgomery, of course as well as to Ms. Mattingly."[1918]

Dr. Porterfield outlined the proof of the other ACE factors present in Lisa's development. "Parental loss and abandonment is shown as a severe risk factor for many, many years in the literature, and we know Lisa Montgomery,



Appellate Case: 17-1716 Page: 523 Date Filed: 11/01/2017 Entry ID: 4596229

it's quite clear her father both takes her away from the mother for this sort of bizarre period of time that's unclear what that was but appears to abscond with her, but then he really just disappears and abandons her, and that's a risk factor for kids to lose a parent."[1919] With regard to substance abuse in the home, Dr. Porterfield testified that many adults in Mrs. Montgomery's family – in addition to her mother and biological and step-fathers – have both substance abuse issues as well as diagnosed mental health disorders.[1920]

Dr. Porterfield discussed the family's history of child objectification and abduction as a non-ACE-study risk factor. She explained that the family's history of taking one another's children as rare, but that she flagged that factor "because it is so pronounced in terms of a pattern that existed in this family of seeing children as objects to be used in battles with one another, literally people take threatening to get rid of kids, getting rid of kids, threatening to steal kids . . . from Lisa's childhood she saw this disturbing pattern that children were objects and it, I believe, was absorbed into her very disturbed sense of self."[1921]

Particularly harmful to Lisa's developing sense of self, was her mother's forcible cutting of Lisa's hair as a sign of she was "bad and dirty"[1922] and Mrs. Shaughnessy's blaming of Lisa for her own victimization. As Dr. Porterfield discussed, "[A]fter this extensive years of sexual abuse was discovered, Mrs. Kleiner blamed Lisa for the abuse, said that [Lisa] had done it, [Lisa] had stolen

[Mrs. Kleiner's] husband, said [Lisa] had broken up the family. [Mrs. Kleiner] said that [Lisa] had made it so we don't have money now. It's very difficult to try to capture how damaging that message is to a child who suffered sexual abuse."[1923] Dr. Porterfield attempted to detail the harm: "[T]his idea of Mrs. Kleiner saying to Lisa, This is your fault, is really just a staggering kind of damage to do to a child."[1924] Dr. Porterfield said this harm was amplified by Mrs. Kleiner's publically repeating her blame of Lisa: ""when you think of an adolescent, this is a time of deep sort of self-consciousness and awareness of who am I in the world, how do people think of me, and you have this woman saying to people all around, This child did this on purpose, she brought it on herself, she was having sex with my husband, that is deeply deeply disturbed behavior by Kleiner – Mrs. Kleiner and very damaging as you see in Lisa, or as I saw, frankly, in my evaluation."[1925]

Dr. Porterfield discussed the symptoms she saw present during her examination of Mrs. Montgomery, including physical manifestations of trauma.

> In the current interview, Lisa reported experiences consistent with dissociation and posttraumatic symptomatology. For example, Lisa reported that when these men were sexually assaulting her she began to "go away" in her mind. She stated that she would "build houses" in her mind and in that way it would be as if what was happening wasn't really happening to her. Lisa described having frequent nightmares of the abuse as a child. She also described having severe headaches . . . I observed Lisa to have an involuntary gag reflex. I also noticed tearfulness and trembling. She bit her lip repeatedly. I observed her

> hands and body shaking. I noticed her neck and face flush red. Lisa reported feeling "sick to her stomach" and feeling "tight inside" during the interview when discussing the rapes[1926]

As Dr. Porterfield described, "Mrs. Montgomery became very anxious and agitated [during discussion of sexual abuse and trafficking]. At time shifting in her seat, crying, getting hot, and having to sort of, you know, shake her clothing to release air. She became – she gagged several times, literally had sort of a physical gag reflex when talking about [the] sexual abuse."[1927] Dr. Porterfield also focused on Mrs. Montgomery's emotional dysregulation and dissociation:

> There is extensive evidence that Mrs. Montgomery was a profoundly dysregulated young woman. So starting – I think, it really, really began to emerge in her teen years when she was being raped and then going into her very disturbed adulthood. This would be – you know, examples of this are her incredible volatility, her inability to handle emotions, retreating in her bed for days, sort of losing it on her kids, I think mistreating her children excessively drinking, being engaged in promiscuous behavior. These are all signs of a person who is not able to manage or regulate the emotions and experiences that are going on in their body.[1928]

Mrs. Montgomery's sense of self – the foundation for all other basic mental and emotional tasks – was profoundly distorted by her experiences:

> [H]er ability to be herself is almost not – she's almost incapable of feeling a sense of self; and what I mean by that is when she feels sense of self, she's confused by that. When she has a feeling, she doesn't really know if the feeling is coming from within her or outside of her. That's very, very disturbing . . . What we know clinically [is that] if that child is being abused by a loved figure: mom, dad, a beloved



Appellate Case: 17-1716 Page: 526 Date Filed: 11/01/2017 Entry ID: 4596229

> person in their life, they then have to make sense why is this happening. It must be that I'm making it happen. I am bringing this on. That then leads to an entire cascade of beliefs about oneself as dirty, disgusting, you know, warped, did it to myself, and that's where that really toxic self-blame happens in sexual abuse survivors, and Mrs. Montgomery is deeply disturbed with that."[1929]

Mrs. Montgomery's distorted sense of self is compounded by her distorted perception of relationships: "a very, very troubled part of Mrs. Montgomery … is her perception of other people; and what I mean by this – and this happens to severe abuse survivors – Mrs. Montgomery grew in a context of experiencing people as a source of physical pain, emotional pain and neglect. She then internalize that that is what human interaction is. People are going to hurt you. They're going to violate you. And what emerged as she grew into an adult was a difficulty perceiving people as anything except a threat or an object, because people to her were the source of such deep, disturbing violence as a kid."[1930]

Dr. Porterfield explained that Mrs. Montgomery's emotional dysregulation, disrupted sense of self, and distorted perceptions of relationships are further exacerbated by (and likely caused by) Mrs. Montgomery's severely dissociate symptomatology.[1931] This is "one of the most severe cases of dissociation [Dr. Porterfield] has ever seen . . . it's pervasively part of who [Mrs. Montgomery] is."[1932] Dr. Porterfield explained that dissociation is a physiological response to overwhelming trauma: "if a child is experiencing something that is physically

hurting them or just horrifying them, it's overwhelming them, one of the things that happens physiologically is that the brain actually release into the body chemicals that are – we call them endogenous opioids. It's just like it sounds. Endogenous [which means] from within, coming from within us. Opioids like you might think of with – that you need during surgery or during, you know, pain."[1933] Dr. Porterfield explained that endogenous opioids are protective during trauma because they decrease and detach the pain.[1934] When a child is a victim of sexual assault, those opioids allow them to survive:

> So a child who is being raped, the child – let's say, if we're going to use Mrs. Montgomery, that's obviously why we are here, a young child, 13, physically not developed, who's being raped by an adult male is going to have a whole cascade of physical discomfort, pain, and horror from that. So they're going to have smells and sounds of an adult male having sex. They're going to have the physical pain in their genital area of an adult male penetrating them, and all of that is going to lead that body to need to, as we talked earlier, survive, cope. What's going to happen is the body releases chemicals that will anesthetize. That decreases the pain the child feels. It decreases the sensory experiences, I'm not really feeling it. It decreases the consciousness. Rape survivors will tell you it was like I left my body and [was] looking down . . .
>
> Those endogenous opiates that I talked about, those things that make you not feel the pain, the good thing is they make you not feel the pain, but the other side of it is they also disconnect us then as that memory of the event is being laid down. That's why after a trauma we often don't have great . . . linear memories. We have fragmented memories. So as that opiate is decreasing pain and decreasing consciousness, it's also decreasing memory and connection.[1935]



Appellate Case: 17-1716 Page: 528 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Porterfield explained that Mrs. Montgomery's dissociation (and resulting lack of reliable contact with reality) is severe – even when compared with survivors of war and state sanctioned torture:

> I've seen survivors of very severe rape and torture who had an okay enough childhood that, yes, they have severe dissociation. When you start reminding them about the kidnapping, for instance, they dissociate. They disconnect. I'm not feeling myself anymore. I can't do this. I'm not in my body. The world's not real, but they have a fundamental sense of self that is intact.
>
> Mrs. Montgomery doesn't have that. Mrs. Montgomery's entire development took place in a context of stress, humiliation, degradation, and so her dissociation is woven deeply into her personality. There is no ground for her to stand on. So her dissociation is not the sort of episodic blips. Her dissociation is completely pervasive part of who she is. She lives in a dissociated state much of the time.[1936]
>
> . . .
>
> Mrs. Montgomery has very severe derealization and depersonalization, and that means she is very vulnerable to not knowing if she's real, if her environment's real, if the interaction is real. It all, like I said, becomes sort of like quicksand for her, and I believe that is because her neurobiological response to early stress was such a heavy load of anesthetizing, altering neurochemicals that she now just daily functionally lives in that kind of – in that kind of operating stance, which is the world does not feel real to her.[1937]

Dr. Porterfield testified that the scientific, psychological knowledge upon which her testimony was based was available in 2007.[a] Trial counsel could have

---

[a] Dr. Porterfield testified that the understanding of complex posttraumatic stress disorder has been around since 1993 and while it is not currently available for



Appellate Case: 17-1716 Page: 529 Date Filed: 11/01/2017 Entry ID: 4596229

easily located an expert with her expertise to testify to the science contained in her testimony. "Psychologists learn what posttraumtic stress is and what complex posttramatic stress is and what dissociation is. These are not – you know, these are not esoteric concepts in psychology.[1938] Dr. Porterfield was critical of trial counsel's attempt to portray Mrs. Montgomery as a good mother contrary to the factual, historical data. "The data is everywhere that Mrs. Montgomery was an incredibly dysfunctional parent [ ] who could not run a home much less raise children."[1939]

Dr. Porterfield's testimony showed that, had trial counsel investigated and learned of the chronic trauma to which Mrs. Montgomery was subjected throughout her childhood and developmental years, counsel could have presented a compelling and scientifically accurate account of the staggering harm caused to Mrs. Montgomery by the childhood maltreatment, gang rape, and blame inflicted by her mother. Had the jury known of the physiological effect of the trauma upon Mrs. Montgomery's brain, the jury could have understood her tangential contact with reality, have understood how that

---

insurance coding in the DSM-V, it is internationally recognized in the International Classification of Diseases (11th edition) and was a generally accepted clinical diagnosis at the time of Mrs. Montgomery's trial (Vol. 7, p, 1710-11, *Porterfield Testimony*).



Appellate Case: 17-1716 Page: 530 Date Filed: 11/01/2017 Entry ID: 4596229

resulted in her fundamental inability to parent or otherwise function effectively in the world, thereby providing mitigation.

### 17. Mrs. Montgomery presents proof of her significant brain impairments.

Dr. Nadkarni, a medical doctor who is board certified in neurology, psychiatry, behavior neurology, epilepsy, and clinical neurophysiology, testified that Mrs. Montgomery's brain is significantly impaired. The Court declared Dr. Nadkarni, who teaches at NYU Medical School, is the clinical director of the NYU Medical center's neuroscience curriculum for psychiatry residents, and diagnoses and treats patients in the epilepsy division of the Medical Center, an expert in the fields of epilepsy, neurology and neuropsychiatry and traumatic brain injury.[1940] Dr. Nadkarni found that Mrs. Montgomery "has deficits that lead me to think that she has both epilepsy and a significant front lobe syndrome, as well as parietal lobe and temporal lobe dysfunction."[1941]

Dr. Nadkarni testified that his opinions were based on a full neurological examination of Mrs. Montgomery in combination with her reported history and symptoms as well as the extensive social history compiled by Jan Vogelsang.[1942] Dr. Nadkarni interviewed Mrs. Montgomery as to her medical history and asked her pertinent questions regarding symptomology, but also compared the information she provided with the historical data from her prior

psychiatric and medical records.[1943] Dr. Nadkarni's neurological examination of Mrs. Montgomery "look[ed] at different parts of the nervous system as they manifest in somebody's comportment and neurological exam, how they function sensory-wise, coordination-wise, mental status wise, all of those things."[1944] The physical examination he performed on Mrs. Montgomery was precisely the examination he performs at NYU on his patients there on a regular basis, including use of the Montreal Cognitive Assessment, a screening tool for cognitive impairment.[1945] On cross examination, Dr. Nadkarni spelled out, concretely, what that examination entailed: "I was sitting in the room with her and I checked her cranial nerves, checked eye movements, and I checked the symmetry of her facial movements, her hearing, the different nerves of her head and face; and then you do a motor examination which involves testing muscle tone and bulk and strength, sensory examination testing basic sensory modalities, coordination examination and a cognitive assessment as well."[1946] Dr. Nadkarni explained that the Montreal Cognitive Assessment is "a good way to measure certain functions that are seen in the way the brain works in terms of cognition. So it involves things like language assessment, side shifting, organization, memory. Very specific cognitive functions are screened on that test."[1947]



Appellate Case: 17-1716 Page: 532 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Nadkarni provided the Court with an overview of brain development and the functions of each region of the brain, including introducing the Court to the Brodmann Map.[1948] The Brodmann Map is a map of the lower-level brain functions, showing which part of the brain corresponds with which function.[1949] Dr. Nadkarni explained that no such map exists for higher level brain functions, as "high-level functions really involve networks of different parts of the brain that go together and those you can't map out so easily locally, structurally."[1950] With reference to the neuropsychological testing performed on Mrs. Montogmery pretrial, Dr. Nadkarni explained, "in neuropsychological testing you can measure those fundamental functions that are listed in the Bodmann Map, but it's very, very hard or I would say it's almost impossible in neuropsychological testing as we know it to map out higher-level functioning, which is a big problem in Lisa's case."[1951]

Dr. Nadkarni summarized his findings: "I think the three main areas that are affected in Ms. Montgomery are the frontal lobe, the parietal lobe, and the temporal or, slash, limbic lobe, and the right hemisphere I think is more affected than the left." [1952] He continued, "In Ms. Montgomery's case these limbic structures, parietal structures, and inferior frontal structures are all – have all been shown to be abnormal . . . [her pattern of brain damage] actually follows kind of a classic pattern, very classic pattern for comportment

difficulties."[1953] Dr. Nadkarni explained that "comportment" in the neurological setting means essentially its vernacular meaning, but signifies a host of neurological abilities: "comportment is comprised by several things that help us enact behaviors in the world, right? So it involves insight, judgment, self-awareness, social adaptation, and empathy, and it lets us behave appropriately in the world we live in and assess when something will have negative consequences or positive consequences and helps us make judgments, basically."[1954]

Dr. Nadkarni explained how Mrs. Montgomery's brain dysfunction is a "classic" presentation. He explained that this brain problem reflects "relatively lower metabolism in the left hemisphere compared to the right hemisphere and relative atrophy in the right hemisphere compared to the left."[1955] According to Dr. Nadkarni, Mrs. Montgomery's parietal lobe, which synthesizes information and stimuli "tagging it appropriately" allowing for critical, often pre-conscious decision making as to "what's important, what's not important, what would be bad for me, what would be good for me," has "significant abnormalities."[1956] Mrs. Montgomery's limbic lobes, which are important for generating emotional "tags and physical experiences that go along with emotional states" is also abnormal.[1957]

Dr, Nadkarni explained that Mrs. Montgomery has damage or dysfunction of her frontal lobes.[1958] He specified that the type of dysfunction he detected could result from Mrs. Montgomery's history of having her head banged on the floor during rape. "99 percent of her problems that are involving the frontal lobe and her temporal and parietal lobe are from repeated traumatic injury. She also had a prenatal toxic history [maternal consumption of alcohol] also so that probably didn't help."[1959] He explained that the sorts of injury she suffered caused both brain damage and epileptic activity: "developmentally and then post-birth, severe traumatic head injuries she's had repeatedly will give you this kind of a picture, and classically those patients present with comportment problems, these frontal lobe syndrome kind of issues. And epilepsy – you have posttraumatic epilepsy also, which I think is what happened with her."[1960]

Mrs. Montgomery also suffers from frontal temporal lobe epilepsy, according to Dr. Nadkarni. Epilepsy is a seizure disorder. Seizures "are any king of behavioral change or experience that somebody can have that's related to abnormal firing of certain parts of the brain."[1961] Dr. Nadkarni explained that "seizures are pleomorphic" which means having "different presentations, different symptoms."[1962] "[I]n a frontal temporal epilepsy, which is I think what Lisa Montgomery suffers from, people can have – the five most common

symptoms are auras, which you retain awareness but you might smell something strange, and the trick is that isn't stereotyped. So the smell is the same every time because the same part of the brain is firing so you get the same kind of sensation . . . out-of-body experiences or dissociative experience in general is a common feature of temporal lobe epilepsy. People can lose time very commonly. So all of the sudden they find themselves doing something and they can't account for the last few minutes, five minutes, ten minutes. And if those symptoms progress enough, you have alteration in your awareness and you might blank out, you might stare, you might have what we call behavioral arrest where you just stop what you are doing."[1963] Dr. Nadkarni explained that there are many types of seizure activity in the brain which do not produce external, visible manifestations: "You would never know by looking at somebody."[1964] He explained that invisible seizures are "more common than convulsions in temporal lobe epilepsy."[1965] This kind of brain misfiring can disrupt thought and consciousness, without necessarily disrupting external behavior, "so people can go through their lives and do whatever they're doing. They might just have an intense déjà vu or an intense smell or something and they can just work through it and nobody else would know."[1966] If, however, "it spreads more, you might have problems speaking. You might be unaware of what's going on around you. You might not be able to understand what people

are saying . . . there's all these things that can happen once the seizure spreads." Temporal lobe seizures compromise memory, because they start in the hippocampus (or next to hippocampus in the amygdala) which is one of the structures in the temporal lobe which is responsible for memory.[1967]

Dr. Nadkarni diagnosed Mrs. Montgomery's temporal lobe epilepsy on the basis of his examination.[1968] He has diagnosed between 5 and 6 thousand patients with temporal lobe epilepsy and is very familiar with the symptoms and manifestations.[1969] He sees patients with temporal lobe epilepsy, "just about every day."[1970] Dr. Nadkarni explained that Mrs. Montgomery "gives a classic history for symptoms of temporal lobe epilepsy over many, many, many years, going back to even her childhood, she's had experiences that go along with temporal lobe epilepsy."[1971] He recounted her symptoms: "episodes of lost time;" "olfactory hallucinations but they were very stereotyped;" "discrete episodes that were brief in duration where she would be doing something and all of the sudden she didn't know how she was doing it." Her neurological exam was also consistent with the diagnosis: "when I examined her physically, she has weakness in her left hand, weakness in coordination in her left hand. That points to sort of brain abnormalities in both the frontal lobe and temporal lobe circuits." Dr. Nadkarni explained that these physical findings are not something a patient can fake; the tests cannot be fooled by lack of effort, "the testing might



Appellate Case: 17-1716 Page: 537 Date Filed: 11/01/2017 Entry ID: 4596229

be subtle but the findings are sort of not subtle for somebody who knows what they're looking for."[1972]

Dr. Nadkarni testified that his initial assessment and report were independent of any information from Dr. Gur's assessment of Mrs. Montgomery. However, once counsel provided him Dr. Gur's data, including both the PET and MRI data, Dr. Nadkarni found that Dr. Gur's information corroborated his own findings.[1973] Dr. Nadkarni's findings on the neurologic examination pointed to frontal lobe dysfunction, "and the PET scan and the MRI also point to those areas as being abnormal along with limbic dysfunction, which is temporal lobe dysfunction, which maps perfectly onto her history of probable epilepsy and the seizures."[1974] He also indicated that his testing reflected the findings on the imaging studies of a "right hemisphere problem."[1975]

After his assessment and diagnosis, Dr. Nadkarni also reviewed the work of the trial team's expert, Dr. Robert Fucetola, whose neuropsychological testing results were also consistent with Dr. Nadkarni's findings. Dr. Fucetola gave Mrs. Montgomery a "much more extensive version" of the Montreal Cognitive Inventory that was given by Dr. Nadkarni – and the two obtained nearly the exact same result. "[W]hich is important. So that's another finding on the neurologic examination . . . there's no explanation for why [Mrs.

Montgomery could not perform basic task of the examination] . . . what it shows is that the front circuits – these same frontal circuits are involve in generation thoughts and words and those frontal circuits, the medial frontal circuits don't work as well with her and that was a focal finding in that neuropsych testing too."[1976]

When questioned how it is that Mrs. Montgomery has brain dysfunction in so many areas of her brain, Dr. Nadkarni explained that injury, malformation, or damage to one area of the brain affect the functioning of other areas because the brain works on the basis of interconnectivity.[1977] "So, it's not she has a tumor or a stroke in one place and now she can't move her hand. It's that these are networks that have been severely damaged."[1978]

> The problem is that it's very hard to assess those networks when we examine patients. So if I look for somebody the way they move, that one thing or if you do neuropsych testing, all of the things that you test in neuropsych testing that were on that Brodmann Map, like language and attention and set shifting, each one of those discretely could be okay in somebody's brain, but their connections between the motional circuitry and the salient circuitry and the judgment circuitry can be completely dysfunctional and you would never know from just neuropsych testing or even not necessarily from neuroimaging all the time. Somebody could have a normal MRI scan, which we don't have in this case, and they can have severe problems in the frontal lobe and comportment, comportment syndrome.[1979] . . . she's sustained multiple head injuries; and if you bomb a city, you can – if you bomb one part, you affect another part. If you bomb multiple parts, which is what's I think happened in her case, then the ramifications can be significant.[1980]



Appellate Case: 17-1716 Page: 539 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Nadkarni testified that the scientific knowledge undergirding his opinions and analysis was available in 2007. "It's been around probably 50 or 60 years at least. There's been an explosion of neuroscience now that we've learned a lot more but these concepts [regarding comportment problems reflecting brain dysfunction] we've known about . . . [That which he testified to] is sort of a behavioral neurology 101."[1981] Dr. Nadkarni agreed that in 2007 a neurologist could have supplied the science and testimony that he provided the Court.[1982]

**18. Mrs. Montgomery presents proof that her brain impairments, mental illness, and Complex Post-Traumatic Stress disorder are more than the sum of each added together: the conditions are compounding, each worsening the impairment caused by the other.**

Mrs. Montgomery presented the expert neuropsychiatric and psychopharmacological testimony of Dr. George Woods, who practices clinical psychiatry in Oakland, California.[a] Dr. Woods explained that his clinical practice informs his forensic work, because "the clinical picture is what counts even in a forensic setting . . . you have to know what's wrong with the person before you can answer forensic questions; and if you are hamstrung in having a

---

[a] Vol. 7, p. 1748-49, *Woods Testimony*; *see* Vol. 7, p. 1751-53, *Woods Testimony* (establishing Dr. Woods' credentials as a forensic expert as well as a clinical neuropsychiatrist); Vol. 7, p. 1755, *Woods Testimony* (the Court declares Dr. Woods an expert in neuropsychiatry).

good understanding of what's going on with the person clinically, then it hampers your ability to answer the forensic question."[1983] Dr. Woods outlined for the Court the referral questions he received from §2255 counsel to guide his evaluation of Mrs. Montgomery:

1) Was Mrs. Montgomery's capacity to appreciate wrongfulness or conform her conduct to the requirements of the law significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge?
2) Was Mrs. Montgomery under severe mental or emotional disturbance at the time of the offense?
3) Is Ms. Montgomery's neurobehavioral history an important component of her social history?
4) Did prior assessments of Ms. Montgomery by trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?
5) Must a reliable psychiatric assessment of Ms. Montgomery include consideration of her neurological deficits?
6) Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?
7) Did her impairments and medications inform her demeanor at trial?[1984]

Dr. Woods' testimony highlighted the importance of the biopsychosocial history and evaluation for a mental health expert**.** Dr. Woods explained, "I must start out by saying that the biopsychosocial history is the most scientific component of any medical examination."[1985] The biopsychosocial history provides context for that which the expert sees in the person evaluated:[1986] "you want to be able to look at documents across the life span, educational records, social service records. You certainly want to take into consideration other mental health evaluations."[1987] Dr. Woods explained that critical genetic information is reflected in the biopsychosocial history: "genetics are part of your biopsychosocial history because in this case we know that family members share genetic disorders, family members share mood disorders, and that's important to know."[1988]

Dr. Woods said that the biopsychosocial provides necessary context for the clinical observations and symptoms, validating information by providing multiple sources: "you look for information that's outside of the forensic setting as well as within the forensic setting."[1989] Dr. Woods explained that the forensic question always circles around a subject's functioning: a clinician must look at the compiled data and see whether it is consistent with how the subject actually functions.[1990] "You gather data, you determine the significance of the data, and then you turn and you look and say, How did that person function? Does this

data – is this data consistent with how this person was able to function? And that's where the forensic component becomes more relevant."[1991]

Dr. Woods offered an example of the type of consistency he looks for in the social history of the client's functioning in the real world and the client's presenting history. In Mrs. Montgomery's case, the social history reflected social services records from 2003 – before the offense – that noted that Mrs. Montgomery might be delusional and might suffer from bipolar disorder.[1992] Dr. Woods termed this sort of consistency between current, observed clinical symptoms and a subject's life history documentation "ecological validity."[1993]

The biopsychosocial history provided Dr. Woods with mental health symptoms noted consistently across Mrs. Montgomery's lifetime.[1994] Dr. Woods focused particularly on the history of Mrs. Montgomery's loss of contact with reality.[1995] Dr. Woods explained that by loss of contact with reality, he intended to convey "someone who can't maintain good contact with what's occurring around them. It doesn't mean they go off into their own world necessarily, but it means that they – it's like hearing something far away and not being able to quite catch it."[1996] He noted, "that's exactly how people describe Ms. Montgomery outside of the forensic setting, growing up, in marriage, as a parent, as a sister. They consistently describe her as not being able to stay connected."[1997]



Appellate Case: 17-1716 Page: 543 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Woods discussed that psychosis was manifest across Mrs. Montgomery's lifetime as reflected by the social history. "[H]er sister said, you know, she's crazy but I don't think she's crazy like schizophrenia. The social worker in 2003 said, Wow, I'm wondering if she may be somewhat delusional. Dr. Kuncel said, you know, again, she sounds delusional. Dr. Hutchinson says, I think you need to look at her thought disorder. You know, [Ms] Vogelsang says, Wow, she's psychotic. And then what do we see? We see the antipsychotic being the treatment that makes the most difference."[1998]

Ms. Vogelsang's report provided critical data for Dr. Wood's assessment. Dr. Woods highlighted that the biopsychosocial reflected a maternal and paternal history of neglect, abandonment, and sexual dysfunction.[1999] "For any clinician that should be a clue in your differential as to whether there is a mood disorder in the family. Mood disorders manifest themselves with these kinds of behaviors."[2000] He pointed to information in the social history that family members had been diagnosed with mood disorders, "this is what's call[ed] an affectively la[den] family . . . when you see mood disorders early in life, there's a greater chance of those mood disorders have a strong genetic component, but what we do know is that mood disorders run in families."[2001]

Dr. Woods also indicated that Ms. Vogelsang's documentation of cognitive impairments through several generations of Mrs. Montgomery's



Appellate Case: 17-1716 Page: 544 Date Filed: 11/01/2017 Entry ID: 4596229

family history was significant to him. “This is what really kind of threw me at first is we see cognitive impairments, intellectual disability, other autism, other types of brain-based impairments not only before Ms. Montgomery, but we’re now seeing these impairments in the children as well and the children of her children.”[2002] The generational component of this information provided further verification of Dr. Woods’ assessment.

Ms. Vogelsang’s social history also provided information on the trauma Mrs. Montgomery experienced during the developmental period which allowed for deeper insight into Mrs. Montgomery’s symptomology. Dr. Woods explained that the biopsychosocial informed the clinical interviews and – particularly the information from David Kidwell – “allowed us to move the ball further in terms of understanding what really had occurred to her.”[2003]

Doctor Woods explained the methodology used to formulate his opinions. He worked in an interdisciplinary team with Dr. Porterfield, a trauma specialist, Dr. Nadkarni, an epilepsy specialist, and Ms. Vogelsang, the social historian and social worker.[2004] For Dr. Woods, “[T]he reports of other mental health evaluators are very important. The clinical interviews are very important. The neurological, neuropsychological, and neuroimaging are very important in understanding the evolution of the science of trauma, and neurobiology is very important.”[2005] Dr. Woods placed significant importance on the observations of

Mrs. Montgomery's treating psychiatrists, Drs. McCandless and Kempke.[a] As he noted, those doctors "attempts to change medications and to add medications, to really try to gain some control over these symptoms, that's very, very important, because it's outside of the forensic setting."[2006]

Dr. Woods acknowledged his reliance on the work of the other members of the multidisciplinary team. He considers the historical data accumulated across the subject's lifetime in the biopsychosocial to be the highest level of scientific inquiry, grounding the examination, observation, clinical interview, and differential diagnosis in historical, non-forensic reality.[2007] Dr. Woods also looked to Dr. Nadkarni's assessment for confirmation of his own neurological findings: "Dr. Nadkarni did some neurological testing I didn't do. He did a smell test [resulting in a finding of] evidence of a frontal lobe dysfunction."[2008] Dr. Woods noted[b] that Dr. Nadkarni documented multiple neurological

---

[a] Vol. 7, p. 1761, *Woods Testimony*; Dr. Kempke testified at the hearing regarding her post-trial treatment of Mrs. Montgomery at the BOP (Vol. 5, p. 1247, *Kempke Testimony*). Dr. Kempke observed Mrs. Montgomery in an acute psychotic state (*id*. at p. 1251). Dr. Kempke's testimony was offered to show corroboration for Dr. Woods, Dr. Nadkarni and Dr. Porterfield's diagnosis and opinions and to show the underlying data considered by Dr. Woods (ie. that Risperdal, an antipsychotic medication, ultimately has been successful at treating Mrs. Montgomery) (*id*. at 1253).

[b] As with Ms. Vogelsang, the district court instructed counsel to curtail Dr. Woods' testimony indicating that "the slides are before me and Dr. Woods can give his conclusions" (Vol. 7, p. 1809, *Order of the Court*). Accordingly, as Dr. Woods' PowerPoint was accepted as an exhibit and the Court indicated the Court would



Appellate Case: 17-1716 Page: 546 Date Filed: 11/01/2017 Entry ID: 4596229

symptoms: "olfactory hallucination of bad small (evidence of frontal lobe dysfunction; episodes of lost time; memory of experiences that she is not sure really occurred; word finding problems; sustained periods when things do not seem real; altered states of consciousness; episodes of losing time."[2009] Dr. Woods acknowledged Dr. Porterfield's credentials "Dr. Porterfield is well known, well respected in the field of trauma and complex trauma, torture. She said massive and pervasive impairments that come with the type of trauma, ongoing trauma and made a diagnosis of complex PTSD."[2010] Dr. Woods also noted the synchronicity of the report from Dr. Sanislow, noting that Dr. Sanislow's informed read of the MMPI results from 2005 and 2007 reflected Mrs. Montgomery's comorbid psychiatric disorders which create greater challenges for Mrs. Montgomery when she is confronted by novel situations. Dr. Sanislow's report also noted that comorbid disorders show up as "multiple profiles on the MMPI-2" – which Dr. Sanislow saw in the neuropsychological data and Dr. Woods saw as confirmatory of his clinical work with Mrs. Montgomery.[2011]

Dr. Woods conducted a thorough examination of Mrs. Montgomery. Dr. Woods interview Mrs. Montgomery on four occasions spaced over three

---

review the slides, where Dr. Woods' testimony was curtailed citation is made to his PowerPoint which reflects his planned testimony.

years.[2012] Dr. Woods testified that spacing the interview out is critical when there is a suspected mood disorder, "you might see them one time when they are depressed. You might see them another time they may be more irritable or elevated. You may see them another time and they look good. So rather than an extended one-day or two-day examination, I try to catch people over the course of several weeks or several months, if possible."[2013] Dr. Woods explained the components of his evaluation: "The clinical interview or assessment also includes a neurological examination it at all possible. So that's what we did here. I sat and I took her social history, her family history, her medication history, her educational history. I talked to her about her various children, her relationships. I talked with her to some degree about her sexual history and abuse. And I think it was on the second interview that I did a neurological examination."[2014]

Inherent in Dr. Wood's assessment of Mrs. Montgomery's neurological functioning was an assessment of her ability to accomplish the tasks of normal life.[2015] From the social history, Dr. Woods learned "[Mrs. Montgomery] had difficulty performing simple tasks. She had difficulty finishing tasks. She had real difficulty, as I talk about, sequencing, being able to really take stock and say, okay, I need a loaf of bread. I also need some milk. I've got four kids. I [have] got to do this, that, and the other. She had difficulty budgeting. She had

problems braiding and brushing her hair. I put that there specifically because braiding and brushing is a sequential phenomenon . . . These are all cognitive tasks that we tend to do fairly easily, but with someone that has the trauma history and the brain impairments that [Mrs. Montgomery] has would be problematic."[2016]

Dr. Wood's neurological examination also yielded significant symptoms of brain impairment. Dr. Woods cited three indicators which were of particular interest: skipping, tandem walking, and the Luria test.[2017] Mrs. Montgomery cannot skip.[2018] "[S]kipping is actually a neurological function. It requires the cerebellum."[2019] The tandem walking task also implicates cerebellar functioning.[2020] The Luria test, which Dr. Woods testified is similar to some of the testing Dr. Nadkarni performed (and on which he obtained similar results) tests frontal lobe functioning.[2021] "And she could not do this. So what we really see are neurological functions that are impaired. Impaired motor control, impaired cognitive functions. She had problems with attention and language, and she had problems regulating fears as well as pleasure."[2022]

Dr. Woods explained the implications of Mrs. Montgomery's cerebellar and frontal lobe dysfunction. With regard to cerebellar dysfunction "these are the symptoms that one sees; distractibility . . . hyperactivity, impulsivity, disinhibition, not being able to control one's anxiety, irritability, rumination,



Appellate Case: 17-1716 Page: 549 Date Filed: 11/01/2017 Entry ID: 4596229

thinking things over and over and over, not being able to let go, over and over, obsessive behaviors, and dysphoria."[2023] Dr. Woods explained that the dysphoria accompanying cerebellar dysfunction equates to "depression, again, tactical defensiveness. You can't stand being touched. You have problems being touched. Sensory overload, which is also called the gating mechanism, too much overwhelms you. [Mrs. Montgomery talked consistently about having to be away from her kids because – although any of us who have kids think this, but sometimes you just can't be there. You just can't be with them. But that's not the same as not being able to take care of their lives et cetera, apathy and childlike behavior."[2024] Dr. Woods explained that the cerebellar dysfunction implicates frontal lobe disorders as well: "We now know that the cerebellum has connections to the frontal lobe, and the frontal lobe is kind of the gross executive functioning, but the cerebellum is kind of the fine tuning of the executive functioning. And clearly she has difficulty. And these are the kinds of dysfunctions that one would see in someone with a history of . . . their mother drinking [while pregnant]."[2025]

Dr. Woods also performed the Barkley Deficits in Executive Functioning Scaled Interview.[2026] This test confirmed the picture presented by Mrs. Montgomery's social history: "She was markedly deficient in her time organization, time management. She was markedly deficient in her



Appellate Case: 17-1716 Page: 550 Date Filed: 11/01/2017 Entry ID: 4596229

organization. She was markedly deficient in her ability to restrain. She was markedly deficient in her motivation. She told actually a story about leaving jobs without even picking up a check."[2027]

Dr. Woods testified that ""before she was adequately treated she had impaired functioning in being able to be independent, in being purposive and organized, and her own self-serving behavior. We note stories of her being very, very dirty, smelling terribly even at the Wendy's where they would have to put her in a separate area so that the customers would not have to smell her."[2028] Dr. Wood's summarized his findings on the Barkley in his PowerPoint, indicating that the scores attained showed that Mrs. Montgomery has impaired functioning in "independent, purposive, self-serving behavior."[2029]

Dr. Woods testified that to a reasonable degree of medical certainty, Mrs. Montgomery's brain is significantly impaired. He explained that her impairments are lifelong and "[h]er brain impairment is merely what we call multifocal. It's in multiple areas. Certainly it's in the back of the brain, the cerebellum. It's certainly in the right side of the brain, the right parietal lobe, the right temporal – frontal lobe"[2030] The types of brain impairment that impair Mrs. Montgomery's functioning are not easily detected with neuropsychological testing.[2031] Dr. Woods' findings were congruent with Dr. Nadkarni's findings.[2032]



Appellate Case: 17-1716 Page: 551 Date Filed: 11/01/2017 Entry ID: 4596229

Doctor Woods explained that Mrs. Montgomery's behaviors were symptoms of her brain impairments and trauma. He gave examples of concrete tasks Mrs. Montgomery was unable to perform which demonstrated brain dysfunction: making a bed, completing projects, effectively treating her children's lice infestation.[2033] He described her inabilities as "sequencing issues."[2034] "These are not just someone who gets frustrated and just throws things away. These are problems with the way that her brain works in terms of if I do this, then I should do that and then I should do that."**[2035]** Dr. Woods reflected that Mrs. Montgomery's social history supported his diagnosis, because her friends and family were aware of her inabilities – though they lacked the expertise to describe the problem in clinical ways.[2036] Dr. Woods explained that Mrs. Montgomery's IQ did not reflect her actual functioning: "This is someone that in a testing situation could do very very well, but they can't translate that, what we call ecological validity . . . so she could have a 120 IQ on tests, but the things that should reflect on the streets she couldn't do."[2037]

Dr. Woods provided a powerful example of Mrs. Montgomery's problem with sequencing, with reference to testimony at the hearing about Mrs. Montgomery's response to the death verdict. According to Dr. Woods, Mrs. Montgomery's statement asking what she could do to help counsel – after the death sentence – was "consistent with impaired sequencing of the frontal



Appellate Case: 17-1716 Page: 552 Date Filed: 11/01/2017 Entry ID: 4596229

lobes."[2038] "To make this statement at this point, again, really reflects her inability to rationally assist [counsel] because of her brain impairment."[2039]

Dr. Woods also saw symptoms of Mrs. Montgomery's trauma history in her behaviors that were reflected in the social history: "I think most of the prominent clinical symptoms were the symptoms of her PTSD. She had significant avoidance, and this isn't an avoidance in that, I don't want to talk about this or I don't want – she was not able to talk about the trauma that she had experienced to the degree that she experienced it, and that really speaks to not the Type 1 PTSD that Dr. Dietz was talking about, the single act, but the complex PTSD, the repetitive acts, the repetitive breaking of spirit. So it's my professional opinion, and I think Dr. Dietz agreed, she had PTSD, but it's much more severe PTSD."[2040]

Dr. Woods discussed that Mrs. Montgomery's history of trauma has caused her to dissociate as a coping mechanism.[2041] Dr. Woods explained that dissociation is purposeful in the sense that "it serves a purpose, but not every time someone dissociates is in fact intentional."[2042] Dr. Woods saw symptoms of dissociation when he attempted to interview Mrs. Montgomery about the sexual abuse Mr. Kidwell disclosed.[2043] While Mrs. Montgomery was able to confirm to Dr. Woods that Mr. Kidwell provided accurate and truthful information,[2044] "she physically flushed. Her cheeks became red. Her answers

became delayed . . . she was unable to elaborate. This is one of the things that Dr. Nadkarni talks about when he talks about her finding it difficult to initiate a conversation, and she becomes dissociative. In fact, she would not talk about it . . . She would not talk about it, and I was like What would happen if we talked about it? And she said, I just can't. I just can't I don't know I don't know."[2045]

Mrs. Montgomery suffered from comorbid psychiatric illness which combined synergistically to compromise her functioning. Dr. Woods found that Mrs. Montgomery suffers from bipolar disorder, and that in combination with her PTSD the dual diagnosis causes severe dysfunction:

> It's difficult to determine to really – and there's not reason to, to determine which of these symptoms are mood based, bipolar based, and which are trauma based because they're comorbidly interactive and they're bipolar and PTSD . . . when you talk about a comorbid disorder, we're talking about disorders that mix and become something that often is even greater and more severe. These brain impairments don't go away when we talk about comorbidity. The traumatic experiences undermine her perception of the reality consistently, even more so than the bipolar disorder.[2046]

Mrs. Montgomery's neurological deficits impact her memory – as does her trauma history.

> [W]hat we see with people that are traumatized is that it impairs their memory . . . trauma really impacts registration, whether [the memory] comes in or not."[2047] Mrs. Montgomery's neurological deficits further compromise her memory. "Ms. Montgomery has two particular neurological deficits that impact her ability to recall. The first one is she has significant right brain . . . from Dr. Nadkarni as well as by neurological exam, she has impairments of her right brain. Her right

> frontal lobe doesn't allow her to pick up things as easily . . . So her ability to kind of get the big picture, to really hold everything in place is impaired.
>
> The other part is her cerebellum, the back of the brain, again, cannot be tested through neuropsychological testing; but, again, Dr. Nadkarni and my testing through really physical examination showed that she has cerebellum injuries. Again, the cerebellum is the fine tuning of executive functioning. The cerebellum is the part of the brain that allows you to really fine tune that sequencing.[2048]
>
> . . .
>
> There may be things that she has complete memory. We call it patchy memory. Depending upon the degree of stress that she's under, the degree of chaos that's going on around her, she may catch less. If she is in a testing situation, where none of that is going on and she's in a quiet room, she may get more.[2049]

The trauma Mrs. Montgomery suffered when trafficked by her mother shaped Mrs. Montgomery's experience and functioning. According to Dr. Woods, Mrs. Montgomery's life experience was profoundly compromised by her mother's actions. "[H]er mother betrayed her. Parents are there to train their children and children will be trained regardless. Particularly young children will run to slaps as well as hugs, and what we see – when we really talk about trafficking, we're talking about Judy Shaughnessy . . .who trafficked her child out to the plumber, to the electrician, who told her it was necessary for her to do this in order to get the services. So she developed a mindset of coping mechanisms that had already been groomed by her stepdad."[2050] Dr. Woods explained that children develop coping



Appellate Case: 17-1716 Page: 555 Date Filed: 11/01/2017 Entry ID: 4596229

mechanisms – even though sometimes those mechanisms are not healthy or appropriate: "Children are going to cope. Children are going to compensate. And so the fact that she was not given appropriate coping mechanisms meant that [she] was given inappropriate coping mechanisms. She was given sexuality, for example. She was given prostitution. She was given, you know, being able to utilize her body in multiple different ways; and, frankly, there are times when she may have been sexual and it was in fact consensual. She may have been hypersexual, but what we see really are the substitution of appropriate coping mechanisms for inappropriate coping mechanisms."[2051]

Mrs. Montgomery developed "learned helplessness," because of the trauma inflicted on her. Dr. Woods explained that learned helplessness "means that over time you give up yourself and you acquiesce to what's been done and what you know that is coming."[2052] Dr. Woods testified that when a child is subjected to such uncontrollable abuse, the child's "anticipatory anxiety" can be "every bit as overwhelming in the long run as the act itself."[2053] This is so, because "anticipatory anxiety erodes your ability to concentrate. It erodes your ability to function. The anticipatory anxiety is what is described by family members when they talk about, well, she was always kind of ditzy. She was always out to lunch. She really wouldn't quite pick things. It occurred at an early age and it occurred

so frequently that it became a part of her, and you certainly see that when you try to interview her."[2054]

Dr. Wood's clinical findings were relevant to his forensic opinions. Dr. Woods testified that trial experts, both for the defense and the government, failed to take into consideration the clinical treatment Mrs. Montgomery received pretrial and its implications for the forensic questions posed.[2055]

> Well, first of all, there was a limited social history [collected pretrial] about the extent of mood disorders in the family. If you knew that, as we know now, that several of her brothers are on the same medications that she's on; that people on both the maternal side of the family as well as the paternal side of the family carries diagnoses of mood disorders and specific diagnoses of bipolar disorder; if you knew that there were other family members that actually carry the same diagnosis, it would inform your clinical opinion as to whether when in 2003 the social worker said, Wow, Ms. Montgomery she has a little bipolar in here. You would say, Wow, that makes sense.
>
> We also know that genetically mood disorders – the incidents of mood disorders is about 4 percent of the population in the United States and about 3.8 percent of the population internationally. If you have one nuclear family member that has a mood disorder or a bipolar disorder, that increases your potential of being bipolar two fold. It doesn't mean that you may have all the symptoms but you may have some. That's exactly what we see in her situation.[2056]

Dr. Woods was critical of trial counsels' failure to follow up on Dr. Fucetola's recommendation of more testing and investigation, pointing out that there was no follow up until he and Dr. Nadkarni conducted neurological examinations.[2057] Dr. Woods testified that Mrs. Montgomery's neurological and

neuropsychological history was not considered or erroneously presented. “It was incomplete and because it was incomplete, it was unreliable.”[2058]

The trial team missed much of Mrs. Montgomery’s symptomology. Dr. Woods testified that his review of Mr. Duchardt’s declaration showed that Mr. Duchardt “normalized” Mrs. Montgomery’s psychiatric symptoms.[2059] Dr. Woods’ cited Mr. Duchardt’s representations that Mrs. Montgomery “never appears mentally ill . . . that she never had trouble understand proceedings; she never had problems asking questions; she never had problems understanding why attorneys were asking her the questions they were asking her.”[2060] Dr. Woods characterized Mr. Duchardt’s representations as “normalizing,” because “at the same time, at the very same time that Mr. Duchardt was observing this, she was being treated with multiple medications for her bipolar disorder. She was having symptoms where they were describing her as irritable, mood disorders, depressed, impaired concentration.”[2061] Dr. Woods recognized Mr. Duchardt’s limitations, but also called to account the team’s failure to use the information they possessed: “Mr. Duchardt is not a psychiatrist, and so I can’t anticipate that he would be able to look at her or anyone else be able to look at her and say, Oh, that’s just a bipolar symptom. He certainly did not take into consideration the mental illness as it was described by Dr. McCandless in her records over the course of years. He certainly didn’t take into consideration that



Appellate Case: 17-1716 Page: 558 Date Filed: 11/01/2017 Entry ID: 4596229

she was being treated with Depakote, she was being treated with valproic acid, she was being treated with Wellbutrin, an antidepressant. An antidepressant that in fact was developed for bipolar depression."[2062] Dr. Woods testified that Mr. Duchardt's representations conflict with the medical records trial counsel possessed.[2063],[a]

In addition to the medical records from the psychiatrists treating Mrs. Montgomery, Dr. Woods outlined the experts' observations and information that the trial team failed to incorporate into their theory of the case. "Dr.

---

[a] Dr. Woods also responded to Mr. Duchardt's allegation that Dr. Woods has an "unfortunate reputation" (Vol. 7, p. 1805, *Woods Testimony*, referencing D.E. 129, p. 78, *citing,* Robert Blecker, *The Death of Punishment, Searching for Justice Among the Worst of the Worst*, Palgrave MacMillan (2013)). Dr. Woods explained that to his understanding, Mr. Blecker is a law professor who disagreed with Dr. Woods' determination that a subject was incompetent to stand trial – on the basis that the crime was horrific (*id*. at 1806). As Dr. Woods explained, "[t]he quality of the offense is not the standard as to whether someone is incompetent or not" (*id*.). Dr. Woods' research revealed that Mr. Blecker cited the opposing (state's) expert for the proposition that Dr. Woods' opinion in that case was wrong (*id*. at 1807). Accordingly, Mr. Duchardt's representation that Dr. Woods had an "unfortunate reputation" was traced back to one opposing expert in a criminal matter who disagreed with Dr. Woods' conclusion (*id*.).

Similarly, Mr. Duchardt misrepresented to the Court that Dr. Woods' qualifications were subject to impeachment based on his license having been suspected in 1993. D.E. 129, p. 78. Dr. Woods clarified, "my license has never been suspended. In 1990 --- between 1990 and 1993 I was involved in a medical board action. The findings were that I had not written a discharge diagnosis of alcoholism on a client and that I had prescribed her three refills. There was no action taken on my license. There has never been an action taken on my license" (*id*.)



Appellate Case: 17-1716 Page: 559 Date Filed: 11/01/2017 Entry ID: 4596229

Hutchinson saw symptoms consistent with bipolar disorder and consistent with trauma. That's elevated mood, the mood changes, and the dissociation . . . Dr. Hutchinson also suggested that [Mrs. Montgomery] be looked at for a thought disorder, psychosis."[2064] Dr. Logan noted symptoms of psychosis, but, according to Dr. Woods, was hindered by the absence of a biopsychosocial evaluation.[2065] Dr. Fucetola recommended neuroimaging because he recognized both the limitations of neuropsychological testing and because he recognized the importance of the 29 point difference between the verbal and performance portions of Mrs. Montgomery's IQ.[2066] But Dr. Woods most strongly faulted the team for failing to appreciate the information garnered by Dr. Linda McCandless: "Dr. McCandless has what I rarely see and that's a long-term treatment of someone that's in this particular situation within the setting for the trial; pretrial, trial and post-trial. She diagnosed her with bipolar disorder, She called it rapid cycling. She saw symptoms of psychosis."[2067] Dr. Woods also noted that Dr. McCandless documented that the Elavil that Mrs. Montgomery was on at the time of trial was sedating Mrs. Montgomery.[2068] Dr. Woods found it significant that Dr. Kuncel noted Mrs. Montgomery's mid-line defects ("wide-set eyes, slight rotation and deformity of the spine . . . These are features that develop in the middle of the body and are all consistent with prenatal



Appellate Case: 17-1716 Page: 560 Date Filed: 11/01/2017 Entry ID: 4596229

alcohol use"[2069]), because Dr. Kuncel's observations were consistent with his own: "It certainly corresponded with the cerebellar problem that you see."[2070]

Dr. Woods explained why trial counsel's reliance on Dr. Ramachandran was misplaced. Because Dr. Ramachandran is not a clinician, "he does not diagnose. He does not treat. And so, consequently he doesn't have the methodology that one would normally expect either clinically or forensically."[2071]

Dr. Woods explained that the records and biopsychosocial amassed by §2255 counsel, including many records possessed by trial counsel, contained information inconsistent with Dr. Dietz's testimony for the government:

> Dr. Dietz said there was no evidence of psychosis and yet in the records in 2003 the social worker who was not involved in the forensic case who described her as being slightly somewhat delusional. Certainly we see Dr. McCandless describing her as having a brief reactive psychosis as well, and we see other people describing her with auditory hallucinations, et cetera. Dr. Dietz notes that she does not have bipolar because he did not see mania. But, again, when you go through the medical records, you see irritability. You see agitation. Dr. Hutchinson described this elevated mood and this unreasonably elevated mood, which is what mania is. And the really difficult part [for Dr. Dietz], of course, is that she's being treated for bipolar during this entire time.[2072]

Dr. Woods explained that the differences in his opinion and those of Dr. Dietz were not simply a "battle of the experts": "we obviously have different opinions. I also think if you look at the medical records . . . if you look at the social history, there's an internal inconsistency [with Dr. Dietz's opinions] that



Appellate Case: 17-1716 Page: 561 Date Filed: 11/01/2017 Entry ID: 4596229

is hard to ignore."[2073] Dr. Woods also explained how his and Dr. Nadkarni's neuropsychiatric evaluations of Mrs. Montgomery were more reliable than Dr. Martell's neuropsychological evaluation and how such information could have been used to rebut Dr. Martell's findings: "neuropsychological testing really only tests 2-5 percent of the brain. So if you are able to do a neurological examination – so when Dr. Martell says there's no – or conditionally he's relying completely on his neuropsychological testing. He didn't do any neurological testing."[2074]

Dr. Woods' testimony supported Mrs. Montgomery's *Riggins* claim. Because of the death of Dr. Dianne Bradford shortly before the evidentiary hearing, the parties stipulated to Dr. Woods' testimony to Dr. Bradford's report detailing her psychopharmacological findings.[2075] Dr. Woods is also a trained psychopharmacologist, though he was clear that Dr. Bradford's renown in that specific discipline exceeded his: "she was the principal researcher for about 72 research projects over time and was a brilliant, brilliant psychopharmacologist."[2076] Dr. Woods specified that Dr. Bradford was known to be "probably one of the top five psychopharmacologists in the world . . . she knew more about medications than anybody."[2077] Dr. Bradford's CV detailing her credentials was entered into evidence,[2078] so Dr. Woods only testified generally as to her teaching credentials (John's Hopkins), that she was the

director of a large pharmaceutical company for over 20 years developing psychiatric medications, and then ended her career as a principal investigator for research at the National Institutes of Health.[2079] Dr. Bradford's report was admitted into evidence by agreement as Exhibit 24 and the government had no objection to Dr. Bradford's opinions being admitted as expert opinion testimony.[2080] Dr. Woods set out the referral questions asked of Dr. Bradford:

1. Did Ms. Montgomery's medication regimen at time of trial affect her outward behavior (manner, appearance) or interfere with her ability to respond appropriately to her external environment?
2. How can genetics and stressful life events have played a role in her disorders?
3. Based on her consensus diagnosis (Dr. McCandless, Dr. Woods, Dr. Kempke) was she receiving appropriate medications for her diagnosis and presenting symptoms at the time of trial?

Dr. Bradford, like Dr. Woods, reviewed the CCA medical records from Mrs. Montgomery's pre-trial incarceration, the BOP medical records from her post-trial imprisonment, the reports of Dr. Woods, Ms. Vogelsang and Dr. Nadkarni, and extensive supporting social history documents.[2081] Dr. Bradford documented each of the medications Mrs. Montgomery was taking at the time of trial[2082] and explained the effects of that medication on Mrs. Montgomery:

> Each of those drugs we that we just described have sedation and somnolence as side effects. They also have motor sedation because you can have cognitive sedation. Your brain kind of slows down. You get kind of foggy. We can have motor sedation where you don't respond so quickly. You can have problems driving . . . So a combination of these drugs goes back to exactly what we talked about in terms of comorbid diseases. When diseases are comorbid, they have greater effects. When drugs are comorbid, they interact and they create greater effects. Now, as it turns out, there is a relationship between amitriptyline, which is the Elavil, and valproic acid . . . both of these drugs compete for sites in the liver. Usually valproic acid wins. When valproic acid wins, greater amounts of Elavil get backed up. So you get higher amounts of Elavil in your blood system than you normally would . . . [This creates] greater somnolence. You have much greater sedation than you would without the valproic acid. So, as I said – and also with head trauma sedation and somnolence are side effects. They are often exaggerated when people suffer from head trauma.[2083]

Dr. Woods explained the distinction between sedation and somnolence:

> Sedation actually affects how your brain works. Sedation affects cognitive functioning. It affects your attention. I think you may recall that one of the things that we saw in the medical records was that Ms. McCandless (sic) would be trying to read discovery --- I mean Ms. Montgomery would be trying to read the discovery and she couldn't stay focused. She couldn't concentrate. It affects your coordination, your physical coordination. It affects your psychomotor activities like driving, et cetera.
>
> Somnolence, on the other hand, makes you sleepy, makes you drowsy. It doesn't necessarily affect your thinking as much. So when you have sedation and somnolence, they can be very problematic.[2084]

Dr. Woods testified, "the medications and particularly the Elavil, but the others as well, impaired her presentation to the jury. They created both sedation and somnolence[2085] . . . These amitriptyline, particularly Elavil, is not dose related.



Appellate Case: 17-1716 Page: 564 Date Filed: 11/01/2017 Entry ID: 4596229

So the sedation of Elavil is not a dose-related phenomenon. It doesn't matter, the dose. It matters how the person responds to it."[2086] Likewise, Dr. Bradford noted that "adverse events do not decrease upon repeated doses (tolerance),"[2087] which Dr. Woods explained means "you could take it for years, the same dose . . . and you would have the same effects."[2088] Dr. Woods's clinical opinion concurred with Dr. Bradford, but he indicated that even more importantly, historical data from Dr. McCandless confirmed that which Dr. Bradford knew about these drugs was actually seen in Mrs. Montgomery's presentation during the time of the trial.

Dr. McCandless documented that the Elavil was sedating Mrs. Montgomery during the trial.[2089] Dr. Woods testified, "what we see in the records is that Dr. McCandless has to decrease the amitriptyline because Ms. Montgomery is becoming so sedated. Dr. McCandless actually uses the word 'sedated.' She's becoming sedated at 50 milligrams of the Elavil. [Dr. McCandless] drops that to 25 milligrams and Ms. Montgomery feels better. And so, again, you see these kind of ipsative steps. She eventually eliminates the Elavil and Ms. Montgomery is doing better."[2090]

Dr. Woods testified that valproic acid increased the sedative effect of the amitriptyline.[2091] He also testified that Ranitidine is "another sedating medication."[2092] He summarized: "So during most of her treatment – I mean



Appellate Case: 17-1716 Page: 565 Date Filed: 11/01/2017 Entry ID: 4596229

during most of the trial, pretrial, trial, post trial . . . she was on multiple drugs that cause sedation."[2093]

Dr. Woods testified in Dr. Bradford's stead that Mrs. Montgomery's symptomology was not being effectively managed at the time of trial.[2094] Dr. Woods testified, "Even though Ms. Montgomery was being treated continuously, Dr. McCandless was struggling because [Mrs. Montgomery] was still symptomatic. Even though Ms. Montgomery was being treated during the entire three years [pretrial detention], Dr. McCandless could not get control over [Mrs. Montgomery's] delusions, could not get control over her agitation, could not get control over her anxiety, could not get control over her organization, and she tried – she actually added another medicine. I think it was Tegretol to the regimen. So at one point [Mrs. Montgomery] was on Elavil, Wellbutrin, and two mood stabilizers trying to control her symptoms. Dr. McCandless never backed off of trying to control her symptoms but was not totally successful, and so she was symptomatic through the pretrial, trial and post trial until the Risperidone."[2095]

Dr. Bradford and Dr. Woods explained that the drug regime impaired Mrs. Montgomery's affect at trial.[2096] "Dr. Bradford concluded that the combination of these drugs had cumulative effects that affected her outward appearance and that it reduced her ability to react to appropriate external cues . . . that the

medications caused a dulling of the senses, caused increased reaction time, which meant – that's kind of an oxymoron. It takes longer to react. Decreased accuracy and unresponsiveness to external stimuli, caused flat affect, which is undistinguishable from the flat affect that is also seen in psychosis."[2097] Dr. Woods testified that flat affect means "your face looks frozen. You literally have difficult[y] moving. It's like Botox."[2098] At the same time, Dr. Bradford and Dr. Woods concluded that Mrs. Montgomery's medication regime was not addressing her psychosis during the trial.[2099] Drs. Bradford and Woods concluded that the flattened affect caused by medication, either alone or in conjunction with the flattened affect caused by psychosis could have caused Mrs. Montgomery to appear unsympathetic and as if she were unfeeling at the time of the trial.[2100]

Dr. Woods gave his expert neuropsychiatric opinion as to the forensic conclusions dictated by the information he considered. He testified that all of his conclusions and opinions were based on science and information that was available at the time of trial.[2101] In Dr. Woods' opinion, Mrs. Montgomery's capacity to appreciate the wrongfulness of her conduct and to conform her conduct to the requirements of the law was significantly impaired at the time of the offense.[2102] "Mrs. Montgomery was suffering from lifelong impairments. The impairment of concentration, the impairment of being able to think

effectively through a problem, the impairment of being able to effectively weigh and deliberate situations had been problematic for most of her life, and certainly things like her brain injury are things that do not go away."[2103] Mrs. Montgomery was suffering from a severe mental or emotional disturbance at the time of the offense.[2104] As Dr. Woods elaborated, "This was a woman who was homeless, whose children were homeless at times, who was fighting with the family consistently, who others in her family considered to be, quote, crazy in that nontechnical sense, who had real difficulty managing her day-to-day life. That was not any less at the time of the offense."[2105] According to Dr. Woods, Mrs. Montgomery's "neurobehavioral history puts it all together . . . When you understand that her brain does not function properly, it takes these behaviors and it translates them into symptoms. When you understand that the part of the brain, the right side of the brain, does not work accurately and there are motor findings of that as well as emotional findings."[2106] Dr. Woods opined that without the neurobehavioral history and symptomology, "your ability to really understand where her symptoms come from is limited."[2107] Dr. Woods said the pretrial assessments of Mrs. Montgomery were limited by the trial team's failure to engage with the red flags which signaled neurological impairment: "the limitations [of the prior assessments] were that there was no neurological testing done, there was not (sic) psychological testing, and it gave us some



Appellate Case: 17-1716 Page: 568 Date Filed: 11/01/2017 Entry ID: 4596229

clues, but there was no neurological testing done to get at her difficulty in other ways. The understanding of the role of neuroimaging was limited, and the fact that the amygdala and hippocampus and other parts of her brain that really do impact trauma and behavior was not well understood. Certainly the role of her being treated was not understood."[2108] Dr. Woods explained that the experts and trial counsel should have appreciated that investigation was necessary in order to uncover the information upon which he based his opinions:

> We now know and we certainly knew in 2005 and we actually knew in 1995 that the brain counts; that the things – that the behaviors that come from the brain, that are driven by the brain make a difference. Our understanding about how vulnerable the brain is was not really clear until the mid, I would say, 1984, 1985. But now we've had 30 years and at that time [of trial] we had 20 years of looking at it. So this brain behavior is very very important and it allows us to look at the differen[tial] diagnosis much more accurately.[2109]

According to Dr. Woods' assessment, Mrs. Montgomery's impairments and medications affected her ability to rationally assist her counsel prior to and during the trial.[2110] He testified that this was so, because "she did not receive appropriate medication for her symptom complex. She received appropriate medication for parts of it but not for that part that allowed her to think, to concentrate, to read; and without that medication, she was unable to disclose the nature and extent of her trauma."[2111] Dr. Woods explained that appropriate medication was



Appellate Case: 17-1716 Page: 569 Date Filed: 11/01/2017 Entry ID: 4596229

necessary for Mrs. Montgomery's disclosure of her trauma, because "it provides a foundation for your thoughts and your emotions. It provides a safety net that allows. It's like building a building. Medications, when they work, really allows one to organize your mind, to think in much more effective ways. "[2112] Dr. Woods summarized his findings and observations of Mrs. Montgomery's impairments, "We see a young woman who, according to lay witnesses, was never able to function effectively, who had children she could not take care of, who had marriages that she could not be a part of, who moved from place to place often from a better home to a less effective home, and that's clear, who traveled at a whim without shoes. She talked about going to the Grand Canyon in the middle of the winter with just shorts on, just taking her children, and we see this in her workplace and we see it in multiple other places. We see a family history of bipolar disorder and other disorders that can lead to psychosis, and we see in the long run treatment that has been effective, and that's a sad comment, but it is true."[2113]



Appellate Case: 17-1716 Page: 570 Date Filed: 11/01/2017 Entry ID: 4596229

## VI. Argument

**A. It is reasonably debatable that the district court's abrupt removal of attorney Judy Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery, contrary to the wishes of Ms. Clarke and Mrs. Montgomery, and without a hearing, violated Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.[a]**

**1. In April, 2006, Judy Clarke had an established attorney/client relationship with Mrs. Montgomery and was the only attorney on the team qualified to represent Mrs. Montgomery.**

**a. Prior to Ms. Clarke's appointment, the defense team was crippled by inexperience, fear, and power struggles.**

Initially, Federal Public Defender Ray Conrad assigned Anita Burns to represent Mrs. Montgomery.[2114] Ms. Burns had no capital experience, no capital mitigation training, and no specialized training in mental illness as it relates to capital defenses.[2115] Recognizing her lack of qualifications, Ms. Burns immediately began consulting with capital defense attorneys with experience with clients who are mentally ill as well as with capital resource attorney, Dick Burr.[2116] At the evidentiary hearing, Ms. Burns described how almost from the beginning, Mr. Owen interfered with her ability to represent Mrs. Montgomery.[2117] For example, Ms. Burns wanted to continue to work with social worker, Bret Dillingham. Mr. Dillingham was brought into the case very

[a] This argument relies on and incorporates by reference the facts as set forth in §§V.A. – V.E., *supra*; as the sources for the facts are provided in the fact section, they are not provided again here.



Appellate Case: 17-1716 Page: 571 Date Filed: 11/01/2017 Entry ID: 4596229

early on by the Kansas Federal Public Defender at the suggestion of an experienced capital attorney in Missouri.[2118] Ms. Burns felt it was important to the case for Mr. Dillingham to continue to visit with Mrs. Montgomery who was extremely fragile and mentally unstable.[2119] Mr. Owen, who was not on the case but was Ms. Burns' immediate supervisor, would not agree to hire Mr. Dillingham.[2120] Further, Mr. Owen overruled Ms. Burns' choice of mitigation specialist.[2121] Also, while Ms. Burns was out of town and without consulting her, Mr. Owen made litigation decisions that Ms. Burns disagreed with.[2122] Ms. Burns went to her boss, Mr. Conrad, and explained that she could not continue to work with Mr. Owen because he was unilaterally making decisions with which she was not comfortable.[2123,a] As a result, Mr. Conrad took Ms. Burns off the case.[2124] No one consulted with Mrs. Montgomery about this change in counsel.[2125]

David Owen replaced Ms. Burns in April 2005.[2126] Owen had no capital experience and openly admitted that he was not qualified to handle the mental health aspects of Mrs. Montgomery's defense.[2127] However, he desired to become "death-qualified."[2128] Owen joined Susan Hunt, who was appointed "lead" counsel by the court.[2129] Ms. Hunt had one previous capital trial and at

---

[a] Ms. Burns testified that Mr. Owen was not good at working with women on "equal footing." Vol 2, p. 327.



Appellate Case: 17-1716 Page: 572 Date Filed: 11/01/2017 Entry ID: 4596229

the time of her appointment in this case, had another capital case pending.[2130] Neither of Ms. Hunt's other cases involved mental health defenses.[2131] Ms. Hunt was very clear that she was not qualified to handle the mental health aspects of this case.[2132]

Owen and Hunt struggled to get a handle on the case.[2133] Both described having a difficult time getting along with mitigation specialist Lisa Rickert.[2134]

Ms. Rickert testified to problems and conflicts working with the team from the beginning.[2135] Ms. Rickert observed that the team was not familiar with how a death penalty case should be handled and observed that both Hunt and Owen were obstructive to her work.[2136] Ms. Rickert testified that her relationship with Owen and Hunt deteriorated and she ultimately resigned after only six months on the case.[2137] Rickert testified that she learned from federal public defender chief investigator, Ron Ninemire, that Mr. Owen had falsely accused her and Mr. Ninemire of having an affair. Ms. Rickert was furious and wanted to confront Mr. Owen. Mr. Ninemire begged her not to for fear he would lose his job. After her resignation, Mr. Owen prohibited Ms. Rickert from saying goodbye to Mrs. Montgomery.[2138]

In July, 2005, the defense team found itself seven months into the case with very little accomplished, no mitigation specialist, and no idea what to do next.[2139] By all accounts, Mrs. Montgomery was extremely mentally ill.[2140]

Each member of the team had concerns that Mrs. Montgomery might not be competent.[2141] She was experiencing dissociation, hallucinations, and psychosis.[2142] She attempted suicide.[2143] Two mental health experts believed she needed in-patient mental health treatment. Owen and Hunt were frozen into inaction because of their lack of experience.[2144]

**b. Judy Clarke joined the team.**

Owen and Hunt reached out to resource counsel, Dick Burr, for help.[a] Burr arranged for a meeting between Owen, Hunt, Clarke and himself to discuss how to get the team on track and moving forward.[2145] Clarke was a national Capital Resource Counsel ("CRC") whose job was to help federal public defender offices with federal capital cases.[2146] Unlike Burr's federal death penalty resource counsel ("FDPRC") position, Clarke was permitted to engage in direct representation in federal capital cases when asked.[2147] Owen and Hunt asked Clarke to join the team and she agreed.[2148] Clarke brought desperately needed experience and resources to the team. Initially, Clarke's role was limited to that of a consultant.[2149] Nonetheless, she brought in two experienced capital mitigation experts, Deb Garvey and David Freedman, to assist.[2150] Garvey is particularly adept at social history investigation and document collection.[2151]

---

[a] Vol. 2, p. 392, *Hunt Testimony*; Vol. 8, p. 2155, *Owen Testimony*; Vol. 3, p. 549, *Burr Testimony*.



Appellate Case: 17-1716 Page: 574 Date Filed: 11/01/2017 Entry ID: 4596229

Freedman, who was a trained capital investigator, also had a master's degree in public health at the time he worked on Mrs. Montgomery's case.[2152] Mr. Freedman is respected in the capital defense community for his ability to identify and develop mental health mitigation.[2153] Both Garvey and Freedman had worked with Ms. Clarke in high-profile and complex death penalty cases as part of the CRC project.[2154] The three immediately began gathering critical social history data with the local team to begin to gather critical social history data.[2155]

After Ms. Clarke spent just a few months acting in a consulting role, Mr. Owen and Ms. Hunt asked her to join the team as counsel of record.[2156] In October 2005, the court appointed Ms. Clarke at Owen and Hunt's request.[2157] By this time, acting on his own, Mr. Owen hired Stephanie Elliott to act as a paralegal for the case even though she had never worked as a paralegal or on serious criminal case.[2158] [a] Mr. Owen and Ms. Hunt hired Holly Jackson as a mitigation specialist to replace Lisa Rickert.[2159] FPD investigator, Ron Ninemire, and private investigator Phil Thompson,[b] remained on the team.[2160]

---

[a] Owen met Elliott at a party and learned that she was a solo practitioner who mostly handled worker's compensation and family law cases. Vol. 2, p. 331-32, *Elliott Testimony*.

[b] Thompson was Susan Hunt's long-time colleague and the investigator she chose to work with on her appointed cases. Exhibit 61, *Thompson Declaration*.

The new team began to have regular meetings where information was shared orally.[2161] They would meet to discuss strategy, assign tasks, and report back.[2162] The team would make to do lists and updated the lists as time permitted.[2163] Document collection began in earnest with Ms. Garvey directing the effort.[2164]

**c. Without consulting the client and behind lead counsel's back, Mr. Owen and Mr. Conrad unilaterally asked the court to remove Ms. Clarke in an unrecorded *ex parte* meeting.**

Even with the addition of Ms. Clarke to the team, Mr. Owen continued to have problems with a need to control the case. In November 2005, Ms. Hunt discussed her frustrations with Ms. Clarke and asked Ms. Clarke to intercede on Hunt's behalf.[2165] Ms. Hunt suggested that the three go out for dinner at a local restaurant and for Ms. Clarke to implore Mr. Owen to relinquish control and allow Hunt to act as lead counsel in the case.[2166] Mr. Owen's version of the dinner differs.[2167] He was offended by the meeting and felt humiliated and demeaned.[2168] Ms. Clarke and Ms. Hunt report that Ms. Clarke merely explained to Mr. Owen what should have already been apparent — he did not have the experience or training to control the direction of the case.[2169]



Appellate Case: 17-1716 Page: 576 Date Filed: 11/01/2017 Entry ID: 4596229

At the same time, Deb Garvey was trying to establish a working relationship with Ron Ninemire.[2170] Ninemire resented Garvey and Ninemire stated, "I am not going to take any orders from any damn woman."[2171]

Despite the tension on the team, it continued to have monthly meetings where Clarke, Garvey, Freedman, and Jackson tried to educate others about the signs and symptoms of mental illness.[2172] The team also talked about best practices with respect to social history interviews and client relationships, noting that it was inappropriate for one team member to attempt to have a "special relationship" with Mrs. Montgomery.[2173] This was an ongoing problem because Ron Ninemire wanted to have a special relationship with Lisa Montgomery and her children.[2174] Mr. Owen wanted to have a special relationship with Mrs. Montgomery's mother.[2175] The team discussed how this was a bad idea because neither man was experienced in trauma or mental health investigation. It was particularly inappropriate with respect to Mrs. Montgomery, whose trauma history they were just beginning to understand.[2176] Though Owen and Ninemire would agree to abide by the decisions made at these meetings, they did not. [2177]

Even so, the records collection was continuing to move forward and interviews were being conducted. By March 2006, Ms. Clarke had convinced world-renowned trauma expert, Judith Hermann, to assist the team and David



Appellate Case: 17-1716 Page: 577 Date Filed: 11/01/2017 Entry ID: 4596229

Freedman had recruited esteemed neuropsychologist Dean Delis[a] to work on the case.[2178] Mr. Freedman and Ms. Clarke had also enlisted forensic pathologist Dr. Werner Spitz to consult on the case.[2179] The team was moving forward toward the October 2006 trial date. [2180]

On the evening of April 19, the team had a particularly heated meeting at Ms. Hunt's home.[2181] Eventually they agreed to break up the meeting for the night and regroup the next day.[2182] Judy Clarke called Dick Burr as she drove away from Hunt's house and asked for his help with easing the tension on the team.[2183] Burr agreed to help, but he never got the chance.[2184]

David Owen went to Ray Conrad's office early the morning of April 20, 2006 sparking a series of events that led to Judy Clarke being removed as counsel and banned from the jail a few short hours later. Accounts of what was said in Mr. Conrad's office, or later that day in the judge's chambers, are in dispute.

Mr. Owen claims that he simply went to Conrad's office to tell him about the meeting at Ms. Hunt's house the evening before and that Mr. Conrad surprised Mr. Owen by picking up the phone and calling the judge.[2185] According to Mr. Owen, the judge summoned him and Mr. Conrad to

---

[a] Delis is the author of two of the most highly used neuropsychological instruments in the world -- the California Verbal Learning Test and the Delis-Kaplan Executive Function Scale.



Appellate Case: 17-1716 Page: 578 Date Filed: 11/01/2017 Entry ID: 4596229

chambers.[2186] Once in Chambers, per Mr. Owen, Mr. Conrad did most of the talking and the judge, *sua sponte*, picked up the phone and ordered the jail to not allow Ms. Clarke to enter as she was no longer counsel for Mrs. Montgomery.[2187] However, while Mr. Conrad does recall suggesting to Mr. Owen that the court could bar Ms. Clarke from visiting Mrs. Montgomery, he also says that he never called the judge and denies attending the in chambers meeting at all.[2188]

Magistrate Judge Maughmer recalls Mr. Conrad being present at the in chambers meeting and that it was Conrad who did most of the talking.[a] The district court judge has stated that Mr. Conrad was present but has not stated how the meeting came to be or what was said.[2189]

---

[a] Counsel were only permitted an informal, un-transcribed, interview with Magistrate Maughmer. The district court judge refused to recuse himself and, therefore, was not deposed. The district court judge made relevant factual statements on the record, from the bench, at a heated status conference regarding Montgomery's motion for the judge to reassign the case – which the district court later described as "an opportunity to inquire as to my recollections" (D.E. 41, p.7). Contrary to the court's characterization, the record shows that counsel were notified that the proceeding was an "oral argument" (*see* Motion to Expand the Record – Attachment 3, *CM/ECF Notification*).
During that same status conference, the district court suggested that the motion to reassign the case was likely motivated by counsel outside the district thus justifying his preference for local counsel in all cases. D.E. 53, p. 10 (district court states "things run smoother" with local counsel and "this may be a case in point"). *See*, §V.D.



Appellate Case: 17-1716 Page: 579 Date Filed: 11/01/2017 Entry ID: 4596229

But it is clear that as a result of that meeting, Ms. Clarke's appointment was terminated without notice to her or Mrs. Montgomery, and without a hearing. Ms. Clarke did not want to withdraw and Mrs. Montgomery did not want Ms. Clarke removed.[2190]

It is undisputed that Mrs. Montgomery was devastated by the court's action. Mrs. Montgomery, who was fragile and ill, was in tears when the judge brought her to court to tell her that he had removed Ms. Clarke from her team.[2191] As it stood, on April 20, 2006, the only lawyers on the team qualified to represent Mrs. Montgomery had been removed.

**d. Susan Hunt tried to undo the damage done, but the court refused and then instructed Ms. Hunt to withdraw from the case.**

On April 25, 2006, and again on May 3, 2006, Ms. Hunt urged the court to reconsider and allow Ms. Clarke back in the case.[2192] Ms. Hunt explained the relationship of trust that Mrs. Montgomery had with Ms. Clarke and that Mrs. Montgomery felt betrayed by the remaining team members.[2193] Ms. Hunt told the Court that although things were tense, the case was progressing and the defense would have been ready for the October, 2006 trial date.[2194] The loss of Ms. Clarke, Ms. Hunt explained, would mean that they would not be ready by that date.[2195] The mitigation specialist, Holly Jackson, felt like she could not continue on the case without the guidance of Ms. Clarke, Ms. Garvey, and Mr.



Appellate Case: 17-1716 Page: 580 Date Filed: 11/01/2017 Entry ID: 4596229

Freedman.[2196] So the team, once again, was without anyone skilled in mitigation or mental health.[2197]

Mr. Owen and Mr. Conrad were offended by Ms. Hunt's attempt to bring Clarke back into the case. By May 1, they initiated another *ex parte* off-the-record conversation — this time complaining about Ms. Hunt.[2198] Two days later, Mr. Owen said he could no longer work with Susan Hunt.[2199] Ms. Hunt suggested to the court that Ms. Clarke could come back on the team with Hunt as co-counsel.[2200] Ms. Hunt explained that the Federal Public Defender's Office in San Diego, would accept an out-of-district appointment and fund the case.[2201] The judge refused this offer and made it clear that he would not reconsider the order removing Ms. Clarke.[2202]

Later, the court called Ms. Hunt and instructed her to withdraw.[2203] No formal hearing was held and, once again, Mrs. Montgomery was not consulted. On May 9, Mr. Owen sent a letter to CCA removing Ms. Hunt from Mrs. Montgomery's visitation and phone list. By May 10, 2006, Mrs. Montgomery had lost three lawyers and two mitigation specialists (all women). Only Ms. Hunt was allowed to communicate with Mrs. Montgomery about leaving the team. Mrs. Montgomery, by all accounts, had lost all hope.[2204]

**2. It is reasonably debatable that the trial court's decision to remove Ms. Clarke as counsel without notice or a hearing was an unconstitutional denial of Mrs. Montgomery's Sixth Amendment right to counsel.**



Appellate Case: 17-1716 Page: 581 Date Filed: 11/01/2017 Entry ID: 4596229

While it is true that an indigent defendant does not have the right to demand a particular attorney be appointed to her case, "[o]nce counsel has been validly appointed to represent an indigent defendant and the parties enter into an attorney-client relationship it is no less inviolate than if counsel is retained." *Stearnes v. Clinton,* 780 S.W.2d 216, 221-22 (Tex. Ct. App. 1989).[a] The constitution does not permit the inviolate relationship between attorney and client to be disturbed by the court over the objection of the attorney and client absent extraordinary circumstances not present here. Once an established attorney-client relationship exists, no valid distinction can be made between the rights of the wealthy to retained counsel and the rights of the poor to appointed counsel. Indeed, "to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Stearnes*, 780

[a] Courts have held that a defendant's preference for appointed counsel should be considered when it is supported by "objective considerations" such as a "relationship of trust and confidence" between the defendant and counsel. *Harris v. People*, 567 P.2d 750, 752 (Cal. 1977) (holding that trial court abused its discretion in denying defendant's preferred choice of counsel, when supported by objective considerations); *Amadeo v. State*, 384 S.E.2d 181, 183 (Ga. 1989) (finding that the trial court's refusal to appoint attorneys who had previously represented the defendant was an abuse of discretion given the prior counsel's knowledge of the defendant's case and the developed relationship and trust between prior counsel and the defendant); *Davis v. Cain*, 662 So.2d 453, 454 (La.1995) (finding that the trial court's denial of a motion for appointment of counsel was an abuse of discretion).

S.W.2d, at 223. This is so, the *Stearnes* court explains, "because the 'attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service.'" *Id.* at 222. (quoting *Smith v. Superior Court of Los Angeles*, 440 P.2d 65, 74 (Ca. 1968)). Relying on *Harling v. United States*, 387 A.2d 1101, 1102 (D.C.Cir.1978), *Stearnes* holds that because "a defendant has the right to retain counsel of his choice and establish an attorney-client relationship. It logically follows . . . that once an attorney is appointed the same attorney-client relationship is established and it should be protected." 780 S.W.2d, at 222.

Therefore, "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at its discretionary whim." *Id.* For, "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (*citing Harling* 387 A.2d at 1102. *see also*, *Matter of Welfare of M.R.S.*, 400 N.W.2d 147, 152 (Minn. Ct. App. 1987). To hold that a court has greater power to remove appointed counsel than it does retained counsel of choice "would be to subject that relationship to an unwarranted and invidious discrimination arising merely



Appellate Case: 17-1716 Page: 583 Date Filed: 11/01/2017 Entry ID: 4596229

from the poverty of the accused." *Smith,* 68 Cal. 2d at 561. The constitution does not permit such discrimination.

The United States Supreme Court has held "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, *or who is willing to represent the defendant even though he is without funds*." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (*quoting Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 24–625 (1989)) (emphasis added). This Sixth Amendment right is separate and distinct from the right to constitutionally effective counsel.

> Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

*Gonzalez-Lopez*, 548 U.S. at 148.

Here, Mrs. Montgomery had an established attorney-client relationship with Ms. Clarke. Ms. Clarke's appointment was not limited in any way.[2205] The record amply supports that Ms. Clarke was the attorney with whom Mrs. Montgomery had the most trust and that Mrs. Montgomery objected to Ms. Clarke's removal. Mrs. Montgomery wrote to the court and explained that she

had trouble trusting Ms. Hunt and Mr. Owen and that she was "the most comfortable with Judy."[2206] Mrs. Montgomery told the Court that Ms. Clarke "answered me in ways I could understand and I had started to feel a part of what was going on."[2207] Further, she explained that Ms. Clarke encouraged her to take psychiatric medications.[2208] Mrs. Montgomery described the loss of Ms. Clarke as "a devastating blow" and that she no longer trusted her team.[2209] Thus, the record establishes that the nature of Mrs. Montgomery's attorney-client relationship with Ms. Clarke, and her objection to Ms. Clarke's removal as her attorney, is the equivalent of the Sixth Amendment deprivation of counsel claim in *Gonzalez-Lopez*.

It is therefore reasonably debatable that the district judge's abrupt removal of Ms. Clarke, without a hearing, and without consulting Ms. Clarke or Mrs. Montgomery was erroneous under the Sixth Amendment and *Gonzalez-Lopez*. To review, the court made its decision after a brief, off-the-record, in chambers meeting with David Owen and Ray Conrad – neither of whom was qualified counsel under 18 U.S.C. § 3599.[2210]

The only complaints about Ms. Clarke that any of the participants to that meeting have described in the §2255 proceedings amount to this: Ms. Clarke wounded Mr. Owen's feelings by telling him the truth –a truth he had previously admitted to the Court and to Ms. Hunt, but that he apparently did not



Appellate Case: 17-1716 Page: 585 Date Filed: 11/01/2017 Entry ID: 4596229

want Ms. Clarke to recognize – that he was not qualified to make decisions in the case and he needed to relinquish control of the case so that Mrs. Montgomery could be properly represented.[a] In doing so, she may have used coarse language.[2211] These complaints do not justify the disruption of the attorney-client relationship between Ms. Clarke and Mrs. Montgomery. They certainly do not compel the conclusion that an attorney had to be immediately removed.

The district court's decision was also erroneous because it failed to inquire of Ms. Clarke, Ms. Hunt, or Mrs. Montgomery before barring Ms. Clarke from the jail and, banning all telephone contact with Mrs. Montgomery, depriving her of any opportunity to consult with Mrs. Montgomery. Had the court held a hearing on the record, it would have learned that while relationships were tense, the case was proceeding forward toward the scheduled trial date: experts were being retained; witnesses were being interviewed; documents were being gathered; and the team was identifying mitigation themes; and discarding theories and experts who would later be resurrected to disastrous effect.

[a] Dick Burr, resource counsel to the team during this time, testified, "I did not see Judy Clarke objectively engaging in any behavior that a rational person in a defense team would react negatively to" (Vol. 3, 606, *Burr Testimony*).



Appellate Case: 17-1716 Page: 586 Date Filed: 11/01/2017 Entry ID: 4596229

Further, it would have learned that the common denominator in team dysfunction was David Owen's need for control and his inability (or unwillingness) to work with women. Mr. Owen's difficulty working with women was well-known in the Federal Public Defender's office. Madelaine Cardarella, current Federal Public Defender for the Western District of Missouri, testified at the evidentiary hearing that Mr. Owen was "very hard to work with."[2212] Ms. Cardarella described Mr. Owen as "belligerent[,]" "misogynistic[,]" and a "bully in every sense of the word."[2213] Mr. Owen would "scream and yell at us" and was "very, very authoritative."[2214] "He was an angry, angry person."[2215] [a] Ms. Cardarella recalled Mr. Owen asking, "You're not one of those militant female lawyer types are you?" when she and Anita Burns were first hired.[2216] Mr. Owen would return to that refrain "after we had done something that he clearly thought was militant female lawyer type behavior."[2217] Ms. Cardarella explained that, as a young lawyer, she felt powerless to do anything about this behavior.

---

[a] Mr. Owen's volatility was not confined to the Missouri office. Charles Dedmon, the First Assistant Public Defender for the District of Kansas and Montgomery's first lawyer, describes an instance where Owen physically challenged him over Montgomery's representation. Exhibit 75, p. 2, *Dedmon Declaration*. Dedmon stated "If it had been me, I would have just gotten out of the way and let Judy Clarke do her job." *Ibid.* Dedmon reports that upon learning that Dedmon had been critical of Owen's handling of the Clarke situation, Owen got "so angry that he challenged me to 'step outside.' He actually wanted a fist fight." *Ibid.*



Appellate Case: 17-1716 Page: 587 Date Filed: 11/01/2017 Entry ID: 4596229

> To be honest, I was – I needed my job. We had just started our family, and I was making twice as much money as I did at the state. So I sort of swallowed it and said, You know, I better not act that way again. The writing was on the wall that David was going to be around and be in charge.[2218] [a]

The district court's justification for its failure to conduct a hearing was its belief (based on limited information) that some lawyer had to be removed and his preference was for local counsel.[2219] From this reasoning, it is clear the district court judge gave no consideration to the fact that by removing Ms. Clarke, it was removing the only lawyer qualified to handle the case. The court also failed to appreciate the importance of the established attorney-client relationship between Clarke and Montgomery.

From this analysis, it is plain that with incomplete information, the district court placed parochial concerns and the comfort level of the court and the local counsel over Mrs. Montgomery's right to continue the established attorney/client relationship with Ms. Clarke. Indeed the district court has stated that it does not believe that the fact that a client has a meaningful relationship with her lawyer is a relevant consideration.[2220] This is error. *Stearnes*, 780 S.W. 2d, at 225 ("Having appointed counsel, a criminal defendant should not be

---

[a] In February 2007, David Owen was demoted as first assistant after comments Owen made to a client angered Magistrate Judge Maughmer. Owen made it clear that he was leaving the office after the Montgomery trial and in fact, did leave the day after the verdict (Vol. 3, p. 690-91, *Cardarella Testimony*).

subjected to a trial and appeal process without the appointed counsel he had grown to accept and gain confidence in"); *see also*, *Smith v. Superior Court of Los Angeles,* 440 P.2d at 74 (attorney-client relationship involves "an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney"); *Amadeo* at 183 (trial court's refusal to appoint attorneys who had previously represented the defendant was an abuse of discretion given the prior counsel's knowledge of the defendant's case and the developed relationship and trust between prior counsel and the defendant).

The district court further erred because he failed to make the sort of detailed inquiry required in a capital case. The appointment of counsel in federal death penalty cases is governed by 18 U.S.C. §3599(e) which states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings.

The legislative purpose behind the passage of 18 U.S.C. §3599 was to provide "enhanced rights of representation" to individuals facing the death penalty. *Martel v. Clair*, 565 U.S. 648, 659 (2012). The Supreme Court reviewed this history in *Martel*:

> In 1988, Congress enacted the legislation now known as §3599 to govern appointment of counsel in capital cases, thus displacing §

> 3006A for persons facing execution (but retaining that section for all others). *See* Anti–Drug Abuse Act, 102 Stat. 4393–4394, 21 U.S.C. §§ 848(q)(4)–(10) (1988 ed.) (recodified at 18 U.S.C. § 3599 (2006 ed. and Supp. IV)). The new statute grants federal capital defendants . . . in light of what it calls "the seriousness of the possible penalty and . . . the unique and complex nature of the litigation." § 3599(d) (2006 ed.) . . . [T]he statute aims in multiple ways to improve the quality of representation afforded to capital petitioners and defendants alike. Section 3599 requires lawyers in capital cases to have more legal experience than § 3006A demands. *Compare §§ 3599(b)–(d) with* § 3006A(b). Similarly, § 3599 authorizes higher rates of compensation, in part to attract better counsel. *Compare* § 3599(g)(1) *with* § 3006A(d) (2006 ed. and Supp. IV). And § 3599 provides more money for investigative and expert services. *Compare* §§ 3599(f) (2006 ed.), (g)(2) (2006 ed., Supp. IV), *with* § 3006A(e) (2006 ed. and Supp. IV). As we have previously noted, those measures "reflec[t] a determination that quality legal representation is necessary" in all capital proceedings to foster "fundamental fairness in the imposition of the death penalty." *McFarland*, 512 U.S. at 855, 859, 114 S.Ct. 2568.

565 U.S. at 659.

Section 3599(e) does not permit the *sua sponte* removal of counsel. The only contemplated circumstances for the removal of counsel are: where the attorney seeks to withdraw or the client asks for the attorney's removal. In those situations, the Court has held that an attorney still may not be relieved of her obligation to continue as counsel unless the Court makes a specific finding that the interests of justice would be served by removal of counsel. *Id.* at 663.

> [T]he "interests of justice" standard contemplates a peculiarly context-specific inquiry. So we doubt that any attempt to provide a general definition of the standard would prove helpful. In reviewing substitution motions, the courts of appeals have pointed to several relevant considerations. Those factors may vary a bit from circuit to circuit, but generally include: the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint;



Appellate Case: 17-1716 Page: 590 Date Filed: 11/01/2017 Entry ID: 4596229

> and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict).

*Id*. No peculiarly context-specific inquiry was made here.

First, no written motion to remove Ms. Clarke was filed. It remains unknown whether an oral motion was made. Mr. Owen claims the district court acted on its own in deciding to remove Ms. Clarke.[2221] The district court has given contradictory information on this point: stating on the record both that "Nothing occurred off the record that was not later discussed on the record,"[2222] "No one, quite frankly, sought to exclude someone from the case as opposed to them"[2223]

As to the timing of Ms. Clarke's removal, it is undisputed that her removal from the case caused delay in the trial. With respect to the adequacy of the district court's inquiry, the record does not show whether the court made any inquiry, but if there was one, it was brief, one-sided, off-the-record, and perfunctory. Moreover, the court's inquiry did not consider the opinions of Mrs. Montgomery or Ms. Clarke. Certainly, the inquiry is inadequate where no record was made and the decision was made without Mrs. Montgomery's knowledge. This was a critical stage in the proceeding and Mrs. Montgomery had a right to be present. *See Lafler v. Cooper*, 566 U.S. 156, 165 (2012); *Musladin v. Lamarque*,. 555 F.3d 830, 836 (9th Cir. 2009).



Appellate Case: 17-1716 Page: 591 Date Filed: 11/01/2017 Entry ID: 4596229

While the asserted cause for the complaint was a breakdown in communication between Mrs. Montgomery and her counsel, there was no breakdown in communication between Mrs. Montgomery and Ms. Clarke. Everyone involved agrees that Ms. Clarke was the lawyer with whom Mrs. Montgomery had the most trust and with whom she felt the most comfortable. Where the only cause for complaint is hurt feelings engendered by a less than delicate expression of a previously acknowledged truth – that Mr. Owen was not competent to be in control of the defense – the interests of justice standard is not met.

The district court's stated preference for local counsel over qualified counsel does not meet the interests of justice standard. "[I]n spinning off § 3599, Congress enacted a set of reforms to improve the quality of lawyering in capital litigation. With all those measures pointing in one direction, we cannot conclude that Congress silently prescribed a substitution standard that would head the opposite way." *Martel*, 565 U.S. at 659-660.

Finally, §3599 requires that if counsel is removed in one of the rare circumstances allowed for under the statute, counsel must be replaced by similarly qualified counsel. At the time the district court removed Ms. Clarke, it was with the understanding that she would not be replaced and that Ms. Hunt

and Mr. Owen would be the ones to try the case.[2224] Neither was similarly qualified under *Martel*.

When given the opportunity to cure its error, the district court declined. Ms. Hunt tried, on two occasions, to move the court to reconsider and bring Ms. Clarke back into the case. Ms. Hunt stated that she was willing to work with Ms. Clarke. As a local attorney, Ms. Hunt could have sponsored Ms. Clarke's *pro hac vice* status in the district court. Ms. Hunt implored the district court and Mr. Owen to put the entire team back together. Ms. Hunt told the court that she was willing to make it happen and even with the tension, they could move forward and get the case ready for trial. The district court refused to even inquire further, even knowing that Mrs. Montgomery was emotionally devastated by its decision. As a result of her efforts, Ms. Hunt was told to withdraw from the case.

**3. The district court's error is structural.**

Because Mrs. Montgomery's established attorney/client relationship was equivalent to that of retained counsel *Gonzalez-Lopez* controls. The erroneous deprivation of Mrs. Montgomery's right to have Ms. Clarke to continue as her lawyer "unquestionably qualifies as 'structural error.' " 548 U.S. at 150 (citation omitted). The Court expressly rejected a prejudice standard similar to



Appellate Case: 17-1716 Page: 593 Date Filed: 11/01/2017 Entry ID: 4596229

*Strickland v. Washington* and likewise rejected a harmless error standard. The Court explained its reasoning:

> Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds," or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

*Gonzales-Lopez*, 548 U.S. at 50. (citation omitted). The Court explains why a *Strickland* prejudice standard would be unworkable in situations such as the one presented here:

> [W]e would not be looking for mistakes committed by the actual counsel, but for differences in the defense that would have been made by the rejected counsel—in matters ranging from questions asked on voir dire and cross-examination to such intangibles as argument style and relationship with the prosecutors. We would have to speculate upon what matters the rejected counsel would have handled differently—or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors. And then we would have to speculate upon what effect those different choices or different intangibles might have had. The difficulties of conducting the two assessments of prejudice are not remotely comparable.

*Id*. at 150–51.

Under structural error analysis, once it is established that the removal of Ms. Clarke was erroneous, the inquiry is complete, and reversal is required. Because this issue is reasonably debatable, a COA should issue.

**4. Even though error is structural, Mrs. Montgomery has demonstrated actual prejudice.**

Even if this Court were to disagree that structural error analysis applies in this situation, the record establishes that Mrs. Montgomery was prejudiced by the removal of Ms. Clarke and corresponding loss of Deb Garvey, David Freedman, Holly Jackson, Susan Hunt, and Phil Thompson from her case. The proof of prejudice is reflected throughout this application in claims relating to the final trial team's ineffective assistance. Beyond the fact that there was an enormous loss of institutional knowledge and that records collection and meaningful interviews slowed considerably after Clarke, *et. al*, were removed, the new team rarely met and failed to communicate with one another. The Clark/Hunt/Owen team had been working diligently on Mrs. Montgomery's case, but Mr. Duchardt was busy with other cases.

The loss of institutional knowledge and lack of coordination led to the disclosure of privileged information to government experts. That information was then passed off as defense expert opinion when, it was nothing of the sort.[a]

[a] See §§V.B., V.C. and V.E., supra.

Ms. Clarke was pursuing a defense based on brain damage and trauma, not a specious NGRI defense based on a little known and rarely diagnosed illness the proof of which didn't even meet the federal definition of insanity. As an experienced capital litigator, Ms. Clarke understood the nuances of Rule 12.2 and would never have subjected Mrs. Montgomery to the wide-ranging five day video-taped interrogation by government experts Drs. Park Dietz and Dan Martell.

Under the Clark/Hunt/Owen team, all team members were sensitive to the fact that Mrs. Montgomery's fragile mental state made her susceptible to created and false memories. Because Mrs. Montgomery had a hard time knowing what was real and not real, the team was scrupulous in not providing her details from the discovery or badgering her with questions for fear that would instill false memories of the crime. After Ms. Clarke's removal, Mr. Duchardt sent paralegal Stephanie Elliott to the jail some 40 times to have Mrs. Montgomery review all of the discovery[2225] and followed that up with repeated questions until he finally got Mrs. Montgomery to "admit" that her brother Tommy was the true killer.[2226] Of course, the Clark/Hunt/Owen team already knew that this was impossible.[2227] Not noticing that the proof of Tommy's alibi was in his file, Duchardt committed to"the Tommy Defense." His haste set off a cascading number of events which took Mrs. Montgomery from being viewed



Appellate Case: 17-1716 Page: 596 Date Filed: 11/01/2017 Entry ID: 4596229

as the remorseful, fragile, devastated, psychotic person that Bret Dillingham, Charles Dedmon, Ron Wurtz, Anita Burns, Susan Hunt, Dr. Marilyn Hutchinson, Dr. William Logan, Judy Clarke, and others observed to being portrayed as a cold-blooded, manipulative, liar who would stoop so low as to falsely blame the crime on her brother.

As an attorney who had previous clients who were psychiatrically medicated, Ms. Clarke understood the command of *Riggins v. Nevada*, 504 U.S. 127 (1992), and would have explained to the jury the effect of the numerous medications that Mrs. Montgomery was taking had on her affect at trial.[a] Mrs. Clarke and others on her team had serious concerns about Mrs. Montgomery's competence to stand trial and would certainly have litigated the issue if they had continued on the case.[2228] Mr. Duchardt has admitted that he seriously questioned Mrs. Montgomery's competence, believing her to be incapable of rationally assisting counsel, but he never raised the issue.[2229]

Ms. Clarke followed the ABA Guidelines, believed in the importance of team, and the use of mitigation specialists. Mr. Duchardt did not follow the guidelines, did not believe in mitigation specialists, and was "not a meetings



Appellate Case: 17-1716 Page: 597 Date Filed: 11/01/2017 Entry ID: 4596229

guy."[2230a] Ms. Clarke would have followed up on the red flags in David Kidwell's interview and discovered the shocking truth that Lisa Montgomery had been the victim of sex trafficking by her own mother. Following the prevailing professional norms embodied in the ABA Guidelines, Ms. Clarke would have discovered and presented to the jury all of the evidence summarized by Jan Vogelsang, Dr. Porterfield, Dr. Woods, and Dr. Nadkarni. Based on that evidence, Ms. Clarke would have been able to paint a far different picture of Mrs. Montgomery to the jury and would have undermined the testimony of the government's experts. In fact, once the facts as outlined in this application were discovered and presented at the hearing, the government did not call its witnesses to contest a single fact or diagnosis, even though Drs. Dietz and Martell were endorsed. An adverse inference can be drawn from the government's failure to present Drs. Dietz and Martell, and this Court can assume that the new evidence changed the government's experts' opinions. Contrary to Mr. Duchardt's belief that the facts of this crime are "horribly aggravating,"[2231] the proof in the record shows fourteen similar cases, yet Mrs. Montgomery is the only person on death row for such a crime.[2232] An approach

[a] Vol. 7, p. 1874, *O'Connor Testimony.* Mr. O'Connor relegated all mitigation and mental health preparation to Mr. Duchardt. By the time of trial Mr. Owen's role was very limited.



Appellate Case: 17-1716 Page: 598 Date Filed: 11/01/2017 Entry ID: 4596229

similar to that outlined at the hearing below is consistent with the approach that Ms. Clarke and her team follow.

Accordingly, a COA should issue.

**B. David Owen and Ray Conrad rendered ineffective assistance of counsel by engaging in conduct leading to the district court's decision to abruptly remove Ms. Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery and contrary to the wishes of Ms. Clarke and Mrs. Montgomery resulting in a violation of Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599**.

The decision to involve the district court in squabbles between members of the defense team was in and of itself professionally unreasonable. It was also professionally unreasonable to approach the court without first consulting with the client. Moreover, it was professionally unreasonable to place personal ego and professional reputation over the needs of the client and fail to make a record of exactly what was said to the court to cause the courts' actions.

Because Mrs. Montgomery was denied a hearing on this claim, ambiguities remain in the record. What the record does show is that within a week of the decision to remove Ms. Clarke, the district court stated that, "I don't have any reservation about the fact that [Clarke] needed to be taken off because her involvement was obstructive in getting a defense for Miss Montgomery together."[2233] A few days later, the court stated that, "the two of you come in here and say Judy Clark [sic] is a non-productive member of the team, causing

problems, we need to have her removed from the defense. And based on your explanation of the situation I did that."[2234] Later in that same transcript when Susan Hunt and David Owen express an inability to work with one another, the court says, "I am really not inclined to let anybody off the case because somebody is having a difficult time getting along . . . my reaction to that is then you need to work it out and you need to resolve it and you need to get past it."[2235] Juxtaposing the district court's statements that it believed lawyers with personality problems should work it out with its statements that Ms. Clarke was obstructive and non-productive, it is reasonable to infer that Mr. Owen and Mr. Conrad said more to the court than that they were simply having personality problems with Ms. Clarke and that she had used some swear words. Further, the district court's on-the-record statement proves that Mr. Owen accused Ms. Clarke of being "abusive" off-the-record: at the April 25, 2006 in chambers (transcribed) conference, the following exchange occurred:

> MR. OWEN: Speaking to that particular issue, Judy Clarke being in the case, [Ms. Hunt] can assume that is her decision or not her decision. I have overruled this by saying I can't work with this person. I don't know how you want to view it. Our office cannot work with that woman. It is impossible. She is just abusive beyond reasonability. We just can't work with her.
>
> THE COURT: I accept**ed** that.[2236]



Appellate Case: 17-1716 Page: 600 Date Filed: 11/01/2017 Entry ID: 4596229

The district court's use of the past tense in expressing that the court had already "accepted" that Ms. Clarke was "abusive" proves that in a prior discussion, the court had been told of this putative abuse and had "accepted" that which the court was told as true. As that prior discussion is not reflected in the two on-the-record discussions (Exhibit 67 and 68), it occurred off the record.[a]

---

[a] In the §2255 proceedings, with regard to the off- the-record removal of Ms. Clarke, the district court has found that "Nothing occurred off the record that was not later discussed on the record" (D.E. 173, p. 24). The court's words, however, prove this is not correct: prior to the May 3, 2006 discussion on-the-record, the court and Mr. Owen and Mr. Conrad had an off-the-record discussion in which Mr. Conrad convinced the court to "accept[]" that Ms. Clarke was abusive.

Given the court's role, generally, as a neutral fact-finder, and, here specifically as the judicial officer in charge of the appointment of counsel, the court's "acceptance" of Mr. Conrad's/Mr. Owen's accusation required some modicum of factual support. If it did not, then the court removed Ms. Clarke without any grounds for doing so. If it removed her for grounds stated off the record that led the court to "accept" Mr. Owen's accusation, then the court's representations to the contrary are inaccurate.

The fact that the district court has also stated that "No one, quite frankly, sought to exclude someone from the case as opposed to them" (D.E. 53) is further support for the belief that Mr. Conrad or Mr. Owen made some fact-based claim against Ms. Clarke. If Mr. Conrad or Mr. Owen had simply indicated the FPD no longer wanted to sponsor Ms. Clarke's *pro hac vice* admission to the district, the district court would not have represented that "No one, quite frankly, sought to exclude someone from the case as opposed to them" (*ibid*.).

That which Mr. Conrad (or Mr. Owen) told the court to cause the court – on the basis of Mr. Conrad's say-so, in an in-chambers, off the record proceeding without lead counsel present – terminate the appointment order of the only qualified counsel in a capital case is a factual dispute to which both Judge Fenner and Magistrate Judge Maughmer are necessary and material witnesses. *See* §VI. E, regarding the need for further discovery and an evidentiary hearing regarding these disputed facts.

The proof in the record shows that it was Owen who was obstructive and that the Clarke team was productive. Moreover, the proof in the record shows that the team would have been able to be ready for trial in October 2006, but for Owen and Conrad's meeting with the district court. So, if, Conrad and Owen said things that caused the district court to believe that Ms. Clarke was obstructive and non-productive, they misled the court as to the nature of the team dynamics.

The district court elided analysis of Mr. Owen and Mr. Conrad's ineffectiveness at the off-the-record, in-chambers hearing by finding that, at all times (excepting a 22 day period between the removal of Ms. Clarke and the appointment of Mr. Duchardt) Mrs. Montgomery "had at least one attorney – first Hunt, then later O'Connor and Duchardt – providing her counsel."[2237] The court then found that as Mrs. Montgomery did not show that anything critical happened in that 22 day period, "Movant was not deprived of such a right during a critical stage in the proceedings."[2238] The district court misses the point. During a critical stage – in chambers, off the record – where the district court determined whether Mrs. Montgomery would continue to be represented by the qualified appointed counsel with whom she had a trusting attorney-client relationship or whether that relationship would be severed, Mr. Owen was the only lawyer for Mrs. Montgomery present – and he was crippled by a conflict



Appellate Case: 17-1716 Page: 602 Date Filed: 11/01/2017 Entry ID: 4596229

of interest. Mr. Owen's conflict of interest is apparent not only from that which he did – *ie.* advocating against his client's interest that the only qualified lawyer be removed from the case – but also from the fact he did not insist that the court wait to talk to Ms. Hunt (lead counsel) before making any decision. Rather, that which is known about that hearing strongly indicates that Mr. Owen either repeated Mr. Conrad's advice that the court bar Ms. Clarke from further contact with Mrs. Montgomery or that Mr. Owen stood silently while his boss did so.[a] Either way, Mr. Owen was not representing Mrs. Montgomery's wishes or best interest either with his words or actions. That Mr. Owen continued to pursue his own interest – at this critical stage with no other counsel for Mrs. Montgomery present – resulted in both ineffective assistance of counsel and also deprivation of counsel at a critical stage.

It is at least reasonably debatable that Mr. Owen and Mr. Conrad rendered ineffective assistance resulting in the disruption of Mrs. Montgomery's attorney/client relationship with Ms. Clarke. A COA should issue.

### C. Mrs. Montgomery was deprived of counsel at a critical stage in the proceedings when David Owen and Ray Conrad met with the district

[a] *Compar*e, Exhibit 62, p. 8, *Owen Declaration* (Mr. Conrad did the talking in chambers and the court *sua sponte* called CCA); D.E. 53 (reflecting the parties interview with Magistrate Judge Maughmer who recalled that Mr. Conrad as doing the talking during the in chambers meeting) *with* Exhibit 72, p. 15 *Conrad Depo*sition (Denying being present at the in-chambers meeting and indicating he told Mr. Owen to advise the court of Owen's feelings and "I said, Tell the judge, he can cancel the visitation if he wants to").



Appellate Case: 17-1716 Page: 603 Date Filed: 11/01/2017 Entry ID: 4596229

**court without her knowledge or consent resulting in the removal of Judy Clarke as counsel for Mrs. Montgomery in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

The in-chambers, off-the-record, meeting that resulted in Ms. Clarke's removal was a critical stage at which Mrs. Montgomery had a right to counsel. *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). The district court dispenses with Mrs. Montgomery's argument by finding that Mrs. Montgomery had counsel "at all times following Hunt's appointment, Movant was represented by at least two attorneys in accordance with the requirements listed in §§3005 and 3599."[2239] However at the time the court removed Ms. Clarke, Mr. Owen and Mr. Conrad were not acting with Mrs. Montgomery's knowledge or consent – and were acting contrary to her best interest by attempting to remove the only qualified counsel from her case. Because Mr. Owen and Mr. Conrad did not consult with Mrs. Montgomery, she did not have the opportunity to object or to secure the presence of Ms. Clarke – or Ms. Hunt – at that hearing to advocate for Mrs. Montgomery's position.  Indeed the record reflects that Ms. Clarke was in the Kansas City metropolitan area and could have been present in court and that Ms. Hunt was in the courthouse and could have been present – had Mr. Conrad, Mr. Owen or the court informed either of them of the meeting.[a]

[a] Exhibit 63, p. 8, *Clarke Declaration*; Exhibit 60, p. 8, *Hunt Declaration* (" I had gotten out of another courtroom in courthouse on another matter"); Exhibit 62, p.

Mr. Owen and Mr. Conrad were acting out of self-interest which created a conflict of interest between the FPD and Mrs. Montgomery. Mr. Owen and Mr. Conrad wanted Ms. Clarke off the case. Mrs. Montgomery wanted Ms. Clarke to remain her counsel,[2240] and Ms. Clarke was willing to do so.[a] Mr. Owen and Mr. Conrad's determination, contrary to the wishes of their client (who they did not bother to consult), to have the court remove Ms. Clarke left Mrs. Montgomery without an advocate at the crucial stage of the district court's determination as which counsel to remove. "[A] 'significant conflict of interest' arises when an attorney's 'interest . . .' is at odds with his client's "'strongest argument.'" *Christeson,* 135 S. Ct. at 894 (quoting *Maples v. Thomas*, 565 U.S. 266, 285 n.8 (2012)). Where the defendant shows an actual conflict of interest, prejudice to his defense is presumed. *Moore v. Mitchell*, 708 F.3d 760, 777 (6th Cir. (2013) (citing *Strickland,* 466 U.S. at 692)).

This complete deprivation of counsel at a critical stage requires reversal. *See United States v. Cronic*, 466 U.S. 648, 659 (1984) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial").

---

8, *Owen Declaration* (Hunt in the courthouse on another matter at the time of the in-chambers meeting).

[a] Exhibit 63, p. 9, *Clarke Declaration*; Vol. 3, p. 675-6, *Clarke Testimony* (Ms. Clarke reached out to Mr. Duchardt about rejoining the representation).



Appellate Case: 17-1716 Page: 605 Date Filed: 11/01/2017 Entry ID: 4596229

**D. Claims A – C are not subject to Procedural Bar.**

The district court's summary order denying relief on Claims 1-3 above addresses the merits of the claims. Because the court did not rely on procedural bar in its ruling, the claim is subject to merits review by this court.[2241]

However, because in its merits review of the above-listed claims, the district court included language which, untethered from the order overall, could be perceived as discussing default, Mrs. Montgomery addresses the notion here. In a section dealing with *Gonzalez-Lopez*, the court wrote, "Clarke did not engage in any effort to remain on the case. Clarke never filed a motion to reconsider or requested a hearing on the matter. Nor did Hunt or any other attorney associated with the case. By all appearances, Clarke consented to the termination of her appointment and acknowledged that it was appropriate."[2242]

The proof is to the contrary: Ms. Clarke did engage in an effort to remain in the case. She sought, and received, approval from the Federal Public Defender in San Diego for that office to take on the case as an out-of-district appointment and allow her to continue on the case with Susan Hunt.[a] What else was she to do? Ms. Clarke's appointment was terminated in the most stunning of ways.

[a] Exhibit 99, *Cahn Letter; see also,* Exhibit 68, *5/3/2006 Transcript* (Ms. Hunt providing Cahn letter to the Court and indicating she is willing to work with Ms. Clarke with the San Diego FPD funding the defense); Exhibit 60, p. 11, *Hunt Declaration*.

She learned of it from a guard at CCA who refused her admittance because of the district court's instruction. The court prohibited phone contact between Ms. Clarke and Mrs. Montgomery. Ms. Clarke had no way of even communicating with her former client about what could or should be done.

Second, Ms. Hunt asked the court, on two occasions, to bring Ms. Clarke back into the case[a] and supported her request with the letter from the federal public defender in San Diego[2243] as well as Lisa Montgomery's written request.[2244] In a footnote, the court criticizes Movant's characterization of what was said in those two meetings, writing, "It appears Movant is trying to recreate the record. The actual record reveals that Hunt presented Clarke's reinstatement as an option but made no formal motion, orally or in writing, to reinstate her."[2245]

While it bears noting that no written motion was made to terminate Clarke (and a factual conflict still exists as to whether she was removed *sua sponte* or upon request) it is odd to require more of Mrs. Montgomery, Ms. Hunt, and Ms. Clarke, than was required of Mr. Owen and Mr. Conrad. Yet Mrs. Montgomery, Ms. Hunt and Ms. Clarke did do more. On April 25, 2006, Ms. Hunt began the meeting with the court by saying, "I just wanted to kind of

[a] Exhibit 67, p. 7, 4/25/06 Transcript ("One option is to bring Judy Clark [sic] and the resources she brings back on board in place of the public defender's office and the public defender's office out here.)



Appellate Case: 17-1716 Page: 607 Date Filed: 11/01/2017 Entry ID: 4596229

revisit what happened last week[.]"[2246] "Revisit" is synonymous with "reconsider." Ms. Hunt went on to tell the court that the decision to terminate Ms. Clarke had hurt the case and the client.[2247] Ms. Hunt stated that she was willing to work with Ms. Clarke if the court would allow Ms. Clarke back in the case.[2248] The court firmly said, "I am not inclined to do that."[2249] Shortly thereafter the court stated, "I appreciate that and I am not inclined to want Miss Clark [sic] to be involved in it."[2250] The court went on to say:

> I can tell you all that I think, as you know, I was very hesitant to have Judy Clark [sic] involved in it from the first place. But that is just the way it goes and I can see why you all at that time thought that would be helpful. I don't have any reservation about the fact that she needed to be taken off the case because her involvement was obstructive in getting a defense for Miss Montgomery put together.[2251]

On May 3, 2006, Ms. Hunt was back in front of the Court after Mr. Owen and Mr. Conrad went to him to complain about Ms. Hunt. The reason for the complaint was that Ms. Hunt was trying to get Ms. Clarke reinstated on the team and Owens refused. Ms. Hunt told the Court:

> I tried to resurrect with Dick Burr, that is one of the topics we talked on Tuesday, let's try and put this back together for the sake of the client. We had the resources, we had all this in place. That was lead counsel, that was my opinion the best way to go. Put aside our personal differences. Always been personal differences, not about the client. That was my opinion as lead counsel what should happen. He said absolutely not and that is where we are at.[2252]

The court then inquired of Mr. Owen, "David, do you think there is a basis for Susan to feel you don't respect her judgment or decisions in the case[.]"[2253] Mr. Owen replied,

> Speaking to that particular issue, Judy Clark [sic] being in the case, she can assume that is her decision or not her decision. I have overruled this by saying I can't work with this person. I don't know how you want to view it. Our office cannot work with that woman. It is impossible. She is just abusive beyond reasonability. We just can't work with her.[2254]

Mr. Owen then made the ultimatum that, if Judy Clarke was in the case, his office was out. Mr. Owen went on to refer to himself as the "whipping boy" and "scape goat (sic)."[2255] After this back and forth, the court expressed its surprise at the "second guessing on the decision to remove Judy Clark[e]."[2256] It references how it had been suggested "well, maybe we ought to bring Judy Clark[e] back in."[2257] The court continued that when the idea of bringing Ms. Clarke back in was brought to him: "I told you pretty clearly as far as I was concerned that wasn't an option, Judy Clark[e] was not coming back in."[2258] The hearing continued with back and forth between Ms. Hunt and Mr. Owen about why as a result of Ms. Hunt's efforts by writing to Dick Burr and asking for help, the two could no longer work together.[2259] Ms. Hunt pointed out that Mr. Owen is the one who has complained about her, and the district court stated, "I understand. That is a little bit petty in the sense, I mean … That is like one brother tattling on another one and then everybody getting mad[.]"[2260]

At the end of the hearing, Mr. Conrad, expressed his anger at Ms. Hunt for wanting Ms. Clarke back on the case and said that he is "bitter" and "upset."[2261] After Mr. Conrad concluded his nearly two-page rant against Ms. Hunt, Ms. Hunt replied, "I disagree with about everything he says what my letter was. But obviously they're [sic] some deep-seeded feelings and I am going to renew my motion to withdraw from the case."[2262] The court then concluded the hearing by expressing its disappointment with "the circumstances."[2263] The court observes that it did not have much more to say and that "if I want to talk to anybody any further about it I will call you back. If not, I will make a decision what we are going to do."[2264] The court then called Ms. Hunt and told her to withdraw. She complied.[2265]

Plainly, efforts were made for the court to reconsider its order. The result was the termination of the lawyer who made those efforts and the court was clear that the Clarke matter was closed. Even so, after Mr. Owen and Mr. Duchardt were appointed, Ms. Clarke and Ms. Hunt encouraged Mr. Duchardt to urge the district court to reconsider.[2266] Mr. Duchardt instructed Ms. Clarke to take no action while he pondered the situation (and tried another case).[2267]

Mr. Duchardt has suggested that he told Ms. Clarke that she should get her bar license in Missouri and enter *pro bono*.[2268] Ms. Clarke does not recall Mr. Duchardt making any such suggestion.[2269] And to do so would have been futile.

The district court was clear: Ms. Clarke was unwelcome. Further, Ms. Clarke could not waive into the Missouri bar because Missouri does not have reciprocity with California. Moreover, as a federal public defender, Ms. Clarke cannot appear without a court appointment, and hers had been terminated.

Herculean efforts were made to get the district court to reconsider and it did not. Mrs. Montgomery cannot be faulted because those efforts were futile.

Finally, it should be noted that Mr. Owen remained on the case after having issued the ultimatum that it was Ms. Clarke and Ms. Hunt or Mr. Owen and a player-to-be-named later. The district court chose option B. As Owen was part of the team that remained, the entire team had a conflict of interest which prohibited it from taking further action. Counsel cannot raise his own ineffectiveness. *Moore v. Mitchell*, 708 F.3d at 778. The first time that un-conflicted counsel was available to raise this claim was in the proceedings below. There was no default.

Even if the court finds default, it is reasonably debatable that Mrs. Montgomery has cause to overcome it because the district court removed the lawyer who was seeking to raise the claim on her behalf and the lawyer who remained is the lawyer who had worked against her interest. Mrs. Montgomery has further established prejudice because she was deprived of her lawyer against her wishes, without a hearing. Under *Gonzalez-Lopez* and *Martel*, that is

all she must show. Moreover, as discussed throughout this application, the newly comprised team made numerous prejudicial professional errors. See §§V.B, V.C, V.E, VI.C.-N.

Because her claims are reasonably debatable, Mrs. Montgomery is entitled to a COA.

**E. It is at least debatable that the district court denied Mrs. Montgomery due process and a fair hearing on claims relating to the removal of Judy Clarke as counsel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. §2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under §2255.**

**1. It is at least debatable that the district court should have recused itself.**

A judge is disqualified from proceedings and must recuse himself where the judge "is, to the judge's knowledge, likely to be a material witness of the proceeding," 28 U.S.C. § 455(b)(5)(iv), or where the judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). This Court has expressly found that recusal under 28 U.S.C.§ 455 (b)(5)(iv) is mandatory. *United State v. Tucker*, 82 F.3d 1423, 1426 (8th Cir. 2006). The Eleventh Circuit has deemed 28 U.S.C. § 455(b) a "*per se* rule that lists certain circumstances requiring recusal." *Summers v. Singletary*, 119 F.3d 917, 920 (11th Cir. 1997) ("§ 455(b) establishes a *per se* rule that lists certain circumstances requiring recusal. Section 455(b) and its subparts apply to genuine conflicts of interest or actual bias. Where these circumstances exist,

disqualification may not be waived."), citing *United States v. Alabama*, 828 F.2d 1532, 1541 (11th Cir. 1987).

As outlined in this section, as well as in the statement of facts, the district court was a party to at least six *ex parte* off-the-record discussions about the matter of the appointment, and termination of, counsel for Mrs. Montgomery.[a]

---

[a] The dates of those meetings are believed to be: 4/20/2006 Maughmer, Conrad, Fenner, and Owen); 4/21/2006 (Owen, Hunt, and Fenner); 4/25/2006 (though the majority of the discussion between Judge Fenner, Hunt and Owen was recorded and transcribed, the parties went off the record at the end of the transcript); 5/1/2006 (meeting between Fenner, Conrad and Owen); 5/8/2006 (Hunt, Owen, and Fenner – unclear if Conrad also present). For ease of reference, a chart of the in-chambers conversations in this matter is attached, here

| Date | Who Present in Chambers | Recorded? | Document Supporting | What occurred |
|---|---|---|---|---|
| October 2005 | Hunt, Owen & Judge Fenner | no | Exhibit 62, *Owen Declaration* | Discussed bringing Clarke onto the case. *See also*, 4/25/06 Transcript of In-Chambers Proceeding (Clarke "only appointed in an effort to see if she could assist in getting a plea"; "I was very hesitant to have Judy Clarke involved in it from the first place"). |
| 4/17/2006 | Owen (to Judge Maughmer) | no | Vol. 2, p. 415, *Testimony of Susan Hunt*; *see also*, Exhibit 60, *Declaration of Susan Hunt; See* No. 13-2958, Attachment 5, *5/62013 Transcript of* | Owen made Judge Maughmer aware of problems within the defense team. |



Appellate Case: 17-1716 Page: 613 Date Filed: 11/01/2017 Entry ID: 4596229

| | | | | |
|---|---|---|---|---|
| | | | *Proceedings* (government's recitation of the information disclosed by Judge Maughmer in the unrecorded interview by the parties: that prior to the 4/20/06 discussion with Judge Fenner, Owen had made Judge Maughmer aware of the problems, though "[Judge Maughmer] couldn't remember any detail"). | |
| 4/20/2006 | Conrad, Owen, Judge Maughmer, & Judge Fenner | no | | |
| 4/21/2006 | Owen, Hunt & Judge Fenner | no | D.E. 71-7 5/2/06 *Dave Owen letter to Dick Burr* ("the next day, at a meeting with the judge, both Susan and I expressed our problems concerning the continued involvement of [Clarke]") | |
| 4/25/2006 | Hunt, Owen, Conrad (listed as present but does not speak on the record) & Judge Fenner | Yes (except for an unknown portion) | Exhibit 68, Transcript of 4/25/2006 In Chambers Hearing | Hunt and Owen complain about conflict between them. Hunt presented idea of FPD/San Diego; FPD will never work with Clarke again. Owen |



Appellate Case: 17-1716 Page: 614 Date Filed: 11/01/2017 Entry ID: 4596229

The motion raises serious constitutional issues about her Sixth Amendment right to counsel and what was said in those meetings. The facts are disputed and

______________________

| | | | | |
|---|---|---|---|---|
| | | | | says, "I'm not asking to get off this case."<br><br>NOTE: Off-the record discussion at end of transcript |
| 5/1/2006 | Owen, Conrad & Judge Fenner | no | Exhibit 68, Transcript of 5/3/2006 In Chambers Hearing (begins by court telling Hunt of this meeting) | |
| 5/3/2006 | Owen, Conrad, Hunt & Judge Fenner | yes | Exhibit 68, Transcript of 5/3/2006 In Chambers Hearing | FPD moves to withdraw; Hunt suggests substituting FPD San Diego; denied; Hunt moves to withdraw; court says will decide |
| 5/8/2006 | Owen, Hunt & Judge Fenner | no | Vol. 2, p. 419, *Testimony of Susan Hunt* (Ms. Hunt testified that there was a meeting on "Monday" in chambers when told to withdraw; May 9, 2006 when Mr. Owen removed Ms. Hunt from the CCA visitation list was a Tuesday, ergo the meeting appears to have been on May 8, 2006). | Hunt told to withdraw |

the district court is a material witness. The issue would be different if a court reporter had transcribed the proceedings, but that did not happen. As a result, Mrs. Montgomery filed the most respectful motion possible, titled "Motion to Reassign" to bring the issue to the attention of the district court.

This motion suggesting he reassign the case for adjudication before a different judge drew ire from the district court and infected his view of the entire case in a prejudicial manner. The court thereafter, chastised non-FPD counsel and suggested that because the government was paying her, the government was her client and had a right to be pleased with the claims she raised.[a] In July, 2013, the court brought counsel into chambers and suggested that the two non-FPD lawyers should be removed from the case. In so doing, the court stated that "I don't see the entitlement to that kind of representation in the case[.]"[2270] As a result of that hearing, the district court began holding back portions of the fees earned by appointed counsel, even though "I don't think you're overbilling."[2271]

---

[a] D.E. 53 p. 17:

THE COURT: Well, I mean, doesn't there have to be some good faith – I mean the government is paying you to do all this right?
Ms. NOURI: Yes, sir.
THE COURT: And, you know, shouldn't any client want some good-faith basis for the actions of their attorney that are being paid for to pursue something?



Appellate Case: 17-1716 Page: 616 Date Filed: 11/01/2017 Entry ID: 4596229

During that hearing, counsel Nouri informed the court that counsel Blegen had been the primary writer of the pleadings in the case up to that point. On June 30, 2014, the district court entered an order titled "Order Limiting Public Funded Representation."[2272] The court wrote:

> Having fully considered the status of Movant's Motion for Collateral Relief to Vacate, Set Aside or Correct Sentence and for New Trial (Doc. #71), the court believes that it is no longer required that Movant have the assistance of three public funded attorneys as well as support staff of the Federal Public Defender to adequately pursue her claims.[2273]

The district court then ordered attorney Blegen, the primary writer, to "conclude her representation of Movant in an orderly fashion."[2274] Ms. Blegen was instructed to withdraw no later than July 28, 2014.[2275]

Mrs. Montgomery filed an emergency writ with this Court. *In Re: Lisa Montgomery*, No. 14-2725.[a] This court ordered the district court judge to respond and then denied the writ without comment.[2276]

In addition to removing the lawyer who was the primary writer of the 2255 Motion and Motion to Reassign, the district court also permitted trial counsel Fred Duchardt to enter his appearance in the case as an interested party, file pleadings,[b] and engage in email correspondence with court staff about matters

---

[a] Mrs. Montgomery asks the Court to take judicial notice of the record in that case.

[b] Mr. Duchardt filed a motion asking the district court to compel habeas counsel to produce the tape recordings of their interview with him. D.E. 92. Mr. Duchardt's revealing statements in the interview were meticulously recounted in the Declaration of Chris Armstrong. Exhibit 83, *Armstrong Declaration*. In the

pending before the court. Over objection, the district court ordered that habeas counsel, at taxpayer expense, ship to Mr. Duchardt the entirety of the original trial file to Mr. Duchardt's residence, risking loss of chain of custody and destruction of evidence.[2277] The district court ordered members of the trial team who did not wish to be interviewed by Mr. Duchardt to submit to questioning by Mr. Duchardt so that he could refresh his memory in order to file an affidavit in response to Mrs. Montgomery's motion.[2278] The district court allowed Mr. Duchardt more than a year to complete his affidavit.[2279]

When the district court entered its order on December 21, 2015, the courtroom deputy emailed counsel, stating that the court would like to schedule the evidentiary hearing of the case in April, 2016. On January 27, 2016, counsel appeared before the court and asked for an October 31, 2016 date. The court stated "October is a long way away and I really don't want to continue this matter that far."[2280] After agreeing to set the case for October 31, 2016, the court warned "one way or another the testimony is going to be presented on October 31st."[2281]

---

motion, Duchardt affirmatively represents to the court that habeas counsel had specifically requested permission to tape and that he has explicitly granted it. This was an untrue statement. Vol. 4, pp. 911-914, *Armstrong Testimony*.



Appellate Case: 17-1716 Page: 618 Date Filed: 11/01/2017 Entry ID: 4596229

At the hearing itself, the court's animosity was apparent. *See* Motion to Expand the Record – Attachment 2, *Declaration of Mr. Lawrence Fox*; §VI. K., *infra*.

Under these unfortunate circumstances, precedent from the United States Supreme Court requires recusal. The "Court's precedents set forth an objective standard that requires recusal when the likelihood of bias on the part of the judge 'is too high to be constitutionally tolerable.' " *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1903 (2016) (*quoting Caperton v. A.T. Massey Coal Co*., 556 U.S. 868, 872 (2009) (*quoting Withrow v. Larkin*, 421 U.S. 35, 47, (1975)).

> Due process guarantees "an absence of actual bias" on the part of a judge. Bias is easy to attribute to others and difficult to discern in oneself. To establish an enforceable and workable framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Of particular relevance to the instant case, the Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case. This objective risk of bias is reflected in the due process maxim that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome."

*Id.*, at 1905–06 (citations omitted). In *Williams,* the appearance of bias flowed from the Pennsylvania Supreme Court Justice's participation in signing off on the death notice while his office was prosecuting Terry Williams. The Justice took no part in the actual trial of the case. There the Court ruled, "Chief Justice



Appellate Case: 17-1716 Page: 619 Date Filed: 11/01/2017 Entry ID: 4596229

Castille's significant, personal involvement in a critical decision in Williams's case gave rise to an unacceptable risk of actual bias. This risk so endangered the appearance of neutrality that his participation in the case 'must be forbidden if the guarantee of due process is to be adequately implemented.'" *Id.* 1908–09 (*quoting Winthrow v. Larkin*, 421 U.S. 35, 47 (1975)).

It is reasonably debatable that, applying the Supreme Court's established precedent, the district court judge should have recused himself from, at the very least, the adjudication of claims A1-A3 and assigned the case to a neutral court. A COA should issue.

**2. The district court erroneously limited discovery.**

Despite Mrs. Montgomery's desire to depose the district court judge and Magistrate Judge Maughmer, who was also present during some of the off-the-record discussion about defense counsel, depositions were not permitted. The district court did allow counsel to interview the magistrate in his chambers and ordered that the interview be transcribed. However, after issuing the order, the magistrate called the judge and suggested that a transcript was not a good idea. When counsel arrived in chambers they were so informed by the magistrate. Mrs. Montgomery was allowed a very brief, timed, and limited deposition of Ray Conrad. Mr. Conrad denied being present at the critical meeting where



Appellate Case: 17-1716 Page: 620 Date Filed: 11/01/2017 Entry ID: 4596229

allegations were made that caused the district court to conclude Ms. Clarke was obstructive. That left the district court itself in possession of that knowledge.

In a hearing on the motion itself, the district court argued with habeas counsel about the merits of the motion, scolded her for filing it, and suggested that it was the product of the outside counsel, thus supporting its preference for local counsel. The district court implied that there had been no good faith basis for the filing of the claim.[a] Counsel responded, setting out the efforts counsel had already made and the information upon which counsel pleaded the claim by information and belief:

> MS. HENRY: . . . what you said to counsel on the record on April 25th was, Hey, look, you represented to me that this woman was being unproductive in the case. Well, that is demonstrably untrue.
>
> We also interviewed David Owen who told us – and I'm not sure if it's in his declaration because I don't have it committed to memory, but one of his complaints about Ms. Clarke is that he claimed she was not getting expert witnesses. She wasn't moving the case along. She wasn't getting evaluations. And that was a specific complaint about her work product. He told us that when we interviewed him in Denver. We know that to be untrue because we have copies of the contracts where she had actually made contact with expert witnesses. So if he had represented that to you or if Mr. Conrad had represented that to you, that would be untrue.

[a] D.E. 53, p. 17 ("shouldn't any client want some good faith basis for the actions of their attorney?")



Appellate Case: 17-1716 Page: 621 Date Filed: 11/01/2017 Entry ID: 4596229

> We have the record that says Mrs. Clarke was describes as abusive to staff. That's a loaded word. It's a conclusory word. But it is a word based on our investigation, having spoken to Ms. Elliot and Mr. Ninemire [that] we also believe to be untrue. That's what we believe. Our motion was filed based on information and [belief], and we have an obligation to Ms. Montgomery to make those allegations because if we don't, under the law, they would be waived forever . . . there was an allegation earlier about this making one of the examples our case in point as to why the Court doesn't like outside counsel coming, and I just wanted the Court to be aware that there's no rabble-rousing going on here, and everything that we have pled we had pled on the basis of good faith.
>
> Our interview of Judge Maughmer this morning, frankly, for me raises even more questions than it provided answers. Mr. Conrad, he says, spoke for 15 to 20 minutes. I disagree with the government's characterization of that as brief. Fifteen minutes of complaints about a lawyer is not brief.
>
> We disagree that this is simply a case management issue. This was – and that there was only one option. Our feeling is that if the Court was led to believe that that was the only option that you had, it had to be based on something more than just Ms. Clarke had been unkind or had said to Mr. Owen, quite truthfully, Mr. Owen, you're not experienced.[2282]

Though counsel provided the court with the good faith basis of the claim, the court has continued to chide counsel for pressing the claim – including in the court's order denying relief to Mrs. Montgomery after the hearing – finding counsel "unprofessional" for pressing the claim after "it was made abundantly clear that any alleged basis for the claim was from a misunderstood and



Appellate Case: 17-1716 Page: 622 Date Filed: 11/01/2017 Entry ID: 4596229

misinterpretation of what had taken place in the removal of Clarke from the trial team."[2283] However, the many inconsistencies in the record[a] support Mrs. Montgomery's position – a genuine issue of fact exists as to what was said to cause the court to precipitously remove Ms. Clark – the court's assurances that this was only a "case management decision" notwithstanding.[2284] Because the court did not reassign the case, Mrs. Montgomery could not seek to depose

---

[a] The inconsistencies include, but are not limited to, proof regarding:

1) Whether Mr. Conrad and Mr. Owen moved to have Ms. Clarke removed: *compare*, D.E. 212, p. 125 ("The Court sought to solve the reported discord among this iteration of the trial team by accepting the request of the local attorneys involved") *with* Exhibit 53, p. 12, *5/6/2013 Transcript* ("No one, really, quite frankly, sought to exclude someone else from the case as opposed to them.");
2) Whether Mr. Conrad was present: *compare*, Exhibit 72, p. 15 *Conrad Depo* (Conrad denied being present at the in-chambers meeting) *with* Exhibit 62, p. 8 ("Judge Fenner summoned both Ray Conrad and me to chambers immediately . . . Mr. Conrad explained the friction being experienced between Judy Clarke, her team and the other members of Lisa Montgomery's defense team.")
3) What the Court was told to support the court's acceptance that Ms. Clarke was "abusive beyond rationality" (*see*, Exhibit 68, p. 23, 5/8/2006 Transcript (the court stating that the court previously "accepted" Mr. Owen's representation regarding Ms. Clarke that "She is just abusive beyond reasonability").
4) Whether the FPD suggested the court bar Ms. Clarke from contact with Mrs. Montgomery or whether the court did so *sua sponte* (*compare*, Exhibit 72, p. 15 *Conrad Depo*. (indicating he told Mr. Owen to advise the court of Owen's feelings and "I said, Tell the judge, he can cancel the visitation if he wants to") *with* Exhibit 62, p.8, *Owen Declaration* ("Then, without further comment or questions, Judge Fenner picked up the phone, called CCA . . . and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit with her.")

Judge Fenner. Though the district court has said that he provided counsel the opportunity to ask questions,[2285] at no time during the hearing did the district court suggest that it was making himself available for discovery. No lawyer would think that discovery was occurring in that forum. Mrs. Montgomery was entitled to discovery of the testimony (under oath, subject to cross examination, overseen by a neutral and detached arbiter of any legal dispute) of both the magistrate judge and the district court.

Mrs. Montgomery has been deprived of her right to seek and present evidence relating to a critical cluster of serious constitutional issues in her case. This was error. *See Wellons v. Hall*, 558 U.S. 220, 224 (2010)(habeas petitioner entitled to discovery where his "speculation" and "surmise" were the result of an absence of the record and he sought discovery to plug the "holes in the record."); *see also*¸ *Bracy v. Gramley*, 520 U.S. 899, 908 (1997) (habeas petitioner entitled to discovery on judicial bias claim).

**3. The district court erroneously denied an evidentiary hearing.**

In a case proceeding under 28 U.S.C. §2255, where the record is not conclusive against the movant and the movant raises disputed issues of fact, a hearing must be held. *Machibroda v. United States*, 368 U.S. 487, 494-495 (1962); *United States v. Nelson*, 297 Fed. Appx. 563, 565 (8th Cir. 2008) ("Our cases teach that issues regarding the ineffectiveness of counsel often require a

hearing to consider evidence not disclosed on the face of the trial record") (*citing*, *Holloway v. United States,* 960 F.2d 1348, 1357 (8th Cir.1992) (noting that remand for an evidentiary hearing is necessary where the record is inconclusive on a claim for ineffective assistance of counsel); *United States v. Dubray,* 727 F.2d 771, 772 (8th Cir.1984) (noting in a direct appeal that ineffective assistance of counsel claims normally "cannot be advanced without the development of facts outside the original record" (internal marks omitted)); *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). The record with respect to Claims A1-3 of this application is not conclusively against Mrs. Montgomery and the facts are indeed in dispute. It is reasonably debatable that Mrs. Montgomery was entitled to a hearing on these issues. A COA should issue.

**4. Constitutional concerns.**

The denial of due process in these proceedings not only implicates the Fourteenth Amendment, but the Sixth and Eighth Amendments as well as this is the only forum for Mrs. Montgomery to raise any new facts or claims post-conviction. Unlike a Petition for Writ of Habeas Corpus brought under 28 U.S.C. §2254, which is civil in nature, a Motion to Vacate or Correct Judgment and Sentence under 28 U.S.C. §2255 is a continuation of the criminal trial. The Advisory Committee Notes to the §2255 Rules ("Note(s)") repeatedly

characterize proceedings under §2255 as a "continuation of the criminal case." For example, the Note to §2255 Rule 1 states that "a motion under §2255 is *a further step in the movant's criminal case and not a separate civil action*," and the Note to §2255 Rule 11 states that "*a §2255 action is a continuation of the criminal case*." (emphases added). The Notes actually distinguish §2255 proceedings from civil actions. *See* Note to §2255 Rule 3 (noting change to require no filing fee of movant "*to recognize specifically the nature of a §2255 motion as being a continuation of the criminal case whose judgment is under attack*") (emphasis added); *id.*, Rule 6 ("This rule differs from the corresponding discovery rule under the §2254 rules in that it includes the processes of discovery available under the Federal Rules of Criminal Procedure as well as the civil. This is because of the nature of a *§2255 motion as a continuing part of the criminal proceeding* . . .") (emphasis added); *id.* Rule 12 (similar).

In a thorough examination of the issue, the Second Circuit recognized that §2255 Rules clarify the criminal nature of the proceeding. *Williams v. United States,* 984 F.2d 28, 30 (2d Cir. 1993). Other courts have followed, acknowledging that "it is now clear that 'a motion under §2255 is a further step in the movant's criminal case and not a separate civil action.'" *United States v. Martin*, 226 F.3d 1042, 1047 n.7 (9th Cir. 2000) (*quoting* Note to § 2255 Rule 1). *See also United States v. Fiorelli*, 337 F.3d 282, 285 (3rd. Cir. 2003); *United*

*States v. Cook*, 997 F.2d 1312, 1319 (10th Cir. 1993). The First Circuit agrees. *See, e.g.*, *United States v. Quin*¸ 836 F.2d 654, 655 n.2 (1st Cir. 1988) ("Although §2255 proceedings are strictly criminal, and § 2254 (habeas corpus) civil, the Civil Rules are equally applicable [under § 2255 Rule 12]."); *United States v. Gordon*, 634 F.2d 638, 639 (1st Cir. 1980) ("Although a section 2255 motion may possess several characteristics of a separate civil proceeding, procedurally it is a 'further step in the movant's criminal case.'" (quoting Note to § 2255 Rule 1)).

As this proceeding is criminal in nature, the constitutional right to effective assistance of counsel is implicated. *Powell v. Alabama,* 287 U.S. 45, 71 (1932); *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963). Further, where this proceeding is the only forum for Mrs. Montgomery to raise claims alleging the violation of her Sixth Amendment right to counsel at trial, sentencing, and on appeal, she has the right to effective assistance of counsel under *Martinez v. Ryan,* 566 U.S. 1(2012); *Trevino v. Thaler*, 569 U.S. 413(2013); and *Maples v. Thomas,* 565 U.S. 266 (2012).

A COA should issue.



Appellate Case: 17-1716 Page: 627 Date Filed: 11/01/2017 Entry ID: 4596229

**F. Multiple deficiencies by successor trial counsel including: failure to consult with prior counsel, virtually stopping record collection; stalling the investigation; working on other cases while ignoring Mrs. Montgomery's; failing to communicate with others working on the case; zeroing in on an improbable NGRI defense and an equally improbable and logically inconsistent innocence defense; refusing to work with his mitigation expert; failing to develop competent expert proof; and making false statements to the court, constitute ineffective assistance of counsel.**

**1. Legal standard**

To establish a claim of ineffective assistance of counsel, Mrs. Montgomery must establish two things, first that her counsel's performance was deficient, and second that she was prejudiced by her counsel's deficient performance. Deficient performance is established where counsel's representation fell below an objective standard of reasonableness, which is measured by prevailing professional norms. *Strickland* 466 U.S. at 687-88. Prejudice is shown where there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id.* at 694. "[Mrs. Montgomery] is not required to prove that she would have prevailed. Rather, reasonable probability is probability sufficient to undermine confidence in the outcome." *Ibid.* A claim of ineffective assistance of counsel requires the court to consider all of the evidence in the record and to judge counsel's errors cumulatively, not in a piecemeal fashion. *Id.* at 695 (court must consider the totality of the record); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (court erred in failing to consider totality of the evidence); *Wiggins v. Smith*, 539 U.S. 510,



Appellate Case: 17-1716 Page: 628 Date Filed: 11/01/2017 Entry ID: 4596229

534 (2003) (court must consider totality of the evidence).[a] A reviewing court must "engage" with all of the evidence in the record. *Porter v. McCollum*, 558 U.S. 30, 44 (2009); *Simmons v. Luebbers*, 299 F.3d 929, 938-39 (8th Cir. 2002).

Here, the district court's analysis is in direct conflict with established precedent. The court clearly stated that it was not considering the errors cumulatively. Rather, it stated that "[b]ecause each ineffective assistance of counsel claim must stand or fall on its own, [it would] examine[] them in turn."[2286] Because the district court failed to consider the cumulative effect of all of counsel's professional errors, its opinion is in error and Mrs. Montgomery is entitled to a COA for this reason alone.[b] *Strickland*, 466 U.S. at 696 (trial court in making prejudice inquiry must take "due account of [counsel's] errors"); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) ("plethora and gravity of [trial counsel's] deficiencies rendered the proceeding fundamentally unfair"); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) ("If counsel

---

[a] *See also*, *Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (holding that the Fifth Circuit erred in failing to consider cumulative effect of errors. "The result reached by the Fifth Circuit is compatible with a series of independent materiality evaluations, rather than on the cumulative evaluation by *Bagley*[.]" In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the United State Supreme Court adopted the *Strickland* formulation for use in the evaluation of *Brady* claims. *Kyles* reiterates that the two standards are the same.

[b] It would also be reasonable for this Court to remand the case with instructions to reconsider Mrs. Montgomery's claims under binding United States Supreme Court precedent.

is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense prejudice may result from the cumulative impact of multiple deficiencies."); *Mackey v. Russell*, 148 F. App'x 355, 365 (6th Cir. 2005) ("the *Strickland* test requires that prejudice be evaluated in light of the cumulative effect of all constitutionally infirm actions by counsel.")

The *Strickland* test is an objective reasonableness standard. Subjective factors, such as the individual court's "sentencing practices"—or the idiosyncratic methods of a particular lawyer for that matter—are not considered. *See Strickland,* 466 U.S. at 695.

Here too, the district court's legal analysis conflicts with precedent. Like the court in *Sears v. Upton*, 561 U.S. 945, 953 (2010), the district court "curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory." Like the lower court in *Sears,* the district court failed to acknowledge that though "a theory might be reasonable, in the abstract, [that] does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [the defendant]. The 'reasonableness' of counsel's theory was, at this stage in the inquiry, beside the point: [the

defendant] might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not." *Ibid.*

When trial counsel offers a "strategic" reason for his actions, the court must decide whether that strategy was objectively reasonable. Strategy decisions are only entitled to deference if made after a thorough investigation of the facts and law applicable to the matter at hand. *Williams v. Taylor*, 529 U.S. at 397; *Wiggins*, 539 U.S. at 534; *Rompilla v. Beard*, 545 U.S. 374, 386-93 (2005); *Porter*, 558 U.S. at 40, *Sears,*561 U.S. at 953; *Simmons*, 299 F.3d at 938-39.

The record supports Mrs. Montgomery's claim that trial counsel's performance objectively fell below prevailing professional norms where trial counsel's actions led to constant turnover in the team, which in turn harmed the team's relationship with Mrs. Montgomery and key witnesses, exacerbating Mrs. Montgomery's already fragile and unstable mental state and causing a loss of critical institutional knowledge. Broadly stated, the final iteration of Mrs. Montgomery's trial team, already crippled by the prior team's errors, furthered the pattern of deficient performance by making haphazard, dangerous, and uninformed decisions to:

> 1) present a not guilty by reason of insanity defense, which an objectively reasonable lawyer would have recognized did not meet the evidentiary standard under federal law, resulted in the exclusion of powerful proof of brain damage at a poorly litigated *Daubert* hearing, and completely undermined the mitigation proof;

2) inject a character defense of Mrs. Montgomery into the first phase that was untrue, inconsistent with the insanity defense, and opened the door to damaging evidence which rendered her sentencing proof incredible;

3) announce an innocence defense in open court that they knew or should have known was factually untrue and also inconsistent with the insanity defense (announced on the same day), critically damaging the relationship with important mitigation witnesses and opened the door for the Government to argue lack of remorse and other bad character evidence;

4) fail to alert the district court to Mrs. Montgomery's mental incompetency; and

5) fail to protect Mrs. Montgomery's right to not be tried under the influence of psychotropic medication where she did not want to take the medication and where the medication altered her affect and demeanor as well as further exacerbated her mental incompetency.

The proof in the record establishes that the reason for these unprofessional errors is not reasoned trial strategy formed after a thorough investigation but rather because, again in broad terms, the final iteration of the defense team:

1) did not have the requisite background, training, or understanding to appreciate how seriously ill Mrs. Montgomery was;

2) failed to meet on a regular basis;

3) virtually stopped gathering records;

4) dramatically cut back on witness interviews;

5) failed to consult with prior counsel and so therefore was unaware that the two mutually inconsistent disastrous defenses of pseudocyesis and 'the Tommy defense' had already been ruled out;

6) had too many other cases on their docket to devote sufficient attention to Mrs. Montgomery;

7) (because the final iteration of the team had not conducted a reasonably thorough investigation) lied to the district court that counsel had two expert witnesses who were writing a report diagnosing that Mrs. Montgomery with pseudocyesis in support of the first phase defense of legal insanity when that was not the case, thereby creating a conflict between himself and Mrs. Montgomery;

8) in the case of the attorney charged with the mental health and mitigation aspects of the case, eschewed prevailing professional norms, including the development of a comprehensive social history; and

9) presented the mental health proof as evidence of the unsupportable NGRI/pseudocyesis defense, causing the jury to then disbelieve or discount the mitigating value of that evidence.

As the Supreme Court recognized in *Cone v. Bell*, "[t]here is a critical difference between the high standard . . . required to satisfy to establish insanity as a matter of [] law and the far lesser standard that a defendant must satisfy to qualify evidence as mitigating in a penalty hearing in a capital case." *Cone v. Bell*, 556 U.S. 449, 474 (2009). Where, here, the counsel's unreasonable, uninformed, as-a-result-of-a-conflict decision to present an unsupported insanity defense rendered the defense's mental health evidence not credible, counsel was ineffective.

Trial counsel's massive, pervasive, and interconnected objectively professional errors prejudiced Mrs. Montgomery. The totality of the evidence in the record is "sufficient to undermine confidence in the outcome" of Mrs. Montgomery's trial. To be clear, Mrs. Montgomery alleges that the errors that



Appellate Case: 17-1716 Page: 633 Date Filed: 11/01/2017 Entry ID: 4596229

counsel made pre-trial and in the first phase of her trial deprived her of a reliable sentencing and that but for counsel's unprofessional errors it is reasonably probable that at least one juror would have voted for a life sentence had trial counsel not made the professional errors as outlined here and in §§V.B. and V.C., *infra*.[a] This issue is debatable among jurists of reason where another court of appeals has found reversible error in a capital case arising from a state prosecution where, as here, trial counsel presented an improbable defense which served to undermine the penalty phase proof and compounded the penalty phase errors:

> In addition to a deficient penalty phase representation, Daniels was likely prejudiced by [trial counsel]'s guilt phase defense that claimed Daniels was not the shooter. As a result, Daniels faced a jury that could only be profoundly annoyed by this ludicrous defense in the face of overwhelming evidence of culpability. Thus, Daniels appeared before the sentencing jury as a man charged with murder to evade arrest, implausibly arguing that he was not the shooter to evade justice. The combination of counsel's guilt and penalty phase deficiencies, including their failure to investigate their client's mental health and failure to overcome a complete communication failure, combined to deny

[a] Mrs. Montgomery does not allege that the proof is sufficient to establish *Strickland* prejudice in the first phase of her trial due to counsel's errors. Mrs. Montgomery does allege that she is entitled to an entirely new trial due to: 1) the errors made with respect to the termination of Judy Clarke, *see* §§V.A. and VI.A.; 2) the competency claims raised in §§V.C. and VI.H.; 3) and the *Riggins* claim, §§V.C. and VI.I.. It is important to note, that the Clarke, competency, and *Riggins* claims are also related to Mrs. Montgomery's overarching ineffectiveness claim, *see*, §VI.G., *infra*.

> Daniels effective representation and prejudiced the outcome of his penalty phase trial.

*Daniels v. Woodford*, 428 F.3d 1181, 1210 (9th Cir. 2005). In *Daniels*, the communication error arose where the trial court made errors in issues relating to the appointment of counsel which undermined the petitioner's trust in his counsel. The appointment of counsel error was different in *Daniels*, but the result of the error did interfere with Mrs. Montgomery's ability to communicate with her counsel and exacerbating her already fragile and unstable mental condition. Like in *Daniels*, trial counsel presented an incredible first phase defense which likely "annoyed" the jury and was used against her as aggravation. The state habeas petitioner in *Daniels* received habeas relief, and Mrs. Montgomery is entitled to a COA.

**2. Prevailing professional norms**

**a. The proof at the hearing established that the ABA Guidelines defined the prevailing professional norms at the time of Mrs. Montgomery's trial. However, contrary to the district court's opinion, Mrs. Montgomery's proof regarding prevailing professional norms was corroborated and animated by Judicial Conference Policy, scholarly research, professional literature, and expert testimony. The district court's order fails to engage with the proof in the record**.

Prevailing professional norms must be the norms established at the time of the representation. In *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009), the Supreme Court held that it was error to measure trial counsel's performance in the 1980's



Appellate Case: 17-1716 Page: 635 Date Filed: 11/01/2017 Entry ID: 4596229

against the 2003 ABA Guidelines. "Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Id.* at 8. Mrs. Montgomery's trial took place four years after the publication of the Guidelines. The United States Supreme Court has repeatedly looked to the ABA Guidelines to inform its analysis of the reasonableness of counsel's actions. *See Williams v. Taylor*, 529 U.S. at 396; *Wiggins*, 539 U.S. at 524; *Rompilla*, 545 U.S. at 387; *Porter*, 558 U.S. at 40, *Sears*, 561 U.S. at 953. The district court's order is often critical of the ABA Guidelines, though at the hearing it specifically found that, "I think you've established that the ABA Guidelines are a barometer to be used to determine professional norms."[2287]

The proof at the hearing establishes that the ABA Guidelines[2288] and the Supplementary Guidelines on Mitigation[2289] reflect the prevailing professional norms for federal capital cases at the time of Mrs. Montgomery's trial. Ron Wurtz, the first attorney to represent Mrs. Montgomery, stated that ABA Guidelines were the professional standard of care in capital cases in the state of Kansas at the time of Mrs. Montgomery's trial.

Russell Stetler, an expert in death penalty investigation and mitigation, testified to the historical development of the Guidelines, providing numerous

scholarly articles, reports, and judiciary policy (25 in all) that support the principles of the Guidelines and independently establish prevailing professional norms.[2290] Mr. Stetler, whose work informed the creation of the current ABA Guidelines and the Supplementary Guidelines on Mitigation, explained that the ABA wanted to reflect in the 2003 version that the Guidelines "were really to be followed. They were not aspirational."[2291] Mr. Stetler further testified that though the Supplementary Guidelines on Mitigation were published in 2008, there was a significant lag time from the drafting of the Supplementary Guidelines to the actual publication date of 2008. The principles in the Supplementary Guidelines are an expression of the prevailing professional norms in 2007.

In fact, as Mr. Stetler testified, the ABA Guidelines are so important that the Judicial Conference has adopted them as the standard of care for counsel in federal cases. The Model CJA plan adopted by the Judicial Conference and appended to the *Guide to Judiciary Policy, Vol. 7A* states, "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 1.1 and 10.2 et seq., and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases."[2292] Madelaine Carderella, Federal Public



Appellate Case: 17-1716 Page: 637 Date Filed: 11/01/2017 Entry ID: 4596229

Defender for the Western District of Missouri, testified that the Model Plan and its requirements are part of the local CJA plan, "to operate pursuant to the provisions of that Model Plan[.]"[2293] Accordingly the Guidelines are the professional norm for the Western District of Missouri.

Marc Bookman, who was qualified and accepted as an attorney expert in capital litigation, testified that the prevailing professional norms are found in the ABA Guidelines, as well as in scholarly articles, case law, publications from the Administrative Office of the Courts, and national training conferences.[2294] Denise LeBouef, who served on the Committee that wrote the ABA Guidelines and who is also an attorney with expertise in capital litigation, swore in her stipulated declaration that the ABA Guidelines were written to "reflect the current consensus on the national standard of care in capital cases."[2295] Ms. LeBouef's unrebutted declaration, which Mr. Bookman adopted, explains:

> There is a standard of practice applicable to all capital cases, in all United States jurisdictions. This has been true since the so-called "modern era" of the death penalty began in 1976, when the United States Supreme Court permitted some states to resume death sentencing and executions. *Gregg v. Georgia*, 428 U.S. 153 (1976). Such standards are expressed by written guidelines and jurisprudence, but exist independently and pre-date such written expression. By far the most comprehensive, accepted, and well-vetted set of standards is to be found in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases (February 2003), the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, as well as the earlier 1989 ABA Guidelines, and applicable case law.[2296]



Appellate Case: 17-1716 Page: 638 Date Filed: 11/01/2017 Entry ID: 4596229

Judy Clarke, who has represented numerous capital defendants referred to the ABA Guidelines throughout her testimony and agreed that they reflected the professional norms for death penalty lawyers.[2297] David Freedman likewise referred to the Guidelines. Lisa Rickert, the first mitigation specialist in the case, testified that she follows the ABA Guidelines.[2298] Holly Jackson, the next mitigation specialist testified that she follows the ABA Guidelines.[2299]

Mr. Duchardt, on the other hand, through his actions and open hostility toward federal death penalty resource counsel and their "playbook,"[2300] demonstrates that he does not adhere to the ABA Guidelines or the prevailing professional norms in capital cases. For example, he finds the idea of a "mitigation specialist" "laughable."[2301] Mr. Duchardt finds it "laughable"[2302] that the experts Mrs. Montgomery presented in her motion, and later at the hearing, "think that they should be reverently referred to with the label of 'mitigation specialist', that they should be able to command large per-hour fees[a] because they tout the 'mitigation specialist' label, and that they and they alone, without any sort of process, should be allowed, on their bare say-sos alone, to

[a] Mitigation specialists are paid less per hour than attorneys. The Spencer Report found the use of mitigation specialists actually saved courts money. Further, the mitigation experts available to Mr. Duchardt from FDPRC and CRC, are salaried employees whose assistance is offered to capital trial teams at no cost.



Appellate Case: 17-1716 Page: 639 Date Filed: 11/01/2017 Entry ID: 4596229

deign those who should be included in their 'mitigation specialist' club and those who should be excluded."[2303]

Though the ABA Guidelines, and prevailing professional norms, require the use of a mitigation specialist, in addition to two lawyers, Mr. Duchardt believes that he served both roles, "so, yeah, I would have been the mitigation specialist."[2304,a]

Dick Burr, who was a member of the federal death penalty resource counsel project[b] at the time of Mrs. Montgomery's trial, testified that he was familiar with Mr. Duchardt. Mr. Burr testified that Mr. Duchardt did not consult with the federal resource counsel project on the Montgomery case. "That was typical for Mr. Duchardt with respect to our project. He rarely consulted with us."[2305] In fact, after Mr. Duchardt's appointment, the project tried to convince Mr.

---

[a] Lead counsel, Mr. O'Connor, left the mental health and mitigation aspects of the case to Mr. Duchardt (Vol. 7, p.1865, O'Connor Testimony). On the eve of trial, Mr. O'Connor took responsibility for the direct examination of Dr. Logan (Vol. 5, p. 945, Logan Testimony). Mr. Owen's role in the case decreased over time and substantially so after he was demoted from first assistant in February, 2007 (see, Vol. 3, p. 691, *Cardarella Testimony*).

[b] Mr. Burr, who at the time of Mrs. Montgomery's trial had over a quarter centuries experience as a death penalty lawyer, is the former director of the NAACP Legal Defense Fund Death Penalty Defense Project, former litigation director for the Texas Resource Center, and from 1997-2014 worked as a part of the Federal Death Penalty Resource Counsel Project ("FDPRC"). FDPRC is a project of the Defender Services Committee working with the Administrative Office of the United States Courts. Their mission is to provide "consulting assistance to … defense counsel appointed in federal capital prosecutions."

Duchardt to accept assistance from the project by assigning a different attorney to consult on the case because, "over the years … none of us had been successful in engaging Mr. Duchardt[.]"[2306]

Mr. Wurtz testified that it was the standard of care to consult with FDPRC in a federal capital case. In fact, the Office of Defender Services requires federal public defender offices to consult with FDPRC.[a] Indeed the 1998 Spencer Report praised the role of FDPRC,

> Dividing the work regionally, Resource Counsel are available to provide assistance to defense counsel in every federal death penalty case. Judges, defense counsel, Administrative Office staff and Department of Justice death penalty policy makers praised their efforts and effectiveness. Resource Counsel's legal advice and pleadings have prevented lawyers from having to "reinvent the wheel" in every case. They have provided substantial assistance to courts and counsel in developing and implementing case budgeting procedures. They have assisted the Administrative Office and federal public defenders in discharging their statutory responsibilities to recommend qualified counsel for appointment. They have provided training opportunities for counsel.[b]

The proof established that the Judicial Conference felt that FDPRC's advice is essential, adopting Recommendation 6 of the Spencer Report which states,

---

[a] The District Court found, "You've established that Mr. Conrad, rarely, if ever, followed the policy recommendation of the Defender Service[s] Committee as adopted by the Judicial Conference" (Vol. 3, p. 547-48).

[b] Exhibit 120, p. 17, Honorable James Spencer, et al., *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, May 1998. The Judicial Conference of the United States adopted the Recommendations of the Spencer Report in September, 1998.

"The Administrative Office of the U.S. Courts should continue to support the Federal Death Penalty Resource Counsel Project, which has become essential to the delivery of high quality, cost-effective defense representation[.]"[a] No attorney working for Mrs. Montgomery consulted with them after Mr. Duchardt's appointment.

Though the proof at the evidentiary hearing did refer to the Guidelines, which the Court accepted as the prevailing professional norms, the proof also relied on other sources (treatises, articles, public defender publications, expert testimony) that reinforced the wisdom of the Guidelines. This approach is consistent with the holding of the Supreme Court's post-*Van* Hook decision in *Padilla v. Kentucky*, 559 U.S. at 367-68 (recognizing that the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications are all "valuable measures of the prevailing professional norms of effective representation")

**b. Prevailing professional norms at the time of Mrs. Montgomery's trial required at a minimum a functioning team of two lawyers, an investigator, a mitigation specialist, and a person qualified to identify and screen for mental health symptoms.**

[a] Exhibit 120, p. 5, Honorable James Spencer, et al., *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, May 1998.



Appellate Case: 17-1716 Page: 642 Date Filed: 11/01/2017 Entry ID: 4596229

The team approach to capital defense has been the standard of care in capital defense "since the earliest days of the modern era."[2307] Indeed in 1987, it was accepted that, "the defense team should be composed of, *inter alia*, attorneys, mitigation specialists, criminal investigators, psychologists, and psychiatrists. In addition, specific problem areas like alcoholism, neuropsychological deficiencies, etc., are addressed by other appropriate professionals."[2308] The value of the team approach, described in 1987, is equally valid today.

> The team approach has proven to be the best method of increasing the chances of a life sentence; the collective efforts of the team heighten productivity and lead to a better defense for the client. Benefits of the team approach include: (1) increased efficiency, since tasks can be delegated to appropriate team members, allowing attorney time to be devoted to legal-oriented problems; (2) expanded knowledge of various disciplines and backgrounds, providing for more informed decision-making and strategy planning; (3) reduced duplication since each team member has specific tasks; and (4) increased support to attorneys to help combat the extreme physical and mental stresses of a death penalty case.[2309]

Critical to the team concept is the notion that every member of the team is an expert in his/her own sub-specialty." Russell Stetler, Marc Bookman, Dick Burr, Judy Clarke, and David Freedman all espoused the importance of the role of the "team" in the preparation and trial of a capital case. Anita Burns, the first lawyer that Mr. Owen caused to be removed from the case, immediately set out to put together a competent team. She reached out to experts in the field, including Dick Burr.[2310] Mr. Burr brought in David Freedman because the team

did not have anyone to identify mental health symptoms. Freedman was initially involved in his consulting capacity with the capital resource counsel "CRC" project – a project of the Administrative Office of the Courts dedicated to assisting Federal Public Defender Offices appointed in capital cases. Freedman said that "[Burr] would have asked me to become involved because he thought there was some possibility that there was a mental health question for the defendant because that's what I would -- why he would have called me as opposed to somebody else. So he likely wanted to have me in the room so that we could hear descriptions of symptoms and behaviors and get a sense of what was being seen at that point so we could provide some guidance."[a]

[a] Vol. 4, p. 832-33, *Freedman Testimony*. *See also* Vol. 3, p. 549, *Burr Testimony*, "David was . . . a really good mitigation specialist . . . and this was a case that was all about mitigation from the very beginning, at least in my perspective[.]" *Id.* Even after Ms. Clarke was terminated, Dr. Freedman was available to trial counsel as a consultant. Over the course of time Dr. Freedman identified symptoms of psychosis, hallucinations, trauma, neurological problems, and possible psychosis." (Vol. 4, p. 841-42, *Freedman Testimony*). By comparison, Mr. Duchardt said, that with respect to Mrs. Montgomery's mental health, "Basically where we were with Lisa is that we were making it up as we went along, because there was nothing obvious wrong with her except her suicide [attempts]." (Exhibit 83, p. 2, *Armstrong Declaration*). The government objected to Dr. Freedman's testimony regarding his observations of Mrs. Montgomery's symptoms because Freedman had been noticed as a fact witness, not as an expert. Mrs. Montgomery's counsel replied that Freedman's testimony was offered to show the red flags that existed at the time Freedman stopped working on the case and also as to the resources that were available to Duchardt, et al., which they rejected. The court replied, "He sounds pretty well qualified to me." (Vol. 4, p. 826, *Freedman Testimony*).

As the defense moved forward, the team expanded to include Judy Clarke, Deb Garvey, David Freedman, and Holly Jackson. Garvey, Freedman, and Jackson were each mitigation specialists who contributed different skill sets to the team. Holly Jackson was the most junior of the mitigation team and was taking direction from Clarke, Garvey, and Freedman. Freedman is an expert in mental health issues. Garvey is particularly skilled at gathering records and organizing data so that it is useful for the team and mental health professionals. The testimony from Stephanie Elliot, Susan Hunt, Judy Clarke, and Ms. Garvey established that prior to Ms. Garvey's work with the defense team, very little had been accomplished as far as requesting and collecting records. Exhibit 101, admitted by stipulation, is a visual representation of the social history records collection efforts during the time frames of the various iterations of the Montgomery defense team.



The timeframes represent the fourteen different snippets of time where the combination of Mrs. Montgomery's team changed.[a] Ms. Garvey was involved either directly or as a consultant with the records collection process from August 8, 2005 through April 19, 2006. These time frames are represented by the lime green, yellow, orange, and red bars on the chart. The red bar is the time frame during which Ms. Clarke served as appointed counsel. The chart further shows that efforts to collect records virtually ceased after Ms. Clarke was terminated.[b]

The proof in the record establishes that Mrs. Montgomery's defense was constantly disrupted by revolving door of defense team members. Exhibit 101 reflects the various time frames when the different team members were added

---

[a] The timeframes are explained through the testimony of various witnesses at the hearing. For instance, the first small graph line was from December 28, 2004 through January 19, 2005. This was during the time Mrs. Montgomery was represented by Anita Burns. On January 20, 2005, Susan Hunt was appointed, so the next graph line represents January 20, 2005 through February 13, 2005. February 13, 2005 is when Lisa Rickert joined the team, and so on. Each bar graph represents a different constellation of team members that worked on Mrs. Montgomery's case, and that team's record collection effort is represented by the corresponding bar on the graph. Unfortunately, the graph introduced into evidence accidentally omitted the scale on the vertical axis. However, the point is the same. Once Mr. Duchardt took over, social history record collection virtually stopped.

[b] Like Dr. Freedman, Ms. Garvey was available to assist Mrs. Montgomery's defense even though Ms. Clarke had been terminated. Duchardt, *et al.,* did not take advantage of this free resource.

or taken away. Exhibit 133, shows the nine different combinations of lawyers assigned to represent Mrs. Montgomery:




Over the course of a year and four months, Mrs. Montgomery lost eleven team members: Dedmon, Wurtz, Dillingham, Burns, Rickert, Clarke, Garvey, Freedman, Jackson, Hunt, Thompson. The lawyers she lost (Dedmon, Wurtz, Burns, Clarke, and Hunt) were all following the ABA Guidelines. The mental health mitigation individuals she lost (Dillingham, Rickert, Garvey, Freedman, Jackson) all saw evidence that led them to believe that Mrs. Montgomery was extremely mentally ill, possibly incompetent, likely psychotic, likely experienced horrifying trauma in her past, likely had neurological problems, and required skillful questioning to avoid tampering with her already compromised memory and broken brain. The remnants included Ron

Ninemire,[a] who "never bought into the mitigation part."[b] Ninemire had only worked on one other capital case that went to trial and in that case no mitigation was presented.[2311, c] Susan Hunt testified that "[Ninemire] flat out told me he didn't really believe in mitigation."[2312]

Stephanie Elliott, the paralegal that Owen had hired after meeting her at a party, remained on the case. Ms. Elliott had no death penalty or mental health training.

David Owen remained on the case. After firing Holly Jackson, Mr. Owen hired Dani Waller to replace her.[2313] Neither Duchardt nor O'Connor had a role in that choice. Waller's "role in terms of what [Duchardt] was doing was not a whole lot."[2314] Waller's "role was very truncated. So instead of it being a comprehensive, holistic, global investigation, it was task oriented with few

---

[a] The parties agreed that Mr. Ninemire was an unavailable witness as he claimed to suffer from "global transient amnesia" and heart problems (Vol.1, p. 46, 47, *Stipulation*).

[b] Philip Thompson was a fact investigator who worked with Susan Hunt. He passed away before the hearing. His declaration was entered by stipulation (Exhibit 61, p.2, *Thompson Declaration*).

[c] That defendant, Mr. Ortiz, has since been granted executive clemency on the basis of proof that Mr. Ninemire failed to uncover in his case. https://www.justice.gov/pardon/obama-commutations#CJAN172017 (last visited October 31, 2017); https://deathpenaltyinfo.org/documents/OrtizClemencyStatement.pdf(last visited October 31, 2017).



Appellate Case: 17-1716 Page: 648 Date Filed: 11/01/2017 Entry ID: 4596229

specific things that needed to be done."[2315] Mr. Owen directed her work[a] and told her that "Fred didn't use mitigation specialists."[2316] At the time of her testimony, Ms. Waller did not "remember a lot about [lead counsel O'Connor]."[2317] She saw him "a couple [of times] at most"[2318] before the trial.

Ms. Waller described the tension between Ninemire and Owen. "I could just tell there was something going on, and Ron didn't want to speak. It was -- you could just tell there was a lot of tension and drama; and then as we worked together more, he would say, I'm not going to speak up if David's there. David gets mad. And David would get mad if I was with Ron and not him. It was just clear something had happened."[2319] To Ms. Waller, the message was "very clear you can't speak up, right? If you have a differing opinion, if you're not on task according to how [Owen] set the task, it doesn't go over well."[2320] The situation with Owen deteriorated further after Owen was demoted, when "he became less involved, but in a way it honestly got worse in the fact that he was never less -- he was always in his office with the door shut and Stephanie in there and then he wanted me in there. So that almost made it harder in a way because if I

[a] Vol. 6, p. 1556, *Waller Testimony. See also*, Exhibit 83, p. 3, *Armstrong Declaration* ("[Mr. Duchardt] recalled that Dave Owen was the person who primarily assigned tasks to Ms. Waller; Mr. Duchardt did not recall asking Ms. Waller to do very much." Duchardt explained that he "did not really have a lot of a relationship with Dani Waller." And, "Ms. Waller did what she was asked to do.")

wasn't in there, he was mad. But, you know, a lot of times they were just in there talking." [2321]

Ms. Waller testified that though she was hired as a mitigation specialist, she was not asked to take a role in evaluating Mrs. Montgomery's mental health, because "there was nothing there."[2322] Ms. Waller testified that the lawyers were disrespectful to her if she disagreed. "[I]f I wasn't on board, it wasn't welcomed. My input just wasn't welcomed."[2323] The district court sought clarification if Ms. Waller was just talking about Mr. Owen, or "all the lawyers" and Ms. Waller replied that though she was "talking more about David … there were a few times that Fred made it pretty clear that he wasn't interested in what I thought or was doing."[2324]

After Ms. Hunt was instructed to withdraw the court appointed John O'Connor as lead counsel. "It seemed very apparent"[2325] to O'Connor that the case would involve mental health issues. O'Connor did not have the experience to handle the mental health aspects of this case.[2326] Mr. O'Connor sought the appointment of additional counsel. He asked Dick Burr for suggestions.[2327] Mr. Burr testified that what had happened to Ms. Clarke was a real "stumbling block"[2328] as far as attracting qualified counsel, but he was able to suggest Denise LeBouef as one of the lawyers who would be qualified to come in as



Appellate Case: 17-1716 Page: 650 Date Filed: 11/01/2017 Entry ID: 4596229

additional counsel.[a] Mr. O'Connor did not follow up on the suggestion and Mr. Duchardt was appointed. Mr. O'Connor delegated the mitigation and mental health aspect of the case to Mr. Duchardt to "a great extent."[2329]

The proof shows that Owen was sidelined and O'Connor left the mental health and mitigation to Mr. Duchardt. Other than read discovery and conduct a few phone calls, O'Connor did not do much work on the case until March, 2007.

The individuals working on the defense for Mrs. Montgomery were not a team. They did not function as a team in the way that the prevailing professional norms require. *See ABA Guidelines*, Guideline 4.1, The Defense Team and Supporting Services.[2330]

Aside from the fact that the disruptions meant that Mrs. Montgomery no longer had a team, the disruptions harmed the case in other important ways. From past experience, Mrs. Montgomery already had good reason to distrust the legal system. When, as a sixteen year old, she told Judge Rineer, Denise Riley, and Nancy Wallentini that Jack Kleiner had raped her, no one stepped in to help her. Moreover, when her mother forced seventeen-year old Lisa Montgomery to take the stand to testify against Kleiner at the divorce proceeding, Kleiner's

---

[a] Ms. LeBouef's qualifications, including the fact that she helped write the Guidelines, are set forth in Exhibit 50, *LeBouef Declaration*.



Appellate Case: 17-1716 Page: 651 Date Filed: 11/01/2017 Entry ID: 4596229

lawyer viciously cross-examined her and no one objected. No one considered how humiliating and soul-crushing it was for Mrs. Montgomery to testify about, what we now know, was only the tip of the iceberg. Her mother was still in control, forcing her to keep her secret. So, when Lisa told the district court in her letter about her past experiences making it hard for her to speak up on her own behalf in court, there was a basis in fact.[a]

It would be difficult for any capital defendant to trust her lawyers given the degree of drama, acrimony, and turnover that existed. Lawyers and investigators simply disappeared without explanation and without her input. The loss of Ms. Clarke and her team was not only devastating from the stand point of losing the only people who really knew how to prepare this case for trial, but also because Mrs. Montgomery had finally identified a lawyer that she could trust—and the court took that lawyer away. Then when Ms. Hunt tried to repair that damage, the court took her away too. David Owen and Ron Ninemire were partly to blame and Mrs. Montgomery lost all hope and trust in them. Mr. Duchardt admitted that Mrs. Montgomery was "devastated" by the loss of Ms. Clarke and her team.[2331]

[a] Of course, competent counsel would have followed up on the red flag in the letter. Duchardt, *et al*., did not.



Appellate Case: 17-1716 Page: 652 Date Filed: 11/01/2017 Entry ID: 4596229

Because Duchardt, *et al*., did not have the experience or skill set necessary to recognize just how mentally ill Mrs. Montgomery was, they did not appreciate the impact of the disruption on Mrs. Montgomery's competence. Because they did not understand the effect of her trauma history, psychosis, mental illness, and neurological impairments, they did not appreciate how the disruption in her team made it all but impossible for Mrs. Montgomery to rationally assist counsel, particularly counsel who did not perceive or understand what they were dealing with.

As Mr. Stetler and Mr. Bookman testified, this sort of disruption in a capital team also hurts successor counsel's ability to connect with witnesses to uncover the difficult and shameful stories that inform mitigation and mental health defenses. Competent mitigation interviews take time to build trust and rapport. Often these witnesses are also trauma survivors. The mitigation interviewer must have time, patience, training, and skill. The only individual left who remotely fit that bill was not allowed to do her job. Duchardt did not even start to try to fill that role until January, 2007. By then he was four months from what he believed to be a firm trial date. The witnesses had interview fatigue having been interviewed by a revolving door of defense team members. The failure to provide Mrs. Montgomery a defense team that complied with prevailing professional norms, and the multiple disruptions to her team, led to a



Appellate Case: 17-1716 Page: 653 Date Filed: 11/01/2017 Entry ID: 4596229

cascading number of poorly informed and hasty decisions which prejudiced Mrs. Montgomery. *See Daniels* 428 F.3d at 1210 (9th Cir. 2005).

**c. Prevailing professional norms at the time of Mrs. Montgomery's trial required frequent communication among all the team members.**

Testimony at the hearing established the critical importance of team meetings. The testimony established that during the time that Ms. Clarke was appointed counsel, the team met often and the meetings were long. Each meeting had an agenda and a training component. The team was intentional about visits with Mrs. Montgomery, noting what symptoms to be aware of and instructing all to be careful to avoid compromising her memory. The team shared their observations at the team meetings so that each member could add his or her reflections and all aspects of the work could benefit from the information.

While the team made follow up task lists and to do lists, those lists were due to be updated at the time that Ms. Clarke was terminated. The testimony also established that not everything that was shared at a team meeting was written down. Prevailing professional norms compel frequent, in person team meetings so that every member of the team can share their information with the rest of the team. As stated earlier, in a team that complies with professional norms, each team member has a different skill set.



Appellate Case: 17-1716 Page: 654 Date Filed: 11/01/2017 Entry ID: 4596229

Duchardt was "not a big meetings guy."[2332] Duchardt's busy litigation schedule did not allow for meetings with the others on the defense. Duchardt, *et al*., rarely met, not even during the trial.[2333] The picture that emerges from the testimony is that Duchardt is an outlier amongst lawyers with capital experience. This failure to communicate was critical. Because the team did not have meetings, Duchardt failed to supervise the materials sent to experts, resulting in Stephanie Elliott sending out privileged material erroneously labeled Dr. Hutchinson report that was later misused to great and destructive effect by government experts Dr. Dietz and Dr. Martell. It led to the improbable insanity by pseudocyesis defense. It led to the premature announcement of the "Tommy Defense."[a] It led to the defense injecting a character defense in the first phase of the trial, presenting Mrs. Montgomery as "beautiful person inside and out" and as good, loving, caring mother. Duchardt should have known that the Government would capitalize on this mistake and use it to present bad act evidence that would have otherwise been excluded. The government did just that, portraying Mrs. Montgomery as a horrible, abusive, lazy mother who was also a liar and manipulator. The Government's portrayal is as untrue as Duchardt's. But it was Duchardt's job to know the facts that the government

---

[a] Mr. Duchardt still believes Tommy Kleiner is the true culprit and that his probation officer "fudged" her records to provide Kleiner an alibi. (Exhibit 83, p.5, *Armstrong Declaration*).

would present and to have done the research to explain those facts within the context of a second phase mental health defense, such as that which was presented at the hearing below.

**d. Prevailing professional norms at the time of Mrs. Montgomery's trial required thorough and complete investigation.**

Counsel's obligation to conduct a thorough and complete investigation is well-established. *Williams v. Taylor*, 529 U.S. at 396; *Wiggins* 539 U.S. at 524; *Rompilla* 545 U.S. at 387. Counsel's duty extends to all aspects of the case and is binding on counsel even where the client is uncooperative or denies facts later found to be true. In *Porter*, the Supreme Court noted that "[c]ounsel thus failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service. The decision not to investigate did not reflect reasonable professional judgment. Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct some sort of mitigation investigation." *Porter*, 558 U.S. at 40 (citations omitted).[a]

No lawyer describes Mrs. Montgomery as uncooperative. All agree that she did her best, but her mental illness and trauma history got in the way. [2334] Trial

[a] *See infra*, §VI.F, G., IAC Sentencing.



Appellate Case: 17-1716 Page: 656 Date Filed: 11/01/2017 Entry ID: 4596229

counsel still had an obligation to conduct a thorough investigation. They did not. Because they did not, they did not understand Mrs. Montgomery's mental state. Because they did not, they forced her to read the discovery in the case beginning in November, 2006, giving her access to information that further distorted her impaired memories of the events.[a] They did not understand that Mrs. Montgomery's trauma history conditioned her to submit to the will of whoever the authority figure in her life may be.[2335] So they did not understand that Duchardt's approach of "pushing" Mrs. Montgomery to tell him who was with her at the crime scene planted the memory that someone else must have been there. As the testimony below explains, Mrs. Montgomery's broken memory was easily altered. Prior to March 7, 2007, Mrs. Montgomery had never implicated her brother. To the contrary, she told the police she was alone and expressed remorse.[2336,2337] Once the memory of Tommy Kleiner being present at the crime scene was suggested and then "firm[ed]"[2338] up by Duchardt's "pushing"[2339] her, Mrs. Montgomery's mind was forever altered. Of course, she wanted to believe that she could not have done such a thing.

---

[a] Stephanie Elliot testified that she visited Mrs. Montgomery upward of 40 times for Mrs. Montgomery to review discovery. Vol. 2, p. 340-41, *Elliott Testimony*; Dr. Woods recounts that the medical records reflect that Mrs. Montgomery exhibited problems with focus and concentration while reading the discovery. Vol. 7, p.1774, *Woods Testimony*. He also notes that Mrs. Montgomery was under the influence of sedating medication while reading he discovery. *Id.*, p. 1829.

Duchardt, because he did not thoroughly investigate alibi witnesses, believed that Tommy Kleiner committed the crime.[a] Duchardt pushed until he got Mrs. Montgomery to agree.

Had he conducted a thorough investigation, Duchardt would have known that Mrs. Montgomery's mental state when he encountered her was altered by her medication regimen. He would have also known that Mrs. Montgomery had trouble knowing what was real and not real.[2340] Instead of taking her stories of grand adventures with her children as truths, he would have investigated and discovered that what really happened on those trips was symptomatic of major mental illness.[2341] Certainly Mrs. Montgomery wanted to be a good, caring, loving mother. But her mental illness, trauma, and broken brain prevented that from being true.

Had he conducted a reasonable investigation of the facts and law, Mr. Duchardt would have known that Dr. Ramachandran was not a competent forensic mental health expert for a first phase defense, since he is not a medical doctor or licensed.[2342] Mr. Duchardt would have known that the pseudocyesis defense he was presenting was: a) not supported by the facts;[b] and b) factually

---

[a] Exhibit 83, p. 5, *Armstrong Declaration* ("as he put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there . . . 'I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on.'").

[b] See, §§V.B., V.C., and V.E.



Appellate Case: 17-1716 Page: 658 Date Filed: 11/01/2017 Entry ID: 4596229

did not meet the standard for insanity under federal law.[a] In fact, Dr. Hutchinson refused to support it, so Mr. Duchardt did not call her as a witness.[2343] Dr. Kuncel likewise could not support it.[2344] Dr. Logan told him it was a bad idea and asked for information that he thought might undermine the defense.[2345] That evidence was never produced until the Government showed it to him on the stand, causing him to backtrack his diagnosis.[b] In fact, Dr. Logan was forced to essentially admit on cross examination that the crime facts demonstrate that Mrs. Montgomery was not legally insane.

Had he been prepared, Duchardt would never have called Dr. McCandless, the CCA psychiatrist with no forensic experience, in the first phase of a capital case, to be the lead witness in support of the insanity defense. Duchardt should have known that McCandless did not have the credentials to be able to defend such a diagnosis.[2346] Had he been prepared, Duchardt would not have so poorly handled the *Daubert* hearing and resulting discovery dispute.[c] He would not have allowed Dr. Kuncel's evaluation to be disrupted.

---

[a] See §V.E.

[b] TT. Vol. 11, p. 2438, Logan Testimony (admitting that if the proof showed that Mrs. Montgomery was deleting incriminating evidence from her email and search history before the murder that could be interpreted as evidence that she knew that what she was about to do was wrong.

[c] See, §§V.B., V.C. and V.E.

Had he been prepared he would have anticipated Dr. Martell's misuse of Dr. Hutchinson's data and presented Dr. Hutchinson to rebut it.[a] He also would have presented a witness like Dr. Sanislow, who would have explained that Dr. Martell's interpretation of the MMPI was inaccurate.[b] Mrs. Montgomery was not malingering. Her answers were consistent with what we now know about her destructive, terrifying trauma history and her comorbid illnesses.[c] Mrs. Montgomery did not lie on the MMPI. She just really is that ill. But trial counsel did not know that. So, Dr. Martell was allowed to testify that she was faking mental illness. This testimony combined with the outlandish insanity defense, and proof that Mrs. Montgomery had said that her brother was the true culprit doomed any penalty phase proof.

All of these errors flow from Duchardt's failure to thoroughly prepare and investigate. His failures flow not from reasoned professional judgment but from ignorance, inattention to the case, failure to consult with the other current members of the defense, and worse, failure to consult with Clarke, Garvey, Freedman, Jackson, Rickert, Hunt, Dedmon, Wurtz, Dillingham, or any member of FDPRC. These professionals would have discussed the case with Duchardt so that he would not have had to "make it up as [he] went along."[2347]

---

[a] See, §§V.B., V.C. and V.E.
[b] See, §§V.B., V.C. and V.E.
[c] See, §§V.B., V.C. and V.E.



Appellate Case: 17-1716 Page: 660 Date Filed: 11/01/2017 Entry ID: 4596229

That investigation stalled after Judy Clarke was terminated is visually apparent when one considers Exhibit 102, stipulated to by the government, which is a graphical depiction of the number of interviews conducted prior to Mr. Duchardt's appointment (in blue) v. those after his appointment (in orange).




The exhibit is striking on its own. Seventy-five percent of all interviews were conducted prior to Duchardt's appointment. But when one considers that the time frame in blue is approximately seventeen months and the area in orange is also approximately seventeen months, the work stoppage (and resulting failure to investigate) is patent.

In sum, counsel's professional errors are similar to the errors made in *Daniels*.

> A major impediment to [trial counsel's] representation of Daniels was Daniels's mistrust of his counsel and the resulting lack of attorney-client communication. This conflict meant that [trial counsel] was unable to effectively communicate with his client Daniels and thus, was deprived of a valuable source of information in preparing for his



Appellate Case: 17-1716 Page: 661 Date Filed: 11/01/2017 Entry ID: 4596229

defense. Ultimately, a complete breakdown in communication with their client Daniels rendered [trial counsel's] assistance ineffective. *See Frazier v. United States*, 18 F.3d 778, 782 (9th Cir.1994) (noting that Strickland's performance prong "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice"). This is particularly true given [trial counsel's] ineffective efforts to overcome the impasse.

The record reveals that although [trial counsel] was aware of the effect this communication block would have on his representation of Daniels, he did little to overcome it. As [trial counsel] conceded, the circumstances and events surrounding his representation of Daniels—including the lack of preparation on the case by the Public Defender's Office, Daniels's lack of confidence in [trial counsel], and [trusted predecessor counsel's] inability to disclose information—deprived him of information that would normally be available to defense counsel.

Nevertheless, [trial counsel] did not apprise the district court of the extent of the communication problem with his client. In addition, even though [trial counsel] believed Daniels's best hope was to testify and explain what had occurred and why, he did not press Daniels to testify. Nor did he explain to Daniels that his testimony was critical to his defense—indeed, that it was the only valid defense strategy. Moreover, [trial counsel] failed to explain to Daniels how his testimony during the guilt phase would benefit his penalty phase presentation. Having Daniels describe his fears and paranoia to the jury would provide context to the psychological or other mitigating evidence offered at the penalty phase.

Even more puzzling is [trial counsel's] failure to contact attorney [trusted predecessor counsel] for assistance in overcoming this problem, despite knowing that Daniels trusted and confided in [trusted predecessor counsels]. [Trusted predecessor counsel] later testified that he had refrained from speaking with [trial counsel] after [trusted predecessor counsel] was designated a prosecution witness to avoid learning any new information from [trial counsel] that he might be forced to reveal to the prosecution. However, [trusted predecessor counsel's] concern should not have kept [trial counsel] from seeking information from [trusted predecessor counsel], as that would not have necessitated [trial counsel] revealing any attorney-client privileged information that [trusted predecessor counsel] did not already know. In

> addition, [trial counsel] could have sought [trusted predecessor counsel's] advice or assistance in securing Daniels's trust.
>
> [Trial counsel], however, took no steps to obtain [trusted predecessor counsel's] assistance in communicating with Daniels. Instead, it appears that [trial counsel] told [trusted predecessor counsels] to "keep [his] hands off and let's see if we can handle this to the best of our ability." Moreover, [trial counsel] did not attempt to use [trusted predecessor counsel] during the penalty phase even though [trusted predecessor counsel] was no longer a prosecution witness and the trial court had expressly suggested that [trial counsel] contact [trusted predecessor counsel]. As the district court concluded, "[i]n light of [trial counsel's] admitted knowledge that Daniels'[s] testimony was critical to his defense and his ongoing inability to communicate with Daniels, his failure to use [trusted predecessor counsel] in any way to overcome the communication failure, particularly by the time of the penalty phase when any threat from [trusted predecessor counsel's] designation as a witness had been lifted, constituted deficient performance."

*Daniels*, 428 F.3d 1201-02.

**e. Prevailing professional norms at the time of Mrs. Montgomery's trial required counsel to be honest with the court, to put the interests of the client ahead of professional interest, and prohibited trial counsel from continuing his representation once a conflict of interest arose.**

**i. The Federal Public Defender's Office had an actual conflict of interest in the representation of Lisa Montgomery**[a] **.**

Professor Larry Fox, former chair of the ABA Standing Committee on Ethics and Professional Responsibility, Supervising Attorney of the Ethics Bureau at Yale University, and leading legal ethics expert, explains the

[a] Mrs. Montgomery incorporates §§V.A., V.B. and VI.A. as if fully set forth herein.

numerous ethical violations and conflicts of interest that the Federal Public Defender's Office labored under before and after the termination of Ms. Clarke.[2348] Those errors include: 1) compromising the Impartiality and Decorum of the Tribunal by proceeding *Ex Parte* and without consulting Hunt or Clarke in violation of Rule 4-3.5; 2) violating their duty of loyalty by seeking to remove Ms. Clarke for their Own Purposes and Against Mrs. Montgomery's Interest in violation of the preamble to the Rule 4, Rule 4-1.3 cmt.1, Rule 4-1.7 cmt.1; 3) disregarding Mrs. Montgomery's interest in continuity of representation in violation of Rule 1-1.16 & cmt.7 and ABA Standards for Criminal Justice: Providing Defense Services (3d ed. 1993), SCJ 5-6.2 and 5-6.3; 4) breaching their duty of communication by failing to consult or inform Mrs. Montgomery about the decision to Remove Ms. Clarke in violation of Rule 4-1.14 and cmt. 2,[a] and Rule 4-1.4; 5) Mr. Conrad failing in his duty to supervise Mrs. Montgomery's representation in violation of the ABA Guidelines, specifically Guidelines 3.1, 7.1, and 10.4,; 6) Ms. Clarke's removal leaving behind a defense team incapable of providing effective representation in violation of the ABA Guidelines, specifically Guidelines 5.1, 10.4, and 10.5.[2349]

---

[a] The Ethical Rule "singles out communication as a duty of particular importance when interacting with a client with diminished capacity" (Exhibit 52, p. 10, *Fox Report*).



Appellate Case: 17-1716 Page: 664 Date Filed: 11/01/2017 Entry ID: 4596229

As described in this application, the fallout from the federal public defender's numerous ethical violations was catastrophic. At the evidentiary hearing, Mr. Owen admitted that the ultimate defense presented for Mrs. Montgomery was ineffective.[2350] He admitted to calling Susan Hunt in the middle of the trial to lament that Mrs. Montgomery's story was not being told.[2351] Mr. Owen testified to the reputation for ineffective representation that Mr. Duchardt had with the federal public defender's office.[2352] Owen was then asked on cross-examination, "Well, if you thought he was ineffective, wouldn't you as an officer of the court have a duty to tell the Court?" Mr. Owen replied, "At that point we had no choice." The government responded, "What do you mean you had no choice?" Owen answered, "Because of the messy way the case had developed throughout the time, we needed somebody that could handle, you know, supposedly as learned counsel, handle the case."[2353]

Thus, the FPD continued their representation of Mrs. Montgomery with an actual conflict of interest, which caused them to render ineffective assistance of counsel. *See Holloway v. Arkansas*, 435 U.S. 475 (1978); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Mickens v. Taylor*, 535 U.S. 162 (2002). *Cf. Christeson*, 135 S. Ct. 891; *Maples* 565 U.S. 266.

**ii. Mr. Duchardt was also operating under an actual conflict of interest that adversely effected Mrs. Montgomery, when he knowingly made untrue statements to the trial court thereby pitting his**



Appellate Case: 17-1716 Page: 665 Date Filed: 11/01/2017 Entry ID: 4596229

**interest in not being found out against Mrs. Montgomery's interest in a fair trial and effective representation.**

As Professor Fox explains, "Rule 4-3.3(a)(1) mandates that a lawyer 'shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of fact or law previously made to the tribunal by the lawyer.'" The record compels the conclusion that Mr. Duchardt knowingly made false statements to the Court at the April 3, 2006 status conference. As of April 3, 2006, Mr. Duchardt faced an April 30, 2007 trial date. The record shows that Mr. Duchardt did not direct his attention toward developing any sort of defense for Mrs. Montgomery until January, 2007, a scant four months from the trial date. At the hearing, Mr. Duchardt told the judge that he had secured two expert opinions (from Dr. Logan and Dr. Ramachandran) that Mrs. Montgomery suffered from pseudocyesis and that her diagnosis would provide a first phase mental disease or defect defense and that Dr. Ramachandran was preparing reports.[2354]

The unrefuted proof in the record is that Dr. Logan had not diagnosed Lisa Montgomery with pseudocyesis.[2355] Dr. Logan had not seen Mrs. Montgomery in over two years. He did not examine Mrs. Montgomery until a week after the status conference[2356] and he "had none of that pseudocyesis stuff [until] we got Ramachandran."[2357] In fact, according to Mr. Duchardt in his 2013 interview,



Appellate Case: 17-1716 Page: 666 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Logan was unable to find a first phase defense until Duchardt "provided him with Ramachandran's report, and Dr. Logan was able to support Dr. Ramachandran's analysis."[2358]

Dr. Logan testified that he had not diagnosed Lisa Montgomery with pseudocyesis as of April 2, 2007 and that Mr. Duchardt's representation to the court was untrue.[2359] In his declaration, Dr. Logan stated that "Mr. Duchardt's primary focus on pseudocyesis was clinically incomplete, myopic, and misguided."[2360]

It is undisputed that Mr. Duchardt's first contact with Dr. Ramachandran was April 2, 2007, the day before the pre-trial hearing.[2361] Dr. Ramachandran was in India at the time of the brief telephone call.[2362] Dr. Ramachandran testified, without contradiction that is "inconceivable" that he would diagnose a patient over the phone based on what their lawyer said.[2363] Dr. Ramachandran did not diagnose Lisa Montgomery prior to April 3, 2007 and he was not preparing a report.

Mr. Duchardt's misrepresentation to the court resulted in the court continuing the case. Mr. Duchardt told the court absent the Logan and Ramachandran reports, the defense would have been prepared for trial, but now, they had a first phase defense which they did not have before. The court made its displeasure known regarding the apparent need to continue the case as the



Appellate Case: 17-1716 Page: 667 Date Filed: 11/01/2017 Entry ID: 4596229

result of the late-arising reports. Further, as Professor Fox points out, this untruth masked the true extent of the defense's unpreparedness.

Dishonesty to the tribunal is an ethical violation. Violations of candor to the tribunal undermines the integrity of the court, in violation of 4-3.3 cmt. 2. Here, Duchardt's false statement was material where it resulted in a continuance of the trial date, complete alteration of the trial defense, hid his unpreparedness from the Court, and resulted in the presentation of a doomed insanity defense which undermined the penalty phase defense.

Independently, Mr. Duchardt had "breached his ethical duties of competence and diligence to Mrs. Montgomery" when he announced his pseudocyesis defense in violation of rules 4-1.1 and 4-1.3. Where his lack of competence and diligence resulted in untrue representations about an improbable first phase defense based on pseudocyesis, Mrs. Montgomery was actually harmed by his unethical behavior.

Mr. Duchardt's dishonesty placed him in conflict with Mrs. Montgomery because, as a result of these ethical breaches, it was in his personal interest to present the insanity defense because to fail to do so would lead the Court to discover his lies. As Duchardt stated in his declaration, "[s]ince pseudocyesis was actually 'used' in the first phase of our trial, it would seem impossible for Current Counsel to legitimately argue that such a representation was a

lie."[2364,2365] This is exactly Movant's point: rather than be found out, Duchardt pressed forward with the doomed defense. As Dr. Logan explained, "Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis."[2366] Duchardt's defense was "full speed ahead on pseudocyesis."[2367]

Duchardt's single-minded focus on pseudocyesis caused him to overstate the significance of Dr. Gur's findings regarding Mrs. Montgomery's neuroimaging studies and neuropsychological testing. Because Mr. Duchardt insisted on presenting Dr. Gur in the first phase of the case, the Government moved to exclude the neuroimaging testimony in the first phase only.[2368] Had Duchardt backed down, and saved the neuroimaging for the second phase, it would not have been excluded. But because he was focused on pseudocyesis, he moved forward, mishandled the *Daubert* hearing and wound up in a discovery battle that resulted in the neuroimaging being excluded all together.[a] All of these professional errors can be traced back to the materially false statements he made to the court.

Finding the defense strategy to be the result of a "reasoned process," the district court relies on Mr. Duchardt's self-serving statements that the decision to rely on pseudocyesis was a strategy decision based upon Mr. Duchardt's

---

[a] *See*, §§V.B., V.C. and VI.F.

assessment that "[i]t seemed to our team that those facts were so uniquely and horribly aggravating that they would overwhelmingly outweigh a standard mitigation defense, and that only with an explanation for such a 'rare' and 'exotic' offense could we hope to save Lisa's life."[a] However, in so doing, the district court blinks the unchallenged proof in the record that unfortunately fetal abduction is not a "rare and exotic an offense" as Mr. Duchardt posits.[b] That Mr. Duchardt did not know of the fourteen other women convicted of murder in the perpetration of fetal abduction—none of whom is on death row other than Mrs. Montgomery—is proof his putative "strategy decision" was, in fact, uninformed, unreasonable, and not strategic. Mr. Duchardt's self-justifying statement reveals that, contrary to his claim, the decision to put forward a NGRI/pseudocyesis defense was not the result of a reasonable strategy but rather the result of his panicked misrepresentations to the court.[2369]

"In short, Mr. Duchardt's mendacity *created* this conflict of interest."[2370]

**3. Counsel's unprofessional errors prejudiced Mrs. Montgomery where her first phase defense utterly**

---

[a] D.E. 212, p. 28 (quoting D.E. 129, *Duchardt Statement* (appropriating Movant's description of the pseudocyesis defense as rare and exotic to describe Movant's crime)).

[b] The district court addresses in its order "only the evidence it deems relevant" and did not address Movant's Exhibit 131, *Chart of Similar Crimes*, setting forth the 16 women who have been found guilty of fetal abduction (including the murder of the mother) in the past 30 years.

**destroyed any chance she had in the second phase of the trial.**

**a. The Tommy Defense**

At the same hearing where Duchardt announced the newly minted insanity defense, he also announced that the defense had learned, from Mrs. Montgomery, that Tommy Kleiner was the person who actually killed the victim and that the defense was in the process of trying to corroborate this new revelation.[2371] There are several problems with what Duchardt told the court, which will be discussed in detail.

However, as an initial matter, the defense that Duchardt was proposing was essentially, "She did not do it, but if she did she was crazy." This defense is simply not plausible and definitely not reasonable strategy in a death penalty case where the client was found in possession of the baby who she knew was not her own as evidenced by her statement to authorities at the time of her arrest, "You have Bobbi Jo's baby."[2372]

Even more importantly, had Mr. Duchardt reviewed the files already in the possession of the defense, he would have learned that Tommy Kleiner had an alibi. Kleiner was at meeting with his probation officer, Erin Garman, at the time of the crime and could not have been at the crime scene. Garman, who also testified about Kleiner's alibi during the government's case at the criminal trial,

testified at the hearing that Kleiner's alibi was substantiated with documents that were filed as part of the public record in Kleiner's court file.[2373] Exhibit 57, which was the ongoing to do list kept by Deb Garvey of defense team tasks,[a] indicates that all of Tommy Kleiner's criminal court cases were collected by February, 2006. Kleiner's Topeka files were obtained by Stephanie Elliott and David Owen on November 22, 2005. His Osage County records were collected in Lyndon, Kansas in February, 2006 by Susan Hunt and Phil Thompson.[b] Kleiner's alibi was sitting in the defense files.

Even if Mr. Duchardt missed Kleiner's alibi sitting in his file, he could have called the previous defense team and asked them what they thought of his new theory.[c] The proof at the hearing is that the Clarke team had already discovered this alibi. Holly Jackson has a clear memory of ruling Tommy out based on his alibi:

---

[a] The to-do list was last updated on March 30, 2006. Ms. Clarke was terminated on April 19, 2006.

[b] Ms. Hunt and Mr. Thompson interviewed the purported eyewitness that was the centerpiece of the Tommy Defense on February 14, 2006 (Vol. 8, p. 1967, *O'Connor Testimony*).

[c] Mr. Duchardt did ask Anita Burns why she had not asked Lisa about the crime and Burns explained that she did not believe that it was appropriate to do so given her mental state. Vol. 2, p. 329, *Burns Testimony*. Duchardt mentions to the Court his criticism of the previous team not exploring the crime facts with Mrs. Montgomery (Exhibit 48, p. 12, *4/3/2007 Transcript*). He could have easily picked up the phone, or even asked David Owen.

> I have a vivid memory about Tommy because I remember exploring the possibility that Tommy was involved in the crime itself, and so I just have a vivid memory of hearing at a meeting with David Owen in Kansas City that Tommy was absolutely, impossibly not involved because he was definitely at a meeting with a probation or parole officer for sure at the time of the crimes, and I just kind of remember feeling kind of personally disappointed that somebody -- the person that we were thinking might be involved had an alibi.[2374]

Ms. Jackson was asked who told her about Tommy's alibi and Jackson replied, "David Owen."[2375] David Freedman also recalled that the team had openly discussed that certain members of the team had hypothesized that Tommy was the true culprit. Though Freedman never believed in that hypothesis, it was investigated and Tommy was ruled out as a suspect because of his alibi. Dr. Freedman testified that all members of the team were aware of the alibi. Dr. Freedman explained, "I think some people were disappointed that Tommy had an alibi, but that's the kind of thing you do investigation to figure out, right? It's not that hard to find. So of the things that you would explore, that was one of the things that we explored and it was not a viable option, and so we moved on to continue the investigation on things that were going to be relevant."[2376]

David Owen testified that he and Ninemire had previously investigated the Tommy Defense and that the team had learned of Tommy's alibi before Duchardt was in the case.[2377] Mr. Owen also testified that he warned Duchardt and O'Connor about proceeding with the Tommy defense and that to do so



Appellate Case: 17-1716 Page: 673 Date Filed: 11/01/2017 Entry ID: 4596229

would cause Mrs. Montgomery's mother to cut off communication between Mrs. Montgomery's family and the defense team.[2378]

Mr. Owen also testified that Mrs. Montgomery never told him that Tommy was involved in the crime.[2379] Rather, Mrs. Montgomery felt as if someone else was with her. At first, Mr. Owen took Mrs. Montgomery literally and the best candidate seemed to be Tommy Kleiner. But that they ruled him out because of his alibi. Mr. Owen came to understand that Mrs. Montgomery's feeling as if someone else was with her was actually a mental health symptom.[a]

Duchardt's failures here include: 1) not reviewing his own files on Kleiner before announcing the defense in open court; 2) not talking to prior counsel; 3) not having someone on the team who was qualified to recognize Mrs. Montgomery's sensation that another person was present was a symptom of complex posttraumatic stress disorder, 4) failure to properly investigate; 5) ignoring David Owen's warning; 6) failure to control his caseload in such a way to allow him to prepare, 7) trying to conceal from the court how unprepared the team was for the looming trial date, and 8) once provided with the alibi with the

[a] The proof demonstrates that Mrs. Montgomery was actually describing the trauma symptoms of depersonalization and derealization (Vol. 7, p. 1694, *Porterfield, Testimony*).



Appellate Case: 17-1716 Page: 674 Date Filed: 11/01/2017 Entry ID: 4596229

government still refusing to believe it and instead hypothesizing that the probation officer altered her records to provide Kleiner an alibi.[2380, a]

With that background, it is important to take apart exactly what was said to the court on the record to contextualize just how much the team's hasty action damaged Mrs. Montgomery.

Mr. Duchardt begins:

> What had amazed John and me when we first came into the case is that the people who were driving the first team had completely avoided talking to Lisa about the incident at all and had actually directed she not be talked to about the incident itself. And because of that dynamic we believe, and I am just representing to you my feeling and my understanding of the situation, it made it even more difficult for Lisa to get at and then discuss the things that are most important to this case and most important to the defense; and that is what happened in Skidmore at Bobbie Stinnett's house.

This first paragraph shows that Mr. Duchardt knew that the prior team intentionally avoided asking Mrs. Montgomery about the crime. The fact that he is "amazed" by this fact demonstrates his lack of expertise in dealing with mentally ill clients whose memories are subject to contamination. Mr. Duchardt also references the "dynamic" of the other team causing it to be "difficult" for Lisa to discuss things. This reference reflects Mr. Duchardt's failure to realize

---

[a] Of all of the defense team's theories, that Erin Garman would provide a false alibi for Tommy Kleiner is perhaps the most outlandish, but also shows their lack of professional judgment. FBI Special Agent Lipanovich called Garman to advise her that the defense was suggesting that she and Kleiner were having an affair. Vol 4, p. 904, *Garman Testimony*.

that Mrs. Montgomery's difficulty disclosing information is due to her mental illness.

> We worked long and hard with Lisa on this issue and finally we got the trust and she did begin sharing with us her recollections, but they were just spotty recollections. To this day she still cannot tell us exactly what happened to Bobbie Joe Stinnett at the precise time that Bobbie Joe was strangled and the baby cut from her stomach.[2381]

With this statement, Mr. Duchardt is trying to give the court the impression that the defense had been diligent in preparation. But his comments are proof that Mr. Duchardt was aware that Mrs. Montgomery's lack of trust in her current lawyers was an impediment to her ability to rationally assist counsel. He is also describing her memory impairments with "spotty" recollections. Because he does not have the skill set, he did not recognize that Mrs. Montgomery's dissociative state during the crime itself made her memory particularly vulnerable to suggestion.

> What Lisa has shared with us beginning in really late '06 and early this year, finally coming to the place was that someone else was with her in the car and was with her at Bobbie Jo Stinnett's house. And there is some independent evidence from other people, other witnesses, including Bobbie Jo's mother who talked to her on the phone just before this incident happened saying the people are here to see the dog, they are outside, indicating there is more than one person involved. And also there is an eyewitness who indicates seeing a car driving away from Bobbie Jo Stinnett's s house with two people in the car.[2382]

Here, Mr. Duchardt is recounting (but does not realize it) Mrs. Montgomery's description of her depersonalization and derealization. Instead of perceiving the symptom of her mental illness, he took her literally. And he supports his



Appellate Case: 17-1716 Page: 676 Date Filed: 11/01/2017 Entry ID: 4596229

hypothesis of the second suspect using an ambiguous reference by the victim and an alleged eyewitness. The statement from the victim could easily have been the vernacular use of the word "they" to refer to a singular person in a gender neutral way. The alleged eyewitness had already been interviewed by Susan Hunt and Phil Thompson and the interview notes were in the file.[2383] But neither Mr. Duchardt nor Mr. O'Connor spoke to Hunt or Thompson. If they had, they would have seen that on February 14, 2006, the alleged eyewitness had identified a picture of Lisa Montgomery's daughter, Kayla – a young teenaged girl – as resembling the driver of the car.[2384] Kayla was living in Alabama at the time of the crime. Ms. Hayes also indicated that she was against the death penalty.[2385] Had they simply read the report, they would have known that Ms. Hayes was not a strong witness.

> We finally got Lisa to confide in us in January that the other person was Tommy Kleiner, her brother. But Lisa insisted we were to not share that information with anyone else. She said she would not repeat it again. She was trying to protect her brother. She hadn't decided whether she was going to let us go forward with any of this but we persuaded her to at least talk to our experts who we were talking to about the situation. So she did talk to our experts about it but we had to get her to agree to be able to go forward with the, with any kind of mental defense she had to agree to talk to the government's experts as well.[a]

Duchardt's representation to the Court that Mrs. Montgomery named Tommy as the suspect in January, 2007, is flatly contradicted by his memo to the team on



Appellate Case: 17-1716 Page: 677 Date Filed: 11/01/2017 Entry ID: 4596229

March 7, 2007.[2386] What Duchardt said in the memo regarding the March 5 and 6 visits between he, his wife,[a] and Mrs. Montgomery is, "During our discussions on what happened the day Bobbie Jo was killed, Lisa became firm on Tommy's involvement."[2387] In the memo, Duchardt recounts Mrs. Montgomery's feelings about another person but that "she has been reluctant to specifically name Tommy." But that was different in March, 2007 after Mr. Duchardt "push[ed]" her as she would "[curl] up into a ball" or use a number of other "defense mechanisms." After Duchardt told her "we have no time left for patience," Mrs. Montgomery "became firm" that her brother was the real killer, "[t]hough Lisa says she cannot retrieve the memories, Lisa is firm that it was Tommy, and not her, who killed Bobbie Jo."[2388]

---

[a] Mr. Duchardt is inconsistent as to whether his wife, Ryland, was in the room during the Tommy discussion. *Compare* Exhibit 157, *Duchardt Memo* (saying Mrs. Montgomery revealed that Tommy was with her during his visit to BOP in Philadelphia at which his wife was present) *with* D.E. 129 ("As I accounted in my memo, it was at an earlier meeting, one at which Ryland was not present, that Lisa revealed Tommy as the person who was with her). The importance of that inconsistency is open to interpretation. But it is important to note that Mr. Duchardt represented his wife as an "expert" and member of the defense in order for her to allowed to attend the visits. It is objectively unreasonable to misrepresent the credentials of a person the lawyer is bringing to prison and it is further objectively unreasonable to involve a non-expert, non-member of the legal team (especially a spouse) to be present for attorney/client communications. This is not the first case where Mr. Duchardt has involved his family in sensitive trauma interviews. *See Purkey v. United States*, 729 F.3d 860, 864 (8th Cir. 2013) (Mr. Duchardt's teenage son present for interview of defendant's brother regarding maternal incest).

This discrepancy is important because the tale that Duchardt spun for the court was intended to create the impression that the team had been working on 'the Tommy defense' for longer than they actually had. His interest in concealing the lack of preparation caused him to mislead the court as to when (and how) Mrs. Montgomery came to "be firm" that her brother was involved.

Because Mr. Duchardt was not prepared, had not put together a biopsychosocial history, had not thoroughly investigated, had not reviewed his file, had not consulted prior (trusted) counsel, and was facing a trial date for which he was unprepared, he and Mr. O'Connor failed to recognize that everything that happened with Mrs. Montgomery in March, 2007, was field of red flags for complex trauma, psychosis, major mental illness and brain damage. Instead, they took it literally and set out to prove their hypothesis, ignoring Mr. Owen's warning.

Duchardt went on to tell the Court that Leona Hayes had "tentatively identified Tommy Kleiner."[2389] Ms. Hayes had not been contacted until the day before the hearing.[2390] After the hearing, Mr. O'Connor took a sworn statement from Ms. Hayes.[2391] Upon being shown a picture of Mr. Kleiner, Ms. Hayes told O'Connor that the person she remembered was "little" and "had blonde-

colored hair. But I've told them[a] this before, yesterday, the nose may not have been the same. The nose is what throws me."[2392] Ms. Hayes continued that she "didn't see the front face. I just seen the side view." When pressed whether it was possible that she saw Tommy Kleiner in the car as it drove away from the scene, she says, "It's possible but not probable."[2393]Ms. Hayes's testimony is not proof of "a tentative" identification.

The reverberations from this misstep were staggering. The FBI told Mr. Kleiner and his family that his sister was trying to blame him for the murder.[2394] As Mr. Owen predicted, Mrs. Montgomery's family shut down.[2395] Mr. Duchardt made no effort to rebuild the already tenuous relationships that were shattered by the false allegation against Tommy.

The government took great advantage of the misstep. They did not reveal their knowledge of the alibi until after Mrs. Montgomery was interrogated on video by Dr. Park Dietz and Dr. Daniel Martell for five days. Mr. Duchardt encouraged Mrs. Montgomery to tell the "Tommy story" to Ramachandran and Logan. Mrs. Montgomery did not tell the "Tommy story" to Gur, whose interaction with her pre-dated the April 3, 2007 hearing. She did not tell Dr.

[a] "Them" refers to Ron Ninemire, and Tom Moss. Mr. Moss was Mr. O'Connor's investigator.



Appellate Case: 17-1716 Page: 680 Date Filed: 11/01/2017 Entry ID: 4596229

Kuncel about Tommy in March. Only after the April 3 hearing, did Mrs. Montgomery implicate anyone other than herself on any recording. Prior to that day, the defense could have argued, with supporting proof from FBI 302s and Dr. Hutchinson's testimony,[2396] that she quickly accepted responsibility and showed extreme remorse. That opportunity vanished with the April 3 hearing.

Even after the government disclosed its knowledge of the alibi, the defense continued to ponder presenting the Tommy defense. It was not abandoned until the eve of trial after voir dire had begun.[a] Duchardt still believes that was a mistake not to try to prove that Mr. Kleiner committed the crime: "As he put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there."[2397]

At trial, the fact that Mrs. Montgomery blamed her brother was used by the Government to undermine the defense in every conceivable way. If Mrs. Montgomery would lie about Tommy, what else was she lying about? How could her mental health experts be believed if they based their examinations on the statements of a liar?[b]

---

[a] On October 3, two days into *voir dire*, the team filed an exhibit list containing an exhibit which purported to be an identification of Tommy Kleiner as the driver of the car speeding away from the crime scene (Crim. D.E. 319, Exhibit 423, *Leona Hayes Statement;* Exhibit 424, *Kean Hayes Statement*).

[b] This again shows why the lack of a biopsychosocial history harmed Mrs. Montgomery. Had one been completed, her experts would have had hard data to support their findings – and the findings would not have been pseudocyesis.

But it was not Mrs. Montgomery that brought Tommy into the case. It was her lawyers. And even Mr. Duchardt told the court that when Mrs. Montgomery reluctantly endorsed the idea that Tommy was there, she "insisted we were to not share that information with anyone else. She said she would not repeat it again." He told the Court that Mrs. Montgomery had to be "persuaded" to talk to "our experts" and "[s]o she did talk to our experts about it[.]"[2398]

The district court's ruling on this claim is that the blame lies completely with Mrs. Montgomery for not disclosing Tommy earlier and therefore allegedly putting her lawyers in the bind of having to make a hasty disclosure because of the looming trial date, or risk the exclusion of Ms. Hayes.[2399] But there was no rush to disclose Ms. Hayes because she was not a credible witness. She had already been interviewed by previous counsel and was not in a position to identify anyone. And, regardless, her testimony was that it was "not probable" that Tommy was in the car. The urgency was manufactured by Duchardt and O'Connors's failure to prepare.

Perhaps because the district court's decision was made without briefing or a transcript, the ruling overlooks critical, undisputed facts. Tommy's alibi was known to the defense. Mr. Duchardt should never have been "push[ing]" Mrs. Montgomery to name Tommy in the first place. But even if she did, competent counsel would have checked their file for all the information that had been



Appellate Case: 17-1716 Page: 682 Date Filed: 11/01/2017 Entry ID: 4596229

gathered about Tommy and would have discovered the alibi. Competent counsel would have heeded Mr. Owen's warning. That Mr. Duchardt and Mr. O'Connor ignored Mr. Owen could be attributable to any number of reasons,[a] but that they did ignore him to Mrs. Montgomery's detriment highlights the lack of communication amongst the team. The district court order places blame on Mrs. Montgomery where Mr. Duchardt is clear that she did not trust this iteration of her defense team. Further, though Duchardt did not realize it, Mrs. Montgomery's incompetence and mental illness were acutely symptomatic in her interactions with him. Had Mr. Duchardt complied with prevailing professional norms and conducted a thorough social history investigation, had someone on the team who was qualified to recognize symptoms as required by the Guidelines, and had the team develop a biopsychosocial history and provide it to a competent multidisciplinary mental health team, 'the Tommy Defense' would never have been an issue.

Finally, Mr. Duchardt's lack of preparedness was not because of anything Mrs. Montgomery did. Rather, it was because of Mr. Duchardt's inattention to

---

[a] Mr. Owen was demoted on February 20, 2007, shortly before the infamous March 5-6, 2007 meeting and 5 weeks before the April 3, 2007 status conference. Owen had made it clear that he was resigning from the office and would leave as soon as the Montgomery case was over. He left the day after the sentencing verdict (Vol. 8, p. 2152, *Owen Testimony*).

the case for nearly six months. Mrs. Montgomery had no control over Mr. Duchardt's schedule.

Clearly the issue is debatable among jurists of reason. A COA should issue.

**b. Counsel were ineffective in pleading NGRI thereby waiving important Rule 12.2 protections, in tying their evidence of brain damage to the unsupportable NGRI defense resulting in loss of powerful proof of brain damage, in failing to prepare witnesses to testify, and for failing to obtain a biopsychosocial history to present to a multidisciplinary team.**

**i. Counsel chose a factually insupportable defense.**

By raising a not guilty by reason of insanity defense, Duchardt placed the burden on Mrs. Montgomery to prove by clear and convincing evidence that due to severe mental disease or defect, she "was unable to appreciate the nature, quality, and wrongfulness of [her] acts." 18 U.S.C. §17. There is no volitional component to the federal standard for a first phase defense. Pseudocyesis could work as a first phase defense only if Mrs. Montgomery had believed the baby was her own due to her mental illness. There was no proof that Mrs. Montgomery ever believed that before the crime.[a] The proof from the defense did not support their affirmative defense.

---

[a] Dr. Logan testified at trial that, "At times she has said she believed the baby was hers [the day after the crime]" but any confusion she suffered after the crime was not proof that she committed the murder while unable to appreciate the wrongfulness of her actions (TT. Vol.11, p. 2411, Logan Testimony).



Appellate Case: 17-1716 Page: 684 Date Filed: 11/01/2017 Entry ID: 4596229

Prior counsel, Judy Clarke, who has represented defendants with serious mental health problems, testified that the burden in an NGRI case is "[v]irtually impossible if you have, you know, somebody who can talk. I mean, if you're comatose and out of it, maybe that would be the time, but it's a virtually impossible standard, I think, to meet."[2400] Defense counsel who raise such claims risk:

> [c]omplete loss of credibility. I mean, the important thing in a capital case … is integrating the first phase with the second phase. Some lawyers before they really think about what it takes to prove an insanity case will say, Well, that's front loading mental health, but what it's doing is giving the jury an opportunity to reject your mental health presentation because it's an insanity defense that's planning or preparation, those kinds of things, just sort of intuitively juries say, I'm not going insanity. You've lost your credibility in the penalty phase.[2401]

Here, the defense was based around the testimony of Dr. Ramachandran, who Mr. Duchardt had referenced as the most published author on the topic of pseudocyesis. The record reflects that Dr. Ramachandran has written a total of five pages on pseudocyesis, summarizing a case study from 1930.[2402] Dr. Ramachandran is a research scientist, not a licensed medical doctor.[2403,2404] His training on the insanity standard was in England and he believed that the test in the United States was the M'Naghten rule.[2405] At the time he testified that Mrs. Montgomery was NGRI, Dr. Ramachandran believed that volition was relevant to the diagnosis.[2406] Dr. Ramachandran does not believe that the question of whether a person knows right from wrong in a dissociative state is



Appellate Case: 17-1716 Page: 685 Date Filed: 11/01/2017 Entry ID: 4596229

answerable.[2407] "It's a philosophical question."[2408] Dr. Ramachandran testified that his area of science "doesn't address that question."[2409]

Dr. Ramachandran testified that his meetings with Mr. Duchardt involved a few telephone calls. But they "[c]ertainly [did] not [discuss] these issues like M'Naghten's Rules, criminal responsibility, dissociative state, we didn't go into any of that."[2410] Prior to Mrs. Montgomery's case, Dr. Ramachandran had testified in two depositions. "I had very little experience at all."[2411]

Duchardt represented to both Ruben Gur and Dr. Logan that Dr. Ramachandran was "expert" on pseudocyesis.[2412] David Freedman had investigated Dr. Ramachandran as a potential witness during his time working on the case. He explained that Dr. Ramachandran's sort of insanity defense had already been discounted.

> [H]ad we remained on the case, I don't think we would have used him as an expert. **I don't think his expertise is right for capital case presentation.** He's an interesting man but, I mean, his goal is to write popular descriptions of case experiences that he's had or heard of and to bring them to popular life so people see how we understand the brain but in a popular way, and pseudocyesis was part of that. It's a chapter -- or section of a chapter in one of his first books.
>
> But it's not -- **it's not a condition that is terribly helpful**. I mean, you know, it's not a -- it's a symptom description. It's not a diagnosis. It's not a life course sort of thing. It's the kind of symptom that comes about in the context of a mental illness. But **what we cared about was the mental illness that would have given rise to those symptoms, those symptomatic set of symptoms. The way in which mental illness gets embodied is what we would have cared about, not the name of pseudocyesis**.

> And so he's not really an expert in the underlying broader piece of that, and so I probably would not have wanted to work with him.[2413]

Dr. Logan shares Dr. Freedman's skepticism of the role of pseudocyesis in an insanity defense. "I did not advocate using pseudocyesis as the foundation for an insanity defense. Therein lies the distinction. You can have a diagnosis but the degree that may have influenced her actions at the time of the crime, I did make that causal connection. In fact, I thought the evidence weighed fairly strongly that she was not under delusion that she was pregnant; otherwise, why would she need somebody's baby?"[2414] It was Dr. Logan's opinion that "the whole thing would have been much better left for the mitigation stage, the full presentation."[2415]

Dr. Logan did not initially diagnose Lisa Montgomery with pseudocyesis or insanity. According to Duchardt, it was not until after he provided Dr. Logan Ramachandran's report that "Dr. Logan was able to support Dr. Ramachandran's analysis."[2416] According to Duchardt, Dr. Logan was "brought along" on pseudocyesis."[2417] In fact, Mr. Duchardt stated that pseudocyesis was not even a working theory when Mrs. Montgomery was being tested in Philadelphia by Dr. Gur and Dr. Gur was also "brought along" after Dr. Ramachandran.[2418]

Here again, the fact that Mr. Duchardt told an untruth to the court is apparent because the Ramachandran report came much later.

Dr. Logan explains in his declaration that Duchardt was “quite taken” with Dr. Ramachandran and “Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis.”[2419] Dr. Logan’s impression of Duchardt’s single-minded focus is corroborated by Dr. Hutchinson who testified that Duchardt contacted her in 2007 and asked her if she could support a NGRI defense based on pseudocyesis. Dr. Hutchinson told him, “I thought that was an unlikely diagnosis given how uncommon it was. I didn’t have anything that supported it but that I certainly hadn’t finished, but that I thought that there might be other explanations.”[2420] As a result, Duchardt did not contact Hutchinson again.

In his declaration, Dr. Logan stated:

> Had I been asked, I would have suggested that the focus of the mitigation be placed on Ms. Montgomery's symptomology - explaining to the jury that Ms. Montgomery was out of touch with reality (psychotic), a condition seen in the context of a major mood disorder. Though she was able to form a plan, Ms. Montgomery's frame of reference was not rational; she was psychotic and her actions resulted from that psychosis and lack of contact with reality. It would have been more consistent with the evidence if the defense had presented a complete picture of the interaction of major depression with psychotic features, severe bipolar disorder, complex trauma, and neurologic impairments. Pseudocyesis is a rare symptom presentation that can occur as part of major depression with psychotic features or severe bipolar disorder.[2421]

Duchardt, and O’Connor, also mishandled the preparation of the insanity defense. Dr. Logan repeatedly asked them to provide him information about Mrs. Montgomery’s email deletions. Duchardt told him that this information

was not available—but it was. The Government cross-examined Dr. Logan with the deletion history that Dr. Logan had requested.[2422] Logan had to admit that the email deletions indicated that Mrs. Montgomery was aware that her actions were wrong, eviscerating the defense. "In my view, Mr. Duchardt's failure to provide me with this critical information such that I could take this information into my clinical evaluation and be prepared to respond appropriately on cross examination was catastrophic."[2423]

Mr. Duchardt made similar errors in his preparation of Dr. Linda McCandless, the only other defense witness to support the NGRI defense. Dr. McCandless "was totally blindsided by the recordings of Ms. Montgomery's phone calls from CCA."[2424] Dr. McCandless has sworn in her stipulated declaration that "[t]estifying at the trial in the Montgomery case was a traumatic experience for me . . . . No attorney sat down with me to go over the questions that I would be asked on direct examination or cross examination . . . . I was very nervous on the witness stand . . . . I was surprised on cross-examination when the government questioned me about tape recordings of phone calls . . . . I took them as a joke."[2425]

Dr. McCandless was the first defense witness to be called by the defense for the insanity defense. She had no forensic training.[2426] She had no social history.[2427] She had not reviewed any other doctor's report. Her evaluation did

not reflect the standard of care for use of an expert in capital trial in either phase. She recalls Mr. Duchardt calling her at night during the trial and telling her that "his witnesses were going to discuss pseudocyesis. I had never heard of it before and I did not know what it was."[2428]

Dr. McCandless stated that she did not know what NGRI meant until she was approached by habeas counsel.[2429] "I did not form an opinion as to whether Mrs. Montgomery was not guilty by reason of insanity. That was not my role."[2430]

After the phone call from Duchardt in the middle of trial, Dr. McCandless interviewed Mrs. Montgomery about the crime over the weekend break. During the previous week, the Government had been hammering home the point that Tommy Kleiner had an alibi. When Mrs. Montgomery spoke to Dr. McCandless, she did not mention Tommy. Because Duchardt did not prepare Dr. McCandless to testify,[2431] he did not consider how the government would exploit the absence of Tommy from Mrs. Montgomery's statements to Dr. McCandless – who Lisa saw as her treating physician. The government was able to argue the absence of Tommy in Mrs. Montgomery's recitation to Dr. McCandless meant that Mrs. Montgomery had changed her story in attempt to



Appellate Case: 17-1716 Page: 690 Date Filed: 11/01/2017 Entry ID: 4596229

fabricate a new insanity defense.[a] Calling an inexperienced witness who did not have sufficient facts, background, or expertise, failing to prepare that witness to testify in order to put forward proof that was inconsistent with the client's prior statements, all violated the standard of care and Mrs. Montgomery was prejudiced.

#### ii. The NGRI plea exposed Lisa Montgomery to an expansive five day video-taped interrogation by seasoned government experts Drs. Park Dietz and Daniel Martell.

A defendant who provided notice of an insanity defense must undergo a mental evaluation under 18 U.S.C. § 4242. Fed. R. Crim. P. 12.2 (c)(1)(A). The results of that examination are immediately available and admissible in the first phase of the trial.

However, a defendant who gives notice of intent to present mental health testimony in the second phase has considerably more protections. Any examination on behalf of the government is sealed and may not be disclosed to the government's attorneys until after a conviction for first degree murder and the defendant confirms her intent to move forward with mental health evidence in the second phase. Fed. R. Crim. P. 12.2(C)(2). The defendant does not have

[a] "After we rested our case she goes and talks to Doctor McCandless and then she is saying it's foggy, it's dream like." (Vol. 13, p. 2800, *Closing Argument by the USA*).



Appellate Case: 17-1716 Page: 691 Date Filed: 11/01/2017 Entry ID: 4596229

to disclose her reports until after she sees the government's. Fed. R. Crim. P. 12.2(C)(3).

Experienced federal capital attorneys understand the importance of the protections afforded to petitioners under 12.2 if they chose to reserve mental health testimony for the second phase of the trial. Conversely, they understand the risks. Mr. Duchardt understood neither.

Ms. Clarke explains, "Well, an insanity defense essentially opens the client up to a government evaluation and discussion of the crime. A penalty phase mental health presentation without an insanity defense there are certain protections built in in terms of the defense being able to [pull] the defense after they see what the government's rebuttal would be essentially."[2432] Ms. Clarke further explains that when the mental health proof is reserved for the penalty phase, the defense can "litigate the parameters around the government's evaluation … So there are limitations that Courts can impose that lawyers should be asking for in a mental health presentation for penalty phase." [2433] Ms. Clarke testified that there has been extensive motion practice in federal capital cases to limit 12.2 evaluations. "From what notice has to be given, how much information has to be provided, who can get it, will there be a taint team, what is -- assuming the Court's going to allow a government rebuttal exam, what's the parameter of the government rebuttal examination? There's a lot of

litigation that should go on around a 12.2 notice."[2434] There was no 12.2 motion practice in this case.

Ms. Clarke also noted that the protections that the lawyer gives up for his client include her Fifth Amendment privilege.[2435] Mrs. Montgomery's confession to the police was brief and she said she acted alone. It was not on video so the jury could not view her mental state. But the brief confession could have been argued as an expression of remorse. If Marilyn Hutchinson, Charles Dedmon, Ron Wurtz, and Bret Dillingham had been called, they could have testified to her remorse. But by pleading NGRI, that opportunity was lost. As Ms. Clarke testified, "It's in conflict, right. I have remorse but I was crazy at the time I did it. It's in conflict. You have to really be -- yeah. I don't know that's water that can be navigated well at all. I would not advise the attempt to present an insanity defense."[2436]

Ms. Clarke testified that when she was counsel of record for Mrs. Montgomery, she and the Government had already engaged in discussions about possible 12.2 proceedings. The Government told her that Park Dietz was "looming large" in the case. By "looming large" she explained, "Park Dietz has, you know, been involved in a number of cases and has a reputation for testifying for the

government for huge sums of money and being very artful at refuting mental health presentations."[2437]

With his NGRI notice, Duchardt threw Mrs. Montgomery to the wolves. Due to their extensive training and experience, Dr. Dietz and Martell are far more skilled at interrogation than the FBI. Mrs. Montgomery was literally backed into a corner with two large men in small room with a video camera trained on her for five days.[a] She tried to end the evaluation only to be hailed in to court to be instructed by the judge[b] that she had to continue. Mrs. Montgomery was medicated, though incompletely,[c] so the flat affect she displays on the video tape is the only proof the jury saw of her demeanor.

Because Duchardt does not believe in the capital defense community's "playbook" of gathering a detailed and documented social history, Dietz and Martell had no social history data upon which to draw conclusions. The result was that Dietz and Martell painted a false picture of Mrs. Montgomery,

---

[a] Dr. Dietz testified that Mrs. Montgomery expressed discomfort at being in the room with two men (Vol. 12, p. 2552, *Dietz Testimony*).
[b] April 21, 2007 was the first time Mrs. Montgomery had ever seen Judge Fenner – or he, her. Her prior appearances were in front of the Magistrate.
[c] Undisputed proof at the evidentiary hearing established that Mrs. Montgomery's symptoms were not adequately under control until she received Risperdol at the BOP but that the medication regime she was receiving would have rendered her facial muscles incapable of much expression, creating a flat affect (Vol. 7, p. 1844, *Woods Testimony*).

suggesting that her own absent expert witnesses[a] believed she was a malingerer and that her PTSD could either be from the crime or molestation, but the only symptom was that she was uncomfortable around some men. "So there doesn't seem to be significant mental impairment from P.T.S.D. assuming she has it."[2438] Dr. Dietz's overriding diagnosis was personality disorder with borderline and anti-social features.[2439] He testified in detail using pejorative terms weaving in stories from her estranged mother (who as it turns out sex-trafficked her) and ex-husband (who as it turned out also raped and beat her).

Dr. Dietz did not testify at the hearing below, though he was noticed by the Government. The fact that he was not called to rebut Petitioner's proof (which was supported by extensive and reliable data) can be used as an adverse inference. In any event the testimony produced at the hearing completely undermines Dietz's opinions.

**c. Trial counsel's inattention, ineffective investigation, and lack of preparation led to the disclosure of privileged information–represented to be the report of Dr. Marilyn Hutchinson, which was then presented by the government experts as proof that a defense expert had concluded that Mrs. Montgomery was a malingerer. Dr. Hutchinson testified that she never wrote a report, she never concluded**

[a] Dr. Hutchinson did not testify at the trial though her testing and putative opinions were the subject of much testimony, mentioned by Dr. Martel some 10 times. *See* §V.C.



Appellate Case: 17-1716 Page: 695 Date Filed: 11/01/2017 Entry ID: 4596229

**that Mrs. Montgomery was a malingerer, and that which was represented as her impressions was not even her work.**

At the hearing below, Dr. Hutchinson testified that Anita Burns and Susan Hunt brought her into the team as a consultant because they were confused and needed direction.[2440] They asked her to attend team meetings and brainstorming sessions. Dr. Hutchinson takes detailed notes and kept notes of those team meetings.[2441] Those notes contained thoughts and impressions of other members of the team. When she is typing her notes she does not always give attribution for who is saying what. She was told that she would not be a testifying witness. The notes were meant for her personal use and were never meant for distribution. Dr. Hutchinson explained that she was in the case for only a short time and she was not provided a biopsychosocial history. She had not spent enough time with Mrs. Montgomery to reach any final conclusions.[2442]

Dr. Hutchinson testified that she worked with a specialist in psychological testing, Karen Willing, who would administer psychological tests. Dr. Willing would type up her notes from the testing. Dr. Willing administered the pure psychological tests and Dr. Hutchinson administered the competency and malingering instruments.  Dr. Willing's name appears at the top of the psychological testing. Had trial counsel reviewed the file he would have seen differences in handwriting and Dr. Willing's name, which should have caused him to inquire of Dr. Hutchinson.



Appellate Case: 17-1716 Page: 696 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Willing would type notes from the interpretative data. “Her job was just to report what there was, because she didn’t interview the defendant. She didn’t have conversations with her. She didn’t read any records. She was not in a position to make any interpretations beyond kind of just what the facts of those tests said, and then it was my job to make the interpretations of putting them all together.”[2443]

Dr. Hutchinson testified that the psychological testing is just a piece of the puzzle but never the whole picture. Dr. Hutchinson testified that she typed a 3 page document that was a summary of the testing summaries. The testing summaries are computer driven and are not specific observations of the patient nor are they are diagnoses.[2444]

Dr. Hutchinson testified that Dr. Willing typed a note that reads, “Nothing in the testing is of much help.” This quote was attributed to Dr. Hutchinson at trial.[2445] Dr. Hutchinson said those were not her words. However, as opposed to how the words were portrayed at trial, Dr. Hutchinson said the meaning of the words was simply that, “The testing doesn’t explain what might have caused this to happen.” It does not mean that the testing ruled out mental illness.[2446]

Dr. Hutchinson identified each piece of paper that had been turned over as her report and confirmed which were her notes and stated that they were never intended to be turned over the prosecution.[2447]



Appellate Case: 17-1716 Page: 697 Date Filed: 11/01/2017 Entry ID: 4596229

Other than his one attempt to get Dr. Hutchinson to agree to a pseudocyesis defense, Mr. Duchardt did not follow up with Dr. Hutchinson regarding her initial impressions and did not provide her with a biopsychosocial history. Dr. Hutchinson stated that she has never worked with Duchardt again and that is her preference.[2448]

Dr. Hutchinson then went item by item and explained how her work product had been misrepresented to the jury. The Government represented that Dr. Hutchinson reported that Mrs. Montgomery had an extreme narcissistic injury (interpreted at trial that Mrs. Montgomery was a narcissist). Dr. Hutchinson stated a) she did not write that; b) Willing wrote it; c) it was a psychological term spit out by the computer; d) no one concluded Mrs. Montgomery was a narcissist rather that was an expression of a significant stressor.[2449]

The Government's expert also misrepresented the words on Hutchinson's summary of test summaries.

> They took individual sentences -- I mean, what they seemed to quote were some of the lines out of Dr. Willing's report but would take part of a line and not all of the line or that -- for example, on one of them I remember it was, "Profile is exaggerated but she is still extremely distressed," and they just put profile exaggerated. Another one was -- I wrote, "Exaggerated but still quite disturbed." They left off that part.
>
> I had emphasized that I thought that PTSD was a likely diagnosis. They completely left that off of their summary of my summary. The sentence was something about an "Exaggerated profile and not likely an indicator of her personality," and the rest of the sentence was, "could



Appellate Case: 17-1716 Page: 698 Date Filed: 11/01/2017 Entry ID: 4596229

> be deliberate or could be extreme vulnerability," and they just put in the first phrase.[2450]

Dr. Martell's direct examination at trial was eleven pages long and he mentions Dr. Hutchinson ten times.[2451] Dr. Hutchinson confirmed that every conclusion that Martell ascribed to her was an untrue statement.[2452] Dr. Martell testified at the criminal trial that Dr. Hutchinson reached the conclusion that Mrs. Montgomery was manipulative and a malingerer.[2453] At the hearing, Dr. Hutchinson testified that this was not true.[2454]

Trial counsel failed by disclosing privileged material. Once it was disclosed, he failed in his duty to investigate it so that he could prevent the state from misrepresenting the documents. Further, he failed in duty to prepare for cross examination of Dr. Martell.

#### d. Resulting ineffectiveness in cross-examination of Dr. Dietz, Dr. Martell, and failure to rebut testimony

Mr. Duchardt's failures in his preparation for his cross-examination of Drs. Dietz and Martell are numerous. Trial counsel's failures resulted in opinions and first phase testimony from Drs. Park Dietz and Daniel Martell which painted a false picture of Lisa Montgomery and destroyed the credibility of the defense. Because of the ill-conceived NGRI and character defenses, Dietz and Martell's testimony undermined the weight and credibility of the fragmented and meager mitigation which was presented.

**i. Mr. Duchardt's cross examination of Dr. Martell was so poor that his co-counsel became visibly upset at counsel table and one team member had to leave the courtroom.**

In addition to not correcting Dr. Martell about Dr. Hutchinson, he adopted the government's misinterpretation of Dr. Hutchinson's records. Second, because he did not investigate and did not properly prepare, he could not confront or cross-examine Dr. Martell about his misinterpretation of the testing data. Had Mr. Duchardt followed the capital defense community's "playbook" (as he calls it) and had an expert complete a comprehensive biopsychosocial history to provide to the experts, it is likely Dr. Martell would not have reached the same conclusions that he did at trial. Indeed, like Dietz, the government noticed Dr. Martell as a witness at the hearing below. Even after Dr. Sanislow meticulously picked apart Dr. Martell's conclusions,[a] the government did not call Dr. Martell to rebut him. An adverse inference can be drawn that Dr. Martell does not dispute the conclusions of the fully informed experts who were presented at the hearing below.

Mr. Duchardt's cross-examination of Dr. Martell was meandering and ineffective. Duchardt started his cross-examination by focusing on a test that Martell had barely mentioned and that had not been damaging. Duchardt

[a] *See* §V.E.; *see also* Vol. 5, p 1361-1456, *Sanislow Testimony.*

elicited testimony that Martell had found that Mrs. Montgomery failed to take responsibility for her own actions and was irresponsible.[2455] Mr. Duchardt elicited damaging testimony from Dr. Martell, not brought out on direct, focusing on his conclusion that Lisa was a "pathological liar." Mr. Duchardt introduced Martell's testimony that, "I seem to recall she denied being a liar or being very good at it. But the history suggested otherwise."[2456]

Troy Schnack, testified to the reaction of the rest of the defense while this cross-examination was going on.

> I think specifically that the cross that you were referring to that this witness seemed to go -- to give some basic information, but the feeling of myself and Stephanie and other people at the table were kind of like, hey, that went very well for us. He didn't really say anything. And then Mr. Duchardt began to do a cross-examination, and as that went, John got -- it was physically obvious that he was upset and would roll back and ask when he was going to stop. It was just not good.[2457]

Mr. Schnack described his reaction to Mr. Duchardt's examination:

> It was just evident that -- I was obviously --obviously I'm not an attorney but it was evident to me that as Mr. Duchardt would press certain issues, it wasn't helping us, and I do my best to maintain, I guess, a poker face while I'm at the table as to not influence the jurors if they're looking at me, and I couldn't just sit there anymore, so I got up as if I needed to go to the restroom and left the courtroom.[2458]

Stephanie Elliott recalls that John O'Connor was frustrated and upset by the cross examination and "said something like Fred has said pathological liar seven times now and Martell never has. Then he needs to stop, something like that."[2459] Ms. Elliott testified that there was further discussion about the cross-



Appellate Case: 17-1716 Page: 701 Date Filed: 11/01/2017 Entry ID: 4596229

examination on the way back to the office by the FPD team members and "Dave said it was a disaster."[2460]

Dr. Martell testified on direct examination about his testing, testing that he ascribed to Dr. Hutchinson, and Dr. Kuncel's testing. Dr. Kuncel's testing was interrupted because the team had not coordinated with the jail, causing her data to be invalid. Dr. Martell therefore testified that a defense witness used an invalid protocol, thereby undermining the credibility of the defense experts and Dr. Kuncel who did not testify until the second phase. He also testified that "Doctor Kuncel found evidence she was malingering." The state made the point that Kuncel, like Hutchinson, was a defense expert. Since Mr. Duchardt was ill-prepared, he did not rebut this testimony and neither Kuncel nor Hutchinson testified in the first phase, leading the jury to believe that Martell's testimony was accurate. The government argued this very point in closing argument. "We didn't hear anything from two defense experts, we didn't hear from [Marilyn] Hutchinson, and Dr. Ruth Kuncel and they all detected signs of malingering, or faking mental illness. I didn't hear that addressed a minutes ago. That's what we have been contending, she was faking mental illness and the objective test proved that. We didn't hear anything to explain those away."[2461] Later in the argument, the government continues, "And you know even their two defense experts, Doctor Martell told you about that. I just mentioned this a few minutes

ago but it's important, Doctor Hutchinson and Doctor Kuncel, they also at the time detected malingering. We didn't hear from them. Why? And again Mr. O'Connor didn't mention any of that. Ask yourself why, why didn't they address that. Why didn't they address those tests because those show she was faking and this defendant is a hoax."[2462]

The government's argument was annihilating and perfectly set up by trial counsel's ineffectiveness.

Had he dedicated the required amount of time necessary to prepare a capital case, worked with a team of qualified individuals, obtained a biopsychosocial history, and an expert in the MMPI, Mr. Duchardt would have been able to show that all of the valid test data actually support the conclusions of Dr. Porterfield, Dr. Woods, Dr. Nadkarni, Dr. Gur, Dr. Davatzikos, Dr. Newberg, Dr. Fucetola and Dr. Hutchinson's 2016 opinion formed after reviewing all the data.

Had trial counsel properly prepared, they could have obtained an expert such as Dr. Charles Sanislow,[a] whose testimony would have supported pre-trial

---

[a] Dr. Sanislow, is a clinical psychologist and associate professor neuroscience and behavior and psychology at Wesleyan University and an adjunct faculty member of the Department of Psychiatry at Yale University School of Medicine. At Yale, Dr. Sanislow studies the cognitive mechanisms of psychopathology, diagnosis and assessment and classification of psychopathology, and posttraumatic stress disorder. He is a consultant for the National Center for PTSD. Dr. Sanislow provided a brief summary of his expertise and his extensive curriculum vitae is in

motions to prevent the administration of an MMPI under Rule 12.2. Dr. Sanislow could have supported a motion to exclude the MMPI because it is not a proper instrument to administer to a person with Mrs. Montgomery's trauma history, and made a pre-trial *Daubert* challenge to the MMPI. Dr. Sanislow could also have presented testimony undermining Dr. Martell's conclusions about what the MMPI reveals about Lisa Montgomery.

Dr. Sanislow concluded, "Ms. Montgomery was doing her best to portray the most accurate sense of herself when presenting her ordered -- her ordered set of responses on the MMPI-2."[a] Dr. Sanislow's testimony is that Mrs. Montgomery's MMPI-2 profile is consistent with the profile of persons who are psychiatrically hospitalized.[2463] The reason that the computer-generated interpretive report saw her scores as invalid is because she was being compared against a different normative sample. Both Dr. Hutchinson and Dr. Logan had opined that Mrs. Montgomery required psychiatric hospitalization. So, rather than showing that Mrs. Montgomery was a manipulating malingerer, the

---

the record along with his declaration. His expertise reveals he is an expert in the MMPI and posttraumatic stress disorder. Vol. 6, p. 1441, *Sanislow Testimony*.

[a] Vol. 6, p. 1441, *Sanislow Testimony*.



Appellate Case: 17-1716 Page: 704 Date Filed: 11/01/2017 Entry ID: 4596229

M.M.P.I.II reflected that Mrs. Montgomery was actually quite ill and answering truthfully.[a]

Dr. Sanislow concluded that the testing "results suggest a multitude of clinically significant symptoms that could be related to several kinds of mental illness, including posttraumatic stress disorder (PTSD), illness in the bipolar spectrum and a possible range of depressive or emotional disorders. It is likely that there are comorbid psychiatric illnesses present, as well as the possibility for neurological problems or a history of brain damage."[2464]

Dr. Sanislow further observed that there were a number of clinical scales with significant elevations. "The degree and the number of clinical scales that were elevated for Ms. Montgomery in the clinically significant range are striking in the potential presence for a range of possible severe mental illnesses. Such severe mental illnesses need not be mutually exclusive. In fact, in cases of severely mentally ill defendants, very high rates of comorbid psychiatric diagnoses are the norm."[2465]

What Dr. Sanislow sees in the test data is corroborated by Dr. Woods, Dr. Porterfield, Dr. Nadkarni, Dr. Gur, Dr. Newberg, Dr. Davatzikos, Dr. Fucetola

---

[a] And when one drills down into her answers on the MMPI and compares them with documented data about her life, which was addressed at the hearing, it is apparent that she was telling the truth.



Appellate Case: 17-1716 Page: 705 Date Filed: 11/01/2017 Entry ID: 4596229

and Dr. Hutchinson.[a] Had trial counsel obtained a review of the MMPI-2 data, which he knew was going to be introduced and be presented in a negative light, he would have received a report like Dr. Sanislow's, which was a red flag that Mrs. Montgomery was very, very ill.

Dr. Sanislow summarized:

> The pattern of symptoms reported is most clearly reflective of trauma-related disorders (e.g., PTSD), somatoform disorders, including dissociative symptoms, and mood regulation disorders (e.g., in the bipolar spectrum), along with a range of depressive symptoms. There is also the possibility of other psychotic spectrum illnesses, including paranoid disorders or delusions, or confusion stemming from neurological problems, acute psychosis, low intellect, or intoxication. However, low intellect can be ruled out due to the results from Ms. Montgomery's IQ test. Intoxication might be ruled out because of controlled environment and test setting, although psychotropic medications could augment the pattern of results.[2466]

Had trial counsel simply consulted an expert in the MMPI, they would have learned that they needed to look deeper, do more investigation, and consider diagnoses outside pseudocyesis.

---

[a] Dr. Kuncel also agrees with all of these mental health professionals. Dr. Kuncel was an expert chosen by the trial team. To the extent that the district court and government have problems with her demeanor on the stand, that only serves to underscore the ineffectiveness of counsel. Dr. Hutchinson was in Kansas City. Had Mr. Duchardt done the work of documenting Mrs. Montgomery's life history and provided that data to Dr. Hutchinson, utilized a multidisciplinary team, and moved forward with the penalty phase defense described at the hearing, Dr. Kuncel would not have been necessary. The problems with her test protocol would not have become a sideshow and Mrs. Montgomery's true clinical picture, including her extreme abuse history where she was trafficked by her own mother who allowed her to be gang-raped by men who anally sodomized her and urinated on her, would have been told.



Appellate Case: 17-1716 Page: 706 Date Filed: 11/01/2017 Entry ID: 4596229

### ii. Mr. Duchardt's incomplete social history investigation left him unprepared to challenge Dr. Dietz's testimony.

The pseudocyesis defense and trial counsel's opening statement placed Mrs. Montgomery's character and truthfulness directly at issue in the first phase of the trial. 'The Tommy defense' did so as well. To believe pseudocyesis as a defense, the jury would have had to also accept that Mrs. Montgomery suffered from post-traumatic stress disorder as a result of abuse that she suffered as a child. Dr. Dietz skillfully undermined the severity of the abuse that Mrs. Montgomery suffered as a child because trial counsel had failed to discover the nature, extent, and severity of that trauma. Because of trial counsel's failure to investigate and failure to recognize Mrs. Montgomery's fragile and impaired memory, the government used the Tommy story as proof that Mrs. Montgomery was not mentally ill, but rather a manipulative liar. Divorced from the penalty phase, the government was able to undermine the reliability of the trauma mitigation even before the jury retired to deliberate in the first phase. *See Cone,* 556 U.S. 449 (recognizing that first phase constitutional errors in an insanity defense case though not prejudicial for the first phase verdict, can be prejudicial in the second phase); s*ee also*, *Daniels, supra* (deficient performance in first phase prejudiced penalty phase).

Dr. Dietz outlined the information that he reviewed during his direct examination. Though Dr. Dietz talked about the importance of documents, it is clear that he only reviewed law enforcement data and relied on interviews of two people: Carl Boman and Lori Colwell. Dr. Dietz did not have access to any of the exhibits that Mrs. Montgomery presented to the district court in §2255. Had he reviewed those documents, it is highly probable that his testimony and opinions would have been different. Moreover, if trial counsel had not persisted with the NGRI defense, had properly investigated, and had presented competent mental health professionals, it is probable that Dietz would not have been called at all. He was not called in the district court in §2255 to rebut any of Mrs. Montgomery's proof.

Because of trial counsel's deficient performance, Dr. Dietz testified that Mrs. Montgomery does not have a major mental illness, but rather just a personality disorder. Dr. Dietz stated that he was not able to document mania and could therefore not support a diagnosis of bipolar disorder.[2467] Had trial counsel conducted the sort of scorched earth biopsychosocial history presented in the district court below, Dietz could have been provided – or confronted with -- substantial documentation of mania and serious mental illness.[2468] Trial counsel's failure to confront Dr. Dietz with any of the documents or data



Appellate Case: 17-1716 Page: 708 Date Filed: 11/01/2017 Entry ID: 4596229

contained in the nearly more than 6,000 pages of documents presented in the district court is proof that trial counsel failed to investigate and prepare.

Dr. Dietz testified that though Mrs. Montgomery does meet the criteria for post-traumatic stress disorder, he could not say whether the PTSD was from sexual abuse as a child or from the crime itself. Dr. Dietz was able to undermine the severity of Mrs. Montgomery's childhood experiences because trial counsel had not uncovered the full extent of the abuse. The testimony was limited to sexual abuse by her stepfather and some physical abuse. But testimony about the sexual abuse was not consistent and the government, through Dr. Dietz, questioned the nature and severity of the abuse. Dr. Dietz's testimony downplayed the sexual abuse testimony such as, in the context of suggesting that Mrs. Montgomery's documented history of mental illness was lacking, minimizing the psychological impact of the sexual abuse:

> At age *16* she had *a few counseling sessions* and that occurred when her mother took her to social service agencies and to a counselor after *the mother claimed* to have found her *in a compromising situation* with her stepfather. In other words, for *the allegation of sexual abuse the mother took her teenage daughter to a counselor*. There were *a few sessions* at that time.[2469]

After this brief discussion of Lisa allegedly being found in a "compromising situation" (ie. when her mother discovered her step father raping her), Dietz moved to a discussion of the unlikeliness of pseudocyesis and the shortcomings of the defense evaluations (because these also lacked data). Then, Dr. Dietz



Appellate Case: 17-1716 Page: 709 Date Filed: 11/01/2017 Entry ID: 4596229

returned to further undermine the nature and severity of Mrs. Montgomery's trauma by testifying with respect to Mrs. Montgomery's psychological testing and PTSD:

> [W]hat the defendant says and the way she behaves in all of the exams I think is *consistent* with her actually having post traumatic stress disorder. And *my problem in analyzing the evidence*, the very evidence that *might have permitted proof* of post traumatic stress disorder has been *corrupted* by some of the tests that were given and by the unrecorded exams which leaves – *a familiar story*, this happened often when a proper record of it all would have offered clear proof she really does suffer from post traumatic stress disorder.
>
> Here we have to give the *benefit of the doubt* to the record or make a judgment and *hunch* and it would be my judgment or *hunch* that she has that condition, *despite some of the evidence not being at hand*.[2470]

Dr. Dietz's testimony sowed the seed of doubt as to whether the sexual abuse actually occurred, suggesting that there was evidence that the abuse did not occur, but that he had a "hunch" that she has PTSD. "Hunch" being different from a reasonable degree of psychiatric certainty. Because trial counsel did not discover it, Dr. Dietz did not have the evidence presented in §2255 that would have erased Dr. Dietz's doubt and changed his hunch to certainty.

With respect to the cause, nature, and severity of Mrs. Montgomery's PTSD, Dr. Dietz questioned whether the abuse she suffered was severe enough to cause PTSD and ultimately said he could not determine the cause. Dr. Dietz testified:



Appellate Case: 17-1716 Page: 710 Date Filed: 11/01/2017 Entry ID: 4596229

> Certainly the physical and sexual abuse *can cause* post traumatic stress disorder. *Some of the people* that undergo that *develop this condition*.
>
> In addition, whoever killed Bobie Jo Stinnett could *certainly* have post traumatic stress disorder because the crime scene was so gruesome and people who commit gruesome killings often give themselves a post traumatic stress disorder by looking at their own handiwork.
>
> So she has more than one possible cause of P.T.S.D. and I *think she probably* has that condition. And the *only symptoms* of that condition that have been mentioned have to do with her being *uncomfortable around men, at least some men some of the time* with her *anxiety.* She does have anxiety symptoms. P.T.S.D. is an anxiety disorder.
>
> *Not heard talk of flash-backs* during the period of these crimes that could have anything to do with the charged offenses. And when asked about nightmare the defendant didn't talk about nightmares of crime but rather talked about *nightmares of shaking Bobbi Jo* to try to wake her up. So there *doesn't seem to be significant mental impairment from P.T.S.D. assuming she has it*. There could be more functional impairment limitations of things she has been willing and able to do but *I don't think it could have anything to do with the charged offense*.[2471]

With this narrative, Dr. Dietz was equivocal about whether Mrs. Montgomery has PTSD, and testified that some people who are abused have it, but is certain that the crime itself could cause it. Then Dr. Dietz juxtaposed "flash-backs" with Mrs. Montgomery's nightmares about the crime to suggest that her PTSD is from the crime, not the abuse, which then laid the foundation for the abuse not being all that severe. Dr. Dietz was certain that the PTSD had nothing to do with the reason Mrs. Montgomery committed the crime, and thus reduced the



Appellate Case: 17-1716 Page: 711 Date Filed: 11/01/2017 Entry ID: 4596229

abuse to irrelevance in the minds of the jury, which certainly carried over to penalty.

Had trial counsel investigated and prepared in compliance with prevailing professional norms, he would have presented testimony and corroboration of Mrs. Montgomery's many symptoms and risk factors for complex PTSD, just as Dr. Porterfield and Dr. Hutchinson explained in the district court.

Dr. Dietz then moved on to describe a series of behaviors that he found consistent with a personality disorder. Each of these behaviors was also consistent with Mrs. Montgomery's true mental health symptomatology – her major mental, illness, brain damage, and complex post-traumatic stress disorder. But because trial counsel had not thoroughly investigated or prepared, Dr. Dietz was able to paint those behaviors as anti-social traits.

After a methodical take-down of Mrs. Montgomery's character, Dr. Dietz returned to the topic of PTSD to once again – in order to call its existence and relevance into question:

> The third issue she *may* have post traumatic stress disorder *as a result of the crime and/or abuse* during her childhood. But neither would constitute a serious disease or defect at the time of the charged offenses. There, too, my *only hesitancy* in saying she has post traumatic stress disorder is her inability to measure signs and symptoms. It's not that I doubt she has it, *it's just again measure*, *given what has happened with the evidence*.[2472]



Appellate Case: 17-1716 Page: 712 Date Filed: 11/01/2017 Entry ID: 4596229

Here again, Dr. Dietz suggested that the lack of data was his stumbling block with post traumatic stress disorder. It was trial counsel's fault that Dr. Dietz lacked that data. Trial counsel failed to collect the data and to do so using reliable, credible witnesses.

Had trial counsel followed through with Ms. Clarke's intent to work with Dr. Judith Herman, who wrote *Trauma and Recovery*, a treatise on PTSD, and had he followed the prevailing professional norms for investigation in a capital case, the massive, pervasive, crippling trauma that Lisa Montgomery suffered and its devastating psychiatric impact, together with is impact on the development of the structure of her brain would have been known. Further, had the issue been introduced in the second phase, it would not have been subject to Dr. Dietz's testimony reducing it to irrelevancy. Moreover, a competent multidisciplinary mental health assessment such as that presented at the hearing would have negated Dr. Dietz' diagnosis of personality disorder and would have taken each piece of aggravation, bad character, and alleged pretending, faking, or lying, and explained those behaviors in the context of her comorbid mental illnesses.

The government ended Dr. Dietz's direct examination by exploring what he referred to as Mrs. Montgomery's changing stories about the offense and played for the jury the video-tape of his interview where Mrs. Montgomery implicated



Appellate Case: 17-1716 Page: 713 Date Filed: 11/01/2017 Entry ID: 4596229

her brother. Dr. Dietz testified that the reason for this implication was because Mrs. Montgomery was "trying to remove responsibility from herself, place it elsewhere, allow the possibility of pinning it on her brother."[2473]

Trial counsel's actions are directly responsible for this testimony. Trial counsel created the Tommy defense, failed to investigate it, and then allowed his client to be interrogated on video about Tommy by a skilled expert who knew about Tommy Kleiner's alibi.  Competent trial counsel would not have placed his client in that position, particularly where, as he told the court, Mrs. Montgomery did not want to implicate her brother, but Mr. Duchardt pushed her into it.[a]

On cross examination, Mr. Duchardt sparred with Dr. Dietz about Dietz's reliance on interviews with Lisa's ex-husband and her Kevin Montgomery's ex-wife, but failed to confront Dr. Dietz with records or data that would have undermined Dr. Dietz's opinion and established Mrs. Montgomery's severe illness.  Dr. Dietz testified that "Carl's character is pretty good as far as I could tell. He seemed like a decent man to me."[2474] Dr. Dietz did not know, because trial counsel did not know, that Carl Boman, like the many other men in her life, also subjected Lisa to sexual trauma. Lisa's brother Teddy Kleiner testified in his stipulated declaration that he personally viewed a homemade video of

[a] See, §§VI.I. and VI.I., below, Competency and *Riggins* Claims.



Appellate Case: 17-1716 Page: 714 Date Filed: 11/01/2017 Entry ID: 4596229

Carl Boman raping his Lisa.[2475] Despite the availability of that proof (which he failed to find, bevause his investigation was unreasonably truncated), Duchardt's cross-examination about Carl Boman's credibility was limited to the fact that he was an ex-husband who held a "grudge" which prompted Dr. Dietz to respond, "I think he still resents some of what has happened here, how could he not."[2476]

Mr. Duchardt elicited from Dr. Dietz that "many people are resilient and don't develop symptoms event though they have the terrible thing happen to them."[2477] This testimony laid the groundwork for the prosecution to later argue that Mrs. Montgomery's trauma was not severe and that she was using the "abuse excuse."

Mr. Duchardt then devoted a substantial portion of his cross-examination trying to convince Dr. Dietz that Mrs. Montgomery suffers from pseudocyesis. The result was a complete loss of defense credibility.

In the middle of the testimony the Court informed Mr. Duchardt that Dr. Ramachandran is not a psychiatrist. Until that point, Mr. Duchardt thought he was. The Court responded, "He's not a psychiatrist based on the record we have."[2478] On the last day of the first phase of Mrs. Montgomery's capital trial, Mr. Duchardt learned that the key witness to his NGRI defense is not a psychiatrist.



Appellate Case: 17-1716 Page: 715 Date Filed: 11/01/2017 Entry ID: 4596229

Mr. Duchardt ended his examination by eliciting this testimony: "I am not aware of any case in which a woman with pseudocyesis has abducted a baby through force or any other way. Women with pseudocyesis don't do that. Scheming manipulative women are known to steal [i]nfants and even fetuses."[2479]

On re-direct, the Government asked Dr. Dietz to comment on Dr. Ramachandran's CV. "There is an indication of training in neuro-anatomy after medical school but I didn't see any indication of residency training in neurology or psychiatry."[2480] This was significant, because "I think it would be interesting to know what training in psychiatry he may have had besides a few months of medical school."[2481] Dr. Dietz concluded that Dr. Ramachandran is "forensically naive and hasn't had occasion to experience what goes on in interviewing people charged with crimes very much."[2482]

Dr. Dietz was the last witness the jury heard in the first phase.

The NGRI defense was shredded and the penalty phase was doomed.

This was constitutionally ineffective assistance of counsel.

**e. The defense pursuit of NGRI resulted in the exclusion of powerful evidence of Mrs. Montgomery's brain injury because of the defense insistence on presenting the evidence in the first phase and the resulting *Daubert* challenge that was poorly litigated.**

Upon his appointment, Fred Duchardt called Ruben Gur before he even met Mrs. Montgomery. He "figured if anybody was going to find an issue here, it was Ruben . . . .  Basically we were making it up as went along, because there was nothing obviously wrong with her except her suicide [attempts]."[2483]

Dr. Gur and Dr. Kuncel were the two experts endorsed by the defense prior to April 3, 2007 when the trial date was April 30, 2007. Gur was known to the Government as a defense witness for the penalty phase. Before the defense announced the pseudoceysis defense on April 3, 2007, the government had not filed a *Daubert* motion. Dr. Gur's evaluation involved a multidisciplinary team of medical, psychiatric, and neuropscychological experts who gather data and provide it to Dr. Gur for analysis. Dr. Gur has two grants from NIH, multiple grants from NASA, and is an internationally recognized expert.[2484] Dr. Gur took the results from MRI (which measures brain structure, PET (which measures brain function), and neuropsychological testing (which measures behavior). Together with his own clinical observations, Dr. Gur was able to provide the following conclusions:

> The current findings consistently indicate **brain dysfunction** in an individual with an otherwise normal intellectual functioning. Behavioral and neurobiological data indicate that Ms. Montgomery is struggling with **genuine deficits that, by profile and severity, are consistent with limbic, hypothlamic and parietal lobe damage**. The neuropsychological evaluation indicates relative deficits in functions related to mesial brain structures, more on the right. Consistent with these findings, the quantitative MRI studies show reduced brain volume



Appellate Case: 17-1716 Page: 717 Date Filed: 11/01/2017 Entry ID: 4596229

in right parietal and medial gray matter, and abnormally high ventricular volume consistent with loss of tissue in medial brain structures. **PET results showed abnormally increased metabolic activity in nearly all temporolimbic structures as well as in some frontal and motor regions and thalamus**. The abnormally increased activity in hippocampus and parahippocampal regions, as well as the amygdala, is more pronounced on the right. This pattern indicates **increased vulnerability to impulsive behavior.** The increased hypothalamic and related activation is **potentially a source of vulnerability to pseudocyesis** (by history).The combination of reduced volume and increased glucose metabolism in the right suggests compensatory processes. **Right hemisphere compensatory activation has been related to dissociative states.** [2485]

Dr. Gur did not diagnose Mrs. Montgomery with pseudocyesis. He did not diagnose her with dissociative disorder. What he did say is that all of the ways in which we have to measure brain damage reveal that Mrs. Montgomery has brain damage. Dr. Gur's report was perfectly valid for a penalty phase defense, when offered with other members of the multidisciplinary team.

Had the trial counsel not pursued the improbable NGRI defense based on pseudocyesis, Dr. Gur's testimony would not have been challenged pre-trial. In fact, in their *Daubert*[a] Motion, the Government does not seek to exclude Dr. Gur's neuropsychological opinions or patented behavioral image at any stage. The government sought to exclude the MRI and PET only from the first phase of the trial.[2486] Mr. Duchardt's response repeated that the motion was related

[a] *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),



Appellate Case: 17-1716 Page: 718 Date Filed: 11/01/2017 Entry ID: 4596229

only to the first phase.[2487] The Government's reply was likewise limited to the first phase of trial.[2488]

As already noted, objectively reasonable counsel would not have been in this bind because they would not have pursued the pseudocyesis defense. But, now, threatened with the loss of powerful, objective proof of brain damage, had trial counsel simply evaluated their first phase defense and withdrawn it, all of the brain damage proof would have been presented in the penalty phase. Proof of brain damage is seen as particularly persuasive in the penalty phase of a capital case. "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) (citing *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)); *see also Sears*, *supra* (counsel ineffective for not presenting evidence of frontal lobe brain damage); *Porter v. McCollum, supra* (counsel ineffective for failing to present evidence of severe childhood abuse and brain abnormality manifesting itself in impulsive, violent behavior); *Williams*, *supra* (counsel ineffective for failing to investigate and present evidence of possible brain damage and other trauma); *Deitrich v. Ryan*, 619 F.3d 1038, 1058, 1061, 1065 (9th Cir. 2010) (reversing dismissal of petition because the failure to present evidence of organic brain damage directly resulting from abusive childhood was ineffective); *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008); *Frierson*

*v. Woodford*, 463 F.3d 982, 993–94 (9th Cir. 2006) (petitioner prejudiced at sentencing hearing by counsel's failure to present evidence of potential organic brain damage and mental disturbance); *Frazier v. Huffman*, 343 F.3d 780, 794 - 96 (6th Cir. 2003) (ordering habeas relief where counsel failed to present mitigating evidence of Frazier's functional brain impairment); *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003) (counsel ineffectively failed to present evidence of mental history and abusive childhood which could have persuaded one juror to vote against the death penalty); *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1989) (brain damage and mental illness).

Compounding these errors, trial counsel failed to prepare and comply with discovery rules resulting in the ultimate exclusion of the MRI and the PET from the entire trial. At the *Daubert* hearing, the state presented testimony attacking the scientific basis of the MRI analysis. Mr. Duchardt failed to call Dr. Christos Davatzikos who performed the MRI analysis as a witness. Dr. Davatzikos testified in the hearing below and explained why the government's criticism of his analysis was not valid.[2489] Further, he testified that he reanalyzed the same data in 2016 and confirmed his results, except that Mrs. Montgomery's brain is even more structurally damaged than previously thought.[2490] Duchardt's failure to prepare and bring all of the necessary witnesses to the hearing prejudiced Mrs. Montgomery when the MRI was excluded. The PET was not excluded,



Appellate Case: 17-1716 Page: 720 Date Filed: 11/01/2017 Entry ID: 4596229

subject to an impossibly tight discovery deadline. Rather than explain to the court that Dr. Gur could not produce the discovery under its deadline, Mr. Duchardt promised compliance.[a] Mr. Duchardt should have requested a continuance (or withdrawn the NGRI claim).

When the discovery deadline passed, the government moved to exclude the PET from the entire trial.[2491] After Gur provided what he believed was the raw data that the government was requesting, the government's expert wrote a letter basically alleging that Dr. Gur's results on the PET were created using an invalid methodology, that government experts were able to show that Mrs. Montgomery's brain was normal using the correct methodology, and alleging that Gur had not provided all of the information that they had requested.[2492] A series of emails and letters were traded back and forth with Gur denying the government's allegations and the government claiming that there was still additional data that Gur was refusing to turn over.[2493]

None of this happened on the record. The remaining proceedings were by email. With an issue this important and hotly contested, a hearing was required. Mrs. Montgomery had a Sixth Amendment right to confrontation and cross-examination. Her case was injured by her counsel's failure to request a hearing,



Appellate Case: 17-1716 Page: 721 Date Filed: 11/01/2017 Entry ID: 4596229

including the opportunity to face the government's experts in an adversarial setting.

On October 3, 2007, on the third day of trial, the PET was excluded.

Mr. Duchardt mishandled the discovery dispute by a) initially telling Dr. Gur to hold off on gathering the data; b) having insisted that Dr. Gur use data from an older generation scanner because that was the scanner used for Dr. Gur's paper published in the journal Science – where that data had been archived and was not retrievable; c) not consulting with Dr. Andrew Newberg who is the person who made the calculations upon which Dr. Gur relied; and d) not requesting a continuance.

Dr. Newberg testified at the hearing below that the allegations made by the government's expert about his methodology were untrue. Dr. Newberg clearly explained his results and his methodology.[2494] As a verification of the accuracy of his 2007 protocol, Dr. Newberg performed the analysis using an FDA-approved program in 2016 and his results were corroborated.[2495]

Though the government endorsed Doctors Mayberg and Evans, they were not called to testify at the hearing below. The government presented no proof that undermines the testimony of Gur, Newberg, and Davatzikos. Mrs. Montgomery has proven that she had brain damage that was not presented to

her jury at sentencing and that it was not presented because of counsel's unprofessional errors.

The exclusion of Dr. Gur's evidence was devastating to the first phase defense. David Owen testified that Mr. Duchardt had been focused on Dr. Gur's testimony from the beginning.[2496] Mr. Owen testified that Mr. Duchardt stated that the defense was "eviscerated" by the exclusion of Gur.[2497]

The district court denied this claim on the basis of an erroneous reading of a April 5, 2007 pre-trial conference.[2498] The district court wrote, "the record establishes the Government intended to seek exclusion of Dr. Gur's testimony regardless of whether Movant pursued an NGRI defense."[2499] The court relied on p. 14 of the April 5, 2007, pretrial conference to support its ruling. However, the record refutes the district court's holding. The hearing on April 5, 2007, was after Mr. Duchardt announced the insanity defense (on April 3). At the beginning of the April 5th hearing, in response to a question regarding what the Government needs in light of the new pseudocyesis evidence, the Government mentioned a *Daubert* challenge. At the end of the conference the magistrate asked if there were any unusual questions of law and the government responded, "the one I mentioned, Your Honor, the Government anticipates filing a *Daubert* challenge to some of the defense testimony."[2500]



Appellate Case: 17-1716 Page: 723 Date Filed: 11/01/2017 Entry ID: 4596229

This statement does not support the court's holding on this issue that the Government intended to challenge the testimony regardless of the NGRI defense. Rather, it reinforces Mrs. Montgomery's point. Had trial counsel not pursued NGRI, the brain evidence would not have been challenged and the brain imaging proof of Mrs. Montgomery's brain impairments would have come in at the penalty stage. Moreover, if trial counsel had pursued the proper defense after thorough investigation, the district court's error in excluding the PET would not have been found harmless by this Court on direct appeal.

Where the only basis for the district court's denial on this aspect of the claim is a misreading of the record, a COA should be granted.

**f. Trial counsel failed to object to improper argument which prejudiced the penalty phase.**

In the first phase closing argument, the government repeatedly argued that Mrs. Montgomery did not show remorse or sadness for the crime.[2501] Remorse is not an element of first degree murder nor is it necessary to prove an insanity defense. Arguments about remorse were therefore improper, but trial counsel failed to object. The government further improperly argued that an insanity defense is an "excuse"[2502] and that to find Mrs. Montgomery not guilty by reason of insanity would mean that she "won."[2503] Once again trial counsel did not object. The government referred to Dr. Ramachandran's testimony as "voodoo science"[2504] – a racist dog whistle. Trial counsel did not object. The

prosecution improperly argued that the jury should reject the insanity defense because of its impact on the victim's family. Trial counsel did not object.[2505]

Prevailing professional norms require trial counsel to object to improper argument and to preserve errors for appeal. Here, trial counsel's failures allowed the prosecution to inject emotion and caprice into the first phase verdict. While this error did not prejudice Mrs. Montgomery in the first phase of her trial, it prejudiced her in the second phase of the trial.

In the penalty phase, the government continued its theme of no remorse and added to it the argument that Mrs. Montgomery was "wicked and evil,"[2506] that Mrs. Montgomery was arguing "the abuse excuse,"[2507] that Mrs. Montgomery shouldn't "get points for having a behavioral problem,"[2508] that she never apologized[2509] (which was an improper comment on her right to silence), that mitigation was a "guilt trip,"[2510] and suggested that by asking for a life sentence Mrs. Montgomery is not "tak[ing] responsibility."[2511]

The failure of trial counsel to object to these improper arguments was prejudicial ineffective assistance of counsel. *See Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015); *Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2007); *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005); *Martin v. Grosshans*, 424 F.3d 588 (7th Cir. 2005).

To the extent that trial counsel invited these errors by their actions, trial counsel counsel's performance was deficient.

#### g. Conclusion

It is reasonably debatable that these multiple examples of deficient performance prejudiced Lisa Montgomery in that but for these errors it is reasonably probable that at least one juror would have voted for a life sentence. This is particularly true when the errors are viewed, as the Supreme Court says they must be, in light of the other errors made by counsel as described throughout this application. A COA should issue.

### G. Mrs. Montgomery's entitlement to relief is reasonably debatable where, in contravention of prevailing professional norms, counsel unreasonably failed to investigate, develop, and present readily available, compelling penalty phase evidence.

By the time the penalty phase started, the jury had a completely inaccurate picture of Lisa Montgomery. Whereas immediately after arrest Mrs. Montgomery was remorseful,[2512] suicidal,[2513] and wanted to plead guilty,[2514] counsel's mishandling of the ill-conceived pseudocyesis/NGRI defense resulted in the jury crediting evidence that Mrs. Montgomery was a manipulative liar who would attempt to inculpate her brother rather than accept responsibility for her actions. The proof presented by the defense at the penalty phase added little to change that equation: counsel presented family members who said they loved

Mrs. Montgomery and wanted to be in relationship with her, including her daughter who had to admit that Mrs. Montgomery had physically abused her from time to time, and Mrs. Montgomery's sister and father who had not seen her in over thirty years. Counsel's experts added little to that discussion: the psychiatric expert had already testified Mrs. Montgomery had pseudocyesis and the social historian testified for nine transcript pages regarding Mrs. Montgomery's life before her testimony deteriorated into a dissection of her faulty testing techniques.

Because of the counsel's ineffectiveness, the jury never heard that Mrs. Montgomery is a profoundly impaired human, one whose ability to function competently in the world was shattered by chronic, pervasive trauma. They never heard that her grasp of reality has been at best tenuous since childhood, the result not only of sexual trauma but also of her mother's coercive control over her. The jury did not hear of Mrs. Montgomery's brain impairments either as cause of her impaired functioning or as effect of her mother repeatedly selling pre-teen Lisa to four and five men at a time who gang raped, beat, and urinated on her. No one explained to the jury how such extreme trauma and betrayal results in biological self-protection at the neuronal level: when the brain dissociates from the trauma so that the victim can survive the pain,

humiliation, and terror, that dissociation affects the wiring of the brain. Over time such dissociation becomes involuntary and severs contact with reality.

The jury did not hear how Mrs. Montgomery nearly escaped her mother's clutches by joining the military, only to find out she was pregnant by her step-brother and be forced into marriage with him by her mother and his father. The jury did not hear that both her husbands caused her to relive her childhood sexual trauma through repetition of bondage, sexual humiliation and pain, nor did the jury hear how Mrs. Montgomery's ability to function day-to-day was compromised by her brain deficits and her chronic dissociation.

The evidence presented in §2255 establishes that it is at least reasonably debatable that Mrs. Montgomery is entitled to relief for the ineffective assistance provided by her trial counsel in the investigation, development, and presentation of the penalty phase of her capital trial. Though trial counsel has maintained that their "database"[a] contained the life history information presented in §2255, counsel 1) have not produced any evidence of that, and, in

---

[a] Testimony at the evidentiary hearing was that when Mr. Duchardt and Mr. O'Connor were appointed, the FPD provided each a copy of the case file on a hard drive (Vol. 3, p. 339-40, Elliot Testimony). Mr. Duchardt referred to a "database" in his conversation with §2255 (Exhibit 83, *Armstrong Declaration*) and in his sworn declaration (D.E. 129) which he believed served as his social history (D.E. 129, p. 34 ("Contrary to the accusation by Current Counsel for Mrs. Montgomery that we had not developed for Lisa a complete 'biopschyhosocial (sic) history' our database gave us a good handle on Lisa's complicated background")).

any case, 2) was ineffective for failing to synthesize the information gathered and present it to their experts in a format that would aid in appropriate assessment and diagnosis or to present it to the jury. Counsel's failure to present the social history information to the jury prevented the jury from knowing the context of Mrs. Montgomery's life and impairments. Though counsel presented some mitigating evidence, including that Mrs. Montgomery had been sexually abused by her step-father, counsel's mitigation presentation of that abuse was undermined by counsel's failure to present the effect that abuse had on Mrs. Montgomery. Counsel failed to present the day-to-day impairments that were manifest in her pre-crime, daily life. Counsel failed to explain how even the sex abuse they did present was mitigating – failing to present the devastating effect of chronic sexual abuse on Lisa's brain and day-to-day functioning.

Had counsel conducted a reasonable investigation of the information they possessed in their own files, counsel would have discovered that the abuse of Mrs. Montgomery was far more devastating than counsel realized – including years of gang rape facilitated by her mother, who sold multiple men access to young Lisa. Counsel's failures were ineffective where had counsel investigated and presented 1) the social history information, 2) the nature of the actual trauma inflicted and the devastation it wrecked on Lisa's forming brain, and 3)

the nature of her brain impairments, the result of the proceeding would have been different.

1. **Contrary to prevailing professional norms, counsel failed to investigate, develop, and present a full social history despite obvious red flags signaling familially linked mental illness, chronic trauma and abuse, an inter-generational family pattern of custodial interference.**

Mrs. Montgomery's entitlement to relief for ineffective assistance of counsel is at least debatable where she showed that trial counsel's presentation of her social history "only scratched the surface of [her] horrific childhood." *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008). Just like in *Johnson*, trial counsel here purported to present Mrs. Montgomery's life story – but did such a superficial job that the truth was obscured. *Id*. (finding that the state court's determination that "most of the additional evidence could be found in some form either in the testimony or in the documents admitted at the mitigation hearing" was an unreasonable application of *Strickland*).

As shown above in §§V.C. and V.E. above, the entire penalty phase was only nine and a half hours of testimony, including a whirlwind eighteen minutes of testimony from Mrs. Montgomery's sister, Diane Mattingly.[a] Mrs. Mattingly could have provided compelling testimony about the seminal trauma Mrs.

[a] Crim. D.E. 327 (Mrs. Mattingly testified from 12:10-12:18pm on October 24, 2007).

Montgomery endured as a four or five year old child lying within arms-reach of her sister as a grown man raped her.[2515] Mrs. Mattingly had provided that information to counsel's mitigation investigator, and would have been willing to testify regarding those horrible memories.[2516] However, despite the mitigation investigator's discussion with counsel regarding Mrs. Mattingly's disclosure and the need for counsel to more fully interview and prepare Mrs. Mattingly before trial,[a] trial counsel did not prep her to testify about the rapes[2517] and then did not ask about the rapes while she was on the stand.[2518] As Mrs. Mattingly explained at the evidentiary hearing, her testimony at the trial reflected not even "the smallest part of what living in the house was. There's so much more."[2519] Mrs. Mattingly testified she would have been willing to testify

---

[a] Vol. 6, p. 1568, *Waller Testimony*. Ms. Waller discussed Mrs. Mattingly's information and disclosures with Mr. Duchardt and the pair planned a trip to Kentucky to further interview and prepare Mrs. Mattingly to testify. Ms. Waller testified she did not know why that plan was abandoned and that she was not present for Mr. Duchardt's preparation of Mrs. Mattingly's testimony. Mrs. Mattingly testified that Mr. Duchardt chose to "prep" her to testify in the presence of her estranged father (who she had only seen once in her life) and Mrs. Montgomery's husband, Kevin, who Mrs. Mattingly had never before met. She described the preparation as Mr. Duchardt talking a lot and not asking her any questions or telling her what questions he would be asking her on the stand. When Mrs. Mattingly entered the courtroom to testify, that was the first time she had seen her sister in over 30 years. (Vol. 6, p. 1544, *Mattingly Testimony*). Though she had asked the attorneys to arrange for her to see Mrs. Montgomery pre-trial, they had refused, wanting to contrive a reunion scene in the courtroom. Mrs. Mattingly broke down weeping on the stand and described the experience of testifying as "extremely overwhelming" and said "for this to be the first time to see [Mrs. Montgomery] was so traumatic." (Vol. 6, p. 1539, 1544, *Mattingly Testimony*).

to everything she said at the evidentiary hearing: "I would have. I would have told the whole thing. I just didn't know what to say. I didn't know what to say."[2520]

In similar rapid fire fashion, Mrs. Montgomery's husband testified for eighteen minutes, her father for six, and her daughters testified for thirteen and eight minutes.[2521] The expert witness through whom it was counsel's strategy to present a summary of the mitigation/social history proof[2522] did not know that was her task.[2523] Her "summary" of Mrs. Montgomery's life compromised a scant nine pages of trial transcript testimony before derailing into the problems inherent in her testing protocol.[2524]

Testimony at the evidentiary hearing established (and the court found) that the ABA Guidelines and prevailing professional norms in the Western District of Missouri require the development of a social history.[2525] Mr. Stetler testified that among the failings of the trial team was that the team acquired some social history knowledge but that the facts learned, "ended up being, you know, filed away but never integrated into the kind of comprehensive life story that you want to put together as you're then selecting your experts for potential testimony and defining the referral questions that the experts should address."[2526] Mr. Stetler emphasized that synthesized historical documents (such as Mr. Duchardt's oft-referenced "database") cannot take the place of a



Appellate Case: 17-1716 Page: 732 Date Filed: 11/01/2017 Entry ID: 4596229

social history narrative, "you can't give anyone, whether it's an expert or a juror, a data dump of tens of thousands of pages of material. You've got to put that material into a framework that makes sense."[2527]

Mrs. Montgomery's experts testified that a complete social history is necessary for accurate diagnosis of mental diseases and defects. All of the members of the multi-disciplinary team assembled in §2255, along with trial experts Drs. Logan and Kuncel and pretrial consulting expert Dr. Hutchinson, testified in §2255 that social history guides and informs psychiatric and psychological inquiry. Dr. Logan, the trial team's psychiatrist, testified that it is standard practice in the capital cases for a social history to be prepared.[2528] Dr. Logan testified that the social history assists him in reaching his diagnostic conclusions, explaining that documentation helps an evaluator to perceive if the subject has distortions of perception or memory, allowing the evaluator to verify that which is reported.[2529] Dr. Woods, explained further, "the biopsychosocial history is the most important scientific component of any medical examination . . . because testing is without context. It's important when you do neuropsychological testing, when you do neuroimaging, when you do psychometric like the MMPI-S, that you understand the context in which that



Appellate Case: 17-1716 Page: 733 Date Filed: 11/01/2017 Entry ID: 4596229

testing was done and you have a much better sense of who that person is if you have some history."[a]

Contrary to professional norms, trial counsel failed to complete a social history. Mr. Duchardt has declared that rather than complete a social history, he relied on his "database" that he believed "gave us a good handle on Lisa's complicated background."[2530] Counsel's only justification for his failure to comply with professional norms is that he believes that use of a biopsychosocial history "has become part of the standard playbook for national capital punishment resources counsel."[b] Testimony at the evidentiary hearing not only established that professional norms (and the ABA Guidelines) require development of a social history but also rebutted Mr. Duchardt's contention that there is some sort of "standard playbook" used by resource counsel. [c,d]

---

[a] Vol. 7, p. 1759, *Woods Testimony.*
[b] D.E. 129, p. 71.
[c] Vol. 1, p. 131, *Stetler Testimony* (criticizing Duchardt's position and testifying that there is no standard mitigation approach. Each case must be shaped on its own facts, including how best to put together the client's life story. "Everything has to be tailored to what you have discovered in the course of the investigation").
[d] Mr. Duchardt was also critical of Ms. Vogelsang as an expert witness, claiming she steps outside of her expertise and that prosecutors undermine expert witnesses who use the "Vogelsang narrative as a script" by undermining Ms. Vogelsang's work. It is worth noting that in this case not only was Ms. Vogelsang's work not undermined, the government stipulated to the admission of her report and attached exhibits but explained on the record that the government found her work to be "exceptionally well-sourced" and that the government was "not contesting the information that she was able to compile and put together in the biuousocialpsych (sic) history here." (Vol. 6, p. 1490, *Objection by the USA*). The district court



Appellate Case: 17-1716 Page: 734 Date Filed: 11/01/2017 Entry ID: 4596229

Counsel's failure to develop a complete social history prevented the jury from hearing the family history of mental illness and instability that contextualizes Mrs. Montgomery's poor functioning. It is one thing to hear that a criminal defendant has been diagnosed by a defense expert as mentally ill, it is quite another to see a chart of all the people in her extended family through several generations who have been diagnosed to have the same mental illness or professionally assessed to manifest the same symptoms.[2531] As Ms. Vogelsang testified, Mrs. Montgomery's family tree is rife with mental instability, both anecdotal family stories of ancestors whose behaviors were symptomatic of mental illness (though they predated modern psychiatric practice) and more

---

noted that the court found a discrepancy in Ms. Vogelsang's work, finding that Ms. Vogelsang cited Exhibit 1-10, *Mary Coleman's Harborview Medical Records*, for the proposition that Ms. Coleman (Mrs. Montgomery's paternal aunt) was diagnosed with depression and treated with Zoloft; the court found that Exhibit 1-10 does not reflect that Ms. Coleman was treated with Zoloft (D.E. 212, p. 41). However both the court and Ms. Vogelsang's PowerPoint are at odds with the actual record: Ms. Vogelsang's Biopsychosocial cites Ms. Coleman's Good Samaritan Hospital Records for the Zoloft prescription (Exhibit 1, p. 10, *Biopsychosocial* (referencing Attachment 254, *Good Samaritan Hospital Records*). The Court is correct that Ms. Vogelsang's PowerPoint references the wrong medical record for Ms. Coleman, however Ms. Vogelsang's report is correct: the Good Samaritan Records (exhibit 1-254) reflect that Ms. Coleman was treated with Zoloft – corroborating Ms. Coleman's declaration that was also admitted as evidence (Exhibit 1-10, *Coleman Declaration*).



Appellate Case: 17-1716 Page: 735 Date Filed: 11/01/2017 Entry ID: 4596229

contemporary family members who have been diagnosed with mood disorders and treated with antipsychotics just like Mrs. Montgomery.[a]

Though the jury heard that Mrs. Montgomery did not get along with her mother, the trial team failed to present the lengthy history of intergenerational mental illness and trauma outlined above at §V.E. and in Ms. Vogelsang's biopsychosocial[b] which would have provided insight into Mrs. Montgomery's mother's inherited instability and impaired functioning and her resulting mistreatment of Mrs. Montgomery. Had the jury heard the information contained in the biopsychosocial, the jury would have understood that Mrs. Montgomery was crippled from childhood by familially linked mental illness, brain damage, and as discussed below, trauma.

The team's failure to complete a social history prevented the team from presenting the strange family pattern of custodial interference which pervades

---

[a] *See*, e.g., Exhibit 142, p.4, *Kleiner Depo*. (Brother Tommy Kleiner currently medicated with Risperdal, the drug which is currently working well to control Mrs. Montgomery's symptoms.

[b] Movant does not argue that the entirety of the Biopsychosocial evaluation should have been presented to the jury, but in light of the district court's curtailing of Ms. Vogelsang's presentation it is impossible to demonstrate, here, exactly the presentation developed in §2255 which should have been presented to the jury. In the absence of a complete record of Ms. Vogelsang's testimony, §2255 counsel is left with no better citation than to the Biopsychosocial which the government convinced the court was the best record. *See* Vol. 6, p. 1490, *USA Objection*.

several generations of Mrs. Montgomery's family – on both sides.[a] As Ms. Vogelsang explained, "this is a very unusual pattern to emerge, and I don't recall ever seeing one emerge like this before. Sometimes in foster care where a child's been taken from place to place, but this is actually family members involving themselves in decisions about where children should be without necessarily going through the court."[2532] Though the district court cut short Ms. Vogelsang's testimony, the record contains the four-page chart of the extensive custodial interference in the family[2533] as well as the extensive discussion of the family history of kidnapping and child snatching contained in the Biopsychosocial.[2534] Counsel failed to develop this theme of custodial interference, though Bret Dillingham noted it almost immediately after Mrs. Montgomery's arrest and documented the pattern in his notes which were in trial counsel's file.[2535]

The failure to develop and present this pattern at trial prevented the jury from considering the context of Mrs. Montgomery's irrational, reactive response to her ex-husband's threats to expose her false pregnancy as a means to gain custody of her children. That is to say, while Mrs. Montgomery's family

[a] Dr. Logan testified "there was quite a theme in this family of using the children somewhat as weapons" (TT. Vol.11, p. 2399, *Logan Testimony*) but he did not present any evidence regarding any history beyond Judy taking Lisa's children from Lisa – failing to contextualize the custody disputes historically.



Appellate Case: 17-1716 Page: 737 Date Filed: 11/01/2017 Entry ID: 4596229

history of child abduction, disappearance, and custodial interference in no way makes her response to her ex-husband's threats rational, it does contextualize how a woman whose perceptions of reality are compromised by pervasive chronic trauma (see below) and brain dysfunction (see below) would over-react to a threat to remove her children. Without the family pattern showing how often children were removed, disappeared, or otherwise were snatched from their parents by not only Lisa's mother and ex-husband but by many family members on both sides of her family going back generations, the jury could not begin to understand the panic which seized Mrs. Montgomery's compromised mind in response to her ex-husband's threats. Had the jury been presented this information, along with appropriate expert testimony regarding the ways in which Lisa's functioning was compromised by trauma and brain dysfunction, it is at least reasonably debatable that the jury would have found the statutory mitigating circumstance that Lisa committed the offense under severe mental or emotional disturbance.[a]

In addition to failing to provide the jury with the direct social history information which would have provided a basis for empathy and mitigation, failure to complete a social history compromised the defense experts'

---

[a] *See*, Crim. D.E. 354 (no jurors found the statutory mitigating factor that the crime was committed under severe mental or emotional disturbance)

assessments preventing the experts from rebutting the government's narrative that Mrs. Montgomery was a manipulative liar. As shown above at §V.E., incorporated by reference (Sanislow. Hutchinson, Porterfield), had the psychological and psychiatric experts known the true nature of the trauma endured by Mrs. Montgomery, the results obtained on the MMPI could have been explained – not as malingering (as the government's expert effectively presented) but as an accurate reflection of Mrs. Montgomery's horrific life experience and suffering.

Here, the picture of Mrs. Montgomery's life was so incomplete and inaccurate that it prevented the jury from making an individualized sentencing determination as required by *Lockett v. Ohio*, 438 U.S. 586 (1978). The jury sentenced a fictitious Lisa Montgomery, one who coworkers characterized as quirky and whose lawyer repeatedly termed a "good mother,"[2536] while the real Lisa Montgomery, whose mother sold her for sex to the plumber and the electrician, whose mother told her to "quit your crying" when the men beat and urinated on her, who dissociated so often to survive that chronic trauma that she lost touch with reality, remained unseen and unrepresented. Where counsel failed to investigate, develop, and present the biopsychosocial history presented



Appellate Case: 17-1716 Page: 739 Date Filed: 11/01/2017 Entry ID: 4596229

in §2255 and described above[a], it is at least debatable that Mrs. Montgomery received ineffective assistance of counsel.

**2. Counsel failed to present evidence of the pervasive trauma that permeated Mrs. Montgomery's life.**

Mrs. Montgomery's entitlement to relief for ineffective assistance of counsel is at least reasonably debatable where trial counsel failed to effectively investigate, develop, and present evidence of the pervasive trauma which permeated Mrs. Montgomery's existence throughout her childhood and into her adulthood. Not only did trial counsel miss the critical red flag signaling that Lisa was not just the victim of step-parent incest but also repeatedly gang raped by men who paid her mother, counsel failed utterly to describe the coercive control exercised by both parents over Lisa or to describe the abuse and systematic depersonalization which robbed her of agency and impaired her perceptions of reality.

Where counsel failed to investigate and discover the unbiased witnesses who could have supported their narrative, counsel's attempt to present Jack Kleiner's abuse of Lisa as mitigation was easily dismissed by the government as "the abuse excuse."[2537] Counsel's failure to flesh out and corroborate the abuse they did present allowed the government to insinuate that Lisa sought her

---

[a] See §V.E. and found at Exhibit 1, incorporated by reference.

step-father's attention to get back at her mother.[2538] Defense counsel played into the government's theory by calling witnesses who testified that Lisa's mother believed that Lisa stole her husband from her.[2539] Mrs. Montgomery's claim of ineffective assistance of counsel is reasonably debatable where the case presented in §2255 shows that, just as in *Porter* and *Wiggins,* counsel "ignored pertinent avenues for investigation of which he should have been aware"– including information contained in his own file. *Porter*, 558 U.S. 30, 40 (2009); *see also*, *Wiggins*, 539 U.S. 510, 525 (2003).

In *Sinisterra v. United States,* where Mr. Duchardt was alleged to have failed to investigate "rape, physical and sexual abuse, homelessness, [and] head injuries," this Court found that "[i]f deemed credible and supported by evidence, these factual assertions might present 'the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability.'" *Sinisterra,* 600 F.3d at 907 (*quoting Wiggins*, 539 U.S. at 535 (recounting petitioner's troubled history, which included privation, abuse, physical torment, sexual molestation, rape, homelessness, and diminished capacity)). Here, Mr. Duchardt again failed to investigate and present the full, horrifying nature of the sexual, emotional and physical abuse inflicted on Mrs. Montgomery, failed to investigate or present her impaired functioning. Mrs. Montgomery's impaired functioning was manifest in the records available to

counsel, including that she squatted – along with her children – in an abandoned trailer without running water. Counsel failed to present her brain dysfunction caused by *en utero* alcohol exposure, trauma, and/or head injuries. The district court erroneously found this "was not a situation, such as in *Sears v. Upton*, where trial counsel presented a questionable and misleading mitigation presentation that resulted from counsel's failure to discover a wealth of information that did not come until the post-conviction process."[2540] Respectfully, that is precisely what happened.

**a. Counsel failed to investigate the readily available proof of the justice system's failure to address Jack Kleiner's rape of Lisa.**

At the evidentiary hearing, Mrs. Montgomery presented stipulated testimony regarding the failure of the justice system to respond to the fact Jack Kleiner raped Lisa for years prior to her sixteenth birthday. Throughout the trial, the government – and several defense witnesses implied that Mrs. Montgomery had not suffered chronic PTSD from Jack Kleiner raping her. The rapes, inaccurately cabined solely to Jack Kleiner and without any discussion of Judy Shaughnessy's betrayal of her daughter by selling her to repairmen, were minimized and the question was posed as to whether they were even rapes or whether Lisa had stolen her mother's husband.[2541] No witness described that Jack repeatedly raped Lisa on the concrete floor of her lean-to room built off the trailer, banging her head into the floor to insure her acquiescence. Further,

proof was introduced that the rapes were discussed in open court during the *Kleiner v. Kleiner* divorce proceeding, and the government was able to suggest to the jury the possibility that the rape was a fiction created by Judy Shaughnessy for the purpose of gaining custody of her children. The fact that no proof was presented showing that the rapes were investigated or even referred to law enforcement furthered the impression that the accusation was spurious.

Counsel was on notice that the government had not accepted that Lisa' PTSD resulted from childhood sexual trauma. The government's psychiatric witness' report which the defense team received pre-trial clearly signaled that Dr. Dietz was not convinced the rapes occurred: "It is beyond the scope of this evaluation to determine the validity of the disputed sexual abuse claim, which apparently was never prosecuted, or to determine whether any sexual contact that may have occurred was willing or not." That Mr. Duchardt was aware of the need to provide as much supporting detail and corroboration of the rapes as possible is apparent from the record: Mr. Duchardt responded to an objection, "Judge, the reason we are laying this foundation is for some reason there has been dispute as you have already indicated whether this sexual abuse is true or not . . ."[2542]

Though the defense never interviewed either, Judge Hugh Rineer and Denise Riley Baker were available to provide the testimony regarding the veracity of Lisa's accusation of rape and the reason why the case was never prosecuted. At the evidentiary hearing the parties stipulated to Ms. Riley's and Judge Rineer's testimony regarding their roles in the reporting and investigation of Jack Kleiner's rape of Lisa. It was stipulated that Judge Rineer presided over the divorce proceeding between the Kleiners. He heard the proof regarding Jack's rape of Lisa and would have testified that "it would not be fair to conclude that he did not find Lisa's testimony regarding sexual abuse credible."[2543] The stipulation included that by the time Judge Rineer heard the accusations, the Oklahoma Department of Human Services had been notified and the case had been referred for prosecution, so he did not make any further report to authorities. Similarly, it was stipulated that Denise Riley Baker was the Oklahoma DHS social worker assigned to investigate the allegations. She conducted an investigation into Lisa's accusation that Jack Kleiner repeatedly raped her and concluded that Lisa was telling the truth. As a result, she recommended that the case be prosecuted and sent the appropriate paperwork to the Tulsa County District Attorney's Office. The fact that the case was never evaluated by any prosecutor indicated to Ms. Riley that the case fell through the



Appellate Case: 17-1716 Page: 744 Date Filed: 11/01/2017 Entry ID: 4596229

cracks, perhaps due to the fact that she sent the paperwork to the Tulsa County prosecutor's office when the Kleiner homestead was in Osage County.[2544]

Had trial counsel investigated Jack Kleiner's rape of Lisa, trial counsel could have presented the testimony of Judge Rineer and Ms. Riley. Their testimony would have rebutted the insinuation that Lisa's report of the rapes was not credible, illuminated the serious nature of the crime against her, and presented the jury with the failure of the adults in Lisa's life, including DHS and the criminal justice system, to protect her.[a] Such testimony could have been further contextualized by expert testimony[b] regarding the effect the trauma had on her development, including the trauma of reporting the rape, testifying in open court regarding the rape, and then having the entire system that should protect her completely abandon her.

The prejudice of counsel's failure to fully investigate the sexual trauma they did present is apparent from the government's closing argument: "I think Mr. Duchardt said in his opening statements that it was day after day, week after week, month after month. There is no evidence of that."[2545]

[a] Mrs. Montgomery alluded to this systemic failure to protect her in her letter to Judge Fenner when he removed Judy Clarke from her case. Exhibit 71, *Lisa Montgomery letter to Judge Fenner* ("I have a history of problems with lawyers in family courts, I have not trusted lawyers, even the ones appointed to me in this case").

[b] *See* §§V.E.

### b. The defense undermined their own narrative by presenting that Lisa's mother believed that Lisa stole her husband.

Mrs. Montgomery's ineffectiveness claim regarding the proof that could have been presented is at least debatable within the context of the poor job counsel did of presenting the proof of the Kleiner rapes. The government did a good job of minimizing the mitigating nature of the trauma the defense did present at trial[a] – as evidenced by the fact that four jurors did not find the existence of the mitigating circumstance that "Lisa Montgomery was the victim of childhood physical and sexual abuse at the hands of her step-father, Jack Kleiner, and was psychologically and emotionally damaged as a result of that abuse."[b] While trial counsel did present that Lisa had been sexually abused by Jack Kleiner, counsel did so in a way which invited the government to cite statistics regarding child abuse implying that as many children suffer abuse every year there was nothing mitigating about the abuse Lisa suffered.[c] As

---

[a] *See* above §V.C., incorporated by reference.

[b] Crim. D. E. 354 (only 8 jurors found the existence of that mitigating circumstance).

[c] TT. Vol. 15, p. 3154 (citing that there are ninety thousand victims of sexual abuse a year); *see also* TT. Vol. 13, p 2851 ("And I want to point out one, thing, a sad thing, a very sad thing but I think the extent of what happens has been exaggerated. You all heard the evidence and you should use collective memories and think back exactly what happened, what the testimony was from her mother, from her sister. I think Mr. Duchardt said in his opening statements it was day after day, week after week, month after month. There is no evidence of that. I am not saying it didn't happen. I think it did. But I think it has been exaggerated . . . a lot of people have

discussed both above and below, the government was able to make that argument because counsel failed to uncover the truly horrifying severity of the sexual trauma Lisa suffered and also because counsel failed to explain to the jury how the sexual trauma affected Lisa's brain development and compromised her day-to-day functioning throughout her life.

In addition to those failures, counsel also affirmatively created the possibility that the jury credited Lisa's mother's narrative that Lisa "stole" her husband. During cross examination of government witness Carl Boman, defense counsel elicited testimony that Mrs. Shaughnessy told Mr. Boman on more than one occasion that Lisa "encouraged" Jack Kleiner.[2546] The defense called David Kidwell to the stand apparently for the sole purpose of introducing his testimony that he heard Ms. Shaughnessy claim that Lisa led Mr. Kleiner on.[2547] Mr. Kidwell testified for four minutes, establishing that Mrs. Shaughnessy is his aunt, that she was a "wild person" growing up, that he did not know if she drank a lot but she went out a lot, that he knew Jack Kleiner raped young Lisa, that Lisa looked like the photo shown in court as a child, and

bad parents and we all know that. And some of them turn out fine, to be fine law abiding citizen and some don't. But you know putting mom and dad, stepdad here on trial, which they tried to do, that's what we call abuse excuse and don't you get tired of it. Any time anybody commits a serious crime anymore the first thing they do, start blaming something that happened in their childhood or somebody did something to me."



Appellate Case: 17-1716 Page: 747 Date Filed: 11/01/2017 Entry ID: 4596229

that Judy said that Mr. Kleiner raped Lisa after Lisa led him on, but that Kidwell did not believe that to be true.[2548] The defense elicited testimony from William Boomhower on direct exam that Mrs. Shaughnessy told his wife that Lisa "took her husband."[2549] Similarly, the defense directed the testimony of Pat Bruton that she had heard that Lisa seduced Jack and that it was Lisa's "fault" that Jack raped her.[2550] The fact that four of the jurors did not find the existence of the mitigating circumstances submitted regarding that Lisa was sexually and physically abused by Jack Kleiner proves that counsel's efforts in this regard were woefully lacking.

**c. Counsel failed to present readily available proof of Judy's lack of care for and silencing of Lisa.**

Counsel failed to present other readily available evidence that would have painted a vivid picture of Lisa's mother's lack of concern for, and silencing of, Lisa. Though counsel called Nancy Wallentini to the stand, counsel failed to mine Ms. Wallentini's records for her observations regarding the Kleiner family. As with many of the putative mitigation witnesses, trial counsel called Ms. Wallentini to testify in the first phase of the trial, attempting to buttress the NGRI/pseudocyesis defense with proof of Mrs. Montgomery's sexual trauma induced PTSD.

At trial Ms. Wallentini testified generally as to her memory of Lisa based on her records.[2551] Ms. Wallentini testified that her records reflected that



Appellate Case: 17-1716 Page: 748 Date Filed: 11/01/2017 Entry ID: 4596229

she provided therapy to sixteen year old Lisa following Lisa's disclosure of sexual abuse and that Ms. Wallentini thought that Lisa needed to address the sexual abuse, become more assertive, and to participate in family therapy. Ms. Wallentini testified that the family aborted therapy following the resolution of the custody case.[2552] The government moved to exclude Ms. Wallentini's records as hearsay and Mr. Duchardt acquiesced without even arguing the Federal Rules of Evidence Rule 803(5) exception.[2553]

As set out in the Biopsychosocial and in Ms. Vogelsang's PowerPoint, Ms. Wallentini's records actually could have provided many telling details had trial counsel presented them or questioned Ms. Wallentini regarding the information contained in them. Ms. Vogelsang's presentation highlighted the importance of the fact (contained in Ms. Wallentini's records) that Ms. Shaughnessy did not seek counseling for Lisa, rather Ms. Shaughnessey's attorney did.[2554] Ms. Wallentini's records reflect that Ms. Wallentini, a trained therapist, observed that "Mo[ther] appears to have lack of empathy for Lisa."[2555] The records reflect Ms. Wallentini's observation that Lisa "continues to be uncomfortable about verbalizing feelings" and that she was recently engaged to Carl Boman (her new step-brother).[2556] The records reflect that Teddy Kleiner, Mrs. Montgomery's younger half-brother, told Ms. Wallentini that his father broke a broom beating on Lisa.[2557] And the records reflect that Ms.



Appellate Case: 17-1716 Page: 749 Date Filed: 11/01/2017 Entry ID: 4596229

Shaughnessy "verbally overwhelmed" Lisa.[2558] As discussed, above, had counsel conducted the requisite investigation, they would have learned of the family pattern of child abduction, including the multiple times Mrs. Shaughnessy either took Lisa's children or helped Carl to do so, counsel would have had support for the statutory mitigating circumstances regarding Mrs. Montgomery acting under emotional disturbance. Had counsel pressed this mitigating circumstance, additional proof of Mrs. Shaughnessy's power over Lisa was available, here, in Ms. Wallentini's records (and, accordingly, her potential testimony). Further, as shown below, had counsel investigated the Kidwell Memo, counsel would have learned how much Mrs. Shaughnessy had to fear from Lisa's full disclosure of the sexual abuse she endured and Ms. Wallentini's records and testimony regarding Mrs. Shaughnessy's "overwhelming" Lisa would have taken on a totally different meaning: Mrs. Shaughnessy had every reason to overwhelm Lisa and prevent full disclosure of the abuse because Mrs. Shaughnessy was sexually trafficking Lisa.

**d. Counsel failed to investigate the Kidwell Memo[a] despite its obvious red flag signaling extreme sexual trauma.**

[a] In addition to the Kidwell Memo written by Dani Waller, the mitigation specialist hired by the ultimate trial team, the necessity of interviewing Mr. Kidwell should have been manifest from counsel's review of prior counsel's file. When Mrs. Montgomery was first arrested in Kansas, she was initially represented by the Kansas Federal Public Defender, who retained a mitigation specialist, Brett Dillingham to being work on a social history. Mr. Dillingham's notes reflect that in his visits with Mrs. Montgomery – within the first weeks following her arrest –



Appellate Case: 17-1716 Page: 750 Date Filed: 11/01/2017 Entry ID: 4596229

As shown, above,[a] counsel were on notice of the extreme sexual trauma inflicted on Lisa by her step-father and his friends with her mother's complicity. In March 2007, mitigation investigator sent the lawyers the Kidwell Memo, setting forth that Lisa was required to service Jack "and his friends."[2559] The Kidwell Memo clearly signaled that the team did not know the full extent of the sexual trauma and that further investigation was required.[2560]

The district court correctly found that "the [Kidwell] statement could have led to additional mitigating evidence," and discussed the dictates in *Wiggins* and *Rompilla* that counsels' strategic decisions to abort investigation be assessed for reasonableness.[2561] The district court, however, denied relief based on three findings, all of which are contrary to the record:

---

Mrs. Montgomery mentioned David Kidwell multiple times (Vol. 2, p. 305, *Dillingham Testimony*). Mr. Dillingham's notes were included in the file passed to the FPD for the Western District of Missouri and were made an exhibit to the hearing (Exhibit 1-291, *Dillingham Declaration,* Attachment 2, p. 5, *Dillingham Handwritten Notes*). Any reasonable investigation would have included interviews with prior counsel and experts – especially where prior counsel and experts had met with Mrs. Montgomery immediately after arrest and were, accordingly, witnesses to her mental state close in time to the crime. Had counsel performed adequately and spoken with Mr. Dillingham – or even simply reviewed his notes in counsel's file – counsel would have been on notice long before the Kidwell Memo that Mr. Kidwell was a significant family member who needed to be interviewed.

[a] See, §V.B., above, incorporated by reference.

1) the Kidwell evidence was "not available at the time of trial."[a]

2) the trial team made a strategic decision to abort further investigation into the Kidwell information; and

3) the trial team only aborted its investigation after "reasonable diligence to corroborate Kidwell's statement."

Mrs. Montgomery's entitlement to relief is at least debatable where the district court's denial of relief is based on facts clearly refuted by the record. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (a claim is "debatable" when it is open to dispute on any logical basis).

**i. The record refutes the district court's finding that the Kidwell evidence was unavailable.**

The district court found that the Kidwell evidence was "not available at the time of trial."[b] However, the uncontested proof at the evidentiary hearing was clearly to the contrary: mitigation investigator Dani Waller located David Kidwell, interviewed him, and obtained the information regarding the gang rapes.[2562] Ms. Waller documented that information in the Kidwell Memo and

---

[a] D.E. 212 p. 40 ("some evidence was not available at the time of trial, specifically Movant's alleged sexual abuse by friends of her step-father, Jack Kleiner, and alleged sex trafficking of Movant by her mother, all during her teenage years").
[b] D.E. 212 p. 40 ("some evidence was not available at the time of trial, specifically Movant's alleged sexual abuse by friends of her step-father, Jack Kleiner, and alleged sex trafficking of Movant by her mother, all during her teenage years").

distributed the information to all attorneys and investigators on the team in March 2007, seven months before trial.[2563]

Mr. Kidwell's availability is further demonstrated by the fact that Mr. Kidwell was subpoenaed to trial and testified for 4 minutes on October 12, 2007.[a] Though counsel failed to ask him a single question that would have reasonably allowed Mr. Kidwell to provide the information about the gang rapes,[2564] Mr. Kidwell (and his knowledge about young Lisa's disclosures) was present at the trial – ready, willing, and clearly able to provide testimony.

Finally, Mr. Kidwell testified by declaration at the evidentiary hearing that, had he been asked, he would have testified to the rapes and young Lisa's disclosure.[b] The government did not contest or in any way refute Mr. Kidwell's testimony, and trial counsel testified that had they known the information which flowed from an investigation of the Kidwell Memo, they would have presented it to the jury.[2565]

---

[a] Crim. D.E. 327 (Kidwell testified from 3:25-3:29 p.m.)

[b] Exhibit 10, p. 6, *Kidwell Declaration* ("I was surprised at how few questions the attorney asked me. It seems like it took longer to swear me in than for my testimony. I had spoken to someone on Lisa's defense team many months before the trial, but that wasn't the lawyer who was asking me questions in court. I told them a lot of what is in this declaration, but not the graphic details. It seems like they didn't spend that much time with me. I thought that I was going to be asked these questions in court. I was willing to testify to all of this information. It bothered me that they lawyer didn't ask me these questions.")



Appellate Case: 17-1716 Page: 753 Date Filed: 11/01/2017 Entry ID: 4596229

The district court's denial of relief based upon the premise that the Kidwell information was "not available at the time of trial" is clearly contrary to the record.

**ii. The record refutes district court's finding that trial counsel made a strategic decision to abort further investigation into Kidwell.**

The district court implicitly found that the trial team acted strategically in aborting the Kidwell investigation after "reasonable diligence to corroborate the Kidwell statement."[2566] However, the timeline of events proven at the evidentiary hearing– and Mr. Duchardt's admission that he did not pay much attention to what Ms. Waller was doing,[a] strongly suggest that no attorney was even aware of the Kidwell disclosure. Ms. Waller and Mr. Ninemire interviewed David Kidwell on March 1, 2007. By the time Ms. Waller typed the memo to the attorneys regarding the interview, Mr. Duchardt was in Philadelphia for Mrs. Montgomery's brain scans.[2567] While in Philadelphia, Mr. Duchardt, after instructing Mrs. Montgomery that she had to answer his questions and had to quit curling into a fetal position, got Mrs. Montgomery to

[a] *See* §V.B., incorporated by reference; Mr. Duchardt explained that he "did not really have a lot of a relationship with Dani Waller," though he characterized her as a "good gal." Mr. Duchardt confirmed that Mr. Owen was the person who primarily assigned Ms. Waller's tasks; her "role in terms of what I was doing was not a whole lot." (Exhibit 83, p. 3-4, *Armstrong Declaration* (quoting Fred Duchardt)).



Appellate Case: 17-1716 Page: 754 Date Filed: 11/01/2017 Entry ID: 4596229

"be[come] firm" on Tommy being present at the scene.[2568] He wrote an excited memo relating how Mrs. Montgomery's revelations changed the focus of their case.[2569] From that point, the attorneys began seriously investigating 'the Tommy defense,' culminating in the team's meeting with the government on April 3, 2007 where, according to the notes of the AUSA, the team claimed to have a "positive" identification of Tommy as being in the car with Mrs. Montgomery as she left the scene.[2570] The focus on 'the Tommy Defense' distracted counsel and Ms. Waller's Kidwell Memo was, apparently, lost in the excitement. Here, as in *Wiggins v. Smith*, the record "underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *See* 539 U.S. 510, 526 (2003).

The district court found counsels' investigation into Mrs. Montgomery's sexual trauma to be reasonable based on an unreasonable interpretation of the evidence. The record shows that Dani Waller burst into tears when questioned at the hearing regarding whether she followed up on the Kidwell Memo.[2571] As she explained, her tears were because she now recognizes that the memo contained "important information that would impact the trajectory of somebody's life and be significant in their functioning and it requires follow-up and rapport building. It requires so much more that it didn't



Appellate Case: 17-1716 Page: 755 Date Filed: 11/01/2017 Entry ID: 4596229

get."[2572] Ms. Waller elaborated that she shared the Kidwell Memo with the lawyers, that her work was directed by the lawyers, but that no follow up was requested.[2573] Ms. Waller's testimony that counsel failed to follow up on the Kidwell Memo was supported by the testimony of both John O'Connor and Dave Owen.[a] However, the district court ignored that testimony and found, without reference to any witness or exhibit, that counsel "limited the scope of the investigation after reasonable diligence to corroborate Kidwell's statement."[2574] The district court's finding that counsel strategically limited the investigation after attempting to corroborate Kidwell's information is refuted by the record.

**iii. The district court's finding that the trial counsel only aborted their investigation after "reasonable diligence to corroborate Kidwell's statement" is refuted by the record and contrary to caselaw.**

The District Court's denial of relief is clearly debatable where the record demonstrates – contrary to the district court's holding – that trial counsel did not attempt to corroborate the Kidwell information. Ms. Waller's testimony is unequivocal – no attorney requested any follow up investigation based on her Kidwell Memo.[2575] Mr. Owen's testimony at the evidentiary hearing

[a]Vol. 7, p. 1983, *O'Connor Testimony*; Vol. 8, p. 2186, *Owen Testimony*; Motion to Expand the Record – Attachment 1, *Supplemental Owen Declaration*. Mr. Duchardt has not provided any proof regarding the Kidwell Memo.



Appellate Case: 17-1716 Page: 756 Date Filed: 11/01/2017 Entry ID: 4596229

corroborates Ms. Waller's. Mr. Owen expressed shock and dismay at the information in the Kidwell Memo regarding multiple perpetrators raping Lisa. Mr. Owen testified that he, "[d]id not know that [prior to being told while on the stand]."[a] Mr. Owen has further clarified his testimony, "I had never heard these allegations from any source until I was asked about them while on the witness stand during the evidentiary hearing. I was quite obviously shocked."[b] Mr. Kidwell's testimony further corroborates Ms. Waller's and Mr. Owen's testimony, setting out that he was only interviewed once pretrial, that he did not talk to the attorney who asked him questions in court before appearing in court, that he thought he would be asked to testify about the gang rapes, but was not.[2576]

Mr. Owen has clarified any possible confusion created by his answer at the evidentiary hearing. When Mr. Owen indicated that the team talked with Jack Kleiner regarding the sexual abuse of Mrs. Montgomery, Mr. Owen did not mean that he did so in response to the Kidwell Memo – indeed Mr. Owen did not even see Mr. Kleiner after reading the Kidwell memo.[2577]

---

[a] Vol. 8, p. 2185, *Owen Testimony*; *Motion to Expand the Record* -- Attachment 1, *Owen Supplemental Declaration* ("I had never heard these allegations from any source until I was asked about them while on the witness stand during the evidentiary hearing. I was quite obviously shocked").

[b] *See Motion to Expand the Record,* Attachment 1, *Owen Supplemental Declaration*.



Appellate Case: 17-1716 Page: 757 Date Filed: 11/01/2017 Entry ID: 4596229

> When I testified with regard to a question about follow up on Ms. Waller's 2007 memo, I was solely referencing the 2005 interviews with Jack Kleiner . . . Ron Ninemire and I interviewed Jack Kleiner two times, both of those interviews took place in 2005 which was early on in my representation of Lisa. **At the time Ron and I interviewed Jack Kleiner we did not know of the allegations of trafficking or gang rape.** When I testified that Jack denied it, what I meant was that Jack had denied he had ever abused Lisa. I did not believe Jack's denials. **We would not have been deterred from investigating any avenue on the basis of what Jack Kleiner said**.[2578]

In order to find counsels' failure to follow up on the Kidwell Memo to be a reasonable tactical decision, district court erroneously found that Ron Ninemire and Dave Owen attempted to corroborate the Kidwell Memo with Mrs. Montgomery.[a] Dave Owen did not testify regarding any such attempt to discuss the Kidwell Memo's contents with Mrs. Montgomery;[2579] Ron Ninemire was unavailable to testify at the evidentiary hearing as he suffers from global transient amnesia.[2580]

Further, there is no proof in the record indicating that any person asked Mrs. Montgomery a single question regarding the Kidwell Memo until the §2255 team did so.[b] The only possible source of the district court's mistake

---

[a] D.E. 212, p. 52 ("In particular, Owen and Ninemire followed up with Jack Kleiner **and Movant** on David Kidwell's statement that she was sexually abused by Jack's friends, but neither provided any corroborating evidence.")
[b] Vol. 7, p. 1707, *Porterfield Testimony* (Kidwell information not in her original April 2016 report (Exhibit 7), but she supplemented her report after interviewing Kidwell and Mrs. Montgomery regarding the Kidwell information (Exhibit 10, dated October 2016)); Vol. 7, p. 1796, *Woods Testimony* (describing Mrs.



Appellate Case: 17-1716 Page: 758 Date Filed: 11/01/2017 Entry ID: 4596229

could be a reliance on Mr. Duchardt's pre-hearing declaration wherein he asserted that the trial team knew every fact in the original social history and that Mrs. Montgomery had denied any facts he did not present.[a] Mr. Duchardt filed

---

Montgomery's physical symptoms when asked about Kidwell's disclosure, including abulia, and reflecting that Mrs. Montgomery was able to confirm the accuracy of Kidwell's statements)

[a] D.E. 129, p. 3; Mr. Duchardt's claim regarding his knowledge of every fact in the biopsychosocial history is similar to his initial position when confronted by his ineffective failure to investigate social history in *U.S. v. Sinisterra*, where this Court found his pre-§2255 hearing position that he knew all the mitigation proof inconsistent with the sworn testimony of the rest of his team:

> We conclude that Sinisterra's claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence merits further review . . .
>
> Sinisterra's § 2255 motion set forth facts pertaining to his life in Colombia, including rape, physical and sexual abuse, homelessness, privation, and head injuries. No testimony or other evidence about these factual allegations was presented at trial. **[Co-counsel] Herndon and [investigator] Grothaus stated that they did not know this information about Sinisterra's upbringing, but Duchardt stated that he was "aware of all of this information prior to the start of the trial."**
> **. . .**

600 F.3d 900, 907 (8th Cir. 2010) (emphasis added).

Mr. Duchardt later testified, contrary to his earlier position, admitting that he did not know the facts set out in the habeas petition:

> Q: Throughout the term of your representation of Mr. Sinisterra, did you ever have any knowledge that Mr. Sinisterra may have been a victim of childhood physical abuse, trauma from witnessing scenes of extreme domestic violence, or sexual molestation?
> A: No, sir.

that declaration September 2, 2014, prior to the §2255 team investigating the Kidwell Memo, interviewing Mr. Kidwell, having Dr. Porterfield interview Mr. Kidwell, and the corresponding supplements to Dr. Porterfield and Ms. Vogelsang's reports filed in 2016. Accordingly, even if Mr. Duchardt were correct that he knew every fact contained in the original social history and correct that Mrs. Montgomery denied the veracity of the parts of that history

---

4:04-cv-08003-GAF, D.E. 119 p. 90, *Duchardt Testimony*.

When asked how he could reconcile his sworn declaration that pretrial he knew all the facts in the habeas petition with his testimony under oath at the hearing, Mr. Duchardt somewhat incoherently explained, "Well, in the deposition you all took of me I had the opportunity to, I guess, correct any misapprehensions about what I may have been trying to say in that statement. Of course, basically what you try to do when you're asked to put together something like this is do your best and to try to anticipate what the questions are. You left me – or actually cocounsel left me with the impression that what was being gleaned out of this [his statement that was showing on the overhead screen as he testified] was that I was trying to say something different than the answers to the questions I just gave to you just before."

Mr. Duchardt described his approach to development of mitigation proof for Mr. Sinisterra in similar terms to his description of his approach for Mrs. Montgomery. Mr. Duchardt explained, "I personally felt very close to Mr. Sinisterra and felt that he was a good man caught in a bad situation and wanted to do our best to portray the goodness in the man. I think that would probably be the general approach that any capital case litigant – or litigator would try to do." *Sinisterra v. U.S.*, 4:04-cv-08003-GAF, D.E. 119 p. 88-89, *Duchardt Testimony*. Mr. Duchardt ultimately admitted that he never asked Mr. Sinisterra if he had been physically or sexually abused as a child. *Id*. at p. 95.



Appellate Case: 17-1716 Page: 760 Date Filed: 11/01/2017 Entry ID: 4596229

that he failed to present, his declaration does not stand for the proposition that Mrs. Montgomery denied that the Kidwell Memo was true. The district court does not reference any source supporting its finding that Mr. Owen and Mr. Ninemire attempted to corroborate the Kidwell Memo with Mr. Kleiner and Mrs. Montgomery, and the record refutes those findings. Rather the record shows that counsel failed to do anything to follow up on the Kidwell Memo – even to discuss the matter with their client.

Even if counsel had discussed the Kidwell memo with Mrs. Montgomery, the proof presented at the hearing established that Mr. Duchardt was aware that Mrs. Montgomery was unable to provide information because of her mental illness and trauma history. Mr. Duchardt testified that he was aware that Mrs. Montgomery was unable to provide complete information regarding her suffering: "to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us."[2581] As Mr. Duchardt vividly described, Mrs. Montgomery did not deny that there was more abuse and suffering than she had disclosed, rather whenever she was asked about additional, undisclosed sexual abuse she curled into a fetal position.[2582]

Dr. Porterfield testified that anyone knowledgeable about trauma would have recognized Mrs. Montgomery's behaviors – such as curling into a fetal position – as symptomatic of extreme trauma.[2583] Accordingly, prevailing

professional norms, including the standards set out by the ABA Guidelines, required the team to recognize the symptoms of mental illness and trauma and respond to the red flags signaled by her inability to discuss the trauma, if counsel had aborted the investigation based on Mrs. Montgomery's failure to corroborate the Kidwell Memo, such a decision would have been unreasonable in light of what was known to counsel, in contravention of *Rompilla*, 545 U.S. at 380 and *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) ("Uncooperative defendants and family members, however, do not shield a mitigation investigation . . . if the attorneys unreasonably failed to utilize other available sources that would have undermined or contradicted information received."). However such analysis is unnecessary where Mr. Owen testified that the team was unaware of the nature of the sexual trauma[2584] (and accordingly could not quiz Mrs. Montgomery for corroboration) and where Mr. O'Connor testified that had such information been known, it would have been presented in mitigation.[2585]

The proof in the record that the trial team failed entirely to investigate the Kidwell Memo stands in complete opposition to the district court's finding that counsels' decision to limit the scope of the mitigation investigation was "objectively reasonable as trial counsel only limited the scope of the investigation after reasonable diligence to corroborate Kidwell's statement."[2586]



Appellate Case: 17-1716 Page: 762 Date Filed: 11/01/2017 Entry ID: 4596229

No one did anything to attempt to corroborate the statement, so counsels' diligence could not be reasonable. The district court's finding to the contrary is at least debatable, because it is contrary to the record.

Further, counsel did not "decide" to limit the investigation. Not only is the proof in the record contrary to the district court's conclusion, the fact that trial counsel presented proof of the rape at trial, despite Kleiner's denial of it, refutes the possibility that Kleiner's "failure to corroborate" the Kidwell Memo was the lawyers' reason for failing to investigate further. The district court tries to parlay failure to follow up on the Kidwell Memo into a strategy decision when it is clear that counsel simply did not read the memo. Ms. Waller burst into tears while testifying that no one followed up on her memo; Dave Owen admitted that no follow up was done; John O'Connor admitted that if counsel had known of other men raping Lisa they would have investigated and presented that proof. The uncontroverted testimony strongly implies that the team simply missed the information in the Kidwell Memo.

The lack of diligence in the investigation of Mrs. Montgomery's sexual history is further demonstrated by the failure to investigate the names of the perpetrators in their file. As shown at the hearing, the names of two of the men who serially raped and beat Lisa were contained in the *Kleiner v. Kleiner* divorce records –in counsel's files. The interrogatories answered by Judy

Kleiner contained the names of the men in whose company she admitted to being in the preceding year.[2587] Among those names were Harold Alee and Gerald Shipley.[2588] The evidence at the hearing established that the trial team possessed those records, but failed to investigate.[2589] The district court's determination that failure to investigate that information was reasonable is at least debatable where it is contrary to Supreme Court jurisprudence. Ronald Rompilla won relief based on his attorney's failure to investigate materials contained in a **c**ourt file that was readily available. Mrs. Montgomery's claim is even stronger than Rompilla's where, here, the names necessary to further the investigation were in defense counsel's own file – and the information framing the need for the investigation was contained in the team's investigator's report to the team. See *Rompilla*, 545 U.S. 374.

Mrs. Montgomery would be entitled to review of the ineffective assistance of counsel claim even if the district court's factual findings were not erroneous. Even had counsel attempted to corroborate the information through Jack Kleiner and Mrs. Montgomery, it is at least debatable that any decision to limit investigation based on failure to obtain corroboration from the perpetrator and the traumatized victim would have been unreasonable in light of all that counsel knew. *See Wiggins*, 539 U.S. at 527.

The reasonableness of counsel's putative reliance on the denial of the alleged perpetrator to abort further investigation is at least debatable where the Eleventh and Ninth Circuits have held that reliance on perpetrator denials is not a reasonable basis for curtailing investigation. In *Johnson v. Secretary, DOC*, the Eleventh Circuit found that the denial of an alleged perpetrator is not a sufficient basis for a reasonable attorney to "fail to pursue those non-statutory mitigating circumstances." *Johnson v. Secretary, DOC*, 643 F.3d 907 (11th Cir. 2011). Counsel's failure to investigate when "based on nothing more than a self-serving denial by the person who had been the alleged abuser" is "unreasonable," especially where, as here, other family members are available and willing to talk. *Id*. at 935; *see also*, *Boyde v. Brown*, 404 F.3d 1159, 1177 (9th Cir. 2014) (finding ineffective assistance of counsel based on counsel's "unreasonable" failure to investigate abuse beyond perpetrators denials); *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008) (where there is information regarding possible mitigation, including abuse history, it is unreasonable for counsel not to interview available family members; reasonable investigation requires "at a minimum, interviewing other family members [besides perpetrator and perpetrator's wife] who could corroborate the evidence of abuse and speak to the resulting impact"). Here, Mrs. Montgomery has shown counsel did not follow up on the Kidwell Memo, but that even if counsel

had done so as erroneously found by the district court, the reasonableness of counsel's reliance upon the denials of the perpetrator to abort investigation is at least debatable by jurists of reason in light of *Johnson v. Secretary, DOC*, *Boyde,* and *Williams v. Allen.*

**e. Counsel failed to investigate, develop, and present other proof of the coercive control and trauma that defined Lisa's existence.**

Trial counsel not only missed the devastating nature of the full story of Lisa's sexual trauma, they also failed to investigate, develop and present the available evidence of the other forms of abuse which defined Lisa's life in the Kleiner household, and then her life with each of her husbands. As shown above,[a] the biopsychosocial history developed as part of §2255 litigation demonstrated the pervasive nature of the abuse inflicted on Lisa. By stipulation the declarations of over forty lay witnesses was admitted as testimony.[2590] While each of those witnesses was available to testify at trial, Ms. Vogelsang summarized for the district court the testimony which was omitted by trial counsel.

Ms. Vogelsang explained that Lisa grew up in a home characterized by coercive control where terror and domination were the norm.[b] Her discussion of the dynamics of coercive control and its debilitating effect on the development

---

[a] §V.E., incorporated by reference.
[b] *See* above at §V.E.

of a child was illuminated by the declaration of the lay witnesses who saw the abuse Lisa endured. The testimony available to trial counsel included but was not limited to:[a]

- Judy banished Lisa's older sister, Diane, from the family: "Diane was Lisa's protector and it was a very powerful thing [for Lisa] to see Diane so easily dispensed with . . . [such banishment] tells that child that they have no control; that they have no power; that there's nothing they can do to stop these traumatic losses, and in this case that her mother is omnipotent."[2591]

- The Kleiners forced Lisa and her sister to physically fight each other. The parents sent the girls to the garage and told not to return until one of them had drawn blood;[2592]

- Lisa lived in isolation, captive to her mother and step-father: "Jack had them out in the country kind of in his own little kingdom. They were isolated. They could have screamed and the neighbors probably wouldn't have heard them."[2593]

- Jack's deviance separated the family from those who dared to come near the house: Preacher Wesley Gann observed Jack pretending to masturbate at the end of Preacher Gann's driveway in the presence of Preacher Gann's wife and child, Jack threatened Preacher Gann and physically assaulted him: "I can't imagine what it would have been like to spend my childhood in his household."[2594]
- Lisa's mother destroyed that which mattered to her children: she sold Lisa's violin, killed Teddy's dog in front of him. As Teddy described it, "She's destroyed or taken away everything I've ever loved and she holds so much power that I know she is capable of anything."[2595]

- Jack's abuse of Lisa was not confined to sexual abuse. Jimmy Miller lived with the Kleiner family and was available to testify to what he saw: "Jack beat the girls too. And these were not short beatings. If he was set off he would come at them with whatever he had in his hands

[a] For a complete discussion of the available testimony *see* Exhibit 1, Biopsychosocial and attachments, incorporated by reference.

> and the only thing the girls could do was duck. I am sure there were times he hit them in the head. He would beat them so badly they had welts on them. He would yell and curse at them while he was beating them. He told them it was their fault that he was beating them. If Judy tried to interfere he would beat her. She couldn't stop him."[2596]

Had trial counsel adequately investigated the conditions of Lisa's life beyond the fact of Kleiner's rape, counsel could have presented the atmosphere of terror and control that contributed to Lisa's complex PTSD. "This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing [jury].'" *Porter*, 558 U.S. at 41 (quoting *Strickland, supra* at 700). Where counsel's ineffectiveness resulted in proof that "only scratched the surface of [her] horrific childhood," Mrs. Montgomery's entitlement to relief is at least reasonably debatable. *Johnson*, 544 F.3d 592.

**f. Counsel failed to effectively use experts to explain the debilitating effects of lifelong, chronic trauma on Lisa.**

Mrs. Montgomery's entitlement to relief is at least reasonably debatable where trial counsel failed to provide the jury with a frame-work for understanding how the trauma that was presented by counsel was mitigating. *Williams v. Taylor*, *supra* at 399 (counsel has a duty to present and explain the significance of all available mitigation evidence). At the evidentiary hearing, Mrs. Montgomery presented the compelling testimony of Dr. Kate Porterfield, a specialist in the effects of chronic PTSD. Dr. Porterfield testified to the scientific, psychological knowledge available at the time of Mrs. Montgomery's



Appellate Case: 17-1716 Page: 768 Date Filed: 11/01/2017 Entry ID: 4596229

trial regarding the effect of pervasive trauma on brain development. Dr. Porterfield not only explained the scientific understanding of how trauma impairs neuronal development and wiring, but also explained the behavioral manifestations of such brain dysfunction – with reference to Mrs. Montgomery's impaired functioning pre-trial.[a] As Dr. Porterfield explained, conditions of chronic trauma as extreme as that which Mrs. Montgomery suffered change the neuronal activity in the brain, often creating – as occurred with Mrs. Montgomery – impaired sense of time, distorted perceptions or reality along with dissociation and psychosis.[b] Where such knowledge was available at the time of trial and where the mitigating nature of seemingly unrelated trauma is not necessarily obvious to all jurors, counsel's failure to do so was deficient performance.[c]

This is especially so here, where Marilyn Hutchinson began an assessment of Mrs. Montgomery and was available for continued work on the

---

[a] *See* §V.E., incorporated by reference.
[b] S*ee* § V.E., above, incorporated by reference
[c] *See* Crim. D.E. 354 (4 jurors did not find that Lisa Montgomery was the victim of childhood physical and sexual abuse at the hands of her stepfather, Jack Kleiner, and was psychologically and emotionally damaged as a result of that abuse; *see also* Vol. 1, p. 99, *Stetler Testimony* (discussing the Capital Jury Project's findings that that which matters to jurors is how traumatic events and psychiatric/psychological diagnoses affected a defendant's actual day-to-day functioning).



Appellate Case: 17-1716 Page: 769 Date Filed: 11/01/2017 Entry ID: 4596229

case. As shown at the evidentiary hearing, Mr. Duchardt contacted Dr. Hutchinson about possible continued work on the case.[2597] However once Dr. Hutchinson expressed skepticism that 1) Mrs. Montgomery had pseudocyesis and that 2) if she did, such would be the most helpful lens through which to present Mrs. Montgomery's impairments to a jury, Mr. Duchardt never contacted her again.[2598]

The proof at the evidentiary hearing showed that Dr. Hutchinson is a skilled psychological expert who has a gift at explaining the causal connection between complex trauma and impaired memory, impaired perceptions of reality, mood disorder, impaired sense of self, dissociation, and psychosis.[a] Dr. Hutchinson was not only available at the time of trial, she had already contracted with the FPD to consult on this case. She had begun – though not completed – her assessment. She saw Mrs. Montgomery in early 2005, not long after the crime and heard Mrs. Montgomery's remorse. She saw Mrs. Montgomery before she was medicated and also after she was medicated. Dr. Hutchison possessed a wealth of observations and clinical and forensic knowledge that counsel squandered. Mrs. Montgomery's entitlement to relief is at least debatable where trial counsel ineffectively failed to present the psychological effect of her trauma and how it impaired her functioning.

---

[a] *See* above at §V.E., incorporated by reference.

Where the Supreme Court has held that counsel must not only present but also "explain[] the significance" of all available mitigation evidence, counsel's failure to present the testimony of an expert qualified to contextualize Mrs. Montgomery's trauma history was ineffective assistance of counsel. *Williams*, 529 U.S. at 399. The district court's finding to the contrary is at least reasonably debatable.

**3. Counsel failed to investigate, develop, and present Mrs. Montgomery's impaired functioning prior to the crime.**

Mrs. Montgomery's entitlement to relief is at least reasonably debatable where counsel failed to investigate and present an accurate representation of Mrs. Montgomery's pre-crime impairments in day-to-day functioning. As discussed by this Court in *Sinisterra*, impairments in functioning – such as Sinisterra's homelessness – "might present 'the kind of troubled history [the Supreme Court] has declared relevant to assessing a defendant's moral culpability.'" *Sinisterra*, 600 F.3d 900, 907 (8th Cir. 2010) (*quoting Wiggins*, 539 U.S. at 535 (recounting petitioner's troubled history, which included privation, abuse, physical torment, sexual molestation, rape, homelessness, and diminished capacity).

Mrs. Montgomery was at times homeless, living in desperate conditions that reflected her impairments – attempting to raise four children while squatting in abandoned buildings. Among the records trial counsel failed to

obtain were the Oklahoma Department of Human Services records introduced into the record as an attachment to the Biopsychosocial.[2599] Those records presented a snapshot of Lisa's impaired functioning in 1993 reflecting that the family was living between two dilapidated structures, one of which was described as having dog feces and cereal on the floor, the other of which was an abandoned trailer with no running water or plumbing. The structure "was found unsafe due to loose wires hanging from the ceiling, floor missing in the kitchen, tools, including a power drill on the floor and no water in the home."[2600] Counsel never presented any of this evidence because counsel failed to investigate and acquire these records – because counsel did not comply with professional norms regarding the creation of a social history.

Counsel failed to present evidence that – years before the crime – Mrs. Montgomery had been unable to stay sufficiently grounded in reality sufficient to keep her family safe. Had counsel complied with professional norms by preparing a social history, including synthesizing the medical records contained in their file, counsel would have been able to present the compelling history of Mrs. Montgomery's inability to effectively parent her children as demonstrated by the children's medical records. Though the district court cut Ms. Vogelsang's testimony short, her PowerPoint (which was accepted into evidence with the government's statement that it was exceptionally well

sourced and related back to her report, the contents of which the government did not contest) reflects the evidence trial counsel should have presented:

## Lisa's Children Suffer as a Result of Her Inability to Function as an Effective Parent

- CJ: ingested trisodium phosphate (1/1/1991)
- Desiree: dehydration secondary to herpes (5/7/1991)
- Desiree: wandered into ball field and was hit with softball, mild concussion (5/12/1991)
- Desiree: in a car wreck and hospitalized, broken arm, broken jaw, concussion, ankle required stitches (7/24/1991)
- Desiree: run over by a truck, tire burns and abrasions on her side (12/26/1992)
- Kayla: ingested bottle of Tylenol (4/22/1993)
- Neighbors called DHS saying children running naked in the yard, house filthy – SHD determined children neglected and needed intervention; family living in house with no running water or plumbing, loose wires handing, floor missing from kitchen, no water in the house; Desiree's teeth were still wired from car wreck two years before (Att. 148, DHS records released under protective order)

130

2601

The proof presented at the evidentiary hearing established that Mrs. Montgomery's functioning was continuously impaired by dissociation and her disconnect with reality.[a] Expert testimony revealed that Mrs. Montgomery's myriad impairments were exacerbated by the continual sexual violence she

[a] *See*, §V.E., incorporated by reference.



Appellate Case: 17-1716 Page: 773 Date Filed: 11/01/2017 Entry ID: 4596229

suffered at her husbands' hands.[a] As discussed, above, her daily life with her children and her attempts to maintain gainful employment were vitiated by constant uncertainty as to what was real and what was not. [b] As Dr. Porterfield explained, such pervasive dissociation is rare and is virtually diagnostic of extreme, pervasive trauma during the time when the person's brain is developing.[2602]

As Dr. George Woods explained, when investigated and properly presented, the limitations Mrs. Montgomery had in dealing with daily life (organization, sequencing, attending, staying rooted in reality) were symptomatic of her brain dysfunction, mental illness and trauma history.[c] Dr. Woods discussed Mrs. Montgomery's day-to-day functioning as it was highly indicative of her brain impairments:

---

[a] *See* Exhibit 1, pps. 94- 95, 128, 173, 179, *Biopsychosocial*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 131 (quoting Exhibit 1-31 *Teddy Kleiner Declaration*: "When I was around eighteen or nineteen years old, Lisa and Carl were living on Colorado Street in Bartlesville, Oklahoma. I think I was trimming trees near there at the time. I went over to Lisa's to hang out with a guy named Kevin that lived down the street. Lisa and Carl were gone at the time. Kevin and I were sitting around and I put a video in the VCR. I thought it was a movie. It was a home video and it showed Carl raping and beating my sister. It was violent and like a scene out of a horror movie. My sister was crying and in pain. I felt sick watching the video.")

[b] *See* § V.E., above incorporated by reference.

[c] *See*, § V.E., above, incorporated by reference.



Appellate Case: 17-1716 Page: 774 Date Filed: 11/01/2017 Entry ID: 4596229







[2603]

Dr. Woods explained that an assessment of neurobehavioral history is a critical component of any social history: brain damage and dysfunction are not only often the result of trauma, but also, they shape and influence a person's functioning.[2604]



Appellate Case: 17-1716 Page: 775 Date Filed: 11/01/2017 Entry ID: 4596229

Counsel's failure to investigate, develop and present this evidence of Mrs. Montgomery's brain dysfunction mirrors the failure found to be ineffective assistance in *Sears v. Upton*, 561 U.S. at 949. The Supreme Court found that Mr. Sears' counsel were ineffective where counsel failed to present evidence of defendant's "substantial deficits in mental cognition and reasoning – ie. problems with planning, sequencing and impulse control." *Ibid*. Dr. Woods' testimony is that Mrs. Montgomery's difficulties with planning, sequencing, and impulse control as a result of brain impairments were manifest in Mrs. Montgomery's social history. Had trial counsel prepared a social history, the psychiatric experts could have presented Mrs. Montgomery's brain impairments.

The Supreme Court has made clear the fact that "along with this new mitigation evidence there was also some adverse evidence is unsurprising . . . Competent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory." *Sears*, 561 U.S. at 951. Here, trial counsel turned a blind eye to witness reports of Mrs. Montgomery's impaired functioning, including reports by her children of her abusing them, because, as Mr. Duchardt explained to the government on cross examination at the hearing, "you guys did a very nice job of bringing out a lot of that kind of stuff. I didn't want to add to that bring out more of it."[2605]



Appellate Case: 17-1716 Page: 776 Date Filed: 11/01/2017 Entry ID: 4596229

Trial counsel made the determination to not present "that kind of stuff" without conducting a reasonable investigation and factual development: trial counsel had not synthesized the information from the children's medical records, had not realized Mrs. Montgomery's functioning had been impaired her whole life, had not presented the social history information to his experts, and did not know that her impairments reflected her brain dysfunction and trauma history. Accordingly, counsel's decision not to "bring out more [of the bad stuff]" was an abdication not a strategy. By failing to investigate, develop and present Mrs. Montgomery's lifelong impairments reflected in social history records and in her children's description of their lives, trial counsel failed to show that Mrs. Montgomery had long suffered the debilitating effects of chronic pervasive trauma, familially linked mental illness, and brain damage.

The district court either misapprehended or failed to engage with the record in finding that counsel were not ineffective in failing to investigate and develop all this proof. For instance, the court found that the sexual violence and torture perpetrated by Carl (the step-brother/ex-husband) was "completely unsupported by the record . . . Movant cites to Jan Vogelsang's declaration (Movant Ex.1) to support this allegation. Vogelsang makes wild accusations against Carl but cites no supporting evidence (footnote: These wholly unsupported accusations are just the type of evidence the Court would have

excluded had trial counsel attempted to present them through Vogelsang or someone like her)."[2606] The district court's analysis, again, fails to reflect the parties' stipulation to the introduction not only of Ms. Vogelsang's report and supplemental report but also all of the attachments—as substantive evidence. The government announced in open court: "**We're not contesting the information that she was able to compile and put together in the biuosocialpsych (sic) history here."**[2607] Ms. Vogelsang's report specifies the sources of her information, including her interviews with Mrs. Montgomery.[2608] Her PowerPoint specifically highlighted the corroboration Ms. Vogelsang relied on to support the claims of sexual assault by Carl, specifically the declaration from Teddy Kleiner that he watched a video of Carl beating and raping Lisa.[2609] Because the district court's analysis failed to contemplate that the government had conceded that Ms. Vogelsang's evidence was reliable and did not contest her social history information and because the court failed to engage with the documentary evidence submitted by the agreement of the parties in lieu of weeks of testimony,[a] the court's finding that counsel was not ineffective for failing is reasonably debatable.

---

[a] Motion to Expand the Record – *Attachment 4, 10/14/2016 Transcript*, p. 2; Vol. 1, p. 1-50, *Announcement of Stipulations and Introduction of Stipulated Exhibits*



Appellate Case: 17-1716 Page: 778 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery's claim of ineffective assistance of counsel is at least reasonably debatable where counsel failed to develop and present proof of her pre-crime disabilities that reflected her trauma history, mental illness, and brain damage – creating, instead, a vacuum of proof susceptible to the government's claim that Mrs. Montgomery malingered her mental illness and that the effect of the trauma she endured was not that bad. The government exploited counsels' failure in making the effective "abuse excuse" argument in closing.[2610] Had counsel properly investigated and presented Mrs. Montgomery's day-to-day impairments, not only would that evidence support the statutory mitigating circumstance that she committed the crime under severe mental or emotional disturbance under 18 U.S.C. §3592 (6), it would have shown that Mrs. Montgomery's claim of abuse was not just an "excuse" but rather the source of her life-long impairments.

**4. Counsel bungled the presentation of evidence about Mrs. Montgomery's brain impairments.**

Mrs. Montgomery's entitlement to relief is at least debatable where trial counsel failed to present evidence of Mrs. Montgomery's brain impairment. Evidence of brain damage and impairment has been repeatedly held to be a significantly mitigating circumstance. "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Caro,* 280 F.3d at 1258 (*citing*, *Penry* 492 U.S. at 331; *Sears*,



Appellate Case: 17-1716 Page: 779 Date Filed: 11/01/2017 Entry ID: 4596229

*supra* (counsel ineffective for not presenting evidence of frontal lobe brain damage); *Porter,* 558 U.S. 30(counsel ineffective for failing to present evidence of severe childhood abuse and brain abnormality manifesting itself in impulsive, violent behavior); *Williams v. Taylor*, *supra* (counsel ineffective for failing to investigate and present evidence of possible brain damage and other trauma); *Deitrich v. Ryan*, 619 F.3d 1038, 1058, 1061, 1065 (9th Cir. 2010) (rev'g dismissal of petition: failure to present evidence of organic brain damage directly resulting from abusive childhood ineffective); *Bond*, 539 F.3d 256; *Frierson*, 463 F.3d at 993–994 (petitioner prejudiced at sentencing hearing by counsel's failure to present evidence of potential organic brain damage and mental disturbance); *Frazier*, 343 F.3d 780 (ordering habeas relief where counsel failed to present mitigating evidence of Frazier's functional brain impairment); *Hamblin,* 354 F.3d at 493 (counsel ineffectively failed to present evidence of mental history and abusive childhood which could have persuaded one juror to vote against the death penalty); *Caro*, 280 F.3d 1247 ((granting habeas relief where counsel failed to present evidence of brain damage caused by exposure to toxins); *Bean*, 163 F.3d 1073 (brain damage and mental illness).

**a. Because counsel failed to conduct a reasonable investigation and create a social history, counsel did not glean Mrs. Montgomery's neurobehavioral history from available documents, records, and witness interviews.**



Appellate Case: 17-1716 Page: 780 Date Filed: 11/01/2017 Entry ID: 4596229

Trial counsel's failure to investigate, develop, and present Mrs. Montgomery's neurobehavioral history to a competent neurological expert prevented the jury from hearing the nature of Mrs. Montgomery's brain impairment – and prevented the psychological and psychiatric experts from providing a fully accurate assessment.[a] As discussed throughout this document, trial counsel failed to adhere to prevailing professional norms regarding development of a social history – one component of which is the tracking of symptoms signaling brain impairment and their effects on functioning over time.[b] Ms. Vogelsang's biopsychosocial evaluation tracked Mrs. Montgomery's impairments and made appropriate diagnosis possible. As Dr. Woods' explained, "her neurobehavioral history puts it all together . . . when you understand that her brain does not function properly, [that understanding] takes these behaviors and it translates them into symptoms. When you understand that the part of the brain, the right side of the brain, does not work accurately and there are motor findings of that as well as emotional findings, but if you don't have that, then your differential diagnosis, your ability to really

[a] Vol. 6, p. 1844, *Woods Testimony* (reliable psychiatric assessment must include consideration of neurological deficits); Exhibit 159, *Woods PowerPoint* at slide 98.
[b] *See*, Exhibit 159, *Woods PowerPoint* at slide 96; for discussion of neurological symptoms, see §V.E., incorporated by reference.



Appellate Case: 17-1716 Page: 781 Date Filed: 11/01/2017 Entry ID: 4596229

understand where her symptoms come from is limited. So her neurological status is very, very important."[a]

Rather than the exhaustive social history given to the experts in §2255, allowing full and reliable psychological, psychiatric, and neurological assessment and appropriate diagnosis of Mrs. Montgomery, trial counsel relied on his database and what Mrs. Montgomery was able to tell him. According to Mr. Duchardt, "because Ms. Montgomery could not disclose the extent of her trauma, he did not have much information to provide the experts, 'there wasn't a hell of a lot to share.' Mr. Duchardt said that he got social history information from Mrs. Montgomery during a long interview with her while she was in Pennsylvania for testing 'and really that was the script.'"[2611]

Mrs. Montgomery's claim is at least reasonably debatable where a circuit court of appeals has held that failure to "investigate and provide experts with the information necessary to evaluate [the defendant's] neurological system for mitigation constituted deficient performance." *Caro*, 280 F.3d at 1254. As the Ninth Circuit recognized, "the duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation. *Ibid*. (*citing Bean*, 163 F.3d at 1079-80. Where

[a] Vol. 6, p. 1843, *Woods Testimony*; *see also* Exhibit 159, *Woods PowerPoint* at slide 28 (outlining "Jan Vogelsang's History of Ms. Montgomery's Neurological Functioning").

counsels' admitted reliance on their client for social history information is contrary to recognized professional norms and where that reliance prevented counsel from providing the trial experts the necessary information for reliable diagnosis of Mrs. Montgomery's brain dysfunction and mental illness, Mrs. Montgomery's entitlement to relief is reasonably debatable.

**b. Counsel failed to investigate or develop proof regarding the neurological effect of trauma on Lisa's developing brain.**

Though trial counsel presented some proof of some of the trauma Mrs. Montgomery endured as a child and adolescent, trial counsel failed to investigate, develop, or present any evidence regarding the neurological effect of that trauma. Proof was available at the time of Mrs. Montgomery's trial to show that chronic, pervasive trauma during the developmental period affects the wiring of the victim's brain.[2612] Mrs. Montgomery presented proof of the neurological effect of trauma through the testimony of Dr. Katherine Porterfield.[a]

Dr. Porterfield explained that "When children are put under severe stress and strain and fear, their neuroendocrine system has now been shown scientifically to have alteration."[2613] She gave an example of the change in cortisol in traumatized children, explaining that these cortisol changes affect the

[a] *See* §V.E. above, incorporated by reference.



Appellate Case: 17-1716 Page: 783 Date Filed: 11/01/2017 Entry ID: 4596229

structure of the brain, specifically the corpus callosum resulting in traumatized children "have less connectivity between left and right parts of their brain."[2614] Dr. Porterfield observed that the trauma/cortisol/corpus callosum/connectivity is related to the finding that Mrs. Montgomery's perceptual IQ is significantly higher than her verbal IQ.[2615]

Dr. Porterfield testified that a traumatized brain functions differently than a brain which has developed more normally:

> One of those things that sometimes get used in my field is [the adage] "what fires together, wires together." The idea there is if a child's brain is required to be in a certain state, let's say a state of fear and threat detection, I have to protect myself, I'm under threat, the parts of the brain that handle fear and threat detection are firing, right? That's trillions of connections. And then they become wired. They become permanently connected. So that child's brain is now what we think of as "survival brain." It's a brain ready for fear. It's ready for threat. It's not a brain really ready to do sort of the normal things that kids have to do. That's how it becomes problematic.[2616]

The timing of the abuse affects which area of the brain is compromised. The limbic system "handles emotions," and "one of the critical developmental periods of the limbic development is early childhood."[2617] "What we find with teenagers who are abused is that they suffer more of those cognitive impairments that come from frontal lobe damage. So, trouble planning, trouble thinking things through, trouble with their reasoning capacity and handling emotion and reasoning together . . . making a good decision, essentially."[2618]



Appellate Case: 17-1716 Page: 784 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Porterfield testified that the duration of the abuse Mrs. Montgomery endured compromised multiple parts of her brain.

> [W]hat we found is that if children are abused, maltreated, frightened during their younger years, sometimes they're going to demonstrate later what we call affective problems, problems with their feelings, handling them, what we call emotional dysregulation. So we've got Mrs. Montgomery certainly experienced in early childhood – while that limbic system was formulating itself and growing, she experience great abuse, fear abandonment, neglect . . . So then we've got Ms. Montgomery abused severely as an adolescent, and we see in Mrs. Montgomery's clinical condition the detrimental effect of that, which is terrible, terrible function in planning, impulse control, and reasoning. So sadly you see the critical periods for her because the abuse took place across her childhood, in her adolescence many of the critical periods [were] times she was under severe traumatic stress and, therefore, her functioning became impaired."[2619]

Dr. Porterfield explained that the brain impairment that results from chronic trauma results in impaired memory, among other negative effects.[2620] Dr. Woods echoed Dr. Porterfield, discussing the effect trauma has on memory: "[W]hat we see with people that are traumatized is that it impairs their memory . . . trauma really impacts registration, whether [the memory] comes in or not."[2621]

Mrs. Montgomery's entitlement to relief is reasonably debatable where another circuit court has held that failure by counsel to "impart[] upon the jury the detrimental impact that child abuse had on [the defendant's] brain" was deficient performance. *Caro, supra*, at 155. Here, trial counsel failed to present testimony of the trauma of which counsel was aware regarding the effect on



Appellate Case: 17-1716 Page: 785 Date Filed: 11/01/2017 Entry ID: 4596229

Mrs. Montgomery's brain with reference to her impaired day-to-day functioning and impaired memory. A COA must issue.

### c. Counsel failed to present the neuropsychological findings indicative of brain damage found by Dr. Fucetola.

Trial counsel possessed evidence of Mrs. Montgomery's brain dysfunction that counsel failed to present. At the evidentiary hearing, Dr. Fucetola testified to the results he obtained from his pre-trial neuropsychological testing of Mrs. Montgomery. Most of Mrs. Montgomery's neuropsychological profile was in the normal range, though she earned a high IQ.[2622] Mrs. Montgomery's scores were widely disparate – some very low and some quite high, which Dr. Fucetola acknowledged reflected the differing parts of the brain tested.[2623]

Dr. Fucetola highlighted the extremely rare disparity between Mrs. Montgomery's verbal and perceptual IQs. There was a "dramatic disparity between her verbal intelligence, which was at the high end of the average range, and her nonverbal intelligence, which was very superior and measured at above the 99th percentile . . . at the time that I saw Ms. Montgomery it struck me as potentially significant because it's quite rare to have a difference that large."[2624] Dr. Fucetola reported the disparity and the significance of it to trial counsel and conducted research to determine possible causes of this disparity.[2625] "I told Duchardt in my report that this merited further investigation."[2626]



Appellate Case: 17-1716 Page: 786 Date Filed: 11/01/2017 Entry ID: 4596229

Dr. Fucetola testified that the significant split in Mrs. Montgomery's IQ points to brain damage or brain dysfunction. Dr. Fucetola explained that the left hemisphere supports verbal IQ while the right hemisphere involves performance or nonverbal IQ.[2627] The type of differential seen here, indicates brain damage on one side. Dr. Fucetola testified that possible etiologies for such brain damage/dysfunction would be developmental in nature[2628] and could include prenatal alcohol exposure,[2629] multiple head injuries, and or major mental illness such as bipolar disorder.[2630] Dr. Fucetola "recommended to Duchardt that he pursue further investigation of her brain functioning and do further imaging."[2631] According to Dr. Fucetola, further investigation – including the neurodiagnostic testing listed in his report – was indicated because of the "unexpected differences" in the performance of the two hemispheres of Mrs. Montgomery's brain.[2632]

Despite the fact that trial counsel had in hand a neuropsychological expert whose testing signaled that Mrs. Montgomery's brain was impaired, trial counsel did not offer Dr. Fucetola as a witness.[2633] Where the jury never heard Mrs. Montgomery's brain was impaired, counsel's failure to present Dr. Fucetola's testimony was ineffective assistance of counsel and Mrs. Montgomery's entitlement to relief is at least debatable.

**d. Counsel sought to present Dr. Gur's findings in the first phase of the trial in support of NGRI/pseudocyesis, thereby drawing**



Appellate Case: 17-1716 Page: 787 Date Filed: 11/01/2017 Entry ID: 4596229

**the state's *Daubert* motion, but failed to present evidence of Mrs. Montgomery's brain damage – including Dr. Gur's MRI or behavioral image – in the penalty phase.**

As discussed, above, trial counsel attempted to present Dr. Gur's testimony in support of the first phase, pseudocyesis, NGRI defense. Counsel's attempt to stretch Gur's testimony into support for pseudocyesis drew a *Daubert* challenge from the government – as to the admission of the Gur evidence in the first phase of the trial.[2634] The government did not move to exclude the Gur evidence in the penalty phase. Mr. Duchardt has sworn that "once Matt actually heard Dr. Gur and the power of the testimony he could offer, Matt fought tooth and nail to keep the Gur testimony out of the case entirely."[2635] However, other than the government's original *Daubert* motion, the Government never moved to keep Dr. Gur's testimony as to the MRI image or his behavioral image out of the penalty phase. The record strongly suggests that had Mr. Duchardt not mishandled the application of Dr. Gur's testimony, the government would never have moved to exclude it.

Even with the exclusion of the MRI and PET data, Dr. Gur was available to testify regarding the science behind his "behavioral image"[a] and its significance with respect to Mrs. Montgomery. According to Dr. Gur, for Mrs. Montgomery the behavioral image indicated deficits that implicate deep gray

---

[a] *See*, §V.E., incorporated by reference; Vol. 8, p.2053-62, *Gur Testimony*.

matter that would not be discovered with neuropsychological testing.[2636] Dr. Gur summed up his findings with respect to Mrs. Montgomery: "so the main finding you see in this image is that is parietal. I thought it was more severe on the right than on the left."[2637]

Dr. Gur testified that his behavioral image was congruent with the MRI and PET data. That is, the neuropsychological, and neuroanatomical data were consistent with each other.[2638] He concluded that "she suffers from brain dysfunction that affects areas that are important for behavior, and that people with that sort of brain dysfunction would have difficulty in certain aspects of their behavioral functioning."[2639] Dr. Gur testified that though the evidence for the correlation was not as "overwhelming" in 2007 as it is today, it was already known that brain damage such as is seen in Mrs. Montgomery could be caused by posttraumatic stress.[2640] Dr. Gur also posited in 2007 that the damage also could have been caused by *en utero* exposure to alcohol.[2641]

Where trial counsel spent tremendous resources – both time and money – developing the brain imaging proof and testimony, it was ineffective assistance of counsel to then fail to use that proof to show Mrs. Montgomery's brain damage to the jury. Once the government filed its *Daubert* motion, counsel was on notice that the imaging evidence might be excluded and should have developed other ways of presenting Mrs. Montgomery's brain dysfunction,

including but not limited to seeking a neurological consult for medical diagnosis of her brain impairments (see below, §e). Counsel has offered no strategic reason for failing to present Dr. Gur at the penalty phase.

The District Court made no findings with regard to counsel's failure to present Dr. Gur's behavioral image. Where Mrs. Montgomery has shown that counsel possessed evidence (not excluded by the district court) of Mrs. Montgomery's brain impairments but failed to present them – and provided no strategic reason for that failure, it is reasonably debatable that she is entitled to relief for ineffective assistance of counsel at the penalty phase. A COA must issue or, in the alternative, the case must be remanded for the district court to make findings regarding counsel's performance with regard to the failure to present Dr. Gur's behavioral image.

**e. Counsel failed to obtain a neurological consult – thereby failing to investigate or develop proof of Mrs. Montgomery's neurological impairments**

It is reasonably debatable that Mrs. Montgomery is entitled to relief for ineffective assistance of counsel where trial counsel failed to have a neurologist evaluate Mrs. Montgomery. Had trial counsel adhered to professional norms and created a social history complete with notation of neurological symptoms, counsel would have been aware of the need to have Mrs. Montgomery evaluated by a neurologist. In fact, even without such a social history, counsel



Appellate Case: 17-1716 Page: 790 Date Filed: 11/01/2017 Entry ID: 4596229

should have been on notice of the need for a neurological consult based upon the results of Dr. Fucetola's neuropsychological testing and Dr. Gur's brain imaging – each of which indicated that Mrs. Montgomery's brain was impaired. Dr. Fucetola specifically reported to trial counsel that further investigation of his findings was "merited."[2642] At the evidentiary hearing, Dr. Woods testified that a reliable psychiatric or psychological assessment must include consideration of neurological deficits.[2643]

In §2255 proceedings, Mrs. Montgomery presented proof from both a neurologist, Dr. Siddharatha Nadkarni, and a neuropsychiatrist, Dr. George Woods. Dr. Nadkarni documented multiple neurological symptoms: "olfactory hallucination of bad smell (evidence of frontal lobe dysfunction; episodes of lost time; memory of experiences that she is not sure really occurred; word finding problems; sustained periods when things do not seem real; altered states of consciousness; episodes of losing time."[2644] Dr. Wood's neurological examination also yielded significant symptoms of brain impairment. Dr. Woods cited three indicators which were of particular interest: skipping, tandem walking, and the Luria test.[2645] Mrs. Montgomery cannot skip.[2646] "[S]kipping is actually a neurological function. It requires the cerebellum."[2647] The tandem walking task also implicates cerebellar functioning.[2648] The Luria test, which Dr. Woods testified is similar to some of the testing Dr. Nadkarni performed

(and on which he obtained similar results) tests frontal lobe functioning.[2649] "And she could not do this. So what we really see are neurological functions that are impaired. Impaired motor control, impaired cognitive functions. She had problems with attention and language, and she had problems regulating fears as well as pleasure."[2650]

Dr. Nadkarni diagnosed Mrs. Montgomery's temporal lobe epilepsy on the basis of his examination,[a] Dr. Nadkarni explained that Mrs. Montgomery "gives a classic history for symptoms of temporal lobe epilepsy over many, many, many years, going back to even her childhood, she's had experiences that go along with temporal lobe epilepsy."[2651] He recounted her symptoms supporting such finding.[2652] Her neurological exam was also consistent with the diagnosis: "weakness in her left hand, weakness in coordination in her left hand. That points to sort of brain abnormalities in both the frontal lobe and temporal lobe circuits."[b] Dr. Nadkarni explained that these physical findings are not something a patient can fake; the tests cannot be fooled by lack of effort,

---

[a] Vol. 7, p. 1732, *Nadkarni Testimony*; *see also* §V.E., incorporated by reference.

[b] After his assessment and diagnosis, Dr. Nadkarni reviewed the work of the trial team's expert, Dr. Robert Fucetola, whose neuropsychological testing results were also consistent with Dr. Nadkarni's findings. Dr. Fucetola gave Mrs. Montgomery a "much more extensive version" of the Montreal Cognitive Inventory that was given by Dr. Nadkarni – and the two obtained nearly the exact same result. "[W]hich is important. So that's another finding on the neurologic examination" (Vol. 7, p. 1737, *Nadkarni Testimony).*

"the testing might be subtle but the findings are sort of not subtle for somebody who knows what they're looking for."[2653]

Dr. Nadkarni found multiple indicators that many of Mrs. Montgomery's brain systems are compromised by dysfunction,[a] either congenital or accrued damage. He likened the dysfunction in Mrs. Montgomery's brain to the effect of a bomb going off in a part of the city: "if you bomb a city, you can – if you bomb one part, you affect another part. If you bomb multiple parts, which is what's I think happened in her case, then the ramifications can be significant."[2654]

Where the jury never heard proof of Mrs. Montgomery's significant neurological impairments due to the ineffective assistance of trial counsel, her entitlement to relief is at least reasonably debatable. *Caro*, *supra* at 1254 (finding failure to evaluate defendant's neurological system deficient performance).

---

[a] Dr. Nadkarni testified that his initial assessment and report were independent of any information from Dr. Gur's pre-trial assessment of Mrs. Montgomery. However, once counsel provided him Dr. Gur's data, including both the PET and MRI data, Dr. Nadkarni found that Dr. Gur's information corroborated his own findings.[a] Dr. Nadkarni's findings on the neurologic examination pointed to frontal lobe dysfunction, "and the PET scan and the MRI also point to those areas as being abnormal along with limbic dysfunction, which is temporal lobe dysfunction, which maps perfectly onto her history of probable epilepsy and the seizures."[a] He also indicated that Nadkarni's testing reflected the findings on the imaging studies of a "right hemisphere problem." (Vol. 7, p. 1736, *Nadkarni Testimony*).

**f. Counsel failed to present the synergistic effects of brain damage, trauma and mental illness, failing to show the jury that each impairment is both a cause and an effect and the combined nature of all together is greater than the sum of each.**

Where the combined synergistic effect of all of Mrs. Montgomery's impairment is greater than the sum of each part, trial counsel were ineffective in failing to present to the jury evidence of all her impairments and their interconnected compounding effect on her functioning. As discussed, above,[a] Drs. Porterfield, Nadkarni, and Woods explained that Mrs. Montgomery suffers from many impairments – and that those impairments cause other dysfunction and exacerbate the effect of still other problems. That is to say, while it is impossible to completely tease apart the chicken from the egg of Mrs. Montgomery's impairments, it is true that a brain inherently compromised by *en utero* exposure to alcohol will be more negatively affected by trauma than a healthy brain. Those greater effects of trauma on the neural connections will cause further problems that are, in turn, enhanced and exacerbated by mental illness, further brain injury and other negative life experiences. As Dr. Woods testified, "We've got complex PTSD. We've got bipolar disorder. We've got brain impairment. When you mix those together, they create more severe and more atypical symptoms."[2655] The jury needed to understand not only that Mrs.

[a] §V.E., incorporated by reference.

Montgomery had a plethora of diagnoses, but to understand how each of those diagnoses reflect both a specific set of symptoms or impairments and combined with all the other diagnoses to create compounding problems. Counsel's failure to present the jury with that proof was ineffective assistance, and Mrs. Montgomery has shown that her entitlement to relief is reasonably debatable.

**5. Counsel failed to present readily available proof of statutory mitigating circumstances**

Mrs. Montgomery's entitlement to relief is at least reasonably debatable where proof at the evidentiary hearing established that trial counsel was ineffective in failing to prove two statutory mitigating circumstances. Dr. Woods testified that Mrs. Montgomery's capacity to appreciate the wrongfulness of the conduct or to conform her conduct to the requirements of the law was significantly impaired at the time of trial – and that Mrs. Montgomery was under a severe mental or emotional disturbance at the time of the offense.

As the special verdict reflects, trial counsel failed to convince any jurors that Mrs. Montgomery committed the offense under severe mental or emotional disturbance and only convinced one juror that her capacity to appreciate wrongfulness or to conform her conduct was impaired.[2656] The evidence at the hearing shows that such proof was available, had trial counsel only investigated, developed, and presented it. As Dr. Woods testified, "a complex mosaic of

neurobehavioral and medial disorders interacted with the effects of lifelong trauma to produce both brain damage and psychiatric disorders. These disorders substantially impaired [Mrs. Montgomery's] capacity to conform her conduct to the requirements of the law."[2657]

Further, had counsel complied with professional norms and developed a comprehensive social history, counsel would have had additional mitigation to support the finding of that circumstance. As discussed above regarding counsel's failure to create a comprehensive social history, the multi-generational family history of child abduction, disappearance, and custodial interference contextualizes Mrs. Montgomery's over-reaction to her ex-husband's threat to remove her children. Without the proof of the multi-generational family pattern, the jury could not begin to understand the panic that seized Mrs. Montgomery's impaired mind.

As Dr. Woods' explained:

> Ms. Montgomery was suffering from lifelong impairments. The impairment of concentration, the impairment of being able to think effectively through a problem, the impairment of the ability to effectively weigh and deliberate situations had been problematic for most of her life, and certainly things like her brain injury are things that do not go away. Her bipolar disorder at times, it can wax and wane . . . Those problems existed at the time of the offense at well .[2658]

Thus, proof of the historical context (that is her family's bizarre history of taking children from each other) would have complimented the mental health



Appellate Case: 17-1716 Page: 796 Date Filed: 11/01/2017 Entry ID: 4596229

evidence. The family history caused Lisa's emotional disturbance from her ex-husband's threat to take their children to be too much for her impaired brain to handle.

Had the jury been presented this information, along with appropriate expert testimony regarding the ways in which Lisa's functioning was compromised by trauma and brain dysfunction it is at least reasonably debatable that the jury would have found the statutory mitigating circumstance that Lisa committed the offense under severe mental or emotional disturbance.[a] Here, Mrs. Montgomery's entitlement to relief must be reasonably debatable where counsel failed to present readily available evidence of two statutory mitigating circumstances.

6. **Mrs. Montgomery's entitlement to relief is at least reasonably debatable where, had counsel complied with prevailing professional norms and conducted a reasonable investigation, provided a social history to trial experts for accurate and reliable diagnosis, and explained both the nature of Mrs. Montgomery's impairments and their causes, including the devastating Complex PTSD she suffered as a result of her mother sexually trafficking her – one juror could have decided to choose life.**

It is reasonably debatable that trial counsel's failure to investigate, develop, and present the evidence outlined above and presented at the

[a] Crim. D.E. 354 (no jurors found the statutory mitigating factor that the crime was committed under severe mental or emotional disturbance).

evidentiary hearing prejudiced Mrs. Montgomery. This is "not a case in which the new evidence 'would have barely altered the sentencing profile presented'" to the jury. *Porter,* 558 U.S. at 41 (*quoting Strickland, supra*, at 700). Here, the district court was to consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding and reweigh it against the evidence in aggravation" – but failed to do so. *Porter*, 558 U.S. 30 (*quoting Williams v. Taylor, supra*, at 397-98 (internal quotation marks omitted)).

Mrs. Montgomery is entitled to a COA or a remand for an appropriate determination where the district court found only "the jury heard the vast majority of the evidence post-conviction counsel alleges to have discovered"[2659] without engaging with the specifics of that which the jury never heard, including:

- The intergenerational familial history of mental illness;
- The intergenerational familial history of substance abuse;
- The intergenerational familial history of child custodial interference;
- The intergenerational familial history of incest and child sex abuse;
- That Lisa was exposed *en utero* to alcohol;
- That as a 4 and 5 year old child Lisa laid within arms-reach of her sister as her sister was raped by her mother's boyfriends;



Appellate Case: 17-1716 Page: 798 Date Filed: 11/01/2017 Entry ID: 4596229

- That her mother and father beat Lisa and her sisters when they were very small girls;

- That Lisa watched as her mother put her older sister out in the cold, on the doorstep in the dark, naked.
- Lisa watched as her mother banished her sister – exiling her from the family and, from Lisa's perspective making her disappear;

- That her mother exercised coercive control over Lisa – controlling her bodily functions and prohibiting speech;

- That her mother destroyed everything precious to Lisa and her siblings as a means of control and manipulation;

- That her mother killed the family pets in front of the children as punishment and a sign of her authority;

- That her mother and step-father forced Lisa and her younger sister to hit each other with boards until one of them drew blood;

- That her step-father beat her head against the concrete floor as he raped her;

- That for years her mother sold her to multiple men for oral, vaginal and anal rape;

- That the men tied Lisa up, beat her, and urinated on her;

- That when Lisa complained about the men beating her, her mother told her to "stop your crying";

- That Lisa told multiple authority figures about the rapes and no one intervened to make her safe or to investigate the perpetrators;

- That as a result of the sexual abuse Lisa began to dissociate, her brain was altered so that dissociation was not volitional and she often lost contact with reality;

- That her mother and step-father forced her into a situation where her 24 year old step-brother was 16 year old Lisa's closest companion and confidant;

- That she almost escaped her mother's control by joining the armed services, but became pregnant by her step-brother;

- That her step-brother/husband raped and beat her and videotaped at least one of the rapes, leaving the tapes where her younger brother could find it;

- That her dissociation continued and impaired her ability to function as she tried to parent small children – that those impairments were documented by social workers and other objective witnesses;

- That as a result of her impairments she squatted in uninhabitable trailers, left her children unsupervised, and sold her body for food.

- That her second husband unwittingly re-traumatized Lisa by engaging in bondage and other S&M sex play;

- That she suffered numerous head injuries;

- That she has temporal lobe epilepsy which compounds her other impairments, further attenuating her sense of what is real and what is not and impairing her ability to attend;

- That she has Complex PTSD from a lifetime of sexual, physical, and emotional abuse and that Complex PTSD compromises her ability to function, rendering her highly reactive, dissociated, and impaired in her perceptions of reality;

- That in the two years preceding the crime, Mrs. Montgomery's functioning as assessed by a neutral professional was deemed significantly impaired and determined to be worsening;

- That her impairments combined with the intergenerational family history of custodial interference to render her highly emotionally



Appellate Case: 17-1716 Page: 800 Date Filed: 11/01/2017 Entry ID: 4596229

> reactive to her ex-husband's threat to take her children and she committed the crime under that emotional disturbance.

The district court's determination is at least reasonably debatable where the district court failed to engage with the totality of all that trial counsel failed to present. "It is possible that the [unpresented] evidence, viewed cumulatively, may have persuaded the jury that [Mrs. Montgomery was far more seriously impaired] than the prosecution was prepared to acknowledge, and that [Mrs. Montgomery's Complex PTSD, brain damage, and temporal lobe epilepsy] played a mitigating, though not exculpating, role in the crimes [s]he committed. The evidence might also have rebutted the [government]'s suggestion that [Mrs. Montgomery] had manipulated [her] expert witnesses into falsely believing [she was mentally ill]." *Cone*, 556 U.S. 449 (*citing Kyles v. Whitley* and holding to determine prejudice of withheld *Brady* material the court must aggregate the missing evidence); *see also*, *Bagley*, 473 U.S. at 682 (adopting the *Strickland* standard for the evaluation of materiality in *Brady* claims); *Kyles v. Whitley*, 514 U.S. at 441 (reiterating that the *Strickland* prejudice and *Brady* materiality standards are the same).

The district court also failed to consider the prejudicial impact of counsel's unreasonable, uninformed, as-a-result-of-a-conflict decision to present an unsupported insanity defense on the jury's contemplation of the mitigation proof. As the Ninth Circuit has found, the presentation of an

implausible defense may so "annoy" the jury that counsel's ineffectiveness in presenting that defense may combine with counsel's failure to present mitigation to prejudice the outcome of the penalty phase. *Daniels v. Woodford*, 428 F.3d at 1210 ("Thus, Daniels appeared before the sentencing jury as a man charged with murder to evade arrest, implausibly arguing that he was not the shooter to evade justice. The combination of counsel's guilt and penalty phase deficiencies, including their failure to investigate their client's mental health and failure to overcome a complete communication failure, combined to deny Daniels effective representation and prejudiced the outcome of his penalty phase trial). Where a circuit court has found ineffectiveness where counsel's implausible first phase defense undermined the mitigating value of the evidence presented in penalty, Mrs. Montgomery's entitlement to relief is clearly debatable among jurists of reason.

This Court must determine whether, based on the totality of counsel's ineffectiveness – considering all of the mitigation that counsel failed to investigate and/or present, and counsel's ineffectiveness in undermining the mitigation they did present by framing that evidence in an implausible NGRI defense – there is a reasonable probability that but for counsel's deficiency the result of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. at 397; *Wiggins*, 539 U.S. at 534. Where 18 U.S.C. §3593 mandates that the

vote of one juror against death shall result in a life sentence, Mrs. Montgomery has shown that it is reasonably debatable that there is a reasonable probability that – had counsel not been unreasonably deficient in the myriad ways set forth above – the result of the proceedings would have been different: at least one juror would have voted against death.

**H. It is reasonably debatable that Mrs. Montgomery was incompetent to stand trial because she was unable to rationally assist counsel due to her brain damage, mental impairments, severe complex trauma, and the incomplete, ineffective and inappropriate regimen of psychotropic medications administered to her by CCA before and during her capital trial. As such, it is reasonably debatable that Mrs. Montgomery's rights to due process, a fair trial, effective assistance of counsel, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated.**

This claim has three subparts which independently and cumulatively justify a COA: 1) a substantive due process claim that Mrs. Montgomery was tried while incompetent; 2) a procedural due process claim that the district court was under a duty to *sua sponte* conduct a competency hearing; and 3) a claim that trial counsel was constitutionally ineffective for failing to litigate Mrs. Montgomery's was incompetence to stand trial.

**1. Constitutional test for competence to stand trial.**

The test for determining whether a criminal defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with



Appellate Case: 17-1716 Page: 803 Date Filed: 11/01/2017 Entry ID: 4596229

a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960); s*ee also*, *Drope v. Missouri*, 420 U.S. 162, 171 (1975) (incompetent persons may not be subjected to trial). Where the record raises a "*bona fide*" doubt about the defendant's mental condition, due process requires the trial court to conduct a competency hearing. *Pate v. Robinson*, 383 U.S. 375, 385 (1966).

**2. Evidence available pre-trial placed counsel and the district court on notice that Mrs. Montgomery's competency was in question.**

The first lawyer to meet Mrs. Montgomery after her arrest, Charles Dedmon, describes Mrs. Montgomery as "fragile and confused." He explains that "she did not seem to comprehend what had happened" and that at times she appeared "detached."[a] Mr. Dedmon relates that Mrs. Montgomery's "mood was definitely unstable" and she was a suicide risk.[2660] Mr. Dedmon related that the U.S. Marshal who transported Mrs. Montgomery stated that "she was the worst

---

[a] Exhibit 75, p.1, *Dedmon Declaration.* The government stipulated to the introduction of Dedmon's declaration. The government never challenged its veracity nor did it offer any proof to the contrary. Movant's proof further showed that Dr. Sallye Wilkinson recorded Mrs. Montgomery's declining mental condition pre-crime (Exhibit 1-289, *Wilkinson Declaration*). In 2002, Dr. Wilkinson, who saw Mrs. Montgomery in counseling for a brief period, diagnosed Mrs. Montgomery with Depression and that her functioning had declined from the previous year. "I believed that Mrs. Montgomery's depressive symptoms had a significant impact on her ability to function in everyday life" (*Ibid*).

off of anyone he had transported" and that an Asst. United States Attorney commented, "Mrs. Montgomery was obviously insane and this wasn't a death penalty case."[2661]

Mr. Dedmon's co-counsel at the Kansas FPD, Ronald Wurtz, corroborates these observations. Wurtz is an experienced death penalty attorney, having previously served as the Chief of the Kansas death penalty defense unit.[2662,a] Mr. Wurtz, who saw Mrs. Montgomery within a week of the crime, stated that she "seemed disoriented" and that she "was difficult to communicate with."[2663] Mr. Wurtz testified that it was "obvious" to him and Dedmon that they "needed to get a psychiatric evaluation."[2664,b]

---

[a] The Kansas FPD had another attorney with death penalty experience, Melody Evans (now Brannon).

[b] Wurtz testified that Dedmon "was a copious note-taker" and that "Charles could get everything almost like a stenographer." Vol. 2, p. 284, *Wurtz Testimony*. Melody Brannon also knew of Dedmon's "practice to take detailed handwritten notes." Exhibit 76, *Brannon Declaration*. Further she said that "Charles told me that he was taking careful notes during his meeting with Lisa Montgomery." *Id.* Dedmon describes in his declaration how he made sure to take detailed notes of his interactions with Mrs. Montgomery because "I believed it was important to document Mrs. Montgomery's mental state and demeanor close to the time of the offense so that whomever ended up with the case would have that information available for Mrs. Montgomery's defense." Exhibit 75, p. 1, *Dedmon Declaration.* Both Wurtz and Dedmon relate that while Judy Clarke did reach out to them to learn their impressions of Mrs. Montgomery and to obtain Mr. Dedmon's file, no other trial attorney working on behalf of Mrs. Montgomery after Ms. Clarke was removed had any contact with Dedmon or Wurtz. *Id*, p. 2; Vol 2, p. 287, *Wurtz Testimony.*

Melody Brannon, the current federal public defender for the District of Kansas, relates that Mr. Dedmon "was very concerned about Lisa Montgomery's fragile mental state. He was worried that she would kill herself."[2665]

After consulting with Federal Death Penalty Resource Counsel, who Dedmon described as "invaluable,"[2666] and Cyndy Short,[2667] an experienced local death penalty lawyer who Dedmon and Wurtz hoped to have appointed as learned counsel, the Kansas FPD team hired Bret Dillingham "to begin the process of developing a social history and also to provide some guidance to the team as to how to address Mrs. Montgomery's acute mental health needs."[2668] Mr. Dillingham, who has a master's degree in social work and is a Menninger-trained LSCSW, interviewed Mrs. Montgomery four times.[2669] Mr. Dillingham suspected Mrs. Montgomery suffered from a "psychotic disorder," "posttraumatic stress disorder," "dissociative disorder," and "neurological problems."[2670] Mr. Dillingham shared his observations with Susan Hunt, David Owen, and Anita Burns.[2671,a]

Anita Burns, the next attorney to meet Mrs. Montgomery, realized that Mrs. Montgomery's mental state was in question.[2672] She spoke with Mr. Dedmon

---

[a] Ms. Burns wanted to continue to work with Mr. Dillingham, but Mr. Owen overruled her (Vol. 2, p. 317, 321-22, *Burns Testimony*).



Appellate Case: 17-1716 Page: 806 Date Filed: 11/01/2017 Entry ID: 4596229

and consulted with Mr. Dillingham. Recognizing the fragility of Mrs. Montgomery's mental state, she later explained to Fred Duchardt that: "I didn't think she was in a mental state at that time that we should talk to her about the facts [of the crime.]"[2673]

Susan Hunt, who represented Mrs. Montgomery from January 2005 through May 2006, also had concerns about Mrs. Montgomery's competency and her ability to assist counsel, which she related to successor counsel Fred Duchardt.[2674] Ms. Hunt testified, "[w]e knew there was some real mental health issues going on. We didn't understand what they were or how to even deal with it."[2675] Because the 2005 iteration of the defense team had never had a client whose mental state compared with Mrs. Montgomery's, the team brought in psychologist Dr. Marilyn Hutchinson as a consultant to "kind of give us an idea where we needed to go, where we needed to look, what we needed to do."[2676] The team similarly consulted with psychiatrist Dr. William Logan after Mrs. Montgomery attempted suicide on March 6, 2005.[2677]

Dr. Hutchinson testified that her role in Mrs. Montgomery's case in early 2005 was purely as a consultant. Dr. Hutchinson was so concerned about the "health of the defendant" that she recommended Mrs. Montgomery be transferred to a psychiatric facility and that her medication regimen to be changed "immediately."[2678] Dr. Hutchinson testified that Mrs. Montgomery's

competency was at issue and that she was "concerned about her decompensation to the point she would not be able to assist counsel."[2679] She observed that Mrs. Montgomery "was having thought disturbances. There was some evidence of bipolar reactivity."[2680] Mrs. Montgomery was "hopeless," and she "was dissociating with some regularity."[2681,a] Dr. Hutchinson believed there was a possibility that the thought disturbances that Mrs. Montgomery was exhibiting could be psychosis.[2682,b] Though Dr. Hutchinson testified that the two measures of competency administered to Mrs. Montgomery did not report incompetence, she also testified that those measures were not indicators of Mrs. Montgomery's ability to assist counsel. Contrary to the opinion of the district court,[c] Dr. Hutchinson never concluded that Mrs. Montgomery was competent. To the contrary, she had serious concerns that Mrs. Montgomery was unable to rationally assist counsel. Because the district court's opinion on this issue is

---

[a] Dr. Hutchinson explained that "[d]issociation is a blending of reality and fantasy" and is a learned behavior of children who are traumatized. "So when someone is doing a lot of dissociation as an adult, it is a common inference that they learned that in childhood" (Vol. 4, p. 1021, *Hutchinson Testimony*).

[b] She did not push to make any conclusions about psychosis at that time because "people who are psychotic sometimes know that those are the things you're not supposed to say out loud, and I didn't want to put her in the position to try and hide that or lie so I wasn't pushing on that" (Vol. 4, p. 1025, *Hutchinson Testimony*).

[c] D.E. 212, p. 93 ("No iteration of the defense team sought a competency hearing though, likely due in part to an expert opinion finding her competent. In March 2005, the defense team employed Dr. Marilyn Hutchinson to examine Movant. Her examination revealed Movant was competent to stand trial.")



Appellate Case: 17-1716 Page: 808 Date Filed: 11/01/2017 Entry ID: 4596229

inextricably intertwined with the court's pivotal misunderstanding of Dr. Hutchinson's testimony, this issue is clearly debatable and a COA should issue for that reason alone.

Dr. Logan was retained by trial counsel in March 2005, after Mrs. Montgomery had attempted suicide. The trial team asked Dr. Logan for a "clinical consultation about what [he] would recommend in regards to treatment[.]"[2683] Dr. Logan received reports that Mrs. Montgomery was depressed, dissociative, and was engaging in episodes of "banging her head against the wall."[2684] Dr. Logan's opinion at that time was that Mrs. Montgomery "was in the midst of a major depressive disorder" and that "she had some psychotic features."[2685] Dr. Logan noted that Mrs. Montgomery was hearing voices.[2686]

Dr. Logan testified that his intervention at that point was clinical and due to "a crisis."[2687] Like Dr. Hutchinson, it was Dr. Logan's opinion that Mrs. Montgomery needed to be transferred to an in-patient psychiatric facility.[2688] In his March 7, 2005 letter, Dr. Logan wrote, "It is my recommendation that Mrs. Montgomery be hospitalized for the treatment of her depression."[2689] Noting that "Mrs. Montgomery has not responded to her medication prescribed by [CCA doctor],"[2690] Dr. Logan advised, "Mrs. Montgomery needs a more aggressive and comprehensive medication regimen to address her



Appellate Case: 17-1716 Page: 809 Date Filed: 11/01/2017 Entry ID: 4596229

symptoms."[2691] Dr. Logan explained that CCA was not in a position to treat Mrs. Montgomery.

Dr. Logan testified that when he wrote his letter on March 7, 2005, he was acting as a consulting clinician and not as a forensic expert and "there was no pending forensic question at all."[2692] Dr. Logan testified that he did believe that Mrs. Montgomery lacked decisional competency in March of 2005, but that was not part of the referral question.[a] In his declaration, Dr. Logan testified, "Because of her severe abuse history, delusions, and psychosis, Ms.

---

[a] Vol. 4, p. 934, Dr. Logan's declaration similarly describes his opinion that Lisa Montgomery was "clearly psychotic, that is to say out of touch with reality" (Exhibit 41, p. 4, *Logan Declaration*). Perhaps because the district court's opinion was written before the transcript was prepared and without the benefit of post-hearing briefing, the district court erroneously faults Dr. Logan for failing to "raise concerns about Movant's ability to assist in her defense" prior to his testimony at the hearing (D.E. 212, p. 95). Dr. Logan did raise his concerns pretrial. His opinion that Mrs. Montgomery required in-patient hospitalization and that she needed psychiatric medication reflected that concern. Dr. Logan's March 7, 2005 letter is the equivalent of a clinician's opinion that Mrs. Montgomery lacks decisional competency given his unrebutted (and corroborated) observations of her psychosis and suicidal ideation.

Dr. Logan's declaration provides the explanation for trial counsel's failure to develop and present Dr. Logan's opinion: Mr. Duchardt was myopic and only wanted to discuss the pseudocyesis defense and that "Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis" (Exhibit 41, p. 3). The district court's order blinks the established practice that expert witnesses only write reports relevant to the referral question crafted by the lawyer. The fact that Mr. Duchardt failed to present Dr. Logan's opinions about competency proves Mr. Duchardt's deficient performance – and should not reflect on Dr. Logan's credibility. It further shows the prejudice to Mrs. Montgomery of losing Ms. Clarke and her team. At the very least, a COA should issue.

Montgomery often dissociated, was perceptually disrupted, and suffered from memory impairment so often seen in severely traumatized, psychotic patients."[2693]

During the time that Judy Clarke was counsel for Mrs. Montgomery, the entire legal team had concerns about Mrs. Montgomery's competency. Team members observed her sitting "in the visiting room with her knees up and her arms around her knees and she would rock" almost in a seated fetal position.[2694] Ms. Clarke, who has substantial experience working with severely mentally ill defendants, testified, "I thought Lisa was psychotic and unable to distinguish sometimes reality from nonreality."[2695] Ms. Clarke testified that she consulted with Dr. George Woods about Mrs. Montgomery's medication needs.[2696]

Ms. Garvey similarly described Mrs. Montgomery getting into a fetal position, dissociating, rocking back and forth, and experiencing auditory and visual hallucinations.[2697]

Dr. Freedman, who has published scholarly articles on a defendant's competence to stand trial and a guide to mental health defenses for practitioners in capital cases, testified that "we had a real question as to her competence" and that competency was "absolutely … a concern with her."[2698]

Trial counsel, David Owen, testified that the legal team prior to Mr. O'Connor and Mr. Duchardt's appointment had serious concerns about Mrs.

Montgomery's competency to stand trial.[2699] Further, Mr. Owen believed that Mrs. Montgomery was not competent to stand trial but did not file a motion for a competency hearing because he deferred to Mr. Duchardt.[2700]

Dick Burr, the CRC counsel who worked with the team until Mr. Duchardt's appointment, described Mrs. Montgomery's mental state as "fragile"[2701] and said, "there were all of those seeds that would lead lawyers to raise a competence question … beginning to bloom."[2702]

Mr. Duchardt testified that he also had concerns about Mrs. Montgomery's ability to assist in her defense.[2703] Duchardt also testified, "I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetent to proceed, I don't necessarily disagree with

them."[2704] However, Mr. Duchardt, did not recognize Mrs. Montgomery's difficulties as legal incompetence.[a] His failure to do so is evidence of his deficient performance and further proof that Mrs. Montgomery was prejudiced by the termination of Ms. Clarke's appointment.

---

[a] According to his sworn statement, Mr. Duchardt did believe that he had developed sufficient proof to support an insanity defense (D.E. 129). *Res ipsa loquitur.*



Appellate Case: 17-1716 Page: 812 Date Filed: 11/01/2017 Entry ID: 4596229

After trial, Mrs. Montgomery was prescribed Risperdal an anti-psychotic, by her treating physician at CCA, Dr. Linda McCandless.[2705] Dr. McCandless stated that she would not have prescribed the medication unless it was needed. Mrs. Montgomery showed improvement on the medication, which is "confirmation that the Risperdal was an appropriate medication to treat Mrs. Montgomery's symptoms."[2706]

After sentencing, Mrs. Montgomery was transferred to the Federal Medical Center at Carswell. There her treating psychiatrist Camille Kempke observed Mrs. Montgomery in an acutely psychotic state on more than one occasion.[2707] Because a mood stabilizer by itself was not enough to treat Mrs. Montgomery's psychosis, Dr. Kempke treated Mrs. Montgomery with the same antipsychotic that Dr. McCandless prescribed after trial, and Mrs. Montgomery responded favorably.[2708]

Based on this background, historical records, the evaluations of the other mental health professionals, and his own assessment, Dr. Woods opined to a reasonable degree of psychiatric certainty that Mrs. Montgomery was incompetent to stand trial.

**3. The record establishes that Mrs. Montgomery was unable to rationally assist counsel at trial.**

The testimony at the evidentiary hearing from Dr. Woods, Dr. Porterfield, Dr. Hutchinson, Dr. Logan, Ms. Vogelsang, Dr. Kempke, Dr. Nadkarni, Dr.

Fucetola, Dr. Gur, Dr. Newberg, and Dr. Davatzikos, which is supported by numerous exhibits including the declarations of Dr. Diane Bradford and Dr. Linda McCandless, compels the conclusion that Mrs. Montgomery was not able to rationally assist counsel at trial rendering her incompetent under *Pate, Drope, and Dusky*.[a]

From his review of extensive data and historical records, Dr. Woods concludes that Mrs. Montgomery suffers from lifelong multifocal brain impairment,[2709] complex posttraumatic stress disorder,[2710] and bipolar disorder.[2711] Dr. Woods found that Mrs. Montgomery's perception of reality is impaired,[2712] her thought process is impaired,[2713] and she has a psychotic disorder.[2714]

Dr. Woods' review of the medical records as well as the declaration of Dr. McCandless and Dr. Bradford, and support from Dr. Kempke's testimony,

---

[a] In analyzing this claim, the district court failed to consider the testimony of Dr. Porterfield, Ms. Vogelsang, Dr. Kempke, Dr. Nadkarni, Dr. Fucetola, Dr. Gur, Dr. Newberg, and Dr. Davatzikos, and the declaration of Dr. Bradford, indicating its failure to appreciate the interrelatedness of the mental health testimony. Moreover, the district court erroneously wrote the Dr. Woods "bases his belief solely on examinations of Movant several years following the trial and his academic knowledge of possible drug side effects" (D.E. 212, p. 95). In so finding, the district court ignored the multiple sources of historical data and the observations of other clinicians upon which Dr. Woods relied – both listed in his declaration and to which he testified in detail (Vol. 7, pp. 1759-1863, *Woods Testimony*; Exhibit 159, pp. 6-7, 20, *Woods PowerPoint*; Exhibit 20, p. 3, *Woods Declaration*).



Appellate Case: 17-1716 Page: 814 Date Filed: 11/01/2017 Entry ID: 4596229

revealed that Mrs. Montgomery's regimen of psychotropic medications before and during trial did not properly treat her illness, rendering her unable to assist counsel at trial.[2715]

Like Dr. Woods, Dr. Bradford found that Mrs. Montgomery "had a long history of untreated psychotic behaviors, which were not treated at the time of the trial."[2716] Dr. Bradford concluded, "In my professional opinion, which I hold to a reasonable degree of scientific certainty, Ms. Montgomery was not receiving appropriate medications at the time of the trial to control her psychosis."[2717]

Scientific data collected at the time of trial establishes that Mrs. Montgomery suffers from life-long brain impairment. Dr. Fucetola testified that the stark 29 point difference between Mrs. Montgomery's verbal IQ and performance IQ is possibly indicative of brain damage,[2718] and Mrs. Montgomery's performance on the FACES test indicated problems with her cognitive functioning. The literature supports a conclusion that when one correlates Mrs. Montgomery's results on her IQ testing with the results on the FACES test, the likelihood that a "normal" person could produce such results is less than 1%.[2719] Dr. Fucetola stated that the possible etiologies were developmentally based and consistent with prenatal alcohol exposure.[2720] Other possibilities include multiple head injuries and bipolar disorder.[2721] Finally, Dr.

Fucetola testified that Mrs. Montgomery's performance on the finger-tapping test is consist with brain damage.[2722]

Dr. Davatzikos, a professional radiologist and, among many other faculty appointments, director of the University of Pennsylvania's Center of Biomedical Imaging and Analysis, testified that the volumetric analysis of the data from the MRI he conducted on Mrs. Montgomery at the time of trial revealed not only an "unusual brain structure" but that the contrast in the size of the different parts of her brain were striking.[2723] "This contrast makes it a lot more abnormal than the actual numbers indicate."[2724] Such variability raises the possibility of neurodevelopmental disorder, psychiatric illness, or traumatic brain injury.[2725] Dr. Davatzikos corroborated his 2007 data by conducting a reanalysis of the 2007 data using a more complex analysis that was available in 2016.[2726] The reanalysis showed even stronger findings of abnormality.[2727]

Dr. Newberg, a physician who is board certified in nuclear medicine and internal medicine as well as a noted as being among the top 50 most influential neuroscientists, testified that Mrs. Montgomery's neuroimaging data demonstrated functional brain abnormalities across the parietal, occipital, cortical, and limbic regions. Like Dr. Davatzikos, Dr. Newberg performed a reanalysis of the neuroimaging data he obtained in 2007 using MIMneuro

software that is approved by the FDA.[2728] The 2016 reanalysis confirmed the validity of the 2007 data.

Dr. Gur, who has two grants from the National Institute of Health, and is a world-renowned neuropsychologist and neuroimaging expert, testified that using the data obtained from Dr. Fucetola, Dr. Davatzikos, and Dr. Newberg, as well as his own analysis, he concluded that Mrs. Montgomery suffered from brain impairment.[2729]

Dr. Nadkarni, who is board certified in neurology, psychiatry, behavioral neurology, epilepsy, and clinical neurophysiology, conducted a neurological evaluation of Mrs. Montgomery.[2730] Dr. Nadkarni conducted his evaluation without reference to the work of Drs. Fucetola, Davatzikos, Newberg, and Gur. However, after he reached his independent conclusions, he reviewed their findings and found them consistent with his own.[2731] Dr. Nadkarni describes Mrs. Montgomery's brain as "broken,"[2732] "severely damaged,"[2733] "crippling,"[2734] and "especially disabling."[2735]

Dr. Porterfield, a clinical psychologist who works at the Bellevue NYU Program for Survivors of Torture with survivors of sexual violence, gang rape, and forced prostitution, testified that from her evaluation of Mrs. Montgomery, personal interview of David Kidwell, and extensive review of the biopsychosocial history, Mrs. Montgomery suffers from complex posttraumatic

stress disorder.[2736] Dr. Porterfield opined that Mrs. Montgomery's "childhood and adolescent experiences of trauma, victimization, and neglect had a massively deleterious effect on her development and her functioning and capacities[.]"[2737] Dr. Porterfield described the neurological impact of trauma on the developing brain.[2738] Her testimony in this regard is corroborated by Drs. Newberg, Gur, Nadkarni, and Woods. Dr. Porterfield described Mrs. Montgomery's level of dissociation as unique.

> [I]t is one of the most severe cases of dissociation I've ever seen. What I mean by that is it's so pervasively part of who she is. I've seen survivors of very severe rape and torture who had an okay enough childhood that, yes, they have severe dissociation. When you start reminding them about the kidnapping, for instance, they dissociate. They disconnect. I'm not feeling myself anymore. I can't do this. I'm not in my body. The world's not real but they have a fundamental sense of self that is intact.
>
> Mrs. Montgomery doesn't have that. Mrs. Montgomery's entire development took place in a context of stress, humiliation, degradation, and so her dissociation is woven deeply into her personality. There is no ground for her to stand on. So her dissociation is not the sort of episodic blips. Her dissociation is a completely pervasive part of who she is. She lives in a dissociated state much of the time.[2739]

Dr. Porterfield further explained, "Mrs. Montgomery has very severe derealization and depersonalization, and that means she is very vulnerable to not knowing if she's real, if her environment's real, if the interaction is real."[2740]

Dr. Porterfield explained that posttraumatic stress disorder is a disorder coming out of our memory functioning in the brain"[2741] and said that people with posttraumatic stress have "a dysfunctional linkage between their memory of the event and their fear reaction in their body[.][2742]



Appellate Case: 17-1716 Page: 818 Date Filed: 11/01/2017 Entry ID: 4596229

The testimony from Dr. Porterfield, as well as all of the other evidence presented, explains how Mrs. Montgomery's untreated, life-long, complex PTSD vitiated her day-to-day functioning. Because Mrs. Montgomery experienced learned helplessness, she could not advocate for herself. She never experienced people with power over her as benevolent. She lived in a dissociative state most of the time, out of touch with reality.

**4. It is reasonably debatable that Mrs. Montgomery was tried while incompetent. (Substantive due process claim)**

When evaluating a substantive due process competency claim, courts must examine all of the evidence in the record, not just the evidence available to the trial court. *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990). Even where a defendant has a factual understanding of the proceedings, she may still be incompetent where, due to her mental illness, she is unable to rationally assist counsel. *Pate*, 383 U.S. 395.

The Fifth Circuit has upheld a finding of incompetency to proceed based on a posttraumatic stress disorder diagnosis provided in an evaluation performed five years after the criminal court proceeding. *Bouchillon v. Collins*, 907 F.2d 589, 594 (5th Cir. 1990). The Fifth Circuit upheld this finding in a habeas case, even where the state court based its finding of competence on the observed demeanor of the defendant.



Appellate Case: 17-1716 Page: 819 Date Filed: 11/01/2017 Entry ID: 4596229

> [T]he Supreme Court indicated in *Pate*, demeanor is not dispositive. *Pate, supra*, 383 U.S. at 386, 86 S.Ct. at 842. "[T]he existence of even a severe psychiatric defect is not always apparent to laymen." *Bruce, supra* at 1059. "One need not be catatonic, raving or frothing, to be [legally incompetent.]" *Lokos, supra*, 625 F.2d at 1267.

*Bouchillon* 907 F.2d at 593–94, (*quoting*, *Bruce v. Estelle*, 536 F.2d 1051, 1059 (5th Cir. 1976); *Lokos v. Capps*, 625 F.2d 1258, 1267 (5th Cir. 1980)). In *Bouchillon*, the Fifth Circuit concluded that posttraumatic stress disorder, alone, could support a finding of incompetence. There, as here, the diagnosis was consistent with the defendant's institutional record of treatment and his history of mental problems.

In *United States v. Rodham*, 233 F. App'x 320, 321 (4th Cir. Jul. 11, 2007), the court upheld a finding of substantive incompetence even though the defendant understood the nature of proceedings against him. There, the district court's finding was based on the defendant's "'paranoia and delusional beliefs caused by bipolar type schizoaffective disorder that were so pervasive and consuming as to make him incompetent to assist in his own defense.'" *Id.*

The Ninth Circuit has held that powerful narcotic drugs that could have dulled the defendant's mental faculties could support a claim that the defendant was incompetent in fact, and that trial counsel was ineffective in allowing him to enter a guilty plea. *United States v. Howard*, 381 F.3d 873, 875 (9th Cir.



Appellate Case: 17-1716 Page: 820 Date Filed: 11/01/2017 Entry ID: 4596229

2004). The opinions of Dr. Woods and Dr. Bradford are consistent with this opinion.

Where a petitioner's personal physician testified at trial that petitioner suffered from severe emotional problems and a mental health expert who examined petitioner a few days after trial found her to be legally insane, the Fifth Circuit remanded a case for a substantive incompetency claim. *Zapata v. Estelle*, 588 F.2d 1017, 1022 (5th Cir. 1979).

Given this body of caselaw, it is reasonably debatable that the evidence in the record, as outlined above and in the statement of facts, establishes that Mrs. Montgomery was unable to rationally assist her counsel at the time of trial. In evaluating this claim, it is important to keep in mind the decisions that Mrs. Montgomery needed to make in consultation with her lawyers.

Those decisions required her to have a rational ability to: 1) assist her lawyers in developing a defense;[a] 2) reveal her traumatic experiences;[b] 3)

---

[a] Here, evidence shows that Mr. Duchardt, Mr. O'Connor, and Mr. Owen failed to understand Mrs. Montgomery's impaired memory and psychiatric condition. This failure caused them to create false memories of her brother, Tommy, as the true perpetrator of the murder. The resulting impact on Mrs. Montgomery's defense was catastrophic and pervaded every aspect of the trial.

[b] Trial counsel admit that Mrs. Montgomery was not able to disclose her trauma history to them. Further, they state that when Ms. Clarke was removed as counsel, Mrs. Montgomery suffered further trauma that compounded her inability to assist counsel. The constant turnover on the team exacerbated Mrs. Montgomery's incompetence.

decide whether to pursue a defense of not guilty by reason of insanity; 4) understand her rights under Rule 12.2 and whether she should waive those rights to allow the government access to her for purposes of what was, in fact, a five day video-taped interrogation by Dr. Park Dietz and Dr. Dan Martell; 5) decide whether to stop taking her medications during trial so that the jury could observe her demeanor un-medicated and/or discuss the impact of taking medications on her affect and how that would be handled through testimony and argument;[a] 6) make a decision about whether to testify at either phase of the trial; and 7) allow her attorneys to confess her guilt in the first phase of the trial.

Mrs. Montgomery was not capable of making any of these decisions in a rational way at the time of her trial. A COA should issue.

**5. It is reasonably debatable that the district court should have conducted a competency hearing. (Procedural due process claim)**

At the time of trial, the district court was on notice that Mrs. Montgomery's mental health was in issue. The court knew about Mrs. Montgomery's suicide attempt at CCA.[2743] Susan Hunt and David Owen discussed with the court the fact that Mrs. Montgomery was extremely mentally ill.[2744] Mr. Duchardt sought, and received, travel authorization from the court to attend Mrs. Montgomery's neuroimaging study in Philadelphia.[b] Mr. Duchardt informed the court that he

---

[a] See §VI.I., below, *Riggins* claim.
[b] Crim. D.E. 134; Crim D.E. 135

was going to raise an insanity defense on April 3, 2007.[2745] Dr. McCandless testified at trial that she had diagnosed Mrs. Montgomery with bipolar disorder.[2746] These facts were sufficient to trigger the district court's duty to *sua sponte* conduct a competency proceeding.

> A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent. Accordingly, an individual raising a procedural competency claim is held to a lower burden of proof than one raising a substantive competency claim.

*McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001) (internal citations omitted). *See also*, *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). To prevail on a procedural incompetency claim, a petitioner need not prove that she was actually incompetent, but rather she must establish that a reasonable judge presiding over her case would have had a "*bona fide* doubt" about her incompetency. *McGregor*, 248 F.3d, at 954. "A petitioner establishes a *bona fide* doubt if [she] shows that a reasonable judge should have doubted whether [she] had 'sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding' and whether petitioner had 'a rational as well as factual understanding of the proceedings against [her].'" *Ibid.,* (*quoting Dusky*, 362 U.S., at 402).



Appellate Case: 17-1716 Page: 823 Date Filed: 11/01/2017 Entry ID: 4596229

In *McMurtrey v. Ryan*, 539 F.3d 1112, 1115 (9th Cir. 2008), the court granted habeas relief to capital petitioner on a claim that he was denied his right to procedural due process where the trial judge failed to conduct a competency hearing. In that case, the trial evidence showed, *inter alia*, that the petitioner was taking psychotropic medications and jail records showed that the petitioner was treated for extreme agitation and that his behavior in the jail was indicative of mental illness. *Id.* at 1119-25.

In *Saddler v. United States*, 531 F.2d 83, 87 (2d Cir. 1976) (per curiam), the court held that when evidence of a defendant's extensive history of mental illness, including a hospitalization following a suicide attempt, became known to the trial court prior to sentencing, it was error for the trial court not to have ordered an evaluation of defendant's competency to be sentenced and a retrospective evaluation of his competence to have pled guilty. The evidence that became available to the court in *Saddler* was that the defendant had two previous psychiatric hospitalizations – one after a suicide attempt, as well as a background of mental disturbances, and an addiction to narcotics. *Id. at 85.*

Considering these decisions from other courts of appeal, it is reasonably debatable that Mrs. Montgomery's procedural due process rights were violated. A COA should issue.

**6. It is reasonably debatable that trial counsel was ineffective in failing to raise a competence claim at trial. (IAC claim)**

**a. Prevailing professional norms.**

Trial counsel has an affirmative duty to conduct a thorough investigation during both phases of the trial without which he "cannot be sure of the client's competency to make informed decisions[.]"[2747] Moreover, trial counsel has an affirmative duty to advise the court of his concerns regarding his client's competency and to preserve the record in that regard.

The Seventh Circuit found trial counsel ineffective in *Brown v. Sternes*, 304 F.3d 677, 680 (7th Cir. 2002), for failing to investigate a non-capital defendant's mental illness and permitting the court appointed experts to evaluate defendant with inadequate data. The medical records counsel neglected to obtain showed defendant suffered from chronic schizophrenia and raised a "*bona fide* doubt" regarding his competence. *Id. at 698.*

In *Williamson v. Ward*, 110 F.3d 1508, 1517 (10th Cir. 1997), the Tenth Circuit rejected trial counsel's proffered strategic reasons for not pursuing a competency determination, finding that trial counsel "did not exercise reasonable professional judgment" when he limited his investigation. *Id.*[a]

**b. Red flags.**

[a] Mrs. Montgomery has previously detailed the many ways in which the trial teams investigation and preparation for trial was deficient. *See* §§V.E.,VI.F, and VI.G. She incorporates those sections as if fully set forth herein.



Appellate Case: 17-1716 Page: 825 Date Filed: 11/01/2017 Entry ID: 4596229

As described in this section, and elsewhere in this application, the evidence of Mrs. Montgomery's mental illness of which Mr. Duchardt was aware, should have caused him to investigate further. Mr. Duchardt admitted that he had a difficult time communicating with Mrs. Montgomery.[2748] He admitted that Mrs. Montgomery could not disclose all of her trauma to his iteration of the defense team.[2749] Mr. Duchardt believed Mrs. Montgomery was so mentally ill as to justify raising an insanity defense.[2750] Given that, he had a duty to conduct further investigation and present her substantive incompetency claim.

In an interview prior to the filing of the §2255 motion, Mr. Duchardt admitted that Mrs. Montgomery could only communicate so much "before she shut down."[2751] Duchardt revealed, "It was only after trial that Lisa began to open up."[2752] He stated that it was difficult to explain the process of a trial to Mrs. Montgomery.[2753] Mr. Duchardt observed that Mrs. Montgomery's functioning improved greatly once she was transferred to the Bureau of Prisons "where she was placed on new psychotropic medication."[2754]

At the hearing below, the government asked Mr. Duchardt, "Did you observe that level of concern when you were dealing with her where she wasn't in a position to assist you all and there was concerns about whether or not she was effectively assisting in her defense?"[2755] Mr. Duchardt replied, "The answer to that is yes."[2756] He continued, "Lisa because of her condition was in a



Appellate Case: 17-1716 Page: 826 Date Filed: 11/01/2017 Entry ID: 4596229

position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems."[2757] Mr. Duchardt went on to summarize, "The bottom line is she was giving it to us every bit as quickly as she could … That wasn't Lisa's fault. And so I absolutely attribute that to her mental illness."[2758]

> And we also felt -- I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them. In terms of a colloquial way of putting it, in terms of a legal defense that would keep a person from being able to stand trial, I don't think so.[2759]

Mr. Duchardt had been excluded from the courtroom and did not have the benefit of the testimony that is outlined here, and elsewhere in this application. That Mr. Duchardt did not identify that what he was experiencing with Mrs. Montgomery as incompetence does not make Mrs. Montgomery any less incompetent. Mr. Duchardt's testimony reveals that he was on notice of facts that would have led an objectively reasonable lawyer to investigate further and to present a claim of incompetency.

**c. Prejudice.**

To demonstrate prejudice, Mrs. Montgomery "must demonstrate that there is a reasonable probability [she] would have been found incompetent to stand trial." *Hummel v. Rosemeyer*, 564 F.3d 290, 303 (3rd Cir. 2009); *see also Bouchillon*, 907 F. 2d, at 595; *Williamson*, 110 F.3d, at 1519. In making this



Appellate Case: 17-1716 Page: 827 Date Filed: 11/01/2017 Entry ID: 4596229

assessment, the court must consider all of the evidence in the record, not just that which was known at trial. There is a reasonable probability that Mrs. Montgomery would have been found incompetent to stand trial, if trial counsel had conducted a thorough investigation and presented all of the evidence of Mrs. Montgomery's brain impairment, complex posttraumatic stress disorder, and major mental illness, including psychosis and thought disorder.

Even though it denied the claim, the district court found "[t]here is little doubt that [Mrs. Montgomery] suffers from serious mental illnesses and brain damage to some extent."[2760] Given the facts and law presented, a COA should issue.

**I. It is reasonably debatable that Mrs. Montgomery's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, full and fair trial, and reliable sentencing were violated when she was administered multiple psychotropic medications during her trial which distorted her affect, while at the same time incompletely treating her comorbid mental illnesses without a detailed pre-trial determination that the administration of the drugs during trial was necessary. Further, trial counsel was ineffective for failing to raise this issue with the trial court; failing to explain this issue to Mrs. Montgomery; and failing to elicit testimony that would explain the physiological impact of the medications to the jury.**

**1. *Riggins v. Nevada* and its progeny hold that a criminal defendant may not be forcibly medicated during trial absent detailed findings that support the involuntary administration of the medication and ameliorative steps are taken to lessen the impact of the medication on the trial rights of the defendant.**

The United States Supreme Court has acknowledged a capital defendant's Eighth Amendment right to show jurors her true mental condition at sentencing.



Appellate Case: 17-1716 Page: 828 Date Filed: 11/01/2017 Entry ID: 4596229

*Riggins v. Nevada*, 504 U.S. 127, 133 (1992). Moreover, the Court has found that a defendant is denied a full and fair trial under the Sixth and Fourteenth Amendments when she is administered psychotropic medications against her will absent detailed findings sufficient to support the involuntary administration. *Id*., p. 129.

Mr. Riggins was administered a single drug, 800 mg of Mellaril, during his capital trial. The proof in the record was that the dosage could make him "uptight" and that he "might suffer from drowsiness or confusion." *Id.*, at 137. The American Psychiatric Association filed an amicus brief in the case explaining, "[I]n extreme cases, the sedation-like effect [of antipsychotic medication] may be severe enough (akinesia) to affect thought processes." *Ibid.* Given this testimony, the Supreme Court held, "[i]t is clearly possible that such side effects had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Ibid*.

*Riggins* rejected a requirement that a criminal defendant need show prejudice to prevail on such a claim. "Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different if Riggins' motion had been granted would be purely speculative." *Ibid.* Thus, a movant who establishes that

there is a possibility that the medications impaired the defense by for example, effecting demeanor or impacting the ability to follow the proceedings, has met her burden under *Riggins.*

> Like the consequences of compelling a defendant to wear prison clothing, *see Estelle v. Williams*, 425 U.S. 501, 504–505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976), or of binding and gagging an accused during trial, *see Allen, supra*, 397 U.S., at 344, 90 S.Ct., at 1061, the precise consequences of forcing antipsychotic medication upon Riggins cannot be shown from a trial transcript. What the testimony of doctors who examined Riggins establishes, and what we will not ignore, is a strong possibility that Riggins' defense was impaired due to the administration of Mellaril.

*Ibid.*

Justice Kennedy wrote a concurrence in *Riggins* explaining in detail the negative consequences at trial that flow from the administration of psychotropic medications to a criminal defendant.

> As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. **In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.** *See* Geimer & Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am.J.Crim.L. 1, 51–53 (1987–1988).

*Riggins*, 504 U.S., at 143–44 (Kennedy, J concurring) (emphasis added). *See* Jeffrey Coe, Note, *Seeking a Sane Solution: Reevaluating Interests in Forcibly*

*Medicating Criminal Defendants to Trial Competency*, 54 Ariz. L. Rev. 1073, 1088 (2012) ("A drug that dulls cognition or causes sedation can make the defendant appear callous or unremorseful, which affects that defendant's right to a fair trial."); Brenda A. Likavec, Note, *Unforeseen Side Effects: The Impact Of Forcibly Medicating Criminal Defendants On Sixth Amendment Rights*, 41 Val. U.L. Rev. 455, 472 (2006) ("In appearing cold and emotionless, the defendant's ability to garner a fair sentence if convicted is also hampered. If the jury has already determined guilt while the defendant is in a medicated state, it could be influenced by those same observations while considering a sentence. A jury may even consider the reaction of the defendant to the conviction itself and impose the sentence based in part on that reaction").

Justice Kennedy goes on to explain that the medications interfere with the defendant's ability to consult with counsel, "The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf. The side effects of antipsychotic drugs can hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in his defense." *Id.*, at 144.

Medications can impact the communication between lawyer and client in myriad ways. The drugs will, "by their very nature, alter the thought processes of the defendant." Brenda A. Likavec, *supra*, at 488. This altered state of mind

impairs communications in ways that the lay attorney may not even recognize. "[F]or the most part, these medications are thought to hamper rather than assist the ability to communicate. Once a defendant is unable to effectively communicate, or when her communication is in fact controlled by medication, she will not have assistance of counsel, her Sixth Amendment rights will be violated, and her subsequent trial will be rendered unfair." *Ibid.* Moreover, the altered state of mind produced by these medications also alter the thinking of the defendant which can alter the defense strategy she pursues, "a medicated defendant, with emotions dulled, might not pursue the most vigorous options in a defense strategy." *Id.*, at 489.

Further, as Justice Kennedy explains, the medications interfere with the defendant's Fifth Amendment right to testify. The right to testify is "essential to our adversary system."

> We have found the right implicit as well in the Compulsory Process Clause of the Sixth Amendment. *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In *Rock*, we held that a state rule excluding all testimony aided or refreshed by hypnosis violated the defendant's constitutional right to take the stand in her own defense. We observed that barring the testimony would contradict not only the right of the accused to conduct her own defense, but also her right to make this defense in person: " 'It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." ' " *Id.*, at 52, 107 S.Ct., at 2709, *quoting Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). We gave further recognition to the right of the accused to testify in his or her own words, and noted



Appellate Case: 17-1716 Page: 832 Date Filed: 11/01/2017 Entry ID: 4596229

> that this in turn was related to the Fifth Amendment choice to speak "in the unfettered exercise of his own will." *Rock, supra*, 483 U.S., at 53, 107 S.Ct., at 2710. In my view medication of the type here prescribed may be for the very purpose of imposing constraints on the defendant's own will, and for that reason its legitimacy is put in grave doubt.

*Id.* at 144–45.

**2. The incomplete and ineffective treatment regimen of multiple psychotropic medications administered to Mrs. Montgomery had significant side effects resulting in her loss of a full and fair trial, interfered with her right to counsel and right to present a defense, and deprived her of a fair sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

Dr. Diane Bradford, a psychopharmacologist with more than forty years experience reviewed Mrs. Montgomery's medical, mental health, and jail records in order to provide an expert opinion regarding the impact of the medications administered to Mrs. Montgomery and their effect on her demeanor and competency. At the time of her death, shortly before the hearing in this case, Dr. Bradford was one of the top five psychopharmacologists in the world.[2761] The government stipulated to the introduction of Dr. Bradford's declaration[2762] and Dr. Woods, who is also qualified to discuss the psychopharmacological properties of the medications, adopted Dr. Bradford's opinions and expounded on them at the hearing. Neither Dr. Bradford, nor Dr. Woods, credentials or expertise were questioned at the hearing. The



Appellate Case: 17-1716 Page: 833 Date Filed: 11/01/2017 Entry ID: 4596229

government presented no proof which contradicted or undermined the scientific basis of Dr. Bradford and Dr. Woods' opinions.

**a. Opinion of Dr. Bradford.**

In her report, Dr. Bradford describes in detail the chemical properties of each of the drugs administered to Mrs. Montgomery and how those chemicals alter the functioning of the brain. She supports her description with scholarly and scientific research. Unlike the defendant in *Riggins*, who was taking a single drug, *Mellaril*, Mrs. Montgomery was taking three drugs which each cause sedation and somnolence: amitriptyline, valproic acid, and ranitidine. Dr. Bradford explains that these drugs have an additive effect and cause prolonged side effects.

> Combination of these drugs in a polypharmaceutical regime results in additive effects of somnolence and sedation. The interaction of amitriptyline with valproic acid leads to the prolongation of the somnolence and sedation from amitriptyline during the following day. Further, side effects such as sedation and somnolence are often exaggerated in people suffering from head trauma, as Ms. Montgomery does (Saddock and Saddock, 2003). Such a degree of sedation and somnolence would likely result in an individual who was not fully aware of the surrounding environment, loss of attention, unable to follow complex procedures or conversations, and unresponsive to emotional (both positive and negative) probes in normal circumstances.[2763]

Dr. Bradford explains that sedation and somnolence are "distinct pharmacological events that are responsible for not only the efficacy, but side



Appellate Case: 17-1716 Page: 834 Date Filed: 11/01/2017 Entry ID: 4596229

effects, as well. These adverse events are specifically associated with various receptor sites, and thus their corresponding neurotransmitter." [2764]

Sedation is characterized by "[i]mpaired cognitive functioning" and "decreased memory and attention."[2765] Sedation also results in physical manifestations "such as coordination and psychomotor activity, e.g., recognition and response time. Somnolence represents sleepiness, drowsiness and a tendency to need to sleep during the day. Both contribute to an overall functional impairment in the individual."[2766] Dr. Bradford provided a chart comparing the various adverse events associated with sedation and somnolence.



[2767]

After a thorough review of each of the medications and their adverse side effects, Dr. Bradford concludes:

> In my professional opinion, which I hold to a reasonable degree of scientific certainty, the three drugs she was taking (valproic acid, ranitidine and amitriptyline) all of which have clinically significant side effects of sedation and somnolence, are additive when coadministered and would affect her outward appearance and reduce her ability to react to appropriate external cues. Besides causing a dulling of the senses, increased reaction time, decreased accuracy, unresponsiveness to external stimuli, these kinds of side effects of drugs can also present



Appellate Case: 17-1716 Page: 835 Date Filed: 11/01/2017 Entry ID: 4596229

> clinically as *flat affect which are undistinguishable from the flat effect as* a *symptom of psychosis (APA, 2000).* So, Ms. Montgomery would appear as a seemingly unsympathetic person without feeling during the course of the trial.[2768]

Dr. Bradford next reviewed Mrs. Montgomery's extensive documented major mental illnesses and reviewed the appropriateness of the treatment regimen at the time of trial. Dr. Bradford concluded that:

> In my professional opinion, which I hold to a reasonable degree of scientific certainty, Ms. Montgomery was not receiving appropriate medications at the time of the trial to control her psychosis. She was receiving therapeutic levels of valproic acid and bupropion for her mania and depression, respectively. Some of her bipolar symptoms were reduced, so the treatment program could be considered a partial response. However, she was still reporting frequent bouts of depression and possibly mania (expressed as irritability).
>
> On the other hand, she was receiving no treatment for her psychotic symptoms. As she was presenting with positive psychotic features during the trial, it is conceivable she was expressing a negative symptom of *flat effect* or seemingly emotionless demeanor presented in the courtroom. On neurocognitive tests, Ms. Montgomery's ability to recognize or discriminate facial affect, which is a neurocognitive aspect of psychosis (Calkins et al.,2010) would mean that she wouldn't be able to respond appropriately to the court, judge and jury's expressions of dismay or horror, disturbing details and unsettling evidence that was presented, making her appear cold-hearted.[2769]

**b. Dr. Woods corroborates Dr. Bradford's opinion.**

Dr. Woods testified adopting the findings of Dr. Bradford and was able to expound upon them at the hearing. Dr. Woods explained the synergistic impact of these medications where, "each of the drugs that we just described have

sedation and somnolence as side effects. They also have motor sedation because you can have cognitive sedation. Your brain kind of slows down. You get kind of foggy. We can have motor sedation where you don't respond so quickly … So a combination of these drugs goes back to exactly what we talked about in terms of comorbid diseases. When diseases are comorbid, they have greater effects. When drugs are comorbid, they interact and they create greater effects."[2770] Like Dr. Bradford, Dr. Woods explained that when the drugs interact "[y]ou have much greater somnolence. You have much greater sedation" and when the patient, like Mrs. Montgomery, has a history of head trauma, the sedation and somnolence effects of the drugs are "often exaggerated."[2771]

Dr. Woods explained that sedation effects "how your brain works" in that it effects "cognitive functioning" and "attention." Dr. Woods' review of the record revealed that the medical records documented Mrs. Montgomery's difficulty with concentration. Somnolence, on the other hand, makes you sleepy, makes you drowsy … So when you have sedation and somnolence, they can be very problematic."[2772]

Dr. Woods made clear that the adverse effects of these drugs is not dose dependent,[2773] a person does not build up a tolerance to them,[2774] and a person cannot volitionally overcome the physiological impact of the medications.[2775]



Appellate Case: 17-1716 Page: 837 Date Filed: 11/01/2017 Entry ID: 4596229

At the time of Mrs. Montgomery's trial she was taking three drugs which cause sedation.[2776]

Dr. Woods also described how sedation effects facial movement, particularly Elavil. "Any sedation but certainly Elavil impairs facial movement because it has a motor function. If you recall where it said there was a motor sedation as well as a cognitive sedation. A motor sedation is a relaxing of a smooth muscle. That's why you give it when someone -- so that relaxing of the smooth muscle is what's called masked facies, f-a-c-i-e-s, and that masked facies can often look like someone is not interested or has no facial expression."[2777]

Dr. Woods described in detail what affect is and how it is measured by range. "Affect is the external expression that one presents to the world, smile, frown, when someone tells a joke, you laugh … There's ranges of affect. Depression, blunted affect; psychosis, flattened affect."[2778] Blunted affect is different from flattened affect. "Blunted affect means someone tells a joke, everybody else is just guffawing and that person is just kind of smiling a little bit. Flat affect means your face looks frozen. You literally have difficult moving. It's like Botox. Your face is literally frozen."[2779]

Further, Dr. Woods clarified, "[b]lunt affect and particularly flat affect are really cognitive findings. So we're talking about the flat affect of psychosis is cognitively developed. The flat affect of drugs is pharmacologically developed.



Appellate Case: 17-1716 Page: 838 Date Filed: 11/01/2017 Entry ID: 4596229

So those are different."[2780] Mrs. Montgomery had both things going on, flat affect from the pharmacological properties of her psychiatric medications combined with the flat affect of psychosis, all of which is well documented in the jail and medical records.[a]

The government tried to suggest through cross-examination that the flat affect that witnesses observed in Mrs. Montgomery may have been the result of her lawyers coaching her to appear a certain way.[b] Dr. Woods explained, without contradiction, why, from a scientific standpoint, this would not be the case. The drugs directly effect "the motor functioning of those muscles. So no matter what they told her the drugs were No. 1."[2781]

Thus, just like Dr. Bradford, Dr. Woods agreed that the combination of the medications "that [a]ffected her outward appearance and that reduced her ability to react to appropriate external cues" both pre-trial and at trial.[2782]

Like Dr. Bradford, Dr. Woods concluded that the treatment regimen was not effective and as a result, Mrs. Montgomery was not competent at the time of trial.[c] "Even though Ms. Montgomery was being treated continuously, Dr.

---

[a] *See, e.g.*, Vol. 7, p. 1856, 1863*, Woods Testimony*. (Dr. McCandless observed Mrs. Montgomery to have a flat affect, including during the trial).
[b] The government's questioning is an example of the ways in which lay people normalize behavior of mentally ill people. Dr. Woods explains this common error at p. 1801 of his testimony.
[c] Concerns about the adequacy of treatment at CCA were raised early on. Dr. Marilyn Hutchinson described her concerns about Mrs. Montgomery in her letter

McCandless was struggling because she was still symptomatic. Even though Ms. Montgomery was being treated during the entire three years, Dr. McCandless could not get control over her delusions, could not get control over her agitation, could not get control over her anxiety, could not get control over her organization, and she tried – she actually added another medicine. I think it was Tegretol to the regimen. So at one point she was on Elavil, Wellbutrin, and two mood stabilizers trying to control her symptoms. Dr. McCandless never backed off of trying to control her symptoms but was not totally successful, and so she was symptomatic through the pretrial, trial, and posttrial until the

to defense counsel which she wrote shortly after Mrs. Montgomery had attempted suicide and had become dissociative. Dr. Hutchinson stated that the anti-depressants that were administered to Mrs. Montgomery by CCA were "quite sedating." Exhibit 37, *Hutchinson Letter*. Dr. Hutchinson was very concerned about Mrs. Montgomery's conditions of confinement which "contributed to the difficulties that arose." *Id.* During the episode Mrs. Montgomery was "numb." After the staff took all of Mrs. Montgomery's clothing (including her paper gown), her mattress and her blanket leaving Mrs. Montgomery literally naked in her cell, Mrs. Montgomery began to pull her hair out and pound on the wall. *Id.* Dr. Hutchinson noted that CCA was providing Mrs. Montgomery with ineffective medication for her disorder and that Mrs. Montgomery did not trust her treatment provider. *Id.* Dr. Hutchinson's overriding recommendation was that Mrs. Montgomery be hospitalized. *Id.* Dr. Logan also observed Mrs. Montgomery's demeanor early on, prior to extended medication. Exhibit 39, *March 7, 2005 Logan Letter*. Dr. Logan described Lisa as depressed, suicidal, experiencing thought disturbances (hallucinations) and sleep disturbances. Dr. Logan opined that Mrs. Montgomery had not responded to the treatment regimen at CCA. In fact the medication "actually seemed to worsen her intrusive traumatic memories and difficulty sleeping." *Id.* Dr. Logan recommended that Mrs. Montgomery be hospitalized. *Id.*

Risperidone."[2783] Thus, Mrs. Montgomery's psychosis was not being treated before or during trial.[2784]

What Dr. Woods saw in the records was multiple cumulative effects from the medications and her mental disorders.[2785]

Mrs. Montgomery was exhibiting "gross impairment in reality testing, delusions and hallucinations."[2786] She lacked insight and her behavior was "grossly disorganized."[2787] She was unable to focus or concentrate.[2788] She had "difficulty in initiating important activities."[2789] Her psychotic symptoms were untreated.[2790] She continued to have "frequent bouts of depression and manic and the negative symptoms [of psychosis]" during the trial.[2791]

Dr. Woods testified to a reasonable degree of scientific certainty that Mrs. Montgomery's multiple impairments as well as the medications prevented her from being able to rationally assist counsel prior to and during her trial.[2792, a]

Dr. Woods explained, "she did not receive appropriate medication for her symptom complex. She received appropriate medication for parts of it but not for that part that allowed her to think, to concentrate, to read; and without that medication, she was unable to disclose the nature and extent of her trauma." Dr. Woods opinion is corroborated in the records as he observed, "we see this vulnerability … back as early as 2003 where at that point the social worker is

---

[a] *See also*, §VI.H., *supra*, Competency Claim, incorporated herein by reference.

describing her thinking as being impaired,[a] and in 2007 with Dr. Kuncel she doesn't speak to competency but she talks to being very concerned about how she's going to be able to handle a trial and how she's going to be able to function. Nothing changed between Dr. Kuncel's observation or that 2003 observation and the time that she was in trial."[2793]

Dr. Woods psychiatric opinion in this regard is fully supported by the testimony of Dr. Porterfield and Dr. Hutchinson. Moreover, both Dr. Kempke and Dr. McCandless noted that once Mrs. Montgomery's psychosis was treated she began to see some improvement.[2794] Though the treatment is ongoing, the bureau of prisons' medical records, and Dr. Woods own observations, reveal that Mrs. Montgomery has experienced improvement in her thinking.[2795]

In conclusion, Dr. Woods opined that the combination of her multiple impairment and her medications affected her demeanor at trial.[2796]

**3. The evidence in the record establishes that Mrs. Montgomery did not voluntarily agree to be medicated during her capital trial in violation of *Riggins*.**

---

[a] Rhonda Gales, a social work with Kansas Department of Social and Rehabilitative Services, thought, "Lisa was mentally unstable. She was very moody and at times irrational." Gales "thought perhaps Lisa was bipolar." Gales thought that Mrs. Montgomery "was a little delusional." Exhibit 43, p. 25, *Kuncel Report*.

The evidence in the record is that "[Mrs. Montgomery] did not want to take any medicine basically."[2797] After an initial attempt to medicate Mrs. Montgomery which resulted in a suicide attempt, CCA did not medicate Mrs. Montgomery with anything other than a sleep aid until February, 2006, when they started her on Wellbutrin.[2798] In March, 2006, they added Depakote.[2799] In the summer of 2006, Elavil was added.[2800, a]

The record shows that Mrs. Montgomery's conditions of confinement exacerbated her symptoms and were coercive. From her arrest until the summer of 2006, Mrs. Montgomery was kept on either suicide watch or in solitary confinement.[2801] "The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators." *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy J., concurring). As Justice Kennedy observes, "common side-effects of solitary confinement include

---

[a] It bears noting that the district court judge, Mr. Duchardt and Mr. O'Connor never observed Mrs. Montgomery completely un-medicated. The first minute entry reflecting the district court judge's appearance on the record with Mrs. Montgomery present is Crim. D.E. 81, which is for the April 21, 2006 proceeding the day after Ms. Clarke was terminated. Mr. Duchardt's billing records reflect he first met Mrs. Montgomery on May 26, 2006. Exhibit 82, *Duchardt Timesheets*. Mr. O'Connor's billing records reflect he met Mrs. Montgomery on May 16, 2006. Exhibit 84, *O'Connor Timesheets*. This is another instance where the loss of institutional knowledge and skills of Judy Clarke, David Freedman, and Debra Garvey prejudiced Lisa Montgomery.



Appellate Case: 17-1716 Page: 843 Date Filed: 11/01/2017 Entry ID: 4596229

anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors." *Id.*, at 2210.

Mrs. Montgomery was not allowed out into general population until after the administration of the medications that she did not want to take.[2802] Thus the threat to Mrs. Montgomery was clear: either take the medication or go back into solitary confinement.

Further, the record is devoid of any record of a discussion with Mrs. Montgomery about her rights in this regard. No person told her that she could refuse to take the medication during her trial so that the jury could observe her in a mental state more reflective of what those who initially came into contact with her observed.[a] No one explained to Mrs. Montgomery that the pharmacological properties of the drugs CCA gave to her would make her face

---

[a] Ron Wurtz, former First Assistant Federal Public Defender for the District of Kansas, was one of the first attorneys to come into contact with Mrs. Montgomery. He described Mrs. Montgomery's un-medicated mental state, "My recollection of her is that she was just totally wrung out. I've described it like she's been drug through a keyhole. She looked like she had been constantly crying. She seemed disoriented. She was difficult to communicate with." Vol. II, p. 280, *Wurtz Testimony*. Mr. Wurtz co-counsel, Charles Dedmon, described Mrs. Montgomery as "fragile and confused." Mrs. Montgomery "did not seem to comprehend what had happened" and would alternate between being "emotional" and "detached." Mr. Dedmon recalls that Mrs. Montgomery's "mood was definitely unstable." Exhibit 75, *Dedmon Declaration*. In fact the local AUSA in Kansas, Ms. Morehead, commented that Mrs. Montgomery was "obviously insane." The US Marshall who transported Mrs. Montgomery described her "the worst off of anyone he had transported." *Id.*

appear cold and expressionless which could cause the jury to see her as remorseless and manipulative.[a] No one advised her that if she continued to be medicated that the jury should be provided proof about the physiological effects of the medication on her affect and demeanor. Certainly no one explained how any of these concerns interacted with her mental health impairments.[b]

Thus, the record supports the fact that Mrs. Montgomery was involuntarily administered psychotropic medications whose side effects interfered with her affect, cognition, and competency. In the words of the Supreme Court, ""[i]t is clearly possible that such side effects had an impact upon not just [Mrs. Montgomery's] outward appearance, [her decision not to testify], [her] ability to follow the proceedings, or the substance of [her] communication with counsel." *Riggins*, 504 U.S. at 137. Given that possibility, Mrs. Montgomery need not show prejudice. Rather, a new trial is required.

---

[a] This was the government's refrain. TT. Vol. 4, p. 886 (no remorse); TT. Vol. 5, p. 1129 (no remorse); TT. Vol. 7, p. 1681 (no remorse); TT. Vol. 8, p. 1697 (not sorry); TT. Vol. 11, p. 2467 (lack of remorse); TT. Vol. 13, p. 2798 (no remorse, not sad); TT. Vol. 13, p. 2798 (not remorseful or sad when she's caught); TT. Vol. 13, p. 2844 ("she's a cold-blooded killer); TT. Vol. 13, p. 2852 (cold-blooded murder); TT. Vol. 13, p. 2860 (cold-blooded, calculated); TT. Vol. 15, 3151 (cold-blooded predator).

[b] Indeed trial counsel was not fully aware of the nature, quality, and severity of Mrs. Montgomery's multiple, serious, comorbid disorders. See §§V.B., and V.C., *supra*.

The district court's resolution of this claim failed to engage with the proof in the record and is reasonably debatable. The district court erroneously found "there is no allegation of involuntary administration of drugs in the present case." D.E. 212, p. 80; p. 96. But Mrs. Montgomery's motion,[2803] as well as the proof presented at the hearing as described herein, did raise the issue of involuntary administration. This is perhaps another example of where the district court denied Mrs. Montgomery due process and a fair adjudication of her claims by issuing his order without benefit of a transcript or post-argument briefing.

The district court infers willingness from Mrs. Montgomery's alleged failure to object to the administration of the medications which her doctor clearly stated she did not want to take -- this is legally impermissible. "[P]resuming waiver from a silent record is impermissible." *Carnley v. Cochran*, 369 U.S. 506, 516 (1962). "[T]he ordinary rule is that a court cannot infer a waiver of a constitutional right from the failure to object. In light of the constitutional rights implicated when a defendant is medicated with [psychotropic] drugs, there is no reason to deviate from this established standard for waiver … Because the CCA impermissibly deemed the medication voluntary from a silent record, a determination that Willis's medication was voluntary is an unreasonable application of clearly established Supreme Court precedents on



Appellate Case: 17-1716 Page: 846 Date Filed: 11/01/2017 Entry ID: 4596229

waivers of constitutional rights." *Willis v. Cockrell*, 2004 WL 1812698, *17 (W.D. Tex. August 9, 2004).

Mrs. Montgomery is entitled to a COA on this issue.

**4. It is reasonably debatable that trial counsel was constitutionally ineffective in failing to protect Mrs. Montgomery's rights under *Riggins v. Nevada* and in failing to ameliorate the impact of the jury observing Mrs. Montgomery under the influence of psychotropic medication.[a]**

**a. It is reasonably debatable that trial counsel's performance fell below prevailing professional norms.**

The ABA Guidelines explain that under prevailing professional norms, counsel have an affirmative duty to "monitor the client's personal condition for any potential legal consequences. For example, actions by prison authorities (e.g. solitary confinement, administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing or have legal implications and changes in the client's mental state … may bear upon his capacity to assist counsel, and ultimately, to be executed."[2804] The footnote to this commentary specifically mentions *Sell v. United States*, 539 U.S. 166 (2003) and *Riggins*.

[a] This claim is also interrelated with Mrs. Montgomery's competency claim, §VI. H., *supra*. Mrs. Montgomery incorporates the facts and law of these sections as if fully set forth herein.



Appellate Case: 17-1716 Page: 847 Date Filed: 11/01/2017 Entry ID: 4596229

Moreover, prevailing professional norms require trial counsel to protect his client's constitutional rights and preserve the record of constitutional error in the trial and/or sentencing of his client. "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial." Stephen B. Bright, *Preserving Error at Capital Trials*, THE CHAMPION, Apr. 1997, at 42-43. *See also*, ABA Guidelines, Guideline 10.8, The Duty To Assert Legal Claims (counsel must consider all legal claims available, thoroughly investigate all legal claims, evaluate each legal claim, preserve the record).[2805]

Here, where trial counsel were on notice that their client was being medicated against her wishes, trial counsel had an affirmative duty to raise a *Riggins* issue. This is particularly true where trial counsel had doubts about her competency, even with medication as discussed in §V. E., *supra*. Indeed the record reflects that before trial, trial counsel discussed that it was important to explain to the jury the effects of the psychotropic medications on Mrs. Montgomery. David Owen testified that the team discussed the importance of alerting the jury to the fact that Mrs. Montgomery was on medications because

of the concern that the medications would affect her demeanor and make her appear cold and remorseless.[2806] This testimony is un-contradicted.

But, trial counsel never considered challenging the involuntary medication of Mrs. Montgomery itself. So, they did not make an objectively reasonable decision to fail to pursue this claim. Trial counsel failed to appreciate the impact of the medications on Mrs. Montgomery's competence, demeanor, how it would undermine their insanity defense, the ways in which the government would capitalize on the resulting flat affect to support their argument for conviction and death, and how the jury would take Mrs. Montgomery's demeanor into consideration during sentencing.

Trial counsel further erred by not discussing these issues with Mrs. Montgomery and taking steps to ensure that she understood the rights she would be giving up by continuing to take the drugs she did not want to take, but which brought her greater freedom in the jail. *See ABA Guidelines*, Guideline 10.5, Relationship with Client (counsel has a duty to discuss legal issues with the client).[2807] Given her incompetency, Mrs. Montgomery would not have been able to make a competent decision with respect to these medications. This, of course, places an even greater burden on trial counsel to raise the *Riggins* claim.

Had trial counsel raised a *Riggins* claim, the burden would have been on the government who bears the burden of proof by clear and convincing evidence,

*United States v. Fazio*, 599 F.3d 835 (8th Cir. 2010), and the court "must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. *See Riggins, supra*, 504 U.S. at 142-145, 118 L Ed 2d 479, 112 S Ct 1810 (Kennedy, J., concurring in judgment)." *Sell*, 539 U.S. at 181. The Court in *Sell* observed, "This standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare." Moreover, as is the case here, "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence[.]" *Id*. at 185-186. Indeed, the *Sell* court cautioned that involuntary "medication is likely justified only where State shows drugs would not significantly affect defendant's "behavior and demeanor" *Id.*, at 179 (quoting *Riggins,* 504 U.S. at 145, Kennedy, J.).

Trial counsel's professional error here is also interrelated with their constitutionally ineffective pre-trial preparation and investigation, failure to

investigate and present evidence of Mrs. Montgomery's incompetence, and failure to competently investigate Mrs. Montgomery's brain impairments and comorbid illnesses.[a]

Trial counsel's performance here is deficient under *Strickland*.

**b. It is reasonably debatable that Mrs. Montgomery was prejudiced in multiple ways by trial counsel's professional errors.**

**i. The jury observed Mrs. Montgomery display a flat affect without any understanding that the medications, and her major mental illness, were responsible.**

David Owen testified that "during the trial Lisa presented a very flat affect and the jury could have interpreted that as 'cold-bloodedness.' At no time did Fred bring the effects of these medications had on Lisa to the jury's attention."[2808, b]

Troy Schnack, a member of the defense team who was present throughout trial describes Mrs. Montgomery's demeanor as "sullen"[2809] and that "her head

---

[a] This is yet another example of how Mrs. Montgomery was prejudiced by the termination of Judy Clarke as her counsel. *See,* §§VI. A. - VI. M., *supra*.

[b] The only testimony offered at trial regarding the effects of the medications came from Dr. McCandless and likely exacerbated the error. Dr. McCandless testified that Mrs. Montgomery had "less severe moods. There has been some, but much less than it was initially before the medication was started." TT. Vol. 10, p. 2084. This explanation, without more, and particularly where the nature, extent, and severity of her comorbid mental illnesses was never presented to the jury serves to only aggravate the fact that the jury viewed Mrs. Montgomery is such a medicated state.

was always down."[2810] Mr. Schnack said that Mrs. Montgomery did not move much during the trial, "a lot of no movement."[2811]

Susan Hunt was present during a portion of the trial. She testified regarding Mrs. Montgomery's demeanor at trial. "She had a flat affect. She showed absolutely no emotion. She just sat in the chair and stared straight ahead. She looked like, you know, her body was just stuffed sitting in the chair. It was obvious to me she was medicated."[2812] Unlike Mr. Duchardt and Mr. O'Connor, Ms. Hunt had seen Lisa Montgomery un-medicated.

These witnesses' observations are consistent with the scientific proof that the drugs control demeanor. No evidence in the record undermined the scientific proof.[a]

Nevertheless, the district court credited John O'Connor and Fred Duchardt's testimony that Mrs. Montgomery's affect was "normal and appropriate given the circumstances."[2813] First, O'Connor met with Mrs. Montgomery on very few occasions. He did not know what her demeanor was like un-medicated. Second, the observation neither defeats the claim nor answers the concerns of *Riggins*. Rather, the district court (who counsel could not question on this point), O'Connor and Duchardt seem to be engaging in the types of

[a] D.E. 212, p. 99, It is true that the district court said "Court gives more credence to Duchardt's and O'Connor's views of Movant's affect… during trial."



Appellate Case: 17-1716 Page: 852 Date Filed: 11/01/2017 Entry ID: 4596229

normalization that Dr. Woods warned against. For example the judge considered the fact that Mrs. Montgomery "dressed nicely"[2814] as proof that her affect was not effected by the medications. Mrs. Montgomery allegedly passed notes and spoke to her lawyers. But nothing in *Riggins* or *Sell*, require that counsel prove the medications will make her catatonic. These vague generalizations do not defeat nor undermine the testimony and scientific evidence which was presented, particularly where the district court judge, O'Connor, and Duchardt never saw Mrs. Montgomery un-medicated and where trial counsel didn't understand the true nature of her mental state.

At the very least, where there is a conflict in the testimony, the issue is reasonably debatable and a COA should issue.

**ii. Government took advantage of Mrs. Montgomery's appearance.**

As described above, un-medicated Mrs. Montgomery was remorseful, sad, fragile, and unstable. By the time she was being interrogated by Dr. Dietz and Dr. Martell, the medications were already having an impact on her affect. The only videos the jury saw of Mrs. Montgomery was her interactions with Drs. Dietz, Martell and Ramachandran. As described earlier, trial counsel was separately ineffective for allowing the government such broad access to Mrs. Montgomery and for instilling in her the false memory that her brother was the true culprit. Having suggested this memory to Mrs. Montgomery, trial counsel



Appellate Case: 17-1716 Page: 853 Date Filed: 11/01/2017 Entry ID: 4596229

allowed her to repeat this story on video under the influence of these medications. The resulting damage was catastrophic.

The government took full advantage of this situation painting Mrs. Montgomery as a cold-blooded, remorseless, liar.

**iii. Mrs. Montgomery was not competent.**

Trial counsel's error was compounded by the fact that the treatment regimen was incomplete and inadequate in that it failed to treat Mrs. Montgomery's psychotic symptoms, as discussed above. *See Sell*, 539 US at 181 (unconstitutional to involuntarily medicate a defendant where such medication is substantially likely to have side effects that will interfere significantly with defendant's ability to consult with counsel.") As the Court in *Sell* observed, "Justice Kennedy, concurring in the judgment, emphasized that antipsychotic drugs might have side effects that would interfere with the defendant's ability to receive a fair trial. *Id.,* at 145, 118 L Ed 2d 479, 112 S Ct 1810 (finding forced medication)." *Id,* at 178-179. The fact that Mrs. Montgomery failed to understand the nature of the proceedings is most starkly demonstrated by the testimony of Troy Schnack that after the verdict came in Mrs. Montgomery said, "Okay, what can I do to help now."[2815] Stephanie Elliott recalled the same conversation.[2816]



Appellate Case: 17-1716 Page: 854 Date Filed: 11/01/2017 Entry ID: 4596229

What the district court judge, Mr. O'Connor, and Mr. Duchardt saw as normal behavior, was in fact a defendant who, consistent with Dr. Bradford and Dr. Woods' opinion, was severely sedated and somnolent.

What the record actually shows, including the medical and jail records, is that given the sedative and somnolent effect of these medications, Mrs. Montgomery was unable to concentrate or focus. Combined with her illnesses she was unable to make decisions about her case, whether to plead not guilty by reason of insanity, whether to go to trial medicated or insist on being un-medicated, whether to agree to be interrogated for five days on video by Dr. Park Dietz and Dr. Dan Martell, whether to take the stand, and the myriad other choices a capital defendant must face.

**iv. Mrs. Montgomery's trial while involuntarily medicated undermined her insanity defense.**

As already discussed, those individuals, including an Assistant United States Attorney and a United States Marshal, recognized that Mrs. Montgomery was quite ill when they observed her close in time to her arrest. Though trial counsel was ineffective in pursuing an insanity defense. Any lawyer who does pursue such a defense should take steps to ensure that his client's involuntary medication does not interfere with that defense.

As the Supreme Court of Vermont has observed:

> In other words, the jury never looked upon an unaltered, undrugged Gary Pray at any time during the trial. Yet his deportment, demeanor,

> and day-to-day behavior during that trial, before their eyes, was a part of the basis of their judgment with respect to the kind of person he really was, and the justifiability of his defense of insanity. At the very least, they should have been informed that he was under heavy, sedative medication, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit. A life sentence ought not to rest on the shaky premise that an undisclosed behavioral alteration, brought about by the State, did not affect the jury's resolution of the issue of insanity. The matter must be retried.

*IN Re Pray*, 336 A.2d 174 (VT. 1975)

**v. Penalty phase.**

Critically, Mrs. Montgomery was harmed in the penalty phase where the demeanor of the defendant is crucial. The jury looks to the defendant to see remorse or regret. The adverse effects of the medication could literally have made the difference between life and death for Mrs. Montgomery. By the time of the penalty phase in the case, counsel's multiple unprofessional errors, including here, undermined the veracity of her entire case in mitigation and the government was able to paint her as cold-blooded and remorseless.

Because it is reasonably debatable that trial counsel performed deficiently, a COA should issue.

**J. Mrs. Montgomery was denied due process at the evidentiary hearing below where the court denied discovery, failed to honor stipulations, cut short testimony, and displayed bias toward habeas counsel.**

At the same time the district court granted an evidentiary hearing on the bulk of Mrs. Montgomery's claims, it also found, "[g]ood cause for discovery has not been established in this case. Instead, Movant may call and question witness and further develop the record on the remaining issues at the forthcoming evidentiary hearing."[2817] When counsel for Mrs. Montgomery raised the issue of reconsidering the court's denial of discovery at the January 27, 2016 hearing, the court reiterated its position stating, "providing the parties an opportunity for evidentiary hearing on these matters and the opportunity to call these witnesses in this bench-tried proceeding obviates the need for any additional discovery by way of deposition of any potential witnesses."[2818]

In contrast, the court granted discovery to the government, ordering that Mr. Duchardt, Mr. O'Connor, and Mr. Owen provide responses to the Motion over Mrs. Montgomery's objection.[2819] Thereafter, the district court allowed Mr. Duchardt to enter an appearance in the case as an interested party to file his own motions for discovery, all of which were then granted. One such discovery order begins, "Nothing should be more important to a lawyer than his or her reputation for honesty and capable representation of the interests of their clients to the best of their ability. When a lawyer's representation is challenged as being less than honest and/or less than capable based upon the lawyer's lack of integrity, ability or effort, the lawyer should not be silenced or handicapped in



Appellate Case: 17-1716 Page: 857 Date Filed: 11/01/2017 Entry ID: 4596229

defending their reputation."[2820] In another Order, granting Mr. Duchardt access to sealed transcripts of matters that took place prior to Mr. Duchardt's appointment as counsel for Mrs. Montgomery, the stated purpose was to allow Duchardt to defend his integrity and professional reputation.[a] The district court granted all of Mr. Duchardt's discovery requests, including ordering that Mrs. Montgomery's habeas counsel to provide Mr. Duchardt the paper copy of the entire file. The court granted Mr. Duchardt's request within days of its filing, without allowing Mrs. Montgomery the opportunity to respond in writing.[b]

The district court's decision to deny discovery unfairly hampered Mrs. Montgomery's preparation for the hearing and prejudicially denied her due process and a fair hearing. The uneven way in which discovery was handled by the district court further illuminates the fact that Mrs. Montgomery was deprived of a fair hearing before an impartial decision maker.

1. **The court's decision to grant an evidentiary hearing, by definition, meant that Mrs. Montgomery met the standard for conducting discovery under Rule 6 of the Rules on Motion Attacking Sentence Under §2255. The denial of discovery was therefore a denial of due process and a full and fair hearing.**

---

[a] There are no allegations that Mr. Duchardt had any role in the termination of Judy Clarke or Susan Hunt as counsel for Mrs. Montgomery.

[b] In her motion to reconsider, Mrs. Montgomery provided alternatives to the return of the paper copy of the file (including providing a complete, searchable, electronic copy). Delivering the paper copy to Mr. Duchardt was unduly burdensome, extraordinarily expensive, and risked compromising chain of custody. D.E. 89. The district court denied the motion the same day.

A §2255 movant, has the right to conduct discovery upon the showing of good cause. Rule 6, Rules on Motion Attacking Sentence Under Section 2255; *Bracy v. Gramley*, 520 U.S. 899 (1997). Good cause is shown, "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" *Bracy*, 520 U.S. at 908–09 (*quoting Harris v. Nelson*, 394 U.S. 286, 300 (1969).

Here, the district court found no good cause, while at the same time finding that Mrs. Montgomery was entitled to a hearing. The district court wrote, "the remaining claims brought by Movant – which include her claims of ineffective assistance of counsel not otherwise addressed herein, competency and effects of her medication, exclusion of Venire person Torres, prosecutorial misconduct regarding Tommy Kleiner, and exclusion of Dr. Gur – all raise issues of fact not conclusively resolved by the Record. (§2255 Mtn, Grounds V-VII, XII-XIII, XV, XVIII, XXII)."[2821] This court has observed that, "a §2255 movant is entitled to an evidentiary hearing unless "the motion and the files and records of the case conclusively show that [he] is entitled to no relief." 28 U.S.C. §2255." *Sinisterra*, 600 F.3d at 906.



Appellate Case: 17-1716 Page: 859 Date Filed: 11/01/2017 Entry ID: 4596229

By operation of law, then, by making allegations that the district court could not resolve on the record, Mrs. Montgomery met the "good cause" standard of *Bracy.* Indeed the standard for good cause is lower than the standard for obtaining a hearing. *See Wellons,* 558 U.S. 220 (habeas petitioner entitled to discovery where his "speculation" and "surmise" were the result of an absence of the record and he sought discovery to plug the "holes in the record.")

Here, Mrs. Montgomery was not allowed to conduct discovery in advance of the hearing which included allegations involving complex expert testimony regarding psychiatric and scientific principles. For example, Mrs. Montgomery alleges that trial counsel was ineffective in his preparation for, and handling of, the government's *Daubert* motion which ultimately led to the exclusion of compelling evidence of Mrs. Montgomery's brain damage. Relatedly, Mrs. Montgomery alleged that the government's experts' claim – that Montgomery's experts did not conduct their analysis in the way that Montgomery's witnesses said that they did – was untrue.

At the hearing, Mrs. Montgomery produced affirmative evidence that the government's experts' allegations were untrue.[a] Because the court twice made clear that it would not permit any pre-hearing discovery, counsel was denied the

[a] *See* Vol. 5, pp. 1120-1182, *Davatzikos Testimony*; Vol. 5, pp. 1182-1245, *Newberg Testimony*; Vol 8, pp. 2028-2031, *Gur Testimony*.

opportunity to seek pre-hearing discovery for the production of Dr. Mayberg and Evan's raw data and calculations. A review of the scientific data reveals that Mayberg and Evan's allegations about the way in which the PET data was interpreted cannot be squared with Dr. Newberg's analysis. It is not a mere matter of interpretation, as the court found. But without access to Mayberg and Evan's raw data, Mrs. Montgomery could not further substantiate her claims. It should be noted that no government expert was called to rebut Dr. Davatzikos, Dr. Newberg, or Dr. Gur, though Dr. Mayberg and Dr. Evans were endorsed witnesses. This court can draw an adverse inference from the government's failure to call either witness.

Moreover, Mrs. Montgomery was prejudiced when she was denied the opportunity to depose Mr. Duchardt prior to the hearing. Mr. Duchardt's conduct in the district court and the tenor of his affidavit, make it clear that he was an unusually hostile witness. Where Mr. Duchardt had provided far different answers in an informal interview prior to the filing of the motion than he did in his one hundred plus page response to the motion, and where Mr. Duchardt's memories are disputed by other witnesses, there was good cause to take his deposition. On the witness stand, Mr. Duchardt equivocated and prevaricated with almost every question asked by habeas counsel. A pre-hearing

deposition was necessary to explore issues with Mr. Duchardt that would have led to further relevant evidence.

**2. Mrs. Montgomery was denied due process and a full and fair hearing where without notice to Mrs. Montgomery, in its final order the district court failed to treat stipulations as agreements between the parties, and where the district court truncated witness' testimony based on the stipulation of the government.**

The district court instructed the parties to stipulate to as much as possible to in order to shorten the length of the hearing. "I'd like for the parties simultaneous with their exhibit list to identify the exhibits that the parties are willing to stipulate to for, at a minimum basis, of identification and stipulate as far as you might deem appropriate, but I expect the parties to cooperate on identification and foundation, not make people jump through a bunch of unnecessary hoops in that regard."[2822]

The parties complied with the court's order. At the pre-hearing conference, the government informed the court, "I think we made progress and our hope is to try to condense this to the extent possible. I recognize this is a fairly lengthy evidentiary hearing. We've been out of town this week trying to solidify some of those issues and I think we're making good progress."[a] Based on the instructions from the court and the agreement of the government, hundreds of

[a] Motion to Expand the Record – Attachment 4, *10/14/2016 Transcript*, p. 2).

exhibits, including testimonial declarations were received by stipulation. The testimony of Dr. Woods, Dr. Porterfield, and Jan Vogelsang was truncated based on the government's objection that the testimony and exhibits being referenced were stipulated to by the government. The government presented no testimony.

Yet, in its final order, the district court failed to honor the stipulations, in many circumstances by not considering the proof at all.[a] If Mrs. Montgomery had been aware that the court would handle the stipulations accordingly, she would have presented the testimony as live proof. If the district court later found that he had questions about proof that had been stipulated to, due process requires that he provide Mrs. Montgomery with an opportunity to present further proof or clarification. *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Gardner v.* Florida, 430 U.S. 349 (1977) (death penalty defendant has a right to explain or deny evidence used against her); *Presnell v. Georgia*, 439 U.S. 14 (1978) (due process requires that capital petitioner are entitled to an adjudication on the basis of the way that the case was tried).

---

[a] The district court's failure to consider and/or engage with large portions of Mrs. Montgomery's proof is in part the reason for the need for the unusually lengthy statement of facts. For example, the district court found Ms. Vogelsang's report of Mrs. Montgomery's first husband's (Carl's) sexual violence to be "completely unsupported by the record" blinking Exhibit 31, Teddy Kleiner Declaration, wherein Mr. Kleiner reported having watched a video tape of Carl Boman (Mrs. Montgomery's first husband) raping and beating Mrs. Montgomery.

### 3. Mrs. Montgomery was denied due process and full and fair hearing where the district court decided her case without post-hearing briefing or a transcript.

The district court made it clear that he would not entertain post-hearing briefing. The district court specifically instructed, "I'm not looking for any briefing or suggestions beyond that; and if my position on that was to change, then as I look at it, I'll let you know."[2823] The transcript in this case was not prepared until after the court entered its final ruling. The district court's decision without benefit of legal briefing or a transcript misstates, overlooks, and misunderstands critical evidence and Mrs. Montgomery's legal theories. This in turn denied Mrs. Montgomery due process in the adjudication of her claims. Further, the process followed by the district court resulted in the necessity of the preparation and filing of the voluminous application here. In the normal course, most of this briefing and argument would have taken place at the district court level.

### 4. Mrs. Montgomery was denied procedural due process and a full and fair hearing where the district court excluded the testimony of Lawrence Fox, Esq.

Mrs. Montgomery noticed Mr. Lawrence Fox as an expert witness months before the hearing. The government was aware of the substance of his testimony and even stipulated to the introduction of his report.[2824] Mr. Fox's report is dated April 29, 2016.[2825] On January 26, 2016, the district court directed that any and all motions regarding the hearing be filed no later than



Appellate Case: 17-1716 Page: 864 Date Filed: 11/01/2017 Entry ID: 4596229

October 12, 2016.[2826] The government filed no such motion. The parties appeared in open court on October 14, 2016 for the purpose of discussing any pre-hearing matters. Despite having had Mr. Fox's report for months, the fact that Mr. Fox was a noticed witness, and that his report was on Petitioner's list of proposed witnesses, the government did not raise any objection to Mr. Fox's testimony at that time.[2827]

Instead, the government waited until just as Mr. Fox was to take the stand to object to the introduction of his testimony. Mrs. Montgomery cried foul, noting that this was exactly the sort of matter that should have been addressed in pre-hearing motions. Without the opportunity for legal briefing, the court excluded Mr. Fox's testimony, and then proceeded to upbraid counsel for running out of witnesses on a Friday afternoon at 3:30 p.m. Mr. Fox was an out of state, *pro bono*, expert witness. Mr. Fox had arranged his schedule to accommodate the district court's schedule. Though Mr. Fox was *pro bono*, his travel expenses were paid. Had she been given the opportunity prior to the hearing, Mrs. Montgomery could have provided legal briefing establishing the relevance and importance of Mr. Fox's testimony. Mr. Fox, who is an expert in legal ethics, was offered to show the ethical conflict engendered by the materially false representations that Mr. Duchardt made to the court.[a] Mrs. Montgomery

[a] *See*, §V.E.



Appellate Case: 17-1716 Page: 865 Date Filed: 11/01/2017 Entry ID: 4596229

maintains that Mr. Duchardt's actions were a tipping point leading to the presentation of an improbable first phase defense and causing her lawyers to fail to investigate numerous red flags which would have led to the discovery of compelling mitigation.

The district court's refusal to allow this testimony denied Mrs. Montgomery a full and fair hearing.

**5. Mrs. Montgomery was denied procedural due process in the district court because she was denied a hearing before an impartial arbiter.**

Procedural due process includes the right to an impartial trier of fact. *In Re Murchison*, 349 U.S. 133 (1955); *Caperton v. A.T. Massey Coal Co.*, 556 U.S 868; *Williams v. Pennsylvania*, 136 S.Ct. 1899. The district court's dim view of Mrs. Montgomery's allegations and her counsel is clear throughout the transcript and its orders as described in this application. Allegations that local trial counsel appointed for Mrs. Montgomery had made untrue statements to the district court drew particular ire, even though Mrs. Montgomery supported each of her allegations with citations to proof in the record. Mrs. Montgomery's view of the record is further supported by Mr. Fox's independent review of the record. Each time these issues were raised, the district court took some sort of action to make its displeasure known (e.g., suggesting that the government was the client of CJA counsel, holding back portions of payment while commenting

that Mrs. Montgomery did not deserve the representation that had been provided, removing counsel, and finally "admonishing" counsel without notice or a hearing).

The district court's actions with respect to discovery in this matter (granting it to trial counsel so that he can protect his professional integrity) but denying it to Mrs. Montgomery, evidence the court's bias against Mrs. Montgomery. The district court's exclusion of Mr. Fox, despite the government's failure to abide by the court's clear direction that all such motions must be filed no later than October 12, 2016, followed by a severe scolding of habeas counsel for having run out of witnesses at 3:30 pm on a Friday afternoon, also evidences its partiality. Because tone and facial expressions are not apparent from a cold record, Mr. Fox has provided this Court with a declaration which describes the district court's open hostility.[a]

A COA should issue.[b]

---

[a] *See*, Motion to Expand the Record – Attachment 2, *Declaration of Lawrence Fox, Esq.*

[b] It would be appropriate for this court to grant a COA on this issue while holding the remaining issues in abeyance pending a remand to a neutral district court judge for further proceedings including discovery, additional evidentiary proceedings, and a reexamination of the entire record after full briefing and argument at the district court level.



Appellate Case: 17-1716 Page: 867 Date Filed: 11/01/2017 Entry ID: 4596229

**K. It is reasonably debatable that Mrs. Montgomery's rights to due process and a fair and reliable sentence free from emotion and caprice under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the introduction of overly prejudicial victim impact evidence. Trial counsel was constitutionally ineffective for failing to object to this proof**.

After introducing victim impact testimony, the government closed its penalty phase case by playing government trial exhibit 54, which is a fourteen minute audiotape of the 911 call made by the victim's mother.[2828] The tape is unduly inflammatory and prejudicial and not proper victim impact evidence. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court held that the prosecution may introduce victim impact evidence that is limited to a "quick glimpse" of the impact of the crime on the family of the victim. *Id.* at 822. Justice O'Connor, in concurrence, reminded the lower courts that "If, in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may seek appropriate relief under the Due Process Clause of the Fourteenth Amendment." *Id.* at 831.

Here the government's proof stepped over the *Payne* line. The playing of the tape for the jury unfairly insert emotion and caprice into the sentencing phase of the trial.



Appellate Case: 17-1716 Page: 868 Date Filed: 11/01/2017 Entry ID: 4596229

Moreover, trial counsel failed to object to the playing of the tape. Trial counsel has an obligation to make objections and preserve legal error. His failure to do so in this instance is yet another example of his ineffectiveness.[a]

A COA should issue.

**L. Mrs. Montgomery's capital sentence violates the Eighth Amendment, evolving standards of decency, and the dignity of man and is therefore constitutionally disproportionate where Mrs. Montgomery is the only individual to be sentenced to death for these crime facts and where Mrs. Montgomery suffers from brain damage and severe mental illness.**

The Eighth Amendment prohibits a sentence which is disproportionate. *Trop v. Dulles*, 356 U.S. 86 (1958). A sentence can be disproportionate based on the crime facts, vulnerabilities unique to a class of defendants, or facts specific to the defendant herself. *See Gregg*, 428 U.S. 153; *Lockett*, 438 U.S. 586; *Coker v. Georgia*, 433 U.S. 584 (1977); *Atkins v. Virginia*, 536 U.S. 304 (2002); *Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012). Further, "[a] penalty … must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' *Trop v. Dulles, supra*, 356 U.S., at 100, 78 S.Ct., at 597 (plurality opinion)." *Gregg*, 428 U.S., 173.

The proof at the hearing is that out of fifteen known cases in the United States in the past thirty years with similar crime facts, Mrs. Montgomery is the

[a] *See*, §V.C., *supra*.

only individual under a sentence of death.[a] These similar cases reflect a geographic diversity and include a woman who previously stabbed a woman with intent to kidnap her baby and another defendant who had burned the remains of the woman and unborn fetus. Where no other person who has committed a similar crime has been executed or is currently condemned, Mrs. Montgomery's capital sentence is disproportionate.

Further, Mrs. Montgomery's brain damage and severe mental illness render her capital sentence similarly disproportionate.

The Supreme Court has also held characteristics common to discrete classes of individuals makes the death penalty disproportionate for those defendants. For example, with respect to individuals with intellectual disabilities,

> The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," is enhanced, not only by the possibility of **false confessions**, but also by the **lesser ability** of [intellectually disabled] defendants to make a **persuasive showing of mitigation** in the face of prosecutorial evidence of one or more aggravating factors. [Intellectually disabled] defendants may be **less able to give meaningful assistance to their counsel** and are typically **poor witnesses**, and **their demeanor may create an unwarranted impression of lack of remorse** for their crimes.

*Atkins v. Virginia*, 536 U.S. 304, 320–21 (2002) (*quoting Lockett,*, 438 U.S. at 605 (emphasis added).

[a] Exhibit 131.

Each factor cited by the Court in *Atkins* as a reason that the death penalty is disproportionate for the intellectually disabled is also true for Mrs. Montgomery. The record shows that Mrs. Montgomery was vulnerable to a "false confession" and in fact was manipulated into implicating her brother with disastrous results. Mrs. Montgomery had a lesser ability to present persuasive mitigation because of her trauma history as Dr. Hutchinson, Dr. Porterfield, and Dr. Woods explained. Expert testimony established that Mrs. Montgomery was less able to assist her counsel because of her comorbid illnesses.[a] Also because of her comorbid illnesses (and the medications used to treat them) Mrs. Montgomery made a poor witness on the video-taped interview with Drs. Dietz and Ramachandran which were shown to the jury. Further, her demeanor may have created the unwarranted impression that Mr. Montgomery lacked remorse.[b]

The government capitalized on Mrs. Montgomery's frailties by arguing that she was remorseless and cold-blooded. Thus the government was able to use factors that should have been mitigating as aggravating evidence against her in violation of the Eighth Amendment.

A COA should issue.

---

[a] *See,* §§V.E., VI.H, and VI.I.*, supra*, competency, *Riggins,* and IAC claims.
[b] *See*, §§ V.B., V.C., V.E., VI.F, VI.G.,VI.H, and VI.I.*, supra*, competency, *Riggins,* and IAC claims.

**M. Government witness, Dr. Park Dietz presented untrue and prejudicial testimony regarding the nature of the Grand Jury investigation into his untrue testimony in the Andrea Yates trial and the circumstances surrounding that untrue testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, *Napue v. Illinois*, 360 US 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).**

At trial, the credibility of the experts was a material issue. The government argued that its experts were far more credible than Mrs. Montgomery's experts. For example, the government argued that in comparison to Dr. Dietz, Dr. Ramachandran was "out of his league."[2829] Dr. Dietz, the government told the jury, is "the foremost forensic psychiatrist in the United States."[2830]

Dr. Dietz had previously given false testimony in the case of Andrea Yates. Another high profile capital murder case involving a woman. *Yates v. State*, 171 S.W.3d 215, 222 (Tex. App. 2005) ("We conclude that there is a reasonable likelihood that Dr. Dietz's false testimony could have affected the judgment of the jury. We further conclude that Dr. Dietz's false testimony affected the substantial rights of appellant.") In that case, his false testimony resulted in her conviction being set aside. The government addressed the Yates matter on direct examination. Dietz' recitation of how his untrue testimony in the Yates trial came to light is refuted by the grand jury transcript[2831] which is in evidence here and the testimony of George Parnham, Andrea Yates' attorney.

Further, on cross examination, Dietz was asked about the fact his actions in the Yates case were the subject of a grand jury investigation. Dietz testified that

"there was a run away grand jury that had kicked out the prosecution" and that Yates' lawyer "got the run-away grand jury to investigate the District Attorney's office and me. The outcome of that was they returned no indictment and found no wrongdoing."[2832] Dietz further described the grand jury as "lawless." In closing argument, the government argued, "you know they did an investigation down there and he was cleared of any wrongdoing."[2833]

The foreperson of the Grand Jury who investigated Dietz, James Brooks, provided a declaration which was stipulated to by the government. Brooks testified that the grand jury was lawfully convened. Brooks testified that the grand jury was guided by the Harris County District Attorney (and therefore did not kick out the prosecution as Dietz swore). Brooks further testified that the inquiry was not instigated by Yates' defense attorney – further contradicting Dietz trial testimony.

Of course, the fact that a jury does not return an indictment is not a finding of no wrongdoing. That testimony and argument was improper. The cross examination of Dr. Dietz by the grand jurors certainly does not compel the conclusion that he was cleared of wrongdoing.[a]

Where Dr. Dietz's testimony was critical to undermining proof of relevant mitigating evidence of Mrs. Montgomery's severe mental illness and trauma,

---

[a] Exhibit 81.

the failure of the state to correct Dr. Dietz' testimony violated *Napue* and *Giglio* and Mrs. Montgomery was prejudiced where the government explicitly relied on this testimony to bolster the credibility of Dr. Dietz.

A COA should issue.

**VII. Conclusion:**

Wherefore, for all the foregoing reasons, the Movant respectfully requests that this Court:

1. Grant her a certificate of appealability on each of the foregoing issues and order briefing and argument; and/or

2. Remand issue §VI.A-D. (relating to the removal of qualified counsel) to the district court for reassignment and further proceedings, including discovery and an evidentiary hearing, before a different judge and hold the remainder of this application in abeyance pending the outcome of that proceeding; and/or

3. Hold this application in abeyance and remand issue §VI.F. and G. (ineffective assistance of trial counsel) to the district court for reassignment to a different judge and for reconsideration and application of Supreme Court precedent regarding the need to consider the cumulative effect of trial counsel's deficiencies. *Strickland v. Washington*, 466 U.S. 668, 695 (1984) (a claim of ineffective assistance of counsel requires the court to consider all of the evidence in the record and to judge counsel's errors cumulatively, not in a piecemeal fashion); *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (court erred in failing to consider totality of the evidence); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (court must consider totality of the evidence); and/or

4) Hold this application in abeyance and remand the case for reassignment to a different district court judge with instructions to reconsider of all the claims raised in the petition honoring the stipulations of counsel and ordering further discovery, testimony, and



Appellate Case: 17-1716 Page: 874 Date Filed: 11/01/2017 Entry ID: 4596229

briefing as needed to clarify any ambiguity in the record resulting from the denial of process at the evidentiary hearing; and/or

5) Any other relief this Court deems just and proper.

Respectfully submitted this 1st day of November, 2017.

LISA G. NOURI
Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

Kelley J. Henry
Mo. Bar No. 38849; Tn. Bar No. 021113
Supervisory Asst. Federal Public Defender

Amy D. Harwell
Tn. Bar No. 18691
Asst. Federal Public Defender
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2017, the above-captioned document was served electronically on David Ketchmark, Jeffrey Valenti, and Phil Koppe, Assistant United States Attorneys representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Kelley J. Henry*
Counsel for Lisa Montgomery

[1] D.E. 173, p. 66, (granting evidentiary hearing on claims V-VII, XII-XIII, XV, XVIII and XXII).
[2] Exhibit 75, *Dedmon Declaration.*
[3] Vol. 4, p. 1021, *Hutchinson Testimony.*
[4] Exhibit 95, *Hunt Letter to CCA* (documenting that Mrs. Montgomery was on suicide watch from her arrival at CCA and was treated by Dr. McCandless).
[5] Vol. 2, p. 280, *Wurtz Testimony.*
[6] Exhibit 75, *Dedmon Declaration.*
[7] Vol. 2, p. 285, *Wurtz Testimony; See also* Exhibit 75, *Dedmon Declaration.*
[8] Vol. 2, p. 301, *Dillingham Testimony*; *see also* Ex. 140, *Dillingham Billing. Records*, documenting his initial visit to Mrs. Montgomery on 12/22/2004.
[9] Vol. 2, p. 301, *Dillingham Testimony.*
[10] Vol. 2, p. 301, *Dillingham Testimony.*
[11] Vol. 2, p. 301, *Dillingham Testimony.*
[12] Exhibit 75, *Dedmon Declaration.*
[13] Vol. 2, p. 302, *Dillingham Testimony.*
[14] Vol. 2, p. 301, *Dillingham Testimony.*
[15] Exhibit 75, *Dedmon Declaration.*
[16] Vol. 2, p. 306, *Dillingham Testimony.*
[17] Ex. 10, *Kidwell Declaration.*
[18] Vol. 2, p. 279, *Wurtz Testimony.*
[19] Vol. 2, p. 280, *Wurtz Testimony.*
[20] Vol. 2, p. 285, *Wurtz Testimony.*
[21] Vol. 2, p. 285, *Wurtz Testimony.*
[22] Exhibit 140, *Dillingham Billing Records (Kansas).*
[23] Exhibit 1-291, p.2 *Dillingham Declaration.*
[24] Exhibit 1-291, p.1 *Dillingham Declaration.*
[25] Vol. 2, p.321, *Burns Testimony.*
[26] Vol. 2, p.315, *Burns Testimony.*
[27] Crim. D.E. 16; Vol. 2, p. 319-20, *Burns Testimony*; Vol. 2, p.390-91 *Hunt Testimony*; Exhibit 93, *Order of Appointment of Susan Hunt.*
[28] Vol. 2, p. 317, 321, *Burns Testimony.*
[29] Vol. 2, p. 321, *Burns Testimony.*
[30] Exhibit 141, *Dillingham Billing Records (Missouri).*
[31] Vol. 3, p. 554, *Burr Testimony.*
[32] Vol. 3, p. 554, *Burr Testimony.*
[33] Vol. 2, p. 690, *Cardarella Testimony.*
[34] Vol. 2, p. 322, *Burns Testimony.*
[35] Vol. 4, p. 985-86, *Hutchinson Testimony.*



Appellate Case: 17-1716 Page: 876 Date Filed: 11/01/2017 Entry ID: 4596229

[36] Vol. 4, p. 997-99, *Hutchinson Testimony* (Dr. Hutchison administered the MacArthur Competence Assessment, the Evaluation of Competency to Stand Trial, Structured Interview of Reported Symptoms, the Dissociative Experience Survey; Dr. Willing administered the "pure psychological testing," including the MMPI).
[37] Vol. 4, p. 995-96, *Hutchinson Testimony.*
[38] Vol. 4, p. 996, *Hutchinson Testimony;* Vol.4, p.926, *Logan Testimony.*
[39] Vol. 4, p. 996-97, *Hutchinson Testimony*; Vol.4, p.926 *Logan Testimony*; see also Exhibit 37, *3/14/05 Hutchinson Letter to Hunt* ("It is not wise that someone with tenuous mental health be placed in [solitary confinement] interminably. A dramatic change in her conditions is warranted lest she find a way to enact her hopelessness into a suicide action").
[40] Vol. 4, p. 926, 928 *Logan Testimony.*
[41] Vol. 4, p. 929, *Logan Testimony.*
[42] Vol. 6, p. 929, *Logan Testimony*; Exhibit 39, *Logan Letter*; Exhibit 37, *Hutchinson Letter*; Vol. 6, p. 1022-25, *Hutchinson Testimony.*
[43] Crim. D.E. 41; 43.
[44] Vol. 2, p. 326, *Burns Testimony;* Vol. 2, p. 400, *Hunt Testimony.*
[45] Vol. 2, p. 326, *Burns Testimony.*
[46] Vol. 2, p. 326, *Burns Testimony.*
[47] Vol. 2, p. 401, *Hunt Testimony.*
[48] Exhibit 60, p. 3, *Hunt Declaration.*
[49] Vol. 2, p. 431, *Rickert Testimony.*
[50] Vol. 2, p. 446-47, *Rickert Testimony.*
[51] Vol. 2, p. 449-52, *Rickert Testimony* (rapport with Mrs. Montgomery); p.433 (interviewed 25-30 witnesses); p.434 (estimated still had close to 100 witnesses left to interview).
[52] Exhibit 71, *Montgomery Letter.*
[53] Vol. 8, p. 2137, *Owen Testimony.*
[54] Exhibit 60, *Hunt Declaration* at p.4; Vol. 2, p. 397, *Hunt Testimony*; *see also*, Exhibit 1-57, *Jackson Declaration* (observing "It was clear [Hunt and Owen] were unfamiliar with ABA Guidelines on the Performance of Counsel in Capital Cases, basic principles of penalty phase investigation, the relationship between trauma and mental health, symptoms of major mental disease, and how to obtain and analyze information to determine its relevance to mitigation and Ms. Montgomery's social history").
[55] Vol. 8, p. 2137, *Owen Testimony.*
[56] Vol. 2, p. 397, 401, *Hunt Testimony.*
[57] Vol. 3, p. 548-49, *Burr Testimony.*
[58] Vol. 3, p. 548-49, *Burr Testimony.*
[59] Vol. 3, p. 556, *Burr Testimony.*



Appellate Case: 17-1716 Page: 877 Date Filed: 11/01/2017 Entry ID: 4596229

[60] Vol. 3, p. 554, *Burr Testimony.*
[61] Vol. 3, p. 556, *Burr Testimony*; Vol. 2, p. 413, *Hunt Testimony.*
[62] Vol. 3, p. 557, *Burr Testimony.*
[63] Vol. 2, p. 435, *Rickert Testimony* ("They would make kind of hypotheses about the mitigation themes and expect the investigation to sort of be tailored to supporting those themes versus conducting an investigation and having the themes emerge from the facts that you gather").
[64] Vol. 3, p. 560, 564-65 *Burr Testimony.*
[65] Vol. 3, p. 561-62, *Burr Testimony.*
[66] Vol. 3, p. 560, *Burr Testimony.*
[67] Vol. 3, p. 562, *Burr Testimony.*
[68] Vol. 3, p. 564, *Burr Testimony.*
[69] Vol. 3, p. 565, *Burr Testimony*; Vol. 8, p. 2155, *Owen Testimony.*
[70] Vol. 3, p. 565, *Burr Testimony.*
[71] Crim. D.E. 63; *see also*, Exhibit 62, p. 5, *Owen Declaration.*
[72] Exhibit 62, p. 6, *Owen Declaration.*
[73] Exhibit 62, p. 6, *Owen Declaration* (discussing the first unrecorded discussion with the Court concerning Ms. Clarke).
[74] Crim. D.E. 63.
[75] Vol. 2, p. 404, *Hunt Testimony.*
[76] Vol. 2, p. 404, *Hunt Testimony.*
[77] Vol. 2, p. 424-25, *Hunt Testimony.*
[78] Ex.62, p. 5, *Owen Declaration*; Vol. 3, p.634, *Clarke Testimony* ("They said we want you to be as involved in all parts of the case as you can be.").
[79] Vol. 8, p. 2140, *Owen Testimony.*
[80] Vol. 3, p. 734-35, *Garvey Testimony.*
[81] Vol. 3, p. 741-43, *Garvey Testimony*; Exhibit 57, *March 30, 2006 To-Do List.*
[82] Vol. 3, p. 629, *Clarke Testimony.*
[83] Vol. 3, p. 630, *Clarke Testimony* (referencing ABA Guidelines description of capital team as *see also*, Vol.1, p. 55-158, *Stetler Testimony* (regarding professional norms); Vol.1, p.159-229, *Bookman Testimony* (same)*;* Exhibits 86 and 103*, ABA guidelines.*
[84] Exhibit 63, p. 4, *Clarke Declaration.*
[85] Vol.3, p. 651, *Clarke Testimony; see also,* Vol. 3, p. 708-09, *Jackson Testimony* (though only on the case 6 months, she was investigating a working theory that Mrs. Montgomery suffered from bipolar disorder, severe trauma from sexual abuse, fetal alcohol spectrum and other neurological deficits and disorders); Vol. 3, p. 736-37, *Garvey Testimony* (listing theories being bipolar, trauma, PTSD, and possibly temporal lobe epilepsy).
[86] Exhibit 1-57, p. 4, *Jackson Declaration.*

[87] Exhibit 1-57, p. 4, *Jackson Declaration.*
[88] Vol. 8, p. 2139, *Owen Testimony*; Vol.3, p 754-55, *Garvey Testimony*; Vol. 3, p. 666-67, *Clarke Testimony;* Herman, Judith Lewis*, Trauma and Recovery,* BasicBooks, 1992.
[89] Vol. 3, p. 669, *Clarke Testimony.*
[90] Vol. 2, p. 405, *Hunt Testimony* (once Judy Clarke and Debra Garvey on the team, records collection "skyrocketed"); Vol. 3, p. 641-42, *Clarke Testimony*; Vol. 3, p.641 *Clarke Testimony* (discussing her focus on records collection); *see also*, Exhibit 101, *Records Collected Before Trial* (bar graph of the timing of records collection by team composition).
[91] Vol. 3, p. 726-27, *Garvey Testimony.*
[92] Vol. 3, p. 727, *Garvey Testimony.*
[93] Vol. 3, p. 728, *Garvey Testimony.*
[94] Exhibit 64, p. 3, *Garvey Declaration.*
[95] Vol. 8, p. 2145, *Owen Testimony* (while Judy Clarke was on the team, Mrs. Montgomery never said Tommy was involved, just that she felt that someone else was in the room; Owen learned that the sort of sensation was a symptom of dissociative disorder).
[96] Vol. 3, p. 670 -71, *Clarke Testimony* (the team was also considering using Dr. Spitz for a *Daubert* challenge to the findings of Dr. Mary Case).
[97] Vol. 3, p. 642-43, *Clarke Testimony* ("there were obstacles, yes. It was primarily purse strings, as I recall, and lack of desire to get records, although [Dave Owen] did at some point, and I can't remember the timing, hire a paralegal to come and help with record collection").
[98] Vol. 3, p. 699-700, *Jackson Testimony.*
[99] Exhibit 64, *Garvey Testimony.*
[100] Vol. 3, p. 681, *Clarke Testimony.*
[101] Vol. 4, p. 841-42, *Freedman Testimony.*
[102] Vol. 4, p. 845, *Freedman Testimony.*
[103] Vol. 4, p. 846, *Freedman Testimony.*
[104] Vol. 4, p. 845-46, *Freedman Testimony.*
[105] Vol. 1, p. 99-100, *Stetler Testimony.*
[106] Vol. 4, p. 836, *Freedman Testimony.*
[107] Vol. 4, p. 836-37, *Freedman Testimony.*
[108] Vol. 4, p. 837, *Freedman Testimony.*
[109] Vol. 4, p. 837, *Freedman Testimony.*
[110] Vol. 2, p. 409-10, *Hunt Testimony.*
[111] Vol. 2, p. 409, *Hunt Testimony.*
[112] Exhibit 60, p. 6, *Hunt Declaration.*
[113] Vol. 2, p. 409, *Hunt Testimony.*



Appellate Case: 17-1716 Page: 879 Date Filed: 11/01/2017 Entry ID: 4596229

[114] Vol. 2, p. 406-07, *Hunt Testimony.*
[115] D.E. 71-21.
[116] Exhibit 63, p. 5, *Clarke Declaration.*
[117] Exhibit 63, p. 6, *Clarke Declaration.*
[118] Exhibit 60, p. 6, *Hunt Declaration.*
[119] Exhibit 63, p. 7, *Clarke Declaration.*
[120] Vol.2, p. 412, *Hunt Testimony.*
[121] Vol. 2, p. 412-13, *Hunt Testimony.*
[122] Exhibit 72, p. 40-1, *Conrad Deposition.*
[123] Exhibit 72, p. 11, *Conrad Deposition.*
[124] Exhibit 72, p. 45, *Conrad Deposition.*
[125] Exhibit 72, p. 10, *Conrad Deposition.*
[126] Vol. 2, p. 415, *Hunt Testimony*; *see also*, Exhibit 60, p. 8, *Hunt Declaration;* Exhibit 44, *Hunt Letter to Burr* (contemporaneously documenting that Owen told her he went to Maughmer).
[127] *See* No. 13-2958, Attachment 5, p. 24, *5/6/2013 Transcript of Proceedings* (government's recitation of the information disclosed by Judge Maughmer in the unrecorded interview by the parties: that prior to the 4/20/06 discussion with Judge Fenner, Owen had made Maughmer aware of the problems, though "he couldn't remember any detail").
[128] Vol. 2, p. 415, *Hunt Testimony.*
[129] Exhibit 71, *Montgomery Letter.*
[130] Exhibit 60, p. 7, *Hunt Declaration*; Vol. 2, p. 415, *Hunt Testimony* (referencing night meeting at her house two days after Owen's discussion with Maughmer)
[131] Exhibit 65, *Hunt Letter to Burr, 4/30/06*; Exhibit 62, p. 7-8,*Owen Declaration*; Exhibit 60, p. 8, *Hunt Declaration.*
[132] Exhibit 63, p. 8, *Clarke Declaration.*
[133] Exhibit 60, p. 7-8, *Hunt Declaration.*
[134] Exhibit 60, p. 7-8, *Hunt Declaration*; Exhibit 62, p. 7-8, *Owen Declaration.*
[135] Exhibit 60, p. 8, *Hunt Declaration.*
[136] *Cf.* Exhibit 62, *Owen Declaration with* Exhibit 72, *Conrad Deposition.*
[137] (Exhibit 62, p. 8, *Owen Declaration*; *see also,* Court of Appeals No. 13-2958, Entry ID 4072350, Attachment 5, p. 11, 24, *5/6/2013, Transcript of Proceedings in Civil Case;* D.E. 52.
[138] Exhibit 62, p. 8, *Owen Declaration.*
[139] Exhibit 32, p. 16-17, *Conrad Deposition.*
[140] Exhibit 62, p. 8, *Owen Declaration*; *see also*, 13-2958, Entry ID 4072350, Attachment 5, *5/6/2013 Transcript* (recounting the government's account of the Maughmer interview).



Appellate Case: 17-1716 Page: 880 Date Filed: 11/01/2017 Entry ID: 4596229

[141] Exhibit 62, p. 8, *Owen Declaration*; Exhibit 72, p. 11. *Conrad Deposition* (Mr. Conrad testified that he "probably saw Judy one time after she got on the case").
[142] Exhibit 60, p. 8, *Hunt Declaration*; but see, Exhibit 65, *4/30/2006 Hunt Letter to Burr* (indicating she was unable to call Ms. Clarke "prior to meeting in the Judge's Chambers on Thursday morning" – April 20th was a Thursday – "I told the court I was never allowed to make that call as David, without my knowledge or consent told the court Ray Conrad suggested the Judge cancel Judy's meeting with the client.").
[143] Exhibit 65, *4/30/2006 Hunt Letter to Burr*; Exhibit 71, *Montgomery Letter.*
[144] Exhibit 32, *Conrad Deposition.*
[145] 13-2958, Entry ID 4072350, Attachment 5, *5/6/2013 Transcript* (recounting the government's account of the Judge Maughmer interview).
[146] D.E. 59.
[147] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/05 and 5/3/05 Transcript* (emphasis added).
[148] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/05 and 5/3/05 Transcript.*
[149] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/05 and 5/3/05 Transcript.*
[150] Exhibit 60, p. 9, *Hunt Declaration.*
[151] Exhibit 60, p. 9, *Hunt Declaration.*
[152] Exhibit 60, p. 9, *Hunt Declaration.*
[153] Exhibit 65, *4/30/06 Hunt Letter to Burr;* Exhibit 60, p. 9, *Hunt Declaration.*
[154] D.E. 113-1.
[155] D.E. 71-21.
[156] D.E. 71-21.
[157] D.E. 71-21.
[158] Exhibit 60, p. 10, *Hunt Declaration.*
[159] Crim. D.E. 81.
[160] Exhibit 60, p. 10, *Hunt Declaration.*
[161] D.E. 113-1, p. 1.
[162] D.E. 113-1, p. 1.
[163] D.E. 113-1, p. 2.
[164] D.E. 113-1, p. 1.
[165] D.E. 113-1, p. 2.
[166] D.E. 113-1, p. 2.
[167] D.E. 113-1, p. 3.
[168] D.E. 113-1, p. 3.
[169] D.E. 71-21.
[170] Exhibit 63, *Clarke Declaration.*
[171] Exhibit 63, *Clarke Declaration.*
[172] Exhibit 63, *Clarke Declaration.*



Appellate Case: 17-1716 Page: 881 Date Filed: 11/01/2017 Entry ID: 4596229

173 Exhibit 63, p. 8, *Clarke Declaration.*
174 Exhibit 71, *May 2006 Montgomery Letter*; Vol. 3, p. 713-14, *Jackson Testimony* (regarding her observations of Mrs. Montgomery immediately after losing Ms. Clarke).
175 Vol. 3, p. 713-14, *Jackson Testimony.*
176 Vol. 3, p. 713-14, *Jackson Testimony.*
177 Vol. 3, p. 713-14, *Jackson Testimony.*
178 Vol. 2, p. 418-19, *Hunt Testimony.*
179 No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/05 Transcript.*
180 Exhibit 60, p. 10, *Hunt Declaration.*
181 No. 13-2958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006 Transcript.*
182 No. 13-2958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006,* p. 2, *Transcript.*
183 No. 13-2958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006*, p. 2, *Transcript.*
184 No. 13-2958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 2, *Transcript.*
185 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 3, *Transcript.*
186 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 3, *Transcript.*
187 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 3, *Transcript.*
188 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 4, *Transcript.*
189 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 4, *Transcript.*
190 Crim. D.E. 63.
191 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 5, *Transcript.*
192 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 6, *Transcript.*
193 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 7, *Transcript.*
194 No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 7, *Transcript*; *see also*, Vol. 2, p. 417, *Hunt Testimony* (regarding Exhibit 99, *Cahn Letter,* (FPD San Diego, offering for his office to accept an appointment and fund the cost of Mrs. Montgomery's defense).



Appellate Case: 17-1716 Page: 882 Date Filed: 11/01/2017 Entry ID: 4596229

[195] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 7, *Transcript.*
[196] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 7, *Transcript.*
[197] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 9, *Transcript.*
[198] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 10, *Transcript.*
[199] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 10, *Transcript*.
[200] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 11, *Transcript.*
[201] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 11, *Transcript.*
[202] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 11, *Transcript.*
[203] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 13, *Transcript.*
[204] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 14, *Transcript.*
[205] No. 132958, Attachment 4, Entry ID 40721350, *April 25, 2006 and May 3, 2006* p. 15, *Transcript.*
[206] D.E. 151-4.
[207] D.E. 151-4.
[208] D.E. 151-4.
[209] D.E. 151-4.
[210] D.E. 151-4.
[211] Exhibit 71, *Montgomery Letter* (filed under seal as Crim. D.E. 84).
[212] Exhibit 71, *Montgomery Letter.*
[213] Exhibit 71, *Montgomery Letter.*
[214] Exhibit 71, *Montgomery Letter.*
[215] Exhibit 71, *Montgomery Letter.*
[216] Exhibit 71, *Montgomery Letter.*
[217] Exhibit 71, *Montgomery Letter*.
[218] Exhibit 71, *Montgomery Letter.*
[219] Exhibit 71, *Montgomery Letter.*
[220] Exhibit 71, *Montgomery Letter.*
[221] Exhibit 71, *Montgomery Letter.*
[222] Exhibit 71, *Montgomery Letter.*
[223] Exhibit 71, *Montgomery Letter.*

[224] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 16, Transcript.*

[225] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006*, *p. 16, Transcript.*

[226] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 21-22*, *Transcript.*

[227] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 16, Transcript.*

[228] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 16-17, Transcript.*

[229] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 16-17, Transcript.*

[230] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 18, Transcript.*

[231] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 18, Transcript.*

[232] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 10, Transcript* (emphasis added).

[233] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 11, Transcript.*

[234] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 19, Transcript.*

[235] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 19, Transcript.*

[236] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 20-21, Transcript.*

[237] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 21, Transcript.*

[238] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 22, Transcript.*

[239] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 23, Transcript.*

[240] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 26, Transcript.*

[241] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 26, Transcript.*

[242] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 26, Transcript.*

[243] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 26-27, Transcript.*

[244] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 28-29, 33, Transcript.*
[245] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 33, Transcript.*
[246] Vol. 2, p. 419, *Hunt Testimony.*
[247] Vol. 2, p. 419, *Hunt Testimony.*
[248] Vol. 2, p. 419, *Hunt Testimony.*
[249] No. 13-2958, Entry ID: 4072350, Attachment 4, *4/25/2006 and 5/3/2006, p. 26, Transcript.*
[250] Exhibit 55, *5/9/06 Email from Owen to Jackson*; *see also*, Vol. 3, p. 716, *Jackson Testimony* ("I was let go. I was fired").
[251] Exhibit 55, *5/9/06 Email from Owen to Jackson.*
[252] Exhibit 55, *5/9/06 Email from Owen to Jackson.*
[253] Vol. 3, p. 716, *Jackson Testimony.*
[254] Vol. 3, p. 716, *Jackson Testimony.*
[255] D.E. 71-9.
[256] D.E. 71-9.
[257] Crim. D.E. 85.
[258] Crim. D.E. 86; *see also*, Vol. 7, p. 1873, *O'Connor Testimony.*
[259] Vol.3, p. 582, *Burr Testimony*; *see also*, Vol. 7, p. 1867, *O'Connor Testimony* (lacking memory of that call but not disputing that it happened).
[260] Vol. 3, p. 582, *Burr Testimony.*
[261] Vol.7, p. 1869, *O'Connor Testimony.*
[262] Vol. 3, p. 582-583, *Burr Testimony* (noting he also recommended Denise LeBouef as possible counsel).
[263] Vol. 3, p. 583, *Burr Testimony.*
[264] D.E. 130.
[265] Vol. 7, p. 1873, *O'Connor Testimony.*
[266] Crim. D.E. 87; *see also* Vol. 7, p. 1873, *O'Connor Testimony* (Mr. Duchardt was learned counsel).
[267] Exhibit 62, p. 11, *Owen Declaration;* Vol. 8, p.1873, *O'Connor Testimony.*
[268] Vol. 8, p. 1874, *O'Connor Testimony.*
[269] Exhibit 83, p. 1, *Armstrong Declaration* (of 2013 interview with Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[270] Vol. 9, p. 2282, *Duchardt Testimony*; *see also*, *Id*. at p. 2279 (testifying that he recalls that in conversations with Ms. Clarke the names Herman and Delis)
[271] Exhibit 83, p. 2, *Armstrong Declaration* (of 2013 interview with Fred Duchardt); see also, Vol.4, p. 911-16 et seq., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).

[272] Exhibit 83, p. 2, *Armstrong Declaration* (of 2013 interview with Fred Duchardt); see also, Vol.4, p. 911-16 et seq., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[273] Exhibit 83, p.3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[274] D.E. 129, p.35.
[275] Exhibit 83, p. 3, *Armstrong Declaration* (of 2013 interview with Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[276] Exhibit 83, p. 2, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[277] Vol. 8, p. 2028-43, *Gur Testimony* (setting forth his credentials; the government stipulated to his expertise, excepting the behavioral image).
[278] Exhibit 82, *Duchardt's CJA Vouchers.*
[279] Exhibit 83, p. 2, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence); D.E. 129, p.64.
[280] Exhibit 62, p. 15, *Owen Declaration.*
[281] Exhibit 83, p. 2, *Armstrong Declaration* (of 2013 interview with Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[282] See Vol.8, p. 1876, *O'Connor Testimony* (admitting the team did not have many lengthy meetings).
[283] Exhibit 62, p. 11, *Owen Declaration*; see also, Vol. 8, p. 1876, *O'Connor Testimony* (admitting that the team did not have many lengthy team meetings).
[284] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[285] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[286] Vol 2, p. 337, *Elliot Testimony.*
[287] D.E.129, p. 9-10.
[288] Vol.8, p. 2281, *Duchardt Testimony*; *see also*, Vol. 8, p. 1883, *O'Connor Testimony* (Mr. O'Connor never spoke with anyone outside the team about work that had been done prior to his assumption of the case; he never contacted Anita Burns, Judy Clarke, nor Susan Hunt).
[289] D.E. 129, p.9.



Appellate Case: 17-1716 Page: 886 Date Filed: 11/01/2017 Entry ID: 4596229

[290] Vol. 8, p. 2140, *Owen Testimony.*
[291] Vol. 8, p. 2141, *Owen Testimony.*
[292] Vol. 8, p. 2282, *Duchardt Testimony.*
[293] Vol. 8, p. 2202, *Duchardt Testimony.*
[294] Vol. 8, p. 2263-64, *Duchardt Testimony.*
[295] D.E. 129, p. 81.
[296] Vol. 8, p. 2182, *Owen Testimony.*
[297] Vol. 8, p. 2202-03, *Duchardt Testimony.*
[298] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence); *but see*, Vol. 8, p. 2268, *Duchardt Testimony* ("in choosing pseudocyesis we were at the infancy of the pseudocyesis matter. Pseudocyesis had actually been -- I found reference to it in what I call the database.")
[299] Vol. 8, p. 2146, *Owen Testimony.*
[300] Exhibit 83, p. 7, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[301] Exhibit 62, p. 11, *Owen Declaration* (failing to reflect the Clarke/Hunt/Owen team's attempt to transfer primary contact with Ms. Shaughnessy to a mitigation specialist trained in mental health (*see*, Exhibit 64, p. 4, *Declaration of Debra Garvey)).*
[302] *See*, TT. Vol. 8, p. 1725-93, *Testimony of Judy Shaughnessy* (no questions regarding incest in her family); TT. Vol. 14, p. 3010-44, *Kuncel Testimony* (defense's putative social historian does not discuss incest or effect of that trauma on Mrs. Montgomery's mother).
[303] Vol. 8, p. 2164, *Owen Testimony.*
[304] Exhibit 62, p. 13, *Owen Declaration.*
[305] Exhibit 62, p. 13, *Owen Declaration.*
[306] Exhibit 62, p. 13, *Owen Declaration.*
[307] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt).
[308] Exhibit 83, p. 3-4, *Armstrong Declaration* (quoting Fred Duchardt).
[309] Vol. 8, p. 1876, *O'Connor Testimony.*
[310] Vol. 6, p. 1555, *Waller Testimony.*
[311] Vol. 6, p. 1555, *Waller Testimony.*
[312] Vol. 6, p. 1556, *Waller Testimony.*
[313] Vol. 6, p. 1557-58, *Waller Testimony.*
[314] Vol. 8, p. 2138, *Owen Testimony* (stating that he had discussed his office's preference not to work with Mr. Duchardt with Magistrate Hayes).
[315] Vol. 8, p. 2156, *Owen Testimony.*
[316] Vol. 8, p. 2176, *Owen Testimony.*

[317] Vol. 8, p. 2176, *Owen Testimony.*
[318] Exhibit 83, p. 2, *Armstrong Declaration* (quoting Fred Duchardt).
[319] Exhibit 62, p. 13, *Owen Declaration.*
[320] Exhibit 1-45, p. 1, *Waller Declaration.*
[321] Vol. 6, p. 1558, *Waller Testimony.*
[322] Vol. 6, p. 1558, *Waller Testimony.*
[323] Vol. 6, p. 1556, 1559, *Waller Testimony.*
[324] Vol. 6, p. 1559, *Waller Testimony.*
[325] D.E. 71. p. 92, 140, 150.
[326] Vol. 6, p. 1567, *Waller Testimony.*
[327] D.E. 96, p. 2-3.
[328] D.E. 129, p.33.
[329] Vol. 6, p. 1566, *Waller Testimony.*
[330] Vol. 6, p. 1566, *Waller Testimony.*
[331] Vol. 6, p. 1566, *Waller Testimony.*
[332] Vol. 6, p. 1561, *Waller Testimony.*
[333] Vol. 9, p. 2290, *Duchardt Testimony.*
[334] Vol. 9, p. 2292, *Duchardt Testimony.*
[335] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[336] Vol. 7, p. 1894, *O'Connor Testimony.*
[337] Vol. 7, p. 1893, *O'Connor Testimony.*
[338] Exhibit 71, *May 2, 2006 Letter from Lisa Montgomery to the Court.*
[339] Exhibit 83, p. 1, *Armstrong Declaration*; *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[340] Exhibit 60, *Hunt Declaration* ("I do know that Mrs. Montgomery felt that Mr. Ninemire had lied to her about the removal of Judy Clarke and she lost all faith in her attorneys.").
[341] Exhibit 71, *May 2, 2006 Letter from Lisa Montgomery to the Court.*
[342] Exhibit 65, *Susan Hunt Letter to Dick Burr.*
[343] Exhibit 65, *Susan Hunt Letter to Dick Burr.*
[344] Exhibit 71, *May 2, 2006 Letter from Lisa Montgomery to the Court.*
[345] Vol. 8, p. 2195, *Duchardt Testimony.*
[346] Vol. 8, p. 2197-98, *Duchardt Testimony.*
[347] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).



Appellate Case: 17-1716 Page: 888 Date Filed: 11/01/2017 Entry ID: 4596229

[348] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[349] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[350] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[351] Exhibit 157, *3/7/2007 Memorandum from Fred Duchardt to Defense Team.*
[352] Vol. 8, p. 2142, *Owen Testimony.*
[353] Vol. 9, p. 2283, *Duchardt Testimony.*
[354] Vol. 9, p. 2283, *Duchardt Testimony.*
[355] *U.S. v. John P. Street*, No: 4:04-CR-00298-GAF (The Court took judicial notice of the case).
[356] Vol. 8, p. 2197, *Duchardt Testimony.*
[357] Exhibit 82, *Duchardt's CJA Vouchers.*
[358] Exhibit 82, *Duchardt's CJA Vouchers.*
[359] Exhibit 45, *Neuropsychological Evaluation by Robert Fucetola, Ph.D.*, 7/26/06 and 7/27/06.
[360] Vol. 8, p. 2215, *Duchardt Testimony.*
[361] Vol. 9, p. 2263, *Duchardt Testimony.*
[362] Vol. 3, p. 693, *Cardarella Testimony.*
[363] Vol. 3, p. 693, *Cardarella Testimony.*
[364] Vol. 8, p. 2153, *Owen Testimony.*
[365] Vol. 6, p. 1564, *Waller Testimony.*
[366] Exhibit 62, p. 16, *Owen Declaration.*
[367] Vol. 9, p. 2307, *Duchardt Testimony*; Exhibit 160, *4/22/08 Memo to FMC Carswell Warden.*
[368] Vol. 9, p. 2307-08, *Duchardt Testimony.*
[369] Vol. 9, p. 2308, *Duchardt Testimony.*
[370] Vol. 6, p. 1571-72, *Waller Testimony.*
[371] Vol. 6, p. 1571, *Waller Testimony.*
[372] Vol. 6, p. 1556, *Waller Testimony.*
[373] Vol. 6, p. 1564, *Waller Testimony.*
[374] Vol. 6, p. 1571-72, *Waller Testimony.*
[375] Vol. 6, p. 1558, *Waller Testimony.*
[376] Vol. 5, p. 1266, *Kuncel Testimony.*
[377] Vol. 6, p. 1572, *Waller Testimony.*

[378] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[379] D.E. 129, p.51.
[380] Vol. 8, p. 2268, *Duchardt Testimony.*
[381] Vol. 4, p. 936, 939 *Logan Testimony*; Exhibit 82, *CJA Voucher for Fred Duchardt.*
[382] Vol. 4, p. 936, *Logan Testimony.*
[383] Vol. 4, p. 936, *Logan Testimony.*
[384] Vol. 4, p. 937, *Logan Testimony.*
[385] Exhibit 82, *Duchardt's CJA Vouchers.*
[386] Exhibit 83, p. 3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[387] D.E.129, p. 55.
[388] Exhibit 83, p. 2, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[389] Exhibit 82, *Duchardt's CJA Vouchers.*
[390] D.E.129, p.57.
[391] Vol. 8, p. 2271-72, *Duchardt Testimony*; Exhibit 36, *Deposition of Dr. Vilayanur Ramachandran* at p. 7 ("I was in India. I do remember [Duchardt] calling").
[392] Vol. 9, p. 2272, *Duchardt Testimony.*
[393] Exhibit 36 p. 8, *Ramachandra Deposition.*
[394] Exhibit 58, p. 13, *Pretrial Conference, Transcript of Proceedings, April 3, 2007.*
[395] Exhibit 58, p. 4, *Pretrial Conference, Transcript of Proceedings, April 3, 2007.*
[396] Exhibit 58, p. 16, *4/3/2007 Transcript of Proceedings.*
[397] Exhibit 82, *Duchardt's CJA Vouchers.*
[398] Vol. 4, p. 937-38, *Logan Testimony.*
[399] Vol. 4, p. 941, *Logan Testimony.*
[400] Exhibit 62, p. 15, *Owen Declaration.*
[401] Vol. 9, p. 2300, *Duchardt Testimony.*
[402] Vol. 9, p. 2301, *Duchardt Testimony.*
[403] Exhibit 157, p. 4, *3/7/2007 Memorandum by Fred Duchardt to Defense Team.*
[404] Vol. 8, p. 2166, *Owen Testimony.*
[405] Vol. 8, p. 1980, *O'Connor Testimony.*
[406] Vol. 8, p. 1980, *O'Connor Testimony.*



Appellate Case: 17-1716 Page: 890 Date Filed: 11/01/2017 Entry ID: 4596229

[407] Vol. 9, p. 2305, *Duchardt Testimony*; see also Exhibit 83, p. 5, *Armstrong Declaration* (indicating that Mr. O'Connor "exercised discretion as lead counsel" in the decision not to go with "the Tommy defense"); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence)
[408] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[409] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[410] Vol. 8, p. 1961, *O'Connor Testimony.*
[411] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[412] Vol. 9, p. 2302, *Duchardt Testimony.*
[413] D.E. 129, p. 54, 57.
[414] Vol. 8, p. 1971, *O'Connor Testimony.*
[415] Vol. 8, p. 1971, *O'Connor Testimony.*
[416] Vol. 8, p. 2169, *Owen Testimony*; Exhibit 138, *4/3/2007 Handwritten Notes of Roseann Ketchmark;* Vol. 8, p. 1992, *O'Connor Testimony* (recalling that Ninemire and Owen surreptitiously obtained Tommy's DNA).
[417] Vol. 8, p. 2170, *Owen Testimony*; *see also*, *U.S.v. Montgomery*, No 05-06002-01-CR-SJ-GAF, D.E. 282, *Government's Motion in Limine to Exclude the Polygraph Testimony of Alan Jennerich and Any Reference to Polygraph Examinations or Results* (filed under seal September 14, 2007) (seeking to exclude proof of the fact Mrs. Montgomery passed the polygraph question regarding whether Mr. Kleiner was at the scene of the homicide); Vol. 8, p. 1991-92, *O'Connor Testimony* (the team had Mrs. Montgomery take a polygraph as to whether Tommy was present in the house on the day of the murder. Mrs. Montgomery passed the polygraph).
[418] Vol. 8, p. 2164, 2166, *Owen Testimony.*
[419] Vol. 8, p. 1978, *O'Connor Testimony.*
[420] Vol. 8, p. 1979, *O'Connor Testimony* (agreeing that he had previously told habeas counsel that he didn't think twice about going forward with the Tommy Kleiner defense in April 2007).
[421] Vol. 8, p. 1963, *O'Connor Testimony.*
[422] Vol. 8, p. 1963, *O'Connor Testimony.*
[423] Vol. 2, p. 464, *Testimony of Agent Lipanovich*; *see also*, Exhibit 142, *Kleiner Deposition.*
[424] Vol. 9, p. 2302, *Duchardt Testimony.*



Appellate Case: 17-1716 Page: 891 Date Filed: 11/01/2017 Entry ID: 4596229

[425] Exhibit 138, *4/3/2007 Handwritten Notes of AUSA Roseann Ketchmark* (reflecting that defense presentation was "Leona [Hayes] made positive id of Tommy").
[426] Vol. 8, p. 1969, *O'Connor Testimony.*
[427] Exhibit 158, *April 3, 2007 Sworn statement of Leona Hayes*; Vol. 8, p. 1965-72, *O'Connor Testimony* ("I don't think she made a positive identification . . . she couldn't' eliminate him").
[428] Exhibit 1-41, *Kleiner Declaration*; see also, Exhibit 142, p. 21, *Kleiner Deposition*.
[429] Exhibit 142, p. 21, *Kleiner Deposition.*
[430] Exhibit 62, p. 13, *Owen Declaration.*
[431] Exhibit 142, p. 18-20, *Kleiner Deposition.*
[432] Exhibit 142, p. 18-21, *Kleiner Deposition.*
[433] Vol. 8, p. 1985, *O'Connor Testimony* (agreeing that when Mrs. Montgomery described feeling as if someone else was present at the scene of the crime the team took her literally); Exhibit 62, p. 13-15, *Owen Declaration* (setting forth the symptoms exhibited by Mrs. Montgomery which needed to be investigated and presented in light of Mrs. Montgomery's "vague memories" of someone else being with her at the murder scene and critiquing the lack of expert psychological/psychiatric assessment of Mrs. Montgomery's "vague memory" in light of her symptomology).
[434] D.E. 129, p. 82.
[435] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[436] Exhibit 157, *Duchardt Memo.*
[437] Vol. 6, p. 1555-59, *Waller Testimony.*
[438] Vol. 6, p. 1571-72, *Waller Testimony.*
[439] Vol. 6, p. 1567, *Waller Testimony.*
[440] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[441] Vol. 3, p. 558-59, *Burr Testimony.*
[442] Exhibit 1-283, *3/1/2007 Kidwell Memo.*
[443] Vol. 6, p. 1569, *Waller Testimony.*
[444] Exhibit 1-283, *Kidwell Memo.*
[445] Vol. 6, p. 1589, *Waller Testimony.*
[446] Vol. 6, p. 1569, *Waller Testimony.*
[447] Vol. 8, p. 1956, *O'Connor Testimony.*
[448] Vol. 4, p. 656, *Clarke Testimony.*



Appellate Case: 17-1716 Page: 892 Date Filed: 11/01/2017 Entry ID: 4596229

[449] Vol. 8, p. 1956, *O'Connor Testimony.*
[450] TT. Vol. 12, p. 2569, *Dietz Testimony.*
[451] TT. Vol. 12, p. 2570, *Dietz Testimony.*
[452] TT. Vol. 12, p. 2570-71, *Dietz Testimony.*
[453] TT. Vol. 12, p. 2571, *Dietz Testimony.*
[454] TT. Vol. 12, p. 2573, *Dietz Testimony.*
[455] TT. Vol. 12, p. 2576, *Dietz Testimony.*
[456] TT. Vol. 12, p. 2577-78, *Dietz Testimony.*
[457] D.E. 129, p. 63.
[458] D.E. 129, p. 53.
[459] F.R.C.P., Rule 12.2.
[460] Vol. 8, p. 1952, *O'Connor Testimony.*
[461] Exhibit 137, *5/9/2007 Ketchmark Notes.*
[462] Vol. 8, p. 1953-54, *O'Connor Testimony.*
[463] Vol. 8, p. 1953, *O'Connor Testimony;* Vol. 8, p. 1954, *Agreement by Counsel* (Stipulation by the parties that Ms. Ketchmark's notes are the best evidence available of that which occurred at the off-the-record hearing).
[464] Exhibit 137, *5/9/2007 Ketchmark Notes.*
[465] Vol. 8, p. 1955, *O'Connor Testimony.*
[466] Vol. 8, p. 1958, *O'Connor Testimony.*
[467] Vol. 1, p. 98, *Stetler Testimony* (citing scholarly articles written on the topic of the need for social history investigation to produce reliable expert testimony in death penalty cases).
[468] D.E. 129, p. 34.
[469] Vol. 6, p. 1568, *Waller Testimony.*
[470] Exhibit 10, p. 3-5, *Kidwell Declaration.*
[471] Exhibit 1-283, *3/1/2007 Kidwell Memo.*
[472] Vol. 8, p. 2025, *O'Connor Testimony.*
[473] Supplement to the Record, *Supplemental Owen Declaration,* p.1
[474] Vol. 8, p. 2186, *Owen Testimony.*
[475] Exhibit 10, p.6, *Kidwell Declaration.*
[476] Vol. 1, p. 117, *Stetler Testimony.*
[477] Vol. 1, p. 118, *Stetler Testimony.*
[478] Supplement to the Record, *Supplemental Owen Declaration,* p.1.
[479] Vol. 4, p. 837, *Freedman Testimony* (reflecting that the team knew information from the *Kleiner v. Kleiner* divorce records); Vol. 2, p. 334, *Elliot Testimony* (when she joined the team in October 2005, the team had some records already collected, including "divorce records from Lisa's mother, Judy").
[480] Exhibit 17, p. 1, *Interrogatories.*
[481] Exhibit 16, *Lisa Montgomery Handwritten Notes re: Names.*

[482] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt).
[483] D.E. 129, p.50 (quotation has been altered to remove Mr. Duchardt's notation that undersigned counsel mistyped "biopsychosocial" as "biopschyhosial" – this change was made in the interest of clarity).
[484] Vol. 1, p. 132-33, *Stetler Testimony.*
[485] Vol. 6, p. 1466, *Vogelsang Testimony.*
[486] Vol. 4, p. 837, *Freedman Testimony.*
[487] Exhibit 1, p. 3 *Biopsychosocial.*
[488] *See*, TT. Vol. 14, p. 3016-32, *Kuncel Testimony* (the sixteen pages of social history presented at trial).
[489] Vol. 6, p. 1476-79, *Vogelsang Testimony*; Exhibit 1-262, *Santa Rosa Hospital Records*).
[490] Vol. 6, p. 1479-80, *Vogelsang Testimony.*
[491] Exhibit 1-71, *Kenneth Alexander, San Antonio State Hospital*; Exhibit 1-75, *Kenneth Alexander, Wyoming Behavioral Institute.*
[492] Vol. 6, p. 1482, *Vogelsang Testimony*; *see also*, Exhibit 1- 58, *Kansas DOC Mental Health Exam* (Teddy); Exhibit 1-41, *Tommy Kleiner Declaration).*
[493] Vol. 6, p. 1475, *Vogelsang Testimony.*
[494] Vol. 6, p. 1476, *Vogelsang Testimony.*
[495] Vol. 6, p. 1467, *Vogelsang Testimony.*
[496] Exhibit 1, p. 173-80, *Biopsychosocial.*
[497] Exhibit 154, p. 70, *Biopsychosocial PowerPoint.*
[498] Exhibit 154, p. 70, *Biopsychosocial PowerPoint.*
[499] Exhibit 1, p. 176, *Biopsychosocial.*
[500] Exhibit 1, p. 180, *Biopsychosocial.*
[501] Exhibit 154, p. 75-77, *Biopsychosocial PowerPoint.*
[502] Exhibit 1-97, p. 2-3, *Barrow Swartz Declaration.*
[503] Exhibit 14, *Baker Declaration.*
[504] Exhibit 1, p. 71, *Biopsychosocial.*
[505] Exhibit 1-31, p. 17, *Teddy Kleiner Declaration.*
[506] Exhibit 19, p. 1, *McClain Declaration.*
[507] Exhibit 19, p. 1, *McClain Declaration*; see also, Vol. 6, p. 1523, *Vogelsang Testimony.*
[508] Exhibit 1-25, *Riley County Court Records, Child in Need of Care* ("The situation of 8-year old Dianne Hedberg was first brought to the agency's attention by her step mother, Mrs. Judy Hedberg.").
[509] Exhibit 1-9, p. 6, *Mattingly Declaration; Vol. 6, p. 1552, Mattingly Testimony.*
[510] (Exhibit 1-9, p. 3, *Mattingly Declaration, see also* Vol. 6, p. 1544-1546, *Mattingly Testimony*).
[511] Exhibit 1-31, p. 8, *Teddy Kleiner Declaration.*



Appellate Case: 17-1716 Page: 894 Date Filed: 11/01/2017 Entry ID: 4596229

[512] Exhibit 8, p. 3, *Porterfield Supplemental Declaration.*
[513] Exhibit 8, p. 4, *Porterfield Supplemental Declaration.*
[514] Exhibit 1-286, p. 1, *Miller Declaration.*
[515] Exhibit 12, p. 1-2, *Gann Declaration.*
[516] Exhibit 1, p. 180 *Biopsychosocial.*
[517] Exhibit 1-97, p. 7, *Barrow Declaration.*
[518] Exhibit 1-2, p. 88, *Rickert Declaration see also,* Exhibit 1-57, *Jackson Declaration.*
[519] Exhibit 1-2, p. 92, *Rickert Declaration.*
[520] Exhibit 1-2, p. 72, *Rickert Declaration.*
[521] Exhibit 1-32, p. 2, *Teddy Kleiner Declaration.*
[522] Exhibit 1-41, p. 1, *Tommy Kleiner Declaration.*
[523] Exhibit 1-85, p. 5, *Craig Declaration.*
[524] Exhibit 1, p. 16-17, *Biopsychosocial Supplement* (quoting Exhibit 1-287, *Harlow Declaration*).
[525] Exhibit 1, p. 5, *Biopsychosocial Supplement.*
[526] Exhibit 1, p. 5, *Biopsychosocial Supplement.*
[527] Exhibit 1-31, p. 22, *Teddy Kleiner Declaration.*
[528] Exhibit 1, p. 105, *Biopsychosocial* (quoting Exhibit 1-105, *Carl James Boman Declaration*).
[529] Exhibit 1, p. 95, *Biopsychosocial.*
[530] Exhibit 1-31, p. 14, *Teddy Kleiner Declaration.*
[531] Exhibit 1, p. 7, *Biopsychosocial Supplement.*
[532] Exhibit 1, p. 7, *Biopsychosocial Supplement.*
[533] Exhibit 1, p. 128, *Biopsychosocial.*
[534] Exhibit 1, p. 180, *Biopsychosocial.*
[535] Exhibit 1, p. 20, *Biopsychosocial Supplement.*
[536] Exhibit 1-57, p. 5, *Jackson Declaration, Incorporating Interview of Camille McKenzie.*
[537] Exhibit 1, p. 94-95, *Biopsychosocial.*
[538] Exhibit 1, p. 159, *Biopsychosocial.*
[539] Exhibit 1, p. 100, *Biopsychosocial.*
[540] Exhibit 1, p.2, *Biopsychosocial Supplement.*
[541] Exhibit 1, p. 110-12, *Biopsychosocial* (citing Exhibit 1-148, *Order Authorizing Disclosure of Records Under Protective Order, Case No JMI2013 3*).
[542] Exhibit 1, p. 112, *Biopsychosocial.*
[543] Exhibit 1, p. 122, *Biopsychosocial* (quoting Exhibit 1-167, p. 5, *Kayla Deanne Boman Declaration* and Exhibit 1-168, *Carl James (C.J.) Boman Declaration.*
[544] Exhibit 1, p. 124, *Biopsychosocial* (quoting Exhibit 1-79, p. 4-5,*Chelsea Boman Veal Declaration*).



Appellate Case: 17-1716 Page: 895 Date Filed: 11/01/2017 Entry ID: 4596229

[545] Exhibit 1, p. 6-7, *Biopsychosocial Supplement.*
[546] Exhibit 1, p. 7, *Biopsychosocial Supplement.*
[547] Exhibit 1, p. 136, *Biopsychosocial* (*quoting* Exhibit 1-174, p. 6, *Kevin Montgomery Declaration*).
[548] Exhibit 1, p. 137, *Biopsychosocial* (*quoting* Exhibit 1-167, p. 3, *Kayla Deanne Boman Declaration*).
[549] Exhibit 1, p. 142, *Biopsychosocial.*
[550] Exhibit 1, p. 6, *Supplement to the Biopsychosocial.*
[551] Exhibit 1, p. 8, *Supplement to the Biopsychosocial.*
[552] Exhibit 1, p. 146, *Biopsychosocial* (*quotin*g Exhibit 1-167, *Kayla Boman Declaration*).
[553] Exhibit 1- 181, p. 4, *FBI 302 of Teddy Kleiner.*
[554] Exhibit 130, *9/12/06 Memo from Dani Waller to Team.*
[555] Exhibit 130, p. 3, *9/12/06 Memo from Dani Waller to Team.*
[556] Exhibit 1, p. 107-8, *Biopsychosocial (quoting* Exhibit 1- 2, *Rickert Declaration).*
[557] Exhibit 1, p. 147, *Biopsychosocial* (quoting Exhibit 1- 57, *Jackson Declaration*).
[558] Exhibit 1-54, p. 13, *Ninemire interview with Teddy Kleiner.*
[559] Exhibit 1-181, p. 3, *FBI 302, Teddy Kleiner.*
[560] Vol. 1, p. 119-20, *Stetler Testimony.*
[561] Exhibit 1-31, p. 21, *Teddy Kleiner Declaration.*
[562] Exhibit 7, p. 11, *Porterfield Report.*
[563] Exhibit 1- 199, *Wilkinson Notes.*
[564] Vol. 1, p. 113, *Stetler Testimony.*
[565] Vol. 4, p. 873, *Fucetola Testimony.*
[566] Vol. 4, p. 885, *Fucetola Testimony.*
[567] Exhibit 1, *passim*, *Biopsychosocial.*
[568] Vol. 7, p. 1693, *Oyler Testimony.*
[569] Vol. 7, p. 1694, *Oyler Testimony.*
[570] Vol. 8, p. 2182, *Owen Testimony.*
[571] D.E. 129, p.81.
[572] Vol. 1, p. 397, *Hunt Testimony;* Exhibit 37, *Hutchinson Report.*
[573] Vol. 4, p. 1033, *Hutchinson Testimony.*
[574] Vol. 4, p. 870, *Fucetola Testimony.*
[575] Vol. 4, p. 1021, *Hutchinson Testimony.*
[576] Vol. 4, p. 998, *Hutchinson Testimony.*
[577] Vol. 4, p. 1029, *Hutchinson Testimony.*
[578] Vol. 4, p. 1030, *Hutchinson Testimony.*
[579] Vol. 4, p. 1031, *Hutchinson Testimony.*



Appellate Case: 17-1716 Page: 896 Date Filed: 11/01/2017 Entry ID: 4596229

[580] Vol. 4, p. 1033, *Hutchinson Testimony.*
[581] Vol. 8, p. 1958, *O'Connor Testimony.*
[582] Vol. 1, p. 212, *Bookman Testimony.*
[583] Vol. 8, p. 2027, *Argument by USA* (noting the trial court's ruling excluding the PET and MRI data and the argument of 2255 counsel that Dr. Gur's behavioral image could still have been presented).
[584] Exhibit 83, p. 6, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[585] Vol. 2, p. 383, *Schnack Testimony.*
[586] Vol.8, p. 2178, *Owen Testimony.*
[587] Exhibit 83, p. 6, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[588] Vol.8, p. 2178, *Owen Testimony.*
[589] D.E. 129, p. 2.
[590] D.E. 129, p. 80.
[591] D.E. 243, p. 80.
[592] D.E. 129, p. 84.
[593] *See*, TT. Vol. 2, p. 427 (court's final analysis excluding Dr. Gur's PET Scan evidence).
[594] Exhibit 83, p.6, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[595] TT. Vol. 2, p. 427, *Final Analysis of the Court* (regarding admitting Dr. Gur's PET Scan results).
[596] *See*, Vol. 8, p. 2192, *Duchardt Testimony* ("actually Lisa is a very sweet person and always in every instance in which I met with her she always tried her best . . ."); *but see*, Vol. 3, p. 670, *Clarke Testimony* (forensic pathologist determined that one person could have committed the crime).
[597]TT. Vol. 7, p. 1647-48, *Strong Testimony;* TT. Vol. 7, p 1646, *Strong Testimony*
[598] Vol. 8, p. 1961, *O'Connor Testimony*; Exhibit 83, p. 5, *Armstrong Declaration*; *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Declaration* (introducing Exhibit 83 as substantive evidence).
[599] Vol. 8, p. 1961, *O'Connor Testimony*
[600] Exhibit 83, p. 5, *Armstrong Declaration (*quoting Mr. Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Declaration* (introducing Exhibit 83 as substantive evidence)



Appellate Case: 17-1716 Page: 897 Date Filed: 11/01/2017 Entry ID: 4596229

[601] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol. 4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[602] D.E. 130, p. 3-4
[603] Vol. 8, p. 2165, *Owen Testimony*
[604] D.E. 129, p. 39-40
[605] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence)
[606] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence)
[607] TT. Vol. 7, p. 1646, *Strong Testimony*; *see also* TT. Vol 7, p.1671-72, *SA Gentine FBI Testimony* (same); TT. Vol 8, p.1690, *SA Oyler FBI Testimony* (same)
[608] TT. Vol. 11, p. 2411, *Logan Testimony*
[609] TT. Vol. 11, p. 2419, *Ramachandran Testimony*
[610] TT. Vol. 3, p. 474-95, *Duchardt Opening Statement*; TT. Vol. 13, p. 2808-36, *O'Connor Closing Argument*; *see also*, TT. Vol. 14, p. 2870-80, *Duchardt Opening Statement;* TT. Vol. 15, p. 3159-80, *Duchardt Closing Statement* (saying nothing about Lisa's putative belief that the baby was hers).
[611] TT. Vol. 13, p. 2824-25, *O'Connor Closing Argument*
[612] D.E. 129, p. 51
[613] TT. Vol. 7, p. 1646, *Strong Testimony.*
[614] TT. Vol. 12, p. 2583, *Dietz Testimony.*
[615] TT. Vol. 12, p. 2583, *Dietz Testimony.*
[616] TT. Vol. 12, p. 2583, *Dietz Testimony.*
[617] TT. Vol. 10, p. 2172, *Ramachandran Testimony.*
[618] Exhibit 36, p. 11-12, *Ramachandran Deposition.*
[619] D.E. 129, p. 55.
[620] Exhibit 83, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[621] TT. Vol. 3, p. 52, *Duchardt Opening Statement.*
[622] Exhibit 36, p. 14, *Ramachandran Deposition.*
[623] Exhibit 36, p. 13, *Ramachandran Deposition.*
[624] Exhibit 36, p. 14, *Ramachandran Deposition.*
[625] Exhibit 36, p. 15, *Ramachandran Deposition.*
[626] Exhibit 36, p. 15, *Ramachandran Deposition.*
[627] Exhibit 36, p. 34, *Ramachandran Deposition; see also,* V.S. Ramachandran, *Phantoms In the Brain*, 294, Harper Collins, 1999 (1998) (directing the reader "For



Appellate Case: 17-1716 Page: 898 Date Filed: 11/01/2017 Entry ID: 4596229

recent work on pseudocyesis, *see* Brown and Barglow, 1971, and Starkman et al., 1985").
[628] TT. Vol. 13, p. 2805, *USA Closing Argument.*
[629] TT. Vol. 10, p. 2181, *Ramachandran Testimony.*
[630] TT. Vol. 11, 2279, *Video of Dietz Interview with Lisa Montgomery played during Ramachandran Testimony.*
[631] TT. Vol. 11, p. 2276, *Ramachandran Testimony.*
[632] Crim. D.E. 248-4, p. 13.
[633] Crim. D.E. 248-4, p. 13.
[634] TT. Vol. 13, p 2801-02, *Closing Argument of the USA.*
[635] TT. Vol. 11, p. 2280, *Ramachandran Testimony.*
[636] TT. Vol. 10, p.2057-62, *Vandenbloom Testimony.*
[637] Crim. D.E. 248-4.
[638] Crim. D.E. 248-4, p. 9,
[639] Crim. D.E. 248-4, p. 9.
[640] Exhibit 36, p. 18-19, *Ramachandran Deposition.*
[641] Exhibit 62, p. 14, *Owen Declaration.*
[642] Vol. 9, p. 2288, *Duchardt Testimony.*
[643] Exhibit 43, p. 53 *Kuncel Report.*
[644] Exhibit 43, p. 41 - 43, *Kuncel Report.*
[645] Exhibit 45, p. 7, *Fucetola Report.*
[646] Exhibit 39, p. 2, *Logan Report.*
[647] Exhibit 41, p. 2-3, *Logan Declaration.*
[648] Exhibit 41, p.3, *Logan Declaration.*
[649] Exhibit 83, p. 6, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[650] Exhibit 83, p. 6, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[651] Vol. 3, p. 655, *Clarke Testimony.*
[652] Vol. 1, p. 202, *Bookman Testimony.*
[653] Vol. 3, p. 655, *Clarke Testimony.*
[654] Exhibit 52, p. 15, *Fox Report.*
[655] Exhibit 52, p. 21, *Fox Report.*
[656] Crim. D.E. 319, Exhibit 423, *Leona Hayes Statement;* Exhibit 424, *Kean Hayes Statement.*
[657] D.E. 129, p. 53.
[658] Crim. D.E. 351, Exhibit 72, *Tommy Kleiner Court documents.*
[659] Vol.4, p. 959, *Logan Testimony.*



Appellate Case: 17-1716 Page: 899 Date Filed: 11/01/2017 Entry ID: 4596229

[660] Vol.4, p. 959, *Logan Testimony.*
[661] Vol.4, p. 959, *Logan Testimony.*
[662] Vol.4, p. 960, *Logan Testimony.*
[663] Vol.4, p. 961, *Logan Testimony.*
[664] D.E. 129, p. 52-53.
[665] TT. Vol. 10, p. 2243, *Ramachandran Testimony.*
[666] Crim. D.E. 322 (sealed), filed 10/08/2007.
[667] Exhibit 83, p. 5, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[668] Vol. III, p. 561, *Burr Testimony;* Vol. III, p. 639, *Clarke Testimony.*
[669] Exhibit 157, *3/7/2007 Duchardt Memo.*
[670] Exhibit 157, *3/7/2007 Duchardt Memo.*
[671] D.E. 129, p. 83.
[672] TT. Vol. 13, p. 2799, *USA Closing Argument.*
[673] Vol. 8, p. 2313, *Duchardt Testimony.*
[674] Vol. 8, p. 2314, *Duchardt Testimony.*
[675] Vol. 8, p. 2313, *Duchardt Testimony.*
[676] Vol. 8, p. 2146, *Owen Testimony.*
[677] Vol. 8, p. 2147, *Owen Testimony.*
[678] Vol. 9, p. 2314, *Duchardt Testimony;* D.E. 129, p. 78.
[679] Vol. 4, p. 1006, *Hutchinson Testimony.*
[680] Vol. 4, p. 1006, *Hutchinson Testimony.*
[681] Exhibit 41, p. 2-3, *Logan Declaration.*
[682] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[683] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[684] Exhibit 83, p. 4, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence) ("Lisa had post-traumatic stress disorder at being in the room with one man by herself much less two men").
[685] Exhibit 137, *5/9/2007 Ketchmark Notes.*
[686] Vol. 8, p. 1954, *Agreement by Counsel.*
[687] Exhibit 137, *5/9/2007 Ketchmark Notes.*
[688] Exhibit 137, *5/9/2007 Ketchmark Notes; see also,* Vol. 8, p. 1955, *O'Connor Testimony.*
[689] Exhibit 137, *5/9/2007 Ketchmark Notes.*

[690] TT. Vol. 11, p. 2456, *Martell Testimony.*
[691] TT. Vol. 11, p. 2452-2504, *Martell Testimony.*
[692] TT. Vol. 2, p. 430.
[693] Vol. 4, p. 1001-02, *Hutchinson Testimony* (subsequent counsel did not ask her about her testing).
[694] TT. Vol. 3 - 13 (guilt phase).
[695] TT. Vol. 3 – 15.
[696] TT. Vol. 11, p. 2459, *Martell Testimony.*
[697] TT. Vol. 1, p. 430.
[698] TT. Vol. 13, p. 2848, *USA Closing Argument.*
[699] TT. Vol. 10, p. 2102-05, *McCandless Testimony.*
[700] TT. Vol. 10, p. 2102-03, *McCandless Testimony.*
[701] TT. Vol. 11, p. 2296, *Ramachandran Testimony.*
[702] TT. Vol. 11, p. 2428, *Logan Testimony* (Mr. O'Connor asking: "Some of the tests each of those psychologist there were indications of malingering, correct?" and Dr. Logan answered: "On some of the tests some interpreted malingering; others did not").
[703] TT. Vol. 11, p. 2459, *Martell Testimony.*
[704] TT. Vol. 11, p. 2459, *Martell Testimony.*
[705] TT. Vol. 11, p. 2460-61, *Martell Testimony.*
[706] TT. Vol. 11, p 2476, *Martell Testimony.*
[707] TT. Vol. 11, p 2, *Martell Testimony.*
[708] TT. Vol. 11, p. 2463, *Martell Testimony.*
[709] TT. Vol. 13, p. 2848, *Closing Argument for the USA.*
[710] TT. Vol. 13, p. 2848, *Closing Argument for the USA.*
[711] Vol. 4, p. 993, *Hutchinson Testimony.*
[712] Vol. 4, p. 991, *Hutchinson Testimony.*
[713] Exhibit 45, p. 2, *Fucetola Report.*
[714] Vol. 8, p. 2180, *Owen Testimony.*
[715] Vol. 8, p. 2263-64, *Duchardt Testimony.*
[716] TT. Vol. 11, p. 2459, *Martell Testimony.*
[717] Vol. 4, p. 1043, *Hutchinson Testimony.*
[718] Vol. 4, p. 1002, *Hutchinson Testimony.*
[719] Vol. 4, p. 1002, *Hutchinson Testimony.*
[720] Vol. 4, p. 999, *Hutchinson Testimony.*
[721] Vol. 4, p. 1000, *Hutchinson Testimony.*
[722] Vol. 4, p. 1001, *Hutchinson Testimony.*
[723] TT. Vol. 11, p. 2452-04, *Martell Testimony.*
[724] Vol. 4, p. 992, *Hutchinson Testimony.*
[725] Vol. 4, p. 1003-04, *Hutchinson Testimony.*



Appellate Case: 17-1716 Page: 901 Date Filed: 11/01/2017 Entry ID: 4596229

[726] Vol. 4, p. 1016-17, *Hutchinson Testimony.*
[727] Vol. 4, p. 1018, *Hutchinson Testimony.*
[728] Vol. 4, p. 1018, *Hutchinson Testimony.*
[729] TT. Vol. 11.
[730] TT. Vol. 3 – 11 .
[731] TT. Vol 13, p. 2844, 2848-49, *USA Rebuttal Closing Argument.*
[732] Vol. 4, p. 1004, *Hutchinson Testimony.*
[733] Vol. 4, p. 1006, *Hutchinson Testimony.*
[734] Vol. 4, p. 1006, *Hutchinson Testimony.*
[735] Vol. 4, p. 1006, *Hutchinson Testimony.*
[736] Vol. 4, p. 1008, *Hutchinson Testimony.*
[737] TT. Vol. 11, p. 2481, *Martell Testimony.*
[738] TT. Vol. 11, p. 2405, *Logan Testimony*; see also Vol. 4, p. 950, *Logan Testimony* ("I gave several diagnoses . . . one was posttraumatic stress disorder, chronic, that began back in her adolescence with sexual abuse and physical abuse by her step father. I think what now carries the name in some circles of complex PTSD").
[739] TT. Vol. 14, p. 3027, *Kuncel Testimony.*
[740] TT. Vol. 11, p. 2461, *Martell Testimony.*
[741] TT. Vol. 12, p. 2566, *Dietz Testimony.*
[742] TT. Vol. 13, p. 2806-07, *USA Closing Argument.*
[743] TT. Vol. 11, p. 2404-05, *Logan Testimony.*
[744] TT. Vol. 11, p. 2416, *Logan Testimony.*
[745] Exhibit 41, p. 2-3, *Logan Declaration.*
[746] Vol. 4, p. 957, *Logan Testimony.*
[747] Exhibit 41, p. 3,, *Logan Declaration.*
[748] TT. Vol.12, p. 2567, *Dietz Testimony* (testifying that the gruesomeness of the crime itself could have caused the PTSD).
[749] Exhibit 40, p. 30, *5/15/2007 Logan Report.*
[750] TT. Vol. 10, p. 2071, *McCandless Testimony.*
[751] TT. Vol. 10, p. 2094, *McCandless Testimony.*
[752] TT. Vol. 10, p. 2071, 2080, 2081, 2128, *McCandless Testimony.*
[753] TT. Vol. 12, p. 2564, *Dietz Testimony.*
[754] TT. Vol. 12, p. 2563, *Dietz Testimony.*
[755] TT. Vol. 12, p. 2565, *Dietz Testimony.*
[756] TT. Vol. 11, p. 2462, *Martell Testimony.*
[757] TT. Vol. 12, p. 2565, *Dietz Testimony.*
[758] TT. Vol. 10, p. 2071, *Dr. McCandless Testimony.*
[759] TT. Vol. 14, p. 3029, *Kuncel Testimony.*

[760] *See*, Exhibit 1 p. 136, *Biopsychosocial*, Exhibit 154, *Vogelsang PowerPoint* at Slide 88, 100 (discussing Lisa's functioning and the role of dissociation).
[761] Crim. D.E. 354.
[762] Crim. D.E. 354 .
[763] Crim. D.E. 354 .
[764] TT. Vol. 3, p. 49, *Duchardt Opening Statement.*
[765] TT. Vol. 9, p.1936, *Desireé Boman Testimony.*
[766] TT. Vol. 3 – 15.
[767] TT. Vol. 3, p.42, *Duchardt Opening Statement.*
[768] Exhibit 130, p.3 *9/12/2006 Waller Memo*; *see also*, Vol. 8, p. 2208, *Duchardt Testimony* (Mr. Duchardt was aware of facts in his file from mitigation specialists that Mrs. Montgomery had committed acts of abuse against her children).
[769] TT. Vol. 9, p.1940, *Desireé Boman Testimony.*
[770] TT. Vol. 9, p.1940, *Desireé Boman Testimony.*
[771] TT. Vol. 9, p.1944, *Desireé Boman Testimony.*
[772] TT. Vol. 9, p.1947, *Desireé Boman Testimony.*
[773] TT. Vol. 9, p.1950, *Desireé Boman Testimony.*
[774] This is incorrect; the record reflects Desireé and CJ Boman testified in the first phase of the trial for the defense and Desire and Chelsea testified in the penalty phase, again called by the defense.
[775] Exhibit 62, p.13, *Owen Declaration.*
[776] Exhibit 1, p. 167 *Biopsychosocial* (citing Attachment 167, *Kayla Boman Declaration*).
[777] Exhibit 83, p.3, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[778] Exhibit 36, p. 14-15, *Ramachandran Deposition* (he does not hold himself out as an expert in pseudocyesis, "Of course not. There is no such thing." Ramachandran has only seen 5 or 6 patients with the diagnosis, including only two in the US – counting Mrs. Montgomery. The other case had objectively measured physical changes, including hormonal changes documented by other physicians).
[779] Exhibit 36, p. 19-20, *Ramachandran Deposition.*
[780] Exhibit 36, p. 18, *Ramachandran Deposition.*
[781] Exhibit 36, p. 18-19, *Ramachandran Deposition.*
[782] TT. Vol. 11, p. 2280, *Ramachandran Testimony.*
[783] TT. Vol. 10, p. 2057-64 *Vandenboom Testimony.*
[784] TT. Vol. 10, p. 2245, *Ramachandran Testimony.*
[785] TT. Vol. 10, p. 2248, *Ramachandran Testimony.*
[786] TT. Vol. 11, p. 2280-81, *Ramachandran Testimony.*
[787] TT. Vol. 11, p. 2280-81, *Ramachandran Testimony.*



Appellate Case: 17-1716 Page: 903 Date Filed: 11/01/2017 Entry ID: 4596229

[788] TT. Vol. 11, p. 2296, *Ramachandran Testimony.*
[789] TT. Vol. 11, p. 2296, *Ramachandran Testimony.*
[790] TT. Vol. 11, p. 2296, *Ramachandran Testimony.*
[791] TT. Vol. 13, p. 2768, *Dietz Testimony.*
[792] TT. Vol. 13, p. 2768, *Dietz Testimony, see* Exhibit 131, *Chart of Similar Crimes* (establishing that Mrs. Montgomery is the only woman sentenced to death for fetal abduction in the past twenty years).
[793] Vol. 2, p. 375, *Schnack Testimony.*
[794] Vol. 2, p. 375, *Schnack Testimony.*
[795] Vol. 2, p. 375-6, *Schnack Testimony.*
[796] Vol. 2, p. 353, *Elliot Testimony.*
[797] Vol. 2, p. 354, *Elliot Testimony.*
[798] TT. Vol. 11, p 2481, *Martell Testimony.*
[799] TT. Vol. 11, p 2476, *Martell Testimony.*
[800] TT. Vol. 11, p 2481-82, *Martell Testimony.*
[801] TT. Vol. 11, p. 2481 - 85, *Martell Testimony.*
[802] TT. Vol. 11, p. 2485, *Martell Testimony.*
[803] TT. Vol. 11, p 2486, *Martell Testimony.*
[804] TT. Vol. 11, p. 2452-2504, *Martell Testimony.*
[805] Vol. 4, p. 961, *Logan Testimony.*
[806] Vol. 4, p. 961-62, *Logan Testimony.*
[807] Vol. 4, p. 961, *Logan Testimony.*
[808] Vol. 4, p. 962, *Logan Testimony.*
[809] Vol. 4, p. 963, *Logan Testimony.*
[810] Exhibit 89, *Deleted History Summary.*
[811] Vol. 4, p. 962-63, *Logan Testimony.*
[812] Exhibit 41, *Logan Declaration*; Vol. 4, p. 963-65, *Logan Testimony.*
[813] TT. Vol. 11, p. 2438, *Logan Testimony*; see also Vol. 4, p. 964, *Logan Testimony*
[814] *See* D.E. 354, (demonstrating that 4 jurors did not find that Mrs. Montgomery was the victim of childhood physical and sexual abuse and was psychologically and emotionally damaged as a result).
[815] Vol. 4, p. 970, *Logan Testimony.*
[816] Exhibit 73, *McCandless Declaration*; TT. Vol. 10, p. 2065 – 2147, *McCandless Testimony.*
[817] TT. Vol. 10, p. 2081, 2095 *McCandless Testimony.*
[818] Exhibit 73, *McCandless Declaration.*
[819] TT. Vol. 10, p. 2081-84, *McCandless Testimony.*
[820] TT. Vol. 10, p. 2110-17, *McCandless Testimony.*
[821] D.E. 129, p. 67-68.



Appellate Case: 17-1716 Page: 904 Date Filed: 11/01/2017 Entry ID: 4596229

[822] Exhibit 73, *McCandless Declaration.*
[823] TT. Vol. 14, p. 3017-3026, *Kuncel Testimony;* Vol. 5, p. 1274, *Kuncel Testimony.*
[824] Exhibit 83, p.2, *Armstrong Declaration.*
[825] Exhibit 83, p.2, *Armstrong Declaration* (quoting Fred Duchardt).
[826] Exhibit 83, p.3, *Armstrong Declaration* (quoting Fred Duchardt).
[827] Vol. 5, p. 1281, *Kuncel Testimony.*
[828] D.E. 129, p.75.
[829] Vol. 6, p. 1490, *Stipulation by the USA* (Note: Ms. Vogelsang's PowerPoint was accepted as Exhibit 154).
[830] D.E. 129, p. 68-69.
[831] Vol. 5, p. 1282, *Kuncel Testimony.*
[832] Vol. 5, p. 1275, *Kuncel Testimony* (referencing her admission that she was not qualified to make a pseudocyesis diagnosis and her resulting confusion over how Mr. Duchardt wished to present her testimony to the jury).
[833] Vol. 5, p. 1276-77, *Kuncel Testimony.*
[834] Vol. 6, p. 1569, *Waller Testimony.*
[835] Exhibit 10, *Kidwell Declaration.*
[836] *Compare*, TT. Vol. 8, p. 2955-59, *Mattingly Testimony with* Vol. 6, p. 1550-51, *Mattingly Testimony; see also,* Exhibit 1-9, p. 11-12, *Mattingly Declaration* .
[837] Vol. 6, p. 1550-51, *Mattingly Testimony.*
[838] Exhibit 1-48, p.3, *Ninemire and Waller Interview with Mattingly.*
[839] Vol. 6, p. 1542, *Mattingly Testimony.*
[840] Vol. 6, p. 1542, *Mattingly Testimony.*
[841] Vol. 6, p. 1543, *Mattingly Testimony.*
[842] Vol. 6, p. 1543, *Mattingly Testimony.*
[843] Exhibit 1-9, p. 11-13, *Mattingly Declaration.*
[844] Vol. 6, p. 1545, *Mattingly Testimony.*
[845] TT. Vol. 14, p. 2956, *Mattingly Testimony.*
[846] Vol. 6, p.1545-47, *Mattingly Testimony.*
[847] Vol. 6, p.1549, *Mattingly Testimony.*
[848] Vol. 6, p.1551-53, *Mattingly Testimony.*
[849] Vol. 6, p. 1553, *Mattingly Testimony.*
[850] TT. Vol. 11, p. 2405, *Logan Testimony.*
[851] TT. Vol. 11, p. 2405, *Logan Testimony.*
[852] TT. Vol. 11, p. 2292, *Logan Testimony.*
[853] TT. Vol. 12, p. 2567-68, *Dietz Testimony.*
[854] TT. Vol. 9, p. 1920 *Arguments of Counsel* (USA objected to admission of the records on hearsay grounds and Duchardt agreed not to attempt to admit them after which the Court sustained the objection).



Appellate Case: 17-1716 Page: 905 Date Filed: 11/01/2017 Entry ID: 4596229

[855] TT. Vol. 9, p. 1923, *Wallentini Testimony.*
[856] Exhibit 1-102, *Wallentini Counseling Records*; *see also* Exhibit 154, *PowerPoint* at 89.
[857] Exhibit 1-102, *Wallentini Counseling Records; see also* Exhibit 154, *PowerPoint* at 90.
[858] Exhibit 1-102, *Wallentini Counseling Records; see also* Exhibit 154, *PowerPoint* at 91.
[859] Exhibit 1-102, *Wallentini Counseling Records; see also* Exhibit 154, *PowerPoint* at 93.
[860] Exhibit 1-102, *Wallentini Counseling Records; see also* Exhibit 154, *PowerPoint* at 89.
[861] Exhibit 1-102, *Wallentini Counseling Records; see also* Exhibit 154, *PowerPoint* at 94.
[862] Vol. II, p. 280, *Wurtz Testimony.*
[863] Exhibit 75, p. 1, *Dedmon Declaration.*
[864] Exhibit 75, p. 1, *Dedmon Declaration.*
[865] Exhibit 75, p. 1, *Dedmon Declaration.*
[866] Exhibit 75, p. 1, *Dedmon Declaration.*
[867] Exhibit 75, p. 1, *Dedmon Declaration.*
[868] Exhibit 24, p. 6-7, *Bradford Declaration.*
[869] Vol. 2, p. 381, *Schnack Testimony.*
[870] Vol. 2, p. 421, *Hunt Testimony.*
[871] Exhibit 37, *3/14/2005 Hutchinson Letter.*
[872] Exhibit 39, *37/2005 Logan Report.*
[873] Exhibit 39, *3/7/2005 Logan Report.*
[874] Exhibit 39, *3/7/2005 Logan Report.*
[875] Exhibit 39, *3/7/2005 Logan Report.*
[876] Exhibit 39, *3/7/2005 Logan Report.*
[877] Exhibit 39, *3/7/2005 Logan Report..*
[878] Vol. 8, p. 2147-48, *Owen Testimony.*
[879] Vol. 8, p. 2147, *Owen Testimony.*
[880] Vol. 8, p. 2145, *Owen Testimony.*
[881] Exhibit 62, *Owen Declaration.*
[882] Exhibit 41, p. 4, *Logan Declaration.*
[883] Crim. D.E. 430.
[884] Crim. D.E. 433.
[885] D.E. 10.
[886] D.E. 13.
[887] D.E. 11.
[888] D.E. 11.



Appellate Case: 17-1716 Page: 906 Date Filed: 11/01/2017 Entry ID: 4596229

[889] D.E. 13.
[890] D.E. 20.
[891] D.E. 32.
[892] D.E. 41.
[893] D.E. 41, p. 4.
[894] D.E. 41, p. 4.
[895] *See* D.E. 41; D.E. 48 (notifying counsel for the first time that Judge Maughmer had been present at the 4/20/2006 in-chambers, off-the-record meeting).
[896] D.E. 71-20, (Ray Conrad refused to be interviewed regarding the in-chambers meeting that resulted in the removal of Ms. Clarke); *see also*, D.E. 53, p. 6 (Mr. Conrad refused to be interviewed about the matter); *see also* Exhibit 68, *5/3/2006 Transcript* (referencing that Ms. Hunt was present for an off-the-record proceeding in chambers on 4/20/2006, that proceeding was *after* the court removed Ms. Clarke from the case and called CCA to ban Ms. Clarke from interaction with Mrs. Montgomery); and Exhibit 65, *Hunt Letter to Burr*.
[897] D.E. 41*; see also* D.E. 53, p. 27.
[898] D.E. 41.
[899] Exhibit 69, *Order.*
[900] Exhibit 66, p. 1, *4/21/2006 Transcript.*
[901] Exhibit 66, p. 2, *4/21/2006 Transcript.*
[902] Exhibit 63, *Clarke Declaration.*
[903] Exhibit 101, *Records Requested Chart.*
[904] Vol. 3, p. 612, *Clarke Testimony*; Vol. 3, p. 693-717, *Jackson Testimony*; Vol. 3, p. 718-65, *Garvey Testimony*; Vol. 4, p. 811-862, *Freedman Testimony.*
[905] Vol. 3, p. 666-69, *Clarke Testimony.*
[906] Vol. 4, p. 844, *Freedman Testimony*; Vol. 3, p. 703, Jackson *Testimony.*
[907] Vol. 3, p. 740, *Garvey Testimony*; Vol. 4, p. 845, *Freedman Testimony.*
[908] D.E. 32; D.E. 41.
[909] D.E. 44.
[910] D.E. 212 at p. 126 ("For Movant's habeas counsel to maintain such a personal and professionally damning allegation of fraud against Conrad and Owen, given the totality of the record herein, is disturbing to the Court").
[911] D.E. 53, p. 5.
[912] D.E. 53, p. 5.
[913] D.E. 53, p. 5. Later in the proceeding Judge Fenner stated that the fact of the matter is that Judy Clarke (as well as all of the lawyers on the case) was being unproductive (*id.* at p. 29 ("The truth of it is they were all unproductive. Ms. Clarke was unproductive. Mr. Owen was unproductive. Ms. Hunt was unproductive. They were all unproductive given the circumstances that existed at that time because they could not function together, and so maybe that was



Appellate Case: 17-1716 Page: 907 Date Filed: 11/01/2017 Entry ID: 4596229

not as artfully stated as it possibly could have been, but it certainly is not the basis for accusing someone of committing fraud").

914 D.E. 53, p. 5.

915 D.E. 53, p. 3.

916 D.E. 53, p.4 *but see*, D.E. 59, ("at the May 6, 2013 hearing, I described my recollection of the *ex parte* discussions. Movant's counsel were given an opportunity to inquire as to my recollections at that time). The court's impression that Counsel could have cross-examined the court regarding that which was told to the court in the off-the-record proceedings is not supported by the record; *See* D.E. 44, (setting the matter for "oral argument" not testimony/proof).

917 See, D.E. 44, (specifying that the matter was set for oral argument); *see also* D.E. 53, p. 3 (opening court by setting out that "I want to talk to you about a few things here, then hear from counsel as to anything that you'd like to reflect upon" explicitly not permitting questioning of the court).

918 D.E. 53 p. 5.

919 D.E. 53, p. 5.

920 D.E. 53, p. 5.

921 D.E. 53, p. 14.

922 D.E. 53.

923 D.E. 53, p. 6.

924 D.E. 53, p. 8.

925 D.E. 53.

926 D.E. 53, p. 25.

927 D.E. 53, p. 29.

928 D.E. 53, p. 30.

929 D.E. 53, p. 30.

930 D.E. 53, p. 30.

931 D.E. 53, p. 30.

932 D.E. 53, p. 17 (emphasis added).

933 D.E. 52 (authorizing deposition of Ray Conrad).

934 D.E. 51.

935 D.E. 59.

936 D.E. 60.

937 D.E. 66, p. 4.

938 D.E. 66, p. 4.

939 D.E. 66, p. 7.

940 D.E. 66, p. 8.

941 D.E. 66, p. 10.

942 D.E. 66, p. 10.

943 D.E. 66, p. 18.



Appellate Case: 17-1716 Page: 908 Date Filed: 11/01/2017 Entry ID: 4596229

[944] No. 14-2725, Entry ID 4177969, Attachment B, p.10.
[945] No. 14-2725, Entry ID 4177969, Attachment B, p.14.
[946] No. 14-2725, Entry ID 4177969, Attachment E.
[947] No. 14-2725, Entry ID 4177969, Attachment E.
[948] No. 14-2725, Entry ID 4177969, Attachment E.
[949] No. 14-2725, Entry ID 4177969, Attachment E.
[950] No. 14-2725, Entry ID 4177969 p. 6.
[951] No. 14-2725, Entry ID 4177969, p. 6.
[952] No. 13-2958, Entry ID 4072350.
[953] D.E. 64.
[954] D.E. 65.
[955] D.E. 65, p. 2.
[956] D.E. 65, p. 2.
[957] D.E. 65, p. 3.
[958] D.E. 65, p. 3.
[959] D.E. 65, p. 4.
[960] D.E. 65, p. 4.
[961] D.E. 65, p. 4.
[962] D.E. 59, p. 7 ("Movant's counsel were given an opportunity to inquire as to my recollections at that time"); D.E. 65, p. 3 ("Counsel for Movant had the opportunity to inquire of me regarding me explanations of the language they claimed as evidence of fraudulent behavior, but chose not to do so").
[963] D.E. 53, p. 32.
[964] D.E. 77.
[965] D.E. 84, (Denying motion for reconsideration).
[966] D.E. 84, (Denying motion for reconsideration).
[967] D.E. 88.
[968] D.E. 91; Petitioner moved for reconsideration (D.E. 89) and the court denied reconsideration (D.E. 90).
[969] D.E. 92.
[970] Exhibit 83, *Armstrong Declaration.*
[971] D.E. 92, p.1-2.
[972] D.E. 94.
[973] D.E. 95.
[974] D.E. 96.
[975] D.E. 81, p.2.
[976] D.E. 96, p. 2-3.
[977] D.E. 98; D.E. 99, (referencing court's emailed order that all responses be filed by 8am on June 16, the motion for extension of time, the fact that no ruling had been issued on the motion for extension of time, Movant's desire to supplement the



Appellate Case: 17-1716 Page: 909 Date Filed: 11/01/2017 Entry ID: 4596229

record with an affidavit in support of her motion by Tuesday June 17, and requesting a protective order).

[978] D.E. 99.

[979] D.E. 100, p. 1 (the court's immediate ruling prevented Mrs. Montgomery from submitting the declaration of Michael P. Downey, Esq. which was subsequently submitted to this court along with Mrs. Montgomery's writ of mandamus; *See* No.14-2437, Entry ID 4170139, Attachment BB.

[980] D.E. 101.

[981] D.E. 103.

[982] No. 14-2437, Entry ID 4167134.

[983] No. 14-2437, Entry ID 4174361.

[984] D.E. 117.

[985] D.E. 117, p. 2 ("The first and only time that the Government has taken a position on Movant's request that counsel be permitted to first review trial counsel's affidavits prior to publication was in their 'Response in Opposition to Petitioner's Petition for Writ of Mandamus/Prohibition.' In that document, the Government successfully argued to the Court of Appeals that Movant had alternative remedies to protect her rights available to her in the district court. Specifically, the Government advised the Court of Appeals: 'Montgomery has several other alternative means for relief, and therefore such an extraordinary remedy as a writ of mandamus or prohibition should not be granted. Alterative remedies include redacting trial counsel's affidavits and/or allowing a full cross-examination of trial counsel at an evidentiary hearing.'").

[986] D.E. 124.

[987] No. 14-2437, Entry ID 4170139.

[988] No. 14-2725, Entry ID 4177969, p. 7.

[989] No. 14-2725, Entry ID 4177969, Attachment F.

[990] No. 14-2725, Entry ID 4177969, Attachment F.

[991] D.E. 115 (objecting to the removal, reciting the history of cost containment already undertaken by the court, noting that removal of Ms. Blegen would result in wasted resources as her knowledge would be lost and remaining counsel would have to accomplish the tasks assigned to Ms. Blegen, advising the court that Tennessee counsel faced execution dates of five clients as well as litigation regarding the method of execution in Tennessee, and reminding the district court of the mandatory nature of 18 U.S.C. §3599 (e)).

[992] D.E. 118.

[993] D.E. 119.

[994] No. 14-2725, Entry ID 4177969.



Appellate Case: 17-1716 Page: 910 Date Filed: 11/01/2017 Entry ID: 4596229

[995] No. 14-2725, Entry ID 4178889.
[996] No. 14-2725, Entry ID 4179320, p.2.
[997] D.E. 125.
[998] D.E. 149.
[999] D.E. 150.
[1000] D.E. 167.
[1001] D.E. 168.
[1002] D.E. 173, (Denying relief as to claims I-Iv, VIII-XI, XVI-XVII and XIX-XXI and granting a hearing as to grounds V-VII, XII-XIII, XV, XVIII, and XXII).
[1003] Motion to Expand the Record, Attachment 4 (12/29/15 *Courtroom Deputy Terry Moore Email*).
[1004] D.E. 175; D.E. 176.
[1005] D.E. 179, p. 12.
[1006] D.E. 179, p. 13.
[1007] D.E. 179, p. 14.
[1008] Vol. 1, p. 51-52, *Counsel Kelley Henry Statement.*
[1009] Vol. 1, p. 47, *Counsel Kelley Henry Statement.*
[1010] Vol. 1, p. 48-49, *Counsel Kelley Henry Statement.*
[1011] Vol. 1, p. 47-52, *Counsel Kelley Henry Statement.*
[1012] *See* D.E. 177, (ordering disclosure of Petitioner's Expert Witnesses by 3/27/16; Witness and Exhibit Lists due by 10/1/2016).
[1013] Vol. 6, p. 1490, *Government's Objection to Vogelsang Testimony* (Characterizing her PowerPoint as "all sourced back"); Vol. 6, p. 1492, *Court's Ruling on Objection* (Limiting Ms. Vogelsang's proposed 3 hour testimony to 1 hour); Vol. 4, p. 180 8-09, *Objection to Dr. George Woods Testimony as Cumulative and Admonishment by the Court to "Skip Over What Was Said"*.
[1014] Vol. 6, p. 1490, *Objection by the USA*.
[1015] Vol. 6, p. 1472, *Vogelsang Testimony.*
[1016] Vol. 6, p. 1491, *Argument of Counsel* (explaining that Ms. Vogelsang's testimony is not just the information contained in the PowerPoint slides, but also her expertise as a social worker in explicating that information).
[1017] Vol. 6, p. 1492, *Argument of Counsel.*
[1018] Vol. 6, p. 1493, *Court's Ruling on Objection.*
[1019] Vol. 7, p. 1809, *Objection by the USA.*
[1020] Vol. 7, p. 1809, *Ruling by the Court.*
[1021] Vol. 5, p. 1304, *Objection by the USA.*
[1022] Vol. 5, p. 1304, *Objection by the USA.*
[1023] Vol. 5, p. 1306, *Ruling of the Court*; the court did accept Professor Fox's report as a proffer of his testimony (Exhibit 52, *Fox Report).*
[1024] Vol. 5, p. 1306, *Ruling of the Court.*



Appellate Case: 17-1716 Page: 911 Date Filed: 11/01/2017 Entry ID: 4596229

[1025] Vol. 6, p. 1309, *Argument of Counsel.*
[1026] Vol. 5, p. 1307-08, *Court's Admonishment of Ms. Harwell for Failing to Anticipate the Exclusion of Professor Fox So To Have Additional Witnesses Ready to Testify*.
[1027] *See*, D.E. 197, (specifying that the court notified the parties that it intends to maintain a 9:00 AM to 5:00 PM daily scheduled. "Parties are reminded that Witnesses should be scheduled so that there is minimal downtime between evidence presentation").
[1028] Vol. 1, p. 230, *Statement of Counsel.*
[1029] Vol. 1, p. 230, *Statement of Counsel.*
[1030] Vol. 2, *Testimony Presented on 11/1/2016.*
[1031] Vol. 2, p. 476, *Statement of Counsel.*
[1032] Vol. 4, p. 1070, *Statement of the Court.*
[1033] Vol. 4, p. 1307, *Statement of Counsel*.
[1034] Vol. 5, p. 1307, *Argument of Counsel*.
[1035] Vol. 5, p. 1307-09, *Court Proceeding 11/4/2016.*
[1036] Vol. 1, p. 55, *Stetler Testimony*; Vol 1, p. 159, *Bookman Testimony.*
[1037] Mr. Bookman identified and adopted the previously filed declaration of Denise LeBouf (Exhibit 50). Ms. LeBouf provided the declaration but was unable to testify; Mr. Bookman reviewed the materials and testified that he agreed with Ms. LeBouf both as to the standards articulated in Ms. LeBouf's declaration and as to her opinions expressed there.
[1038] Vol. 1, p. 83, *Stetler Testimony.*
[1039] Vol. 1, p. 83, *Stetler Testimony.*
[1040] Vol. 1, p. 91-92, *Stetler Testimony.*
[1041] Vol. 1, p. 185, *Bookman Testimony.*
[1042] Vol. 2, p. 296, *Ruling of the Court.*
[1043] Vol. 1, p. 94, *Stetler Testimony.*
[1044] Vol. 1, p. 94-95, *Stetler Testimony.*
[1045] Vol. 1, p. 96, *Stetler Testimony.*
[1046] Vol. 1, p. 96-97, *Stetler Testimony.*
[1047] Vol. 1, p. 98, *Stetler Testimony.*
[1048] Vol. 1, p. 98, *Stetler Testimony.*
[1049] Vol. 1, p. 98, *Stetler Testimony.*
[1050] Vol. 1, p. 99, *Stetler Testimony.*
[1051] Vol. 1, p. 99-100, *Stetler Testimony.*
[1052] Vol. 1, p. 101, *Stetler Testimony.*
[1053] Vol. 1, p. 105, *Stetler Testimony.*
[1054] Vol. 1, p. 105, *Stetler Testimony.*
[1055] Vol. 1, p. 105, *Stetler Testimony.*

[1056] Vol. 1, p. 106, *Stetler Testimony.*
[1057] Vol. 1, p. 107, *Stetler Testimony.*
[1058] Vol. 1, p. 107, *Stetler Testimony.*
[1059] Vol. 1, p. 109, *Stetler Testimony.*
[1060] Vol. 1, p. 109, *Stetler Testimony.*
[1061] Vol. 1, p. 206-07, *Bookman Testimony.*
[1062] Vol. 1, p. 207, *Bookman Testimony.*
[1063] Vol. 1, p. 109, *Stetler Testimony.*
[1064] Vol. 1, p. 110, *Stetler Testimony.*
[1065] Vol. 1, p. 110, *Stetler Testimony.*
[1066] Vol. 1, p. 191, *Bookman Testimony.*
[1067] See, Exhibit 83, *Armstrong Declaration*, p. 3.
[1068] Vol. 1, p. 192, *Bookman Testimony.*
[1069] Vol. 1, p. 192, *Bookman Testimony.*
[1070] Vol. 1, p. 110, *Stetler Testimony.*
[1071] Vol. 1, p. 103, *Stetler Testimony.*
[1072] Vol. 1, p. 110, *Stetler Testimony.*
[1073] Vol. 1, p. 111, *Stetler Testimony.*
[1074] Vol. 1, p. 111, *Stetler Testimony.*
[1075] Vol. 1, p. 112, *Stetler Testimony.*
[1076] Vol. 1, p. 124, *Stetler Testimony.*
[1077] Vol. 1, p. 113, *Stetler Testimony.*
[1078] Vol. 1, p. 114, *Stetler Testimony.*
[1079] Vol. 1, p. 114-15, *Stetler Testimony.*
[1080] Vol. 1, p. 115, *Stetler Testimony.*
[1081] Vol. 1, p. 117, *Stetler Testimony.*
[1082] Vol. 1, p. 117, *Stetler Testimony.*
[1083] Vol. 1, p. 118, *Stetler Testimony.*
[1084] Vol. 1, p. 119, *Stetler Testimony.*
[1085] Vol. 1, p. 119, *Stetler Testimony* (quoting Exhibit 130, *Memo*).
[1086] Vol. 1, p. 120, *Stetler Testimony.*
[1087] Vol. 1, p. 120, *Stetler Testimony.*
[1088] Vol. 1, p. 12, *Stetler Testimony.*
[1089] Vol. 1, p. 197, *Bookman Testimony.*
[1090] Vol. 1, p. 198, *Bookman Testimony.*
[1091] Vol. 1, p. 198, *Bookman Testimony.*
[1092] Vol. 1, p. 121, *Stetler Testimony.*
[1093] Vol. 1, p. 123, *Stetler Testimony.*
[1094] Vol. 1, p. 123, *Stetler Testimony.*
[1095] Vol. 1, p. 123, *Stetler Testimony.*

[1096] Vol. 1, p. 124, *Stetler Testimony.*
[1097] Vol. 1, p. 126, *Stetler Testimony.*
[1098] Vol. 1, p. 127, *Stetler Testimony.*
[1099] Vol. 1, p. 128, *Stetler Testimony.*
[1100] Vol. 1, p. 129, *Stetler Testimony.*
[1101] Vol. 1, p. 129, *Stetler Testimony.*
[1102] Vol. 1, p. 198, *Bookman Testimony.*
[1103] Vol. 1, p. 199, *Bookman Testimony.*
[1104] Vol. 1, p. 199, *Bookman Testimony.*
[1105] Vol. 1, p. 132, *Stetler Testimony.*
[1106] Vol. 1, p. 128, *Stetler Testimony.*
[1107] Vol. 1, p. 133, *Stetler Testimony.*
[1108] Vol. 1, p. 201, *Bookman Testimony.*
[1109] Vol. 1, p. 201, *Bookman Testimony.*
[1110] Vol. 1, p. 202, *Bookman Testimony.*
[1111] Vol. 1, p. 203, *Bookman Testimony.*
[1112] Vol. 1, p. 204, *Bookman Testimony.*
[1113] Vol. 1, p. 204, *Bookman Testimony.*
[1114] Vol. 1, p. 208-09, *Bookman Testimony.*
[1115] Vol. 1, p. 208, *Bookman Testimony.*
[1116] Vol. 1, p. 209, *Bookman Testimony.*
[1117] Vol. 1, p. 212, *Bookman Testimony.*
[1118] Vol. 1, p. 212, *Bookman Testimony.*
[1119] Vol. 1, p. 212, *Bookman Testimony.*
[1120] Vol. 1, p. 213, *Bookman Testimony.*
[1121] Vol. 1, p. 215, *Bookman Testimony.*
[1122] Ms. Clarke testified that she has been doing capital work since 1995, including serving as capital resource counsel to Federal Public Defenders (Vol.3, p. 617-18, *Clarke Testimony*). She has served as President of the National Association of Criminal Defense Lawyers, publishes the federal criminal case manual, and has presented at over 40 seminars (Vol. 3, p. 619, *Clarke Testimony*).
[1123] Vol. 3, p. 630, *Clarke Testimony.*
[1124] Vol. 3, p. 627, *Clarke Testimony.*
[1125] Vol. 3, p. 630, *Clarke Testimony.*
[1126] Vol. 3, p. 639, *Clarke Testimony.*
[1127] Vol. 3, p. 655, *Clarke Testimony.*
[1128] Vol. 3, p. 655, *Clarke Testimony.*
[1129] Vol. 3, p. 625, *Clarke Testimony.*
[1130] Vol. 3, p. 623, *Clarke Testimony*; Vol. 4, p. 847, *Freedman Testimony* (point of team meetings is to talk through issues and make decisions together); Vol. 3, p.



Appellate Case: 17-1716 Page: 914 Date Filed: 11/01/2017 Entry ID: 4596229

699, *Jackson Testimony* (team had a lot of meetings to try to come to consensus on the case objectives).
[1131] Vol. 3, p. 625, *Clarke Testimony.*
[1132] Vol. 3, p. 644, *Clarke Testimony*.
[1133] Vol. 3, p. 623, *Clarke Testimony.*
[1134] Vol. 3, p. 641, *Clarke Testimony.*
[1135] Vol. 3, p. 642, *Clarke Testimony.*
[1136] Vol. 3, p. 732, *Garvey Testimony.*
[1137] Vol. 4, p. 848, *Freedman Testimony.*
[1138] Vol. 3, p. 529, *Burr Testimony* (referencing the Spencer Project, Exhibit 122).
[1139] Vol. 3, p. 529, *Burr Testimony.*
[1140] Vol. 3, p. 534, *Burr Testimony.*
[1141] Vol. 3, p. 541, *Burr Testimony.*
[1142] Vol. 3, p. 548, *Burr Testimony.*
[1143] Vol. 3, p. 560, *Burr Testimony.*
[1144] Vol. 3, p. 560, *Burr Testimony.*
[1145] Vol. 3, p. 561-62, *Burr Testimony.*
[1146] Vol. 3, p. 562, *Burr Testimony.*
[1147] Vol. 3, p. 563, *Burr Testimony.*
[1148] Vol. 3, p. 564, *Burr Testimony.*
[1149] Vol. 3, p. 565, *Burr Testimony.*
[1150] Vol. 3, p. 565, *Burr Testimony.*
[1151] Vol. 3, p. 629, *Clarke Testimony.*
[1152] Vol. 3, p. 634, *Clarke Testimony.*
[1153] Vol. 3, p. 565, *Burr Testimony.*
[1154] Vol. 3, p. 631, *Clarke Testimony.*
[1155] Vol. 3, p. 633, *Clarke Testimony.*
[1156] Vol. 3, p. 572, *Burr Testimony.*
[1157] Vol. 3, p. 638, *Clarke Testimony.*
[1158] Vol. 3, p. 637, *Clarke Testimony.*
[1159] Vol. 3, p. 639, *Clarke Testimony.*
[1160] Vol. 3, p. 639, 46, *Clarke Testimony.*
[1161] Vol. 3, p. 639, *Clarke Testimony.*
[1162] Vol. 3, p. 642, *Clarke Testimony.*
[1163] Vol. 2, p. 405, *Hunt Testimony.*
[1164] Vol. 2, p. 406, *Hunt Testimony.*
[1165] Vol. 2, p. 405, *Hunt Testimony.*
[1166] Vol. 3, p. 631, *Clarke Testimony.*
[1167] Vol. 3, p. 634, *Clarke Testimony.*
[1168] Exhibit 101, *Graph of Records Collected Before Trial.*



Appellate Case: 17-1716 Page: 915 Date Filed: 11/01/2017 Entry ID: 4596229

[1169] Vol. 3, p. 729-30, *Garvey Testimony.*
[1170] Vol. 3, p. 730, *Garvey Testimony.*
[1171] Vol. 3, p. 747, *Garvey Testimony.*
[1172] Vol. 3, p. 747, *Garvey Testimony.*
[1173] Vol. 3, p. 558, *Burr Testimony.*
[1174] Vol. 3, p. 559, *Burr Testimony.*
[1175] Vol. 3, p. 555, *Burr Testimony.*
[1176] Vol. 3, p. 562, *Burr Testimony.*
[1177] Vol. 3, p. 556, *Burr Testimony.*
[1178] Vol. 3, p. 565, *Burr Testimony.*
[1179] Vol. 3, p. 647, *Clarke Testimony.*
[1180] Vol. 3, p. 652, *Clarke Testimony.*
[1181] Vol. 3, p. 667-69, *Clarke Testimony.*
[1182] Vol. 3, p. 573, *Burr Testimony.*
[1183] Vol. 3, p. 575, *Burr Testimony.*
[1184] Vol. 3, p. 650, *Clarke Testimony.*
[1185] Vol. 3, p. 651, *Clarke Testimony.*
[1186] Vol. 3, p. 713, *Jackson Testimony.*
[1187] Vol. 4, p. 854, *Freedman Testimony.*
[1188] Vol. 2, p. 418, *Hunt Testimony.*
[1189] Vol. 3, p. 714, *Jackson Testimony.*
[1190] Vol. 3, p. 714, *Jackson Testimony.*
[1191] Vol. 2, p. 299, *Dillingham Testimony.*
[1192] Vol. 3, p. 560, *Burr Testimony.*
[1193] Vol. 3, p. 751, *Garvey Testimony.*
[1194] Vol. 4, p. 902, *Garmen Testimony.*
[1195] Vol. 3, p. 704, *Jackson Testimony.*
[1196] Vol. 3, p. 704, *Jackson Testimony.*
[1197] Vol. 4, p. 844, *Freedman Testimony.*
[1198] Vol. 4, p. 845, *Freedman Testimony.*
[1199] Vol. 3, p. 661, *Clarke Testimony.*
[1200] Vol. 3, p. 741, *Garvey Testimony.*
[1201] Vol. 3, p. 741, *Garvey Testimony.*
[1202] Vol. 4, p. 845, *Freedman Testimony.*
[1203] Vol. 4, p. 845, *Freedman Testimony.*
[1204] Vol. 4, p. 845-46, *Freedman Testimony.*
[1205] Vol. 4, p. 846, *Freedman Testimony.*
[1206] Vol. 4, p. 846, *Freedman Testimony.*
[1207] Vol. 3, p. 652, *Clarke Testimony.*



Appellate Case: 17-1716 Page: 916 Date Filed: 11/01/2017 Entry ID: 4596229

[1208] Vol. 3, p. 666-67, *Clarke Testimony*; *see also*, Judith Herman, Trauma and Recovery, Basic Books, 1992, 2015.
[1209] Vol. 3, p. 666, *Clarke Testimony.*
[1210] Vol. 3, p. 669, *Clarke Testimony.*
[1211] Vol. 3, p. 669, *Clarke Testimony.*
[1212] Vol. 3, p. 713 -14, *Jackson Testimony*
[1213] Vol. 2, p. 417-18, *Hunt Testimony*
[1214] Vol. 2, p. 418, *Hunt Testimony*
[1215] Vol. 3, p. 713-14, *Jackson Testimony*
[1216] Vol. 3, p. 715, *Jackson Testimony*
[1217] Vol. 3, p. 715, *Jackson Testimony*
[1218] Vol. 3, p. 715, *Jackson Testimony*
[1219] Vol. 3, p. 715 - 17, *Jackson Testimony*
[1220] Exhibit 71.
[1221] Vol. 3, p. 419, *Hunt Testimony*
[1222] Vol. 3, p. 555, *Burr Testimony.*
[1223] Vol. 3, p. 555, *Burr Testimony.*
[1224] Vol. 3, p. 556, *Burr Testimony.*
[1225] Vol. 3, p. 557, *Burr Testimony.*
[1226] Vol. 3, p. 557, *Burr Testimony*; *see also*, Vol. 3, p. 699-700, *Jackson Testimony*.
[1227] Vol. 3, p. 700, *Jackson Testimony*.
[1228] Vol. 3, p. 577, *Burr Testimony.*
[1229] Vol. 3, p. 648, *Clarke Testimony.*
[1230] Vol. 3, p. 649, *Clarke Testimony.*
[1231] Vol. 3, p. 577, *Burr Testimony;* Vol. 3, p. 650, *Clarke Testimony.*
[1232] Vol. 2, p. 395, *Hunt Testimony.*
[1233] Vol. 2, p. 406, *Hunt Testimony.*
[1234] Vol. 2, p. 407, *Hunt Testimony.*
[1235] Vol. 4, p. 826, *Comment by the Court*.
[1236] Vol. 4, p. 829, *Freedman Testimony.*
[1237] Vol. 4, p. 829, *Freedman Testimony.*
[1238] Vol. 3, p. 643, *Clarke Testimony.*
[1239] Vol. 2, p. 416, *Hunt Testimony.*
[1240] Vol. 3, p. 649, *Clarke Testimony.*
[1241] Vol. 3, p. 650, *Clarke Testimony.*
[1242] Vol. 3, p. 701, *Jackson Testimony.*
[1243] Vol. 3, p. 702, *Jackson Testimony.*
[1244] Vol. 4, p. 836, *Freedman Testimony.*
[1245] Vol. 3, p. 690, *Cardarella Testimony.*



Appellate Case: 17-1716 Page: 917 Date Filed: 11/01/2017 Entry ID: 4596229

[1246] Vol. 3, p. 690, *Cardarella Testimony.*
[1247] Vol. 3, p. 690-91, *Cardarella Testimony.*
[1248] Vol. 8, p. 2153, *Owen Testimony.*
[1249] Vol. 8, p. 2153, *Owen Testimony.*
[1250] Exhibit 83, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[1251] Exhibit 83, *Armstrong Declaration* (quoting Fred Duchardt); *see also*, Vol.4, p. 911-16 *et seq*., *Armstrong Testimony* (introducing Exhibit 83 as substantive evidence).
[1252] Vol. 3, p. 606, *Burr Testimony.*
[1253] Vol. 3, p. 582, *Burr Testimony.*
[1254] Vol. 3, p. 582, *Burr Testimony.*
Vol. 7, p. 1867, *O'Connor Testimony* (Mr. O'Connor does not recall reaching out to Dick Burr though he does not dispute Mr. Burr's testimony).
[1255] Vol. 3, p. 582, *Burr Testimony*; see also Exhibit 50, *LeBouf Declaration.*
[1256] Vol. 3, p. 583, *Burr Testimony.*
[1257] Vol. 3, p. 585, *Burr Testimony.*
[1258] Vol. 3, p. 585, *Burr Testimony.*
[1259] Vol. 3, p. 586, *Burr Testimony.*
[1260] Vol. 3, p. 675, *Clarke Testimony.*
[1261] Vol. 3, p. 675, *Clarke Testimony.*
[1262] Vol. 3, p. 675, *Clarke Testimony.*
[1263] Vol. 3, p. 675, *Clarke Testimony.*
[1264] Vol. 3, p. 676-77, *Clarke Testimony*; compare with D.E. 129, p. 19.
[1265] Vol. 3, p. 677, *Clarke Testimony.*
[1266] Vol. 3, p. 680, *Clarke Testimony.*
[1267] Vol. 3, p. 680, *Clarke Testimony.*
[1268] Vol. 3, p. 680, *Clarke Testimony.*
[1269] Vol. 8, p. 2192, *Duchardt Testimony.*
[1270] Vol. 8, p. 2137, *Owen Testimony*; Vol. 7, p. 1868, *O'Connor Testimony.*
[1271] Vol. 8, p. 2195, *Duchardt Testimony.*
[1272] Vol. 8, p. 2198, *Duchardt Testimony.*
[1273] Vol. 8, p. 2195, *Duchardt Testimony.*
[1274] Vol. 8, p. 2201, *Duchardt Testimony.*
[1275] Vol. 8, p. 2201, *Duchardt Testimony.*
[1276] Vol. 8, p. 2202, *Duchardt Testimony.*
[1277] Vol. 8, p. 2204, *Duchardt Testimony.*
[1278] Vol. 8, p. 2205, *Duchardt Testimony.*
[1279] Vol. 8, p. 2215, *Duchardt Testimony.*

[1280] Vol. 8, p. 2263, *Duchardt Testimony.*
[1281] Vol. 8, p. 2264, *Duchardt Testimony.*
[1282] Vol. 8, p. 2206, *Duchardt Testimony.*
[1283] Vol. 8, p. 2207, *Duchardt Testimony.*
[1284] Vol. 8, p. 2211, *Duchardt Testimony.*
[1285] Vol. 8, p. 2212, *Duchardt Testimony.*
[1286] Vol. 8, p. 2293, *Duchardt Testimony.*
[1287] Vol. 8, p. 2294, *Duchardt Testimony.*
[1288] Vol. 7, p. 1983, *O'Connor Testimony.*
[1289] Vol. 8, p. 2184, *Owen Testimony.*
[1290] Vol. 8, p. 2185, *Owen Testimony.*
[1291] Vol. 8, p. 2149, *Owen Testimony.*
[1292] Vol. 8, p. 2149, *Owen Testimony.*
[1293] Vol. 8, p. 2151, *Owen Testimony.*
[1294] Vol. 7, p. 1899-900, *O'Connor Testimony.*
[1295] Vol. 8, p. 1958, *O'Connor Testimony*
[1296] D.E.129, p. 61.
[1297] D.E.129, p. 64.
[1298] Vol. 8, p. 2201, *Duchardt Testimony.*
[1299] Vol. 8, p. 2140, *Owen Testimony.*
[1300] Vol. 8, p. 2140, *Owen Testimony.*
[1301] Vol. 8, p. 2141, *Owen Testimony.*
[1302] D.E. 129, p. 33.
[1303] Vol. 8, p. 2183, *Owen Testimony.*
[1304] Vol. 8, p. 2147, *Owen Testimony.*
[1305] Vol. 8, p. 2148, *Owen Testimony.*
[1306] Vol. 8, p. 2148, *Owen Testimony.*
[1307] Vol. 8, p. 2310, *Duchardt Testimony.*
[1308] Vol. 8, p. 2311, *Duchardt Testimony.*
[1309] Exhibit 73, *McCandless Declaration*; Vol. 7, p. 1761, 1804, *Woods Testimony* (referencing medication regime at CCA, pre-trial).
[1310] Vol. 8, p. 2148, *Owen Testimony.*
[1311] Vol. 8, p. 2148, *Owen Testimony.*
[1312] Vol. 8, p. 2148, *Owen Testimony.*
[1313] Vol. 8, p. 2149, *Owen Testimony.*
[1314] Vol. 7, p. 1896-97, *O'Connor Testimony.*
[1315] Vol. 8, p. 2267, *Duchardt Testimony.*
[1316] Vol. 8, p. 2308, *Duchardt Testimony.*
[1317] Vol. 8, p. 2300, *Duchardt Testimony*
[1318] Vol. 8, p. 2146, *Owen Testimony.*

[1319] Vol. 8, p. 2313, *Duchardt Testimony.*
[1320] Vol. 8, p. 2314, *Duchardt Testimony.*
[1321] Vol. 8, p. 2304, *Duchardt Testimony.*
[1322] Vol. 8, p. 2305, *Duchardt Testimony.*
[1323] Vol. 8, p. 2144, *Owen Testimony.*
[1324] Vol. 8, p. 2145, *Owen Testimony.*
[1325] Vol. 8, p. 2145, *Owen Testimony.*
[1326] Vol. 8, p. 2145, *Owen Testimony.*
[1327] Vol. 7, p. 1888, *O'Connor Testimony.*
[1328] Vol. 7, p. 1889, *O'Connor Testimony.*
[1329] Vol. 7, p. 1980, *O'Connor Testimony.*
[1330] Vol. 8, p. 2146, *Owen Testimony.*
[1331] Vol. 7, p. 1889, *O'Connor Testimony.*
[1332] Vol. 7, p. 1889, *O'Connor Testimony.*
[1333] Vol. 7, p. 1890, *O'Connor Testimony.*
[1334] Vol. 8, p. 2268, *Duchardt Testimony.*
[1335] Vol. 8, p. 2270, *Duchardt Testimony.*
[1336] Vol. 8, p. 2271, *Duchardt Testimony.*
[1337] Vol. 8, p. 2271- 72, *Duchardt Testimony*; but see Exhibit 82, *Duchardt Vouchers* (which do not reflect any additional communique between Mr. Duchardt and Dr. Ramachandran on 4/2/2007 other than the telephone conference).
[1338] Vol. 8, p. 2273, *Duchardt Testimony.*
[1339] Vol. 7, p. 1952, *O'Connor Testimony.*
[1340] Vol. 7, p. 1952, *O'Connor Testimony.*
[1341] Vol. 7, p. 1953, *O'Connor Testimony.*
[1342] Vol. 7, p. 1954, *Statement of USA.*
[1343] Vol. 7, p. 1955, *O'Connor Testimony.*
[1344] Vol. 7, p. 1955, *O'Connor Testimony.*
[1345] Vol. 7, p. 1955, *O'Connor Testimony.*
[1346] Vol. 4, p. 983, *Hutchinson Testimony.*
[1347] Vol. 4, p. 983, *Hutchinson Testimony.*
[1348] Vol. 4, p. 989, *Hutchinson Testimony.*
[1349] Vol. 4, p. 993, *Hutchinson Testimony.*
[1350] Vol. 4, p. 994, *Hutchinson Testimony.*
[1351] Vol. 4, p. 1006, *Hutchinson Testimony.*
[1352] Vol. 4, p. 1006, *Hutchinson Testimony.*
[1353] Vol. 4, p. 1006, *Hutchinson Testimony.*
[1354] Vol. 4, p. 1006, *Hutchinson Testimony.*
[1355] Vol. 4, p. 1008, *Hutchinson Testimony.*
[1356] Vol. 4, p. 1008, *Hutchinson Testimony.*

[1357] Vol. 4, p. 1010-11, *Hutchinson Testimony.*
[1358] Vol. 4, p. 1011, *Statement by the Court.*
[1359] Vol. 4, p. 1012, *Hutchinson Testimony.*
[1360] Vol. 4, p. 1012, *Hutchinson Testimony.*
[1361] Vol. 4, p. 988, *Hutchinson Testimony.*
[1362] Vol. 4, p. 988, *Hutchinson Testimony.*
[1363] Vol. 4, p. 1013, *Hutchinson Testimony.*
[1364] Vol. 4, p. 1013, *Hutchinson Testimony.*
[1365] Vol. 4, p. 1013-14, *Hutchinson Testimony.*
[1366] Vol. 4, p. 1015, *Hutchinson Testimony.*
[1367] Vol. 4, p. 1015, *Hutchinson Testimony.*
[1368] Vol. 4, p. 1015, *Hutchinson Testimony.*
[1369] Vol. 4, p. 1016, *Hutchinson Testimony.*
[1370] Vol. 4, p. 1016, *Hutchinson Testimony.*
[1371] Vol. 4, p. 1008, *Hutchinson Testimony.*
[1372] Vol. 4, p. 1018-19, *Hutchinson Testimony.*
[1373] Vol. 4, p. 1019, *Hutchinson Testimony* (specifying that trazadone has little antidepressant effect and is extremely sedating).
[1374] Vol. 4, p. 1019, *Hutchinson Testimony.*
[1375] Vol. 4, p. 1020-121, *Hutchinson Testimony.*
[1376] Vol. 4, p. 1020, *Hutchinson Testimony.*
[1377] Vol. 4, p. 1021, *Hutchinson Testimony.*
[1378] Vol. 4, p. 1021, *Hutchinson Testimony.*
[1379] Vol. 4, p. 1025, *Hutchinson Testimony.*
[1380] Vol. 4, p. 1027, *Hutchinson Testimony.*
[1381] Vol. 4, p. 1028, *Hutchinson Testimony.*
[1382] Vol. 4, p. 1029, *Hutchinson Testimony.*
[1383] Vol. 4, p. 1029, *Hutchinson Testimony.*
[1384] Vol. 4, p. 1030, *Hutchinson Testimony.*
[1385] Vol. 4, p. 1031, *Hutchinson Testimony.*
[1386] Vol. 4, p. 1033, *Hutchinson Testimony.*
[1387] Vol. 4, p. 1032, *Hutchinson Testimony.*
[1388] Vol. 4, p. 1033, *Hutchinson Testimony.*
[1389] Vol. 4, p. 1035, *Hutchinson Testimony.*
[1390] Vol. 4, p. 1035, *Hutchinson Testimony.*
[1391] Vol. 4, p. 1035, *Hutchinson Testimony.*
[1392] Vol. 4, p. 1036, *Hutchinson Testimony.*
[1393] Vol. 4, p. 1036, *Hutchinson Testimony.*
[1394] Vol. 4, p. 1037, *Hutchinson Testimony.*
[1395] Vol. 4, p. 1038, *Hutchinson Testimony.*



Appellate Case: 17-1716 Page: 921 Date Filed: 11/01/2017 Entry ID: 4596229

[1396] Vol. 4, p. 1039, *Hutchinson Testimony.*
[1397] Vol. 4, p. 1039, *Hutchinson Testimony.*
[1398] Vol. 4, p. 1040, *Hutchinson Testimony.*
[1399] Vol. 4, p. 1042, *Hutchinson Testimony.*
[1400] Vol. 4, p. 1043, *Hutchinson Testimony.*
[1401] Vol. 4, p. 1047, *Hutchinson Testimony.*
[1402] Vol. 4, p. 1051, *Hutchinson Testimony.*
[1403] Vol. 4, p. 1054, *Hutchinson Testimony.*
[1404] Vol. 4, p. 1053, *Hutchinson Testimony.*
[1405] Vol. 4, p. 1053, *Hutchinson Testimony.*
[1406] Vol. 4, p. 1054, *Hutchinson Testimony.*
[1407] Vol. 4, p. 1017, *Hutchinson Testimony.*
[1408] Vol. 4, p. 1018, *Hutchinson Testimony.*
[1409] Vol. 4, p. 1018, *Hutchinson Testimony.*
[1410] Vol. 4, p. 1018, *Hutchinson Testimony.*
[1411] Vol. 4, p. 922, *Logan Testimony.*
[1412] Vol. 4, p. 923, *Logan Testimony.*
[1413] Vol. 4, p. 924, *Logan Testimony.*
[1414] Vol. 4, p. 924, *Logan Testimony.*
[1415] Vol. 4, p. 928, *Logan Testimony.*
[1416] Vol. 4, p. 928, *Logan Testimony.*
[1417] Vol. 4, p. 928, *Logan Testimony.*
[1418] Vol. 4, p. 932, *Logan Testimony.*
[1419] Vol. 4, p. 929, *Logan Testimony.*
[1420] Vol. 4, p. 929, *Logan Testimony.*
[1421] Vol. 4, p. 930, *Logan Testimony.*
[1422] Vol. 4, p. 930, *Logan Testimony.*
[1423] Vol. 4, p. 932, *Logan Testimony.*
[1424] Vol. 4, p. 934, *Logan Testimony.*
[1425] Vol. 4, p. 965, *Logan Testimony.*
[1426] Vol. 4, p. 936, *Logan Testimony.*
[1427] Vol. 4, p. 938, *Logan Testimony.*
[1428] Vol. 4, p. 936, *Logan Testimony.*
[1429] Vol. 4, p. 936, *Logan Testimony.*
[1430] Vol. 4, p. 938, *Logan Testimony.*
[1431] Exhibit 58, p. 4; Vol. 4, p. 941, *Logan Testimony.*
[1432] Vol. 4, p. 942, *Logan Testimony.*
[1433] Vol. 4, p. 950, *Logan Testimony.*
[1434] Vol. 4, p. 950, *Logan Testimony.*
[1435] Vol. 4, p. 950, *Logan Testimony.*



Appellate Case: 17-1716 Page: 922 Date Filed: 11/01/2017 Entry ID: 4596229

1436 Vol. 4, p. 950, *Logan Testimony.*
1437 Vol. 4, p. 951, *Logan Testimony.*
1438 Vol. 4, p. 951, *Logan Testimony.*
1439 Vol. 4, p. 951, *Logan Testimony.*
1440 Vol. 4, p. 952, *Logan Testimony.*
1441 Vol. 4, p. 953, *Logan Testimony.*
1442 Vol. 4, p. 943, *Logan Testimony.*
1443 Vol. 4, p. 942, *Logan Testimony.*
1444 Vol. 4, p. 955, *Logan Testimony.*
1445 Vol. 4, p. 956, *Logan Testimony.*
1446 Vol. 4, p. 956, *Logan Testimony.*
1447 Vol. 4, p. 958, *Logan Testimony.*
1448 Vol. 4, p. 958, *Logan Testimony.*
1449 Vol. 4, p. 960, *Logan Testimony.*
1450 Vol. 4, p. 958, *Logan Testimony.*
1451 Vol. 4, p. 959, *Logan Testimony.*
1452 Vol. 4, p. 960, *Logan Testimony.*
1453 Vol. 4, p. 953, *Logan Testimony.*
1454 Vol. 4, p. 954, *Logan Testimony.*
1455 Vol. 4, p. 954, *Logan Testimony.*
1456 Vol. 4, p. 962, *Logan Testimony*; Exhibit 62, *Deleted History Summary.*
1457 Vol. 4, p. 962-63, *Logan Testimony.*
1458 Vol. 4, p. 964, *Logan Testimony.*
1459 Vol. 4, p. 964, *Logan Testimony.*
1460 Vol. 4, p. 964, *Logan Testimony.*
1461 Vol. 4, p. 966, *Logan Testimony.*
1462 Vol. 4, p. 966, *Logan Testimony.*
1463 Vol. 4, p. 964, *Logan Testimony* (responding to a question about whether he shared with Mr. Duchardt the risk of separating out pseudocyesis from the other mental health diagnoses and presenting it as a first phase defense).
1464 Vol. 4, p. 957, *Logan Testimony.*
1465 Vol. 4, p. 863, *Fucetola Testimony.*
1466 Vol. 4, p. 864, *Fucetola Testimony.*
1467 Vol. 4, p. 865, *Fucetola Testimony.*
1468 Vol. 4, p. 865, *Fucetola Testimony.*
1469 Vol. 4, p. 866, *Fucetola Testimony.*
1470 Vol. 4, p. 870, *Fucetola Testimony.*
1471 Vol. 4, p. 870, *Fucetola Testimony.*
1472 Vol. 4, p. 870, *Fucetola Testimony.*
1473 Vol. 4, p. 870, *Fucetola Testimony.*



Appellate Case: 17-1716 Page: 923 Date Filed: 11/01/2017 Entry ID: 4596229

[1474] Vol. 4, p. 871, *Fucetola Testimony.*
[1475] Vol. 4, p. 871, *Fucetola Testimony.*
[1476] Vol. 4, p. 872, *Fucetola Testimony.*
[1477] Vol. 4, p. 873, *Fucetola Testimony.*
[1478] Vol. 4, p. 879, *Fucetola Testimony.*
[1479] Vol. 4, p. 875, *Fucetola Testimony.*
[1480] Vol. 4, p. 878, *Fucetola Testimony.*
[1481] Vol. 4, p. 879, *Fucetola Testimony.*
[1482] Vol. 4, p. 879, *Fucetola Testimony.*
[1483] Vol. 4, p. 885, *Fucetola Testimony.*
[1484] Vol. 4, p. 885, *Fucetola Testimony.*
[1485] Vol. 4, p. 876, *Fucetola Testimony*; Exhibit 144, *Frequencies of Differences Between WAIS-III IQ and Index Scores by Ability Level: FSIQ ≥ 120* (chart of Mrs. Montgomery's IQ scores as compared to her scores on Faces Test).
[1486] Vol. 4, p. 881, *Fucetola Testimony.*
[1487] Vol. 4, p. 883, *Fucetola Testimony.*
[1488] Vol. 4, p. 883, *Fucetola Testimony.*
[1489] Vol. 4, p. 883, *Fucetola Testimony.*
[1490] Vol. 4, p. 884, *Fucetola Testimony.*
[1491] Vol. 4, p. 885, *Fucetola Testimony.*
[1492] Vol. 4, p. 879, *Fucetola Testimony.*
[1493] Vol. 5, p. 1263, *Kuncel Testimony.*
[1494] Vol. 5, p. 1265, *Kuncel Testimony.*
[1495] Vol. 5, p. 1275, *Kuncel Testimony.*
[1496] Vol. 5, p. 1274, *Kuncel Testimony.*
[1497] Vol. 5, p. 1281, *Kuncel Testimony.*
[1498] D.E. 129, p. 75.
[1499] Vol. 5, p. 1274-75, *Kuncel Testimony.*
[1500] Vol. 5, p. 1279, *Kuncel Testimony.*
[1501] Vol. 5, p. 1274, *Kuncel Testimony.*
[1502] Vol. 5, p. 1274, *Kuncel Testimony.*
[1503] Vol. 5, p. 1288, *Kuncel Testimony.*
[1504] Vol. 5, p. 1289, *Kuncel Testimony.*
[1505] Vol. 5, p. 1278, *Kuncel Testimony.*
[1506] Vol. 5, p. 1267-72, *Kuncel Testimony.*
[1507] Vol. 5, p. 1267, *Kuncel Testimony.*
[1508] Vol. 5, p. 1269, *Kuncel Testimony.*
[1509] Vol. 5, p. 1270, *Kuncel Testimony.*
[1510] Vol. 5, p. 1268-69, *Kuncel Testimony.*
[1511] Vol. 5, p. 1269, *Kuncel Testimony.*



Appellate Case: 17-1716 Page: 924 Date Filed: 11/01/2017 Entry ID: 4596229

[1512] Vol. 5, p. 1298, *Kuncel Testimony.*
[1513] Vol. 5, p. 1277, *Kuncel Testimony.*
[1514] Vol. 5, p. 1278, *Kuncel Testimony.*
[1515] Vol. 5, p. 1302, *Kuncel Testimony.*
[1516] Vol. 6, p. 1380, *Sanislow Testimony.*
[1517] Vol. 6, p. 1366, *Sanislow Testimony.*
[1518] Vol. 6, p. 1367, *Sanislow Testimony.*
[1519] Vol. 6, p. 1372, *Sanislow Testimony.*
[1520] Vol. 6, p. 1373, *Sanislow Testimony.*
[1521] Vol. 6, p. 1374, *Sanislow Testimony.*
[1522] Vol. 6, p. 1375, *Sanislow Testimony.*
[1523] Vol. 6, p. 1376, *Sanislow Testimony.*
[1524] Vol. 6, p. 1376 - 77, *Sanislow Testimony.*
[1525] Vol. 6, p. 1377, *Sanislow Testimony.*
[1526] Vol. 6, p. 1393, *Sanislow Testimony.*
[1527] Vol. 6, p. 1393-94, *Sanislow Testimony.*
[1528] Vol. 6, p. 1394, *Sanislow Testimony.*
[1529] Vol. 6, p. 1392, *Sanislow Testimony*; Exhibit 153, *Personality Assessment Inventory.*
[1530] Vol. 6, p. 1393, *Sanislow Testimony.*
[1531] Vol. 6, p. 1399, *Sanislow Testimony.*
[1532] Vol. 6, p. 1400, *Sanislow Testimony.*
[1533] Vol. 6, p. 1383, *Sanislow Testimony.*
[1534] Vol. 6, p. 1385, *Sanislow Testimony.*
[1535] Vol. 6, p. 1385, *Sanislow Testimony.*
[1536] Vol. 6, p. 1386, *Sanislow Testimony.*
[1537] Vol. 6, p. 1386, *Sanislow Testimony.*
[1538] Vol. 6, p. 1387, *Sanislow Testimony.*
[1539] Vol. 6, p. 1387, *Sanislow Testimony.*
[1540] Vol. 6, p. 1421, *Sanislow Testimony.*
[1541] Vol. 6, p. 1422, *Sanislow Testimony.*
[1542] Vol. 6, p. 1422-23, *Sanislow Testimony.*
[1543] Vol. 6, p. 1429, *Sanislow Testimony.*
[1544] Vol. 6, p. 1424, *Sanislow Testimony.*
[1545] Vol. 6, p. 1424, *Sanislow Testimony.*
[1546] Vol. 6, p. 1430, *Sanislow Testimony.*
[1547] Vol. 6, p. 1395, *Sanislow Testimony.*
[1548] Vol. 6, p. 1395, *Sanislow Testimony.*
[1549] Vol. 6, p. 1419, *Sanislow Testimony.*
[1550] Vol. 6, p. 1427, *Sanislow Testimony.*

[1551] Vol. 4, p. 1425, *Sanislow Testimony.*
[1552] Vol. 6, p. 1430, *Sanislow Testimony.*
[1553] Vol. 6, p. 1385, *Sanislow Testimony.*
[1554] Vol. 6, p. 1431, *Sanislow Testimony.*
[1555] Vol. 6, p. 1433, *Sanislow Testimony.*
[1556] Vol. 6, p. 1436, *Sanislow Testimony.*
[1557] Vol. 6, p. 1436, *Sanislow Testimony.*
[1558] Vol. 6, p. 1436, *Sanislow Testimony.*
[1559] Vol. 6, p. 1436, *Sanislow Testimony.*
[1560] Vol. 6, p. 1437, *Sanislow Testimony.*
[1561] Vol. 6, p. 1439, *Sanislow Testimony.*
[1562] Vol. 6, p. 1441, *Sanislow Testimony.*
[1563] Vol. 6, p. 1386, *Sanislow Testimony.*
[1564] Vol. 5, p. 1120, *Davatzikos Testimony.*
[1565] Vol. 5, p. 1131, *Announcement by USA; id.* at p. 1133, *Acceptance by Court.*
[1566] Vol. 5, p. 1132-33, *Davatzikos Testimony.*
[1567] Vol. 5, p. 1149, *Davatzikos Testimony.*
[1568] Vol. 5, p. 1130, *Davatzikos Testimony.*
[1569] Vol. 5, p. 1130, *Davatzikos Testimony.*
[1570] Vol. 5, p. 1164, *Davatzikos Testimony.*
[1571] Vol. 5, p. 1134, *Davatzikos Testimony.*
[1572] Vol. 5, p. 1157, *Davatzikos Testimony.*
[1573] Vol. 5, p. 1138, 1157, *Davatzikos Testimony.*
[1574] Vol. 5, p. 1149, *Davatzikos Testimony.*
[1575] Vol. 5, p. 1136, *Davatzikos Testimony.*
[1576] Vol. 5, p. 1137, *Davatzikos Testimony.*
[1577] Vol. 5, p. 1138, *Davatzikos Testimony.*
[1578] Vol. 5, p. 1148, *Davatzikos Testimony.*
[1579] Vol. 5, p. 1145, *Davatzikos Testimony.*
[1580] Vol. 5, p. 1145, *Davatzikos Testimony.*
[1581] Vol. 5, p. 1145, *Davatzikos Testimony.*
[1582] Vol. 5, p. 1146, *Davatzikos Testimony.*
[1583] Vol. 5, p. 1146-47, *Davatzikos Testimony.*
[1584] Vol. 5, p. 1148, *Davatzikos Testimony.*
[1585] Vol. 5, p. 1148, *Davatzikos Testimony.*
[1586] Vol. 5, p. 1150, *Davatzikos Testimony.*
[1587] Vol. 5, p. 1151, *Davatzikos Testimony.*
[1588] Vol. 5, p. 1152, 53, *Davatzikos Testimony.*
[1589] Vol. 5, p. 1157, *Davatzikos Testimony.*
[1590] Vol. 5, p. 1156, *Davatzikos Testimony.*

[1591] Vol. 5, p. 1156, *Davatzikos Testimony.*
[1592] Vol. 5, p. 1165, *Davatzikos Testimony.*
[1593] Vol. 5, p. 1157, *Davatzikos Testimony.*
[1594] Vol. 5, p. 1185, *Newberg Testimony.*
[1595] Vol. 5, p. 1193, *Newberg Testimony.*
[1596] Vol. 5, p. 1192, *Newberg Testimony.*
[1597] Vol. 5, p. 1191, *Newberg Testimony.*
[1598] Vol. 5, p. 1193, *Newberg Testimony.*
[1599] Vol. 5, p. 1194, *Newberg Testimony.*
[1600] Vol. 5, p. 1194, *Newberg Testimony.*
[1601] Vol. 5, p. 1197, *Newberg Testimony.*
[1602] Vol. 5, p. 1199, *Newberg Testimony.*
[1603] Vol. 5, p. 1212, *Newberg Testimony.*
[1604] Vol. 5, p. 1212, *Newberg Testimony.*
[1605] Vol. 5, p. 1216, *Newberg Testimony.*
[1606] Vol. 5, p. 1216, *Newberg Testimony.*
[1607] Vol. 5, p. 1218, *Newberg Testimony.*
[1608] Vol. 5, p. 1219, *Newberg Testimony.*
[1609] Vol. 5, p. 1220, *Newberg Testimony.*
[1610] Vol. 5, p. 1226, *Newberg Testimony.*
[1611] Vol. 5, p. 1227, *Newberg Testimony.*
[1612] Vol. 5, p. 1227, *Newberg Testimony.*
[1613] Vol. 5, p. 1228, *Newberg Testimony.*
[1614] Vol. 5, p. 1229, *Newberg Testimony.*
[1615] Vol. 5, p. 1229, *Newberg Testimony.*
[1616] Vol. 5, p. 1230, *Newberg Testimony.*
[1617] Vol. 5, p. 1233, *Newberg Testimony.*
[1618] Vol. 5, p. 1232, *Newberg Testimony.*
[1619] Vol. 5, p. 1233-34, *Newberg Testimony.*
[1620] Vol. 5, p. 1234, *Newberg Testimony.*
[1621] Vol. 5, p. 1235, *Newberg Testimony.*
[1622] Vol. 5, p. 1236, *Newberg Testimony.*
[1623] Vol. 8, p. 2028, *Gur Testimony.*
[1624] Vol. 8, p. 2029, *Gur Testimony.*
[1625] Exhibit 28, *Gur Combined Reports.*
[1626] Vol. 8, p. 2041, *Gur Testimony.*
[1627] Vol. 8, p. 2043, *Gur Testimony.*
[1628] Vol. 8, p. 2041, *Gur Testimony.*
[1629] Vol. 8, p. 2042, *Gur Testimony.*
[1630] Vol. 8, p. 2043, *Gur Testimony.*

[1631] Vol. 8, p. 2044, *Gur Testimony.*
[1632] Vol. 8, p. 2043, *Gur Testimony.*
[1633] Vol. 8, p. 2047, *Gur Testimony.*
[1634] Vol. 8, p. 2048, *Gur Testimony.*
[1635] Vol. 8, p. 2049, *Gur Testimony.*
[1636] Vol. 8, p. 2050, *Gur Testimony.*
[1637] Vol. 8, p. 2063, *Gur Testimony.*
[1638] Vol. 8, p. 2065, *Gur Testimony.*
[1639] Vol. 8, p. 2052, *Gur Testimony.*
[1640] Vol. 8, p. 2055, *Gur Testimony.*
[1641] Vol. 8, p. 2055, *Gur Testimony.*
[1642] Vol. 8, p. 2056, *Gur Testimony.*
[1643] Vol. 8, p. 2058, *Gur Testimony.*
[1644] Vol. 8, p. 2059, *Gur Testimony.*
[1645] Vol. 8, p. 2061, *Gur Testimony.*
[1646] Vol. 8, p. 2061, *Gur Testimony.*
[1647] Vol. 8, p. 2061, *Gur Testimony.*
[1648] Vol. 8, p. 2066, *Gur Testimony.*
[1649] Vol. 8, p. 2067, *Gur Testimony.*
[1650] Vol. 8, p. 2067, *Gur Testimony.*
[1651] Vol. 8, p. 2068, *Gur Testimony.*
[1652] Vol. 8, p. 2069, *Gur Testimony.*
[1653] Vol. 8, p. 2069, *Gur Testimony.*
[1654] Vol. 8, p. 2069, *Gur Testimony.*
[1655] Vol. 8, p. 2070, *Gur Testimony.*
[1656] Crim. D.E. 243, p.2.
[1657] Vol. 8, p. 2070, *Gur Testimony.*
[1658] Vol. 8, p. 2070, *Gur Testimony.*
[1659] Vol. 8, p. 2071, *Gur Testimony.*
[1660] Vol. 8, p. 2072, *Gur Testimony.*
[1661] Vol. 8, p. 2072, *Gur Testimony.*
[1662] Vol. 8, p. 2073, *Gur Testimony.*
[1663] Vol. 8, p. 2073, *Gur Testimony.*
[1664] Vol. 8, p. 2073, *Gur Testimony.*
[1665] Vol. 8, p. 2080, *Gur Testimony.*
[1666] Vol. 8, p. 2082, *Gur Testimony.*
[1667] Vol. 8, p. 2081, *Gur Testimony.*
[1668] Vol. 8, p. 2083, *Gur Testimony.*
[1669] Vol. 8, p. 2083, *Gur Testimony.*
[1670] Vol. 8, p. 2084 - 85, *Gur Testimony.*

[1671] Vol. 8, p. 2086, *Gur Testimony.*
[1672] Vol. 8, p. 2087, *Gur Testimony.*
[1673] Vol. 8, p. 2090, *Gur Testimony.*
[1674] Vol. 8, p. 2091, *Gur Testimony.*
[1675] Vol. 8, p. 2091, *Gur Testimony.*
[1676] Vol. 8, p. 2092, *Gur Testimony.*
[1677] Vol. 8, p. 2093, *Gur Testimony.*
[1678] Vol. 8, p. 2095, *Gur Testimony.*
[1679] Exhibit 36, p. 8, *Ramachandran Deposition.*
[1680] Exhibit 36, p. 8, *Ramachandran Deposition.*
[1681] Exhibit 36, p. 9, *Ramachandran Deposition.*
[1682] Exhibit 36, p. 33, *Ramachandran Deposition.*
[1683] Exhibit 36, p. 11, *Ramachandran Deposition*.
[1684] Exhibit 36, p. 16, *Ramachandran Deposition.*
[1685] Exhibit 36, p. 12, *Ramachandran Deposition.*
[1686] Exhibit 36, p. 14, *Ramachandran Deposition.*
[1687] Exhibit 36, p. 15, *Ramachandran Deposition.*
[1688] Exhibit 36, p. 12, *Ramachandran Deposition.*
[1689] Exhibit 36, p. 14, *Ramachandran Deposition.*
[1690] Exhibit 36, p. 16, *Ramachandran Deposition.*
[1691] Exhibit 36, p. 34, *Ramachandran Deposition.*
[1692] Exhibit 36, p. 17, *Ramachandran Deposition.*
[1693] Exhibit 36, p. 17, *Ramachandran Deposition.*
[1694] Exhibit 36, p. 18, *Ramachandran Deposition.*
[1695] Exhibit 36, p. 18, *Ramachandran Deposition.*
[1696] Exhibit 36, p. 18, *Ramachandran Deposition.*
[1697] Exhibit 36, p. 19. *Ramachandran Deposition.*
[1698] Exhibit 36, p. 19, *Ramachandran Deposition.*
[1699] Exhibit 36, p. 19, *Ramachandran Deposition.*
[1700] Exhibit 36, p. 27, *Ramachandran Deposition.*
[1701] Exhibit 36, p. 20, *Ramachandran Deposition.*
[1702] Exhibit 36, p. 22, *Ramachandran Deposition.*
[1703] Exhibit 36, p. 22, *Ramachandran Deposition.*
[1704] Exhibit 36, p. 28, *Ramachandran Deposition.*
[1705] Vol. 6, p. 1570,*Waller Testimony*; Exhibit 1-283, *3/1/2007 Kidwell Memo*
[1706] See, Exhibit 10, p. 6, *Kidwell Declaration.*
[1707] Exhibit 10, *Kidwell Declaration* (stipulated by the government as Mr. Kidwell's testimony).
[1708] Vol. 6, p. 1568-1569,*Waller Testimony;* Exhibit 1-283, *3/10/2007 Kidwell Memo.*



Appellate Case: 17-1716 Page: 929 Date Filed: 11/01/2017 Entry ID: 4596229

[1709] Vol. 6, p. 1589-1705, *Porterfield Testimony*; Exhibit 7, *Porterfield Declaration*, Exhibit 8, *Porterfield Supplemental Declaration;* Exhibit 155, *Porterfield PowerPoint.*
[1710] Exhibit 155, *Porterfield PowerPoint* at Slide 1 (Summary of Conclusions)
[1711] *See* Exhibit 1, *Biopsychosocial.*
[1712] Vol. 6, p. 1464-65, *Vogelsang Testimony.*
[1713] Vol. 4, p. 837, *Freedman Testimony*; Vol. 1, p. 99-100, *Stetler Testimony.*
[1714] Vol. 6, p. 1469, *Vogelsang Testimony.*
[1715] Vol. 4, p. 1490, *Objection by the USA.*
[1716] Vol. 4, p. 1490, *Objection by the USA* ("it's all sourced back").
[1717] Vol. 6, p. 1467, *Vogelsang Testimony.*
[1718] Vol. 6, p. 1466, *Vogelsang Testimony.*
[1719] Vol. 6, p. 1467, *Vogelsang Testimony.*
[1720] Vol. 6, p. 1468, *Vogelsang Testimony.*
[1721] Exhibit 154, *Biopsychosocial PowerPoint* at slides 2-5.
[1722] Vol. 6, p. 1474, *Vogelsang Testimony.*
[1723] Vol. 6, p. 1475, *Vogelsang Testimony.*
[1724] Vol. 6, p. 1475 -76, *Vogelsang Testimony.*
[1725] Vol. 6, p. 1476, *Vogelsang Testimony.*
[1726] Exhibit 1-1, *Hedberg Declaration.*
[1727] Exhibit 154, *Biopsychosocial PowerPoint* at slide 7.
[1728] Exhibit 154, *Biopsychosocial PowerPoint* at slide 7; Vol. 6, p. 1477, *Vogelsang Testimony.*
[1729] Vol. 6, p. 1478, *Vogelsang Testimony.*
[1730] Exhibit 154, *Biopsychosocial PowerPoint* at slide 17 (citing Exhibit 1-255, *Judy Shaughnessy Interview*).
[1731] Vol. 6, p. 1479, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 17 (citing Exhibit 1-103, *Judy Shaughnessy Interview*).
[1732] Vol. 6, p. 1480, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial. PowerPoint* at slide 11 (showing Exhibit 1-262, *Santa Rosa Medical Center Records*).
[1733] Vol. 6, p. 1479, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 10 (showing Exhibit 1-262, *Santa Rosa Medical Center Records*).
[1734] Vol. 6, p. 1480, *Vogelsang Testimony.*
[1735] Vol. 6, p. 1480, *Vogelsang Testimony.*
[1736] Vol. 6, p. 1481, *Vogelsang Testimony.*
[1737] Vol. 6, p. 1481, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 13 (noting Mr. Alexander's medical records show that he has at times believed he is the President's dog).

[1738] Vol. 6, p. 1481 - 82, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 14.
[1739] Vol. 6, p. 1482, *Vogelsang Testimony.*
[1740] Vol. 6, p. 1482, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 14 (showing Exhibit 1-58, *Kansas DOC Mental Health Exam*).
[1741] Exhibit 154, *Biopsychosocial PowerPoint* at slide 16 (showing Exhibit 1-41, *Tommy Kleiner Declaration*); *see also*, Exhibit 142, p.4, *Tommy Kleiner Deposition* (testifying that he is on Risperdal); *id*. at p. 28 (the Risperdal is for anger issues and "mood swings"); *id*. at p. 32 (also has taken Depakote).
[1742] Vol. 6, p. 1468, *Vogelsang Testimony* ("the kind of experiences that [the parents] had in their own childhoods, the way in which they were parented, the environment they lived in and how it shaped them has a significant and critical impact on the way they look at and raise their own children").
[1743] Vol. 6, p. 1483, *Vogelsang Testimony.*
[1744] Vol. 6, p. 1483, *Vogelsang Testimony.*
[1745] Vol. 6, p. 1483, *Vogelsang Testimony.*
[1746] Exhibit 154, *Biopsychosocial PowerPoint* at slide 20 (citing Exhibit Nos. 1-114, 1-2, 1-21, 1-105); Exhibit 154, *Biopsychosocial PowerPoint* at slide 20 (citing Exhibit Nos. 1-114, *Stadler Declaration,* 1-2, *Rickert Declaration,* 1-21, *Figg Declaration*, 1-105 *Carl James Boman Declaration*).
[1747] Exhibit 154, *Biopsychosocial PowerPoint* at slide 20 (citing Exhibit Nos. 1-114, 1-2, 1-21, 1-105).
[1748] Vol. 6, p. 1483, *Vogelsang Testimony.*
[1749] Vol. 6, p. 1484, *Vogelsang Testimony.*
[1750] Vol. 6, p. 1484, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 21 (citing Exhibit 1-285, *Barabash Declaration*).
[1751] Vol. 6, p. 1487, *Vogelsang Testimony.*
[1752] Vol. 6, p. 1488, *Vogelsang Testimony.*
[1753] Vol. 6, p. 1488, *Vogelsang Testimony.*
[1754] Vol. 6, p. 1488, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slides 25-29 (showing, Exhibit 1-7 *Patterson's military records*).
[1755] Exhibit 154, *Biopsychosocial PowerPoint* at slide 30.
[1756] Vol. 6, p. 1495, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 33.
[1757] Vol. 6, p. 1496, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 35.
[1758] Vol. 6, p. 1496, *Vogelsang Testimony.*
[1759] Vol. 6, p. 1496, *Vogelsang Testimony.*
[1760] Vol. 6, p. 1497, *Vogelsang Testimony.*



Appellate Case: 17-1716 Page: 931 Date Filed: 11/01/2017 Entry ID: 4596229

[1761] Vol. 6, p. 1497, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 38.
[1762] Vol. 6, p. 1498, *Vogelsang Testimony.*
[1763] Vol. 6, p. 1498, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 38 (quoting Exhibit Nos. 1-2, 1-31).
[1764] Vol. 6, p. 1500, *Vogelsang Testimony.*
[1765] Vol. 6, p. 1500, *Vogelsang Testimony.*
[1766] Vol. 6, p. 1500, *Vogelsang Testimony.*
[1767] Vol. 6, p. 1501, *Vogelsang Testimony.*
[1768] Vol 6, p. 1492, *Objection of Counsel Noted.*
[1769] Vol. 6, p. 1468, *Vogelsang Testimony.*
[1770] Vol. 6, p. 1468, *Vogelsang Testimony.*
[1771] Vol. 6, p. 1468, *Vogelsang Testimony.*
[1772] Exhibit 154, *Biopsychosocial PowerPoint* at slides 39-41; 65-69; 111-127.
[1773] Exhibit 154, *Biopsychosocial PowerPoint* at slide 111.
[1774] Exhibit 1, p. 99, *Biopsychosocial.*
[1775] Vol. 6, p. 1501, *Vogelsang Testimony.*
[1776] Vol. 6, p. 1502, *Vogelsang Testimony.*
[1777] Vol. 6, p. 1504, *Vogelsang Testimony.*
[1778] Vol. 6, p. 1504, *Vogelsang Testimony.*
[1779] Vol. 6, p. 1508, *Vogelsang Testimony* (providing the Court with references to scholarship by Dr. James Garbarino, No Place to Be a Child; Dr. Evan Stark; Dr. Pearman, and Kathy Whelan).
[1780] Vol. 6, p. 1510, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 75.
[1781] Exhibit 154, *Biopsychosocial PowerPoint* at slide 76 (quoting Exhibit 14, *Declaration of Linda Baker*).
[1782] Vol. 6, p. 1510-11, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 77 (reflecting Exhibit 12, *Gann Declaration*).
[1783] Exhibit 1 at p. 69-70, *Biopsychosocial* (though Ms. Vogelsang did not testify to this information, as the government stipulated to her report as if it were her testimony, the details from her report are included here).
[1784] Exhibit 154, *Biopsychosocial PowerPoint* at slide 71 (quoting Exhibit 1-37, *Patty Baldwin FBI 302*); Exhibit 1 at p. 71, *Biopsychosocial* (specifying that at times the girls were handed two-by-fours with which to hit one another).
[1785] Vol. 6, p. 1517, *Vogelsang Testimony.*
[1786] Vol. 6, p. 1522, *Vogelsang Testimony.*
[1787] Exhibit 154, *Biopsychosocial PowerPoint* at slide 105 (quoting Exhibit 1-31, *Teddy Kleiner Declaration*).

[1788] Vol. 6, p. 1523, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 107 (reflecting Exhibit 1-31, *Teddy Kleiner Declaration*).
[1789] Vol. 6, p. 1512, *Vogelsang Testimony.*
[1790] Vol. 6, p. 1512, *Vogelsang Testimony.*
[1791] Vol. 6, p. 1512, *Vogelsang Testimony.*
[1792] Vol. 6, p. 1512, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 80 (quoting Exhibit 10, *Kidwell Declaration*).
[1793] Vol. 6, p. 1513, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 80 (quoting Exhibit 10, *Kidwell Declaration*).
[1794] Vol. 6, p. 1512, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 81 (quoting Exhibit 10, *Kidwell Declaration*).
[1795] Vol. 6, p. 1514, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 80 (quoting Exhibit 1-31, *Teddy Kleiner Declaration).*
[1796] Vol. 6, p. 1514, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 83 (quoting Exhibit 1-284, *Carl Boman Declaration).*
[1797] Vol. 6, p. 1515, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 84 (quoting Exhibit 17, *Kleiner v. Kleiner*).
[1798] Vol. 6, p. 1515, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 81 (quoting Exhibit 10, *Kidwell Declaration*).
[1799] Vol. 6, p. 1516, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 86 (Exhibit 1-39, *Kleiner v. Kleiner Divorce Transcript*).
[1800] Vol. 6, p. 1516, *Vogelsang Testimony.*
[1801] Vol. 6, p. 1516, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 86 (quoting Exhibit 1-31, *Teddy Kleiner Declaration.*
[1802] Vol. 6, p. 1516-17, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 88 (Exhibit 1-39, *Kleiner v. Kleiner Divorce Transcript*).
[1803] Vol. 6, p. 1516-17, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 88 (Exhibit 1-39, *Kleiner v. Kleiner Divorce Transcript*, and reflecting that Judy only left Jack when he "took a fist after my daughter Patti").
[1804] Vol. 6, p. 1518, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 89 (Exhibit 1-102, *Counseling Records*).
[1805] Vol. 6, p. 1518, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 88 (Exhibit 1-102, *Counseling Records*).
[1806] Vol. 6, p. 1518, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 93 (Exhibit 1-102, *Counseling Records*).
[1807] Vol. 6, p. 1518, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 94 (Exhibit 1-102, *Counseling Records*, noting "family completed legal process and was not interested in treatment").
[1808] Vol. 6, p. 1519, *Vogelsang Testimony.*
[1809] Vol. 6, p. 1519, *Vogelsang Testimony.*

[1810] Vol. 6, p. 1520, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 98 (photograph of Lisa at 17 with short hair).
[1811] Vol. 6, p. 1521, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 99 (Exhibit 1-88, *Mary Osborne Hodges Declaration*).
[1812] Vol. 6, p. 1521, *Vogelsang Testimony.*
[1813] Vol. 6, p. 1521- 22, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 100.
[1814] Exhibit 1, p. 90, *Biopsychosocial.*
[1815] Vol. 6, p. 1524, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 102 (Exhibit 1-98, *Nita Milburn Montgomery Declaration*).
[1816] Vol. 6, p. 1524, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 103 (reflecting Exhibit 1-504, Enlistment Records).
[1817] Vol. 6, p. 1524, *Vogelsang Testimony.*
[1818] Vol. 6, p. 1526, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 109 (chart of children born to Lisa Montgomery).
[1819] Vol. 6, p. 1526, *Vogelsang Testimony*; Exhibit 154, *Biopsychosocial PowerPoint* at slide 77 (reflecting Exhibit 12, *Gann Declaration*).
[1820] Vol. 6, p. 1527-28, *Vogelsang Testimony.*
[1821] Vol. 6, p. 1528-29, *Vogelsang Testimony.*
[1822] Exhibit 1, p. 96-97, *Biopsychosocial.*
[1823] Exhibit 1, p. 97-98, *Biopsychosocial.*
[1824] Exhibit 1, p. 98, *Biopsychosocial.*
[1825] Exhibit 1, p. 98, *Biopsychosocial.*
[1826] Exhibit 1, pps. 3, 8, 42, 83, 96, 113, 115, 175, *Biospychosocial*.
[1827] Exhibit 1, p. 100, *Biopsychosocial* (quoting Exhibit 1-105, *Carl James Boman Declaration*).
[1828] Exhibit 1, p. 104, *Biopsychosocial.*
[1829] Exhibit 1, p. 104, *Biopsychosocial.*
[1830] Exhibit 1, p. 104, *Biopsychosocial.*
[1831] Exhibit 1, p. 114, *Biopsychosocial.*
[1832] Exhibit 1, p. 114, *Biopsychosocial.*
[1833] *See also*, Exhibit 154, *Biopsychosocial PowerPoint* at slide 133 (chart of Family Pattern of Interference with Parental Custody Continues) (setting out each interference with child custody).
[1834] Exhibit 1, p. 178, *Biopsychosocial.*
[1835] Exhibit 1, p. 105, *Biopsychosocial.*
[1836] Exhibit 1, p. 95, *Biopsychosocial.*
[1837] Exhibit 1, p. 7, *Vogelsang Supplemental Declaration.*
[1838] Exhibit 154, *Biopsychosocial PowerPoint* at slide 131.
[1839] Exhibit 1-31, *Teddy Kleiner Declaration.*



Appellate Case: 17-1716 Page: 934 Date Filed: 11/01/2017 Entry ID: 4596229

[1840] Exhibit 1, p. 105, *Biopsychosocial* (quoting Exhibit 1-31, *Carl James Boman Declaration*).
[1841] Exhibit 154, *Biopsychosocial PowerPoint* at slide 129.
[1842] Exhibit 154, *Biopsychosocial PowerPoint* at slide 130.
[1843] Exhibit 1, p. 112, *Biopsychosocial* (citing Exhibit 1-148, *Order Authorizing Disclosure of Records Under Protective Order,* Case No. JMI 2013) (of note, these records were not obtained by trial counsel).
[1844] Exhibit 1, p. 112, *Biopsychosocial* (citing Exhibit 1-135, *C.J. Boman, Children's Hospital, San Diego*, 1-25-1991).
[1845] Exhibit 1, p. 113, *Biopsychosocial* (citing Exhibit 1-151, *Kayla Boman, Jane Phillips Memorial Medical Center*, 4-23-1993).
[1846] Exhibit 1, p. 111, *Biopsychosocial* (citing Exhibit 1-148, *Order Authorizing Disclosure of Records Under Protective Order*, Case No. JMI 2013) (of note, these records were not obtained by trial counsel).
[1847] Exhibit 1, p. 109, *Biopsychosocial* (citing Exhibit 1-105, *Carl James Boman Declaration*).
[1848] Exhibit 1, p. 6, *Vogelsang Supplemental Declaration.*
[1849] Exhibit 1, p. 112, *Biopsychosocial.*
[1850] Exhibit 1, p. 122, *Biopsychosocial.*
[1851] Exhibit 1, p. 122, *Biopsychosocial.*
[1852] Exhibit 1, p. 7, *Vogelsang Supplemental Declaration.*
[1853] Exhibit 1, p. 7, *Vogelsang Supplemental Declaration.*
[1854] *See*, Exhibit 154, *Biopsychosocial PowerPoint* at slide 140 (chart of Lisa's fictious pregnancies).
[1855] Exhibit 1, p. 117, *Biopsychosocial.*
[1856] Exhibit 1, p. 117, *Biopsychosocial.*
[1857] Exhibit 1, p. 117, *Biopsychosocial*; (citing Exhibit 1-2, *Rickert Declaration*).
[1858] Exhibit 1, p. 117, *Biopsychosocial.*
[1859] Exhibit 1, p. 142, *Biopsychosocial* (quoting Exhibit 1-197, *Vanita June Boman Declaration*).
[1860] Exhibit 1, p. 147, *Biopsychosocial.*
[1861] Exhibit 1, p. 148, *Biopsychosocial.*
[1862] Exhibit 1, p. 9, *Vogelsang Supplemental Declaration* (quoting Exhibit 1-276, *Dustin Montgomery Declaration*).
[1863] Exhibit 1, p. 9, *Vogelsang Supplemental Declaration.*
[1864] Exhibit 1, p. 17, *Vogelsang Supplemental Declaration.*
[1865] Exhibit 1, p. 128, *Biopsychosocial.*
[1866] Exhibit 1, p. 3, *Vogelsang Supplemental Declaration.*
[1867] Exhibit 1, p. 4, *Vogelsang Supplemental Declaration.*



Appellate Case: 17-1716 Page: 935 Date Filed: 11/01/2017 Entry ID: 4596229

[1868] Exhibit 1, p. 142, *Biopsychosocial* (quoting Exhibit 1-219, *Justin Kleiner, Case Activity Log for Monthly Family Contact*, 12-20-2004.).
[1869] Exhibit 1, p. 142, *Biopsychosocial* (quoting Exhibit 1-54, *Ninemire interview with Teddy Kleiner*, 1-22-2005; Exhibit 1-2, *Rickert Declaration*; Exhibit 1- 19, *Treibs Declaration*).
[1870] Exhibit 1, p. 165, *Biopsychosocial* (quoting Exhibit 1-2, *Rickert Declaration.*
[1871] Exhibit 1, p. 5, *Vogelsang Supplemental Declaration.*
[1872] Exhibit 1, p. 5, *Vogelsang Supplemental Declaration.*
[1873] Exhibit 1, p. 9, *Vogelsang Supplemental Declaration* (quoting Exhibit 1-276, *Dustin Montgomery Declaration*).
[1874] Exhibit 154, *Biopsychosocial PowerPoint* at slide 139 ("The Stressors in Lisa's Life Become Overwhelming").
[1875] Exhibit 1, p. 164, *Biopsychosocial.*
[1876] Exhibit 1, p. 177, *Biopsychosocial.*
[1877] Exhibit 1, p. 178-80, *Biopsychosocial.*
[1878] Vol. 7, p, 1589, *Porterfield Testimony.*
[1879] Vol. 7, p. 1589, *Porterfield Testimony.*
[1880] Vol. 7, p, 1589, *Porterfield Testimony.*
[1881] Vol. 7, p, 1589, *Porterfield Testimony.*
[1882] Vol. 7, p, 1640, *Porterfield Testimony.*
[1883] Exhibit 8, *Porterfield Supplemental Declaration.*
[1884] Exhibit 8, p.1, *Porterfield Supplemental Declaration.*
[1885] Exhibit 8, p.3, *Porterfield Supplemental Declaration.*
[1886] Exhibit 8, p.3, *Porterfield Supplemental Declaration.*
[1887] Exhibit 8, p.3, *Porterfield Supplemental Declaration.*
[1888] Exhibit 8, p.6, *Porterfield Supplemental Declaration.*
[1889] Exhibit 8, p.6, *Porterfield Supplemental Declaration.*
[1890] Exhibit 8, p.3, *Porterfield Supplemental Declaration.*
[1891] Vol. 7, p, 1641, *Porterfield Testimony.*
[1892] Vol. 7, p, 1642, *Porterfield Testimony.*
[1893] Vol. 7, p, 1642, *Porterfield Testimony.*
[1894] Vol. 7, p, 1645-46, *Porterfield Testimony.*
[1895] Vol. 7, p, 1646, *Porterfield Testimony*; Exhibit 155, *Porterfield PowerPoint* at Slide 8.
[1896] Vol. 7, p, 1647, *Porterfield Testimony*; Exhibit 155, *Porterfield PowerPoint* at Slide 9-11.
[1897] Vol. 7, p, 1648-49, *Porterfield Testimony.*
[1898] Vol. 7, p, 1649, *Porterfield Testimony.*
[1899] Vol. 7, p, 1649 - 50, *Porterfield Testimony.*



Appellate Case: 17-1716 Page: 936 Date Filed: 11/01/2017 Entry ID: 4596229

[1900] Vol. 7, p, 1651, *Porterfield Testimony; see also,* Vol. 4, p. 874-76, *Fucetola Testimony* (testifying that there is an exceptionally rare 29 point differential between Mrs. Montgomery's performance and verbal IQ).
[1901] Vol. 7, p, 1651, *Porterfield Testimony* (internal quotation marks added for clarity).
[1902] Vol. 7, p, 1651, *Porterfield Testimony.*
[1903] Vol. 7, p, 1652, *Porterfield Testimony.*
[1904] Vol. 7, p, 1653, *Porterfield Testimony.*
[1905] Vol. 7, p, 1656, *Porterfield Testimony.*
[1906] Vol. 7, p, 1657, *Porterfield Testimony*.
[1907] Vol. 7, p, 1657, *Porterfield Testimony*; Exhibit 155, *Porterfield PowerPoint* at Slide 20-22.
[1908] Vol. 7, p, 1664, *Porterfield Testimony.*
[1909] Exhibit 155, *Porterfield PowerPoint* at Slide 22.

[1910] Vol. 7, p, 1658 -59, *Porterfield Testimony*.
[1911] Vol. 7, p, 1667, *Porterfield Testimony.*
[1912] Exhibit 155, *Porterfield PowerPoint* at Slide 34-36.
[1913] Vol. 7, p, 1671, *Porterfield Testimony.*
[1914] Exhibit 155, *Porterfield PowerPoint* at Slide 23-33; Vol. 7, p, 1669-80, *Porterfield Testimony.*
[1915] Vol. 7, p. 1670, *Porterfield Testimony.*
[1916] Vol. 7, p, 1677, *Porterfield Testimony.*
[1917] Vol. 7, p, 1674, *Porterfield Testimony.*
[1918] Vol. 7, p, 1673, *Porterfield Testimony.*
[1919] Vol. 7, p, 1678, *Porterfield Testimony.*
[1920] Vol. 7, p, 1680, *Porterfield Testimony.*
[1921] Vol. 7, p, 1681, *Porterfield Testimony.*
[1922] Vol. 7, p, 1674, *Porterfield Testimony.*
[1923] Vol. 7, p, 1675, *Porterfield Testimony.*
[1924] Vol. 7, p, 1675, *Porterfield Testimony.*
[1925] Vol. 7, p, 1676, *Porterfield Testimony.*
[1926] Exhibit 8, p.4 - 5, *Porterfield Supplemental Declaration.*
[1927] Vol. 7, p, 1704-05, *Porterfield Testimony.*
[1928] Vol. 7, p, 1682, *Porterfield Testimony.*
[1929] Vol. 7, p, 1685 - 86, *Porterfield Testimony.*
[1930] Vol. 7, p, 1687, *Porterfield Testimony.*
[1931] Vol. 7, p, 1692, *Porterfield Testimony.*
[1932] Vol. 7, p, 1692, *Porterfield Testimony.*
[1933] Vol. 7, p, 1688, *Porterfield Testimony.*



Appellate Case: 17-1716 Page: 937 Date Filed: 11/01/2017 Entry ID: 4596229

[1934] Vol. 7, p, 1689, *Porterfield Testimony.*
[1935] Vol. 7, p, 1689 - 90, *Porterfield Testimony.*
[1936] Vol. 7, p, 1692, *Porterfield Testimony.*
[1937] Vol. 7, p, 1694, *Porterfield Testimony.*
[1938] Vol. 7, p, 1693, *Porterfield Testimony.*
[1939] Vol. 7, p, 1683, *Porterfield Testimony.*
[1940] Vol. 7, p. 1714, *Admission of Expert Nadkarni Testimony.*
[1941] Vol. 7, p. 1715, *Admission of Expert Nadkarni Testimony.*
[1942] Vol. 7, p. 1715, *Nadkarni Testimony* (referencing Exhibit 23, *Nadkarni Report*, listing documents he reviewed).
[1943] Vol. 7, p. 1715, *Nadkarni Testimony.*
[1944] Vol. 7, p. 1716, *Nadkarni Testimony.*
[1945] Vol. 7, p. 1717, *Nadkarni Testimony.*
[1946] Vol. 7, p. 1742, *Nadkarni Testimony.*
[1947] Vol. 7, p. 1717, *Nadkarni Testimony.*
[1948] Vol. 7, p. 1719-25, *Nadkarni Testimony.*
[1949] Vol. 7, p. 1725, *Nadkarni Testimony.*
[1950] Vol. 7, p. 1724, *Nadkarni Testimony.*
[1951] Vol. 7, p. 1724, *Nadkarni Testimony.*
[1952] Vol. 7, p. 1725, *Nadkarni Testimony.*
[1953] Vol. 7, p. 1726, *Nadkarni Testimony.*
[1954] Vol. 7, p. 1726, *Nadkarni Testimony.*
[1955] Vol. 7, p. 1726, *Nadkarni Testimony.*
[1956] Vol. 7, p. 1727, *Nadkarni Testimony.*
[1957] Vol. 7, p. 1728, *Nadkarni Testimony.*
[1958] Vol. 7, p. 1728, *Nadkarni Testimony.*
[1959] Vol. 7, p. 1744, *Nadkarni Testimony.*
[1960] Vol. 7, p. 1745, *Nadkarni Testimony.*
[1961] Vol. 7, p. 1729, *Nadkarni Testimony.*
[1962] Vol. 7, p. 1729, *Nadkarni Testimony.*
[1963] Vol. 7, p. 1730-31, *Nadkarni Testimony.*
[1964] Vol. 7, p. 1724, *Nadkarni Testimony.*
[1965] Vol. 7, p. 1731, *Nadkarni Testimony.*
[1966] Vol. 7, p. 1731, *Nadkarni Testimony.*
[1967] Vol. 7, p. 1732, *Nadkarni Testimony.*
[1968] Vol. 7, p. 1732, *Nadkarni Testimony.*
[1969] Vol. 7, p. 1734, *Nadkarni Testimony.*
[1970] Vol. 7, p. 1734, *Nadkarni Testimony.*
[1971] Vol. 7, p. 1733, *Nadkarni Testimony.*
[1972] Vol. 7, p. 1735, *Nadkarni Testimony.*



Appellate Case: 17-1716 Page: 938 Date Filed: 11/01/2017 Entry ID: 4596229

[1973] Vol. 7, p. 1718, *Nadkarni Testimony*.
[1974] Vol. 7, p. 1735, *Nadkarni Testimony*.
[1975] Vol. 7, p. 1736, *Nadkarni Testimony*.
[1976] Vol. 7, p. 1737, *Nadkarni Testimony*.
[1977] Vol. 7, p. 1737, *Nadkarni Testimony*.
[1978] Vol. 7, p. 1737, *Nadkarni Testimony*.
[1979] Vol. 7, p. 1738, *Nadkarni Testimony*.
[1980] Vol. 7, p. 1739, *Nadkarni Testimony*.
[1981] Vol. 7, p. 1727, *Nadkarni Testimony*.
[1982] Vol. 7, p. 1727, *Nadkarni Testimony*.
[1983] Vol. 7, p. 1750-51, *Woods Testimony*.
[1984] Vol. 7, p. 1756, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slides 2-5.
[1985] Vol. 7, p. 1759, *Woods Testimony*.
[1986] Vol. 7, p. 1759, *Woods Testimony*.
[1987] Vol. 7, p. 1760, *Woods Testimony*.
[1988] Vol. 7, p. 1759, *Woods Testimony*.
[1989] Vol. 7, p. 1761, *Woods Testimony*.
[1990] Vol. 7, p. 1762, *Woods Testimony*.
[1991] Vol. 7, p. 1762, *Woods Testimony*.
[1992] Vol. 7, p. 1761, *Woods Testimony*.
[1993] Vol. 7, p. 1766; 1791, *Woods Testimony*.
[1994] Exhibit 159, *Woods PowerPoint* at slide 27.
[1995] Vol. 7, p. 1789, *Woods Testimony*.
[1996] Vol. 7, p. 1790, *Woods Testimony*.
[1997] Vol. 7, p. 1790, *Woods Testimony*.
[1998] Vol. 7, p. 1790, *Woods Testimony*.
[1999] Vol. 7, p. 1787, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slide 25.
[2000] Vol. 7, p. 1787, *Woods Testimony*.
[2001] Vol. 7, p. 1787, *Woods Testimony*.
[2002] Vol. 7, p. 1789, *Woods Testimony*.
[2003] Vol. 7, p. 1782, *Woods Testimony*.
[2004] Vol. 7, p. 1760, *Woods Testimony*.
[2005] Vol. 7, p. 1760, *Woods Testimony*.
[2006] Vol. 7, p. 1761, *Woods Testimony*.
[2007] Vol. 7, p. 1759, *Woods Testimony*.
[2008] Vol. 7, p. 1820, *Woods Testimony*.
[2009] Exhibit 159, *Woods PowerPoint* at slide 64-65.
[2010] Vol. 7, p. 1822, *Woods Testimony*.
[2011] Exhibit 159, *Woods PowerPoint* at slide 70; Vol. 7, p. 1823, *Woods Testimony*.

[2012] Vol. 7, p. 1777, *Woods Testimony.*
[2013] Vol. 7, p. 1778, *Woods Testimony.*
[2014] Vol. 7, p. 1776, *Woods Testimony.*
[2015] Exhibit 159, *Woods PowerPoint* at slide 28.
[2016] Vol. 7, p. 1791, *Woods Testimony.*
[2017] Vol. 7, p. 1792, *Woods Testimony.*
[2018] Vol. 7, p. 1792, *Woods Testimony.*
[2019] Vol. 7, p. 1792, *Woods Testimony.*
[2020] Vol. 7, p. 1792, *Woods Testimony.*
[2021] Vol. 7, p. 1792, *Woods Testimony.*
[2022] Vol. 7, p. 1792-93, *Woods Testimony.*
[2023] Vol. 7, p. 1793, *Woods Testimony.*
[2024] Vol. 7, p. 1793, *Woods Testimony.*
[2025] Vol. 7, p. 1794, *Woods Testimony.*
[2026] Vol. 7, p. 1794, *Woods Testimony.*
[2027] Vol. 7, p. 1800, *Woods Testimony.*
[2028] Vol. 7, p. 1800, *Woods Testimony.*
[2029] Exhibit 159, *Woods PowerPoint* at slide 39.
[2030] Vol. 7, p. 1763, *Woods Testimony.*
[2031] Vol. 7, p. 1793, *Woods Testimony.*
[2032] Vol. 7, p. 1781, 96, 1820,*Woods Testimony.*
[2033] Vol. 7, p. 1764-65, *Woods Testimony.*
[2034] Vol. 7, p. 1765, *Woods Testimony.*
[2035] Vol. 7, p. 1765, *Woods Testimony.*
[2036] Vol. 7, p. 1766, *Woods Testimony.*
[2037] Vol. 7, p. 1766, *Woods Testimony.*
[2038] Vol. 7, p. 1773, *Woods Testimony.*
[2039] Vol. 7, p. 1773, *Woods Testimony.*
[2040] Vol. 7, p. 1767, *Woods Testimony.*
[2041] Vol. 7, p. 1795, *Woods Testimony.*
[2042] Vol. 7, p. 1795, *Woods Testimony.*
[2043] Vol. 7, p. 1796, *Woods Testimony.*
[2044] Vol. 7, p. 1797, *Woods Testimony.*
[2045] Vol. 7, p. 1796, *Woods Testimony.*
[2046] Vol. 7, p. 1768, *Woods Testimony.*
[2047] Vol. 7, p. 1779-80, *Woods Testimony.*
[2048] Vol. 7, p. 1781, *Woods Testimony.*
[2049] Vol. 7, p. 1782, *Woods Testimony.*
[2050] Vol. 7, p. 1784, *Woods Testimony.*
[2051] Vol. 7, p. 1785, *Woods Testimony.*

[2052] Vol. 7, p. 1786, *Woods Testimony.*
[2053] Vol. 7, p. 1786, *Woods Testimony.*
[2054] Vol. 7, p. 1786, *Woods Testimony.*
[2055] Vol. 7, p. 1771, *Woods Testimony.*
[2056] Vol. 7, p. 1771-72, *Woods Testimony.*
[2057] Vol. 7, p. 1772, *Woods Testimony.*
[2058] Vol. 7, p. 1775, *Woods Testimony.*
[2059] Vol. 7, p. 1803, *Woods Testimony.*
[2060] Vol. 7, p. 1803, *Woods Testimony.*
[2061] Vol. 7, p. 1804, *Woods Testimony.*
[2062] Vol. 7, p. 1805, *Woods Testimony.*
[2063] Vol. 7, p. 1805, *Woods Testimony.*
[2064] Vol. 7, p. 1810, *Woods Testimony.*
[2065] Vol. 7, p. 1810, *Woods Testimony.*
[2066] Vol. 7, p. 1810, *Woods Testimony.*
[2067] Vol. 7, p. 1811, *Woods Testimony.*
[2068] Vol. 7, p. 1811, *Woods Testimony.*
[2069] Vol. 7, p. 1813, *Woods Testimony.*
[2070] Vol. 7, p. 1814, *Woods Testimony.*
[2071] Vol. 7, p. 1819, *Woods Testimony.*
[2072] Vol. 7, p. 1816, *Woods Testimony.*
[2073] Vol. 7, p. 1817, *Woods Testimony.*
[2074] Vol. 7, p. 1819, *Woods Testimony.*
[2075] Vol. 7, p. 1823, *Woods Testimony.*
[2076] Vol. 7, p. 1824, *Woods Testimony.*
[2077] Vol. 7, p. 1837, *Woods Testimony.*
[2078] Exhibit 25, *Bradford CV.*
[2079] Vol. 7, p. 1824, *Woods Testimony.*
[2080] Vol. 7, p. 1837, *Woods Testimony.*
[2081] Vol. 7, p. 1825, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slide 76; *see also* Exhibit 24, p.2, *Bradford Report*.
[2082] Exhibit 159, *Woods PowerPoint* at slide 77; *see also* Exhibit 24, p.3, *Bradford Report*.
[2083] Vol. 7, p. 1828-29, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slide 78-79; *see also* Exhibit 24, pp.3-4, *Bradford Report*.
[2084] Vol. 7, p. 1829, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slide 80-82; *see also* Exhibit 24, pp.3-4, *Bradford Report*.
[2085] Vol. 7, p. 1774, *Woods Testimony.*
[2086] Vol. 7, p. 1830, *Woods Testimony.*



Appellate Case: 17-1716 Page: 941 Date Filed: 11/01/2017 Entry ID: 4596229

[2087] Exhibit 159, *Woods PowerPoint* at slide 84; *see also* Exhibit 24, p.5, *Bradford Report*.
[2088] Vol. 7, p. 1831, *Woods Testimony.*
[2089] Vol. 7, p. 1811, *Woods Testimony.*
[2090] Vol. 7, p. 1832, *Woods Testimony.*
[2091] Vol. 7, p. 1833, *Woods Testimony.*
[2092] Vol. 7, p. 1834, *Woods Testimony.*
[2093] Vol. 7, p. 1834, *Woods Testimony.*
[2094] Exhibit 159, *Woods PowerPoint* at slide 89; *see also* Exhibit 24, p.13, *Bradford Report*.
[2095] Vol. 7, p. 1835, *Woods Testimony.*
[2096] Vol. 7, p. 1837, *Woods Testimony* ; Exhibit 159, *Woods PowerPoint* at slide 90; *see also* Exhibit 24, p.7,12, *Bradford Report*.
[2097] Vol. 7, p. 1837-38, *Woods Testimony.*
[2098] Vol. 7, p. 1838, *Woods Testimony.*
[2099] Vol. 7, p. 1839-40, *Woods Testimony.*
[2100] Vol. 7, p. 1840, *Woods Testimony*; Exhibit 159, *Woods PowerPoint* at slide 91; *see also* Exhibit 24, p.12-13, *Bradford Report*.
[2101] Vol. 7, p. 1841, *Woods Testimony.*
[2102] Vol. 7, p. 1841, *Woods Testimony.*
[2103] Vol. 7, p. 1841, *Woods Testimony.*
[2104] Vol. 7, p. 1842, *Woods Testimony.*
[2105] Vol. 7, p. 1842, *Woods Testimony.*
[2106] Vol. 7, p. 1843, *Woods Testimony.*
[2107] Vol. 7, p. 1843, *Woods Testimony.*
[2108] Vol. 7, p. 1844, *Woods Testimony.*
[2109] Vol. 7, p. 1844, *Woods Testimony.*
[2110] Vol. 7, p. 1844, *Woods Testimony.*
[2111] Vol. 7, p. 1845, *Woods Testimony.*
[2112] Vol. 7, p. 1845-46, *Woods Testimony.*
[2113] Vol. 7, p. 1847, *Woods Testimony.*
[2114] Vol. 2, p. 315, *Burns Testimony.*
[2115] Vol. 2, p. 313-15, *Burns Testimony.*
[2116] Vol. 2, p. 317-18, *Burns Testimony.*
[2117] Vol. 2, p. 323-24, *Burns Testimony.*
[2118] Vol. 2, p. 316-17, *Burns Testimony.*
[2119] Vol. 2, p. 317, 321, *Burns Testimony.*
[2120] Vol. 2, p. 322, *Burns Testimony.*
[2121] Vol. 2, p. 324, *Burns Testimony*.
[2122] Vol. 2, p. 322-23, *Burns Testimony*.

[2123] Vol. 2, p. 326, *Burns Testimony*.
[2124] Vol. 2, p. 326, *Burns Testimony*.
[2125] Vol. 2, p. 326, *Burns Testimony*.
[2126] Crim. D.E. 41, 43.
[2127] Vol. 8, p. 2137, *Owen Testimony*.
[2128] D.E. 151-10, p. 3.
[2129] Vol. 2, p. 391, *Hunt Testimony*.
[2130] Vol. 2, p. 388-89, *Hunt Testimony*.
[2131] Vol. 2, p. 389, *Hunt Testimony*.
[2132] Vol. 2, p. 397, *Hunt Testimony; see also,* Exhibit 60, p. 4, *Hunt Declaration*.
[2133] Vol. 3, p. 560, *Burr Testimony*.
[2134] Vol. 2, p. 404-05, *Hunt Testimony*; Vol. 8, p. 2154, *Owen Testimony*.

[2135] Vol. 2, p. 434-35, *Rickert Testimony*.
[2136] Vol. 2, p. 435-38, *Rickert Testimony*.
[2137]Vol. 2, p. 445-47, *Rickert Testimony*.
[2138] Vol. 2, p. 446-48, *Rickert Testimony*.
[2139] Vol. 2, p. 402-03, *Hunt Testimony*.

[2140] Vol. 2, p. 397, *Hunt Testimony*; Vol. 8, p. 2146, *Owen Testimony*; Vol. 3, p. 551, *Burr Testimony;* Vol. 2, p. 449-50, *Rickert Testimony*.

[2141] Vol. 2, p. 422, *Hunt Testimony*; Vol. 8, p. 2146, *Owen Testimony*; Vol. 2, p. 450, *Rickert Testimony*.

[2142] Vol. 2, p. 449-50, *Rickert Testimony*.
[2143] Vol. 2, p. 399, *Hunt Testimony*.
[2144] Vol. 4, p. 933, *Logan Testimony*; Vol. 4, p. 1022, *Hutchinson Testimony*.
[2145] Vol. 3, p. 564-65, *Burr Testimony*.
[2146] Vol. 3, p. 617-18, *Clarke Testimony*.

[2147] Vol. 3, p. 565, *Burr Testimony*.
[2148] Vol. 3, p. 633-34, *Clarke Testimony*.

[2149] Vol. 3, p. 628-29, *Clarke Testimony*.

[2150] Vol. 3, p. 631, *Clarke Testimony*.

[2151] Vol. 3, p. 631, *Clarke Testimony*.

[2152] Vol. 4, p. 812, 827, *Freedman Testimony*.

[2153] Vol. 3, p. 618, *Clarke Testimony*.

[2154] Vol. 3, p. 618, 631, *Clarke Testimony*.

[2155] Vol. 3, p. 633-34, *Clarke Testimony*.

[2156] Vol. 3, p. 634, *Clarke Testimony*.

[2157] Vol. 3, p. 634-35, *Clarke Testimony*.

[2158] Vol. 8, p. 2158, *Owen Testimony*.

[2159] Vol. 3, p. 695-99, *Jackson Testimony*.

[2160] Vol. 2, p. 407, *Hunt Testimony*.

[2161] Vol. 2, p. 407, *Hunt Testimony*; Vol. 3, p. 625, *Clarke Testimony*; Vol. 8, p. 2140, *Owen Testimony*; Vol. 3, p. 699, *Jackson Testimony*.

[2162] Vol. 2, p. 407-08, *Hunt Testimony*; Vol. 3, p. 643-45, *Clarke Testimony*; Vol. 8, p. 2140-41, *Owen Testimony*; Vol. 3, p. 699-701, *Jackson Testimony*.

[2163] Vol. 3, p. 741-42, *Garvey Testimony*.

[2164] Vol. 3, p. 725-26, *Garvey Testimony*.

[2165] Vol. 2, p. 409, *Hunt Testimony*; Vol. 3, p. 682, *Clarke Testimony*.

[2166] Vol. 2, p. 409, *Hunt Testimony*; Vol. 3, p. 682, *Clarke Testimony*.

[2167] Exhibit 62, p. 6-7, *Owen Declaration*.

[2168] Exhibit 62, p. 6-7, *Owen Declaration*.

[2169] Vol. 2, p. 398, *Hunt Testimony*.

[2170] Vol. 3, p. 738, *Garvey Testimony*.

[2171] Vol. 2, p. 406-07, *Hunt Testimony*.

[2172] Vol. 3, p. 713, *Jackson Testimony*.

[2173] Vol. 3, p. 626-27, *Clarke Testimony*.

[2174] Vol. 2, p. 408, *Hunt Testimony*.

[2175] Vol. 3, p. 649, *Clarke Testimony*.

[2176] Vol. 3, p. 701-02 *Jackson Testimony*.

[2177] Vol. 4, p. 848, *Freedman Testimony*.

[2178] Vol. 3, p. 665-66, *Clarke Testimony*.



Appellate Case: 17-1716 Page: 944 Date Filed: 11/01/2017 Entry ID: 4596229

[2179] Vol. 3, p. 669, *Clarke Testimony*.

[2180] Vol. 3, p. 665-71, *Clarke Testimony*.

[2181] Exhibit 60, p. 7-8, *Hunt Declaration*.

[2182] Exhibit 60, p. 8, *Hunt Declaration*.

[2183] Exhibit 63, p. 8, *Clarke Declaration*.
[2184] Vol. 3, p. 548, *Burr Testimony*.
[2185] Exhibit 62, p. 8 *Owen Declaration*.

[2186] Exhibit 62, p. 8, *Owen Declaration*.
[2187] Exhibit 62, p. 8, *Owen Declaration*.
[2188] Exhibit 72, p. 16-17 *Conrad Deposition*.
[2189] Exhibit 68, p. 16, *May 3, 2006 Transcript*.
[2190] Exhibit 63, p. 9, *Clarke Declaration*; Exhibit 71, *Montgomery Letter*.
[2191] D.E. 113-1.
[2192] Exhibit 67, p. 7, *4/25/06 Transcript*; Exhibit 68, p. 18, *5/3/06 Transcript*.
[2193] Exhibit 67, p. 3, *4/25/06 Transcript*; Exhibit 68, p. 17, *5/3/06 Transcript*.
[2194] Exhibit 67, p. 13, *4/25/06 Transcript.*
[2195] Exhibit 67, p. 14, *4/25/06 Transcript.*
[2196] Exhibit 67, p. 9, *4/25/06 Transcript.*
[2197] Exhibit 67, p. 5, *4/25/06 Transcript.*
[2198] Exhibit 68, p. 16, *5/3/06 Transcript.*
[2199] Exhibit 68, p. 21-22, *5/3/06 Transcript*.
[2200] Exhibit 68, p. 19, 24, *5/3/06 Transcript.*
[2201] Exhibit 99, *Cahn Letter.*
[2202] Exhibit 67, p. 14, *4/25/06 Transcript*; Exhibit 68, p. 25, *5/3/06 Transcript.*
[2203] Vol. 2, p. 419, *Hunt Testimony.*

[2204] Vol. 2, p. 418, *Hunt Testimony*; Vol. 3, p. 713-15, *Jackson Testimony*; Exhibit 71, *Montgomery Letter.*

[2205] D.E. 53, p. 3.
[2206] Exhibit 71, p. 2, *Montgomery Letter.*
[2207] Exhibit 71, p. 2, *Montgomery Letter.*
[2208] Exhibit 71, p. 2, *Montgomery Letter.*
[2209] Ex. 71, *Montgomery Letter.*
[2210] Vol. 2, p. 315, *Burns Testimony;* Vol. 8, p. 2156-57, *Owen Testimony.*
[2211] D.E. 53, p. 14.
[2212] Vol. 3, p. 689, *Cardarella Testimony.*



Appellate Case: 17-1716 Page: 945 Date Filed: 11/01/2017 Entry ID: 4596229

[2213] Vol. 3, p. 690, *Cardarella Testimony.*
[2214] Vol. 3, p. 690, *Cardarella Testimony.*
[2215] Vol. 3, p. 690, *Cardarella Testimony*.
[2216] Vol. 3, p. 690, *Cardarella Testimony.*
[2217] Vol. 3, p. 690, *Cardarella Testimony.*
[2218] Vol. 3, p. 690-91, *Cardarella Testimony*.
[2219] D.E. 53, p. 23.
[2220] D.E. 173, p. 12.
[2221] Exhibit 62, p. 8-9, *Owen Declaration.*
[2222] D.E. 173, p. 24.
[2223] D.E. 53, p. 14.
[2224] Exhibit 67, *4/25/06 Transcript*; Exhibit 68, *5/3/06 Transcript.*
[2225] Vol. 2, p. 341-42, *Elliot Testimony.*
[2226] *See*, Exhibit 157, *Duchardt Memo.*
[2227] Vol. 3, p. 704, *Jackson Testimony*; Vol. 4, p. 844, *Freedman Testimony*; Vol. 8, p. 2145, *Owen Testimony.*

[2228] Vol. 4, p. 854, *Freedman Testimony.*

[2229] Vol. 9, p. 2134, *Duchardt Testimony.*
[2230] Exhibit 83, p. 3, *Armstrong Declaration.*
[2231] *See*, D.E. 129, p. 61.
[2232] *See*, Exhibit 131, *Chart of Similar Crimes.*
[2233] Exhibit 67, p. 13, *4/25/2006 Transcript.*
[2234] Exhibit 68, p. 19, *5/3/2006 Transcript.*
[2235] Exhibit 68, p. 20, *5/3/2006 Transcript.*
[2236] Exhibit 68, p. 23, *5/3/06 Transcript.*
[2237] D.E. 173, p. 19.
[2238] D.E. 173, p. 20.
[2239] D.E. 173, p. 16.
[2240] Exhibit 71, *Montgomery Letter.*
[2241] D.E. 173, p. 8-20.
[2242] D.E. 173, pp. 13-14.
[2243] Exhibit 99, *Cahn Letter.*
[2244] Exhibit 71, *Montgomery Letter.*
[2245] D.E. 173, p. 14, n.6.
[2246] Exhibit 67, p. 2, *4/25/2006 Transcript.*
[2247] Exhibit 67, p. 2-6, *4/25/06 Transcript.*
[2248] Exhibit 67, p. 7, *4/25/06 Transcript.*
[2249] Exhibit 67, p. 10, *4/25/06 Transcript.*
[2250] Exhibit 67, p. 11, *4/25/06 Transcript.*



Appellate Case: 17-1716 Page: 946 Date Filed: 11/01/2017 Entry ID: 4596229

[2251] Exhibit 67, p. 13, *4/25/06 Transcript.*
[2252] Exhibit 68, p. 22, *5/3/2006 Transcript*.
[2253] Exhibit 68, p. 23, *5/3/2006 Transcript*.
[2254] Exhibit 68, p. 23, *5/3/2006 Transcript*.
[2255] Exhibit 68, p. 24, *5/3/2006 Transcript*.
[2256] Exhibit 68, p. 24, *5/3/2006 Transcript.*
[2257] Exhibit 68, p. 24, *5/3/2006 Transcript*.
[2258] Exhibit 68, p. 24-25, *5/3/2006 Transcript.*
[2259] Exhibit 65, *Hunt Letter to Burr*.
[2260] Exhibit 68, p. 27, *5/3/2006 Transcript.*
[2261] Exhibit 68, p. 31, *5/3/2006 Transcript.*
[2262] Exhibit 68, p. 33, *5/3/2006 Transcript*.
[2263] Exhibit 68, p. 33, *5/3/2006 Transcript.*
[2264] Exhibit 68, p. 33, *5/3/2006 Transcript.*
[2265] Vol. 2, p. 419, *Hunt Testimony.*

[2266] Vol. 2, p. 423, *Hunt Testimony*; Vol. 3, p. 676, *Clarke Testimony.*

[2267] Vol. 3, p. 675-76, *Clarke Testimony.*

[2268] D.E. 129.
[2269] Vol. 3, p. 676-77, *Clarke Testimony.*

[2270] D.E. 115-1, p. 14.
[2271] D.E. 115-1, p. 22.
[2272] D.E. 114.
[2273] D.E. 114, p.1.
[2274] D.E. 114, p.2.
[2275] D.E. 114, p.2.
[2276] 14-2725, Entry ID 4178889; Entry ID 4185600.
[2277] D.E. 91.
[2278] D.E. 100.
[2279] D.E. 77; D.E. 140.
[2280] D.E. 179, p.10.
[2281] D.E. 179, p.15.
[2282] D.E. 53, p. 27-28.
[2283] D.E. 212, p. 125.
[2284] D.E. 53, p. 7.
[2285] D.E. 53.
[2286] D.E. 212, p. 21.
[2287] Vol. 2, p. 296.

[2288] Exhibit 103.
[2289] Exhibit 87.
[2290] Exhibits 86, 87, 88, 90, 96, 97, 104-123.
[2291] Vol. 1, p. 81, *Stetler Testimony.*
[2292] Vol. 1, p. 95, *Stetler Testimony.*; Exhibit 88, p. 28, *Guide to Judiciary Policy, Vol. 7A, Appx. 2A.*
[2293] Vol. 3, p. 687, *Cardarella Testimony*.
[2294] Vol. 1, p. 179, *Bookman Testimony*.
[2295] Exhibit 50, p. 7, *LeBoeuf Declaration*.
[2296] Exhibit 50, p. 8, *LeBoeuf Declaration*.
[2297] Vol. 2, p. 621-22, *Clarke Testimony.*
[2298] Vol. 3, p. 455, *Rickert Testimony*.
[2299] Vol. 3, p, 706, *Jackson Testimony*.
[2300] D.E. 129, p. 71.
[2301] Exhibit 83, p. 3, *Armstrong Declaration*.
[2302] D.E. 129, p. 33.
[2303] D.E. 129.
[2304] Exhibit 83, p. 3, *Armstrong Declaration*.
[2305] Vol. 3, p. 585, *Burr Testimony*.
[2306] Vol. 3, p. 586, *Burr Testimony*.
[2307] Exhibit 50, p. 14, *Lebouef Declaration*.
[2308] Exhibit 117, James Hudson, et al., *Using the Mitigation Specialist and the Team Approach*, The Champion (June, 1987).
[2309] Exhibit 50, p. 14, *Lebouef Declaration*.
[2310] Vol. 1, p. 318, *Burns Testimony*.
[2311] Vol. 2, p. 395, *Hunt Testimony.*
[2312] Vol. 2, p. 395, *Hunt Testimony*.
[2313] Vol. 6, p. 1555, *Waller Testimony*. *See also*, Exhibit 83, p. 3, *Armstrong Declaration.*
[2314] Exhibit 83, p. 4, *Armstrong Declaration*.
[2315] Vol. 6, p. 1555, *Waller Testimony.*
[2316] Vol. 6, p. 1557, *Waller Testimony*.
[2317] Vol. 6, p. 1559, *Waller Testimony*.
[2318] Vol. 6, p. 1559, *Waller Testimony.*
[2319] Vol. 6, p. 1561, *Waller Testimony.*
[2320] Vol. 6, p. 1562, *Waller Testimony.*
[2321] Vol. 6, p. 1564, *Waller Testimony.*
[2322] Vol. 6, p. 1557, *Waller Testimony*.
[2323] Vol. 6, p. 1567, *Waller Testimony*.
[2324] Vol. 6, p. 1567, *Waller Testimony*.



Appellate Case: 17-1716 Page: 948 Date Filed: 11/01/2017 Entry ID: 4596229

2325 Vol. 7, p. 1868, *O'Connor Testimony*.
2326 Vol. 7, p. 1868-69 (mental defenses not O'Connor's strong suit).
2327 Vol. 3, p. 582, *Burr Testimony*.
2328 Vol. 3, p. 582, *Burr Testimony*.
2329 Vol. 7, p. 1874, *O'Connor Testimony*.
2330 Exhibit 103, p. 952.
2331 Exhibit 83, p. 1, *Armstrong Declaration.*
2332 Exhibit 83, p. 3, *Armstrong Declaration.*
2333 Vol. 2, p. 335, 357-58, *Elliot Testimony.*
2334 Vol. 8, p. 2313, *Duchardt Testimony.*
2335 Exhibit 1, *passim*, *Biopsychosocial.*
2336 TT. p. 1646-1652, *Strong Testimony.*
2337 Vol. 4, p. 1021, *Hutchinson Testimony.*
2338 Exhibit 157, *3/7/07 Memo to Team*.
2339 Exhibit 157, *Duchardt Memo.*
2340 Vol. 7, p. 1694, *Porterfield Testimony.*
2341 Exhibit 1, *passim, Biopsychosocial.*
2342 Exhibit 36, p. 12, *Ramachandran Depo*.
2343 Vol. 5, p. 1006, *Hutchinson Testimony.*
2344 Vol. 5, p. 1275, *Kuncel Testimony.*
2345 Exhibit 41, p. 2, *Logan Declaration.*
2346 Exhibit 73, *McCandless Declaration.*
2347 Exhibit 83, p. 2, *Armstrong Declaration* (*quoting* Duchardt).
2348 Exhibit 52, p. 1-14, *Fox Report.*
2349 Exhibit 52, p. 1-14, *Fox Report*.
2350 Vol. 8, p. 2150, *Owen Testimony.*
2351 Vol. 8, p. 2150, *Owen Testimony.*
2352 Vol. 8, p. 2138, 56, *Owen Testimony.*
2353 Vol. 8, p. 2176, *Owen Testimony*.
2354 Exhibit 58, 4/5/07 *Transcript.*
2355 Vol. p. 942, *Logan Testimony.*
2356 Vol. 5, p. 938, *Logan Testimony.*
2357 Exhibit 83, p. 2, *Armstrong Declaration*.
2358 Exhibit 83, p. 4-5, *Armstrong Declaration.*
2359 Vol. 5, p. 942, *Logan Testimony.*
2360 Exhibit 41, p. 2, *Logan Declaration.*
2361 D.E. 129.
2362 Exhibit 36, Ramachandran Depo.
2363 Exhibit 36, p. 8, *Ramachandran Deposition*.
2364 D.E. 129, p. 58.



Appellate Case: 17-1716 Page: 949 Date Filed: 11/01/2017 Entry ID: 4596229

[2365] D.E. 129, p. 58.
[2366] Exhibit 41, p. 3, *Logan Declaration*.
[2367] Exhibit 41, p. 3, *Logan Declaration*.
[2368] Crim. D.E. 243.
[2369] *See also*, Vol. 8, p. 151, *O'Connor Testimony* (admitting he did not research similar crimes).
[2370] Exhibit 52, p. 21, *Fox Report.*
[2371] Exhibit 59, 4/5/2006 Transcript.
[2372] TT. Vol. 7, p. 1646, *Strong Testimony.*
[2373] Vol. 4, p. 902, *Garman Testimony*.
[2374] Vol. 3, p. 704, *Jackson Testimony*.
[2375] Vol. 3, p. 704, *Jackson Testimony*.
[2376] Vol. 4, pp. 844-845, *Freedman Testimony*.
[2377] Vol. 8, p. 2145, *Owen Testimony*.
[2378] Vol. 8, p. 2144, *Owen Testimony*.
[2379] Vol. 8, p. 2144, *Owen Testimony*.
[2380] Exhibit 83, p. 5, *Amstrong Declaration.*
[2381] Exhibit 58, p. 12, *4/3/2006 Transcript.*
[2382] Exhibit 58, p. 13, *4/3/2006 Transcript.*
[2383] Vol. 7, p. 1967, *O'Connor Testimony.*
[2384] Vol. 8, p. 1995, *O'Connor Testimony*.
[2385] Vol. 8, p. 1868, *O'Connor Testimony*.
[2386] Exhibit 157, *Duchardt Memo.*
[2387] Exhibit 157, p. 4, *Duchardt Memo*.
[2388] Exhibit 15, *Duchardt Memo.*
[2389] Exhibit 58, p. 15, *4/3/2006 Transcript.*
[2390] Vol. 8, p. 1971, *Owen Testimony*.
[2391] Exhibit 158, Leona Hayes Statement.
[2392] Vol. 8, p. 1971, *Owen Testimony*, Exhibit 158, p. 18, *Hayes Statement.*
[2393] Vol. 8, p. 1972, *Owen Testimony*, Exhibit 158, p. 21, *Hayes Testimony*.
[2394] Exhibit 142, Kleiner Depo.
[2395]Exhibit 142, p. 18, *Tommy Kleiner Depo.*
[2396] Vol. 4, p.1021, *Hutchinson Testimony.*
[2397] Exhibit 83, *Armstrong Declaration.*
[2398] Exhibit 58, p. 13, *4/3/2007 Transcript*.
[2399] D.E. 212, p. 29.
[2400] Vol. 3, p. 655, *Clarke Testimony*.
[2401] Vol. 3, p. 655, *Clarke Testimony*.
[2402] Exhibit 36, p. 12-14, *Ramachandran Deposition*.
[2403] Exhibit 36, p. 12, *Ramachandran Deposition*.



Appellate Case: 17-1716 Page: 950 Date Filed: 11/01/2017 Entry ID: 4596229

[2404] Exhibit 36, p. 11, *Ramachandran Deposition*.
[2405] Exhibit 36, p. 17, *Ramachandran Deposition*.
[2406] Exhibit 36, p. 17, *Ramachandran Deposition*.
[2407] Exhibit 36, p. 18, *Ramachandran Deposition*.
[2408] Exhibit 36, p. 18, *Ramachandran Deposition*.
[2409] Exhibit 36, p. 23, *Ramachandran Deposition*.
[2410] Exhibit 36, p. 20, *Ramachandran Deposition*.
[2411] Exhibit 36, p. 20, *Ramachandran Deposition*.
[2412] Vol. 4, pp. 937, 945, *Logan Testimony*.
[2413] Vol. 4, pp. 845-846,*Freedman Testimony* (emphasis added).
[2414] Vol. 4, p. 981, *Logan Testimony*.
[2415] Vo. 4, p. 966, *Logan Testimony*.
[2416] Exhibit 83, p. 5, *Armstrong Declaration*.
[2417] Exhibit 83, p. 7, *Armstrong Declaration*.
[2418] Exhibit 83, p. 7, *Armstrong Declaration*.
[2419] Exhibit 41, p.3, *Logan Declaration*.
[2420] Vol. 4, p. 1006, *Hutchinson Testimony*.
[2421] Exhibit 41, pp. 2-3, *Logan Declaration*.
[2422] Vol. 4, p. 964, *Logan Declaration*.
[2423] Exhibit 41, p. 1, *Logan Declaration*.
[2424] Exhibit 41, p. 1, *Logan Declaration*.
[2425] Exhibit 73, pp. 2-3, *McCandless Declaration*.
[2426] Exhibit 73, p.2, *McCandless Declaration*.
[2427] Exhibit 73, p.2, *McCandless Declaration*.
[2428] Exhibit 73, p. 2, *McCandless Declaration*.
[2429] Exhibit 73, p.2, *McCandless Declaration*.
[2430] Exhibit 73, p.2, *McCandless Declaration*.
[2431] Exhibit 73, p.2, *McCandless Declaration*.
[2432] Vol. 3, p. 656, *Clarke Testimony*.
[2433] Vol. 3, pp. 656-657, *Clarke Testimony*.
[2434] Vol. 3, pp. 662, *Clarke Testimony.*
[2435] Vol. 3, pp. 658, *Clarke Testimony.*
[2436] Vol. 3, pp. 658, *Clarke Testimony.*
[2437] Vol. 3, p. 660, *Clarke Testimony.*
[2438] TT. Vol. 12, p. 2570, *Dietz Testimony*.
[2439] TT. Vol. 12, p. 2576, *Dietz Testimony*.
[2440] Vol. 4, p. 989-90, *Hutchinson Testimony.*
[2441] Vol. 4, p. 919, *Hutchinson Testimony.*
[2442] Vol. 4, p. 1017-20, *Hutchinson Testimony.*
[2443] Vol. 4, p. 1002, *Hutchinson Testimony*.



Appellate Case: 17-1716 Page: 951 Date Filed: 11/01/2017 Entry ID: 4596229

[2444] Vol. 4, p. 1001-02, *Hutchinson Testimony.*
[2445] Vol. 4, p. 1003-04, *Hutchinson Testimony.*
[2446] Vol. 4, p. 1003, *Hutchinson Testimony.*
[2447] Vol. 4, p. 1004-06, *Hutchinson Testimony.*
[2448] Vol. 4, p. 1007, *Hutchinson Testimony.*
[2449] Vol. 4, p. 1035, *Hutchinson Testimony.*
[2450] *Id.*, p. 1036.
[2451] TT. Vol. 11, p. 2452- 2504, *Martell Testimony.*
[2452] Vol. 4, pp. 983, 1068, *Hutchinson Testimony.*
[2453] TT. Vol. 11, p. 2459, *Martell Testimony.*
[2454] Vol. 4, p. 1039, *Hutchinson Testimony.*
[2455] TT Vol.11, p. 2468, *Martell Testimony*.
[2456] TT Vol 11, p. 2476, *Martell Testimony*.
[2457] Vol. 2, p. 375, *Schnack Testimony*.
[2458] Vol. 2, p. 376, *Schnack Testimony*.
[2459] Vol. 2, p. 353, *Elliott Testimony*.
[2460] Vol. 2, p. 354, *Elliott Testimony*.
[2461] Vol. 13, p. 2844, Government's First Phase Closing Argument.
[2462] Vol. 13, p. 2849, Government's First Phase Closing Argument.
[2463] Exhibit 26, p. 27, *Sanislow Declaration*.
[2464] Exhibit 26, p. 27, *Sanislow Declaration.*
[2465] Exhibit 26, p. 28, *Sanislow Declaration.*
[2466] Exhibit 26.
[2467] TT Vol. 12, p. 2563, *Dietz Testimony.*
[2468] *See e.g.,* Exhibit 1, *Biopsychosocial History and attachments thereto*; Exhibit 4, *Genograms*; Exhibit 5, *Mental Health Symptoms Chart*; Exhibit 6, *Chronology of Trauma to Lisa Montgomery*; Exhibit 23, *Nadkarni* Report; Exhibit 29, *10/22/2007 Gur Report*; Exhibit 154, *Vogelsang PowerPoint*; Exhibit 155, *Porterfield PowerPoint*; Exhibit 159, *Woods PowerPoint*.
[2469] TT Vol. 12, p. 2554, *Dietz Testimony* (emphasis added).
[2470] TT Vol. 12, p. 2566, *Dietz Testimony*.
[2471] TT. Vol. 12, pp. 2567-2568, *Dietz Testimony* (emphasis added).
[2472] TT Vol. 12, p. 2614, *Dietz Testimony.*
[2473] TT Vol. 12, p. 2649, *Dietz Testimony.*
[2474] TT. Vol. 13, p. 2707, *Dietz Testimony*.
[2475] Exhibit 1-31, p.14, *Teddy Kleiner Declaration.*
[2476] TT Vol. 12, p. 2707, *Dietz Testimony.*
[2477] TT Vol. 12, p. 2699, *Dietz Testimony*.
[2478] TT Vol. 13, p. 2745, *Dietz Testimony*.
[2479] TT Vol. 13, p. 2751, *Dietz Testimony*.



Appellate Case: 17-1716 Page: 952 Date Filed: 11/01/2017 Entry ID: 4596229

[2480] TT Vol. 13, p. 2760, *Dietz Testimony*.
[2481] TT Vol. 13, p. 2760, *Dietz Testimony*.
[2482] TT Vol. 13, p. 2761, *Dietz Testimony*.
[2483] Exhibit 83, p. 2, *Armstrong Declaration*.
[2484] Vol. 5, p. 1164, *Davatzikos Testimony.*
[2485] Exhibit 28, p. 4, *Gur Report* (emphasis added).
[2486] Crim. D.E. 243.
[2487] Crim. D.E. 248.
[2488] Crim. D.E. 257.
[2489] Vol. 5, p. 1139, *Davatzikos Testimony.*
[2490] Vol. 5, p. 1139-45, *Davatzikos Testimony.*
[2491] Crim. D.E. 273.
[2492] Crim. D.E. 292-2.
[2493] D.E. 284; D.E. 292.
[2494] Vol. 5, p. 1182-1244, *Newberg Testimony.*
[2495] Vol. 5, p. 1235, *Newberg Testimony.*
[2496] Vol. 8, p. 2178, *Owen Testimony*.
[2497] Vol. 8, p. 2178, *Owen Testimony*.
[2498] Exhibit 59, 4/5/07 *Transcript.*
[2499] D.E. 212, p.26.
[2500] Exhibit 59, p. 14, 4/5/07 *Transcript.*
[2501] TT Vol. 13, p. 2798, *Closing Argument.*
[2502] TT Vol. 13, p. 2801, *Closing Argument.*
[2503] TT Vol. 13, p. 2851, *Closing Argument.*
[2504] TT Vol. 13, p. 2806, *Closing Argument.*
[2505] TT Vol. 13, p. 2851, *Closing Argument.*
[2506] TT Vol. 15, p. 3147, *Closing Argument*.
[2507] TT Vol. 15, p. 3155, *Closing Argument*.
[2508] TT Vol. 15, p. 3155, *Closing Argument*.
[2509] TT Vol. 15, p. 3157, *Closing Argument*.
[2510] TT Vol. 15, p. 3185, *Closing Argument*.
[2511] TT Vol. 15, p. 3190, *Closing Argument*.
[2512] Vol. 5, p. 1021, *Hutchinson Testimony.*
[2513] Vol. 5, p. 994, *Hutchinson Testimony.*
[2514] Vol. 5, p. 1030, *Hutchinson Testimony.*
[2515] Vol. 6, p. 1550-53, *Mattingly Testimony.*
[2516] Vol. 6, p. 1153.
[2517] Vol. 6, p. 1543.
[2518] Crim. D.E. 348; Vol. 6, p. 1538–53, *Mattingly Testimony.*
[2519] Vol. 6, p. 1545, *Mattingly Testimony.*

[2520] Vol. 6, p. 1553, *Mattingly Testimony.*
[2521] Crim. D.E. 347.
[2522] Vol. 8, p. 2293, *Duchardt Testimony.*
[2523] Vol. 5, p. 1281, *Kuncel Testimony.*
[2524] TT. p. 3017-3026, *Kuncel Testimony;* Vol. 5, p. 1274, *Kuncel Testimony.*
[2525] Vol.1, p. 55-158, *Stetler Testimony*; Vol. 1, p. 159-229, *Bookman Testimony; see also,* Vol. 3, p. 686-88 (ABA Guidelines incorporated into the Model Plan for the Western District of Missouri, the FPDO is directed to follow the Model Plan (Exhibit 88)); *see also* Exhibit 90, *Amended Plan for the Implementing of the CJA* (directing FPD and CJA attorneys to adhere to Model Plan).
[2526] Vol. 1, p. 113, *Stetler Testimony.*
[2527] Vol. 1, p. 132-33, *Stetler Testimony.*
[2528] Vol. 4, p. 945, *Logan Testimony.*
[2529] Vol. 4, p. 945, *Logan Testimony.*
[2530] D.E. 129 p. 50.
[2531] *See* Exhibit 154, *Biopsychosocial PowerPoint* at slide 3.
[2532] Vol. 6, p. 1475, *Vogelsang Testimony.*
[2533] Exhibit 154, *Biopsychosocial PowerPoint* at slide 133-36.
[2534] Exhibit 1, *passim.*
[2535] Vol. 2, p. 304, *Dillingham Testimony*; Exhibit 1-291, *Dillingham Declaration.*
[2536] Crim. D.E.422, p 14.
[2537] TT. Vol. 13, p. 2852, *Government Closing Argument.*
[2538] TT. Vol. 13, p. 2852 *Government Closing Argument.*
[2539] Vol. 8, p. 1835 -45, *Boomhower Testimony*, Vol. 8, p. 1825 – 26, *Kidwell Testimony.*
[2540] D.E. 212, p. 34 (*citing Sears v. Upton*, 561 U.S. 945, 948-51 (2010)).
[2541] Vol. 8, p. 1835 -45, *Boomhower Testimony*, Vol. 8, p. 1825 – 26, *Kidwell Testimony.*
[2542] TT. Vol. 5, p. 1089, *Boman Testimony.*
[2543] Vol. 1, p. 49, *Rineer Stipulation.*
[2544] Vol. 1, p. 48-79, *Riley Stipulation.*
[2545] TT. Vol. 13, p. 2852, *USA Closing at Guilt/Innocence.*
[2546] TT. Vol. 14, p. 1091, *Boman Testimony.*
[2547] TT. Vol. 8, p. 1824-35, *Kidwell Testimony.*
[2548] TT. Vol. 8, p. 1824-35, *Kidwell Testimony.*
[2549] TT. Vol. 8, p. 1843, *Boomhower Testimony.*
[2550] TT. Vol. (IT SAYS 8), p. 1859, *Bruton Testimony.*
[2551] TT. Vol. 9, p. 1921, *Wallentini Testimony.*
[2552] *See, generally*, TT. Vol. 9, p. 1920-29, *Wallentini Testimony.*
[2553] TT. Vol. 9, p. 1920.



Appellate Case: 17-1716 Page: 954 Date Filed: 11/01/2017 Entry ID: 4596229

[2554] Exhibit 154, *Biopsychosocial PowerPoint* at slide 89.
[2555] Exhibit 154, *Biopsychosocial PowerPoint* at slide 89.
[2556] Exhibit 154, *Biopsychosocial PowerPoint* at slide 91.
[2557] Exhibit 154, *Biopsychosocial PowerPoint* at slide 91.
[2558] Exhibit 1-102, p. 3, *Wallentini Records.*
[2559] Exhibit 1-283, *Kidwell Memo*.
[2560] Exhibit 1-283, *Kidwell Memo*; Exhibit 10, *Kidwell Declaration.*
[2561] D.E. 212, p. 33.
[2562] Exhibit 1-283, *Kidwell Memo.*
[2563] Exhibit 1-283, *Kidwell Memo*, Vol. 6, p. 1569, *Waller Testimony.*
[2564] Vol. 8, p. 8-7, *Kidwell Testimony.*
[2565] Vol. 7, p. 1983, *O'Connor Testimony*; Vol.8, p. 2184-85, *Owen Testimony.*
[2566] D.E. 212, p. 49.
[2567] Exhibit 26, Duchardt Voucher.
[2568] Exhibit 157, Duchardt Memo.
[2569] Exhibit 157, Duchardt Memo.
[2570] Exhibit 138, *Handwritten Notes.*
[2571] Vol. 6, p. 1564, *Waller Testimony.*
[2572] Vol. 6, p. 1575-76, *Waller Testimony.*
[2573] Vol. 6, p. 1569, 1575-76, *Waller Testimony.*
[2574] D.E. 212 p. 49.
[2575] Vol. 6, p. 1564, *Waller Testimony.*
[2576] Exhibit 10, *Kidwell Declaration.*
[2577] *Motion to Expand the Record,* Attachment 1, *Owen Supplemental Declaration*.
[2578] *Motion to Expand the Record,* Attachment 1, *Owen Supplemental Declaration*.
[2579] Vol. 8, p. 2136-87, *Owen Testimony.*
[2580] Vol.1, p. 46, 47, *Stipulation to Ninemire's unavailability*.
[2581] Vol. 8, p. 2314, *Duchardt Testimony.*
[2582] Exhibit 157, *Duchardt Memo.*
[2583] Vol. 6, p. 1662, *Porterfield Testimony.*
[2584] Vol. 8, p. 2184-85, *Owen Testimony.*
[2585] Vol. 7, p. 1983, *O'Connor Testimony.*
[2586] D.E. 212, p. 49.
[2587] Exhibit 17, *Kleiner v. Kleiner Interrogatories.*
[2588] Exhibit 17, *Kleiner v. Kleiner Interrogatories.*
[2589] Vol.3, p. 746, *Garvey Testimony*; Vol. 2, p. 334, *Elliot Testimony.*
[2590] Vol. 1, p. 51, *Stipulation of the parties.*
[2591] Vol.6, p. 1500, *Vogelsang Testimony.*
[2592] Exhibit 154, *Biopsychosocial PowerPoint* at slide 71.

[2593] Exhibit 154, *Biopsychosocial PowerPoint* at slide 76; Exhibit 1-14, *Baker Declaration.*
[2594] Exhibit 154, *Biopsychosocial PowerPoint* at slide 77; Exhibit 1-12, *Gann Declaration.*
[2595] Exhibit 154, *Biopsychosocial PowerPoint* at slide 105 & 107; Exhibit 1-31, *Teddy Kleiner Declaration.*
[2596] Exhibit 1-286, *Miller Declaration.*
[2597] Vol. 4, p. 1006, *Hutchinson Testimony.*
[2598] Vol. 4, p. 1006, *Hutchinson Testimony*.
[2599] Exhibit 1, p. 110, Biopsychosocial; Exhibit 1-148, Oklahoma DHS Records.
[2600] Exhibit 1, p. 110, Biopsychosocial; Exhibit 1-148, Oklahoma DHS Records.
[2601] Exhibit 154, *Biopsychosocial PowerPoint* at slide 130.
[2602] Vol. 7, p. 1651, *Porterfield Testimony.*
[2603] Exhibit 159, Woods PowerPoint at slide 9 & 10.
[2604] Exhibit 159, Woods PowerPoint at slide 96.
[2605] Vol. 8, p. 2294, *Duchardt Testimony.*
[2606] D.E. 212, p. 88.
[2607] Vol. 6, p. 1490, *Objection by the USA*.
[2608] Exhibit 1, *Biopsychosocial*
[2609] Exhibit 154, *Biopsychosocial PowerPoint* at slide 131
[2610] TT. Vol.15, p 2851.
[2611] Exhibit 83, *Armstrong Declaration* (quoting Fred Duchardt).
[2612] Vol. 7, p. 1648, *Porterfield Testimony.*
[2613] Vol. 7, p, 1649, *Porterfield Testimony.*
[2614] Vol. 7, p, 1649 - 50, *Porterfield Testimony.*
[2615] Vol. 7, p, 1651, *Porterfield Testimony; see also,* Vol. 4, p. 874-76, *Fucetola Testimony* (testifying that there is an exceptionally rare 29 point differential between Mrs. Montgomery's performance and verbal IQ).
[2616] Vol. 7, p, 1651, *Porterfield Testimony* (internal quotation marks added for clarity).
[2617] Vol. 7, p, 1651, *Porterfield Testimony.*
[2618] Vol. 7, p, 1652, *Porterfield Testimony.*
[2619] Vol. 7, p, 1653, *Porterfield Testimony.*
[2620] Vol. 7, p, 1658 -59, *Porterfield Testimony.*
[2621] Vol. 7, p. 1779-80, *Woods Testimony.*
[2622] Vol. 4, p. 871, *Fucetola Testimony.*
[2623] Vol. 4, p. 871, *Fucetola Testimony.*
[2624] Vol. 4, p. 872, *Fucetola Testimony.*
[2625] Vol. 4, p. 873, *Fucetola Testimony.*
[2626] Vol. 4, p. 879, *Fucetola Testimony.*



Appellate Case: 17-1716 Page: 956 Date Filed: 11/01/2017 Entry ID: 4596229

[2627] Vol. 4, p. 875, *Fucetola Testimony.*
[2628] Vol. 4, p. 878, *Fucetola Testimony.*
[2629] Vol. 4, p. 879, *Fucetola Testimony.*
[2630] Vol. 4, p. 879, *Fucetola Testimony.*
[2631] Vol. 4, p. 885, *Fucetola Testimony.*
[2632] Vol. 4, p. 885, *Fucetola Testimony.*
[2633] *See, generally*, TT. Vol. 3-15.
[2634] Crim. D.E. 243.
[2635] D.E. 129.
[2636] Vol. 8, p. 2061, *Gur Testimony.*
[2637] Vol. 8, p. 2061, *Gur Testimony.*
[2638] Vol. 8, p. 2066, *Gur Testimony.*
[2639] Vol. 8, p. 2067, *Gur Testimony.*
[2640] Vol. 8, p. 2067, *Gur Testimony.*
[2641] Vol. 8, p. 2068, *Gur Testimony.*
[2642] Exhibit 45, *Neuropsychological Evaluation*.
[2643] Exhibit 159, *Woods PowerPoint* at slide 98.
[2644] Exhibit 159, *Woods PowerPoint* at slide 64–65.
[2645] Vol. 7, p. 1792, *Woods Testimony.*
[2646] Vol. 7, p. 1792, *Woods Testimony.*
[2647] Vol. 7, p. 1792, *Woods Testimony.*
[2648] Vol. 7, p. 1792, *Woods Testimony.*
[2649] Vol. 7, p. 1792, *Woods Testimony.*
[2650] Vol. 7, p. 1792-93, *Woods Testimony.*
[2651] Vol. 7, p. 1733, *Nadkarni Testimony.*
[2652] Vol. 7, p. 1734, *Nadkarni Testimony.*
[2653] Vol. 7, p. 1735, *Nadkarni Testimony.*
[2654] Vol. 7, p. 1739, *Nadkarni Testimony.*
[2655] Vol. 7, p. 1823, *Woods Testimony.*
[2656] D.E. 354.
[2657] Vol. 7, p. 1841, *Woods Testimony.*
[2658] Vol. 6, p. 1841-42, *Woods Testimony.*
[2659] D.E. 212, p. 36.
[2660] Exhibit 75, p.1, *Dedmon Declaration.*
[2661] Exhibit 75, p.1, *Dedmon Declaration.*
[2662] Vol. 2, p. 277-78, *Wurtz Testimony.*
[2663] Vol. 2, p. 280, *Wurtz Testimony.*
[2664] Vol. 2, p. 285, *Wurtz Testimony.*
[2665] Exhibit 76, *Brannon Declaration.*
[2666] Exhibit 75, p. 1, *Dedmon Declaration.*

[2667] Vol. 2, p. 282, *Wurtz Testimony*; Vol. 2, p. 293, *Dillingham Testimony.*
[2668] Exhibit 75, p. 1, *Dedmon Declaration.*
[2669] Vol. 2, p. 299, *Dillingham Testimony.*
[2670] Vol. 2, p. 303, *Dillingham Testimony;* Exhibit 1-291, *Dillingham Declaration,* Attachment 2, p. 3, *Dillingham Report.*
[2671] Vol. 2, p. 306, *Dillingham Testimony*; Vol. 2, p. 317, *Burns Testimony.*
[2672] Vol. 2, p. 317, *Burns Testimony.*
[2673] Vol. 2, p. 329, *Burns Testimony.*
[2674] Vol. 2, p. 422, *Hunt Testimony.*
[2675] Vol. 2, p. 397, *Burns Testimony.*
[2676] Vol. 2, p. 398, *Burns Testimony.*
[2677] Vol. 2, p. 399, *Burns Testimony.*
[2678] Vol. 4, p. 1023, *Hutchinson Testimony*; Exhibit 37, *March 2005 letter of Marilyn Hutchinson.*
[2679] Vol. 4, p. 1022, *Hutchinson Testimony.*
[2680] Vol. 4, p. 1020, *Hutchinson Testimony.*
[2681] Vol. 4, p. 1021, *Hutchinson Testimony.*
[2682] Vol. 4, p. 1025, *Hutchinson Testimony.*
[2683] Vol. 4, p. 926, *Logan Testimony.*
[2684] Vol. 4, p. 928, *Logan Testimony.*
[2685] Vol. 4, p. 929, *Logan Testimony.*
[2686] Vol. 4, p. 932, *Logan Testimony.*
[2687] Vol. 4, p. 929, *Logan Testimony.*
[2688] Vol. 4, p. 933, *Logan Testimony.*
[2689] Exhibit 39, p. 2, *Report of Dr. William S. Logan.*
[2690] Exhibit 39, p. 1, *Report of Dr. William S. Logan.*
[2691] Exhibit 39, p. 3, *Report of Dr. William S. Logan.*
[2692] Vol. 4, p. 930, *Logan Testimony.*
[2693] Exhibit 41, p. 3, *Logan Declaration.*
[2694] Vol. 3, p. 638, *Clarke Testimony.*
[2695] Vol. 3, p. 646, *Clarke Testimony.*
[2696] Vol. 3, p. 669, *Clarke Testimony.*
[2697] Vol. 3, p. 735-36, *Garvey Testimony.*
[2698] Vol. 4, p. 854-55, *Freedman Testimony.*
[2699] Vol. 8, p. 2146, *Owen Testimony.*
[2700] Vol. 8, p. 2146-47, *Owen Testimony.*
[2701] Vol. 3, p. 572, *Burr Testimony.*
[2702] Vol. 3, p. 574, *Burr Testimony.*
[2703] Vol. 9, p. 2313, *Duchardt Testimony*.
[2704] Vol. 9, p. 2314, *Duchardt Testimony.*



Appellate Case: 17-1716 Page: 958 Date Filed: 11/01/2017 Entry ID: 4596229

[2705] Exhibit 73, p. 3, *McCandless Declaration.*
[2706] Exhibit 73, p. 4, *McCandless Declaration.*
[2707] Vol. 5, p. 1251-53, *Kempke Testimony.*
[2708] Vol. 5, p. 1253-54, *Kempke Testimony.*
[2709] Vol. 7, p. 1763, *Woods Testimony.*
[2710] Vol. 7, p. 1767, *Woods Testimony.*
[2711] Vol. 7, p. 1767, *Woods Testimony.*
[2712] Vol. 7, p. 1768, *Woods Testimony.*
[2713] Vol. 7, p. 1769, *Woods Testimony.*
[2714] Vol. 7, p. 1810, *Woods Testimony.*
[2715] Vol. 7, p. 1835-36, *Woods Testimony*; *See also*, Exhibit 20, p. 27, *Woods Declaration;* Exhibit 159, p. 99, *Woods PowerPoint.*
[2716] Exhibit 24, p. 12, *Bradford Declaration.*
[2717] Exhibit 24, p. 13, *Bradford Declaration.*
[2718] Vol. 4, p. 876, *Fucetola Testimony.*
[2719] Vol. 4, p. 876-79, *Fucetola Testimony.*
[2720] Vol. 4, p. 879, *Fucetola Testimony.*
[2721] Vol. 4, p. 879, *Fucetola Testimony.*
[2722] Vol. 4, p. 882-83, *Fucetola Testimony.*
[2723] Vol. 5, p. 1146, *Davatzikos Testimony.*
[2724] Vol. 5, p. 1147, *Davatzikos Testimony.*
[2725] Vol. 5, p. 1148, *Davatzikos Testimony.*
[2726] Vol. 5, p. 1155, *Davatzikos Testimony.*
[2727] Vol. 5, p. 1155-59, *Davatzikos Testimony*; *See also*, Exhibit 29, p. 1, *10/11/16 Gur Report.*
[2728] Vol. 5, p. 1229, *Newberg Testimony*; *See also*, Exhibit 29, p. 3, *10/11/16 Gur Report*; Exhibit 148, *Montgomery MIM Reanalysis* .
[2729] Vol. 8, p. 2029-97, *Gur Testimony.*
[2730] Vol. 7, p. 1712, *Nadkarni Testimony.*
[2731] Vol. 7, p. 1718, *Nadkarni Testimony.*
[2732] Vol. 7, p. 1722, *Nadkarni Testimony.*
[2733] Vol. 7, p. 1737, *Nadkarni Testimony.*
[2734] Vol. 7, p. 1738, *Nadkarni Testimony.*
[2735] Vol. 7, p. 1739, *Nadkarni Testimony.*
[2736] Vol. 7, p. 1639, *Porterfield Testimony.*
[2737] Vol. 7, p. 1638-39, *Porterfield Testimony.*
[2738] Vol. 7, p. 1647-54, *Porterfield Testimony.*
[2739] Vol. 7, p. 1692, *Porterfield Testimony.*
[2740] Vol. 7, p. 1694, *Porterfield Testimony.*
[2741] Vol. 7, p. 1658, *Porterfield Testimony.*



Appellate Case: 17-1716 Page: 959 Date Filed: 11/01/2017 Entry ID: 4596229

2742 Vol. 7, p. 1658, *Porterfield Testimony.*
2743 Crim. D.E. 33; Crim. D.E. 68 (discussing letters seized from Mrs. Montgomery's cell); Crim. D.E. 40; Crim. D.E. 45; Crim. D.E. 46; Crim. D.E. 48.
2744 Exhibit 67, *4/25/06 Transcript*; Exhibit 68, *5/3/06 Transcript.*
2745 Exhibit 58, *4/3/07 Transcript.*
2746 TT. Vol. 10, p. 2071, *McCandless Testimony.*
2747 Exhibit 103, p. 1021, *ABA Guidelines.*
2748 Vol. 8, p. 2313, *Duchardt Testimony.*
2749 Vol. 8, p. 2314, *Duchardt Testimony.*
2750 Vol. 8, p. 2314, *Duchardt Testimony.*
2751 Exhibit 83, p. 4, *Armstrong Declaration.*
2752 Exhibit 83, p. 4, *Armstrong Declaration.*
2753 Exhibit 83, p. 4, *Armstrong Declaration.*
2754 Exhibit 83, p. 4, *Armstrong Declaration.*
2755 Vol. 9, p. 2313, *Duchardt Testimony.*
2756 Vol. 9, p. 2313, *Duchardt Testimony.*
2757 Vol. 9, p. 2313, *Duchardt Testimony.*
2758 Vol. 9, p. 2313-14, *Duchardt Testimony.*
2759 Vol. 9, p. 2314, *Duchardt Testimony.*
2760 D.E. 212, p. 95.
2761 Vol. 7, p. 1837, *Woods Testimony.*
2762 Exhibit 24, *Bradford Declaration.*
2763 Exhibit 24, p. 6, *Bradford Declaration.*
2764 Exhibit 24, p. 3, *Bradford Declaration.*
2765 Exhibit 24, p. 3, *Bradford Declaration.*
2766 Exhibit 24, p. 3, *Bradford Declaration.*
2767 Exhibit 24, p. 3, *Bradford Declaration.*
2768 Exhibit 24, p. 12-3, *Bradford Declaration* (emphasis in original).
2769 Exhibit 24, p. 13-4, *Bradford Declaration.*
2770 Vol. 7, p. 1827-28, *Woods Testimony.*
2771 Vol. 7, p. 1828-29, *Woods Testimony.*
2772 Vol. 7, p. 1829, *Woods Testimony.*
2773 Vol. 7, p. 1830, *Woods Testimony.*
2774 Vol. 7, p. 1831, *Woods Testimony.*
2775 Vol. 7, p. 1864, *Woods Testimony.*
2776 Vol. 7, p. 1834, *Woods Testimony.*
2777 Vol. 7, p. 1836, *Woods Testimony.*
2778 Vol. 7, p. 1838, *Woods Testimony.*
2779 Vol. 7, p. 1838, *Woods Testimony.*
2780 Vol. 7, p. 1856, *Woods Testimony.*



Appellate Case: 17-1716 Page: 960 Date Filed: 11/01/2017 Entry ID: 4596229

[2781] Vol. 7, p. 1864, *Woods Testimony.*
[2782] Vol. 7, p. 1837-38, *Woods Testimony.*
[2783] Vol. 7, p. 1835-36, *Woods Testimony.*
[2784] Vol. 7, p. 1836, *Woods Testimony.*
[2785] Vol. 7, p. 1839, *Woods Testimony.*
[2786] Vol. 7, p. 1835, *Woods Testimony.*
[2787] Vol. 7, p. 1835, *Woods Testimony.*
[2788] Vol. 7, p. 1840, 1845, *Woods Testimony.*
[2789] Vol. 7, p. 1840, 1845, *Woods Testimony.*
[2790] Vol. 7, p. 1839, *Woods Testimony.*
[2791] Vol. 7, p. 1840, *Woods Testimony.*
[2792] Vol. 7, p. 1844, *Woods Testimony.*
[2793] Vol. 7, p. 1844-45, *Woods Testimony.*
[2794] Vol. 5, p. 1251-54, *Kempke Testimony*; Exhibit 73, p. 3-4, *McCandless Declaration.*
[2795] Vol. 7, p. 1845-46, *Woods Testimony.*
[2796] Vol. 7, p. 1846, *Woods Testimony.*
[2797] TT. Vol. 10, p. 2082, *McCandless Testimony.*
[2798] TT. Vol. 10, p. 2082, *McCandless Testimony.*
[2799] TT. Vol. 10, p. 2083, *McCandless Testimony.*
[2800] TT. Vol. 10, p. 2083-84, *McCandless Testimony.*
[2801] TT. Vol. 10, 2079, *McCandless Testimony.*
[2802] TT. Vol. 10, p. 2094, *McCandless Testimony.*
[2803] D.E. 71, p. 133, 184, 197.
[2804] Exhibit 103, p. 1010-11, *ABA Guidelines.*
[2805] Exhibit 103, p. 1028-34, *ABA Guidelines.*
[2806] Vol. 8, p. 2147-48, *Owen Testimony.*
[2807] Exhibit 103, p. 1005, *ABA Guidelines.*
[2808] Exhibit 62, p. 17, *Owen Affidavit.*
[2809] Vol. 2, p. 380, *Schnack Testimony.*
[2810] Vol. 2, p. 381, *Testimony of Troy Schnack.*
[2811] Vol. 2, p. 381, *Testimony of Troy Schnack.*
[2812] Vol. 2, p. 421, *Hunt Testimony.*
[2813] D.E. 212, p. 98.
[2814] D.E. 212, p. 98.
[2815] Vol. 2, p. 381, *Schnack Testimony.*
[2816] Vol. 2, p. 359-60, *Elliott Testimony.*
[2817] D.E. 173, p. 65.
[2818] D.E. 179, p. 17.
[2819] D.E. 77.



Appellate Case: 17-1716 Page: 961 Date Filed: 11/01/2017 Entry ID: 4596229

[2820] D.E. 100, p. 1.
[2821] D.E. 173, pp. 64-65.
[2822] D.E. 179, p. 15.
[2823] Vol. 8, 2217.
[2824] Vol. 1, p. 52.
[2825] Exhibit 52, *Report of Lawrence J. Fox*.
[2826] D.E. 179, p. 18.
[2827] 10/14/2016 Transcript.
[2828] TT. Vol. 14, p. 2902.
[2829] TT. Vol. 8, p. 2846.
[2830] TT. Vol. 8, p. 2845.
[2831] Exhibit 91.
[2832] TT. Vol. 7, p. 2664.
[2833] TT. Vol. 8, p. 2850.



Appellate Case: 17-1716 Page: 962 Date Filed: 11/01/2017 Entry ID: 4596229