**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-1716 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee. | ) | |

# GOVERNMENT'S RESPONSE TO APPELLANT'S REQUEST FOR ISSUANCE OF A CERTIFICATE OF APPEALABILITY

The United States of America, by Timothy A. Garrison, United States Attorney, and the undersigned Assistant United States Attorney, all for the Western District of Missouri, files the following response to appellant Lisa M. Montgomery's request for an issuance of a certificate of appealability from the district court's denial of her 28 U.S.C. § 2255 motion. For the reasons set forth below, the Government requests that Montgomery's request be denied.

## Table of Contents


I. Summary ..... 4

II. Prior Proceedings Related To § 2255 Motion ..... 9

A. Motion to Vacate Sentence ..... 9

B. District Court Order Dated 12/21/15 ..... 13

C. District Court Order Dated 03/03/17 .......... 14

III. Procedural History and Trial Testimony .......... 17

A. Procedural History .......... 17

B. Trial Testimony .......... 23

C. Montgomery's Guilt Phase Case-in-Chief .......... 36

D. Montgomery's Penalty Phase Case-in-Chief .......... 73

IV. Post-Conviction Proceedings .......... 80

A. Procedural History of Movant's § 2255 Motion .......... 80

B. Testimony at Evidentiary Hearing .......... 85

V. Arguments .......... 170

A. Legal Standard .......... 170

B. Claims Asserted in Application for a COA Regarding Removal of Judy Clarke .......... 175

C. The District Court Properly Removed Attorney Judy Clarke, the Third Attorney Appointed to the Defense Team and Admitted Pro Hac Vice, When Ms. Clarke Had Engaged in Conduct That Resulted in the Refusal of the FPD, Who Had Sponsored Her Admission in the Case, to Continue Working With Her and Which Interfered With the Effective Representation of Montgomery .......... 177

D. The District Court Did Not Deny Montgomery Her Sixth Amendment Right to Counsel by Removing Judy Clarke, Who Was Admitted Pro Hac Vice, Based on the Admitted Dysfunction of the Trial Team and Who Was the Third Attorney Appointed to Represent Montgomery .......... 191

E. David Owen and Ray Conrad Did Not Render Ineffective Assistance of Counsel by Engaging in Conduct Leading to the District Court's Decision to Remove Ms. Clarke From the Defense Team Without Notice to Ms. Clarke or Montgomery and Purportedly Contrary to the Wishes of Ms. Clarke And Montgomery, Allegedly Resulting in a Violation of Montgomery's Rights to Counsel, Due Process, and a Fair Trial As Protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599 ....................205

F. Montgomery Was Not Deprived of Counsel at a Critical Stage in the Proceedings When Mr. Owen and Mr. Conrad Met With the District Court Regarding the Problems Involved in the Defense Team Which Resulted in the Removal of Ms. Clarke as Counsel for Montgomery Purportedly in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution ........................................................................208

G. Claims A – C Are Subject to Procedural Bar ...................................212

H. The District Court Did Not Deny Montgomery Due Process and a Fair Hearing On Claims Relating to the Removal of Judy Clarke as Counsel in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under § 2255 When the Court Denied Montgomery's Motion to Re-Assign the Case .................................215

I. Montgomery's Allegations of Multiple Deficiencies by Trial Counsel Are Unfounded Because Trial Counsel Properly Explored and Prepared a Viable NGRI Trial Defense, Which Was Substantially Supported by the Evidence Available to Trial Counsel and Did So In a Constitutionally Effective Manner ...........238

J. Prevailing Professional Norms and Constitutional Requirements ....243

K. The Allegation That Montgomery's Trial Counsel Rendered Ineffective Assistance in the Presentation of Evidence Regarding Her Alleged Brain Impairments ......................................................334

L. The Allegation That Montgomery's Rights Were Violated When She Was Administered Drugs During Her Trial Which Allegedly Distorted Her Demeanor But Also Allegedly Failed to Treat Her Mental Illness Issues ....................360

M. Allegations That the District Court Improperly Denied Discovery, Failed to Honor Stipulations, Cut Short Testimony, and Displayed Bias to Habeas Counsel....................369

N. The Allegation That Montgomery's Rights to Due Process and a Fair Sentence Were Violated by the Introduction of Victim Impact Evidence....................375

O. The Argument That Montgomery's Capital Sentence Violates the Eighth Amendment Because It is Constitutionally Disproportionate for This Offense ....................377

P. The Allegation That Dr. Park Dietz Presented False Testimony Regarding the Nature of the Grand Jury Investigation Into His Testimony in the Andrea Yates Case ....................378

VI. Conclusion ....................380

## I. <u>Summary</u>

On March 19, 2013, Lisa M. Montgomery filed her motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255, attacking her conviction and sentence. (DCD 32.)[1] The Government filed its suggestions in opposition on June 18, 2013. (DCD 58.) Montgomery requested, and the district court granted, permission to file an amended § 2255 motion on October 1, 2013. (DCD 55, 71.)

---

[1]"DCD" refers to the district court docket entries in Montgomery's civil case, No. 12-08001-CV-SJ-GAF.



Appellate Case: 17-1716 Page: 4 Date Filed: 07/30/2018 Entry ID: 4687987

The district court denied a number of Montgomery's claims in an order issued on December 21, 2015, without holding an evidentiary hearing. (DCD 173.) With respect to the remainder of Montgomery's claims, the district court conducted an evidentiary hearing which commenced on October 31, 2016, and concluded on November 10, 2016, after which the court heard closing arguments. (DCD 201-209.) On March 3, 2017, the court issued an order denying the remainder of Montgomery's claims and declining to issue a certificate of appealability (COA). (DCD 212.) Montgomery filed a notice of appeal on March 31, 2017. (DCD 214.) Thereafter, Montgomery filed an application for a COA with this Court on November 1, 2017, presenting the following issues for which a COA is requested:

1. Whether the district court's abrupt removal of attorney Judy Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery, contrary to the wishes of Ms. Clarke and Mrs. Montgomery, and without a hearing, violated Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.

2. Whether the trial court's decision to remove Ms. Clarke as counsel without notice or hearing was an unconstitutional denial of Mrs. Montgomery's Sixth Amendment right to counsel.

3. Whether counsel David Owen and Federal Public Defender Ray Conrad rendered ineffective assistance of counsel by engaging in conduct leading to the district court's decision to abruptly remove Ms. Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery and contrary to the wishes of Ms. Clarke and Mrs. Montgomery resulting in a violation of Mrs. Montgomery's rights to counsel, due process, and a fair trial

as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.

4. Whether Mrs. Montgomery was deprived of counsel at a critical stage in the proceedings when David Owen and Ray Conrad met with the district court without her knowledge or consent resulting in the removal of Ms. Clarke as counsel for Mrs. Montgomery in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5. Though the district court's ruling on claims 1-4 was on the merits, if the court believes any of those claims are subject to procedural default, Mrs. Montgomery requests a COA under *Slack v. McDaniel*, 529 U.S. 473 (2000), as to whether any such claim is subject to procedural default and if so, whether Mrs. Montgomery has shown cause and prejudice sufficient to overcome the procedural bar.

6. Whether the district court denied Mrs. Montgomery due process and a fair hearing on claims relating to the removal of Ms. Clarke as counsel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. §2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under §2255.

7. Whether multiple deficiencies by successor trial counsel including: failure to consult with prior counsel, virtually stopping record collection; stalling the investigation; working on other cases while ignoring Mrs. Montgomery's; failing to communicate with others working on the case; zeroing in on an improbable NGRI defense and an equally improbable and logically inconsistent innocence defense; refusing to work with his mitigation expert; failing to develop competent expert proof; and making false statements to the court, constitute ineffective assistance of counsel.

8. Whether Mrs. Montgomery is entitled to relief where, in contravention of prevailing professional norms, counsel unreasonably failed to investigate, develop, and present readily available, compelling penalty phase evidence.



Appellate Case: 17-1716 Page: 6 Date Filed: 07/30/2018 Entry ID: 4687987

9. Whether Mrs. Montgomery was incompetent to stand trial because she was unable to rationally assist counsel due to her brain damage, mental impairments, severe complex trauma, and the incomplete, ineffective, and inappropriate regimen of psychotropic medication administered to her by CCA before and during her capital trial. As such, it is reasonably debatable that Mrs. Montgomery's rights to due process, a fair trial, effective assistance of counsel, and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendment were violated.

10. Whether Mrs. Montgomery's Fifth Sixth, Eighth, and Fourteenth Amendment rights to due process, full and fair trial, and reliable sentencing were violated when she was administered multiple psychotropic medications during her trial which distorted her affect, while at the same time incompletely treating her comorbid mental illnesses without a detailed pre-trial determination that the administration of the drugs during trial was necessary. Further, whether trial counsel was ineffective for failing to raise issue with the trial court, failing to explain this issue to Mrs. Montgomery, and failing to elicit testimony that would explain the physiological impact of medications to the jury

11. Whether Mrs. Montgomery was denied due process at the evidentiary hearing below where the court denied discovery, failed to honor stipulations, cut short testimony, and displayed bias towards habeas counsel.

12. Whether Mrs. Montgomery's rights to due process and a fair reliable sentence free from emotion and caprice under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the introduction of overly prejudicial victim impact evidence. Whether trial counsel was constitutionally ineffective for failing to object to this proof.

13. Whether Mrs. Montgomery's capital sentence violates the Eighth Amendment, because it is constitutionally disproportionate where Mrs. Montgomery is the only individual to be sentenced



Appellate Case: 17-1716 Page: 7 Date Filed: 07/30/2018 Entry ID: 4687987

to death for these crime facts and where Mrs. Montgomery suffers from brain damage and severe mental illness.

14. Whether Dr. Park Dietz, presented untrue and prejudicial testimony regarding the nature of the Grand Jury investigation into his untrue testimony in the Andrea Yates trial and the circumstances surrounding that untrue testimony in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972.)

(Montgomery COA 11-14.)

Generally, these arguments fall under several broad categories, that: (1) Montgomery's rights were violated by the removal of one of her appointed attorneys at the pretrial stage of the proceedings; (2) her trial counsel rendered ineffective assistance by proceeding with a defense of not guilty by reason of insanity (NGRI), and failed to sufficiently develop and investigate mitigation evidence; (3) Montgomery was incompetent to stand trial and that medications affected her demeanor at trial, which was not explained to the jury; and (4) the district court erred in the proceedings before, and the way it conducted the evidentiary hearing for the § 2255 motion.[2] However, as demonstrated below: (1) Montgomery does not have a right to a particular appointed attorney; (2) the decision

[2]The remaining issues regarding the admission of the victim's mother's 911 call, the constitutionality of the death penalty imposed on Montgomery, and the testimony of Dr. Dietz are, in contrast to the other issues, set forth in perfunctory fashion in the last five pages of Montgomery's 304 pages of argument.

to move forward with a NGRI defense was an informed decision based on the facts of the case, and Montgomery's trial counsel did, in fact, develop and present substantial evidence in support of mitigation; (3) the credible evidence developed on the record showed that Montgomery was not incompetent to stand trial nor did she have a flat affect during the trial; and (4) the district court did not err in the way it conducted the evidentiary hearing.

Accordingly, Montgomery's application for a certificate of appealability should be denied.

## II. Prior Proceedings Related To § 2255 Motion

### A. *Motion to Vacate Sentence*

Montgomery's amended § 2255 motion to vacate her sentence was filed on October 1, 2013. (DCD 71.) The 238-page motion alleged the following claims:[3]

1. The removal of Montgomery's appointed pretrial counsel, Judy Clarke, violated her constitutional right to counsel. (DCD 71 at 15-47.) Members of Federal Public Defenders Office perpetrated a fraud on the court leading to the removal of Ms. Clarke by leading the court to believe that Ms. Clarke had been "disruptive." (DCD 71 at 47-52.)

2. Montgomery was deprived [effective assistance] of counsel during a critical stage of the criminal proceedings and the attorneys of the Federal Public Defender had an actual conflict of interest in the removal of Ms. Clarke. (DCD 71 at 52-56.)

[3]Montgomery does not allege a number of these claims in her application for a certificate of appealability.

3. The final trial team of Fred Duchardt, John O'Connor, and David Owen had a conflict of interest regarding Ms. Clarke's removal and the appellate attorneys provided ineffective assistance of counsel by not raising this issue. (DCD 71 at 56-59.)

4. Montgomery's trial team provided ineffective assistance of counsel in the following specific ways:[4]

   a. Failure to Retain competent mental health and neurological experts (DCD 71 at 135-36);

   b. Failure to conduct a mitigation investigation that complied with ABA Guidelines and prevailing professional norms (DCD 71 at 136-44);

   c. Failing to function as a cohesive team (DCD 71 at 144-46);

   d. Fred Duchardt provided ineffective assistance of counsel by having his wife present at meetings with Montgomery (DCD 71 at 146-50);

   e. Failing to pursue plea negotiations (DCD 71 at 150-52);

   f. Misrepresenting issues to the district court, failing to request a continuance and announcing a defense before it had been fully investigated (DCD 71 at 152-62);

   g. Misrepresentations to the court created an actual conflict of interest on the part of Mr. Duchardt (DCD 71 at 162);

   h. Mr. Duchardt failed to maintain an appropriate caseload (DCD 71 at 162-63);

[4]This section of Montgomery's § 2255 motion, alleging ineffective assistance of counsel involving her trial attorneys, begins on page 59 of her brief and continues to page 135, making a number of factual allegations absent any particular arguments. The "specific allegations of constitutionally ineffective assistance of counsel" begin on page 135.

i. Presenting a defense of not guilty by reason of insanity (DCD 71 at 163);

j. Failing to properly present evidence of Dr. Gur relating to brain damage (DCD 71 at 163-67);

k. Failing to exclude the testimony of witness Mary Case prior to trial (DCD 71 at 167-70);

l. Failing to properly conduct jury selection (DCD 71 at 170-78);

m. Failing to have a cohesive theory of defense (DCD 71 at 178-80);

n. Relying on a defense of pseudocyesis (DCD 71 at 180-82);

o. Presenting Montgomery as a "hard worker" and a "good mother" (DCD 71 at 182-84);

p. Failing to recognize the impact that Montgomery's medications would have on her demeanor during trial (DCD 71 at 184-85);

q. Failure to prepare defense witnesses (DCD 71 at 185-86);

r. Announcing and relying on the "Tommy Defense" (DCD 71 at 186)

s. Presenting Dr. McCandless as a Guilt Phase witness (DCD 71 at 186-88);

t. Eliciting testimony harmful to the defense (DCD 71 at 188-90);

u. Failing to ask defense experts in the guilty phase whether to a reasonable degree of medical certainty Montgomery was unable to conform her behavior to the law as a result of mental illness (DCD 71 at 190);

v. Failing to prepare for and cross-examine the Government's witnesses (DCD 71 at 190-92);



Appellate Case: 17-1716 Page: 11 Date Filed: 07/30/2018 Entry ID: 4687987

w. Failing to prepare a mitigation case and to tell Montgomery's story during the penalty phase (DCD 71 at 192-93);

x. Failing to exclude the 911 tape prior to trial and failing to object during trial (DCD 71 at 193-94);

5. Montgomery was tried while she was incompetent. (DCD 71 at 195-97.)

6. The jury was permitted to see Montgomery under the effects of psychotropic medication during trial. (DCD 71 at 197-98.)

7. The Government based its decision to prosecute Montgomery federally on improper and inapplicable factors. (DCD 71 at 198-200.)

8. The admission of the 911 tape during the penalty phase prejudiced Montgomery. (DCD 71 at 200-01.)

9. Counsel for the Government misstated the law in the penalty phase opening and closing argument. (DCD 71 at 201-03.)

10. Women and African-Americans were unconstitutionally underrepresented in the Grand Jury. (DCD 71 at 204-08.)

11. Identification of one venire person as "Cuban" resulted in her exclusion based on race. (DCD 71 at 208-11.)

12. The Government engaged in misconduct by advising Montgomery's brother that she was blaming him for the murder and to not tell the defense team about his alibi. (DCD 71 at 211-12.)

13. Suppression of exculpatory evidence by the Government and knowing use of perjured testimony. (DCD 71 at 212-13.)

14. Witnesses Mayberg and Evens presented false, misleading, unreliable unscientific and specious testimony during the *Daubert* Hearing. (DCD 71 at 213-14.)



Appellate Case: 17-1716 Page: 12 Date Filed: 07/30/2018 Entry ID: 4687987

15. Trial court errors including the exclusion of hearsay evidence in the penalty phase, and jury instruction errors in the guilt phase and penalty phase. (DCD 71 at 214-25.)

16. Death penalty is disproportionately and unconstitutionally applied as to Montgomery. (DCD 71 at 225-27.)

17. Ineffective assistance of counsel on appeal. (DCD 71 at 227-28.)

18. Montgomery's severe mental illness precludes her execution. (DCD 71 at 228-30.)

19. Montgomery's capital sentence is constitutionally disproportionate. (DCD 71 at 230.)

20. Montgomery's sentence violates international law. (DCD 71 at 231-33.)

21. Montgomery's sentence must be vacated due to cumulative prejudicial effects of the errors alleged. (DCD 71 at 233-34.) This argument is not presented in Montgomery's application for a COA as a separate argument.

### *B.* ***District Court Order Dated 12/21/15***

On December 21, 2015, the district court issued an order denying a number of Montgomery's claims set forth in her § 2255 motion. (DCD 173.) Included in this order were denials of Montgomery's claims regarding the removal of Judy Clarke, one of three appointed pretrial defense attorneys. The court ruled it had properly removed Ms. Clarke, who had been admitted *pro hac vice* under the sponsorship of the Assistant Federal Public Defender David Owen, from the pretrial defense team because the defense team was no longer functioning effectively. (DCD 173 at 8-16.) In conjunction with this claim, the court also denied allegations

that Mr. Owen and his supervisor, Federal Public Defender Ray Conrad, had committed fraud on the court in the removal of Ms. Clarke (DCD 173 at 17-18.); that both Mr. Owen and Mr. Conrad had a conflict of interest in the removal of Ms. Clarke (DCD 173 at 18-21); and that appellate counsel were ineffective because they failed to raise this issue on appeal. (DCD 173 at 21.)

This Order also denied her claims of prosecutorial misconduct alleging bias on the part of the United States Attorney, and nine trial errors involving penalty phase opening and closing arguments that Montgomery does not raise in her application for a COA. (DCD 173 at 22-38.) In addition, Montgomery complained about the composition of the grand jury that indicted her, but does not raise this issue in the application for a COA. (DCD 173 at 39.)

The court also denied Montgomery's claims of various errors alleged to have been committed by the trial court regarding the admission or exclusion of evidence and involving jury instructions. (DCD 173 at 40-57.) Most of these claims do not appear in Montgomery's application for a COA. In addition, the court denied Montgomery's constitutional attacks on the death penalty, one of which she retains in her application for a COA. (DCD 173 at 58-63.)

### *C.* ***District Court Order Dated 03/03/17***

Following the resolution of the claims set forth above, the district court granted an evidentiary hearing on Montgomery's remaining ineffective assistance of



Appellate Case: 17-1716 Page: 14 Date Filed: 07/30/2018 Entry ID: 4687987

counsel claims, competency and effects of her medication, the exclusion of Venire Person Torres, prosecutorial misconduct regarding witness Tommy Kleiner, and the exclusion of Dr. Gur. (DCD 173 at 64.) The evidentiary hearing on these remaining issues commenced on October 31, 2016, and concluded on November 10, 2016, with closing arguments following the hearing. (DCD 201-209.)

On March 3, 2017, the district court entered an order denying Montgomery's remaining claims. (DCD 212.) The findings and the conclusions of the district court in this order are set forth more fully below to the extent that they apply to Montgomery's current claims in her application for a COA.

Generally, however, with respect to the ineffective assistance of counsel claim, the district court noted that Montgomery's primary argument (repeated in various forms in her application for a COA) is that the trial team rendered ineffective assistance of counsel because it presented a defense of not guilty by reason of insanity (NGRI), and, instead, should have presented all of its mental health evidence in the penalty phase as mitigating evidence. (DCD 212 at 22.)

In response to this overall assertion, the district court observed that the statement of trial counsel, Fred Duchardt, reflected an understanding that the nature of the crime committed by Montgomery, i.e., "killing an innocent acquaintance for the purpose of stealing her baby," forced the defense to consider a strategy and a

defense, pseudocyesis,[5] that would account for this type of crime. Trial counsel John O'Connor concurred, stating that the pseudocyesis defense allowed the trial team to carry Montgomery's obsession with pregnancy throughout the trial. (DCD 212 at 22-23.)

The court further found that Montgomery's trial counsel possessed evidence supporting the pseudocyesis defense, including lay witnesses who testified that Montgomery appeared pregnant and expert testimony that she suffered from pseudocyesis as well as depression, borderline personality disorder, and PTSD.[6] The district court concluded that the testimony at the evidentiary hearing, as well as the written statements of the trial team, demonstrated that the decision to proceed with their defense strategy was the result of a reasoned process. (DCD 212 at 23.) The court found that this trial strategy does not constitute ineffective assistance of counsel simply because it is unsuccessful, and concluded that trial counsel's decisions were within the wide range of effective assistance of counsel required by the Sixth Amendment. (DCD 212 at 24.)

---

[5] A mental disorder in which the individual falsely believes that she is pregnant to the extent that she displays the physical signs of pregnancy.

[6] *See also United States v. Montgomery*, 635 F.3d 1074, 1082 (2011).

## III. <u>Procedural History and Trial Testimony</u>

### *A. Procedural History*

On December 17, 2004, following her arrest, a one-count complaint was filed in the United States District Court for the Western District of Missouri alleging that Lisa M. Montgomery on December 16, 2004, kidnapped infant Victoria Jo Stinnett and transported her in interstate commerce from Skidmore, Missouri, to Melvern, Kansas, and that the actions of Montgomery resulted in the death of the infant's mother, Bobbie Jo Stinnett, in violation of 18 U.S.C. § 1201(a)(1). (Crim. DCD 1.)[7]

On December 28, 2004, the district court appointed the Federal Public Defender's Office (FPD) for the Western District of Missouri to represent Montgomery. (Crim. DCD 8.) The FPD assigned Anita Burns as counsel.

On January 12, 2005, a grand jury in the Western District of Missouri returned a one-count indictment charging that, on December 16, 2004, Montgomery willfully and unlawfully kidnapped, abducted, carried away, and held Victoria Jo Stinnett, and willfully transported her in interstate commerce from Skidmore, Missouri, across the state line to Melvern, Kansas, and that the actions of Montgomery resulted in the death of Bobbie Jo Stinnett, in violation of 18 U.S.C. § 1201(a)(1). (Crim. DCD 15.) On January 20, 2005, Montgomery made her initial appearance on the

[7]"Crim. DCD" refers to the district court docket entries in Montgomery's underlying criminal case, *United States v. Montgomery*, No. 05-06002-01-CR-SJ-GAF.

indictment and was arraigned before United States Magistrate Judge John T. Maughmer. (Crim. DCD 18.)

On January 30, 2005, the district court appointed Susan Hunt as learned counsel. (Crim. DCD 16.)

On January 31, 2005, the Government filed a motion to dismiss the criminal complaint against Montgomery, and the court entered an order dismissing the complaint. (Crim. DCD 24.)

On March 23, 2005, the United States Magistrate Judge granted Montgomery's motion for a continuance and set the trial for April 24, 2006. (Crim. DCD 37.)

On April 23, 2005, Anita Burns withdrew from the case (Crim. DCD 41) and the FPD assigned David Owen as counsel.

On October 7, 2005, the district court appointed Judy Clarke as counsel *pro hac vice* at the request of David Owen. (Crim. DCD 37.)

On November 16, 2005, the Government filed its notice of intent to seek the death penalty. (Crim. DCD 64.)

On January 23, 2006, the court again granted Montgomery's request to continue the trial and set the trial for October 23, 2006. (Crim. DCD 72.)

On April 20, 2006, the district court terminated Ms. Clarke's representation of Montgomery. (Crim. DCD 79.) On April 21, 2006, the court held an *ex parte*



Appellate Case: 17-1716 Page: 18 Date Filed: 07/30/2018 Entry ID: 4687987

hearing with Montgomery and her counsel regarding Ms. Clarke's removal. (Crim. DCD 81.) On April 25, 2006, the court met with Mr. Owen and Ms. Hunt again regarding Ms. Clarke's removal.

On May 10, 2006, Susan Hunt moved to withdraw as Montgomery's counsel. (Crim. DCD 85.) On May 12, 2006, the court granted Ms. Hunt's motion and appointed John O'Connor as counsel. (Crim. DCD 86.) On May 16, 2006, the court appointed Fred Duchardt as additional counsel. (Crim. DCD 87.)

On July 12, 2006, the court again granted Montgomery's motion to continue and set the trial for April 30, 2007. (Crim. DCD 93.)

On March 13, 2007, a grand jury returned a superseding indictment against Montgomery charging a violation of 18 U.S.C. § 1201(a)(1). (Crim. DCD 154.) The superseding indictment charged the same crime as outlined in the initial indictment but added an amended "Notice of Special Findings" section that included the intent factors and aggravating circumstances the grand jury found in support of the death penalty.

On April 26, 2007, the court granted Montgomery's motion to continue and set the trial for October 1, 2007. (Crim. DCD 223.) Montgomery filed a multitude of pretrial motions which the court denied.

On August 28 and September 4, 2007, the court held hearings pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), regarding the



Appellate Case: 17-1716 Page: 19 Date Filed: 07/30/2018 Entry ID: 4687987

admissibility of certain testimony from one of Montgomery's proposed expert witnesses, Dr. Ruben Gur. (Crim. DCD 260, 263.) Dr. Gur had generated a report indicating that he had conducted brain imaging on Montgomery and made findings relevant to her mental state based on that procedure.

The Government objected to this proposed testimony and presented counter testimony by Dr. Alan Evans and Dr. Helen Mayberg. Both government experts challenged the scientific reliability of Dr. Gur's methodology, findings, and conclusions.[8] (08/28/07 Hrg. Tr. 8-30, 41-42.)[9] The court noted that the Government was unable to challenge Dr. Gur's findings directly because he had not yet produced the raw data that allegedly supported his claims. At a hearing on September 5, 2007, the court ordered Dr. Gur to produce the raw data to the Government's experts no later than September 12, 2007. (Status Conf. Tr. 2-17.)[10] The deadline came and passed and Dr. Gur failed to provide any raw data. After

---

[8]Both government experts, Dr. Mayberg and Dr. Evans, conducted separate tests comparing Montgomery's PET scans with the 23 individuals Dr. Gur had used in the comparison group (normals) as part of his analysis. Both government experts found that Dr. Gur's comparison method was seriously flawed and that, when the comparisons were done properly, Montgomery's brain was well within the normal limits of the comparison group. (08/28/07 Hrg. Tr. 12, 19, 30-32.)

[9]"08/28/07 Hrg. Tr." refers to the transcript of the *Daubert* hearing held on August 28, 2007.

[10]"Status Conf. Tr." refers to the transcript of the status conference held on September 5, 2007.



Appellate Case: 17-1716 Page: 20 Date Filed: 07/30/2018 Entry ID: 4687987

further challenge by the Government (Crim. DCD 273), on September 19, 2007, Dr. Gur finally turned over the raw data he claimed he had relied upon in arriving at his opinions, and which was necessary to enable the Government's experts to recreate the tests performed by Dr. Gur.

The court found that the comparison method utilized by Dr. Gur was scientifically invalid, and that any conclusions drawn from such a contrast also were invalid. As a result, the court excluded Dr. Gur's testimony pertaining to the imaging of Montgomery's brain.

Montgomery, however, had an array of other experts testify to her mental illness at trial. These included Vilayanur Ramachandran, M.D., Dr. William Logan, M.D., Dr. Linda McCandless, M.D., and Dr. Ruth Kuncil, M.D. The Government presented the testimony of Dr. Park Dietz, M.D., and Dr. Daniel Martell, Ph.D. A jury was empaneled and trial began on October 1, 2007. On October 22, 2007, the jury found Montgomery guilty of the kidnapping of Victoria Jo Stinnett and the murder of Bobbie Jo Stinnett. (Crim. DCD 341.)

The penalty phase of the trial began on October 23, 2007. On October 26, 2007, the jury unanimously found that the aggravating factors presented by the Government outweighed the mitigating factors submitted by Montgomery and found that Montgomery should be sentenced to death. (Crim. DCD 353.) On April 4,



Appellate Case: 17-1716 Page: 21 Date Filed: 07/30/2018 Entry ID: 4687987

2008, following a denial of Montgomery's motion for a new trial, the court sentenced Montgomery to death. (Crim. DCD 402.)

On April 5, 2008, Montgomery filed her notice of appeal with the United States Court of Appeals for the Eighth Circuit. (Crim. DCD 403.) On June 22, 2011, the Eighth Circuit issued an opinion affirming Montgomery's conviction and sentence in *United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011).

In her appeal to the Eighth Circuit, Montgomery raised the following nine issues: (1) the sufficiency of the evidence; (2, 3) the exclusion of the brain imaging evidence from Dr. Gur during the trial and during the penalty phase; (4) the admission of evidence regarding Montgomery's "mothering skills" and her failure to apologize to her children for her actions; (5, 6) the exclusion of Montgomery's proposed evidence, during the guilt and penalty phases of the trial, that her physical reactions during a defense-sponsored polygraph examination "were not indicative of deception"; (7) the sufficiency of the evidence during the penalty phase of the trial that Montgomery's murder of Bobbie Jo Stinnett was committed "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim"; (8) whether this the district court erred in submitting to the jury Penalty Phase Instruction No. 1, which instructed the jury "that the defendant must be sentenced to death" if the jury unanimously found that the aggravating factors sufficiently outweighed any mitigating factors; and (9) whether Montgomery was



Appellate Case: 17-1716 Page: 22 Date Filed: 07/30/2018 Entry ID: 4687987

entitled to a new trial or a new sentencing hearing based upon the "cumulative effect" of any or all of these alleged errors.

After her conviction and sentence were affirmed by the Eighth Circuit, Montgomery filed a petition for a writ of certiorari with the United States Supreme Court, which was denied on March 19, 2012. *Montgomery v. United States*, 565 U.S. 1263 (2012) (Mem).

### *B. Trial Testimony*

On the afternoon of December 16, 2004, the Nodaway County, Missouri, Sheriff's Department received a frantic 911 call from Becky Harper stating that her daughter, Bobbie Jo Stinnett, was injured. (Tr. 518-19, 525-27.)[11] Mrs. Harper had arrived at her daughter's house in Skidmore, Missouri, to find her daughter lying in a pool of blood. (Tr. 518, 544.) Mrs. Harper informed the dispatcher that it appeared that her daughter's stomach had exploded. (Tr. 518-19, 526.) Mrs. Stinnett was eight months pregnant at the time, awaiting the birth of a baby girl. (Tr. 499, 502, 514, 518, 534.)

Emergency personnel and investigators immediately determined that Mrs. Stinnett's mid-section had been cut laterally, her fetus had been removed, and the umbilical cord had been cut. (Tr. 533-35, 573, 575.) Upon arrival at the

---

[11]"Tr." refers the transcript of the trial held on October 1, 2007, through October 26, 2007.



Appellate Case: 17-1716 Page: 23 Date Filed: 07/30/2018 Entry ID: 4687987

emergency room, hair was found clenched in both of Stinnett's hands, and strangulation marks were observed on her neck. (Tr. 538, 549, 579, 584-85, 1632-33.) A subsequent medical examination of Mrs. Stinnett's body confirmed that she had been strangled. (Tr. 656-58.)

In addition to the incision wound to the lower abdomen, which had been made in order to remove the fetus, Mrs. Stinnett had suffered blows to the head and to the nose. (Tr. 655, 660-63, 814-15.) She also suffered cuts on her fingers and abrasions on both elbows. (Tr. 652-54.) Medical examinations later confirmed that Mrs. Stinnett was initially strangled to unconsciousness, and her abdomen was cut open; she then regained consciousness and struggled against her attacker. (Tr. 657, 666, 810-11, 815.) At that point, she was then strangled to death, then her abdomen was cut open further and the baby was fully removed. (Tr. 810-11, 828-31.)

Given the circumstances of the crime, investigators from the Nodaway County Sheriff's Department, the St. Joseph, Missouri Police Department, Missouri Highway Patrol, the Maryville, Missouri Department of Public Safety, the Cameron, Missouri Police Department, the Kansas City Regional Computer Forensic Laboratory, and the Federal Bureau of Investigation (FBI), began an intensive investigation, which included an Amber Alert. (Tr. 536, 539, 556, 579, 588, 631, 636.)



Appellate Case: 17-1716 Page: 24 Date Filed: 07/30/2018 Entry ID: 4687987

Mrs. Stinnett's mother told investigators at the scene that her daughter was involved in the breeding of rat terrier dogs and someone had scheduled an appointment to come to her daughter's house to look at a dog just prior to the murder and abduction. (Tr. 506-07, 515, 538-39, 634.) Mrs. Stinnett frequently used the Internet in connection with her dog breeding business. (Tr. 500-01, 740-42.)

A computer forensic examiner was able to view Mrs. Stinnett's computer at the scene. (Tr. 539, 671-76.) A preliminary search of her computer revealed instant message communications with a person using the name ADarlene Fisher@ from Fairfax, Missouri. (Tr. 635, 679-84.) Police were not able to locate anyone in Fairfax, Missouri, with the name Darlene Fischer. (Tr. 541, 557, 635-36.) However, the computer examiner determined that the message board postings contained an IP address. Law enforcement utilized the IP address to trace back the communication to a computer in the home of Kevin Montgomery in Melvern, Kansas. (Tr. 639-40, 698.) Kevin Montgomery is Lisa Montgomery's husband.

Additionally, a dog breeder in Franklin, North Carolina, reviewed messages on a rat terrier message board and found a message from Darlene Fischer to Mrs. Stinnett the night before her murder. (Tr. 699-702, 1320-21.) The breeder provided the IP address of that message to the FBI. (Tr. 702, 1323.) Law enforcement determined that the subscriber associated with the IP address was also Kevin Montgomery with a physical address in Melvern, Kansas. (Tr. 1323-26.)



Appellate Case: 17-1716 Page: 25 Date Filed: 07/30/2018 Entry ID: 4687987

Further, a tip was also called in by a woman, Patsy Hughes, informing police that she had seen the Amber Alert, and that a friend of hers, Lisa Montgomery, had just reported having a child under circumstances that Ms. Hughes said concerned her. (Tr. 567-69, 638, 1202.) Ms. Hughes provided police with Montgomery's address in Melvern, Kansas. (Tr. 569, 1202.)

On December 17, 2004, law enforcement authorities began immediate surveillance of Montgomery's residence in Melvern, Kansas. (Tr. 1284, 1637, 1667.) A red vehicle matching the description of a vehicle seen at Mrs. Stinnett's residence at the time of the crime was at Montgomery residence. (Tr. 620-21, 626-28, 633, 1637, 1667.) When law enforcement approached the home and knocked on the front door, Kevin Montgomery voluntarily allowed the officers and agents into the home. (Tr. 1006, 1284, 1638.) When they entered the home, officers saw Montgomery sitting on the sofa, holding the infant while watching the Amber Alert scroll across the bottom of the television screen. (Tr. 1289, 1639, 1668.) At the request of law enforcement officers, Montgomery allowed an officer to hold the infant, and agreed to be questioned by police outside the home. (Tr. 1006-07, 1285, 1640-41.)

Montgomery told investigators that she delivered her baby on December 16, 2004, at the Birth & Women's Center in Topeka, Kansas. (Tr. 1640.) A subsequent check at the Birth & Women's Center revealed that there were no births at the center



Appellate Case: 17-1716 Page: 26 Date Filed: 07/30/2018 Entry ID: 4687987

on December 16, 2004. (Tr. 1342.) She then admitted that this was a lie she had told her husband. (Tr. 1643.)

She then claimed to have actually delivered her baby in her home the day before in order to save money. (Tr. 1643.) She said two friends had been with her at the time of the birth. (Tr. 1643.) When asked the names of the friends, Montgomery stated that, in truth, her friends were not with her but they were just on stand-by in case there were problems. (Tr. 1643.)

When her in-laws arrived at the residence, Montgomery demanded to be taken from the scene. (Tr. 1644.) She was transported to a substation of the Osage County Sheriff's Department to continue the interview. (Tr. 1645.) Shortly after arrival, Montgomery stated to investigators, "You have Bobbie Jo's baby." (Tr. 1646.) Thereafter, Montgomery confessed to having strangled Mrs. Stinnett and to removing the fetus. (Tr. 1646, 1649.) She admitted the baby she had was Mrs. Stinnett's baby and that she had lied to her husband about giving birth to a child. (Tr. 1646.) Specifically, as Rodney Strong, an investigator with the Northwest Major Case Squad testified, Montgomery told the police the following:

> Yes, she said yesterday she was in Bobbie Jo's house. She was there when Bobbie Jo got a phone call. Bobbie Jo told the caller on the phone someone is here looking about a dog and she would see that person later. Lisa said she choked Bobbie Jo with a white cord she brought with her. She showed us marks on her hand when she was telling us. I could see red irritation marks on both her hands. (Tr. 1646.)

* * * *



Appellate Case: 17-1716 Page: 27 Date Filed: 07/30/2018 Entry ID: 4687987

Q. Go ahead and continue where you were at?

A. She said she brought the white cord with her she strangled Bobbie Jo with, showed us the marks on her hands? [sic] She told us she pulled the baby out of Bobbie Jo with her hands, she said she had gloves on because it was cold. And she said she didn't wash up in Bobbie Jo's house. She said she clamped the baby's umbilical cord with a clamp she brought she had in the car.

And she told us she acted alone. She said her husband Kevin was at work until five or five thirty. And by then they was back in Topeka with the baby. She told us the things she used to do this with were all in the trunk of her red Toyota.

Q. What happened next?

Q. At 3:36 P.M. Lieutenant Fritz asked her a pointed question, are you telling us you killed Bobbie Jo and Lisa Montgomery said yes. The questioning continued and she made some more admissions. She told us she had been to Bobbie Jo's house before regarding the puppies and she looked up Bobbie Jo's internet address on the internet and then she gave some details about yesterday's event again.

Q. What did she tell you?

A. She told us that while she was at Bobbie Jo's house they took the puppies outside and let them play. She said she almost left Bobbie Jo's house but didn't. She brought the white cord into Bobbie Jo's inside her coat. She also brought a knife she had in the pocket. She had cord clamps in the car and again repeated everything in the trunk of her car, told us she thought she cut her finger while she was taking baby out and she pointed to the Band-Aid on her left hand and little finger.

She told me when she left Bobbie Jo's house she was holding the baby's umbilical cord between her fingers and that she held the baby when she got in the car and drove away. She remembers the sun was in her eyes and she was driving away.

> She told me she drove a short distance away from the house and stopped, got a cord clamp and clamped the cord and she told us she retrieved a suction ball and suctioned the baby. The baby was crying a little bit and she retrieved a baby seat out of the trunk of the car. Brought it up in the passenger compartment and put the baby in there.

(Tr. 1649-50.)

At the same time that law enforcement officers were interviewing Montgomery, FBI agents obtained consent to search from Kevin Montgomery for searches of the residence and Montgomery's red car. (Tr. 1008-10.) In the trunk of the car, they found a trash bag containing numerous items, including a bloody coat, a bloody towel, a bloody disposable pad, and an umbilical cord clamp. (Tr. 1258-60.) In the pockets of that coat, they found a knife with blood on it and a length of laundry cord line with blood and hair on it. (Tr. 1258-59.)

DNA testing confirmed that Mrs. Stinnett was a contributor to the blood on the knife and the hair on the rope. (Tr. 1305, 1309.) DNA testing also indicated that fingernail scrapings obtained from Montgomery contained a mixture, the major component identified to Lisa Montgomery, the minor component being consistent with Mrs. Stinnett. (Tr. 1313-14.)

Inside Montgomery's residence, law enforcement found a birthing kit (with a umbilical cord clamp and infant nasal suction bulb missing), a digital camera, a disposable camera, birth announcements, a motion for change of custody of Montgomery's children filed by her ex-husband, and a letter, purporting to be



Appellate Case: 17-1716 Page: 29 Date Filed: 07/30/2018 Entry ID: 4687987

authored by Dr. Stephen Saylor, dated October 8, 2003, and referencing the loss of a baby and Montgomery's donation of that baby to science. (Tr. 1241-48.) Dr. Saylor later testified that he did not author the October 8, 2003, letter, and never treated Montgomery. (Tr. 1621-22.)

Investigators were able to piece together the events that led up to the crime and the events that followed. Montgomery met Bobby Jo and Zeb Stinnett at a dog show in Abilene, Kansas, in April 2004. (Tr. 501-02, 919.) Shortly after this dog show, Mrs. Stinnett learned that she was pregnant and began telling other dog breeders on the Internet website message boards and in e-mails about her pregnancy. (Tr. 738-39, 743-44, 1644.) It was determined through computer evidence that Montgomery viewed these same websites and posted to the same message boards on multiple occasions. (Tr. 760, 1676.)

During this time period, Montgomery began falsely claiming she was also pregnant. (Tr. 504, 894-97, 909, 1190.) However, this was not the first time that Montgomery falsely claimed she was pregnant.

In 1990, after the birth of her fourth child with her first husband, Carl Boman, Montgomery had a tubal fulguration, which occluded her fallopian tubes by cauterization. (Tr. 1064-67.) This sterilization procedure made it impossible for Montgomery to become pregnant. (Tr. 2061-62.) Yet, despite knowledge of her

own procedure, Montgomery continued to fake pregnancies in front of individuals who were not aware of it.

In 1994, while still married to Carl Boman, Montgomery had an extramarital affair. (Tr. 1068-69.) Montgomery claimed that she was pregnant by the man with whom she had the affair. (Tr. 1071-72, 1097, 1751.) Mr. Boman and Montgomery later reconciled and Montgomery ceased making the claim. (Tr. 1071-72, 1097-99.)

In 2000, prior to her marriage to her second husband, Kevin Montgomery, Montgomery claimed that she was pregnant and needed money from Kevin Montgomery to have an abortion. (Tr. 938, 962-63.) Kevin Montgomery gave her the money and the pregnancy was not mentioned again. (Tr. 963, 1038.)

In 2002, Montgomery told Kevin Montgomery, along with her friends in the area, that she was pregnant again. (Tr. 745-48, 882, 938, 965, 1138-39, 1755, 1936.) Montgomery claimed that she was receiving prenatal care from Dr. Robert Hutchinson, a local physician, but would not allow Kevin Montgomery to attend any prenatal visits with her. (Tr. 965-66.) Dr. Hutchinson testified that he never provided prenatal care for Montgomery. (Tr. 1624.)

In 2004, Montgomery again claimed that she was pregnant. (Tr. 504, 754, 834, 849, 882, 892, 938, 971, 1121, 1166, 1182.) She again told Kevin Montgomery that she was monitoring her pregnancy with Dr. Hutchinson. (Tr. 972, 974.) Montgomery told her friends and immediate family that she was due in



Appellate Case: 17-1716 Page: 31 Date Filed: 07/30/2018 Entry ID: 4687987

December 2004. (Tr. 981.) Montgomery put in for maternity leave with her employers. (Tr. 1124-25, 1182.)

In 2004, Carl Boman and Montgomery were in a custody dispute over their children. Mr. Boman heard that Montgomery was once again claiming to be pregnant. (Tr. 1075.) Mr. Boman knew that Montgomery could not become pregnant due to her sterilization. Mr. Boman and his second wife, Vanessa, sent e-mails to Montgomery telling her that they planned to expose her lies in court and to use it against her in the custody proceedings. (Tr. 1077-81, 1107-08, 1469-72, 1491-98, 1504-06, 1526-27.)

On December 10, 2004, Mr. Boman filed a motion for change of custody of the two minor children, Chelsea and C. J., who still resided with Montgomery. (Tr. 1082-83.) Mr. Boman testified that Montgomery boasted to him on the telephone in both November and December 2004 that she would prove him wrong. (Tr. 1082-84.)

Computer forensic examiners later conducted a thorough search and examination of Montgomery's computer. (Tr. 1408-11, 1427-28, 1565-66.) The Internet history clearly established that Montgomery had been targeting Mrs. Stinnett and planning her crime for months. The Internet history extracted from 2004 showed numerous searches to websites containing images and information pertaining to fetuses and neonates at varying ages of gestation. (Tr. 1443-1521.) An



Appellate Case: 17-1716 Page: 32 Date Filed: 07/30/2018 Entry ID: 4687987

ultrasound photograph was also located, along with the website that was visited to obtain it. Both the original ultrasound and a cropped version of the ultrasound, where the real mother's name was edited out and replaced by Lisa Montgomery's name, was located on Montgomery's hard drive. (Tr. 1439-41.) Further forensics examinations showed that after the ultrasound photograph was edited, it was printed from Montgomery's computer. (Tr. 1442.) Witnesses testified that Montgomery showed them the ultrasound photograph in 2004 claiming that it was her baby. (Tr. 973-74, 1182, 1193-94.)

The Internet history also showed visits to websites about home birthing (Tr. 1474-76, 1482-84, 1531-33), water birthing (Tr. 1531-33), Pitocin and oxytocin to induce birth (Tr. 1485-87), cesarean sections and emergency cesarean sections (Tr. 1501-03, 1511-17, 1531-33), the process of obtaining birth certificates (Tr. 1474-76, 1484-85), and the calculation of child support. (Tr. 1431, 1436-37, 1448.) Evidence also was located regarding the research and purchase of the home birthing kit. This was the same home birthing kit located inside the Montgomery house at the time of the search. (Tr. 1477-78.)

Further, there was computer activity directly related to Mrs. Stinnett, including online communications where Montgomery inquired about Mrs. Stinnett's location and residence. (Tr. 1425-26, 1487, 1498-1502, 1506-08.) The Internet history also revealed visits to Mrs. Stinnett's own webpage and photograph



Appellate Case: 17-1716 Page: 33 Date Filed: 07/30/2018 Entry ID: 4687987

accounts, which included photographs of Mrs. Stinnett and her dogs and photographs of Mrs. Stinnett posing to document her pregnant abdomen. (Tr. 1488-89, 1498.) There were also a series of Internet searches for the address and directions to Mrs. Stinnett's house located in northwest Missouri. (Tr. 1488-89, 1508-09.)

Using credit card records, cell phone records, and computer records, investigators were able to determine that the day before the murder/abduction, Montgomery drove to northwest Missouri. (Tr. 1327-32.) Based upon e-mail search warrant results and the Internet history, investigators learned that, upon returning to her residence later that day, Montgomery created and used the "Darlene Fischer" account, with the e-mail address fischer4kids@hotmail.com. (Tr. 1545-49.) Specifically, "Darlene Fischer" communicated by instant messenger with another rat terrier breeder, Jason Dawson, about obtaining a puppy that Montgomery already knew that Mrs. Stinnett was selling. (Tr. 759-61.) Dawson referred her to Mrs. Stinnett. (Tr. 760.)

Computer examiners located communications between "Darlene Fisher" and Mrs. Stinnett in which "Fischer" indicated that she wished to purchase one of Mrs. Stinnett's puppies and set up a meeting with Mrs. Stinnett at her residence the following day. (Tr. 1552-53, 1555-63.) Mrs. Stinnett e-mailed Montgomery MapQuest directions to her home in Skidmore, Missouri. (Tr. 713-16.) Additionally, computer analysis revealed that Montgomery, prior to the time she left



Appellate Case: 17-1716 Page: 34 Date Filed: 07/30/2018 Entry ID: 4687987

her residence and traveled to Mrs. Stinnett's home, selectively deleted incriminating Internet history. (Tr. 1566-70.) Investigators still were able to retrieve the deleted Internet history from the hard drive of Montgomery's computer. (Tr. 1566-70.)

According to Montgomery, she drove to Mrs. Stinnett's home in Skidmore, Missouri, on the day of the crime. (Tr. 1649.) She and Mrs. Stinnett visited for approximately two hours and played with Mrs. Stinnett's dog. (Tr. 1650.) Around 2:30 p.m., after Mrs. Stinnett had received a telephone call from her mother, Becky Harper, Montgomery assaulted and eventually killed Mrs. Stinnett. (Tr. 516, 523, 1671.) Montgomery strangled Mrs. Stinnett with a rope that she had hidden in her coat pocket and used a kitchen knife, which was also hidden in her coat pocket, to cut Stinnett and remove the fetus. (Tr. 1650, 1665.) According to Montgomery, she then fled the Skidmore area in her vehicle, taking the baby with her. (Tr. 1650.)

Following the crimes, Montgomery drove to Topeka, Kansas. (Tr. 1330.) She telephoned her husband, Kevin, advising him that she had driven to Topeka to do some Christmas shopping when she went into labor and gave birth at the Women's Birthing Center. (Tr. 986, 1340.) Kevin Montgomery and two of the Montgomery's teenage children traveled to Topeka to meet Montgomery and the new baby. (Tr. 988-93.)

After traveling back to Melvern, Montgomery called her family and friends to announce the baby, whom she named Abigail. (Tr. 851-53, 941-42, 994-95.) Kevin



Appellate Case: 17-1716 Page: 35 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery's parents and a friend of the family visited her. (Tr. 994-95, 1175.) Photographs were taken that evening of the Montgomerys and the baby. (Tr. 992.) Law enforcement officers later seized the photographs as evidence. (Tr. 1243.) Birth announcements, found at the Montgomery residence, were filled in with the name "Abigail." (Tr. 1002.)

The following morning, December 17th, Montgomery, her husband, and the infant traveled to the nearby town of Melvern, Kansas. (Tr. 996.) The Montgomerys showed off the baby to various people around town. They stopped at the bank and ate breakfast at the Whistle Stop Café. (Tr. 871, 884-85, 996-97.) Then they traveled to Lyndon, Kansas, stopping at the Casey's General Store and the Osage County Courthouse. (Tr. 835-37, 878, 999-1000, 1128.) After returning to their residence, investigators approached the home, contacted Montgomery, and subsequently arrested her. (Tr. 1005-08.)

The baby, Victoria Jo Stinnett, who is now with her father, Zeb Stinnett (Bobbie Jo Stinnett's widower), suffered only a cut above one eye. (Tr. 991, 1286, 1669.)

### *C. __Montgomery's Guilt Phase Case-in-Chief__*

Montgomery's defense at trial was that she was not guilty by reason of insanity. Montgomery called 27 witnesses during the guilt phase. Although the defense experts testified that Montgomery suffered from severe mental illnesses that

prevented her from being able to appreciate the nature and quality or the wrongfulness of her acts at the time of the offense, the defense spent much of their case-in-chief humanizing Montgomery and explaining how her childhood was spent in a terror-ridden environment. The witnesses testified how Montgomery was able to survive years of physical, emotional, verbal, and sexual abuse.

*1.* *John Patterson*

John Patterson testified that he is Montgomery's biological father. Patterson met Montgomery's mother Judy in a bar, married her, and they had Montgomery. (Tr. 1702-03.) Patterson was an alcoholic, and Judy drank heavily while pregnant with Montgomery. (Tr. 1709-10.) Patterson was an absent father the first year of Montgomery's life, while Judy had affairs with multiple men in the family home. When Patterson finally came home from military duty in Korea, he had a volatile relationship with Judy. Patterson described how men would come to their home and fist fight over Judy upon his return from Korea. (Tr. 1711.) The home environment was so bad that Patterson abandoned the family. Patterson testified, "I just couldn't deal with Judy anymore. I abandon[ed] them and that's the only thing I can say." (Tr. 1715.) Patterson also described how he witnessed Judy physically abusing his older daughter, Diane. (Tr. 1716-17.) Patterson testified that while he was in Vietnam, he received a letter from Judy telling him that "Diane was gone, that she



Appellate Case: 17-1716 Page: 37 Date Filed: 07/30/2018 Entry ID: 4687987

adopted her out" even though Patterson was Diane's biological father. (Tr. 1717-18.)

Patterson testified that he has a history of mental illness and was placed in a psychiatric ward in the army for psychiatric treatment. (Tr. 1718.) Patterson explained how he still has post-traumatic stress disorder attacks to this day. (Tr. 1719.)

2. *Judy Shaughnessy*

Judy Shaughnessy (Judy), Montgomery's mother, testified. Judy testified she has been married multiple times. She was previously married to John Hedberg Patterson, Jack Kleiner, Richard Boman, Hecter Ochoa, and Danny Shaughnessy. (Tr. 1725-26.)

Judy testified she moved around frequently when Montgomery was a child. Montgomery was born in the State of Washington, as was Montgomery's younger sister, Patty. (Tr. 1726.) Judy moved with Montgomery and Patty to Larenfield, Kansas; then Rossville, Kansas; then back to the State of Washington; then Colorado Springs, Colorado; then Rossville, Kansas; then Ogden, Kansas; then Tulsa, Oklahoma; then Modesto, California; then San Antonio, Texas, then Sperry, Oklahoma; then Cleveland, Oklahoma. (Tr. 1727-29.)

While in Oklahoma Judy met and married Jack Kleiner. (Tr. 1729.) Judy described Kleiner as a cruel man who drank a fifth of rum every night. (Tr. 1730-



Appellate Case: 17-1716 Page: 38 Date Filed: 07/30/2018 Entry ID: 4687987

31.) Judy testified that Kleiner struck the children, and Judy's daughters told Judy that Kleiner made them go in the bathroom and take their pants down to get whipped with a belt. (Tr. 1731.) Judy testified that she caught Kleiner having sex with Montgomery in February of 1984 when Montgomery was 15 years old. (Tr. 1734, 1743.)[12] Judy stated that when she saw Kleiner on top of Montgomery she got a gun and was going to kill him, but could not do it. She testified that in the morning Kleiner threatened to kill her and the children if she told anybody. (Tr. 1765.) Montgomery disclosed to Judy that Kleiner had been molesting her for quite some time. (Tr. 1733.) However, Judy never filed charges against Kleiner and made no formal report. (Tr. 1738, 1742.)

Judy also testified that after Montgomery's 1990 sterilization procedure after the birth of Montgomery's fourth child, Montgomery claimed to be pregnant on multiple occasions. (Tr. 1751, 1755.) Judy testified that when Montgomery was grown, Judy thought something was wrong with Montgomery's mental health, but could not convince Montgomery to seek counseling or treatment. (Tr. 1756.)

---

[12]Shaughnessy identified pictures of Montgomery at the ages of four or five, five, six or seven, an older age not specified, and fourteen. Shaughnessy equivocated considerably in her identification but did agree that the photographs depicted Montgomery as she was growing up. (Tr. 1744-45.)

*3. Patty Baldwin*

Patty Baldwin (Patty), Montgomery's sister, testified that Jack Kleiner repeatedly physically abused both she and Montgomery during their childhood, including frequent naked beatings with a belt that occurred over many years. (Tr. 1803.) Patty also witnessed Kleiner sexually abusing Montgomery. (Tr. 1804.)

*4. Jackie Moffett*

Jackie Moffett (Jackie), Montgomery's stepsister, testified that Jack Kleiner is her father. Jackie testified that Kleiner was a very mean alcoholic who abused all of his children. (Tr. 1810.) Jackie testified about how terrifying it was to watch Kleiner abuse the younger children. Jackie specifically remembered how she and Montgomery sat at the kitchen table physically shaking as Kleiner abused Patty by picking her up by her hair and pulling her into the bathroom. (Tr. 1813.) Jackie also testified how Judy never hugged or showed her children affection. Jackie testified that Montgomery and Patty were singled out and received harsher treatment than the other children Kleiner and Judy later had together. (Tr. 1815.) Jackie also testified that she felt guilt and fear for Montgomery and Patty because she moved out of the house and left them unprotected at the abusive hands of Judy and Kleiner. (Tr. 1816.)



Appellate Case: 17-1716 Page: 40 Date Filed: 07/30/2018 Entry ID: 4687987

5. *Becky Perkey*

Becky Perkey (Becky), Montgomery's stepsister, testified that Jack Kleiner is her father. Becky testified that growing up in a house with Kleiner was constant terror because of the constant beatings the children received. (Tr. 1818.) She remembered Kleiner beating her with his fists, his knees, and chipping her tooth with a telephone receiver. (Tr. 1819.) Becky also remembered how terrified Montgomery was when Kleiner and Judy were beating Patty. Becky described seeing Montgomery with her head down, her lips quivering, and Montgomery was shaking all over. (Tr. 1821-22.) Becky also testified that she never saw Judy express any love towards Montgomery and never saw Judy protect Montgomery. (Tr. 1823.)

6. *David Kidwell*

David Kidwell testified that Montgomery's mother, Judy, is his aunt. He testified that he is close in age with Judy and grew up around her. He testified that Judy grew up as a "wild" person. (Tr. 1824.) He further testified that Judy told him that she caught Jack Kleiner raping Montgomery. (Tr. 1825.) Judy told Kidwell that she thought young Montgomery had brought the rape on, that Montgomery had led Jack Kleiner on, and Judy thought Montgomery had enticed Jack Kleiner. (Tr. 1826.)



Appellate Case: 17-1716 Page: 41 Date Filed: 07/30/2018 Entry ID: 4687987

7. *Michael Boman*

Michael Boman (Michael) testified that Richard Boman is his father. He testified that when he was in the second grade Judy and her five children moved in with Richard and Michael. (Tr. 1828.) Michael described Judy as argumentative and verbally and physically abusive. (Tr. 1829-30.) Michael testified that Montgomery would try to stick up for him when Judy was abusive to Michael. (Tr. 1831.) Michael testified that when he was 16 years old he ran away from home because of Judy's abuse. (Tr. 1833.)

8. *William Boomhower*

William Boomhower testified that he knew Montgomery when she lived in Deming, New Mexico. (Tr. 1836.) Boomhower testified that Montgomery and her husband Carl Boman brought their children to events at the Moose Lodge where Boomhower served as governor of the lodge, such as weekly dinners, Halloween parties, Easter parties, and Christmas parties. (Tr. 1837-38.) Boomhower also testified that Judy and Richard lived in Deming, New Mexico, at the same time as Montgomery. Boomhower testified that Judy "used" people, and that it was common knowledge that Judy claimed Montgomery took Judy's husband (Jack Kleiner) away from Judy. (Tr. 1841, 1843.)

*9. Phyllis Perdue*

Phyllis Perdue testified that she knows Judy Shaughnessy (Judy) through Perdue's work as a child welfare specialist in Tulsa County, Oklahoma. (Tr. 1846.) Perdue testified that Judy was trying to get legal custody of Judy's grandson, Justin Kleiner, but that during the home study of Judy, she disappeared for seven to eight months and the state denied legal custody. (Tr. 1847, 1849-50.)

*10. Pat Brunton*

Pat Brunton testified that she worked for three years in Shawnee County, Kansas, to find placement for foster children or reintegration with biological parents. (Tr. 1852.) Brunton testified she worked with Justin Kleiner's parents, Bonnie and Teddy Kleiner. (Tr. 1853.)

Brunton testified that Montgomery tried to assist Bonnie Kleiner with learning how to clean, cook, and launder clothes. (Tr. 1855.) Brunton described Montgomery as quiet and always very polite. Brunton told the jury how Montgomery raised goats and spun yarn by hand. Brunton testified that Montgomery's children were well balanced and clean and that the children had their needs met. Brunton testified that Montgomery was a good mother with good mothering skills. Brunton testified how surprising this was since Montgomery had not been raised well herself. Brunton testified about reports that Montgomery's



Appellate Case: 17-1716 Page: 43 Date Filed: 07/30/2018 Entry ID: 4687987

mother, Judy, had many husbands and Judy had sexual activity with men in front of the children. (Tr. 1857.)

Brunton described Judy as dishonest and as a manipulative woman who actually pits her children against one another. (Tr. 1858.) Brunton testified that she believes Montgomery was the family scapegoat, and that Montgomery was wrongly blamed for the family's problems. Brunton testified thatMontgomery was sexually raped and molested by Jack Kleiner, and that Judy told Brunton that Montgomery had seduced Jack Kleiner; that it was Montgomery's fault she was raped, and that Montgomery was trying to steal Jack Kleiner from Judy. (Tr. 1859.) Brunton testified that she has worked with at least 200 families, and that Judy Shaughnessey's family is "easily the second most dysfunctional family" she has ever worked with. (Tr. 1864.)

*11.* *<u>Teddy Kleiner</u>*

Teddy Kleiner (Teddy) testified that he is Montgomery's half-brother. Teddy testified that his father, Jack Kleiner, was a drunk when he and Montgomery were growing up. (Tr. 1865.) Teddy testified that Jack Kleiner was physically abusive to the children, and he witnessed Jack Kleiner raping Montgomery when they were growing up in the Kleiner home. (Tr. 1866.) Teddy described Montgomery as being a passive person that "any ten year old kid on the street could beat up." Teddy explained that Montgomery did not show her emotions very well. (Tr. 1874.)



Appellate Case: 17-1716 Page: 44 Date Filed: 07/30/2018 Entry ID: 4687987

Teddy testified that he thought Montgomery was pregnant when he saw her. (Tr. 1876.)

*12. Joy Montgomery*

Joy Montgomery (Joy) testified that she is Montgomery's mother-in-law. Joy testified that in 2004 Montgomery said she was pregnant, and Joy believed her. (Tr. 1882.) Joy further testified that one day in 2004, Montgomery's mother, Judy, and sister, Jerry, came to Joy's home, knocked on Joy's door and just walked in stating that Montgomery was not pregnant and could not get pregnant. (Tr. 1882.) Joy testified that she thought Judy and Jerry were just trying to stir up trouble. (Tr. 1883.)

*13. Roger Montgomery*

Roger Montgomery (Roger) testified that he is Montgomery's father-in-law. Roger testified that in 2004 he thought Montgomery was pregnant. (Tr. 1892.) Roger testified that one day in 2004, Montgomery's mother and sister came to the door in a "hysterical type of atmosphere" and made accusations that Montgomery was not really pregnant. (Tr. 1892.) Roger testified that he did not believe Judy because he was aware of the problems Judy had caused Montgomery in the past. (Tr. 1893.)



Appellate Case: 17-1716 Page: 45 Date Filed: 07/30/2018 Entry ID: 4687987

*14. Monica Guitterrez*

Monica Guitterrez testified that she worked with Montgomery when Montgomery lived in Deming, New Mexico. (Tr. 1896.) Guitterrez testified that Montgomery would occasionally bring her children to work, and that Montgomery would interact with her children. (Tr. 1899.) Guitterrez testified that Montgomery was having marital problems and seemed sad. (Tr. 1900-01.) Guitterrez testified that Montgomery and her mother, Judy, did not have a loving mother-daughter relationship. (Tr. 1902.) Guitterrez also testified that Montgomery frequently talked non-stop in a rapid and repetitious manner. (Tr. 1904.)

*15. Tamara Hand*

Tamara Hand testified that Montgomery worked for her when Montgomery lived in Deming, New Mexico, at the newspaper office called the Deming Headlight. (Tr. 1910.) Hand testified that Montgomery was a good employee. Hand never had any trouble with Montgomery, and allowed Montgomery to bring her children to work. (Tr. 1912.) Hand testified Montgomery interacted well with her children, Montgomery's children were well behaved, and Montgomery gave them instructions and helped them with their homework. (Tr. 1913.) Hand described Montgomery's job as stressful. (Tr. 1914.) Hand testified that Montgomery handled her assignments and duties responsibly. (Tr. 1915.)

*16. Nancy Wallentini*

Nancy Wallentini testified that in the 1980's she worked at Family and Children Services in Tulsa, Oklahoma. (Tr. 1919.) As part of Wallentini's job, in 1984 and 1985, she conducted counseling sessions with Montgomery because of allegations that Jack Kleiner had sexually abused Montgomery. (Tr. 1922-23.) Wallentini described Montgomery in 1984 as a "shy 16 year old" who was nervous during the counseling sessions and reluctant to talk about the abuse. (Tr. 1923.) Wallentini testified that in 1984 Montgomery was not involved in many school activities because Montgomery had the responsibility of caring for her younger siblings at home. (Tr. 1923.) Wallentini testified that Montgomery was sexually abused for approximately two years and that the abuse began when Montgomery was in eighth or ninth grade. (Tr. 1924, 1926.)

Wallentini further described Montgomery as having difficulty expressing emotions and was blocking feelings. (Tr. 1926.) Wallentini testified that Jack Kleiner told Montgomery not to tell mother of the sexual abuse and that if Montgomery would not submit, Kleiner would do it with someone else (presumably a sibling). (Tr. 1926.) Wallentini testified that she had five sessions with Montgomery where it was just one-on-one. (Tr. 1928.) Wallentini concluded her testimony by saying the length of time she spent counseling Montgomery was definitely not sufficient. (Tr. 1929.)

*17. Desiree Boman*

Desiree Boman (Desiree) testified that Montgomery is her mother. (Tr. 1935.) Desiree testified that at the time of the offense she believed her mother was pregnant. (Tr. 1935-36.) Montgomery wore maternity clothes and her stomach was larger. (Tr. 1936.) Desiree testified that Montgomery also appeared pregnant in 2002 and 2003. (Tr. 1936.) Montgomery took Desiree with her to shop for maternity clothes. (Tr. 1937.) Desiree testified that Montgomery disciplined all the children, but Desiree does not remember her sister, Chelsea, getting slapped by Montgomery over a yarn-spinning incident. (Tr. 1939.) Desiree testified that Montgomery worked a lot, and at times worked three jobs. (Tr. 1940-41.) Desiree also testified that when she was in fifth grade, Montgomery home-schooled her for about a year and took her to the mountains and on picnics. (Tr. 1952.)

*18. Carl Boman*

Carl Boman, Jr. (C.J.) testified that Montgomery is his mother. (Tr. 1956.) C.J. testified that at the time of the offense he believed his mother was pregnant. C.J. testified that Montgomery looked pregnant and she sometimes had morning sickness. (Tr. 1956.) C.J. also testified that Montgomery did not object to C.J. living with his father, but that Montgomery wanted C.J. to finish the school year before moving. (Tr. 1957.)



Appellate Case: 17-1716 Page: 48 Date Filed: 07/30/2018 Entry ID: 4687987

*19. Rick Malone*

Rick Malone testified that he was assistant manager at Wendy's restaurant when Montgomery worked there in 2004. Malone testified that in 2004 Montgomery looked pregnant and he definitely believed that she was pregnant. (Tr. 1961.) Malone testified: "Actually one time in particular, we had a rule at Wendy's you had to tuck in your shirt and I remember poking fun of her tucking her shirt. She lifted it out because she was wearing maternity pants and it wasn't possible to tuck in the shirt because of the pants she was wearing." (Tr. 1961.)

*20. Stephanie Herrick*

Stephanie Herrick testified that she is wheelchair-bound because of a disease called cytotaxia that attacks the muscles of the body. (Tr. 1963.) She testified that her husband worked with Montgomery at Casey's before the offense. Herrick described Montgomery as happy-go-lucky and generous. Herrick testified that Montgomery gave her a puppy for companionship because Herrick was at home all day by herself. (Tr. 1964.) Herrick testified that she and Montgomery went to a movie and dinner the weekend before the offense. (Tr. 1965.) Herrick testified that Montgomery looked pregnant because Montgomery had an enlarged stomach. (Tr. 1965-66.)



Appellate Case: 17-1716 Page: 49 Date Filed: 07/30/2018 Entry ID: 4687987

*21. Becky Bodine*

Becky Bodine testified that she fostered Montgomery's nephew, Justin. Bodine testified that Justin's parents are Bonnie and Teddy Kleiner. (Tr. 1973.) Bodine testified that Montgomery testified in support of Bodine adopting Justin. (Tr. 1974.)

*22. Troy Schnack*

Troy Schnack testified that he is a computer system administrator with the Federal Public Defender's Office. Schnack testified that he conducts forensic examinations of computers and uses the same tools as the Government's expert used in the Montgomery case. (Tr. 1978-79.) Schnack further testified that he conducted a forensic examination of Montgomery's computer. (Tr. 1980.) Schnack presented many of his computer findings to the jury including Montgomery's extensive search for her half-sister, Diane Hedberg (Tr. 1987); her search for baby care items as far back as 2002, (Tr. 1982), and crying over the placement of her nephew, Justin. (Tr. 1989.) Schnack read a posting by Montgomery that said "[m]y nephew is a year and a half old and he was in foster care for over 14 months with wonderful foster parents who truly loved and adored him. We won't be able to have visits with him. And here is why. My mother is the type of person that if I had him for a weekend and he got a bruise would turn me in instantly for abuse and then try to have my children taken so she could get them, too. She is on her sixth marriage and wants an instant



Appellate Case: 17-1716 Page: 50 Date Filed: 07/30/2018 Entry ID: 4687987

family with her new younger husband and this is her way to do it. When my little brother was arrested, she immediately went to the state and tried to have my children removed from my home. They didn't because I was able to prove she did it in retaliation but the threat is still there. So I am not sure at this point what to do. Lisa M." (Tr. 1990-91.) Schnack also explained to the jury that in April of 2004 Montgomery searched photos from many dog breeders' accounts other than just Bobbie Jo Stinnett, such as Jason Dawson, Tracy Ramirez, and Patricia Hughes. (Tr. 1994.)

*23. <u>Eugene VandenBoom</u>*

Eugene VandenBoom testified that he is a physician specializing in ObGyn. (Tr. 2057.) Dr. VandenBoom testified that he was involved in having Montgomery tested to determine if she remained sterile after her tubal fulguration surgery. (Tr. 2061.) The test performed is called a hysterosalpingo gram. (Tr. 2059.) The testing did in fact confirm that Montgomery remained sterile, and she could not become pregnant after her original tubal fulguration procedure in 1990. (Tr. 2061-62.)

*24. <u>Dr. Linda McCandless</u>*

Dr. Linda McCandless testified that she is a psychiatrist who works mainly at Corrections Corporation of America (CCA). (Tr. 2065-66.) Dr. McCandless testified that she first evaluated Montgomery at CCA, four days after her December 17, 2004, arrest. (Tr. 2068.) During the evaluation, she questioned



Appellate Case: 17-1716 Page: 51 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery about her medical history, her family's medical history, and completed a mental status evaluation. (Tr. 2069.) Dr. McCandless diagnosed Montgomery with bi-polar disorder, rapid dysthymic disorder, possible alcohol dependency, possible brief psychotic episodes, and possible dissociate amnesia. (Tr. 2071.) Dr. McCandless based her diagnosis of bi-polar disorder largely on Montgomery's detailed history of mood swings since the age of 28 or 29 and Montgomery's long history of depression following highs. (Tr. 2072.) Dr. McCandless explained to the jury how the mental illness of bi-polar disorder can cause racing thoughts, inability to concentrate, increased energy, poor judgment, and impulsive decisions. (Tr. 2073.) Dr. McCandless based her diagnosis of dysthymic disorder on Montgomery's depression for at least 21 of the past 24 months. (Tr. 2073.) Dr. McCandless explained that her notes indicated she should "rule out brief psychotic episodes" which meant that she should be looking for that disorder because it cannot be ruled out. (Tr. 2074.) The same rule-out diagnosis applied to dissociative amnesia. (Tr. 2075.)

Dr. McCandless testified that she questioned Montgomery about the offense. Montgomery told Dr. McCandless that she did not remember the incident of the murder, and that "I can't think that I would do something like that." (Tr. 2075.) Montgomery also was unsure if she felt suicidal at that time, and was later placed on suicide watch. (Tr. 2076.) Dr. McCandless described to the jury how inmates on



Appellate Case: 17-1716 Page: 52 Date Filed: 07/30/2018 Entry ID: 4687987

suicide watch are stripped of their clothing and put in a paper gown so that no clothing can be used for self-harm. The inmates are not allowed eating utensils and are given only finger food. Inmates are basically left in a cell with only a mattress.

Montgomery was on suicide watch from December 21, 2004 until January 17, 2005. (Tr. 2077.) Once taken off suicide watch, Montgomery began to hoard sleeping pills and was placed on suicide watch again until March 18, 2005. Montgomery was then placed in an isolation setting because of the high profile nature of the criminal case. (Tr. 2078-79.)

Dr. McCandless testified that she had a total of 62 medical visits with Montgomery in the year 2005. (Tr. 2079.) Dr. McCandless continually monitored Montgomery's unstable moods, sleeping habits, and speech, which confirmed the bi-polar mental illness. (Tr. 2080.) In February of 2006, Dr. McCandless began Montgomery on an anti-depressant drug regime called Wellbutrin. (Tr. 2082.) In March of 2006, Dr. McCandless began Montgomery on a mood stabilizer drug regime called Depakote. (Tr. 2083.) Dr. McCandless also testified that because of Montgomery's history of persistent migraine headaches, she treated Montgomery with the drug Elavil. (Tr. 2083-84.) Dr. McCandless stated that since Montgomery has been on the anti-depressant and mood stabilizer drugs she has less severe mood swings. (Tr. 2084.)



Appellate Case: 17-1716 Page: 53 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. McCandless testified that Montgomery told her the following regarding her reported pregnancies:

> What was reported to me recently was basically that the patient had informed me she had a tubal ligation, I believe this was in 1990. And since that time she stated she was pregnant on three different occasions after the tubal ligation. This was in 1994, February, 2003 and April, 2004. She explained she believed the tubal ligation, quote, reversed; end of quote. She had told me on the initial interview on 12-21-04 that she had become pregnant with her second husband, Kevin, but the baby was stillborn at seven months gestation.
>
> I (Dr. McCandless) was unaware of the tubal ligation during the initial interview. She states she believes she started, she started believing she was pregnant in late February, 2003. Today, on that day of the interview she states, quote, I know that's one of those things that I believed at the time, end of quote. She states her husband believed she was pregnant also. She questioned whether the birth of Justin, her brother's child, triggered this belief. She states she's not sure if she did a pregnancy test. She states she put on weight, quote, where you would be pregnant, end of quote, referring to her body. And stopped having menstrual periods. She states she did not go to the doctor and attributed this to being busy with two jobs and, quote, trying to hold things together, end of quote.
>
> She states she believed she was pregnant until May, 2003. She states she does not know why she stopped believing she was pregnant. She said she let her family know that, quote, I lost my baby, end of quote.
>
> She then left and went to Colorado for one and a half weeks to stay with her second stepfather. She states she and her husband didn't even talk about it, end of quote, in regard to the loss of the baby.
>
> The third time she believed she was pregnant was starting in April, 2004. She states that, quote, we used pregnancy test, end of quote, referring to Kevin and herself.

> On the day of the interview she stated, quote, Kevin said he did not see it, referring to the result of the test. She states she gained 25 pounds and had gotten up to a weight of 150. She compared this to the weight of her other pregnancies when she had gained no more than 15 pounds.
>
> She also reported being, quote, sick every morning for a good month, end of quote. Felt very tired and had back pain. She tells me she, quote, thought I had the baby on the 13th. This is in December, 2004. She states she had been home all day. She denies remembering going into labor. She states the baby may have been, quote, born dead, quote, or, quote, I think I didn't do anything and let the baby die, end of quote. She states that she, quote, buried her out back, meaning on the residence where they were living. She states no-one has ever looked for the baby and, quote, I still think the baby is out there, end of quote.
>
> She states, quote, how can you take something you believed at that time and it not be possible, end of quote. She goes on to tell me she thought the test done a couple of months ago would prove she really was pregnant or had been pregnant. She states she had the thought, quote, they will see that it was really true.

(Tr. 2085-87.)

Dr. McCandless was unable to "rule out" the mental illnesses of psychosis or dissociative amnesia. In fact Dr. McCandless explained how Montgomery's repeated reports of being pregnant after being sterilized, and Montgomery's belief of having still-births, and Montgomery showing off the kidnapped baby as if it were her baby led Dr. McCandless to believe Montgomery suffered from delusions and psychosis, which Dr. McCandless called "delusional cycling psychosis." (Tr. 2093-94.) Dr. McCandless ended her testimony by explaining how Montgomery



Appellate Case: 17-1716 Page: 55 Date Filed: 07/30/2018 Entry ID: 4687987

eventually was able to be housed with the general population at CCA, and Montgomery was doing well with the other inmates. (Tr. 2094-95.)

*25.* *Beverly Kemper*

Beverly Kemper testified that she is a registered nurse who specializes in mental health. (Tr. 2148.) Nurse Kemper explained how she was intake nurse at CCA when Montgomery came to the facility. (Tr. 2149.) Nurse Kemper testified that she has spent a great deal of time with Montgomery over the years. (Tr. 2151.) Nurse Kemper described Montgomery as initially appearing like any other young woman, "[h]owever, it didn't take long to understand that there were a lot of hidden things within her that she was not able to verbalize and give to you, that she was a very troubled young lady." Nurse Kemper explained that Montgomery's history of family issues and past abuse were "very hidden." (Tr. 2151-52.)

*26.* *Dr. Vilayanur Ramachandran*

Dr. Vilayanur Ramachandran testified that he has been the Director of the Research Center for Brain and Cognition at the University of California, San Diego, for the past 25 years. (Tr. 2165.) He testified that he is a medical doctor and also obtained a Ph.D. in nuclear science in neurology from the University of Cambridge in England. He held post-doctoral research fellowships at Oxford University in England and also at the California Institute of Technology. (Tr. 2165-66.) He testified he has published approximately 150 papers related to brain damage and



Appellate Case: 17-1716 Page: 56 Date Filed: 07/30/2018 Entry ID: 4687987

psychiatry in peer reviewed journals, and has written two books. (Tr. 2168-69.) He is also a professor of neuro-science and psychology, and has a visiting professorship at Harvard, Johns Hopkins, and Stanford. (Tr. 2171.) He has also received an award from the International Neuro-Psychiatry Association for outstanding contributions to neuro-psychiatry, and was chosen in Newsweek Magazine as one of the top hundred most prominent people in the next century. (Tr. 2171-72.)

Dr. Ramachandran testified about delusions. He testified that delusions are when you have a false belief about yourself or a false belief about the world, and the belief becomes a dominant theme in your life to the point it dominates your life. Those who suffer from delusions sincerely believe in the delusion. Dr. Ramachandran explained that the deluded person will cling to the delusion and try to protect the delusion at all cost. (Tr. 2174.) He also explained the psychological phenomenon of dissociation to the jury and discussed the concept of an amputees' "phantom arm" and a woman having a "phantom pregnancy." (Tr. 2176.) Dr. Ramachandran testified that the unusual aspect of pseudocyesis, i.e., phantom pregnancy is that, while most delusions are purely mental, pseudocyesis "translates into actual physical changes." (Tr. 2177.)

Dr. Ramachandran testified that delusional states can progress to a point where the person becomes dissociative:

> Q. Can these delusional states progress to a point where they're actually dissociative.



Appellate Case: 17-1716 Page: 57 Date Filed: 07/30/2018 Entry ID: 4687987

> A. Yes, it can because one of the characteristics of delusion as I mentioned is their extreme tenacity and the person wants to cling to the belief, not give it up at all. So what happens if you, up to a point you can do that, you can say, well, I don't think I am really paralyzed and they are making it up. The medical students are lieing [sic]. But when you get to a point it's really threatening to the belief system they have constructed for months and years, elaborated a belief system and phantasy world they are living in, when it becomes too threatening they will dissociate, they will go into what is called decompensate, going to a dissociate state and go into this trans-like state for an hour, a few hours and act out and then completely forget about what happened.
>
> So, yes, the answer you can progress to the delusional state into a dissociate state in order to protect your delusion.

(Tr. 2178-79.)

Dr. Ramachandran continued to explain the disorder of pseudocyesis. A person with this disorder may actually have bodily changes that mimic that of someone who is actually pregnant. (Tr. 2081-82.) He testified that pseudocyesis is a mental illness that is recognized in the Diagnostic and Statistical Manual Fourth Edition. It is a disorder that is not new to medicine, but has been recognized for a thousand years. (Tr. 2082.) Dr. Ramachandran has studied pseudocyesis and written about it. Dr. Ramachandran testified that he has seen at least six cases of pseudocyesis in his practice. He testified that pseudocyesis is a somatoform disorder that causes hormonal changes in the body. (Tr. 2183.) He further explained:

> What is unique about pseudocyesis, in addition to the symptoms like I am paralyzed or I have a coronary, my chest is paining every day, in addition you actually have signs, difference between symptoms and signs. Symptoms you can sometimes malinger. Being in the business



Appellate Case: 17-1716 Page: 58 Date Filed: 07/30/2018 Entry ID: 4687987

you know when they are doing signs, you cannot malinger when you get physical changes, that's what is unique about pseudocyesis.

Q. Describe to the jury what we are talking about the signs.

A. Well, because of this belief, the cascade of hormonal change is set up. When the belief affecting your emotional system in the brain and then the actual physical signs include breast enlargement. Sometimes you don't see all the signs in every patient all the time but a collection of symptoms you see are breast enlargement, nipple pigmentation, little tibiales on the breast, deposits of fat. Sometimes the patient will feel fetal quickening and toward term what we call contractions where you actually have contractions of the uterus. You can get a forward curvature, called lumbar lordosis doing that. Sometimes you get craving for strange food, nausea, vomiting, all of them described in pseudocyesis, every one of them. Not every patient has the whole spectrum. You may have many of them but not all of them.

(Tr. 2184-85.)[13]

Dr. Ramachandran then explained to the jury in detail how the physical manifestations and hormone changes occur in a person suffering pseudocyesis. (Tr. 2185-88.) Dr. Ramachandran testified that in the gynecology publications in the United States you see that pseudocyesis is mentioned as a common consequence of childhood sexual abuse. (Tr. 2190, 2195.) Like Montgomery, those who suffer from post-traumatic stress disorder (PTSD) are also pre-disposed to suffer from pseudocyesis disorder. (Tr. 2191-92.) Additionally, persons who suffer from PTSD

---

[13]Kevin Montgomery testified that Lisa Montgomery had many of the symptoms mentioned by Dr. Ramachandran, including that her belly swelled, her periods stopped, morning sickness, pain, crankiness, breast enlargement and change in the color of her nipples. (Tr. 967, 1039.)



Appellate Case: 17-1716 Page: 59 Date Filed: 07/30/2018 Entry ID: 4687987

are prone to developing a dissociative state. He testified that PTSD and dissociative state often co-exist in a person, and they feed off each other. In other words, you can have dissociative states causing PTSD and PTSD leading to a dissociative state. He testified that childhood sexual abuse can lead to PTSD and can also lead to pseudocyesis. "[W]e know for sure childhood sexual abuse is a pre-disposition to pseudocyesis and can possibly act through the PTSD to produce pseudocyesis. That is clear." (Tr. 2192.)

Dr. Ramachandran testified that he reviewed large amounts of records including medical records of Montgomery, witness statements, police reports, and reports from all the mental experts who evaluated Montgomery. He also testified that he personally examined Montgomery for several hours. It was Dr. Ramachandran's expert opinion to a reasonable degree of medical certainty, after studying the records and examining Montgomery that she suffered from the severe mental illness of pseudocyesis. (Tr. 2197-98.)

Dr. Ramachandran explained to the jury that Montgomery's inability to remember and describe the killing of Bobbie Jo Stinnett is typical of someone in a dissociative state. (Tr. 2201.) Dr. Ramachandran again confirmed his opinion that to a reasonable degree of medical certainty, when Bobbie Jo Stinnett was killed, Montgomery was suffering from the severe mental disease of pseudocyesis. (Tr. 2205.) He explained that once Montgomery had the delusion that she was pregnant,

she would do everything she could to sustain the delusion and that included fabricating evidence, which is common conduct for those with delusions. (Tr. 2206.) Additionally, Dr. Ramachandran testified that Montgomery's dysfunctional relationship with her mother was a traumatic assault on Montgomery's ego, and could be a pre-disposition factor to a delusional state such as pseudocyesis. (Tr. 2214-15.) Once Montgomery was in a delusional state, she was obsessed and started web searches, talked to people about her pregnancy, created a nursery, and did everything that enhanced the delusion and sustained the delusion. (Tr. 2221.) When Montgomery's delusion that she was pregnant was challenged, her response was typical of someone who is deluded. Dr. Ramachandran explained that "as with all delusions, when they are challenged in a neuro-psychiatric setting the person does their very best to cling to the delusion by either manufacturing evidence or changing evidence, not deliberately, with the intent of deceit, but this is typical of the delusional state." (Tr. 2229.) Dr. Ramachandran said this is why Montgomery manufactured fake ultrasounds, denied she was sterile, claimed she went to prenatal medical appointments, and claimed she delivered a baby at home. (Tr. 2229-44.)[14]

[14]Dr. Ramachandran repeated this conclusion on cross-examination:

> Q. Can you point to anything in the D. S. M. IV or any peer review literature that indicates delusional patients lie or create forged documents to convince other people their delusions are true?



Appellate Case: 17-1716 Page: 61 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Ramachandran ruled out the possibility that Montgomery was malingering based on several factors:

> Q. The word kept getting used in the case about malingering, did you see any indication of malingering in your testing with Lisa or in any of the other information that you reviewed in terms of her presentation?
>
> A. Can I look at my notes? First of all, she had physical signs, several eye-witness accounts and her husband giving in graphic detail her signs of pregnancy.
>
> Q. In other words, those are things that would rule out malingering?
>
> A. Absolutely. No way in which you can malinger the symptoms of pregnancy. In my mind just that evidence alone is sufficient.
>
> The second piece of evidence what you showed earlier, all those e-mails unrelated to C. section, she's talking about home birth and all of that, dozens and dozens. If she were malingering why would she do web searches of things completely unrelated to her murder.
>
> Thirdly, she wouldn't be constantly announcing the fact that she's going to have a baby, she's going to have twins. The last person, somebody was malingering for malicious intent and contemplating a murder would not do completely unrelated, irrelevant searches on the computer.
>
> [Fourthly], she was looking at things like home birthing, already mentioned that and if she were intending to plan, this is part of her malingering and she wanted to plan a murder why would she spend such a short time, four or five [minutes] or maybe eight [minutes], given

---

> A. I can, they're [sic] a lot of published documentation a delusional patient can do things and say things which appear false to other people but they themselves are not lieing[sic], they believe it to be true.

(Tr. 2273.)



Appellate Case: 17-1716 Page: 62 Date Filed: 07/30/2018 Entry ID: 4687987

> the complexity of the procedure and the amount of planning that any normal person would engage in to perform such a surgery.

(Tr. 2249-50.)

Dr. Ramachandran ended his testimony by confirming his opinion to a reasonable degree of medical certainty, that at the time of the offense, Montgomery was suffering from the severe mental disease or defect of pseudocyesis with delusions and a dissociative state, and that at the time of the offense she was unable to appreciate the nature and quality or wrongfulness of her conduct. (Tr. 2250-51.)

*27.* *Dr. William Logan*

The last witness called by the defense in the guilt phase of the trial was Dr. William Logan. Dr. Logan testified that he is a physician specializing in psychiatry. He obtained undergraduate degrees in both biology and psychology, as well as a graduate degree in medicine with a sub-specialization in psychiatry. He is board certified in both psychiatry and forensic psychiatry. (Tr. 2379-81.)

Dr. Logan testified that he served as the director of the law and psychiatry department at the Menninger Clinic for eight years before working in his private practice called Logan and Peterson. (Tr. 2283.) Dr. Logan then gave greater details about his specific experience in forensic work, courtroom experience, professional memberships, publications and presentations, and professional consultation work for the Government. (Tr. 2284-88.)



Appellate Case: 17-1716 Page: 63 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Logan testified that in Montgomery's case he reviewed a large amount of information including police reports, witness statements, autopsy and crime scene materials, CCA records, school records, family history, mental health records, and expert evaluations and expert reports involved in the case. Dr. Logan also examined Montgomery on three different occasions for a total of approximately ten hours. (Tr. 2289.)

Dr. Logan testified that as part of his evaluation of Montgomery he looked at her history and her family's history. In particular, he obtained information about the mental health of various family members because genetics could have an impact on Montgomery's mental health. (Tr. 2391.) Dr. Logan testified that he looked at Montgomery's development as a child. In particular, he looked at the mother-child experience, whether her mother drank during pregnancy, and whether her mother smoked. He looked to see if Montgomery crawled and walked on time, and any signs of abnormalities. He looked at Montgomery's family life to determine if both parents were there, if there was conflict in the home, whether somebody left, whether Montgomery witnessed violence in the home, whether she had any head injuries or other kinds of injuries, or whether she had significant illnesses. Dr. Logan explained how it is important to understand that other relatives can play a role in a child's development, and how experiences such as physical, sexual, and emotional abuse can affect someone for years. Dr. Logan testified he wants to know about a person's

experiences in the formative years, such a substance abuse, that forms the foundation on which the child's later development will be built. Dr. Logan explained that the more trauma and abuse there is, the more likely it is that a person will crumble when faced with life's struggles and tribulations instead of weathering them and essentially mastering life's problems. (Tr. 2392.)

Dr. Logan found several factors and experiences in Montgomery's background that he felt were significant. It was significant that her father was seldom around and left when Montgomery was about four years old. Another significant factor was the negative effect on Montgomery when her step-sister, Diane, was taken from the home. Another factor was that Montgomery moved frequently growing up. Dr. Logan counted ten or eleven moves between the ages of 4 and 18. (Tr. 2393.)

Dr. Logan testified that a "major influence" in Montgomery's life was the "significant physical abuse" of her by her stepfather, Jack Kleiner. In particular, Dr. Logan explained that Jack Kleiner would humiliate Montgomery by stripping her naked to get lashed with a belt and other things that were really excessive. Dr. Logan found that Montgomery grew up with a lot of fear and intimidation. He also told the jury about Montgomery's childhood involving years of sexual abuse by her stepfather that included sexual intercourse. (Tr. 2394.) Dr. Logan explained how incestual sexual abuse leaves the victim with a real sense of betrayal, and the



Appellate Case: 17-1716 Page: 65 Date Filed: 07/30/2018 Entry ID: 4687987

betrayal usually involves the mother because at some level the mother knew and failed to protect the child. Dr. Logan explained how Montgomery was thrust into a role inappropriate for her age, and she learned from her stepfather that her primary value from him was not to be nurtured or follow her own ambitions, but rather her value was to service his sexual needs. (Tr. 2395.) He testified that it is not unusual to see an incest victim get married early, have a history of promiscuity or engage in premature sexual activity.

In reviewing the records, Dr. Logan found that Montgomery did not receive the therapy she needed after the sexual abuse was brought to the attention of authorities. Dr. Logan found that Montgomery's prognosis for recovery from the sexual abuse was especially bad because her mother viewed her as a competitor and blamed Montgomery for being a "home wrecker." (Tr. 2396-97.)

Dr. Logan testified that the stepfather threatened Montgomery that if she did not submit he would sexually abuse her younger sister, Patty. Dr. Logan also testified that the stepfather followed up on his physical threats against Montgomery and described Montgomery's household as "violent." (Tr. 2397-98.)

Dr. Logan testified at length regarding the relationship between Montgomery and her mother. He described it as a "love-hate" relationship in which on one hand she felt persecuted by her mother, but that she would strive for her mother's acceptance. He told the jury how there was certainly a lot of anger in the



Appellate Case: 17-1716 Page: 66 Date Filed: 07/30/2018 Entry ID: 4687987

relationship, and yet Montgomery was always striving for acceptance from her mother to "seal over the wounds of their family and try and create a family situation that didn't exist." (Tr. 2398.)

Dr. Logan discussed how there was a theme in Montgomery's life regarding losing her children, and how her mother used children as weapons. In Montgomery's life there was a constant battle around her keeping her children. Once her mother took Desiree and Chelsea from Montgomery, when the girls were very small, and refused to give them back. Another time her mother confronted her inside a church and pulled a couple of Montgomery's children out of her arms and kept the children from Montgomery until a court awarded her custody again. (Tr. 2399.) Montgomery's mother would complain to Social Services to have the children taken away. Dr. Logan described the conflict between Montgomery and her mother like the "Hatfields and McCoys." (Tr. 2400-01.)

Dr. Logan testified that because of who Montgomery was, and because of the trauma she sustained by her family, she failed to develop healthy ways of dealing with conflict. Dr. Logan gave examples of when Montgomery was in grade school, she was a shy, quiet girl who primarily liked to read and escape into fantasy. As Montgomery grew, she dealt with conflict by literally escaping by running away or changing her environment. Dr. Logan explained that Montgomery's first marriage to Carl Boman was a form of running away to get away from home. (Tr. 2401.)

He gave another example of Montgomery's dysfunctional method of coping by drinking alcohol heavily when she lived in New Mexico. Dr. Logan explained that Montgomery would also cope with conflict by false pregnancies. Dr. Logan told the jury about the conflict and stress in Montgomery's life each time she had a false pregnancy. (Tr. 2402.)

Dr. Logan testified about Montgomery's sterilization and its effect on her. Dr. Logan explained that Montgomery felt pressured from Carl and her mother to have a tubal fulguration. She believed her mother would take her children away if she refused to have the sterilization. Dr. Logan explained that in light of Montgomery's history of sexual abuse, one of the areas Montgomery felt safe and secure was in having children, and that had been Montgomery's role growing up, to take care of younger siblings. He explained that the sterilization and the loss of her ability to reproduce was emotionally traumatizing to Montgomery. Montgomery felt that Judy was forcing her into the sterilization as retaliation for Montgomery having sex with Judy's husband. Montgomery felt that Carl was forcing her into the sterilization as revenge for Montgomery having an affair with Brett. (Tr. 2403.)

Dr. Logan then testified about his finding that Montgomery suffered from post-traumatic stress disorder (PTSD). Dr. Logan explained that PTSD occurs when someone is exposed to a traumatic event that "floods their body's alarm system or brain alarm system." (Tr. 2404.) Dr. Logan testified that PTSD can be seen in



Appellate Case: 17-1716 Page: 68 Date Filed: 07/30/2018 Entry ID: 4687987

children who have been sexually and physically abused. PTSD occurs when someone is "extremely scared and feeling helpless to do anything about it." Dr. Logan described some of the symptoms of PTSD as the need to escape and avoidance. PTSD also causes difficulty sleeping, difficulty concentrating, and irritability. Dr. Logan testified that Montgomery's PTSD went untreated and formed shifts in mood, nightmares, difficulty sleeping, depression and anxiety. Dr. Logan also was of the opinion that Montgomery's multiple suicide attempts was a form of escape when she felt particularly overwhelmed. One of Montgomery's suicide attempts was when her mother and Carl took her children away from her and refused to give them back. (Tr. 2404-05.)

Dr. Logan was then questioned about pseudocyesis and delusions. He explained that delusions are a fixed belief in something that is not real. Once a person has a delusion, it may change somewhat in form and intensity over time, but "once the person believes in something they tend to latch on to it and want to hold on to it." (Tr. 2406.) Dr. Logan testified that pseudocyesis is a mental illness that can be triggered by incest, and for Montgomery it could also be triggered by feeling her tubal fulguration was forced upon her. Dr. Logan is of the opinion that the loss of Montgomery's ability to reproduce had a profound effect on her self-image. Montgomery could not deal with reality in a healthy way, instead her ability to deal with reality is "somewhat plastic and changeable." (Tr. 2407.)



Appellate Case: 17-1716 Page: 69 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Logan explained that if Montgomery gets an unpleasant truth, she does not check outside of herself to see whether something is true, but rather goes on what she feels inside as the truth. "From what she feels inside she starts imagining scenarios which over time progress to become reality" for her. (Tr. 2408.) Dr. Logan explained that these false realities are delusions, and to protect the delusions, a person may try to hide them from someone who may interfere with the delusion.

Dr. Logan also explained that it is hard to challenge a person's delusions successfully. "The harder you challenge with reality the harder they dig in." (Tr. 2409-10.) Dr. Logan explained how Montgomery truly believed her delusion that she was pregnant. "It was a fantasy in which she indulged herself and became delusional and her thinking is plastic enough if she imagines it can be true, if she imagines it long enough it becomes true in her mind." (Tr. 2411.)

Dr. Logan explained his views regarding whether Montgomery was malingering or delusional:

> A. I found her behavior in my opinion to be delusional, particularly with the issue of the pseudocyesis. Some of the things that you do not see if a person was just feigning a pregnancy to fool people, number one, I didn't see strong motive, somebody going to malinger something I am not sure what the advantage to her would have been. These things seem to come up not at times when she was trying to get anything recognized by medical people but more as retreat when there was a lot of stress in her family.



Appellate Case: 17-1716 Page: 70 Date Filed: 07/30/2018 Entry ID: 4687987

> Certainly someone mentioned the stresses of Carl and Vanessa talking about getting custody of the kids and trying to expose her as being an unfit mother, she was crazy about these pregnancies. But she already started believing she was pregnant way back in April of 2004. The belief she was pregnant started coming about pretty soon after she testified against her mother in the custody battle against Justin and she was experiencing retaliation. Somebody might try to take some kid away. So if there was any motivation it was an internal one, not one for any kind of external gain to benefit from that.
>
> The other thing that is characteristic of pseudocyesis, I don't want to cover a lot of ground Doctor Ramachandran has probably already covered but physiological changes you see with this delusion, women believe so strongly they are pregnant they actually start to have some signs, symptoms of pregnancy. Some bloating, some symptoms that will be consistent with pregnancy, nausea in the morning, some cessation of menstrual periods, some will even have a false pregnancy test.
>
> Some debate in this case because Lisa didn't show the pregnancy test to her husband but sometimes people who have this particular condition will have physical signs and symptoms that go along with it. That is why it's generally put in the category of psychiatry, somatization disorder, disorder of bodily function in which a person has some distortion out there, body function that does not correspond to physiological reality . Some things more common in that regard would be for example anorexia, despite being extremely emaciated and thin they think they're too fat when they look in a mirror and see themselves as obese even though they may only weigh 59 pounds and on the verge of death, trigger in their mind what is taking place, not tracking with what their body is actually doing.

(Tr. 2413-14.)

Defense counsel questioned Dr. Logan about Montgomery's mental state at the time of the offense. Dr. Logan's expert opinion was that at the time of the offense, "she dissociated, she had a feeling of unreality, she did not feel like herself."

(Tr. 2416.) "At the time itself there appeared to be some episode of dissociation that is usually seen in a period of extreme stress." (Tr. 2417.) Montgomery thought, at least in her delusion, she had lost her baby earlier that week. At the time of the offense, Montgomery was in the midst of chaos. There were many traumatic things going on in her life such as wanting to leave her husband; Carl was threatening to take custody of her children; her husband was behind on his child support; she was having a lot of money problems, and financial pressures; one of her best friends died and she had not recovered from that loss. Dr. Logan explained that at the time of the offense, Montgomery's "world was really closing in on her." (Tr. 2417-18.)

Dr. Logan summarized his opinion by stating that Montgomery's "mental illness drove her to kill without really an adequate consideration of the reality of the wrongfulness of what she was doing and the gravity of what she was doing. I think after she drove away she realized what had happened to some degree but with a plasticity she approaches life with she started to pretend the baby was hers and I think came to believe the baby almost was hers. But the police interviewed her at a critical time. For a brief period of time they were able to break through that delusion." (Tr. 2419.)

Dr. Logan ended his testimony by giving his expert opinion, to a reasonable degree of medical certainty, that Montgomery suffered from pseudocyesis at the time of the offense, which is a severe mental illness. (Tr. 2420.) Dr. Logan further gave



Appellate Case: 17-1716 Page: 72 Date Filed: 07/30/2018 Entry ID: 4687987

his expert opinion that in a delusional dissociate state caused by pseudocyesis Montgomery "would not be able to appreciate the nature, quality and wrongfulness of her conduct." (Tr. 2423.)

By its verdict, the jury rejected Montgomery's defense during the guilt phase of the trial returning a verdict of guilty on October 25, 2007.

### *D. Montgomery's Penalty Phase Case-in-Chief*

The Government called four witnesses in its case-in-chief during the penalty phase. (Tr. 2881-2903.) Montgomery called a large number of mitigation witnesses to testify during the penalty phase of her trial. Many of the witnesses testified about the difficult circumstances of Montgomery's childhood and her neglectful, alcoholic, and abusive parents. The witnesses also testified how Montgomery was a good person and a loving mother. These witnesses included a unit manager, a correctional officer, and a correctional counselor at the CCA holding facility in Leavenworth, Kansas; Montgomery's husband, two of her daughters, her biological father, a half-sister, a cousin, a forensic psychiatrist, and a clinical psychologist.

#### *1. Cynthia Collins*

Cynthia Collins, a unit manager at CCA, testified that Montgomery was never a problem while she was incarcerated at CCA. (Tr. 2906.) Ms. Collins further testified that it was "rare" to have an inmate who caused no problems like Montgomery. (Tr. 2907.) Ms. Collins testified that Montgomery used her time



Appellate Case: 17-1716 Page: 73 Date Filed: 07/30/2018 Entry ID: 4687987

productively while incarcerated and made remarkable crafts with her hands. (Tr. 2907-08.) Ms. Collins testified that Montgomery helped other inmates learn the art of tatting and assisting others in CCA's quilting program. (Tr. 2908.) Ms. Collins testified that Montgomery was an avid reader; was talented at drawing self-portraits; and served her time peaceably while incarcerated. (Tr. 2908-11.)

2. *Teresa Taylor*

Teresa Taylor, a correctional officer at CCA, testified that Montgomery caused no problems and "was easy to deal with" at CCA. (Tr. 2915.) Montgomery was pleasant, very polite, and did what she was told to do while incarcerated at CCA. (Tr. 2915.)

3. *Tracy Tinsley*

Tracy Tinsley, a correctional counselor at CCA, testified that she spent time with Montgomery at CCA. Tracy Tinsley described Montgomery as not causing any problems; never being a disciplinary problem; reading often; attending religious services; and involved in crafts. Ms. Tinsley also testified that Montgomery "has taught a lot of other younger women who don't know anything about tatting how to tat and she has also taught them how to quilt." (Tr. 2919.)

4. *Kevin Montgomery*

Kevin Montgomery, who is Montgomery's husband, testified that he and Montgomery married and enjoyed many family activities together with their



Appellate Case: 17-1716 Page: 74 Date Filed: 07/30/2018 Entry ID: 4687987

children. Mr. Montgomery testified the family events included attending Montgomery's children's football games, high school choir concerts, basketball games, junior high band musicals and recitals, softball games, and volleyball games. The family also enjoyed going to community festivals, and Montgomery enjoyed projects with her children such as sewing. (Tr. 2928-31.) Mr. Montgomery testified that Montgomery loved her children, and that he and Montgomery were still very much in love. (Tr. 2932.)

*5.* *Desiree Boman*

Desiree Boman, who is Montgomery's oldest daughter, testified that she and her mother sewed dresses together, and that her mother encouraged Desiree to try new things. (Tr. 2936-37.) Desiree testified she and her sister, Chelsea, wanted to play football in school, and her mother talked to the school board to help Desiree and Chelsea become part of the team. (Tr. 2938.) Desiree also testified that her mother helped her with 4-H projects such as raising and showing animals and took the children on trips to different places. Desiree testified that she loves her mother very much, and she knows her mother loves her. (Tr. 2939-40.)

*6.* *Chelsea Boman*

Chelsea Boman, who is Montgomery's middle daughter, testified that she is in the army reserves and that her mother helped her get through basic training with encouragement. (Tr. 2944-45.) Chelsea also testified that some of her best

memories of her mother are times spent camping and doing things together with her. (Tr. 2945.) Chelsea testified about trips to Colorado and San Antonio with her mother and attending different festivals as a family. Chelsea testified that she loves her mother and continues to have a loving relationship with her mother even though Montgomery is incarcerated. (Tr. 2946-48.)

*7. John Patterson*

John Patterson, Montgomery's biological father, testified that when Montgomery was just a small child he abandoned her and his other daughter, Diane. Patterson testified he made the mistake of "leaving my two daughters with a crazy lady." (Tr. 2953.) The crazy lady he was referring to was Montgomery's mother, Judy, who raised Montgomery. Patterson testified that he has reunited with Montgomery and wants to maintain a relationship with her even though she is incarcerated. (Tr. 2954.)

*8. Diane Mattingly*

Diane Mattingly, Montgomery's half-sister, testified that she is about four years older than Montgomery. (Tr. 2955.) Mattingly testified that Montgomery's mother, Judy, raised her until Mattingly was taken away. Mattingly testified how difficult it was for Montgomery and her to live with and be raised by Judy. Mattingly described her childhood with Judy as "walking on egg shells." (Tr. 2956.) Mattingly testified that she and Montgomery could never please Judy; that Judy would hit them



Appellate Case: 17-1716 Page: 76 Date Filed: 07/30/2018 Entry ID: 4687987

if they did anything wrong; and they were told by Judy they were not good enough. (Tr. 2956.) Mattingly testified that Judy did not take care of her children. It was instead Mattingly who tried to take care of Montgomery and her little sister, Patty. Mattingly testified that she was the one that fed them, clothed them, and protected them. Mattingly testified that when she was taken away from the home, she was sick because she knew Montgomery and Patty would no longer be cared for. (Tr. 2957.)

*9.* *Wendy Triebs*

Wendy Triebs, Montgomery's cousin, testified how Montgomery's mother, Judy, was mean-spirited towards Montgomery. (Tr. 2969, 2973.) Triebs also testified about some of the mental illnesses in her family. Triebs testified that she suffers from depression with psychosis and has been diagnosed with a bi-polar disorder. Triebs testified that her brother Kenny also suffers from mental illnesses. (Tr. 2977.) Triebs went on to explain how her parents got her the mental health care that she needed, but Montgomery did not receive the mental health care she needed. Triebs explained how Montgomery's mother had a negative impact on Montgomery receiving care for her mental illness. (Tr. 2978, 2981.)

*10.* *Dr. William Logan*

Dr. William Logan, a forensic psychiatrist who had testified in the guilty phase of the trial, testified that Montgomery was a victim of sexual abuse, and that



Appellate Case: 17-1716 Page: 77 Date Filed: 07/30/2018 Entry ID: 4687987

she suffered from the mental diseases of post-traumatic stress disorder, pseudocyesis, dissociation, depression, and borderline personality disorder. (Tr. 2986-87.) Dr. Logan further testified that Montgomery's ability to comprehend the nature, quality and wrongfulness of her actions at the time of the offense was substantially impaired to a reasonable degree of medical certainty. (Tr. 2988.) Dr. Logan also testified that at the time of the offense Montgomery was operating under a severe mental or emotional disturbance. (Tr. 2988-89.)

Dr. Logan also explained how Montgomery's mental illnesses stem in large part from the chronic childhood neglect, molestation, physical and emotional abuse that Montgomery suffered from throughout her life. (Tr. 2990-91.) Dr. Logan testified that Montgomery had difficulty with "reality testing" and suffers from paranoia and delusions. (Tr. 2991-92.) Dr. Logan explained how Montgomery had been in the midst of severe turmoil throughout her entire life. (Tr. 2993.)

*11.* *Dr. Ruth Kuncel*

Dr. Ruth Kuncel, a clinical psychologist, testified that she conducted a comprehensive mental evaluation of Montgomery. (Tr. 3016.) Dr. Kuncel described how Montgomery was abandoned by her biological father and the trauma Montgomery sustained from being torn away from her sister Diane at a young age. (Tr. 3017.) Dr. Kuncel described the ramifications of Montgomery being abused sexually and physically as a child. (Tr. 3018.) Dr. Kuncel testified that Montgomery



Appellate Case: 17-1716 Page: 78 Date Filed: 07/30/2018 Entry ID: 4687987

did not feel safe, she grew up with a great deal of logical confusion, a great deal of fear, and over-whelming anxiety. (Tr. 3018-19.) Dr. Kuncel explained when everything is confusing to Montgomery, there is not a sense of knowing what is real and what is not real. (Tr. 3020.) Dr. Kuncel also testified that the psychiatric medication that Montgomery is now taking has cut down on Montgomery's fear, overwhelming anxiety, and depressive symptoms. (Tr. 3026.)

Dr. Kuncel also diagnosed Montgomery with a substantial post-traumatic stress disorder as a result of her childhood physical and sexual abuse. (Tr. 3029.) Dr. Kuncel further diagnosed Montgomery with major depression and general anxiety. (Tr. 3017.) Dr. Kuncel testified that at the time of the offense Montgomery's capacity to appreciate the wrongfulness of her conduct, and to conform her conduct to the requirement of the law was very, very seriously impaired. (Tr. 3030.) Dr. Kuncel testified that Montgomery was suffering from a severe mental disturbance at the time of the offense. (Tr. 3030-31.) Dr. Kuncel also testified that Montgomery was not malingering. (Tr. 3034.)

The jury returned a verdict of death. (Tr. 3194.) The Court thereafter pronounced this sentence on Montgomery. (Tr. 3197-98.)[15]

---

[15]This Statement of Facts involves the evidence adduced at trial that bears on a number of Montgomery's claims regarding ineffective assistance of counsel. Facts relating to other claims raised in the application for a COA are set forth in those specific sections.



Appellate Case: 17-1716 Page: 79 Date Filed: 07/30/2018 Entry ID: 4687987

## IV. Post-Conviction Proceedings

### *A. Procedural History of Movant's § 2255 Motion*

On March 19, 2013, Montgomery filed her initial motion pursuant to 28 U.S.C. § 2255. (DCD 32.) On March 20, 2013, the district court issued an order directing the Government to answer Montgomery's motion. (DCD 40.)

On March 21, 2013, Montgomery filed a motion to reassign the case pursuant to 28 U.S.C. § 455(b)(5)(iv), requesting that Judge Fenner disqualify and recuse himself from further proceedings on the grounds that he was a material witness in the case. (DCD 41 at 1-2.) The Government filed its response to the motion to reassign on April 9, 2013. (DCD 42.) On May 6, 2013, the district court conducted a hearing on Montgomery's motion to reassign. (DCD 51.) As a result of issues raised during this hearing, the district court authorized Montgomery and the Government to depose the Federal Public Defender, Ray Conrad. (DCD 52.)

On June 6, 2013, Montgomery filed supplemental suggestions in support of her motion to reassign. (DCD 54.) In this motion, Montgomery sought disqualification of the district court pursuant to 28 U.S.C. § 455(a) alleging "the appearance of impropriety" in the court's supposed consideration of information acquired through off the record proceedings. (DCD 54 at 1.)

On June 25, 2013, the court denied Montgomery's motion to reassign the case. (DCD 59.) On September 5, 2013, Montgomery filed a motion to stay proceedings

because she had filed an application for a writ of mandamus with this Court on the same day.[16] (DCD 64 at 2.) On September 19, 2013, the Government filed its response to Montgomery's motion. On September 24, 2013, the district court denied Montgomery's motion to stay. (DCD 70.) Thereafter, on the same day, Montgomery sought to stay the proceeding in the district court pending a resolution by this Court of the application for writ of mandamus. On October 17, 2013, this Court summarily denied the application for a writ of mandamus and further denied the motion to stay proceedings as moot.

On October 1, 2013, Montgomery filed an amended motion for relief pursuant to 28 U.S.C. § 2255. (DCD 71.) The Government's response was due on October 18, 2013, however, the Government sought, and was granted, an extension of time until January 15, 2014, in which to file its response. (DCD 73, 74.)

On November 25, 2013, the Government sought a motion to compel an affidavit from Fred Duchardt. (DCD 75.) The motion noted that Mr. Duchardt objected to preparing an affidavit because it took him 300 uncompensated hours to prepare an affidavit in another capital case. Instead, Mr. Duchardt suggested that he provide testimony through an alternative means such as a hearing or deposition. However, the Government stated that it had been attempting for two months to obtain Mr. Duchardt's response and had been unsuccessful. The Government

[16] This Court docketed the case as 13-2958.

therefore requested that Mr. Duchardt be compelled to provide an affidavit. (DCD 75 at 2.) The Government, however, sympathized with effort involved in preparing a response to the 238-page § 2255 motion largely involving ineffective assistance of counsel claims and suggested that Mr. Duchardt and co-counsel John O'Connor be reimbursed, if possible, through CJA funds for their time in preparing the affidavits. (DCD 75, 3.)

On December 10, 2013, Montgomery filed her objections to the motion to compel defense counsel to provide an affidavit. (DCD 76.) On December 10, 2013, the district court granted the Government's motion to compel, but declined to reimburse either Fred Duchardt or John O'Connor from CJA funds for their time in preparing the affidavits.

On December 27, 2013, Mr. Duchardt moved for reconsideration of the court's order compelling him to provide an affidavit. (DCD 78.) The district court denied Mr. Duchardt's motion for reconsideration on January 17, 2014. (DCD 84.)

On May 31, 2014, Mr. Duchardt filed a motion seeking the return of Montgomery's file. (DCD 86.) On June 2, 2014, the district court entered an order granting Mr. Duchardt's and Mr. O'Connor's unopposed motion for an extension of time to file their affidavits, granting an extension of time to the Government to file its response, and granting the motions for return of files. (DCD 91.)



Appellate Case: 17-1716 Page: 82 Date Filed: 07/30/2018 Entry ID: 4687987

On June 11, 2014, Fred Duchardt moved for an order clarifying the district court's previous order on the motion for reconsideration filed by Mr. Duchardt. (DCD 96.) On June 16, 2014, the court entered an order in response to Mr. Duchardt's motion requiring various current and former members of the Federal Public Defender's Office as well as a retained expert witness to cooperate with Mr. Duchardt and Mr. O'Connor regarding the claims raised against them. (DCD 100.) On the same day, Montgomery filed a motion for an emergency stay pending another application for a writ of mandamus. (DCD 101.) On June 17, 2014, the district court denied the motion for a stay. (DCD 103.) On June 20, 2014, this Court entered an order staying the district court's order of June 16, 2014, pending this Court's ruling on Montgomery's application for a writ of mandamus. (DCD 105.)

On June 27, 2014, Montgomery filed her application for a writ of mandamus in this Court in Case No. 14-2437. This Court ordered the Government to respond and on July 9, 2014, the Government filed its response. On July 11, 2014, this Court filed its judgment denying Montgomery's application for a writ of mandamus and denying her request for an oral argument as moot. This Court further vacated the stay of the district court's order of June 16, 2014. (DCD 116.)

On June 30, 2014, the district court entered an order limiting public funded representation, noting that it no longer believed that, based on the current stage of proceedings, Montgomery required the assistance of three publicly funded attorneys



Appellate Case: 17-1716 Page: 83 Date Filed: 07/30/2018 Entry ID: 4687987

as well as the support of the staff of the Federal Public Defender. (DCD 114.) Accordingly, the court directed that one of Montgomery's counsel, Christine Blegen, withdraw from the case by July 28, 2014. (DCD 114, 2.)

On July 21, 2014, Montgomery filed a motion to stay the district court's order limiting publicly funded representation so that she could pursue her third application for a writ of mandamus in this case. (DCD 119.) On July 22, 2014, Montgomery filed her application for a writ of mandamus in this Court docketed as Case No. 14-2725. On July 24, 2014, this Court sent a letter requesting the district court to respond to the application for a writ of mandamus. The district court filed its response to Montgomery's application for a writ of mandamus on July 25, 2014. On August 13, 2014, this Court issued its judgment denying Montgomery's application for a writ of mandamus.

On February 2, 2015, the Government filed its response to Montgomery's amended § 2255 motion. (DCD 140.) On September 1, 2015, Montgomery filed her reply suggestions. (DCD 149.)

As noted above, on December 21, 2015, the court filed an order denying a number of Montgomery's claims for relief and granting her motion for an evidentiary on the remaining claims. The court also denied a prior discovery motion filed by Montgomery. (DCD 173.)



Appellate Case: 17-1716 Page: 84 Date Filed: 07/30/2018 Entry ID: 4687987

On October 31, 2016, the court conducted an evidentiary hearing on Montgomery's remaining § 2255 claims, which continued over nine days. (DCD 201-209.) On March 3, 2017, the court issued an order denying the remainder of Montgomery's claims and declining to issue a certificate of appealability (COA). (DCD 212.)

On March 31, 2017, Montgomery filed her notice of appeal, and this Court docketed the case as No. 17-1716. On November 1, 2017, Montgomery filed her application for a COA.

## *B. Testimony at Evidentiary Hearing*

### *1. Russell Stetler*

Montgomery began the presentation of her case with the testimony of Russell Stetler who testified that he served as the National Mitigation Coordinator for federal death penalty projects, which is an organization committed to providing assistance to Federal Public Defenders (FPD). (Civ. Tr. 55-56.)[17] Montgomery offered Mr. Stetler as an expert in investigation and mitigation in death penalty cases. (Civ. Tr. 71.)

Mr. Stetler thereafter described in some detail the American Bar Association (ABA) Guidelines for the performance of counsel in death penalty cases. (Civ. Tr.

[17] "Civ. Tr." refers to the transcript of the evidentiary hearing conducted in this case by the district court in Case No. 12-08001-CV-SJ-GAF.

81-96.) Mr. Stetler thereafter testified that the mitigation investigation performed in Montgomery's case did not comply with the prevailing professional norms in 2004-2007. (Civ. Tr. 105.) Specifically, Mr. Stetler pointed to the large amount of turnover in personnel, including multiple mitigation specialists. (Civ. Tr. 107-08.) Mr. Stetler testified that this was an issue of particular importance when dealing with a client with mental issues. (Civ. Tr. 109.) Mr. Stetler also testified that "gender is a big issue," because some of the turnover involved women. (Civ. Tr. 110-11.) Mr. Stetler testified that it was important to have meetings and collect records. He noted that the defense team had collected a lot of records but opined that he was not sure they knew what to do with the records. (Civ. Tr. 111.)

Mr. Stetler criticized Fred Duchardt about his view of mitigations specialists, but admitted that there is no certification to designate a mitigation specialist:

> Q. Well, let's break that apart. Is there a club? Is there a list of certified mitigation specialists?
>
> A. No. In fact, it's interesting. One of the discussions that arose in the period after the revision of the ABA Guidelines is whether there should be a certification process, and the consensus that emerged was that it was more important to establish performance standards, which ultimately became the supplementary guidelines rather than certifying certain individuals and saying they are qualified and, therefore, the work that they do is good work.

(Civ. Tr. 130.)

On cross-examination, Mr. Stetler admitted that the ABA Guidelines were simply that – guidelines – rather than a required standard of care and certainly was



Appellate Case: 17-1716 Page: 86 Date Filed: 07/30/2018 Entry ID: 4687987

not at the time of Montgomery's trial. (Civ. Tr. 141.) Mr. Stetler also admitted that despite his criticisms of Mr. Duchardt, he and John O'Connor had successfully avoided a death penalty in a Kansas capital federal prosecution immediately before their appointment in Montgomery's case. (Civ. Tr. 143.) Mr. Stetler also admitted that he was aware that Mr. Duchardt had avoided the death penalty in two other federal capital cases and had, in fact, obtained an acquittal on one of them. (Civ. Tr. 144.)

In addition, Mr. Stetler, who had been critical in his initial declaration[18] of the alleged failure of the trial team to obtain a resolution other than death, admitted that he was unaware that on April 3, 2007, Montgomery's trial team met with attorneys for the Government seeking a non-death penalty resolution. (Civ. Tr. 145.)[19] Mr. Stetler also admitted that Mr. Duchardt attempted to obtain a non-death penalty resolution before the October 2007, trial. (Civ. Tr. 148-49.)

Mr. Stetler also admitted that, especially with a crime like the one committed by Montgomery, mental health presented itself as an issue immediately. (Civ. Tr. 151.) He conceded that the defense presented expert testimony that Montgomery suffered from the mental disease pseudocyesis and that, at the time of the offense,

---

[18]Montgomery Exh. 47.

[19]The trial team based this attempt on recently learned information from Montgomery that her brother, Tommy Kleiner, had been with her at the time of the offense. (Civ. Tr. 145.)



Appellate Case: 17-1716 Page: 87 Date Filed: 07/30/2018 Entry ID: 4687987

she was delusional and unable to appreciate the wrongfulness of her conduct or to comport herself to legal standards. (Civ. Tr. 152.)

Mr. Stetler further admitted that although he had been critical of the trial team's alleged failure to present evidence of Montgomery's sexual abuse as a child, eight of the jurors found that she had been subject to significant sexual abuse as a child. Moreover, nine jurors found that despite the significant physical and sexual abuse she had endured, she was still able to provide good mothering for her children. (Civ. Tr. 154.)

Mr. Stetler concluded his cross-examination by admitting that the defense team's attempt to place another culpable person (Tommy Kleiner) at the scene of the crime met one of the statutory mitigating factors present in federal death penalty cases. (Civ. Tr. 155.)

*2.* *Marc Bookman*

The next witness to testify was Marc Bookman, who is the director of the Atlantic Center for Capital Representation in Philadelphia, which is a non-profit organization that consults on death penalty cases. (Civ. Tr. 159-60.) Montgomery tendered Mr. Bookman as an expert on the standard of care in capital cases. (Civ. Tr. 172.)

Mr. Bookman opined that the defense team did not function as a team because they did not have meetings and, while tasks were delegated, they "never

synthesize(d) those tasks into a whole." (Civ. Tr. 191.) Habeas counsel posited to Mr. Bookman that Montgomery's trial team "met as an entire team less than ten hours over the course of 16 months," and Mr. Bookman testified that was an insufficient amount of time, but he did not identify the number of hours that he would consider to be sufficient. (Civ. Tr. 192.)[20]

Mr. Bookman opined that the trial team failed to come to grips with the evidence showing that Montgomery was a bad mother. (Civ. Tr. 197.) He also stated that a biopsychosocial history was the standard of care for death penalty cases. (Civ. Tr. 199.) Mr. Bookman also cautioned that a biopsychosocial history should be completed before such tests as an MRI or a PET scan, although he appeared to base this conclusion on cost grounds, not on the basis that such tests would be counter-productive. (Civ. Tr. 200.)

Mr. Bookman also discussed the not guilty by reason of insanity (NGRI) defense and cautioned against its use. Mr. Bookman stated, "We also know from the Capital Jury Project data that a failed innocence defense is a very likely death sentence, because it gives the appearance that a defendant has tried to fool the jury, has tried to get over it and is not willing to accept responsibility for what he or she

[20]Habeas counsel did not inquire or direct Mr. Bookman's attention to the number of times various members of the defense team contacted each other by telephone, email or in other ways, or the number of times various members of the defense team (although not the whole team) would meet to discuss issues.



Appellate Case: 17-1716 Page: 89 Date Filed: 07/30/2018 Entry ID: 4687987

has done."[21] (Civ. Tr. 202.) Mr. Bookman also concluded that the pseudocyesis defense would not "work" and that the defense attorney would lose credibility in front of this jury and concluded that this is what happened in this case.[22] (Civ. Tr. 204.)

Mr. Bookman also testified about plea negotiations and stated that there are "many, many attorneys across the country that have pled cases that were seemingly unpleadable. . . ." (Civ. Tr. 205.) As part of this testimony, Mr. Bookman discussed a trial team's approach to the then-emerging "Tommy Defense" and its impact on the plea negotiations. (Civ. Tr. 208-09.)

On cross-examination, Mr. Bookman admitted that team meetings were not the only way to communicate and that things such as phone calls, emails, FaceTime, and other elements of modern technology could also facilitate communication. (Civ. Tr. 218.)

---

[21]Mr. Bookman provided no metric for this data nor a theoretical basis by which the Capital Jury Project arrived at this conclusion. For example, were capital juries who imposed the death penalty in NGRI cases later asked what their vote would have been if the defendant had not presented such a defense? If so, how many jurors were asked this question and under what circumstances? Were they asked as a group or individually and how long after the verdict?

[22]Again, Mr. Bookman fails to provide a basis for how he arrived at this conclusion, other than speculation on his part. In fact, under cross-examination, he admitted that this was simply his opinion. (Civ. Tr. 228.)

With respect to assertions about the efficacy of plea negotiations, Mr. Bookman admitted that he had never attempted to negotiate a non-death penalty result in a capital case with the Western District of Missouri. (Civ. Tr. 220-21.) As Mr. Bookman found out, the Western District of Missouri has never negotiated a less than death result in a capital case once certified by the Department of Justice. (Civ. Tr. 221.)

The Government also pointed out that Mr. Bookman's analysis of the "Tommy Defense" was based on current information, not what was known at the time:

> Q. But, see, that's why I say you're backward looking. You're assuming facts that didn't exist on April 3rd, 2007. No one knew that Tommy had an alibi at that point. That wasn't done until much later in the investigation to figure out whether Tommy could have been there or not because there is a third party who claims they saw a person there. Certainly as we sit here now, we know that the evidence that they offered to them on April 3rd, 2007, wasn't going to be good, but they didn't know that, nor did we know that.
>
> * * *
>
> A. I'll take your word that they didn't. I don't know the chronology enough to say, so I'm going to assume you're right.

(Civ. Tr. 223-24.)

*3. <u>Ronald Wurtz</u>*

Mr. Wurtz testified that he is a retired Federal Public Defender (FPD) in the District of Kansas. (Civ. Tr. 276-27.) He initially represented Montgomery at the



Appellate Case: 17-1716 Page: 91 Date Filed: 07/30/2018 Entry ID: 4687987

time of her initial appearance in Kansas federal court.[23] (Civ. Tr. 279-80.) Mr. Wurtz testified that Montgomery was upset after her arrest. (Civ. Tr. 280.)

Mr. Wurtz testified that no one from the Western District of Missouri FPD ever talked to him regarding the week that he represented Montgomery, until Judy Clarke talked to him about a week before her removal from the trial team.[24] (Civ. Tr. 287.)

*4. Brett Dillingham*

Mr. Dillingham testified that he is a jury consultant who has done some mitigation work, but is not a mitigation specialist. (Civ. Tr. 289, 293.) Charles Dedmon (the Kansas FPD) hired Mr. Dillingham, but spent time working with Montgomery at the request of Anita Burns, who represented Montgomery in the Western District of Missouri for the FPD. (Civ. Tr. 294, 296-97.)

Mr. Dillingham testified that he met Montgomery on several occasions, the last time being on January 4, 2005. (Civ. Tr. 299, 307.) During that time, Montgomery did not tell Mr. Dillingham that her brother Tommy was involved in

---

[23]Law enforcement officers arrested Montgomery on December 17, 2004. (Civ. Tr. 280.) Montgomery's Rule 5 removal hearing occurred a week later on December 23, 2004. (Civ. Tr. 286.) Accordingly, Mr. Wurtz's involvement with Montgomery in terms of the length of time was quite limited.

[24]At that time, Ms. Clarke had been officially involved in the case for approximately seven months.



Appellate Case: 17-1716 Page: 92 Date Filed: 07/30/2018 Entry ID: 4687987

the crime, but she did share information about her history of sexual abuse. (Civ. Tr. 299-300.) Moreover, Montgomery told Mr. Dillingham that she had no memory of the offense, but "must have" or "probably" did it. (Civ. Tr. 301.)[25]

Mr. Dillingham testified that his last meeting with Susan Hunt occurred on January 14, 2005. (Civ. Tr. 307.) He had no further involvement with Montgomery's case after that time. (Civ. Tr. 308.)

On cross-examination, Mr. Dillingham reiterated that during his first meeting with Montgomery, which involved no females other than her and occurred within approximately a week of the murder, Montgomery was open about her past and informed him about the sexual abuse by Jack Kleiner that began when she was approximately 12 years old. (Civ. Tr. 307.) Montgomery made no allegations at that time of gang rapes or sex trafficking. (Civ. Tr. 312.)

---

[25]Habeas counsel drew testimony from Mr. Dillingham that Montgomery was taking responsibility for the crime. (Civ. Tr. 301.) In fact, however, Montgomery actually accepted responsibility for the crime only at some time after her initial questioning. During her first interview with law enforcement officers, Montgomery stated that she had given birth to the baby and provided them with a cover story regarding the birth that changed as questioning continued. (Tr. 1640-43.) Later during that day at the police station, Montgomery specifically confessed to strangling Mrs. Stinnett with the white cord and abducting her baby with the items she had brought with her. (Tr. 1646, 1649-50). However, a review of the record shows that thereafter she would only say words to the effect that she "must have" or "probably" committed the crime.



Appellate Case: 17-1716 Page: 93 Date Filed: 07/30/2018 Entry ID: 4687987

*5. Anita Burns*

Ms. Burns works for the FPD for the Western District of Missouri. (Civ. Tr. 313.) She was assigned to represent Montgomery by the FPD, Ray Conrad. (Civ. Tr. 315.) Since Ms. Burns had no capital experience, the court appointed Susan Hunt as lead counsel on January 20, 2005. (Civ. Tr. 319-20.)

Ms. Burns testified that she was not pleased with the way Montgomery's case had been structured because she had to report to Assistant FPD David Owen regarding the case. (Civ. Tr. 323.) This resulted in her withdrawing from the case on April 14, 2005. (Civ. Tr. 313.)

Ms. Burns speculated that Mr. Owen had trouble interacting with women, but was unable to point to anything specific and admitted that Mr. Owen did not treat women differently. (Civ. Tr. 327.)

Ms. Burns testified that she talked with Fred Duchardt when he entered the case and he asked her why counsel had never talked to Montgomery about the facts of the case. (Civ. Tr. 328-29.) Ms. Burns stated that she did not think that Montgomery was in a mental state at that time and that there would be plenty of time to talk with her about the facts later. "I felt it was more important early on to



Appellate Case: 17-1716 Page: 94 Date Filed: 07/30/2018 Entry ID: 4687987

establish a rapport with her so that we could get into those facts later on when the time was appropriate." (Civ. Tr. 329.)[26]

*6. Stephanie Elliott*

Ms. Elliott is employed as a paralegal with the FPD. (Civ. Tr. 330.) David Owen hired her in the beginning of October of 2005 to provide document support in Montgomery's case. (Civ. Tr. 331-33.) Ms. Elliott testified that when she started there were already "voluminous" records collected in the case, including school records, birth and death certificates, court records regarding divorces by Montgomery and her mother, and some criminal records. (Civ. Tr. 334.)

Ms. Elliott testified that there were fewer defense team meetings after the appointments of Fred Duchardt and John O'Connor to the case. She explained that, from her perspective this may have been because of the number of records that had already been gathered, so that they could just download the records accumulated on a hard drive. (Civ. Tr. 336-37.) In addition to the hard drives, Messrs. Duchardt and O'Connor received paper copies of the discovery. (Civ. Tr. 339-40.)

Ms. Elliott had many meetings with Montgomery, primarily to review discovery with her. (Civ. Tr. 341.) Ms. Elliott also testified about events prior to

[26]Fred Duchardt and John O'Connor's representation of Montgomery began approximately a year after Ms. Burns withdrew her representation.



Appellate Case: 17-1716 Page: 95 Date Filed: 07/30/2018 Entry ID: 4687987

trial, such as witness interviews, and during the trial, when events did not go as planned. (Civ. Tr. 342-57.)[27]

*7.* *Troy Schnack*

Mr. Schnak is employed by the FPD office for the Western District of Missouri as a computer system administrator. (Civ. Tr. 361.) In Montgomery's case, Mr. Schnack handled computer forensics at the request of David Owen. (Civ. Tr. 364.) Mr. Schnack also testified that at Fred Duchardt's request, on or around September 28, 2007, he prepared a memo concerning a summary of deleted internet files found on Montgomery's computer. (Civ. Tr. 370.) Mr. Schnack also prepared a map of the various residences Montgomery occupied in her life. (Civ. Tr. 372.)

---

[27]For example, Ms. Elliott testified about the disappointing testimony of Desiree Boman:

> Well, she gave testimony that in all the times that, you know, Ron and even the mitigation specialist they interviewed her that she had never told any of them before, you know, I think that Lisa would hit them with hangers, just some physical abuse that, you know, that, of course, that Desiree was asked about that and she, you know, said that there wasn't, then she had said that in court. So when we were walking back, you know, Dave and Ron were just very upset, like she had plenty of opportunity to tell us and is she lying? Why would she lie to us? They were pretty upset about it.

(Civ. Tr. 352.)



Appellate Case: 17-1716 Page: 96 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Schnack described Montgomery's attitude as "sullen" during the trial, however, after the jury read the verdict, she became animated and asked what she could do to help. (Civ. Tr. 381.)

On cross-examination, Mr. Schnack admitted that often attorneys counsel their clients to have an appropriate demeanor and was not privy to any conversations that Fred Duchardt or John O'Connor may have had with Montgomery concerning this issue. (Civ. Tr. 384-85.)

*8.* *Susan Hunt*

Ms. Hunt is an attorney appointed to represent Montgomery as lead counsel on January 20, 2005. (Civ. Tr. 391.) Prior to that, Ms. Hunt had acquired capital defense experience in six prior cases, including a federal death penalty case. (Civ. Tr. 388-89.)

Ms. Hunt testified about retaining Lisa Rickert as a mitigation specialist on the recommendation of the resource counsel. (Civ. Tr. 396.) She also testified that she retained Dr. Marilyn Hutchinson to conduct an evaluation of Montgomery's mental state. (Civ. Tr. 397.) Ms. Hunt also retained Dr. William Logan to evaluate Montgomery after an apparent suicide attempt. (Civ. Tr. 399.)

Ms. Hunt testified that Anita Burns resented Mr. Owen being her supervisor and she complained about it "a lot." Ms. Hunt testified that Ms. Burns told the FPD,

Ray Conrad, that it was either her or Mr. Owen who would represent Montgomery, and Mr. Conrad assigned the task to Mr. Owen. (Civ. Tr. 400.)

Ms. Hunt testified that there was no "guilt-and-innocence" phase to the case. She stated that her review of the discovery showed that there was nothing to contest and that the case was a "done deal." (Civ. Tr. 402.)

Ms. Hunt related bringing Judy Clarke into the case around or before July of 2005. (Civ. Tr. 403.) Ms. Clarke remained involved with the case from that point and was formally appointed in September of 2005 *pro hac vice* sponsored by Mr. Owen. (Civ. Tr. 403.) Ms. Hunt testified that she and Mr. Owen wanted Ms. Clarke to take over the mitigation part of the case. In that regard, Ms. Clarke's involvement would also bring in Debra Garvey as a mitigation specialist, as well as David Freeman. (Civ. Tr. 404.) Ms. Clarke's goal was to get the case to the point that the Government would accept a life sentence. (Civ. Tr. 408.)[28]

Ms. Hunt testified that Ms. Rickert, previously retained as a mitigation specialist on the recommendation of resource counsel, was adverse to collecting records. Accordingly, when Ms. Garvey began work on the case, record collection "skyrocketed." (Civ. Tr. 405.)

---

[28]Ms. Clarke instituted a policy forbidding other individuals from seeing Montgomery on their own, particularly Ron Ninemire. (Civ. Tr. 408.) This was the case even though Lisa Rickert testified that Montgomery had a good relationship with Mr. Ninemire. (Civ. Tr. 457.)



Appellate Case: 17-1716 Page: 98 Date Filed: 07/30/2018 Entry ID: 4687987

Ms. Hunt then described, to some extent, the events that led to Ms. Clarke's dismissal. (Civ. Tr. 409-12.)[29] She also related her own removal from the case. (Civ. Tr. 419.) Ms. Hunt testified that after her removal from the case, she had several conference calls involving herself, Judy Clarke, and Fred Duchardt. (Civ. Tr. 422.)

Ms. Hunt testified that she watched about 45 minutes of the trial one day and that it appeared to her that Montgomery had a flat affect. (Civ. Tr. 421.)

On cross-examination, Ms. Hunt testified that a division of labor is not uncommon in a capital case. (Civ. Tr. 424-25.) Ms. Hunt was not aware what roles the trial team assigned to themselves. (Civ. Tr. 426.)

*9. <u>Lisa Rickert</u>*

Ms. Rickert testified that she is a mitigation specialist who worked on Montgomery's case from February to August of 2005 after Anita Burns retained her. (Civ. Tr. 424, 430.)

Ms. Rickert testified that she interviewed 25 to 30 witnesses, including Montgomery. (Civ. Tr. 433.) Ms. Rickert testified that Ron Ninemire, the investigator for the FPD, was very good during interviews, that he was not intrusive,

---

[29]The court previously had ruled on the issue of Judy Clarke's removal before the evidentiary hearing.



Appellate Case: 17-1716 Page: 99 Date Filed: 07/30/2018 Entry ID: 4687987

and that allowed Ms. Rickert to build rapport with the witness.[30] She did not believe that the same was true of Susan Hunt or David Owen. (Civ. Tr. 436.)

Ms. Rickert testified that she was working on a biopsychosocial history, but that apparently this was an issue for Ms. Hunt and Mr. Owen who did not understand why she would interview a second or third cousin. (Civ. Tr. 438-39.) She testified about other difficulties she had with the attorneys regarding witness interviews. (Civ. Tr. 439-43.) Ms. Rickert testified that Ron Ninemire told her that Mr. Owen had insinuated that she and Mr. Ninemire were having an affair, so she resigned from the case. (Civ. Tr. 446-47.)[31]

Ms. Rickert testified that she talked with Montgomery about her history of sexual abuse, including the construction of a room to continue the abuse.[32] (Civ. Tr. 451.)

---

[30]In fact, Ms. Rickert testified that Mr. Ninemire appeared to have a good working relationship with Montgomery and that she responded nicely and was friendly and smiled when he was around. (Civ. Tr. 457.)

[31]Ms. Hunt stated in her declaration that she and Mr. Owen had several problems with Ms. Rickert because she engaged in interviews without keeping them apprised and because she did not want to collect records. Ms. Hunt stated that Ms. Rickert resigned from the case at Mr. Owen's request. (Montgomery Exh. 60, 3.)

[32]Although, again, there was no description by Montgomery of gang rapes or sex trafficking.

*10. Special Agent Kurt Lipanovich*

Special Agent (SA) Lipanovich is employed by the FBI and was the case agent in the Montgomery case. (Civ. Tr. 460.) Habeas counsel inquired of SA Lipanovich whether he ever told Judy Clarke and others that the sex between Jack Kleiner and Montgomery was consensual and he replied that he did not. (Civ. Tr. 462.)

SA Lipanovich also testified that he contacted Tommy Kleiner's probation officer on April 5, 2007 about Kleiner's location on the day of the murder, and she told him to get a subpoena for the information. (Civ. Tr. 467.) As a result of his investigation, SA Lipanovich determined that Tommy Kleiner was with his probation officer at or near the time of the murder approximately 175 miles from the murder scene. (Civ. Tr. 471.)

*11. Richard Burr*

Mr. Burr is associated with the Federal Death Penalty Resource Counsel. (Civ. Tr. 527.) He testified that the Western District of Missouri is one of the "harshest" jurisdictions with respect to the death penalty. (Civ. Tr. 536.) He also reviewed the death penalty authorization process. (Civ. Tr. 537-39.) Mr. Burr testified that once the Attorney General grants authorization, it is difficult to obtain de-authorization. (Civ. Tr. 539.)

Mr. Burr testified that the FPD, Ray Conrad, rarely consulted with the Resource Counsel and was unsure whether Mr. Conrad consulted on this case.



Appellate Case: 17-1716 Page: 101 Date Filed: 07/30/2018 Entry ID: 4687987

(Civ. Tr. 545.) Mr. Burr testified that he did not consider Susan Hunt to be learned counsel. (Civ. Tr. 548.)

Mr. Burr stated that he received reports prepared by Lisa Rickert, which raised "red flags" indicating Montgomery's mental illness issues. (Civ. Tr. 558.) Mr. Burr testified that prior to July of 2005, the defense team was "stuck on what I think were sort of silly issues of guilt/innocence." (Civ. Tr. 560.) Mr. Burr then went on to provide opinions on delusions Montgomery might have and how they could affect her memory and the possibility that she suffered from temporal lobe impairments affecting her memory.[33] (Civ. Tr. 562-63.)

Mr. Burr then testified how Ms. Clarke became associated with the case and the people that she brought with her, including Debra Garvey, David Freedman, and Holly Jackson. (Civ. Tr. 565-66, 570.) Ms. Clarke kept Mr. Burr "apprised of how the case was proceeding." (Civ. Tr. 571.) From this he managed to "glean impressions," including that Montgomery was "fragile," and that Ms. Clarke "developed a relationship with her that was much more stabilizing for her than any relationship she had with anybody else on the defense team . . . ." (Civ. Tr. 572.)[34] Mr. Burr then went on in considerable detail to discuss psychological issues

[33]A review of Mr. Burr's testimony does not reveal any medical degrees.

[34]Later during the evidentiary hearing, Ms. Clarke would criticize the FPD investigator, Ron Ninemire, for having a special relationship with Montgomery. (Civ. Tr. 648-49.)



Appellate Case: 17-1716 Page: 102 Date Filed: 07/30/2018 Entry ID: 4687987

involving trauma and memory. He then discussed "the role of gender as it relates to cultural competence," again expressing opinions about how the "mere presence of a male" can set off time bombs. (Civ. Tr. 573-75.)

Mr. Burr also testified that in April of 2006, Montgomery's defense team had "engaged" Judith Hermann, a trauma expert, for assistance, had "retained" Dean Delis, a neuropsychologist, and "were also reaching out to" Werner Spitz, a forensic pathologist. (Civ. Tr. 579-80.)[35] Mr. Burr then discussed his interactions with John O'Connor and Fred Duchardt. (Civ. Tr. 581-86.)

On cross-examination, Mr. Burr stated that there was no obligation on any member of the defense team to reach out to the Resource Counsel. (Civ. Tr. 571.) He also admitted that although he maintained contact through emails and letters with the defense team after Ms. Clarke left, he never expressed in writing that the defense team was making a mistake and that they needed to ask for additional time before making their mitigation presentation to the Department of Justice. He also confirmed that any iteration of the defense team could have sought a reconsideration based on additional evidence. (Civ. Tr. 601.) In addition, Mr. Burr was unable to

[35]These preliminary steps to identify experts occurred approximately 15months after the murder and 10 months after Ms. Clarke became involved in the case in July of 2005, in a case where, according to all the testimony, everyone agreed from the beginning that mental issues were going to be a major factor.



Appellate Case: 17-1716 Page: 103 Date Filed: 07/30/2018 Entry ID: 4687987

specify any written communication in which he told Ms. Hunt and Mr. Owen to focus only on mitigation and not on the issue of guilt or innocence. (Civ. Tr. 604.)

*12. Judy Clarke*

Ms. Clarke began her testimony discussing her experience in death penalty litigation, including team dynamics, the need for meetings, and interactions with the client. (Civ. Tr. 621-28.) Ms. Clarke testified that she began her involvement in Montgomery's case on July 10, 2005, in a meeting with Dick Burr, Susan Hunt and David Owen. (Civ. Tr. 628-29.) Ms. Clarke testified about assembling other people for the trial team including Debra Garvey, David Freedman, and Holly Jackson soon after the July meeting. (Civ. Tr. 630-32.)

Ms. Clarke discussed the death penalty authorization meeting with the Department of Justice in late September of 2005, noting that often the Department will grant an extension of time. (Civ. Tr. 634-35.) Ms. Clarke believed that would be important in this case because of the mental health issues involved. (Civ. Tr. 636.) Ms. Clarke discussed the pitfall of normalizing the client's behavior because of the need to keep the relationship professional. (Civ. Tr. 640.)[36]

Ms. Clarke testified about the dangers of one member of the defense team, specifically Ron Ninemire, having a special relationship with Montgomery.

[36]However, earlier Ms. Clarke criticized Ms. Hunt and Mr. Owen because they did not express "warmth" for Montgomery. (Civ. Tr. 629.)



Appellate Case: 17-1716 Page: 104 Date Filed: 07/30/2018 Entry ID: 4687987

(Civ. Tr. 648-49.) Ms. Clarke also criticized Mr. Owen for his relationship with Judy Shaughnessy, Montgomery's mother. (Civ. Tr. 649-50.) Ms. Clarke then discussed the parameters of an insanity defense. (Civ. Tr. 654-59.)

Ms. Clarke stated that she had two communications with Fred Duchardt after his appointment to the case. The first conversation was generally about the case and possible staff issues and the second involved whether Ms. Clarke could get back into the case.[37] (Civ. Tr. 674.) When asked about Tommy Kleiner, Ms. Clarke stated that he had not been "firmly excluded" at the time Mr. Duchardt contacted her. (Civ. Tr. 678.)

*13. Laine Cardarella*

Ms. Cardarella is the FPD for the Western District of Missouri. (Civ. Tr. 683-84.) Ms. Cardarella discussed the Western District of Missouri's plan for implementing the Criminal Justice Act. (Civ. Tr. 687.) She also discussed David Owen, describing him as "belligerent," "misogynistic," and a "bully. (Civ. Tr. 690.) She confirmed that Ray Conrad demoted Mr. Owen from the position of First Assistant sometime after a hearing in February of 2007. (Civ. Tr. 692.)

[37]Since the Western District of Missouri FPD, and specifically David Owen, was assigned to the case, and since the court removed Ms. Clarke because the FPD, and specifically Mr. Owen, refused to work with her, it is unknown what conditions had changed that would allow her to re-enter the case.



Appellate Case: 17-1716 Page: 105 Date Filed: 07/30/2018 Entry ID: 4687987

*14. Holly Jackson*

Ms. Jackson testified that she is a mitigation specialist. (Civ. Tr. 694.) David Owen contacted her seeking a replacement for a mitigation specialist who was no longer in the case.[38] Ms. Jackson stated that she met with Mr. Owen and Ron Ninemire and agreed to work with them, describing them as "very nice gentlemen." (Civ. Tr. 697.)

Ms. Jackson testified that Mr. Owen supervised her. (Civ. Tr. 699.) Ms. Jackson stated that she had trouble receiving travel approval from Mr. Owen, particularly when it involved multiple interviews of the same person. (Civ. Tr. 700.)

Ms. Jackson discussed the problems with being the second mitigation person on the team because witnesses had already developed a rapport and discussed sensitive issues with the first mitigation specialist:

> A. Being the first mitigation person on a case is difficult because of the nature of the work is just all about -- is a very sensitive task. You're asking people to divulge parts of their life that are very sensitive and people don't want to talk about it, and each witness requires some level of rapport and trust, and in some cases you're asking them to give you their Social Security record, ask them to delve into their lives; and when a person comes on and starts that process, to pull that person and to have another person come on just really creates such a -- people just wonder, okay, who's the next person and why should I trust this person? There's just -- just for all the reasons that you would think that a person might just be pulled out of nowhere, that's just a problem and people -- and witnesses and family members it's in the back of their mind and it seems to always be a concern.

[38]In the chronology of events, that person would have been Lisa Rickert. (Civ. Tr. 702.)

> Q. Do people get tired of repeating the same information to new people?
>
> A. They do. They do. And they tell you that they do and they -- many tell you that they don't want to talk about it again or they say, Why should I? You know, you're just going to leave. Or just shut down altogether. Or they say, I told the other person. There's some difficulties with that.[39]

(Civ. Tr. 703.)

Ms. Jackson then discussed a number of charts she created in order to create a "tapestry". (Civ. Tr. 705-08.) Ms. Jackson discussed Montgomery's sexual abuse history and testified that her characteristics "are very symptomatic of case law and DSMs and psychological books." (Civ. Tr. 711.) She then testified that Montgomery displayed "what I would consider a bipolar disorder." (Civ. Tr. 712.) Ms. Jackson concluded that Montgomery was suffering from a major mental illness and could not "assist rationally with her defense." (Civ. Tr. 713.) [40]

Ms. Jackson stated that David Owen fired her in an email on May 9, 2016. (Civ. Tr. 715.)[41]

---

[39]In fact, the main issue that concerned Susan Hunt and David Owen at the time the court removed Judy Clarke from the trial team was not the removal of Ms. Clarke, but the likelihood that they would lose Holly Jackson. (4/25/06 Hrg. Tr. at 6-7, 9.)

[40]A review of Ms. Jackson's testimony does not reveal any medical degrees.

[41]During the April 25, 2006, hearing, Susan Hunt informed the court why Ms. Jackson would no longer be part of the defense team:



Appellate Case: 17-1716 Page: 107 Date Filed: 07/30/2018 Entry ID: 4687987

*15.* *Debra Garvey*

Ms. Garvey testified that she is a mitigation specialist with the FPD in Los Angeles. (Civ. Tr. 719.) Ms. Garvey testified she has a close working relationship with Judy Clarke and still works with her. (Civ. Tr. 723.)

Ms. Garvey began work on Montgomery's case in August of 2005. (Civ. Tr. 727.) She then discussed the acquisition of records for the case. (Civ. Tr. 728-31.) She then discussed the team meetings and investigator meetings. (Civ. Tr. 733-34.) At that time, Montgomery's case involved three attorneys, two paralegals, two mitigation specialists and one mental health expert. (Civ. Tr. 733.)

Ms. Garvey then gave working theories that had been developed (without, based on the record, the benefit of expert opinion) that Montgomery was bi-polar, possibly epileptic and certainly had PTSD that was trauma related. She clarified that the epilepsy she saw was a temporal lobe epilepsy. (Civ. Tr. 736.)[42] Ms. Garvey stated that the local members of the defense team were not "compassionate or

---

> She does not have, and that is what she told me, she does not have the background and experience to go and look for experts. And she said, my God, now you are going to look to me to try to find experts to help you with that and I am not at all qualified for this and I am not sure ethically, professionally I can stay on that case.

(4/25/06 Hrg. Tr. at 9.)

[42]Although Ms. Garvey testified that she had been trained to recognize these symptoms (Civ. Tri. 737), neither her testimony nor her declaration reveal where or how and from whom she received this training. (Montgomery Exh. 64.)

sympathetic" to Montgomery, which distressed her. (Civ. Tr. 738.) She also criticized Ron Ninemire for visiting Montgomery because he was a single man. (Civ. Tr. 739.)

Habeas counsel asked Ms. Garvey if she knew of sexual abuse from people other than Montgomery's stepfather. Ms. Garvey replied that she did, but did not know the source, saying she "imagine[d]" that she "probably heard some of it" from family members or Montgomery herself.[43] Likewise, when asked about sex trafficking, Ms. Garvey stated that she "suspected" it, but it was not "nailed down." (Civ. Tr. 757-58.)

On cross-examination, Ms. Garvey could point to no documentation to support these speculations. (Civ. Tr. 763-64.) She stated that she was aware that Jack Kleiner was sharing Montgomery sexually with friends, but that sex trafficking was "just a possibility."[44] Ms. Garvey conceded that if post-conviction proceedings occurred over a longer period of time than trial proceedings, it would be possible to accumulate more documentation. (Civ. Tr. 765.)

[43]There is no indication in the record that Montgomery ever told her trial team about sexual abuse from friends of her stepfather.

[44]It is unknown how Ms. Garvey could have known about allegations of sexual molestation by people other than Jack Kleiner. It would be approximately a year after she left the case in 2006 that David Kidwell, in a memo dated March 1, 2007, mentioned it as something Montgomery had told him. Moreover, no one knew about supposed sex trafficking until Montgomery herself alleged trafficking years after conviction.

*16.* *Dr. David Freedman*

David Freedman has a doctorate in psychiatric epidemiology and works at the Department of Psychiatry and Behavioral Medicine at UCLA. (Civ. Tr. 812.)

Dr. Freedman began his interaction with Montgomery's case in January of 2005, because Dick Burr had concerns that mental issues might arise in Montgomery's case. (Civ. Tr. 832.) He next became involved in July of 2005 when Ms. Clarke asked for his assistance. (Civ. Tr. 834.)

Dr. Freedman testified that it was his view that David Owen was not going to be able to obtain facts regarding Montgomery's sexual abuse from Judy Shaughnessy and that he was hindering the investigation by maintaining a relationship with her.[45] (Civ. Tr. 836.) Dr. Freedman opined, "nobody cares anymore" about abuse. (Civ. Tr. 837.)[46]

Dr. Freedman explained that they attempted to "train the local" FPD on issues relevant to the case. (Civ. Tr. 839.) One of the issues that the "local team" did not understand was Montgomery's memory issues. (Civ. Tr. 840-41.) Dr. Freedman testified that the defense team knew that Tommy Kleiner was not involved in the

[45]Dr. Freedman does not elaborate on how he came to this view.

[46]Dr. Freedman did not provide a metric to determine that nobody cares about abuse.

crime because his appointment with his probation officer gave him an alibi at the time of the murder. (Civ. Tr. 844.)

Dr. Freedman testified that he did not believe that Dr. Ramachandran, who testified regarding pseudocyesis, had the right expertise for a capital case presentation. (Civ. Tr. 845.) Dr. Freedman believed that pseudocyesis was not a diagnosis, but rather, a symptom of a mental illness. He stated that he communicated that opinion to the rest of the team. (Civ. Tr. 846.)

Dr. Freedman testified that asking Montgomery about the facts of the case would not be "informative" and that it really did not matter to a large degree. He stated that based on the law enforcement investigation, they knew what had happened and that Montgomery's statements would have added nothing. (Civ. Tr. 853.)

Dr. Freedman testified that although he was only on the case for six months, he had real concerns about Montgomery's competency, but that her competency had not been tested. (Civ. Tr. 854.)

On cross-examination, however, Dr. Freedman admitted that his involvement with the case began in January of 2005, and ended when Ms. Clarke left the case, which would be in April of 2006. (Civ. Tr. 855-56.) Dr. Freedman also testified that he did not know how the Tommy Kleiner alibi was documented, either by record or just by someone saying it in a meeting, but not preparing a memo. (Civ. Tr. 860.)



Appellate Case: 17-1716 Page: 111 Date Filed: 07/30/2018 Entry ID: 4687987

*17. Dr. Robert Fucetola*

Dr. Fucetola is a professor of neurology and clinical neuropsychology at Washington University in St. Louis, with a Ph.D. in clinical psychology. (Civ. Tr. 863.)

Dr. Fucetola testified that Fred Duchardt asked him to do a neuropsychological evaluation of Montgomery in order to provide information to Dr. Ruben Gur. (Civ. Tr. 865.) Dr. Fucetola tested Montgomery on July 26 and 27 of 2006. (Civ. Tr. 866.) Dr. Fucetola testified that among the records provided to him by Stephanie Elliott to do his evaluation, there was a copy of Marilyn Hutchinson's raw data on her tests, which was ultimately turned over to Government experts. (Civ. Tr. 870.)

Dr. Fucetola testified that Montgomery scored within normal range on a majority of the tests. Montgomery had an I.Q. of 124, scoring in the 95th percentile with a verbal intelligence score of 111 and a nonverbal intelligence of 140. (Civ. Tr. 871-72.) Dr. Fucetola testified that this disparity was highly uncommon and seen in less than one percent of the psychiatric inpatient population. (Civ. Tr. 872-74.) Dr. Fucetola also testified that there was a large difference between Montgomery's visual memory abilities and her nonverbal I.Q., which is also rare. (Civ. Tr. 876.)

Dr. Fucetola speculated on possible etiologies for this disparity, including abnormal brain development, head injuries, and mental illness. (Civ. Tr. 878-79.)

Dr. Fucetola also testified that Montgomery had an unexpected result in the Finger Tapping test, which he wrote off to injury at the time to her hand. (Civ. Tr. 880-81.) A later review of medical records indicated that the injury should not have caused the test result, and Dr. Fucetola testified that the result could be "potentially relevant." (Civ. Tr. 882.) Dr. Fucetola testified that Montgomery was not malingering. (Civ. Tr. 884.)

On cross-examination, Dr. Fucetola admitted that the predictive validity of I.Q. splits shown by Montgomery have been called into question. (Civ. Tr. 888.) Dr. Fucetola also testified that although he believed the behavioral image map of Dr. Gur was reliable, he had not studied the underlying science. (Civ. Tr. 890-91.)

*18. Erin Garmin*

Ms. Garmin is a probation officer in Kansas who supervised Tommy Kleiner. (Civ. Tr. 897.) She testified that Tommy Kleiner was with her on the date of the murder. (Civ. Tr. 898.)

*19. Chris Armstrong*

Mr. Armstrong is a retired investigator for the FPD in the Middle District of Tennessee. (Civ. Tr. 911.) He testified about taking notes during an interview of Fred Duchardt. (Civ. Tr. 912-14.)



Appellate Case: 17-1716 Page: 113 Date Filed: 07/30/2018 Entry ID: 4687987

*20. Dr. William Logan*

Dr. Logan works as a psychiatrist in private practice. (Civ. Tr. 920-21.) He testified that he became involved in Montgomery's case when he received a call from Susan Hunt to conduct a clinical consultation. (Civ. Tr. 924.) Dr. Logan found that Montgomery was in the midst of a major depressive disorder that had psychotic features. (Civ. Tr. 929, 932.) Dr. Logan also testified that although not a "focus," if asked, he would have said that Montgomery lacked decisional competence in March of 2005. (Civ. Tr. 934.)

Fred Duchardt contacted Dr. Logan on March 22, 2007. At that time, Mr. Duchardt sent information to Dr. Logan that "caught me up to speed." (Civ. Tr. 936.) Mr. Duchardt also told Dr. Logan that Dr. Ramachandran would be part of the evaluation group. (Civ. Tr. 937.) Dr. Logan testified that although Mr. Duchardt mentioned pseudocyesis, he wanted Dr. Logan to testify regarding insanity at the time of the offense. Dr. Logan stated that prior to April 10, 2007, he was asked to do a diagnostic evaluation that included pseudocyesis, but denied that he had reached that diagnosis. (Civ. Tr. 939, 942.)

Dr. Logan testified that he would normally do a social history as part of his own evaluation, but in this case, since there was limited time, his history of Montgomery was not extensive. (Civ. Tr. 942.) Dr. Logan also testified that Dr. Ramachandran is "one of the few experts in pseudocyesis" and had seen more



Appellate Case: 17-1716 Page: 114 Date Filed: 07/30/2018 Entry ID: 4687987

cases than anyone because pseudocyesis is "an exceedingly rare condition." (Civ. Tr. 945.)

Dr. Logan testified that when he saw Montgomery in April and May of 2007, she was much less guarded, had no hallucinations, and had a good working relationship with her psychiatrist, Dr. McCandless. (Civ. Tr. 948.) Dr. Logan diagnosed Montgomery with PTSD, major depressive disorder, possible bi-polar disorder, and pseudocyesis. (Civ. Tr. 950.) He also diagnosed borderline personality disorder. (Civ. Tr. 951.)

Dr. Logan stated that he felt the defense team concentrated too much on pseudocyesis. (Civ. Tr. 956.) He also stated that he believed that Montgomery claimed that Tommy Kleiner helped in the crime because she could not accept what she did. (Civ. Tr. 958.) He stated that this might be a sign of disassociation. (Civ. Tr. 960.)

Dr. Logan testified that although the deletion of emails by Montgomery could be interpreted as an indication that she knew what she was doing was wrong, there were other significant examples of planning by her, such as bringing a knife and rope with her. He stated, however, that she had been so overwhelmed by her emotional crisis that she could not recognize the nature and wrongfulness of her actions, even though she may have known the legal wrongfulness. (Civ. Tr. 965.)



Appellate Case: 17-1716 Page: 115 Date Filed: 07/30/2018 Entry ID: 4687987

On cross-examination Dr. Logan described the very specific details that Montgomery provided in April of 2007 regarding Tommy Kleiner's actions with her on the day of the murder to include where she picked him up, their discussions about what kind of dog she wanted, and that Bobbi Jo Stinnett offered him a glass of water. (Civ. Tr. 974.) Montgomery also described conversations she had with Kleiner after the murder. (Civ. Tr. 975.)

Dr. Logan also testified that his evaluation of pseudocyesis was independent of any focus Fred Duchardt may have had. He again confirmed that he had diagnosed Montgomery with a somatoform disorder (pseudocyesis). (Civ. Tr. 978.) Dr. Logan again confirmed his opinion that Montgomery could not morally appreciate the full gravity and extent of the wrongfulness of her conduct, which he conceded is the hallmark of the insanity defense. (Civ. Tr. 981-82.)

*21. Dr. Marilyn Hutchinson*

Dr. Hutchinson is a psychologist. (Civ. Tr. 982.) Dr. Hutchinson stated that the FPD contacted her in January of 2005 to help in Montgomery's defense as a consultant. (Civ. Tr. 990.) She joined with them during two team meetings and took notes, solely as a consultant, for a brief time. (Civ. Tr. 991-94.) Dr. Hutchinson did not believe, at that time, that Montgomery should be questioned about "traumatic events." (Civ. Tr. 995.)

In January of 2005, Dr. Hutchinson and one of her associates, Dr. Karen Willing, conducted some psychological testing on Montgomery. These included an Evaluation of Competency to Stand Trial, the MacArthur Competence Assessment Tool, a Structured Interview of Reported Symptoms, and a Dissociative Experience Survey. In addition, Dr. Willing tested Montgomery's intelligence and tested her through the Minnesota Multiphasic Personality Interview (MMPI) and the Millon Clinical Multiaxial Inventory (MCMI). (Civ. Tr. 998-99.) In addition, Dr. Hutchinson met with Montgomery on March 9, 2005, for two hours. (Montgomery Exh. 37.)

At some point in 2007, Fred Duchardt contacted Dr. Hutchinson to advise her that he planned to present an insanity defense. Dr. Hutchinson stated she thought the diagnosis "unlikely," but did not have anything supporting that conclusion. Dr. Hutchinson did not have further involvement in the case.[47] (Civ. Tr. 1006.)

Dr. Hutchinson testified that in order to do an evaluation in this case, she would have had to meet with Montgomery for another 10 to 20 hours, conduct a neurological exam, and interview family members to create a social history. (Civ. Tr. 1018.)

When asked about some of the specific questions on the testing, Dr. Hutchinson noted that at one point (presumably the arraignment), Montgomery

---

[47]She testified, however, that her direct involvement ended in March of 2005.



Appellate Case: 17-1716 Page: 117 Date Filed: 07/30/2018 Entry ID: 4687987

stated she did not want to enter a not guilty plea. She then stated that she "did it," then states that she does not remember, but that if she did do it, she deserves to be punished. (Civ. Tr. 1031.)

On the issue of malingering, Dr. Hutchinson differed from the interpretation of Dr. Martell:

> A. Well, those actually were my tests. Those were the two competency instruments that measured different things -- or the two malingering instruments, and that he [Dr. Martell] reached the conclusion that she was malingering a mood disorder and she was malingering a bad memory. Well, in fact, she has both of those problems. So if you come up with -- I mean, she's been diagnosed with bipolar disorder, and she had a lot of times when she talked about memory issues, so the fact that those two came up high wouldn't be indicative of malingering. The other instrument which is about consistency of reporting of symptoms she didn't have any significant scores, which meant that she was being truthful, I think, on both of them.

(Civ. Tr. 1041-42.)

Dr. Hutchinson stated that Dr. Martell's testimony mischaracterized the testing. (Civ. Tr. 1042.)

On cross-examination, Dr. Hutchinson testified that she disagreed with Dr. Martell's conclusion from the testing that Montgomery was malingering, but agreed that the tests showed she was exaggerating. Dr. Hutchinson testified that the difference between the two was, by her definition, malingering involved portraying

characteristics not based in fact, but exaggeration involved emphasizing something that exists.[48] (Civ. Tr. 1061.)

Dr. Hutchinson confirmed that she worked on the case from January of 2005 until March of 2005. (Civ. Tr. 1063.) Dr. Hutchinson also testified that her testing showed that Montgomery was competent to stand trial, but had concerns that in the future that status may change. (Civ. Tr. 1064.)

Dr. Hutchinson admitted that since her tests occurred over two years before the trial, she was unaware whether Montgomery was willing to accept responsibility at the time of trial. (Civ. Tr. 1065.) Dr. Hutchinson also admitted that she did not know about independent testing by Dr. Martell showing malingering on the part of Montgomery. (Civ. Tr. 1067-68.)

*22. Dr. Christos Davatzikos*

Dr. Davatzikos is a radiologist at the University of Pennsylvania. (Civ. Tr. 1120.) He is an expert on brain structure. (Civ. Tr. 1130.)

---

[48]That is not the definition of malingering in the DSM. As the Eighth Circuit noted in its opinion on direct appeal:

> DSM–IV states that the essential feature of malingering is "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as ... evading criminal prosecution." *Diagnostic and Statistical Manual of Mental Disorders* at 739.

*United States v. Montgomery*, 635 F.3d 1074, n. 5 1084 (8th Cir. 2011).



Appellate Case: 17-1716 Page: 119 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Davatzikos provided the quantitative analysis of the Magnetic Resonance Imaging (MRI)[49] in Montgomery's case to Dr. Gur from which Dr. Gur generated reports in August, September, and October of 2007 and in January of 2008. (Civ. Tr. 1133.)

Dr. Davatzikos testified that Montgomery's MRI showed an unusual brain structure in 2007. (Civ. Tr. 1146.) He also stated that he agreed with the report submitted by Dr. Gur in 2007. (Civ. Tr. 1151.) However, Dr. Davatzikos admitted that in 2007, he had a limited database and, based on that, he could see what the Government's experts were saying about the testing. (Civ. Tr. 1152, 1157.)

On cross-examination, Dr. Davatzikos testified that the MRI analysis alone is not diagnostic. (Civ. Tr. 1167.) Dr. Gur then took this information, as well as information obtained from other sources, to create a behavioral image. (Civ. Tr. 1168.) Dr. Davatzikos also admitted that he was not named in Dr. Gur's April 3, 2007, report other than in a footnote regarding an algorithm being used as it relates to the MRI analysis, quoting a paper authored by Drs. Davatzikos and Shen. (Civ. Tr. 1170-72.) The same was true of the supplemental report by Dr. Gur in April of 2007. (Civ. Tr. 1173.)[50] Dr. Davatzikos admitted that the 2016 re-analysis

[49]Dr. Davatzikos testified that quantitative analysis involved taking precise measurements of the MRI to see abnormalities in the brain. (Civ. Tr. 1136.)

[50]Habeas counsel then stipulated that Dr. Davazikos is not specifically named in the reports generated by Dr. Gur. (Civ. Tr. 1173.)



Appellate Case: 17-1716 Page: 120 Date Filed: 07/30/2018 Entry ID: 4687987

conducted on Montgomery with a different database did not include Dr. Gur's behavioral image. Dr. Davatzikos also admitted that a report he provided Dr. Gur has never been produced to any habeas counsel or the Government. (Civ. Tr. 1178-79.)

*23. Dr. Andrew Newberg*

Dr. Newberg is a professor of emergency medicine and radiology at Thomas Jefferson University in Philadelphia. (Civ. Tr. 1183.)

Dr. Newberg testified that he was involved in the PET[51] imaging study of Montgomery. (Civ. Tr. 1192.) He stated that, like Dr. Davatzikos, he was not specifically named in the reports prepared by Dr. Gur. (Civ. Tr. 1194.)

Dr. Newberg testified that Montgomery's PET indicated that she had a third to a half of her brain that was out of the normal range, which is statistically significant to one in three million people. (Civ. Tr. 1208.) However, Drs. Mayberg and Evans, the Government experts evaluating the evidence, wanted to view the raw data[52] for each individual in the normative sample used as a comparator. Dr. Newberg testified that this was difficult to accomplish because the scans for the

---

[51]PET is an acronym for Positron Emission Topography, which is a way of determining brain activity. (Civ. Tr. 1196-97.)

[52]The Government experts wanted to review the cpp data (counts per pixel), which is a quantification of the radioactive counts generated from each pixel of a particular brain structure. (Civ. Tr. 1204.)

control group were on different computers that had been changed and on different hard drives. (Civ. Tr. 1215-16.)[53]

Drs. Mayberg and Evans also had questions about the different generations of scanners used in the normative sample compared to the one used on Montgomery. (Civ. Tr. 1218.) Dr. Newberg testified that there would be variations among different scanners, but that the values "for the most part" would hold. (Civ. Tr. 1219.)

Dr. Newberg testified that a PET scan is not a diagnostic for a mood disorder or PTSD or a somatoform disorder. (Civ. Tr. 1224.)

On cross-examination, Dr. Newberg admitted that no one particular area of the brain does only one particular task. (Civ. Tr. 1236-37.) Dr. Newberg conceded that he did not write a report on his findings in 2007, and did not send any correspondence to either the Government or Montgomery's trial counsel. (Civ. Tr. 1238.) Dr. Newberg also stated that he never contacted the Government experts analyzing his report, but was unsure when he learned about the criticism of his methodology. (Civ. Tr. 1238.)

---

[53]During cross-examination, Dr. Newberg conceded that Dr. Gur did not include Dr. Newberg's raw data (other than as a graph) in Dr. Gur's original report. In fact, Dr. Newberg testified that Dr. Gur did not provide that data until October 22, 2007, three weeks after Montgomery's trial began. (Civ. Tr. 1242.)

*24. Dr. Elizabeth Kempke*

Dr. Kempke is a psychiatrist who was employed at the Federal Bureau of Prisons Medical Center in Carswell from 2008 to 2010. (Civ. Tr. 1245, 1247.) Dr. Kempke served as Montgomery's treating psychiatrist. (Civ. Tr. 1249-50.)

Dr. Kempke testified that when she saw Montgomery, she was being medicated for bipolar disorder and that later Montgomery had psychotic episodes. (Civ. Tr. 1251-52.) Dr. Kempke prescribed an antipsychotic called Risperidone, and Montgomery's symptoms resolved. (Civ. Tr. 1253.)

*25. Dr. Ruth Kuncel*

Dr. Kuncel is a retired forensic psychiatrist who has been involved in roughly 40 capital murder cases. (Civ. Tr. 1255, 1258.) Dani Waller, a mitigation specialist on Montgomery's defense team, recommended Dr. Kuncel to David Owen. (Civ. Tr. 1263-64.) Dr. Kuncel's initial contacts from January to March of 2007, were with Mr. Owen, but, after March of 2007, she dealt with Fred Duchardt. (Civ. Tr. 1266.)

Dr. Kuncel testified that her testing[54] of Montgomery was interrupted because the Bureau of Prisons transferred Montgomery to Philadelphia after the first day of testing. (Civ. Tr. 1267.) Dr. Kuncel then completed the testing in Philadelphia.

[54]Dr. Kuncel was administering the M.M.P.I. test at the time Montgomery was transferred. (Civ. Tr. 1269.)



Appellate Case: 17-1716 Page: 123 Date Filed: 07/30/2018 Entry ID: 4687987

(Civ. Tr. 1268.) Dr. Kuncel admitted that conducting the testing in this manner compromised the data. (Civ. Tr. 1271.)

Dr. Kuncel did not testify in the guilt phase of the trial, because she did not have an expertise in pseudocyesis. (Civ. Tr. 1273.) Dr. Kuncel testified that she did not know what her "role" was in the case when she testified in the penalty phase and that she was "confused" and "adrift." (Civ. Tr. 1274-75.) She testified that it was important to her to testify on direct a certain way, so that she can refer back to her direct testimony on cross-examination. (Civ. Tr. 1275-76.)

Dr. Kuncel also took issue with Dr. Martell's evaluation of her test data showing that Montgomery was malingering, although she admitted "[e]ach of these [tests] are evidence of possible malingering." (Civ. Tr. 1277.) Dr. Kuncel disagreed with Dr. Martell's conclusion of malingering. (Civ. Tr. 1277-78.)

Dr. Kuncel did not have a clear recollection of her trial preparation session with Mr. Duchardt. (Civ. Tr. 1282.) Dr. Kuncel testified that she was unprepared to answer a question about where she was from and did not know how to answer:

> We had had a discussion down that road with the – I have family -- she once lived in Coffeyville, Kansas. My father once lived in Coffeyville, Kansas. I have a background of small town Missouri communities. So I think what he was trying to get at is are you familiar with the social/cultural background associated with her history, and there was something to be said for that, but instead he asked me something like where I was originally from. That's an entirely different question. So I was stuck trying from the beginning to answer his question but deal



Appellate Case: 17-1716 Page: 124 Date Filed: 07/30/2018 Entry ID: 4687987

> with the reality of what I thought he was asking. And there's also the fact that not everybody's thrilled about me being from Chicago.[55]

(Civ. Tr. 1283.)

Dr. Kuncel then testified that the "literal" answer to the question was that she was born in Chicago, grew up in St. Louis, and has lived in Chicago since attending the University of Chicago. (Civ. Tr. 1283.) However, she stated that she did not know how to answer the question because Mr. Duchardt had failed to prepare her.[56] (Civ. Tr. 1284.)

Dr. Kuncel prepared a 55-page report at the request of Montgomery's trial team that set forth her social history and background. (Civ. Tr. 1287-88.) Dr. Kuncel testified that she was aware at the time of trial that a great number of people had sexual access to Montgomery and who engaged in sadomasochistic behavior.[57] (Civ. Tr. 1289.)

---

[55]Dr. Kuncel did not elaborate on how she knew that people, presumably the jury, were not thrilled about her being from Chicago.

[56]It has been the experience of the undersigned Government counsel that asking a witness where they are from does not usually involve an extensive amount of preparation.

[57]The record does not indicate how Dr. Kuncel was aware of multiple individuals sexually abusing Montgomery at the time of the trial. It does not appear in the section of her report regarding her interview with Montgomery about the sexual abuse during her childhood. (Montgomery Exh. 43 at 9.)



Appellate Case: 17-1716 Page: 125 Date Filed: 07/30/2018 Entry ID: 4687987

On cross-examination, Dr. Kuncel testified that she understood that she had been retained in her capacity as a forensic psychologist and did not lack clarity on that issue. (Civ. Tr. 1292.) Government counsel also discussed the difficulty encountered on cross-examination by Dr. Kuncel's failure to respond to questioning. (Civ. Tr. 1292-93.) Government counsel pointed out that Dr. Kuncel's trial testimony was affected by her attempts to interpret a question rather than answer it. For example, when counsel again asked her "[w]here are you from originally?" she replied "[i]t depends on what you mean by your question." (Civ. Tr. 1294.)

Dr. Kuncel also confirmed that Montgomery's testing under the Structured Inventory of Malingered Symtomoly (SIMS test), indicated that she was malingering her symptoms. (Civ. Tr. 1299.) Dr. Kuncel also testified that her report indicated that Montgomery had "psychological symptoms consistent with . . . somatoform disorder not otherwise specified (pseudocyesis)." (Civ. Tr. 1299-1300.)

*26. Dr. Charles Sanislow*

Dr. Sanislow is a clinical psychologist contacted by habeas counsel to evaluate the 2005 and 2007 MMPI tests administered to Montgomery. (Civ. Tr. 1363, 1382.)

Dr. Sanislow discussed the structure of the MMPI and how it is administered, as well as the computer scoring of the various test subscales. (Civ. Tr. 1388-1416.) Dr. Sanislow discussed some of the hazards in interpreting the test results. (Civ. Tr.



Appellate Case: 17-1716 Page: 126 Date Filed: 07/30/2018 Entry ID: 4687987

1417-19.) Dr. Sanislow then provided his interpretation of the 2005 MMPI test conducted on Montgomery, noting that she displayed a significant amount of psychological distress. (Civ. Tr. 1421.)

Dr. Sanislow testified that the test data showed evidence of PTSD, mood disorder, dissociative disorder, somatoform disorder, psychosis, and neurological problems. (Civ. Tr. 1433.) On specific scales, Dr. Sanislow testified that Montgomery scored above the addiction potential and an elevated scale for PTSD. (Civ. Tr. 1434.) She also showed familial discord, self-alienation, and social alienation. (Civ. Tr. 1436.) She also had an elevated score for antisocial behavior, but not antisocial attitudes. (Civ. Tr. 1438.) Dr. Sanislow testified that the results for the 2005 MMPI and the 2007 MMPI were consistent. (Civ. Tr. 1439.) Dr. Sanislow testified that the data from the testing indicated that Montgomery was not malingering. (Civ. Tr. 1441.)

On cross-examination, Dr. Sanislow confirmed that he was a clinical psychologist and not a forensic psychologist,[58] and that the two disciplines have different goals when they work on a case. (Civ. Tr. 1443-45.) Dr. Sanislow stated that he did not conduct any tests nor did he conduct a clinical interview of Montgomery in working on this case. (Civ. Tr. 1446.) Dr. Sanislow also confirmed that many of his conclusions are hypotheses because he was missing data that would

[58]Dr. Martell is a board certified forensic neuropsychologist. (Civ. Tr. 1452.)

be available to someone who had conducted interviews. (Civ. Tr. 1449-50.) Dr. Sanislow also conceded that Dr. Martell had substantially more information because he conducted additional tests and a clinical interview. (Civ. Tr. 1251.)

*27. Janet Vogelsang*

Ms. Vogelsang has a master's degree in social work and is in private practice. (Civ. Tr. 1461.) She presented a biopsychosocial history of Montgomery to the court. (Civ. Tr. 1473.)

Ms. Vogelsang testified about Montgomery's family history, noting a family pattern of custodial interference and substance abuse as well as mental issues. (Civ. Tr. 1475-83.) She discussed the kidnapping of Montgomery's father by her grandfather. (Civ. Tr. 1487.) She went through a history of Montgomery's father. (Civ. Tr. 1487-89.) Ms. Vogelsang also testified about how Montgomery's parents met and their marriage as it related to their children. (Civ. Tr. 1494-98.)

Ms. Vogelsang reported on the number of residences Montgomery occupied as a child. (Civ. Tr. 1498.) She related the separation of Montgomery from her half-sister, Diane. (Civ. Tr. 1499-1500.) Ms. Vogelsang discussed Judy Shaughnessy and Montgomery's relationship with Jack Kleiner, including Kleiner's physical and sexual abuse. (Civ. Tr. 1501-11.) She included in her testimony the allegation recently made by Montgomery that Judy Shaughnessy traded sex with Montgomery for, apparently, utilities specifically, plumbing, electrical work, and propane gas.

(Civ. Tr. 1512.) She also related that Montgomery told a cousin, David Kidwell, that Jack Kleiner was sharing her sexually with his friends. (Civ. Tr. 1512-13.)

Ms. Vogelsang testified regarding Judy Shaughnessy's reaction when she found Montgomery having sex with Jack Kleiner that involved pointing a gun to his head. (Civ. Tr. 1516.) However, Ms. Vogelsang stated that the reason Judy Shaughnessy and Jack Kleiner separated was because he slapped Montgomery's sister, Patty.[59] (Civ. Tr. 1517.) Ms. Vogelsang also recounted Judy Shaughnessy killing Teddy Kleiner's dog and selling Montgomery's violin. (Civ. Tr. 1522-23.)

Ms. Vogelsang then testified about Montgomery's life after leaving the family home, including her marriage to Carl Boman, and having children with him. (Civ. Tr. 1523-26.) She also briefly reviewed Montgomery's marriage to Kevin Montgomery. (Civ. Tr. 1528.)

On cross-examination, Ms. Vogelsang testified that she prefers to have eight months to a year to prepare a biopsychosocial history because of the work it takes to create the document. (Civ. Tr. 1532.) Ms. Vogelsang admitted that her first biopsychosocial history was dated March 17, 2013, but then she filed a supplement three and a half years later on August 5, 2016 because of additional information. She then conducted more interviews. (Civ. Tr. 1532-33.)

---

[59]Given the many accusations of physical abuse of the children during trial, it would seem odd that slapping one of them would be reason to divorce.

Ms. Vogelsang also conceded that when she began her work, a significant amount of work in the form of records collected and interviews conducted by the defense team had already been accomplished. (Civ. Tr. 1534.) Ms. Vogelsang also admitted that if the court had not granted the evidentiary hearing, the information contained in her supplemental declaration would not have come to light. (Civ. Tr. 1535.)

*28. Diane Mattingly*

Ms. Mattingly is Montgomery's half-sister. (Civ. Tr. 1538.) When she arrived for her testimony during trial she met Fred Duchardt. (Civ. Tr. 1542.) Habeas counsel asked Ms. Mattingly about how she felt during testimony and about her relationship with Judy Shaughnessy. (Civ. Tr. 1544-48.) Ms. Mattingly also testified about taking care of Montgomery and their sister, Patty. (Civ. Tr. 1549-50.) She also testified that she was sexually abused as a child.[60] (Civ. Tr. 1551.)

*29. Danielle Waller*

Ms. Waller is a mitigation specialist hired by David Owen. (Civ. Tr. 1554.) Ms. Waller described her role as task oriented to specific assignments by Mr. Owen, primarily to maintain contact with witnesses and find new witnesses. (Civ. Tr. 1555-56.)

[60]Ms. Mattingly did not testify that Montgomery knew about this abuse.

Ms. Waller described tension between Ron Ninemire and David Owen. (Civ. Tr. 1561.) She also described an incident where she believed that Mr. Owen was unhappy that a witness rode with them to a restaurant and read a newspaper during another witness interview. (Civ. Tr. 1562-63.)

Ms. Waller testified that she interviewed David Kidwell, who told her that Montgomery had told him about Jack Kleiner requiring Montgomery to have sex with his friends, but admitted that she did no follow-up on the information. (Civ. Tr. 1569.)

Ms. Waller also testified that during trial, Judy Shaughnessy was saying things to witnesses. (Civ. Tr. 1574.) She also testified that the attorneys felt betrayed by the testimony of Montgomery's children. (Civ. Tr. 1575.)

*30. Dr. Katherine Porterfield*

Dr. Porterfield is a psychologist at Bellvue Hospital who habeas counsel asked to conduct an evaluation of Montgomery. (Civ. Tr. 1577, 1583.) Dr. Porterfield prepared two reports, one dated April 22, 2016, and a second sent as a letter/addendum dated October 10, 2016. (Civ. Tr. 1585-86.)

Dr. Porterfield discussed the possible effects of stress and fear on the neuroendocrine system. (Civ. Tr. 1649.) She testified that adolescent trauma by Montgomery could impair her functioning. (Civ. Tr. 1653.) She then discussed the Adverse Childhood Experiences (ACE) study regarding childhood stress. (Civ. Tr.

1654-56.) She testified that Montgomery has nine out of ten ACE events in her childhood. (Civ. Tr. 1657.)

Dr. Porterfield testified that Montgomery has PTSD and discussed the causes of PTSD. (Civ. Tr. 1657-59.) She then discussed the criteria for PTSD and discussed a concept called learned helplessness, involving an experiment on dogs. (Civ. Tr. 1661-65.) She then discussed complex PTSD, which she diagnosed in Montgomery based on the ACE risk factors. (Civ. Tr. 1666-81.)

Dr. Porterfield testified that Montgomery has a distorted body image and perception of other people. (Civ. Tr. 1686-88.) She then discussed disassociation. (Civ. Tr. 1690-94.) Dr. Porterfield reviewed protective factors for traumatic events, which, she testified, were absent in Montgomery's life. (Civ. Tr. 1696-97.)

On cross-examination, Dr. Porterfield stated that habeas counsel retained her late 2015 or early 2016, and that in March 2016, she spent eleven hours interviewing Montgomery, apparently resulting in the report prepared on April 22, 2016. (Civ. Tr. 1705-06.) Dr. Porterfield further confirmed that the primary difference between her initial report in April of 2016, and October of 2016 supplement, is the information from David Kidwell and Montgomery regarding sexual assaults by people other than Jack Kleiner and that this information was not available in April of 2016 or it would have been included in her initial report and there would have been no need for a supplement. (Civ. Tr. 1707.)

Dr. Porterfield also conceded that PTSD is a concept that has been recognized in the D.S.M.[61] since the 1980's, but that complex PTSD has not been adopted into the manual. She further confirmed that the testimony at trial that Montgomery suffered from PTSD was undisputed. (Civ. Tr. 1708.)

*31. <u>Dr. Siddhartha Nadkarni</u>*

Dr. Nadkarni works in the fields of neurology and psychiatry in the epilepsy division at NYU Medical Center. (Civ. Tr. 1712.) He conducted a neurological examination of Montgomery including a test for cognitive impairment, resulting in a report written in September of 2013. (Civ. Tr. 1717-18.) He also reviewed the data from Dr. Gur's reports, including PET and MRI results. (Civ. Tr. 1718.)

Dr. Nadkarni testified that Montgomery cannot assess the emotional states of others and has difficulties with "comportment", i.e., insight, judgment, self-awareness, social adaptation, and empathy. (Civ. Tr. 1722, 1726.) Dr. Nadkarni stated that Montgomery has "classic history" for temporal lobe epilepsy, although he admitted that he was unable to test her using an electroencephalogram (EEG). (Civ. Tr. 1732-33.) Dr. Nadkarni testified that his findings were consistent with the results of Dr. Gur and Dr. Fucetola. (Civ. Tr. 1735-36.) Dr. Nadkarni testified that these issues would affect other parts of her brain. (Civ. Tr. 1738.)

[61]The Diagnostic and Statistical Manual of Mental Disorders.



Appellate Case: 17-1716 Page: 133 Date Filed: 07/30/2018 Entry ID: 4687987

On cross-examination, Dr. Nadkarni described the neurological examination he conducted on Montgomery, which was primarily a physical exam checking eye movements, facial movements, hearing, and a motor examination. He testified that it would be helpful to conduct an EEG, which can show epileptic spikes and abnormal brain functioning from seizures, but he confirmed that an EEG was not performed. (Civ. Tr. 1742.)

*32. <u>Dr. George Woods</u>*

Dr. Woods is a physician who specializes in psychiatry and neuropsychiatry. (Civ. Tr. 1746.)

Habeas counsel requested that Dr. Woods conduct an examination of Montgomery's case and prepare a report regarding specific referral questions. (Civ. Tr. 1756-57.) As a result of his review, Dr. Woods testified that Montgomery has brain impairment in multiple areas, which was masked by her academic functioning. (Civ. Tr. 1763-64.) He stated that Montgomery had trouble with sequencing issues. (Civ. Tr. 1765.) He also testified that she had obsessive qualities. (Civ. Tr. 1766-67.)

Dr. Woods testified that Montgomery suffered from PTSD and had bipolar disorder. (Civ. Tr. 1767.) He stated that Dr. McCandless treated Montgomery's bipolar disorder during her incarceration at CCA from 2006 through 2009. (Civ. Tr.

1769-70.) Dr. Woods testified that Montgomery's medications impaired her presentation to the jury. (Civ. Tr. 1774.)

Dr. Woods conducted clinical interviews of Montgomery in January and February of 2013, from which he prepared an initial report and then he interviewed her two times in 2016 from which he prepared a supplemental report.[62] (Civ. Tr. 1775-76.) Dr. Woods testified that Montgomery has two neurological deficits that affect her ability to recall, the first is an impairment to her right brain and the second to her cerebellum. (Civ. Tr. 1780-81.) He testified that she may or may not have complete memories of things that happened to her. (Civ. Tr. 1781-82.)

Dr. Woods testified that he had reviewed the declaration of David Kidwell and Carl Boman regarding Montgomery's allegations of sexual assaults of individuals other than Jack Kleiner.[63] (Civ. Tr. 1783.) He testified that these alleged events created a mindset of coping mechanisms, including prostitution and hyper-sexuality and he noted: ". . . frankly, there are times when she may have been sexual and it was in fact consensual." (Civ. Tr. 1784-85.) When asked to specify what he

[62]Dr. Woods testified that the third and fourth interviews in 2016 were in part to review with Montgomery the allegations put forward in David Kidwell's declaration. (Civ. Tr. 1794.)

[63]It should be remembered that Carl Boman is also accused, through another witness, of raping Montgomery. (Montgomery COA 745.) That information is not contained in Mr. Boman's declaration.

meant, Dr. Woods discussed the difference between agreement and consent. (Civ. Tr. 1785-86.)

Dr. Woods testified about Montgomery's difficulty finishing tasks, such as braiding or brushing her hair because of her sequencing issues. (Civ. Tr. 1791.) He stated that Montgomery could not skip or do heel to toe walking or strike her palm, the side of her hand and her fist, indicating cerebellum and frontal lobe issues. (Civ. Tr. 1791-92.) He also testified that he administered the Barkley test, which revealed deficiencies in time organization and management. (Civ. Tr. 1799-1800.) From this test, he concluded that, before Montgomery was adequately treated,[64] she had impaired functioning in being purposive and organized. (Civ. Tr. 1800.)

Habeas counsel then discussed Fred Duchardt's declaration in which he discussed Dr. Woods's "unfortunate reputation." In his statement, Mr. Duchardt related:

> Also, it must be noted that Dr. Woods is the only professional who has evaluated Lisa who has expressed an opinion that Lisa was not competent at the time that she stood trial. Dr. Woods has an unfortunate reputation that he finds incompetence to stand trial in persons who all other experts, including defense experts, have found competent.[18] Blecker, Robert, *The Death of Punishment, Searching for Justice among the Worst of the Worst* Palgrave Macmillan (2013), p. 135-137. We did not seek a finding of incompetence to proceed because there was no basis in medicine, fact or law for such an effort.

---

[64]Dr. Woods identified Risperdal as being a particularly effective medication for Montgomery. (Civ. Tr. 1797.)



Appellate Case: 17-1716 Page: 136 Date Filed: 07/30/2018 Entry ID: 4687987

> [18]To the extent that it is being argued by Current Counsel for Mrs. Montgomery that I should have used Dr. Woods in lieu of one or more of the experts I used, I do not believe that would have been appropriate for the reasons cited above, and also because Dr. Woods' qualifications would have been subject to impeachment based upon a 1993 finding against him of malpractice for which his license to practice medicine was suspended for a time (See ***In re the matter of the accusation against George Washington Woods, Jr. M.D.***, California Medical Board Case Number D-5595.

(DCD 129 at 78-79.)

Dr. Woods disputed the statement regarding his reputation and that his license had been suspended.[65] (Civ. Tr. 1805-08.)

Dr. Woods then went through the reports of the previous witnesses and discussed his conclusions from their reports. (Civ. Tr. 1809-15, 1820-23.) Dr. Woods disagreed with the statement of the Government's expert, Dr. Dietz, that there was no evidence of psychosis and that Montgomery was not bipolar. (Civ. Tr. 1816.) He also commented on the testimony of Drs. Martell and Ramachandran. (Civ. Tr. 1818-19.)

Dr. Woods also summarized the statement of Dr. Bradford, indicating that the combination of drugs taken by Montgomery during trial would produce both sedation and somnolence, affecting her appearance. (Civ. Tr. 1823-32, 1837-38.)

---

[65]Dr. Woods testified that he had been involved in a medical board action, but that action did not affect his license. (Civ. Tr. 1807-08.)



Appellate Case: 17-1716 Page: 137 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Woods testified that sedation slows down the brain, leaving the patient "foggy" and unable to stay focused or concentrate. (Civ. Tr. 1828-29.) He stated somnolence would make a patient sleepy.[66] (Civ. Tr. 1829.)

Dr. Woods testified that Montgomery's mental illnesses were not adequately treated at the time of trial. (Civ. Tr. 1836.) He further testified that Montgomery's

---

[66]In his statement Fred Duchardt disputed this conclusion by Dr. Woods:

> [N]one of the medications used to treat Lisa ever made her appear to me as "flat" or "absent" or "disengaged" or "remorseless." Throughout preparation for trial, and at trial, Lisa was always full of questions and attentive to answers. As Current Counsel for Mrs. Montgomery is well-aware from review of my file, I have pages and pages of pretrial letters and trial time notes[17] written by Lisa raising intelligent issues of fact and law related to the case However, I see no indication that Current Counsel for Mrs. Montgomery ever shared all of these items, which run counter to Dr. Woods' conclusions, with Dr. Woods. Lisa was completely and consistently engaged at trial, and always appeared so. There were a few times when Lisa got displeased looks on her face, especially when untoward testimony came from witnesses like ex-husband Carl Boman and mother Judy Shaughnessy. I kept a close watch for those instances, and I interacted with Lisa at those points to get her out of those funks, thereby improving her outer appearance at those difficult times.
>
> > [17]Actually, the mass of trial time notes I have preserved in my file are only a small fraction of the total of the notes which Lisa produced. I have only those notes which were produced while I was in close proximity to Lisa or which were given to me for review by others, and therefore got put into my trial file at the end of a trial day. I am unsure where a large bulk of additional notes which I saw at time of trial which were directed to Dave Owen and others got to.

(DCD 129 at 77-78.)

capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law were significantly impaired at the time of her offense. (Civ. Tr. 1841.)

On cross-examination, Dr. Woods confirmed that he began his work on Montgomery's case in 2013, several years after she began her treatment on Risperdal in 2009. (Civ. Tr. 1849.) Dr. Woods stated that although he is board certified in general psychiatry, he is not board certified in neuropsychiatry, nor in forensic psychiatry. (Civ. Tr. 1850-51.)

Dr. Woods also confirmed his testimony on direct examination that Montgomery was "withholding", i.e., not providing certain information. He stated that withholding and malingering have similar meanings related to failing to be completely truthful about symptomology. (Civ. Tr. 1851-52.) Dr. Woods stated that the computer profile from the psychometric testing of Dr. Willing showed symptom exaggeration by Montgomery during the testing. (Civ. Tr. 1852-53.)

Dr. Woods also admitted that the psychometric testing of Montgomery by Dr. Kuncel showed symptom exaggeration on the Structured Inventory of Malingering Scales (SIMS) test and that her actual score on this test indicated malingering. (Civ. Tr. 1853-54.) Dr. Woods also confirmed that Dr. Martell had invalidated the results of the MMPI because he believed Montgomery had symptom exaggeration or malingered the results. (Civ. Tr. 1854.)



Appellate Case: 17-1716 Page: 139 Date Filed: 07/30/2018 Entry ID: 4687987

As to Montgomery's affect, Dr. Woods testified that her demeanor at the trial was based on reports by lay people and, further, could be based on advice from her attorney regarding the appropriate demeanor to present to the jury (as Mr. Duchardt noted in his statement). (Civ. Tr. 1856-57.)

Finally, with regard to Montgomery's supposed inability to sequence and plan, Dr. Woods admitted on cross-examination that her conduct in the crime included:

1. Research on the victim, Bobbie Jo Stinnett;
2. Research on the dogs in which Mrs. Stinnett had an interest,
3. Research on caesarian sections;
4. The creation of a false persona by the name of Darlene Fisher;
5. Deletion of the computer evidence regarding the crime;
6. Bringing a rope with her;
7. Bringing a knife with her;
8. Bringing a home birthing kit; and
9. Performing a caesarian section on Mrs. Stinnett

(Civ. Tr. 1859-60.)

*33. <u>John O'Connor</u>*

Mr. O'Connor is an attorney and the lead counsel for Montgomery during her criminal trial with Fred Duchardt appointed as learned counsel. (Civ. Tr. 1873.)



Appellate Case: 17-1716 Page: 140 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. O'Connor divided the trial work between himself, Mr. Duchardt, and Mr. Owen, with Mr. O'Connor working primarily on guilt and innocence, Mr. Duchardt primarily involved in mental health and mitigation, and Mr. Owen handling the computer forensic aspects of the case. (Civ. Tr. 1874.)

Mr. O'Connor stated that his time sheets regarding Montgomery's case do not encompass all the time he spent on the case because he did not record all his time. (Civ. Tr. 1877-78.) Mr. O'Connor noted that Fred Duchardt would likely keep more complete records because of the nature of his practice. (Civ. Tr. 1879.)

Mr. O'Connor stated that he would have liked to have known if Tommy Kleiner had an alibi and what the prior defense team had determined with respect to Dr. Ramachandran and the pseudocyesis defense, however, he noted that whether he would have agreed with their decisions is another question. (Civ. Tr. 1888-89.)

Mr. O'Connor testified that he was aware that Montgomery had trust issues with men, but that he understood Stephanie Elliott had developed a rapport with Montgomery, which the trial team wanted to continue until either Mr. O'Connor or Mr. Duchardt could build the relationship they needed. (Civ. Tr. 1892-93.)

Mr. O'Connor testified that introducing Mr. Duchardt's wife, Ryland Duchardt, to Montgomery to help in terms of her mental state and issues regarding men was a judgment call he trusted to Mr. Duchardt. (Civ. Tr. 1896.) Mr. O'Connor



Appellate Case: 17-1716 Page: 141 Date Filed: 07/30/2018 Entry ID: 4687987

also testified that he relied on Mr. Duchardt's representations regarding Dr. Ramachandran. (Civ. Tr. 1898.)

Mr. O'Connor stated that although he and Mr. Duchardt sought to de-authorize the death penalty in this case, he did not believe that was a reasonable outcome given the facts. (Civ. Tr. 1903.) He further stated that while proportionality may be an issue, the individual facts and circumstances of a case are more important. (Civ. Tr. 1959.)

Mr. O'Connor testified that one way of developing a better plea position would be to establish an alternative co-participant. (Civ. Tr. 1959.) In that regard, Mr. O'Connor identified two eyewitnesses, Leona and Kean Hayes, who reported seeing two individuals in the car that matched Montgomery's car description.[67] (Civ. Tr. 1959-60.) Mr. O'Connor stated that Leona Hayes identified a person that could match the description of Tommy Kleiner. (Civ. Tr. 1964.) Thereafter followed a discussion of whether Ms. Hayes could properly identify the second person in the car and whether she identified Kayla Boman as the driver of the car in a statement on February 14, 2006.[68] (Civ. Tr. 1966-68.) Habeas counsel and Mr. O'Connor

[67]Mr. O'Connor stated that it remained his position that there was another person who committed the crime. (Civ. Tr. 1961.)

[68]Ms. Boman was in Alabama at the time of the crime. (Civ. Tr. 1968.)



Appellate Case: 17-1716 Page: 142 Date Filed: 07/30/2018 Entry ID: 4687987

discussed whether Ms. Hayes identified Tommy Kleiner specifically in a statement taken of her on April 3, 2007. (Civ. Tr. 1969-73.)

Mr. O'Connor testified that the possibility of Tommy Kleiner's involvement in the crime was "potentially a viable defense" in both mitigation and trial. (Civ. Tr. 1797.) Mr. O'Connor also stated that based on Montgomery's statements, she was identifying Tommy Kleiner as being present in the case. (Civ. Tr. 1980.) However, ultimately Mr. O'Connor decided not to present Tommy Kleiner as a co-participant in the crime. (Civ. Tr. 1981.)

Habeas counsel then directed Mr. O'Connor's attention to a memorandum prepared by Fred Duchardt regarding Montgomery's revelation that Tommy Kleiner was present during the crime and asked him questions about it. Mr. O'Connor stated that he was not there and that habeas counsel would have to ask Mr. Duchardt. (Civ. Tr. 1991.)

Habeas counsel then questioned Mr. O'Connor regarding the polygraph taken by Montgomery, which revealed no deception when she confirmed that Tommy Kleiner was present during the crime. They also discussed the successful efforts of Dave Owen and Ron Ninemire to obtain a sample of Mr. Kleiner's DNA on March 21, 2007, in order to have it tested. (Civ. Tr. 1992.) Mr. O'Connor testified that, if he believed that Mr. Kleiner had a good alibi and had evidence to support it, they probably would not have pursued that line of defense. (Civ. Tr. 1993.)

On cross-examination, Mr. O'Connor testified that upon reviewing the prior witness interview, Ms. Hayes never positively identified Kayla Boman as the second person in the car with Montgomery following the crime. (Civ. Tr. 1995-96.) However, Mr. O'Connor did confirm that prior counsel believed that Ms. Hayes was correct in identifying two people in the car. (Civ. Tr. 1996.)

Mr. O'Connor testified that he did not object to Ryland Duchardt's involvement in the case because, based on his own observations, she interacted with Montgomery in a positive way. (Civ. Tr. 1998-99.) Mr. O'Connor stated that Mrs. Duchardt assisted the defense team in communicating with Montgomery.[69] (Civ. Tr. 1999.)

Mr. O'Connor testified that he advised Montgomery on the demeanor that he wanted her to present during trial, which included not smiling or laughing, and not staring at any member of the jury, but "kind of look through folks". (Civ. Tr. 2001.) Mr. O'Connor stated that Montgomery passed notes to various members of the defense team, remained engaged during trial, and followed his directions about an appropriate demeanor during trial. (Civ. Tr. 2002.)

Mr. O'Connor confirmed that Fred Duchardt's memorandum of March 7, 2007, discussed that Tommy Kleiner's presence at the crime scene had become more

[69]Mr. O'Connor related that he had asked some women from his church parish to meet with Montgomery and help her select clothing to wear in trial to provide her a supporting environment. (Civ. Tr. 2000.)



Appellate Case: 17-1716 Page: 144 Date Filed: 07/30/2018 Entry ID: 4687987

"firm." Mr. Duchardt also indicated in his memo that the defense would have to interpose a not guilty by reason of insanity defense in short order based on the scheduled trial date in six to eight weeks. (Civ. Tr. 2003.)

Mr. O'Connor testified that on April 2, 2007, his investigators met with Ms. Hayes and, from that meeting, they believed that she had made a positive identification of Tommy Kleiner. Thereafter, on April 3, 2007, Mr. O'Connor met with Government attorneys and then with the court. Mr. O'Connor then met with Ms. Hayes along with a court reporter to take a statement. During that statement, Ms. Hayes stated that she was "pert near sure" that the other individual was Tommy Kleiner. (Civ. Tr. 2004-06.)

Mr. O'Connor testified that these efforts, i.e., the Hayes interview, the DNA sample and polygraph exam, were in order to get the death penalty removed from the case. (Civ. Tr. 2008.)

Mr. O'Connor stated that his time sheets were not accurate because he was not a billable hours attorney, but 95% of the time, he simply charged a flat fee. (Civ. Tr. 2012.) He stated that he believed that he had sufficient time to prepare the case for trial, but that he would have been comfortable asking the court for a continuance if he felt it necessary. (Civ. Tr. 2014.)

Mr. O'Connor stated that his trial team had meetings and communications through emails, telephone calls, texting, and in person. An example of this



Appellate Case: 17-1716 Page: 145 Date Filed: 07/30/2018 Entry ID: 4687987

communication is the eight-page letter sent by Fred Duchardt on March 7, 2007. (Civ. Tr. 2015.)

Mr. O'Connor stated that, even though the defense team did not use the Tommy Kleiner accomplice defense, Dr. Ramachandran was able to use Montgomery's belief that Kleiner was present to show her delusional dissociative state. (Civ. Tr. 2018-19.)

Mr. O'Connor also testified that the defense team pursued the not guilty by reason of insanity defense because, based on the nature of the offense, it appeared to be the best way to convince the jury to save Montgomery's life:

> We believed that was the best defense to put forward to the jury in light of the facts and circumstances of the case and try to convince the jury just on the face alone without experts, it looks like someone wouldn't be in their right mind to commit this. You have some evidence to support that. I think that goes a long way in trying to get that theme home to the jury to save Lisa's life.

(Civ. Tr. 2019.)

Mr. O'Connor testified that he made this decision after discussion with the trial team and based on his 27 years of criminal defense work. (Civ. Tr. 2020.) He testified that pursuing an insanity defense allowed the jury to hear the evidence twice and applying a consistent defense approach to the case to establish a theme from start to finish. Thus, the jury was free to conclude that, even if Montgomery did not establish a not guilty by reason of insanity defense, the evidence was sufficient to mitigate her punishment. (Civ. Tr. 2021.)

*34. Dr. Ruben Gur*

Dr. Gur is employed at the University of Pennsylvania in the Department of Psychiatry.[70] (Civ. Tr. 2028.) He testified that Fred Duchardt contacted him in May of 2006, about performing an analysis of neuroimaging and neuropsychological data on behalf of Montgomery. (Civ. Tr. 2051.)

Dr. Gur testified that he received the raw data of the neuropsychological testing provided by Dr. Fucetola and put that data into the brain imaging algorithm, which is called a behavioral image.[71] (Civ. Tr. 2053-54.) Dr. Gur testified that the resulting scale was "unitless", meaning that the behavioral image is used only to ask where is the most likely damage and not how severe the damage is. (Civ. Tr. 2056-57.) Thus, the behavioral image does not affect any data, it simply provides a

---

[70]In discussing his qualifications, Dr. Gur pointed out that he had a high h-index, which is a number indicating the number of times his work has been cited by others, comparing a high h-index with being an "ace" pilot in the Air Force. He used the high h-index to state that he was one of the top 1500 scientists internationally. (Civ. Tr. 2040.) However, as Dr. Gur admitted on cross-examination, a high h-index is not an indication of high quality.

[71]Dr. Gur explained that the brain imaging began as a project with funding from the National Institutes of Mental Health involving four neuropsychologists and asking them to rate each neuropsychological test result with regard to the brain regions implicated by the results. (Civ. Tr. 2041.) Then each expert was asked back a year later to provide those ratings again. Dr. Gur used those ratings to create an algorithm which allow inputting of neuropsychological test results to create an image of the brain to show the brain regions that seem most compromised based on the neuropsychological test results. (Civ. Tr. 2053.)



Appellate Case: 17-1716 Page: 147 Date Filed: 07/30/2018 Entry ID: 4687987

pictorial representation of the brain systems most likely involved based on the neuropsychological testing. (Civ. Tr. 2059.)

Dr. Gur testified that based on the behavioral image, Montgomery appeared to have damage in the parietal lobe. (Civ. Tr. 2061.) Dr. Gur stated that he prepared a report dated April 3, 2007, that summarized the information from the neuropsychological testing, the behavioral image, and the MRI and PET scans. (Civ. Tr. 2061-62.) Dr. Gur noted that this report took into account the opinions of Drs. Davatzikos and Newberg, but that they were not named in the report. (Civ. Tr. 2062.) Dr. Gur testified that his report concluded that Montgomery suffered from brain dysfunction that affects behavior and that possible causes of this dysfunction involved PTSD, her mother's use of alcohol while pregnant with Montgomery, and head injury. (Civ. Tr. 2067-68.) Dr. Gur testified that the brain dysfunction was consistent with pseudocyesis. (Civ. Tr. 2070.)

Dr. Gur testified that Montgomery's MRI showed large ventricles, indicating tissue damage (atrophy) or tissue that failed to develop (dystrophy). (Civ. Tr. 2071-72.) This was in the area of the limbic structures that relate to emotional behaviors. (Civ. Tr. 2072.) Dr. Gur stated that the parietal lobe also seemed to be much smaller relative to the rest of the brain. (Civ. Tr. 2073.)

Dr. Gur testified that he used a normative sample developed between 1990 and 1993. (Civ. Tr. 2086.) However, this group was tested under a different

generation of scanners and the data (defined as the raw-raw data) from these scanners were no longer available at the time of trial because the computers had been decommissioned. (Civ. Tr. 2086-87.)

Dr. Gur's report stated that the PET results indicated brain activity that showed increased vulnerability to impulsive behavior and pseudocyesis (by history) and dissociative states. (Civ. Tr. 2096.)

On cross-examination, Dr. Gur admitted that a high h-index did not indicate whether others cited his work positively or negatively and, in fact, a doctor who wrote a heavily criticized report would have a high h-index. (Civ. Tr. 2098-99.) Dr. Gur also conceded that he is not a board-certified forensic psychologist.

Dr. Gur also stated that he was not qualified to read an MRI, which Dr. Davaztikos performed, or a PET scan, which Dr. Newberg conducted. (Civ. Tr. 2100-01.) However, he did not name either Dr. Davatzikos or Dr. Newberg in his initial report. (Civ. Tr. 2103.) Even after the discovery dispute arose and the court scheduled a *Daubert* hearing, Dr. Gur omitted the names of Drs. Davatzikos and Newberg in a second report issued on August 23, 2007. (Civ. Tr. 2104.)

In addition, in a letter dated September 28, 2007, responding to the criticism of the Government experts regarding the PET scan raw data, Dr. Gur again failed to identify Dr. Newberg as the person doing the analysis. (Civ. Tr. 2105.) Moreover, in a letter dated October 2, 2007, which was after trial began in Montgomery's case,



Appellate Case: 17-1716 Page: 149 Date Filed: 07/30/2018 Entry ID: 4687987

Dr. Gur again omitted naming Drs. Davatzikos and Newberg and still had not provided the raw data requested. (Civ. Tr. 2106.) Finally, in a letter dated October 22, 2007, Dr. Gur provided some raw data, although he indicated it was not the raw data requested. (Civ. Tr. 2108.)

Dr. Gur testified that he spent about three hours with Montgomery to take her history, primarily to determine if at some time in her life her brain had been exposed to damage. (Civ. Tr. 2112.)

Dr. Gur confirmed that his behavioral image is based on the judgments of four experts. (Civ. Tr. 2113-14.) He stated that he was familiar with a paper that criticized his method and appeared to agree that an empirical basis of applying brain function to behavior would be better but that "unfortunately" that process was not available at the time. (Civ. Tr. 2120.)

Dr. Gur also admitted that Dr. Aguirre, who is a Ph.D. and an M.D. in Dr. Gur's department, had referred to Dr. Gur's system as "neurohuckster."[72] (Civ. Tr. 2120.) Dr. Gur stated that according to Dr. Aguirre, the Department of Justice came to him because the Department was puzzled that Dr. Gur's testimony is accepted in multiple courts and that individuals avoided the death penalty based on it. The Department wanted to know how it was possible that everyone charged with

[72]Dr. Aguirre provided his statement in an online lecture for neuroethics. (Civ. Tr. 2121.)

a capital offense happens to have brain damage. Dr. Gur stated that, if his method did not show brain damage, he did not testify. (Civ. Tr. 2122.)

Dr. Gur testified that he is the only one who uses his algorithm. (Civ. Tr. 2127.) He also conceded that his testimony had been discounted in another capital case in the Western District of Missouri. (Civ. Tr. 2130.)

*35. George Parnham*

Mr. Parnham is an attorney in the State of Texas. (Civ. Tr. 2132.) He testified that he was trial counsel in the prosecution of Andrea Yates by the State of Texas, both on the original trial and on re-trial. Mr. Parnham stated that the court required a re-trial because of testimony of Dr. Dietz on cross-examination that turned out not to be true. (Civ. Tr. 2132.) Mr. Parnham stated that he contacted the grand jury in Harris County about Dr. Dietz's testimony, which resulted in Dr. Dietz's testimony before the grand jury. (Civ. Tr. 2133-34.)

*36. David Owen*

Mr. Owen served as one of the trial counsel for Montgomery. (Civ. Tr. 2136.) Mr. Owen testified that he was not a capital-qualified attorney nor did he have expertise in mental health cases. (Civ. Tr. 2137.) The court appointed Fred Duchardt as learned counsel in the case to work on the mental health issues. (Civ. Tr. 2138.) John O'Connor was the lead counsel in the case who determined the assignments. (Civ. Tr. 2141.)

Mr. Owen stated that when Mr. Duchardt entered the case, he, Ron Ninemire, and Stephanie Elliott would have told Mr. Duchardt what they knew about the case. (Civ. Tr. 2141.)

Mr. Owen testified that he was the point person between Judy Shaughnessy and the defense team. (Civ. Tr. 2143.) Based on this relationship, Mr. Owen cautioned Fred Duchardt and John O'Connor about proceeding with the "Tommy Defense." However, he also explored the defense with Ron Ninemire, but tried to keep knowledge of that fact away from Judy Shaughnessy. (Civ. Tr. 2144.)

Mr. Owen stated that Montgomery never directly told him that Tommy Kleiner was the person that was with her at the time of the murder. However, she made comments that led Mr. Owen to believe that Tommy was with her. Mr. Owen stated that since Montgomery had given them the information regarding Tommy Kleiner, the defense had a duty to explore that issue. (Civ. Tr. 2145.)

Mr. Owen confirmed that the prior trial team had decided that it would not use pseudocyesis in guilt phase, but had decided to use it in mitigation. Mr. Owen also stated that he did not believe Montgomery was competent to stand trial, but did not file any competency motions based on the decision of the trial team. (Civ. Tr. 2146-47.)

Mr. Owen testified that the defense team had discussed having one of the doctors discuss the effect of psychotropic medications and their effect, but that did

not occur. (Civ. Tr. 2147-48.) Mr. Owen stated that Mr. Duchardt maintained contact with Montgomery's children and thought their relationship with her would be a factor in mitigation. (Civ. Tr. 2149.)

Mr. Owen testified that he called Susan Hunt during trial and told her that "we were not getting mitigation evidence to the jury that we thought was important. Her [Mrs. Montgomery's] story wasn't being told." (Civ. Tr. 2150.) Mr. Owen also stated that he was independently aware that mentally ill individuals can premeditate, but that information was not presented to the jury. (Civ. Tr. 2150-51.)

On cross-examination, Mr. Owen stated that he and Susan Hunt decided to terminate the first mitigation specialist, Lisa Rickert, from the defense team because she would not communicate with the defense team regarding her progress or any information she had gathered.[73] Holly Jackson replaced Ms. Rickert. (Civ. Tr. 2154.) Mr. Owen stated that he was able to work with Ms. Jackson, but that she left the team because she was "star struck" by Judy Clarke and wanted to leave when Ms. Clarke left.[74] (Civ. Tr. 2155.)

[73]Although Ms. Rickert sent a resignation letter, Mr. Owen testified that she did so after he and Ms. Hunt told her that they no longer desired her services. (Civ. Tr. 2183.)

[74]Mr. Owen identified an email dismissing Ms. Jackson, but stated that he sent the email after she informed Mr. Owen and Ms. Hunt that she could not work with them anymore. (Civ. Tr. 2184.)



Appellate Case: 17-1716 Page: 153 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Owen stated that the FPD preferred not to work with Fred Duchardt because they had observed his death penalty cases and felt that he was a "Milquetoast" in his defense. (Civ. Tr. 2156.) Mr. Owen stated that he was aware that cases in the Western District of Missouri are not decertified, and that there was not much success in negotiating cases after the death penalty certification. (Civ. Tr. 2158.)

Mr. Owen testified that Ron Ninemire assigned himself the job of finding the last mitigation specialist, Dani Waller. Mr. Owen stated that, so far, the recommendations of Dick Burr at the Resource Counsel involving Lisa Rickert and Judy Clarke had not worked out well. (Civ. Tr. 2159-60.) Ron Ninemire supervised the other investigators for the FPD, including two women. Mr. Owen did not observe that Mr. Ninemire had any trouble working with women and testified that he did not have trouble working with women. He denied being misogynistic and bullying the women in the case. (Civ. Tr. 2161.)

Mr. Owen testified that he wanted to keep Judy Shaughnessy happy so she would not interfere in the investigation of the case. He described Mrs. Shaughnessy as "woefully narcissistic" and stated that she would "bulldoze out of the way" anything that put her in a bad light. (Civ. Tr. 2164.) Mr. Owen stated that he felt it was his job to try to smooth the relationship between Montgomery and her mother to help his client's environment. (Civ. Tr. 2165-66.)

Government counsel refreshed Mr. Owen's recollection from the letter sent by Fred Duchardt that, in fact, Montgomery had named Tommy Kleiner as a co-participant in the crime. (Civ. Tr. 2167.) Mr. Owen reiterated that on March 29, 2007, he and Ron Ninemire obtained a cigarette butt used by Mr. Kleiner to run his DNA profile to investigate Montgomery's claim of his involvement. (Civ. Tr. 2169.)

Mr. Owen confirmed that on April 2, 2007, Ron Ninemire and another investigator, Tom Moss, interviewed Leona Hays and her son to determine Tommy Kleiner's identity. Mr. Owen stated that the investigators believed that Ms. Hayes had made an identification of Mr. Kleiner. (Civ. Tr. 2171.) Thereafter, on April 3, 2007, John O'Connor interviewed Ms. Hayes with a court reporter. (Civ. Tr. 2172.)

Mr. Owen confirmed that Fred Duchardt focused on the pseudocyesis defense, using the expertise of Dr. Ramachandran who diagnosed Montgomery as suffering from pseudocyesis. Dr. Ramachandran testified during the guilt phase that Montgomery was in a delusional state at the time of the crime to the extent that she would not have known right from wrong, rendering her not guilty by reason of insanity. Mr. Owen affirmed that similarly, Dr. Logan testified that Montgomery suffered from pseudocyesis, which was a major mental disease or defect that precluded her ability to know right from wrong. (Civ. Tr. 2173-74.)

Mr. Owen repeated that he believed Montgomery's story was not being told, but admitted that her story was one of physical and sexual abuse, and that eight or

nine members of the jury, depending on how the question was asked, found that Montgomery had been the victim of significant sexual and physical abuse. (Civ. Tr. 2175.)

When asked why he considered Fred Duchardt a "Milquetoast," Mr. Owen stated that he both did not like Mr. Duchardt's style and believed him to be ineffective. However, he admitted that Mr. Duchardt both handled the case and the experts in the case. (Civ. Tr. 2175-77.)

On re-direct, habeas counsel asked Mr. Owen about the allegations of gang rape and sex trafficking. He stated that the trial team had been unable to substantiate the information that appeared in the David Kidwell interview memorandum. He testified that the team followed up as best they could, but was unable to identify any names. (Civ. Tr. 2185-86.)

*37.* *Fred Duchardt*

Mr. Duchardt handled Montgomery's case from May of 2006, through the direct appeal. He testified that following the filing of the § 2255 motion, he entered his appearance as an interested party and asked for and received his file from habeas counsel. He also talked with members of the FPD with a court reporter present. (Civ. Tr. 2190.) He stated that he undertook these actions to write a court-ordered statement in response to Montgomery's § 2255 motion. He noted that both he and habeas counsel had resisted the order that he file a response. (Civ. Tr. 2191.)



Appellate Case: 17-1716 Page: 156 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt stated that he did not have a hard time building rapport with Montgomery. He noted that Montgomery had had a good relationship with Judy Clarke and that the loss of that relationship had a major impact on her, however, by the time he talked to her, others had explained to her what had happened with Ms. Clarke. (Civ. Tr. 2192.)

Mr. Duchardt testified that Montgomery had not been apprised of all the arguments between Judy Clarke, Susan Hunt, and David Owen, so that "when it blew up" it came as a surprise to her. (Civ. Tr. 2194.)

Mr. Duchardt stated that he was "gender challenged" in dealing with Montgomery because she had a difficult time trusting men. (Civ. Tr. 2195.) He also testified that Montgomery's life experiences had told her that she should not ask to have her needs met which interfered with communication. (Civ. Tr. 2198.)

Mr. Duchardt stated that when he entered the case, a "tremendous" amount of information had been collected already and more continued to accumulate.[75] The FPD maintained this information at their offices and had created a database, i.e., a master file, containing most of the same documents that were on paper. Mr. Duchardt received a copy of this electronic file to learn the facts of the case. (Civ. Tr. 2200.)

[75]Mr. Duchardt testified that the FPD had accumulated most of these documents. (Civ. Tr. 2202.)



Appellate Case: 17-1716 Page: 157 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt stated that he only learned about experts contacted by Ms. Clarke during the current proceedings and only after asking the FPD office to locate a separate financial file reflecting that information. (Civ. Tr. 2201.) Mr. Duchardt stated that he could not attribute much work product to Ms. Clarke based on the materials in the file. (Civ. Tr. 2201-02.) When habeas counsel pointed out the number of documents collected during the time of Ms. Clarke's involvement in the case, Mr. Duchardt stated that his review of the file indicated that neither Ms. Clarke nor Ms. Garvey, her mitigation specialist, performed that work. He also attributed the document collection to the early stages of the case. (Civ. Tr. 2203-04.)

Mr. Duchardt stated that the experts presented by habeas counsel in the § 2255 proceeding appeared to rely on information contained in the trial team's database. (Civ. Tr. 2205.)

Mr. Duchardt stated that he presented Montgomery as a good mother because she was a good mother and she wanted to be portrayed as a good mother. (Civ. Tr. 2206.) He stated that he did not trust the account of Judy Shaughnessy or Carl Boman to the contrary because each of them consistently misrepresented facts about various situations. (Civ. Tr. 2207.)



Appellate Case: 17-1716 Page: 158 Date Filed: 07/30/2018 Entry ID: 4687987

Habeas counsel discussed with Mr. Duchardt a report impugning Montgomery's parenting skills in 1993.[76] Mr. Duchardt stated that he had information from many individuals regarding Montgomery's behavior at the time, i.e., ten years before the crime. He believed that he properly presented that type of information, but chose to highlight the good parts of Montgomery's history. (Civ. Tr. 2209-12.)

Mr. Duchardt testified that he brought experts into the case very quickly after he discussed matters with Judy Clarke and Susan Hunt because he knew mental issues would be important in the case. In fact, he contacted Dr. Gur the day after the court appointed him and Dr. Fucetola about a month later because he believed Dr. Gur would be more difficult to schedule. (Civ. Tr. 2213-14.) Mr. Duchardt stated that he left the responsibility of getting documents to Dr. Fucetola to the paralegal, Stephanie Elliott. (Civ. Tr. 2215.)

Mr. Duchardt stated that he believed that meetings with the team should occur if there is something to be accomplished by the meeting. (Civ. Tr. 2265.) However, he thinks that things can be accomplished quickly through quicker communications. He stated that he chooses the communication to match the job. (Civ. Tr. 2265-66.)

[76]On cross-examination, Mr. Duchardt noted that the information contained in the report sounded like the way Judy Shaughnessy would attack Montgomery, by having other people make accusations. He stated that he found no independent evidence to support the information in the report. (Civ. Tr. 2295.)



Appellate Case: 17-1716 Page: 159 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt could not provide all of his emails in this case to habeas counsel because his computer crashed and he was unable to access the files. (Civ. Tr. 2266.)

Mr. Duchardt testified that his first contact with Dr. Ramachandran was on April 1, 2007. He had a phone conference with Dr. Ramachandran on April 2, 2007, and prepared some materials, which were dispatched on April 3, 2007. (Civ. Tr. 2270-71.) Prior to dispatching those materials, he had emailed some materials to Dr. Ramachandran. (Civ. Tr. 2271-72.)

On cross-examination, Mr. Duchardt confirmed with Government counsel that he had never talked substantively about his representation of Montgomery because he believed that he still had an attorney-client relationship and was uncomfortable providing the Government with material absent a court order. (Civ. Tr. 2273-74.)

Mr. Duchardt related his professional history in capital litigation beginning in 1984 with the Public Defender in Clay County regarding a murder involving a man named Bill Worth. This began a series of cases over the next ten years, none of which resulted in the death penalty and a couple of which resulted in acquittals. (Civ. Tr. 2275.) Mr. Duchardt began federal capital work in 1995 in a case involving Dennis Moore, which led to a string of federal death penalty cases from 1995 to the present time in the Western District of Missouri and the District of Kansas. (Civ. Tr. 2276.)

Mr. Duchardt stated that he contacted Judy Clarke and Susan Hunt to get their perspective on the case and to determine why they were no longer on the case. Mr. Duchardt testified that during his calls with Ms. Clarke she failed to mention either Judy Hermann or Dr. Delis, the two experts contracted by the FPD. (Civ. Tr. 2278-79.) Moreover, in his review of the files, Mr. Duchardt never saw a reference to these two experts. (Civ. Tr. 2280.)

Mr. Duchardt stated that he had worked with both Dr. Gur and Dr. Fucetola previously and reached out to them at the time of his appointment in order to get a "goodly amount" of work accomplished before he had to begin work on the *Street* case.[77] In addition, it seemed to both Mr. Duchardt and John O'Connor that the problem with the original trial team was that "nobody had taken the necessary steps to pull the trigger and get experts involved into the case." (Civ. Tr. 2281.)

Mr. Duchardt testified that his involvement in the *Street* case did not impair his representation of Montgomery. (Civ. Tr. 2283.) He further testified that if he had needed a continuance, he would have requested one. (Civ. Tr. 2284.)

Mr. Duchardt stated that his representation to the court on April 3, 2007, regarding Drs. Ramachandran and Logan, was based on his conversations with

[77] The *Street* case, *United States v. Phil Street*, was another capital case in which Mr. Duchardt was counsel. The *Street* trial began the first time in July of 2006, and mistried in August. It was then re-tried in November and December of 2006. (Civ. Tr. 2213.)

Dr. Ramachandran, who did not give him a firm diagnosis but indicated that they were "absolutely" looking at a case of pseudocyesis. Mr. Duchardt noted that both Drs. Ramachandran and Logan came back with a diagnosis of pseudocyesis. (Civ. Tr. 2286.) Mr. Duchardt stated that Drs. Ramachandran and Logan gave him a factual basis to argue a not guilty by reason of insanity defense: "I think they absolutely did, especially when you have Dr. Ramachandran who isn't licensed to practice medicine but is an expert in the field backstopped with Dr. Logan who is licensed to practice and is an expert in the field lending his support to the diagnosis. That was our idea." (Civ. Tr. 2287.)

Mr. Duchardt stated that before establishing the pseudocyesis defense, he had intended to approach the case much as habeas counsel suggested because they had no expert who believed that there was a mental disease or defect that excluded responsibility or even amounted to a mitigating factor. However, pseudocyesis provided a defense that amounted to an exclusion of responsibility and mitigating factors that qualified under the FDPA. (Civ. Tr. 2288.)

Mr. Duchardt testified that he had discussions with his team members and Montgomery regarding the implications of proceeding with a not guilty by reason of insanity defense. (Civ. Tr. 2289-90.)



Appellate Case: 17-1716 Page: 162 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt stated that he was unaware of any dysfunction or lack of cohesion on the defense team and stated that neither David Owen nor Dani Waller brought the complaints reflected in their affidavits to his attention. (Civ. Tr. 2290.)

Mr. Duchardt summarized his view of mitigation specialists based on his prior experience with them.

> A. Right. And part of the problem that comes in is that people use the term "mitigation specialist" kind of loosely to describe a multiple number of roles that usually are played by different people, and there are more precise terms that should be used to kind of tease out those different -- those different roles, and that's the problem I always have with the moniker of mitigation specialist because nobody actually drills down to what the particular role is.
>
> For instance, in this case we had Dani and she's nominally a mitigation specialist. There were other nominal mitigation specialists who essentially did investigation work in this case along the lines of mitigation investigation. My problem with those kinds of mitigation investigators, which I've voiced many times, is that it's really, in many cases, an inefficient use of time because those people many times are not willing to go out and do the grunt work of actually doing mitigation investigation. Many of them are afraid to do it for a lot of different reasons. They can't get the job done.
>
> For instance, in this case Dani many times wanted the investigator, Ron, to go with her on some of the investigations, and they were certainly investigations that Ron could have done himself. Certainly the two of them together handling that was just fine. I have actually engaged so-called mitigation specialists in cases where they literally wouldn't go out to do the work because they were afraid to. They had to take along an investigator, and so I have said many times I would rather identify and develop a person who can do the whole thing, and that's what I've done in many other cases.
>
> In this particular case we had the luxury of both people, and so I didn't have to worry about that particular problem. And as I've said in my



Appellate Case: 17-1716 Page: 163 Date Filed: 07/30/2018 Entry ID: 4687987

> affidavit, if you look at Dani's billing records,[78] I can't see that there was a problem in her being able to do pretty much whatever she wanted and felt like she needed to do to help us. And my whole impression of everything she did was that she did a very good job.

(Civ. Tr. 2291-92.)

Mr. Duchardt also explained how he approached the idea that Montgomery was a "good mother."[79] He testified that his closing argument emphasized that Montgomery "was a woman who had all the bad cards dealt to her but she did her level best, and the proof was in the pudding as to how hard she had worked in that she had some of the sweetest, nicest kids who were in no trouble, who never got into any kind of trouble." (Civ. Tr. 2294.) This was the basis for Mitigation Factor No. 8, "that despite having been the victim of significant sexual, physical and emotional abuse, Lisa Montgomery raised four good children and worked many jobs to support her children." (Civ. Tr. 2295-96.)

Mr. Duchardt testified that he had reviewed the biopsychosocial history written by Jan Vogelsang and knew who she was at the time of trial. (Civ. Tr. 2296.)

---

[78]In his statement, Mr. Duchardt noted that based on her billing records, Ms. Waller was very much involved in the Montgomery case preparation, since she billed more than $85,000 for work on the case. (DCD 129 at 31.)

[79]Mr. Duchardt noted that he did not identify this concept as a "good mother." Rather, he put forth the concept to reflect the mitigation factor submitted to the jury, i.e., that Montgomery had suffered significant sexual, physical and emotional abuse, but still worked to provide for her children, who, by all accounts, grew up without substantial emotional issues. (Civ. Tr. 2296.)



Appellate Case: 17-1716 Page: 164 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt stated that he believed that Dr. Ruth Kuncel provided similar information set forth in the biopsychosocial history of Ms. Vogelsang, and that Dr. Kuncel was more qualified than Ms. Vogelsang.[80] Mr. Duchardt stated that Ms. Vogelsang, who is not a psychologist, but rather a social worker, often reaches conclusions beyond the level of her expertise. (Civ. Tr. 2297.)

Mr. Duchardt testified that Montgomery had been telling other members of the team (not Mr. Duchardt) that she felt someone else was with her at the time of the murder. In addition, there was independent evidence to support that statement. He stated that Becky Harper, Bobbie Jo Stinnett's mother had testified that when she talked to Bobbie Jo on the telephone, Bobbie Jo had said that the people were there to look at the dogs.[81] In addition, there was a witness (Leona Hayes) who indicated that she saw two people in the car driving away from the house. (Civ. Tr. 2300.)

Mr. Duchardt stated that he was unsure when Montgomery identified Tommy Kleiner, but believed it occurred during a discussion with her in Philadelphia. Government counsel refreshed Mr. Duchardt's recollection with the memorandum he wrote from Philadelphia on March 7, 2007, mentioning Montgomery's identification of Tommy Kleiner. (Civ. Tr. 2300-01.)

---

[80]Mr. Duchardt stated that he was unaware that Dr. Kuncel felt unprepared for her testimony and wished that she had said something at the time. (Civ. Tr. 2298.)

[81]Ms. Harper testified: "At about two-thirty I called Bobbie Jo and she said they were there looking at the puppies." (Crim. Tr. 516.)

Mr. Duchardt testified that the March 7, 2007 memorandum identifying Tommy Kleiner as an accomplice was six to eight weeks before the scheduled trial date. Based on Montgomery's statements as set forth in the memorandum, Mr. Duchardt reached out to the Government trial team to set up a meeting, because of the effect it could have on the decision to move forward on the death penalty. (Civ. Tr. 2301-02.) Mr. Duchardt stated that this was the reason for the meeting with the Government attorneys on April 3, 2007. In addition, Mr. Duchardt wanted to disclose this information as soon as possible because the existing discovery deadlines had passed and he felt it crucial to present this information in order to use it at trial. (Civ. Tr. 2303-04.)

Mr. Duchardt testified that he did not in any way plant the notion that Tommy Kleiner was involved with Montgomery in the crime and, in fact, took steps to insure that he did not make that suggestion.[82] When asked about the possibility of Kleiner's involvement, despite the evidence that he was with his probation officer on the date of the murder, Mr. Duchardt remained convinced that this was still an open question:

> A. Well, I'm still the person who still thinks that those records don't prove that, and I was the one who argued all the way along that we should drill down further past those records because -- there were actually indications in other records that Tommy was actually present

[82] The United States would note that this is the only evidence in the case regarding the contention that the defense team convinced Montgomery to name Tommy Kleiner as an accomplice. Although habeas counsel repeatedly assert that the defense team tampered with Montgomery's memory of the event to include Tommy Kleiner, there is no evidence to support that argument.



Appellate Case: 17-1716 Page: 166 Date Filed: 07/30/2018 Entry ID: 4687987

> on a different date, because he was supposed to be in court on a different date and was supposed to go immediately to talk to his probation officer that date, but -- and so I believed that we were in good shape to make a very creditable, if not, strong argument that the -- what had been accounted into the computers by the probation officer was actually covering up that she had failed to make that accounting for her time on the date that Tommy actually appeared, which was the week before.
>
> But having said all of that, yes, the records that were presented and that we essentially by decision of John for the team, we conceded that Tommy wasn't there.

(Civ. Tr. 2305.)

During trial, Dr. Ramachandran used Montgomery's belief of an accomplice as further indication of her mental illness and her dissociative state. (Civ. Tr. 2306.)

Mr. Duchardt explained the presence of his wife during interviews with Montgomery was to act as a protective mechanism against Montgomery's fears that Mr. Duchardt would have some kind of sexual agenda. He stated that his wife has training in social work, has a bachelor's degree in social work and a master's degree in counseling and so has the qualifications to act as an expert, but that her role in Montgomery's case was simply to be present to show her that Mr. Duchardt was not a danger to her. (Civ. Tr. 2308.) Mr. Duchardt also noted that he sent the memorandum noting his wife's involvement to all the members of the defense team. (Civ. Tr. 2309.)

With respect to the alleged flat affect of Montgomery caused by her medications, Mr. Duchardt testified:



Appellate Case: 17-1716 Page: 167 Date Filed: 07/30/2018 Entry ID: 4687987

> A. I think the characterization that was made is silly. Lisa was consistently engaged with all of us. Lisa had the natural trepidation about being a defendant on trial and was obviously worried about that. That's part of the reason that we tried to make sure to have somebody with her to be able to answer the questions that she would ask; and Stephanie, I believe, is the one who came up with the mechanism of Lisa having a sticky notepad to be able to pose questions and be able to ask the things as things would go along. And, I mean, my best recollection is she was using pad after pad of those being able to interpose questions, whether it would be to Dave or to Stephanie or to Ryland.
>
> John and I particularly kind of stayed away from that just so that we could pay attention to what was going on, but I observed all of that. I mean, Lisa, for my impression, worked very hard to pay very close attention to everything that was going on and did her best to interact and pass the notes. I saw nothing of a flat affect at all.

(Civ. Tr. 2310-11.)

Mr. Duchardt testified that, if Montgomery had been presenting a flat affect, he would have asked her about it and if she had done anything untoward that required an explanation, he would have taken steps to provide one. However, he repeated that there was no reason to do so based on the way that Montgomery presented herself. (Civ. Tr. 2311-12.)

In a similar vein, Mr. Duchardt testified that, while Montgomery had difficulty communicating with members of the defense team regarding some issues, she was absolutely not incompetent in the sense that a court could order her examined to restore her competence. (Civ. Tr. 2314.)



Appellate Case: 17-1716 Page: 168 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Duchardt testified that he approached the Department of Justice in the letter dated September 29, 2007, on the eve of the October trial setting, in order to de-certify the death penalty decision in the case. He explained that he waited until that time because he did not have results of Dr. Gur's raw data before then. At that time, Mr. Duchardt believed that they had in place the pseudocyesis defense, coupled with the neurological testing, to make one last presentation to the Department. (Civ. Tr. 2317-18.) Mr. Duchardt testified the phrasing in the letter that "It has recently come to my attention" was simply used as an introduction, explaining why he was coming back in the fashion that he did. (Civ. Tr. 2319.)

Government counsel then reviewed Mr. Duchardt's death penalty cases with him, noting that he received a less than death sentence in the Hargrove case, an acquittal in the Street case after it was overturned on appeal, a less than death sentence in the Dennis Moore case, and a less than death sentence in the Carl Haskell case. Mr. Duchardt stated that he takes his responsibility in death penalty cases very seriously and believed that he had performed to the best of his abilities in Montgomery's case. (Civ. Tr. 2322-23.)

## V. Arguments

### *A. Legal Standard*

#### *1. Habeas Relief Pursuant to 28 U.S.C. § 2255*

Title 28 U.S.C. § 2255(a) provides:

> **(a)** A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Arguments that might warrant reversal on direct appeal do not necessarily support collateral attack. *United States v. Frady*, 456 U.S. 152, 165 (1982).

With respect to Montgomery's ineffective-assistance-of-counsel issues, which make up the bulk of her arguments in her application for a COA, the Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364 (1993). Counsel is constitutionally ineffective when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the efforts are so prejudicial that the adversarial balance



Appellate Case: 17-1716 Page: 170 Date Filed: 07/30/2018 Entry ID: 4687987

between the defense and prosecution is upset. *Id*. at 369. *See also Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390 (2000). The United States Supreme Court has not stated specific rules for what is considered effective assistance, and instead commands that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521(quoting *Strickland*, 466 U.S. at 688) (alteration omitted).

A court may examine the "prejudice" aspect of a claim without having to determine first whether the representation fell below the objective standard of reasonableness. *McCann v. Armontrout*, 973 F.2d 655, 660 (8th Cir. 1992) (citing *Strickland*, 466 U.S. at 697.

It is Montgomery's burden to prove affirmatively the prejudice aspect of this claim. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992). The review of counsel's performance is highly deferential, and the presumption is that counsel is competent and effective. *Kelly v. United States,* 819 F.3d 1044, 1047 (8th Cir. 2016); *Smith v. Lockhart*, 921 F.2d 154, 156 (8th Cir. 1990).

Finally, in order to demonstrate prejudice, Montgomery "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This reasonable probability arises when the reviewing court lacks confidence in the outcome after surveying the entire record below. *White v. Luebbers*, 307 F.3d 722,

728 (8th Cir. 2002). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

Most of Montgomery's claims of ineffectiveness are nothing more than an exercise in second-guessing the performance of trial counsel. In evaluating an attorney's performance, a court must begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because individual criminal defense attorneys might employ different trial strategies. *Strickland*, *id.* at 689; *see also United States v. Luke*, 686 F.3d 600, 604 (8th Cir. 2012). Courts should avoid "the distorting effects of hindsight" and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time. *Strickland*, *id.* at 689. The burden is on the petitioner to show that counsel's representation was not within the range of sound defense strategy. *Id.* at 690. To establish prejudice, Montgomery must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, Montgomery has clearly failed to make the required showing, and this Court should deny her application for a COA.



Appellate Case: 17-1716 Page: 172 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery also has raised a number of claims that do not involve assertions of ineffective assistance of counsel, or newly discovered evidence. These claims, in other words, could have been raised on direct appeal, but were not. Courts normally will not entertain such arguments in a § 2255 motion if a movant did not raise the claim prior to trial, at trial, or on direct appeal. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002).

In order to obtain § 2255 relief despite such procedural default, a movant must show both cause for her failure to assert the claim in earlier proceedings, and actual prejudice from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). The showing of cause and prejudice, however, is not required if: (1) a movant seeks § 2255 relief based on facts not developed at trial that should be considered to avoid a fundamental miscarriage of justice as the conviction of an innocent person, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991); (2) the Government fails to object to the consideration of newly raised issues, *West v. United States*, 994 F.2d 510, 512 (8th Cir. 1993); or (3) the § 2255 motion raises certain constitutional claims that may be adequately addressed only on collateral review, *Massaro v. United States*, 538 U.S. 500, 509 (2003).

*2. <u>Certificate of Appealability</u>*

Title 28, United States Code, Section 2253 provides:

> **(a)** In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on



Appellate Case: 17-1716 Page: 173 Date Filed: 07/30/2018 Entry ID: 4687987

appeal, by the court of appeals for the circuit in which the proceeding is held.

**(b)** There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

**(c)(1)** Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

> **(A)** the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> **(B)** the final order in a proceeding under section 2255.

**(2)** A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

**(3)** The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

As the Supreme Court explained in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604 (2000):

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at

least, that jurists of reason would find it debatable whether the Application states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

## *B. Claims Asserted in Application for a COA Regarding Removal of Judy Clarke*

The first five claims asserted in the application for a COA involve the removal of Judy Clarke from the defense team. Ms. Clarke, a California attorney, had been admitted *pro hac vice* at the request of FPD counsel David Owen. At a later time, Mr. Owen informed the court that Ms. Clarke had been abusive to him and his staff at the FPD and that the FPD office would no longer work with her.

Montgomery's claims arising from the removal of Ms. Clarke include the following:

1. Whether the district court's abrupt removal of attorney Judy Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery, contrary to the wishes of Ms. Clarke and Mrs. Montgomery, and without a hearing, violated Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.

2. Whether the trial court's decision to remove Ms. Clarke as counsel without notice or hearing was an unconstitutional denial of Mrs. Montgomery's Sixth Amendment right to counsel.

3. Whether counsel David Owen and Federal Public Defender Ray Conrad rendered ineffective assistance of counsel by engaging in conduct leading to the district court's decision to abruptly remove Ms. Clarke from the defense team without notice to Ms. Clarke or Mrs. Montgomery and contrary to the wishes of

Ms. Clarke and Mrs. Montgomery resulting in a violation of Mrs. Montgomery's rights to counsel, due process, and a fair trial as protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.

4. Whether Mrs. Montgomery was deprived of counsel at a critical stage in the proceedings when David Owen and Ray Conrad met with the district court without her knowledge or consent resulting in the removal of Ms. Clarke as counsel for Mrs. Montgomery in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5. Though the district court's ruling on claims 1-4 was on the merits, if the court believes any of those claims are subject to procedural default, Mrs. Montgomery requests a COA under *Slack v. McDaniel*, 529 U.S. 473 (2000), as to whether any such claim is subject to procedural default and if so, whether Mrs. Montgomery has shown cause and prejudice sufficient to overcome the procedural bar.

(Montgomery COA 12.)

All of these claims revolve around the removal of the third attorney from the defense team, appointed as neither lead counsel nor learned counsel, who had engaged in conduct that destroyed the cohesion of the defense team and which, by her own admission, had affected Montgomery's representation in a detrimental way. Taken together, these claims assert that the district court, when faced with the implosion of the defense team almost a year and a half after the initiation of the case, violated Montgomery's right to counsel in removing Ms. Clarke and in the way the removal occurred.



Appellate Case: 17-1716 Page: 176 Date Filed: 07/30/2018 Entry ID: 4687987

C. ***The District Court Properly Removed Attorney Judy Clarke, the Third Attorney Appointed to the Defense Team and Admitted Pro Hac Vice, When Ms. Clarke Had Engaged in Conduct That Resulted in the Refusal of the FPD, Who Had Sponsored Her Admission in the Case, to Continue Working With Her and Which Interfered With the Effective Representation of Montgomery.***

Summary of Argument

Montgomery alleges that the removal of Judy Clarke, one of three attorneys appointed to her pretrial defense team, violated her constitutional rights to counsel, due process, and a fair trial. (Montgomery COA 542-70.) Montgomery claims that, since Ms. Clarke had established an attorney-client relationship with her, the court could not remove Ms. Clarke from the case. Montgomery also claims that the removal of Ms. Clarke without notice or a hearing, denied her of her right to counsel, that this error was structural and that, even if it were not structural, Montgomery has demonstrated actual prejudice.

However, Montgomery did not have a right to a particular appointed counsel; she would only have a right to a particular counsel if she had retained counsel. Moreover, the evidence is undisputed that the trial team composed of Susan Hunt, David Owen ,and Judy Clarke were no longer performing as a team and that the FPD office refused to work with Ms. Clarke because of her perceived abusive conduct.

Faced with this development, almost a year and a half into the case, the district court made a decision to remove Ms. Clarke, who no longer had the support of her



Appellate Case: 17-1716 Page: 177 Date Filed: 07/30/2018 Entry ID: 4687987

sponsoring attorney, Mr. Owen. Neither Montgomery nor Ms. Clarke objected to her removal, and Ms. Clarke never sought re-admission to the case.

1. *Factual Basis Regarding the Appointment and Termination of Ms. Clarke*

As noted above, on October 7, 2005, the court appointed Ms. Clarke *pro hac vice* at the request of FPD David Owen. (Crim. DCD 63.) According to his affidavit[83] filed in the § 2255 proceeding, Mr. Owen met Ms. Clarke when he reached out for assistance in Montgomery's case and contacted Dick Burr, who was a capital resource counsel for the Administrative Office of the United States Courts. Mr. Burr suggested that Ms. Hunt and Mr. Owen travel to Oklahoma to discuss the case and, at that time, introduced them to Ms. Clarke.[84] At the time of this meeting, Mr. Owen and Ms. Hunt had already retained Holly Jackson as a mitigation specialist (after having previously terminated Lisa Rickert as a mitigation specialist). In addition, Ron Ninemire, an investigator for the FPD, and Phil Thompson, an investigator with Susan Hunt, were conducting the fact investigation of the offense. Furthermore, the FPD had hired Stephanie Elliott to provide paralegal help. (DCD 149-2 at 4.)

[83]Although Mr. Owen testified at the evidentiary hearing, he did not discuss the issues regarding Ms. Clarke upon which the district court had previously ruled.

[84]Ms. Clarke recalled that this meeting occurred in the summer of 2005. (DCD 151-3 at 2.)



Appellate Case: 17-1716 Page: 178 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Owen described a number of meetings with Ms. Clarke both at the FPD's offices and at Ms. Hunt's residence.[85] Mr. Owen stated that at these meetings, Ms. Clarke "arrived with an entourage of people." These individuals included Deb Garvey, another mitigation investigator, and David Freeman who was reportedly an expert in mental health issues. (DCD 149-2 at 5.)[86]

Mr. Owen detailed the collapse of his relationship with Ms. Clarke in his affidavit:

> During November, 2005, the relationship between Judy Clarke and myself drastically deteriorated. Susan Hunt and I had determined we needed a chart or spreadsheet form to organize and prioritize our work. As I, with the assistance of Troy Schnack (Computer Systems Administrator for the Federal Public Defender for the Western District of Missouri), was doing most of the computer work of analyzing the investigation into and forensic analysis of Lisa Montgomery's computer use I took it upon myself to design the form for use by all of Lisa Montgomery's defense team. In the process I input example data to illustrate how the form would work.
>
> Judy Clarke then called a meeting with Susan Hunt and me. This meeting took place at a restaurant near Susan Hunt's home. At this meeting, **Judy Clarke displayed the form and stated, in a voice loud enough other patrons could hear, "You are too stupid to set priorities and don't have enough trial experience to make**

[85]It is unclear whether this meeting occurred prior to Ms. Clarke's appointment.

[86]Thus, at this time Montgomery's trial team consisted of three attorneys (Mr. Owen, Ms. Hunt, and Ms. Clarke), two mitigation specialists (Jackson and Garvey), two investigators (Ninemire and Thompson), a paralegal (Elliott) and a mental health specialist (Freedman).



Appellate Case: 17-1716 Page: 179 Date Filed: 07/30/2018 Entry ID: 4687987

**any decisions.**" Of course, I was immensely embarrassed and deeply offended. A number of times during this meeting I tried to explain the data on the forms was just examples to show how the form would work. **Each time she told me to "shut up, you're too stupid."**[87] (Emphasis added.)

There were other problems with Judy Clarke's team. David Freedman was condescending and dismissive, refusing to listen or accept any input from the existing defense team. Deb Garvey, though extremely experienced, would "step on" Ron Ninemire's toes without any consideration of his professional experience or personal feelings. It seemed like every time he would make an investigative decision, she would countermand it with something trivial and then later would institute the same decision originally put forth by Ron Ninemire.

At one point, Judy Clarke wanted to hire a law student she had become enamored with and wanted her to obtain experience in death penalty representation. She also wanted the Federal Public Defender for the Western District of Missouri to pay her stipend. I discussed this with Ray Conrad. At the beginning of the case, prior to Anita Burns's entry of appearance, Ray Conrad stated the Federal Public Defender's office would obtain the funding from the Administrative Office and ensure expenditure of all monies necessary for the defense of Lisa Montgomery. I believe Ray Conrad's exact words were "We will spend every nickel necessary." Providing a law student with experience in death penalty cases was not deemed necessary for the defense of Lisa Montgomery and would subtract from the funding needed for the obtaining of records, the hiring of experts and general expenses incumbent in the representation of a death penalty case.

[87]Neither Ms. Clarke nor Ms. Hunt directly refutes Mr. Owen's quoted language and neither offers direct quotes of what Ms. Clarke said to Mr. Owen. Ms. Clarke merely states that she was "direct and forthcoming" and "stated matter-of-factly that he did not know enough to be the leader of the team." (DCD 151-3 at 7.) Ms. Hunt states that Ms. Clark told Mr. Owen "that he should not be setting priorities and didn't have enough experience to make decisions about priorities. (DCD 151-1 at 6.)

(DCD 149-2 at 6-7.)

In his deposition, Ray Conrad stated that the problems with Ms. Clarke began almost from the beginning when she was rude to the secretaries in the FPD and yelled at Stephanie Elliott, the paralegal. (Montgomery Exh. 72, 9-10.) Mr. Conrad also stated that almost from the first meeting both Ron Ninemire, the FPD investigator, and David Owen, Ms. Clarke had insulted them by calling Mr. Owen a "country bumpkin" and stupid and telling Ninemire that he did not know enough to have an opinion. (Montgomery Exh. 72 at 10.) Mr. Conrad stated that Mr. Owen's complaints about Ms. Clarke had generated conversations for months about whether she should be removed from the case. (Montgomery Exh. 72 at 12.)

The tensions within the trial team resulted in another meeting on April 19, 2005, this time at Ms. Hunt's residence, to discuss whether Ms. Clarke should leave the defense team. After Ms. Clarke left the meeting, Mr. Owen and Ms. Hunt continued to discuss whether Ms. Clarke should withdraw from representation. Ms. Hunt stated that she wanted to "sleep on it" and they decided that they should visit with the court the next morning. (DCD 149-2 at 8.)[88]

---

[88]Ms. Clarke also admits that the team dynamics had deteriorated to the point that it was affecting Montgomery's effective representation:

> I believe that some of the resentment and resistance that led to the need to have that conversation over dinner and the hurt feelings that remained after, worsened the divisions that were apparent on the team

The next morning, on April 20, 2005, Mr. Owen apprised his supervisor, Ray Conrad, about the discussion with Ms. Hunt the previous evening.[89] Mr. Conrad then called Judge Fenner who called Mr. Conrad and Mr. Owen to his chambers.[90] (DCD 149-2 at 8.) Mr. Owen described the events of this meeting in the following fashion:[91]

> Upon entering Judge Fenner's chambers he asked Ray Conrad about the situation with Judy Clarke. Mr. Conrad explained the friction being experienced between Judy Clarke, her team and the other members of Lisa Montgomery's defense team. No court reporter was present. If memory serves me correctly, Ray Conrad offered, as a solution to the problem, for the Office of the Federal Public Defender to withdraw from representing Lisa Montgomery as both Susan Hunt and Judy Clarke had death penalty experience. Judge Fenner summarily rejected that idea. Susan Hunt was not present during this meeting with Judge Fenner as she was still in the hearing in another courtroom. Then, without further comment or questions, Judge Fenner picked up the phone, called CCA (where

---

> when I first became counsel on the case. I tried very hard to keep the various factions working together as a whole but failed. However, as much as I tried, I could never figure out how to fix what was wrong . . . [t]he drama that infected this team was definitely detrimental to the work that we were trying to accomplish for Lisa Montgomery.

(Judy Clarke Declaration 7; Montgomery Exh. 3.)

[89]Mr. Conrad stated in his deposition that Mr. Owen advised him that Ms. Clarke had attacked Ms. Hunt and that Ms. Hunt now agreed that Ms. Clarke should be removed from the case. (Montgomery Exh. 72 at 12.)

[90]Mr. Conrad does not recall attending the meeting in chambers or even making the initial phone call to the Judge. (Montgomery Exh. 72 at 16-17.)

[91]While there is no transcript of this meeting, district court reviewed the events in further hearings described below.

> Lisa Montgomery was being housed) and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit with her. These events transpired very quickly and I had no time to consult with Susan Hunt. Additionally, Ron Ninemire and Judy Clarke were on their way to CCA at this time to visit with Lisa Montgomery. Ron Ninemire did not know about Ray Conrad contacting Judge Fenner nor the fact Judge Fenner summoned Ray Conrad and myself to chambers.
>
> Susan Hunt was entering Judge Fenner's chambers just as this meeting ended. I explained what had happened and Susan Hunt was very upset as she had not yet made the final decision whether to seek Judy Clarke's removal from the case. She had the impression I made the decision to involve Judge Fenner and thereby not respecting her role as lead counsel. I had not made that decision. That was Ray Conrad's decision and he was my boss.
>
> Lisa Montgomery was not given any prior notice these events had happened.

(DCD 149-2 at 9.)

On April 21, Judge Fenner conducted an *ex parte* hearing to inform Montgomery of the removal of Ms. Clarke, explaining that she was an additional attorney on the defense team when it was a normal practice to have two attorneys and that he no longer believed she would be helpful in the case. (04/21/06 Hrg. Tr. 2.) The court pointed out that Montgomery still had the services of two experienced attorneys. (04/21/06 Hrg Tr. 2-3.) The court concluded:

> But I know that any circumstance of this nature can be a cause of concern for a party and I wanted to make sure you heard from me what my decision was in this case and that you had the opportunity to have an explanation from me as to why I made the decision that I made. And if there is anything you would like to ask me further about that I would be happy to discuss that with you further as well.



Appellate Case: 17-1716 Page: 183 Date Filed: 07/30/2018 Entry ID: 4687987

> THE DEFENDANT: (Indicates no.)
>
> THE COURT: Are you all right with this decision. Miss Hunt, I know this is all come up very quickly but have you had an opportunity to discuss any of this with Miss Montgomery. Has she expressed any concern to you you would like to relate to me?
>
> MS. HUNT: Yesterday Mr. Ninemire met with her for about an hour and a half at C. C. A. We met with her this morning just before this hearing and while I think she's upset obviously -- and I have told her to be honest with the court and I don't know how she feels but she hasn't expressed any problems so far.
>
> THE COURT: For the record here this morning Miss Montgomery indicated by nodding her head "no" when I asked her if she had any questions or anything further that she wanted to discuss in this matter. Mr. Ninemire, do you have anything further from your conversation with Miss Montgomery you would like to offer by way of any concern she expressed to you I might address.
>
> MR. NINEMIRE: No, Your Honor, I believe we had a long time to discuss it and I think she just expressed a lot of upset and I didn't hear any other concerns. As Miss Hunt says we encouraged her if she had any concerns she should be honest with the court and tell you and it would not hurt our feelings.

(04/21/06 Hrg. Tr. 4.)

The court again told Montgomery that he made the decision to remove Ms. Clarke, but that he wanted to give her the opportunity to hear from him what his position was on the issue and to give her the opportunity to speak to him. He again gave her the opportunity to ask questions about the issue, but the record indicates no further communication from Montgomery. (04/21/06 Hrg. Tr. 5.)

Four days later, on April 25, 2006, the court conducted another hearing with Ms. Hunt and Mr. Owen. During this hearing, Ms. Hunt expressed concern about Montgomery's state of mind and her reaction to the removal of Ms. Clarke. (04/25/06 Hrg. Tr. 2-5.) The court responded that this issue had to be resolved as it was based on Ms. Clarke's status as the third attorney on the case:

> THE COURT: Maybe to some extent. Don't be too hard on yourself because from my perspective Ms. Clark was a third attorney who was only appointed in an effort to see if she could assist in getting a plea worked out and that was what the situation was from the very beginning. And if she was being obstructive toward the case being handled properly and there being good communication among all the attorneys and if she was presenting difficulty with the two of you who are the ones who are going to have to try the case, I don't really have any reservation about the judgment call that needs to be made in that kind of a circumstance. You can always look back in hindsight things should have gone differently and if you were going to do it over again you might do it this way. I wouldn't be too critical of what happened in that regard. We made the effort to discuss it with the defendant as soon as we possibly could. I can understand she's not a person that understood all of that.

(04/25/06 Hrg. Tr. 4-5.)

Ms. Hunt agreed with the court that Ms. Clarke had been brought on board for a plea,[92] but that she also provided assistance with mental health issues.

---

[92]In this regard, Ms. Hunt's statement to the court regarding Ms. Clarke's role in a plea negotiation somewhat contradicts Mr. Owen's affidavit: "At no point was it ever believed Ms. Clarke would only assist in obtaining a favorable plea agreement. Susan Hunt and I were well aware the United States Attorney's Office for the Western District of Missouri was seeking the death penalty and would never agree to a plea bargain for life imprisonment without parole regardless of any pretrial mitigation evidence we presented." (DCD 149-2 at 4.)



Appellate Case: 17-1716 Page: 185 Date Filed: 07/30/2018 Entry ID: 4687987

(04/25/06 Hrg. Tr. 5-6.) In addition, Ms. Hunt informed the court thatwith the loss of Ms. Clarke, the defense team would also lose a "mental health person" (presumably David Freedman), and a mitigation specialist (presumably Deb Garvey). In addition, the team would lose the other mitigation specialist they had hired (Holly Jackson). (04/25/06 Hrg. Tr. 6.)

Faced with this situation, Ms. Hunt proposed several alternatives, beginning with trying to put the original defense team back together. Alternatively, Ms. Hunt suggested that it would be necessary to hire another mitigation specialist because Ms. Jackson stated that she was not qualified to stay on the case. (04/25/06 Hrg. Tr. 7-9.)

The court stated that it would rather see if Ms. Jackson could be persuaded to remain with the case, rather than bringing back Ms. Clarke. While the court considered whether a return of Ms. Clarke would be "the right thing to do," Mr. Owen commented: "Judge, I will throw this out on that line. *My office will not work with Judy Clark ever again. We just are not going to take that abuse*." (04/25/06 Hrg. Tr. 10.) (Emphasis added.)

Ms. Hunt then suggested that the FPD for the Western District of Missouri could withdraw and the FPD for "that office" (presumably the San Diego FPD) be added. The court rejected that option. (04/25/06 Hrg. Tr. 10.) Ultimately, the parties decided that they would attempt to retain Ms. Jackson or obtain another mitigation

specialist. The parties discussed the need for a continuance based on the status of the case and the need to contact other individuals. The court stated:

> I can tell you all that I think, as you know, I was very hesitant to have Judy Clark involved in it from the first place. But that is just the way it goes and I can see why you all at that time thought that would be helpful. I don't have any reservation about the fact that she needed to be taken off the case because her involvement was obstructive in getting a defense for Miss Montgomery put together.
>
> Ms. Hunt: It was being put together but it was tense.
>
> The Court: Somebody has to be in charge and in this case it's you.

(04/25/06 Hrg. Tr. 13.)

On May 3, 2006, the court conducted another *ex parte* hearing with Susan Hunt, Dave Owen, and Ray Conrad to discuss the status of the case. The hearing began with Ms. Hunt noting that Montgomery had filed a letter with the court expressing concern about the removal of Ms. Clarke. (05/03/06 Hrg. Tr. 16-17.)[93] Ms. Hunt then summarized the prior status of the case:

> I think we came to you last week, I forget two weeks ago. Basically I think what we told you there was some big problems with functioning, right, wrong, I think the blame lies with everyone. I think the blame lies with me, the blame lies with the federal public defender, the blame lies with Judy. There were problems working together and that is why we came to you.

(05/03/06 Hrg. Tr. 17.)

[93] The pagination from the April 25, 2006, transcript continues into the May 3, 2006 transcript, even though there are two separate transcripts.

Ms. Hunt went on to explain that the removal of Ms. Clarke had affected Montgomery, and Ms. Hunt and Mr. Owen should have discussed the matter with Montgomery. Ms. Hunt then said that there were fundamental problems with the team "continuing on." (05/03/06 Hrg. Tr. 18.) The court then summarized the situation from his perspective:

> THE COURT: One thing about it, Lisa Montgomery doesn't get to pick who her attorneys are. She's entitled to have effective counsel and that is my responsibility to see to it that is accomplished. And it's also your responsibility as her counsel to see to it that takes place. So it's unfortunate Lisa Montgomery is upset and if she doesn't like what is going on, I have told Lisa Montgomery it was my decision and it was my decision alone. And, you know, I am very, very surprised by everything that has taken place in this case over the last couple of weeks. First the two of you come and say Judy Clark is a non-productive member of the team, causing problems, we need to have her removed from the defense. And based upon your explanation of the situation I did that.
>
> And then a few days later the two of you came back and you wanted to think about reconsidering that and maybe bringing Judy Clark back in. And then a few days later we have a situation where the two of you say that you are not able to work together and get along. And as I told David and remember when they came in and talked that, knowing both of you I find it hard to believe you would have some kind of an issue you couldn't sit down and talk about and get it resolved and get it behind you. And as I told you at one of our meetings over the course of the last couple of weeks I considered you the lead attorney in the case (talking to Susan). And certainly in any relationship I expect the attorneys to talk things through and work with each other and be receptive to each other's input and opinion on how things ought to be handled. But when it comes right down to if there is a difference of opinion where a decision has to be made then somebody has to be in a position to make that decision.

(05/03/06 Hrg. Tr. 19-20.)

The court then suggested that counsel work together to resolve their differences because he did not want to remove anyone from the case. Ms. Hunt responded that she and Mr. Owen had met with Dick Burr of the National Resource Counsel to secure someone who would be able work on Montgomery's mental health issues and Burr informed them that he was unable to find anyone. "He says basically there is nobody that can do this." (05/03/06 Hrg. Tr. 20-21.)

Ms. Hunt continued to say that if anyone left the defense team it should be her because the defense needed the resources of an FPD office, but the court noted that the FPD had indicated that their office should withdraw. (05/03/06 Hrg. Tr. 21-22.) Ms. Hunt then related an instance where Ms. Clarke contacted Mr. Burr to come back into the case, but Mr. Owen had cancelled the proposed meeting. In Ms. Hunt's view, this meant that she was not in a position to act as lead counsel. (05/03/06 Hrg. Tr. 22-23.) When asked by the court about this development, Mr. Owen replied:

> Speaking to that particular issue, Judy Clark being in the case, she can assume that is her decision or not her decision. I have overruled this by saying I can't work with this person. I don't know how you want to view it. Our office cannot work with that woman. It is impossible. She is just abusive beyond reasonability. We just can't work with her.[94]

---

[94]Consistent with his complaints to the court about Judy Clarke, Mr. Owen advised the Capital Resource Counsel on May 2, 2006, in a letter: "I was not and still am not willing to continue to be abused [by Judy Clarke] and will not tolerate any employee of the Federal Public Defender being abused the way Ron Ninemire was abused [by Judy Clarke]." (Mr. Owen Letter to Richard Burr at 3; Montgomery Exh. 7.)

(05/03/06 Hrg. Tr. 23.)

Mr. Owen then stated that he had no objection to bringing the former team back together, but that the FPD office could not work with her. Mr. Owen also noted that he could not transfer the budgetary responsibilities from the FPD to Ms. Hunt. (05/03/06 Hrg. Tr. 23-24.)

Mr. Owen related a communication from Mr. Burr that indicated that the Resource Counsel could not get additional resources on the case because of the FPD. Mr. Owen continued:

> It is my viewpoint that in the best interest of the client, best interest of proceeding in this case through to trial in a timely fashion that it would be best for our office to get off. That way Susan could continue because not only have we got the problem between Susan and me we have the mitigation specialist who, quite frankly, was hired by our office, is paid by our office but will not deal with our office. She wouldn't even return my calls.

(05/03/06 Hrg. Tr. 26.)

The parties then discussed which of them should remain on the case, with Ms. Hunt noting that the FPD should remain because FPD personnel had the most contacts with witnesses and that they had the resources, such as paralegal help and expert contracts, necessary to conduct the case. Ms. Hunt then related a prior instance where the court did not provide the budgetary support she believed was necessary (05/03/06 Hrg. Tr. 27-29.) The court stated:

> THE COURT: It would be extremely unusual if people didn't have differences and even serious differences and disagreements about how

> things ought to go. You just ought to be able to work through them. I know that I keep saying that and I guess that if you tell me, if you are both telling me that is not going to happen then I have got to decide what I am going to do. But that certainly would be what I would expect and anticipate from both of you. But I can't make it happen and if that is not possible or highly unlikely then I will decide what I am going to do. But really it seems to me like you ought to put these things aside and do your job of representing Lisa Montgomery. And I know you are both capable people and it's a hard case. It's a difficult case. All of these cases are. They take a long time. It's not something that is over in a short period of time and it's just an awful lot you have to deal with and that makes it a rough road.[95]

(05/03/06 Hrg. Tr. 30-31.)

Ms. Hunt subsequently moved to withdraw from the case and the court appointed John O'Connor as lead counsel and Fred Duchardt as learned counsel.

### *D.* ***The District Court Did Not Deny Montgomery Her Sixth Amendment Right to Counsel by Removing Judy Clarke, Who Was Admitted Pro Hac Vice, Based on the Admitted Dysfunction of the Trial Team and Who Was the Third Attorney Appointed to Represent Montgomery.***

Title 18, United States Code, Section 3005 governs the appointment of counsel in a capital case. This statute provides:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the

---

[95]Following this summation by the court, there was further discussion with Mr. Conrad objecting to statements that Ms. Hunt made in a letter regarding budgetary matters, concluding with Ms. Hunt again saying that the FPD should remain on the case. (5/03/06 Hrg. Tr. at 31-33.)



Appellate Case: 17-1716 Page: 191 Date Filed: 07/30/2018 Entry ID: 4687987

> Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. The defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

Virtually from the beginning of the case and at all times thereafter, Montgomery had the services of at least two attorneys, at least one of whom was learned counsel, and most of the time had the services of three attorneys. Thus, this issue is not one of adequate representation of Montgomery; rather it is an assertion by Montgomery that she is entitled to the representation she prefers.

Moreover, all the arguments regarding the removal of Ms. Clarke could have been raised at the time of trial[96] or on appeal and, therefore, have been waived by Montgomery.

Montgomery first argues that Ms. Clarke's removal from the defense team denied her right to counsel under the Sixth Amendment. (Montgomery COA 553-57.) In support of this argument, Montgomery directs this Court's attention to a decision of the Texas Court of Appeals, *Stearnes v. Clinton*, 780 S.W.2d 216, 221-22 (Tex.Ct.App. 1989). In *Stearnes*, the court issued a writ of mandamus when it determined that the trial court did not have justification in the removal of appointed

[96] Indeed, as noted by the court more fully below, no one, including Ms. Clarke, ever sought her readmission to the case or requested a hearing on the matter.

counsel. The court concluded that, once a valid appointment had been made, ". . . the trial court cannot arbitrarily remove him as attorney of record over the objections of the defendant and counsel." *Id.* at 225-26.

Montgomery also directs this Court's attention to *United States v. Gonzales-Lopez*, 548 U.S. 140, 126 S.Ct. 2557 (2014), for the proposition that removal by the court of retained counsel, or one willing to represent a defendant *pro bono*, violates the Sixth Amendment right to counsel.

However, Montgomery did not have a Sixth Amendment right to choose court-appointed counsel; rather, a district court retains full and unfettered discretion to appoint, remove, and reassign counsel in court-appointed cases. As the district court noted in his opinion, the *Gonzalez-Lopez* case itself states, "the right to counsel of choice does not extend to defendants who require counsel appointed to them." *Id.* at 151. *See also Hunter v. Delo*, 62 F.3d 271, 274 (8th Cir. 1995) (citing *United States v. Swinney*, 970 F.2d 494, 499 (8th Cir. 1992) ("Substitution of counsel is a matter committed to the sound discretion of the district court.")). The relevant statutory authority also recognizes the discretion of the court in this regard. *See* 18 U.S.C. § 3006A(c) ("The United States Magistrate Judge or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceeding.")

To the extent that *Stearnes* holds that a judge does not have the authority to substitute counsel, it is in conflict with relevant federal law. To the extent that *Stearnes* holds that a court may not substitute counsel without appropriate justification, it is distinguishable from the facts present in Montgomery's case. All of the parties, including Ms. Clarke, noted that the tensions within the defense team had increased so much that they were affecting the effective representation of Montgomery. Moreover, Mr. Owen made it clear on multiple occasions that the FPD would no longer work with Ms. Clarke.

Thus, the defense counsel presented the court with an untenable situation, nearly a year and a half after the start of the case, in which they could no longer work together. The court properly consulted and relied upon the Federal Public Defender's Office pursuant to 18 U.S.C. §§ 3005 and 3599, and correctly removed *pro hac vice* attorney Judy Clarke after she lost the support of her local office and sponsoring attorney because she was negatively affecting the progress of Montgomery's defense team as a whole. Moreover, although Montgomery relies on *Gonzalez-Lopez* in support of her claim that Ms. Clarke's removal deprived her of her Sixth Amendment right to counsel, *Gonzalez-Lopez* clearly states that the Sixth Amendment only guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant for free. *Id*. at 145. Unlike the *Gonzalez-Lopez* case, all of



Appellate Case: 17-1716 Page: 194 Date Filed: 07/30/2018 Entry ID: 4687987

the attorneys in Montgomery's case were court-appointed and paid by government funds.

Montgomery attempts to blur the lines by claiming that Judy Clarke, a government-funded, court-appointed attorney, was offering her services for "free," and therefore Montgomery had a Sixth Amendment right to her services. However, while Ms. Clarke was not going to bill Montgomery for her services, that does not mean that she was working for free. Ms. Clarke was an employee of the Federal Public Defender's Office in San Diego, California, and was paid for by the Administrative Office of the United States Courts with government funding. Pursuant to 18 U.S.C. § 3006A(g)(2)(A), attorneys employed by a Federal Public Defender are prohibited from working in separate legal work on their own in private practice. This was again confirmed by local Federal Public Defender Ray Conrad. (Montgomery Exh. 72 at 51-52.) As a FPD employee paid for by the Government, Ms. Clarke could not offer her services for "free," since she was a salaried employee under court appointment. Ms. Clarke's situation, therefore, was entirely different from a retained or *pro bono* attorney retained by the defendant in *Gonzalez-Lopez.*

Furthermore, unlike the defendant in *Gonzalez-Lopez*, Montgomery never made any efforts to either bring Ms. Clarke on board in the first place or have her return after she was removed. While defendants have a Sixth Amendment right to choose their own counsel if the counsel selected are not court appointed, all of



Appellate Case: 17-1716 Page: 195 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery's attorneys were appointed by the court. Thus, *Gonzalez-Lopez* is inapplicable in her case. Moreover, even if Montgomery had passionately sought the representation of Ms. Clarke after her removal because Ms. Clarke was both court appointed and *pro hac vice*, the court maintained complete discretion to choose Montgomery's representation.

Next, Montgomery faults the district court for failing to conduct a hearing prior to Ms. Clarke's removal. (Montgomery COA 557-60.) Montgomery argues that, if the court had conducted a hearing, it would have learned that the case was proceeding and would have learned that Mr. Owen was the underlying cause of all the problems because of his "need for control and his inability (or unwillingness) to work with women."[97] (Montgomery COA 557-58.)

However, it is beyond dispute that animosity in the defense team rendered it impossible to continue as constituted and, therefore, the parties required a decision by the court to continue Montgomery's representation. As the court explained in its ruling:

> Movant cites to no cases, nor is the court aware of any cases, where it has been deemed error for a trial court to remove an appointed attorney on that attorney's motion to withdraw, co-counsel's motion to remove,

---

[97]One of Mr. Owen's co-workers describes Mr. Owen as "misogynistic," "bully," and "very, very authoritative." (Montgomery COA 558.) Regardless of the truth of these assertions, the Government submits that many attorneys, both male and female, may have difficulties in continuing a working relationship with another attorney who calls them a "country bumpkin" or tells them to "shut up, you're too stupid."

> or a court's *sua sponte* removal before holding a hearing on the matter. Movant does cite non-controlling decisions that *sua sponte* removal must be based on "some principled reasons," [citations omitted], but those cases do not indicate that a hearing is required. The record clearly establishes that the court's decision was not arbitrary and was based on principled reasons to ensure a cohesive defense team for Movant.

(DCD 173 at 14.)

Moreover, the court noted that Ms. Clarke was not entitled to a hearing on the issue because she was not removed for disciplinary reasons and her status as *pro hac vice* status was not revoked. Rather, she was simply removed because of "a breakdown in communication between members of the defense team, a significant personality conflict between her and co-counsel, the FPD's recommendation to terminate Ms. Clarke's appointment, and the preference for local counsel." (DCD173 at 14.)

Montgomery also contends (Montgomery COA 560-64) that a detailed inquiry is required in a capital case because of the requirements of 18 U.S.C. § 3599(e), which provides:

> **(e)** Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

In ruling on this portion of the motion, the district court noted:

> This Court does not believe § 3599(e) precluded it from terminating Ms. Clarke's appointment to the case. The court had principled reasons for its decision and did not arbitrarily enter the order terminating the appointment. No one denies that Movant's defense team was dysfunctional following Ms. Clarke's appointment. After Ms. Hunt's appointment as learned counsel in January 2005, Movant was at all times represented by a minimum of two attorneys, at least one of whom had knowledge and experience in death penalty cases, fulfilling the requirements of § 3005. Ms. Clarke's appointment was not necessary to comply with statutory obligations, but rather, she was appointed to aid in Movant's defense in the interests of justice. When it became clear that Ms. Clarke's appointment was no longer in the interests of justice due to the breakdown in communication between her and other defense team members, her appointment was terminated. *Cf. Martel*, 132 S. Ct. at 1286-87 (adopting the "interests of justice" standard to § 3599 motions to substitute counsel filed by capital defendants).

(DCD 173 at 11-12.)

The court compared the situation in Montgomery's case to the facts in *United States v. Orleans-Lindsay*, 572 F.Supp.2d 144 (D.D.C. 2008). In that case, like here, the defendant complained that the court had removed the attorney with whom he was most familiar, which "resulted in a deterioration of his ability to communicate with his lead counsel." *Id.* at 174. The court rebutted the defendant's claim noting: "Upon appointing two death penalty qualified attorneys to represent Plaintiff, the court determined that Mr. Ponds' services were no longer necessary, particularly in light of the Judicial Conference's recommendation that only two counsel be appointed to represent death penalty defendants absent exceptional circumstances." *Id.* After reviewing defendant's plea colloquy, where defendant stated that he had



Appellate Case: 17-1716 Page: 198 Date Filed: 07/30/2018 Entry ID: 4687987

been satisfied with the representation he received, the court concluded: ". . . Petitioner's complaints fail to establish that the court somehow erred by fulfilling its statutory obligations to ensure the quality of Petitioner's representation and respecting the Judicial Conference's recommendation of two attorneys for defendants facing the death penalty." *Id.*

Montgomery argues that pursuant to 18 U.S.C. § 3599(e), Ms. Clarke could only be removed on her motion or upon Montgomery's motion and, therefore, the court's *sua sponte* removal was improper. (Montgomery COA 560-61.) However, Montgomery ignores the fact that Ms. Clarke could not even participate in the case absent Mr. Owen's support. 18 U.S.C. § 3599(b) provides:

> **(b)** If the appointment is made before judgment, at least one attorney so appointed must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years' experience in the actual trial of felony prosecutions in that court.

Since Ms. Clarke had not been admitted to practice in the Western District of Missouri "for not less than five years," she could not independently be appointed to represent Montgomery. Ms. Clarke, therefore necessarily required an association with an attorney who was qualified to represent Montgomery under § 3599(b). In this case, that attorney was David Owen, who sponsored Ms. Clarke to make her appearance *pro hac vice*.

In 2006, Rule 83.5(l) of the Local Rules of the United States Courts for the Western District of Missouri, set forth, in pertinent part, the following conditions for a visiting attorney to appear in a particular case:

> Any attorney residing outside of this district and admitted to practice before and then in good standing in the United States District Court in the district of residence, may, upon written motion, be permitted by this Court to appear and participate as an attorney in the trial of any action or the hearing of any motion, petition or other proceeding then pending before this Court, but only if the attorney associates with an active Missouri resident member in good standing of this Bar who shall participate in the preparation and trial of the case or the presentation of the matter involved and on whom service of all papers may be made.

Thus, in order to be admitted to the case *pro hac vice*, Ms. Clarke had to "[a]ssociate with an active Missouri resident member in good standing of this Bar." Since Mr. Owen no longer wished to associate with Ms. Clarke, she was no longer qualified to continue representation under § 3599(b).

Montgomery contends that there had been no motion made to remove Ms. Clarke. (Montgomery COA 562.) Again, Montgomery is ignoring that Mr. Owen had clearly stated his position to the court that his office would no longer associate with Ms. Clarke, which made her removal necessary. (04/25/06 Hrg. Tr. 10.)

Next, Montgomery argues that Ms. Clarke's removal from the case caused a delay in the trial. (Montgomery COA 562.) Actually, neither Mr. Owen nor Ms. Hunt seemed to be particularly worried about the removal of Ms. Clarke



Appellate Case: 17-1716 Page: 200 Date Filed: 07/30/2018 Entry ID: 4687987

delaying the trial. Instead, they were much more concerned that their mitigation specialist, Ms. Jackson, would be leaving along with Ms. Clarke. (04/25/06 Hrg. Tr. 6-7, 9-10.)[98]

Next, Montgomery argues that § 3599 requires that Ms. Clarke be replaced by similarly-qualified counsel. (Montgomery COA 563.) Montgomery insists that this did not happen, although she presents no evidence to support this assertion. In that regard, it is important to note that Ms. Clarke was neither lead counsel nor learned counsel in this case. Accordingly, her replacement was simply as a third attorney to the case, which ultimately occurred with the appointment of Fred Duchardt. Clearly, Mr. Duchardt has death penalty experience similar to Ms. Clarke.

Next, Montgomery contends that the district court had the opportunity to reconsider and bring Ms. Clarke back into the case. (Montgomery COA 564.) However, as the court noted in its opinion, ". . . Ms. Clarke did not engage in *any* effort to remain on the case. Ms. Clarke never filed a motion or requested a hearing

---

[98] As Ms. Hunt explained:

> MS. HUNT: Now you don't know this, this is our third mitigation person. We look like a bunch of idiots to these witnesses. We went, through nobody's fault, but she wasn't really doing a good job. That was early on. Holly is this woman's name, Holly Jackson, and she has established relationships with a lot of core people involved that need to be established in this case and frankly I think that is a huge problem. Now we have to start over. It's unintended consequences, it really is.

(4/25/06 Hrg. Tr. at 9-10.)

on the matter. Nor did Ms. Hunt or any other attorney associated with the case." (DCD 174 at 13-14.) The court noted that had Ms. Clarke wished to challenge her termination from the case, she had the ability to do so: "Courts have routinely recognized that an attorney who has been unwillingly removed from a case has a personal stake in that decision and has standing to appeal that decision on her own behalf." (DCD 173 at 15.) Thus, the record is absent that Ms. Clarke at all contested her removal from the case, nor did anyone formally seek her re-admittance.

*1. The district court's asserted error is not structural.*

Again, Montgomery attempts to use *Gonzalez-Lopez*, a case involving retained counsel, to support her proposition that the removal of appointed counsel, Ms. Clarke, from the case was a structural error for which no prejudice must be shown. (Montgomery COA 564-65.) Once again, Montgomery is incorrect. As noted above, the court in *Gonzalez-Lopez* stated that ". . . the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151. Thus, the structural error discussed in *Gonzalez-Lopez* involved the removal of retained counsel of defendant's choice in violation of the Sixth Amendment. No such violation occurred in this case because Montgomery had no retained counsel.

Furthermore, Montgomery was always adequately represented by counsel. As the district court found:

> The flaw in Movant's argument that Ms. Clarke's termination resulted in a structural error is that, at all times following Ms. Hunt's appointment, Movant was represented by at least two attorneys in accordance with the requirements listed in §§ 3005 and 3599. She was never actually denied counsel, let alone at a critical stage. She may have been denied Ms. Clarke's representation, but as stated above, indigent defendants are not entitled to counsel of their choice. *Gonzalez-Lopez*, 548 U.S. at 151. Thus, the termination of Ms. Clarke's appointment, by itself, cannot result in structural error requiring an automatic finding of prejudice even if the court did not have authority to remove her. Rather, Movant must establish that other appointed attorneys were ineffective either under the *Strickland* harmless error standard or because of some other structural error. *See People v. Noriega*, 229 P.3d 1, 5 (Cal. 2010).

(DCD 173 at 16-17.)

2. *Montgomery cannot show actual prejudice in the removal of Ms. Clarke.*

Next, Montgomery argues that she can show actual prejudice in the removal of Ms. Clarke through arguments made later in her application for a COA. However, as will be shown below, Montgomery received effective assistance of counsel and Ms. Clarke's removal did not affect her case.

Moreover, although Montgomery claims that there are all manner of beneficial effects that would have flowed from Ms. Clarke's retention, there is little evidence to support that assertion. (Montgomery COA 566-69.) Indeed, as Mr. Duchardt explained in his statement (DCD 129), there is little evidence that Ms. Clarke had accomplished much in the time that she worked on the case:

> It is also claimed that, at the time that she was removed, Judy Clarke was in full swing fulfilling the role of preparing a mental health defense for the case in that she "had sent out two expert contracts" to,



Appellate Case: 17-1716 Page: 203 Date Filed: 07/30/2018 Entry ID: 4687987

a neuropsychologist, Dean Delis, Ph.D., and a psychiatrist, Judith Herman, M.D. (Doc. 71, p. 26, fn. 3). It is purported by current Counsel for Mrs. Montgomery that these representations about expert preparation are supported by the say-sos by Judy Clarke and me (Doc. 71, p. 26, fn. 3). Actually, my contrary recollections are correctly accounted in the affidavit of the investigator for Current Counsel for Mrs. Montgomery, that until I read Judy's 2013 affidavit, all information which I had received indicated was that in the six months Judy was on the case, there were no experts who had been identified, much less enlisted, by Judy (Ex. 19, p. 2). To be more specific, no one ever mentioned the names of Dean Delis or Judith Hermann to me. Even in her 2013 affidavit, Judy never mentions anything about "contracts", instead indicating that she had "contact" with Delis and Hermann (Ex. 3, p. 10).[99]

* * * *

There are a couple of other critical facts from the record which are not brought out by Current Counsel for Mrs. Montgomery. For instance, even though Judy Clarke was part of the defense team for more than six months, from October of 2005 to April of 2006, she did not file one motion in the case, and did not leave behind any work

[99]Mr. Duchardt states that he found documentation about Delis and Hermann in 2014:

> I have once again searched the data base for the Montgomery case, and I have once again found no reference of any kind to either of Hermann or Delis. I have also asked that Laine Cardarella, current Federal Public Defender for the Western District of Missouri, search all of that office's financial records, which were not included in the database, in an effort to find any reference to a "contract" or anything else of a financial nature for Dean Delis or Judith Herman. On August 29, 2014, I was informed, for the first time, that a search of the Federal Public Defender Office's separate financial records for 2006 show that, in April of 2006, monies were allotted for Dean Delis and for Judith Herman. The records also show that no money was spent on Delis and only about $400 was spent on Hermann.

(DCD 129 at 10-11.)



Appellate Case: 17-1716 Page: 204 Date Filed: 07/30/2018 Entry ID: 4687987

> product related to preparation of any motion. Moreover, though the members of Judy's defense team are described in glowing terms in the Petition, there is no sign in the database of any work produced by them in the six months that they and Judy were on the job.

(DCD 129 at 8-9, 13.)

Montgomery's argument that the removal of Ms. Clarke prejudiced her is based on speculation and is not supported by the record.

### *E. David Owen and Ray Conrad Did Not Render Ineffective Assistance of Counsel by Engaging in Conduct Leading to the District Court's Decision to Remove Ms. Clarke From the Defense Team Without Notice to Ms. Clarke or Montgomery and Purportedly Contrary to the Wishes of Ms. Clarke And Montgomery, Allegedly Resulting in a Violation of Montgomery's Rights to Counsel, Due Process, and a Fair Trial As Protected by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and 18 U.S.C. § 3599.*

*Summary of Argument*

Montgomery argues that Mr. Owen and Mr. Conrad's decision to alert the district court to the deterioration and implosion of the defense team was professionally unreasonable as was the decision to proceed without first consulting the client. Montgomery contends that Mr. Owen and Mr. Conrad "place[d] personal ego and professional reputation over the needs of the client." (Montgomery COA 570-74.)

As repeatedly occurs in her application for a COA, Montgomery seeks to insert some sort of insidious reason for the removal of Judy Clarke from the defense team. However, there is simply no basis for this assertion. Instead, as stated on



Appellate Case: 17-1716 Page: 205 Date Filed: 07/30/2018 Entry ID: 4687987

numerous occasions, the court removed Ms. Clarke because the defense team could no longer function with her presence. The reason for her removal is as simple as that fact.

*Argument*

The Government notes that Montgomery presents no decisional law in this section and very little in the way of evidence. Rather, Montgomery apparently bases this argument on speculation that Mr. Owen and Mr. Conrad *must* have said something with respect to the removal of Ms. Clarke that disparaged her. Montgomery contends: "Juxtaposing the district court's statements that it believed lawyers with personality problems should work it out with its statements that Ms. Clarke was obstructive and non-productive, it is reasonable to infer that Mr. Owen and Mr. Conrad said more to the court than that they were simply having personality problems with Ms. Clarke and that she had used some swear words." (Montgomery COA 571.) Montgomery concludes: "So, if, Mr. Conrad and Mr. Owen said things that caused the district court to believe that Ms. Clarke was obstructive and non-productive, they misled the court as to the nature of the team dynamics." (Montgomery COA 573.)

This argument appears to be a variation of Montgomery's claim in the district court that Mr. Owen and Mr. Conrad perpetrated a "fraud on the court." The district court ruled on Montgomery's argument by noting that such an allegation exacts a

demanding standard that "must be supported by clear, unequivocal, and convincing evidence." *Nichols v. Klein Tools*, 949 F.2d 1047, 1048 (8th Cir. 1991). The court found that there was no evidence to support this assertion:

> Movant has no evidence that Mr. Owen and/or Mr. Conrad perpetrated a fraud on the court. That memories have faded and some conversations went unreported is not clear, unequivocal, and convincing evidence of fraud. Movant merely speculates that there *must* have been some false information provided to the court for it to terminate Ms. Clarke's appointment to the case. The court's reasons for terminating Ms. Clarke's appointment have been thoroughly discussed above as well as during the hearing on Movant's Motion to Reassign the case and in resulting Orders. (Civ. Case, Docs. ## 53, 59, 65). The affidavits submitted, along with statements made by the undersigned and Judge Maughmer, establish that a disruptive conflict between appointed counsel existed, which was or was going to negatively impact Movant's defense. As Ms. Hunt put it, the defense team comprised of herself, Mr. Owen, and Ms. Clarke was "doomed to fail." Movant has no clear, unequivocal, and convincing evidence that Mr. Owen or Mr. Conrad misrepresented the nature of that conflict, let alone knowingly lied, to the court.

(DCD 173 at 18.)

In this variation of the argument, Montgomery no longer argues that Mr. Owen and Mr. Conrad committed fraud on the court, but instead argue that they provided ineffective assistance of counsel in seeking Ms. Clarke's removal. Moreover, Montgomery alleges that Mr. Owen had a conflict of interest because, since Ms. Clarke had been abusive to him, he was seeking the removal of Ms. Clarke who, it is asserted, was "the only qualified lawyer" in the case. (Montgomery COA 574.)



Appellate Case: 17-1716 Page: 207 Date Filed: 07/30/2018 Entry ID: 4687987

Thus, Montgomery presents a tautological argument that only Ms. Clarke could provide effective representation and therefore, seeking her removal is proof of ineffectiveness. Under this theory, Montgomery need not show actual ineffectiveness or prejudice but need only show that the court removed Ms. Clarke (who made no effort to remain in the case) without consulting Montgomery (who made no objection when provided the opportunity by the court).

The Government suggests that there are no facts or authority supporting Montgomery's position and no COA should issue.

### *F.* ***Montgomery Was Not Deprived of Counsel at a Critical Stage in the Proceedings When Mr. Owen and Mr. Conrad Met With the District Court Regarding the Problems Involved in the Defense Team Which Resulted in the Removal of Ms. Clarke as Counsel for Montgomery Purportedly in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.***

*Summary of Argument*

Montgomery next argues that the meeting that resulted in the removal of Ms. Clarke from the case was a critical stage in the proceedings at which she had a right to counsel. Montgomery contends that she had no counsel at the proceeding because Mr. Owen and Mr. Conrad, her duly appointed counsel, were not acting in her best interest. (Montgomery COA 574-76.)

In ruling on this issue, the court noted that, as stated above, Montgomery was never without counsel: "She was never actually denied counsel, let alone at a critical stage. She may have been denied Ms. Clarke's representation, but as stated above,



Appellate Case: 17-1716 Page: 208 Date Filed: 07/30/2018 Entry ID: 4687987

indigent defendants are not entitled to counsel of their choice. *Gonzalez-Lopez*, 548 U.S. at 151." (DCD 173 at 16.) Montgomery's argument that she was denied counsel, even as counsel represented her, is untenable. Montgomery presents a novel theory that she was denied counsel because her counsel, Mr. Owen and Mr. Conrad, were not acting in her best interest. Montgomery presents no authority to support this proposition, moreover, since even Ms. Clarke admitted that the defense team was no longer effective, Mr. Owen and Mr. Conrad were acting in Montgomery's best interest in trying to resolve the situation.

*Argument*

The Sixth Amendment, of course, guarantees criminal defendants the right to effective assistance of counsel. *Sweeney v. United States*, 766 F.3d 857, 859 (8th Cir. 2014) (citing U.S. Const. Amend. VI). "Normally, in order to succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was 'deficient' and that the 'deficient performance prejudiced the defense.'" *Walking Eagle v. United States*, 742 F.3d 1079, 1082 (8th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). However, prejudice may be presumed when a defendant experiences a "complete denial of counsel" at a critical stage of his trial. *United States v. Cronic*, 466 U.S. 648, 659 (1984).

Relying on *Cronic*, Montgomery asserts that Mr. Owen and Mr. Conrad were suffering from a "conflict of interest" when they sought Ms. Clarke's removal from

the defense team, and that her removal constituted "structural error" that requires no showing of prejudice. But neither *Cronic*, nor any of the other cases they cite in support of their argument, support such a claim.

While it is clear that Mr. Owen had a "conflict" with Ms. Clarke that prevented them from functioning as an effective defense team, he had no "conflict of interest" that would have required his disqualification. Moreover, removing Ms. Clarke from the defense team obviously did not result in a complete denial of counsel for Montgomery at a critical stage of the proceedings.

*Cronic* involved a case where a young, inexperienced lawyer, with limited experience in criminal matters, was given only 25 days to prepare for a trial which was both serious and complex, and which involved witnesses who were difficult to contact. Nevertheless, the court held that ineffectiveness would not be presumed, and that the defendant still was required to show prejudice. *Cronic*, 466 U.S. at 666-67.

Likewise, none of the other cases cited by Montgomery in her application, *Cuyler v. Sullivan*, 446 U.S. 335, 337 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978), or *Mickens v. Taylor*, 535 U.S. 162 (2002), support her claim that Mr. Owen and Mr. Conrad were operating under an actual conflict of interest when they sought Ms. Clarke's removal from the case. *Cuyler* and *Holloway* involved defense attorneys who were representing three joint defendants with potentially conflicting



Appellate Case: 17-1716 Page: 210 Date Filed: 07/30/2018 Entry ID: 4687987

interests. *Cuyler*, 446 U.S. at 337; *Holloway*, 435 U.S. at 478-80, 488, 490. In *Mickens*, one of Mickens's attorneys arguably had a conflict of interest because he had been representing the alleged victim on an unrelated matter at the time that the murder occurred. *Mickens*, 535 U.S. at 164-65.

None of these cases, then, involved a situation involving multiple court-appointed attorneys where the court removed one of those attorneys at the request of another because of conflicts between those attorneys. Although the personal interest of an attorney can, in some cases, create a conflict between counsel and his client, it is incumbent upon the client to show that the interests of the attorney actually conflicted with the interests of the client, and that some sort of deficient performance by the attorney was attributable to the purported conflict. *United States v. Hearst*, 638 F.2d 1190, 1193-94 (9th Cir. 1980) (attorney's book deal about client's case not shown to impact decisions made at client's trial); *Garcia v. Brunnell*, 33 F.3d 1193, 1198-99 (9th Cir. 1994) (attorney's anticipated move to prosecutor's office not shown to impact decisions made at client's trial); *United States v. Michaud*, 925 F.2d 37, 41-42 (1st Cir. 1991) (attorney teaching course to IRS agents not shown to conflict with duties to tax fraud client); *United States v. Sayan*, 968 F.2d 55, 64-65 (D.C. Cir. 1992) (claim that trial attorney failed to seek continuance only to curry favor with trial judge attorney not supported by the record).

Obviously, Montgomery cannot make such a showing in this case. At best, she merely can establish that there existed a clash in personalities between members of her defense team. The court resolved this conflict by removing Ms. Clarke from the defense team at the request of the Federal Public Defender's Office – the same office that originally sought her participation in the case. Thus, despite what Montgomery argues in her application, the court's decision to remove Ms. Clarke from the case was not a result of fraud, deception, or a "conflict of interest" on the part of the Federal Public Defender's office. Rather, the court based its decision upon clear and convincing evidence that Ms. Clarke's presence was corrosive and disruptive to the smooth and effective functioning of her defense.

## *G. Claims A – C Are Subject to Procedural Bar.*

*Summary of Argument*

Next, Montgomery argues that there is no procedural bar to raising the issue of Clarke's removal at this time, contending that the district court did not rely on procedural bar in his ruling and only addressed the merits of the arguments. (Montgomery COA 577-83.)

However, none of the claims raised by Montgomery regarding the removal of Ms. Clarke were objected to at the time, nor were they the subject of direct appeal, nor does she allege in her application for a COA that her counsel were

constitutionally ineffective for failing to do so. Accordingly, Montgomery has procedurally defaulted these claims.

*Argument*

In ruling on Montgomery's claims regarding the removal of Clarke, the district court noted:

> Again, Ms. Clarke did not personally challenge the court's decision to terminate her appointment. Ms. Clarke did not file a request for reconsideration or a hearing. Nor did she seek a writ of mandamus or appeal the decision. Courts have routinely recognized that an attorney who has been unwillingly removed from a case has a personal stake in that decision and has standing to appeal that decision on her own behalf. *See Kirkland v. Nat'l Mortgage Network*, *Inc.*, 884 F.2d 1367, 1370 (11th Cir. 1989) (dismissal of underlying action did not moot attorney's disqualification because the "grounds of dishonesty and bad faith could well hang over his name and career for years to come"). To the extent Movant argues on Ms. Clarke's behalf, such argument has been waived.

(DCD 173 at 15.)

In short, Ms. Clarke never moved to be re-admitted to the case and neither did anyone else.[100] In fact, despite all the current protestations by Montgomery, the record is bereft of any request by her that Ms. Clarke be re-admitted to represent her. At the hearing immediately after Ms. Clarke's removal, Montgomery, although

[100]"Ms. Clarke never filed a motion to reconsider or requested a hearing on the matter, nor did Ms. Hunt or any other attorney associated with the case. By all appearances, Ms. Clarke consented to the termination of her appointment and acknowledged that it was appropriate. (DCD 174 at 13-14.)

given the opportunity on several occasions, did not object to Ms. Clarke's removal. (04/21/06 Hrg. Tr. 2-3, 5.)

Moreover, in her letter filed with the court on May 3, 2016, approximately two weeks after Ms. Clarke's removal, Montgomery does not request that Ms. Clarke be re-instated. Instead, she writes that she has trouble with self-expression so it was suggested (she does not say by whom) that she write a letter. She further states that because of her history with lawyers in family court, she has difficulty trusting attorneys and asserts that this is also true in her current case. (Montgomery Exh. 71 at 1.) She states that she initially had trouble trusting Ms. Clarke, but grew to trust her. She writes that when Ms. Clarke did not meet her on April 20, 2005, she felt that she was not receiving complete information and wondered if she had done something wrong. (Montgomery Exh. 71 at 2.) She then relates how Ms. Clarke's removal made her feel and affected her behavior and concludes by praising Ms. Hunt. (Montgomery Exh. 71 at 3.) However, at no point does she request that the court re-appoint Ms. Clarke to represent her. The simple fact is that no one made a motion that Ms. Clarke return to represent Montgomery.[101]

[101]The court stated in its order: "Movant claims that Ms. Hunt orally moved for Ms. Clarke's reinstatement during the conferences in chambers. (2255 Mtn., pp. 39-47). It appears Movant is trying to recreate the record. The actual record reveals that Ms. Hunt presented Ms. Clarke's reinstatement as an option but made no formal motion, orally or in writing, to reinstate her." (DCD 174 at n.6.)



Appellate Case: 17-1716 Page: 214 Date Filed: 07/30/2018 Entry ID: 4687987

Accordingly, since no motion was made at the time and this matter was not brought up on direct appeal, Montgomery has forfeited this argument.

There is no basis, either on the merits or procedurally, for a COA to issue regarding the removal of Judy Clarke from the pretrial defense team.

### *H.* ***The District Court Did Not Deny Montgomery Due Process and a Fair Hearing On Claims Relating to the Removal of Judy Clarke as Counsel in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 2255, and Rules 6 and 8 of the Rules on Motions Attacking Sentence Under § 2255 When the Court Denied Montgomery's Motion to Re-Assign the Case.***

#### *1. The issue of recusal of the district court*

*Summary of Argument*

Montgomery seeks a COA contending that the district court should have recused itself under the provisions of 28 U.S.C. § 455(b)(1) and (b)(5(iv) on the basis that the judge was likely to be a material witness in the proceeding and that he "has personal knowledge of disputed evidentiary facts concerning the proceeding." (Montgomery COA 581.) Montgomery also contends that her motion to recuse the district court from the case "drew ire from the district court and infected his view of the entire case in a prejudicial manner." (Montgomery COA 587.) Thereafter, Montgomery lists a series of actions purportedly to show the bias of the district court. (Montgomery COA 587-91.)

However, there were no facts in dispute, since it is clear from the record that the reason the court removed Ms. Clarke from the case was because she had been

abusive to her co-counsel resulting in a deterioration of their relationship to the extent that it was affecting the representation of Montgomery. As repeatedly stated, and disputed by no one, because of Ms. Clarke's conduct, the FPD refused to work any further with Ms. Clarke and, therefore, the district court had to remove one of the them from the case.[102] There is no evidence to support any other interpretation regarding why the district court removed Ms. Clarke from the pretrial defense team (indeed, the district court judge repeatedly made clear why he removed Ms. Clarke). Accordingly, the district court would be no more a witness in this case than in any other case where a court took judicial action in a case. Likewise, the district court had no more personal knowledge of the proceeding than any other judge would have in a judicial proceeding.

With respect to the actions taken by the court which Montgomery contends shows bias, clearly the court was simply acting within its discretion in facilitating the resolution of the case and controlling the costs of litigation. Montgomery cites no decisional law that prohibits the actions taken by the district court in this proceeding.

[102]It is, in fact, difficult to imagine a scenario more likely to result in ineffective assistance of counsel than a defense team that will not work together.

2. *Procedural history and proceedings regarding motion to reassign.*

On March 21, 2013, Montgomery filed a "Motion to Reassign Case Pursuant to 28 U.S.C. § 455(b)(5)(iv)." (DCD 41.) In her motion, Montgomery requested an order for disqualification and recusal pursuant to 28 U.S.C. § 455(b)(1), arguing that the district court had personal knowledge of disputed facts, and § 455(b)(5)(iv), arguing that the district court was a material witness in the case. Both of these arguments specifically involved the removal of Judy Clarke from Montgomery's pretrial defense team.

On April 9, 2013, the Government filed a response to Montgomery's motion to disqualify Judge Fenner. (DCD 45.) Montgomery filed her reply on April 23, 2013. (DCD 46.)

On May 6, 2013, the court conducted a hearing regarding the motion to reassign. (DCD 51, 53.) At the beginning of the hearing, the court clarified two issues that Montgomery raised in the motion to reassign:

> There are a couple of matters that are raised in the motion to reassign the case that I would like to comment on and I think deserves some clarification.
>
> There was a comment that I made about Ms. Clarke being nonproductive, and I think that comment is misunderstood or taken out of context in the scope of the entire matter, and those choice of words were my words. They were not the words of Mr. Owen or Mr. Conrad, and what I meant when I said that, was that the defense team was not able to be productive because of the conflict that existed between counsel, and I think that's rather obvious in the record.



Appellate Case: 17-1716 Page: 217 Date Filed: 07/30/2018 Entry ID: 4687987

> Further my comment that Ms. Clarke was only appointed in an effort to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team; however, no one conveyed to me Ms. Clarke should only be involved to assist with the plea, and her appointment in the case was not limited and no one at any time suggested to me that it should be.

(DCD 53 at 3.)

Thereafter, the court engaged in dialogue with habeas counsel, Lisa Nouri, about the motion to reassign the case. Ms. Nouri insisted that habeas counsel needed to develop further the reason why the court had terminated Judy Clarke's representation, suggesting that something other than the reasons stated on the record must account for Ms. Clarke's removal:

> Ms. Nouri: Now, if you're talking specifically about fraud on the court resolving the Judy Clarke issue, it makes me wonder what could have been said to get a district judge to remove such a prominent, high profile, effective capital defense attorney.
>
> THE COURT: Don't you think it's pretty obvious under the record that that defense team could not work together, they were not functioning, and they could not adequately represent Ms. Montgomery in the case on the basis of the record that's before you?

(DCD 53 at 6.)

Again, Nouri insisted that she did not know what information was conveyed to the court that "push[ed] you to remove Judy Clarke from the case. I don't know." (DCD 53 at 6.) Again, the court replied:

> Nobody pushed me to do anything. I had a case management decision to make. I was told that the team that had been composed was not able to work together. I was told that the public defender's office could not and would not work with Judy Clarke, and so I had to make a decision. Ms. Hunt had reservations about the entire process as well.

(DCD 53 at 7.)

As the hearing progressed, the court attempted to discern what information Montgomery believed he possessed that would make him a material witness. Although Ms. Nouri recounted, as Montgomery does in her application for a COA, a number of discussions that were not recorded, she did not articulate any information that was not otherwise on the record regarding the removal of Ms. Clarke. The district court judge, however, made clear repeatedly why he removed Ms. Clarke from the defense team:

> THE COURT: Ms. Nouri, it wasn't my purpose to try to judge right or wrong or who was at fault and who could possibly behave better than they did. It was my purpose to deal with the dysfunction that existed and resolve that so that Ms. Montgomery could be adequately represented in the case and it could be moved forward.

(DCD 53 at 11.)

> THE COURT: Well, Ms. Nouri, they were not functioning as a team. They were at odds with each other. It seemed pretty apparent that the public defender's office here was deeply offended by Ms. Clarke. Now, whether that was Ms. Clarke's fault or Mr. Owen's fault or Mr. Conrad's fault or Ms. Hunt's fault, I did not launch a full-scale investigation to make that determination.[103] I accepted the situation for what it was. It wasn't good.

[103] The court's statement in this regard mirrors the statement of Ms. Hunt to the court at the hearing on May 3, 2006, regarding the removal of Ms. Clarke:



Appellate Case: 17-1716 Page: 219 Date Filed: 07/30/2018 Entry ID: 4687987

> It wasn't what it should have been but it had to be resolved and that was what was done.

(DCD 53 at 13.)

The court and habeas counsel then discussed the need to interview Ray Conrad and the court concluded that this request was "something I will have to give consideration to." (DCD 53 at 22.)[104]

On June 6, 2013, Montgomery filed "Supplemental Suggestions in Support of Her Motion to Reassign Case." (DCD 54.) In this pleading, Montgomery argued that, in addition to her prior grounds to reassign the case, that there was "the appearance of impropriety inherent in Judge Fenner's consideration of information that he acquired through off-the record proceedings." (DCD 54 at 1.) Montgomery claimed that the appearance of impropriety arose from "ex parte, off the record discussions" that were "calculated, material and wholly unnecessary." (DCD 54 at 11.)

---

> Basically I think what we told you there was some big problems with functioning, right, wrong, I think the blame lies with everyone. I think the blame lies with me, the blame lies with the federal public defender, the blame lies with Judy. There were problems working together and that is why we came to you.

(5/03/06 Hrg. Tr. 17.)

[104]The court authorized habeas counsel to depose Mr. Conrad on the same day. (DCD 52.)



Appellate Case: 17-1716 Page: 220 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery also claimed that the court's statement that Ms. Clarke's removal was a "case management decision" showed evidence of pre-judgement. Montgomery also argued that the court's statement that he did not see any basis to accuse Mr. Conrad and Mr. Owen of unethical behavior (in conjunction with Montgomery's assertion that they had committed fraud on the court) showed evidence of pre-determination. (DCD 54 at 12.)

On June 25, 2013, the court entered an order denying Montgomery's motion to reassign. In that order, the court rejected Montgomery's allegations that his comments reflected prejudice on his part:

> After considering all the facts, the court determines a reasonable person could not conclude my impartiality might reasonably be questioned. First, the Record demonstrates Movant's original defense team had come to an impasse. Evidence introduced by both Movant and the Government establish that Owen, Hunt, and Clarke would not continue working together, which was recognized by Conrad. My comments concerning the productivity of the defense team, taken in that context, indicate no bias or prejudice. Second, my use of the phrase "case management decision" does not indicate any bias or prejudice. The decision to remove Clarke was a case management decision, regardless of my justifications. Accordingly, whether the representations made to me by Hunt, Owen, Conrad, or anyone else were true, my decision to remove Clarke was a case management decision and any comments to that effect do not demonstrate bias or prejudice. Third, it is common for a judge to comment on or question the basis for a party's legal theories, including the comments I made concerning Movant's claim of fraud on the court. But, exploration of a party's legal theory does not indicate prejudice on behalf of the judge. Accordingly, for these reasons, disqualification under § 455(a) is not warranted.

(DCD 59 at 4.)

The court also rejected Montgomery's claim that he had personal knowledge of the case, noting that all information he had obtained regarding the case in his judicial capacity and that information obtained in a judicial capacity cannot be the basis for disqualification. (DCD 59 at 5-6.) In addition, the court noted that he did not have personal knowledge of disputed evidentiary facts because there was no dispute that the court removed Ms. Clarke from the pretrial defense team because of the inability of the defense team to work together. (DCD 59 at 6-7.)

Finally, the court rejected Montgomery's argument that he was a material witness because the substance of the *ex parte* discussions was not in dispute. In addition, he had already described his recollection of events in the May 6, 2013, hearing in an extended colloquy with habeas counsel who were allowed to question the court about his recollection. The court also noted that he had provided habeas counsel the opportunity to question both Ray Conrad and Magistrate Judge Maughmer. (DCD 59 at 7.)

On July 22, 2014, Montgomery sought a writ of mandamus with this Court in Case No. 14-2725. The district court filed its response on July 25, 2014. On August 13, 2014, this Court denied Montgomery's petition for a writ of mandamus.

*Argument*

Montgomery contends that the district court should have recused itself under the provisions of 28 U.S.C. § 455(b)(1) and (b)(5)(iv), which provide, in pertinent part:

> **(b)** He (a Judge) shall also disqualify himself in the following circumstances:
>
> **(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> * * * *
>
> **(5)** He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person;
>
> * * * *
>
> > **(iv)** Is to the judge's knowledge likely to be a material witness in the proceeding.

Montgomery seeks a COA regarding her argument that the district judge should have recused himself under 28 U.S.C. § 455. Specifically, Montgomery contends that: (1) pursuant to 28 U.S.C. § 455(b)(1), the district court judge had personal knowledge of disputed evidentiary facts concerning Montgomery's 28 U.S.C. § 2255 proceeding, and (2) pursuant to 28 U.S.C. § 455(b)(5)(iv), the district court judge believed he was likely to be a material witness in Montgomery's 28 U.S.C. § 2255 proceeding. Montgomery also apparently argues that the court acted in a biased manner in conducting the § 2255 proceedings.

Montgomery apparently contends that there were several different discussions, which, because they were not transcribed, resulted in the district court

having personal knowledge and being a material witness. Montgomery lists these discussions as follows:

1. A discussion in October 2005, among Ms. Hunt, Mr. Owen, and the court regarding the appointment of Ms. Clarke;

2. A discussion on April 17, 2006, between Mr. Owen and Magistrate Judge John Maughmer;

3. A discussion on April 20, 2006, between Mr. Owen, Mr. Conrad, and the district court regarding the removal of Ms. Clarke from the defense team;

4. A purported discussion on April 21, 2006, among Mr. Owen, Ms. Hunt, and the district court regarding the problems concerning Ms. Clarke's continued involvement;

5. A discussion on May 1, 2006, between Mr. Owen, Mr. Conrad, and the district court;

6. A discussion on May 8, 2006, among Mr. Owen, Ms. Hunt, and the district court regarding Ms. Hunt's withdrawal from the case.

Montgomery alleges that as a result of these discussions, Judge Fenner acquired knowledge of disputed facts and became a material witness to some of Montgomery's claims in her 28 U.S.C. § 2255 motion. Montgomery contends that this requires disqualification of the court pursuant to 28 U.S.C. § 455.

However, the contents of these discussions do not constitute a valid basis for this Court to recuse and disqualify itself for several reasons. First, and most importantly, there is no dispute that Mr. Owen stated on multiple occasions that he could not work with Ms. Clarke on Montgomery's case based on her conduct toward him. Second, the district court judge acquired the information and facts during his participation in the case, in his judicial capacity, and were not obtained through an "extrajudicial source." Third, Montgomery has not shown that the judge believed he was "likely to be a material witness" in Montgomery's 28 U.S.C. § 2255 proceeding. Fourth, the district court judge was in the best position to preside over the § 2255 proceeding since he had been extensively involved in this case since 2005, had been intimately involved in all the proceedings, and had acquired a familiarity with all the issues far beyond any other court.

The listed discussions involving the court did not give rise to Judge Fenner acquiring knowledge of disputed evidentiary facts, or to Judge Fenner believing he was likely to be a material witness. Rather, the dispositive facts involved in the unrecorded communications, as well as the related recorded communications that followed, are uncontroverted. Those dispositive facts were that the FPD's office, and specifically, Assistant FPD David Owen, could no longer work productively with Judy Clarke, the attorney Mr. Owen had petitioned the court to appoint on a *pro hac vice* basis.

Further, even assuming, solely for the sake of argument, that there are varying accounts of trial counsels' actions and statements during the discussions with Judge Fenner, there is absolutely no dispute or varying accounts that Mr. Owen repeatedly stated that Ms. Clarke verbally abused him and his staff at the FPD's office. Nor is it in dispute that Mr. Owen's relationship with Ms. Clarke had deteriorated to the point that Mr. Owen could no longer tolerate working together with Ms. Clarke as co-counsel for Montgomery. Finally, it is not disputed that Mr. Owen communicated this information to the court resulting in the removal of Ms. Clarke from the case.

*3.* *28 U.S.C. § 455(b)(1)*

As to Montgomery's claim under 28 U.S.C. § 455(b)(1), "[t]his rule applies to knowledge which the judge obtained extrajudicially." *United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987). Discussions in the judge's chambers were held to be "in the course of a judicial proceeding." *United States v. Bailey*, 175 F.3d 966, 969 (11th Cir. 1999); *see also United States v. Sims*, 845 F.2d 1564, 1570 (11th Cir. 1988) (in camera hearing is not extrajudicial). Moreover, facts learned by a judge in his judicial capacity cannot be the basis for disqualification. *Hale v. Firestone Tire and Rubber Co.*, 756 F.2d 1322, 1329 (8th Cir. 1985) (citing *United States v.*



Appellate Case: 17-1716 Page: 226 Date Filed: 07/30/2018 Entry ID: 4687987

*Patrick*, 542 F.2d 381 (7th Cir. 1976)). *See also United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976).[105]

In *ISC v. Nobel Biocare Investments*, 688 F.3d 98 (2d Cir. 2012), ISC's former counsel met with the district court privately, and without a court reporter, to advise the judge of his reasons for applying to withdraw as counsel. The Second Circuit held that the unrecorded *ex parte* conversation with the district court did not merit recusal of the judge. The Second Circuit went on to find that the communication did not qualify as "extrajudicial" and that "[a]ny information the district court acquired was obtained in the normal course of adjudicating a withdrawal motion." *ISC v. Nobel Biocare Investments*, 688 F.3d at 107.

Also as to Montgomery's claim under 28 U.S.C. § 455(b)(1), the "evidentiary facts concerning the proceeding" must be in "dispute." As the district court noted on multiple occasions, there is no dispute that Assistant FPD David Owen felt he could no longer work productively with Judy Clarke and this was communicated to Judge Fenner. Despite attempts by Montgomery to read more into the removal of

---

[105]In *Bernstein* the court noted:

> The rule of law, without belaboring the point, is that what a judge learns in his judicial capacity whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification.

(533 F.2d at 785.)



Appellate Case: 17-1716 Page: 227 Date Filed: 07/30/2018 Entry ID: 4687987

Ms. Clarke, the record is consistent over many years and multiple proceedings, that the court removed Ms. Clarke for the stated reason. There is simply nothing in dispute.

*4. 28 U.S.C. § 455(b)(5)(iv)*

As to Montgomery's claim under 28 U.S.C. § 455(b)(5)(iv), Montgomery must show that the judge "or his spouse . . . is to the judge's knowledge likely to be a material witness in the proceeding." Montgomery has not made such a showing. The responsibility for deciding a § 455 recusal motion lies solely with the judge to whom the motion is directed. *In re Kensington International Limited*, 353 F.3d 211, 223, n.12 (3d Cir. 2003) (citing *Bernard v. Coyne*, 31 F.3d 842, 843 (9th Cir. 1994)); *See also Shadid v. Oklahoma City*, 494 F.2d 1267, 1268 (10th Cir. 1974) (the decision to recuse is left to the sound discretion of the judge)). "Discretion is confided in the district judge in the first instance to determine whether to disqualify himself . . . [because the] judge presiding over a case is in the best position to appreciate the implications of those matter alleged in a recusal motion." *In re Kensington International Limited*, 353 F.3d at 224 (citing *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)). The Ninth Circuit stressed in *Kensington* that the discretion confided in district judges to determine whether a recusal is warranted "is particularly true where, as here, the district court judge has presided over (i) an extraordinarily complex litigation, (ii) for an extended period of

time," and (iii) the judge "has been intimately involved in these proceedings for the past two years." *Id*.

In Montgomery's case, the district court had been involved in a complex litigation over a number of years. Moreover, as related above, he was not a material witness because the issue in dispute, i.e., the removal of Judy Clarke, had been fully documented on the record and the district court's only involvement in the matter was in his judicial capacity.

*5.* *Alleged Bias of the District Court*

Montgomery also argues, apparently under § 455, that the district court acted in a prejudicial manner following her motion to recuse. (Montgomery COA 587.) In support of this proposition, Montgomery points to the removal of one of her publicly-funded attorneys, Christine Blegen, as evidence of the district court's prejudice. Montgomery also references that the court allowed Fred Duchardt access to the original trial file in order to complete his affidavit regarding the case. In addition, she complains about the court's purported animosity at the § 2255 hearing. Montgomery concludes that, under these circumstances, recusal is required.

*6.* *Removal of Christine Blegen*

Montgomery appears to argue that the removal of one of her habeas counsel, Christine Blegen, shows animus on the part of the district court. (Montgomery COA 587-88.) Indeed, Montgomery filed an application of writ of mandamus in this

Court, No. 14-2725, arguing (1) that the district court had no authority to remove Ms. Blegen, and (2) that the court's removal of Ms. Blegen was somehow a disciplinary measure.

However, a review of the district court's response reveals that the judge's actions were related to the cost of the § 2255 litigation and to nothing else:

> Movant's authority in support of her position that the district court does not have authority to remove CJA-appointed counsel is clearly distinguishable from the circumstances of the case at bar. In the authority cited by Movant, chiefly the case of *Stearnes v. Clinton*, 780 S.W.2d 216 (Tx. Ct. App. 1989)[106], the defendant's only attorney was removed by the court arbitrarily and without good cause. In this case, the removal of Ms. Blegen is a cost containment measure. Ms. Blegen is not lead counsel and is one of four public-funded attorneys working on Movant's behalf herein. Ms. Lisa Nouri was CJA-appointed as lead counsel, and Ms. Blegen was CJA-appointed to assist Ms. Nouri. Ms. Nouri and Ms. Blegen prevailed upon the district court to allow Ms. Kelley Henry, Public Defender for the Federal Public Defender's Office for the Middle District of Tennessee, to assist with the investigation and preparation of Movant's Motion for Relief Pursuant to § 2255. Ms. Henry has enlisted the further assistance in this matter of Ms. Amy Hartwell, another Federal Public Defender for the Federal Public Defender's Office for the Middle District of Tennessee.
>
> In the case at bar, Movant is currently represented by four attorneys, all publically funded. The transcript of the proceeding conducted on July 12, 2013, between the district court, Ms. Nouri, Ms. Blegen, and Ms. Henry shows that the district court's costs concerns were openly and thoroughly addressed with counsel a year ago. At that time, CJA attorneys' fees had already been amassed in the amount of $330,000, and counsel intended on subsequently filing an amended § 2255 motion. As of February 28, 2014, $352,310.82 in attorneys'

[106]The *Stearnes* case is the same one cited by Montgomery for the proposition that the district court had no authority to remove Judy Clarke from the original trial team.



Appellate Case: 17-1716 Page: 230 Date Filed: 07/30/2018 Entry ID: 4687987

> fees had been requested for payment by Ms. Nouri and Ms. Blegen combined. I do not have a more recent update, but there has been considerable activity in the case since February 28, 2014. Notably, this is the third writ sought by Movant with Movant's second writ having been denied just two weeks ago on July 11, 2014.
>
> As of five months ago, accumulated requests for over $350,000 in attorneys' fees had been submitted to the district court and the Government has yet to respond to the Motion herein. Costs are an obvious and very real concern to the district court.
>
> Statutorily, since Movant is indigent, she is entitled to at least one attorney. 18 U.S.C. § 3599(a)(1). Movant presently has four attorneys and all are publically funded. Movant argues that cost containment measures have been taken, and that is true. A cap of $550,000 for attorneys' fees has been set. However, that cap is not meant to be a guarantee that counsel can continue to spend public funds when there are additional cost-saving measures that can be employed. Just because a cap was set does not mean that the district court believes that it is necessarily reasonable to reach the cap. Additionally, further arguments can be anticipated that once the cap is reached, Movant will be denied effective assistance of counsel because her CJA attorneys are not being paid for their service.

(Resp. to Writ of Mandamus at 1-2, (No. 14-2725, July 25, 2014.))

The court went on to explain that a recent budget crunch with the FPD office had eased and that, in the court's judgment, two CJA funded attorneys were "an excessive and unnecessary expenditure going forward" since Montgomery's claim had been perfected and she was still represented by the FPD Office of the Middle District of Tennessee. (Response to Writ of Mandamus at 3, No. 14-2725, July 25, 2014.)

Clearly, the district court's reasons for removal of a publicly-funded CJA counsel from a habeas counsel team that already had far more attorneys than required by the statute were based on the law and economics, and not upon some animus toward habeas counsel because of the motion to re-assign.

Montgomery apparently also claims that allowing Fred Duchardt to review the original trial file demonstrates bias on the part of the district court. Montgomery cites no law for this proposition. Indeed, allowing trial counsel to refresh his recollection of a trial that occurred ten years earlier, lasted multiple weeks, and involved years of pretrial proceedings, would hardly seem to be a controversial action showing bias by the district court. In addition to failing to cite any authority for this proposition, Montgomery also fails to articulate how the court's action demonstrates bias.

Finally, Montgomery contends that the district court's animosity at the evidentiary hearing was apparent, and directs this Court to her motion to expand the record and the Declaration of Mr. Lawrence Fox. (Montgomery COA 590.) In that motion, Montgomery complains that the district court expressed displeasure when habeas counsel did not have enough witnesses on two occasions. In the first instance, habeas counsel announced to the court:

> MS. HENRY: Your Honor, at this time I have to apologize to the court. I mis -- I mistimed today. Erin Garman, who was our next witness, who was a witness who was going to have to travel eight hours round trip today for what we anticipated to be testimony at the end of the day.



Appellate Case: 17-1716 Page: 232 Date Filed: 07/30/2018 Entry ID: 4687987

> Given the way things moved and what I thought was going to be a longer day, I told her to come on Thursday.
>
> All of our next witnesses, which are very lengthy tomorrow, and we may go longer tomorrow, are flying in. We don't have any local witnesses available, and I very much apologize to the court. It's 100 percent my responsibility.

(Civ. Tr. 475.)

The court reminded habeas counsel that often matters move faster than anticipated and the habeas counsel should be aware of that and compensate for it:

> THE COURT: All right. Well, I don't like it and I don't want it to happen again. You know, you get people here. I don't care how long they've got to travel. I don't care if you've got to put them up overnight. Things oftentimes, more often than not, move faster than counsel anticipate and, you never know what the extent of cross-examination of your witnesses are going to be, but it has not been extensive to this point, and so you need to take that into consideration as well.

(Civ. Tr. 477.)

Habeas counsel agreed with the court, apologized again and said "it is 100% my fault, Your Honor, and I apologize." (Civ. Tr. 477.)

On the second occasion, the Government moved to exclude the testimony of Lawrence Fox, an attorney who was to testify on ethical conduct. The court granted the motion of the Government, stating: "I don't think I need an expert to tell me what is ethical behavior by an attorney and what isn't." (Civ. Tr. 1306.) With the consent of both parties, the court then accepted Mr. Fox's declaration as his testimony. (Civ. Tr. 1306.)

Habeas counsel then announced that they were out of witnesses once again. The court responded:

> Well, this is becoming an intolerable habit. I mean, I don't know how -- what I can do to impress upon you the importance for us to be able to move this. I mean, I know it's not the only case you've got, it's not the only case they've got, it's not the only case I've got.

(Civ. Tr. 1307.)

* * * *

> The last thing I said to you yesterday was don't run out of witnesses at three o'clock, and here we are at 3:15 after I just came back. We took a break. And you're out of witnesses again.

(Civ. Tr. 1308.)

A review of the record shows that the court, while frustrated by the failure of habeas counsel to have sufficient witnesses to fill the workday, did not insult counsel, vilify them, or use any unacceptable language. The court simply wanted to impress on habeas counsel the need to have witnesses to move the case to a speedy resolution. Clearly, the actions of the court do not show such (or any) bias that Montgomery's constitutional rights were violated.

*7. The district court did not erroneously limit discovery.*

Next, Montgomery argues that the court erroneously limited discovery because it did not allow her to depose both the district court and the magistrate judge. (Montgomery COA 591-95.) Montgomery continues to assert that there was some mysterious reason why the court removed Ms. Clarke from the pretrial defense team



Appellate Case: 17-1716 Page: 234 Date Filed: 07/30/2018 Entry ID: 4687987

which, she alleged in her § 2255 motion, arose from Mr. Owen and Mr. Conrad perpetrating a fraud on the court. (DCD 71 at 47-52.)[107]

As the court noted on numerous occasions, the reasons for Clarke's removal were clear at all times and there was no need for an evidentiary hearing on the matter.

> THE COURT: Don't you think it's pretty obvious under the record that that defense team could not work together, they were not functioning, and they could not adequately represent Ms. Montgomery in the case on the basis of the record that's before you?

(DCD 53 at 6.)[108]

---

[107]It was this allegation of fraud to which the court took exception stating:

> I'm surprised that you allege that the public defender's office, specifically Mr. Conrad and Mr. Owen, committed a fraud on the court, which to me if that truly were to have occurred, it clearly would be unethical and unprofessional to do that, and I understand that you had some questions about the fact as to what was said between us, actually, basically what was said by Mr. Owen and Mr. Conrad, but I don't see any basis to accuse Mr. Conrad and Mr. Owen of that type of unethical conduct. . . .

(DCD 53 at 5.)

Indeed, in its order denying relief, the court ruled: "Movant has no evidence that Owen and/or Conrad perpetrated a fraud on the court." (DCD 173 at 18.)

[108]That record would include Mr. Owen's statements that his office refused to work with Ms. Clarke: "Judge, I will throw this out on that line. My office will not work with Judy Clark ever again. We just are not going to take that abuse." (4/25/06 Hrg. Tr. at 10.)

"I was not and still am not willing to continue to be abused [by Judy Clarke] and will not tolerate any employee of the Federal Public Defender being abused the way Ron Ninemire was abused [by Judy Clarke]." (Mr. Owen Letter to Richard Burr at 3; Montgomery Exh. 7.)

> THE COURT: Nobody pushed me to do anything. I had a case management decision to make. I was told that the team that had been composed was not able to work together. I was told that the public defender's office could not and would not work with Judy Clarke, and so I had to make a decision. Ms. Hunt had reservations about the entire process as well.

(DCD 53 at 7.)

> THE COURT: Ms. Nouri, it wasn't my purpose to try to judge right or wrong or who was at fault and who could possibly behave better than they did. It was my purpose to deal with the dysfunction that existed and resolve that so that Ms. Montgomery could be adequately represented in the case and it could be moved forward.

(DCD 53 at 11.)

> THE COURT: Well, Ms. Nouri, they were not functioning as a team. They were at odds with each other. It seemed pretty apparent that the public defender's office here was deeply offended by Ms. Clarke. Now, whether that was Ms. Clarke's fault or Mr. Owen's fault or Mr. Conrad's fault or Ms. Hunt's fault, I did not launch a full-scale investigation to make that determination. I accepted the situation for what it was. It wasn't good. It wasn't what it should have been but it had to be resolved and that was what was done.

(DCD 53 at 13.)

The position of the district court regarding the reasons for Ms. Clarke's removal is both consistent and transparent. Clearly, there was no need to depose either the district court (who made the decision) or Magistrate Judge Maughmer (who did not) to find out why the court acted in the way he did. Thus, there is no "genuine issue of fact [that] exists as to what was said to cause the court to precipitously remove Ms. Clark." (Montgomery COA 595.)

8. *The district court did not erroneously deny an evidentiary hearing.*

As demonstrated above, the record reveals that the court's reason for removing Ms. Clarke is abundantly clear. Moreover, Montgomery was able to question the court about his reasons in the May 6, 2013, hearing and there is a record of the proceeding. In short, there is nothing in the record indicating the need for further inquiry. Simply because Montgomery refuses to accept the court's reason for Ms. Clarke's removal does not mean that she is entitled to an evidentiary hearing on the matter.

9. *Constitutional concerns.*

Montgomery claims that the removal of Ms. Clarke, one of three attorneys appointed to her, raises a constitutional concern. Montgomery argues that the alleged denial of due process in the § 2255 proceeding implicates constitutional concerns because the § 2255 proceeding is a continuation of the criminal case. (Montgomery COA 597.) However, this Court has noted repeatedly the habeas proceedings are civil in nature. *Mandacina v. United States*, 328 F.3d 995, 999 n.3 (8th Cir. 2003) (citing *United States v. Craycraft*, 167 F.3d 451, 457 n. 6 (8th Cir. 1999)).

Moreover, none of Montgomery's complaints in this regard are constitutional issues. As set forth above, Montgomery was able to explore completely the reason for the removal of Ms. Clarke from her pretrial defense team.

No COA should issue on this claim.

## *I. Montgomery's Allegations of Multiple Deficiencies by Trial Counsel Are Unfounded Because Trial Counsel Properly Explored and Prepared a Viable NGRI Trial Defense, Which Was Substantially Supported by the Evidence Available to Trial Counsel and Did So In a Constitutionally Effective Manner.*

*Summary of Argument*

Montgomery alleges specific failures on the part of her trial team, which resulted in the following five errors:

> (1) Presented a not guilty by reason of insanity (NGRI) defense, which did not meet the evidentiary standard under federal law, resulted in the exclusion of proof of brain damage at a *Daubert* hearing, and undermined the mitigation proof;
>
> (2) Injected a character defense of Mrs. Montgomery into the first phase that was untrue, inconsistent with the insanity defense, and opened the door to damaging evidence, which rendered her sentencing proof incredible;
>
> (3) Announced an innocence defense in open court that they knew or should have known was factually untrue and also inconsistent with the insanity defense (announced on the same day), which damaged the relationship with important mitigation witnesses and opened the door for the Government to argue lack of remorse and other bad character evidence;
>
> (4) Failed to alert the district court to Mrs. Montgomery's mental incompetency; and
>
> (5) Failed to protect Mrs. Montgomery's right to not be tried under the influence of psychotropic medication where she did not want to take the medication and where the medication altered her affect and demeanor as well as further exacerbated her mental incompetency.

(Montgomery COA 602-03.)

However, the district court found, and the evidence establishes, that the actions listed above were based on a reasoned analysis by the defense team on how to proceed with the case with the best chance of success given the evidence available to them at the time it became known to them. Moreover, Montgomery has little evidence to support a number of her allegations.

Montgomery also alleges that these supposed errors arose from the nine deficiencies of the defense team including that they:

> 1) did not have the requisite background, training, or understanding to appreciate how seriously ill Mrs. Montgomery was;
>
> 2) failed to meet on a regular basis;
>
> 3) virtually stopped gathering records;
>
> 4) dramatically cut back on witness interviews;
>
> 5) failed to consult with prior counsel and so therefore was unaware that the two mutually inconsistent defenses of pseudocyesis and "the Tommy defense" had already been ruled out;
>
> 6) had too many other cases on their docket to devote sufficient attention to Mrs. Montgomery;
>
> 7) (because the final iteration of the team had not conducted a reasonably thorough investigation) lied to the district court that counsel had two expert witnesses who were writing a report diagnosing Mrs. Montgomery with pseudocyesis in support of the first phase defense of legal insanity when that was not the case, thereby creating a conflict between himself and Mrs. Montgomery;
>
> 8) in the case of the attorney charged with the mental health and mitigation aspects of the case, eschewed prevailing professional norms, including the development of a comprehensive social history; and

> 9) presented the mental health proof as evidence of the unsupportable NGRI/pseudocyesis defense, causing the jury to then disbelieve or discount the mitigating value of that evidence.

(Montgomery COA 603-04.)

However, a review of the evidence shows that the defense team:

1. Appropriately retained experts to assess the extent of Montgomery's mental issues, something the prior team had failed to do to that point;

2. Communicated on a regular and frequent basis concerning Montgomery's case;

3. Appropriately utilized the records that had been obtained to that point, by arranging the information in a useable form in a database and obtained the records necessary to present their defense;

4. Appropriately interviewed witnesses (many of which had already been interviewed);

5. Evaluated the pseudocyesis defense and the "Tommy defense" in an adequate fashion to utilize them at trial;

6. Devoted sufficient attention to Montgomery's case despite having other cases on their docket, especially given the circumstances they were presented at the time of their entry into the case;

7. Advised the district court of the possibility of the pseudocyesis defense at the earliest possibility as they were required to under the discovery schedule;

8. Appropriately presented the relevant factors concerning Montgomery's mental health issues, including information concerning her background; and

9. Appropriately relied on a NGRI defense during the guilt phase of Montgomery's trial.



Appellate Case: 17-1716 Page: 240 Date Filed: 07/30/2018 Entry ID: 4687987

At its base, Montgomery's arguments regarding ineffective assistance of counsel primarily arise from trial counsel's use of a NGRI defense and its failure to prepare a "biopsychosocial history." However, trial counsel clearly considered the NGRI defense based on the nature of the crime, the nature and history of Montgomery, and the expert witness testimony. Moreover, the biopsychosocial history evidence was not necessary to the presentation of Montgomery's case, especially since the trial counsel presented almost all the relevant evidence in the biopsychosocial history to the trial jury.

*1.* *Overview of argument regarding trial strategy.*

Montgomery's trial team, with respect to both lead (John O'Connor) and learned (Fred Duchardt) counsel, entered the case in April of 2006, approximately 17 months after the crime and Montgomery's arrest.[109] During that time, five attorneys and three mitigation specialists had all come and gone from the defense team. There were no expert reports nor had any expert conducted an evaluation for trial presentation. No one had discussed the facts of the case with Montgomery.

The case presented to Mr. O'Connor and Mr. Duchardt involved a defendant who was the mother of four children and had no criminal history, but who had

[109]David Owen had been involved in the case since early in 2005. However, since he was neither lead nor learned counsel, presumably he would not have been the deciding factor in defense presentation and mitigation. Based on all accounts, Mr. Owen's primary responsibility during trial was to deal with the computer evidence in the case.



Appellate Case: 17-1716 Page: 241 Date Filed: 07/30/2018 Entry ID: 4687987

committed an undeniably heinous crime: the murder of a young woman, pregnant with her first child, who had that baby literally cut out of her while she was still alive.

Montgomery also had a well-documented history of years of physical and sexual abuse by her stepfather, Jack Kleiner, along with evidence that her mother, with whom she had a tumultuous relationship, blamed Montgomery for the abuse. Despite this history, the evidence was that Montgomery had worked hard to support her family and that her children were well behaved without the trauma she had suffered.

The evidence also established that Montgomery had undergone a sterilization procedure and, since that time, she had a history of false pregnancies, including immediately prior to the crime. The evidence of these pregnancies would include not only Montgomery's claims of being pregnant, but also the statements of family and friends regarding changes to her body during these false pregnancies, which would amount to physical proof of a mental illness.

Faced with this set of circumstances, the trial team decided to explore and present a not guilty by reason of insanity (NGRI) defense. They obtained expert diagnoses of post-traumatic stress disorder, depression, borderline personality disorder, and pseudocyesis. The experts were willing to testify, and did in fact testify, that Montgomery's pseudocyesis delusion led to a dissociative state when



Appellate Case: 17-1716 Page: 242 Date Filed: 07/30/2018 Entry ID: 4687987

she murdered Mrs. Stinnett and abducted her baby, and concluded that Montgomery was unable to appreciate the nature and quality of her actions.

Montgomery now argues that her trial attorneys were constitutionally deficient in presenting this defense. She insists that the evidence does not support the NGRI defense (although, clearly the experts at trial testified that Montgomery met the definition of legal insanity.) She argues, instead, that her counsel should have left raising the mental issue to the penalty phase of the trial.

A review of the available evidence establishes that Montgomery's trial counsel made a considered decision to advance this defense as a consistent theme throughout. Indeed, acting as they did, Montgomery's trial team was able to present the defense twice in an effort to avoid first a conviction and second the death penalty. Montgomery is mistaken that following this strategy amounts to constitutional inefficiency.

## *J. Prevailing Professional Norms and Constitutional Requirements.*

### *1. The ABA Guidelines and the requirement of reasonable performance.*

Summary of Argument

Montgomery contends that the ABA Guidelines define the prevailing professional norms (PPN). (Montgomery COA 606-13.) While that may be true, it does not define how a court should analyze effective assistance of counsel in a constitutional sense.

Argument

Montgomery expends considerable time in her application for a COA (and did so at the evidentiary hearing) discussing the PPN as set forth by the ABA Guidelines in 2003. Montgomery cites the statements of Russell Stetler who worked on the 2003 Guidelines and advised that they "were really to be followed. They were not aspirational." (Montgomery COA 608.) In addition, Montgomery describes the testimony of Marc Bookman, Denise LeBouf, and, again, Judy Clarke, for their support of the ABA Guidelines.

However, as the district court noted in its order, while helpful, the ABA Guidelines are not the standard by which constitutionally effective counsel are measured:

> Many of Movant's ineffective assistance of counsel claims involve an argument that trial counsel did not comply with the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), available at Movant Exhibit 103, and prevailing professional norms. (2255 Mtn, p. 141). However, as instructed by the Supreme Court in *Strickland*, the guiding principal for judging a claim for unconstitutional ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *see also Luke*, 686 F.3d at 604. The Supreme Court has criticized the use of the ABA Guidelines and their predecessors as specific commands. *Strickland*, 466 U.S. at 688-689 ("More specific guidelines are not appropriate . . . [and] the existence of detailed guidelines for representation could distract counsel."); *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009).[7] This is not to say the ABA Guidelines have never been considered by the Supreme Court. To the contrary, the court has accepted the ABA Guidelines for their

evidentiary value as they relate to proving prevailing professional norms under *Strickland*. *See Rompilla v. Beard*, 545 U.S. 374, 387 (referring to the ABA Guidelines "as guides to determining what is reasonable."); *Wiggins*, 539 U.S. at 524-25 (citing ABA Guidelines); *Williams*, 529 U.S. at 396 (using ABA Guidelines to support assertion that trial counsel failed to conduct necessary survey of defendant's prison and mental health records). Private organizations, like states, can create standards for criminal defense attorneys to promote quality representation, but the Supreme Court has "held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." See *Van Hook*, 558 U.S. at 9. (quotation omitted).[8]

The Eighth Circuit has likewise stated that "the ABA guidelines may serve as 'guides to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.'" *Sinisterra v. United States*, 600 F.3d 900, 908 (8th Cir. 2010) (quoting *Van Hook*, 558 U.S. at 7). Trial counsel's failure to follow each suggestion made in the ABA Guidelines does not itself justify habeas relief. *See id.* at 908-09 (acknowledging a proper mitigation investigation obviates the need for the ABA Guidelines' recommendation of a mitigation specialist).

[7]The Supreme Court discussed the expansion of the guidelines from a two-page commentary in the 1980 edition to a 131-page publication in 2003. *Van Hook*, 558 U.S. at 8. "They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from the moment of conception, and that counsel contact virtually everyone who knew the defendant and his family and obtain records concerning not only the client, but also his parents, grandparents, siblings, and children." *Id.* (alteration, ellipses, and quotations omitted).

[8] Justice Alito, in his concurring opinion, opined that "[t]he ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole . . . and I see no reason why the ABA Guidelines



Appellate Case: 17-1716 Page: 245 Date Filed: 07/30/2018 Entry ID: 4687987

> should be given a privileged position . . . ." *Van Hook*, 558 U.S. at 13-14 (Alito. J., concurring).

(DCD 212 at 19-20.)

Montgomery appears to be attempting to equate the ABA standards with the constitutional requirements for effective assistance of counsel. As the district court noted, the Supreme Court has specifically rejected this approach. *See Bobby v. Van Hook*, 558 U.S. 4 (2009): "To make matters worse, the Court of Appeals (following Circuit precedent) treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel "'must fully comply.'" *Strickland* stressed, however, that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition. We have since regarded them as such." *Id.* at 8. (Internal citations omitted.)

2. *<u>Composition of the trial team under prevailing professional norms.</u>*

<u>Summary of Argument</u>

Montgomery argues that her trial team evolved over time resulting in the loss of a number of members and that the final iteration "did not function as a team" in the way that the PPN would require. (Montgomery COA 613-25.) However, the record establishes that the final trial team, staffed with three attorneys, an investigator, a mitigation specialist, and a paralegal were more than adequate personnel to present the case.

Argument

Montgomery complains that the trial team went through several iterations, and over the course of time, and through the events of the case, she "lost eleven team members: Dedmon, Wurtz, Dillingham, Burns, Rickert, Clarke, Garvey, Freedman, Jackson, Hunt, [and] Thompson." (Montgomery COA 618.) With respect to the attorneys in this group, Dedmon and Wurtz were counsel appointed in Kansas and they were "lost" when the case was transferred to Missouri;[110] Burns was "lost" when the FPD reassigned the case to Owen; Clarke was "lost" when the FPD refused to work with her anymore, and Hunt was "lost" when she moved to withdraw. Of the non-lawyers, Dillingham, a social worker hired by the Kansas attorneys, was not retained when Owen replaced Anita Burns. Rickert had been replaced by Holly Jackson because of issues involving job performance.[111] Garvey, Freedman, and

[110]The transfer of the case to Missouri happened almost immediately after Montgomery's arrest. Law enforcement officers arrested Montgomery on December 17, 2004, and the United States Attorney's Office for the Western District of Missouri filed a complaint on the same day. (DCD 1.) Montgomery made her first appearance in the Western District of Missouri on December 28, 2005. (DCD 60.)

[111]"Mr. Owen and I had problems with Ms. Rickert. Ms. Rickert engaged in several interviews and would not keep us apprised of her activities. We also had personality problems with her. She did not want to collect records and I thought that should be part of her tasks." Declaration of Susan Hunt. (DCD 151-1 at 3.) David Owen also testified that Ms. Rickert would not communicate with the defense team. (Civ. Tr. 2154.)



Appellate Case: 17-1716 Page: 247 Date Filed: 07/30/2018 Entry ID: 4687987

Jackson all left of their own volition after Clarke's removal from the trial team, and Thompson was an investigator who left following Hunt's departure.

Other than simply listing the individuals who were associated with a case that spanned two states over nearly three years, Montgomery does not explain how these personnel changes entitle her to any relief or why they were the fault of her eventual trial team. Montgomery does claim that the attorneys who left the team were following the ABA Guidelines but, as explained above, this does not prove either constitutional competence or incompetence on the part of counsel. Moreover, she claims that the mental health mitigation individuals she lost saw evidence that Montgomery was "extremely mentally ill, possibly incompetent." However, there is no indication, in the 16 months that these individuals were involved in the case (presumably informing the trial team attorneys of their concerns at one of their numerous meetings), that anyone brought these concerns to the court's attention or that they filed a motion to determine mental competency under 18 U.S.C. § 4241.

Montgomery also claims that this turnover in personnel made it difficult for her to trust her defense counsel and, without any apparent evidence, contends that it affected her competence. (Montgomery COA 623-24.) She also asserts that such personnel turnover affected the ability to connect with witnesses and caused the witnesses to contract "interview fatigue." (Montgomery COA 624.) Again, this assertion is made without any apparent evidence as to how much "interview fatigue"



Appellate Case: 17-1716 Page: 248 Date Filed: 07/30/2018 Entry ID: 4687987

occurred or how it affected the witnesses or the presentation of evidence. Moreover, as noted above, Montgomery does not show prejudice from the change of personnel, nor does she show how it was the fault of her trial team.

Montgomery describes the actual trial team as the "remnants," including FPD investigator Ron Ninemire, FPD paralegal Stephanie Elliott, mitigation specialist Dani Waller, and attorneys John O'Connor, Fred Duchardt, and David Owen. Montgomery complains that there was tension between some of the team members, e.g., Dani Waller spoke of tension between Ron Ninemire and David Owen. (Montgomery COA 620.) However, nothing set forth by Montgomery regarding the final trial team's interactions compare with one of the attorneys telling the other to "shut up" because they were "too stupid" or referring to them as a "country bumpkin."[112]

Moreover, clearly the trial team functioned as a team. John O'Connor acted as lead attorney, handling the fact investigation of the offense and presentation during the guilt phase of the case; Fred Duchardt worked with the mental health experts and handled the mitigation aspects of the case, and David Owen handled issues involving computer forensics and otherwise filled in where necessary. (Civ. Tr. 2141; *see also* David Owen Affidavit, DCD 149-2 at 11.) Moreover, the defense

[112]*See* Owen Affidavit (DCD 149-2 at 6) and Conrad Deposition. (Montgomery Exh. 72 at 10.)

team was adequately staffed with support personnel, including a mitigation specialist, paralegal, and an investigator.

Montgomery's claim that her trial team did not act as a team is not supported by the evidence.

c. *The evidence establishes that Montgomery's trial team engaged in frequent contact.*

Summary of Argument

Next, Montgomery complains that the team did not have frequent meetings and blames this alleged lack of communication with a whole list of asserted errors, without establishing that frequent meetings, in and of themselves, would have solved the listed issues. (Montgomery COA 625-27.) However, a review of Mr. Duchardt's time sheets reveals that while meetings may not have been frequent, there was substantial communication among members of the team.

Argument

Following his appointment in mid-May until the end of June of 2006, Fred Duchardt's time sheet reveals the following interactions with the trial team:

| Date | Interaction |
|---|---|
| 5/16 | Phone conf. w/ John O'Connor |
| 5/16 | Phone conf. w/ Judy Clarke |
| 5/16 | Phone conf. w/ Susan Hunt |
| 5/17 | Phone conf. w/ John O'Connor |
| 5/17 | Conf. with John O'Connor, Dave Owen, Ray Conrad and FPD staff |
| 5/19 | Phone conf. w/ John O'Connor |
| 5/19 | Communications with FPD staff |

5/22 Phone conf. w/ John O'Connor
5/24 Phone conf. w/ John O'Connor
5/30 Phone conf. w/ FPD staff and John O'Connor
5/31 Phone conf. w/ FPD staff
5/31 Conf. with FPD staff
6/5 Communication with Dave Owen
6/12 Communication to client via Stephanie Elliott
6/13 Communications to defense team re issues from visit w/ client
6/14 Communication to Dave Owen re: client visit
6/14 Conf. w/ Dave Owen and Stephanie Elliott
6/14 Communication with Dave Owen
6/15 Phone conf. w/ John O'Connor
6/17 Communications with case team
6/19 Communications with Dave Owen
6/20 Phone conf. w/ Dave Owen
6/21 Phone conf. w/ Dave Owen
6/22 Phone conf. w/ Dave Owen
6/23 Phone conf. w/John O'Connor
6/23 Conf with Dave Owen and mitigation specialist
6/26 Communications with defense staff
6/28 Phone conf. w/ Dave Owen and witness
6/30 Communications with co-counsel

(Montgomery Exh. 82.)

Mr. Duchardt's time sheets reveal a constant stream of these types of interactions from the time of Mr. Duchardt's appointment to approximately the time of trial. While these may not be the "team meetings" upon which Montgomery now insists, it is clear that there was a steady flow of communications, phone calls, and conferences with one or more or all of the members of the defense team.

The Government suggests that there is nothing magically productive about a meeting and that, indeed, many times one-on-one communication may be more

effective.[113] In any event, it is not constitutionally deficient to communicate in a way other than habeas counsel prefers.

4. *Montgomery's trial team conducted a thorough and complete investigation.*

Summary of Argument

Montgomery lumps a number of varying claims into this section, which she also brings up later in the brief. (Montgomery COA 627-34.) Under the rubric that the defense team failed to conduct a thorough and complete investigation, Montgomery complains of the following:

1. That Fred Duchardt "pushed" her into naming Tommy Kleiner as an accomplice.[114] Montgomery presents this argument beginning on page 642 of the application for a COA.

2. That Mr. Duchardt would know that Dr. Ramachandran was not a competent forensic psychiatrist and that the pseudocyesis defense would not succeed. Montgomery presents this argument beginning on page 656 of the application for a COA.

3. That Mr. Duchardt would not have called Dr. McCandless, Montgomery's treating psychiatrist at the CCA detention facility, to testify in the guilt phase of the trial. Montgomery presents this argument beginning on page 660 of the application for a COA.

4. That Mr. Duchardt would have anticipated the misuse of data prepared by Dr. Hutchinson. Montgomery presents this argument beginning on page 666 of the application for a COA.

---

[113]As John O'Connor testified, the defense team communicated in a variety of ways including through emails, telephone calls, texting, and in person. (Civ. Tr. 2015.)

[114]Colloquially named by the parties as the "Tommy Defense."

5. That Mr. Duchardt failed to consult with the defense team and failed to consult with prior counsel. This argument is something of a stand-alone and is easily refuted by Montgomery's own exhibit, which shows that Fred Duchardt consulted with Judy Clarke and Susan Hunt in separate phone conferences on May 15, 2006, the day he was appointed. He also communicated with Susan Hunt on July 11, 2006, and with both Susan Hunt and Judy Clarke on a phone conference on July 13, 2006. Moreover, as noted, Mr. Duchardt had multiple methods of contacting various members of the defense team and did so quite frequently.

(Montgomery Exh 82.)

Montgomery presents these issues in other portions of the application for a COA and the Government will address them at that time.

Montgomery also claims that the investigation stalled following Judy Clarke's departure, and presents a pie chart regarding the number of interviews conducted prior to Fred Duchardt's appointment and afterward. (Montgomery COA 632.) However, as noted above, both Mr. Duchardt and Mr. O'Connor entered the case after almost a year and a half of pretrial proceedings and investigation. It would be surprising if Montgomery's trial team waited until a year and a half had gone by before they interviewed the majority of their witnesses. In fact, one would expect that the proffered pie chart would show exactly what it does, i.e., that most of the interviews occurred earlier in the investigation rather than later.



Appellate Case: 17-1716 Page: 253 Date Filed: 07/30/2018 Entry ID: 4687987

5. *Montgomery's trial team did not have a conflict of interest with her.*

i. *The FPD did not have a conflict of interest in representing Montgomery.*

Summary of Argument

Montgomery argues that the FPD operated under a conflict of interest because they did not advise the court that they thought that Fred Duchardt was ineffective. (Montgomery COA 634-36.) However, the record reveals that, in context, the statement did not refer to constitutional ineffectiveness.

Argument

During the evidentiary hearing, David Owen testified regarding the view of the FPD with respect to Fred Duchardt:

> Q. You told Judge Fenner in your testimony you had a preference not to work with Fred Duchardt. Can you tell him why?
>
> A. Throughout the course of the time our office had observed Fred and how he did death penalty cases in this courthouse, and we felt that -- I really don't want to talk bad about anybody, but at the time we felt that he was real Milquetoast in his defense.

(Civ. Tr. 2156.)

> Q. Earlier you said that, whether it was you or the office, you didn't want to work with Fred because you thought he was Milquetoast in his defense cases?
>
> A. Correct.
>
> Q. Do you mean ineffective or you just don't like his style?
>
> A. Probably a little of both.



Appellate Case: 17-1716 Page: 254 Date Filed: 07/30/2018 Entry ID: 4687987

Q. Well, if you thought he was ineffective, wouldn't you as an officer of the court have a duty to tell the court?

A. At that point we had no choice.

Q. What do you mean you had no choice?

A. Because the messy way the case had developed throughout the time, we needed somebody on the case that could handle, you know, supposedly as learned counsel, handle the case.

Q. Which he was doing?

A. Yes.

(Civ. Tr. 2175-76.)

In context, the Government suggests that Mr. Owen was not saying that Mr. Duchardt was constitutionally ineffective, unless being a "milquetoast" is a constitutional deficiency.[115] It is thus difficult to see how Mr. Owen would alert the district court that his co-counsel is a milquetoast, much less how that would have resulted in Mr. Duchardt's removal.[116] Moreover, it is difficult to see how that would result in Mr. Owen having a conflict of interest with Montgomery, since Mr. Owen stated that Mr. Duchardt, in fact, was "handling" the case as learned counsel.

[115]"Milquetoast" is defined as a "timid, meek person." Webster's II New Riverside University Dictionary (1984).

[116]Mr. Owen during his testimony does not elaborate on how Mr. Duchardt supposedly rendered ineffective assistance or provide any analysis on this point.

Montgomery asserts, "At the evidentiary hearing, Mr. Owen admitted that the ultimate defense presented for Mrs. Montgomery was ineffective." (Montgomery COA 636.) Montgomery footnotes this statement (footnote 2350) to Mr. Owen's testimony at Vol. 8, page 2150 of the transcript from the evidentiary hearing. However, a review of this page of the transcript fails to reveal "an admission that the ultimate defense presented for Mrs. Montgomery was ineffective." Instead, it relates a phone call from Mr. Owen to Susan Hunt during the trial that "we were not getting the mitigation evidence to the jury we thought was important." It does not relate the nature of that evidence or why it was not being presented, or who, other than Mr. Owen, had reached that conclusion.[117] Montgomery attempts to convert this comment made to another attorney during trial as an "admission" of (presumably constitutional) ineffectiveness, but the record simply does not bear out this conclusion.

6. *__Fred Duchardt did not have a conflict of interest in representing Montgomery.__*

__Summary of Argument__

Next, Montgomery alleges that Fred Duchardt had a conflict of interest because he represented that two experts would testify regarding her pseudocyesis

[117]In fact, on cross-examination, Mr. Owen admitted that Montgomery's story was one of physical abuse and sexual abuse and that a majority of the jurors had that as a mitigating factor. (Civ. Tr. 2175.)



Appellate Case: 17-1716 Page: 256 Date Filed: 07/30/2018 Entry ID: 4687987

delusion. (Montgomery COA 636-41.) Montgomery contends that this representation caused the district court to continue the case, which, she asserts, compelled Mr. Duchardt to present the insanity defense.

First, Montgomery presents no decisional authority to support her theory of a conflict of interest. However, as a factual matter, a review of the record shows that the court understood that the pseudocyesis defense was a preliminary diagnosis, that Mr. Duchardt did not misrepresent the issue to the court, and that the matter had to be raised at that time because of the time constraints then existing.

Nothing Montgomery presents establishes that Fred Duchardt had a conflict of interest with her.

Argument

At the time the defense team announced that they were exploring a mental disease defense on April 3, 2007, specifically, pseudocyesis, they were past the time limit to identify their mental health experts. The "Amended Scheduling and Trial Order" in effect at the time required the defense to provide discovery on their expert witnesses by March 23, 2007, and mental health experts and evidence by March 30, 2007. (Crim. DCD 95, 166.) The defense team was obligated, therefore, to inform both the Government and the court of new defense theories as soon as possible to ensure they could be used at the trial then scheduled for April 30, 2007. (DCD 212 at 68.)

After Mr. O'Connor advised the court of new developments, the court set a hearing for the next day, April 3, 2007. In its order denying Montgomery's § 2255 motion following the evidentiary hearing, the court set forth the evidence regarding the pseudocyesis defense and its understanding of the possibility of that defense:

> The next day, on April 3, 2007, the court held a status conference. (Crim. Case, Doc. # 201). The transcript of the conference reveals that Duchardt told the court that the eyewitness identification was "tentative"[118] and the court was aware that Dr. Ramachandran's diagnosis of pseudocyesis was only "preliminary." (Movant Ex. 58, 4, 14-15). Dr. Logan's possible testimony was only briefly mentioned and the status of Dr. Logan's diagnosis was not discussed. (*Id.* at 4). However, the court understood the pseudocyesis defense was in its infancy and that neither Dr. Ramachandran nor Dr. Logan was in a place to supply a report at that time. Based on Dr. Ramachandran's agreement to examine Movant and prepare a report before the April 30, 2007 trial date, Duchardt told the court the defense could be ready in time for the trial. (*Id.* at 18). The Government, on the other hand, expressed concerns that their own experts would not have sufficient time to examine Movant and write reports to rebut the defense's experts. (*Id.* at 5, 7). The court did not grant a continuance at that time. (*Id.* at 19).

(DCD 212 at 68-69.)

Clearly, the district court understood that pseudocyesis was simply a preliminary diagnosis. The court made this clear when it analyzed Montgomery's claim regarding Mr. Duchardt's alleged misrepresentation:

> Movant next contends that Duchardt made misrepresentations to the court during the April 3, 2007 status conference. (2255 Mtn, pp. 152-

[118]The reference by the court concerning a tentative eyewitness investigation involved possible corroboration of Montgomery's identification of Tommy Kleiner as a participant in the crime. (Montgomery Exh. 58, 13.)

61). Specifically, Movant contends that Duchardt lied to the court when he advised that Dr. Ramachandran had diagnosed Movant with pseudocyesis. (*Id.*). At the evidentiary hearing, Movant additionally contended that Duchardt lied about Dr. Logan's diagnosis. Movant further alleges that these lies misled the court about the progress her trial team was making in preparing her defense. (*Id.*). The Government opposes, arguing that no misrepresentations were made. (Gov't Resp., p. 93).

Movant's claim arises from the exchange between Duchardt and the court during the April 3, 2007 pretrial conference, which is reproduced here:

> 5 [Duchardt speaking] And the issue that has come to the fore because of
> 6 everything is a diagnosis called pseudocyesis,
> 7 p-s-e-u-d-o-y-e-s-i-s, and that will be a diagnosis that
> 8 will impact upon the first phase defense in terms of mental
> 9 disease or defect.
> 10 THE COURT: Who is it that is giving you a
> 11 preliminary diagnosis.
> 12 MR. DUCHARDT: That is Dr. Ramachandran and also
> 13 Dr. Logan.

(Movant Ex. 58, 4). The transcript is clear. The court understood that any diagnosis from Drs. Ramachandran or Logan was merely preliminary.[119] Duchardt did not misrepresent the status of those diagnoses or otherwise lie to the court during the April 3, 2007 pretrial conference.[120]

---

[119]In his statement, Mr. Duchardt related that he was able to speak to Dr. Ramachandran for 20 minutes on April 2, 2007. In that conversation, Mr. Duchardt related the circumstances of the case and Dr. Ramachandran "gave appropriate caveats" but confirmed that it sounded like pseudocyesis was "in play in this case." (DCD 129 at 57.)

[120]In fact, Dr. Ramachandran stated in his deposition that while he would not give a diagnosis until he had examined the patient, he would give an initial opinion based on a recitation of the situation. (Montgomery Exh. 36, 8-9.) The Government would note that as to Dr. Logan, Mr. Duchardt may have been in error to the extent

(DCD 212 at 70.)

Montgomery claims that Mr. Duchardt "pressed forward with the doomed [pseudocyesis] defense" because he misrepresented the preliminary pseudocyesis diagnosis to the court in the April 3, 2007 hearing. (Montgomery COA 640.) She concludes that this misrepresentation created a conflict of interest between Mr. Duchardt and herself.

However, since Mr. Duchardt did not misrepresent the status of the pseudocyesis defense to the court, Montgomery's complaint that Mr. Duchardt had a conflict of interest[121] in presenting the defense (which was supported at trial by the testimony of multiple witnesses and experts) clearly fails. This would be true even if there were legal support for Montgomery's conflict of interest theory, which she fails to provide.

7. *The trial team competently presented an appropriate guilt phase defense when it had to deal with and ultimately abandon an accomplice*

---

that he conveyed to the court that Dr. Logan had provided a preliminary diagnosis of pseudocyesis. However, even if Mr. Duchardt misspoke, that would not create a conflict of interest with Montgomery since Dr. Ramachandran (who was the proffered expert on pseudocyesis) had already spoken to Mr. Duchardt about pseudocyesis as a possible diagnosis and since, at trial, both Drs. Ramachandran and Logan diagnosed pseudocyesis.

[121]More importantly for Montgomery's theory to have any relevance, Mr. Duchardt would have to *believe* that he had misrepresented facts to the court in order for him to feel that there was a conflict of interest between himself and Montgomery. There is no evidence to support the contention that Mr. Duchardt believed this to be the case. Indeed, all the facts are to the contrary.

*<u>defense introduced by Montgomery and when it presented an NGRI defense that was supported by both fact witnesses and expert opinion</u>*

*a. The "Tommy Defense"*

<u>Summary of Argument</u>

Montgomery complains that the trial team erred in informing the court in the hearing on April 3, 2007, that she had identified Tommy Kleiner as being present during the murder. (Montgomery COA 641-55.) Montgomery contends that her prior counsel had already discounted this possibility and that the trial team failed to investigate the issue properly.

There are two major problems with Montgomery's criticism of the defense team. The first is that she was the one who identified Tommy Kleiner as being with her at the time of the murder, requiring her trial team to investigate the possibility further. The second is that John O'Connor decided to abandon this defense before trial.

<u>Argument</u>

During the hearing on April 3, 2007, Fred Duchardt described the need to explore the possibility that another individual, Tommy Kleiner, was present with Montgomery during the crime:

> What Lisa has shared with us beginning in really late '06 and early this year, finally coming to the place was that someone else was with her in the car and was with her at Bobble Jo Stinnett's house. And there is some independent evidence from other people, other witnesses, including Bobbie Jo's mother who talked to her on the phone just before



Appellate Case: 17-1716 Page: 261 Date Filed: 07/30/2018 Entry ID: 4687987

> this incident happened saying the people are here to see the dog, they are outside, indicating there is more than one person involved. And also there is an eyewitness who indicates seeing a car driving away from Bobbie Jo Stinnett's s house with two people in the car.
>
> We finally got Lisa to confide in us in January that the other person was Tommy Kliner, (sic) her brother. But Lisa insisted were to not share that information with anyone else. She said she would not repeat it again. She was trying to protect her brother. She hadn't decided whether she was going to let us go forward with any of this but we persuaded her to at least talk to our experts who we were talking to about the situation. So she did talk to our experts about it but we had to get her to agree to be able to go forward with the, with any kind of mental defense she had to agree to talk to the government's experts as well. In the meantime what we were trying to do was take the onus off of her in terms of the situation of her brother being involved and trying to find some independent evidence of that.

(04/03/07 Hrg. Tr. 13.)

Montgomery attempts to circumvent her responsibility for introducing Tommy Kleiner as an accomplice by contending that Fred Duchardt "pushed"[122] her

[122] Montgomery's insistence that Fred Duchardt "pushed" her into identifying Kleiner as an accomplice arises from language Mr. Duchardt used in a memorandum dated March 7, 2007. In that memo, which recounts a discussion between Montgomery and Mr. Duchardt, he notes that Montgomery often brought up tangential subjects, i.e., her daughter's pregnancy, to avoid talking about "substantive issues." He states that Montgomery explained that she often did not discuss painful subjects as a defense mechanism. "She explains that when she goes to retrieve one trauma, all of the traumas come out. When you pull one finger out of the dike on one issue, the entire flood comes rushing out. She protects herself from all of the memories, now as earlier in her life, by just not thinking about any of those things." (Montgomery Exh. 157 at 2.) Later in the memorandum, Mr. Duchardt states that he had not previously pushed her to talk about the facts of the case, but that now they needed her to "reveal things to us because of the essential nature of the issues in terms of defending her at trial." (Montgomery Exh. 157 at 3.)



Appellate Case: 17-1716 Page: 262 Date Filed: 07/30/2018 Entry ID: 4687987

into saying that Tommy Kleiner was with her during the crime.[123] However, a review of the record reveals that there is no evidence to support this assertion, other than taking language Mr. Duchardt used in a memorandum out of context.[124]

Mr. Duchardt related in his statement how the interviews with Montgomery proceeded during their pretrial meetings:

> The only thing which can be read as a criticism of substance is the accusation that Ryland and I, in our interviews with Lisa, "planted" the memory that Lisa's brother Tommy was with her when she went to Bobbie Jo Stinnett's home, and that Lisa thereafter just repeated the "script" we had given her (Doc. 71, p. 72-73, 82). This is absolutely wrong. To the contrary, it was Lisa who, for months, had been volunteering to others on the team about her memory that someone else

---

At no point does Mr. Duchardt state that he "pushed" Montgomery into identifying Tommy Kleiner as her accomplice.

[123]"Once the memory of Tommy Kleiner being present at the crime scene was suggested and then "firm[ed] up by Duchardt's "pushing" her, Mrs. Montgomery's mind was forever altered." (Montgomery COA 628.) As stated above, there is no evidence that Fred Duchardt suggested Kleiner's involvement.

[124]During the evidentiary hearing Mr. Duchardt testified in the following fashion concerning the Tommy Kleiner issue:

> Q. And what I want to ask you, sir, did you ask her questions in a suggested fashion? Did you in any way plant the notion that Tommy was the one who was involved with her?
>
> A. Of course not.
>
> Q. Did you in fact take steps to make sure you didn't do that?
>
> A. Right. Yes.

(Civ. Tr. 2304-05.)



Appellate Case: 17-1716 Page: 263 Date Filed: 07/30/2018 Entry ID: 4687987

> was with her at Bobbie Jo's house. Lisa refused to say who that someone else was, reasoning that she needed to stay silent about that person for that person's protection. The entire team took great pains to make sure to never lead Lisa on any subject, and everyone, including Ryland and I, were extremely careful to not suggest anything, but just patiently listen until Lisa got to a point at which she wanted to share more. As I accounted in my memo, it was at an earlier meeting, one at which Ryland was not present, that Lisa revealed Tommy as the person who was with her (Ex. 23, p. 4). During the meetings with Lisa while Ryland was present, we let Lisa talk, without prompting, about her recollections those and all other regards (Ex. 23, p. 4).

(DCD 129 at 48.)

As Mr. Duchardt made clear in his statement, Montgomery drove the need to explore the "Tommy Defense" because of her insistence that Kleiner was present at the crime:

> Current Counsel for Mrs. Montgomery also claim that we set Lisa up for failure because we "encouraged Lisa to talk about …the Tommy defense in all the evaluations that occurred" even though we, as a team, eventually decided to concede Tommy's alibi and consequent lack of participation (Doc. 71, p. 85). Current Counsel for Mrs. Montgomery correctly point out that I strongly disagreed with conceding the Tommy alibi (Doc. 71, p. 85). John as the lead counsel, with strong support from Dave[13], made that call for strategy reasons which were understandable, but with which I disagreed. Regardless of how we decided to handle *Lisa's insistence that Tommy was present*, Current Counsel for Mrs. Montgomery criticize us for letting Lisa talk about that, though failing to explain how, short of either not using any mental defense whatsoever or telling Lisa to lie, we could have hidden Lisa's firm recollections about Tommy from thorough expert questioning. *The truth of the matter was that Lisa's recollections meant that the Tommy story was in the case, and we just had to figure out the best way to handle the Tommy story.* (Emphasis added.)
>
> [13]This is another example of Dave's active participation in the case, contrary to claims that Dave was frozen out.



Appellate Case: 17-1716 Page: 264 Date Filed: 07/30/2018 Entry ID: 4687987

(DCD 129 at 53.)

The "Tommy Defense" arose because Montgomery introduced it to the defense team, which was then required to explore it.[125] This defense had several advantages because it provided an explanation for the physical strength needed to commit the crime, i.e., strangulation,[126] and there was corroborating evidence from an eyewitness who stated that there were two people in a car leaving the scene of the murder.[127] Moreover, there was testimony from Becky Harper, Bobbi Jo Stinnett's mother, that during a phone call on the day of the murder, Ms. Stinnett stated that "they" were at her residence, looking at the puppies. (Tr. 516.)

---

[125]Whether or not a prior defense team had discarded the "Tommy Defense" would not be particularly dispositive of the obligation of the trial team to explore this defense, especially in a situation where Montgomery was describing in detail her interactions with Tommy Kleiner on the day of the murder.

[126]As Mr. Duchardt related in his statement:

> [I]t had always seemed to those of us who dealt with Lisa on a daily basis that she was herself too physically weak to have been able to subdue and kill Bobbie Jo by herself. Interestingly enough, during one of our interviews with Tommy, he himself made precisely this observation about Lisa's lack of physical prowess making it highly unlikely she could have committed the crime by herself.

(DCD 129 at 52.)

[127]That person would be Leona Hayes. (Civ. Tr. 1964-66.)



Appellate Case: 17-1716 Page: 265 Date Filed: 07/30/2018 Entry ID: 4687987

Ultimately, John O'Connor, as lead counsel decided that the defense team would not present evidence of Tommy Kleiner as a co-participant in the crime. (Civ. Tr. 1981). This was not a decision with which Fred Duchardt agreed because he thought that there was evidence to dispute the alibi, i.e., that Kleiner was with his probation officer at the time of the offense. As Mr. Duchardt testified at the evidentiary hearing:

> Well, I'm still the person who still thinks that those records don't prove that [Tommy Kleiner was with his probation officer], and I was the one who argued all the way along that we should drill down further past those records because -- there were actually indications in other records that Tommy was actually present on a different date, because he was supposed to be in court on a different date and was supposed to go immediately to talk to his probation officer that date, but -- and so I believed that we were in good shape to make a very creditable, if not, strong argument that the -- what had been accounted into the computers by the probation officer was actually covering up that she had failed to make that accounting for her time on the date that Tommy actually appeared, which was the week before.
>
> But having said all of that, yes, the records that were presented and that we essentially by decision of John for the team, we conceded that Tommy wasn't there.

(Civ. Tr. 2305.)

In the final analysis, Montgomery is attempting to obtain relief for a defense that she created but that her trial team declined to present. There is no basis under these facts for the issuance of a COA.

Montgomery also argues that the "Tommy Defense" contradicts her insanity defense. It is less than clear that this is the case, i.e., Montgomery could have been

insane and still had an accomplice. Even if a contradiction existed, however, the defense team would still have had an obligation to explore Montgomery's claims that another person was involved in the crime with her. Finally, since the ultimate trial defense did not include the involvement of an accomplice, but instead wove Montgomery's belief that Tommy Kleiner was with her into the insanity defense, it is unclear how Montgomery suffered prejudice from her counsel's actions.

Again, this is not the basis for the issuance of a COA.

8. *The decision to present an NGRI defense was a viable trial strategy undertaken after an evaluation of Montgomery's history, the testimony of witnesses and experts.*

a. *Factual support for NGRI defense.*

Summary of Argument

Simply put, Montgomery now disagrees with the decision to advance a NGRI defense, insisting that it was not supported by the evidence. In support of this argument, Montgomery presents the opinions of various individuals such as Judy Clarke (who the court removed from the defense team for personnel reasons) and David Freeman (who voluntarily left the defense team with Ms. Clarke). (Montgomery COA 655-62.)

However, the record reveals that there was ample evidence presented to support an NGRI defense including the testimony of multiple experts who testified



Appellate Case: 17-1716 Page: 267 Date Filed: 07/30/2018 Entry ID: 4687987

not only regarding pseudocyesis, but supported an NGRI defense with a number of other major mental illnesses.

Argument

Montgomery made the same claim in her § 2255 motion, i.e, that the pseudocyesis defense was not supported by the facts and that it was not sufficient for an insanity defense. However, as Mr. Duchardt related in his statement, the record establishes that pseudocyesis was not the only mental illness presented to the jury upon which it could base its NGRI conclusion:

> Contrary to the notion that our mental health defense was single-minded, the record of testimony and argument establishes that the jury was urged to find that Lisa Montgomery suffered from variegated mental diseases and defects, including pseudocyesis, major depression, post-traumatic stress disorder, bipolar disorder, borderline personality disorder as well as trauma-caused brain injuries (Tr. 2071, 2091, 2198-2200, 2205, 2213-2214, 2245-2248, 2405-07, 2420-23, 2989, 2993-94, 3021, 3027-3031, 3159-3180).

(DCD 129 at 62.)

Both Drs. Ramachandran and Logan testified that because of Montgomery's severe mental disease or defect, she was unable to appreciate the nature, quality and wrongfulness of her actions. (Tr. 2250, 2988, 3030.)

The court also discussed the basis for an NGRI defense in its decision:

> [C]ounsel did have evidence supporting the pseudocyesis defense from both lay and expert witnesses. Some family and friends testified that Movant looked pregnant. *Montgomery*, 635 F.3d at 1079. Drs. Ramachandran and Logan testified that Movant suffered from pseudocyesis, depression, borderline personality disorder, and PTSD.

> *Id.* at 1082. Both doctors also testified that Movant was in a delusional, dissociative state at the time of the offense. *Id.* at 1083; Trial Tr. 2250-51, 2423). Insanity defenses themselves are rather uncommon; however, when used, an insanity defense generally includes allegations of delusions and dissociation. *See*, *e.g.*, *United States v. Lasley*, 832 F.3d 910, 912 (8th Cir. 2016); *United States v. Samples*, 456 F.3d 875, 877-78 (8th Cir. 2006); *Weekley v. Jones*, 76 F.3d 1459, 1462-63 (8th Cir. 1996); *United States v. Blumberg*, 961 F.2d 787, 789 (8th Cir. 1992).

(DCD 212 at 23.)

Indeed, this Court confirmed the evidence in support of the not guilty by reason of insanity defense in its opinion on direct appeal, *United States v. Montgomery*, 635 F.3d 1074, 1082 (8th Cir. 2011):

> Montgomery filed her notice of intent to assert the defense of insanity and to present expert evidence relating to mental disease or defect. *See* Fed.R.Crim.P. 12.2. Defense counsel engaged Vilayanur Ramachandran, M.D., and William Logan, M.D., to evaluate Montgomery. Both Drs. Ramachandran and Logan diagnosed Montgomery with depression, borderline personality disorder, post-traumatic stress disorder, and pseudocyesis. The government's expert, Park Dietz, M.D., agreed that Montgomery suffered from depression, borderline personality disorder, and post-traumatic stress disorder but did not diagnose her as suffering from pseudocyesis.

Clearly, the defense team presented sufficient evidence to support an NGRI defense.

9. *Allegation that the NGRI defense exposed Montgomery to questioning from government experts.*

Summary of Argument

Montgomery complains that an NGRI defense required her to undergo a mental evaluation under 18 U.S.C. § 4242 and Fed. R. Crim. P. 12.2(c)(1)(A). (Montgomery COA 662-66.) Montgomery claims that there are protections in a penalty phase mental defense.

However, short of not presenting any mental defense at all, any supposed protections are illusory. Whether or not the Government's experts examined Montgomery for the guilt phase, or the penalty phase, the same examination would have occurred.

Argument

Montgomery touts the supposed benefit of waiting until the penalty phase to present a mental defense: "Any examination on behalf of the government is sealed and may not be disclosed to the government's attorneys until after a conviction for first degree murder and the defendant confirms her intent to move forward with mental health evidence in the second phase." (Montgomery COA 662.)

However, the proof of Montgomery's guilt was overwhelming since, after initially denying her involvement, she had confessed to the crime and she also had the physical evidence of the crime in her car and on her computer in addition to having the baby. Unless the defense interposed an NGRI defense, a conviction on

the murder charge was essentially certain and the case would have proceeded to the penalty phase immediately.

Montgomery refers this Court to the opinion of Judy Clarke who states: "Well, an insanity defense essentially opens the client up to a government evaluation and discussion of the crime. A penalty phase mental health presentation that a mental health presentation without an insanity defense there are certain protections built in in terms of the defense being able to [pull] the defense after they see what the government's evidence would be." (Montgomery COA 663.) One wonders what arguments would have been made regarding ineffective assistance of counsel had the trial team pulled a mental health defense under circumstances where Montgomery had a history of childhood physical and sexual abuse, had delusions of multiple pregnancies (and births) after a successful sterilization, and had been diagnosed with depression, borderline personality disorder, and post-traumatic stress disorder. One way or another, especially based on the nature of the crime (as well as her background), the issue of Montgomery's mental health was going to be a major feature at trial. The advantage of an NGRI defense was to present a consistent position throughout the trial. As John O'Connor testified in the evidentiary hearing:

> We believed that [the NGRI defense] was the best defense to put forward to the jury in light of the facts and circumstances of the case and try to convince the jury just on the face alone without experts, it looks like someone wouldn't be in their right mind to commit this. You have some evidence to support that. I think that goes a long way in trying to get that theme home to the jury to save Lisa's life.

(Civ. Tr. 2019.)

Mr. O'Connor testified that this was a reasoned choice he discussed with his trial team and which he believed was tactically the best thing to do on Montgomery's behalf even though it would expose her to government witnesses earlier in the case than otherwise, because it provided her with a consistent defense throughout the trial. (Civ. Tr. 2020.)[128]

This is, again, simply an attack on the decision of the defense team to proceed with a NGRI defense, which they made following an examination of the

---

[128]Mr. O'Connor explained another advantage to an NGRI defense:

> Q. And not just as much as you could get before the jury. When you go with an NGRI, you do have the advantage of being able to let the jury hear it twice, correct?
>
> A. Again, I'm big on taking the theme from start to finish.
>
> Q. So by doing the NGRI, you have a consistent defense approach to the case, correct?
>
> A. Yes.
>
> Q. In my words, the jury gets two bites at the apple. Either, A, they can believe the evidence sufficient to find her not guilty by reason of insanity in the guilt phase; or if not, they can say, Well, she might be guilty but, gosh, darn it, she just wasn't quite right. We could give her a mitigated sentence; is that fair?
>
> A. I think that's fair.

(Civ. Tr. 2021.)



Appellate Case: 17-1716 Page: 272 Date Filed: 07/30/2018 Entry ID: 4687987

circumstances of the crime and the defendant and based on expert evaluations. This reasoned choice on the part of the trial team is not the basis for a COA.

*10. Allegation that trial counsel's inattention led to the disclosure of privileged information indicating that Montgomery was a malingerer.*

Summary of Argument

Montgomery claims that the Government used notes by Dr. Hutchinson to misrepresent her mental condition to the jury. However, there was nothing significant in Dr. Hutchinson's notes that was not otherwise presented as part of the evidence in this case.

Argument

Montgomery claims that the Government used notes and testing from Dr. Hutchinson to misrepresent information to the jury. (Montgomery COA 666-70.) Montgomery claims specifically that this resulted in Dr. Martell testifying that Dr. Hutchinson found evidence of malingering.

However, a review of Dr. Martell's direct testimony shows that he analyzed primarily the results of tests conducted by Dr. Kuncel and included his own testing as well. The tests administered by Dr. Martell, which he testified showed evidence of malingering, were the same tests given by Dr. Hutchinson.[129] In addition,

---

[129]Dr. Martell testified that he gave Montgomery a number of different tests:

A. Okay, I administered a number of psychological tests looking for evidence she may have mental disorders. They included the Minnesota

Dr. Martell relied on his own observations of Montgomery as well as interviews with other witnesses. (Tr. 2463, 2477-80.)

With respect to Dr. Martell's statements regarding Drs. Hutchinson and Kuncel, Dr. Martell spent the majority of his time focusing on the testing of Dr. Kuncel, rather than Dr. Hutchinson:

> Doctor Hutchinson and Doctor Kuncel found evidence she was malingering.
>
> Historically, Doctor Hutchinson saw her first about a month after the instant offense in January of 2005. And she gave the M. M. P. I. I also gave and the M.C.P.M.I. I also gave. And she noted evidence on both of those tests Miss Montgomery was exaggerating her symptoms or malingering.

---

> Multi-Phasic Personality Inventory two or M. M. P. I. This is a paper and pencil test that looks for evidence of mental disorders. The patient fills it out themselves. It's scored by a computer very objectively. Their answers are compared to large samples of people in the community around the country. I also administered personal assessment inventory that works in the same way.
>
> I also administered the Millon Clinical Multi-Axial Inventory Three. Again another objective test that she completes herself and is scored by the computer. Something called detailed assessment of post traumatic stress. This is specifically designed to look at P. T. S. D. or post traumatic stress disorder. A test called the psychopathic checklist revised. Psychopathy is different from psychopathology. Psychopathy, you may have heard the term are the worse kind of anti-social personality characteristics. And this test is designed to look for people who might be psychopaths.
>
> I also gave her an impulsivity scale.

(Tr. 2458-61, 2463.)



Appellate Case: 17-1716 Page: 274 Date Filed: 07/30/2018 Entry ID: 4687987

Doctor Kuncel gave something during her exam, this was two years later in January. And then she saw her again in March of 2007. She gave something called the structured interview of malingered or SIM. The SIM has various scales that measure different kinds of faking. And Miss Montgomery was selective, she didn't fake everything. For example, there is a scale for faking low intelligence. She did not fake low intelligence. In fact, she has a superior I. Q. Dr. Hutchinson tested it at 120 which is in the superior range and actually noted she probably would have scored higher but she didn't give her best effort at the time of Doctor Hutchinson's testing.

So on this test with Doctor Kuncel she didn't pretend to have a low I.Q, didn't pretend to be out of touch with reality or psychotic, but she did pretend to have an amnestic disorder. And amnestic is like amnesia, a problem with memory. So she pretended to have a memory problem and she also pretended to have an affective disorder, a mood disorder, depressive or mania or both. She exaggerated the symptoms of a mood disorder.

Those two scales together caused the overall SIMs score to be in the range of malingering performance.

The next day, Doctor Kuncel give gave her a different test called the SIRS, another interview of malingering and she passed. So she is selective, some days she seems to malinger and/or other tests at other times she doesn't. So it's a little bit like the boy who cried wolf, never quite sure when you are getting the truth and when you are getting what she wants you to hear or when you are being manipulated.

Doctor Kuncel also administered the M.M.P.I. and/or other M.M.P.I there is a scale called the fake bad Lees-Haley. That fake bad scale, her score for that scale was 28 which is very high for women and indicates that she was faking bad on the M.M.P.I. for Doctor Kuncel. So there were no indications in Doctor Kuncel's testing, two indications in Doctor Hutchinson's testing.

And then I tested her myself and again she malingered on the M.M.P.I. exaggerated symptoms on the M.C.M.I. In, fairness although she did exaggerate on those these I gave her other tests where she had valid scores and the results were interpretable.

(Tr. 2459-61.)

Moreover, on cross-examination at the evidentiary hearing Dr. Hutchinson herself testified that Montgomery's responses to the preliminary tests given to her showed evidence of exaggeration of symptoms, but did not want to call it malingering. (Civ. Tr. 1061.)

Thus, whether or not Dr. Hutchinson's test interpretations were somehow employed inaccurately, her tests were simply duplicative of other tests and the testimony of Dr. Martell, which showed that Montgomery had characteristics of malingering. There is no prejudice to Montgomery under these facts and no COA should issue.

11. *Claim of ineffective cross-examination of Dr. Dietz and Dr. Martell, and failure to rebut testimony.*

a. *The cross-examination of Dr. Martell.*

Summary of Argument

Montgomery argues that Fred Duchardt's cross-examination of Dr. Martel "was meandering and ineffective." (Montgomery COA 671.) She reviews statements from various members of the defense team about how they felt about the cross-examination. (Montgomery COA 672-73.) She then argues that Mr. Duchardt should have obtained the services of the witnesses habeas counsel obtained to testify



Appellate Case: 17-1716 Page: 276 Date Filed: 07/30/2018 Entry ID: 4687987

at the evidentiary hearing, relying primarily on the testimony of Dr. Sanislow. (Montgomery COA 674-77.)

However, Dr. Martell both personally examined Montgomery and administered tests to her. He also discussed Montgomery's history with other witnesses. Dr. Sanislow, who is not a forensic psychologist, based his testimony simply on a review of existing reports regarding the MMPI administered to Montgomery without a complete range of data on which to base his conclusions.

Argument

Montgomery begins this section of her argument by presenting anecdotal hearsay evidence from the defense team's computer system administrator, Troy Schnack, and the team's paralegal, Stephanie Elliott, about John O'Connor's reaction to Fred Duchardt's cross-examination of Dr. Martell. (Montgomery COA 672.) Interestingly, although Montgomery called Mr. O'Connor to testify, habeas counsel did not make any inquiry regarding this matter to Mr. O'Connor, relying, instead, on the interpretations of other individuals.

Similarly, although Montgomery cites Ms. Elliott to the effect that David Owen believed Mr. Duchardt's cross-examination "was a disaster" (Montgomery COA 673), she did not make inquiry of Mr. Owen regarding this issue, although she called him as a witness.



Appellate Case: 17-1716 Page: 277 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery's primary complaint in this section is the failure of trial counsel to obtain the services "of an expert such as Dr. Charles Sanislow who would have supported pretrial motions to prevent the administration of an MMPI under Rule 12.2." (Montgomery COA 674-75.) Montgomery contends that Dr. Sanislow would have testified that the MMPI is not a proper instrument to administer to an individual with her trauma history. Montgomery's argument, therefore, is that the district court would have prevented the administration of a major psychometric test given to her by not only Dr. Martell (Civ. Tr. 2458), but also Drs. Hutchinson (Civ. Tr. 2459) and Kuncel (Civ. Tr. 2461) who were both assisting her in her defense. Since her experts had already employed this test, the Government suggests that it would be unlikely that the district court would prevent the Government's experts from using it as well.

Montgomery presented Dr. Sanislow at the evidentiary hearing on her § 2255 motion to testify concerning the tests administered to her. However, on cross-examination, Dr. Sanislow, who is not a forensic psychologist, admitted that he conducted no psychometric testing, did not conduct a clinical interview of Mrs. Montgomery, and based his analysis only on materials referred to him by the defense. (Tr. 1446-47.) Dr. Sanislow further stated that although he analyzed Dr. Martell's tests, he never contacted Dr. Martell to discuss his work. (Tr. 1449.) He also admitted that he presented only hypotheses in his declaration because he



Appellate Case: 17-1716 Page: 278 Date Filed: 07/30/2018 Entry ID: 4687987

was "missing the full range of data that would be available to someone who themselves conducted an interview." (Tr. 1450.) Dr. Sanislow conceded that Dr. Martell had conducted tests other than the MMPI and had actually interviewed Montgomery. (Tr. 1451-53.)

Moreover, the district court also noted that Dr. Sanislow's testimony was essentially duplicative:

> Dr. Sanislow testified at the evidentiary hearing regarding his background with Minnesota Multiphastic Personality Inventory ("MMPI") testing and to rebut Dr. Martell's conclusions that Movant exaggerated her symptoms when taking the MMPI, which is referred to as malingering. Dr. Sanislow also testified regarding the difference between clinical and forensic psychologists and the different standards for reports. He acknowledged that he is a clinical practitioner while Dr. Martell is a forensic psychologist. Dr. Sanislow's testimony generally mimicked testimony given by Dr. Kuncel at trial. At trial, Dr. Kuncel challenged Dr. Martell's conclusions regarding malingering by explaining her opinion on the MMPI testing protocol and the results of Movant's MMPI tests.[130]

(DCD 212 at 41.)

There is nothing that Dr. Sanislow presented at the evidentiary hearing that would more effectively (as opposed to Dr. Kuncel) counter the testimony of Dr. Martell, a board certified forensic psychologist, who performed more tests and developed a much greater matrix of information for his diagnosis. While Montgomery now claims that the cross-examination of Dr. Martell was

---

[130] *See*, *e.g.*, Tr. 3045-47.

unsatisfactory, she does not present sufficiently reliable evidence for this conclusion.[131]

*12. The cross-examination of Dr. Dietz.*

Summary of Argument

Montgomery claims that Dr. Dietz, an expert called by the Government, would have changed his testimony if her trial counsel had presented him with the exhibits prepared by Montgomery for the evidentiary hearing. Alternatively, she speculates that her evidence would have been so persuasive that the Government would not have called Dr. Dietz to testify at all. (Montgomery COA 679.) Thus, Montgomery concludes that her trial counsel rendered ineffective assistance by failing to either change the opinion of the Government's expert witness or force the Government to abandon his testimony.

[131] Montgomery also complains that the Government used the test results of Drs. Kuncel and Hutchinson in their closing arguments to show that their tests indicated that she was malingering. The problem with this complaint is that the test scores *did* show that Montgomery was malingering, although not on a consistent basis. Montgomery's real complaint is that the test scores could be interpreted in a different way, e.g., Dr. Hutchinson did not consider the results to be malingering because she defines "malingering" to be completely fabricating symptoms rather than simply exaggerating them. (Civ. Tr. 1061.) However, as noted above, the DSM-IV includes in its definition of malingering the gross exaggeration of symptoms. *Diagnostic and Statistical Manual of Mental Disorders* at 739. In any event, there was substantial testimony from Drs. Ramachandran and Logan refuting the diagnosis of malingering.



Appellate Case: 17-1716 Page: 280 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery presents no evidence to support this conclusion; just generalized statements regarding Dr. Dietz's testimony and the "scorched earth biopsychosocial history" that she speculates would have changed his testimony. (Montgomery COA 679.) However, it is pure conjecture on Montgomery's part to assert that her trial counsel could force Dr. Dietz to change his opinion, or to force the Government not to call him.

<u>Argument</u>

Montgomery's central argument in this section appears to be that had her trial counsel properly investigated the case, the cross-examination of Dr. Dietz would have been based on the evidence that she presented at the evidentiary hearing, primarily the testimony of Drs. Hutchinson and Porterfield. Montgomery also contends that Dr. Dietz "undermine[d] the severity of Mrs. Montgomery's childhood experiences" and was "equivocal" about PTSD. (Montgomery COA 680, 682.)[132]

These arguments appear to be different from the arguments presented to the district court. In the proceedings below, the court identified Montgomery's complaints about the cross-examination of Dr. Dietz in the following fashion:

> In Montgomery's next claim of ineffective assistance of counsel, she contends trial counsel was ineffective in preparing for and cross-examining the Government's two mental health experts, Drs. Daniel Martell and Park Dietz. (2255 Mtn, pp. 190-92). Specifically, Movant argues trial counsel should have prepared for and cross-examined both

[132]Montgomery also again complains about the trial team's decisions regarding the "Tommy Defense" discussed in more detail above.



Appellate Case: 17-1716 Page: 281 Date Filed: 07/30/2018 Entry ID: 4687987

> doctors on the underlying sources of their opinions; challenged the relevancy of Dr. Dietz's testimony in other high profile cases; objected to speculative and character testimony; and better prepared to cross-examine Dr. Dietz about his testimony in *Yates v. Texas*, 171 S.W.3d 215 (Tex. App. 2005). (*Id.*). The Government opposes, arguing trial counsel could not question Drs. Martell and Dietz on unsubstantiated facts and that trial counsel made reasonable, tactical decisions for crossexamining the witnesses in the manner in which they did. (Gov't Resp., pp. 123-26).

(DCD 212 at 87.)

Thus, there are no findings by the district court to which Government counsel may direct this Court's attention regarding the allegations in the application for COA, because Montgomery did not make these arguments below and apparently raises them for the first time on appeal.

In the argument presented in this Court, Montgomery contends that Dr. Dietz did not diagnosis her with a major mental illness, did not confirm that her PTSD arose before the murder, and downplayed the sexual abuse history.

In fact, Dr. Dietz did testify that Montgomery suffered from PTSD because of childhood trauma:

> I think it's quite clear from the context of the clip that was shown this morning what she is describing is an intrusive thought which would be a symptom of post traumatic stress disorder and she even likens it to the experience of becoming uncomfortable or having uncomfortable thoughts when the behavior of some male reminds her of sexual abuse. They're times she's triggerd to recall that and apparently they're times when she's triggered to remember her mother being critical of her which I believe happened a great deal in her childhood, she could never do anything right.

> So I think this is corroboration for her having post traumatic stress disorder concerning childhood events in which things remind her of those bad experiences and they pop into her head unwanted and then she does something to distract herself or try to put it out of her mind which is the way patients who have P. T. S. D. behave.

(Tr. 2762.)

However, as a practical matter, to the extent that Dr. Dietz's testimony that Montgomery's PTSD may have arisen because of either childhood trauma and/or because of the murder she committed is essentially indisputable, since no expert for either the Government or Montgomery conducted a clinical exam of her prior to the crime and diagnosed PTSD. Moreover, Dr. Dietz testified that regardless of whether Montgomery had PTSD because of the crime or because of childhood abuse, neither would constitute a serious disease or defect. (Tr. 2614.)

Montgomery complains about the cross-examination of Dr. Dietz alleging that Fred Duchardt should have impeached his reliance on the statements by Montgomery's ex-husband, Carl Boman, although conceding that Dr. Dietz admitted that Boman was biased against Montgomery.[133] Montgomery then

[133]Montgomery insists that her counsel should have impeached Dr. Dietz with an allegation that her brother, Teddy Kleiner, once saw a sex tape involving Boman and Montgomery with "Boman raping [his] Lisa." (Montgomery COA 686.) First, this statement is a conclusion on the part of Kleiner, i.e., rape is a legal conclusion that cannot necessarily be drawn from watching two people have sex. Indeed, had Kleiner believed he was watching evidence of an actual rape, he should have reported to the authorities, but did not. As the district court noted, this claim against Carl Boman, based on "wild accusations" by Jan Vogelsang, would not have been admitted in court. (DCD 212 at 88.)

complains that Mr. Duchardt spent "a substantial portion of his cross-examination trying to convince Dr. Dietz that Mrs. Montgomery suffers from pseudocyesis." (Montgomery COA 686.)

However, Mr. Duchardt's statement shows that his cross-examination of Dr. Dietz involved a different tack:

> I believe that the record of my cross-examination of Dr. Dietz reflects that I was trying to paint Dietz as a gun for hire. My allowing Dietz to talk about certain of the notches on his gun handle was part of that approach.

(DCD 129 at 95.)

Indeed, a review of the transcript reveals that Mr. Duchardt elicited testimony from Dr. Dietz that he received $6,000 per day and had billed $50,000 up to that point in the case. (Tr. 2655-56.). The district court noted that trial counsel made a strategic decision to portray Dr. Dietz as a "gun for hire," which is a "virtually unchallengeable" tactical and strategic decision. (DCD 212 at 89.)

Mr. Duchardt also went over Dr. Dietz's testimony in the Andrea Yates case where he testified incorrectly on the stand, resulting in a reversal of the conviction and a grand jury investigation. (Tr. 2661-66.) During cross-examination, Dr. Dietz

---

Moreover, Montgomery does not explain how this allegation, assuming it is true, would change the testimony of Dr. Dietz. As the district court found, Drs. Martell and Dietz "based their opinions on much more than just the statements of Judy [Shaughnessey] and Carl [Boman]. (Trial Tr. 2456-63, 2540-41, 2545-48.)" (DCD 212 at 87.)

also testified that his sources of information, Carl Boman and Lori Colwell both had antagonism toward Montgomery and had "an axe to grind". (Tr. 2667-69.) He further admitted that some of his information regarding Montgomery throwing items at Boman were wrong based on Boman's testimony at the trial. (Tr. 2671.) Under cross-examination, Dr. Dietz also admitted that there was no doubt in his mind that Montgomery had been physically abused by her stepfather for a long period of time and sexually abused for a period of years from the age of 14. (Tr. 2697.)

The cross-examination of Dr. Dietz attacked his credibility by showing the amount of money paid by the Government for his opinion, an error in a previous opinion resulting in reversal and errors in Montgomery's case. Mr. Duchardt's cross-examination was not constitutionally ineffective and Montgomery's contentions to the contrary are based on pure speculation.

13. *<u>The allegation that the pursuit of an NGRI defense resulted in exclusion of brain injury evidence.</u>*

<u>Summary of Argument</u>

Montgomery argues that pursuit of the NGRI defense in the guilt phase resulted in the exclusion of the brain scan evidence by Dr. Gur in the penalty phase. Montgomery contends, essentially, that if her trial counsel had not proceeded with the insanity defense in the guilt phase, Dr. Gur's testimony would not have been challenged. Montgomery suggests that her trial counsel should have abandoned the penalty phase defense in order to preserve the brain scan evidence.



Appellate Case: 17-1716 Page: 285 Date Filed: 07/30/2018 Entry ID: 4687987

(Montgomery COA 690.) Montgomery also complains that her trial counsel's discovery failures resulted in the exclusion of evidence regarding the MRI and the PET.

However, much of Montgomery's argument is based on pure speculation. Moreover, this Court previously has ruled on Montgomery's claim on direct appeal, and found that the exclusion of this evidence was harmless error.

<u>Argument</u>

Montgomery claims that the attempt to use the brain scan evidence of Dr. Gur in the penalty phase to support the NGRI defense was constitutionally deficient because it led to the exclusion of this evidence. Montgomery also contends that her trial counsel failed to comply with discovery rules resulting in the exclusion of the MRI and PET results.

Montgomery's arguments were a matter of substantial review by this Court in her direct appeal. In that opinion, this Court concluded that Montgomery's PET scan data showing abnormalities in the areas regulating emotion processing and core functions "had minimal probative value." The *Montgomery* court noted that Dr. Gur had conceded that the abnormalities found do not predict behavior and did not cause Montgomery to commit the crime. *United States v. Montgomery*, 625 F.3d 1074, 1090 (8th Cir. 2011).

This Court further found that Dr. Gur's opinion that the PET results formed a basis for establishing pseudocyesis was not sufficiently supported by reliable scientific principles and that the district court did not abuse its discretion in excluding Dr. Gur's opinion during the guilt phase of the trial. *Id.* at 1090-91. The court concluded, however, that Dr. Gur's interpretation of the PET data was "arguably admissible" in the penalty phase, but concluded that its omission was harmless error:

> Under the Federal Death Penalty Act's low threshold for admissibility, Dr. Gur's interpretation of the PET scan was arguably admissible.[8] Whether its exclusion constituted reversible error is another question. We conclude that any error in excluding the proposed testimony was harmless beyond a reasonable doubt. The jury heard extensive testimony from Drs. Ramachandran, Logan, and Kuncel, as well as from Montgomery's treating psychiatrist, about Montgomery's background and psychiatric diagnoses. Dr. Gur's testimony would have informed the jury that Montgomery's brain had certain functional abnormalities, would have offered his minimally probative and scientifically unreliable opinion that the abnormalities were consistent with the pseudocyesis diagnosis, and would have expressed his opinion that "the brain she has may explain at least part of what happened" and that the abnormalities contributed to her actions. Nevertheless, we conclude that what we said in *Purkey* is of equal force in this case: "[A]lthough we recognize that a jury may be more likely to believe that someone suffers from a problem if its cause is explained, we nevertheless harbor no doubt that considering the minimal probative value of the evidence and the overwhelming evidence and jury findings of serious aggravating factors, its exclusion was harmless." 428 F.3d at 758.

*Id.* at 1092.



Appellate Case: 17-1716 Page: 287 Date Filed: 07/30/2018 Entry ID: 4687987

This Court also noted that the district court did not abuse its discretion in excluding the MRI data from both the guilt and penalty phases of the trial because, although it showed abnormalities in Montgomery's brain structure, those results were not "clinically significant." *Id.* at 1093.

All of Montgomery's arguments regarding the exclusion of the brain imaging information were the subject of substantial examination on appeal. This includes Montgomery's discovery argument, where the court found that her counsel had complied with their discovery obligations and any exclusion of the PET evidence because of a discovery violation was "unwarranted." *Id.* at 1092, n.8.

This Court has already concluded that the exclusion of Dr. Gur's evidence was harmless. While Montgomery complains that her trial counsel "mishandled the discovery dispute," nothing her counsel did would have changed the fact that however presented, Dr. Gur's testimony was excluded based on the considered discretion of the district court based on the evidence.

*14. <u>Claim that trial team failed to object to improper argument in the penalty phase.</u>*

<u>Summary of Argument</u>

Next, Montgomery claims that her trial counsel failed to object to improper argument, which prejudiced the penalty phase. However, Montgomery has completely failed to show that the comments were improper or, if they were, that they prejudiced her.

Argument

Montgomery argues that the Government made improper comments to which her trial counsel failed to object in the penalty phase. Among these comments, Montgomery lists remarks that she failed to show remorse, that an insanity defense is an "excuse," that Dr. Ramachandran's testimony was "voodoo science,"[134] and that the prosecution argued that the jury should reject the insanity defense because of its impact on the victim's family. Montgomery also claims error in failing to object to penalty phase comments that she was "wicked and evil"[135] and that she was arguing the "abuse excuse" and that she never apologized.[136] (Montgomery COA 695-96.) Montgomery presents no authority to support her contention that these particular comments by the Government are improper.

---

[134]Montgomery contends that this phrase is "a racist dog whistle" without further expanding on why she would make such a remarkable accusation. (Montgomery COA 695.) She does not, for example explain why "voodoo science" is any more racist than, for example, "voodoo economics" or why the jury would understand the comment to be racist.

[135]Government counsel did not call Montgomery "wicked and evil" but instead said that the crime committed by the Montgomery was "wicked and evil." (Tr. 3147.)

[136]In fact, trial counsel did object to this comment and raised it on appeal, albeit unsuccessfully. *United States v. Montgomery*, 635 F.3d 1074, 1096-97 (8th Cir. 2011.)



Appellate Case: 17-1716 Page: 289 Date Filed: 07/30/2018 Entry ID: 4687987

In the cases cited by Montgomery, the comments by the Government were far more egregious than anything she cites in her application for a COA.

In *Zapata v. Vasquez*, 788 F.3d 1106, 1113-14 (9th Cir. 2015), the court found that the prosecutor committed misconduct by recounting the crime from the victim's perspective in a false and ethnically inflammatory way using slurs as a way to appeal to the passions of the jury and that the defendant's counsel was deficient in failing to object. Montgomery's case presents none of these factors.

In *Girts v. Yanai*, 501 F.3d 743, 757 (6th Cir. 2007), the court found ineffective assistance of counsel when the prosecutor commented multiple times[137] on the defendant's failure to testify and counsel failed to object.

[137]Among the comments made by the prosecution were the following:

> "Again these are his words. And the words that you heard from these folks supplied by him are unrefuted, and they are uncontroverted. *There has been no evidence offered to say that these people are incorrect. None at all."*
>
> "with respect to the source [of the cyanide], the *defendant had no less than three occasions to tell the police* that he had ordered the cyanide."
>
> "Ladies and gentlemen, we don't have to tell you how it was introduced into her system. We know that it was ingested. *And there is only one person that can tell you how it was introduced, and that's the defendant."*

*Girts*, 501 F.3d at 755.



Appellate Case: 17-1716 Page: 290 Date Filed: 07/30/2018 Entry ID: 4687987

In *Hodge v. Hurley*, 426 F.3d 368, 377-84 (6th Cir. 2005), the court found ineffective assistance of counsel when defense counsel failed to object during argument where the prosecutor commented on the credibility of witnesses, that the jury had to conclude that the alleged victim's family members were intentionally lying in order to acquit, argued that any disagreement between experts meant that one expert was lying and suggested that the defendant's bad character could tip the scale if the jury did not believe an eyewitness account.

In *Martin v. Grosshans*, 424 F.3d 588, 591-92 (7th Cir. 2005), the prosecutor referenced serial killers in an attempt to neutralize defendant's character witnesses and the court concluded that defendant's counsel was ineffective in failing to object or call for a mistrial.

A review of the facts of the cases cited by Montgomery demonstrates the paucity of her arguments regarding improper argument in this case. Nothing said by the Government in either the guilty phase argument or the penalty phase argument, even assuming the statements were improper, begins to approach the repeated and egregious comments demonstrated in the cases cited by Montgomery.



Appellate Case: 17-1716 Page: 291 Date Filed: 07/30/2018 Entry ID: 4687987

15. *Claim that trial counsel failed to develop penalty phase evidence.*

Summary of Argument

*Exhibit 1 – The Vogelsang Declaration*

This section of Montgomery's application is set forth in six sections, and twelve subsections, and essentially revolves around a central concept that her trial counsel failed to develop the biopsychosocial history that Montgomery sets forth as Exhibit 1 of her § 2255 motion. (Montgomery COA 697-768.) This exhibit (DCD 152-1) is a 184-page declaration by Janet Volgelsang signed by Ms. Vogelsang on March 17, 2013,[138] and filed on September 3, 2015, approximately eight years following the conclusion of the trial. Appended to this declaration are 293 additional documents amounting to approximately 3,000 additional pages. In addition, on August 5, 2016, approximately nine years after the trial, Ms. Vogelsang filed a supplemental declaration involving more interviews.

A review of Ms. Vogelsang's declaration reveals that it is filled with conclusory statements and conjecture. This was also the view of Montgomery's trial counsel, Fred Duchardt, who was familiar with Ms. Vogelsang's work and the problems associated with it:

> I have been familiar with Ms. Vogelsang's work for many years, and over the years I have been made aware that, at least in some of the early

[138]It should be noted that the document marked as Exhibit 1, presumably for trial purposes, but appearing to be an identical document to the one previously filed, is dated August 5, 2016.

cases in which Ms. Vogelsang was used, defendants achieved penalty phase success in having Ms. Vogelsang do in those cases what she has done for Current Counsel for Mrs. Montgomery this case, that is weave a poignant story from available information. The trouble is that the more Ms. Vogelsang has been used, the more that prosecutors have developed counterplans against her sort of plan. Prosecutors noticed that Ms. Vogelsang relies upon hearsay, often many times removed, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such hearsay is minimal, and that therefore such information is excludable under 18 U.S.C. 3593(c). Similarly, prosecutors noticed that Ms. Vogelsang relies upon great detailing of the troubled lives, including mental illnesses, of relations of a defendant, and even of those not related to the defendant, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such information about family members and others is minimal, and that therefore such information is excludable under 18 U.S.C. 3593(c). And Prosecutors noticed that Ms. Vogelsang, beyond her social worker expertise, repeatedly draws medical, psychiatric and psychological conclusions from the information she is provided, and now prosecutors regularly interpose successful penalty phase challenges against Ms. Vogelsang's beyond-her-expertise conclusions.[139] Finally, Prosecutors noticed that, in Vogelsang cases, all of the experts used the Vogelsang narrative as a script, and that

---

[139]For example, Ms. Vogelsang's biopsychosocial history concludes with the following paragraph:

> Lisa continues to be psychotic as a result of co-morbid conditions of serious mental illness, neurological impairment, and complex trauma reactions. Lisa experiences sustained loss of contact with reality and extremely disordered perceptions of time, personhood, and events. She experiences temporal disconnection from events, relationships, and situations in which she is a major participant. This disconnection is greater and more than dissociation associated with traumatic events. She is ashamed, fearful, distrustful, paranoid, suicidal, anxious, depressed, sleep disturbed, hyper vigilant, and self loathing.

(DCD 152-1 at 180.) Ms. Vogelsang does not attribute these conclusions to any medical doctor.

> therefore the conclusions of other experts could be undermined through the undermining of the Vogelsang narrative.

(DCD 129 at 73-74.)

Mr. Duchardt, then, made a reasoned analysis and concluded that he would reject the work of Ms. Vogelsang in presenting the relevant history of Montgomery. He did not neglect this approach; he actively rejected it for the stated reasons. This is a strategic choice made after a thorough analysis and is therefore "virtually unchallengeable." *Strickland*, 466 U.S. at 490. This was also the conclusion of the district court:

> Movant's remaining argument would be that trial counsel, despite having enough information to make a reasonable trial decision, chose the wrong strategy. Again, choices made after such thorough investigation are presumptively reasonable. *See Strickland*, 466 U.S. at 689- 90. Movant asserts trial counsel failed to tell Movant's story, and argues the team should have called witnesses, such as Jan Vogelsang, to testify during the penalty phase. Duchardt's written statement and evidentiary hearing testimony criticizes Movant's assertions. (Duchardt Statement, pp. 70-75). Movant does not establish unconstitutional ineffective assistance by presenting an expert at a habeas proceeding that may have been more helpful to her defense. *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007). Movant must demonstrate that counsel's failure to find or present the witness was objectively unreasonable. *See Sidebottom v. Delo*, 46 F.3d 744, 752-53 (8th Cir. 1995) (applying *Strickland* to determine whether counsel's failure to call expert witness was reasonable). Duchardt stated that, while he was aware of Vogelsang's practice at the time of the trial, he was skeptical of her efficacy, as prosecutors across the country were successfully challenging her testimony through objections based on grounds of hearsay and improper expert opinions. (Duchardt Statement, pp. 70-75). Whether Duchardt correctly forecasted the court's potential exclusion of Vogelsang's presentation, the record demonstrates he strategically considered whether her mitigation presentation would be



Appellate Case: 17-1716 Page: 294 Date Filed: 07/30/2018 Entry ID: 4687987

> useful. *See United States v. Battle*, 264 F. Supp. 2d 1088, 1194-95 (N.D. Ga. 2003) (excluding Vogelsang's attempt to testify about defendant's family's mental health conditions when Vogelsang failed to provide the sources of her findings).[17] The scope of the trial team's investigation and the testimony that recreated the reasoning behind the trial team's strategic decisions fails to establish objectively unreasonable performance.
>
> > [17]State courts have also expressed skepticism regarding Vogelsang's sources and utility. *See Davis v. State*, 9 So.3d 539, 558-59 (Ala. Crim. App. 2008); *Gudinas v. State*, 816 So.2d 1095, 1108-09 (Fla. 2002).

(DCD 212 at 34-35.)

In addition to Mr. Duchardt's issues with utilizing the services of Ms. Vogelsang based on prior cases, the district court also provided examples of deficiencies in Ms. Vogelsang's presentation in Montgomery's case:

> However, a review of Vogelsang's PowerPoint presentation reveals its contents are riddled with issues. For example, Vogelsang represents that numerous individuals in Movant's family suffer from mental impairments, citing to various attachments to the biopsychosocial history she completed. Most of these purported impairments are solely supported by the individual's statement they suffer from an impairment without stating they have a diagnosis and without medical records to confirm a diagnosis. Two specific examples follow. First, Movant's father, John Patterson, stated he suffered from depression and indicated he had some anxiety, but nowhere in his declaration did he state he was diagnosed with either condition. (Movant Ex. 1-6). Second, Movant's aunt, Mary Lee Coleman, claims she was diagnosed with depression and treated with the drug Zoloft. However, the medical records contain no diagnosis of depression or any reference to Zoloft. (Movant Ex. 1-10). While the court does not recount all of the discrepancies it found when comparing Vogelsang's PowerPoint presentation with the documents supposedly supporting the statements therein, suffice it to say the court would have excluded any testimony from Vogelsang found unreliable or cumulative.



Appellate Case: 17-1716 Page: 295 Date Filed: 07/30/2018 Entry ID: 4687987

(DCD 212 at 40-41.)

In addition, Montgomery's trial team presented essentially all of the relevant information in Ms. Vogelsang's declaration to the trial jury as the trial court found:

> Vogelsang admitted that nearly all of the evidence included in her biopsychosocial history and accompanying attachments and PowerPoint presentation came from trial counsel's database. The vast majority of this evidence was presented at trial through lay witnesses and Drs. Kuncel and Logan. Some evidence in the database was statements from Movant's mother and ex-husband, which trial counsel deemed unreliable and made a strategic choice not to present. And some evidence was not available at the time of trial, specifically Movant's alleged sexual abuse by friends of her stepfather, Jack Kleiner, and alleged sex trafficking of Movant by her mother, all during her teenage years.

(DCD 212 at 40.)

Moreover, the failure to present the biopsychosocial history upon which Montgomery now insists did not prejudice her as the district court found:

> Further, Movant would need to demonstrate she was prejudiced by the trial team's alleged deficient performance. *Strickland*, 466 U.S. at 693. Movant asserts that "[her] life has been one filled with trauma, suffering, and abuse at the hands of one person after another, resulting in brain damage, mental illness, and loss of contact with reality." (2255 Mtn, p. 193). She believes trial counsel failed to present this sad story to the jury, and "[n]o reasonable jury could have heard the evidence collected by post-conviction counsel and be unmoved." (*Id.*). However, the record reflects the jury heard the vast majority of the evidence post-conviction counsel alleges to have discovered. Any alternative strategy would have encompassed much of the same information as the trial team originally presented. The aggravating evidence's seriousness simply outweighed the mitigation evidence presented. "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." *James*, 100



Appellate Case: 17-1716 Page: 296 Date Filed: 07/30/2018 Entry ID: 4687987

> F.3d at 590. Movant was not prejudiced by any unconstitutional short coming of trial counsel's mitigation presentation.

(DCD 212 at 36.)

The Government suggests that the analysis of trial counsel and of conclusions of the district court should be kept in mind during discussion of Montgomery's complaints under this section.

16. *The allegation that trial counsel failed to investigate and develop a full social history.*

Summary of Argument

Montgomery argues that her counsel failed to develop a social history in the detail that she now claims is necessary and faults the presentation of evidence at the trial.

A review of the record, however, shows that her trial counsel did present the relevant credible evidence regarding Montgomery's physical and sexual abuse as a child. However, Montgomery's current claim that her counsel needed to present evidence of multi-generational conduct is irrelevant.

Argument

Montgomery claims that her counsel only scratched the surface of her childhood traumas. As an example, Montgomery claims that her half-sister, Diane Mattingly, could have provided testimony about the "seminal trauma

Mrs. Montgomery endured" which involved molestation, not of Montgomery, but of Ms. Mattingly. (Montgomery COA 701-02.)

In fact, there is no evidence that Montgomery was even aware of Ms. Mattingly's ordeal.[140] Without evidence of knowledge on the part of Montgomery, the relevance of what occurred to Ms. Mattingly is virtually non-existent, except for possible use by the Government to show that, although Ms. Mattingly had been raped as a young child, she never murdered a pregnant woman.

While Montgomery complains on many occasions about the supposed benefits of a biopsychosocial history, she never establishes any prejudice from the decision of the trial team to forego this approach.[141] Montgomery claims that the jury would have been more impressed with a presentation of mental illness through multiple generations than from a defense expert who testifies that a defendant is mentally ill. First, there is no metric to test the validity of this assertion because a jury might well wonder why it is hearing testimony about the defendant's great

---

[140]"She (Ms. Mattingly) does not know if Lisa was asleep or not (during the rape of Ms. Mattingly)." (DCD 155-8 at 3.)

[141]For example, Dr. Logan reportedly states that it is standard practice for a social history to be prepared and that it would have been helpful for him. It does not, however, appear to have been necessary for Dr. Logan to reach the conclusion that Montgomery suffered from a mental illness which caused her to commit the crime without considering the wrongfulness of her actions. (Tr. 2419.)



Appellate Case: 17-1716 Page: 298 Date Filed: 07/30/2018 Entry ID: 4687987

grandfather, where Ms. Vogelsang begins her narrative,[142] rather than about this defendant. Next, a jury might wonder what forms the diagnostic basis the assertions of past mental issues, whether those asserted issues are related or inheritable and how many individuals form the population from which the stories of mental illness are culled. These issues do not appear to be addressed in Ms. Vogelsang's declaration.

For example, Ms. Vogelsang presents the following list of varied illnesses on her father's side of the family, none of which appear related to pseudocyesis, or to each other. Moreover, many of the illnesses presented are not based on clinical diagnoses, but are instead based on anecdotal recollections of family members:[143]

> 1. Montgomery's great grandmother died from "sugar diabetes" and "had Lupus,"[144] according to Thomas Allen Hedberg, Montgomery's paternal half-uncle. (DCD 152-1 at 8; Montgomery Exh. 1, Attach. 1 at 41.)

---

[142](DCD 152-1 at 11.)

[143]For example, Ms. Vogelsang declares that Montgomery's great-great uncle "may have been mentally ill" because her grandmother said that he was "odd and picked blackberries and put a crate on his head." (DCD 152-1 at 11.) At the time of her interview, Montgomery's grandmother said she has "significant memory problems." (Montgomery Exh. 1, Attach. 2 at 1.)

[144]Ms. Vogelsang states in her biopsychosocial history that "John's grandmother 'died from sugar diabetes' and 'had Lupus'" (DCD 152-1 at 8) as if this were an actual diagnosis. Ms. Vogelsang includes the Lupus diagnosis in her slide presentation of her biopsychosocial history. (Montgomery Exh. 154 at 8.) However, a review of the source document, the declaration of Thomas Allen Hedberg, shows that the actual statement is: "Mom thought maybe her mom had Lupus too." (Montgomery Exh. 1, Attach. 1 at 5.) There is no further basis given



Appellate Case: 17-1716 Page: 299 Date Filed: 07/30/2018 Entry ID: 4687987

2. Montgomery's grandmother had Alzheimer's disease and dementia "when she died" according to Mary Lee Coleman, Montgomery's paternal aunt. (DCD 152-1 at 8.)

3. Montgomery's father, John Patterson, stated that he had anxiety and depression and "drank way too much." (DCD 152-1 at 8.) Patterson believed that the depression resulted from the side effects of heart medication that he was taking, even though his doctors told him that depression was not a possible side effect. (Montgomery Exh. 1, Attach. 6 at 41.) It does not appear that a doctor actually diagnosed Patterson with clinical depression.

4. Montgomery's half-sister, Diane Rae had depression and anxiety. Ms. Vogelsang also states that her son "understands" that Ms. Rae has "struggled with depression and bipolar her whole life." (DCD 152-1 at 9; Montgomery Exh. 1, Attach. 80 at 4.) However, Ms. Rae states that her doctors changed an initial bipolar diagnosis to a diagnosis of PTSD and depression. (Montgomery Exh. 1, Attach. 9 at 8.)

5. Montgomery's paternal aunt had "a series of neurological events," not otherwise specified, for which she received a number of treatments, including surgery. (DCD 152-1 at 9.)

6. Montgomery's paternal half uncle, Thomas Allen Hedberg developed depression. (DCD 152-1 at 9.) Mr. Hedberg does not state that he has been clinically diagnosed with depression, but does state that he cures it by going motorcycle riding. (Montgomery Exh. 1, Attach. 1 at 9.)

Also, because Mr. Hedberg related a story where he became angry at a dog and threw it across the room "to teach it to leave me alone" (Montgomery Exh. 1, Attach. 1 at 6), Ms. Vogelsang concluded that he suffered from "uncontrollable emotions similar to his mother's blackouts" (DCD 152-1 at 9). However, Mr. Hedberg did not state that his anger was "uncontrollable," nor did he state that he blacked out.

7. Montgomery's paternal cousin, Heather Hedberg, "struggled with major depression, was treated with Wellbutrin, and spent her school

---

for this diagnosis, leaving the reliability of the statement in the biopsychosocial history in question.



Appellate Case: 17-1716 Page: 300 Date Filed: 07/30/2018 Entry ID: 4687987

> years in special education classes." (DCD 152-1 at 10.) This sentence construction appears to state that doctors diagnosed Ms. Hedberg with depression and prescribed Wellbutrin as a treatment. However, Ms. Hedberg's statement is not so explicit, nor does it appear that the Wellbutrin was prescribed for chronic depression.[145]

Clearly, some members of Montgomery's family struggled with documented mental issues, which her counsel presented during the trial.[146] But much of the

---

[145]Ms. Hedberg stated:

> As soon as I got pregnant it was like I lost my mind. All I could do is sleep. I lost my memory, and if someone told me something I had forgotten it by the time they stopped talking. The entire pregnancy was like this. Even after I gave birth, and I was living with my mom for a few months while the baby was tiny, all I could do was sleep. The doctors put me on Wellbutrin and that made me like a robot. I couldn't think or talk at all. I stopped taking the Wellbutrin and just slept all the time. I felt very very tired.

(Montgomery Exh. 1, Att. 11, 4.)

[146]For example, Montgomery's cousin Wendy Trieb testified about members of the family with mental illness:

"They thought I had an eating disorder, but it quickly changed to depression with psychosis and then not long after that they changed to bi-polar disorder." (Tr. 2977.) "I have been hospitalized and [have seen] psychiatrists." (Tr. 2979.) "(Cousin Kenny reportedly) had bi-polar disorder." (Tr. 2977-78.)

Montgomery's father testified about his commitment to a psychiatric hospital while in the army (Tr. 1718) as well as his alcoholism and his wife's consumption of alcohol while pregnant with Montgomery:

"I (John) was an alcoholic until 1960." "[I drank] close to a case of beer a night." (Tr. 1703.) "I (John) am [still] an alcoholic." (Tr. 1709.) "Judy was drinking [when she was pregnant with Lisa.]" (Tr. 1708) "Q. But Judy was drinking



Appellate Case: 17-1716 Page: 301 Date Filed: 07/30/2018 Entry ID: 4687987

information presented in the biopsychosocial history is of dubious reliability, which is accentuated by the way in which it is presented. Moreover, the relevance of these apparently unrelated conditions, (i.e., Lupus, Alzheimer's disease, post-partum depression) to Montgomery's mental condition is not well-explained. This is especially apparent when contrasted against multiple expert witnesses, who have actually conducted multiple clinical exams and psychometric test on Montgomery, and who testified repeatedly and in detail about Montgomery's her own mental issues.

Montgomery also takes her trial counsel to task for failing to present the "strange family pattern of custodial interference." (Montgomery COA 707.) However, her attorneys did present evidence of custodial interference that directly affected Montgomery as Dr. Logan testified:

> Q. Did the conflict you recall usually revolve around the children?
>
> A. There was quite a theme in this family of using the children somewhat as weapons. One of the early things that happened was Lisa's perception, at least, was that Judy tried to interfere with her marriage of Carl, how Judy perceived had interferred with Jack. And one of the ways this was done Judy moved in and basically she and her then husband Richard wanted to take care of Desiree and Chelsea. So when they were very small children she took them for a while and refused to give them back to Lisa. There was another time that happened too after Kayla was born and they had been out in California where there was a confrontation at the church and they actually pulled a couple of the kids out of Lisa's arms and Lisa was without the kids

---

when she was pregnant with Lisa? A. Yes. . . . She would drink to being inebriated. We drank heavily." (Tr. 1710.)

> until they went back to court in Oklahoma and she was awarded custody. So there was, one of the things that consistently came up, even in later relationships, constant theme of battling around the kids.

(Tr. 2399.)

Not content with custodial interference that directly affected Montgomery and of which she was actively aware, habeas counsel argue that Montgomery's trial counsel should have also included the story of how her grandfather, Robert Patterson, kidnapped her father, John Patterson, when he was only four years old. Ms. Vogelsang recounts in her biopsychosocial history: "Robert snuck into the back yard of Marie's home in Federal Way, Washington. John was playing in the backyard when he saw a man he did not recognize, Robert, watching him. The man told four-year-old John that they were going for a ride in the car. Robert took John from the backyard without any toys, clothes, or food." (DCD 152-1 at 14.)

This passage is emblematic of the issues with Ms. Vogelsang's biopsychosocial history. First, there is no evidence that Robert Patterson "snuck" (or strode or ambled or ran or walked) anywhere because there is no description of how he entered the yard. Second, John Patterson was not in the back yard, he was in the front yard (which probably makes "sneaking" less likely).[147] Third, the kidnapping occurred in 1946 in Tacoma, Washington, not Federal Way,

[147] "I was playing in the front yard of our house when someone came into the front yard and kidnapped me." (Montgomery Exh. 1, Att. 6, 2.)



Appellate Case: 17-1716 Page: 303 Date Filed: 07/30/2018 Entry ID: 4687987

Washington. John Patterson did not move to Federal Way, Washington until 1954.[148] ("Declaration of John Joseph Patterson"; Montgomery Exh. 1, Att. 6, 10.)

As Mr. Duchardt pointed out, the reliance of other experts on the validity of the information contained in the biopsychosocial history undermines their opinions as well, which is one of the reasons he rejected Ms. Vogelsang.[149] Moreover, how the kidnapping of John Patterson at the age of four affected Montgomery several decades later (or whether she even knew about it at the time she committed the murder) is not established. Montgomery's trial counsel rightly concluded that the best evidence to show the impact of custodial interference involved her own loss of her children. Such a conclusion is not ineffective assistance.

[148] "During the summer of 1954 Gordon and my mother, my sisters Mary and Lori and my brother Tom and I all moved to Federal Way, Washington." (Montgomery Exh. 1, Att. 6, 10.)

[149] "Finally, Prosecutors noticed that, in Vogelsang cases, all of the experts used the Vogelsang narrative as a script, and that therefore the conclusions of other experts could be undermined through the undermining of the Vogelsang narrative." (DCD 129 at 74.)



Appellate Case: 17-1716 Page: 304 Date Filed: 07/30/2018 Entry ID: 4687987

17. *<u>The allegation that trial counsel failed to present evidence of the trauma in Montgomery's life.</u>*

a. *The allegation that trial counsel failed to show that the justice system failed to address Jack Kleiner's sexual abuse of Montgomery.*

<u>Summary of Argument</u>

Montgomery claims that trial counsel failed to interview individuals who would provide testimony concerning her accusations of rape and why the case was not prosecuted.

There is little doubt that Montgomery had been raped by her stepfather, Jack Kleiner, an issue to which multiple witnesses testified and which was conceded by the Government's expert witnesses. There is also no doubt that the evidence at trial was that law enforcement authorities did not prosecute Kleiner for the crime.

<u>Argument</u>

Montgomery argues that there was some dispute as to Jack Kleiner's sexual abuse of her and suggests that witnesses would have testified as to their speculation that a prosecution "fell through the cracks" possibly because of a jurisdictional issue regarding her county of residence. (Montgomery COA 713-16.)

The record in this case, however, is replete with testimony that Jack Kleiner had physically and sexually abused Montgomery during her childhood.[150]

[150]Montgomery's sexual abuse was also a theme repeated in her trial counsel's opening statement and closing argument:



Appellate Case: 17-1716 Page: 305 Date Filed: 07/30/2018 Entry ID: 4687987

Judy Shaughnessy, Montgomery's mother, testified that she found Jack Kleiner raping Montgomery in 1984 (when Montgomery was 15) and was told by

---

> You will also hear what all too predictively next happened, when you have got a grown man making young little girls strip down to accept punishment. You will hear about that man then starting to fondle Lisa at about age 12. Then you will hear about years, literally years of this man raping that girl from thirteen to fourteen to sixteen, all happening in a little town called Sperry, Oklahoma. In Sperry, Oklahoma Kleiner had his family in a trailer house which he added an extra room on for Lisa to be in so he could have his way with her just that much more easily for himself. And it went on day after day after week after month after year, this girl being raped by this man.

(Tr. 477-78 [Defendant's Opening Statement].)

> There came hope again for those dreams. She found a new life. Her mom at age five married another man, she had a new dad. And instead of those hopes and dreams it became a life of terror and abuse and survival. Those who were to protect her did not. There was mental abuse. There was physical abuse. There was sexual abuse. Her virginity was stolen on the floor of her bedroom by her father, a drunk alcoholic. She was told if she didn't submit her little sister would be next, she would regret it. Day after day this went on. A special room was built for this little girl so she could be taken there by a man with alcohol on his breath and lust in his heart and he would leave her on the floor, his fluid in her until the mood struck him again.

(Tr. 2813 [Defendant's closing guilt phase argument].)

> It's not five times, it's not fifty times, it's whenever Jack Kleiner wanted it. It was so blatant the other kids saw it. And they told you about it. The only thing she thought she was functional as is a sex object.

(Tr. 3164 [Defendant's closing penalty phase argument].)



Appellate Case: 17-1716 Page: 306 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery that it had been occurring for some time. (Tr. 1733-34, 1743. 1765.) Judy Shaughnessy also admitted that Kleiner was not prosecuted for this crime. (Tr. 1738.) Patty Baldwin, Montgomery's sister, testified that Jack Kleiner physically abused both she and Montgomery by forcing them to strip down and using a belt on them on many occasion. (Tr. 1803.) She also testified that she saw Kleiner having sex with Montgomery. (Tr. 1804.) David Kidwell, Montgomery's cousin, testified that he was aware that Kleiner raped Montgomery and that Montgomery's mother told him that Montgomery had "led Jack on." (Tr. 1825.) Pat Brunton, a social worker, testified that she was aware that Kleiner had raped Montgomery and that Judy Shaughnessy told her that Montgomery had seduced him. (Tr. 1859.) Teddy Kleiner testified that Jack Kleiner would take a strap to the children and that it was obvious that Jack Kleiner was raping Montgomery. (Tr. 1866.)

Moreover, as noted above, under cross-examination, Dr. Dietz also admitted that there was no doubt in his mind that Montgomery had been physically abused by her stepfather for a long period of time and sexually abused for a period of years from the age of 14.[151]

---

[151]Q. . . . So let me just ask you directly, is there some sort of doubt in your mind about the truthfulness of the accusations made against Jack Kleiner regarding ten years of physical abuse and two to three years of sexual abuse of Lisa?

Accordingly, Montgomery's trial team presented ample evidence regarding the nature of her childhood physical and sexual trauma through a number of witnesses who testified before the jury.

In addition, the testimony at trial showed that law enforcement failed to prosecute Kleiner for his assaults on Montgomery. Habeas counsel contends that witnesses should have been presented to explain the failure to prosecute and to "rebut[] the insinuation that Lisa's report of the rapes was not credible."

---

> A. No. I think they're some proof issues but I am convinced that Lisa Montgomery was physically abused for a long time by Jack Kleiner and that she was sexually abused for a shorter period of time.
>
> Q. But still a fairly lengthy period of time, two and a half to three years, right, maybe more?
>
> A. It's hard to determine but I think most of the time, what she said it was ages 14 and 15, right up to her 16th birthday.

(Tr. 2697.)

> Q. So again I just want to make sure that you don't have any doubts concerning the sort of degrading way in which Lisa and her sister Patty were disciplined with the clothes being taken off of them and beaten in that fashion.
>
> A. Whipped with their clothes off. No, I believe that's true. And I believe that Jack Kleiner sexually abused her.
>
> Q. Is it a fair word I am using, degrading?
>
> A. Yes.

(Tr. 2698.)

(Montgomery COA 176.) This argument would have little relevance even if Montgomery had been the only one reporting the rapes. However, as set forth above, multiple witnesses testified about Kleiner's physical and sexual abuse, not just Montgomery. Thus, Montgomery's report of sexual abuse does not appear to lack credibility, regardless of whether it was prosecuted and regardless of other witnesses who might have testified on this issue or who might have speculated on why no prosecution occurred.

*b. The allegation that the defense team undermined its narrative by showing that Judy Shaughnessy believed that Montgomery stole her husband.*

Montgomery concedes that her trial counsel "did present that Lisa had been sexually abused by Jack Kleiner" but somehow "invited" the Government to show that there are many children who suffer abuse. She also complains that her counsel "affirmatively created the possibility" that the jury may believe that Montgomery "stole" her husband. Montgomery concludes, without any evidence, that this caused four of the jurors to fail to find a mitigation circumstance related to sexual and physical abuse by Kleiner. (Montgomery COA 717-19.)

The Government suggests that a decision to present evidence showing that a child is being raped by one parent while the other parent blames her for it does not need any defense. The fact that Judy Shaughnessy believed that Montgomery, a

young adolescent when Kleiner began molesting her, sought out his advances, simply reinforces the narrative that both of Montgomery's parents mistreated her.[152]

Moreover, it is not the fault of Montgomery's trial counsel that there have been, in fact, many victims of childhood sexual and physical abuse who did not grow up to murder a pregnant woman and kidnap her child. Similarly, it is not Montgomery's trial counsel's fault that counsel for the Government would point out this rather obvious fact.

Intuitively, evidence of Judy Shaughnessy's belief that her daughter "stole" her husband would show the isolation of Montgomery by the actions of both parents, a theme that developed throughout the trial and which is described more fully in the next section. Counsel for the Government does not know why four jurors did not find the mitigating circumstance regarding physical and sexual abuse despite the evidence presented. The Government suggests that, similarly, habeas counsel does not know the jurors' thoughts and presents no more than speculation in attributing this result to the testimony that Judy Shaughnessy believed Montgomery "stole" her husband.

[152] In fact, this evidence would tend to refute Judy Shaughnessy's testimony that she was unaware of Jack Kleiner's sexual predations on Montgomery until Montgomery was almost sixteen years old. If, as she testified, Ms. Shaughnessy did not know about Kleiner's activities until she found him actually raping Montgomery, how would she know that Montgomery led him on years earlier? This evidence would suggest that Ms. Shaughnessy was aware of (or at least suspected) Kleiner's attacks on Montgomery at a much earlier time.



Appellate Case: 17-1716 Page: 310 Date Filed: 07/30/2018 Entry ID: 4687987

*18. The claim that trial counsel failed to present proof of Judy Shaughnessy's lack of care for and silencing of Montgomery.*

Summary of Argument

Montgomery apparently claims that her trial counsel failed to obtain sufficient information from Nancy Wallentini, who counseled her on several occasions after Judy Shaughnessy found Jack Kleiner raping her regarding Judy Shaughnessy's lack of empathy for, and control of, Montgomery during her counseling sessions. (Montgomery COA 720.) The evidence adduced at trial, however, reveals that a number of witnesses testified regarding Ms. Shaughnessy's treatment and control of Montgomery.

Argument

Montgomery asserts that her trial counsel failed to obtain from Nancy Wallentini, the counselor who treated her after the assaults by Jack Kleiner came to light, information showing the lack of concern on the part of Judy Shaughnessy regarding Montgomery's circumstances. However, Montgomery's trial counsel presented substantial evidence regarding the "tumultuous" relationship between Ms. Shaughnessy and Montgomery, as this Court found in its opinion on direct appeal.[153]

A review of the record shows that Ms. Wallentini testified:

---

[153] "From childhood on, Montgomery had endured a tumultuous relationship with her mother." *Montgomery*, 635 F.3d at 1080-81.

> Well, basically I said that Lisa was a shy 16 year old teenager who had allegedly been sexually abused by her stepfather and she was quite nervous during the session, had difficulty talking about it which is not unusual. She said she was not involved in many activities in school because of the responsibility she had for caring for the younger children at home.

(Tr. 1923.)

Ms. Wallentini went on to testify that the sex abuse had been happening for a couple of years, that Montgomery was withdrawn, not assertive and meeting others' needs. (Tr. 1924.) Ms. Wallentini further testified that Montgomery told her that the abuse began in the eighth or ninth grade, that Kleiner had told her not to tell Judy Shaughnessy or she would regret it and that if she did not submit he would do it with someone else (most likely a sibling). (Tr. 1926.)

Montgomery claims that her trial counsel could have developed more evidence regarding her relationship with Judy Shaughnessy, including observations by Ms. Wallentini that Ms. Shaughnessy "appears to have a lack of empathy" and that she "verbally overwhelmed" Montgomery.[154] However, this is not a unique observation and, in fact, multiple witnesses testified about Ms. Shaughnessy's lack of empathy and her control of Montgomery during her childhood.

As noted above, Dr. Dietz, an expert retained by the Government, testified at trial that Montgomery's PTSD could be "triggered to remember her mother being

---

[154] This last comment appears in conjunction with Judy Shaughnessy complaining about her children not knowing the value of a dollar and always wanting money. (Montgomery Exh. 1, Attach. 102 at 3.)

critical of her which I believe happened a great deal in her childhood, she could never do anything right." (Tr. 2762.)

Patricia Brunton, employed to make a determination regarding the custody of Montgomery's nephew, Justin Kleiner, testified that she was surprised that Montgomery was a good mother to her children considering Montgomery's own upbringing by Judy Shaughnessy. Ms. Brunton testified:

> Q. Tell the jury about your own impressions of Judy?
>
> A. My impression of Judy, I see her as a manipulative woman who actually pits her children against one another. And the alliance in the family changes according to Judy's personal agenda. I have seen family members change their story in order to get back into Judy's good graces. I find her manipulative. I find her dishonest. She was unwilling to comply with some of the conditions we put on supervision with Justin.

(Tr. 1858.)

> Q. Did you witness any interaction between Judy and Lisa?
>
> A. Yes.
>
> Q. What kind of interaction was that?
>
> A. I was under the impression that Lisa was the family scapegoat. Judy had her kids spying on one another. She would have Tommy running to Lisa in Lyndon to see what Lisa was doing and a lot of the blame seemed to fall on Lisa for the family's problems.

(Tr. 1859.)

> Q. And how would you characterize the Judy Shaughnessy family in relation to all those other[] [families]?

> A. They are easily the second most dysfunctional family I have ever worked with.

(Tr. 1864.)

Wendy Trieb, Montgomery's cousin, testified that Judy Shaughnessy became upset when Montgomery came to a family reunion (Tr. 2969), and that she was mean to Montgomery and would berate her. (Tr. 2973.) Diane Mattingly, Montgomery's half-sister testified that living with Judy Shaughnessy was "like living walking on egg shells." (Tr. 2956.)

> A. You could never please her, you know, it's like if you did something wrong you would get hit or, you know, you were told that you were not good enough. It was just constantly you felt like you could not please her.
>
> Q. Is this the way she treated not only you but your little sisters, too?
>
> A. Yes.
>
> Q. Would you describe for the jury how it was that you ended up being taken away from Judy?
>
> A. I don't know what happened but one day they were there to take me. And Judy kept telling me it was my fault, that I caused this. And I am thinking how is it my fault, I was the one that took care of these kids.
>
> Q. Tell the jury - -
>
> A. I was the one that fed them and clothed them and protected them. And when I left I am so sick because I knew who was going to take care of these kids anymore.

(Tr. 2956.)



Appellate Case: 17-1716 Page: 314 Date Filed: 07/30/2018 Entry ID: 4687987

Clearly, Montgomery's trial team presented substantial evidence concerning the traumas involved in her childhood from both her mother and her stepfather.

*19.* *<u>The claimed failure to investigate the Kidwell memo.</u>*

As noted, the record at trial was replete with individuals who testified that Montgomery's stepfather, Jack Kleiner, physically abused her from the time she was a small child and sexually abused Montgomery from eighth or ninth grade to the time Judy Shaughnessy found Kleiner raping Montgomery in 1984. However, Montgomery claims that her counsel rendered ineffective assistance because they did not discover alleged sexual abuse reported by one individual, her cousin, David Kidwell. In a three-page memo regarding an interview of Mr. Kidwell dated March 1, 2007, Dani Waller wrote one sentence: "Lisa told him that sometimes Jack would come home drunk with his friends and make her perform sexually with them."[155] (Montgomery Exh. 1, Att. 283, 2.)

According to Mr. Kidwell, in a declaration[156] dated nine years after the trial on September 3, 2016, a very different and much more detailed version of events unfolded. Mr. Kidwell reported that Montgomery was subjected to multiple gang

[155]There is nothing further in the report about the meaning of the phrase "perform sexually with them" i.e., whether it involved exposing herself to them (or them to her) or involved actual physical contact and what that contact might be.

[156]Mr. Kidwell did not testify at the evidentiary hearing and was therefore not subject to cross-examination regarding his allegations.



Appellate Case: 17-1716 Page: 315 Date Filed: 07/30/2018 Entry ID: 4687987

rapes during her adolescence from friends of Kleiner who would serially rape her vaginally, orally, and anally for hours on many occasions, who would slap her "if she was doing it wrong" and would then urinate on her. (Montgomery Exh. 10, 4.) Moreover, Mr. Kidwell, reportedly in law enforcement at the time, never reported these events to anyone, even though he was "horrified." (Montgomery Exh. 10, 4.)

Thereafter, habeas counsel approached Montgomery with these allegations. In a letter dated October 10, 2016, Dr. Porterfield reported on Montgomery's claims regarding the Kidwell information. During that interview, Montgomery added that her mother, Judy Shaughnessy, also made her have sex with various repairmen, i.e., the plumber, electrician and other workers, in order to "pay the bills" for their services. (Montgomery Exh. 8, 3.)

In ruling on this issue, the district court found the following:

> She (Waller) also interviewed Movant's cousin, David Kidwell, who stated Movant had told him "that sometimes Jack [Movant's stepfather] would come home drunk with his friends and make her perform sexually with them." (Movant Ex. 1-283, p. 2). Although the statement could have led to additional mitigating evidence, the team was unable to corroborate it through Jack Kleiner or Movant herself. This was objectively reasonable as trial counsel only limited the scope of the investigation after reasonable diligence to corroborate Kidwell's statement. *See Strickland*, 466 U.S. at 690-91; *see also Weaver*, 793 F.3d at 860-62 (determining attorney reasonably investigated potential witnesses' testimony on his client's behalf).

(DCD 212 at 49.)

> As noted previously, David Kidwell gave his statement regarding sexual abuse by Jack Kleiner's friend to Movant's trial team well before

> the trial began. The trial team attempted to follow up on this allegation. Jack Kleiner was confronted with this information but refuted Kidwell's accusations and refused to provide names of the alleged perpetrators. Further, Movant herself failed to corroborate Kidwell's statement at that time. Carl Boman, although interviewed several times by Movant's trial team, never disclosed any statements by Movant regarding the purported sex trafficking and gang rapes. While both Movant and her ex-husband could have corroborated Kidwell's statement at the time of trial, they did not for whatever reason. Thus, the factual basis for Movant's claim of new evidence[157] existed at the time of trial and Movant is not entitled to relief for it. Additionally, it is not objectively unreasonable for trial counsel to not present evidence that Movant and other witnesses either did not or would not discuss at or before the time of trial.

(DCD 212 at 121-22.)

Montgomery claims that the district court made three erroneous findings with respect to this issue, that: (1) the Kidwell evidence was "not available at the time of the trial"; (2) the trial team made a strategic decision to abort further investigation in the Kidwell information; and (3) the trial team only aborted its investigation after

---

[157]The court's analysis at this point was directed at Montgomery's claim of new evidence which emerged during the evidentiary hearing:

> However, a secondary argument emerged during the evidentiary hearing: that Movant's revelation of alleged sex trafficking and gang rape constituted newly discovered evidence and, had it been presented at the trial, it would have resulted in a life sentence if presented to the jury. While this argument was not fully briefed, the court will address it here in the interest of judicial economy.

(DCD 212 at 121.)



Appellate Case: 17-1716 Page: 317 Date Filed: 07/30/2018 Entry ID: 4687987

"reasonable diligence to corroborate Kidwell's statement." (Montgomery COA 723.) Each of these issues is discussed below.

*20. Unavailability of the evidence of gang rapes and sex trafficking.*

Montgomery disputes the district court's finding that this evidence was unavailable at the time of the trial.[158] Clearly, based on the court's analysis above, the court was aware of Waller's memorandum, and specifically found that it was available prior to trial. (DCD 212 at 49.) In context, then, when discussing the unavailability of the evidence, the court was referring to the much more detailed allegations of gang rapes on multiple occasions involving sadism and urination and the allegations of sex trafficking by Judy Shaughnessy made by Mr. Kidwell and Montgomery herself nine years after trial.[159] This information was not available at the time of trial.

---

[158]"And some evidence was not available at the time of trial, specifically Montgomery's alleged sexual abuse by friends of her stepfather, Jack Kleiner, and alleged sex trafficking of Montgomery by her mother, all during her teenage years." (DCD 212 at 40.)

[159]Mr. Kidwell's declaration (Montgomery Exh. 10) is dated September 3, 2016, and Montgomery's interview regarding these allegations and her further assertion that her mother engaged in trafficking her to various repairmen occurred on September 14, 2016, according to the letter written by Dr. Porterfield on October 10, 2016.

Indeed, Ms. Vogelsang's initial 184-page biopsychosocial history[160] filed on September 3, 2015, eight years after trial, fails to relate the information detailed by Mr. Kidwell and Montgomery regarding gang rapes and sex trafficking. This is the case, even though Ms. Vogelsang states: "Lisa's participation in the biopsychosocial history I prepared was enhanced by her current medication regimen, a trusting relationship with her defense team, and the team's experience in working with mentally ill and traumatized clients. The team devoted considerable informed effort to overcome Lisa's profound and almost insurmountable fear of disclosing information which is painful, deeply buried, and humiliating." (DCD 152-1 at 4.)

Moreover, Ms. Vogelsang's 20-page supplemental biopsychosocial history dated August 5, 2016, also fails to recite the information regarding gang rapes and sex trafficking.

Thus, neither habeas counsel's "trusting relationship" with Montgomery nor the extensive investigation by Ms. Vogelsang, uncovered the allegations which they

---

[160]Ms. Vogelsang states that in preparing the biopsychosocial history she ". . . followed the standard of care in my profession and in the capital defense community paying particular attention to case law *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009); *Sears v. Upton*, 130 S.Ct. 3259 (2010); and the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 Revision) and the Supplemental Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (2008)." (DCD 152-1 at 1.) She further states that her assessment demonstrates "what was known about Lisa at the time of trial." (DCD 152-1 at 6.)

now fault her trial team for failing to find. The court's determination, therefore, that information regarding sadistic multiple gang rapes and sex trafficking was not available at the time of trial is well founded.

*21. Decision to abort further investigation.*

Next, Montgomery claims that the court erred in finding that trial counsel made a strategic decision to abort further investigation into Mr. Kidwell's allegations. She states the evidence "strongly suggest(s) that no attorney was even aware of the Kidwell disclosure." (Montgomery COA 725.)

Montgomery makes this assertion, even though David Owen testified that he attempted to corroborate the information provided by Mr. Kidwell.

> Q. This is Movant's 1-283, a March 1st, 2007, interview with a gentleman by the name of David Kidwell, and it's a memo from Dani Waller addressed to, among others, yourself. Do you see that there, sir?
>
> A. Yes.
>
> Q. And on the second page can you read the highlighted portion there, sir? "Jack would come home drunk with his friends and make her perform sexually with them."
>
> A. Okay.
>
> Q. But the other men were not investigated; isn't that fair to say?
>
> A. Could never find out who they were.
>
> Q. So that wasn't followed up on?

A. It was followed up the best we could. We went and talked to Jack Kleiner about it, and he denied it ever happened, wouldn't give us any names.

Q. And that was the extent of the follow-up?

A. As far as I know.

(Civ. Tr. 2185-86.)

Contrary to Montgomery's suggestion, the evidence shows that trial counsel were aware of the information contained in Mr. Kidwell's interview and attempted to "follow[] up as best we could." When they were unable to conduct further inquiry, they aborted the investigation.

22. *<u>Allegation that the trial court erred in finding that trial counsel used "reasonable diligence" to corroborate Mr. Kidwell's statement.</u>*

Next, Montgomery argues that the trial court erred in finding that the trial team used reasonable diligence with respect to the Kidwell interview based on the testimony of Mr. Owen. (Montgomery COA 727-37.) Montgomery directs this Court to Mr. Owen's "supplemental statement" contained as part of her motion to expand the record on appeal.[161] In this "supplemental statement," Mr. Owen claims that his answers to the questions set forth above (which specifically addressed

[161] The Government suggests that this Court should not allow Montgomery to expand the record for the reasons stated in its response to her motion to expand the record.



Appellate Case: 17-1716 Page: 321 Date Filed: 07/30/2018 Entry ID: 4687987

Mr. Kidwell's allegation that Montgomery had sex with Kleiner's friends) really only involved allegations of sex with Kleiner.

The record of the evidentiary hearing is quite clear and directed to the statement contained in the Waller memorandum concerning individuals other than Jack Kleiner having sex with Montgomery. Mr. Owen's protestations that he believed he was only talking about Jack Kleiner's molestations of Montgomery make no sense. First, the question was not directed at Kleiner's actions, but clearly at the language in the Kidwell interview regarding Kleiner's friends. Second, the trial team's inquiry clearly targeted individuals other than Kleiner because, as Mr. Owen testified, Jack Kleiner "wouldn't give us any names." (Civ. Tr. 2186.) This response is utterly nonsensical if Mr. Owen believed that he was answering a question related only to Jack Kleiner's sexual activities with Montgomery. Finally, the response by Mr. Owen that they took no further action to check out the allegation of sexual activity makes no sense because there were multiple people (as Mr. Owen surely knows) who corroborated the statement that Kleiner was having sex with Montgomery and who testified about it. Therefore, clearly Mr. Owen's response to the questions put to him by habeas counsel involved the efforts of the defense team to determine if men other than Jack Kleiner had sexually molested Montgomery.

There is no room for ambiguity or doubt concerning the subject matter of the questions put to Mr. Owen at the evidentiary hearing involving the allegation of

individuals other than Jack Kleiner having sex with Montgomery. Mr. Owen's supplemental declaration, made without the safeguards of cross-examination to insure accuracy, should not be used to discredit his explicit testimony.[162]

Montgomery claims that her trial counsel's actions in attempting to corroborate Mr. Kidwell's claims of gang rape (presumably along with her current

---

[162]Mr. Owen states in his supplemental declaration (¶ 6) that he did not know about the allegations of sex trafficking or gang rape at the time he interviewed Jack Kleiner. This statement would be accurate since no one knew about those particular allegations until Mr. Kidwell and Montgomery made them in 2016.

Moreover, the questions put to Mr. Owen appear to be a conflation of the accounts of Mr. Kidwell regarding gang rapes involving Kleiner and Montgomery regarding sexual trafficking by Judy Shaughnessy. For example, habeas counsel asked Mr. Owen:

> Q. And you did not know that Lisa Montgomery's mother allowed sometimes three and four men to rape her anally, orally, and vaginally? You didn't know that, did you?
>
> A. Did not know that.
>
> Q. And you didn't know that when those men finished with her, they would urinate on her?
>
> A. No, didn't know that either.

(Civ. Tr. 2185.)

In fact, those allegations arose from Mr. Kidwell's description of the actions of Jack Kleiner's friends. Montgomery did not make those allegations with respect to her mother's conduct, which involved trafficking her to various repairmen to pay for the additional room, at least according to Dr. Porterfield's letter of October 10, 2016.

claims of sex trafficking) were insufficient. She argues that counsel could not rely on Jack Kleiner's denials that trial counsel never asked her the question and that, even if she had been asked, trial counsel could not rely on her denials.[163] Instead, Montgomery claims that her trial team should have reviewed divorce records where Judy Shaughnessy, in response to interrogatories, listed the names of two men who, Montgomery now says, were involved in raping her. Montgomery does not clarify how her trial counsel would have known that Shaughnessy's listing of two men meant that they had raped her (they were not listed in the interrogatories for that reason).[164] Nevertheless, she concludes that the fact that those names (along with others) were mentioned by her mother in the interrogatories of a divorce proceeding meant that her trial team failed to investigate her current allegations of rape by men other than Jack Kleiner. (Montgomery COA 735.)

Montgomery tries to compare this situation with *Rompilla v. Beard*, 545 U.S. 374, 126 S.Ct. 2456 (2005). In *Rompilla*, the trial counsel failed to examine the file of a prior conviction on which the state intended to rely in seeking the death penalty.

---

[163]"Even if counsel had discussed the Kidwell memo with Mrs. Montgomery, the proof presented at the hearing established that Mr. Duchardt was aware that Mrs. Montgomery was unable to provide information because of her mental illness and trauma history." (Montgomery COA 732.)

[164]In response to an interrogatory asking her to provide the name and address of men with whom she had "kept company," Judy Shaughnessy provided the names and addresses of eight different men, including her attorney.

The Supreme Court found that the failure of trial counsel to obtain and review the prior conviction upon which the state planned to base a statutory aggravator was constitutionally deficient:

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. App. 665–666. There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans. *Ibid.* It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.

545 U.S. at 383-84, 125 S.Ct. at 2464.

Clearly, Montgomery's claim that her counsel could have found evidence of sexual abuse, as described by Mr. Kidwell in his 2016 declaration, from two names in an interrogatory to a 1984 divorce proceeding is substantially different from the situation in *Rompilla*, where counsel failed to review a public file regarding a prior conviction upon which the Government had stated that it would rely to impose the death penalty. This is particularly true where, as here, not one individual reported the details described by Mr. Kidwell. This list includes all the witnesses who lived with Montgomery during her childhood and reported the physical and sexual abuse



Appellate Case: 17-1716 Page: 325 Date Filed: 07/30/2018 Entry ID: 4687987

by Jack Kleiner, Nancy Wallentini who counseled Montgomery regarding the sexual abuse by Kleiner, Dr. Logan who spent multiple hours talking with Montgomery, Janet Vogelsang, who interviewed Montgomery for her biopsychosocial history (which does not contain the allegations made by Mr. Kidwell), and Dr. Kate Porterfield, who interviewed Montgomery for habeas counsel.[165] Nor does this list include Montgomery herself in any interactions with her trial counsel (in any of its iterations, including Judy Clarke), her habeas counsel, nor any of their staff. None of these individuals reported that Montgomery was the victim of gang rapes and sexual trafficking until Mr. Kidwell and Montgomery made the allegation nine years after trial and shortly before the evidentiary hearing.

23. *<u>The allegation that counsel failed to investigate, develop and present proof of control and trauma</u>.*

Montgomery claims that evidence of childhood trauma was not developed and presented. (Montgomery COA 737-39.) Montgomery points to the biopsychosocial history developed by Ms. Vogelsang. However, as the district court noted in its ruling: "Vogelsang admitted that nearly all of the evidence included in her biopsychosocial history and accompanying attachments and PowerPoint presentation came from trial counsel's database. The vast majority of this evidence

[165] In the portion of her interview with Dr. Martell, where Montgomery describes her sexual abuse, she does not describe gang rapes or sexual trafficking. (Tr. 3138-39.)



Appellate Case: 17-1716 Page: 326 Date Filed: 07/30/2018 Entry ID: 4687987

was presented at trial through lay witnesses and Drs. Kuncel and Logan." (DCD 212 at 40.)

In support of the finding by the district court, the Government would note that Montgomery's trial counsel presented the following evidence at trial:

1. Montgomery's father was and is an alcoholic (Tr. 1703, 1709), and that her mother drank while pregnant with her. (Tr. 1708, 1710.)

2. Montgomery's mother and father were constantly fighting. (Tr. 1710.)

3. Montgomery's mother would hit her children if they did something wrong. (Tr. 2956.)

4. Montgomery and her sisters were trapped behind a door while her mother struggled to keep a man out of the house. (Tr. 2957.)

5. Montgomery's mother had sexual activity with men in front of the children. (Tr. 1857.)

6. Montgomery's mother had Diane Mattingly, Montgomery's sister who also took care of her, forcibly removed from the house and adopted out. (Tr. 1717, 1787-88, 2952, 2956-58.) From this, Montgomery learned that her mother was powerful enough to get rid of a child if they were "bad." (Tr. 2393.) Montgomery also learned that people, like her father and her sister, simply disappear from her life. (Tr. 3017-18.) These circumstances show Montgomery's insecurity at a very early age. (Tr. 3022.)

7. Montgomery's stepfather, Jack Kleiner, like her father, was also an alcoholic. (Tr. 1730-31, 1865-66.) Kleiner was also an abusive, cruel man. (Tr. 1730, 1809-10, 1818-19, 1866.) Kleiner would strip Montgomery and her sister of their clothes and beat them with a belt. (Tr. 1731-32, 1803, 2394.)

8. In addition to the physical abuse, Jack Kleiner sexually abused Montgomery beginning in eighth or ninth grade. (Tr. 1733-34, 1804, 1825, 1866, 1926.) Kleiner told Montgomery that if she told her mother

she would regret it and that if she did not submit he would do it with [Patty]. (Tr. 1926, 2397.)

9. Montgomery tried to protect herself by taking her little brother to bed, but Kleiner would just remove him. In addition, Montgomery could not stay at a friend's house or have friends over so that Kleiner could have access to her or to hide what he was doing. (Tr. 3139.) Montgomery learned from these experiences that her primary value was to satisfy her stepfather's sexual needs. (Tr. 2395.)

10. Judy Shaughnessy caught Jack Kleiner raping Montgomery (Tr. 1733, 1743), but then allowed him to move back into the house. (Tr. 1736, 1747.) Shaughnessy actually blamed Montgomery for having sex with Kleiner. (Tr. 2478.)

11. The effect of these traumas and experiences resulted in Montgomery withdrawing from the world by reading books and escaping into fantasy (Tr. 1770, 2401, 2156-57, 2470-71) and passively meeting other people's needs. (Tr. 1924-25.) Montgomery's ability to deal with reality became plastic and changeable. (Tr. 2407.)

Clearly, the evidence at trial adequately showed the "coercive trauma and control that defined Lisa's existence." (Montgomery COA 737.) Montgomery fails to show prejudice based on the alleged incidents omitted from the trial presentation.

*24. Alleged failure to effectively use experts.*

Montgomery alleges she is entitled to relief because trial counsel failed to provide the jury with a "framework" to understand how trauma was mitigating. (Montgomery COA 739-42.) Montgomery does not show that her trial counsel failed to present this evidence. Indeed, Dr. Logan testified at length regarding Montgomery's traumatic childhood and relationship with her mother. (Tr. 2393-2400.) He concluded that this trauma resulted in untreated PTSD (Tr. 2405) and

pseudocyesis, which he associated with the incest and forced sterilization (Tr. 2407). He further concluded that this situation, combined with stressors faced by Montgomery in her life, caused her to kill without understanding the nature of her actions. (Tr. 2419.)

Montgomery's argument that her trial counsel failed to review the trauma of her life and its possible effect on the murder she committed is meritless.

*25. The allegation that counsel failed to investigate, develop, and present Montgomery's impaired functioning prior to the crime.*

Summary of Argument

Montgomery next complains that her trial counsel rendered ineffective assistance by failing to show that she had a history of dysfunction for a number of years prior to the crime. (Montgomery COA 742-50.) Montgomery argues that the testimony of Dr. George Woods shows that Montgomery has difficulty "with planning, sequencing and impulse control as a result of brain impairments [that] were manifest in Mrs. Montgomery's social history." (Montgomery COA 747.)

However, a cursory review of Montgomery's actions in planning the murder of Bobbi Jo Stinnett reveals that she carefully and deliberately carried out a number of steps to commit the crime, such that, whatever other mental issues Montgomery might have suffered from, the inability to plan and sequence was not one of them.

Argument

Montgomery directs this Court to *Sears v. Upton*, 561 U.S. 945 (2010), where the court held that trial counsel rendered constitutionally ineffective assistance when counsel failed to show that the defendant had problems with planning, sequencing and impulse control and testing showed that defendant scored "at or below the first percentile in several categories of cognitive function." *Id.* at 949.

In this case, Montgomery has an I.Q. score of 120. (Civ. Tr. 1766.) The evidence presented at trial showed that Montgomery acted in a deliberate and carefully structured way to commit the murder of Mrs. Stinnett including researching caesarian births, creating a false identity online to approach Mrs. Stinnett, bringing all of the items she would need to commit the murder, and delivering the baby by caesarian section. The cross-examination of Dr. Woods effectively brought out Montgomery's ability to plan and sequence events:

> Q. Now, in December of 2014 there are some pretty sequenced events in Lisa Montgomery's life, weren't there?
>
> A. 2004?
>
> Q. December of 2004. I said '14. December of 2004. Excuse me.
>
> A. Yes.
>
> Q. By that I mean you were aware that she did research –
>
> A. Yes.
>
> Q. -- on the victim in this case, Bobbie Jo Stinnett, right?

A. Yes.

Q. Not only did she do research on her, she did research on dogs, specifically Rat Terrier dogs?

A. Yes.

Q. Not only did she do that, she did research on how to conduct C-sections?

A. Yes.

Q. Not only that, she was able to create a false persona or fake person by the name of Darlene Fisher to engage in email communications with Bobbie Jo Stinnett?

A. Yes.

Q. Not only that, she was able to delete her criminal history in indication of trying to cover up what she was doing, correct?

A. Yes.

Q. In that sequencing she was able to bring a rope with her?

A. That's my understanding, yes.

Q. She was able to bring a knife with her?

A. Yes.

Q. She was able to bring a home birthing kit with her, and she was able to manage her way from where she lived in Kansas to Skidmore, Missouri, to Bobbie Jo Stinnett's house?

A. Yes.

Q. And with scant minutes of training on the Internet, able to successfully perform a Caesarean section on a live human?

A. Yes, she did. She did cut her open, yes.

Q. You're a medical doctor?

A. Yes.

Q. Learned how to do a C-section. It's not something you just do as in the Easy Bake Oven over night, is it?

A. Yeah. I wouldn't hardly call it an effective C-section, but I do understand what you're saying.

Q. Well, an effective C-section for you is where the mother and the child both live?

A. Yes.

Q. An effective C-section for a Caesarean abductor means getting the baby, and she got that done, didn't she?

A. Yes, she did.

(Tr. 1859-60.)

While Dr. Woods refused to admit that these actions were a function of sequencing, he did admit that Montgomery had successfully accomplished all of those action. (Tr. 1861.)

The Government suggests that the cross-examination of Dr. Woods amply demonstrates the futility of arguing that Montgomery was cognitively impaired and unable to plan or execute a sequence of events.

As part of this argument, Montgomery contends that her trial counsel should have presented evidence of her inability to function as an effective parent, listing a

number of events, without actually relating them to any particular failures of Montgomery's parenting skills and how these unfortunate events were her fault. (Montgomery COA 744.) For example, Montgomery includes various events involving her children such as ingesting Tylenol, being in a car accident, being hit by a softball, being hit by a truck, without explaining how all of these events were as a result of Montgomery's inability to function as an effective parent or in any way explaining how these events were her fault. Just as a matter of common sense, many unfortunate things can happen to children whether or not their parents are "effective."

Habeas counsel believes that it would have been more effective trial strategy to present evidence of Montgomery's functional impairment in the past regarding raising her children to show substantial deficits in her ability to plan and sequence. However, Montgomery's case is substantially different from the defendant in *Sears* who had scored at or below the first percentile in several categories of cognitive function in standardized tests. *Sears v. Upton*, 501 U.S. at 949. Montgomery presents no such evidence in her case. Moreover, the nature and planning of the murder, as shown in the cross-examination of Dr. Woods, would inherently contradict an assertion of functional impairment.



Appellate Case: 17-1716 Page: 333 Date Filed: 07/30/2018 Entry ID: 4687987

There is simply no merit to the claim that Montgomery's trial counsel rendered ineffective assistance because they did not portray her as a dysfunctional parent who was unable to adequately plan and carry out tasks.[166]

### *K. The Allegation That Montgomery's Trial Counsel Rendered Ineffective Assistance in the Presentation of Evidence Regarding Her Alleged Brain Impairments.*

Summary of Argument

Next, Montgomery claims that her trial counsel "bungled" the presentation of her brain impairments. (Montgomery COA 750-66.) Specifically, she alleges that her trial counsels' failed to: (1) develop Montgomery's history which, she alleges, prevented psychiatric experts from providing a full assessment; (2) show the neurological effect of trauma; (3) present evidence of brain dysfunction; (4) present Dr. Gur's findings; and (5) obtain a neurological consult.

Argument

A review of the record, however, shows that trial counsel fully developed the psychiatric testimony necessary to present their NGRI defense based on the available evidence, including the evidence of brain trauma. Moreover, Montgomery cannot

[166] In fact, the evidence was to the contrary. Pat Brunton, who conducted the investigation into the placement of Montgomery's nephew, Justin Kleiner, testified that Montgomery was a good mother to her children who "seemed well balanced and clean and they seemed to be having their needs met." (Tr. 1857.)



Appellate Case: 17-1716 Page: 334 Date Filed: 07/30/2018 Entry ID: 4687987

show prejudice arising from these alleged deficiencies. There is no basis for a COA to issue on these grounds.

*1. Alleged failure to create a social history.*

Montgomery complains once again about a failure to prepare a biopsychosocial history and its supposed efficacy in preparing a diagnosis. The issues related to the accuracy of the biopsychosocial history prepared by Ms. Vogelsang are set forth in greater detail above. As Mr. Duchardt noted, the deficiencies in Ms. Vogelsang's biopsychosocial history would infect the opinions based on it: "Finally, Prosecutors noticed that, in Vogelsang cases, all of the experts used the Vogelsang narrative as a script, and that therefore the conclusions of other experts could be undermined through the undermining of the Vogelsang narrative." (DCD 129 at 40.)

Montgomery contends that the failure to develop a biopsychosocial history "prevented the psychological and psychiatric experts from providing a fully accurate assessment." (Montgomery COA 752.) The problem with this assertion, as repeatedly demonstrated, is that Montgomery's experts were able to make full assessments of her mental issues and made findings based on those assessments. Those findings included that Montgomery suffered from a severe mental illness at the time of the murder that prevented her from understanding the wrongfulness of her actions or conforming her conduct to the law. (Tr. 2250-51, 2419, 2988, 3030.)



Appellate Case: 17-1716 Page: 335 Date Filed: 07/30/2018 Entry ID: 4687987

In this case, the trial team provided their expert witnesses sufficient information for them to reach their conclusions presented at trial independently in both the guilt phase and the penalty phase. Relying on the information presented in a document of dubious accuracy would have undermined those opinions.

2. *Allegation that trial counsel failed to investigate or develop proof regarding brain trauma.*

Next, Montgomery contends that her trial counsel failed to present evidence of the neurological effect of trauma she endured during childhood. In this regard, Montgomery directs this Court's attention to the testimony of Dr. Kate Porterfield who essentially speculated on how her experiences could have affected her brain structure.

Dr. Porterfield is a clinical psychologist, not a forensic psychologist (Civ. Tr. 1579, 1587), who based her analysis in part on the biopsychosocial history of Ms. Vogelsang as well as interviews with Montgomery. (Civ. Tr. 1584.) Dr. Porterfield prepared a 20-page report in letter form sent to habeas counsel on April 22, 2016. (Montgomery Exh. 7.) Because she relied on Ms. Vogelsang's biopsychosocial history for her analysis, this letter did not discuss the allegations of abuse arising from the interview with David Kidwell, which are not contained in the biopsychosocial history.

Accordingly, Dr. Porterfield prepared a supplemental report on October 10, 2016, containing her analysis of a September 1, 2016, interview of Mr. Kidwell.

(Montgomery Exh. 8.) She does not discuss in the supplemental report how her prior reliance on Ms. Vogelsang's biopsychosocial history is questionable since the discovery of information Ms. Vogelsang failed to uncover. She also fails to discuss how she herself missed this information during her prior interviews with Montgomery.

The court summarized Dr. Porterfield's testimony and noted that much of her testimony had been presented to the trial jury:

> Dr. Kate Porterfield, a clinical psychologist, testified regarding childhood development and how trauma, like that suffered by Movant, affects development. Dr. Porterfield began meeting with Movant in 2016 and diagnosed her with Complex PTSD, a diagnosis not recognized in the DSM-IV. She also explained the adverse childhood experiences ("ACEs") tool, noting that Movant had nine out of ten risk factors on the ACEs scale. Additionally, Dr. Porterfield discussed Movant's dissociation and ability to parent. While not framed in the same way as Dr. Porterfield's testimony, Drs. Logan's and Kuncel's testimony at trial contained many of the same themes.

(DCD 212 at 41.)

In fact, a review of Dr. Logan's testimony shows that he listed approximately a dozen traumatic factors that influenced Montgomery's development including: (1) an absent father; (2) the adoption of her sister, Diane; (3) frequent moves; (4) significant physical abuse; (5) significant sexual abuse; (6) the failure of her mother to protect her; (7) a lack of adequate therapy; (8) that her mother blamed Montgomery for having sex with Jack Kleiner; (9) Kleiner threatening to abuse her sister if Montgomery refused to have sex with him; (10) using Montgomery's

children as weapons; (11) her mother reporting her to social services; and (12) killing one of Montgomery's dogs and telling her that she would be next. (Tr. 2393-2401.) Dr. Logan explained how these traumatic events shaped Montgomery's behavior in later life resulting in pseudocyesis. (Tr. 2402.) He also described how these events affected Montgomery's ability to deal with reality, which became "somewhat plastic and changeable." (Tr. 2407.)

Clearly, Montgomery's trial team presented substantial evidence of the trauma involved in her life and how it affected her later in life. Dr. Logan's testimony, in particular, described Montgomery's history and trauma and how it affected her.

3. *<u>The allegation that Montgomery's trial team failed to present neuropsychological findings indicative of brain damage.</u>*

Montgomery alleges that her trial counsel were in possession of evidence of brain damage that they failed to present. However, Montgomery fails to establish any actual conclusion of brain damage that her counsel failed to present to the jury and, thus, fails to establish any prejudice.

At the evidentiary hearing, Dr. Robert Fucetola testified that he had been hired by Mr. Duchardt to perform cognitive testing on Montgomery in anticipation of behavioral imaging by Dr. Gur. (Civ. Tr. 864-65, 867-68.) Dr. Fucetola's testing showed that Montgomery had an IQ of 124 with a disparity between her verbal intelligence, which was 111 and her nonverbal intelligence, which was 140. (Civ.

Tr. 872.) While Dr. Fucetola noted that this was a rare combination of I.Q. scores, it was about equally rare in healthy adults and those with a mental illness. (Civ. Tr. 874.) Dr. Fucetola then went on to speculate about possible causes of this split, but reached no conclusions. (Civ. Tr. 878-79.)

On cross-examination, Dr. Fucetola admitted that the predictive validity of the IQ split between verbal and nonverbal intelligence has been called into question. (Civ. Tr. 888.) Dr. Fucetola also admitted that he had not examined the reliability of the behavioral imaging of Dr. Gur that his testing would be used to support. (Civ. Tr. 891.)

There is nothing in Dr. Fucetola's report establishing prejudice to Montgomery. In fact, Dr. Fucetola appears to reach no conclusions on his own but instead simply speculates on a number of different theories.[167]

4. *<u>The allegation that Montgomery's trial team failed to present Dr. Gur's behavioral image during the penalty phase.</u>*

Montgomery complains that her trial team failed to present the evidence of Dr. Gur's behavioral imaging during the trial. However, Dr. Gur himself noted that the behavioral imaging itself was just a pictorial representation of possible deficits in Montgomery's brain based on Dr. Fucetola's testing:

[167]The language of Montgomery's application for a COA reflects this inconclusiveness and ambiguity, e.g., "Mrs. Montgomery's IQ points to brain damage," the IQ differential "indicates brain damage," and "possible etiologies" for the IQ difference are noted. (Montgomery COA 758.)



Appellate Case: 17-1716 Page: 339 Date Filed: 07/30/2018 Entry ID: 4687987

> Q. And Dr. Fucetola also testified that when comparing Mrs. Montgomery's performance IQ with her performance on tests of visual immediate and visual delay, that the data placed Mrs. Montgomery in the less than bottom 2 percent of the population with respect to those scores. Would that also be an indication of the sort of variability within her neuropsychological testing that warrants further consideration?
>
> A. Exactly. The behavioral image is not designed to replace any of those conclusions by Dr. Fucetola. He is a very accomplished and highly respected neuropsychologist. I did not question any of his conclusions. They seemed very reasonable. The only thing that the behavioral image contributed was a pictorial depiction of what are the brain systems most likely involved in the deficits shown on the neuropsychological testing of Ms. Montgomery.

(Civ. Tr. 2058-59.)

Thus, Dr. Gur's behavioral image is no more than a different way of presenting Dr. Fucetola's testing. However, since as noted above, Dr. Fucetola did not reach any definite conclusions about brain damage, the behavioral image is of no particular import.

Indeed, Dr. Gur testified that a behavioral image cannot be used to diagnose a specific mental illness. (Civ. Tr. 2045.) Instead, Dr. Gur also uses MRI data and PET data and looks for "consistency across data from the neuropsychological to the neuroanatomical to the neurophysiological." (Civ. Tr. 2046.) In this regard, the Government would note that Dr. Gur's process was severely inhibited because both the MRI data and the PET data had been excluded from the case on relevancy



Appellate Case: 17-1716 Page: 340 Date Filed: 07/30/2018 Entry ID: 4687987

grounds.[168] *Montgomery*, 635 F.3d at 1088-93. With the exclusion of this information, the behavioral image, whatever its dubious probative value, had no support.

5. *The allegation that trial counsel failed to develop evidence of Montgomery's neurological impairments.*

Next, Montgomery argues that her trial counsel failed to have a neurologist examine her. (Montgomery COA 761-64.) Habeas counsel directs this Court's attention to the testimony of Dr. Nadkarni, a neurologist, and his diagnosis that Montgomery suffers from neurological impairment and epilepsy. As the district court noted in its order, no other expert[169] made this diagnosis:

> Dr. Siddhartha Nadkarni is an expert in epilepsy, neurology, and psychiatry. Dr. Nadkarni performed a neurological examination on Movant and found deficits indicating she has epilepsy. Epilepsy causes seizures. Seizures can take many forms beside convulsions, including a psychotic experience; the ability to retain awareness but smell something strange; an out of body experience; a loss of time; or dissociation. Dr. Nadkarni believes Movant suffers from seizures that could explain some of her symptoms. While trial counsel had no expert witness testifying that Movant had epilepsy, they did attempt to introduce evidence regarding brain damage. The court's exclusion of this evidence was deemed harmless error or was within the court's discretion. *Montgomery*, 635 F.3d at 1090. Moreover, Dr. Nadkarni's diagnosis of epilepsy stands alone against all other diagnoses of Movant,

[168]Moreover, this Court had found that the exclusion of Dr. Gur's testimony in penalty phase regarding the PET scan amounted to harmless error. *Montgomery*, 635 F.3d at 1092.

[169]This list would include Drs. Ramachandran, McCandless, Logan, Martell, Dietz and Kuncel at trial, and Drs. Hutchinson, Fucetola, Davatzikos, Newberg, Logan, Ramachandran, Kempke, Kuncel, Sanislow, Porterfield, and Woods at the evidentiary hearing.

> and does not fit into either trial counsel's theme or habeas counsel's proposed theme.

(DCD 212 at 43.)

Habeas counsel also points to the testimony of Dr. Woods regarding specific tests he conducted on Montgomery. (Montgomery COA 762.) However, as the district court noted, Dr. Woods only met with Montgomery four times, twice in 2013 and twice in 2016, long after the crime and trial. Moreover, his testimony regarding Montgomery's capacity to appreciate the wrongfulness of her conduct due to a mental disease or defect at the time of the offense "essentially mimics the testimony of Drs. Ramachandran and Logan." However, unlike Dr. Woods, Drs. Ramachandran and Logan testified consistent with Montgomery's trial strategy. (DCD 212 at 42.)

Montgomery's trial team presented substantial expert testimony regarding her traumatic childhood and how it affected her behavior. The testimony of Dr. Woods is simply cumulative to that evidence.

6. *Alleged failure of Montgomery's trial team to present synergistic effects of brain damage, trauma, and mental illness.*

Montgomery concludes this section by complaining once again about the failure of the trial team to call on Drs. Porterfield, Nadkarni, and Woods to present evidence that she now insists is important to her case. (Montgomery COA 765-66.)



Appellate Case: 17-1716 Page: 342 Date Filed: 07/30/2018 Entry ID: 4687987

However, simply because Montgomery's trial team did not present the experts she now wants, does not mean that they were constitutionally deficient in offering the testimony of Drs. Ramachandran, Logan, Kuncel, and McCandless to present evidence of her mental state. As the court found in its order, her trial counsel presented testimony consistent with the defense they had reasonably chosen:

> "The fact that a later expert, usually presented at habeas, renders an opinion that would have been more helpful to the defendant's case does not show that counsel was ineffective for failing to find and present that expert." *Marcrum*, 509 F.3d at 511; *United States v. Davis*, 406 F.3d 505, 509-510 (8th Cir. 2005). Movant's trial counsel made a strategic decision as to how the case would proceed and hired experts in accordance with that strategy. *See Forrest v. Steele*, 764 F.3d 848, 858-59 (8th Cir. 2014) (finding trial counsel's decision to hire experts and pursue trial defense strategy was not ineffective, though habeas evidence showed counsel could have hired other experts and pursued different strategy). "The selection of an expert witness is a paradigmatic example of the type of 'strategic choice' that, when made 'after thorough investigation of the law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, --U.S.--, 134 S. Ct 1081, 1089 (2014) (alterations omitted) (quoting *Strickland*, 466 U.S. at 690). [footnote omitted] Because Movant presented expert testimony at trial consistent with the trial strategy and, in many ways, consistent with the proposed testimony presented during the evidentiary hearing, Movant's trial team was operating within the broad latitude of constitutionally reasonable professional assistance and was not ineffective for failure to hire competent mental and neurological experts.

(DCD 212 at 43-44.)

Montgomery's trial team made the strategically valid decision to present a not-guilty-by-reason-of-insanity defense based on expert testimony that she suffered from depression, borderline personality disorder, post-traumatic stress disorder, and

pseudocyesis. *Montgomery*, *supra*, 635 F.3d at 1082. The experts presented at trial supported the reasonable defense strategy developed by trial counsel. Her trial counsel did not render ineffective assistance by not calling other, different expert witnesses who would not have testified consistent with the trial strategy.

7. *The allegation that Montgomery's trial counsel failed to present readily available proof of statutory mitigating circumstances.*

Montgomery claims that her trial counsel failed to prove two statutory mitigating circumstances. (Montgomery COA 766-68.) This contention is, again, that Montgomery's trial team should have presented the testimony of Dr. Woods and prepared the biopsychosocial history of Ms. Vogelsang. Montgomery argues that the biopsychosocial history, with its family history, would somehow enhance the testimony of Dr. Woods.[170] It is essentially a rehash of the arguments above, subject to the same deficiencies.

8. *The allegation that Montgomery's trial counsel failed to provide a social history to trial experts.*

This is a summary section, where Montgomery simply lists a number of supposed events arising from Ms. Vogelsang's deeply flawed biopsychosocial history (and a number of alleged events that Ms. Vogelsang failed to uncover). (Montgomery COA 768-74.) As noted above, Montgomery's trial counsel presented

---

[170]However, the quotation of Dr. Woods's testimony presented by Montgomery in her petition has nothing to do with her family history. (Montgomery COA 767.)

much of this evidence at trial, consistent with the trial strategy of an NGRI defense based on pseudocyesis resulting in a dissociative state, which occurred when Montgomery murdered Bobbi Jo Stinnett. Much of the rest of the list is comprised of evidence not presented in the biopsychosocial history, but allegedly discovered later, approximately nine years after trial and neither internally consistent nor corroborated (unlike the trial evidence.)

The analysis presented in the sections above deals with the issues associated with this evidence, and their role in determining ineffective assistance of counsel. The simple repeating of these allegations in this section does not improve their validity nor make them any more germane to an evaluation of Montgomery's application for a COA.

Montgomery directs this Court's attention to *Cone v. Bell*, 556 U.S. 449 (2009), in support of her argument. However, the distinction between *Cone* and Montgomery's case emphasizes the paucity of her argument. In *Cone*, the evidence showed that the prosecution had suppressed *Brady* evidence in the police files at the time of Cone's trial that would have supported his contention that he was addicted to drugs at the time of the offense. The court found that this evidence, while insufficient to change the verdict of guilt, may have had a bearing on punishment and remanded the case for a determination of the merits of Cone's *Brady* claim. *Id.* at 476.

The facts in Montgomery's case are very different from the facts in *Cone.* Here, there was no suppression of *Brady* evidence contained in the police file at the time of the trial. Instead, Montgomery struggles to interject evidence uncovered nine years after trial alleging gang rapes and sex trafficking. Montgomery presumably knew about this evidence at the time of the trial but failed to disclose this information to any of the many psychiatrists and medical doctors who examined her at the behest of both her trial counsel and habeas counsel until a few months before the evidentiary hearing in this case.

9. *The allegation that Montgomery was incompetent to stand trial.*

Summary of Argument

Next, Montgomery contends that she was incompetent to stand trial. She alleges: (1) a substantive due process claim that she was tried while incompetent; (2) a procedural due process claim that the district court was under a duty *sua sponte* to conduct a competency hearing; and (3) a claim of ineffective assistance of counsel for failure to litigate the claimed incompetency. (Montgomery COA 774-99.)

The record reveals, however, that Montgomery was legally competent to stand trial. Montgomery had been found competent to stand trial by one of her own experts and her interactions with counsel and the court did not indicate that she suffered from incompetency.

Argument

Title 18, United States Code, Section 4241 sets forth the standard by which a court determines the incompetency of a defendant. This statute requires that "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *See also United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2009).

There are two elements to a competency finding: (1) whether "the defendant has a rational as well as factual understanding of the proceedings against him"; and (2) whether the defendant is able to consult with his lawyer with a reasonable degree of rational understanding." *United States v. Ghane*, 593 F.3d 775, 780 (8th Cir. 2010) (quoting *United States v. Denton*, 434 F.3d 1104, 1112 (8th Cir. 2006)). The court determines that a defendant can properly assist in his or her own defense based on whether the defendant possesses a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373 (1996). In making this determination, the court must give some credence to the trial attorney's opinion regarding whether the defendant is competent to assist in his own defense. *United States v. Denton*, 434 F.3d at 1113. The court may also rely on its own observations of the defendant. *Id.*

at 1112. It is the defendant's burden to prove by a preponderance of the evidence that she is incompetent. *Cooper*, 517 U.S. at 355.

In his statement, Fred Duchardt refuted the current claims of incompetency by describing his interactions with Montgomery during the trial:

> Lisa was readily able to engage anyone and everyone in cogent conversation, even at her darkest times. Lisa never had problems understanding the proceedings against her. Lisa never had problems understanding the questions we were asking her about her background and the crime, and never had problems understanding why we were asking the questions which we were. Lisa's problems in answering certain of our questions were not on the level of lack of understanding. Rather, Lisa had a complex protective shield, developed over years of abuse, which she had to be persuaded to let down, and which she ultimately did let down, in order for interchange to occur on matters of import. The only matters which Lisa has suppressed completely, and about which I believe she still cannot account, concern the details about how Bobbie Jo Stinnett was killed.

(DCD 129 at 76-77.)

The trial court also agreed with Mr. Duchardt's assessment of Montgomery's demeanor during pretrial and trial appearances:

> Further, the trial team had good reason to doubt the court would find Movant incompetent. At pretrial appearances and throughout the trial, Movant appeared engaged in and displayed understanding of the proceedings. As testified by all three of her trial defense attorneys and observed by the court, Movant passed notes to her counsel asking questions and giving suggestions. Moreover, Movant's own consulting expert had determined she was competent to stand trial.

(DCD 212 at 94.)

The last sentence of the passage above refers to the finding of Dr. Marilyn Hutchinson in a letter dated March 14, 2005, stating that Montgomery was competent to stand trial. Dr. Hutchinson confirmed that finding during her cross-examination by government counsel at the evidentiary hearing:

> Q. If that letter was dated March 14th, 2005, it would be your recollection that would be about the end of your services in this case until we got to the post conviction side of it?
>
> A. That would be the last thing I did, yes.
>
> Q. During that time you indicated that you provided some competency measures and one of those was the MacArthur?
>
> A. Yes.
>
> Q. And that's basically the legal standard of competency for someone to appear in court and have a prosecution continue against them, correct?
>
> A. It's one of them.
>
> Q. It's one of them. And at the conclusion of that, did you have a conclusion whether she was competent at the time you tested her?
>
> A. Well, as I said, she was competent on the measures that that measures. The ability to assist counsel I was concerned about.
>
> Q. Okay. I believe in the notes that were provided it said that she was competent on all measures that she's been tested on at that point, correct?
>
> A. That's correct.

(Civ. Tr. 1064.)

Despite the finding by her own expert and the observations of both the trial team and the district court, Montgomery insists that she was incompetent to stand trial. In support of this assertion, Montgomery presents a litany of comments by several of her prior counsel regarding her demeanor prior to trial. (Montgomery COA 775-77.) Judy Clarke also added comments about her concern for Montgomery's mental state based on her behavior, comments that are echoed by other members of the Clarke team, including Deb Garvey and Dr. Freedman, "noting that they had a real question as to her competence." (Montgomery COA 782.)

However, remarkably, none of the attorneys who are now voicing their concerns about Montgomery's competence, and who represented her for months, moved to have her competence examined. As the district court concluded in its ruling, this is likely because Dr. Hutchinson had already found Montgomery competent to stand trial.[171]

---

[171]The district court's order analyzed the competency issue in the following fashion:

> Prior to trial, Movant's defense team had concerns about her ability to assist in her defense given her reluctance to share information regarding her past and the crime itself with her counsel. These concerns started with her first defense team and persisted through her ultimate trial counsel of O'Connor, Duchardt, and Owen. No iteration of the defense team sought a competency hearing though, likely due in part to an expert opinion finding her competent. In March 2005, the defense team employed Dr. Marilyn Hutchinson to examine Movant. Her examination revealed Movant was competent to stand trial.



Appellate Case: 17-1716 Page: 350 Date Filed: 07/30/2018 Entry ID: 4687987

Next, Montgomery cites from the testimony of various experts who testified at her evidentiary hearing. In its ruling, the district court discounted the testimony of two of those individuals, Drs. Woods and Logan:

> There is little doubt that Movant suffers from serious mental illnesses and brain damage to some extent. Drs. George Woods and William Logan opined at the evidentiary hearing that Movant was not competent to assist in and understand her defense. Dr. Woods pointed to Movant's comment at the end of the trial regarding how she was now ready to help in her defense as evidence that she was incompetent because it purportedly showed problems with frontal lobe sequencing. However, Dr. Woods did not examine Movant prior to or concurrently with her trial and bases his belief solely on examinations of Movant several years following the trial and his academic knowledge of possible drug side effects.[34] While Dr. Logan did examine Movant as a consulting expert in March 2005 following a suicide attempt and ultimately as a testifying expert, he did not express his belief that she lacked decisional competency until these habeas proceedings, excusing this failure on the fact that he was not asked to do so. Because Dr. Logan had several opportunities to raise concerns about Movant's ability to assist in her defense but failed to do so on each occasion, his opinion on Movant's competency warrants little credence.
>
> Viewing the facts in their totality, the evidence that Movant was unable to understand and assist in her defense does not satisfy the preponderance of the evidence standard required for a finding of incompetency in light of the court's own observations during pretrial proceedings and the trial; opinions from her own consulting expert who examined her before the trial; and all iterations of her defense teams' decisions not to seek a competency hearing. *See Cooper*, 517 U.S. at 355.[172] Additionally, trial counsel was not ineffective for failing to raise the competency issue with the court as it would have been futile.

---

(DCD 212 at 93.)

[172]*Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373 (1996).

> [34]Interestingly, Dr. Woods stated that he agreed with Dr. Hutchinson's conclusions, the same doctor that had examined Movant in March 2005 and found her competent.

(DCD 212 at 95.)

Like Dr. Woods, the experts who testified on her behalf at the evidentiary hearing all suffer from the same deficiency, i.e., they did not examine (or observe) Montgomery at the time of trial. Indeed, a review of the comments by the experts Montgomery sets forth in her application reveals that none of the experts states that she did not understand the proceedings or was not able to assist in her defense. (Montgomery COA 785-90.)

Instead, Montgomery presents evaluations by several of her experts who, for example, allege that her brain was "broken" or "severely damaged" or that she is completely disassociated much of the time. (Montgomery COA 788-89.) The problem with these evaluations of complete dissociation and dysfunctional behavior is that none of these conclusions is consistent with the testimony of Montgomery's life activities. The fact of the matter is that the testimony at trial showed that Montgomery worked multiple jobs (and had a long history of work),[173] and she

[173]A number of Montgomery's employers testified at the trial, including Cheryl Fine, who worked with Montgomery at the Casey's General Store; Judy Moore, who employed Montgomery at the Greyhound station, Mona Marcotte, who worked with Montgomery at Wendy's, and Tamara Hand, who previously worked with Montgomery on a newspaper in New Mexico.

raised four children, home schooling them for a year. (Tr. 1952.) Other than the recurrent episodes of pseudocyesis (which Montgomery's habeas counsel want to reject as a trial theory), there is no evidence in Montgomery's life history that would support the type of complete disassociation and psychosis that her current experts have concluded that she suffered her entire life.[174]

*10. Substantive due process claim.*

Montgomery grounds her substantive due process claim on her right not to be tried while incompetent. Since she was found competent to stand trial and since the parties actually at the trial observed and interacted with her in a way that confirmed her competence, this claim has no merit.

Due process prohibits the trial and conviction of a defendant who is mentally incompetent. *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904 (1975). The burden of persuasion is on Montgomery to show that she was incompetent by a preponderance of the evidence. *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995). This Court reviews a district court's competency determination for clear

[174]*See*, for example, the testimony of Pat Brunton, the placement officer, who testified that both Bonnie Taylor and Teddy Kleiner, in an effort to retain custody of their son, Justin Kleiner, moved into Montgomery's residence so that Montgomery could show Bonnie how "do things around the home, to clean, to do laundry, to cook and do dishes, simple tasks around the home that Bonnie really didn't have a grasp on prior." (Tr. 1854-55.) Ms. Brunton also testified that Montgomery was a good mother raising well balanced children who were clean and seemed to be having their needs met. (Tr. 1857.)

error. "Retrospective determinations of whether a defendant is competent to stand trial . . . are strongly disfavored." *Weisberg v. Minnesota*, 29 F.3d 1271, 1278 (8th Cir. 1994). Moreover, not every manifestation of mental illness demonstrates incompetence to stand trial, nor does "low intelligence, mental deficiency, or bizarre, volatile and irrational behavior" equate to mental incompetency. *Medina*, 59 F.3d at 1107.

This Court's decision in *Voight v. United States*, 88 F.3d 587 (8th Cir. 1996) provides useful instruction on this issue. In *Voight*, the petitioner filed a § 2255 motion and the district court granted an evidentiary hearing on the issue of whether Voight was incompetent to stand trial and whether his attorney provided ineffective assistance in failing to request an competency hearing. The district court found that the petitioner failed to produce sufficient evidence of mental incompetency and that there was no reason to doubt competency at trial. *Id.* at 589. This Court affirmed, noting:

> We have carefully reviewed the record and we hold the district court's finding that there was insufficient doubt as to petitioner's competence to stand trial is not clearly erroneous. The record supports the district court's finding that petitioner understood the nature of the proceedings and the charges against him and was able to assist his attorneys and consult with them with a degree of rational understanding. As noted by the district court, petitioner's history of mental illness, including his treatment with anti-psychotic medication, was substantially offset by petitioner's extensive and effective communication with his attorneys before, during and after trial, his demeanor during trial and as a witness, his failure to tell his trial attorneys about his mental condition during trial, and the opinion of his doctor (petitioner was psychotic in

> November 1988 and in March 1990, but the doctor could not speculate as to petitioner's competence at time of trial).

*Id.* at 591.

Similarly, in Montgomery's case, the observations of both defense counsel and the district court were that she was fully engaged in the trial process and did not manifest any incompetency to stand trial. In addition, of course, the examination by Dr. Hutchinson concluded that Montgomery was competent to stand trial. (Civ. Tr. 1064.)

The cases cited by Montgomery in support of her claim, none of which are Eighth Circuit cases, do not involve the same facts as her case. In *United States v. Bouchillon*, 907 F.2d 589 (5th Cir. 1990), the defendant was a Vietnam veteran with a long history of mental problems and substance abuse and had repeatedly been diagnosed with PTSD-Delayed. He did not receive a competency hearing before his guilty plea, and neither a psychologist or a psychiatrist evaluated him prior to his plea. *Id.* at 590-91. In Montgomery's case, of course, there was a prior expert evaluation of her competency to stand trial.

In *United States v. Rodham*, 233 Fed. Appx. 320 (4th Cir. 2007), that court found no error in an incompetency finding by a district court based its own evaluation of the defendant's testimony and the testimony of an expert. These evaluations concluded that the defendant's "paranoia and delusional beliefs cause by bipolar type schizoaffective disorder are so pervasive and consuming s to make



Appellate Case: 17-1716 Page: 355 Date Filed: 07/30/2018 Entry ID: 4687987

him incompetent to assist in his own defense." *Id*. at 321. There is no such medical conclusion in Montgomery's case.

In *Zapata v. Estelle*, 588 F.2d 1017 (5th Cir. 1979), the defendant was examined shortly after her trial by a psychiatrist who concluded that she had severe depression, feelings of paranoia, and was legally insane. In addition, her personal physician testified that the defendant suffered from hallucinations of men trying to kill her and that she had severe emotional problems. *Id.* at 1019. The appellate court concluded "albeit barely," based on the examination a few days after trial and the testimony of her personal physician, that there was a substantial doubt as to competency. *Id.* at 1021-22. The court also found, however, that it was not incumbent on the trial court to have ordered a competency hearing on its own motion and further concluded that Zapata's attorney did not render ineffective assistance of counsel in failing to request a competency hearing. *Id.* These facts, like those of the other cases cited by Montgomery, are substantially different from her case.

Accordingly, there is no basis to find that Montgomery was incompetent to stand trial.



Appellate Case: 17-1716 Page: 356 Date Filed: 07/30/2018 Entry ID: 4687987

### *11. Procedural due process claim.*[175]

In this claim, Montgomery argues that the district court should have conducted a competency hearing on its own based on information regarding her suicide attempt, the statements by Ms. Hunt and Mr. Owen regarding her mental illness, the notice of the insanity defense, and Dr. McCandless's testimony at trial that she diagnosed Montgomery with bipolar disorder.

If there is a sufficient doubt about the mental competency of an accused, a trial court has a responsibility to order a hearing *sua sponte*. *Griffin v. Lockhart*, 935 F.2d 926 (8th Cir. 1991). Absent some contrary indication, state and federal judges are entitled to presume that defendants are competent. *Branscomb v. Norris*, 47 F.3d 258, 261 (8th Cir. 1995). Treatment with anti-psychotic drugs does not *per se* render a defendant incompetent to stand trial. *Sheley v. Singletary*, 955 F.2d 1434, 1438 (11th Cir. 1992). As this Court explained in *Branscomb*, 47 F.3d at 261:

> Due process requires the trial court to hold a competency hearing *sua sponte* whenever evidence raises a sufficient doubt about the accused's mental competency to stand trial. *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir.1991). While we can describe no precise quantum of proof necessary to establish "sufficient doubt," the trial court should consider evidence of irrational behavior by the accused, the accused's demeanor, and any prior medical opinion as to the mental competency of the accused to stand trial. *Id.* at 930. Additionally, the trial court may consider an express doubt by the accused's attorney, but such doubt

---

[175]Montgomery cannot rely on a statutory basis for this claim since the relevant statute, 18 U.S.C. § 4241, does not have a provision for the court to *sua sponte* order a competency hearing, perhaps reflecting an understanding by Congress that this is an issue best addressed by the parties.



Appellate Case: 17-1716 Page: 357 Date Filed: 07/30/2018 Entry ID: 4687987

> alone is not enough to establish sufficient doubt. *Id.* The habeas petitioner has the burden to prove that objective facts known to the trial court raised a sufficient doubt to require a competency hearing. *Id.* We ask whether a reasonable judge, in the same situation as the trial court, should have experienced doubt about the accused's competency to stand trial. *Id.*

None of the events cited by Montgomery would raise sufficient doubt as to her legal competency to stand trial, especially in the face of a competency finding by an expert and the court's own observation of Montgomery in pre-trial hearings and at trial. Simply because she asserted a defense that she was insane at the time of the offense does not mean that Montgomery was incompetent to stand trial three years later. Nor do any of the other examples cited by Montgomery raise doubts as to legal competency. There is no reason, based on the evidence before the court, to doubt the competency of Montgomery at the time of trial.

*12. Ineffective assistance of counsel in failing to raise competency claim.*

Montgomery claims that Fred Duchardt rendered ineffective assistance of counsel in failing to raise the competency issue. Montgomery does not explain why she targets Mr. Duchardt with this claim as opposed to any of the many other individuals who represented her for almost a year and a half before his entry in the case including, most particularly Judy Clarke, who reportedly had expertise with mental issues in criminal defendants.



Appellate Case: 17-1716 Page: 358 Date Filed: 07/30/2018 Entry ID: 4687987

In any event, Mr. Duchardt testified at the evidentiary hearing that he had issues obtaining information from Montgomery, but that this did not establish legal incompetency:

> The problem we had with Lisa all along and it starts -- well, it starts. One of the primary instances that you see is that memo that we talked about about the bringing out that Tommy was involved. Lisa because of her condition was in a position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems.
>
> She -- you could explain to her until you're blue in the face that she really -- that we were on a time frame and we needed information from her as quickly as she could give it to us. The bottom line is she was giving it to us every bit as quickly as she could, and so we were coming up with information when she was able to give it and it was coming at, you know, the last minute as we were sitting there in March of 2007 before an April of 2007 trial date. That wasn't Lisa's fault. And so I absolutely attribute that to her mental illness.
>
> Do I think she was incompetent to where a Court would determine that we should have some kind of continuance to be able to restore her to competence? Absolutely not. I didn't think there was anything that we could take that difficulty for -- that Lisa was experiencing and make that a viable argument as to her competence.
>
> And we also felt -- I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so – to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them. In terms of a colloquial way of putting it, in terms of a legal defense that would keep a person from being able to stand trial, I don't think so.

(Civ. Tr. 2313-14.)

As Mr. Duchardt states, and Montgomery ignores, there is a substantial difference between an individual with mental issues and legal incompetency.

Moreover, as the district court noted in its order, based on the court's own observations both during pretrial proceedings and the trial itself, the expert opinion as to Montgomery's competency, and the failure of every iteration of the her defense team to request a competency hearing, "trial counsel was not ineffective for failing to raise the competency issue with the court as it would have been futile." (DCD. 212, 95.) Thus, Montgomery suffered no prejudice from her counsel's failure to raise the competency issue because it would have been to no avail.

### L. ***The Allegation That Montgomery's Rights Were Violated When She Was Administered Drugs During Her Trial Which Allegedly Distorted Her Demeanor But Also Allegedly Failed to Treat Her Mental Illness Issues.***

Summary of Argument

Montgomery claims that she was involuntarily medicated and that this medication affected her demeanor at trial. Montgomery further argues that her trial team rendered ineffective assistance of counsel by failing to address this issue. (Montgomery COA 799-827.)

There is no evidence, however, that authorities involuntarily medicated Montgomery, and her arguments arising from case law involving involuntary medication, with its attendant procedural safeguards, do not apply in her case. Moreover, the observations of trial counsel and court establish that Montgomery did not have a flat affect and was not dispassionate during the proceedings, but rather was animated and engaged.

Argument

1. *Montgomery was not involuntarily medicated.*

Montgomery contends that her rights under *Riggins v. Nevada*, 504 U.S. 127 (1992), were violated when she was administered medications involuntarily without proper inquiry by the court.[176] In *Riggins*, the defense moved the district court for an order suspending medications until the end of Riggins's trial. The court denied Riggins's request.

The Supreme Court stated that, once the district court denied Riggins's request to terminate the medication, the continued administration of the medication was involuntary or forced. *Id.* at 133. The *Riggins* court found that the involuntary administration of medication "represents a substantial interference with that person's liberty." *Id*. (quoting *Washington v. Harper*, 494 US. 210, 229 (1990)). Given this

---

[176]Montgomery alleges forced medication for the first time before this Court. Montgomery failed to present this issue to the district court for adjudication at the evidentiary hearing. As the district court noted:

> There is no allegation of involuntary administration of drugs in the present case, so *Riggins* itself does not provide Movant with a basis for relief. Movant fails to demonstrate either *Strickland* prong regarding any alleged failure of trial counsel to advise the jury she was under the influence of medication at trial. As discussed in Section (III)(B)(ii), Movant has failed to demonstrate her medications produced a flat affect at trial. It follows that trial counsel could not have been objectively unreasonable for failing to warn the jury of a flat affect that was not apparent. Similarly, Movant cannot have been prejudiced.

(DCD 212 at 80.)

situation, the court concluded: "Thus, once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug." *Id.* at 135.

However, *Riggins* dealt with the involuntary medication of the defendant and the procedure the Supreme Court determined that must be followed in undertaking this course. *Riggins* does not apply in Montgomery's case because she was not involuntarily medicated. Montgomery attempts to make as much as possible from the statement by Dr. McCandless that she "did not want to take any medicine basically." (Montgomery COA 814.) Montgomery valiantly attempts to take this one phrase and draw from that statement the conclusion that she was involuntarily medicated. However, a fuller examination of this testimony would be helpful:

> Q. Was Lisa medication resistant?
>
> A. Yes, she was.
>
> Q. Explain, I am trying to use the right terminology, explain to the jury what is meant by that?
>
> A. She did not want to take any medicine basically. And when we did, when I did it I often used lower than what a normal starting dose would be.
>
> Q. Just to persuade her to go ahead and take it?
>
> A. *If she so desired.*

(Tr. 2082.) (Emphasis added.)



Appellate Case: 17-1716 Page: 362 Date Filed: 07/30/2018 Entry ID: 4687987

Clearly, Dr. McCandless was attempting to persuade Montgomery to take the medication she had prescribed, but left the decision to her. There was no involuntary administration of drugs in Montgomery's case.[177] Compare the evidence in this case,

---

[177]Montgomery claims: "Mrs. Montgomery was not allowed out into general population until after the administration of the medications she did not want to take." (Montgomery COA 815.) According to its attendant footnote, this statement is allegedly supported by the trial transcript at page 2094. However, a review of this portion of the transcript does not reveal that the prison authorities threatened Montgomery with solitary confinement unless she took her medication. Rather, it reflects a concern by Dr. McCandless that the warden's decision to place Montgomery in the general population might cause safety concerns:

> Q. Did there come a point where you after medication was started for Lisa, that you essentially approved her being moved into general population?
>
> A. Actually it was a decision that the warden made.
>
> Q. When I asked that question I probably should have put it a little differently. Was the decision made and did you not object to that decision?
>
> A. Initially I didn't like the idea. But as time went on and I continued my interviews and basically felt I had a relationship with her in terms of she was to report at any time if she felt threatened or any time uncomfortable the general population. So as time went on I became more comfortable with that.
>
> Q. Basically has that worked out pretty well?
>
> A. It has so far.

(Tr. 2094-95.)



Appellate Case: 17-1716 Page: 363 Date Filed: 07/30/2018 Entry ID: 4687987

for example, with the facts in the *Riggins* decision where the defendant in fact moved to terminate the administration of medication. 504 U.S. at 133.

Similarly, in *Sell v. United States*, 539 U.S. 166, 171 (2003), the defendant refused to take anti-psychotic medication and the staff of the medical center in which he was incarcerated sought, and received, permission to administer the medication against the defendant's will. In *United States v. Fazio*, 599 F.3d 835, 837 (8th Cir. 2010), the defendant did not believe that he suffered from mental illness and refused to take medication. The Government sought and received a court order to medicate the defendant forcibly. *Id.* at 838.

None of these circumstances, nor anything approaching them, exits in this case. There is simply no evidence of forced medication of Montgomery and her claims under *Riggins* and all the arguments that flow from them are without merit.

*2. The issue of Montgomery's demeanor during trial.*

To the extent that Montgomery's arguments regarding her demeanor arise from the *Riggins* case,[178] they fail because the ruling in that case does not apply. The district court noted this fact in its order denying relief:

> Movant next alleges the medications she was taking at the time of trial left her with a flat affect, which violated her purported right to have the jury view her in an unaltered state. (2255 Mtn, pp. 197-98). First, it is unclear that Movant has raised a valid constitutional challenge based on her purported flat affect resulting from medications she voluntarily

[178] Montgomery cites extensively from Justice Kennedy's concurrence in *Riggins*. (Montgomery COA 801-04.)



Appellate Case: 17-1716 Page: 364 Date Filed: 07/30/2018 Entry ID: 4687987

> took. Movant cites only to the concurring opinion in *Riggins* for the proposition that she had a constitutional right to have the jury view her and her reactions to the proceedings in a fair and unadulterated way. In *Riggins*, the defendant sought to cease the *involuntary* administration of psychotropic and regulating medications prior to trial to allow the jury an unaltered view of him, just as he had been at the time of the offense. *Riggins*, 504 U.S. at 130. While *Riggins* may be instructive regarding general principals of the relationship between psychotropic medication and the demands of the adversarial system, its judicial legacy is that the case starts the analytical framework to determine whether a prisoner can be medicated against her will without compromising the adversarial process. Here, there is simply no evidence that Movant took the drugs involuntarily. Consequently, *Riggins* is not particularly instructive in a case such as this where the defendant voluntarily took prescribed psychotropic medications throughout the proceedings. On this basis alone, the court could deny relief on her seventh ground for habeas relief; however, the credible evidence does not support Movant's claims of a flat affect.

(DCD 212 at 96.)

To the extent that Montgomery's complaints in this regard arise from some source other than *Riggins*, they fail because the record does not support them. Neither Dr. Bradford nor Dr. Woods observed Montgomery during the trial. (Montgomery Exh. 24;[179] Civ. Tr. 1856.)

In his statement, Fred Duchardt asserted that Montgomery not only did not have a "flat" affect during trial but, in fact, he had to interact with her when she became too emotional:

> [N]one of the medications used to treat Lisa ever made her appear to me as "flat" or "absent" or "disengaged" or "remorseless". Throughout

[179] Montgomery Exh. 24 is the declaration of Dr. Bradford analyzing the medications that Montgomery took.



Appellate Case: 17-1716 Page: 365 Date Filed: 07/30/2018 Entry ID: 4687987

> preparation for trial, and at trial, Lisa was always full of questions and attentive to answers. As Current Counsel for Mrs. Montgomery is well-aware from review of my file, I have pages and pages of pretrial letters and trial time notes[17] written by Lisa raising intelligent issues of fact and law related to the case. However, I see no indication that Current Counsel for Mrs. Montgomery ever shared all of these items, which run counter to Dr. Woods' conclusions, with Dr. Woods. Lisa was completely and consistently engaged at trial, and always appeared so. There were a few times when Lisa got displeased looks on her face, especially when untoward testimony came from witnesses like ex-husband Carl Boman and mother Judy Shaughnessy. I kept a close watch for those instances, and I interacted with Lisa at those points to get her out of those funks, thereby improving her outer appearance at those difficult times.

(DCD 129 at 77-78.)

John O'Connor also described Montgomery's animated demeanor during trial:

> My recollection of Lisa at trial was that she was fully engaged. She often passed notes to Fred and others raising questions about what witnesses were saying. One instance in particular illustrates her level of engagement. Dr. Mary Case, a pathologist, testified about a mark that Dr. Case claimed was sustained during the offense. Lisa grew so emotional that we had to ask the court for a recess. During the recess, Dr. Case went back to see the mark on Lisa, which caused her (Dr. Case) to recant her testimony about the mark after the recess. I believe this single instance – pleading with us to stop the trial in the middle of testimony – was a strong gauge on Lisa's involvement in her own trial. I did not see her to be cold or remorseless in front of the jury. Nothing about her demeanor in front of the jury raised concerns for me, other than her emotional state at the time of Dr. Case's testimony.

(DCD 130 at 4.)

The lack of a "flat" affect was analyzed by the district court, who had the same conclusions as Fred Duchardt and John O'Connor. After recounting the testimony

at the evidentiary hearing of Troy Schnack, who stated that Montgomery looked sullen, and Susan Hunt, who said she felt that Montgomery showed no affect, the court noted that neither Mr. Schnack nor Ms. Hunt were privy to any advice Montgomery might have received from trial counsel regarding her demeanor. (DCD 212 at 98.) The court then went on to summarize the testimony of Fred Duchardt and John O'Connor regarding Montgomery's demeanor and added its own observations:

> On the other hand, trial counsel Fred Duchardt and John O'Connor observed that Movant's affect was normal and appropriate given the circumstances. O'Connor testified at the evidentiary hearing that he had advised Movant to appear engaged in the trial. Not only did Movant appear engaged, she actively participated in her defense. She passed notes to counsel throughout the trial and asked them questions during breaks. She also dressed nicely and took their advice on how to portray herself. While she had a natural trepidation, she worked very hard to pay close attention and interact with the team. Duchardt testified that, had he observed a flat affect or any other sign of disengagement, he would have addressed it with her and with the jury by questioning a witness about what they were seeing.
>
> The court's observations at the trial parallel that of Duchardt's and O'Connor's recollections. Nothing about Movant's demeanor gave the court pause to question Movant's competency. She was engaged in the proceedings and had an appropriate affect given the nature of the circumstances. Given this, the fact that Hunt and Schnack did not know how trial counsel had advised Movant regarding her demeanor, and that Duchardt and O'Connor sat at counsel table with Movant throughout the trial, the court gives more credence to Duchardt's and O'Connor's views of Movant's affect and demeanor during the trial. While the medications Movant was taking at the time of trial may have had effects on her appearance, the evidence does not support the severity of the effects suggested by Dr. Woods. Therefore, to the extent Movant has a valid constitutional challenge to have the jury view her in an unaltered



Appellate Case: 17-1716 Page: 367 Date Filed: 07/30/2018 Entry ID: 4687987

> state when she voluntarily took medications that may have influenced her affect, Movant has not shown that her state was altered in such a way that resulted in an unfair trial.

(DCD 212 at 98-99.)

Thus, the record does not support and indeed, actively refutes, the contention that Montgomery presented a flat affect during the trial.

*3.* *Ineffective assistance of counsel.*

Montgomery complains that her counsel rendered ineffective assistance of counsel under the *Riggins* decision. However, as shown above, the *Riggins* ruling does not apply in this case, since Montgomery was not involuntarily medicated. Accordingly, trial counsel cannot not be constitutionally ineffective for failing to raise an issue that did not apply in this case.

Similarly, since Montgomery did not have a flat affect, trial counsel did not provide ineffective assistance in not raising this issue. The district court made this finding in disposing of the claim: "As discussed in Section (III)(B)(ii), Movant has failed to demonstrate her medications produced a flat affect at trial. It follows that trial counsel could not have been objectively unreasonable for failing to warn the jury of a flat affect that was not apparent. Similarly, Movant cannot have been prejudiced." (DCD 212 at 80.)

Based on all the relevant available evidence of the individuals who actually observed her during the pretrial and trial proceedings in this case, Montgomery did



Appellate Case: 17-1716 Page: 368 Date Filed: 07/30/2018 Entry ID: 4687987

not suffer from a flat affect and her trial team did not render ineffective assistance in failing to raise this issue.

## *M.* ***Allegations That the District Court Improperly Denied Discovery, Failed to Honor Stipulations, Cut Short Testimony, and Displayed Bias to Habeas Counsel.***

Summary of Argument

Next, Montgomery complains about the conduct of the district court during the course of both the pretrial proceedings and during the trial. (Montgomery COA 829-38.) Specifically, Montgomery claims that the following actions and decisions of the district court prejudiced her:

1. The court failed to grant Montgomery's discovery requests;
2. The court failed to honor stipulations between the parties;
3. The court issued an opinion without a transcript or post-trial briefing;
4. The court excluded the testimony of Lawrence Fox; and
5. The court denied Montgomery a hearing before an impartial arbiter

In response, the Government would note the following:

1. A court has discretion in deciding whether to grant a discovery request and Montgomery failed to show good cause for the discovery she says she was denied;
2. Montgomery offers no evidence to support her contention that the court failed to honor stipulations;
3. Montgomery fails to provide any authority for the proposition that a court must wait for a transcript and post-hearing briefing before it can issue its ruling;

4. The court properly excluded the testimony of Lawrence Fox whose testimony apparently was to advise the court on the law; and

5. The court conducted this case as an impartial arbiter.

Argument

*1. The alleged denial of discovery.*

Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts governs discovery in § 2255 cases: This rule provides, in pertinent part:

> Rule 6. Discovery
>
> (a) Leave of Court Required. A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure of Civil Procedure, or in accordance with the practices and principles of law. . . . .
>
> (b) Requesting Discovery. A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

In her application for a COA, Montgomery fails to specify a reference in the record where she provided reasons for the request. Instead, she asserts that since the court granted her an evidentiary hearing, her discovery requests must be granted. (Montgomery COA 831.) Montgomery cites no authority for this automatic granting of discovery once the court grants an evidentiary hearing. Moreover, the language of Rule 6 does not support this automatic discovery rule. In fact, the rule clearly

makes the granting of discovery discretionary, i.e., "[a] judge *may,* for good cause, authorize a party to conduct discovery . . ." (Emphasis added.) *See also Smith v. United States*, 618 F.2d 507, 509 (8th Cir. 1980).

Montgomery simply provides no reasons in the record for any requested discovery other than her blanket assertion that the court granted her an evidentiary hearing and therefore must grant her discovery. The record is clear, however, that the court did grant Montgomery discovery, e.g., authorizing habeas counsel to depose Ray Conrad. (DCD 52.) Moreover, Montgomery's complaint that the court allowed Fred Duchardt and John O'Connor to review the file prior to drafting affidavits is meritless.[180] Both attorneys were attempting to provide information on a complicated capital case that had ended years before. Providing them with a review of the file could only aid in the fact-finding process.

Accordingly, this Court should deny Montgomery's application for a COA on this ground.

*2. <u>Alleged failure to honor stipulations.</u>*

Montgomery next asserts that the district court failed to honor stipulations of the parties. (Montgomery COA 833-34.) Montgomery does not assert how she

[180]It is also unclear how the court's order to Fred Duchardt and John O'Connor requiring them, over their objection, to provide a written affidavit (DCD 84), resulted in a denial of discovery to Montgomery.

knows the court failed to honor stipulations, which stipulations the court failed to honor (other than the one involving Carl Boman discussed in the footnote below), or how she was prejudiced by the alleged failure of the court to honor stipulations.[181]

Accordingly, Montgomery's application for a COA on this ground should be denied.

3. *Alleged error in failure to wait for a transcript or order post-hearing briefing.*

Next, Montgomery claims that the court denied her due process because the court issued its ruling without benefit of a transcript or further briefing.[182] (Montgomery COA 835.) Montgomery cites no authority for the proposition that

---

[181] Montgomery claims that the court's alleged failure to "consider and /or engage with large portions of Mrs. Montgomery's brief is in part the reason for the need for the unusually lengthy statement of facts." (Montgomery COA 834.) Montgomery points to Teddy Kleiner's allegation that he saw a video of Carl Boman raping her as an example of something that the court determined was unsupported by the record that required the lengthy fact section. It is unclear why Montgomery directs this Court's attention to that example, since she does not allege that the United States stipulated that Carl Boman assaulted her. Moreover, as pointed out elsewhere, the term "rape" is a legal conclusion, for which Kleiner had no support and which, therefore, is not supported by the record. There is no stipulation to honor in this regard. The court is not required to agree with an unproven conclusion in order to "honor" a stipulation.

[182] Montgomery's § 2255 motion is 238 pages long and the Government's response is 163 pages long. The court also had Montgomery's 162 exhibits for its review, including Montgomery's Exhibit 1, which had 293 attachments totaling over 3,000 pages. The court, therefore, had a substantial record from which it could draw in crafting its order.

this is a denial of a constitutional right. She complains that the court "misstates, overlooks and misunderstands critical evidence and Mrs. Montgomery's legal theories." (Montgomery COA 835.) Montgomery does not explain how she knows this to be the case or why the court's role in presiding over the evidentiary hearing and whatever notes it took during the hearing was insufficient. Simply because the court did not find certain evidence credible or certain legal theories persuasive does not mean that it failed to examine them.[183]

Accordingly, Montgomery's application for a COA on this ground should be denied.

4. *Alleged denial of due process in excluding the testimony of Lawrence Fox.*

Montgomery alleges that the court denied her due process when it did not admit the testimony of Lawrence Fox. (Montgomery COA 835-37.) Montgomery asserts that Mr. Fox, who is an expert in legal ethics, would have explained the ethical conflict regarding Fred Duchardt's representations to the court. Montgomery fails to cite any authority for the proposition that the court's exclusion of the testimony of someone who would opine on the law results in a denial of due process.

[183]Indeed, Montgomery's legal theories are not that complicated. The main thrust of her § 2255 is that she had a right to counsel of her choice, that her trial counsel rendered ineffective assistance of counsel because it chose to present an NGRI defense during the guilt phase, and failed to prepare a biopsychosocial history. None of her other attendant theories regarding, for example, expert witnesses, are particularly complicated.

As this Court has ruled in the past: "The exclusion of expert testimony is a matter committed to the sound judicial discretion of the trial judge, and we will reverse only for an abuse of that discretion." *United States v. Strong*, 826 F.3d 1109, 1115 (8th Cir. 2016) (quoting *United States v. Kime*, 99 F.3d 870, 883 (8th Cir. 1996)).

When Montgomery offered Mr. Fox to testify, habeas counsel explained that he would testify "regarding the rules of professional responsibility and the ethics governing the conduct of lawyers" (Civ. Tr. 1305.) The court responded: "I think judging the ethics of an attorney is kind of like determining attorney's fees. I don't think I need an expert to tell me what is ethical behavior by an attorney and what isn't. So I'm not inclined to allow that testimony." (Civ. Tr. 1306.) Instead, the court accepted Fox's declaration (Montgomery Exh. 52) as an offer of proof regarding his testimony. (Civ. Tr. 1306.)

Montgomery fails to show how the district court abused its discretion in declining Mr. Fox's opinion on legal issues, especially since the court accepted his declaration as an offer of proof. Accordingly, this Court should deny Montgomery's application for a COA on this ground.

*5. Montgomery's allegation that she was denied an impartial arbiter.*

Montgomery attempts to lump together her previous complaints and allege that the district court was not an impartial arbiter of her claim. Since there is no

basis for her claims individually, she gains nothing by restating them here. Accordingly, this Court should deny Montgomery's application for a COA on this ground.

### *N. <u>The Allegation That Montgomery's Rights to Due Process and a Fair Sentence Were Violated by the Introduction of Victim Impact Evidence.</u>*

Montgomery contends that the Government violated her rights in the penalty phase by introducing the 911 call made by the victim's mother.[184] (Montgomery COA 839-40.) Montgomery directs this Court's attention to *Payne v. Tennessee*, 501 U.S. 808 (1991), in support of her argument. However, *Payne* upheld the right of the jury to hear such evidence:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne*, 501 U.S. at 827, 111 S. Ct. at 2609.

---

[184]During the evidentiary hearing, Montgomery withdrew her claim that Fred Duchardt was ineffective for failing to have the 911 tape excluded. "And, finally, we are now withdrawing subclaim, I believe that's 24, of Roman V, page 3 of the Court's memo and page 193 of Movant' motion, and that relates to ineffective assistance of counsel with respect to seeking to exclude the 911 tape." (Civ. Tr. 1865.) To the extent that she re-asserts it at this time (Montgomery COA 840), the United States suggests this Court should disregard Montgomery's argument.



Appellate Case: 17-1716 Page: 375 Date Filed: 07/30/2018 Entry ID: 4687987

Montgomery asserts that the evidence in this case "stepped over the *Payne* line" (Montgomery COA 839) without providing any metric by which she makes this assertion. As the district court noted in its ruling, quoting *Payne*, the Government has a legitimate interest in counteracting the mitigation efforts of the defendant in order to show that the victim is also an individual "whose death represents a unique loss to society and in particular to his family." (DCD 212 at 40) The court further noted: "The statements contained in the 911 recording were not these types of opinions and characterizations [regarding the crime and the defendant]. As Montgomery admits in her summary of the recording, it contained simply a mother's anguish at finding her daughter dead. Thus, the admission of the recording was not inappropriate under *Payne* or *Booth.*[185]" (DCD 212 at 41.)

Moreover, Montgomery failed to raise this issue on direct appeal and, therefore, cannot raise it here for the first time.

---

[185] *Booth v. Maryland*, 482 U.S. 496 (1987).

## O. ***The Argument That Montgomery's Capital Sentence Violates the Eighth Amendment Because It is Constitutionally Disproportionate for This Offense.***

Montgomery insists that out of 15 cases in the last 30 years involving similar crimes, she is the only defendant sentenced to death. Accordingly, she concludes that her sentence is unconstitutional.[186] (Montgomery COA 840-42.)

The Supreme Court has occasionally struck down the death penalty for a crime or a particular category of crimes as being disproportionate. *See*, *e.g.*, *Coker v. Georgia*, 433 U.S. 584 (1977) (striking down the death penalty for the crime of rape). However, in this case, Montgomery asks this Court to find the death penalty disproportionate for a certain type of murder. She contends that, since others who have committed similar offenses did not receive the death penalty, it would be unconstitutional to impose that punishment on her.

As the district court pointed out, the Supreme Court has rejected the argument that a defendant can prove a constitutional violation by demonstrating that similarly situated defendants did not receive the death penalty. *McClesky v. Kemp*, 481 U.S. 279, 307 (1987). *See also United States v. Johnson*, 495 F.3d 951, 961 (8th Cir. 2007) (rejecting argument that death penalty was disproportionate when co-defendant received life imprisonment).

[186]Montgomery's other arguments on constitutionality involve alleged intellectual disability and flat affect during trial, which are factually refuted elsewhere in this brief.



Appellate Case: 17-1716 Page: 377 Date Filed: 07/30/2018 Entry ID: 4687987

Finally, Montgomery has forfeited this claim because she failed to assert this argument at trial or on direct appeal.

Accordingly, this Court should deny Montgomery's application for a COA on this ground.

## *P. The Allegation That Dr. Park Dietz Presented False Testimony Regarding the Nature of the Grand Jury Investigation Into His Testimony in the Andrea Yates Case.*

Montgomery's last claim is that Dr. Park Dietz testified untruthfully and that the Government violated its obligations under *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), when it failed to correct the record. (Montgomery COA 843-45.) This assertion is meritless.

At trial, Dr. Dietz testified that he had inaccurately testified in a prior case, involving a defendant named Andrea Yates. Dr. Dietz had testified that the facts in Ms. Yates's case were similar to an episode of a television program named "Law and Order":

> In that case after I completed my direct testimony about Mrs. Yates and my opinions and cross-examination began, one of the questions I was asked had to do with the television series that I had been a consultant to for some years called Law and Order.
>
> In response to the question about the television show I gave an answer in which I tried to describe an episode that was on some of the same issues as the Yates case. And the answer that I gave was incorrect, that is the description of the show I gave was wrong, I was mistaken about it.



Appellate Case: 17-1716 Page: 378 Date Filed: 07/30/2018 Entry ID: 4687987

> I didn't learn about that mistake until a week later when the show contacted me to ask what episode I was talking about. As we tried to research it we couldn't find a show with the same plot I had given. And I contacted the prosecutors who had me testify and said I made a mistake about that, I would like to come back and fix it. They told me instead to write a letter they would put in the record as a stipulation.
>
> So I tried that day to figure out how I got this wrong, wrote a letter doing the best I could to explain it. Sent it off. The letter wasn't put in the record. Instead what got put in the record an agreed-to stipulation if I returned to Houston I would have testified that no such episode aired or existed. Later there would be a lot of concern about this mistake about the plot of the T. V. show and that concern included various allegations that the prosecutors and I had conspired to make it up.
>
> And the end result of it all was that it became part of the appeal and the judge who had that appeal to decide on decided that what I had done was give false testimony. He likened it to a rape victim recanting her testimony and thought that because the prosecutor had relied on my mistake about the T. V. show in his cross-examination of another witness and in his closing argument that it could have been unfair and could have biased the jury about Andrea Yates. So he reversed the conviction.

(Tr. 2527-28.)

On cross-examination, defense counsel further inquired about the repercussions of Dr. Dietz testimony:

> Q. And you actually were though investigated, there was a grand jury investigation about what happened, is that correct, sir?
>
> A. Well, to be accurate, there was a run-away grand jury that had kicked out the prosecution, was investigating Houston crime lab, invited, well they consulted a member of the defense bar who it's my understanding invited George Harman, Andrea Yates' lawyer, and the one who changed his story about whether it was an honest mistake or he was accusing me as a liar, of lieing [sic], invited him to come before



Appellate Case: 17-1716 Page: 379 Date Filed: 07/30/2018 Entry ID: 4687987

> the grand jury without an official there to give his theory. And he got the run-away grand jury to investigate the District Attorney's office and me. The outcome of that was that they returned no indictment and found no wrongdoing. But it did generate a lot of press with it.

(Tr. 2664.)

Montgomery is unclear which statement she contends that the Government should have corrected and fails to explain how the Government knew to correct them. She does state: "Of course, the fact that a jury does not return an indictment is not a finding of no wrongdoing. That testimony and argument was improper." (Montgomery COA 844.) However, Montgomery fails to identify what wrongdoing the grand jury found that would make this statement untrue and would trigger an obligation on the part of the Government to correct the record. Of course, to the extent that the term "wrongdoing" refers to a criminal charge, the grand jury failed to find wrongdoing.

Moreover, like so many other issues, Montgomery failed to raise this issue at trial or on direct appeal, and cannot bring it in this proceeding for the first time.

Montgomery's argument in this regard is meritless. Accordingly, this Court should deny Montgomery's application for a COA on this ground.

## VI. <u>Conclusion</u>

Based on the reasons and authorities set forth above, Montgomery has failed to present any basis for the issuance of a certificate of appealability. Accordingly,



Appellate Case: 17-1716 Page: 380 Date Filed: 07/30/2018 Entry ID: 4687987

the Government respectfully asks this Court to deny Montgomery's application for a certificate of appealability.


Respectfully submitted,

TIMOTHY A. GARRISON
United States Attorney

By /s/ *Bruce E. Clark*

BRUCE E. CLARK
LAJUANA M. COUNTS
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, 5th Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), that this response complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 95,735 words. This response was prepared using Microsoft Word 2016 software. In making this certification I have relied upon the word-count feature of Microsoft Word 2016. Furthermore, this response has been determined to be virus-free in compliance with Eighth Circuit Rule 28A(h).

/s/ *Bruce E. Clark*
Bruce E. Clark
Assistant United States Attorney



Appellate Case: 17-1716 Page: 382 Date Filed: 07/30/2018 Entry ID: 4687987

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2018, the foregoing was electronically filed with the Clerk of the court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. A copy will be served on participants in the case by the CM/ECF system or by U.S. Mail, postage prepaid.

Amy D. Harwell
Federal Public Defender
Federal Public Defender's Office
810 Broadway, Suite 200
Nashville, Tennessee 37203

Kelley J. Henry
Assistant Federal Public Defender
Federal Public Defender's Office
810 Broadway, Suite 200
Nashville, Tennessee 37203

Lisa G. Nouri
2526 Holmes
Kansas City, Missouri 64108

*Attorneys for Appellant*

/s/ *Bruce E. Clark*
Bruce E. Clark
Assistant United States Attorney