CAPITAL CASE
IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| LISA MONTGOMERY, | ) | |
| | ) | |
| Movant – Appellant, | ) | NO. 17-1716 |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT WESTERN DISTRICT |
| United States, | ) | OF MISSOURI, |
| | ) | |
| Respondent – Appellee. | ) | NO. 12-08001-CV-W-GAF |

## REPLY TO RESPONDENT'S RESPONSE TO PETITIONER'S APPLICATION FOR CERTIFICATE OF APPEALABILITY

In response to Lisa Montgomery's application for a certificate of appealability (App COA), the Government filed a three hundred and eighty-two page (382) brief. Within that brief, the Government debated the merit of Mrs. Montgomery's claims for two hundred and twelve (212) pages of argument. R. 4687987 (hereafter *Response*). Thus, based on the Government's response, it appears that Mrs. Montgomery's entitlement to relief is at least debatable among people of reason. *Miller-El v. Cockrell*, 537 U.S. 322 (2003). Despite the lengthy argument presented by the Government as to each claim, the Government repeatedly intones that "There is no basis, either on the merits or procedurally, for a COA to issue" (*see*, e.g., *Response* at 215).

These incantations lack specificity and only perfunctorily address the critical question before this Court of whether Mrs. Montgomery is entitled to a COA. As this Court recently noted, "a litigant may not advert perfunctorily to an argument, hoping that we will do its work for it by developing the argument and putting flesh on its bones." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts*, Inc., No. 17-1762, 2018 WL 5726690, at *4 (8th Cir. Nov. 2, 2018) (citing, *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018)). Respondent's conclusory argument against a COA fails for both reasons: there is no flesh on its bones and the merits briefing demonstrates that the claims are at least debatable.

At bottom, the Government responds to each of Mrs. Montgomery's claims regarding ineffective assistance of counsel with a mantra that however counsel performed Mrs. Montgomery cannot show prejudice because of the nature of the crime she committed. As the proof presented at the evidentiary hearing established that every other person in the country to be charged with a similar crime has received a sentence less than death, the Government's claim of "no prejudice" rings hollow.



Appellate Case: 17-1716 Page: 2 Date Filed: 11/27/2018 Entry ID: 4730024

The proof establishes that Mrs. Montgomery is the only person sentenced to death for the killing of a mother while removing the baby. As Exhibit 131, *Chart of Similar Crimes*, demonstrates, Mrs. Montgomery's sentence is disproportionate to that received by other, similarly situated murderers. Where Exhibit 131 shows that the community can be (and in every other case has been) satisfied by a life sentence in response to such a crime, Mrs. Montgomery has shown prejudice resulting from the mishandling of her case. Mrs. Montgomery's entitlement to relief on her claims of ineffective assistance of counsel is at least debatable among reasonable jurists where she has shown she is the only person on death row for the crime of fetal abduction. *Id.* at 342 (the *Miller-El* standard was established where Miller-El showed one prong of a *Brady* claim; "the question is the debatability of the underlying constitutional claim, not the resolution of that debate").

Where the Government has responded to Mrs. Montgomery's claims in a piecemeal manner, Mrs. Montgomery makes this reply following the outline established by the Government. Where Mrs.



Appellate Case: 17-1716 Page: 3 Date Filed: 11/27/2018 Entry ID: 4730024

Montgomery does not make additional arguments, she relies on her initial application for COA.

**Reply to Government's Response Regarding the Claims about the Removal of Judy Clarke:**

Without any discussion of whether the claim is reasonably debatable, the Government dismisses Mrs. Montgomery's application for a COA regarding her entitlement to relief due to the removal of Ms. Clarke as counsel (*see* App COA at 542-99), with only an incantation that no COA should issue. *Response* at 215. To the contrary, Mrs. Montgomery's entitlement to relief is clearly debatable where the Government's argument that the claim is not meritorious admits that the District Court removed Ms. Clarke based upon her putative obstructiveness – about which there are clear issues of fact. *Response* at 185. Further, the Government claims that the court's removal of Ms. Clarke cannot support entitlement to relief where 1) Mr. Owen was the sponsor of her *pro hac vice* status and 2) where neither Ms. Clarke nor Mrs. Montgomery protested Ms. Clarke's removal. *Response* at 200. The Government is wrong on both counts.

First, the Government's position is not supported by the facts as to the idea that the removal was necessary because Mr. Owen no longer



Appellate Case: 17-1716 Page: 4 Date Filed: 11/27/2018 Entry ID: 4730024

wished to sponsor Ms. Clarke's *pro hac vice* status. While the record is silent as to any overt discussion of Mr. Owen withdrawing his support of Ms. Clarke's admission, the record is not silent that Ms. Hunt – who was equally credentialed to support Ms. Clarke's admission as Mr. Owen – asked for Ms. Clarke to remain in the case and also provided the court a letter from Ms. Clarke's boss, the Federal Public Defender for the Southern District of California, Ruben Cahn, requesting that the office be appointed on the case. Exhibit 68, *Transcript of 4/25/2006 In Chambers Hearing* (providing the court Exhibit 99, *Cahn Letter)*; *Id., Transcript of 5/3/2006 In Chambers Hearing*; Vol. 2, p. 417 *Hunt Testimony* ; *see also* Exhibit 44, *Hunt letter to Burr.*[1] Where the record refutes the facts upon which the Government relies to establish that

---

[1] The Government also alleges that Ms. Clarke could not have appeared in the case (*Response* at 195) which not only blinks Ms. Hunt's role as lead counsel (and potential sponsor of Ms. Clarke) but also contradicts Mr. Duchardt's contention that Ms. Clarke could have simply entered an appearance in the case (after taking the Missouri state bar). D.E. 140, Att. B, *Duchardt Statement,* at p. 15-16, 19; *see also* Exhibit 83, p.2, *Armstrong Declaration* ("Mr. Duchardt felt that as Ms. Clarke had been admitted *pro hac vice,* she did not have a leg to stand on, legally. He told Ms. Clarke to get herself admitted to practice in the Western District of Missouri and they could talk further.").

Mrs. Montgomery is not entitled to relief, Mrs. Montgomery's entitlement to relief is, at the very least, debatable.

Likewise, Mrs. Montgomery's entitlement to relief is debatable where the Government wrongly claims that the entire claim is defaulted because neither Mrs. Montgomery nor Ms. Clarke objected to the court's removal of Ms. Clarke. *Response* at 212 ("However, none of the claims raised by Montgomery regarding the removal of Ms. Clarke were objected to at the time . . . Accordingly, Montgomery has procedurally defaulted these claims"). [2] Contrary to the Government's contention, however, both Mrs. Montgomery and her counsel did object to the removal of Ms. Hunt: Mrs. Montgomery did so in her letter to the court (Exhibit 71, *Montgomery letter*) and Ms. Hunt did so repeatedly. Exhibit 68, *Transcript of 4/25/2006 In Chambers Hearing* (providing the court Exhibit 99, *Cahn Letter*); *Id., Transcript of 5/3/2006 In Chambers Hearing*; Vol. 2, p. 417 *Hunt Testimony* ; *see also* Exhibit 44, *Hunt letter to Burr.*

---

[2] Mrs. Montgomery has argued that the claim is not subject to a procedural bar where the District Court dismissed the claim on the merits. *See*, Entry ID #4596229, 606 - 12 (citing D.E. 173, p. 8-20).

The Government argues that Mrs. Montgomery's claims about the removal of Ms. Clarke are defaulted, because 1) Mrs. Montgomery did not ask for Ms. Clarke to be re-appointed (*Response* at 173) and 2) no one asked for a hearing or for reconsideration of the court's removal of Ms. Clarke. *Response* at ftnt 100.[3] The Government's argument is disingenuous where Mrs. Montgomery's letter to the court was beyond clear that she wanted Ms. Clarke to remain her counsel. Exhibit 71, *Montgomery letter* ("of all the lawyers I have had to date, I have felt the most comfortable with Judy . . . I trusted her advice . . . Being able to find an attorney that understands me and I in turn understand them is a difficult task. I felt I had found this combination in Judy . . . with Judy gone it is difficult to have any confidence in the future of my case . . . Removing Judy from my team has been a devastating blow to me"). Further, the record shows that Ms. Hunt moved the court on the record to reconsider the removal on both April 25 and May 3 and supported her request with Mrs. Montgomery's letter. Exhibit 68, *Transcript of*

[3] The Government contradictorily accuses Ms. Clarke of having defaulted Mrs. Montgomery's claims by not demanding a hearing on her removal (*Response* at ftnt 100) and then also alleges that Ms. Clarke was not entitled to a hearing on her removal because her *pro hac vice* status was not revoked. *Response* at 197.

*4/25/2006 In Chambers Hearing* (providing the court Exhibit 99, *Cahn Letter*); *Id., Transcript of 5/3/2006 In Chambers Hearing*; Vol. 2, p. 417 *Hunt Testimony.*[4]

The Government's argument that Mrs. Montgomery defaulted this claim by failing to specifically state the words "I want Ms. Clarke to be reappointed" is beyond cavil. This Circuit has followed the Supreme Court's clear decree that where a question arises as to the sufficiency of a *pro se* pleading, *pro se* litigants are "held to a lesser pleading standard than other parties." *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (quoted in *Rush v. State Arkansas DWS*, 876 F.3d 1123, 1125–26 (8th Cir. 2017)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (noting that *pro se* complaints are to be liberally construed). Where pleading requirements in formal, even jurisdictional, pleadings are to be liberally construed for *pro se* litigants, it certainly runs afoul

[4] Footnote 101 of the Response refers to Ms. Hunt's discussion with the court as "only an option" not a "motion," however it is clear from the record that Ms. Hunt was asking (ie. moving) the court for the re-appointment of Ms. Clarke and that the court clearly stated the court was not open to doing so. Exhibit 68, *Transcript of 4/25/2006 & 5/3/2006 In Chambers Hearing.* Where the Government's argument relies on the legal definition of "to move" rather than reflecting the clear import of the content of the record, Mrs. Montgomery's claim is clearly debatable.

of the Supreme Court's edict to require Mrs. Montgomery – mentally ill and traumatized by the loss of her trusted counsel – to intone magic words rather than to consider the clear import of her entire letter. *See*, e.g., *Kowitz v. Trinity Health*, 839 F.3d 742, 749 (8th Cir. 2016) (holding in ADA case that "[t]here is no requirement to use magic words like 'reasonable accommodation'"); *United States v. Gray*, 369 F.3d 1024, 1026 (8th Cir. 2004) (holding in Fourth Amendment context that withdrawal of consent for a search "need not be effectuated through particular 'magic words'"); *Valspar Corp. v. Sherman*, 211 F. Supp. 3d 1209, 1213 (D. Minn. 2016) ("This Court doubts that the Eighth Circuit would employ such a formalistic, 'magic words' approach to deciding important issues of contract interpretation and jurisdiction—especially when doing so would place it far apart from the settled approach of other circuits.").

The Government attempts to elide the structural nature of Mrs. Montgomery's claims regarding the removal of Ms. Clarke by reframing the discussion in terms of choice of counsel. *Response* at 202. However as Mrs. Montgomery has shown, *once an established attorney-client relationship exists* (as it is uncontested existed between Mrs.



Appellate Case: 17-1716 Page: 9 Date Filed: 11/27/2018 Entry ID: 4730024

Montgomery and Ms. Clarke) no valid distinction can be made between the rights of the wealthy to retained counsel and the rights of the poor to appointed counsel. *Stearnes v. Clinton*, 780 S.W.2d 216, 221-23 (Tex. Crim. App. 1989); *Harris v. People*, 567 P.2d 750, 752 (Cal. 1977); *Amadeo v. State*, 384 S.E.2d 181, 183 (Ga. 1989); *Davis v. Cain*, 662 So. 2d 453, 454 (La. 1995). The Government has in no way contested that Ms. Clarke was counsel of record for Mrs. Montgomery, and reasonable jurists could reasonably debate whether the court's removal of Ms. Clarke constituted impermissible interference in the attorney-client relationship.

The Government addresses the merits of Mrs. Montgomery's claims about the removal of Ms. Clarke arguing that the district court was right to remove Ms. Clarke because "she was negatively affecting the progress of the Montgomery defense team as a whole." *Response* at 194. The Government's argument hinges on a factual determination that is clearly debatable under the facts presented in support of this claim.[5] Where the proof shows that the district court believed that Ms.

[5] Note: the district court denied Mrs. Montgomery any hearing on this issue D.E. 173, *Order* at 8-22 denying hearing on Clarke issues Grounds I-IV, so further factual development is necessary to support Mrs.



Appellate Case: 17-1716 Page: 10 Date Filed: 11/27/2018 Entry ID: 4730024

Clarke was being “obstructive” but does not reflect why he believed that or whether that belief was in any way rational or based upon reliable information, further factual development is necessary before the facts can be reliably determined. What is apparent from the proof before the Court, however, is that at the time the district court made that determination, Ms. Clarke was the only qualified attorney representing Mrs. Montgomery (Exhibit 60, *Hunt Declaration*; Vol. 8, p. 2137, *Owen Testimony)* and that she was being productive not obstructive. *See* App for COA at p325-40 (covering the progress made in the six months Ms. Clarke represented Mrs. Montgomery including: record collection (nearly all the records collected prior to trial were collected under Ms. Clarke's leadership); identification of red flags of mental illness and trauma; observation, investigation, and assessment of Mrs. Montgomery's mental health and her competency to stand trial, discovery of Tommy Kleiner's alibi, rejection of Dr. Ramachandran as

---

Montgomery's entitlement to relief. *Machibroda v. U.S.,* 386 U.S. 487, 494-95 (1962); *U.S. v. Hayman*, 72 S.Ct 263, 272 (1952); *U.S. v. Nelson*, 347 F.3d 701 (8th Cir. 2008); *Sinisterra v. U.S.*, 600 F. 3d 900 (8th Cir. 2010).



Appellate Case: 17-1716 Page: 11 Date Filed: 11/27/2018 Entry ID: 4730024

an appropriate expert witness, identification and retention of appropriate mental health experts).

The Government then argues that Mrs. Montgomery has failed to show prejudice resulting from the removal of Ms. Clarke. To support that position, the Government baldly asserts that "[c]learly Duchardt has death penalty experience similar to Ms. Clarke" (*Response* at 201) and claims that Mrs. Montgomery did not present evidence to support the accusation to the contrary.[6] In so doing, Respondent blinks that the district court did not grant Mrs. Montgomery a hearing on this claim and prevented Mrs. Montgomery from asking witnesses regarding this issue. Vol. 2, p. 413 (court's *sua sponte* interruption of testimony regarding the work done by the Clarke team because "we're getting

---

6 To compare the experience of the federal capital attorney with the most clients on federal death row with the attorney widely acknowledged as the pre-eminent death penalty lawyer in the country – who has settled multiple high profile death penalty cases with facts at least as aggravated as this one (*see*, https://deathpenaltyinfo.org/node/1418 (regarding the plea of Ms. Clarke's client Eric Rudolph to four life sentences for killing two and injuring 150 others in the bombing of the 1996 Olympics); http://www.cnn.com/US/9801/22/unabomb.wrap/ (regarding the plea of Ms. Clarke's client, Ted Kaczynski, to life without parole for 16 bombings that killed 3 people and injured 29) – is quite a stretch.

beyond what's relevant here"); p. 417 (court's interruption in *Hunt Testimony*: "we're not here to rehash all that").

Where Mrs. Montgomery has shown that she is the only person on death row in the entire country for the crime of a fetal kidnapping and where multiple other such crimes have resulted in sentences less than death and where Mrs. Montgomery has shown that Mr. Duchardt failed to investigate, develop, and present compelling evidence that she was sexually trafficked by her mother resulting in life-long impaired perception of reality and serious mental illness from that sexual trauma and betrayal and that Duchardt myopically pursued a fanciful and doomed innocence defense that destroyed the credibility of the entire defense, the issue of the prejudice flowing from the district court's removal of Ms. Clark is at least debatable. A certificate of appealability should issue on these claims including the claim that the district court erred in failing to grant an evidentiary hearing on these issues.

**Reply to Government's Response Regarding the Ineffectiveness of Owen and Conrad in Having Clarke Removed:**

In response to Mrs. Montgomery's application for a COA regarding the ineffectiveness of the Office of the Federal Public Defender in its representation of Mrs. Montgomery during the in-chambers conference



Appellate Case: 17-1716 Page: 13 Date Filed: 11/27/2018 Entry ID: 4730024

with the court that resulted in the removal of Ms. Clarke, the Government says that Mrs. Montgomery "presented very little in the way of evidence" of this case. *Response* at 206. The Government forgets that this claim, like all the claims regarding the removal of Ms. Clarke, was dismissed by the district court for procedural reasons and Mrs. Montgomery was prohibited from developing a full record on this claim. D.E. 173 *Order*; *see also* Vol. 2, p. 413; p. 417.

In the same way, the Government ignores the evidence in the record in support of this claim. The Government derides Mrs. Montgomery's contention that Ms. Clarke was the only qualified lawyer in the case (*Response* at 207 "there are no facts or authority supporting Montgomery's position") ignoring the undisputed fact that both Ms. Hunt and Mr. Owen had informed the court they were not qualified to handle the case (Exhibit 60, *Hunt Declaration*; Vol. 8, p. 2137 *Owen Testimony*) and that they solicited Ms. Clarke's involvement because she was qualified. Exhibit 67, p. 5, *Transcript of 4/21/2006 in Chambers Conference* ("what [Ms. Clarke] brought to this case is a tremendous experience in mental health issues which the court is aware of is one of the guidelines for representation. You have to have somebody on your



Appellate Case: 17-1716 Page: 14 Date Filed: 11/27/2018 Entry ID: 4730024

team with a mental health background, experience and ferreting those issues out and handling them and presenting them. I have never had a serious mental health case and I don't think Dave has.").

Having disregarded the facts, the Government accuses Mrs. Montgomery of relying on a "tautological argument." *Response* at 208. However where the facts show that: 1) Hunt and Owen were not qualified (by their own assessment as well as that of others) (Exhibit 60, *Hunt Declaration* ("I said that neither Mr. Owen nor I had the experience to do a mental health capital case"); Vol. 8, p. 2137, *Owen Testimony* (Owen did not consider himself to be "capital qualified," had no background in cases with mental health issues, and considered this case beyond his level of expertise)); 2) where Clarke was the only qualified attorney working on the case (Ex. 67, above); 3) where Owen decided unilaterally to have Clarke removed as counsel without the approval of lead counsel Hunt (Exhibit 60, *Hunt Declaration* ("I was not consulted or advised of this in chamber conference. Neither was Ms. Clarke, or our client, Lisa Montgomery"); Vol 3, p. 415, *Hunt Testimony*); 4) where Owen induced the court to remove the only qualified attorney through accusations of "obstructive" and "abusive"

behavior (*Response* at 194, admitting that the court removed Clarke due to Owens' accusations), Owens' representation of Mrs. Montgomery was deficient. *Strickland v. Washington*, 466 U.S. 668 (1984).

Further, trial counsels' testimony at the evidentiary hearing supports Mrs. Montgomery's claim that she was prejudiced by Owens' deficient performance. Vol. 8, p. 2191, *Duchardt Testimony* (the loss of Mrs. Montgomery's "very nice relationship with Judy and the circumstances under which she lost that relationship with Judy had a major impact on her"); Vol. 3, p. 418, *Hunt Testimony* ("when Judy was dismissed, she lost all hope. She told me that. She called me crying"); Exhibit 60, *Hunt Declaration* ("I told the judge that the loss of Judy Clarke was devastating to the client and that Mrs. Montgomery felt betrayed and lied to by the defense team"). It is at least debatable among jurists of reason that Mrs. Montgomery should have been granted a hearing on this claim and allowed to develop further proof to support her entitlement to relief.

**Reply to Government's Response Regarding Claims that Mrs. Montgomery was Denied Counsel at a Critical Stage in the Proceeding:**

Continuing to spin the facts, the Government claims that the court's procedural bar of Mrs. Montgomery's claim that she was denied



Appellate Case: 17-1716 Page: 16 Date Filed: 11/27/2018 Entry ID: 4730024

counsel at a critical stage is not debatable. The Government asserts two erroneous factual bases in support of this procedural bar: 1) Mrs. Montgomery did not ask for Ms. Clarke to be reinstated and 2) Ms. Clarke did not ask to be re-appointed. *Response* at 214. As discussed above, to read Mrs. Montgomery's letter as not requesting that Ms. Clarke be allowed to continue as counsel more than strains credulity, it breaks it. Further, the letter Ms. Hunt gave the court from Ms. Clarke's boss offering to accept appointment in the case belies the Government's characterization that Ms. Clarke did not try to assume representation of Mrs. Montgomery. *Compare* Exhibit 99, *Cahn Letter, with Response* 214 at ftnt 101.

The Government disingenuously argues that Ms. Hunt did not move for the reinstatement of Ms. Clarke, linguistically quibbling about what constitutes an oral motion. "The actual record reveals that Ms. Hunt presented Ms. Clarke's reinstatement as an *option* but made no formal motion, orally or in writing, to reinstate her." *Response* at 214, ftnt101 (emphasis added). While it is true that Ms. Hunt presented the possibility of the San Diego Federal Public Defender assuming responsibility for the case in the place of the Federal Public Defender

for the Western District of Missouri as an "option" – it is not true that she did not move for Ms. Clarke's readmission to the case. Where an attorney discusses "options" for the re-entry of qualified counsel into the case, especially where that attorney informs the court that the removal of that qualified counsel was a "mistake," that attorney has "moved" the court to reappoint that counsel. Any other pedantic parsing of language serves only to belie that which was intended by the parties to the communication. Exhibit 68, *Transcript of 4/25/2006 and 5/3/2006 In Chambers Hearing;* Exhibit 60, *Hunt Declaration* ("My preference was to put the team back together with Ms. Clarke. Mr. Owen strongly objected and the Court denied that Option. Another option was to remove the local Federal Public Defender Office and have the San Diego Federal Public Defender Office take over the case with Ms. Clarke and me as the co-counsel. Mr. Owen again told the Court that he was strongly opposed to that option as well and that his office had no intention of asking to withdraw. The Court denied that option as well").

In addition to the factual misrepresentations, the Government erroneously claims that *Cronic* requires a showing of prejudice. *Response* at 210 (arguing that *Cronic* does not support Mrs.

Montgomery's claim and citing *Cronic*'s ineffective assistance of counsel analysis to require prejudice to be shown). To the contrary, the applicable portion of *Cronic* plainly states that "There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. Most obvious, of course, is the complete denial of counsel." *United States v. Cronic*, 466 U.S. 648, 659 (1984). It is this portion of *Cronic* upon which Mrs. Montgomery relies. Here, where Mr. Owen – for reasons of his own – went behind lead-counsel Hunt's back and advocated to the court for the removal of the only qualified attorney on the case without the knowledge of that attorney and without Mrs. Montgomery's knowledge or permission, Mrs. Montgomery was without counsel at that critical stage. There was no one in the room advocating for her interests or protecting her right to qualified counsel. *Cronic's* deprivation of counsel structural error analysis applies.

The Government relies on Owen's presence – despite his advocacy in opposition to Mrs. Montgomery's wishes and best interest – to take the case out of the *Cronic* legal analysis. *Response* at 210 ("[Mr. Owen] has no "conflict of interest" that would have required his

disqualification. Moreover removing Ms. Clarke from the defense team obviously did not result in a compete denial of counsel for Montgomery at a critical stage of the proceeding"). The Government claims the Ninth Circuit's opinion in *Hearst* controls and that Mrs. Montgomery has not met the Ninth Circuit's requirements for showing that Mr. Owen's conflict of interest affected the representation. *U.S. v. Hearst*, 638 F.2d 1190 (9th Cir. 1980). The Government is wrong.

Mrs. Montgomery has shown an actual conflict of interest between her interests and Mr. Owen's and that that conflict of interest "had an adverse effect on her counsel's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (cited in *Hearst*, at 1193).[7] Mr. Owen's interest was in the removal of Ms. Clarke. That interest was contrary both to Mrs. Montgomery's subjective interest (she clearly indicated in her letter that she had preferred Ms. Clarke over the other attorneys, Exhibit 71,

---

[7] The Government slightly alters the Ninth Circuit's *Hearst* test claiming that it requires a showing that the "interests of the attorney actually conflict with the interests of the client *and that some sort of deficient performance* was attributable to the conflict." *Response* at 211. That is not the test. As the Ninth Circuit identified in *Hearst*, the test is the *Cuyler v. Sullivan* test which does not require any showing of deficient performance, rather only that the conflict showed "an adverse effect on counsel's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).



Appellate Case: 17-1716 Page: 20 Date Filed: 11/27/2018 Entry ID: 4730024

*Montgomery Letter*) and to the objective interest in competent counsel, given that Ms. Clarke was the only attorney assigned to the case who was qualified to represent Mrs. Montgomery. Exhibit 60, *Hunt Declaration* ("I said that neither Mr. Owen nor I had the experience to do a mental health capital case"); Vol. 8, p. 2137, *Owen Testimony* (Owen did not consider himself to be "capital qualified," had no background in cases with mental health issues, and considered this case beyond his level of expertise)). Where Mr. Owen's ego-driven interest in removing Ms. Clarke from the team was contrary to Mrs. Montgomery's interest and where Mrs. Montgomery has shown that Owen's interest had "an adverse effect on [his] performance" in that he sought removal of the only qualified counsel, Mrs. Montgomery has shown that the conflict of interest violated her Sixth Amendment right to counsel under *Cuyler v. Sullivan*. *See also Christeson v. Roper*, 135 S. Ct. 891, 894 (2015) (a "significant conflict of interest" arises when an attorney's "interest in avoiding damage to [his] own reputation" is at odds with his client's strongest argument). This issue is debatable and a COA should issue.



Appellate Case: 17-1716 Page: 21 Date Filed: 11/27/2018 Entry ID: 4730024

**Reply to Response Regarding The Claim of Denial of Due Process For Failure to Recuse:**

The Government's response to Mrs. Montgomery's claim of entitlement to a COA where the district court denied her due process of law in refusing to recuse itself sidesteps the critical issues. The Government claims that there are "no facts in dispute" with regard to this claim. *Response* at 215. Respondent is wrong: many, many facts are at issue, including facts cited in the Government's response about which Mrs. Montgomery was denied any process.

The Government claims that the district courts removal of Ms. Clarke was essentially ministerial and that the reasons for the removal are beyond dispute. In so doing, the Government assumes facts that have never been determined, including: 1) that Ms. Clarke was removed from the case because she was abusive to co-counsel, 2) that Ms. Clarke's putative abuse caused a deterioration of the relationship between the defense team, and 3) that the relationship deteriorated to the extent that the representation of Mrs. Montgomery was affected. *Response* at 216 ("it is clear from the record that the reason the court removed Ms. Clarke from the case was because she had been abusive to her co-counsel resulting in a deterioration of their relationship to the



Appellate Case: 17-1716 Page: 22 Date Filed: 11/27/2018 Entry ID: 4730024

extent that it was affecting the representation of Montgomery."). Each of those facts is disputed and Mrs. Montgomery is entitled to a hearing for the determination of the facts by a neutral fact-finder who is not a witness.

In support of its version of events, the Government repeatedly cites to the district court's on-the-record statements at the May 5, 2016 hearing where the court purported to have clarified his basis for the removal of Ms. Clarke. *Response* at 217 (quoting D.E. 53 at 3). However, the Government's reliance on the court's after-the-fact, un-cross-examined summary demonstrates Mrs. Montgomery's point: the facts were at issue and Mrs. Montgomery was entitled to a hearing for the fleshing out of the claim and the development of proof. *Post hoc* statements by the court without Mrs. Montgomery enjoying the protection of cross-examination and without further factual development do not dispose of the issue.[8] *Parkus v. Delo*, 33 F.3d 933, 39 (8th Cir. 1994).

---

[8] The Government erroneously contends that Mrs. Montgomery was able to question the court about his reasons for the removal of Ms. Clarke at the May 6, 2013 hearing. *Response* at 237. False. The record accurately reflects that the court took the bench and almost immediately made a statement "there are couple of matters that are



Appellate Case: 17-1716 Page: 23 Date Filed: 11/27/2018 Entry ID: 4730024

The Government also claims that nothing that occurred in an unrecorded in chambers conference is disputed. *Response* at 225. That is untrue. The Government claims there is nothing to see in this mess, that the court's reasoning for removing Clarke was transparent – that she was removed because Owen said she was abusive and that he would not work with her. *Response* at 216. Strangely the Government is the only party to have knowledge of what happened in the unrecorded, ex parte conference in chambers. The district court has disavowed the

---

raised in the motion to reassign the case that I would like to comment on and I think deserves some clarification" followed by the court's colloquy regarding what he meant when he said what he said. Following that colloquy, the court turned to other matters. Counsel for Mrs. Montgomery was not prepared to question the court regarding these issues and, indeed, had been denied discovery of the court's testimony. *See* D.E. 46, *Motion for Discovery* (including Deposition of Judge Fenner); D.E. 48, *Order* (notifying counsel that Magistrate Judge Maughmer present at the in chambers meeting and saying that Maughmer would submit to an interview); D.E. 49, *Order* (Maughmer interview will be "on the record" and the Government will be allowed to be present and also ask questions – though when counsel arrived at Judge Maughmer's chambers, counsel were told Maughmer would not permit the interview to be on the record). No questioning of the trial court was permitted. *See also* D.E. 59, Order Denying Motion to Reassign (distinguishing between the parties movant was permitted to interview and the court — who movant was not permitted to interview. The court also erroneously stated that "Movant's counsel were given an opportunity to inquire as to my recollections at that time" — which is contradicted by the record of the May 6, 2013 hearing).



Appellate Case: 17-1716 Page: 24 Date Filed: 11/27/2018 Entry ID: 4730024

statements the court made on the record as to why Ms. Clarke was removed leaving only questions as to what the justification was. *Compare* Exhibit 68, *May 3, 2006 Transcript* (court said "the two of you come in here and say Judy Clarke is a non-productive member of the team, causing problems, we need her removed from the defense. And based on your explanation of the situation I did that) *with* 13-2958, Attachment 5, *May 6, 2013 Transcript* ("There was a comment that I made about Ms. Clarke being nonproductive, and I think that comment is misunderstood or taken out of context in the scope of the entire matter") and Exhibit 68, *4/25/2006 Transcript of In Chambers Proceeding* (court says Clarke "only appointed in an effort to see if she could assist in getting a plea") *with* 13-2958, Attachment 5, *May 6, 2013 Transcript* ("my comment that Ms. Clarke was only appointed in an effort to see if she could assist in getting a plea worked out was really a misstatement on my part, an awkward way of conveying that assistance with negotiating the plea was one of the considerations that was addressed to me in adding Ms. Clarke to the defense team").[9] If, as the

[9] Other inconsistencies creating material issues of fact that require a hearing include, but are not limited to, proof regarding:

Government contends, she was removed because Mr. Owen claimed she was "abusive" then that claim begs many, many more questions as to what he maintained she had done that was abusive and how the court

---

1) Whether Mr. Conrad and Mr. Owen moved to have Ms. Clarke removed: *compare*, D.E. 212, p. 125 ("The Court sought to solve the reported discord among this iteration of the trial team by accepting the request of the local attorneys involved") *with* Exhibit 53, p. 12, *5/6/2013 Transcript* ("No one, really, quite frankly, sought to exclude someone else from the case as opposed to them.");
2) Whether Mr. Conrad was present: *compare*, Exhibit 72, p. 15 *Conrad Depo* (Conrad denied being present at the in-chambers meeting) *with* Exhibit 62, *Owen Declaration* p. 8 ("Judge Fenner summoned both Ray Conrad and me to chambers immediately . . . Mr. Conrad explained the friction being experienced between Judy Clarke, her team and the other members of Lisa Montgomery's defense team.")
3) What the Court was told to support the court's acceptance that Ms. Clarke was "abusive beyond reasonability" (*see*, Exhibit 68, p. 23, *5/8/2006 Transcript* (the court stating that the court previously "accepted" Mr. Owen's representation regarding Ms. Clarke that "She is just abusive beyond reasonability").
4) Whether the FPD suggested the court bar Ms. Clarke from contact with Mrs. Montgomery or whether the court did so *sua sponte* (*compare*, Exhibit 72, p. 15 *Conrad Depo*. (indicating he told Mr. Owen to advise the court of Owen's feelings and "I said, Tell the judge, he can cancel the visitation if he wants to") *with* Exhibit 62, p.8, *Owen Declaration* ("Then, without further comment or questions, Judge Fenner picked up the phone, called CCA . . . and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit with her.")

determined that such was true and how the court weighed the removal of the putatively abusive, yet qualified counsel versus the removal of the putatively aggrieved yet unqualified counsel. A COA should issue.

**Reply to Response to Ineffective Assistance of Trial Counsel Claims:**

The Government fails to address two of the central components of Mrs. Montgomery's entitlement to a COA on her IAC claims: 1) the fact that the district court already found that the claims had some merit – and hence held an evidentiary hearing and 2) that the district court failed to apply established precedent requiring the court to consider all of counsel's deficiencies in the aggregate rather than one at a time. *Compare App. COA* at 599-606 with *Response* (the word "cumulative" does not even appear in the Government's Response and the word "totality" only appears in a block quote related solely to competence). Where the Government does not even argue that the district court used the correct legal standard in its determination and does not dispute that the grant of the evidentiary hearing demonstrates that there is some merit to the claims, it is at least debatable that Mrs. Montgomery is entitled to relief and a COA should issue.

Instead of engaging with the proof in the manner prescribed by the Supreme Court in *Strickland*, *Williams,* and *Wiggins*, the Government responds to Mrs. Montgomery's claim of ineffective assistance of counsel with lists of the Government's re-characterizations of her claims. *Response* at 238-240. The Government thereafter focuses on its own list of that which it contends that trial counsel did in the case. *Response* at 240. In so doing, the Government glosses over the heart of Mrs. Montgomery's claims, divorcing the fact that the defense's pretrial strategy opened the door to devastating proof that presented Mrs. Montgomery as a manipulative liar rather than as traumatized and out of touch with reality. Counsel's misguided strategy also undermined the scant mitigation presented and allowed the Government to paint the defense as liars (i.e., presenting that she was a good mother). The Government's dissection of these interrelated deficiencies of counsel belies the ineffectiveness of counsel's representation.

Further, the Government missed that the proof at the hearing established that the prevailing professional norms in the Western District of Missouri at the time of Mrs. Montgomery's trial were the



Appellate Case: 17-1716 Page: 28 Date Filed: 11/27/2018 Entry ID: 4730024

ABA Guidelines. As to all the components of Mrs. Montgomery's IAC claims, the Government responds with repeated citations to *Van Hook*. *Response* at 244 (quoting *Order*, 212 at 19-20); 45, 46. The Government does admit that this Court, in *Sinisterra* noted that the Guidelines are guides to what reasonable representation entails "only to the extent they describe the professional norms prevailing when the representation took place." *Response* at 245 (quoting *Sinisterra v. U.S.*, 600 F.3d 900, 908 (8th Cir. 2010). Precisely. Mrs. Montgomery's proof at the hearing clearly established that the professional norms at the time of trial were reflected in the Guidelines. *App. COA* at p. 297-299. Indeed, the district court found, "I think you've established that the ABA Guidelines are a barometer to be used to determine professional norms," after hearing testimony from Russ Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects, and Marc Bookman, Director of the Atlantic Center for Capital Representation. Vol. 2, p.296, *Ruling of the Court*.

In contravention to the proof of the prevailing professional norms, the Government argues that "the biopsychosocial history evidence was not necessary to the presentation of Montgomery's case, especially since



Appellate Case: 17-1716 Page: 29 Date Filed: 11/27/2018 Entry ID: 4730024

the trial counsel presented almost all the relevant evidence in the biopsychosocial history to the jury." The Governments argument 1) flies in the face of the ABA Guidelines and the prevailing professional norms established by the proof at the hearing (Vol. 1, p. 105, 112, *Stetler Testimony*; Vol. 1, p. 199, *Bookman Testimony*) and 2) ignores that trial counsel established that Mrs. Montgomery was raped maybe only once by one man (TT. Vol. 13, p. 2851-2) and then lived a normal happy life until one day she cut a baby out of someone.[10] In reality, the biopsychosocial history presented at the hearing established that Mrs. Montgomery's family history was rife with mental illness going back several generations on each side; that she was abused by both parents and subjected to cruel and degrading treatment by her mother; that her step-father groomed her for sexual violence, forcing her strip for punishment and to lie exposed bent over the bathtub; that she was raped and sodomized by multiple perpetrators multiple times; that her mother not only knew of the rapes but profited from them and told Lisa that she had to continue to endure the sodomy; that Lisa told her

[10] Trial counsel's ridiculous innocence defense completely undermined all of the mitigation and cast its reliability into doubt.



Appellate Case: 17-1716 Page: 30 Date Filed: 11/27/2018 Entry ID: 4730024

cousin, a law enforcement officer, who did nothing to protect her; that Lisa's grasp on reality was compromised by these events – and that that symptom was noted by those around her when she was in middle and high school; that Lisa was unable to organize her life and frequently was erratic and impulsive; that Lisa had impaired insight throughout her life and was often out of touch with reality; that delusions and dissociation impaired her day to day life and her parenting; that she continued to suffer sexual violence in both her marriages which exacerbated her unresolved trauma from childhood and further weakened her grasp of reality; that Lisa never functioned well or competently in the world and that her day to day existence was symptomatic of extreme sexual violence, mental illness, and brain dysfunction. Had an accurate biopsychosocial evaluation been performed, counsel's experts could have appropriately diagnosed and described Mrs. Montgomery's brain impairment and serious mental illness, the synergistic, co-morbid effects of which made her unable to function and impaired her perception of reality. A COA should issue.



Appellate Case: 17-1716 Page: 31 Date Filed: 11/27/2018 Entry ID: 4730024

- **Composition of the Trial Team:**

The Government argues that Mrs. Montgomery has failed to show her entitlement to relief based upon the ineffective assistance of counsel with regard to the composition of the trial team. *Response* at 248. The Government's points seem to be two-fold: 1) whatever happened was not Fred Duchardt and John O'Connor's fault – they got there after the fact; and 2) there was no prejudice from that which happened. *Response* 248. Respondent's response blinks the fact that Mrs. Montgomery's trial team included Dave Owen – the attorney who caused the disintegration of the original two teams and who was responsible for the removal or withdrawal of every woman who worked on the case.[11] Further, Mr.

---

[11] Except, of course, Dani Waller and Stephanie Elliot, whose roles were, unfortunately, minimal. Ms. Waller testified that she was completely cowed by the history of the case, that it was "very clear you can't speak up, right?" Vol. 6, p. 1562, *Waller Testimony*. Ms. Waller, who was ostensibly the team mitigation specialist, was prevented from participating in the development of the penalty phase by Mr. Duchardt. Exhibit 83, *Armstrong Declaration* (*see also* Vol. 4, p. 911-916, introducing *Armstrong Declaration* as substantive testimony) ("Her role in terms of I was doing [ie. the penalty phase preparation] was not a whole lot" and indicating that he assumed "lead" on mental health evidence which meant, "yeah, I would have been the mitigation specialist"). The valuable evidence she did uncover – ie. the witness who knew that Lisa was gang raped as a fourteen year old – was ignored. *See generally*, App COA 96-98. Ms. Elliot was the paralegal who was



Appellate Case: 17-1716 Page: 32 Date Filed: 11/27/2018 Entry ID: 4730024

Owen caused Mrs. Montgomery to lose the knowledgeable and trained mitigation specialists, Debra Garvey and David Freedman, losing both their expertise and their institutional knowledge of the case. Where Mrs. Montgomery has shown that the turnover in counsel negatively affected both her mental health and the development of the evidence in the case, her claim of IAC of trial counsel is reasonably debatable.

Contrary to the Government's contention, the advent of Fred Duchardt and John O'Connor did not present a "do-over" for Sixth Amendment analysis. Mrs. Montgomery has shown that her case suffered from missed red-flags, undeveloped mitigation, and the presentation of a nonsensical defense, those harms flowed from Mr. Owens' ineffectiveness in deciding to have Ms. Clarke removed from the case – and Mr. Owen was part of the ultimate trial team; his ineffectiveness is not erased by the appointment of other counsel.

Mrs. Montgomery has shown she was prejudiced by counsel's ineffectiveness in building and keeping a competent trial team. The Government claims that Mrs. Montgomery's contention that the

---

hired at a cocktail party because she was in Mr. Owen's cousin's book group. She kept the file.

turnover in counsel affected her competency to stand trial is "without any apparent evidence." *Response* at 248. However the proof is that as a result of the turn over Mrs. Montgomery was guarded and Mr. Duchardt found "we could only get so far before she shut down." Exhibit 83, *Armstrong Declaration* (*see also* Vol. 4, p. 911-916, introducing *Armstrong Declaration* as substantive testimony) (discussed at *App. COA* 85-87). Mr. Duchardt's experience of Mrs. Montgomery's inability to trust him is an extension of that which Ms. Hunt saw before she left the team. That is, the loss of Ms. Clarke caused Mrs. Montgomery to "re-live some parts of her life unintentionally" causing her to be "devastated" and to feel "we all lied to her." Exhibit 68, *Transcript of 4/25/2006 and 5/3/2006 In Chambers Hearing*. A COA should issue.

- **Experts/NGRI:**

In response to Mrs. Montgomery's claim of ineffective assistance of counsel for pleading NGRI, the Government responds only "clearly the experts at trial testified that Montgomery met the definition of legal insanity" as if that settled the matter. *Response* at 243. The Government fails to engage with the facts: counsel's assertion of NGRI did not make logical sense. The experts knew that Mrs. Montgomery did



Appellate Case: 17-1716 Page: 34 Date Filed: 11/27/2018 Entry ID: 4730024

not believe the baby was her own – so the pseudocyesis (if she had such) did not cause the crime. She did not cut the baby out of Mrs. Stinnett because of pseudocyesis. *App COA* at 655-62 (citing *Ramachandran Deposition* (wherein he admitted he did not know the legal standard for insanity and that he believed that volition was a relevant component to insanity in the U.S.) and the *Logan Testimony* (wherein he stated that Mrs. Montgomery did not believe the baby was hers)). Where Mrs. Montgomery has shown why Mr. Duchardt persisted with the presentation of Dr. Ramachandran (*App. COA* at 118-120), shown that Dr. Ramachandran was not as qualified at Mr. Duchardt believed (*App. COA* at 120), and that Dr. Ramachandran did not know the basic legal elements comprising his "opinion" (*App. COA* at 656-657), the Government's resort to "well, Ramachandran said it" does not end the inquiry. The Government has in no way dispelled the facts presented by Mrs. Montgomery and those facts show that counsel persisted with an unqualified and uninformed expert due to counsel's misrepresentations to the court. Further, the facts show that expert's opinions did not logically support the defense for which they were offered. Mrs.

Montgomery has shown that the issue of her entitlement to relief is at least debatable. A COA should issue.

With similar diffidence, the Government dismisses Mr. Duchardt's deception regarding Drs. Ramachandran and Logan. The Government contends that the record is clear that "the court understood that any diagnosis from Drs. Ramachandra or Logan was merely preliminary." *Response* at 259. That is beside the point. If the court "understood" that, then Mr. Duchardt had successfully deceived the court, because 1) Dr. Ramachandran had only had one telephone call with counsel, had not reviewed documents (as they were only "dispatched" shortly before the court hearing) and had not provided any diagnosis, "preliminary" or otherwise as he had never met the client – indeed he was still on vacation in India (*App. COA* at 638) and 2) Dr. Logan had not begun work on the case. Vol. 4, p. 936, *Logan Testimony*. Further, Mr. Duchardt was not privy to whatever the court "understood;" he only knew he had told a whopper.

The Government attempts to erase the conflict this deception created by claiming that a conflict would only exist if Mr. Duchardt believed that he had misrepresented the situation to the court.

*Response* at 260, ftnt 121. Though the Government focuses on the district court's putative understanding that the diagnosis Mr. Duchardt revealed was "preliminary" – Mr. Duchardt made another misrepresentation that he could not have believed was innocent.

The Government argues that there is no proof that Mr. Duchardt believed he had misrepresented anything to the court, so there was no conflict. *Response* at 260 ftnt 121. However Mr. Duchardt could not possibly have believed that his experts were writing reports –when neither expert had examined Mrs. Montgomery and, indeed, Dr. Ramachandran was still in India. The Government's focus on the fact the district court has subsequently, in §2255 proceedings, said it understood that the experts' putative diagnoses were "preliminary" in no way dispels the deception perpetrated by Mr. Duchardt's claim that his experts were preparing reports. Exhibit 58, *4/5/07 Transcript*. Neither expert was in any way preparing a report. Neither expert had reviewed materials nor examined Mrs. Montgomery, so neither had any information or opinions to report. Mr. Duchardt's claim that the experts were working on reports was blatantly false. The Government does not



Appellate Case: 17-1716 Page: 37 Date Filed: 11/27/2018 Entry ID: 4730024

even attempt to dispel or refute that this statement was a lie – or that Mr. Duchardt necessarily knew that it was.[12]

Further, the Government's response regarding the conflict created by Mr. Duchardt's deception does not even address that counsel's deception resulted in counsel allowing the government's experts to evaluate Ms. Montgomery *before* defense experts. That is to say, before Mr. Duchardt even knew whether his experts would support NGRI or pseudocyesis, he allowed the Government's experts access to Mrs. Montgomery for them to rebut his claims. *App. COA* at 118-120, 134-138; *see also*, *App. COA* at 662-66 for discussion of Rule 12.2 protections and how Duchardt should have proceeded.

The district court's determination of this issue hinged on 1) the court's determination that the court knew that the reports were "preliminary" and 2) the court's belief that Mr. Duchardt "advanced" the pseudocyesis theory "after a thorough investigation of the facts and

---

[12] The Government's response also does not address the expert opinion of Professor Larry Fox regarding the conflict created by Mr. Duchardt's misrepresentations. *See*, Exhibit 52, *Fox Report*; *see also*, 17-1716, Entry ID 4596230, *Motion to Expand the Record*, Attachment, *Fox Declaration.* Although Professor Fox was not allowed to testify, the Government stipulated to the introduction of his report. As such, it is in the record and the Court may consider it.

circumstances of Movant's case." D.E., 212, *Order* at 22. However the evidence preponderates against that finding: Mr. Duchardt could not have "thoroughly" investigated the facts and circumstances of her case where he had 1) no biopsychosocial history to provide to his experts (as was required by prevailing professional norms) and 2) did not yet have any diagnosis (preliminary or otherwise) from those experts as they had not yet evaluated Mrs. Montgomery. Mr. Duchardt did not "thoroughly investigate" prior to announcing his theory of the case: he panicked.

Where reasonable jurists could debate whether a conflict existed between counsel, who deceived the court in order to appear prepared, and the client, who did not benefit from counsel's premature commitment to the pseudocyesis defense, a COA should issue. The First Circuit has held that where a petitioner can show that "some plausible alternative defense strategy or tactic might have been pursued" but for counsel's conflict, "[she] need not show that the defense would necessarily have been successful if it had been used, but merely that it possessed sufficient substance to be a viable alternative." *Brien v. United States*, 695 F.2d 10, 15 (1st Cir. 1982); *see also Cuyler v. Sullivan*, 446 U.S. 335, 337 (1980) ("a defendant who shows that a

conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (internal citations omitted) (internal quotation marks omitted)); *McCoy v. Court of Appeals of Wisconsin, Dist. 1*, 486 U.S. 429, 436 (1988) ("The lawyer may not ignore his or her professional obligations . . .Neither paid nor appointed counsel may deliberately mislead the court with respect to either the facts or the law . . ." (internal quotations omitted)); *Wheat v. United States*, 486 U.S. 153, 160-62 (1988) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them . . . When a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's . . . counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant . . . Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks . . . [over] the fairness of the proceedings in his own court.").



Appellate Case: 17-1716 Page: 40 Date Filed: 11/27/2018 Entry ID: 4730024

Here, there was another "plausible alternative defense strategy" – asking for a continuance to prepare a thorough social history, providing that history, including the trauma history, to competent experts, and then presenting Mrs. Montgomery's impairments in the penalty phase. Such a strategy would have prevented the Government from attacking Mrs. Montgomery's credibility in the first phase of the trial – indeed, the Government would not have even seen the social history or the expert reports until the interlude between the two phases. Rule 12.2, Rules of Criminal Procedure.[13] However Mr. Duchardt was unable to choose between the strategies as to how to use his experts as he had already announced his first phase defense (prior to the experts even evaluating Mrs. Montgomery) which created a conflict – he could not

---

[13] The district court's order does not discuss Mrs. Montgomery's argument that Mr. Duchardt was ineffective for disclosing this unsupported affirmative defense in light of the option to continue to investigate and to present whatever evidence the team managed to accumulate in the penalty phase. D.E. 212 at 70-72 (discussing the Duchardt conflict without reference to other possible strategies). Where Mr. Duchardt's actions cannot be strategic (his experts had not evaluated Mrs. Montgomery so he did not have information upon which to make a strategic decision) his failure to seek a continuance so he could continue preparation before committing to a defense was ineffective. That he continued to insist on that defense to Mrs. Montgomery's detriment was a result of his conflict of interest.



Appellate Case: 17-1716 Page: 41 Date Filed: 11/27/2018 Entry ID: 4730024

change his strategy without admitting that he had deceived the court. Because reasonable jurists could debate the merit of this claim, a COA should issue.

- **The Tommy Defense:**

In response to Mrs. Montgomery's claim of ineffective assistance of counsel for the trial team's announcement of "the Tommy Defense" in open court, the Government takes two positions: 1) it was Mrs. Montgomery's fault that anyone thought that someone was with her; and 2) Mr. O'Connor prevented the presentation of that defense so it cannot be IAC. The Government's response misses several points.

First, the team's failure to recognize Mrs. Montgomery's "sensation" that someone else was present as a symptom of her mental disorders was ineffective assistance of counsel. The proof introduced at the hearing established that the prevailing professional norms at the time of the trial required that someone on the defense team be qualified by training and experience to recognize mental health symptoms. Vol. 1, p. 114-15, *Stetler Testimony*. Mrs. Montgomery's sensation that she was not alone at the time of the murder is a classic description of dissociation. Vol. 7, p. 1693, *Porterfield Testimony* (classic symptoms of

dissociation are depersonalization and de realization). That the trial team decided to investigate that which turned out to be a symptom of dissociation was not ineffective. What was ineffective was announcing that the team was doing so in open court. Exhibit 58, *Transcript of Pretrial Conference*, p. 14-16. That announcement turned Mrs. Montgomery's family against the trial team, making it virtually impossible for the team to gather critical mitigation information. Exhibit 142, *Kleiner Deposition*. Interestingly, Mr. Owen, who admitted he had little experience with mental illness or capital representation, warned the team that this would happen if "the Tommy Defense" were to be made public. Vol. 8, p. 2144, *Owen Testimony*. Mr. Duchardt, who the Government lauds as extremely experienced in capital representation (*Response* at 201), announced the defense anyway. Exhibit 58, *Transcript of 4/3/07 Pre-Trial Hearing*. The Government's response that a severely mentally ill and brain damaged traumatized woman caused the team to have to investigate her symptoms is no response at all; Mrs. Montgomery's mental illness was the team's *raison de etre* from the beginning.

Second, that Mr. O'Connor prevented Mr. Duchardt from presenting an affirmative defense that Tommy Kleiner was culpable does not remotely end the inquiry. The jury still heard that Mrs. Montgomery told the Government's experts that Kleiner was present. TT. Vol.12, p. 2638, *Dietz Testimony*. Where the trial team had not yet had Mrs. Montgomery evaluated and did not have psychological insight into how her sensation that Kleiner was present fit into her constellation of symptoms, that the Government experts got the first crack at asking her about Kleiner's presence was ineffective assistance of counsel.

The "Tommy Defense" only became an issue through the trial team's ineffectiveness. The prior team had ruled out the possibility that Mr. Kleiner was present. *App. COA* p. 642-44 (citing *Jackson*, *Freidman*, and *Owen Testimony*). Even if successor counsel did not believe they should rely on the work of the Clarke team, they should not have announced the defense in open court without reviewing the information gathered by the Clarke team and/or investigating the matter themselves. Where the trial team failed to do any of those things despite the readily available information of Mr. Kleiner's alibi, the

announcement in open court that Mrs. Montgomery had named her brother as the culprit was ineffective assistance of counsel and Mrs. Montgomery is entitled to a COA.

In defense of Mr. Duchardt's "Tommy Defense," the Government points to two red-herrings: the witness who believed there were two people in the car and Ms. Harper's report that Ms. Stinnet said that "they" were at the house. *Response* at 265. The Government seems to argue that as there was some conceivable reason to investigate whether there were two perpetrators, Mr. Duchardt was not ineffective in announcing that Mrs. Montgomery had said her brother committed the crime. *Id*. However the proof is to the contrary. Not only should Mr. Duchardt have investigated the "Tommy Defense" before making such an announcement in open court, the proof also shows that the trial team had Mrs. Montgomery review the discovery in the case, including those two red-herrings in November 2006 before she made the disclosures to Mr. Duchardt. Vol. 2, p. 341, *Elliot Testimony*. The trial team's failure to recognize Mrs. Montgomery's trauma-response/dissociation and to carefully guard her from suggestive information was another deficient



Appellate Case: 17-1716 Page: 45 Date Filed: 11/27/2018 Entry ID: 4730024

performance. *See*, Vol. 4, p. 681, *Clarke Testimony* (discussing care taken to avoid planting memories of the crime during Clarke's tenure).

The Government elides Mr. Duchardt's internally inconsistent versions of the events. While Mr. Duchardt now claims that he did not ask Mrs. Montgomery leading questions or otherwise do anything that might have tampered with Mrs. Montgomery's memory regarding who was with her at the time of the crime (Vol. 9, p. 2304, *Duchardt Testimony*) the records of his meetings with her belie that assertion. Exhibit 157, *Duchardt Memo* ("I was back to pushing her" and "we shall be continuing to push these issues" also noting that Mrs. Montgomery only "became firm that it was Tommy" after the "pushing"). Mr. Duchardt's credibility on this issue is suspect where he has gone to lengths to specify under oath that the Tommy disclosure came during a meeting when his wife was not present (D.E. 129, p.4, *Duchardt Statement*) where his contemporaneous memo clearly indicated that she was present. Exhibit 157, *Duchardt Memo* (noting that "I took Ryland with me" and "sessions on March 5 and 6 between Lisa, Ryland and me were also productive.").



Appellate Case: 17-1716 Page: 46 Date Filed: 11/27/2018 Entry ID: 4730024

The Government claims that any ineffectiveness in announcing the Tommy Defense" did not prejudice Mrs. Montgomery as the Government characterizes that the trial team "wove Montgomery's belief that Tommy Kleiner was with her into the insanity defense." *Response* at 267. While the Government is not wrong that Mrs. Montgomery's putative memory was actually a psychiatric symptom, the Government is very wrong that the disclosure did not prejudice Mrs. Montgomery. As multiple witnesses attested, once Mrs. Montgomery's family heard that the defense team intended to try to pin the crime on Tommy Kleiner, they closed ranks and did not assist with the case. Exhibit 62, p. 13, *Owen Declaration*; Exhibit 142, p. 18-20, *Kleiner Deposition*. Further, the prejudice where the team's deficient performance handed the Government additional opportunities to paint Mrs. Montgomery as a manipulative liar who would turn on her brother to save herself infected the entire trial and weighed heavily at sentencing. Where the team's ineffectiveness in announcing the Tommy Defense is at least debatable among jurists of reason, Mrs. Montgomery is entitled to a COA.

- **Evidence of NGRI/Waiver of Rule 12.2 Protections**

In response to Mrs. Montgomery's claim that the trial team was ineffective for asserting the NGRI defense rather than putting forward the mental health case in the penalty phase, the Government insists that the protections of Rule 12.2 of the Criminal Rules of Procedure are "illusory." *Response* at 270. Such a response would be a surprise to the district court for the Northern District of Iowa (*see, U.S. v. Johnson*, 362 F.Supp.2d 1043, 1076 (N.D. Iowa, 2005) or the Eastern District of New York (*see U.S. v. Wilson*, 493 F.Supp.2d 348 (E.D.N.Y., 2006)) or the District of Massachusetts (*see United States v. Sampson*, 335 F.Supp.2d 166 (D.Mass.2004), or any of the myriad other districts and circuits that have wrestled to insure the 12.2 protections were applied correctly. *See also*, 1A Fed. Prac. & Proc. § 207 Notice of Expert Evidence on a Mental Condition by Peter Henning.

The Government has now decided that there existed "ample evidence" to support Mrs. Montgomery's NGRI defense. *Response* at 267. Such an admission presents an interesting legal conundrum – where the law requires the affirmative insanity defense must then be established by clear and convincing evidence (18 U.S.C. Sec. 17(b); *U.S.*



Appellate Case: 17-1716 Page: 48 Date Filed: 11/27/2018 Entry ID: 4730024

*v. Byrd*, 834 F.2d 145, 146 (8th Cir. 1987)), the Government's admission that there is "ample" evidence to support such a defense seems an admission. Even if the Government has not, now, belatedly, conceded Mrs. Montgomery's insanity, the admission that there was "ample" evidence of her insanity clearly places Mrs. Montgomery outside the category of offenders for whom the death penalty is to be reserved. *Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution" (internal quotation marks omitted)); *Kennedy v. Louisiana*, 554 U.S. 407, 420, (2008) (citing Roper, *supra*, at 568); *see also*, *Kansas v. Marsh*, 548 U.S. 163, 206 (Souter, J., dissenting).

As Mrs. Montgomery explained in detail in her application for COA, reasonable jurists could debate the ineffectiveness of her counsel where counsel chose a factually insupportable defense (*App. COA* at 655-62) pursuit of which unnecessarily exposed her to a five day video-taped interrogation by two Government experts (*id.* at 662-66), the testimony about which counsel were unprepared to rebut without a biopsychosocial evaluation (*id.* at 678-87) and which resulted in the



Appellate Case: 17-1716 Page: 49 Date Filed: 11/27/2018 Entry ID: 4730024

exclusion of brain impairment testimony (*id.* at 687-95). Where the Supreme Court has mandated that counsel's failures be weighed both individually and cumulatively with all the errors alleged in the petition, reasonable jurists could debate Mrs. Montgomery's entitlement to relief. A COA should issue.

- **IAC for Mishandling Dr. Hutchinson's Raw Data**

The Government misses the point of Mrs. Montgomery's claim about the mishandling of Dr. Hutchinson's notes. The Government claims that "thus whether or not Dr. Hutchinson's test interpretations were somehow employed inaccurately, her tests were simply duplicative of other tests." *Response* at 276. The point, however, is that because the trial team did not interview Dr. Hutchinson (in contravention of prevailing professional norms (Vol. 4, p. 1001-02, *Hutchinson Testimony*; Exhibit 103, *ABA Guidelines*; Exhibit 87, *Supplementary Guidelines*) they were 1) unaware of the ways Dr. Martell mis-stated or misused her data but also 2) allowed the Government to tell the jury that a **defense** expert had found Mrs. Montgomery to be malingering. That a defense expert supposedly agreed with Dr. Martell made Dr. Martell essentially bulletproof. Where the truth is that Dr. Hutchinson

did not think Mrs. Montgomery was malingering but rather thought that the results of the testing were highly indicative of extreme trauma and would have testified that her test results corroborated Mrs. Montgomery's biopsychosocial history, the trial team's failure to handle that evidence and possible testimony correctly (ie. the trial team's failure to interview Dr. Hutchinson, to handle her test results correctly, and to put her testimony on the stand) was deficient performance that prejudiced Mrs. Montgomery. The Government's dismissal of the testing as duplicative does not address the fact that the defense team's credibility was vitiated when it was made to appear that they were hiding a defense witness who agreed with Dr. Martell. TT, Vol. 13, p. 2844, 2848 (AUSA Whitworth arguing adverse inference from failure of Hutchinson to testify).

The Government's response misses entirely Mrs. Montgomery's argument that, had counsel investigated the MMPI, counsel could have prohibited Dr. Martell from testifying about the MMPI at all. *App. COA* at 675. The proof shows that the MMPI is not a proper instrument to administer to a person with Mrs. Montgomery's trauma history and explained why the computer-generated results (upon which Dr. Martell

relied in testifying that Mrs. Montgomery was malingering) were not reliable; had counsel simply investigated the MMPI, counsel could have excluded Dr. Martell's devastating testimony under *Daubert*. *Id*. (citing Exhibit 26, p. 28, *Sanislow Declaration*); *see also id*. at 397-406.

Where reasonable jurists could debate the ineffectiveness of trial counsel's handling of the Hutchinson data – including the mishandling of the MMPI data, a COA should issue.

- **IAC Cross of Government Experts:**

In response to Mrs. Montgomery's claims about the trial team's handling of the Government's mental health experts, the Government argues that the claim lacks merit because Dr. Martell would have been allowed to administer the MMPI to Mrs. Montgomery even if counsel had properly investigated Mrs. Montgomery's traumatic background. The Government relies on the fact that Drs. Hutchinson and Kuncel administered the MMPI for support of this position. *Response* at 278. But this response begs Mrs. Montgomery's point: if trial counsel had followed the prevailing professional norms and developed an adequate biopsychosocial history and then used that history to inform the choice of experts and provided that history to defense experts so they could



Appellate Case: 17-1716 Page: 52 Date Filed: 11/27/2018 Entry ID: 4730024

make appropriate determinations of which tests to give (and how to interpret the data, *see App. COA* at 397-406, 675; Exhibit 26, p. 28, *Sanislow Declaration*), Drs. Kuncel and Hutchinson either would not have administered the MMPI or would have interpreted its results very differently. *See*, Vol. 5, p. 1278-79, *Kuncel Testimony*; Vol. 4, p. 1012, 1018, 1047, 1051-52, *Hutchinson Testimony;* Exhibit 26, p. 28, *Sanislow Declaration*. Further, had Dr. Martell administered the MMPI, prepared counsel would have cross-examined him with the data regarding the MMPI that was contained in Dr. Sanislow's testimony. Vol. 6, p. 1382-1441, *Sanislow Testimony*.[14]

---

[14] Neither the Government nor the court below seem to have understood the import of Dr. Sanislow's testimony where the district court found and respondent argues that Sanislow "generally mimicked" Dr. Kuncel's testimony. *Response* at 279. Respondent claims that there is nothing that Dr. Sanislow presented that would more effectively counter Dr. Martell than Dr. Kuncel did, but simultaneously makes the point that Dr. Sanislow is an academic not a forensic psychologist. *Response* at 278. It is precisely that point: Dr. Sanislow is an academic who has studied the application of the MMPI for his entire professional career. He understands how the test is designed and how it works and how it may be misinterpreted (as here). As shown in the Application for COA (and not re-argued here) proper use of an expert such as Dr. Sanislow would have resulted in a successful *Daubert* challenge to Dr. Martell's misuse of the MMPI. Even if the court had permitted Dr. Martell to testify about the MMPI, his testimony would have been rebutted by proper cross-examination and proof from the biopsychosocial that Mrs. Montgomery was not malingering but answering truthfully. Her



Appellate Case: 17-1716 Page: 53 Date Filed: 11/27/2018 Entry ID: 4730024

With regard to Mrs. Montgomery's other claims about the mis-handling of the Government's experts, the Government responds that trial counsel could not have impeached Dr. Dietz with the proof regarding the videotape of Carl Boman raping Mrs. Montgomery because the district court found this to be a "wild accusation" by Ms. Vogelsang. *Response* at 281. Where the Government stipulated at the hearing to not only the admission of Ms. Vogelsang's report and PowerPoint but also to the admission of all the supporting documentation for her report *as substantive evidence*, the Government's claim is faulty. Vol. 1, p. 51-52, *Admission of Vogelsang Report and Attachments via stipulation*. The Government stipulated to the admission of a sworn statement by Teddy Kleiner regarding the day when as a sixteen year old he popped a video tape into the VHS player and saw his brother-in-law brutally raping his sister. Exhibit 1-31, p. 14, *Kleiner Declaration*. Ms. Vogelsang did not make make up this "wild

---

truthful answers show that she meets the criterion for people who are psychiatrically hospitalized. Vol. 6, p. 1431, *Sanislow Testimony*.



Appellate Case: 17-1716 Page: 54 Date Filed: 11/27/2018 Entry ID: 4730024

accusation," rather it was supported by the stipulated testimony of Mr. Kleiner.[15]

Finally, the Government argues that the defense team decision to portray Dr. Dietz as a hired gun is "virtually unchallengeable." That would be true if the defense team had come to that decision after a reasonable investigation and assessment of the options. *Strickland v. Washington*, 466 U.S. 668 (1984) (strategic choices made after less than complete investigation are reasonable only to the extent that professional judgments support the limitations on the investigation); *Wiggins v. Smith*, 539 U.S. 510 (2003) (same); *Williams v. Taylor*, 529 U.S. 362 (2000) (same). However, here, where the defense team failed to comply with the prevailing professional norms and conduct an adequate

---

[15] The Government also attempts to cast some aspersions on Mr. Kleiner's veracity, claiming that "if Kleiner believed he was watching evidence of an actual rape, he should have reported to the authorities but he did not." *Response* at 283 ftnt 133. Respondent's position 1) ignores that Mr. Kleiner was sixteen years old at the time; 2) ignores his lengthy psychiatric history (Exhibit 1-58, *Kansas DOC Mental Health Exam*; Exhibit 1-41, *Kleiner Declaration*); and 3) ignores the lengthy history of the entire Kleiner family overtly looking the other way when Lisa was being sexually traumatized. That her younger brother followed in the footsteps of their mother, their father, their cousin the sheriff's deputy, the therapist who treated the family after the divorce, his mother's lawyer, and his two older sisters, is hardly surprising. *See*, *App. for COA* at 435-65.



Appellate Case: 17-1716 Page: 55 Date Filed: 11/27/2018 Entry ID: 4730024

investigation or develop proof which would be useful to counter Dr. Dietz's testimony their choices were not "strategic" under *Strickland*. Where reasonable jurists could debate the merit of Mrs. Montgomery's claims regarding counsel's ineffectiveness, a COA should issue.[16]

- **IAC at the Penalty Phase**

The Government focuses much of its argument regarding Mrs. Montgomery's claim of ineffective assistance of counsel at the penalty phase on Mr. Duchardt's "strategy" in not presenting the evidence introduced at the evidentiary hearing. *Response* at 292-334. However where counsel made such supposedly strategic decisions without full investigation and in contravention of prevailing professional norms, the legitimacy of such "strategy" is at least debatable and Mrs. Montgomery's claims deserve encouragement to go forward.

[16] It should be noted that counsel for Mrs. Montgomery and the Government interviewed Drs. Dietz and Martell as part of the discovery in this case. Following those interviews and the discussion of the evidence developed by 2255 counsel, the Government did not call Dr. Dietz or Dr. Martell to testify at the hearing. Counsel requested that the district court make an adverse inference based upon the fact that Drs. Dietz and Martell, apparently, no longer supported the Government's theory of the case. Vol. 9, p. 2374

Respondent mischaracterizes Mrs. Montgomery's claims regarding Mr. Duchardt's failure to investigate, develop, and present readily available compelling penalty phase evidence as a mere claim that counsel failed to hire Ms. Vogelsang. *Response* at 292. Respondent claims that Mr. Duchardt said that he rejected the idea of hiring Ms. Vogelsang and that, hence, his decision was a strategic decision worthy of deference. Response at 294. The Government misses the point.

The point made by Mrs. Montgomery's claim is that counsel had a duty under the prevailing professional norms to investigate and present all the biopsychosocial history information that was presented at the hearing. *See App. COA* at 697-774. Clearly that information could have been presented through a number of witnesses, including but in no way limited to Ms. Vogelsang. What matters about Mrs. Montgomery's claim is that counsel failed to present the evidence that would have shown that Mrs. Montgomery's mental illness and impaired functioning began early in her life and that it compromised nearly every aspect of her life up to and including the crime. It was important that the jury hear that the childhood trauma that gave rise to her impaired thought process together with her structurally and functionally impaired brain and

severe mental illness that led to the crime did not *just* cause the crime, that it also impaired her perception of reality throughout her life. Where counsel failed to present that compelling information that would have allowed the jury to understand how impaired Mrs. Montgomery was and to see that her mental health diagnoses may have only been discovered after the crime but that her illness was of long-standing, it is reasonably debatable that counsel was ineffective and Mrs. Montgomery's claims deserve to go forward.

The Government inanely argues that the trial team "presented essentially all of the relevant information in Ms. Vogelsang's declaration" *Response* at 296. The Government's argument ignores the context in which the defense team presented the mitigation evidence: the defense team not only allowed the development of Government expert testimony that Mrs. Montgomery was a manipulative liar, the team presented proof of a farfetched and factually unsupportable defense, completely vitiating any credibility the defense might have in presenting mitigation. Further, by needlessly exposing Mrs. Montgomery to 1) discovery information, 2) pressure to remember who was with her, and 3) Government experts the defense created testimony

that Mrs. Montgomery was not only a liar – but one that would throw her brother under the bus to save herself. The trial team not only did not, as the Government contends, present nearly all the mitigating proof available, but they also created a context where the mitigation they did present could not be believed.

The Government's argument that "essentially all" the mitigation was presented is illogical where the trial team failed to present the proof that Mrs. Montgomery was repeatedly gang raped and was sexually trafficked by her mother. Further, the Government attempts to undermine the power of the proof presented at the evidentiary hearing with specious claims such as "there was no evidence that Mrs. Montgomery was aware of Ms. Mattingly's ordeal." *Response* at 298. Where Ms. Mattingly described the repeated rapes, the Government's quibble that Ms. Mattingly scrupulously did not swear (some forty-years after the fact) as to what another person witnessed is ridiculous in light of the testimony that four year old Lisa was close enough to touch hands with her sister while she was being raped.

Similarly, the Government attempts to redeem the trial team's failure to comply with the professional norm requiring a full



Appellate Case: 17-1716 Page: 59 Date Filed: 11/27/2018 Entry ID: 4730024

biopsychosocial history by arguing that the trial experts were able to diagnose Mrs. Montgomery without such a history. *Response* at 298. Where Drs. Logan, Kuncel, and Hutchinson have testified that the complete social history would have changed and strengthened their diagnosis, the Government's argument is misleading. Vol. 4, p. 1012, 1047-52, *Hutchinson Testimony*; Vol. 5, p. 1278-79, 1288-90, *Kuncel Testimony*; Vol. 4, p. 957, *Logan Testimony*. One diagnosis is not as good as another and a diagnosis based upon crazy behavior at the crime and subsequent to the crime is radically less reliable than a diagnosis based upon family history and life-long symptoms corroborated through historical documents and disinterested third party witnesses. Where the jury clearly did not credit Dr. Logan's testimony, the Government's invocation that Dr. Logan was able to "diagnose" Mrs. Montgomery without a social history is irrelevant. Where Dr. Logan testified at the evidentiary hearing that his diagnosis of Mrs. Montgomery was incomplete and inaccurate because he did not have her full social



Appellate Case: 17-1716 Page: 60 Date Filed: 11/27/2018 Entry ID: 4730024

history (Vol. 4, p. 926-943, 952, 957, 976, *Logan Testimony*), the Government's argument is specious.[17]

The Government wrongly claims that the trial team presented "ample evidence regarding the nature of her childhood physical and sexual trauma through a number of witnesses who testified before the jury." *Response* at 308. Such a claim can only be construed as true if one equates proof of one coerced rape by a step-father with repeated forcible sodomy by multiple perpetrators at the same time that were permitted by one's mother. The proof at the evidentiary hearing established the fallacy of the Government's claim: the trauma is simply not equivalent. Where the trial team did not present any proof that Mrs. Montgomery was forcibly raped and sodomized by multiple perpetrators or that her mother trafficked her – rather to the contrary presented proof that the

[17] The Government also observes that the relevance of some of Ms. Vogelsang's testimony "is not well-explained." *Response* at 302. Any fault in the explanation of the relevance of some of the information lies with the Government where the district court limited Ms. Vogelsang's testimony (after an objection from the Government) in light of the Government's stipulation that her report was "exceptionally well sourced" and the Government's decision that it was "not contesting the information she was able to compile" (Vol. 6, p. 1490). That is, had Mrs. Montgomery been allowed to present the entirety of Ms. Vogelsang's testimony, the relevance called into question in the Government's brief would have been made plain.

rape was not coerced, the Government's claim that the trial team presented ample evidence of the nature of her trauma is offensive.

The Government attempts to salvage the district court's mischaracterization of the Kidwell testimony as not available at the time of the trial by claiming that the "much more detailed allegations of gang rape" were not available at the time of trial. *Response* at 318. In so doing, the Government ignores that the "more detailed" information would have been available at the time of trial if anyone had done the investigation to find it. *See App. COA* at 482502 (explaining how, once Mrs. Montgomery knew that Mr. Kidwell had, in fact, believed her childhood disclosure of the abuse, Mrs. Montgomery was able to confirm Mr. Kidwell's information and provide additional details; also setting out Mr. Boman's corroboration of Mrs. Montgomery's disclosure and that he was willing to provide that information once he knew that counsel had Mrs. Montgomery's permission for him to discuss it). The Government argues that the District Court's finding that counsel decided to abort the investigation after being unable to corroborate Kidwell's information was reasonable – asking this Court to disregard Mr. Owen's sworn declaration that he did not attempt to corroborate



Appellate Case: 17-1716 Page: 62 Date Filed: 11/27/2018 Entry ID: 4730024

Kidwell's information (as the district court erroneously believed) because he did not know about the Kidwell disclosure. *See App. COA* at 725 (arguing that the proof at the evidentiary hearing refutes that trial counsel attempted to corroborate the Kidwell Memo). Where the court's determination of counsel's reasonableness hinges on a clearly debatable interpretation of the facts, the issue deserves to go forward.

The Government only glancingly addresses Mrs. Montgomery's central contention with regard to the district court's finding: it was unreasonable for the attorneys to abort the investigation based on the refusal of one of the perpetrators to corroborate the account. *App. COA* at 735 -37 (arguing that even if the district court were correct as to the facts, aborting investigation under the circumstances was unreasonable). The Government does not respond to Mrs. Montgomery's citation of *Johnson* and *Boyd* wherein the Ninth and Eleventh Circuits have determined that perpetrator denials are not a reasonable basis for curtailing investigation or to Mrs. Montgomery's argument that Mr. Duchardt testified that he knew that Mrs. Montgomery was unable to provide such information because of her mental illness and trauma history. *Compare App. COA* p. 727-37 *with Response* at 323-35. As the



Appellate Case: 17-1716 Page: 63 Date Filed: 11/27/2018 Entry ID: 4730024

district court's determination of the issue is contrary to the law in two circuits, the issue is clearly debatable. In light of the factual and legal debatablity of this claim, it deserves to go forward and a COA must issue.

- **IAC Brain Damage Evidence:**

In response to Mrs. Montgomery's claim that trial counsel failed to present proof that Mrs. Montgomery's brain was seriously impaired, the Government splits hairs. The Government finds fault with Dr. Porterfield's credentials – implying that somehow her expertise as a clinical instructor and therapist at the Bellevue NYU Program for Survivors of Torture is somehow inapt because she is a clinical psychologist rather than a forensic one. *Response* at 336. To the contrary, Dr. Porterfield's day to day experience treating survivors of torture is that which qualifies her to speak to the symptoms and syndromes experienced by such people. Vol. 3, p. 1583, *Porterfield Testimony* (Government announcement that the Government was not challenging Dr. Porterfield's qualifications, background, or experience and the court's acceptance of her as an expert in clinical psychology

with a specialty in trauma)[18]. The Government attempts to equate the testimony of Dr. Porterfield regarding the neurological impairment that occurs as a result of trauma with Dr. Logan's testimony at trial, where Dr. Logan listed some of the same stressors as having contributed deleteriously to Mrs. Montgomery. *Response* at 337. That some of the same stressors were identified as having had an impact is not the same as having presented the testimony regarding how such neurological effect occurs. Dr. Porterfield explained the scientific basis for the fact that trauma changes the structure of the brain. Dr. Logan did not offer the equivalent testimony. Dr. Hutchinson could have provided that testimony, if the defense had called her. But, because Dr. Hutchinson did not support Mr. Duchardt's pseudocyesis defense, trial counsel abandoned her completely underscoring trial counsel's ineffectiveness and conflict of interest. *See infra* (NGRI and Conflict of Interest Claims).

---

[18] Dr. Porterfield's experience training prosecutors at the International Criminal Court at the Hague may have influenced the Government's recognition of the preeminence of her credentials. Vol. 6, p. 1580, *Porterfield Testimony*.



Appellate Case: 17-1716 Page: 65 Date Filed: 11/27/2018 Entry ID: 4730024

Where brain impairment has been shown to be the single most compelling mitigating factor to juries, it is reasonably debatable that trial counsel's failure to educate the jury was ineffective assistance of counsel. *Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002); *Dietrich v. Ryan*, 619 F.3d 1038 (9th Cir. 2010). Mrs. Montgomery is entitled to a COA on this issue.

- **IAC Neurology Evidence:**

The Government wrongly argues that there was no IAC for failure to develop proof that Mrs. Montgomery's brain is impaired by a seizure disorder, claiming that because "no other expert" agreed with Dr. Nadkarni his findings were irrelevant or unreliable. *Response* at 341. The Government's position misses the relevant point that only one other doctor, Dr. Woods, was qualified to make an epilepsy diagnosis and that Dr. Woods accepted and endorsed Dr. Nadkarni's assessment. Vol. 7, p. 1760, 72, 81, 91-92, 96, 1820, *Woods Testimony*. The Government also attempts to discredit Dr. Woods by emphasizing that Dr. Woods "only" met with Mrs. Montgomery four times some years after the crime. *Response* at 342. However, the Government's criticism omits that Dr. Woods reviewed all of the treatment notes from Mrs.



Appellate Case: 17-1716 Page: 66 Date Filed: 11/27/2018 Entry ID: 4730024

Montgomery's incarceration, thereby acquainting himself with all the available information about her psychiatric history. Vol. 7, pp. 1759-1863, *Woods Testimony*; Exhibit 159, *Woods PowerPoint*; Exhibit 20, p. 3, *Woods Declaration*.

Mrs. Montgomery's claim of ineffective assistance of counsel for failure to present proof regarding her temporal lobe epilepsy is reasonably debatable among jurists of reason and deserved encouragement to go forward. The trial court's dismissal of this claim is debatable where the trial court misapprehended the consistency of the proof amongst Mrs. Montgomery's multi-disciplinary team, erroneously finding that Dr. Nadkarni's diagnosis was in opposition to the diagnoses of the other experts instead of understanding that Mrs. Montgomery's brain impairments are accurately described by a constellation of both medical and psychiatric diagnoses and that her epilepsy manifests in symptoms that are also consistent with psychiatric disorders. Vol. 7, p. 1823, *Woods Testimony*.[19] The issue deserves a COA.

---

[19] In other contexts, the Supreme Court has recognized the fallacy of ruling out one diagnosis when other comorbid diagnoses produce overlapping symptoms. *Moore v. Texas*, 137 S.Ct. 1039 (2017). The symptoms of temporal lobe epilepsy are not medically exclusive, but rather are also symptoms of trauma disorders and major mental illness.



Appellate Case: 17-1716 Page: 67 Date Filed: 11/27/2018 Entry ID: 4730024

- **IAC Exclusion of Gur:**

In its discussion of the merits of the claim, the Government contends that Dr. Gur's findings that were excluded by the district court were "not clinically significant." Response at 288. However, the proof at the hearing is to the contrary. *App. COA* at p424, quoting Vol. 8, p. 2080, *Gur Testimony* ("throughout medicine any value that is more than one standard deviation away from average is considered of clinical significance . . So one standard deviation is the place where a finding becomes clinically significant . . . That's what you learn when you learn how to do a psychological assessment. These are the standards in the field.") Where trial counsel attempted to stretch Dr. Gur's testimony into a first phase defense and in so doing elicited a *Daubert* challenge as to the admission (in the first phase), it is reasonably debatable that counsel performed ineffectively. *See, App. COA* at 759; *see also*, Vol. 5, p. 1182-1244, *Newberg Testimony and* Vol. 5, p. 1120-1182, *Davatzikos Testimony*.

---

*App. COA* at 502-11; *see also*, Vol. 7, p. 1781, 96, 1820, *Woods Testimony*.



Appellate Case: 17-1716 Page: 68 Date Filed: 11/27/2018 Entry ID: 4730024

**Reply to the Response to the Competency Claim:**

The district court has found that "there is little doubt that [Mrs. Montgomery] suffers from serious mental illnesses and brain damage." D.E. 212, *Order* at 95. However the Government relies on the trial team's reliance on Dr. Hutchinson's "finding" as proof that Mrs. Montgomery was not incompetent to stand trial and that trial counsel were not ineffective for failing to litigate her competency. Response at 349 (characterizing Dr. Hutchinson's pretrial letter as a "finding). The problem with the Government's position is that Dr. Hutchinson's testing did not show what the trial team assumed – nor what the Government argues. In the passage quoted by the Government, Dr. Hutchinson specified that, though the scoring of testing suggested that Mrs. Montgomery was "competent on the measure that [the test] measures" Dr. Hutchinson was "concerned about" Mrs. Montgomery's ability to assist counsel. *Response* at 349. In questioning not cited by the Government, Dr. Hutchinson was even clearer. When asked, "So you felt her competency was at issue at this time?" she answered, "Correct." Vol. 6, p. 1022, *Hutchinson Testimony*. Had the trial team discussed her findings with Dr. Hutchinson, they would have learned of



Appellate Case: 17-1716 Page: 69 Date Filed: 11/27/2018 Entry ID: 4730024

her opinions. Counsel's failure to do so was ineffective assistance of counsel. *See*, Vol. 6, p. 1006, *Hutchinson Testimony* (Duchardt contacted her to see if she would support pseudoceysis defense and never asked her about her testing).

The Government also posits that of the experts Mrs. Montgomery cites in support of her competency claim "none . . . states that she did not understand the proceedings or was not able to assist in her defense." *Response* at 352. This is incorrect. Dr. Woods testified that Mrs. Montgomery was unable to assist counsel at Vol. 7, p. 1773 (discussing that his findings of front lobe problem "really reflects her inability to rationally assist because of her brain impairment").

As to all the other claims, Mrs. Montgomery relies on her application for certificate of appealability.

WHEREFORE, for the all of the above-stated reasons, Mrs. Montgomery respectfully requests that her COA application be granted.

Respectfully submitted,

LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

KELLEY J. HENRY, Mo. Bar No. 38849
Supervisory Asst. Federal Public Defender
AMY D. HARWELL, Tn. Bar No. 18691
Asst. Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER-MIDDLE DISTRICT OF TENNESSEE
Capital Habeas Unit
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

BY: /s/ *Kelley Henry*
*Attorneys for Lisa Montgomery*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2018, the above-captioned document was served electronically on Bruce Clark, Assistant United States Attorney representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Kelley Henry*



Appellate Case: 17-1716 Page: 71 Date Filed: 11/27/2018 Entry ID: 4730024